# United States Court of Appeals
## *for the*
# Third Circuit

THOMSON REUTERS ENTERPRISE CENTRE GMBH;
WEST PUBLISHING CORPORATION,

*Plaintiffs-Appellees,*

– v. –

ROSS INTELLIGENCE INC.,

*Defendant-Appellant.*

ON APPEAL FROM AN ORDER OF THE UNITED STATES
DISTRICT COURT FOR THE DISTRICT OF DELAWARE,
IN NO. 1:20-CV-00613, HONORABLE STEPHANOS BIBAS, CIRCUIT JUDGE

## BRIEF *AMICI CURIAE* OF THE COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION, CHAMBER OF PROGRESS, AND NETCHOICE IN SUPPORT OF APPELLANT ROSS INTELLIGENCE, INC. AND REVERSAL

MICHAEL S. KWUN
ELIZABETH H. DINH
KWUN BHANSALI LAZARUS LLP
555 Montgomery Street, Suite 750
San Francisco, California 94111
(415) 630-2350
*Attorneys for Amici Curiae*

September 29, 2025

C P COUNSEL PRESS    (800) 4-APPEAL • (715144)

**Rule 26.1 Disclosure**

The Computer & Communications Industry Association has no parent corporation, and as a non-stock, not-for-profit corporation, no publicly held company owns 10% or more of its stock.

Chamber of Progress has no parent corporation, and as a non-stock, not-for-profit corporation, no publicly held company owns 10% or more of its stock.

NetChoice has no parent corporation and no publicly held company owns 10% or more of its stock.

# Contents

Rule 26.1 Disclosure ................................................................. i

Authorities ........................................................................... iii

Introduction ......................................................................... 1

Interest of *Amici Curiae* ......................................................... 2

Argument ............................................................................. 4

    I.   This Case Is Different From Generative AI Cases, and This Court Should Ensure That Its Decision Does Not Lead to Unintended Consequences ............................................. 4

    II.  ROSS, Not Thomson Reuters, Is Entitled to Summary Judgment on the Issue of Fair Use ..................................... 7

        A.   The first fair use factor—the purpose and character of the use—favors ROSS, because ROSS's use of West headnotes was transformative ........................................... 8

        B.   The fourth fair use factor—the effect of the use on the market for the copyrighted work—favors ROSS, because its legal search engine does not substitute for the copied headnotes and legitimately competes with Westlaw ............................... 14

        C.   Because all of the statutory fair use factors favor ROSS, the equities as a whole necessarily favor ROSS ..................... 18

Conclusion ........................................................................... 19

Combined Certifications ........................................................... 20

# Authorities

## Cases

*A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630 (4th Cir. 2009) ......13, 14

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508 (2023) .................................................................................................8

*Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87 (2d Cir. 2014)........................11, 12

*Bartz v. Anthropic PBC*, No. 24-cv-05417, 2025 WL 1741691 (N.D. Cal. June 23, 2025) ...........................................................................5, 6

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994) ...............................14, 17

*Google LLC v. Oracle Am., Inc.*, 593 U.S. 1 (2021) ......................................7, 9, 10

*Kadrey v. Meta Platforms, Inc.*, No. 23-cv-03417, 2025 WL 1752484 (N.D. Cal. June 25, 2025) .............................................................4, 5

*N.Y. Times Co. v. Roxbury Data Interface, Inc.*, 434 F. Supp. 217 (D.N.J. 1977) ..............................................................................................12

*Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007)..............12, 13

*Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908 (9th Cir. 2004) ................................................................................................8

*Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510 (9th Cir. 1992) ......................16

*Sony Computer Entm't, Inc. v. Connectix Corp.*, 203 F.3d 596 (9th Cir. 2000) .............................................................................................17, 18

*United States v. Melendrez*, 389 F.3d 829 (9th Cir. 2004)........................................8

*White v. W. Publ'g Corp.*, 29 F. Supp. 3d 396 (S.D.N.Y. 2014) ..............................6

## Statutes

17 U.S.C. § 102 ........................................................................................................15

17 U.S.C. § 107 ..............................................................................................7, 8, 14

## Opinions Below

Memorandum Opinion I, 694 F. Supp. 3d 467 (D. Del. 2023) ....................1, 10, 12

