No. 25-2153

IN THE

# United States Court of Appeals
# for the Third Circuit

_____

THOMSON REUTERS ENTERPRISE
CENTRE GMBH and WEST PUBLISHING
CORP.,

*Appellees,*

*v.*

ROSS INTELLIGENCE INC.,

*Appellant,*

_____

On Appeal from an Order of the United States District Court
for the District of Delaware
Civil Action No. 20-613 (The Honorable Stephanos Bibas)

_____

## BRIEF OF COPYRIGHT LAW PROFESSORS AS *AMICI CURIAE* IN SUPPORT OF APPELLANT

_____

Rebecca Tushnet
rtushnet@law.harvard.edu
520 Hauser, Harvard Law School
1575 Massachusetts Avenue
Cambridge, MA 02138
Telephone: 703-593-6759

*Attorney for Amici Curiae*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ ii

STATEMENT OF INTEREST OF AMICI CURIAE ............................................... 1

SUMMARY OF ARGUMENT .............................................................. 1

I. ROSS'S PURPOSE IN USING THE HEADNOTES WAS HIGHLY
   TRANSFORMATIVE AND STRONGLY FAVORS FAIR USE ...................... 3

   A. ROSS's Limited Use of Headnotes Served a Highly Transformative
      Purpose of Training an AI Model with Non-Infringing Outputs ..................... 4

   B. The District Court Misapplied the Supreme Court's Guidance in *Warhol*
      by Conflating a Tool with the Copyrighted Work at Issue ............................ 11

II. HEADNOTES ARE FACTUAL AND HAVE AT MOST A THIN SCOPE
    OF COPYRIGHT PROTECTION ..................................................... 15

III. ROSS USED A RELATIVELY SMALL PORTION OF THE TOTAL
     NUMBER OF HEADNOTES, AN AMOUNT THAT WAS REASONABLE
     FOR A TRANSFORMATIVE PURPOSE ............................................. 18

IV. ROSS'S TRANSFORMATIVE USE OF HEADNOTES DID NOT CAUSE
    HARM TO ANY COGNIZABLE COPYRIGHT MARKET ........................... 20

Conclusion ................................................................................... 27

# TABLE OF AUTHORITIES

## CASES

*A.V. ex rel. Vanderhye v. iParadigms*, LLC, 562 F.3d 630 (4th Cir. 2009)........9, 10

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*,

    598 U.S. 508 (2023)............................................................ 4, 5, 8, 11, 12, 13, 14

*Authors Guild v. Google*, 804 F.3d 202 (2d Cir. 2015).... 8, 9, 10, 12, 21, 24, 25, 26

*Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87 (2d Cir. 2014) ................................9

*Authors Guild, Inc. v. HathiTrust*, 902 F. Supp. 2d 445 (S.D.N.Y. 2012)...............9

*Banks v. Manchester,* 128 U.S. 244 (1888) ................................................ 6, 17, 26

*Bartz v. Anthropic PBC*, -- F. Supp. 3d --, 2025 WL 1741691

    (N.D. Cal. June 23, 2025) .................................................... 3, 7, 10, 22

*Bill Graham Archives v. Dorling Kindersley Ltd*., 448 F.3d 605

    (2d Cir. 2006) ........................................................................ 20, 22

*Cambridge Univ. Press v. Patton*, 769 F.3d 1232 (11th Cir. 2014) .......................23

*Campbell v. Acuff-Rose Music, Inc.,* 510 U.S. 569 (1994)... 4, 10, 11, 14, 20, 21, 26

*Castle Rock Entm't, Inc. v. Carol Publ. Group, Inc.,* 150 F.3d 132

    (2d Cir. 1998)........................................................................22

*Couch v. Telescope Inc*., 611 F.3d 629 (9th Cir. 2010)............................................2

*DSC Communications Corp. v. DGI Technologies, Inc.*, 81 F.3d 597

    (5th Cir. 1996)........................................................................25

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340 (1991) ............................16

*Georgia v. Public.Resource.Org, Inc.*, 590 U.S. 255 (2020)..............................6, 17

*Google LLC v. Oracle America, Inc.*, 593 U.S. 1 (2021) ........... 8, 11, 14, 18, 20, 25

*Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972 (2d Cir. 1980) .................13

*Houchins v. KQED, Inc.*, 438 U.S. 1 (1978) (Stevens, J., dissenting) .....................3

*Kadrey v. Meta Platforms, Inc.*, -- F. Supp. 3d --, 2025 WL 1752484

    (N.D. Cal. June 25, 2025) .............................................................. 3, 8, 10, 21, 22

*Kelly v. Arriba Soft Corp.*, 336 F.3d 811 (9th Cir. 2003).......................................20

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,* 387 F.3d 522

    (6th Cir. 2004)............................................................................................ 10, 25

*Monsanto v. Quinn*, 674 F.2d 990 (3d Cir. 1982)....................................................3

*Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007) .....................20

*Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510 (9th Cir. 1992)..... 10, 13, 20, 26

*Sony Comput. Entm't, Inc. v. Connectix Corp.*, 203 F.3d 596

    (9th Cir. 2000)............................................................................................ 10, 25

*Thomson Reuters Enter. Ctr. GmbH v. ROSS Intelligence Inc.*,

    No. 20-cv-613-SB, 2025 WL 1488015 (D. Del. May 23, 2025)..........................2

