No. 25-2153

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

---

THOMSON REUTERS ENTERPRISE CENTRE GMBH AND WEST PUBLISHING CORPORATION,

*Plaintiffs-Appellees*,

v.

ROSS INTELLIGENCE INC.,

*Defendant-Appellant.*

---

On Appeal from the United States District Court
for the District of Delaware,
Civil Action No. 1:20-cv-00613 (Hon. Stephanos Bibas)

---

BRIEF OF *AMICI CURIAE* NEXT-GENERATION LEGAL RESEARCH AND
TECHNOLOGY PLATFORMS IN SUPPORT OF APPELLANT

---

Phillip R. Malone
August Gebhard-Koenigstein
  (CA Certified Law Student)
JUELSGAARD INTELLECTUAL PROPERTY AND
  INNOVATION CLINIC
MILLS LEGAL CLINIC AT
  STANFORD LAW SCHOOL
559 Nathan Abbott Way
Stanford, CA 94350
(650) 725-6369
pmalone@law.stanford.edu

*Counsel for* Amici Curiae

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Third Circuit Local Appellate Rule 26.1.1 (a) and (b):

(1) A*mici* Dispute Resolution AI, Free Law Project, and Paxton AI Inc., disclose that they have no parent corporation, do not issue stock, and are not affiliated with any publicly held corporation with a financial interest in the outcome of this proceeding.

(2) *Amici* Cicerai Corp., Juristai, and Trellis Research Inc., disclose that they have no parent corporation, that they do issue stock but no publicly held corporation owns 10% or more of that stock, and that they are not affiliated with any publicly held corporation with a financial interest in the outcome of this proceeding.

**TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT .................................................. i

INTEREST OF AMICI CURIAE ................................................. 1

SUMMARY OF ARGUMENT ................................................. 2

ARGUMENT ................................................. 4

I.    Individual Headnotes Are Not Copyrightable Works. ......................... 4

      A.    Individual Headnotes Lack Sufficient Originality for
            Copyright Protection. .................................................. 4

      B.    The Merger Doctrine Precludes Individual Headnotes from
            Being Copyrightable. .................................................. 8

II.   The District Court Erred in Rejecting ROSS's Fair Use Defense
      On Summary Judgment. .................................................. 10

      A.    ROSS's Use of the Headnotes Was Transformative. ............... 12

      B.    The District Court Should Have Given the Second Fair
            Use Factor More Weight. .......................................... 17

      C.    The District Court Correctly Found for ROSS on Factor
            Three, but Its Reasoning Supports a Finding of
            Transformative Use Under Factor One. ................................ 19

      D.    The District Court Erred by Deciding Factor Four on
            Summary Judgment and by Giving It Disproportionate
            Weight. .................................................. 21

III.  The District Court's Copyrightability and Fair Use
      Determinations Undermine the Public Interest in Competition
      and Innovation. .................................................. 24

      A.    Overbroad Assertions of Copyright Should Not Permit
            Rightsholders to Monopolize Markets or Stifle Valuable
            Innovation. .................................................. 24

    B.     Innovation in AI-Assisted Research Serves the Public
                Interest and Does  Not Create a Substitute for Headnotes. ...... 25

CONCLUSION ............................................................................................ 28

CERTIFICATE OF COMPLIANCE............................................................ 29

CERTIFICATE OF SERVICE .................................................................... 30

# TABLE OF AUTHORITIES

**Cases**                                                                     **Page(s)**

*A.V. v. iParadigms, LLC,*
    562 F.3d 630 (4th Cir. 2009) .................................................................. 14, 15

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith,*
    598 U.S. 508 (2023)............................................................... 11, 12, 21, 22

*Authors Guild, Inc. v. HathiTrust,*
    755 F.3d 87 (2d Cir. 2014) .................................................................. 14, 15

*Authors Guild v. Google, Inc.,*
    804 F.3d 202 (2d Cir. 2015) ...............................................................*passim*

*Bartz v. Anthropic PBC,*
    No. 24-cv-05417, 2025 WL 1741691 (N.D. Cal. June 23, 2025)..................... 15

*Cambridge Univ. Press v. Patton,*
    769 F.3d 1232 (11th Cir. 2014) .................................................................. 24

*Campbell v. Acuff-Rose Music, Inc.,*
    510 U.S. 569 (1994)............................................................................*passim*

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,*
    499 U.S. 340 (1991)..........................................................................4, 5, 7, 17

*Georgia v. Public.Resource.Org, Inc.,*
    590 U.S. 255 (2020)............................................................................2, 6, 25

*Google LLC v. Oracle Am., Inc.,*
    593 U.S. 1 (2021)...............................................................................*passim*

*Harper & Row Publishers, Inc. v. Nation Enters.,*
    471 U.S. 539 (1985) ................................................................................... 21

*Holmes v. Hurst,*
    174 U.S. 82 (1899)....................................................................................... 8

*Kadrey v. Meta Platforms, Inc.,*
    No. 3:23-cv-03417, 2025 WL 1752484 (N.D. Cal. June 25, 2025) .................. 15

*Publ'ns Int'l, Ltd. v. Meredith Corp.*,
88 F.3d 473 (7th Cir. 1996) ............................................... 9

*Sega Enters. Ltd. v. Accolade, Inc.*,
977 F.2d 1510 (9th Cir. 1992) ........................................ 24

