# United States Court of Appeals

*for the*

# Third Circuit

Case No. 25-2153

THOMSON REUTERS ENTERPRISE CENTRE GMBH;
WEST PUBLISHING CORP,

– v. –

ROSS INTELLIGENCE INC,

*Appellant.*

ON APPEAL FROM AN ORDER OF THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF DELAWARE IN NO. 1:20-CV-00613,
HONORABLE STEPHANOS BIBAS, CIRCUIT JUDGE

## BRIEF FOR *AMICUS CURIAE* AUTHORS ALLIANCE, INC. IN SUPPORT OF DEFENDANT-APPELLANT, ROSS INTELLIGENCE, INC.

Karen E. Keller
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
*Attorney for Amicus Curiae Authors
Alliance, Inc.*

# CORPORATE DISCLOSURE STATEMENT

Authors Alliance, Inc., a 501(c)(3) nonprofit organization, has no parent company. There is no publicly held corporation that holds 10% or more of Authors Alliance's stock.

*/s/ Karen E. Keller*
Karen E. Keller
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
*Attorney for Amicus Curiae Authors*
*Alliance, Inc.*

Dated: September 29, 2025

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................... iii

STATEMENT OF INTEREST OF AMICUS CURIAE .......................................... 1

SUMMARY OF ARGUMENT .......................................................................... 1

ARGUMENT ................................................................................................ 4

I.     The first factor favors a secondary use that serves a distinct purpose; an analysis of transformativeness, among others, can help determine if the secondary use indeed has a distinct purpose ....................................................................................... 4

      A.     The first factor conclusively weighs in favor of a use that has a distinct purpose, regardless of the similarity in broader business purposes of the *users* ................................... 5

      B.     Intermediate copying is allowed for a wide range of unlicensed uses and is not limited to computer programs ...................................................................................... 9

      C.     Uses to extract facts and ideas are highly transformative even when the original work is not reproduced as output ................................................................ 12

      D.     Being refused a license before making a use cannot in itself be used to show bad faith ................................................. 16

      E.     Rendering a valuable service to the public without allowing public access to the original work provides sufficient justification for commercial copying under the first factor ......................................................................... 18

II.    The fourth factor only considers markets which are traditional, reasonable, or likely to be developed ................................. 19

CONCLUSION ............................................................................................. 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*American Geophysical Union v. Texaco Inc.*,
    60 F.3d 913 (2d Cir. 1994) ...........................................................20

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*,
    598 U.S. 508 (2023)........................................... 4, 5, 15, 18

*Assessment Techs. of Wis., LLC v. WIREdata, Inc.*,
    350 F.3d 640 (7th Cir. 2003) ........................................11

*Authors Guild v. Google, Inc.*,
    804 F.3d 202 (2d Cir. 2015) ............................................ *passim*

*AV Ex Rel. Vanderhye v. iParadigms, LLC*,
    562 F. 3d 630 (4th Cir. 2009) ......................................14

*Baker v. Selden*,
    101 U.S. 99 (1879).......................................................5

*Bellsouth Advertising & Publishing Corp. v.*
    *Donnelley Information Publishing, Inc.*,
    999 F.2d 1436 (11th Cir. 1993) ..................................11

*Bill Graham Archives v. Dorling Kindersley*,
    448 F.3d 605 (2d Cir. 2005) .................................. 20, 21

*Cambridge Univ. Press v. Patton*,
    769 F.3d 1232 (11th Cir. 2014) ..................................20

*Campbell v. Acuff-Rose Music, Inc.*,
    510 U.S. 569 (1994)......................................... *passim*

*Chapman v. Maraj*,
    No. 218CV09088VAPSSX, 2020 WL 6260021
    (C.D. Cal. Sept. 16, 2020) ..........................................12

*Fisher v. Dees*,
    794 F.2d 432 (9th Cir. 1986) ......................................16

*Google LLC v. Oracle Am., Inc.*,
    593 U.S. 1 (2021)..........................................................8

*Google LLC v. Oracle America, Inc.*,
    593 U.S. 1 (2021) ............................................................ 16, 17, 21

*Kadrey v. Meta Platforms, Inc.*,
    No. 23-cv-03417-VC, 2025 U.S. Dist. LEXIS 121064
    (N.D. Cal. June 25, 2025) .............................................................21

