No. 25-2153

# United States Court of Appeals for the Third Circuit

---

THOMSON REUTERS ENTERPRISE CENTRE GMBH and WEST PUBLISHING CORP.,

*Plaintiffs-Appellees*,

v.

ROSS INTELLIGENCE INC., *Defendants-Appellant*.

---

On Appeal from the United States District Court for the District of Delware, No. 1:20-cv-613-SB

---

**BRIEF *AMICUS CURIAE* OF ABRAHAM KANG, ESQ. AND KUNAL PATEL IN SUPPORT OF APPELLANTS**

---

ABRAHAM KANG, ESQ.
KUNAL PATEL
15732 Los Gatos Blvd #5002
Los Gatos, CA 95032
650-600-0178
abejkang@gmail.com

Sept 28, 2025                          *Independent Counsel*

# TABLE OF CONTENTS

## Table of Contents

**TABLE OF CONTENTS** .................................................................................................II

**TABLE OF AUTHORITIES** ...........................................................................................III

CASES ............................................................................................................................. III
STATUTES AND RULES ..................................................................................................... III

**INTERESTS OF AMICUS CURIAE** ...............................................................................1

**SUMMARY OF ARGUMENT** ........................................................................................1

**ARGUMENT** ....................................................................................................................7

**CONCLUSION** ...............................................................................................................33

**CERTIFICATION OF BAR MEMBERSHIP** ..............................................................35

**CERTIFICATE OF COMPLIANCE** .............................................................................36

**CERTIFICATE OF SERVICE** ......................................................................................37

CERTIFICATION OF BAR MEMBERSHIP

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Cases

Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith, 598 U.S. 508 (2023)
Authors Guild v. Google, Inc., 804 F.3d 202 (2d Cir. 2015)
Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569 (1994)
Google LLC v. Oracle America, Inc., 593 U.S. 1 (2021)
Sega Enters. Ltd. v. Accolade, Inc., 977 F.2d 1510 (9th Cir. 1992)
Sony Comput. Entm't v. Connectix Corp., 203 F.3d 596 (9th Cir. 2000)

Statutes and Rules

17 U.S.C. § 107
U.S. Const. art. I, § 8, cl. 8

# INTERESTS OF AMICUS CURIAE

Amicus curiae Abraham Kang, Esq. is an attorney specializing in technology and intellectual property law and a computer scientist with research expertise in natural language processing and artificial intelligence systems.[1] Amicus curiae Kunal Patel is a technical expert in machine learning and natural language processing. This combined expertise provides the Court with a unique perspective on the technical realities of how AI systems like ROSS Intelligence process language and the profound implications for copyright law. Amici are deeply concerned that the district court's decision, if upheld, would establish a precedent based on a fundamental misunderstanding of how machine learning transforms text into functional tools, thereby stifling critical innovation in legal technology and beyond. All parties have consented to the filing of this brief. No party's counsel authored this brief in whole or in part, and no person other than amici contributed money intended to fund its preparation or submission.

# SUMMARY OF ARGUMENT

The district court's decision rests on a cascade of errors rooted in a misunderstanding of artificial intelligence. Its fundamental error, which infects its

---

[1] No party's counsel authored this brief in whole or in part. In addition, no party or party's counsel contributed money intended to fund preparing or submitting this brief, and no one other than *amicus curiae*, its members, or its counsel contributed money that was intended to fund preparing or submitting this brief. Fed. R. App. P. 29(a)(4)(E). All parties have consented to the brief's filing.

entire fair use analysis, was analyzing the wrong act. By focusing on the downstream, competitive outputs of ROSS's search tool instead of the initial, direct transformation of copyrighted text into mathematical vector embeddings, the court applied the fair use factors to the wrong conduct entirely. This error of law requires reversal.

I.  The court's analytical error is exposed by a simple hypothetical: if ROSS were structured as two separate companies—one creating embeddings from headnotes (a transformative, non-expressive use) and another licensing those embeddings to build a search tool (a non-infringing act)— the identical technology would suddenly become lawful. This thought experiment underscores a doctrinal point: the fair use inquiry, especially after Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith, 598 U.S. 508 (2023), must consider the specific context and purpose of the defendant's original use, not just whether in some abstract sense the defendant's product competes with the plaintiff's. The Second Circuit's decision in Authors Guild v. Google, Inc., 804 F.3d 202 (2d Cir. 2015) is highly persuasive on this point and supports the need to separate the analysis in this manner.

II. The creation of vector embeddings is a quintessential transformative use.
The court failed to recognize that text serves as functional "code" for
machine learning models. ROSS's process is directly analogous to the
reverse engineering in Sega Enters. Ltd. v. Accolade, Inc., 977 F.2d 1510
(9th Cir. 1992) and Sony Computer Entm't, Inc. v. Connectix Corp., 203
F.3d 596 (9th Cir. 2000), where intermediate copying was necessary to
access unprotectable functional elements, and where no protected
expression appeared in the final product. Further, the district court tried to
distinguish the software cases by saying the intermediate copying doctrine
only applied where necessary and in software contexts. But that is a
misreading of the doctrine. The principle underlying those cases is: if
copying is done for a lawful purpose (to get at unprotectable elements)
and the final product does not encroach on the original protected
expression, it should be viewed favorably in fair use. Under the Supreme
Court's recent guidance in Warhol 598 U.S. 531-532, ROSS's use is
transformative because its purpose—to train an AI to understand legal
semantics—is fundamentally different from Westlaw's purpose for its
headnotes, which is to provide human-readable summaries.

