# United States Court of Appeals

*for the*

# Third Circuit

Case No. 25-2153

THOMSON REUTERS ENTERPRISE CENTRE GMBH;
WEST PUBLISHING CORP.,

*Plaintiffs-Appellees,*

– v. –

ROSS INTELLIGENCE INC.,

*Defendant-Appellant.*

ON APPEAL FROM AN ORDER OF THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

## BRIEF OF *AMICUS CURIAE* PHOENIX CENTER FOR ADVANCED LEGAL AND ECONOMIC PUBLIC POLICY STUDIES IN SUPPORT OF PLAINTIFFS-APPELLEES

LAWRENCE J. SPIWAK
PHOENIX CENTER FOR ADVANCED
  LEGAL AND ECONOMIC PUBLIC
  POLICY STUDIES
*Attorney for Phoenix Center*
5335 Wisconsin Avenue NW,
  Suite 440
Washington, DC 20015
(202) 274-0235

# CERTIFICATE OF COUNSEL REGARDING CONSENT TO FILE

Pursuant to Federal Rule of Appellate Procedure 29(a)(2), counsel for the Phoenix Center hereby certifies that all parties have consented to the filing of this brief.

s/ *Lawrence J. Spiwak*

Lawrence J. Spiwak, Esq.
President and General Counsel
Phoenix Center for Advanced Legal and Economic
Public Policy Studies
5335 Wisconsin Avenue, NW, Suite 440
Washington, D.C. 20015
Tel: (202) 274-0235

## CORPORATE DISCLOSURE STATEMENTS

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(A) the Phoenix Center for Advanced Legal & Economic Public Policy Studies submits the following corporate disclosure statement: The Phoenix Center is a non-profit 501(c)(3) non-stock corporation organized under the laws of Maryland.  As such, the Phoenix Center has no parent companies and no one holds an ownership interest in the Phoenix Center.

s/ *Lawrence J. Spiwak*

Lawrence J. Spiwak, Esq.
President and General Counsel
Phoenix Center for Advanced Legal and Economic
Public Policy Studies
5335 Wisconsin Avenue, NW, Suite 440
Washington, D.C. 20015
Tel: (202) 274-0235

## CERTIFICATE REGARDING AUTHORSHIP

Pursuant to Federal Rule of Appellate Procedure 24(a)(4)(E), the Phoenix Center certifies that no party's counsel authored this brief, in whole or in part; that no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and that no person other than the Phoenix Center contributed money that was intended to fund preparing or submitting the brief.

s/ *Lawrence J. Spiwak*

Lawrence J. Spiwak, Esq.
President and General Counsel
Phoenix Center for Advanced Legal and Economic
Public Policy Studies
5335 Wisconsin Avenue, NW, Suite 440
Washington, D.C. 20015
Tel: (202) 274-0235

November 21, 2025

# **TABLE OF CONTENTS:**

**Page:**

CERTIFICATE OF COUNSEL REGARDING CONSENT
TO FILE...................................................................................... i

CORPORATE DISCLOSURE STATEMENTS........................... ii

CERTIFICATE REGARDING AUTHORSHIP........................... iii

TABLE OF AUTHORITIES ..............................................................v

INTEREST OF AMICUS .................................................................1

SUMMARY OF ARGUMENT .......................................................2

ARGUMENT ...................................................................................4

I.     AI Training is a Legitimate Economic Market for Purposes of
       Copyright ...........................................................................4

II.    The District Court Correctly Denied Fair Use for Ross's Improper
       Copying of Thomson Reuters's Works.................................7

CONCLUSION........................................................................... 14

CERTIFICATE OF COMPLIANCE ........................................... 15

CERTIFICATE OF SERVICE .................................................... 17

CERTIFICATION OF ADMISSION TO BAR ........................... 18

# TABLE OF AUTHORITIES:

**Page(s):**

## CASES:

*Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith*,
  598 U.S. 508 (2023)........................................................... 12, 13

*Campbell v. Acuff-Rose Music, Inc,*
  510 U.S. 569 (1994)...................................................................9

*Harper & Row, Publishers, Inc. v. Nation Enterprises,*
  471 U.S. 539 (1985)................................................................ 10

*Sony Corp. of Am. v. Universal City Studios, Inc.,*
  464 U.S. 417 (1984)................................................................ 10

