# United States Court of Appeals

*for the*

# Third Circuit

Case No. 25-2153

THOMSON REUTERS ENTERPRISE CENTRE GMBH;
WEST PUBLISHING CORP,

– v. –

ROSS INTELLIGENCE INC,

*Appellant.*

ON APPEAL FROM AN ORDER OF THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF DELAWARE

## BRIEF OF *AMICI CURIAE* RECORDING INDUSTRY ASSOCIATION OF AMERICA AND NATIONAL MUSIC PUBLISHERS ASSOCIATION IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE

JONATHAN Z. KING
COWAN, LIEBOWITZ & LATMAN, P.C.
*Attorneys for Amici Curiae*
114 West 47th Street, 21st Floor
New York, New York 10036
(212) 790-9200

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *amici* state that they are each 501(c)(6) nonprofit organizations, that neither has a parent corporation, and that no publicly held corporation owns 10% or more of either of their stock.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. ii

INTEREST OF *AMICI CURIAE* ......................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ......................................2

ARGUMENT ......................................................................................................7

    I.    THERE IS NOTHING TRANSFORMATIVE ABOUT COPYING COPYRIGHTED MATERIALS TO ACHIEVE THE SAME PURPOSE AS THOSE MATERIALS ...........................7

        A.    The Clarified Meaning of Transformative Use .........................7

        B.    ROSS Copied Headnotes to Achieve the Same Purpose as Those Headnotes ...................................................................11

    II.    COPYING COPYRIGHTED WORKS TO GENERATE MARKET SUBSTITUTES CAN NEVER BE FAIR .......................16

        A.    Relevant Markets Must Be Construed Broadly in the Context of AI ...........................................................................17

        B.    AI Damages Potential Markets Regardless of Whether Its Outputs Are Infringing ...................................................21

CONCLUSION .................................................................................................29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*A&M Records v. Napster, Inc.*,
    239 F.3d 1004 (9th Cir. 2001) ...................................................................13

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*,
    598 U.S. 508 (2023)......................................................................*passim*

*Authors Guild v. Google, Inc.*,
    804 F.3d 202 (2d Cir. 2015) ...................................................................14

*Authors Guild, Inc. v. HathiTrust*,
    755 F.3d 87 (2d Cir. 2014) .....................................................................14

*Blanch v. Koons*,
    467 F.3d 244 (2d Cir. 2006) ...................................................................10

*Campbell v. Acuff-Rose Music, Inc.*,
    510 U.S. 569 (1994)................................................................8, 17, 18

*Capitol Records, LLC v. ReDigi Inc.*,
    910 F.3d 649 (2d Cir. 2018) ...................................................................13

*Cariou v. Prince*,
    714 F.3d 694 (2d Cir. 2013) .....................................................................8

*Google LLC v. Oracle Am.*,
    593 U.S. 1 (2021)................................................................................16, 24

*Harper & Row Publishers, Inc. v. Nation Enterprises*,
    471 U.S. 539 (1985)................................................................................16

*Kadrey v. Meta Platforms, Inc.*,
    2025 U.S. Dist. LEXIS 121064788 (C.D. Cal. June 25, 2025).........22, 23, 28

*Kelly v. Arriba Soft Corp.*,
    336 F.3d 811 (9th Cir. 2003) ...................................................................14

*Kienitz v. Sconnie Nation LLC*,
    766 F.3d 756 (7th Cir. 2014) .....................................................................8

*Murphy v. Millennium Radio Grp. LLC*,
    650 F.3d 295 (3d Cir. 2011) ...............................................................17, 24

*Perfect 10, Inc. v. Amazon.com, Inc.*,
    508 F.3d 1146 (9th Cir. 2007) .........................................................14

*Sega Enters. Ltd. v. Accolade, Inc.*,
    977 F.2d 1510 (9th Cir. 1992) .........................................................15

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
    464 U.S. 417 (1984)..........................................................................28

*Stewart v. Abend*,
    495 U.S. 207 (1990)............................................................................6

*Thaler v. Perlmutter*,
    130 F.4th 1039 (D.C. Cir. 2025)......................................................28

*Thomson Reuters Enter. Ctr. GmbH v. ROSS Intel. Inc.*,
    765 F. Supp. 3d 382 (D. Del. 2025) ...........................11, 16, 17, 21

*Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.*,
    342 F.3d 191 (3d Cir. 2003) ............................................................17


**Statutes & Other Authorities:**

17 U.S.C. § 107(1) .......................................................................................8

17 U.S.C. § 107(4) ...............................................................................16, 22

Fed. R. App. P. 29(a)(2)...............................................................................1

Fed. R. App. P. 29(a)(4)(E).........................................................................1

*Copyright and Artificial Intelligence Part 3: Generative AI Training*
    (Prepublication Version) (May 2025) ............................................22

Nimmer, *Nimmer on Copyright* § 13F.05[B][2].........................................8

Nimmer, *Nimmer on Copyright* § 13F.05[C][1].......................................15

Nimmer, *Nimmer on Copyright* § 13F.08................................................16

Nimmer, *Nimmer on Copyright* § 13F.10[G][2][a][i] ...............................9

Nimmer, *Nimmer on Copyright* § 13F.14[C][1]......................................15

# INTEREST OF *AMICI CURIAE*[1]

The Recording Industry Association of America ("RIAA") is a 501(c)(6) nonprofit trade organization that supports and promotes the creative and financial vitality of recorded music and the people and companies that create it in the United States. RIAA's several hundred members – ranging from major American music companies with global reach to artist-owned labels and small businesses – make up this country's most vibrant and innovative music community. RIAA's members create, manufacture, and/or distribute sound recordings that comprise the majority of all legitimate recorded music consumption in the United States. They also own copyrights and/or other exclusive rights in sound recordings embodying the performances of some of the most popular and successful recording artists of all time. In support of its members, RIAA works to protect the intellectual property rights of artists and music labels.

