# United States Court of Appeals

*for the*

# Third Circuit

Case No. 25-2153

THOMSON REUTERS ENTERPRISE CENTRE GMBH and
WEST PUBLISHING CORPORATION,

*Plaintiffs-Appellees*,

— v. —

ROSS INTELLIGENCE INC.,

*Defendant-Appellant.*

ON APPEAL FROM AN ORDER OF THE DISTRICT COURT FOR THE DISTRICT
OF DELAWARE IN CASE NO. 1:20-CV-00613, HONORABLE STEPHANOS BIBAS

**AMICUS CURIAE BRIEF FOR
ASSOCIATION OF AMERICAN PUBLISHERS
IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE**

Lucy Grace D. Noyola
ASSOCIATION OF AMERICAN
PUBLISHERS
1730 Pennsylvania Avenue, NW
Suite 300
Washington, DC 20006
Telephone: (202) 220-4546
lnoyola@publishers.org

*Attorney for Amicus Curiae
Association of American Publishers*

COUNSEL PRESS     (800) 4-APPEAL • (387224)

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Third Circuit Local Appellate Rule 26.1.1, the Association of American Publishers, Inc. ("AAP") makes the following disclosure:

AAP is a not-for-profit trade association operated for the purpose of representing its book, journal, and education publisher members on matters of law and policy. AAP has no parent company, and no publicly held company owns any interest in AAP.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES .................................................................................. iii

STATEMENT OF INTEREST ................................................................................1

SUMMARY OF ARGUMENT ..............................................................................2

ARGUMENT ..........................................................................................................5

I.     Fair Use Should Not Frustrate the Framework Established by the
       Constitution and Crafted by Congress............................................................5

II.    Recognizing an AI Training Market Promotes the Purpose of
       Copyright .......................................................................................................7

       A.     Unlicensed Uses of Copyrighted Works for AI Training Is a
              Cognizable Market Harm ....................................................................8

       B.     An AI Training Market for Textual Works Exists and Is
              Expanding...........................................................................................11

       C.     A Licensing Market for AI Training Benefits Both Copyright
              and AI Development ...........................................................................15

III.   AI Training Is Not a Transformative Use of Copyrighted Works ...............17

       A.     Uses That Are Merely Technologically Transformative Are Not
              Legally Transformative .....................................................................18

       B.     Transformativeness Generally Requires a Purpose or Character
              That Relates Back to the Original Work .............................................21

CONCLUSION .....................................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*A&M Records, Inc. v. Napster, Inc.*,
   239 F.3d 1004 (9th Cir. 2001) ..................................................................19

*A.V. v. iParadigms, LLC*,
   562 F.3d 630 (4th Cir. 2009) ................................................... 20, 23

*Am. Geophysical Union v. Texaco Inc.*,
   60 F.3d 913 (2d Cir. 1994)......................................................................10

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*,
   598 U.S. 508 (2023)......................................... 2, 10, 17, 18, 19, 22, 23

*Authors Guild v. Google, Inc.*,
   804 F.3d 202 (2d Cir. 2015)....................................................................20

*Authors Guild, Inc. v. HathiTrust*,
   755 F.3d 87 (2d Cir. 2014)......................................................................20

*Bartz v. Anthropic PBC*,
   787 F. Supp. 3d 1007 (N.D. Cal. 2025)...................................................9

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
   448 F.3d 605 (2d Cir. 2006)......................................................................5

*BMG Music v. Gonzalez*,
   430 F.3d 888 (7th Cir. 2005) ..................................................................11

*Bouchat v. Baltimore Ravens Ltd. P'ship*,
   619 F.3d 301 (4th Cir. 2010) ....................................................................8

*Campbell v. Acuff-Rose Music, Inc.*,
   510 U.S. 569 (1994)........................................ 3, 6, 8, 9, 10, 17, 19, 22

*Disney Enters., Inc. v. VidAngel, Inc.*,
   869 F.3d 848 (9th Cir. 2017)...................................................................19

*Folsom v. Marsh*,
   9 F. Cas. 342 (C.C.D. Mass. 1841) (No. 4901) ....................................6

*Google LLC v. Oracle Am., Inc.*,
   593 U.S. 1 (2021)....................................................................................20

*Hachette Book Grp., Inc. v. Internet Archive*,
115 F.4th 163 (2d Cir. 2024) ...........................................................8, 19

*Harper & Row, Publishers, Inc. v. Nation Enters.*,
471 U.S. 539 (1985)......................................... 5, 7, 8, 10, 11

*Iowa State Univ. Rsch. Found., Inc. v. ABC*,
621 F. 2d 57 (2d Cir. 1980).............................................................7

*Kadrey v. Meta Platforms, Inc.*,
788 F. Supp. 3d 1026 (N.D. Cal. 2025) .................................... 9, 10, 21

*Kelly v. Arriba Soft Corp.*,
336 F.3d 811 (9th Cir. 2003) ....................................................... 20, 23

*Kienitz v. Sconnie Nation LLC*,
766 F.3d 756 (7th Cir. 2014) ...............................................................8

*Kirtsaeng v. John Wiley & Sons, Inc.*,
579 U.S. 197 (2016)...........................................................................15

*Mazer v. Stein*,
347 U.S. 201 (1954)............................................................................5

*New Era Publ'ns Int'l, ApS v. Carol Publ'g Grp.*,
904 F.2d 152 (2d Cir. 1990)...............................................................5

*Perfect 10, Inc. v. Amazon.com, Inc.*,
508 F.3d 1146 (9th Cir. 2007) ..........................................................20

*Princeton Univ. Press v. Mich. Document Servs., Inc.*,
99 F.3d 1381 (6th Cir. 1996) .........................................................8, 10

*Sega Enters. Ltd. v. Accolade, Inc.*,
977 F.2d 1510 (9th Cir. 1992) ...................................................... 20, 23

