# United States Court of Appeals

*for the*

# Third Circuit

Case No. 25-2153

THOMSON REUTERS ENTERPRISE CENTRE GMBH;
WEST PUBLISHING CORP.,

*Plaintiffs-Appellees,*

— v. —

ROSS INTELLIGENCE INC.,

*Defendant-Appellant.*

ON APPEAL FROM AN ORDER OF THE UNITED STATES
DISTRICT COURT FOR THE DISTRICT OF DELAWARE

## BRIEF OF *AMICUS CURIAE* RELX, INC. IN SUPPORT OF PLAINTIFFS-APPELLEES

BROOKE R. WATSON
TROUTMAN PEPPER LOCKE LLP
301 South College Street, 34th Floor
Charlotte, North Carolina 28202
(704) 998-4079

MICHAEL D. HOBBS, JR.
AUSTIN PADGETT
TROUTMAN PEPPER LOCKE LLP
600 Peachtree Street, NE, Suite 3000
Atlanta, Georgia 30308
(404) 885-3000

*Attorneys for Amicus Curiae RELX, Inc.*

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Third Circuit Local Appellate Rule 26.1(b), *amicus curiae* RELX, Inc. is a wholly owned subsidiary of RELX Overseas Holdings Limited. RELX Overseas Holdings Limited is a wholly owned subsidiary of RELX (Holdings) Limited. RELX (Holdings) Limited is a wholly owned subsidiary of RELX Group plc. RELX Group plc is a wholly owned subsidiary of RELX PLC, a public limited company, incorporated in the United Kingdom.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ...........................................................i

TABLE OF AUTHORITIES ................................................................. iii

INTEREST OF *AMICUS CURIAE* ...........................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ......................................2

ARGUMENT ......................................................................................7

    I.     Legal Precedent Affirms That Headnote Annotations of Legal Materials Created by Private Parties Are Copyrightable. ....................7

    II.    Each Headnote Is a Copyrightable Work Because They Are Original and Creative. .......................................................................10

    III.   Use of Headnotes by An Unauthorized Party Will Limit the Public's Access To These Valuable Legal Research Tools. ...............17

CONCLUSION .................................................................................24

CERTIFICATE OF COMPLIANCE ....................................................26

# TABLE OF AUTHORITIES

**Page**

## Cases

*Brown v. Bd. of Ed. of Topeka, Shawnee Cnty., Kan.*, 347 U.S. 483 (1954)...........13

*Callaghan v. Myers*, 128 U.S. 617 (1888) .......................................................... 8, 19

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994).....................................21

*Davis v. Gap, Inc.*, 246 F.3d 152 (2d Cir. 2001) ....................................................22

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340 (1991) ............................10

*Georgia v. Public.Resource.Org, Inc.*, 590 U.S. 265 (2020)......................... 7, 9, 18

*Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539 (1985) ........ passim

*Howell v. Miller*, 91 F. 129 (6th Cir. 1898) ..............................................................8

*Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945) ...............................................16

*Kregos v. Associated Press*, 937 F.2d 700 (2d Cir. 1991)......................................16

*Lawrence v. Dana*, 15 F. Cas. 26 (C.C.D. Mass. 1869) ...........................................8

*Matthew Bender & Co., Inc. v. West Publ'g Co.*, 158 F.3d 674 (2d Cir. 1998) ....................................................................................................................11

*Mazer v. Stein*, 347 U.S. 201 (1954)................................................................. 7, 20

*Miranda v. Arizona*, 384 U.S. 436 (1966) ..............................................................14

*New York Times Co. v. Sullivan*, 376 U.S. 254 (1964)...........................................15

*Oracle Am., Inc. v. Google Inc.*, 750 F.3d 1339 (Fed. Cir. 2014) ..........................16

*Pennoyer v. Neff*, 95 U.S. 714 (1877) .....................................................................15

*Princeton Univ. Press v. Mich. Document Servs., Inc.*, 99 F.3d 1381 (6th Cir. 1996) ............................................................................................21

*Schroeder v. William Morrow & Co.*, 566 F.2d 3 (7th Cir. 1977) .........................17

*W. Pub. Co. v. Mead Data Cent., Inc.*, 799 F.2d 1219 (8th Cir. 1986) ...................9

*W.H. Anderson Co. v. Baldwin Law Pub. Co.*, 27 F.2d 82 (6th Cir. 1928)..............8

*Wadsworth v. Walmart Inc.*, 348 F.R.D. 489 (D. Wyo. 2025) ...............................21

*Wheaton v. Peters*, 33 U.S. 591 (1834) ...................................................................8

**Statutes**

17 U.S.C. §107(4) ...................................................................................................19

Code of Ala., tit. 7, §§ 908–917............................................................................15