Memorandum Opinion II, 765 F. Supp. 3d 382
(D. Del. 2025) ......................................................4, 6, 7, 9, 10, 11, 12, 15, 16, 18

Memorandum Opinion III, 2025 WL 1488015 (D. Del. May 23, 2025) ..............1, 7

**Other Materials**

GILBERT RYLE, THE CONCEPT OF MIND (1949) ...........................................................8

**Introduction**

While this is one of the first appellate proceedings regarding fair use and artificial intelligence (AI), the AI at issue in this appeal is very different from the generative AI models that are being considered in other litigation. *Amici* request that this Court take care that its decision does not sweep unintentionally broadly. Issues specific to generative AI models are not before this Court and should be decided on their own merits.

On the merits of this case, while the district court engaged in a deliberative analysis in deciding the fair use question before it,[1] it misconstrued the legal questions raised by the first and fourth statutory fair use factors. Commendably, in certifying its order for interlocutory appeal, the court also recognized that "the questions here are hard." Memorandum Opinion III, 2025 WL 1488015, at *1 (D. Del. May 23, 2025). This appeal presents an opportunity to ensure that the law of fair use is faithfully applied.

---

[1] In fact, the opinion on appeal was the district court's second such opinion, having previously reached the considered conclusion that the question of fair use had to be tried, because genuine disputes of material fact precluded summary judgment on fair use in favor of either party. Memorandum Opinion I, 694 F. Supp. 3d 467 (D. Del. 2023).

The Computer & Communications Industry Association (CCIA) is an international, not-for-profit association representing a broad cross-section of communications, technology, and internet industry firms that collectively employ more than 1.6 million workers, invest more than $100 billion in research and development, and contribute trillions of dollars in productivity to the global economy. For more than 50 years, CCIA has promoted open markets, open systems, and open networks. CCIA regularly files *amicus* briefs to promote balanced copyright policies that reward, rather than stifle, innovation. A list of CCIA members is available at https://www.ccianet.org/members.

Chamber of Progress is a tech-industry coalition devoted to a progressive society, economy, workforce, and consumer climate. Chamber of Progress backs public policies that will build a fairer, more inclusive country in which the tech industry can operate responsibly and fairly, and in which all people benefit from technological leaps. Chamber of Progress seeks to protect internet freedom and free speech, to promote innovation and economic growth, and to empower technology customers and users. Chamber of Progress's work is supported by its

---

[2] No party's counsel authored this brief in whole or in part. No party or a party's counsel contributed money that was intended to fund preparing or submitting this brief. No person other than the *amici curiae*, their members, or their counsel contributed money that was intended to fund preparing or submitting this brief.

corporate partners, *see* https://progresschamber.org/partners/, but its partners do not sit on its board of directors and do not have a vote on, or veto power over, its positions. Chamber of Progress does not speak for individual partner companies, and it remains true to its stated principles even when its partners disagree.

NetChoice is a national trade association of online businesses that share the goal of promoting free enterprise and free expression on the internet. For over two decades, NetChoice has worked to ensure the internet remains innovative and free. NetChoice advocates on behalf of its membership by, among other things, participating in litigation involving issues of vital concern to the online community and by filing *amicus* briefs in cases that, like this one, could shape the way important technological innovations develop. Several of NetChoice's members develop and provide AI applications and services. A list of NetChoice's members is available at: https://netchoice.org/about/#association-members.

This brief offers the perspective of the broader technology community on the important issues of copyright law presented by this appeal. *Amici* represent and partner with companies that are actively developing and using AI, particularly generative AI, and have an interest in seeing that the legal regime surrounding AI is balanced and effective for all participants.

All parties have consented to the filing of this brief.

## Argument

### I. This Case Is Different From Generative AI Cases, and This Court Should Ensure That Its Decision Does Not Lead to Unintended Consequences.

The district court's opinion notes that ROSS's AI "is not generative AI (AI that writes new content itself)." Memorandum Opinion II, 765 F. Supp. 3d 382, 398 (D. Del. 2025). Instead, ROSS offers a legal search tool that "spits back relevant judicial opinions that have already been written" in response to legal questions posed by a user. *Id.* Due to the differences between ROSS's AI and generative AI, the district court pointed out that "only non-generative AI" was before it. *Id.* at 399.