*Thomson Reuters Enters. Ctr. GmbH v. ROSS Intelligence Inc.*,

    694 F. Supp. 3d 467 (D. Del. 2023)....................................................... 15, 16, 24

*Thomson Reuters Enters. Ctr. GmbH v. ROSS Intelligence Inc.*,

765 F. Supp. 3d 382 (D. Del. 2025)........................... 5, 11, 12, 15, 16, 18, 19, 25

*Video Pipeline, Inc. v. Buena Vista Home Ent.*, 342 F.3d 191 (3d Cir. 2003) ..........5

## STATUTES

17 U.S.C. § 107 ....................................................................................................20

## OTHER AUTHORITIES

H.R. REP. NO. 94-1476 (1976) ...............................................................................11

Justin Hughes, *Size Matters (Or Should) in Copyright Law*, 74 FORDHAM L. REV. 575 (2005)……………………………………………………………………...19

Margot E. Kaminski & Guy A. Rub, *Copyright's Framing Problem*, 64 UCLA L. REV.1102 (2017)…..……....……………………………………………………….19

Matthew Sag, *Fairness and Fair Use in Generative AI*, 92 FORDHAM L. REV. 1887 (2024)……………………………………………………………………….. 6

Pierre N. Leval, *Toward a Fair Use Standard*, 103 HARV. L. REV. 1105 (1990).....4

9 WRITINGS OF JAMES MADISON (G. Hunt ed. 1910)………………………….3

## STATEMENT OF INTEREST OF AMICI CURIAE

Amici are scholars whose research and teaching has focused on copyright law. Amici have no direct interest in the outcome of this litigation.[1] Amici are listed in alphabetical order:

**Edward Lee,** Professor of Law, Santa Clara Law

**Matthew Sag**, Jonas Robitscher Professor of Law in Artificial Intelligence, Machine Learning, and Data Science, Emory University

**Pamela Samuelson**, Richard M. Sherman Distinguished Professor of Law, UC Berkeley School of Law

**Christopher Jon Sprigman**, Murray and Kathleen Bring Professor of Law Co-Director, Engelberg Center on Innovation Law and Policy New York University School of Law

**Rebecca Tushnet**, Frank Stanton Professor of the First Amendment, Harvard Law School

## SUMMARY OF ARGUMENT

Judge Bibas was the first judge to rule on whether using copyrighted material to train an AI model is a fair use. ROSS Intelligence (ROSS) used headnotes created by Thomson Reuters (Thomson) for the purpose of training an AI model so

---

[1] Institutional affiliations are listed for informational purposes only. Amici certify that no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund the preparation or submission of this brief; and no person other than the amici contributed money that was intended to fund the preparation or submission of this brief.

it can answer people's queries about the law by providing direct quotes from judicial opinions. In three opinions, Judge Bibas wrestled with this question of law: twice on summary judgment motions and a third on ROSS's petition for this interlocutory appeal. Noting that this Court "has not yet spoken on this 'novel and difficult question[] of first impression,'" Judge Bibas conceded there was a substantial ground for difference of opinion with his decision. *Thomson Reuters Enter. Ctr. GmbH v. ROSS Intelligence Inc.*, No. 20-cv-613-SB, 2025 WL 1488015, at *1 (D. Del. May 23, 2025) (quoting *Couch v. Telescope Inc.*, 611 F.3d 629, 633 (9th Cir. 2010)).

Judge Bibas's conscientious effort to tackle the novel fair use issues here was commendable. But his fair use analysis was unsound. Westlaw headnotes are fact-intensive and far less expressive than visual art, poetry, and other creative works at the core of copyright. ROSS's use of a relatively small percentage of Westlaw headnotes served a highly transformative purpose to train and develop its new AI model capable of identifying patterns of *unprotected* information in the headnotes. Based on its training, ROSS's AI was able to build a generalized method to provide answers to people's legal questions with direct quotes from judicial opinions. Significantly, ROSS's trained model produced *no* infringing outputs whatsoever.

When Judge Bibas ruled against ROSS's fair use defense, he did not have the benefit of two subsequent federal court decisions, both of which held that the use of

in-copyright materials to train an AI model is a highly transformative fair use. *See Bartz v. Anthropic PBC*, -- F. Supp. 3d --, 2025 WL 1741691, at *7 (N.D. Cal. June 23, 2025); *Kadrey v. Meta Platforms, Inc.*, -- F. Supp. 3d --, 2025 WL 1752484, at *9 (N.D. Cal. June 25, 2025). These recent decisions are well-supported by Supreme Court and circuit court precedents in similar cases involving fair uses to develop technologies that disseminate no infringing outputs. There, as here, people benefit from new search tools that enhance their ability to find information. Indeed, ROSS's tool provides a public benefit of the highest order in our democracy by fostering an informed citizenry with greater accessibility to judicial opinions.[2] ROSS's nonexpressive, highly transformative use is a fair use.

## I. ROSS'S PURPOSE IN USING THE HEADNOTES WAS HIGHLY TRANSFORMATIVE AND STRONGLY FAVORS FAIR USE

ROSS's use of headnotes was highly transformative: ROSS used them not for their expressive value but to train its new AI model that answered people's legal

---

[2] *Cf. Houchins v. KQED, Inc.*, 438 U.S. 1, 31 (1978) (Stevens, J., dissenting) ("Our system of self-government assumes the existence of an informed citizenry. As Madison wrote: 'A popular Government, without popular information, or the means of acquiring it, is but a Prologue to a Farce or a Tragedy, or, perhaps both.'") (quoting 9 WRITINGS OF JAMES MADISON 103 (G. Hunt ed. 1910)); *Monsanto v. Quinn*, 674 F.2d 990, 1001 (3d Cir. 1982) (recognizing the First Amendment interest in informed citizenry).

questions with quotes from judicial opinions. The purpose and character of this transformative use strongly favors fair use.