*Silvertop Assocs. v. Kangaroo Mfg.*,
931 F.3d 215 (3d Cir. 2019) ........................................ 8, 9

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
464 U.S. 417 (1984) ...................................................... 17

*Southco, Inc. v. Kanebridge Corp.*,
390 F.3d 276 (3d Cir. 2004) (en banc) ........................... 5

*Stewart v. Abend*,
495 U.S. 207 (1990) ................................................. 11, 17

*Twentieth Century Music Corp. v. Aiken*,
422 U.S. 151 (1975) ................................................. 10, 11

*Wheaton v. Peters*,
33 U.S. 591 (1834) ....................................................... 23

**Statutes**

17 U.S.C. § 102(b) ........................................... 4, 8, 18

17 U.S.C. § 107 ......................................... 11, 12, 19, 22

**Other Authorities**

Melia Russel, *2 Companies Ruled Legal Tech for Decades. AI is
Blowing That Wide Open.*, Bus. Insider (Aug. 31, 2025) ................................. 26

*Expanding Primary Sources*, UF Law, https://perma.cc/8N6N-EYAT
(last visited Sep. 28, 2025) ........................................ 10

Meggie Keefe, *Free vs. Westlaw: Why You Need the West Key
Number System*, Thomson Reuters, https://perma.cc/YP6Z-JV4R
(last visited Sep. 23, 2025). ........................................ 5

U.S. Const. art. 1, § 8, cl. 8 ....................................... 7

4 NIMMER ON COPYRIGHT § 13F.06 ............................................................ 17, 18, 19

4 NIMMER ON COPYRIGHT § 13F.07 .................................................................. 19

4 NIMMER ON COPYRIGHT § 13F.08 .................................................................. 22

John Dethman, *Trust v. Antitrust*: *Consolidation in the Legal Publishing Industry*, 21 Legal Reference Servs. Q. 123 (2002). ...................... 27

## INTEREST OF *AMICI CURIAE*

*Amici* Cicerai Corp., Dispute Resolution AI, Free Law Project, Juristai Legal Technology Group Inc., Paxton AI, Inc., and Trellis Research, Inc., are nonprofit and commercial developers of next-generation legal research, access and retrieval, document and data analysis, and drafting tools used by lawyers, courts, law schools, and the public.[1] These tools serve the public interest by dramatically transforming the ways in which users research, access, analyze, and utilize the law. Many of these tools depend on access to judicial opinions and on non-expressive, intermediate uses of text—such as search, indexing, and model training—that do not output Appellees' Westlaw text or substitute for its headnotes or its proprietary editorial content.

Although *amici* compete with Appellees in various ways, *amici* have no direct financial interest in the outcome of this litigation. Rather, they share an interest in ensuring that overbroad assertions of copyright, such as those over headnotes in this case, are not permitted to chill innovation, raise barriers to entry, limit competition in legal-information markets, and reduce public access to the law and to justice.

---

[1] Neither the parties nor their counsel have authored this brief in whole or in part; neither they nor any other person or entity other than *amici curiae* and their counsel contributed money that was intended to fund preparing or submitting this brief. The parties have provided blanket consent for the filing of *amicus* briefs.

## SUMMARY OF ARGUMENT

"[N]o one can own the law. 'Every citizen is presumed to know the law,' and 'it needs no argument to show . . . that all should have free access' to its contents." *Georgia v. Public.Resource.Org, Inc.*, 590 U.S. 255, 265, (2020) (citation omitted). So too for judicial opinions. *Id.* ("[Judges] cannot be the 'author[s]' of the works they prepare 'in the discharge of their judicial duties.'"). The same should be true of the headnotes at issue in this case, which serve a discrete and limited purpose as often near-verbatim summaries and verbatim quotes that faithfully and accurately describe a specific point of law from a judicial opinion.

Individual headnotes are uncopyrightable because they lack the originality required for copyright protection, and the district court erred in finding to the contrary. And, because there are no or only a few other ways to concisely and precisely express the specific individual legal points stated in an opinion, the expression in a headnote cannot be distinguished from the underlying legal idea it aims to convey. The district court therefore also erred by rejecting the merger defense.

But even if headnotes like those in Westlaw's platform were copyrightable, the district court erred in concluding on summary judgment that Appellant ROSS Intelligence's indirect use of those headnotes as inputs to train a new artificial intelligence (AI) legal research tool was not fair use. Instead, a correct application

of the four fair use factors should have concluded that ROSS's use was highly transformative and would not serve as a market substitute for headnotes.

The district court's errors undermine significant public interests at the heart of our copyright system and fair use. *Amici*, like ROSS before it was shut down by Appellees' lawsuit, are helping to create the next generation of powerful legal tools and services that reflect critical innovation and are helping to introduce much-needed competition in the legal research, drafting, and analytics markets. These innovations promise dramatic improvements in how everyone accesses, understands, and uses the law. But many also require the ability to use headnotes or similar information as an input (but not output) in an intermediate step of training their AI tools and systems.

Allowing overbroad assertions of copyright over headnotes, or denying fair use protection for using such materials for intermediate, transformative purposes like training new AI models or developing groundbreaking AI systems, undermines the public interest and will exacerbate existing barriers to legal information, impede innovation, and reduce competition, perpetuating the dominance of the current few major players.