*Katz v. Chevaldina*,
    No. 14-14525 (11th Cir. 2015) ....................................................17

*Midlevel-U, Inc. v. ACI Info. Grp.*,
    989 F.3d 1205 (11th Cir. 2021) .....................................................8

*NXIVM Corp. v. Ross Inst.*,
    364 F.3d 471 (2d Cir. 2004) .................................................. 19, 20

*Perfect 10, Inc. v. Amazon.com, Inc.*,
    508 F.3d 1146 (9th Cir. 2007) .....................................................15

*Romanova v. Amilus Inc.*,
    138 F.4th 104 (2d Cir. 2025) ....................................... 6, 9, 10, 18

*Rosemont Enterprises, Inc. v. Random House, Inc.*,
    261 F. Supp. 691 (S.D.N.Y. 1966) .............................................17

*Seltzer v. Green Day, Inc.*,
    725 F.3d 1170 (9th Cir. 2013) .....................................................13

*Sony Computer Entm't, Inc. v. Connectix Corp.*,
    203 F.3d 596 (9th Cir. 2000) ...................................................6, 10

*Sony Corp. of America v. Universal City Studios, Inc.*,
    464 U.S. 417 (1984) .......................................................................6

*Sundeman v. The Seajay Society, Inc.*,
    142 F.3d 194 (4th Cir. 1998) .......................................................11

*Thomson Reuters Enter. Ctr. GMBH v. Ross Intel. Inc.*,
    765 F. Supp. 3d 382 (D. Del. 2025) ..............................................7

*Tresóna Multimedia, LLC v. Burbank High Sch. Vocal Music Ass'n*,
    953 F.3d 638 (9th Cir. 2020) ................................................. 20, 21

**Statutes & Other Authorities:**

17 U.S.C. § 107(4) ....................................................................19

iv

4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 13.05 (2019).................................................................... 20, 21

Fed. R. App. P. 29(a)(2)...........................................................1

Fed. R. App. P. 29(a)(4)(E).....................................................1

Mark A. Lemley & Bryan Casey, *Fair Learning*, 99 Tex. L. Rev. 743 (2020)...............................................................................13

Pierre N. Leval, *Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105 (1990)...............................................................................16

## STATEMENT OF INTEREST OF AMICUS CURIAE[1]

Authors Alliance is a 501(c)(3) nonprofit with over 3,000 members. Authors Alliance aims to help authors understand and enjoy their rights and promotes policies that enable knowledge and culture to be widely available and discoverable. Members of Authors Alliance hope to see their work widely disseminated and read. Member authors rely on fair use every day in their research and writing— uses that could be significantly constrained by the decision in this case. This includes a number of our members who are researchers that rely on the very same fair use rationale put forward by ROSS to engage in academic text and data mining and AI research.

## SUMMARY OF ARGUMENT

This case raises fundamental questions about the scope of fair use that extend far beyond AI training or the technology directly before the court. We agree with ROSS and the other amici in support of ROSS that AI training— including of the kind presented in this case—should be considered fair use. Our brief aims to help the court understand why the district court erred on two specific facets of the fair use analysis and why, if the district court's view is adopted by this

---

[1] All parties have consented to the filing of this brief. Fed. R. App. P. 29(a)(2). No counsel for any party authored this brief in whole or in part, and no person other than amici or their counsel contributed money intended to fund the preparation or submission of this brief. Fed. R. App. P. 29(a)(4)(E).

court, it would threaten a wide variety of long-accepted transformative fair uses engaged in by creators, students, and researchers.

First, under the first fair use factor, assessing the "purpose and character of the use," the district court wrongly conflated competing *users* with competing *uses.* ROSS and Thomson Reuters both provide competing legal research services; that is true. But the issue before the district court was not about copyright in the entirety of the Thomson Reuters legal research service, or Westlaw, or even the KeyNumber system. The District Court segmented all other claims and chose to focus solely on the copyright claims in headnotes—short factual summaries of public domain cases. ROSS did not use those headnotes to publish competing headnotes, or in any other way substitute for Thomson Reuters' expressive content. Instead, ROSS made intermediate copies of the headnotes to extract statistical relationships for its training algorithm—a highly transformative use that serves an entirely distinct purpose from the original headnotes. The court's narrow interpretation of intermediate copying—limiting it only to computer code cases where copying is necessary—contradicts decades of precedent recognizing that non-public copying for the purpose of accessing unprotectable elements strongly favors fair use across a wide range of uses.