III. The court's market analysis improperly extended copyright protection from expressive content to functional capabilities. Following the Sony line of cases from the Ninth Circuit, which the Court may find instructive, copyright protects the 'games' and not the 'gaming console.' Here, copyright protects the headnotes, not the search functionality built from them. The court's contrary holding transforms copyright into a patent-like monopoly over an entire technological field.

IV. The Supreme Court's recent decision in Warhol 598 U.S. 528-529 reinforces ROSS's fair use position because ROSS's use has a "further purpose" distinct from the original, whereas Warhol's did not. In Warhol 598 U.S. 509, the Court held that merely adding new meaning or message to a work is not sufficient for fair use if the defendant's use shares the "same purpose" as the original in a commercial setting. Warhol's painting of Prince, when licensed to a magazine, served the same illustrative purpose as the original photo (depicting Prince in a magazine). Here, by contrast, ROSS's use of Westlaw headnotes shares no such substitutive purpose to West's headnotes. West's headnotes are created to be read by attorneys as mini-summaries alongside judicial opinions – a tool for

human legal research within Westlaw. ROSS's use was to teach a machine how to understand queries and find concepts – a purpose worlds apart from a person reading summaries in Westlaw. In Warhol's terms, ROSS's use had a "further purpose or different character" that was distinct and served a new function, which strongly favors fair use. Moreover, any superficial commercial similarity (both companies ultimately provide legal research tools) should not override the fundamentally different character of the original use.

V.  Furthermore, Warhol 598 U.S. at 536-37 instructs us to examine market harm with precision. It is not enough that the use is commercial; the question is whether it usurps the market for the "original" or its derivatives. The central question it asks is whether the use "merely supersedes the objects of the original creation . . . (sup-planting the original), or instead adds something new, with a further purpose or different character." Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 579 (1994).

ROSS's tool did not supplant demand for Westlaw – it lacked the citator, the extensive annotations, and the guarantee of authoritative accuracy that Westlaw provides. West's paying customers (large law firms, libraries, etc.) were unlikely to cancel Westlaw for ROSS, a nascent

technology providing a different kind of research experience. Conversely, ROSS appealed to those priced out of Westlaw or seeking a different approach. Treating ROSS as a market replacement for Westlaw is thus a false equivalence. Indeed, by bringing new people into the realm of legal research, ROSS potentially enlarges the overall pie of legal information usage. Under Warhol, if the uses occupy distinct markets or fulfill different market needs, that significantly diminishes any claim of market harm. The district court's contrary view – speculating about a "potential market" for licensing headnotes to AI developers – is precisely the kind of unfounded, hypothetical derivative market analysis that courts should avoid. As commentators note, creating an entirely new licensing market for AI training data (one that never existed before) and counting it under factor four would stretch copyright beyond its intended domain. Copyright law protects markets for the expressive use of works (like people reading or viewing them), not markets for functional uses of works in technological processes. Westlaw's core market remains intact and unthreatened by a tool that does something fundamentally different.

As a result, the District Court's ruling should be reversed.

# ARGUMENT

## I. THE DISTRICT COURT COMMITTED A FOUNDATIONAL LEGAL ERROR BY ANALYZING THE WRONG STEP IN ROSS'S TECHNOLOGICAL PROCESS.

The district court's entire fair use analysis is built on a flawed premise: it evaluated the wrong object at the wrong stage. By focusing on the final outputs of ROSS's search engine and their competitive relationship with Westlaw's product, the court conflated the first fair use factor—the purpose and character of the use—with the fourth factor's market effect analysis. This created an unworkable precedent that, if upheld, would grant copyright holders a de facto veto over any technological innovation that leads to a competing functionality, regardless of how transformative the underlying process may be.

### A. The Proper Fair Use Inquiry Must Center on the Direct Use of the Copyrighted Work, Not Downstream Competition.

The district court's analytical error is exposed by a simple hypothetical. Imagine ROSS had structured itself as two separate companies:

- **ROSS-Embed**, which, like many existing AI companies, ingests text to create and sell access to embedding models; and

- **ROSS-Search**, which licenses these non-expressive embeddings to power a search engine that queries a database of public domain law.

Under this structure, ROSS-Embed's use of headnotes would be a clear transformative use to create a functional, non-expressive mathematical tool. ROSS-Search, meanwhile, would never touch copyrighted material. The identical technological process is thus deemed infringing or non-infringing based solely on corporate structure—a result that cannot be what copyright law intends.