*Bartz v. Anthropic PBC,*
  No. C 24-05417, 2025 WL 1741691 (N.D. Cal. June 23, 2025) ..............6

## STATUTES:

17 U.S.C. § 101.........................................................................7

17 U.S.C. § 107.................................................................. 7,8,11

## MISCELLANEOUS

Beard, T.R., Ford, G.S. and Stern, M., *Fair Use in The Digital Age,* 65 J.
  Copyright Soc'y U.S.A. 1 (2018) ......................................... 10

Beebe, B. *An Empirical Study of U.S. Copyright Fair Use Opinions, 1978-
  2006,* 156 U. Penn. L.R. 549 (2009) ................................. 10, 11

Guaglione, S., *2024 In Review: A Timeline of The Major Deals Between Publishers And AI Companies,* DIGIDAY (December 27, 2024) (available at: https://digiday.com/media/2024-in-review-a-timeline-of-the-major-deals-between-publishers-and-ai-companies) ............................................4

Kwon, D., *Publishers Are Selling Papers To Train AIs — And Making Millions Of Dollars,* NATURE (December 9, 2024) (available at: https://www.nature.com/articles/d41586-024-04018-5) ........................ 4,5

Ponsford, D., *News Generative AI Deals Revealed: Who Is Suing, Who Is Signing?,* Press Gazette (November 14, 2025) (available at https://pressgazette.co.uk/platforms/news-publisher-ai-deals-lawsuits-openai-google) ...........................................................................................5

## **INTERESTS OF AMICUS CURIAE:**

The Phoenix Center is a non-profit 501(c)(3) research organization that studies the law and economics of the digital age. Among other research areas, the Phoenix Center and its scholars have published significant academic work about intellectual property and copyright, including several papers on the appropriate bounds of fair use. The Phoenix Center, therefore, has an established interest in the outcome of this proceeding and we believe that our perspective will assist the Court in resolving this case.

# SUMMARY OF ARGUMENT:

The age of Artificial Intelligence ("AI") is upon is.  AI promises to unleash massive efficiencies across the U.S. economy, from manufacturing to healthcare.  But as AI deployment becomes more prevalent, new legal questions come to the fore.  This is such a case.

In the case at bar, Ross contends that its use of AI to scrape Thomson Reuter's intellectual property is a "fair use."  The District Court disagreed, ruling that Ross's use was both commercial in nature and that Ross's infringement had an adverse effect upon the value of Thomson Reuters's intellectual property.  The central dispute in this case, therefore, is what exactly constitutes the relevant market for Thompson Reuters's work?  As we demonstrate below, the District Court correctly defined one such market as the market as AI training.  Licensing copyrighted works for AI training is an article of commerce—an established market available to copyright owners.  Ross's argument that there is no market for "headnotes" for AI training was correctly rejected.  Indeed, Ross's own actions demonstrate plainly that there is a market for headnotes data for AI training (particularly as the record reveals that Ross attempted to transact in that very market).  The fact Westlaw said "no" does not excuse the taking.  A copyright owner chooses in what

markets its creations may be bought and sold.  The rejection of a seller is no excuse for theft.

**ARGUMENT:**

## I. AI Training is a Legitimate Economic Market for Purposes of Copyright

AI training is relatively new phenomenon.  Indeed, much of the confusion in this debate over copyright and AI training stems from a fundamental misunderstanding about how copyrighted works are being used in AI development. Typically, courts and commentators focus on whether an AI outputs the original work, but this misses the real market activity.  The relevant use is not the eventual output—it's the training itself.

There is an active market for content for AI training.  AI companies have entered into licensing agreements for training with several content providers, including Reddit, Shutterstock, the Associated Press, the Financial Times, Bloomberg, Thomson Reuters, S&P Global, among others.   In fact, an entire industry has evolved around curating and selling high-quality training data, including, to name a few, companies like Scale AI, Appen, Common Crawl, Cohere for AI, and Labelbox.  Even content aggregators exist, including Calliope Networks and Troveo AI, which create portfolios of audiovisual content for licensing by AI companies.  *See, e.g.,* S. Guaglione, *2024 In Review: A Timeline of The Major Deals Between Publishers And AI Companies,* DIGIDAY (December 27, 2024);  D. Kwon, *Publishers Are Selling*

*Papers To Train AIs — And Making Millions Of Dollars,* NATURE (December 9, 2024); D. Ponsford*, News Generative AI Deals Revealed: Who Is Suing, Who Is Signing?,* PRESS GAZETTE (November 14, 2025).