The National Music Publishers Association ("NMPA") is a nonprofit trade association representing the United States music publishing and songwriting industry. Over the last one hundred years, NMPA has served as the leading voice representing American music publishers before Congress, in the courts, within the

---

[1] All parties have consented to the filing of this brief. Fed. R. App. P. 29(a)(2). No counsel for any party authored this brief in whole or in part, and no person other than *amici* contributed money intended to fund the preparation or submission of this brief. Fed. R. App. P. 29(a)(4)(E).

music, entertainment, and technology industries, and to the public. NMPA's
membership includes publishers of all sizes, from major music publishers to
independently owned and operated publishers, representing musical works of all
genres. Taken together, compositions owned or controlled by NMPA's hundreds
of members account for the vast majority of musical compositions licensed for
commercial use in the U.S.

RIAA and NMPA are actively engaged in representing the interests of their
members in addressing the extraordinary legal challenges of artificial intelligence
("AI"). Both have submitted comments to the U.S. Copyright Office concerning
the impact of AI on the music ecosystem, and their respective members are
engaged in litigation challenging the infringing use of copyrighted sound
recordings and musical compositions in training AI models. *Amici* hereby voice
their strong support for the opinion below, which correctly holds that training an
AI model on copyrighted works to create a competing service or product cannot
qualify as fair use.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The music community has a long history of confronting new technologies
that facilitate widespread copyright infringement. These threats have evolved in
sophistication and scope with every generation. What was once the challenge of
curbing infringement in the analog world, such as the unauthorized duplication of

cassette tapes, grew into the global threat of online infringements of exact digital copies distributed through peer-to-peer file sharing networks and the proliferation of user-generated content on streaming platforms.  Whether by letter, litigation, or license, rightsholders have successfully relied on copyright law in each new technological context to protect the key assets on which the entire music ecosystem is built – copyrighted music and the bundle of exclusive rights that attends it.

But as daunting as past challenges have been, they are dwarfed in scope and jeopardy by AI services that produce digital files that emulate and compete with human-authored music.  To train these models, AI companies unlawfully duplicate virtually all copyrighted music on the internet to ensure that the resulting outputs sound credibly similar in style and genre to the music on which the models were trained and to the music users seek in prompting the models.  The resulting outputs are proliferating in the marketplace at alarming rates.  They flood streaming platforms, displace human-authored music, dilute royalty pools by diverting payments to fictional bands, and deceive consumers, who cannot tell whether they are listening to human artists or digital files created by a computer.  Given this looming threat, *amici's* members have sued AI services that train on their sound

recordings and musical compositions.[2]  Those services have responded by asserting that their conduct is exonerated by the fair use doctrine.  They are wrong.

The instant case represents the first opportunity for a federal appellate court to determine what is being widely litigated throughout the country – whether copying copyrighted works for purposes of training a commercial AI model is subject to the defense of fair use when that model is used in a manner that competes with the copyrighted material on which it is trained.  In this case, the district court correctly answered that question in the negative.  And while the factual contexts of AI legal research tools and AI-generated music may differ, the lower court's holding establishes key precedent that training an AI model on copyrighted works to compete with and substitute for those copyrighted works can never be fair use.  *Amici* submit this brief to state their strong support for the lower court's holding and to explain why the positions advocated by appellant ROSS Intelligence, Inc. ("ROSS") and its supporting *amici* stray far from the proper application of the fair use doctrine in ways that deeply threaten the music ecosystem.

---

[2] *See Concord Music Group, Inc. et al. v. Anthropic PBC*, Civil Action No. 24-cv-03811-EKL (SVK) (N.D. Cal.) (musical compositions); *UMG Recordings, Inc., et al.  v. Uncharted Labs, Inc.*, Civil Action No. 1:24-cv-04777-AKH (S.D.N.Y.) (sound recordings); *UMG Recordings, Inc., et al. v. Suno, Inc.*, Civil Action No. 1:24-cv-11611 (FDS) (D. Mass) (sound recordings) ("Suno Litigation").

*Amici* focus on two facets of the lower court's ruling.  First, *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508 (2023) clarified that the key question of "transformativeness" under the first fair use factor is whether the challenged use serves a *purpose* similar to that of the original work, regardless of whether the secondary work adds new expression or meaning.  The lower court's finding that ROSS's copying of Westlaw headnotes achieved the same overarching purpose as those headnotes – to assist in finding case law – is correctly faithful to *Warhol*.

ROSS and its supporters protest that its purpose in copying the headnotes was only to train its AI model to create a machine-readable language.  That argument impermissibly truncates the analysis to only the initial technological step of ROSS's system and turns a blind eye to ROSS's ultimate aim of copying headnotes to devise something that directly competes with those headnotes as a legal research tool.  Purpose connotes intent and design, and infringing copyrights to create something that achieves the same objectives as the copyrighted work – whether to help a lawyer to find cases or to service public consumption of music – is not transformative.