*Soc'y of the Holy Transfiguration Monastery, Inc. v. Gregory*,
689 F.3d 29 (1st Cir. 2012)..................................................................8

*Sony Comput. Ent., Inc. v. Connectix Corp.*,
203 F.3d 596 (9th Cir. 2000) ....................................................... 20, 23

*SunTrust Bank v. Houghton Mifflin Co.*,
268 F.3d 1257 (11th Cir. 2001) ...................................................... 5-6

**Constitutional Provisions:**

U.S. Const. art. I, § 8, cl. 8 .................................................................1, 5

**Statutes and Regulations:**

17 U.S.C. § 107 .............................................................5, 18, 19, 21-22

37 C.F.R. § 201.40 .................................................................................19

**Other Authorities:**

4 *Nimmer on Copyright* § 13F.08[B] (2025) ..........................................11

*AI Licensing by Copyright Owners*, Copyright Alliance,
    https://tinyurl.com/54ucpbkv (last visited Nov. 24, 2025) ..................12

*AI Training Dataset Market Size, Share, Growth, Trends and Industry Analysis, By
    Type (Text, Image/Video, Audio), By Application (IT, Automotive, Government,
    Healthcare, BFSI, Retail & E-commerce, Others), Regional Insights and
    Forecast From 2025 to 2035*, Business Research Insights (last updated Nov. 3,
    2025), https://tinyurl.com/ysbhfssk ...................................................15

*CCC Announces AI Systems Training License for the External Use of Copyrighted
    Works Coming Soon*, Copyright Clearance Center (Mar. 4, 2025),
    https://tinyurl.com/2ynpbeu9 ..............................................................12

*Condé Nast U.S. Brands to Be Part of Amazon's New Alexa AI Assistant
    Technology*, Condé Nast (Feb. 26, 2025), https://tinyurl.com/5yvrpaf2 ............12

H.R. Rep. No. 94-1476 (1976).................................................................18

Exemption to Prohibition on Circumvention of Copyright Protection Systems for
    Access Control Technologies, 80 Fed. Reg. 65944 (Oct. 28, 2015) ...................19

Federal Rule of Appellate Procedure 29(a)(2)...........................................1

*Generative AI to Become a $1.3 Trillion Market by 2032, Research Finds*,
    Bloomberg (June 1, 2023), https://tinyurl.com/39nj42m7 ...................................16

H. Comm. on the Judiciary, 89th Cong., Supplementary Report of the Register of
    Copyrights on the General Revision of the U.S. Copyright Law: 1965 Revision
    Bill (Comm. Print 1965) ...................................................................19

Hannah Miller & Dina Bass, *Microsoft Signs AI-Learning Deal with News Corp.'s HarperCollins*, Bloomberg (Nov. 19, 2024), https://tinyurl.com/5hzrdz2w.......13

*Introducing the Perplexity Publishers' Program*, Perplexity (July 30, 2024), https://tinyurl.com/4wa8aku5 ...............................................................................13

Jéssica Dutra & Robert Stoner, *Copyright Industries in the U.S. Economy: The 2024 Report*, International Intellectual Property Alliance (2025), https://tinyurl.com/4k23ffay ..................................................................................16

Jonathan M. Barnett, *A "Minority Report" on Antitrust Policy in the Generative AI Ecosystem*, J. Corp. L. (2025) (forthcoming 2026), https://tinyurl.com/29kx2cmy...................................................................................17

Jonathan Gillham, *OpenAI Partnerships List*, Originality.AI (Sep. 22, 2025), https://tinyurl.com/2s47b5dh ................................................................................13

Kyle Wiggers, *Microsoft Starts Paying Publishers for Content Surfaced by Copilot*, TechCrunch (Oct. 1, 2024), https://tinyurl.com/yc2kzxx5...................13

*LexisNexis Launches Nexis+ AI an Advanced Generative AI-Powered Decision Intelligence Platform to Transform Company Research*, LexisNexis (July 17, 2024), https://tinyurl.com/y3ancatb......................................................12

*Meta Platforms to Use Reuters News Content in AI Chatbot*, Reuters (Oct. 25, 2024), https://tinyurl.com/47sfbtmr.......................................................................13

Michael M. Grynbaum & Cade Metz, *The Times and Amazon Announce an A.I. Licensing Deal*, The N.Y. Times (May 29, 2025), https://tinyurl.com/bdeuxdrw................................................................................12

*Microsoft Signs AI-Learning Deal with News Corp.'s HarperCollins*, Bloomberg (Nov. 19, 2024), https://tinyurl.com/5hzrdz2w ..................................................13

Paul Goldstein, *Copyright's Highway: From Gutenberg to the Celestial Jukebox* 202-07 (rev. ed. 2003)............................................................................17

Pierre N. Leval, *Campbell as Fair Use Blueprint?*, 90 Wash. L. Rev. 597 (2015)............................................................................22

Pierre N. Leval, *Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105 (1990)......................................................................19

Press Release, *AAP StatShot Annual Report: Publishing Revenues Totaled $32.5 Billion for Calendar Year 2024*, Association of American Publishers (Aug. 26, 2025), https://tinyurl.com/bdztk8s6....................................................................16

Press Release, Informa PLC (May 8, 2024), https://tinyurl.com/ra95ukx8 ............13

Press Release, *Wiley Launches New Partnership Innovation Program to Deliver AI Advantages for Researchers and Practitioners*, Wiley (Oct. 17, 2024), https://tinyurl.com/mprwau5s ...............................................................13

Press Release, *Wiley Partners with Pi School to Enhance the European Space Agency's AI-Powered Earth Virtual Expert (EVE) Project*, Wiley (Mar. 13, 2025), https://tinyurl.com/3e42r74d ....................................................13

*ProRata AI Signs Partnerships with More than 500 Publications, Giving Gist.ai One of the Largest Licensed Content Libraries in Generative AI Search*, BusinessWire (June 6, 2025), https://tinyurl.com/2s43mcxe .............................13