**Other Authorities**

Alabama Law, *Prepare to Practice Resources*, https://guides.library.law.ua.edu/c.php?g=1228537&p=10220794 .............18

Copyright Office, *Compendium of U.S. Copyright Office Practices* §§ 313.6(C)(2), 717.1 (3d ed. 2021), *available at* https://www.copyright.gov/comp3/docs/compendium.pdf ............................9

Jill Sturgeon, *Bloomberg's Point of Law: Can They Compete with Headnotes?*, Colo. Law, Aug./Sept. 2018, available at https://scholar.law.colorado.edu/articles/1178/ ............................................18

LexisNexis, *Case Law & Shepard's® Editorial Process*, https://www.lexisnexis.com/pdf/LexisNexis_Case_Law_Shepards_29 _Step_Editorial_Process.pdf.......................................................... 2, 11, 12

LexisNexis, *Headnotes in Legal Research: LexisNexis Guide*, https://supportcenter.lexisnexis.com/app/answers/answer_view/a_id/1 094669/~/overview-and-frequently-asked-questions-about-headnotes- 17, 18

Loyola University Chicago School of Law Library, *Basic Legal Research: Case Law*, https://lawlibguides.luc.edu/firstyearlegalresearch/caselaw ........8

Stanford Law School, *Case Finding and Advanced Searching Strategies*, https://guides.law.stanford.edu/cases/headnotes ...........................................18

Susan Nevelow Mart, *The Relevance of Results Generated by Human Indexing and Computer Algorithms: A Study of West's Headnotes and Key Numbers and LexisNexis's Headnotes and Topics*, 102 Law Libr. J. 221 (2010) ................................................................................................13

U.S. Copyright Office, *Public Records System*, http://bit.ly/2VTNDI9...................9

**Rules**

Fed. R. App. P. 29(a)(2)..............................................................................1

Fed. R. App. P. 29(a)(4)(e) ........................................................................1

## INTEREST OF *AMICUS CURIAE*[1]

RELX, Inc. d/b/a LexisNexis ("LexisNexis") operates one of the world's largest legal research platforms in a similar manner to its competitor Plaintiffs-Appellees Thomson Reuters Enterprise Centre GmbH and West Publishing Corporation (collectively, "Plaintiffs-Appellees"). Customers pay to access case law, state and federal statutes, state and federal regulations, law journals, and treatises through end-user licenses. LexisNexis also creates, manages, publishes, and licenses editorial case law headnote annotations that summarize key points of law and case holdings ("LexisNexis Headnotes"). LexisNexis owns copyright registrations issued by the U.S. Copyright Office for the LexisNexis Headnotes just as Plaintiffs-Appellees own copyright registrations for their headnote annotations ("Westlaw Headnotes") issued by the U.S. Copyright Office. As the creator, publisher, and owner of the LexisNexis Headnotes, LexisNexis has unique knowledge regarding the issues in this case and has a strong interest in this Court's review of the District Court's Order granting partial summary judgment, as well as the decision of this Court.

---

[1] *Amicus curiae* has obtained consent from counsel for all parties to file a brief under Fed. R. App. P. 29(a)(2). Under Fed. R. App. P. 29(a)(4)(e), *amicus curiae* affirms that no counsel for a party authored this brief in whole or in part, and no party or counsel for a party made a monetary contribution to fund the preparation or submission of this brief. No person or entity other than *amicus curiae* or its counsel made a monetary contribution to the brief's preparation or submission.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Although LexisNexis and Plaintiffs-Appellees are competitors in the legal research publishing field, LexisNexis agrees that the District Court's decision affirming the long line of cases holding that copyright law protects the Westlaw Headnotes correctly interprets copyright law and properly protects an open and thriving market for the creation of legal annotations by private publishers, which benefits the public's access to and understanding of the law.

The necessary consequences of reversing the District Court's holding will lead to private publishers no longer offering headnote annotations like those offered by LexisNexis and Plaintiffs-Appellees. The District Court's decision thus benefits private legal research platform, while strengthening the core purpose of copyright law and the public interest in legal research and education.

As the District Court properly held, the issue in this case is not the copying of judicial opinions by Ross Intelligence, Inc. ("Defendant-Appellant"), but rather the copying of Westlaw Headnotes. Editorial headnote annotations provide a public-facing bridge between complex judicial opinions and the communities who must understand and apply them: judges, practitioners, students, journalists, and pro se litigants. *See* LexisNexis, *Case Law & * Shepard's® *Editorial Process*, https://www.lexisnexis.com/pdf/LexisNexis_Case_Law_Shepards_29_Step_Editorial_Process.pdf (last visited November 13, 2025) [hereinafter "*Case Law EP*"]. By

distilling controlling holdings, locating issues within an established taxonomy, and articulating rules in accessible prose, headnotes reduce the time, cost, and error associated with legal research. This lowers barriers to entry for smaller firms and self-represented parties, promotes more uniform application of the law, and enhances courts' efficiency by directing them to the precise passages that matter most. Editorial headnotes also advance legal education by translating technical reasoning into clear summaries, helping students, journalists, and non-specialists understand a case decision. In an era of information overload, this clarity is valuable infrastructure that enables accurate and timely engagement with the law.