"'Generative AI' is a type of artificial intelligence that creates new content, such as text, images, videos, or sound." *Kadrey v. Meta Platforms, Inc.*, No. 23-cv-03417, 2025 WL 1752484, at *4 (N.D. Cal. June 25, 2025). The complex mathematical patterns used by the models that power generative AIs are derived from large training datasets. *Id.* For example, a "large language model"—a generative AI model that can accept text as an input and generate text in response—is trained using a vast amount of text, from which it "learn[s] an immense amount about the statistical relationships among words." *Id.* at *5.

After the decision on appeal here issued, two courts emphatically found that using copyrighted material to train a generative AI model is a fair use. In *Kadrey*,

4

Judge Chhabria of the Northern District of California concluded that "[t]here is no serious question that Meta's use of the plaintiffs' books had a 'further purpose' and 'different character' than the books—that it was *highly transformative*." 2025 WL 1752484, at *9 (emphasis added). Generative AI large language models "are innovative tools that can be used to generate diverse text and perform a wide range of functions." *Id.* Such an AI can be asked "to edit an email [the user has] written, translate an excerpt from or into a foreign language, write a skit based on a hypothetical scenario, or do any number of other tasks." *Id.* Even the *Kadrey* plaintiffs conceded that generative AIs can be used as personal tutors, to assist with ideation, or to help generate business reports. *Id.*

Two days before the *Kadrey* decision, Judge Alsup (also sitting in the Northern District of California), considered a different generative AI model, and likewise concluded that the purpose and character of using copyrighted works to train large language models is transformative—"*spectacularly so*." *Bartz v. Anthropic PBC*, No. 24-cv-05417, 2025 WL 1741691, *7 (N.D. Cal. June 23, 2025) (emphasis added). While the *Bartz* plaintiffs cited Judge Bibas's opinion, Judge Alsup concluded that the ROSS machine learning system presented very different facts. *See id.* at *8. A more analogous case would be "an AI tool trained—using court opinions, and briefs, law review articles, and the like—to receive legal prompts and respond with fresh legal writing." *Id.* "And, on facts

much like those, a different court . . . found fair use." *Id.* (citing Judge Rakoff's

decision in *White v. W. Publ'g Corp.*, 29 F. Supp. 3d 396, 400 (S.D.N.Y. 2014),

which held that West and Lexis engaged in fair use when they included in their

legal search databases copyrighted briefs written by the plaintiff attorney).

Judge Bibas, by noting the distinction between generative AI and other

systems (like the ROSS system) that could be termed "artificial intelligence,"

reduced the likelihood that a district court decision about one type of machine

learning might be inappropriately relied upon as precedent in a case about

*generative* AI. The *Bartz* plaintiffs attempted to blur that distinction, but Judge

Alsup correctly recognized that generative AI is different from the machine

learning used by ROSS in its legal search engine. *Amici* thus encourage this Court

to avoid overly broad statements that might inadvertently cause mischief in other

cases that present different facts, about different types of AI, and especially about

generative AI.[3]

---

[3] In addition, the fact that Thomson Reuters and ROSS offer directly competing
legal search engines permeated the district court's analysis. Because ROSS used
West headnotes "to make it easier to develop a competing legal research tool," the
district court concluded that ROSS's use was not transformative. Memorandum
Opinion II, 765 F. Supp. 3d at 399. Its conclusion that ROSS's use was not
transformative in turn influenced its conclusion that ROSS unfairly harmed
Westlaw's market. *See id.* at 400. If this Court relies on the direct competition
between Thomson Reuters and ROSS in the market for legal search engines, it
should state that reliance clearly and directly, because many cases about AI—
generative or otherwise—do not involve direct competitors.

## II. ROSS, Not Thomson Reuters, Is Entitled to Summary Judgment on the Issue of Fair Use.

In *Google LLC v. Oracle Am., Inc.*, Google copied a portion of the Java SE computer program. 593 U.S. 1, 6 (2021). The Court assumed "for argument's sake" that the copied material was protected by copyright. *Id.* at 7. The Court held that the copying "nonetheless constituted a fair use." *Id.*

In the present case, the district court certified for interlocutory appeal the issues of both originality and fair use. Memorandum Opinion III, 2025 WL 1488015, at *1. Because much of the record is sealed, *amici*'s ability to address the issue of originality is limited. For example, the appendix detailing the headnotes that the district court concluded were copied is under seal. Memorandum Opinion II, 765 F. Supp. 3d at 395. *Amici* thus focus this brief on fair use, and, as the Supreme Court in *Google* did, assume *for argument's sake* that the material at issue in this case is protected by copyright.