### A. ROSS's Limited Use of Headnotes Served a Highly Transformative Purpose of Training an AI Model with Non-Infringing Outputs

The Supreme Court has consistently recognized that whether a challenged use has a "transformative" purpose is a "central" concern of the first fair use factor, which focuses on the purpose and character of that use:

> The central purpose of this investigation [under Factor 1] is to see … whether the new work merely supersedes the objects of the original creation …, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message; it asks, in other words, whether and to what extent the new work is "transformative." … the more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use.

*Campbell v. Acuff-Rose Music, Inc.,* 510 U.S. 569, 579 (1994) (cleaned up).

Courts examine whether "a use shares the purpose or character of an original work, or instead has a further purpose or different character." *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 528 (2023) ("*Warhol*"). As the *Warhol* Court explained: "A use that has a further purpose or different character is said to be 'transformative.'" *Id.* at 529 (quoting Pierre N. Leval, *Toward a Fair Use Standard*, 103 HARV. L. REV. 1105, 1111 (1990); *Campbell*, 510 U.S. at 585).

ROSS's use of a limited number of Thomson's headnotes in its internal process of training an AI model is highly transformative. ROSS's use had the

purpose of providing data for its AI model to analyze the *unprotected* patterns between the headnotes and parts of judicial opinions, so that the AI model can identify different parts of judicial opinions generally and answer people's legal questions by providing direct quotes from the opinions.

If ROSS had merely copied the headnotes, including any protectable expression therein, and reproduced them in the model's outputs in response to user queries, that use would not have been transformative. *Cf. Video Pipeline, Inc. v. Buena Vista Home Ent.*, 342 F.3d 191, 199 (3d Cir. 2003) (disseminating video clips had same purpose of movie trailers). Such a purpose would be the same as Thomson's in publishing the headnotes: providing synopses of legal analyses encapsulated in the headnotes and making them available to researchers. *See Warhol*, 598 U.S. at 533 ("The same copying may be fair when used for one purpose but not another.").

But that's not what ROSS did. Instead, ROSS developed and trained an AI search tool using memos containing a limited selection of headnotes. *Thomson Reuters Enters. Ctr. GmbH v. ROSS Intelligence Inc.*, 765 F. Supp. 3d 382, 395 (D. Del. 2025). ROSS fed the memos into a computer system, where no human would ever read them, for the further transformative purpose of building a new machine learning model. ROSS's model does not store the headnotes. It is not a library or a database. Instead, the model dissects the *unprotected* correlations and patterns that

5

characterize both headnotes and parts of judicial opinions. The model then maps the relationship between questions people might have about the law and statements judges have made about the law. Neither the questions that users input, nor the model's answers—relevant quotes from judicial opinions—are within the scope of Thomson's copyright. *Georgia v. Public.Resource.Org, Inc.*, 590 U.S. 255, 264 (2020) (quotations from judicial opinions are "free for publication to all") (quoting *Banks v. Manchester,* 128 U.S. 244, 253 (1888)).

ROSS's legal research tool does not output any protected expression in Thomson's headnotes. ROSS therefore made a "nonexpressive use" of Thomson's headnotes—a use not for the purpose of distributing or otherwise capitalizing on the headnotes' expressive content, but rather a use of the facts, ideas, or other unprotected elements they contain.[3] Such uses are inherently transformative: they do not "supersede the objects of the original creation" by substituting for its expressive content. Rather, they distill uncopyrightable information in the works on which the model was trained, and then use that information for new ends. Where, as here, the resulting output is not substantially similar—and indeed, in this instance, does not

---

[3] *See, e.g.*, Matthew Sag, *Fairness and Fair Use in Generative AI*, 92 FORDHAM L. REV. 1887, 1903 (2024) (explaining that "[c]ourts have consistently held that technical acts of copying that do not communicate an author's original expression to a new audience constitute fair use) and listing examples of such nonexpressive cases.

reproduce or distribute *any* protected content in Thomson's works—the nonexpressive use "adds something new, with a further purpose or different character." Here, it provides a new AI search tool to answer people's questions about the law in a new way.

Courts in other circuits have faced this type of intermediate use of copyrightable works; that is, uses that do not disseminate any protected authorial expression. They have consistently held it to be transformative. Most recently, two federal judges in the Northern District of California concluded that AI training was a highly transformative use. In *Bartz v. Anthropic*, Judge Alsup found that Anthropic's purpose in using millions of copies of books to train its AI large language model (LLM), was highly transformative—even "spectacularly so." *Bartz*, 2025 WL 1741691, at *7. As Judge Alsup explained: such use in AI training enables the model to "map statistical relationships" among the books copied in the training datasets to develop AI technology that produces new, noninfringing outputs in response to user requests. *Id.* Indeed, such use to develop AI is "among the most transformative many of us will see in our lifetimes." *Id.* at *18.[4] Judge Chhabria

_____

[4] Judge Alsup briefly distinguished the district court's decision in this case in rejecting the arguments of the plaintiffs before him. *Bartz*, 2025 WL 1741691, at *8. However, the factual distinction Judge Alsup noted—that ROSS's model does not write new content—does not include the more salient facts here: (1) ROSS's model is capable of answering questions in a new way that the compiled judicial opinions

reached a similar conclusion with respect to the "highly transformative purpose" in Meta's training of its AI model with copies of millions of books. *Kadrey,* 2025 WL 1752484, at *9 (citing *Google LLC v. Oracle America, Inc.*, 593 U.S. 1, 30 (2021)). The AI model's use of the books during training is different from human consumption of the books. *Id.* at *10.