# ARGUMENT

## I.     INDIVIDUAL HEADNOTES ARE NOT COPYRIGHTABLE WORKS.

The district court erred in concluding as a matter of law for purposes of summary judgment that individual headnotes are copyrightable. This conclusion is wrong for two reasons. First, because their very purpose is to be faithful and concise statements of points of law in a judicial opinion, individual headnotes do not have sufficient originality to qualify for copyright protection. Second, even if they did, because there are usually few, and often no, other feasible ways of faithfully and succinctly expressing the particular point of law from an opinion that individual headnotes must capture, copyright's merger doctrine would preclude their copyrightability.

### A.     Individual Headnotes Lack Sufficient Originality for Copyright Protection.

To qualify for copyright protection, a work must be an "original work[] of authorship." 17 U.S.C. § 102(b). "[O]riginality requires independent creation plus a modicum of creativity." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 346 (1991). Most works have the requisite creativity because they "possess some creative spark." *Id.* at 345. But the very nature of headnotes inhibits the expression of that spark. Headnotes exist to faithfully and accurately describe "a specific point[]

of law addressed in a particular case." Meggie Keefe, *Free vs. Westlaw: Why You Need the West Key Number System*, Thomson Reuters, https://perma.cc/YP6Z-JV4R (last visited Sep. 23, 2025).

The near-verbatim summaries and verbatim quotes that make up the headnotes in Westlaw's platform cannot be considered sufficiently original for copyright protection. Many of those headnotes are themselves literally copied from the judicial opinions they describe. *See* D.E. 770 at 10. The remaining headnotes, those that paraphrase a point of law rather than copy it, are simple (and often near-verbatim) restatements of fact about an opinion's content. Since "facts do not owe their origin to an act of authorship," they are not original. *Feist*, 499 U.S. at 347. Merely restating a fact accurately does not make it original. Just as census takers do not "'create' the population figures that emerge from their efforts," *id.*, headnote authors do not create the specific point of law they are documenting. In fact, if a headnote author were to exercise creativity, she would risk failing to accomplish the headnote's purpose of accurately describing a specific point of law. *See Southco, Inc. v. Kanebridge Corp.*, 390 F.3d 276, 282 (3d Cir. 2004) (en banc) (Alito, J.) ("Indeed, if any creativity were allowed to creep into the numbering process, the system would be defeated.").

The district court held that all headnotes, even those that quote judicial opinions verbatim, "have original value as individual works" because their creation

involves "editorial expression." D.E. 770 at 7-8. The district court came to that conclusion after analogizing the headnote author's editorial judgment "to that of a sculptor." D.E. 770 at 7. The court's logic is: just as a sculptor takes an uncopyrightable block of marble and creates copyrightable expression by choosing what to cut away and what to leave in place, Appellees' Westlaw creates protectable expression by taking a court opinion and "identifying which words matter and chiseling away the surrounding mass." *Id*.

The sculpture analogy, however, crumbles upon closer inspection. Its most fundamental flaw is the notion that a court opinion is somehow equivalent to an untouched, blank block of marble. Not so. The more accurate analogy is that a judicial opinion is the final product of *a judge* taking a block of marble and carefully, skillfully chiseling away the surrounding mass to create a host of precise details, each of which reveal a specific point of law or fact. The resulting opinion looks nothing like the initial block of marble; it is instead a highly sculpted work made up entirely of many discrete bits of expressive (but uncopyrightable) content that are very directly tailored to the specific case.[2]

---

[2] Of course, judicial opinions are not eligible for copyright protection under the government edicts doctrine, but the Supreme Court has made clear that they would otherwise "plainly qualify as '[l]iterary works . . . expressed in words.'" *Georgia*, 590 U.S. at 269 (citation omitted).

The creative choices available to a *sculptor* eying a block of raw marble are vast—the sculptor must decide what subject to depict, what shapes, forms and textures to use, and whether there is a deeper message he aims to convey. But the choices available to a *headnote author* could not be more different. The headnote author starts with the already carefully crafted and detailed (and uncopyrightable) opinion "sculpted" by a court. Her task is then specific and narrow: to reproduce each of the individual relevant parts of the opinion as faithfully and succinctly as possible in a headnote. The proper sculptor analogy would be an artist taking an already-sculpted work of public-domain art and then attempting to reproduce precisely and directly particular parts of it—parts that would stand out to anyone trained in art—as faithfully as possible, often identically. That capturing of individual uncopyrightable details may be laborious but, as in *Feist*, it is not original creative expression. *See Feist*, 499 U.S. at 352 (rejecting the "sweat of the brow doctrine" involving the "underlying notion that copyright was a reward for the hard work that went into compiling facts").

The policy considerations described in Section III, *infra*, also weigh heavily in favor of a finding of uncopyrightability. The Constitution's Progress Clause limits the monopolies granted by copyright law to works that promote "useful arts." U.S. Const. art. I, § 8, cl. 8. Copyright protection thus provides authors with an incentive to create useful art by protecting them from unauthorized copying that deprives them

from receiving a return on their work. *See Feist*, 499 U.S. at 349. But a simple and highly faithful restatement of a point of law is not a useful art the creation of which we need to incentivize at the significant cost to society of restraining competition and stifling innovation.