The district court's flawed reasoning, if adopted by this Court, could inhibit countless legitimate activities long protected by fair use, such as artists studying

famous paintings through sketching; students translating passages for language practice; and researchers copying materials to extract and report on factual information or engage in scholarly analysis. These uses, like ROSS's training of its algorithm, involve copying for distinct purposes that serve the public interest without substituting for the original work's market.

Second, under the fourth factor, the court improperly focused on speculative markets rather than actual markets Thomson Reuters had exploited or was likely to exploit for its headnotes. Copyright law does not grant rightsholders control over transformative markets just because they express a desire to license works for those purposes. To do so would collapse the fourth factor inquiry, leading courts to find market harm in any instance where a copyright holder makes a bare allegation that it had a desire to license their works for the subject use.

ROSS's use serves compelling public interests by increasing access to legal information through innovative research tools, while its outputs consist entirely of public domain judicial opinions that cannot substitute for Westlaw's proprietary content. Properly applied, both the first and fourth factors strongly support fair use. This Court should preserve the vitality of fair use for all creators, researchers, and innovators and reverse the district court's contrary ruling.

# ARGUMENT

**I.** **The first factor favors a secondary use that serves a distinct purpose; an analysis of transformativeness, among others, can help determine if the secondary use indeed has a distinct purpose.**

The first factor asks "whether the new work merely 'supersede[s] the objects' of the original creation ... ('supplanting' the original), or instead adds something new, with a further purpose or different character." *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 528 (2023) (quoting *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994)). Many facets of the use may be examined to determine if the secondary use has a distinct purpose or character to support a finding of fair use under the first factor. *Id.* at 549–50 ("Fair use instead strikes a balance between original works and secondary uses based in part on objective indicia of the use's purpose and character, including whether the use is commercial and, importantly, the reasons for copying.").

The district court erred in its analysis of the first factor in several ways; we will discuss four. First, it wrongly focused on the nature and purpose of *user* instead of their *use* of the work to conclude ROSS's *use* is not transformative. Second, it wrongly restricted intermediate copying precedent to apply only to computer code. Third, it wrongly inferred bad faith from ROSS's failed attempt at obtaining a license. And, finally, it ignored how ROSS's providing a valuable

service to the public—without allowing public access to the original work—provides sufficient justification for its commercial copying.

### A. The first factor conclusively weighs in favor of a *use* that has a distinct purpose, regardless of the similarity in broader business purposes of the *users*.

The "central question under the first factor" is "whether the new use served a purpose distinct from the original, or instead superseded its objects." *Andy Warhol Found. for the Visual Arts, Inc.,* 598 U.S. at 542 (citing *Campbell,* 510 U.S. at 579). *Warhol* asks whether the secondary *use* of the work serves a distinct enough purpose, not whether the new *user* and the original *user* can be generalized as sharing similar business goals. *Id.* at 545–547 (examining if the defendant's "use [was] similar to the [original work's] typical use," and, in denying fair use, stressed that the use made by the defendant and the use made by the plaintiff share the same purpose of licensing to a magazine). Copyright law protects the substitutive copying of protected expression. It does not exist to protect market share or business models, something the district court focused on in its analysis of the first factor.

Similarity of the parties' lines of business is irrelevant to the copyright infringement analysis—including the fair use defense—as long as the defendant's specific *use* is not infringing. *See Baker v. Selden*, 101 U.S. 99 (1879) (noting it was irrelevant that both parties authored and sold books describing similar

bookkeeping systems, and both aimed for the broader adoption of their bookkeeping systems); *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417 (1984) (finding fair use though both parties were providing users with access to televised transmissions); *Sony Computer Entm't, Inc. v. Connectix Corp.*, 203 F.3d 596 (9th Cir. 2000) (finding fair use despite both businesses aimed at allowing users to play Sony video games); *cf. Romanova v. Amilus Inc.*, 138 F.4th 104 (2d Cir. 2025) (holding a secondary *use* sharing similar purposes as the original work to be infringing, despite the different purpose and nature of the secondary *user*). The ROSS district court erred in focusing on how ROSS and Westlaw both aimed to facilitate legal research with their products. Under well-established case law, the correct focus is to analyze whether ROSS's purpose for utilizing the headnotes were distinct from the headnotes' original purpose.