Thomson Reuters may argue that corporate structure shouldn't determine copyright liability. We agree. That is precisely why the court must analyze the *actual use* of the copyrighted work—the embedding creation—not the eventual commercial application. The absurdity isn't in our hypothetical; it's in an analysis that makes identical technology legal or illegal based on corporate organization.

## B. Distinct Functionality: From Keyword Retrieval to Semantic Understanding.

Traditional legal research tools like Westlaw and Lexis operate primarily on lexical search – the user inputs keywords or Boolean queries, and the system matches those to documents (cases, statutes, etc.) that contain those terms. Westlaw has, of course, enhanced this with its headnotes and Key Number taxonomy, allowing researchers to find cases by taxonomy topic. But fundamentally, it's a human-driven process: the user must figure out which legal topics or terms apply, and then read the results (a list of cases with headnotes or summaries) to determine relevance.

ROSS's approach was fundamentally different. It aimed to use natural language processing (NLP) and machine learning to interpret a user's free-form question and find relevant legal answers even if the question didn't use the exact keywords a lawyer might use. In effect, it was trying to add a layer of *semantic understanding* on top of the raw body of law. This yields functionality that Westlaw's keyword search cannot offer out of the box. For example, a user could ask ROSS: "*What is required to prove negligence in an accident case?*" and ROSS's engine, having been trained on many formulations of that question (perhaps gleaned from headnotes on negligence), would recognize the concept and link it to cases

defining negligence elements, even if those cases used different terminology (like "duty, breach, causation, damages" without using the word "accident"). A traditional search might miss cases that don't contain the word "accident" or require manual filtering. ROSS thus provides a *concept-based search*.

This new functionality is transformative in its own right. It is not simply providing the same search results faster or cheaper; it's providing qualitatively different results – arguably more intuitive for non-experts and capable of finding needles in haystacks when the user isn't sure what terms to use. It's a bit like the difference between searching for websites in the 1990s with exact keywords versus modern search engines that handle questions and synonyms. Westlaw has decades of expertise embedded in its taxonomy and headnotes, but it still generally requires the user to navigate that taxonomy or craft the right query. ROSS was an attempt to let the *machine* take on more of that burden.

From a *purpose and character* perspective (factor one), this difference in functionality underscores that ROSS's use of the headnotes was *in service of a new purpose*. Westlaw's headnotes serve an *explanatory purpose for humans* – they are meant to be read as summaries. ROSS's use of those headnotes served a *computational purpose for a machine* – they were meant to be processed as data to improve search. Those are distinct purposes, even if at a high level both relate to

legal research. The law is clear that we must not be misled by broad categorizations; we need to examine how the defendant's use *differs in purpose or character* from the original copyright protected material. Here, the difference is the shift from human-readable content to machine-readable insights. This is precisely the kind of transformative difference that fair use encourages, because it expands the utility of knowledge into new domains (in this case, artificial intelligence).

## II. ROSS'S CREATION OF VECTOR EMBEDDINGS IS A QUINTESSENTIAL TRANSFORMATIVE USE.

### A. Legal Text Functions as Programming Code for Machine Learning Models, Making the Functional Use Doctrine of *Google* and *Sega* Directly Applicable.

The district court dismissed the persuasive Ninth Circuit precedent of *Sega Enterprises Ltd. v. Accolade, Inc.*, on the grounds that it involved computer code, not written words. This is a distinction without a difference. To an ML model, text *is* its code. ROSS's use of the headnotes was *non-expressive*: the headnotes were converted into a numerical form (vectors and weights in the neural network) that captures *patterns of language and meaning*, not the literal expressive content. ROSS's machine learning model ingests text not for its expressive content, but to

learn patterns and semantic relationships. This is directly analogous to reverse engineering object code to understand its unprotectable functional elements, a use *Sega* protected because it was the only way to access the ideas and functional elements required to create a new, non-infringing product.

In *Google LLC v. Oracle America, Inc. 593 U.S. 1, 2-3 (2021)*, the Supreme Court found copying was fair use because it was "needed to allow programmers to work in a different computing environment" Courts have recognized that such intermediate copying (of headnotes) for analysis, where no protected expression is output to the user, can be fair use.

## B. ROSS's Use is Transformative Under *Warhol, Sony, Authors Guild and A.V. ex rel. Vanderhye* Because Its Purpose is Fundamentally Different from the Original Work.

The Supreme Court's decision in *Warhol* 598 U. S. 508, 511 (2023) clarified that the transformative inquiry hinges on whether the secondary use serves the "same or highly similar" purpose as the original. The district court misapplied this test. Westlaw's purpose for its headnotes is to provide human-readable editorial summaries. ROSS's purpose was entirely different: to use the headnotes as

functional data to train an AI model on the statistical relationships between legal concepts. Unlike in *Warhol*, where both works were licensed as magazine illustrations of Prince, here the uses are fundamentally distinct. ROSS's use is therefore transformative under *Warhol*'s own framework.