Plainly, licensing copyrighted works for AI training is an article of commerce—an established market available to copyright owners. Indeed, in the instant case, Ross approached Thomson Reuters to secure its headnotes to train its AI. Upon Thomson Reuters's rejection, Ross employed LegalEase to create content to train its AI via "Bulk Memos," which the District Court found were built, in part, from Westlaw headnotes. *District Court Order* at p. 3.

When companies license content from Reddit, Shutterstock, news organizations, or others, they typically are not buying permission for AI systems to generate replicas of the original content. They are purchasing access to high-quality expressive material for a specific algorithmic purpose: training AI models. This creates a distinct market for training data, where the product being sold is well-crafted content suitable for teaching AI systems to recognize and replicate effective communication.

The deeper problem with fair use claims for AI training becomes clear when we examine what these systems seek from copyrighted works. AI

training does not extract some abstract, unprotected element from creative content—it specifically values high-quality writing, for example, precisely because it succeeds at its original expressive purpose. *C.f. Bartz v. Anthropic PBC,* No. C 24-05417, 2025 WL 1741691 (N.D. Cal. June 23, 2025). A romance novel trains the system effectively because it works as romance; a news article improves the model because it informs and engages readers skillfully; exceptional writing trains the system to write exceptionally. The training process seeks to capture and replicate the very creative achievements that copyright protects.

Making matters worse, in the instant case Ross not only trained its AI on copyrighted content, but did so to compete directly with Thomson Reuters in the market for legal research. Yet, Ross's use of Thomson Reuters's copyrighted material without permission or compensation to train its AI "is enough." *District Court Order* at p. 22. There is an active market for the use of copyrighted content for AI training, and using the copyrighted content in this way affects the value (or business opportunities) of the copyrighted content. In using Thomson Reuters's headnotes, Ross did not seek to transform them, but to use them in their actual expressive purpose, as it was the headnotes' actual expressive purpose that had value in the training.

Ross's "tokenization" of the headnotes is immaterial to its fair use claim. *See* Ross Brief at 12. If tokenization were transformative enough to justify fair use, then every scanner, photocopier, and file format converter would enjoy the same copyright exemption. But tokenization is not a transformation—it is a translation. Just as words may be translated into a foreign language to facilitate understanding by human intelligence, copyrighted works are translated through tokenization to facilitate understanding by artificial intelligence. Section 101 of the Copyright Act (17 U.S.C. §101) expressly protects translations as derivative works requiring authorization, not as fair use exceptions. The functional necessity of translation has never exempted secondary works from copyright protection; neither should the functional necessity of tokenization.

## II. The District Court Correctly Denied Fair Use for Ross's Improper Copying of Thomson Reuters's Works

In determining whether the use made of a work in any particular case is a fair use, Section 107 of the Copyright Act (17 U.S.C. § 107) provides a list of factors a court should consider. These factors include:

> (1)      the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

> (2)      the nature of the copyrighted work;

(3)     the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4)     the effect of the use upon the potential market for or value of the copyrighted work.

In the case at bar, the District Judge denied Ross's fair use defense based on factors (1) and (4), which it decided favored Thomson Reuters.

As for the first factor, the District Court found that Ross's use was commercial and was "not transformative because it [did] not have a 'further purpose or different character' from Thomson Reuters's."  In fact, noted the District Court, "Ross was using Thomson Reuters's headnotes as AI data to create a legal research tool to compete with Westlaw." *District Court Order* at 17.  As to the fourth factor, the District Court noted that Ross's product was "meant to compete with Westlaw by developing a market substitute." *Id.* at p. 22.

But what is the "market" for which Ross's infringing use of Thomson Reuters's intellectual property affected?  There were two markets recognized by the District Court.  First, the District Court reasoned that the "original market is obvious:  legal-research platforms." *District Court Order* at 22. The District Court found that Ross developed as product "meant to compete with Westlaw by developing a market substitute." *Id.*

Yet, as the District Court also correctly noted, not only must it consider "current markets but also potential derivative ones 'that creators of original works would in general develop or license other to develop.'" *Id.* (*citing Campbell v. Acuff-Rose Music, Inc*, 510 U.S. 569, 590 (1994)). And as the District Court correctly determined, "at least one potential derivative market is also obvious: data to train legal AIs." *Id.* Indeed, noted the court, it did "not matter whether Thomson Reuters has used the data to train its own legal search tools; the effect on a *potential* market for AI training is enough." *Id.* (emphasis in original).