Second, as to the fourth fair use factor, the district court correctly held that ROSS's infringement adversely invades the legal research and AI training data markets even where the outputs of its system (judicial opinions) are not themselves

infringing.  While ROSS and its allied *amici* balk that the district court stretches

market harm too far, the court's analysis is both correct and compelled by the text

and purpose of the fourth factor.  Historically, given the limits of prior

technologies, fair use cases have considered the market impacts of particular

secondary uses that are substantially similar to the copied materials.  AI, however,

has a unique capacity to output an endless stream of content that displaces the

market for and value of the copyrighted works on which it trained.  That kind of

harm falls squarely within the types of substitutional impact the fourth fair use

factor addresses.  It is for this reason that the Copyright Office and at least one

other court have determined, like the district court here, that non-infringing AI

outputs impose cognizable market harm when they supplant the copyrighted works

on which they were trained.

Treating such non-infringing outputs as potential market impairments under

factor four is also consonant with the basic purposes of copyright protection and

the fair use doctrine.  The incentive structure of copyright law rewards authors for

their creative efforts so that the public benefits from the fruits of those creative

labors.  The fair use doctrine, in turn, ensures that the copyright monopoly does not

"stifle the very creativity" copyright law was "designed to foster."  *Stewart v.

Abend*, 495 U. S. 207, 236 (1990).  Allowing AI to generate market substitutes by

copying the creative labors of human authors runs counter to both purposes.  It

suffocates authors' incentives to produce creative works for the public's benefit, and it saturates the market with uncopyrightable imitations of human authorship far removed from the kind of human creativity copyright law aims to promote. This Court should confirm that, regardless of whether outputs are themselves infringing, AI models impose cognizable market harm when those models undermine the market for the works on which they are trained. Affirmance is necessary to ensure that copyrights will not be unilaterally exploited without authorization to engineer their own demise.

## **ARGUMENT**

## I.    **THERE IS NOTHING TRANSFORMATIVE ABOUT COPYING COPYRIGHTED MATERIALS TO ACHIEVE THE SAME PURPOSE AS THOSE MATERIALS**

In assessing the first fair use factor, the district court appropriately looked to ROSS's *purpose* in copying the headnotes – to develop a competing legal research tool – and the commercial nature of that purpose. ROSS's efforts to redefine that purpose and diminish the import of its commercial motivations run headlong into the Supreme Court's recent clarification of how the first fair use factor is to be assessed.

### A.    **The Clarified Meaning of Transformative Use**

The first fair use factor considers "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit

educational purposes." 17 U.S.C. § 107(1).  Since the concept was first analyzed

by the Supreme Court in *Campbell v. Acuff-Rose Music, Inc.*, 510 U. S. 569

(1994), this factor has largely hinged on whether the use in question is

"transformative."  Unfortunately, while courts regularly recite the same language

regarding what makes a use "transformative," they have applied the concept

inconsistently and often in direct conflict with one another.  *Compare, e.g., Cariou*

*v. Prince*, 714 F.3d 694 (2d Cir. 2013) (finding that appropriation artist's painting

of "lozenges" and other elements over plaintiff's photographs was transformative

fair use) to *Kienitz v. Sconnie Nation LLC*, 766 F.3d 756, 758 (7th Cir. 2014)

("*Cariou* and its predecessors in the Second Circuit do not explain how every

'transformative use' can be 'fair use' without extinguishing the author's rights

under §106(2)").  As Nimmer observes, "[t]ransformative use bristles with

potential puzzles" such that "[c]onfusion … clouds the transformative use inquiry."

Nimmer, *Nimmer on Copyright* § 13F.05[B][2].

Perhaps because of this uneven history, the Supreme Court's recent *Warhol*

decision resets the table regarding the first fair use factor and transformativeness.

*Warhol* invokes the familiar inquiry into "'whether the new work merely

'supersede[s] the objects' of the original creation … ('supplanting' the original), or

instead adds something new, with a further purpose or different character.'"  598

U.S. at 528 (quoting *Campbell,* 510 U. S. at 579).  But it refocuses that "central

question" of transformativeness on whether the secondary use serves a *similar purpose* to that of the original work, regardless of whether the secondary work adds new expression or meaning.  It warns, for example, that while "new expression may be relevant to whether a copying use has a sufficiently distinct purpose or character, it is not, without more, dispositive of the first factor."  *Id.* at 525.  The Court likewise explains that merely adding "new expression, meaning, or message" cannot automatically tilt the first factor towards a transformative fair use, because otherwise, the concept "transformative use" would "swallow the copyright owner's exclusive right to prepare derivative works."  *Id.* at 541.  The pivotal question is thus not how much the second work changes the original, but rather whether it reflects a *different purpose* from the work from which it copied.  *See Nimmer*, § 13F:10[G][2][a][i] (one of *Warhol's* primary "moves" was "to adopt distinctive purpose as the lodestar for transformative use").

　　*Warhol* further ties this focus on *purpose* to the notion of *substitution*, often considered under the fourth fair use factor discussed below: "…the first factor relates to the problem of substitution—copyright's *bête noire*.  The use of an original work to achieve a purpose that is the same as, or highly similar to, that of the original work is more likely to substitute for, or supplant, the work."  598 U.S. at 528 (citations and quotation omitted).  *See also id.* at 532-32 ("A use that shares the purpose of a copyrighted work, by contrast, is more likely to provide 'the

public with a substantial substitute'").  In other words, regardless of how many

expressive changes the secondary use offers, if the purpose of the secondary use is

similar to the original, the copying risks becoming a potential "substitute" for the

original work and is not transformative.