*ProRata Announces Gist.ai, New AI Search Engine Based Entirely on High-Quality Licensed Content*, BusinessWire (Dec. 9, 2024), https://tinyurl.com/247hurau...............................................................13

*Purr-fectly Informed: Le Chat and AFP Team up to Deliver AI Powered by News, Providing Le Chat Users with Richer, More Reliable and More Accurate Responses*, Mistral (Jan. 16, 2025), https://tinyurl.com/59b55t49 .....................13

Sam Quigley, *News/Media Alliance Announces AI Licensing Partnership with ProRata*, News/Media Alliance (Mar. 26, 2025), https://tinyurl.com/y4ycxcbn ..............................................................13

Sara Fischer, *Dow Jones Expands AI Marketplace to Nearly 5,000 Publishers*, Axios (Feb. 25, 2025), https://tinyurl.com/57tzrcku ..........................................12

Wendy J. Gordon, *Fair Use as Market Failure: A Structural and Economic Analysis of the Betamax Case and Its Predecessors*, 82 Colum. L. Rev. 1600 (1982) ........................................................................11

*Welcoming More Global News Organizations to Perplexity's Publishers' Program*, Perplexity (Dec. 5, 2024), https://tinyurl.com/2u6t9x9e .....................................13

## STATEMENT OF INTEREST

The Association of American Publishers, Inc. ("AAP") is a not-for-profit organization that represents approximately 117 book, journal, and education publishers in the United States on matters of law and policy, advocating for outcomes that incentivize the publication of creative expression, professional content, and learning solutions.[1]  As one of the oldest industries in the Nation, the publishing industry has a direct and compelling interest in the efficacy, administration, and enforcement of federal copyright laws, especially the bundle of exclusive rights that are the foundation of copyright and the basis by which houses of all sizes and sectors create and disseminate a wide array of original works of authorship to the public in furtherance of the Copyright Clause, U.S. Const. art. I, § 8, cl. 8.

Publishers fulfill the goals of copyright by investing substantial time, expertise, and resources in the creation and distribution of new works, including literature, scholarship, professional content, and scientific journals, and also by making available to the public extensive catalogs of previously published works during the term of copyright protection.  From print books to eBooks, audiobooks,

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(2), the parties have consented to the filing of all amicus curiae briefs.  No counsel for any party authored this brief in whole or in part, and no entity or person aside from amicus made a monetary contribution toward the preparation or submission of this brief.

interactive courseware, apps, digital subscription models, and AI training, the publishing industry has both thrived and evolved for more than two centuries in the United States because exclusive rights have remained nimble and adaptable to new technologies, formats, platforms, and delivery models, to the benefit of society.

AAP and its members have an interest in the application of the fair use doctrine as a reasonable limitation on exclusive rights, consistent with the fundamental objectives of copyright law. With the expansion of AI, including generative AI, and corporate practices of acquiring and training books, journals, and other copyrighted content without permission, this case has implications beyond its particular facts. Amicus seeks to ensure that the fair use doctrine is correctly applied to further the purpose of copyright law, which is to encourage the creation and distribution of original works by affording authors and publishers a suite of copyright interests to exercise and enjoy in exchange for economic reward.[2]

## SUMMARY OF ARGUMENT

Copyright is a "powerful engine of creativity"—a key driver for the vast catalogs of American literature and other creative works that are treasured around the world. *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 550 (2023). Marketable exclusive rights have enabled authors and publishers to

---

[2] Amicus takes no position on the issue of copyrightability in this brief.

inform and inspire for generations, and our future society depends on their talents and continued creative contributions.  Under the framework established by the Constitution and crafted by Congress, fair use should apply on a case-by-case basis, with all four factors analyzed "in light of the purposes of copyright." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577-78 (1994).  The fair use doctrine permits limited uses of copyrighted works that do not harm the owners' interests.  But it does not sanction commercial copying of copyrighted works for the development of products or services that compete in the same markets.

AI developers such as ROSS seek a sweeping expansion of fair use for AI training.  Their fair use arguments ignore markets to which rightsholders are fundamentally entitled and are both exploiting and preparing to exploit, and press for a theory of transformativeness premised on technological innovation instead of a use tied to the protected works that justifies the copying.

The evolving and rapidly expanding marketplace for the use of textual works in AI training is a critical part of the fair use analysis.  Fair use does not give a free ride at the copyright owner's expense where a market exists or is likely to develop for AI training.  Recognizing a licensing market for AI training advances the goals of copyright and allows both copyright owners and AI developers to share in the commercial success of AI.

3

The technological innovation of AI is no talisman for fair use, or transformativeness for that matter. AI tools, like ROSS's, exploit creative works for their expressive value and for the same purpose, and do not provide any new information or insights about the works to warrant their taking. Moreover, the current state of AI is but one moment in technological development and not a reason to eliminate copyright principles that have served this country since the 18th century.

If the unlicensed use of copyrighted works for AI training is found to be fair use, copyright owners will be denied compensation and markets that are rightfully theirs. More AI developers will be emboldened to join the corporate theft of copyrighted content. And society as a whole will lose as fewer works are written and published.

Affirmance of the district court's decision against fair use adheres to the fundamental purpose and aims of copyright law. It ensures that exclusive rights remain meaningful and protected. It incentivizes authors and publishers who have invested substantial resources in creating and distributing works to continue their creative labors. And the continued creation and distribution of expressive works inures to the benefit of the public good, as well as AI development.

The unlicensed, unchecked use of copyrighted works for AI training is not fair use. This Court should affirm.