The creation of these headnote annotations is an expensive, human-intensive endeavor that demands legal training and judgment. Editors read and synthesize judicial decisions, as well as relevant statutes and other primary and secondary sources, and they make thoughtful, creative judgments in drafting the headnote annotations' contents. Consistent with these hallmarks of authorship, courts and the U.S. Copyright Office have long recognized that the expressive elements of editorial materials—textual summaries and the selection, coordination, and arrangement of legal information—are protected by copyright. That protection leaves ideas, rules, and case opinions in the public domain, but safeguards the editors' original wording and organizational judgments, thereby preserving incentives to invest in the high-cost, high-skill work that makes the public-domain law intelligible and usable.

Indeed, for these reasons, courts have long established that individual headnote annotations and the arrangement of those headnote annotations, whether in the form of LexisNexis Headnotes or Westlaw Headnotes, are protected by copyright, and the U.S. Copyright Office has confirmed this by issuing registrations protecting them. *See* Section I, *infra*.

The primary commercial value that LexisNexis, Plaintiffs-Appellees, and other publishers derive from the creation of these headnote annotations results from end-user licenses with individuals and professional organizations to access their legal research platforms. Users do not purchase headnotes as a standalone commodity; they license the right to use a curated, continuously updated knowledge system in which expressive annotations are central: they drive search relevance, organize doctrine within a proprietary taxonomy, link issues across authorities, and integrate with citators, analytics, and workflow tools. Renewal and adoption decisions by firms, courts, law schools, and corporate legal departments turn on this editorial layer's quality, consistency, and coverage, which materially reduces research time, error, and risk. This licensing model reflects the economics of editorial production. Creating and maintaining headnotes requires sustained human judgment—reading opinions, selecting and characterizing issues, drafting concise summaries, classifying topics, ordering propositions, and cross-referencing authorities—followed by rigorous quality control and continual updates as the law

evolves.  That the LexisNexis Headnotes and the Westlaw Headnotes often vary considerably even though they arise from the same court opinion reflects that there is not simply one rote, mechanistic process that yields identical headnote annotations.  Rather, the creative process is different for each private legal publisher, which results in different products that courts and the U.S. Copyright Office have recognized are entitled to copyright protection.

Licensing fees are the mechanism by which the costs of those creative are recouped, and future investment is funded; the value of the headnote annotations is realized when authorized users gain platform access under contractual terms that ensure reliability, security, and responsible use.

The District Court's decision reaffirms the rights of private legal publishers, whether those created by LexisNexis, or Plaintiff-Appellees, or any other publisher, to protect their headnote annotations.  It also upholds their rights to derive value from these headnote annotations' distribution to interested citizens through licenses to their respective legal research platforms.

If the District Court's holding is reversed and headnote annotations could then be copied by competitors at no cost and used to create legal research tools powered by artificial intelligence ("AI") by groups such as Defendant-Appellant, LexisNexis's ability to recoup the substantial costs of the headnote annotations' creation would be destroyed.  This will inevitably lead to the discontinuance of the

creation of such headnote annotations and the valuable end-user licenses permitting access to the same, causing needless harm to the public. Permitting uncompensated appropriation would distort competition by privileging copyists over creators and hollowing out the incentive structure that sustains rigorous editorial review, quality control, and continuous updates. It would also flood the market with uncurated AI outputs lacking accountability and provenance, increasing research errors and doctrinal drift—harms felt most acutely by courts, small practitioners, and pro se litigants.

Defendant-Appellant has provoked fears of apocalyptic doom that, if Plaintiffs-Appellees prevail in this case, they will be granted a monopoly in the law. That LexisNexis and Plaintiffs-Appellees are ardent competitors in the private legal publishing business confirms that fair and honest competition to create headnote annotations assisting the public in understanding the law is not just possible but occurs every day. That a competitor of Plaintiffs-Appellees would appear in this case in support of the legal positions of Plaintiffs-Appellees confirms that the Defendant-Appellant's premise that allowing copyright protection for the creative process of authoring headnote annotations would grant Plaintiffs-Appellees a monopoly in the law is simply false. This Court should affirm the District Court's findings on summary judgment, making clear that these publicly beneficial headnote annotations have the full protections of U.S. copyright law.