The district court rejected ROSS's fair use defense. Considering the four statutory fair use factors, 17 U.S.C. § 107(1)–(4), the court found that the second and third factors favored ROSS, but that the first and fourth favored Thomson Reuters. Memorandum Opinion II, 765 F. Supp. 3d at 397–400. Weighing the equities as a whole, the court concluded that ROSS's use was not fair. *Id.* at 401.

But in considering the first and fourth factors, the district court applied the wrong legal standard. Section 107 addresses whether a particular "use" of material

protected by copyright is "fair," and the first and fourth factors, by their statutory terms, require consideration of "the use," 17 U.S.C. § 107(1), (4)—i.e., the specific use accused as an infringement. With respect to the first factor, however, instead of considering the purpose and character of ROSS's *use* of copied material, the district court considered the purpose and character of ROSS's legal search engine. The court committed a similar category mistake[4] when it considered the fourth factor. These two legal errors led the court to conclude, incorrectly, that ROSS's use was not fair.

> **A.   The first fair use factor—the purpose and character of the use— favors ROSS, because ROSS's use of West headnotes was transformative.**

The first fair use factor addresses "the purpose and character of the use." 17 U.S.C. § 107(1). This factor "requires an analysis of *the specific 'use'* of a copyrighted work that is alleged to be 'an infringement.'" *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 533 (2023) (emphasis added, and citing § 107).

---

[4] A "category mistake" is one that treats a concept as if it belongs to a category other than its actual one. *See, e.g., United States v. Melendrez*, 389 F.3d 829, 838 (9th Cir. 2004); *see also Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 930 n.21 (9th Cir. 2004) (citing GILBERT RYLE, THE CONCEPT OF MIND 16 (1949)).

The district court granted summary judgment in favor of Thomson Reuters as to 2,243 West headnotes that ROSS copied, treating each headnote as "an individual, copyrightable work." Memorandum Opinion II, 765 F. Supp. 3d at 393.[5] The fair use inquiry thus must focus on that use—the use of the 2,243 West headnotes—not on a comparison between the ROSS legal search engine and Westlaw as a whole.[6]

The Supreme Court's fair use analysis in *Google* illustrates this principle. Although Oracle owned the copyright to the computer program Java SE, Google's copying was limited to 11,500 lines of code from the "Sun Java API"—a portion of Java SE. 593 U.S. at 9. The Supreme Court thus considered whether Google's specific use "of the Sun Java API"—i.e., its use of the copied lines of code—was transformative. *Id.* at 26. The Court concluded that Google used "the Sun Java

---

[5] Thomson Reuters alleges that ROSS infringes 21,787 headnotes. *Id.* at 394. It moved for summary judgment only on two subsets of 5,367 and 2,830 headnotes. *Id.* The district court denied summary judgment as to the 5,367 headnote subset because Thomson Reuters failed to establish conclusively that ROSS copied those headnotes. *Id.* With respect to the 2,830 headnote subset, the court granted summary judgment as to 2,243 headnotes—"only on the headnotes for which actual copying is so obvious that no reasonable jury could find otherwise." *Id.* at 395.

[6] *Amici* focus on the headnotes because the district court did not grant summary judgment to Thomson Reuters regarding actual copying of the Key Number System. *Id.* at 394. At least on the record available to *amici*, it is difficult to ascertain what the purpose and character of ROSS's purportedly infringing use of the Key Number System was—or even how ROSS used the Key Number System at all.

API" to create a new mobile phone operating system that provided "a new collection of tasks operating in a distinct and different computing environment." *Id.* at 30–31. The Court considered that Sun (Oracle's predecessor) had created the "copied portions of the Sun Java API . . . to enable programmers to call up implementing programs that would accomplish particular tasks." *Id.* at 30. Although Google used the copied code for the same reason, *id.*, it wrote its own new code for the implementing programs. *Id.* at 31. The Supreme Court held that Google's use of the copied lines of code was transformative, because Google's use created new products and furthered the development of computer programs by others. *Id.* at 32. The first factor thus favored fair use. *Id.* Throughout its analysis, the Court correctly focused on the material that Google copied—the 11,500 lines of code from the Sun Java API—rather than Java SE as a whole.