Circuit court decisions have recognized fair uses where the search technology went beyond the copying involved here and included a permanent internal database of many copied works. They have done so because the technology had the transformative purpose of enabling people to find information through non-infringing outputs.

Consider *Authors Guild v. Google*, a case on which the *Warhol* Court relied. *See Warhol*, 598 U.S. at 531-32 (discussing *Authors Guild v. Google*, 804 F.3d 202, 207, 218 (2d Cir. 2015)). Google scanned millions of books for the transformative purpose of enabling within-text searches of books. That was a fair use. *Authors Guild*, 804 F.3d at 208-09. In an opinion written by Judge Leval, the Second Circuit held that Google's massive copying of books served a "highly transformative purpose of identifying books of interest to the searcher" by showing only non-

_____

alone cannot, and (2) ROSS's outputs are simply parts of uncopyrightable judicial opinions and the underlying works used to train are simply headnotes, which fall well outside the core of copyright. *See infra* pp. 22-25.

infringing snippets of a relevant book. *Id.* at 218. The Second Circuit also found a transformative purpose in Google Book Search's "ngrams tool" that "allows readers to learn the frequency of usage of selected words in the aggregate corpus of published books in different historical periods." *Id.* at 217.

In *HathiTrust*, a case also involving book search technology, the Second Circuit likewise found a transformative purpose. Library books were copied to enable a broad set of research uses relating to metadata derived from those works. *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 97 (2d Cir. 2014). The district court had earlier noted that the database had "already given rise to new methods of academic inquiry such as text mining." *Authors Guild, Inc. v. HathiTrust*, 902 F. Supp. 2d 445, 460 (S.D.N.Y. 2012), *aff'd in part, vacated in part*, 755 F.3d 87 (2d Cir. 2014). *See also A.V. ex rel. Vanderhye v. iParadigms*, LLC, 562 F.3d 630, 639–40 (4th Cir. 2009) (copying student papers to build anti-plagiarism technology was transformative and "completely unrelated to expressive content").

Like the use here, the uses in *Authors Guild* and *HathiTrust* were not criticisms of or comments on the original works; instead, the tools offered new ways to find information and new insights. Google Book Search's frequency data is about social and linguistic change in the use of words. *See Authors Guild*, 804 F.3d at 209. To the extent that the snippet function disclosed information, that information was often unprotectable fact. *Id.* at 224 ("A snippet's capacity to satisfy a searcher's need

for access to a copyrighted book will at times be because the snippet conveys a historical fact that the searcher needs to ascertain."). As the Second Circuit concluded in *Authors Guild*, "no doubt … the purpose of this copying is the sort of transformative purpose described in *Campbell* as *strongly favoring satisfaction of the first factor*." *Id.* (emphasis added). *See also Lexmark Int'l, Inc. v. Static Control Components, Inc.,* 387 F.3d 522, 544 (6th Cir. 2004) (discussing copying for interoperability under fair use); *Sony Comput. Entm't, Inc. v. Connectix Corp.*, 203 F.3d 596, 599–601 (9th Cir. 2000) (copying as intermediate step in creation of noninfringing emulation software was transformative); *Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1522–23 (9th Cir. 1992), *as amended* (Jan. 6, 1993) (copying that enabled creation of competing, noninfringing alternative was "a legitimate, essentially non-exploitative purpose").

The trial court erred in limiting the reach of *Sega* and similar cases to computer code. The court of appeals' fair use decisions in *Authors Guild*, *HathiTrust*, and *iParadigms* did not involve any "copying [of] computer code." These cases involved the copying of library books and term papers, respectively. Tellingly, the more recent district court rulings concerning the use of books to train LLMs are not computer code cases either. *See Kadrey*, 2025 WL 1752484, at *6; *Bartz*, 2025 WL 1741691, at *7. The district court's narrow reading of *Sega* also ignored that none of those other fair use cases turned on the degree to which copying

was "necessary for competitors to innovate" or "the need to copy to reach the underlying ideas." *ROSS*, 765 F. Supp. 3d at 398. Those cases recognized a transformative purpose in copying that made possible a non-infringing output disseminated to the public that was new and useful. None of these cases hold that fair use is a rule of strict necessity. It is rather a means to encourage new works (like ROSS's model) and new insights.

These fair use decisions are all consistent with the Supreme Court's and Congress's recognition that fair use is a flexible doctrine that "requires judicial balancing, depending upon relevant circumstances, including 'significant changes in technology.'" *Oracle*, 539 U.S. at 19; *see* H.R. REP. NO. 94-1476, at 66 (1976) ("The bill endorses the purpose and general scope of the judicial doctrine of fair use, but there is no disposition to freeze the doctrine in the statute, especially during a period of rapid technological change.").