### B. The Merger Doctrine Precludes Individual Headnotes from Being Copyrightable.

Not only does the substance of a headnote lack sufficient originality to distinguish the headnote as its own creative work of expression, but the expression in a headnote also cannot be distinguished from the underlying legal idea it aims to convey. The district court therefore erred by summarily rejecting the merger defense. The right secured by copyright law is not "the right to ideas alone, since in the absence of means of communicating them they are of value to no one but the author." *Holmes v. Hurst*, 174 U.S. 82, 86 (1899); *see also* 17 U.S.C. §102(b) (excluding broad categories of material, including ideas, from copyright protection). When there are "no or few other ways of expressing a particular idea," the idea "merges" with the expression and is therefore not copyrightable. *Silvertop Assocs. v. Kangaroo Mfg.*, 931 F.3d 215, 222 (3d Cir. 2019) (citations omitted).

The district court rejected ROSS's invocation of the merger doctrine because "there are many ways to express points of law from judicial opinions." D.E. 770 at 15. Yet this misunderstands the doctrine as applied to the facts of this case. Granting

Thompson Reuters copyright protection over verbatim or near-verbatim, one-to-two sentence summaries of points of law would in effect allow it to "monopolize [the] underlying idea"—here, a specific (uncopyrightable) legal principle from a specific case. *Silvertop Assocs.*, 931 F.3d at 222. "[T]he merger doctrine exists to deny that protection." *Id.* It is true that human language by its nature sometimes supplies more than a single way of conveying the same idea differently, especially if an author is willing to engage in verbal gymnastics. But Westlaw's authors cannot engage in such gymnastics, or even anything close to them, because of how constrained their creativity is when writing a headnote. *See* D.E. 547 at 2 (district court describing headnotes as "*short* summaries of points of law that appear in [an] opinion") (emphasis added).

For many individual headnotes, there are only a limited number of reasonable, natural ways to concisely and faithfully express the underlying idea—the specific point of law. A headnote exists to accurately distill a given legal principle (the idea), so the headnote's author must adhere closely to the judicial opinion's original textual expression of the principle. A headnote that concisely and faithfully describes a particular legal principle with no added creative expression, much like a recipe that only consists of directions for producing a certain dish, therefore falls on the idea side of the idea/expression dichotomy. *See Publ'ns Int'l, Ltd. v. Meredith Corp.*, 88 F.3d 473, 480 (7th Cir. 1996) (holding recipes consisting only of "lists of required

ingredients and the directions for combining them to achieve the final products" were not copyrightable).

If there were in fact many ways for Westlaw to express an underlying legal idea from a case, Westlaw would not default to copying or closely paraphrasing the source material. *See* D.E. 787, ROSS Opening Brief in Support of Interlocutory Appeal, at 3 ("The [Westlaw] editors are instructed to 'follow the court's language' 'insofar as possible' to achieve '[a]ccuracy.'"); *see also Expanding Primary Sources*, UF Law, https://perma.cc/8N6N-EYAT (last visited Sep. 28, 2025) ("In Westlaw, attorney-editors examine a case, then write the headnotes for that case, although *headnote language typically tracks the court's opinion*.") (emphasis added).

## II.  THE DISTRICT COURT ERRED IN REJECTING ROSS'S FAIR USE DEFENSE ON SUMMARY JUDGMENT.

The primary goal of copyright is "to expand public knowledge and understanding." *Authors Guild v. Google, Inc.*, 804 F.3d 202, 212 (2d Cir. 2015). But the Supreme Court has recognized that copyright can impede others' creativity and impose costs on consumers in the form of higher prices. *Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 17 (2021) (noting that copyright protection can "raise prices to consumers," "impose special costs," and "stand in the way of others exercising their own creative powers"). Copyright law thus "reflects a balance of competing

claims upon the public interest: Creative work is to be encouraged and rewarded, but private motivation must ultimately serve the cause of promoting broad public availability of literature, music, and the other arts." *Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156 (1975).

This "balancing act between creativity and availability" is reflected in the defense of fair use, codified in Section 107 of the Copyright Act. *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 526-27 (2023). The fair use defense "permits courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster." *Stewart v. Abend*, 495 U.S. 207, 236 (1990) (citation omitted). Courts recognize fair use as a crucial means of ensuring that copyright does not exceed its legitimate scope and impermissibly restrain competition, limit innovation, and harm consumers. In *Google v. Oracle*, for example, the Supreme Court reiterated the importance of fair use as a tool to "keep a copyright monopoly within its lawful bounds." 593 U.S. at 22. On the one hand, fair use recognizes exclusive rights when there is a "legitimate need" to incentivize the production of copyrighted material; on the other hand, it considers "the extent to which yet further protection creates unrelated or illegitimate harms in other markets or to the development of other products." *Id.*

In granting summary judgment to Appellees on fair use, the district court lost sight of the critical "balancing act" role that fair use is intended to play. It ignored

the Supreme Court's admonition that fair use should keep Appellees' copyright monopoly "within its lawful bounds" and failed to properly assess the extent to which allowing Thompson Reuters to assert its copyright over fair use claims would cause "illegitimate harms" in the "development of other products" by ROSS, *amici*, and others. *Id.*

When making fair use determinations, courts look to four factors laid out in the statute:

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107.

## A. ROSS's Use of the Headnotes Was Transformative.

A transformative use is one that "has a further purpose or different character." *Warhol*, 598 U.S. at 525. "[T]he degree of transformation required to make 'transformative' use of an original work must go beyond that required to qualify as a derivative." *Id.* at 529. And while the commercial nature of a use is relevant, it is

not dispositive and must be "weighed against the degree to which the use has a further purpose or different character." *Id*. at 531.