It is important that Thomson Reuters does not claim that ROSS infringed the entire Westlaw research tool and database. Indeed, the district court took great pains to narrow its inquiry, making its fair use determination only with respect to the copyrights that it incorrectly concluded Thomson Reuters owned in a subset of the headnotes in this case.[2] Despite this initial focus on the copyright claim, the

---

[2] For purposes of this fair use analysis we write assuming that the District Court's decision on the copyrightability of the headnotes is upheld. However, we strongly agree with ROSS and other amici who have argued that the headnotes are not protectable.

court repeatedly fell back into analysis of Thomson Reuters' overall business model and apparent competition with ROSS.  For example, the district court relied heavily on the idea that the research process with ROSS's legal research tool resembles the Westlaw research process. *Thomson Reuters Enter. Ctr. GMBH v. Ross Intel. Inc.*, 765F. Supp. 3d 382, 398 (D. Del. 2025) (hereinafter "Op.").  But that has no bearing on whether ROSS's use of West's *headnotes* is the same. Indeed, despite the two businesses sharing a similar purpose of providing legal research tools, their usage of headnotes is distinct. Thomson Reuters uses headnotes to enable human users to browse, read, and understand key legal concepts and, in conjunction with the Key Number System, to access a list of cases that deal with the same subject through the Westlaw interface. Far from "merely 'supersed[ing] the objects' of the original creation," ROSS's use of headnotes in creating memos to train its transformer neural network architecture clearly does not serve the same expressive purpose as Thomson Reuter's headnotes.  Rather, ROSS's use aims at extracting factual and functional relationships from the Bulk Memo question-and-answer pairs to teach its algorithms how to evaluate relevance.

Ultimately, the only outputs produced by ROSS's algorithms are public domain judicial opinions. Beyond the fact that public domain judicial opinions can be accessed through both Westlaw and ROSS (among many other alternative platforms), ROSS's use of the headnotes is not substitutive in any way: users can

only access and utilize the headnotes through Westlaw. *Cf. Midlevel-U, Inc. v. ACI Info. Grp.*, 989 F.3d 1205, 1222 (11th Cir. 2021) (holding that an index of full-length blog articles was not fair use because the index "obviate[d] any need for an Index subscriber to visit [the] website [containing the original posts] directly").

Precision, especially in cases such as this, is important. We urge the court to recall that copyright protects original expression, not markets or business models; fair use turns on the nature and purpose of the secondary *use*—not the business or occupation of the *user*. Shifting the inquiry to compare the secondary *user* to the original *user* would improperly constrict many legitimate, socially valuable uses, while also allowing infringing uses to go unscrutinized. Similarity in users' business should not impact the first factor analysis in any way.

The district court's ruling would upset both important precedent and many traditionally important uses that fair use supports. Under the district court's approach, 2 Live Crew's parody in *Campbell v. Acuff-Rose Music* would be suspect under the first fair use factor simply because both the original artist and the parodist operate in the music industry and both seek to reach music audiences. 510 U.S. at 585.

Similarly, Google's use of Oracle's API in *Google LLC v. Oracle Am., Inc.,* 593 U.S. 1 (2021), would fail, because both companies develop software platforms for programmers. The transformative book search in *Authors Guild v. Google*

would fail the first factor because both Google and publishers are in the business of making books discoverable to readers. Documentary filmmakers using archival footage would lose fair use protection because they arguably compete in the same entertainment market as the original content creators. Academic critics writing about literature would be vulnerable to infringement claims because they, like the original authors, aim to engage readers with literary works. Such results would eviscerate decades of fair use precedent and chill countless forms of commentary, criticism, research, and innovation that depend on using copyrighted works within the same broad industry or field as the original creator.