In *Sony Computer Entertainment, Inc. v. Connectix Corp.*, 203 F.3d 596, 605 (9th Cir. 2000), a company copied Sony's PlayStation BIOS code to reverse-engineer the functional elements and create a new product (a console emulator). The Ninth Circuit provided that even copying an entire work can be fair if done to understand the unprotected functional concepts within, especially when the final product does not contain the plaintiff's expression. The court refused to let copyright be used to "erect an artificial hurdle" *Sony Computer Entertainment, Inc. v. Connectix Corp.*, 203 F.3d 596, 605 (9th Cir. 2000), to accessing those unprotected elements. Although the Ninth Circuit's holding is only persuasive in the 3rd district, ROSS's training involved copying headnotes to extract the unprotected *ideas and linguistic patterns* that would enable a new functional tool. Once that process was done, ROSS's search engine did not reproduce the headnotes. To the extent ROSS's AI internalized anything from West's text, it was *the idea that certain words and concepts go together*.

The transformative nature of ROSS's use becomes even clearer when analogized to *search engine indexing*.

The Second Circuit's ruling in *Authors Guild v. Google, Inc.* 804 F.3d 202 (2d Cir. 2015). Google scanned millions of books (verbatim copies) but did so to create a text-searchable index and allowed users to see only snippets of the text. The Second Circuit reasoned this to be a "highly transformative" use because it *"augments public knowledge by making available information about Plaintiffs' books without providing the public with a substantial substitute for matter protected by the Plaintiffs' copyright interests in the original works"*. *Authors Guild v. Google, Inc.*804 F.3d 202, 214 (2d Cir. 2015). Specifically, converting text into a searchable database was a new purpose (research tool) that did not allow readers to consume the expressive content as a substitute for the books themselves. The court noted that although Google copied entire works, it did so for a transformative aim, and it limited the display to ensure no more than tiny bits were revealed, thus preserving authors' markets. ROSS's use is analogous: it effectively ingested the text for *indexing and AI learning*, not for republication. ROSS did not offer even snippets of headnotes to its users, which is even more protective of

West's expression than Google's snippet display was for books. In fact, *not a single sentence of a West headnote was shown to a ROSS user*. An analysis ROSS's solution provided: "*not a single human accessing Ross's platform would be exposed to Westlaw headnotes. The copying was purely instrumental, aimed at training an AI…*" *Akshat* Agrawal and Sneha Jain*, From Headnotes to Head-scratchers: The Functional Fallacies in Thomson Reuters v. Ross Intelligence,* spicyIP (Feb 18, 2025), https://spicyip.com/2025/02/from-headnotes-to-head-scratchers-the-functional-fallacies-in-thomson-reuters-v-ross-intelligence.html. This is the antithesis of exploiting another's expression for its direct value; it is using the text to achieve a function (better search) that the text's authors never intended.

Another instructive analogy is *A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630 (4th Cir. 2009), involving the Turnitin.com plagiarism detection service. Turnitin made copies of student papers by archiving them in a database, to compare against future submissions for plagiarism. Students sued, claiming this archival was infringement. The Fourth Circuit emphatically rejected the claim, finding fair use. Even though Turnitin was a commercial service, its use of the papers was *vastly different in purpose* from the students' original creative intent.

Citing the Ninth Circuit, the Fourth Circuit noted that a use can be transformative "*in function or purpose without altering or adding to the original work*." *A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 639 (4th Cir. 2009) Turnitin didn't republish the papers or analyze their creative themes; it used them as *data* for a system that detects copying. That is a direct parallel to ROSS's use of headnotes as data for a system that finds relevant legal authorities using flexible semantic relationships. The Fourth Circuit also found that this use did not harm any market for the student papers (there was no market for licensing high school essays, and certainly not for plagiarism-checking). In a similar vein, ROSS's use of the headnotes has not diminished the market for Westlaw's headnotes.

In sum, factor one ("purpose and character") strongly favors ROSS. The purpose was transformative: *to extract non-expressive information and enable new research capabilities*. The character was highly functional and innovative, akin to analysis or indexing rather than expressive creation. ROSS did not usurp West's expressive function; it employed the headnotes in a new context entirely. This is the core of what fair use protects: *innovation that builds upon existing works without encroaching on the original markets or expressive value*.

## III. THE DISTRICT COURT'S MARKET HARM ANALYSIS IMPROPERLY EXTENDS COPYRIGHT PROTECTION TO FUNCTIONAL CAPABILITIES, CREATING AN ANTI-COMPETITIVE WEAPON.

### A. Like Hardware in *Sony*, Search Functionality Falls Outside Copyright's Protective Scope.

The court's fourth factor analysis conflates harm to Westlaw's business with harm to the market for its copyrighted headnotes. This runs counter to the reasoning in the Ninth Circuit's holding in *Sony Comput. Entm't v. Connectix Corp., 203 F.3d 596 (9th Cir. 2000)*. There, the court found that although an emulator might harm Sony's PlayStation hardware sales, this was not cognizable under copyright because copyright protects the "games" (expression), not the "console" (function). The parallel is exact: copyright protects the headnotes (expressive content), not the search platform (functional capability). The "harm" Thomson Reuters alleges is to its monopoly over advanced legal search, not to the market for headnotes as expressive works.