Ross contends on appeal that there is no existing or potential market for headnotes as training data. Ross Brief at p. 51. This contention is obviously incorrect. Ross's own actions demonstrate plainly that there is a market for headnotes data for AI training; Ross attempted to transact in that very market. Ross acknowledges that "Westlaw stated that it would not license its content as AI training data," *id.,* but the fact Westlaw said "no" does not excuse the taking. A copyright owner chooses in what markets its creations may be bought and sold. The rejection of a seller is no excuse for theft. Given these facts, the District Court found Ross's arguments to be "unpersuasive." As the District Court observed,

> Even taking all facts in favor of Ross, it meant to compete with
> Westlaw by developing a market substitute. And it does not
> matter whether Thomson Reuters has used the data to train its
> own legal search tools; the effect on a *potential* market for AI
> training data is enough. Ross bears the burden of proof. It has
> not put forward enough facts to show that these markets do not
> exist and would not be affected. *District Court Order* at p. 22
> (emphasis in original).

The District Court's ruling is correct.

While the four factors "are to be explored, and the results weighed

together, in light of the purposes of copyright," the U.S. Supreme Court states

that the fourth factor is "undoubtedly the single most important element of

fair use," *Harper & Row, Publishers, Inc. v. Nation Enterprises,* 471 U.S. 539,

566 (1985), and that the "purpose of copyright is to create incentives for

creative effort." *Sony Corp. of Am. v. Universal City Studios, Inc.,* 464 U.S.

417, 449-450 (1984). Copyright is the motivation for the creation of new

works by establishing sufficient protections to facilitate on average the

recovery of the opportunity costs of creation. *See* T.R. Beard, G.S. Ford and

M. Stern, *Fair Use in The Digital Age,* 65 J. COPYRIGHT SOC'Y U.S.A. 1, 5

(2018). Looking for patterns in hundreds of fair use decisions over the period

1976 through 2005, Professor Barton Beebe's empirical analysis of decisions

suggests that the fourth factor is a controlling meta-factor for deciding fair use

cases. B. Beebe, *An Empirical Study of U.S. Copyright Fair Use Opinions,*

*1978-2006,* 156 U. PENN. L.R. 549-624 (2009).  In only 2.7% of cases did the final determination conflict with the fourth factor.  *Id.*  Given the case-by-case analysis of fair use, the small share of cases that conflict with the fourth factor is strong evidence of the fourth factor's importance.

The first task in assessing how the secondary use affects the "potential market for or value of the copyrighted work" is to identify the markets in which the original work may be plausibly sold or licensed.  Market definition is a threshold question: *what are the markets in which the original work could be the subject of ordinary commercial activity?  And then, does the secondary use fall into any of these ordinary commercial activities?*

When an original work may be sold in many markets, the "value of the copyrighted work" (17 U.S.C. § 107(4)) is the sum of revenue from all these business opportunities.  That is, if a work may be sold in three markets with expected revenue $R_i$, then the "value of the copyrighted work" is $V = R_1 + R_2 + R_3$.  Reducing revenues from any of these three opportunities reduces the value of the copyrighted work, which weighs against a finding of fair use by the fourth factor.  For instance, a copyrighted book may be licensed as a basis for a plotline in a computer game. This game does not compete in the market for books—it's a video game.  That does not excuse the unauthorized taking

of the property.  The use of a book for the storyline of a video game is a market in which the author may participate (a derivative work), and the unauthorized use reduces the "value of the copyrighted work."

It is critical, therefore, to consider whether a secondary use interferes with the business potential of the original work in any of its realistic (actual or potential) revenue-generating opportunities.  To secure incentives for creative effort, all market applications should be protected from exploitation by unauthorized secondary users.  Copyright is not limited to what may be viewed as a "primary market" or "original market"—it spans all markets for which the content may be sold or licensed.  A secondary use that evades licensing fees is potentially no less damaging than a secondary use that competes with the original work in retail markets.  In fact, many works are created entirely for the licensing market.