Finally, *Warhol* rebalanced the impact of commerciality on an otherwise

transformative use.  Whether a use is commercial, even though mentioned

expressly in the first fair use factor, has sometimes been eclipsed where the use is

deemed sufficiently transformative.  *See, e.g.*, *Blanch v. Koons,* 467 F.3d 244, 254

(2d Cir. 2006) ("since the new work is substantially transformative, the

significance of other factors, [including] commercialism[,] are of [less

significance]") (citations omitted).  *Warhol* resets that balance:

> … the first fair use factor considers whether the use of a copyrighted work
> has a further purpose or different character, which is a matter of degree, and
> *the degree of difference must be balanced against the commercial nature of
> the use*.  If an original  work and a secondary use share the same or highly
> similar purposes, and the secondary use is of a commercial nature, the first
> factor is likely to weigh against fair use, absent some other justification for
> copying.

*Id.* at 532-33 (emphasis added).  Thus, even where the purported fair use achieves

some different purpose, the degree of difference must be weighed against the

commercial nature of the use.

**B.    ROSS Copied Headnotes to Achieve the Same Purpose as Those Headnotes**

The district court hewed closely to *Warhol* in finding that ROSS copied Westlaw headnotes for the same purpose as those headnotes were originally created – to facilitate researching case law.  *See Thomson Reuters Enter. Ctr. GmbH v. ROSS Intel. Inc*., 765 F. Supp. 3d 382, 398 (D. Del. 2025).  As *Warhol* teaches, a use that is commercial and aims to achieve such similar purposes cannot be transformative.

Dismissing this straightforward analysis as "oversimplified," *see* Brief for Appellant ("App. Br.") at 43, ROSS insists that its purpose in copying headnotes was distinct from their utility as summaries of points of law and legal research tools and that ROSS's copying aimed instead to "transform[] legal memoranda into machine-readable language."  *Id.* at 44.  A number of the *amici* make a similar pitch.  *See, e.g.*, Brief *Amici Curiae* of the Computer & Communications Industry Association, Chamber Of Progress, and Netchoice in Support of Appellant ROSS Intelligence, Inc. and Reversal ("CCIA Br.") at 12 ("Training an AI-powered search engine is an entirely different purpose than the purpose of the copied headnotes themselves");  Brief of Copyright Law Professors as *Amici Curiae* in Support of Appellant  at 4-5 ("ROSS's use had the purpose of providing data for its AI model to analyze the *unprotected* patterns between the headnotes and parts of judicial opinions," whereas headnotes provide "synopses of legal analyses"); Brief

*Amicus Curiae* of Abraham Kang, Esq. and Kunal Patel in Support of Appellants at 13 (purpose of headnotes is "to provide human-readable editorial summaries," whereas ROSS's purpose was … to use the headnotes as functional data to train an AI model on the statistical relationships between legal concepts").  In their view, ROSS's purported purpose, in other words, was purely technological – to train an AI model, full stop.

The Court should reject this contrived and myopic analysis.  To be sure, ROSS did use headnotes to train its AI model, but its ultimate "purpose" in copying resides in what that model was trained to do – offer a legal research tool to use in lieu of Westlaw headnotes.  The question of purpose cannot be an isolated snapshot of one part of a technological system that has the downstream aim of providing substitutes for the works on which that system was built.  If that were the case, then every tech-savvy copycat could define its "purpose" in purely technological terms, without regard to the ultimate use the technology was designed to enable.  But as the Supreme Court explains, the first fair use factor looks to "the reasons for … the copier's use of an original work." *Warhol*, 598 U.S. at 528.  ROSS's reasons for copying headnotes could not be more clear – to offer users a competitive alternative to using headnotes, or Westlaw more broadly, to find cases.

But ROSS also tries to have it both ways. Even as it denies this ultimate purpose in creating a competitive legal research tool, it elsewhere argues for a much broader "ultimate" purpose justification, divorced from its obvious motives for copying. In other brief sections, it claims it copied headnotes to "progress[] science and technology at once" (*id.* at 23), and to facilitate "broad knowledge transfers" (*id.* at 50). The music community faces similar arguments from AI defendants, who invoke the technological innovations of AI as a justification for infringement. But just as purpose cannot ignore the copier's ultimate aims in copying, it also cannot be defined so broadly that technological innovation trumps copyright protection *per se*. Many novel technologies fail to qualify as transformative where, despite their innovations, they served the same intended purpose as the copyrighted works they copied. *See, e.g.*, *Capitol Records, LLC v. ReDigi Inc.*, 910 F.3d 649, 653 (2d Cir. 2018) (technology that "migrated" sound files from one computer to another to permit resale of digital music files was not transformative where those "resales compete with sales of the same recorded music by the rights holder"); *A&M Records v. Napster, Inc.*, 239 F.3d 1004 (9th Cir. 2001) (new technology that permitted peer-to-peer file sharing deemed not transformative). ROSS copied headnotes purportedly to produce "new forms of research," App. Br. at 51, but the purpose and intent of that research is the same as headnotes – to find cases.