# ARGUMENT

## I.    Fair Use Should Not Frustrate the Framework Established by the Constitution and Crafted by Congress

The Constitution empowers Congress to enact a statutory scheme to encourage and reward individual efforts in the creation and dissemination of creative works through the mechanism of exclusive rights.  U.S. Const. art. I, § 8, cl. 8 (granting Congress the power of securing copyrights to authors to "promote the Progress of Science and useful Arts"); *Mazer v. Stein*, 347 U.S. 201, 219 (1954) (explaining the "economic philosophy behind" the Copyright Clause is "the conviction that encouragement of individual effort by personal gain is the best way to advance public welfare through the talents of authors").  "By establishing a marketable right to the use of one's expression, copyright supplies the economic incentive to create and disseminate ideas." *Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 558 (1985).

The fair use doctrine under 17 U.S.C. § 107 recognizes limited circumstances permitting the unauthorized uses of copyrighted works. Publishers themselves regularly rely on fair use for uses such as displaying copyrighted images for documentary purposes in historical works, *see Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605 (2d Cir. 2006), quoting from copyrighted works for critical biographies, *see New Era Publ'ns Int'l, ApS v. Carol Publ'g Grp.*, 904 F.2d 152 (2d Cir. 1990), and creating critical retellings of fictional works, *see SunTrust*

*Bank v. Houghton Mifflin Co.*, 268 F.3d 1257 (11th Cir. 2001). Fair use should be decided on the facts of each case, with each of the statutory factors considered "in light of the purposes of copyright." *Campbell*, 510 U.S. at 577-78. As a limitation to copyright protection, the doctrine should "avoid rigid application" "when, on occasion, it would stifle the very creativity which [the copyright statute] is designed to foster." *Id.* at 577.

The public interest in promoting the creation and distribution of expression through financial reward is central to the fair use analysis. Original works should not be used merely "to get attention or to avoid the drudgery in working up something fresh." *Id.* at 580. As Judge Story noted almost two centuries ago: "None are entitled to save themselves trouble and expense, by availing themselves, for their own profit, of other men's works, still entitled to the protection of copyright." *Folsom v. Marsh*, 9 F. Cas. 342, 349 (C.C.D. Mass. 1841) (No. 4901).

Congress is the appropriate body to consider how to account for other public interests in copyright law, and courts should be wary about applying public interests that would contravene the Constitutional goals of copyright beyond what Congress provided for in its statutory framework. ROSS, along with its amici, rally around unfettered or increased access to the law. *See* ROSS Br. 2, 52; EFF Br. 4-5, 14-15; Professors Br. 3, 26. But consideration of the interest in increasing knowledge must give deference "to the scheme established by the Copyright Act for fostering the

original works that provide the seed and substance of this harvest," by "assur[ing] contributors to the store of knowledge a fair return for their labors." *Harper*, 471 U.S. at 545-46. The public's interest in the free flow of information is already accounted for by other aspects of the law, such as making facts uncopyrightable. *Id.* at 558 (citing *Iowa State Univ. Rsch. Found., Inc. v. ABC*, 621 F. 2d 57, 61 (2d Cir. 1980)). But the issue here is not whether the public should have greater accessibility to judicial opinions, which are already excluded from copyright protection, but whether fair use extends to copying of expressions about judicial opinions. Courts rebuke the appropriation of expressions of non-copyrightable information: "The fair use doctrine is not a license for corporate theft, empowering a court to ignore a copyright whenever it determines the underlying work contains material of possible public importance." *Harper*, 471 U.S. at 557-58 (quoting *Iowa State*, 621 F.2d at 61).

## II.    Recognizing an AI Training Market Promotes the Purpose of Copyright

Exclusive rights anticipate that mutually beneficial agreements for most uses of copyrighted works will be reached through the marketplace. Fair use is limited to those uses that do not prejudice a copyright owner's markets.

Of the fair use factors, the fourth factor focusing on "the effect of the use upon the potential market for or value of the copyrighted work" is "undoubtedly the single most important element of fair use." *Harper*, 471 U.S. at 566; *accord*

*Hachette Book Grp., Inc. v. Internet Archive*, 115 F.4th 163, 189 (2d Cir. 2024); *Kienitz v. Sconnie Nation LLC*, 766 F.3d 756, 758 (7th Cir. 2014); *Soc'y of the Holy Transfiguration Monastery, Inc. v. Gregory*, 689 F.3d 29, 64 (1st Cir. 2012); *Bouchat v. Baltimore Ravens Ltd. P'ship*, 619 F.3d 301, 312 (4th Cir. 2010); *Princeton Univ. Press v. Mich. Document Servs., Inc.*, 99 F.3d 1381, 1385 (6th Cir. 1996). "Fair use, when properly applied, is limited to copying by others which does not materially impair the marketability of the work which is copied." *Harper*, 471 U.S. at 566-67. Where an actual or potential market exists for licensing works for AI training, courts should consider the effects of an AI developer's unlicensed uses on that market, along with the effects on the incentives to create and distribute works.

## A. Unlicensed Uses of Copyrighted Works for AI Training Is a Cognizable Market Harm

The district court appropriately accounted for the harms caused by ROSS's conduct. The fourth fair use factor requires consideration of "not only the extent of market harm caused by the particular actions of the alleged infringer, but also whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact." *Campbell*, 510 U.S. at 590 (internal quotations omitted). The relevant market harms include both harm to the original work and harm to the market for derivative works. *Id.* Here, the district court was correct in considering the harm to the original copyrighted works (West's headnotes) and the harm to the potential market for those works (AI training data).

Whereas ROSS refuses to accept an AI training market by improperly focusing on West's licensing activities, ROSS Br. 51, its amici argue that AI training is not a cognizable market for fair use by misplacing reliance on two recent district court decisions, *see* Professors Br. 22. The first two cases to confront the use of copyrighted works to train generative AI tools both ruled that rightsholders were not entitled to a market for licensing for AI training—without endeavoring to apply or even acknowledging Supreme Court precedent on market harm when making that ruling. *See Kadrey v. Meta Platforms, Inc.*, 788 F. Supp. 3d 1026, 1052 (N.D. Cal. 2025); *Bartz v. Anthropic PBC*, 787 F. Supp. 3d 1007, 1032 (N.D. Cal. 2025). The *Bartz* court simply deemed that a market for AI training was neither protected by the Copyright Act nor entitled by copyright owners to exploit. 787 F. Supp. 3d at 1032. The *Kadrey* court provided an explanation for its ruling, but it seemed to hinge solely on its finding that AI is transformative. 788 F. Supp. 3d at 1052.