**ARGUMENT**

**I.    Legal Precedent Affirms That Headnote Annotations of Legal Materials Created by Private Parties Are Copyrightable.**

"The economic philosophy behind the [Copyright Clause] empowering Congress to grant . . . copyrights is the conviction that encouragement of individual effort by personal gain is the best way to advance public welfare through the talents of authors and inventors in 'Science and useful Arts.'" *Mazer v. Stein*, 347 U.S. 201, 219 (1954) (quoting U.S. Const., Art. I, § 8, cl. 8).  That incentive structure applies with particular force to editorial headnote annotations, which embody human judgment and expressive synthesis. The District Court properly recognized this, instructing that, "copyrights encourage people to develop things that help society, like good research tools. Their builders earn the right to be paid accordingly." D.I. 770 ("Op.") 23.

Precedential opinions draw this consistent line: while judicial opinions and other edicts of government remain in the public domain, privately authored explanatory and educational materials are protected to the extent they contain original expression.  *See e.g.*, *Georgia v. PublicResource.org*, 590 U.S. 255, 265 (2020) (recognizing that the Supreme Court has long "upheld the reporter's interest in several explanatory materials" including "headnotes"). Indeed, Loyola University's legal research professors warn their first-year law school students that "[t]he headnotes and summary are NOT written by the court; they are written by

West editors.  Therefore, you should *never* cite to a case based on what you've read in the syllabus and headnotes; you must read the case and cite to the language written by the court."  *See* Loyola University Chicago School of Law Library, *Basic Legal Research: Case Law*, https://lawlibguides.luc.edu/firstyearlegalresearch/caselaw (last visited November 17, 2025).  Consistent with this principle, copyright law has long granted protection for annotations of legal materials.  *See Howell v. Miller*, 91 F. 129 (6th Cir. 1898); *W.H. Anderson Co. v. Baldwin Law Pub. Co.*, 27 F.2d 82 (6th Cir. 1928); *Callaghan v. Myers*, 128 U.S. 617, 645–46 (1888) (affirming that "[t]he general proposition that the reporter of a volume of law reports can obtain a copyright for it as an author, and that such copyright will cover the parts of the book of which he is the author, although he has no exclusive right in the judicial opinions published, is supported by authority"); *compare Wheaton v. Peters*, 33 U.S. 591 (1834) (remanding to the circuit court with instructions that the matter be tried by a jury to determine if the author, Wheaton, complied with statutory requirements for U.S. copyright) *with Callaghan*, 128 U.S. at 648–49 (1888) (concluding that there must have been copyrightable material in *Wheaton*, e.g., the "various head-notes" in the reporter, or "it would have been useless to send the case back to the circuit court" to determine whether Wheaton complied with the statutory requirements to obtain a lawful copyright); *Lawrence v. Dana*, 15 F. Cas. 26 (C.C.D. Mass. 1869); *see also* U.S. Copyright Office, *Compendium of U.S. Copyright Office Practices* §§

313.6(C)(2), 717.1 (3d ed. 2021), *available at* https://www.copyright.gov/comp3/docs/compendium.pdf (last visited November 13, 2025) ("A legal publication that analyzes, annotates, summarizes, or comments upon legislative enactments, judicial decisions, executive orders, administrative regulations, or other edicts of government may be registered as a non-dramatic literary work, if the publication was 'prepared by a private party, or a non-lawmaking official' 'who lack[s] the authority to make or interpret the law,' and if it contains a sufficient amount of original authorship." (citing *Georgia*, 590 U.S. at 269)); *see also W. Pub. Co. v. Mead Data Cent., Inc.*, 799 F.2d 1219, 1223 (8th Cir. 1986) (Mead "readily conced[ing] that . . . headnotes prepared by West, merit copyright protection"); *cf. Georgia*, 590 U.S. at 265, 267–68 (finding that annotations of the Official Code of Georgia are not copyrightable due to authorship of annotations by arm of Georgia legislature but noting that copyrights may vest in legal explanatory "works created by . . . private parties[] who lack the authority to make or interpret the law"). The U.S. Copyright Office has repeatedly recognized this by registering multiple copyrights for LexisNexis works that include the LexisNexis Headnotes. [2]

Privately authored headnote annotations—like those created by LexisNexis

---

[2] *See, e.g.*, U.S. Copyright Reg. Nos. TX0005728912 (2003), TX0006843247 (2008), TX0007758979 (2013), TX0009129671 (2020) TX0009516885 (2025) (searchable through Copyright Office's public catalog at U.S. Copyright Office, *Public Records System*, http://bit.ly/2VTNDI9).

and Plaintiffs-Appellees—are protected expression under settled, black-letter law. Abandoning this core principle would conflict with Supreme Court and circuit authority and the Copyright Office's guidance, unsettle decades of reliance by courts, publishers, and users and destabilize the licensing markets and editorial investments in these valued resources.