ROSS, like Google, created a new system—ROSS's natural language legal search engine. Memorandum Opinion I, 694 F. Supp. 3d at 475. ROSS also crafted its own code. Memorandum Opinion II, 765 F. Supp. 3d at 398 ("the material [ROSS] allegedly copied from Thomson Reuters was not computer code"). And though Google's product itself reproduced the 11,500 copied lines of code, ROSS's legal search engine does not include *any* of the West headnotes. *Id.* ("the headnotes do not appear as part of the final product that [ROSS] put forward to consumers"). The district court thus applied the wrong legal standard when it

compared the purpose and character of the ROSS legal search engine to the overall purpose and character of Westlaw. *Id.* The fair use analysis instead should have focused on the purpose and character of ROSS's use of the copied West headnotes.

ROSS's use of the headnotes—the 2,243 headnotes for which the district court granted summary judgment, but also any other headnotes for which Thomson Reuters might prove infringement at trial—was transformative, because its use of the headnotes imbued them with new meaning and purpose. Indeed, the Second Circuit has held that the "creation of a full-text searchable database is a quintessentially transformative use." *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 97 (2d Cir. 2014). To create the HathiTrust Digital Library that was at the heart of that case, HathiTrust and its member colleges, universities, and other nonprofits made digital copies of "entire books." *Id.* The HathiTrust Digital Library, however, did not allow users to *view* those books. *Id.* It instead only allowed users to conduct word searches, to discover where within those books specific words or phrases could be found. *Id.*

The results returned by the full-text search feature of the HathiTrust Digital Library were "different in purpose, character, expression, meaning, and message" from the underlying books that were used to create and power the Digital Library; the Second Circuit could "discern little or no resemblance between the original text and the results of the [Digital Library] full-text search." *Id.* The Digital Library's

full-text search did not supersede the objects or purposes of the copied books, and instead "add[ed] to the original something new with a different purpose and a different character." *Id.*; *see also N.Y. Times Co. v. Roxbury Data Interface, Inc.*, 434 F. Supp. 217, 221 (D.N.J. 1977).

Just as the HathiTrust Digital Library did not allow users to access the copied books, users of the ROSS legal search engine cannot access West headnotes. Memorandum Opinion II, 765 F. Supp. 3d at 398. The headnotes instead were used to make the bulk memos that ROSS then used to train its natural language legal search engine, using machine learning AI techniques. Memorandum Opinion I, 694 F. Supp. 3d at 475. Training an AI-powered search engine is an entirely different purpose than the purpose of the copied headnotes themselves, each of which seeks to convey a single point of legal doctrine that is present somewhere in the text of the case to which the headnote is attached.

The Ninth Circuit reached a similar outcome in *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007). The district court had preliminarily enjoined Google from creating and publicly displaying thumbnail images[7] of Perfect 10's photographs of nude models. *Id.* at 1154. Google included these thumbnail images in the search results for its image search engine. *Id.* at

---

[7] The "thumbnails" were "reduced, lower-resolution versions" of the full-sized images. *Id.* at 1155.

1155. Considering Google's fair use defense, and specifically the first factor, the

Ninth Circuit held that Google's use of the thumbnails was "highly

transformative," because "a search engine transforms the image into a pointer

directing a user to a source of information," thus providing a social benefit in the

form of an electronic reference tool. *Id.* at 1165. Because "Google use[d] Perfect

10's images in a new context to serve a different purpose," and because the

transformative nature of that use was "more significant than any incidental

superseding use," the court concluded that the first factor weighed "heavily" in

favor of Google. *Id.* at 1165, 1167.