### B. The District Court Misapplied the Supreme Court's Guidance in *Warhol* by Conflating a Tool with the Copyrighted Work at Issue

In holding that the first fair-use factor favored Thomson, the district court misapplied the Supreme Court's decision in *Warhol*. The *Warhol* Court reiterated the above-quoted language on transformativeness from *Campbell* and noted, further, that "the first factor relates to the problem of substitution—copyright's bête noire. The use of an original work to achieve a purpose that is the same as, or highly similar

to, that of the original work is more likely to substitute for, or supplant, the work." *Warhol*, 598 U.S. at 527–28 (cleaned up).

The district court misunderstood the Supreme Court's reference to "the purpose of a copyrighted work" to call for a comparison of the ultimate business objectives of the plaintiff and the defendant. *See ROSS*, 765 F. Supp. 3d at 397–98 ("ROSS's use is not transformative because it does not have a 'further purpose or different character' from Thomson Reuters's."). The district court further found that ROSS's use of the headnotes lacked a "further purpose or different character" because ROSS and Thomson were "competitors" in the business of providing legal research tools and services. *Id.* at 398.

Respectfully, that is a fundamental misunderstanding of what the Supreme Court said in *Warhol*. Competition is not the relevant inquiry; substitution of expression is. As the Court explained in *Warhol*, "[a] use that shares the *purpose* of a copyrighted work…is more likely to provide the public with a substantial *substitute for matter protected by the copyright owner's interests in the original work* or derivatives of it, which undermines the goal of copyright." *Warhol,* 598 U.S. at 531–32 (cleaned up, emphasis added). The Court addressed substitution in terms of "matter protected by the copyright owner's interests in the original work," *id.*, not substitution in terms of mere competition. *See Authors Guild*, 804 F.3d at 224

(focusing on "appropriation" that "serve[s] as a substitute for the original" and analyzing market harm in "*the protected aspect* of the author's work").

The *Warhol* Court did not suggest that all competing photos of the musician Prince (the subject of Goldsmith's copyrighted photograph) were unfair. Nor would such an approach comport with copyright's purpose. Copyright does not protect facts, ideas, or useful functions. Indeed, it *encourages* the production of competing works that do not trade on an original author's protected expression, but only copy facts and other information asserted therein. *Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972, 974 (2d Cir. 1980) (re-expressing similar historical narrative was not infringement); *Sega*, 977 F.2d at 1523–24 (copying game console software in process of reverse engineering to understand how to build compatible games was fair use); *Bartz*, 2025 WL 1741691, at *8 (AI model learned unprotected methods and concepts of language from training works).

The *Warhol* Court focused on the problem of expressive substitution—the use of an author's protected *original expression* in a competing expressive work. Put differently, the *Warhol* Court's concern was whether the defendant's appropriation of the plaintiff's creative expression would lead to the defendant's work substituting for the plaintiff's as content licensed for magazine covers for stories about Prince. The Second Circuit found that the defendant's work was a substantially similar copy of the plaintiff's, which the Foundation did not contest before the Supreme Court.

13

*Warhol*, 598 U.S. at 524. That substantial similarity of expression, which both the plaintiff and defendant were providing to the public, was the background against which the Court assessed the potential substitution of Warhol's works for Goldsmith's in magazine licensing.

The *Warhol* Court was not dealing with nonexpressive internal use, which can create a potential for substitution, but not one based on similar expression. Instead, nonexpressive internal use may lead to similar *function* or *utility* in the product offered to consumers.

Nothing in the Supreme Court's fair use jurisprudence relating to the first statutory factor is about whether the two parties happened, in general, to sell similar products or services. If that were the relevant inquiry, then defendant 2 Live Crew would have lost in *Campbell* because, like the plaintiff music publisher, the defendant sold music. Likewise, Google would have lost because its purpose was to compete with Java and lure programmers away. *Oracle*, 593 U.S. at 39.

Given the district court's error on transformativeness, its overweighting of commerciality was erroneous. *Campbell*, 510 U.S. at 579 ("the more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use."); *Warhol*, 598 U.S. at 538 ("a use's transformativeness may outweigh its commercial character").

## II.    HEADNOTES ARE FACTUAL AND HAVE AT MOST A THIN SCOPE OF COPYRIGHT PROTECTION

Amici agree with the district court that the nature-of-the-work factor favors ROSS,[5] although this factor should weigh more heavily in ROSS's favor than the district court thought that it did.

The district court was correct in holding that Thomson's headnotes are "not that creative." *ROSS*, 765 F. Supp. 3d at 399. The district court's earlier opinion was also correct in finding that Thomson's choices about how to phrase each headnote are "constrained" because they "largely track the language of the opinion." *Thomson Reuters Enters. Ctr. GmbH v. ROSS Intelligence Inc.*, 694 F. Supp. 3d 467, 484 (D. Del. 2023). The phrasing of headnotes is further constrained by the need for accuracy

---

[5] However, amici disagree with the lower court about what counts as the relevant work of authorship in the fair use analysis in *ROSS*. The district court seems to assume that Thomson could proceed with its infringement claim as if each headnote ROSS used for training its AI model was itself an original work of authorship. *ROSS*, 765 F. Supp. 3d at 392-93. This is error. Headnotes are annotations about particular points judges have made in their court opinions. Headnotes are thus integral parts of annotated opinions. They do not have separate economic significance as individual works of authorship. Annotated opinions may be works of authorship. But ROSS did not use whole annotated opinions, only the headnotes. The relevant work of authorship, which the appellee registered with the U.S. Copyright Office, was a compilation database. *ROSS*, 765 F. Supp. 3d at 39. The headnotes are part of that database. The Copyright Office does not register individual headnotes as works of authorship. This point is also important for its relationship to factor three (amount taken).

and concision. The headnotes are largely comprised of statements of fact summarizing the contents of uncopyrightable judicial opinions. Like other fact-intensive works, headnotes enjoy only a "thin" scope of copyright protection. *See Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 349 (1991) ("[C]opyright in a factual compilation is thin."). There is, moreover, no originality at all in the ordering of the headnotes within each annotated opinion because this order is dictated not by Thomson but by the order in which the judges set forth various points in their opinions.