ROSS's output to an end user is a search result containing text of a judicial opinion. The user sees *none* of Westlaw's headnotes, as the district court itself acknowledged. D.E. 770 at 21 ("There is no factual dispute: Ross's output to an end user does not include a West headnote."). It is hard to imagine a more transformative use than one whose output does not incorporate any of the copyrighted material. According to the district court, however, ROSS's use of the headnotes was not transformative because it shared the same purpose as the headnotes, namely, to help users with legal research. D.E. 770 at 17. But this states the use's purpose at too high a level of abstraction. If the purpose were always described in this manner, the use of copyrighted material by potential competitors would almost never be transformative.[3] Here, ROSS copied the headnotes at an *intermediate* stage. D.E. 770 at 17-18. Its purpose in using them was to train its legal search engine to return relevant judicial opinions upon a user entering a natural language query. In so doing, ROSS quite literally transformed the headnotes into something entirely different –

---

[3] For example, Two Live Crew's use of Roy Orbison's "Oh, Pretty Woman"—held to be a transformative parody by the Supreme Court—could, at a higher level of abstraction, be described as having the same purpose as Orbison's copyrighted work: creating a commercial song. *See Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994).

an intermediate input for training an AI system rather than a similar, potentially competing headnote.

The district court erroneously concluded that fair use in intermediate copying only applies in computer-programming copying cases where the need to copy depends in part on the need to "reach the underlying ideas." D.E. 770 at 19. In its discussion of the first factor, however, the district court does not cite, let alone distinguish, numerous on-point intermediate copying cases that *do not involve computer programming* but where the uses were nevertheless held transformative. *See, e.g., A.V. v. iParadigms, LLC,* 562 F.3d 630 (4th Cir. 2009) (holding that archiving of students' copyrighted works by plagiarism checker software was fair use because defendant transformed the works by using them to prevent plagiarism and not for factual knowledge); *Authors Guild, Inc. v. HathiTrust,* 755 F.3d 87, 97 (2d Cir. 2014) (holding digitization of books by libraries for text analysis was a "quintessentially transformative use" because "the result of a word search is different in purpose, character, expression, meaning, and message from the page (and the book) from which it is drawn"); *Authors Guild v. Google*, 804 F.3d (holding digital copying of entire books for the purpose of creating a book search engine was a transformative fair use).

Most significantly, *Authors Guild v. Google*, which the district court does not cite at all in its discussion of factor one but cites four times elsewhere in its opinion,

also involved copying in the context of content indexing by a for-profit entity. There, the Second Circuit had "no difficulty concluding that Google's making of a digital copy of Plaintiffs' books for the purpose of enabling a search for identification of books containing a term of interest to the searcher involve[d] a highly transformative purpose." *Id.* at 216.

Here, ROSS's copying of Westlaw's headnotes could be described in almost exactly the same terms, except that instead of enabling a search for the identification of books, it enabled a search for identification of judicial opinions relevant to the searcher's queries. And, if anything, Google's use was *less* transformative than ROSS's because Google Books displayed "snippets" from the copyrighted work to the user, *see id.* at 217, whereas ROSS did not display any part of Westlaw's headnotes in its output to users. *See* D.E. 770 at 21. In sum, the district court erred in finding for Westlaw as a matter of law on factor one without first grappling with and attempting to distinguish *Authors Guild v. Google*, to say nothing of *A.V. v. iParadigms, LLC,* 562 F.3d 630 (4th Cir. 2009) and *Authors Guild, Inc. v. HathiTrust,* 755 F.3d 87 (2d Cir. 2014).[4]

---

[4] Further, in cases decided since the district court's opinion, other courts considering the use of copyrighted material in training generative AI systems have concluded— in no uncertain terms—that such uses are transformative. See *Bartz v. Anthropic PBC*, No. 24-cv-05417, 2025 WL 1741691, at *5, 7, 8 (N.D. Cal. June 23, 2025) (deeming the use of copyrighted works to train Anthropic's Claude large language model "exceedingly", "spectacularly," and "quintessentially" transformative); *Kadrey v. Meta Platforms, Inc.*, No. 3:23-cv-03417, 2025 WL 1752484, at *9 (N.D.

Finally, to the extent that the district court differentiates this case from intermediate copying software cases because the copying in those cases was "necessary for competitors to innovate," D.E. 770 at 18, that is not a suitable basis for dismissing ROSS's use as not transformative. First, whether copying is "necessary" is more appropriately discussed with respect to the second factor (the nature of the copyrighted work). As noted by the district court in its discussion of the two software intermediate copying cases it cites, the copied computer code in those cases contained "underlying ideas" that could "be reached only by copying their expression." D.E. 770 at 19. That speaks to the nature of the copyrighted works in those cases, not the degree of transformation of the plaintiffs' uses.

Second, whether intermediate copying is a necessity—rather than a convenience—for innovating depends entirely on which level of generality is selected to ask and answer the question. In *Google LLC v. Oracle Am., Inc.*, 593 U.S. 1 (2021), the Supreme Court could have found that copying Oracle's Java declaring code was not strictly necessary for creating Google's new Android development platform because Google did not *need* to make its new Android development platform easier to use for Java programmers. Instead, the Court took into account "the costs and difficulties of producing alternative APIs with similar appeal to

Cal. June 25, 2025) ("There is *no serious question* that Meta's use of the plaintiffs' books had a 'further purpose' and 'different character' than the books—that it was *highly* transformative.") (emphasis added).

programmers" and opted to prevent Java API's declaring code from serving as a "lock limiting the future creativity of new programs." *Google v. Oracle*, 593 U.S. at 39. Here, as in that case, producing an alternative to headnotes would be incredibly costly and difficult, and enforcing the copyright rather than finding fair use would "limit[] the future creativity" of new legal research tools. *Id*.