**B.** **Intermediate copying is allowed for a wide range of unlicensed uses and is not limited to computer programs.**

Intermediate copying refers to the creation of a non-public, preliminary work as a step toward producing a different, public-facing work. During the creative process, temporary or intermediate copying of copyrighted works can often be leveraged to facilitate the extraction of unprotectable facts and ideas. The issue of intermediate copying is seldom litigated, but is exceedingly common. It has arisen most frequently in computer code copying cases, particularly in the reverse engineering context, and it was on these cases (and only these cases) that the district court relied, ultimately concluding that those precedents were inapplicable.

The district court ignored the wide variety of other areas of application. As the Second Circuit in *Romanova v. Amilus Inc.*, recently observed, "[t]he most

paradigmatically recognized transformative uses are rarely the subject of litigation, so that there are few precedential cases discussing them." 138 F.4th 104, 111 (2d Cir. 2025). With so little case law at hand, it is understandable that the district court improperly concluded, based on an analysis of three intermediate copying cases, that these cases were distinguishable because they were "about copying computer code." *Op.* at 398. It further noted that, in each of the computer code cases it reviewed, "[t]he copying was *necessary* for competitors to innovate." *Id*. The district court proceeded to explain that ROSS did not need to copy computer code to achieve its purpose, and therefore intermediate copying does not excuse its unlicensed use. *Id.* This, however, is not a proper distinction. The "computer code" cases cited by the district court found intermediate copying to be noninfringing not because the cases dealt with computer codes but because the copying was for "gaining access to the unprotected elements [of plaintiff's work]." *Sony Computer Entm't, Inc.,* 203 F.3d at 602.

Here, ROSS used headnotes as embodied in the Bulk Memos in order to access the uncopyrightable elements of the headnotes and extract functionality. The "computer code" case law is clearly relevant and applicable. ROSS only used Westlaw headnotes as intermediate copies, whereas Ross converted them into numerical data, capturing the relationships among legal terms to train its algorithms. It did not display or republish any of them publicly. The district court

fully acknowledged the importance of non-public copying when evaluating the third factor, stating that only the portion of a work made accessible to the public should be considered. *Op*. at 398. That reasoning should be consistently applied to the first fair use factor.

It is also important that, although there is not extensive prior case law on all aspects of common intermediate copying, the caselaw we do have is far from confined to computer programs, or even extraction of facts as we have in this instance. While it is undisputed that any copying, public or private, can satisfy a prima facie infringement claim, non-"computer code" case law has long recognized that the non-public nature of an intermediate copy strongly favors fair use. *See Bellsouth Advertising & Publishing Corp. v. Donnelley Information Publishing, Inc.*, 999 F.2d 1436 (11th Cir. 1993) (*en banc*) (holding that direct copying of a competitor's yellow pages to produce a competing directory was fair use when the publicly accessible final product did not incorporate the plaintiff's expression); *Sundeman v. The Seajay Society, Inc.*, 142 F.3d 194 (4th Cir. 1998) (finding fair use where defendants made an intermediate, complete copy of an unpublished manuscript for scholarly study, and the resulting publications contained only factual summaries and short quotations); *Assessment Techs. of Wis., LLC v. WIREdata, Inc.*, 350 F.3d 640 (7th Cir. 2003) (holding that copying real estate assessment data to extract unprotectable factual information was fair use

because the ultimate use did not exploit the copyrighted expression); *Chapman v. Maraj*, No. 218CV09088VAPSSX, 2020 WL 6260021, at *10 (C.D. Cal. Sept. 16, 2020) (finding that copying of a song in the creation of a new work for purposes of private artistic experimentation and seeking license approval did not infringe plaintiff's derivative rights). A ruling that intermediate copying applies only to computer programs would create a deeply problematic precedent by artificially constraining a doctrine that has long facilitated transformative uses across different creative and academic disciplines. Such uses facilitate the extraction of unprotectable facts and ideas and enable the creation of transformative, often socially beneficial works. Without such clear protection of intermediate copying, numerous legitimate activities—such as a student copying a book page while drafting a research paper, or a designer copying a political photograph to create a parody—would be chilled by the threat of litigation.

C.     **Uses to extract facts and ideas are highly transformative even when the original work is not reproduced as output.**

ROSS's use of Thomson Reuters' headnotes in the Bulk Memos was not to compete in publishing the same headnotes, but to distill features representing statistical relationships between questions and answers to power its algorithms. In short, ROSS transformed the headnotes it had access to during the training process. This is a classic example of algorithms extracting only unprotected metadata about

copyrighted works. *See* Mark A. Lemley & Bryan Casey, *Fair Learning*, 99 Tex. L. Rev. 743 (2020).