**B. Protecting a Speculative "Training Data" Market Creates Circular Reasoning that Defeats Fair Use.**

The district court found market harm based on a "potential derivative market" for "data to train legal AIs" Thomson Reuters Enter. Ctr. GmbH v. Ross Intel. Inc., No. 1:20-cv-613-SB (D. Del. Feb. 11, 2025) This reasoning is dangerously circular. As the Second Circuit in *Authors Guild v. Google, Inc.* reasoned, a copyright owner cannot preempt a transformative market merely by declaring an intent to license its data for a use that the innovator created. "Those precedents do not support the proposition Plaintiffs assert—namely that the availability of licenses for providing unprotected information about a copyrighted work, or supplying unprotected services related to it, gives the copyright holder the right to exclude others from providing such information or services." *Authors Guild v. Google, Inc.* 804 F.3d 202

If this logic were to stand, fair use for technology would effectively die, as any transformative use could be blocked by a copyright holder's claim to a hypothetical license fee.

Additionally, consider the *licensing market for headnotes*. Westlaw presumably values its headnotes as part of its competitive edge. But before AI like ROSS came along, West was not selling or licensing those headnotes separately – they were bundled with Westlaw. After ROSS, is there a realistic scenario where West could license headnotes to third-party AI developers? Possibly, but even if so, that's not a traditional, reasonable, or likely to be developed market in the pre-ROSS world. Courts caution against letting rights holders count *any* imaginative licensing opportunity as a lost market. Otherwise, nothing would be fair use because one can always say "I could have charged for that use." The Fourth Circuit in *iParadigms* implicitly recognized that even though Turnitin was commercial, the students were not trying to sell their papers to plagiarism detectors – so there was no market harm. By analogy, legal publishers have not (until very recently) had a practice of monetizing their content for AI training. Denying fair use here would be like saying to innovators, "if you want to train an AI, you must pay every content owner whose works you touch, because they now have a new market to charge for AI training uses." That outcome would devastate the progress of machine learning, which depends on learning from large corpora. It's also not what copyright's market analysis is meant to protect – it protects markets for people's consumption of creative works, not the use of works as fodder for creating new tools.

**C. ROSS's semantic search tool serves a different market and purpose than Westlaw, expanding access to legal information rather than substituting for West's products.**

Westlaw is a comprehensive legal research system targeted at professional lawyers, offering not just search, but a trove of editorial content (headnotes, Key Numbers, citators, etc.) and a high level of curation. ROSS's tool, by contrast, was an AI-driven search engine aiming to answer legal questions in plain language. This distinction matters under the *first* and *fourth* fair use factors: ROSS's purpose was to facilitate understanding and accessibility (a tool for semantic comprehension), which is quite distinct from Westlaw's purpose of delivering curated legal content in a proprietary interface. The audience and market for ROSS also differ. By enabling natural language queries, ROSS opened the door for pro se litigants, small-firm attorneys, and non-specialists who struggle with traditional Boolean keyword search. For example, a self-represented tenant might ask, "*Can my landlord evict me for not paying two months' rent if I lost my job?*" – ROSS's semantic search could interpret this question and retrieve relevant cases on landlord-tenant law that the tenant would not know how to find via Westlaw's keyword system. Westlaw's classic search might require knowing precise legal terms (e.g. "failure to pay rent," "unlawful detainer," etc.), which laypersons don't

know. In this way, ROSS provided new functionality and served an *underserved segment*, rather than siphoning off Westlaw's established customer base.

ROSS and Westlaw are more *complements* than true substitutes. One could use ROSS to identify information and still rely on Westlaw for in-depth research or validation. ROSS targeted a gap in the market (affordable, intuitive search) rather than poaching Westlaw's core subscriber base. And crucially, ROSS's use did not rob West of the ability to exploit its work in any *traditional* sense – Westlaw continued to function and profit during ROSS's existence, and West's unique content (the headnotes themselves) remained exclusively on Westlaw. Thus, factor four, especially when viewed in light of *Warhol*'s emphasis on distinguishing markets, leans toward fair use. We now turn to *Warhol* explicitly to situate this case in the Supreme Court's latest fair use framework.

## D. The Supreme Court's *Warhol* Decision Confirms ROSS's Use Is Fair, Non-Substitutive, and Socially Beneficial

The *Andy Warhol Foundation v. Goldsmith*, 598 U.S. 508 (2023) decision has prompted much discussion about the fair use doctrine's trajectory. Some have

interpreted *Warhol* as a narrowing of fair use, particularly of the "transformative use" concept, because the Court ruled against the defendant despite the new work having a different look and message. It is important to carefully apply *Warhol*'s teachings to the present case, and when we do, it becomes clear that *Warhol* actually supports ROSS's position in crucial ways. *Warhol* refines the analysis of factor one and factor four, focusing on the importance of the *purpose* of the secondary use and its potential market substitution. We address those in turn as they apply here.