We see this logic in *Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith,* 598 U.S. 508 (2023), where the Supreme Court described the market opportunities for photographs.  There, the Court stated that a

> typical use of a celebrity photograph is to accompany stories about the celebrity, often in magazines. For example, Goldsmith licensed her photographs of Prince to illustrate stories about Prince in magazines such as Newsweek, Vanity Fair, and People. She even licensed her photographs for that purpose after Prince

died in 2016. A photographer may also license her creative work to serve as a reference for an artist, like Goldsmith did in 1984 when Vanity Fair wanted an image of Prince created by Warhol to illustrate an article about Prince. *Warhol,* 598 U.S. at 534-35.

Similarly, Goldsmith could sell her images for billboards, print advertisements, book covers, and a host of other opportunities, none of which might compete with selling the photograph to individuals or magazines (though excessive use may reduce its value). But each infringing use competes with Goldsmith's right to license her photographs across the full breadth of opportunities provided by her copyright.

Once the plausible, ordinary commercial uses of the original property are established, the next question is whether a secondary use trespasses on any of these commercial uses. The effect of the secondary use on the copyright owner's market opportunities depends on the "purpose and character" of the secondary use (the second factor). In the instant case, the secondary use is AI training (and, then, to make a competing legal research platform). The question, therefore, is AI training a market opportunity? As the District Court correctly found, and the active market for AI training data confirms, the answer is "yes," and the unauthorized use for AI training "is enough." *District Court Order* at p. 22.

## **CONCLUSION:**

For the reasons set forth herein, the Phoenix Center joins Plaintiffs-Appellees in urging this Court to uphold the District Court's decision in this case.

Respectfully submitted,

s/ *Lawrence J. Spiwak*

Lawrence J. Spiwak, Esq.
President and General Counsel
Phoenix Center for Advanced Legal and Economic Public Policy Studies
5335 Wisconsin Avenue, NW
Suite 440
Washington, D.C. 20015
Tel: (202) 274-0235

November 21, 2025

## **CERTIFICATE OF COMPLIANCE:**

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify the following:

This brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because this brief contains 2,555 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii) of the Federal Rules of Appellate Procedure.  This brief complies with the typeface requirements of Rule 32(a)(5) of the Federal Rules of Appellate Procedure and the type style requirements of Rule 32(a)(6) of the Federal Rules of Appellate Procedure because this brief has been prepared in a proportionally spaced typeface using Word for Microsoft 365 in 14 point Times New Roman font.

This brief complies with the electronic filing requirements of Local Rule 31.1(c) because the text of this electronic brief is identical to the text of the paper copies, and Microsoft's Windows Defender virus detection program was run on the file containing the electronic version of this brief and no viruses have been detected.

/s/ *Lawrence J. Spiwak*

Lawrence J. Spiwak, Esq.
President and General Counsel
Phoenix Center for Advanced Legal and
Economic Public Policy Studies
5335 Wisconsin Avenue, NW, Suite 440
Washington, D.C. 20015
Tel: (202) 274-0235
Email:  lspiwak@phoenix-center.org

November 21, 2025

**CERTIFICATE OF SERVICE:**

I, Lawrence J. Spiwak, hereby certify that on this 21st day of November, 2025, a copy of the foregoing amicus brief in support of Plaintiffs-Appellees of was electronically filed with the Third Circuit Court of Appeals, and service was made upon counsel of record through the Court's electronic docketing system.

/s/ *Lawrence J. Spiwak*

Lawrence J. Spiwak, Esq.
President and General Counsel
Phoenix Center for Advanced Legal and Economic Public Policy Studies
5335 Wisconsin Avenue, NW
Suite 440
Washington, D.C. 20015
Tel: (202) 274-0235
Email:  lspiwak@phoenix-center.org

November 21, 2025

- 17 -

## **CERTIFICATION OF ADMISSION TO BAR:**

I, Lawrence J. Spiwak, hereby certify as follows:

1.  I am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

2.  Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that the foregoing is true and correct.

/s/ *Lawrence J. Spiwak*

Lawrence J. Spiwak, Esq.
President and General Counsel
Phoenix Center for Advanced Legal and Economic Public
Policy Studies
5335 Wisconsin Avenue, NW
Suite 440
Washington, D.C. 20015
Tel: (202) 274-0235
Email:  lspiwak@phoenix-center.org

November 21, 2025