Consistent with its mischaracterization of the "purpose" of its copying,
ROSS insists that its conduct was "at least as transformative" (App. Br. at 41) as
Google's copying of books to create a searchable database that locates books
containing a given search term. *See Authors Guild v. Google, Inc.*, 804 F.3d 202,
216 (2d Cir. 2015). ROSS also cites the related line of cases holding that copying
to create search functionality is transformative. *See* App. Br. at 41 citing *Authors
Guild, Inc. v. HathiTrust*, 755 F.3d 87, 97 (2d Cir. 2014) (creation of searchable
database deemed transformative); *Perfect 10, Inc. v. Amazon.com, Inc*., 508 F.3d
1146, 1165 (9th Cir. 2007) (transformative use of thumbnail images to facilitate
searching); *Kelly v. Arriba Soft Corp*., 336 F.3d 811, 819 (9th Cir. 2003) (same).
But in these search functionality cases, the technology that helped users find
legitimate copies of books or images on the internet did not compete with,
substitute for, or serve the same purpose as those works themselves. *See, e.g.*,
*Authors Guild*, 804 F.3d at 207 (search functionality provided "information about
Plaintiffs' books without providing the public with a substantial substitute for
matter protected by the Plaintiffs' copyright"); *Kelly*, 336 F.3d at 820 ("[t]he
thumbnails do not stifle artistic creativity because they are not used for illustrative
or artistic purposes and therefore do not supplant the need for the originals").
ROSS, on the other hand, copied legal research tools – in this case, headnotes – to
create an alternative and competing legal research tool. Its purpose was

functionally identical to that of the works it copied and thus cannot be transformative.

ROSS does no better invoking intermediate copying cases like *Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510 (9th Cir. 1992). *See* App. Br. at 44. At the threshold, there is no blanket immunity for "intermediate" copying. To consider fair use, a court must first determine that actionable copying has taken place. Even where copying is "merely preliminary to further uses, intermediate copying can be no less an infringement of the copyright owner's exclusive reproduction right than 'final' copying." *Nimmer* § 13F.14[C][1]. In *Sega*, Sega manufactured the Genesis video game console on which only its own video games could be played, and Accolade reverse-engineered the Genesis code so that consumers would be able to play Accolade's games on Sega's device. In finding this intermediate copying to be fair use, the court stressed *inter alia* that Accolade's reverse engineering helped increase the number of games compatible with Sega's console, thereby fostering "growth in creative expression, based on the dissemination of other creative works … that the Copyright Act was intended to promote." *Id.* at 1523. *See also Nimmer* §13F.05[C][1] (Court justified reverse engineering in *Sega* "as an activity that allows for the proliferation of further creative expression"). ROSS's copying of headnotes, in contrast, contributed to no growth in any creative expression; it simply enabled ROSS to unfairly create a competitive service.

ROSS is also wrong to quarrel with the lower court's view that the intermediate copying cases are distinguishable because they concern computer code. As the Supreme Court recently admonished, computer programs differ from other types of copyrighted works in that they "almost always serve functional purposes," so that "fair use plays a particularly important role in determining the lawful scope of a computer program copyright." *Google LLC v. Oracle Am.*, 593 U.S. 1, 21-22 (2021). If the scope of potential fair uses is thus broader for inherently functional material, it is correspondingly narrower for creative works. And artistic works, like music and literary works, are the *least* susceptible to fair uses.

## II.     COPYING COPYRIGHTED WORKS TO GENERATE MARKET SUBSTITUTES CAN NEVER BE FAIR

The fourth fair use factor addresses "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). As the lower court noted, the fourth factor is "undoubtedly the most important element of fair use." *See Thomson Reuters*, 765 F. Supp. 3d at 400 (quoting *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 566 (1985)). *See also Warhol*, 598 U.S. at 555. "The primary consideration under factor four is whether defendant's utilization functions as a market substitute for plaintiff's work." *Nimmer* § 13F.08.

This factor considers impacts on both the existing and "potential" markets for the copyrighted work, *see Thomson Reuters*, 765 F. Supp. 3d at 400 (citing *Campbell*, 510 U.S. at 592), and requires courts to consider not only market harm "caused by the particular actions of the alleged infringer, but also whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market for the original." *Murphy v. Millennium Radio Grp. LLC*, 650 F.3d 295, 308 (3d Cir. 2011) (quoting *Campbell,* 510 U.S. at 590). The fourth factor considers the impact of the challenged use on not only the market for, but also "the *value* of the copyrighted work," including non-monetary value. *See Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc*., 342 F.3d 191, 202 (3d Cir. 2003) (citations omitted).

### A.    Relevant Markets Must Be Construed Broadly in the Context of AI

The lower court correctly determined that the relevant markets for purposes of factor four include those for legal research platforms and data to train legal AI products and services. *Thomson Reuters*, 765 F. Supp. 3d at 400. It appropriately held that ROSS impacted both, because "it meant to compete with Westlaw by developing a market substitute," and because its use affected at least "a *potential* market for AI training data," whether or not Thomson Reuters had exploited that market. *Id.* ROSS argues that the lower court defined markets too broadly. *See*

17

App. Br. at 49 ("The market for legal research platforms is not the relevant fair use inquiry, which focuses on the copyrighted work, not businesses in general").  In ROSS's view, the only relevant market is "the market for headnotes," and there is no existing or potential market for "headnotes as *independent* search tools" or "headnotes as training data."  *Id.* at 51 (emphasis added).