Both cases disregard the Supreme Court's admonition against absolutes when analyzing fair use. Particularly, with respect to *Kadrey*, transformativeness is not determinative of market harm (or its absence). *Campbell* announced no categorical rule rejecting market harm from a transformative use but rather declined to create a presumption or inference of no market harm from a transformative use. *See* 510 U.S. at 591. Two decades later, the Supreme Court continued to eschew a rigid, bright-line rule: While the first factor and transformativeness may relate to the fourth

factor, "the relationship is not absolute." *Warhol*, 598 U.S. at 536 n.12. In finding

that harm from works used for transformative purposes is not cognizable, the *Kadrey*

court impermissibly allowed the tail to wag the dog. *See* 788 F. Supp. 3d at 1052.

Courts should consider whether the market at issue is one that "creators of

original works would in general develop or license others to develop." *Campbell*,

510 U.S. at 592; *see also Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 929-

30 (2d Cir. 1994) (considering markets that are "traditional, reasonable, or likely to

be developed"); *Princeton*, 99 F.3d at 1387 (same). Taking care to note the

complexities that may arise in different cases, the Supreme Court explained that

criticisms and parodies in their purest forms are not protectible markets given the

"unlikelihood" that copyright owners would "license critical reviews or lampoons

of their own productions." *Campbell*, 510 U.S. at 592.

Here, there is no unlikelihood of licensing by copyright owners that would

favor a presumption against market harm from AI applications. As discussed *infra*

Section II.B, rightsholders are not only willing but actually are granting licenses to

AI developers seeking to use copyrighted textual works to build and operate their AI

tools. Fair use should not be used to displace a "fully functioning market that

encourages the creation and dissemination" of creative works. *Harper*, 471 U.S. at

566 n.9. "[To] propose that fair use be imposed whenever the 'social value [of

dissemination] . . . outweighs any detriment to the artist,' would be to propose

depriving copyright owners of their right in the property precisely when they encounter those users who could afford to pay for it." *Id.* at 559 (quoting Wendy J. Gordon, *Fair Use as Market Failure: A Structural and Economic Analysis of the Betamax Case and Its Predecessors*, 82 Colum. L. Rev. 1600, 1615 (1982)).

In addition, evidence of an actual market for licensing textual works for AI training avoids the circularity problem complained of by amici, *see, e.g.*, Authors Alliance Br. 21; Professors Br. 22. The concern with circularity arises only when considering potential or theoretical markets. *See* 4 *Nimmer on Copyright* § 13F.08[B] (2025) (describing the circularity risk arising from the "inquiry into potential markets").

Courts should recognize legitimate licensing channels that have been made available to and accepted by those who wish to access and use copyrighted materials. "Copyright law lets authors make their own decisions about how best to promote their works; copiers . . . cannot ask courts (and juries) to second-guess the market and call wholesale copying 'fair use.'" *BMG Music v. Gonzalez*, 430 F.3d 888, 891 (7th Cir. 2005).

**B.    An AI Training Market for Textual Works Exists and Is Expanding**

Books, scholarly journal articles, analyses of legal opinions, and other textual works are incredibly valuable as training materials for AI developers. Published

works provide high-quality sources of text for AI training because they undergo a rigorous editorial process, are rich in expressive content, and cover diverse topics.

A viable market for copyrighted works as AI training materials has emerged with the advent of AI. The Copyright Clearance Center, which has long provided a wide range of licensing solutions, introduced collective licenses designed for AI systems in early 2025. *CCC Announces AI Systems Training License for the External Use of Copyrighted Works Coming Soon*, Copyright Clearance Center (Mar. 4, 2025), https://tinyurl.com/2ynpbeu9. Direct licensing deals between copyright owners and AI developers frequently have been announced. *See AI Licensing by Copyright Owners*, Copyright Alliance, https://tinyurl.com/54ucpbkv (last visited Nov. 24, 2025). The chart below lists publicly-reported licensing agreements for textual works, including with Amazon,[3] Dow Jones,[4] LexisNexis,[5]

---

[3] *See, e.g.*, *Condé Nast U.S. Brands to Be Part of Amazon's New Alexa AI Assistant Technology*, Condé Nast (Feb. 26, 2025), https://tinyurl.com/5yvrpaf2; Michael M. Grynbaum & Cade Metz, *The Times and Amazon Announce an A.I. Licensing Deal*, The N.Y. Times (May 29, 2025), https://tinyurl.com/bdeuxdrw.

[4] *See, e.g.*, Sara Fischer, *Dow Jones Expands AI Marketplace to Nearly 5,000 Publishers*, Axios (Feb. 25, 2025), https://tinyurl.com/57tzrcku.

[5] *LexisNexis Launches Nexis+ AI an Advanced Generative AI-Powered Decision Intelligence Platform to Transform Company Research*, LexisNexis (July 17, 2024), https://tinyurl.com/y3ancatb.

Meta,[6] Microsoft,[7] Mistral,[8] OpenAI,[9] Perplexity,[10] Pi School,[11] Potato,[12] and

ProRata[13]:

---

[6] *Meta Platforms to Use Reuters News Content in AI Chatbot*, Reuters (Oct. 25, 2024), https://tinyurl.com/47sfbtmr.

[7] *See, e.g.*, Kyle Wiggers, *Microsoft Starts Paying Publishers for Content Surfaced by Copilot*, TechCrunch (Oct. 1, 2024), https://tinyurl.com/yc2kzxx5; Hannah Miller & Dina Bass, *Microsoft Signs AI-Learning Deal with News Corp.'s HarperCollins*, Bloomberg (Nov. 19, 2024), https://tinyurl.com/5hzrdz2w; Press Release, Informa PLC 3 (May 8, 2024), https://tinyurl.com/ra95ukx8.