## II.   Each Headnote Is a Copyrightable Work Because They Are Original and Creative.

"Originality" is a pre-requisite to copyright protection. *See, e.g.*, *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345 (1991). "Creation of a nonfiction work, even a compilation of pure fact, entails originality." *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 547 (1985). As explained by the District Court,

> [A] headnote can introduce creativity by distilling, synthesizing, or explaining part of an opinion and thus be copyrightable. A block of raw marble, like a judicial opinion, is not copyrightable. Yet a sculptor creates a sculpture by choosing what to cut away and what to leave in place. That sculpture is copyrightable. . . . Identifying which words matter and chiseling away the surrounding mass expresses the editor's idea about what the important point of law from the opinion is. That editorial expression has enough "creative spark" to be original. So all headnotes, even any that quote judicial opinions verbatim, have original value as individual works.

Op. 23. It is well established that "[o]riginal, as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied

from other works), and that it possesses at least some minimal degree of creativity." *Feist*, 499 U.S. at 345.

Defendant-Appellant argues that headnote annotations deviating from judicial opinions are not sufficiently creative because they are "dictated by 'industry conventions.'" D.I. 27 ("Br.") 25 (citing *Matthew Bender & Co., Inc. v. West Publ'g Co.*, 158 F.3d 674 (2d Cir. 1998)). This statement is patently false. Each LexisNexis Headnote is an original and creative work derived from a series of editorial choices independently made by each legal research publisher throughout the process, including selection, phrasing, synthesis, coordination, and arrangement—judgments not dictated by the underlying court opinions. As part of the process, LexisNexis's team of attorney-editors reads and synthesizes judicial opinions and relevant statutes and secondary sources to generate substantive, original headnote annotations of legal cases. *See Case Law EP*, *supra*. The LexisNexis editor-employees read case law opinions to identify rules of law, discussion points, and interpretation issues. *See id.* Generation of these LexisNexis Headnotes often include a written analysis of the court's application of the law to the particular facts of a case, a description of the court's interpretation, or construction of the provision. *See id.* Once LexisNexis experts quality check the LexisNexis Headnotes, they select the most on-point and specific classification from the LexisNexis taxonomy scheme for indexing, link select cross-references to related authorities and resources, and integrate Shepard's

signals. *See id.* The LexisNexis Headnotes are subject to continuous review by LexisNexis to ensure continued accuracy, with updates reflecting subsequent treatment, amendments, and superseding authorities through documented revision workflows. *See id.*

This process and each of these steps and creative decisions is not dictated by any industry convention. Indeed, there is no industry committee or manual of guidelines and rules. Those do not exist. It is simply a reflection of LexisNexis's complete and absolute dedication to maintaining a sterling reputation for analysis and accuracy and its promise and commitment to its customers and the public to provide legal research tools of the highest order.

Defendant-Appellant's statement that "a competitor would have difficulty" creating an alternative to a given headnote annotation is likewise false and not supported by the facts. Br. 26. While LexisNexis cannot speak to the specific creative process employed by Plaintiffs-Appellees to create their Westlaw Headnotes, LexisNexis posits that a creative process must nonetheless be employed because LexisNexis and Plaintiffs-Appellees review the same opinions but generate *different* headnotes. The creative process has been highlighted by legal research scholars:

> In the West system, editors take the legal concepts from a case, summarize the concept in the editor's own language, and link the resulting headnote with the appropriate key number in the West Digest System. West's digests are basically compiled subject arrangements of

the West headnotes. There is a direct correlation between the headnote and the related key number.

Susan Nevelow Mart, *The Relevance of Results Generated by Human Indexing and Computer Algorithms: A Study of West's Headnotes and Key Numbers and LexisNexis's Headnotes and Topics*, 102 Law Libr. J. 221, 223–24 (2010). Ultimately, and for the purposes of this argument, most importantly, "LexisNexis and West Group editors create headnotes and link them to topics differently." *Id.* at 223.

Given the different approaches to creating their headnote annotations, it is not surprising that even though the case opinions they draw from are the same, the texts of the respective LexisNexis Headnotes and Westlaw Headnotes are frequently quite different. This is confirmed by a review of a representative sample of the headnote annotations from several cases from both LexisNexis and Westlaw databases:

| LexisNexis | West |
|---|---|
| *Brown v. Bd. of Ed. of Topeka, Shawnee Cnty., Kan.*, 347 U.S. 483 (1954) | |
| Segregation of Caucasian and African-American children in public schools has a detrimental effect upon the African-American children. The impact is greater when it has the sanction of the law; for the policy of separating the races is usually interpreted as denoting the inferiority of the African-American group. A sense of inferiority affects the motivation of a child to learn. | The segregation of children in public schools solely on the basis of race, even though the physical facilities and other tangible factors may be equal, deprives the children of minority group of equal educational opportunities, and amounts to a deprivation of the equal protection of the laws guaranteed by the Fourteenth Amendment to the Federal Constitution. U.S.C.A. Const. Amend. |

| LexisNexis | West |
|---|---|
| Segregation with the sanction of law, therefore, has a tendency to retard the educational and mental development of African-American children and to deprive them of some of the benefits they would receive in a racially integrated school system. | 14. |