The Fourth Circuit has likewise held that using copyrighted material for a

different purpose can be transformative. In *A.V. ex rel. Vanderhye v. iParadigms,*

*LLC*, that court considered the Turnitin Plagiarism Detection Service offered by

iParadigms. 562 F.3d 630 (4th Cir. 2009). The Turnitin service provides schools

with an automated means for detecting plagiarism in student submissions. *Id.* at

634. Schools can optionally have iParadigms archive submitted student works, and

those archived works then become part of the database Turnitin uses to evaluate

the originality of future submitted works. *Id.* Several students sued iParadigms for

infringing their copyrights based on the archiving feature in Turnitin. *Id.* at 635. In

assessing fair use, the Fourth Circuit concluded that iParadigms' use was

transformative and favored fair use. *Id.* at 640. This was true even though the

Turnitin system stored each archived work "unaltered and in its entirety." *Id.* at

639. iParadigms' use of the archived student works "had an entirely different

function and purpose than the original works" and the lack of substantive changes

to the copied content did not preclude the use from being transformative. *Id.*

Evaluated under the proper legal framework, ROSS's use—like Google's

use, like HathiTrust's use, and like iParadigms' use—was transformative. The first

fair use factor therefore favors ROSS, not Thomson Reuters.

**B. The fourth fair use factor—the effect of the use on the market for the copyrighted work—favors ROSS, because its legal search engine does not substitute for the copied headnotes and legitimately competes with Westlaw.**

The fourth fair use factor is "the effect of the use upon the potential market

for or value of the copyrighted work." 17 U.S.C. § 107(4). This factor considers

whether the defendant's use supersedes the objects of the original work. *Campbell*

*v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 591 (1994). A "lethal parody" or a

"scathing theater review" might "kill[] demand for the original," but "it does not

produce a harm cognizable under the Copyright Act." *Id.* at 591–92. Where the

new work does not act "as a substitute" for the original work, purported harm to

the market is not cognizable under the fourth factor. *Id.* at 591.

In considering the fourth factor, the district court examined the market harm

to Westlaw. That was error: the use in question was the use of *headnotes*, and the

district court held that each headnote was an individual copyrightable work.

Memorandum Opinion II, 765 F. Supp. 3d at 393.[8] Because here the "copyrighted work" referenced in the fourth factor was the headnotes, the district court should have considered the harm to the market for the copied headnotes.

ROSS's product does not substitute for the copied headnotes. No customer seeking a West headnote would seek out ROSS's product, because the headnotes are nowhere within ROSS's product and are not accessible to ROSS's users. *Id.* at 398 ("the headnotes do not appear as part of the final product that [ROSS] put forward to consumers").[9] Because the ROSS legal search engine does not substitute for the West headnotes, the fourth fair use factor favors ROSS.

Harm to Westlaw in any event is not cognizable under the fourth factor, because a use that "simply enables the copier to enter the market for works of the

---

[8] To conclude that each headnote is a copyrightable work, the district court wrongly analogized a headnote to a sculpture. *Id.* Although "[a] block of raw marble, like a judicial opinion, is not copyrightable," the court reasoned that "a sculptor creates a sculpture by choosing what to cut away and what to leave in place" and a sculpture is copyrightable. *Id.* (citing 17 U.S.C. § 102(a)(5)). But when a sculptor cuts marble away from a raw block, that leaves behind empty space that itself is an integral element of the resulting sculpture. A marble "sculpture" with no empty space would not be a sculpture at all—at most it would be a smaller marble block, no more copyrightable than the larger raw block of marble from whence it came. A headnote made of selected words from a judicial opinion has nothing analogous to the empty space in a sculpture. As noted above, however, *amici* assume for argument's sake that the headnotes are protected by copyright.

[9] Again, *amici* focus on the headnotes rather than the Key Number System because the district court did not grant summary judgment regarding actual copying of the Key Number System. *Id.* at 394.

same type as the copied work" is not unfair. *Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1523 (9th Cir. 1992). To the contrary, if the defendant's work is not substantially similar to the copyrighted work, "an attempt to monopolize the market by making it impossible for others to compete runs counter to the statutory purpose of promoting creative expression and cannot constitute a strong equitable basis for resisting the invocation of the fair use doctrine." *Id.* at 1523–24.

Here, the district court found that the *bulk memos* were substantially similar to the West headnotes. Memorandum Opinion II, 765 F. Supp. 3d at 395–96. But ROSS used the bulk memos to create "numerical data about the relationships among legal words to feed into its AI"; the headnotes themselves "do not appear as part of the final product . . . ." *Id.* at 398. ROSS's legal search engine thus is not substantially similar to the headnotes. Neither is the ROSS legal search engine substantially similar to Westlaw.[10] It thus would run counter to the purpose of the Copyright Act to allow Thomson Reuters to keep ROSS out of the market occupied by Westlaw.