While the district court's earlier ruling characterized headnotes as "not especially close" to the core of copyright, *ROSS*, 694 F. Supp. 3d at 484, they are even farther from the core of copyright than the district court suggested. In particular, the district court's statements, in its most recent opinion, analogizing the editorial decisions Thomson's lawyers make when constructing headnotes to choices sculptors face when making decisions about how to carve a block of marble to create a work of art, are unhelpful.[6] *ROSS*, 765 F. Supp. 3d at 393. In the case of virtually

_____

[6] As derivative works tied very closely to uncopyrightable judicial opinions, the individual headnotes could only have a thin copyright. It seems quite unlikely that a rephrasing of any individual headnote would incorporate any original expression contributed by Thomson. The trial court held otherwise, and because we are unable to see the underlying headnotes and allegedly infringing memos, we cannot dispute this finding—although we note our skepticism. But even if the district court is correct on this point, it does not matter to the fair use analysis: indeed, much of what

every sculpture, the author is making decisions about expressive elements shaping the work, such as perspective, pose, and expression, that are far more numerous and intricate, and far less constrained by external factors, than the work headnote authors do to summarize a holding in a judicial opinion. This makes carving a sculpture from a block of marble far more creative than accurately summarizing parts of judicial opinions.

Indeed (and as the district court elsewhere acknowledged, *ROSS*, 694 F. Supp. 3d at 478), the headnotes often crib much of their language directly from the opinion itself. The district court also suggested that headnotes had copyrightable originality even when they consist of verbatim statements from the texts of judicial opinions. *ROSS*, 765 F. Supp. 3d at 393. Those statements, however, are integral parts of government edicts that are not protectable by copyright law. *Georgia*, 590 U.S. at 264 (quoting *Banks v. Manchester*, 128 U.S. 244, 253 (1888)) (quotations from judicial opinions are "free for publication to all").

Moreover, while it is true that the second statutory fair use factor is often given little weight, in this case it should weigh heavily—and perhaps should be weighted

———————————

we say in this brief would be exactly the same if ROSS had trained a machine learning model on copyrightable abstracts of poetry so that it was able to match user questions about poetry with the uncopyrighted titles of relevant poems or poems licensed direct from the poets themselves.

*most heavily* of all the statutory factors. In *Google v. Oracle*, the Supreme Court analyzed the second statutory factor first because of the functional nature of the Java API and the significant constraints on Google's choices when deciding to re-implement Java on its Android smartphone platform. *Oracle*, 593 U.S. at 26-29. The imperative of fidelity to the contents of judicial opinions means that decisions about headnote content here are arguably even more constrained.

### III. ROSS USED A RELATIVELY SMALL PORTION OF THE TOTAL NUMBER OF HEADNOTES, AN AMOUNT THAT WAS REASONABLE FOR A TRANSFORMATIVE PURPOSE

The district court correctly found that the third fair use factor favored ROSS, 765 F. Supp. 3d at 399-400, but, like the second statutory factor, the third statutory factor should weigh even more heavily in favor of fair use. As ROSS observed in its petition for this interlocutory appeal, the 2,243 headnotes about which the lower court made its fair use ruling constitute a very small part of Thomson's copyrighted compilation. They are akin to the 11,500 declarations that Google reimplemented in its Android smartphone platform which the Supreme Court concluded were a miniscule part of the 2.86 million lines of code in the Java Special Edition, the relevant work of authorship at issue in that case. *Oracle*, 579 U.S. at 33. The *Oracle* Court observed that "copying a large[] amount of material can fall within the scope of fair use where the material copied captures little of the material's creative expression or is central to a copier's valid purpose." *Id*. The Court added that "the

'substantiality' factor will generally weigh in favor of fair use where, as here, the amount of copying was tethered to a valid, and transformative, purpose." *Id*. at 34. These principles should hold true in *ROSS* as well.

Without careful attention to the boundaries of works, especially works at the edges of copyright protection such as compilations of headnotes, plaintiffs can artificially increase the apparent "amount" of what was taken for fair use analysis—exactly what happened here when the district court reasoned on a headnote by headnote basis. Justin Hughes, *Size Matters (Or Should) in Copyright Law*, 74 FORDHAM L. REV. 575, 579-80 (2005) (explaining dangers of recognizing "microworks"); *id.* at 613 ("If our goal is to create special incentives for the building of houses, we do not necessarily need special incentives for the making of bricks or the mixing of mortar.…"); Margot E. Kaminski & Guy A. Rub, *Copyright's Framing Problem*, 64 UCLA L. REV. 1102, 1142-44 (2017) (explaining the interaction between work size and fair use; noting the risks of a plaintiff "gaming" the work's size).