## B. The District Court Should Have Given the Second Fair Use Factor More Weight.

"[S]ome works are closer to the core of intended copyright protection than others." *Campbell*, 510 U.S. at 586. In short, "the more creative a work, the more protection it merits from copying." 4 NIMMER ON COPYRIGHT § 13F.06[A]. When the copied material consists of factual works and factual compilations, defendants are entitled greater leeway to claims of fair use. *See Stewart*, 495 U.S. at 237-38 (contrasting fictional short story with factual works); *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 455 n.40 (1984) (contrasting motion pictures with news broadcasts); *Feist*, 499 U.S. at 348-51 (contrasting creative works with bare factual compilations).

The district court correctly found that the second fair use factor favored ROSS because headnotes are "far from the most creative works." D.E. 770 at 20. However, quoting the Second Circuit's 2015 decision in *Authors Guild v. Google*, it noted the second factor "has rarely played a significant role in the determination of a fair use

dispute." *Id.* The district court was too quick to discount the factor in this case, where it should play a critical role. While it is true that the second factor has historically been less significant in importance, the Supreme Court in *Google v. Oracle* "brought [the second factor] roaring to primary status." 4 NIMMER ON COPYRIGHT § 13F.06[A][2]. The Court started its fair use analysis with the second factor, finding that the factor pointed towards fair use because Oracle's API declaring code, "if copyrightable at all," lies far "from the core of copyright." *Google v. Oracle*, 593 U.S. at 29.

The Court placed particular emphasis on the second factor because "of the unique features of declaring code beyond mere functionality." 4 NIMMER ON COPYRIGHT § 13F.06[A][2]. It deemed Google's argument on the second factor strong because the underlying work Google had copied was "inextricably bound" with ideas uncopyrightable under 17 U.S.C. § 102(b). *Google. v. Oracle*, 593 U.S. at 27 (describing Oracle's declaring code as "inextricably bound together with a general system, the division of computing tasks, that no one claims is a proper subject of copyright" and with "the idea of organizing tasks into what we have called cabinets, drawers, and files, an idea that is also not copyrightable"). Westlaw's headnotes, assuming they are copyrightable, are likewise "inherently bound together with uncopyrightable ideas." *Id.* at 28. Here, those ideas are specific points of law and legal principles from uncopyrightable judicial opinions.

The Court in *Google v. Oracle* "signaled the importance of calibrating fair use analysis to the protectability of the precise material copied." 4 NIMMER ON COPYRIGHT § 13F.06[A][2]. Because this material consists of short, factual restatements of law that even the district court was not comfortable holding copyrightable in its original summary judgment order, D.E. 547 at 7-8, the district court in its subsequent summary judgment order erred in relying on *Authors Guild v. Google,* a Second Circuit case that predated *Google v. Oracle*, to dismiss the second factor as insignificant.

### C. The District Court Correctly Found for ROSS on Factor Three, but Its Reasoning Supports a Finding of Transformative Use Under Factor One.

The third factor examines "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3). Courts ask whether the amount copied is "reasonable in relation to" the copying's purpose. *Campbell*, 510 U.S. at 586. The factor three inquiry therefore requires an assessment of both the quantitative and qualitative significance of the copying. 4 NIMMER ON COPYRIGHT § 13F.07[B].

Here the district court was right to decide factor three for ROSS. However, the reasoning it provided for doing so makes even more apparent its error in not finding ROSS's use transformative with respect to the first factor. The district court cites *Authors Guild v. Google* for the proposition that what matters is not "the

amount and substantiality of the portion used in making a copy, but rather the amount and substantiality of what is thereby made accessible to a public for which it may serve as a competing substitute." D.E. 770 at 21 (quoting *Authors Guild v. Google*, 804 F.3d at 222). It concludes: "[b]ecause Ross did not make West headnotes available to the public, Ross benefits from factor three." *Id.*

Since "the extent of permissible copying varies with the purpose and character of the use," factor one is of fundamental importance to factor three. *Campbell*, 510 U.S. at 586-87. Here, as in *Authors Guild v. Google*, the use was transformative, hence why it matters for factor three that ROSS's output did not include any of Westlaw's material. In the *Authors Guild v. Google* quote cited by the district court, the Second Circuit is referring specifically to Google Books' "snippet view" feature, which would display a maximum of three "snippets" of a copied book, each of which contained the user's search term. *See Authors Guild v. Google*, 804 F.3d at 222. In its analysis of the first factor, the Second Circuit found the snippets feature "add[ed] importantly to the *highly transformative* purpose of identifying books of interest to the searcher." *Id.* at 218 (emphasis added).