The district court attempts to distinguish generative AI from ROSS's use, which it characterizes as a tool that merely "spits back relevant judicial decisions that have already been written." *Op.* at 398. While this may be the end result of the tool that ROSS created, the actual use of the headnotes—to extract data about them for development of a model—is a process legally indistinguishable from a wide variety of other machine learning, text data mining, and AI applications, including many that researchers rely upon every day.

AI models, even when they are not generative, are transformative in nature when they are not designed to reproduce copyrighted works contained in the training data. ROSS's legal research algorithms do not display headnotes to end users, nor do they retain any of the headnotes. Such repurposing of copyrighted content to enable new technological functions, without being substitutive of the original work, falls squarely within what is traditionally considered "transformative." *Seltzer v. Green Day, Inc*., 725 F.3d 1170, 1176 (9th Cir. 2013) ("If ... the secondary use adds value to the original—if the quoted matter is used as raw material, transformed in the creation of new information, ... new insights and understandings—this is the very type of activity that the fair use doctrine intends to protect.").

In *AV Ex Rel. Vanderhye v. iParadigms, LLC*, 562 F. 3d 630 (4th Cir. 2009), for example, the Fourth Circuit easily concluded that iParadigms' plagiarism detection tool was transformative. The tool in that case "makes a 'fingerprint' of the work by applying mathematical algorithms to its content. This fingerprint is merely a digital code. Using the digital fingerprint made of the student's work, the Turnitin system compares the student's work electronically to content available on the Internet ... and student papers previously submitted to Turnitin." *Id*. at 630, n.1. The court concluded that such a use was transformative, because "the use of a copyrighted work need not alter or augment the work to be transformative in nature. Rather, it can be transformative in function or purpose without altering or actually adding to the original work." *Id*. at 640.

Similarly, in *Authors Guild v. Google, Inc*., 804 F.3d 202 (2d Cir. 2015), the Second Circuit concluded that Google's copying of millions of books was fair use. One of Google's contested uses was the deployment of those books to enable "'text mining' and 'data mining.'" *Id*. at 209. The court explained that "Google's 'ngrams' research tool draws on the Google Library Project corpus to furnish statistical information to Internet users about the frequency of word and phrase usage over centuries." The court concluded that "through the ngrams tool, Google allows readers to learn the frequency of usage of selected words in the aggregate corpus of published books in different historical periods. We have no doubt that

the purpose of this copying is the sort of transformative purpose described in *Campbell* as strongly favoring satisfaction of the first factor." *Id.* at 217. *See also Perfect 10, Inc. v. Amazon.com, Inc*., 508 F.3d 1146, 1165 (9th Cir. 2007) (determining that Google's reproduction of copyrighted images as thumbnails in search results was a transformative use).

Such a transformative functionality is fundamentally different from, for example, "[A] musician who finds it helpful to sample another artist's song to make his own, a playwright who finds it helpful to adapt a novel, or a filmmaker who would prefer to create a sequel or spinoff." *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 547-8 (2023).

Under *Warhol,* the first factor conclusively favors a use when it is both noncommercial and serves a distinct purpose. *See* 598 U.S. at 532 ("In sum, the first fair use factor considers whether the use of a copyrighted work has a further purpose or different character, which is a matter of degree, and the degree of difference must be balanced against the commercial nature of the use"). Given that a *noncommercial* transformative use supports a finding of fair use, a clear judicial finding that AI training is transformative under the first fair use factor becomes especially important for academic researchers. Universities, public research institutions, and independent scholars train non-generative AI systems on copyrighted material in many different fields ranging from the humanities to

medicine. For such not-for-profit uses, knowing that the act of training itself is recognized as transformative provides critical legal certainty. Without it, researchers face uncertainty that could stall entire fields of inquiry.

### D. Being refused a license before making a use cannot in itself be used to show bad faith.

We agree with the district court that bad faith may not be relevant in assessing fair use. *Oracle*, 593 U.S. at 32. However, we do not agree that bad faith might be found where there was "copying after Thomson Reuters refused to license its content." *Op.* at 399.