## 1. Under *Warhol*, "New Expression" Alone Isn't Enough—Distinct Purpose Is Key.

One of the central holdings of *Warhol* is that when evaluating factor one ("purpose and character of the use"), courts should not be swayed solely by the fact that the secondary work has some new meaning or aesthetic differences. The question is whether the secondary use has a *"further purpose or different character"* that is substantially distinct from the original, taking into account the commercial nature of the use. As the Court put it, *"Although new expression, meaning, or message may be relevant to whether a copying use has a suffciently distinct purpose or character, it is not, without more, dispositive of the first factor." Andy Warhol Foundation v. Goldsmith*, 598 U.S. 508, 509 (2023).

In *Warhol*, the Foundation argued that Warhol's orange silkscreen of Prince had a different meaning (commenting on fame) than Goldsmith's photo (which showed Prince in a vulnerable state). The Court did not dispute there was a different meaning, but it found that this new meaning did not translate into a new *purpose* when Warhol's work was licensed to a magazine to illustrate a story about Prince, just as Goldsmith's photo had been. Both were used *"as portraits of Prince used to depict Prince in magazine stories about Prince"*. Thus, factor one favored Goldsmith, because the use was of the *same kind* (portrait in magazine) and commercial, despite Warhol's additions.

Applying that reasoning here, we ask: Did ROSS's use of West's headnotes have a further purpose or different character, or was it fundamentally the same purpose as West's? At a superficial level, one might say both Westlaw and ROSS used the headnotes for "legal research." But the *granular purpose* differs greatly. Westlaw uses headnotes to provide information *to human readers* (lawyers) – that is an *end-user-facing purpose*. ROSS used headnotes to *develop an algorithm* – an *internal, developmental purpose*. It's akin to the difference between using a photograph as a magazine illustration (like in *Warhol*) versus using a photograph to calibrate a copy machine – the latter is a completely different purpose. We contend that ROSS's use was further removed from West's purpose than many classic fair uses are. It is not like a parody (where you overtly comment on the original to make people laugh –

there, at least you present something to the public that relates to the original's content). Here, ROSS did not present West's content to the public at all; it used it to improve a tool. That is a *fundamentally different character* of use.

Moreover, *Warhol* emphasized considering the context of the use. ROSS's use occurred in the context of creating a new technology, not in the context of compiling a rival legal digest for lawyers to read. The context was technology and accessibility, which is distinct from West's context of publishing and legal scholarship. If we were to analogize to *Warhol*, this case would be like if Warhol had used Goldsmith's photo not to make a painting for magazines, but to train a computer vision algorithm to recognize Prince's face – an entirely different purpose. Under such a hypothetical, even *Warhol*'s majority might have found factor one to favor the defendant.

In assessing the "character" of ROSS's use, one should also factor in that ROSS's use was *transformative in function*, as discussed. The Supreme Court did not reject the concept of transformativeness – it cautioned against automatically labeling something transformative just because of a new aesthetic. It said to look at *whether the use is of a different character or purpose*, which is essentially another way of describing a truly transformative use. By that standard, ROSS's use checks the

box: different purpose (teaching an AI vs informing a lawyer) and different character (functional/utilitarian vs expressive/informational).

## 2. ROSS's Purpose Diverges from West's: Functional Accessibility vs. Curated Content.

We have covered this above, but to put it in the *Warhol* framework explicitly: *Warhol* asks, what is the "*justification for the use*" *Andy Warhol Foundation v. Goldsmith*, 598 U.S. 508, 510 (2023) and does it serve a different objective from the original? ROSS's justification was to unlock the information in headnotes to create something new – an AI that makes legal research easier. West's justification in writing headnotes is to aid lawyers in research by giving them summaries within Westlaw. One is about *serving a machine's learning process* and indirectly the end-users through the machine's outputs; the other is about *directly serving the end-users with editorial content*.

Consider an analogy: West's headnotes are like an English translation of complex legal ideas. ROSS then took those translations and used them to teach a robot to speak legal language so that laypeople could converse with it. West is in the business of producing legal translations (among other things); ROSS is in the business of building a legal "conversational partner." Those are not the same business or purpose, even if they both intersect on the terrain of legal information.

We can also glean insight from *Warhol*'s discussion of derivative works. The Court was concerned that if "new meaning" alone defined transformativeness, then almost any derivative work (like a movie adaptation of a novel) could claim fair use, which would undermine the derivative works right. But the Court noted that derivative works often share the same purpose as the original (to tell the same story in a different form). In our case, ROSS's use is not a derivative work in the normal sense – it's not a sequel, adaptation, abridgment, or any traditional repackaging of the headnotes. It doesn't tell the same "story" as the headnotes in a new form. It uses the headnotes to enable something qualitatively different (a search response, not a summary of a case). If anything, Thomson Reuters's theory, if accepted, would grant it a power akin to a derivative work right over any AI or research method that uses its content. That would be a vast expansion of its rights, which *Warhol* cautions against. *Warhol* reminds us that transformativeness should not swallow the derivative works right – but here ROSS's use isn't the type of derivative work Congress intended to protect (it's not an expressive work that supersedes the original's function; it's a tool *about* the originals).