ROSS's conspicuous qualification about a market for headnotes as "*independent* search tools" betrays its oblivion to the real-world effects of its copying.  It construes the relevant market in the narrowest possible sense and ignores that headnotes accomplish the same tasks as ROSS's platform – locating language and legal principles in court decisions.  It does not matter whether ROSS independently licenses headnotes as a standalone tool, because as ROSS elsewhere acknowledges, the harms considered by factor four are those of "market substitution."  App. Br. at 47 (quoting *Campbell*, 510 U.S. at 593).  A legal researcher looking for a case about a given legal topic might elect to use ROSS's platform instead of a Westlaw headnote.  One can substitute for the other, even if ROSS's platform can search in other ways.

Moreover, ROSS ignores what this Court has emphasized about factor four – that it considers the effect on the market for the copyrighted work *or* the "value of the copyrighted work."  Nothing could devalue headnotes more than copying them to render them obsolete.  Paradigmatic fair uses, like using a brief excerpt of a

novel in a book review, do not undermine the inherent value of the copyrighted works.  Copying copyrighted headnotes to offer a substitute, on the other hand, deprives them of their exclusive value, both independently and as part of Westlaw more broadly.

The parallel objection that there is no "existing or potential" market for data to train AI models legally is a familiarly erroneous one to *amici*, who face similar arguments in their own legal battles with AI companies that train their models on copyrighted music.  Like ROSS, these companies argue that no market for licensing music as training data exists and that none can develop, because in their view, training is always fair use.

The passage of time has proven them wrong.  Fair use is not a *fait accompli* just because training is involved – the market for training licenses depends on the objective of the training, and copyrighted works should not be used with impunity when the training results in technologies that cannibalize the market for the copyrighted works.  Although AI is a new technology mired in copyright infringement suits, a licensing market is already building among the largest industry players despite the AI community's mantra of fair use.

Indeed, in just the past several months, some of the largest music companies in the world have announced pathbreaking deals to license their copyrights for training music-related AI systems:

- Universal Music Group ("UMG") and Warner Music Group ("WGM") have entered into separate collaborations with Stability AI, a major "multi modal" generative AI company, to develop AI music creation tools trained on licensed music. *See https://www.universalmusic.com/universal-music-group-and-stability-ai-announce-strategic-alliance-to-co-develop-professional-ai-music-creation-tools/; https://www.wmg.com/news/warner-music-group-and-stability-ai-join-forces-to-build-the-next-generation-of-responsible-ai-tools-for-music-creation.*

- Music technology company KLAY Vision Inc. has entered into separate AI licensing deals with UMG, WMG, and Sony Music Entertainment to develop an AI music platform "trained entirely on licensed music." *See https://www.musicbusinessworldwide.com/umg-sony-and-warner-strike-licensing-deals-with-new-ai-music-platform-klay/.*

- UMG and WMG have entered into separate agreements with Udio, an AI-music generator, to develop music creation platforms trained on licensed music. *See https://www.universalmusic.com/universal-music-group-and-udio-announce-udios-first-strategic-agreements-for-new-licensed-ai-music-creation-platform/; https://www.wmg.com/news/warner-music-group-and-udio-collaborate-to-build-a-new-licensed-music-creation-service.*

- Music publisher Kobalt entered into a "landmark licensing agreement" with ElevenLabs' new AI music platform, which will be "trained on cleared catalog from Kobalt." *See https://www.musicbusinessworldwide.com/kobalts-ai-suno-most-favored-nation/.*

These deals did not exist when the instant case was filed and when *amici's* own AI litigations commenced. Their emergence portends a vital licensing market that AI defendants ignore in the courtroom while courting in the marketplace.

### B.    AI Damages Potential Markets Regardless of Whether Its Outputs Are Infringing

ROSS objects to the lower court's analysis of factor four, because the outputs of its legal research tool – judicial opinions – are not themselves infringing.  *See* App. Br. at 50; *Thomson Reuters*, 765 F. Supp. 3d at 399-400 (no dispute that "ROSS's output to an end user does not include a West headnote").  ROSS builds this argument into its statement of the question presented regarding fair use: "Does the fair use doctrine protect ROSS's internal use of Westlaw's headnotes in memos that served as training data for an AI legal search engine that produced *only non-infringing outputs*?"  App. Br. at 31 (emphasis added).  In this view, non-infringing outputs excuse unauthorized copying of the copyrighted works that made those outputs possible.

This argument is a favored refrain of the tech sector.  *Amici* supporting ROSS advance it repeatedly.  *See, e.g.*, CCIA Br. at 15 ("ROSS's product does not substitute for the copied headnotes … because the headnotes are … not accessible to ROSS's users"); Brief for Amicus Curae [sic] Foundation for American Innovation in Support of Defendant-Appellant  at 21 ("Outputs contain no headnote text and thus cannot have competed with or displaced licensed publication of headnote prose").  AI companies that train their models on copyrighted music make this argument a centerpiece of their fair use defense.  *See, e.g.*, Answer of Defendant Suno, Inc. to Complaint in Suno Litigation at 5 (it is fair

use to copy plaintiffs' sound recordings "as part of the process of developing a new technology" where "the ultimate outputs of that new technology are themselves non-infringing").

The fixation with non-infringing outputs is wrong as a matter of both law and policy. The input/output distinction invoked in the AI context is more rhetorical polemic than legal doctrine. The question is not whether the initial act of unauthorized copying is publicly visible, but whether the fruits of that copying are justified as a fair use. And where that initial copying is the key prerequisite step in producing copious content that supplants copyrighted works in their applicable marketplace, the answer must be an unequivocal no.