[8] *Purr-fectly Informed: Le Chat and AFP Team up to Deliver AI Powered by News, Providing Le Chat Users with Richer, More Reliable and More Accurate Responses*, Mistral (Jan. 16, 2025), https://tinyurl.com/59b55t49.

[9] Jonathan Gillham, *OpenAI Partnerships List*, Originality.AI (Sep. 22, 2025), https://tinyurl.com/2s47b5dh.

[10] *See, e.g., Introducing the Perplexity Publishers' Program*, Perplexity (July 30, 2024), https://tinyurl.com/4wa8aku5; *Welcoming More Global News Organizations to Perplexity's Publishers' Program*, Perplexity (Dec. 5, 2024), https://tinyurl.com/2u6t9x9e.

[11] Press Release, *Wiley Partners with Pi School to Enhance the European Space Agency's AI-Powered Earth Virtual Expert (EVE) Project*, Wiley (Mar. 13, 2025), https://tinyurl.com/3e42r74d.

[12] Press Release, *Wiley Launches New Partnership Innovation Program to Deliver AI Advantages for Researchers and Practitioners*, Wiley (Oct. 17, 2024), https://tinyurl.com/mprwau5s.

[13] *See, e.g., ProRata AI Signs Partnerships with More than 500 Publications, Giving Gist.ai One of the Largest Licensed Content Libraries in Generative AI Search*, BusinessWire (June 6, 2025), https://tinyurl.com/2s43mcxe; *ProRata Announces Gist.ai, New AI Search Engine Based Entirely on High-Quality Licensed Content*, BusinessWire (Dec. 9, 2024), https://tinyurl.com/247hurau; Sam Quigley, *News/Media Alliance Announces AI Licensing Partnership with ProRata*, News/Media Alliance (Mar. 26, 2025), https://tinyurl.com/y4ycxcbn.

| Licensee | Content Owner |
|----------|---------------|
| Amazon | The Associated Press |
| | Business Insider |
| | Condé Nast |
| | Forbes |
| | Hearst |
| | The New York Times |
| | Politico |
| | Reuters |
| | TIME |
| | USA Today |
| | Vox |
| | The Washington Post |
| Dow Jones | The Associated Press |
| | The Wall Street Journal |
| | The Washington Post |
| LexisNexis | The Associated Press |
| Meta | Reuters |
| Microsoft | Axel Springer |
| | Financial Times |
| | HarperCollins |
| | Hearst |
| | Reuters |
| | Taylor & Francis |
| | USA Today |
| Mistral | Agence France-Presse |
| OpenAI | American Journalism Project |
| | The Associated Press |
| | The Atlantic |
| | Axel Springer |
| | Axios |
| | Condé Nast |
| | Dotdash Meredith |
| | Financial Times |
| | GEDI |
| | Guardian Media Group |

| Licensee | Content Owner |
|----------|---------------|
| OpenAI (cont.) | Hearst |
| | Le Monde |
| | News Corp |
| | Prisa Media |
| | Schibsted Media Group |
| | TIME |
| | Vox Media |
| | The Washington Post |
| Perplexity | Adweek |
| | Fortune |
| | The Independent |
| | The Los Angeles Times |
| | TIME |
| Pi School | Wiley |
| Potato | Wiley |
| ProRata.ai | Adweek |
| | The Atlantic |
| | Atlas Obscura |
| | Arena Group |
| | Axel Springer |
| | Buzzfeed |
| | DMG Media Group |
| | Financial Times |
| | Fortune |
| | Guardian Media Group |
| | Hello! |
| | Mediahuis |
| | Mumsnet |
| | News/Media Alliance (on behalf of its members) |
| | Prospect |
| | Reach PLC |
| | Sky Media Group |
| | TIME |
| | Vox Media |

As shown above, the market for licensing textual works for AI training is not hypothetical and no longer a potential market. Licensing for AI training is an actual market that is rapidly expanding—to the tune of $6 billion today and $52.4 billion in a decade. *See AI Training Dataset Market Size, Share, Growth, Trends and Industry Analysis, By Type (Text, Image/Video, Audio), By Application (IT, Automotive, Government, Healthcare, BFSI, Retail & E-commerce, Others), Regional Insights and Forecast From 2025 to 2035*, Business Research Insights (last updated Nov. 3, 2025), https://tinyurl.com/ysbhfssk.

### C.     A Licensing Market for AI Training Benefits Both Copyright and AI Development

As the Supreme Court has explained: "[C]opyright law ultimately serves the purpose of enriching the general public through access to creative works. The statute achieves that end by striking a balance between two subsidiary aims: encouraging and rewarding authors' creations while also enabling others to build on that work." *Kirtsaeng v. John Wiley & Sons, Inc.*, 579 U.S. 197, 204 (2016) (internal citations and quotation marks omitted). Recognizing a licensing market for AI training promotes the purpose of copyright in several ways.

First and foremost, licensing encourages and rewards creativity and the dissemination of both new and previously published works by providing compensation to both authors and publishers. The U.S. publishing industry supports an extensive network of American businesses and thousands of jobs, with books and

course materials generating $32.5 billion for 2024.  Press Release, *AAP StatShot Annual Report: Publishing Revenues Totaled $32.5 Billion for Calendar Year 2024*, Association of American Publishers (Aug. 26, 2025), https://tinyurl.com/bdztk8s6. The publishing industry is an integral part of broader U.S. copyright industries, which in 2024 collectively contributed more than $2 trillion to the U.S. gross domestic product.  Jéssica Dutra & Robert Stoner, *Copyright Industries in the U.S. Economy: The 2024 Report*, International Intellectual Property Alliance 8 (2025), https://tinyurl.com/4k23ffay.  The revenues publishers earn through the licensing and distribution of their works is used to compensate authors and invest in the next generation of books and other expressive works.