### *Miranda v. Arizona*, 384 U.S. 436 (1966)

| LexisNexis | West |
|---|---|
| The constitutional requirement that, as a prerequisite to any questioning, an individual held for interrogation by a law enforcement officer has the right to remain silent does not depend upon whether he is aware of his rights without a warning being given. | Whatever background of person interrogated, warning at time of interrogation as to availability of right to remain silent is indispensable to overcome pressures of in-custody interrogation and to insure that individual knows that he is free to exercise privilege at that point and time. |

| LexisNexis | West |
|---|---|
| **New York Times Co. v. Sullivan**, 376 U.S. 254 (1964) | |
| The test as to the applicability of the Fourteenth Amendment is not the form in which state power has been applied but, whatever the form, whether such power has in fact been exercised. | The proposition that Fourteenth Amendment is directed against state action and not private action is inapplicable in case presenting question of extent to which constitutional protections for speech and press limit a state's power to award damages in libel action brought by public official against critics of his official conduct; it matters not that state courts have applied state law in a civil action and that it is common law only, though supplemented by statute; the test is not the form in which state power has been applied but, whatever the form, whether such power has in fact been exercised. U.S.C.A. Const. Amend. 14; Code of Ala., tit. 7, §§ 908–917. |
| **Pennoyer v. Neff**, 95 U.S. 714 (1877) | |
| The State through its tribunals, may subject property situated within its limits owned by non-residents to the payment of the demand of its own citizens against them; and the exercise of this jurisdiction in no respect infringes upon the sovereignty of the State where the owners are domiciled. | A state, having within its territory property of a nonresident, may hold and appropriate it to satisfy the claims of its citizens against him; and its tribunals may inquire into his obligations to the extent necessary to control the disposition of the property. |

| LexisNexis | West |
|---|---|
| **_Int'l Shoe Co. v. Washington_, 326 U.S. 310 (1945)** | |
| A foreign corporation may be deemed present in a state, so as to make it constitutionally liable to be sued there, when the activities of the corporation in the state have not only been continuous and systematic but also give rise to the liability sued on, even though no consent to be sued or authorization to an agent to accept service of process has been given. | "Presence" of foreign corporation in state for purpose of maintenance of suit against it exists when activities of corporation in state of forum have not only been continuous and systematic, but also give rise to liabilities sued on, even though no consent to be sued or authorization to an agent to accept service of process has been given. |

The examples above clearly confirm that there is not one rote mechanistic process that private research publishers use for creating headnote annotations that spit out identical versions. "Under the merger doctrine, a court will not protect a copyrighted work from infringement if the idea contained therein can be expressed in only one way." *Oracle Am., Inc. v. Google Inc.*, 750 F.3d 1339, 1360 (Fed. Cir. 2014). The fact that "there are a sufficient number of ways of expressing [an] idea . . . preclude[s] a ruling that the idea has merged into its expression." *Kregos v. Associated Press*, 937 F.2d 700, 707 (2d Cir. 1991). The District Court correctly recognized this holding, "there are many ways to express points of law." Op. 15. The significant differences between the LexisNexis Headnotes and the Westlaw Headnotes as shown above confirms the truth of this holding, and that the "merger doctrine" is simply inapplicable to the creation of headnote annotations.

Annotations are not facts.  They are the interpretation of facts.  Just as *The New York Times* and *The Wall Street Journal* often cover the same factual events, the resulting articles are different, with both entitled to copyright protection.  The Supreme Court held in its seminal decision, *Harper & Row*, that the "[c]reation of a nonfiction work, even a compilation of pure fact, entails originality." *Harper & Row Publishers*, 471 U.S. at 547  (citing *Schroeder v. William Morrow & Co.*, 566 F.2d 3 (7th Cir. 1977) (copyright in gardening directory)).  The different processes and creative choices exercised by LexisNexis and Plaintiffs-Appellees to create headnote annotations, and the different results they achieve confirms the determination of the District Court that they are entitled to copyright protection both individually and collectively.