---

[10] The fact that both products are legal search engines does not make them substantially similar, just as the fact that a Honda Civic and a Toyota Camry are both cars does not make them substantially similar to each other. *See Sega*, 977 F.2d at 1523 (a use is not unfair merely because it enables "works of the same type as the copied work").

This principle is demonstrated by the case *Sony Computer Entertainment, Inc. v. Connectix Corp.*, 203 F.3d 596 (9th Cir. 2000). The Ninth Circuit considered whether Connectix had made fair use of the copyrighted PlayStation BIOS, which Connectix engineers had "repeatedly copied" to figure out how it worked, all to create the Connectix Virtual Game Station. *Id.* at 598–99. Virtual Game Station allowed consumers to "load a PlayStation game into the computer's CD-ROM drive, and play the PlayStation game," emulating the hardware and software of a PlayStation. *Id.* at 599.

Notwithstanding that consumers could use Virtual Game Station to play PlayStation games instead of using a Sony PlayStation game console, the Ninth Circuit concluded that the fourth fair use factor favored Connectix, not Sony. *Id.* at 607. Because Virtual Game Station's use of the PlayStation BIOS was transformative, that made it "a legitimate competitor in the market for platforms on which Sony and Sony-licensed games can be played." *Id.*; *Campbell*, 510 U.S. at 591 ("when . . . the second use is transformative, market substitution is at least less certain, and market harm may not be so readily inferred"). While that would result in some economic loss for Sony—and some loss of control over the market for consoles that play Sony PlayStation games—"copyright law . . . does not confer such a monopoly." 203 F.3d at 607. Copyright law instead favored Connectix's

right to make a transformative use of the PlayStation BIOS—even to compete with the PlayStation. *Id.* at 607–08.

ROSS's use of the West headnotes was transformative, and was part of what enabled it to create its own new natural language legal search engine. Any harm to Thomson Reuters caused by ROSS's legitimate competition in the market for legal search engines is not cognizable under the fourth factor. The fourth fair use factor therefore favors ROSS, not Thomson Reuters.

## C. Because all of the statutory fair use factors favor ROSS, the equities as a whole necessarily favor ROSS.

The district court erred in finding that the first and fourth fair use factors favored Thomson Reuters; these factors instead favor ROSS. Because the district court found that the second and third fair use factors also favor ROSS, Memorandum Opinion II, 765 F. Supp. 3d at 399–400, that means that *all* the statutory fair use factors favor ROSS. In weighing the equities as a whole, the district court should have granted ROSS summary judgment of fair use. The district court's failure to do so was legal error and warrants reversal.

## Conclusion

The district court's analysis of the first and fourth fair use factors was legally erroneous. *Amici* therefore urge the Court to reverse the district court's grant of summary judgment for Thomson Reuters, and instead direct the grant of summary judgment for ROSS, as all four factors support a conclusion of fair use.

Respectfully submitted,

September 29, 2025

s/ Michael S. Kwun
MICHAEL S. KWUN
Cal. State Bar No. 198945
ELIZABETH H. DINH
Cal. State Bar No. 329295
KWUN BHANSALI LAZARUS LLP
555 Montgomery Street, Suite 750
San Francisco, California 94111
(415) 630-2350
*Attorneys for Amici Curiae*

# Combined Certifications

The undersigned attorney certifies as follows:

1.      **Bar Membership:** I am one of the attorneys whose name appears on this brief and I am a member of the bar of this court.

2.      **Type Volume, Typeface, and Type Style:** This brief complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this brief contains 4,563 words. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in 14-point Times New Roman, a proportionally spaced typeface with serifs, using Microsoft Word 16.

3.      **Service:** Counsel for all parties required to be served are registered to use the court's electronic-filing system and are being electronically served by the filing of this brief with that system.

4.      **Identical Text:** The text of the electronic brief is identical to the text in the paper copies of this brief.

5.      **Virus Check:** The electronic file for this brief was checked for viruses using version 5.17.0 of the virus detection program Malwarebytes and no virus was detected.

September 29, 2025                     *s/ Michael S. Kwun*
                                      MICHAEL S. KWUN