Additionally, the content that ROSS's AI system outputs to end users "does not include a Westlaw headnote," *ROSS*, 765 F. Supp. 3d at 399-400, where any creativity in Thomson's selection, coordination, and arrangement of concepts is concentrated. The district court should have given more weight to the fact that ROSS's AI system does not embody or output the contents of the headnotes. ROSS

used the headnotes only in the training process; that is, as an intermediate step in the process of developing a new non-infringing product, as in *Sega v. Accolade*, 977 F.2d at 1518-19.

The core question is thus whether the amount taken was "reasonable in relation to the purpose of the copying." *Campbell*, 510 U.S. at 586. Where the amount fits the asserted purpose, as internal copying to extract information does here, that weighs in favor of the defendant. *Oracle*, 593 U.S. at 34 (factor three "will generally weigh in favor of fair use where, as here, the amount of copying was tethered to a valid, and transformative, purpose."); *see also Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 613 (2d Cir. 2006) (copying entire work was reasonable in relation to purpose); *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1167–68 (9th Cir. 2007) (use of entire image was necessary since using less would diminish usefulness of visual search engine which had transformative purpose) (citing *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 821 (9th Cir. 2003)).

## IV. ROSS'S TRANSFORMATIVE USE OF HEADNOTES DID NOT CAUSE HARM TO ANY COGNIZABLE COPYRIGHT MARKET

The fourth statutory fair use factor calls for consideration of "the effect of the [challenged] use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). This factor "focuses on whether the copy brings to the marketplace a competing substitute for the original, or its derivative, so as to deprive the rights holder of significant revenues because of the likelihood that potential purchasers

may opt to acquire the copy in preference to the original." *Authors Guild*, 804 F.3d at 223.

It is highly relevant to the market effects analysis in this case that ROSS has not marketed or otherwise provided headnotes to the public in competition with Thomson, which is the kind of use that would directly harm the market for Thomson's work. ROSS's use does not even affect, let alone supplant, demand for the headnotes because, as the district court found, ROSS's AI system does not output any headnote expression. Nor is the ROSS AI model a derivative work of Thomson's headnotes. *See Kadrey v. Meta Platforms, Inc.*, 2023 WL 8039640, at *1 (Nov. 20, 2023) (dismissing plaintiffs' allegation that "every output of the LLaMA language models is an infringing derivative work": [T]he complaint offers no allegation of the contents of any output, let alone of one that could be understood as recasting, transforming, or adapting the plaintiffs' books."); *Andersen v. Stability AI Ltd.*, 744 F. Supp. 3d 956, 975 & n.16 (N.D. Cal. 2024) (allowing a derivative theory against AI image generator, while recognizing summary judgment can examine "what the evidence shows concerning how these products operate and, presumably, whether and what the products can produce substantially similar outputs").

In *Campbell*, the Supreme Court recognized that when second-comers make transformative uses of a first author's works by using them for a different purpose, there is less of a risk of market substitution for the expressive elements of the first

author's work. *Campbell*, 510 U.S. at 591 ("[W]hen … the second use is transformative, market substitution is at least less certain, and market harm may not be so readily inferred."). And the more transformative the second-comer's use of the work is, the less is the risk of market substitution. *Id.* at 579 ("[T]he more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use.").

*Campbell* teaches that copyright owners do not have the right to monopolize transformative markets. *Campbell*, 510 U.S. at 592 ("there is no protectible derivative market for criticism."). Both *Kadrey* and *Bartz* held that authors did not have a cognizable right to license the highly transformative use of AI training under the fourth factor. *Kadrey*, 2025 WL 1752484, at *16 ("[T]o prevent the fourth factor analysis from becoming circular and favoring the rightsholder in every case, harm from the loss of fees paid to license a work for a transformative purpose is not cognizable."); *Bartz*, 2025 WL 1741691, at *17 (rejecting harm in alleged market to license for AI training because "a market for that use is not one the Copyright Act entitles Authors to exploit."). *See also Castle Rock Entm't, Inc. v. Carol Publ. Group, Inc.,* 150 F.3d 132, 146 n.11 (2d Cir. 1998) (holding that a copyright owner cannot control fair use markets merely "by developing or licensing a market for parody, news reporting, educational or other transformative uses of its own creative work"); *Bill Graham Archives*, 448 F.3d at 614-615 ("Copyright owners may not

preempt exploitation of transformative markets" "merely by developing or licensing … transformative uses"); *cf. Cambridge Univ. Press v. Patton*, 769 F.3d 1232, 1278 (11th Cir. 2014) ("Plaintiffs may not head off a defense of fair use by complaining that every potential licensing opportunity represents a potential market for purposes of the fourth fair use factor.").

ROSS's use of copyrighted works as training data was highly transformative and posed no threat of expressive substitution. This Court should rule, as other circuits have done and hold that copyright owners do not have the right to control highly transformative uses.

The *Campbell* Court was also critical of the argument that Campbell had acted in bad faith by asking for a license and not getting one. *Campbell*, 510 U.S. at 585 n. 18. Asking for a license may simply be a good faith way to avoid litigation, but if a challenged use is a transformative fair use, a license isn't needed. *Campbell* also recognized that some copyright owners might be unwilling to license certain types of uses, such as critical commentary or parodies of their works, and that this very unwillingness indicates that there is not likely to be a fair use-relevant market harm from the use. *Id.* at 592 ("[T]he unlikelihood that creators of imaginative works will license critical reviews or lampoons of their own productions removes such uses from the very notion of a potential licensing market.").