The Second Circuit's analysis of the third factor—cited by the district court—must be read in the context of its analysis of the first, in which it found a transformative use. The Second Circuit noted that the snippets, which are "in a form that communicates little of the sense of the original [work]," (*i.e.*, they have a

transformed purpose of helping identify books to the searcher) and therefore cannot be said to be "'substantial' in the sense intended by the statute's third factor." *Id.* at 223. Implicit to the idea of assessing ROSS's *output* and not the *inputted* copyrighted material for determining the substantiality of the copying, is the fact that ROSS's purpose (training an AI tool that indexes relevant cases in responses to user search queries) is fundamentally different from the purpose of a headnote (summarizing a specific point of law).

### D. The District Court Erred by Deciding Factor Four on Summary Judgment and by Giving It Disproportionate Weight.

The district court also erred when it made the unqualified assertion, quoting *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 566 (1985), that factor four "is undoubtedly the single most important element of fair use." D.E. 770 at 21. While that may have been true in 1985, it is no longer true.

Imposing rigid hierarchies among the factors like this stands in stark contrast to the Supreme Court's contemporary approach to copyright fair use, which is context-sensitive and requires a case-by-case determination. *See Campbell*, 510 U.S. at 578 (holding that the four factors may not be "treated in isolation, one from another" and that "all are to be explored, and the results weighed together, in light of the purposes of copyright"); *Google v. Oracle*, 593 U.S. at 20 (explaining that fair use is a "flexible" concept that "courts must apply [] in light of the sometimes

conflicting aims of copyright law, and [fair use's] application may well vary depending upon context"); *Warhol*, 598 U.S. at 527 (quoting *Google v. Oracle* to highlight the flexibility and context-dependent nature of fair use). The district court erred by giving factor four more weight than the other factors based on a quote that has long since been rendered out-of-date.

The district court was also wrong to decide the fourth factor in Appellees' favor on summary judgment. *See* D.E. 770 at 21-23. Factor four requires an assessment of "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). The factor focuses on "actual or potential market substitution." *Warhol*, 598 U.S. at 536 n.12. "Market impact, by nature, poses a factual question." 4 NIMMER ON COPYRIGHT § 13F.08[F]; *see also Campbell*, 510 U.S. at 593-94 (noting the existence of an "evidentiary hole" and holding it "impossible to deal with the fourth factor except by recognizing that a silent record on an important factor bearing on fair use disentitled the proponent of the defense . . . to summary judgment"); *Google v. Oracle*, 593 U.S. at 36-40 (deferring to the jury's finding of facts and drawing the conclusion that the fourth factor favored fair use). Additionally, transformativeness plays a key role. "[T]he more the copying is done to achieve a purpose that differs from the purpose of the original, the less likely it is that the copy will serve as a satisfactory substitute for the original." *Authors Guild v. Google*, 804 F.3d at 223 (citing *Campbell*, 510 U.S. at 591). Finally, courts must

"take into account the public benefits the copying will likely produce" and whether they are "comparatively important, or unimportant, when compared with dollar amounts likely lost." *Google v. Oracle*, 593 U.S. at 35-36.

ROSS's use serves a different purpose than Westlaw's headnotes and thus is not a market substitute for them. Likewise, ROSS's use of the headnotes as an input to train AI powered legal-research tools is also strongly in the public interest. ROSS's product would provide the public with the capability to more easily and robustly search for, analyze, and access judicial opinions, a goal that is well-established as serving the public interest. *See*, *e.g., Wheaton v. Peters*, 33 U.S. 591, 649 (1834) (refusing to grant copyright interest in Supreme Court opinions because doing so would "limit the knowledge of the law of the land, as determined and established by this court, to but a small portion of the community; while all are interested in knowing it"). The district court's claim that "the public has no right to Thomson Reuters's parsing of the law," D.E. 770 at 23, is irrelevant because ROSS's product would not provide the public with any of Thomson Reuter's parsing of the law, only with the text of the judicial opinions themselves.

The district court's grant of summary judgment for Thomson Reuters was error and should be reversed.

III.  **THE DISTRICT COURT'S COPYRIGHTABILITY AND FAIR USE DETERMINATIONS UNDERMINE THE PUBLIC INTEREST IN COMPETITION AND INNOVATION.**

A.  **Overbroad Assertions of Copyright Should Not Permit Rightsholders to Monopolize Markets or Stifle Valuable Innovation.**

The Supreme Court in *Google v. Oracle* explained that "[a]n attempt to monopolize the market by making it impossible for others to compete runs counter to the statutory purpose of promoting creative expression." 593 U.S. at 39 (quoting *Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1523-24 (9th Cir. 1992)). To meet copyright's ultimate goal, courts "must be careful not to place overbroad restrictions on the use of copyrighted works," otherwise they risk "prevent[ing] would-be authors from effectively building on the ideas of others." *Cambridge Univ. Press v. Patton*, 769 F.3d 1232, 1238 (11th Cir. 2014).

The need for these limits is clear: the Supreme Court has recognized that copyright can impede others' creativity and impose costs on consumers in the form of higher prices. *Google v. Oracle*, 593 U.S. at 17. When assertions of copyright threaten to exceed the proper scope of the creator's exclusive rights, courts must ensure that copyright's limited goal of incentivizing creativity does not serve to unduly restrain competition and innovation. Thus, "copyright should not grant anyone more economic power than is necessary to achieve the incentive to create." *Id*. at 21 (quoting report by the Commission on New Technological Uses of Copyrighted Works) (internal quotations omitted).