Requesting a license before using a work can certainly be evidence of *good* faith. But making an unlicensed use cannot, in itself, be sufficient evidence showing bad faith. *See Campbell*, 510 U.S. at 585 n.18, citing *Fisher v. Dees*, 794 F. 2d 432, 437 (9th Cir. 1986) ("If the use is otherwise fair, then no permission need be sought or granted. Thus, being denied permission to use a work does not weigh against a finding of fair use."). Good faith, as Judge Leval of the Second Circuit explains, refers to "the morality of the secondary user." Pierre N. Leval, *Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105, 1126 (1990). Where the secondary user reasonably believes the use is lawful, and where there is no broad societal consensus that such a use is morally objectionable, a plaintiff's preference regarding secondary uses should not be determinative of "morality." If

it were, such a rule would make every unlicensed use inherently immoral, creating a presumption against fair use.

Indeed, many instances of fair use are made explicitly against the rightsholder's wishes, yet cannot be said to be made in bad faith. *See e.g., Google LLC v. Oracle America, Inc.*, 593 U.S. 1 (2021) (noting that Google's initial attempts to obtain a license did not weigh against fair use); *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 585 n.18 (1994) (rejecting the argument that 2 Live Crew's request for permission undermined their fair use defense, noting that such a request "may simply have been made in a good-faith effort to avoid litigation"); *Katz v. Chevaldina*, No. 14-14525 (11th Cir. 2015*) (*holding that a blogger's use of an unflattering photograph for critical commentary was fair use.); *Rosemont Enterprises, Inc. v. Random House, Inc.*, 261 F. Supp. 691 (S.D.N.Y. 1966) (finding fair use in a biographer's use of quotes against the wishes of the copyright holder.). Authors must retain the freedom to make socially beneficial fair uses where the rightsholder disapproves of a license. Protecting fair uses that are contrary to the wishes of rightsholders is essential to fostering free social discourse as well as innovation.

**E.    Rendering a valuable service to the public without allowing public access to the original work provides sufficient justification for commercial copying under the first factor.**

Courts have recognized copying as justified when it enables the provision of valuable information or services of public interest. *See Romanova v. Amilus Inc.*, 138 F.4th at 115 ("Courts have found other justifications—mostly in circumstances where the copying … enabled the furnishing of valuable information on any subject of public interest *or rendered a valuable service to the public*, in most cases limited to circumstances in which the benefit was provided without allowing public access to the copy, thus assuring that the copied work not serve as a substitute for the original in the marketplace.") (emphasis added).

ROSS stated that its aim was to "increase the accessibility of the law by directing the public straight to the language contained in judicial opinions." Def-App. Brief at 58. Unlike an AI output that might directly replace a copyrighted work and displace sales, ROSS's output consists solely of public domain judicial opinions, which Westlaw has no exclusive rights to control or monetize. The value of ROSS's service lies precisely in increasing access to the public domain materials through enhanced research tools. Despite any alleged commercial nature of the secondary use, a justification based on rendering a valuable service to the public without allowing access to the plaintiff's original work is enough to support a finding of fair use under the first factor. *Accord Warhol,* 598 U.S. at 532–33 ("If

an original work and a secondary use share the same or highly similar purposes, and the secondary use is of a commercial nature, the first factor is likely to weigh against fair use, *absent some other justification for copying*.") (emphasis added). More competition among legal research service providers will drive down price, thereby expanding access to affordable legal research tools for individual researchers and nonprofit organizations that advocate for underrepresented groups.

## II. The fourth factor only considers markets which are traditional, reasonable, or likely to be developed.

Finally, the district court erred under in its market harm analysis. The fourth fair use factor considers "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). It examines "whether the secondary use 'usurps the market of the original work.'" *Authors Guild*, 755 F.3d at 99 (quoting *NXIVM Corp. v. Ross Inst*., 364 F.3d 471, 482 (2d Cir. 2004)).

As it did with the first factor, when analyzing the fourth factor, the district court mistakenly focused on the underlying business model instead of the specific use. *Op*. at 400. ("The original market is obvious: legal-research platforms."). The correct approach is to focus on the existing market for headnotes, rather than considering the market for the entire Westlaw platform. Not all decrease in a rightsholder's revenue or disruption in their business model weighs in favor of the plaintiff.