Thus, we respectfully submit that under the clarified factor one analysis of *Warhol*, ROSS's use has a different purpose and character. It is a paradigmatic example of when the first factor should favor the defendant: a secondary use that unlocks

value in the original for a new end (improving access) and does so in a different manner of operation.

### 3. Market Effect Post-*Warhol*: No Cognizable Harm to Westlaw's Core Market.

*Warhol* also impacts factor four. The Court in *Warhol* essentially found that because the Andy Warhol Foundation (AWF)'s use targeted the same market (magazine image licensing) that Goldsmith's photo was part of, it presented a potential market harm – licensing images of Prince for magazines was an economic use Goldsmith was entitled to, and Warhol's license displaced a potential license Goldsmith could have earned. The Court noted that AWF actually did get paid and Goldsmith was not paid for that use, showing a direct usurpation of a traditional market for the photograph.

In our case, what is the "market" for West's headnotes? Primarily, it is part of the Westlaw subscription package. Westlaw's value proposition is: pay us, and you get access to a comprehensive legal research system including these headnotes that save you time. ROSS's tool was not a wholesale replacement for that proposition. It did not offer all case law, all headnotes, citators, etc., in one package. It offered an AI Q&A on legal issues that would then point you to sources (which one could obtain from public databases or elsewhere). It is not obvious that a large law firm

would drop Westlaw in favor of ROSS. (In fact, after ROSS shut down, no law firm presumably got rid of Westlaw because nothing quite fills that space entirely).

So the core market – professional legal research subscriptions – likely saw *de minimis* impact from ROSS. Perhaps Thomson Reuters' argument is that ROSS was nipping at the edges or could have grown into a competitor. But fair use doesn't protect against *nascent competition per se*; it protects against loss of *traditional licensing revenue*. West was not licensing headnotes to others nor selling a la carte headnote services. It monetized them through Westlaw, and that continued.

Another angle: Thomson Reuters might argue that if ROSS is allowed to use the headnotes for free, then Thomson Reuters (TR) is deprived of a licensing market to sell its data to AI developers (like selling an API or dataset). However, here *Warhol* actually provides a counter: *Warhol* teaches that we should primarily consider harm to traditional, reasonable, or likely to be developed markets for the original. A market for licensing headnotes to tech companies was not one TR had developed or reasonably could have expected in the pre-generative-AI world. It only becomes "likely" if courts say it must be licensed – a circular reasoning we should avoid. The *Second Circuit* in *Authors Guild v. Google, Inc.* 804 F.3d 202 (2d Cir. 2015) warned against paying a party for a hypothetical loss of a license that they never

would have claimed, as that would let rights holders tax any use just by asserting they would have sold a license.

Furthermore, *Warhol* didn't jettison the principle that transformative uses often have less impact on the original market. It reinforced that if the use is not serving as a substitute in the original's market, factor four can favor fair use. The Court noted that when purpose is different, that usually implies a different market audience or usage. Here, *the audience for ROSS vs. Westlaw overlaps less than one might think*, as discussed. ROSS's audience included self-represented individuals and cost-sensitive users, an audience Westlaw has historically not reached effectively. To the extent ROSS tapped into a new user base, Westlaw cannot claim harm for losing customers it never had. And to the extent some Westlaw customers might use ROSS on the side, that's not a lost sale of Westlaw – at most it's lost time spent on Westlaw, but they likely still pay for Westlaw access anyway (often on a flat fee basis).

It is also instructive to consider *what Westlaw's headnotes compete with*. Primarily, they compete with Lexis's headnotes or other publishers' digests. Those are similar products. ROSS's outputs (like an AI-generated answer or just a ranked list of cases by semantic relevance) are not a one-to-one substitute for a West headnote. They are a different type of tool. Thus, from a competition standpoint, Westlaw's

real competitive worry might be if Lexis or Bloomberg copied their headnotes. But ROSS didn't copy them to offer them to users; ROSS wasn't telling users "here are Westlaw's headnotes for free." That would obviously harm Westlaw's market. ROSS instead said "ask me a question, I'll point you to answers in the law." That's innovative and doesn't pick the pocket of West's business in the same direct way.

One more aspect post-*Warhol*: The Court indicated that when examining market harm, one should not presume it in the case of transformative uses (rejecting the idea from some older cases that any unmet license equals harm). Instead, one looks concretely at how the use impacts the original's usually intended market. We've gone through that and find minimal impact. Indeed, had ROSS proven wildly successful, Thomson Reuters might have innovated or competed, which is the dynamic copyright is meant to allow – encouraging creativity by protecting works, but not to the extent of blocking new technologies that require some incidental use of those works.

In sum, under *Warhol*'s focus, factor four here should not be the stumbling block the district court made it out to be. ROSS's use does not "share substantially the same purpose" or "target the same audience" in a way that tips factor four against fair use. Rather, it serves a different purpose to an expanded audience, with no direct sale of West's expression taking place. If anything, it's more akin to a

complementary product that could live alongside Westlaw. Thus, factor four, properly considered, favors ROSS or at least is neutral.