That result is commanded first by the broad language of the statute itself, which looks without qualification to the "effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). As the Copyright Office observed in determining that non-infringing AI outputs can impose market harm, "[t]he statute on its face encompasses any 'effect' upon the potential market." *Copyright and Artificial Intelligence Part 3: Generative AI Training* (Prepublication Version) (May 2025) ("CO AI Report") at 65. The focus, in other words, is on the *consequence* of the infringing copying, *i.e.*, whether the effect is substitutional, and not on any particular means by which that consequence is imposed. The court in *Kadrey v. Meta Platforms, Inc.*, 2025 U.S. Dist. LEXIS

121064788 at * 61 (C.D. Cal. June 25, 2025) recognized as much when it refuted the notion that only infringing outputs cause cognizable market harm: "[L]ess similar outputs, such as books on the same topics or in the same genres, can still compete for sales with the books in the training data. And by taking sales from those books, or by flooding stores and online marketplaces so that some of those books don't get noticed and purchased, those outputs would reduce the incentive for authors to create."

Moreover, the same authorities recognize that AI's capacity to produce limitless market substitutes imposes a particularly acute threat of market harm within the meaning of factor four:

> [AI] involves a technology that can generate literally millions of secondary works, with a miniscule fraction of the time and creativity used to create the original works it was trained on. No other use – whether it's the creation of a single secondary work or the creation of other digital tools – has anything near the potential to flood the market with competing works the way that LLM training does.

*Kadrey*, 2025 U.S. Dist. LEXIS 121064788 at *64. The Copyright Office reached the same conclusion:

> The speed and scale at which AI systems generate content pose a serious risk of diluting markets for works of the same kind as in their training data. That means more competition for sales of an author's works and more difficulty for audiences in finding them. If thousands of AI-generated romance novels are put on the market, fewer of the human-authored romance novels that the AI was trained on are likely to be sold.

CO AI Report at 65.

What these authorities acknowledge is precisely what ROSS and its

supporting *amici* avoid.  AI is unlike any prior technology in the sheer breadth of

its potential for infringement and corresponding market disruption.  As noted

above, factor four requires consideration of "whether unrestricted and widespread

conduct of the sort engaged in by the defendant" would substantially impair the

market for the copyrighted work."  *Murphy*, 650 F.3d at 308.  AI's ability to flood

markets with substitutional content, even when the output is not itself infringing,

represents the apotheosis of "unrestricted and widespread" intrusion into the

market for copyrighted works.  Moreover, fair use is always a matter of "applying

general principles, the application of which requires judicial balancing, depending

upon relevant circumstances, including 'significant changes in technology.'"

*Google*, 593 U.S. at 19 (citation omitted).  It would do violence to those principles

to pretend that a new technology that copies copyrighted works in massive

quantities to produce an endless supply of ready substitutes is even remotely fair.

The experience of the music industry provides a stark example of the real-

world market impacts of training on copyrighted works.  AI companies that

produce audio files designed to emulate popular music boast, for example, that

they are trained on "essentially all music files of reasonable quality that are

accessible on the open Internet."  *See* Suno Answer at 9.  The music business is

largely based on a licensing model that grants rights to use music in countless

commercial and technological settings, including the aforementioned AI-training deals. The indiscriminate and unpermitted copying of music for training data is a direct assault on that market just as it is developing.

This staggering scale of unauthorized copying is matched by an equally breathtaking number of resulting outputs finding their way into the music marketplace and competing directly with the music that enabled their production. The streaming service Deezer, which developed a technology to identify AI-generated music on its platform, recently announced that it receives "over 50,000 fully AI-generated tracks every day – accounting for more than 34% of the total daily delivery." *See https://newsroom-deezer.com/2025/11/deezer-ipsos-survey-ai-music/.* Spotify, the world's largest streaming platform, responded to an earlier Deezer estimate of 28% that it has "no reason to disbelieve it's a similar amount on any streaming service." *See https://www.billboard.com/pro/spotify-exec-ai-music-removing-songs-on-the-record/.* So even at this early developmental stage, approximately *one third* of content being uploaded to the major music consumption platforms is generated by AI built on the backs of the music it is drowning out.

AI is also the tool of alleged music fraudsters, one of whom was indicted for allegedly using bots to stream thousands of AI-generated tracks on streaming services and earning $10 million in royalties. *See https://www.justice.gov/usao-*

*sdny/pr/north-carolina-musician-charged-music-streaming-fraud-aided-artificial-intelligence*; *https://www.wired.com/story/ai-bots-streaming-music/*. Using AI-generated tracks that are "cheap, quick and easy to make," other unscrupulous actors are "flooding Spotify, Apple Music and the rest with Al-generated tracks, to try and hoover up the royalties generated by people listening to them." *See https://www.theguardian.com/music/2025/jun/03/ai-bot-farms-and-innocent-indie-victims-how-music-streaming-became-a-hotbed-of-and-fakery.*