Second, licensing provides AI developers authorized access to human-created works and high-quality training materials.  AI technology depends on vast quantities of copyrighted content to effectively build and operate their models.  *See* ROSS Br. 3.  The generative AI market alone is projected to grow to $1.3 trillion in less than 10 years.  *Generative AI to Become a $1.3 Trillion Market by 2032, Research Finds*, Bloomberg (June 1, 2023), https://tinyurl.com/39nj42m7.  For AI to flourish as forecasted, licensing is needed to ensure that the well of human creation does not run dry.

Third, licensing enables a competitive and innovative ecosystem built upon copyrighted works.  "[I]n an environment with weak IP rights, the content and data

production segments of the AI industry are likely to experience higher entry costs and increased concentration since those functions can only be supported when embedded within integrated structures that necessitate increased capital and technical requirements." Jonathan M. Barnett, *A "Minority Report" on Antitrust Policy in the Generative AI Ecosystem*, J. Corp. L. (2025) (forthcoming 2026), https://tinyurl.com/29kx2cmy. Without licensing, participation in AI innovation would be limited to only large, well-integrated firms that have the funds and infrastructure to acquire and build massive training datasets. Licensing is pro-competitive because it lowers barriers to entry and expands access to copyrighted materials to more AI developers. Stronger copyright protection also "may galvanize the market forces needed to reduce transaction costs," such as offering pricing options based on customer usage to creating voluntary collective licensing schemes, Paul Goldstein, *Copyright's Highway: From Gutenberg to the Celestial Jukebox* 202-07 (rev. ed. 2003), thus promoting the permissioned use of copyrighted works to more market participants.

## III.    AI Training Is Not a Transformative Use of Copyrighted Works

A central inquiry of the first fair use factor, "the purpose and character of the use," is whether the new use supersedes the original work or if it is transformative. *Campbell*, 510 U.S. at 578-79. Transformativeness considers the degree to which the new use has a further purpose or different character, *Warhol*, 598 U.S. at 529,

but does not turn on whether or to what extent the use is innovative, *id.* at 543 n.18. To be transformative—and thus justified—under copyright law, a use should relate back to the original work by providing new information or insights about that work. AI tools exploit the expressive elements of copyrighted works without justification.

## A. Uses That Are Merely Technologically Transformative Are Not Legally Transformative

The fair use doctrine is intended to adapt—not yield—to changes in technology. The Copyright Act of 1976, including § 107, was enacted during a period of rapid technological developments. H.R. Rep. No. 94-1476, at 66 (1976). Congress expected copyright protection to encompass new, and not yet understood, technologies; the amendments were necessary in part because "technical advances have generated new industries and new methods for the reproduction and dissemination of copyrighted works." *Id.* at 47. The statute thus was designed with broad, technologically neutral rights and specific exceptions so that copyright owners could presumptively retain their exclusive rights even over new technological uses:

> A real danger to be guarded against is that of confining the scope of an author's rights on the basis of the present technology so that, as the years go by, his copyright loses much of its value because of unforeseen technical advances.
>
> For these reasons, we believe that the author's rights should be stated in the statute in broad terms, and that the specific limitations on them should not go any further than is shown to be necessary in the public interest.

18

H. Comm. on the Judiciary, 89th Cong., Supplementary Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law: 1965 Revision Bill 14 (Comm. Print 1965).

"Transformative" appears nowhere in the text of § 107. Whether a use is transformative is a judicially-created doctrine that is just one aspect of one factor of the four-factor fair use test. *See Campbell*, 510 U.S. at 578-79 (citing Pierre N. Leval, *Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105, 1111 (1990)). Transformativeness thus should not dictate the fair use analysis.

Using copyrighted works merely to produce something new or technologically advanced neither amounts to fair use nor decides the issue of transformativeness. *See Warhol*, 598 U.S. at 543 n.18 ("The Court did not hold that any secondary use that is innovative, in some sense, . . . is thereby transformative."). For example, technological processes that convert copyrighted works into a different form or medium are not transformative for purposes of fair use. *See, e.g.*, *Hachette*, 115 F.4th at 181-82 (digitizing books); *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 861-62 (9th Cir. 2017) (formatting movies for streaming); *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1015 (9th Cir. 2001) (downloading digital MP3 files from CDs); Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, 80 Fed. Reg. 65944, 65960 (Oct. 28, 2015) (codified at 37 C.F.R. § 201.40) (space-shifting and format-shifting).

ROSS's reliance on fair use cases involving technological advances in copying is misplaced. *See* ROSS Br. 40-42. None of those cases addressed copying that exploited or depended on the expressive content of the original works. *See, e.g., Authors Guild v. Google, Inc.*, 804 F.3d 202, 224-25 (2d Cir. 2015); *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 97-98 (2d Cir. 2014); *A.V. v. iParadigms, LLC*, 562 F.3d 630, 638-40 (4th Cir. 2009); *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1164-68 (9th Cir. 2007); *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 818-20 (9th Cir. 2003).

Fair use cases involving computer programs do not help ROSS either. *See* ROSS Br. 44-46. The purpose of the copying in those cases was to access non-protected, functional parts of computer programs for facilitating software interoperability. *See Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 30-32 (2021); *Sony Comput. Ent., Inc. v. Connectix Corp.*, 203 F.3d 596, 603-07 (9th Cir. 2000); *Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1522, 1524-26 (9th Cir. 1992). Whereas in those cases, the non-protected information could be accessed only by copying copyrighted content, the same cannot be said of AI training on textual works. ROSS's professed interest in only judicial opinions rings hollow because it already had access to the law and did not need to copy protected content.