## III. Use of Headnotes by An Unauthorized Party Will Limit the Public's Access To These Valuable Legal Research Tools.

As the Court is aware, headnote annotations summarize legal principles found in a court's opinion, appearing above reported cases on legal platforms and following the chronological order of the opinion.  *See* LexisNexis, *Headnotes in Legal Research: LexisNexis Guide*, https://supportcenter.lexisnexis.com/app/answers/answer_view/a_id/1094669/~/overview-and-frequently-asked-questions-about-headnotes-  (last visited November 14, 2025).  They are not mere verbatim restatements.  Headnote annotations reflect editors' judgment in the selection, phrasing, and arrangement of salient legal propositions.  Headnote annotations such

as those created by LexisNexis and Plaintiffs-Appellees provide great benefit to the public's understanding of the law. *See id.* ("Purpose: Headnotes help users quickly identify the key legal issues and rulings in a case."). They serve as invaluable research tools for both attorneys and informed citizens. *See* Stanford Law School, *Case Finding and Advanced Searching Strategies*, https://guides.law.stanford.edu/cases/headnotes (last visited November 14, 2025) (noting that "[h]eadnotes are excellent research tools to assist you in finding other cases that address similar legal issues"); Jill Sturgeon, *Bloomberg's Point of Law: Can They Compete with Headnotes?*, Colo. Law, Aug./Sept. 2018, at 12, available at https://scholar.law.colorado.edu/articles/1178/ ("Westlaw and Lexis Advance add headnotes to cases to help legal researchers quickly identify points of law discussed in the case and determine whether a case is relevant to their legal questions. These headnote systems also enable researchers to find cases discussing issues similar to the ones they are researching."); Alabama Law, *Prepare to Practice Resources*, https://guides.library.law.ua.edu/c.php?g=1228537&p=10220794 (last visited November 14, 2025) (instructing law students that "headnote summaries can help you identify the parts of an opinion that are the most pertinent to your fact pattern"); *cf. Georgia*, 590 U.S. at 274 (recognizing the "practical significance" of statutory annotations, specifically, and discussing that access to such annotations will assist the citizenry in "learning [their] legal rights and duties"). In *Callaghan v. Myers*,

the Supreme Court recognized this value, holding that, "a publication of the mere opinions of the court, in a volume, without more, would be comparatively valueless to anyone." 128 U.S. at 626.

Despite the uniform recognition of the copyright protection afforded to headnote annotations discussed in Section I, *supra*, Defendant-Appellant asks this Court to transform copyright law to destroy the commercial value of headnote annotations by stripping them of their long-time and well recognized copyright protection. Such a change would collapse the idea–expression distinction by treating privately authored explanatory text as if it were an "edict of government," contrary to settled doctrine. *See* Section I, *supra*. It would also undermine settled reliance interests of courts, practitioners, and the public who depend on high-quality annotated research tools. The fourth fair-use factor examines "the effect of the use upon the potential market for the for or value of the copyrighted work." 17 U.S.C. §107(4); *Harper*, 471 U.S. at 566. Extracting and repurposing case headnote annotations to build a competing product as attempted by Defendant-Appellant squarely targets the core market served by the headnote annotations and displaces demand for licensed access. The harm extends beyond current sales to derivative and emerging licensing channels—most notably authorized AI training, validation, and model improvement—where curated editorial content has distinct, monetizable value. When a party bypasses licensing to supply a functionally substitutive dataset,

it usurps the original's role, depresses pricing, and erodes uptake across customer segments, thereby diminishing the work's value and the incentives to maintain the editorial quality that licensing is meant to support. This market displacement and loss of reasonably anticipated licensing opportunities weigh heavily against fair use under the fourth factor. LexisNexis confirms support for Plaintiffs-Appellees' position that reversing the District Court's decision would destroy the value of privately created headnote annotations, contrary to the core "economic philosophy" of the copyright laws of this nation. *See Mazer*, 347 U.S. at 219.

As the District Court properly explained, "Copyrights encourage people to develop things that help society, like good legal-research tools. Their builders earn the right to be paid accordingly." Op. at 23. Legal research platforms' ability to copyright their respective headnote annotations, as well as the right to license those annotations for profit, give them incentive to create such headnote annotations. This reality was confirmed in *Harper & Row*, which held that copyright supplies "the economic incentive to create and disseminate ideas" because "encouragement of individual effort by personal gain is the best way to advance public welfare through the talents of authors and inventors." 471 U.S. at 558. This incentive is realized in competitive licensing markets where expressive headnote annotations differentiate platforms and drive adoption, renewal, and continuous improvement. Removing protection would depress investment in editorial review and updates. Indeed, for

this reason, licenses are exceedingly important to the legal research industry. *See Princeton Univ. Press v. Mich. Document Servs., Inc.*, 99 F.3d 1381, 1391 (6th Cir. 1996) (considering the argument "that unlicensed copying will 'stimulate artistic creativity for the general public good'" and rejecting this suggestion on the grounds that it "would be more persuasive if the record did not demonstrate that licensing income is significant to the publishers"); *Wadsworth v. Walmart Inc.*, 348 F.R.D. 489, 492–93 (D. Wyo. 2025) (highlighting that "[l]egal research has improved over time" with the development of "databases like Lexis and Westlaw"); *cf. Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 593 (1994) (recognizing that "[e]vidence of substantial harm" when considering the fair use defense "would weigh against a finding of fair use, because the licensing of derivatives is an important economic incentive to the creation of originals" (footnote omitted)).