The district court focused its market effects analysis on ROSS's intent to offer to the public a legal research tool that competed, at least to some degree, with Thomson's Westlaw service. With due respect, this focus was a mistake. As the Supreme Court noted in *Feist Publications, Inc. v. Rural Telephone Service Co., Inc.*, 499 U.S. 340, 350 (1991), unprotectability of facts, and freedom to copy them, "is neither unfair nor unfortunate. It is the means by which copyright advances the progress of science and art." Market harm from copying facts or ideas is not cognizable under the fourth factor, because copyright protects only the author's expression, not the facts or ideas conveyed. *Cf. id.* at 349 ("[C]opyright assures authors the right to their original expression, but encourages others to build freely upon the ideas and information conveyed by a work.").

Thomson's legal research tool is distinct from Thomson's headnotes. Any competition between ROSS's legal research tool and Thomson's Westlaw does not involve the expressive content of Thomson's headnotes, but rather their unprotected *factual* content: the law. As the district court correctly noted in its first opinion, "not all losses are created equal." *ROSS*, 694 F. Supp. 3d 467, 485. Citing Judge Leval's opinion in *Authors Guild*, the district court recognized that a competitive loss suffered by the defendant that stems from something other than competition with the *expressive content* of plaintiff's copyrighted work is not cognizable under the fourth

statutory factor. *ROSS*, 694 F. Supp. 3d 467, 485–86, citing and quoting *Authors Guild*, 804 F.3d at 224.

Other courts have agreed. *Lexmark Int'l*, 387 F.3d at 545 (competing with producer's product is not cognizable copyright harm); *Connectix*, 203 F.3d at 607 (relevant market is market for copyrighted work); *DSC Communications Corp. v. DGI Technologies, Inc.*, 81 F.3d 597, 601 (5th Cir. 1996) (legitimate copyright market is market for copyrighted work, not market for associated hardware).

The focus in this case should be on whether ROSS's use of the headnotes undermined a market for those headnotes, not for Thomson's larger services. As explained above, it does not. ROSS's AI tool does not output protectable expression from Thomson's headnotes as answers to user queries. Indeed, ROSS does not even use the headnotes to generate text that may be *similar* to the headnotes. As the district court correctly acknowledged, when a user enters a legal question, ROSS's model generates texts from "relevant judicial opinions that have already been written." *ROSS*, 765 F. Supp. 3d at 398.

Moreover, this Court should follow the Supreme Court's directive in *Google v. Oracle* and consider public benefits that arise from the challenged use in assessing its market effects. *Oracle*, 141 S. Ct. at 1206 ("[W]e must take into account the public benefits the copying will likely produce."). ROSS's use creates a public benefit in bringing more competition to the electronic legal research market that

Thomson currently dominates and in creating a new and different way of answering legal questions. Notably, the public benefits from new research tools to better understand the law contained in judicial opinions, which are "free for publication to all." *Banks*, 128 U.S. at 253.

To borrow the Second Circuit's words in *Authors Guild*, creating a tool that enhances people's ability to understand the law purely through non-infringing quotes from judicial opinions "serv[es] copyright's overall objective of contributing to public knowledge." *Authors Guild*, 804 F.3d at 214. Indeed, creating a new product or service that does not compete with the "protected aspect" of the plaintiff's work—i.e., the work's expressive content—is not conduct that the Copyright Act is meant to deter, but rather, to encourage. *See Campbell*, 510 U.S. at 579 ("[T]he goal of copyright, to promote science and the arts, is generally furthered by the creation of transformative works. Such works thus lie at the heart of the fair use doctrine's guarantee of breathing space within the confines of copyright…."); *Sega*, 977 F.2d at 1523 (holding that copying of plaintiff's copyrighted software for the purpose of reverse engineering was fair use because defendant "sought only to become a legitimate competitor" in producing videogames that were compatible with plaintiff's game platform).

For all these reasons, the district court erred in holding that the fourth statutory factor counted against a finding of fair use. Had the district court undertaken the

proper competitive analysis, the fourth statutory factor would have counted heavily in favor of fair use. This Court should so hold as a matter of law.

**CONCLUSION**

For the foregoing reasons, this Court should reverse.

Respectfully submitted,

*/s/ Rebecca Tushnet*
REBECCA TUSHNET
Harvard Law School
1575 Massachusetts Ave.
Cambridge, MA 02138
(703) 593-6759
*Counsel for* Amici Curiae

Dated: September 29, 2025

# CERTIFICATE OF COMPLIANCE

This document complies with the word limit of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)—which set the limitation for an amicus brief at one half of the maximum length authorized for a party's principal brief (i.e., 6,500 words)—because excluding the parts of the brief exempted by Federal Rule 32(f), the brief contains 6499 words on the basis of a count made by the word processing system used to prepare the brief.

Pursuant to Federal Rules of Appellate Procedure 32(a)(5) and 6, I hereby certify that this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

Respectfully submitted,

*/s/ Rebecca Tushnet*

REBECCA TUSHNET
Harvard Law School
1575 Massachusetts Ave.
Cambridge, MA 02138
(703) 593-6759
*Counsel for* Amici Curiae

Dated: September 29, 2025

## CERTIFICATE OF SERVICE

I hereby certify that on September 29, 2025, a copy of the foregoing is being filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Respectfully submitted,

*/s/ Rebecca Tushnet*
REBECCA TUSHNET
Harvard Law School
1575 Massachusetts Ave.
Cambridge, MA 02138
(703) 593-6759
*Counsel for* Amici Curiae

Dated: September 29, 2025