Granting copyright protection over, or denying fair use of, a succinct and precise (and often near-verbatim or even verbatim) encapsulation of a specific point of law articulated in a judicial opinion deprives others from "build[ing] freely upon the ideas and information conveyed" by the opinion, when that sort of work should be "encourage[d]." *Id.* That the material underlying each headnote is a judicial opinion is particularly important here. Judicial opinions are not copyrightable. And because the "whole work done by the judges constitutes the authentic exposition and interpretation of the law, which, binding every citizen, is free for publication to all," *Georgia*, 590 U.S. at 264 (citation omitted), it is all the more important that entities like Thompson Reuters cannot gain a copyright over or block fair use of judicial opinions by simply restating—in many cases word-for-word—particular legal facts contained within those works. That is particularly true where, as here, an entrenched incumbent like Thompson Reuters seeks to use the assertion of copyright to restrain competition and exclude potential rivals and, in the process, to thwart valuable innovation by newer entrants like ROSS and *amici* and others.

**B.    Innovation in AI-Assisted Research Serves the Public Interest and Does Not Create a Substitute for Headnotes.**

As the district court correctly observed, "the law is no longer a brooding omnipresence in the sky; it now dwells in legal-research platforms," and Appellee Thomson Reuters "owns one of the biggest of those platforms: Westlaw." D.E. 770

at. 2. For many years, the legal research and analytics market was stagnant, long dominated by a handful of entrenched incumbents, including Appellees. But *amici* and the next generation of powerful legal tools and services they and other entities developed have begun to introduce badly needed alternatives. Melia Russel, *2 Companies Ruled Legal Tech for Decades. AI is Blowing That Wide Open.*, Bus. Insider (Aug. 31, 2025) ("'What we're seeing is a new era of competition,' Thomson Reuters chief executive Steve Hasker told analysts on a recent earnings call, citing 'a bunch of startups' and newly energized incumbents.").

This legal research and analytics revolution has vast potential for dramatic improvements in the capability and quality of all sorts of tools, systems, and services. Modern research and analytics tools utilize AI to analyze text, rather than republishing others' prose. These systems ingest inputs to learn statistical relationships and then return links, relevance scores, or quotations from *judicial opinions*—not headnotes.

Treating non-expressive training and indexing as infringement would deter precisely the improvements courts, lawyers, and the public rely on: faster retrieval, better recall and precision, and broader access to primary law. It would also allow a single publisher to control how the law is searched, locking in incumbent products and pricing—contrary to important limits on copyright protection and the principle that no one owns the law. Preserving fair use for intermediate, analytical uses—and

declining to extend protection to short, near-verbatim summaries closely tethered to opinions—promotes competition in legal research and analytics technologies (but not headnotes) without depriving Appellees of markets for their editorial products.

The district court's ruling, if allowed to stand, will stifle innovative development of a wide range of AI technologies and systems by *amici* and other legal technology developers, many of which are small and have limited ability to defend infringement lawsuits, however meritless.

The effect will be similar to that highlighted by the American Association of Law Libraries regarding West's earlier claims of copyright in the numbering and pagination of its volumes, to "give one publisher substantial control over the legal information market," and "severely limit[] the ability of others to enter the market and compete effectively." John Dethman, *Trust v. Antitrust*: *Consolidation in the Legal Publishing Industry*, 21 Legal Reference Servs. Q. 123, 135 (2002).

## CONCLUSION

For the reasons set forth above, the district court erred in finding that the West headnotes are sufficiently original to qualify for copyright protection and that the merger doctrine does not preclude their copyrightability. It also erred in granting summary judgment for Appellees on the question of fair use. The public interest is strongly served by not permitting overbroad copyright claims to stifle valuable innovation and competition. This Court should reverse and confirm that headnotes are not copyrightable and that search, indexing, and model training remain lawful where their outputs neither reproduce nor substitute for headnotes.

Dated: September 29, 2025

Respectfully submitted,
/s/ Phillip R. Malone

Phillip R. Malone
August Gebhard-Koenigstein
  (CA Certified Law Student)
JUELSGAARD INTELLECTUAL PROPERTY
AND INNOVATION CLINIC
MILLS LEGAL CLINIC AT STANFORD LAW
SCHOOL
559 Nathan Abbott Way
Stanford, CA 94350
(650) 725-6369
pmalone@stanford.edu

*Counsel for Amici Curiae*

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Rule 29(a)(5) and 32(a)(7)(B) of the Federal Rules of Appellate Procedure because this brief contains 6,496 words, excluding the parts of the brief exempted by Rule 32(f) of the Federal Rules of Appellate Procedure.

This brief complies with the typeface requirements of Rule 32(a)(5) of the Federal Rules of Appellate Procedure and the type style requirements of Rule 32(a)(6) of the Federal Rules of Appellate Procedure because this brief has been prepared in a proportionally spaced typeface using Word for Microsoft 365 in 14-point Times New Roman font.

This brief complies with the electronic filing requirements of Local Rule 31.1(c) because (1) the text of this electronic brief is identical to the text of the paper copies and (2) the virus detection program CrowdStrike Falcon Sensor version 7.27.19907.0 was run on the file containing the electronic version of this brief and no viruses were detected.

Dated: September 29, 2025      Respectfully submitted,
/s/ Phillip R. Malone

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the appellate CM/ECF system on September 29, 2025. All counsel of record are registered CM/ECF users, and service will be accomplished by the CM/ECF system.

Dated: September 29, 2025          Respectfully submitted,
                                       /s/ Phillip R. Malone