The district court further added that "at least one potential derivative market is also obvious: data to train legal AIs." *Id.* It is always the case that "plaintiff suffers a loss of a potential market if that potential [market] is defined as the theoretical market for licensing." *Tresóna Multimedia, LLC v. Burbank High Sch. Vocal Music Ass'n*, 953 F.3d 638, 652 (9th Cir. 2020) (quoting 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 13.05 (2019)). For that reason, a copyright holder cannot prevent others from making transformative uses merely "by developing or licensing a market for ... other transformative uses of its own creative work." *Id.* (quoting *Bill Graham Archives v. Dorling Kindersley,* 448 F.3d 605, 614–15 (2d Cir. 2005)). In *Bill Graham Archives*, the Second Circuit held that expressing a willingness to license images by itself neither establishes a market nor shows impairment to a traditional market. 448 F.3d at 614. Thomson Reuters' express wish to monopolize an AI training market that it has provided no evidence for similarly cannot be given weight under the fourth factor.

Only cognizable harm on traditional, reasonable, or likely to be developed markets should be considered. *American Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 929–30 (2d Cir. 1994). Limiting the scope of markets considered under the fourth factor to only those that exist or may reasonably be developed will encourage more creative outputs in unforeseen and uncultivated markets. *See Cambridge Univ. Press v. Patton*, 769 F.3d 1232, 1276 (11th Cir. 2014) ("The goal

of copyright is to stimulate the creation of new works, not to furnish copyright holders with control over all markets.").

Courts have always resisted the argument that the rightsholder is entitled to the market of a transformative use; otherwise many rightsholders would want to control every secondary use in the market, and the fourth factor would become circular and irrelevant. *See Kadrey v. Meta Platforms, Inc.*, No. 23-cv-03417-VC, 2025 U.S. Dist. LEXIS 121064, at *56 (N.D. Cal. June 25, 2025) ("to prevent the fourth factor analysis from becoming circular and favoring the rightsholder in every case, harm from the loss of fees paid to license a work for a transformative purpose is not cognizable.") (citing *Tresóna*, 953 F.3d at 652 (9th Cir. 2020); *Bill Graham*, 448 F.3d at 614–15 (2d Cir. 2006); *Oracle*, 593 U.S. at 38 ("cautioning against the 'danger of circularity'" (quoting 4 Nimmer § 13.05)).).

If the Court adopts the district court's interpretation of the fourth factor, rightsholders will be permitted to monopolize entire fields of scholarship and technological innovation. The Court should decline that invitation.

## CONCLUSION

For the foregoing reasons, we request this Court to rule that both the first factor and fourth factor favor ROSS's transformative and non-substitutive use of Thomson Reuters' headnotes.

Respectfully submitted,

*/s/ Karen E. Keller*
Karen E. Keller
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
*Attorney for Amicus Curiae Authors*
*Alliance, Inc.*

Dated: September 29, 2025

I certify that this document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 5000 words.

This document also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word Version 2508 in Times New Roman font size 14.

This brief complies with the electronic filing requirements of Local Rule 31.1(c) because the text of this electronic brief is identical to the text of the paper copies, and the Vipre Virus Protection, version 3.1 has been run on the file containing the electronic version of this brief and no viruses have been detected.

*/s/ Karen E. Keller*
Karen E. Keller
Shaw Keller LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
*Attorney for Amicus Curiae Authors Alliance, Inc.*

Dated: September 29, 2025

# CERTIFICATION OF ADMISSION TO BAR

I, Karen Keller certify as follows:

     1.    I am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

     2.    Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that the foregoing is true and correct.

*/s/ Karen E. Keller*
Karen E. Keller
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
*Attorney for Amicus Curiae Authors*

Dated: September 29, 2025    *Alliance, Inc.*

## CERTIFICATE OF FILING AND SERVICE

I certify that on this 29th day of September 2025, the foregoing Amicus

Curiae Brief was filed through the CM/ECF system, served upon counsel of record

for Appellant and Appellee through the CM/ECF system, and seven hardcopy

briefs will be properly served on the Court within three days of electronic filing.

*/s/ Karen E. Keller*
Karen E. Keller
Shaw Keller LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
*Attorney for Amicus Curiae Authors*

Dated: September 29, 2025          *Alliance, Inc.*