**4. Merger and Public Policy Underscore That Upholding Fair Use Serves Democratic Access to Law.**

While *Warhol* does not explicitly address merger or public interest concerns, it doesn't forbid considering the broader context. The Supreme Court has often noted that fair use is an equitable rule of reason and not a mechanical checklist. Here, equity and reason tilt heavily towards allowing ROSS's innovative use. We reiterate the merger point in *Warhol* terms: If the expression is so tied up with the idea that using the expression is mainly a vehicle to get the idea, then the secondary use is less harmful to the core incentive of copyright (which is to encourage creation of expressive works). West's headnotes likely were created with knowledge that they're factual summaries—West's editors are paid to do it as part of West's service, not primarily to create literary works of art. Allowing ROSS's fair use thus does not undermine the incentive for West to produce headnotes; West does it to enhance Westlaw's value, and that remains true.

On the flip side, disallowing this fair use would have significant negative ramifications: It would create a permission requirement for any machine learning application that touches copyrighted text, even when the end result uses no

protected expression. It would privilege a large incumbent's control over information at the expense of startups and the public. Copyright would become an instrument not to protect creative expression from misappropriation, but to prevent others from even learning from that expression to build new tools. This would be akin to saying an artist who views copyrighted paintings to learn techniques is infringing – an outcome that would shock the conscience and stifle artistic growth. In the modern context, AI is the student and copyrighted works are the teachers; fair use is what permits the learning. The Third Circuit should be mindful that its ruling here could influence AI development far beyond the legal research arena. Setting a precedent that training AI equals infringement (especially on thin, factual works like headnotes) could hamstring progress in beneficial AI applications (like summarizing medical literature, enhancing education, etc.).

Lastly, we emphasize that *access to the law* is a fundamental public good. Headnotes are not the law, but they are keys to the courthouse of understanding the law. ROSS's mission aligned with that public good – to make those keys available in a new way. Fair use has always had a strong undercurrent of serving the public interest (hence the mention of scholarship, research, etc., in §107). Here, the public interest looms large. Nothing in *Warhol* suggests that courts should ignore the public benefits of a use; rather, those benefits often tie into the transformative character (factor one) and factor four (if the public benefits without undermining

the original market, that's a win-win scenario which fair use is meant to facilitate). This is such a scenario.

In conclusion of this section, *Warhol* fine-tunes fair use but does not overturn its core. When we fine-tune ROSS's case through the *Warhol* lens, we see a use that is non-substitutive, different in purpose, and beneficial – exactly the kind of use that should be deemed fair. The district court's analysis, which largely predated *Warhol* (and in some respects anticipated it, but misapplied it), focused too much on superficials (that both parties deal in legal research) and too little on specifics (what was taken and how it was used). We urge this Court to apply *Warhol* with a clear eye: ROSS is not the *Warhol* scenario of an artist selling a decorative print in the same market as the original photographer. ROSS is the engineer using materials to build a machine that helps people in a different way. That is transformative by purpose, and fair by nature.

## CONCLUSION

For the foregoing reasons, the District Court's ruling should be reversed.

Respectfully submitted,

/s/ Abraham Kang
ABRAHAM KANG, ESQ.
Counsel of Record for Amici Curiae

15732 Los Gatos Blvd #5002
Los Gatos, CA 95032
650-600-0178
abejkang@gmail.com

KUNAL PATEL
Amicus Curiae

September 29, 2025

# CERTIFICATION OF BAR MEMBERSHIP

Pursuant to Local R. 28.3(d) and Local R. 46.1(e), I certify that I, Abraham Kang, am admitted as an attorney and counselor of the United States Court of Appeals for the Third Circuit.

/s/ Abraham Kang
Abraham Kang
15732 Los Gatos Blvd
#5002
Los Gatos, CA 95032
650-600-0178
abejkang@gmail.com

Aug 29, 2025

**CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 29 and Local R. 31.1, I certify the following:

1.      This brief complies with Rule 29 because it contains 6,849 words, excluding those parts exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and Fed. R. App. P. 32(a)(6) because the brief has been prepared in Times New Roman 14-point font using Microsoft Word for Mac.

3.      This brief complies with the electronic filing requirements of Local R. 31.1(c) because the text of the electronic brief is identical to the text of the paper copies and because Malwarebytes Anti-Malware was run on the file containing the electronic version of this brief and no viruses were detected.

/s/ Abraham Kang
Abraham Kang
15732 Los Gatos Blvd #5002
Los Gatos, CA 95032
650-600-0178
abejkang@gmail.com

Aug 29, 2025

**CERTIFICATE OF SERVICE**

I certify that the foregoing was filed with the Clerk using the appellate CM/ECF system on Aug 29, 2025. All counsel of record are registered CM/ECF users, and service will be accomplished by the CM/ECF system.

/s/ Abraham Kang
Abraham Kang
15732 Los Gatos Blvd #5002
Los Gatos, CA 95032
650-600-0178
abejkang@gmail.com

Aug 29, 2025