AI-generated music can also garner remarkable consumer attention, including in circumstances where consumers are unaware that they are listening to synthetic music. A band named "Velvet Sundown" captured over one million listeners in just a few weeks, before the band and its music were revealed to be entirely AI-generated. *See https://www.side-line.com/ai-generated-music-is-climbing-the-charts/.* Another fictional band offering AI-generated music accumulated more users in two months than the real band it cited as an influence was able to garner in a decade. *See https://www.rollingstone.com/music/music-news/ai-imitator-spotify-holding-absence-bleeding-verse-1235438985/.* And an entirely made-up "artist" named "Xania Monet" enjoyed 17 million streams during just two months and entered into a $3 million "record contract" – whatever that might mean – that might otherwise have gone to a human artist. *See https://www.billboard.com/pro/ai-artist-record-deals-ethical-sign-xania-monet.*

The surge in AI-generated content has dire consequences for the music community.  Streaming platforms allocate royalties in proportion to the percentage of streams attributable to rightsholders.  AI content that crowds its way onto these services and generates streams – whether legitimately or not – dilutes the pool of royalties and diverts payments away from human artists whose works were used without authorization to create that content.  *See* CO AI Report at 65 (where AI-generated content infiltrates markets, "[r]oyalty pools can also be diluted").  Those artists are thus unwittingly conscripted into undermining their own markets and stripped of incentives to create music when they are so easily replaced by machines that offer an alternative at the touch of a button.  Consider the market for advertising music.  An advertiser can pay a composer/producer a fee to create the theme for a radio spot, or it can go to an AI model trained on that composer's music to generate something sufficiently equivalent for free.  It would be hard to imagine a more substitutional use case.

One study estimates that AI-generated music will be worth a cumulative $42 billion by 2028, with a corresponding loss of 24% of human music creator's revenue.  *See https://www.musicbusinessworldwide.com/market-for-gen-ai-outputs-to-be-worth-over-16bn-annually-by-2028-but-it-could-cannibalize-24-of-music-creators-revenues-cisac-predicts/.*  Record companies and music publishers will see equivalent losses, depriving them of the resources to find and cultivate

new talent.  Beyond measurable diversion of revenue or royalties, the proliferation of AI-generated music saturates an already dense marketplace, distorts digital platform algorithms that recommend music to listeners, and drives "cheap content oversupply" – generic content diluting human artistry.

Moreover, recognizing this kind of market harm comports with the broader purposes of copyright law to stimulate *human* creative authorship.  Copyright law affords authors incentives to produce creative works that "serve the cause of promoting broad public availability of literature, music, and the other arts." *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 431-32 (1984) (citation omitted).  Duplicating copyrighted works *en masse* to generate limitless market substitutes destroys those incentives.  *See Kadrey*, 2025 U.S. Dist. LEXIS 121064788 at * 64 (flooding market with competitive outputs "would reduce the incentive for authors to create").

And it is no answer that the outputs of AI may resemble human artistry.  The substitutional outputs generated by AI are not themselves copyrightable, because they are not the products of human authorship but rather predictive algorithms. *See Thaler v. Perlmutter*, 130 F.4th 1039 (D.C. Cir. 2025) (AI-generated artwork not the product of human authorship and thus deemed uncopyrightable).  Unlike human authors, "machines … do not respond to economic incentives." *Id.* at 1050. Thus, it is no part of copyright law to encourage, much less to exonerate, the

unfettered copying of copyrighted works to generate synthetic substitutes.  Fair use

ensures that copyright protection does not "stifle the very creativity" copyright law

encourages; it lets authors stand on the shoulders of other authors.  It does not,

however, excuse the parasitic use of copyrights to replace them with

uncopyrightable, machine-generated imitations.

## **CONCLUSION**

For the foregoing reasons, the district court's grant of summary judgment

rejecting fair use should be affirmed.

Dated: November 25, 2025        COWAN, LIEBOWITZ & LATMAN, P.C.

By:  */s/ Jonathan Z. King*
Jonathan Z. King (jzk@cll.com)
114 West 47th Street
New York, NY 10036-1525
(212) 790-9200

*Attorneys for Amici Curiae*

## <u>CERTIFICATION OF ADMISSION TO BAR</u>

I, Jonathan Z. King, hereby certify as follows:

1.     I am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

2.     Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that the foregoing is true and correct.

Dated: November 25, 2025                  COWAN, LIEBOWITZ & LATMAN, P.C.

By: */s/ Jonathan Z. King*
Jonathan Z. King (jzk@cll.com)
114 West 47th Street
New York, NY 10036-1525
(212) 790-9200

*Attorneys for Amici Curiae*

## CERTIFICATION OF COMPLIANCE WITH FEDERAL RULE OF APPELLATE PROCEDURE 32(a) AND LOCAL RULE 31.1

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify the following:

This brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because this brief contains 6,455 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii) of the Federal Rules of Appellate Procedure.

This brief complies with the typeface requirements of Rule 32(a)(5) of the Federal Rules of Appellate Procedure and the type style requirements of Rule 32(a)(6) of the Federal Rules of Appellate Procedure because this brief has been prepared in a proportionally spaced typeface using Word for Microsoft 365 in 14 point Times New Roman font.

This brief complies with the electronic filing requirements of Local Rule 31.1(c) because the text of this electronic brief is identical to the text of the paper copies, and a virus detection program the Vipre Virus Protection, version 3.1 was run on the file containing the electronic version of this brief and no viruses have been detected.

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I, Melissa Pickett, hereby certify pursuant to Fed. R. App. P. 25(d) that, on November 25, 2025 the foregoing was filed through the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system. The required copies have been sent to the court on the same date as above.

<u>/s/ Melissa Pickett</u>
Melissa Pickett
Counsel Press