Rather, ROSS's aim, as with many AI tools, was to extract the expression of original works and represent them in a different form for the same purpose as the

original works: to explain, organize, and synthesize judicial opinions for those seeking to find and understand the law. *See* TR Br. 5, 7-9; ROSS Br. 10 ("ROSS had developed an AI model that captured *meaning* . . . ."). In ROSS's AI training process, copyrighted content is captured, broken down into usable segments or "tokenized," and converted into "numerical representations" that reflect the "relationship[s] between words." ROSS Br. 11-13. This entire process takes from text the very essence of their expression.[14] Creating a technological tool to achieve the same purpose of the original works does not constitute a transformative use under copyright law.

## B. Transformativeness Generally Requires a Purpose or Character That Relates Back to the Original Work

Transformativeness may not be analyzed in a vacuum. To be transformative, a use should have a compelling justification for the copying or otherwise have a different purpose or character that directly refers or relates back to the original work. AI training does not accomplish this.

The Copyright Act identifies classic examples of fair uses that convey something new or different by providing insight or information about the original work or making the original expression an object of the new work. *See* 17 U.S.C.

---

[14] Because statistical relationships between words and concepts "are the product of creative expression," AI's use of copyrighted works for their expressive value also weighs against the second fair use factor. *See Kadrey*, 788 F. Supp. 3d at 1049.

§ 107 (referring to criticism, comment, news reporting, teaching, scholarship, and research).  As Judge Leval observed, the purpose of transformative copying that results in fair use is "ordinarily to communicate some kind of commentary *about* the original or provide information *about* it."  Pierre N. Leval, *Campbell as Fair Use Blueprint?*, 90 Wash. L. Rev. 597, 609-10 (2015).

*Campbell* instructs that, if a new work "has no critical bearing on the substance or style of the original composition, which the alleged infringer merely uses to get attention or to avoid the drudgery in working up something fresh, the claim to fairness in borrowing from another's work diminishes accordingly (if it does not vanish)."  510 U.S. at 580.  While the Supreme Court at the time was distinguishing between parody and satire, these teachings from *Campbell* carried through in other contexts in *Warhol*.  *See, e.g.*, 598 U.S. at 530-32, 546-47.  Citing *Campbell*, *Warhol* clarified that a fair use should "target" the original work or otherwise provide a "compelling justification for the use."  *Id.* at 540; *see also id.* at 532 (discussing parody's "need[] to mimic an original to make its point" and "commentary or criticism that targets an original work" as permissible justifications); *id.* at 547 n.21 (addressing why targeting matters).  The fair use claim in that case fell away where the new works lacked any critical bearing on, and did not "comment on, criticize, or otherwise target," the original photograph. *Id.* at 546-47 & n.20.

Notably, in other cases involving technologically-driven copying, fair use was found where the new uses directly referred or related back to the original works. In particular, copying enabled technological tools to convey information *about* the copyrighted works. *See, e.g.*, *Kelly*, 336 F.3d at 815-16, 818-19 (displaying thumbnails of images as links to works); *iParadigms*, 562 F.3d at 638 (detecting plagiarism of students' written works). Even in cases where copying of copyrighted software was deemed necessary to access functional, non-protected elements of the software—thus providing sufficient justification for the new use, *see Warhol*, 598 U.S. at 533 n.8, 547 n.21—the original software was the object of the new use and was marketed as such, *see Sony*, 203 F.3d at 598 (noting that purpose was to "emulate" the functioning of the Sony PlayStation console); *Sega*, 977 F.2d at 1522 (considering purpose to release "Genesis-compatible games").

AI training uses are not transformative because they do not provide information or commentary about the original works on which they are trained. The author's original expressive choices are extracted and embedded into the model's internal representation, not to analyze them, but to capitalize on them. Indeed, AI tools typically are black boxes—providing little to no transparency about the materials and datasets used for training or outputs yet exploiting them for all their expressive value.

## CONCLUSION

The Court should affirm the district court's summary judgment that ROSS's use of copyrighted works for AI training is not fair use.

Dated:  November 25, 2025

s/ Lucy Grace D. Noyola
Lucy Grace D. Noyola (DC 985723)
ASSOCIATION OF AMERICAN
PUBLISHERS
1730 Pennsylvania Avenue, NW
Suite 300
Washington, DC 20006
Telephone: (202) 220-4546
lnoyola@publishers.org

*Attorney for Amicus Curiae*
*Association of American Publishers*

## CERTIFICATE OF BAR ADMISSION AND COMPLIANCE

I hereby certify to the following:

Pursuant to Local Appellate Rule 28.3(d), I am a member in good standing of the bar of the Court of Appeals for the Third Circuit. Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that the foregoing is true and correct.

Pursuant to Federal Rules of Appellate Procedure 29(a)(5), 32(a)(7)(B)(i), and 32(g)(1), this brief complies with the type-volume limitation. This brief contains 5,423 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

Pursuant to Local Appellate Rule 31.1(c), the text of the electronic brief filed with the Court is identical to the text in the paper copies.

Pursuant to Local Appellate Rule 31.1(c), the electronic brief filed with the Court was scanned for viruses using Vipre Virus Protection, version 3.1, and no virus was detected.

Dated: November 25, 2025

*s/ Lucy Grace D. Noyola*
Lucy Grace D. Noyola
ASSOCIATION OF AMERICAN
PUBLISHERS
1730 Pennsylvania Avenue, NW
Suite 300
Washington, DC 20006
Telephone: (202) 220-4546
lnoyola@publishers.org

*Attorney for Amicus Curiae*
*Association of American Publishers*

**CERTIFICATE OF SERVICE**

Pursuant to Federal Rule of Appellate Procedure 25(d), I hereby certify that on November 25, 2025, I caused the foregoing brief to be filed with the Clerk of the Court for the United States Court of Appeals for the Third Circuit, using the CM/ECF system.  I further certify that, to my knowledge, all parties in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

*s/ Lucy Grace D. Noyola*
Lucy Grace D. Noyola