LexisNexis relies on the protection of its copyrights to license its research services to consumers, including but not limited to law schools, law firms, law students, and courts. Licensees of LexisNexis's research services then obtain access to its legal research platform and headnote annotations under the license's terms. These licenses ensure authenticated, reliable access and fund ongoing editorial maintenance, quality control, and expansion of coverage—benefits that flow directly to courts, practitioners, students, and other licensees.

There is significant overhead cost of creating and maintaining the headnote annotations because the creative process to create headnote annotations requires time and skill, as discussed in detail in Section II, *supra*. These fixed, front-loaded editorial costs, such as reading, synthesis, drafting, classification, review, and updates, cannot be recouped absent a functioning licensing market for the expressive headnote annotations embedded in the licensed platform.

Consumers who access LexisNexis Headnotes or Westlaw Headnotes from platforms like Defendant-Appellant, rather than directly from the source, would not contribute to defraying the costs incurred by publishers such as LexisNexis to maintain, update and make their case law headnotes available to the public on-line. *See Davis v. Gap, Inc.*, 246 F.3d 152, 167–68, 175–76 (2d Cir. 2001) (freely taking a copyrighted work allowed defendant to avoid "paying the customary price," that plaintiff "was entitled to charge" for use of work, causing plaintiff to "suffer[] market harm"). Because under the legal framework posited by Defendant-Appellant where headnote annotations would be publicly accessed for free, LexisNexis would not receive fees from such use of its headnote annotations, continuing to create headnote annotations would be economically untenable and cause substantial economic harm to LexisNexis. This uncompensated substitution erodes the core market in which headnote annotations are monetized and predictably leads to reduced quality, fewer updates, and increased risk of misapplication.

Therefore, reversing the District Court would destroy the commercial market for LexisNexis' Headnotes and the headnote annotations of all other current private providers. Reversal would allow the headnote annotations to be freely distributed by platforms such as Defendant-Appellant such that legal research platforms would have no incentive to create, update, publish, and maintain a robust headnote annotation system created by experienced LexisNexis employee editors who are lawyers. The foreseeable result is a contraction in innovation and in the diversity of independently authored resources, leaving users with fewer, lower-quality options and diminishing the accuracy and efficiency of legal research. *See Harper*, 471 U.S. at 568 n.9 (Where "there is a fully functioning market that encourages the creation and dissemination" of a work, "permitting 'fair use' to displace normal copyright channels disrupts the copyright market without a commensurate public benefit.")

Devoid of the copyright protection previously afforded to the headnote annotations and faced with freeriding organizations such as Defendant-Appellant, no publisher will operate under the previous structure. In that world, LexisNexis would be forced to forego providing headnote case law annotations to its subscribers. American consumers will lose meaningful access to case law interpretation and robust legal resources, causing significant damages to the advancement of legal education and practice. These harms will fall most heavily on courts, small firms, legal aid organizations, and pro se litigants, who rely on clear summaries and citator

integration to increase efficiency and to avoid error. The chilling of editorial investment is precisely the outcome the Copyright Clause was designed to avert.

## CONCLUSION

For the foregoing reasons, the Court should affirm the District Court's Order.

[*valediction on following page*]

Dated: November 26, 2025

Respectfully submitted,

*/s/ Michael D. Hobbs, Jr.*
Michael D. Hobbs, Jr. (GA Bar No. 358160)
Austin Padgett (OH Bar No. 85368)
TROUTMAN PEPPER LOCKE LLP
600 Peachtree Street NE # 3000
Atlanta, GA 30308
Tel: (404) 885-3330
michael.hobbs@troutman.com
austin.padgett@troutman.com

Brooke R. Watson (NC Bar No. 55802)
TROUTMAN PEPPER LOCKE LLP
301 South College Street, 34th Floor
Charlotte, NC 28202
Tel: (704) 998-4079
brooke.watson@troutman.com

*Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

In accordance with Federal Rule of Appellate Procedure 32(g), I certify that this brief: (i) complies with the type-volume limitation of Rule 29(b)(4) because it contains 5,293 words, excluding the parts of the brief exempted by Rule 32(f); and (ii) complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Office Word in font size 14, type-style Times New Roman.

I am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

The electronic copy of this brief has been virus scanned with Vipre Virus Protection, version 3.1, and no virus was detected.

The text in the electronic brief is identical to the text in the paper copies.

I certify that on this 26th day of November 2025, a copy of the foregoing Amicus Brief was electronically filed with the Third Circuit Court of Appeals, and service was made upon counsel of record through the Court's electronic docketing system.

/s/ *Michael D. Hobbs, Jr.*
Michael D. Hobbs, Jr.