# United States Court of Appeals

*for the*

# Third Circuit

Case No. 25-2153

THOMSON REUTERS ENTERPRISE CENTRE GMBH;
WEST PUBLISHING CORP,

*Plaintiffs-Appellees,*

— v. —

ROSS INTELLIGENCE INC,

*Defendant-Appellant.*

ON APPEAL FROM AN ORDER OF THE UNITED STATES
DISTRICT COURT FOR THE DISTRICT OF DELAWARE
IN NO. 1:20-CV-00613, HONORABLE STEPHANOS BIBAS, CIRCUIT JUDGE

## BRIEF OF *AMICI CURIAE* ON BEHALF OF
## AMERICAN NATIONAL STANDARDS INSTITUTE AND
## SIX STANDARDS ORGANIZATIONS IN SUPPORT
## OF APPELLEES AND AFFIRMANCE

STANLEY J. PANIKOWSKI
DLA PIPER LLP (US)
4356 Executive Drive, Suite 1100
San Diego, California 92201
(858) 677-1400
stanley.panikowski@us.dlapiper.com

J. KEVIN FEE
JANE W. WISE
DLA PIPER LLP (US)
500 Eighth Street, NW
Washington, DC 20004
(202) 799-4000
kevin.fee@us.dlapiper.com
jane.wise@us.dlapiper.com

*Attorney for Amicus Curiae*

Dated: November 26, 2025



# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Local Appellate Rule 26.1.1, *amici curiae* state that they are not publicly held corporations and do not have any parent corporation, and that no publicly held corporation owns 10% or more of their stock.

Date: November 26, 2025                    */s/ J. Kevin Fee*
                                          J. Kevin Fee

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF AUTHORITIES .................................................................... iii

INTERESTS OF AMICUS CURIAE ......................................................iv

I.    INTRODUCTION ........................................................................1

II.   ARGUMENT......................................................................................2

      A.    COPYRIGHT LAW PROTECTS THOMSON REUTERS'
           WORKS....................................................................................2

      B.    ROSS MISAPPLIES *BANKS* AND THE GOVERNMENT EDICTS
           DOCTRINE, BOTH OF WHICH ARE INAPPLICABLE TO
           PRIVATELY-AUTHORED WORKS. ...................................4

      1.    The Supreme Court Has Long Recognized Privately-Authored Works
           on Legal Subjects Are Copyrightable. ....................................4

      2.    The Supreme Court Recently Affirmed the Inapplicability of the
           Government Edicts Doctrine to Privately-Authored Works. ................7

      3.    The 2,243 Headnotes That Are the Subject of the Summary Judgment
           Decision Are Copyrightable Because They Are Creative Works
           Authored by a Private Party. ..................................................9

III.  CONCLUSION.................................................................................10

CERTIFICATE OF ADMISSION TO BAR ............................................11

CERTIFICATE OF COMPLIANCE....................................................12

CERTIFICATE OF SERVICE ..............................................................13

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Banks v. Manchester*,
128 U.S. 244 (1888)...................................................................................4, 5, 9

*Callaghan v. Myers*,
128 U.S. 617 (1888).........................................................................................6, 7

*Facility Guidelines Inst., Inc. v. UpCodes, Inc.*,
677 F. Supp. 3d 955 (E.D. Mo. June 15, 2023) ..................................9

*Feist Publications, Inc. v. Rural Telephone Service Co.*,
499 U.S. 340 (1991)..........................................................................................1

*Georgia v. Public.Resource.Org, Inc.*,
590 U.S. 255 (2020)...............................................................................*passim*

*Harper & Row Publishers, Inc. v. Nation Enterprises*,
471 U.S. 539 (1985)..........................................................................................3

*Mazer v. Stein*,
347 U.S. 201 (1954)..........................................................................................3

*National Fire Protection Ass'n, Inc. v. UpCodes, Inc.*,
753 F. Supp. 3d 933 (C.D. Cal. Aug. 23, 2024) ..................................9

*Twentieth Century Music Corp. v. Aiken*,
422 U.S. 151 (1975)..........................................................................................3

*Wheaton v. Peters*,
33 U.S. (8 Pet.) 591 (1834) .............................................................................4

**Statutes**

17 U.S.C. § 201(a) ...........................................................................................11

**Constitutional Provisions**

United States Constituion Art. 1, § 8, cl. 8 ...................................................2

## INTERESTS OF AMICUS CURIAE[1]

*Amici Curiae* include American National Standards Institute, Incorporated ("ANSI"), a national standards coordinating institution, along with six standards development organizations ("SDOs") that participate in developing technical and specialized standards: American Society for Testing and Materials ("ASTM"), International Association of Plumbing & Mechanical Officials ("IAPMO"), International Code Council, Inc. ("ICC"), National Electrical Manufacturers Association ("NEMA"), The National Fire Protection Association, Inc. ("NFPA"), and ULSE Inc. ("UL").

Amici are private organizations that create "standards." These highly technical, highly creative works are incredibly valuable to industry and the public. Standards describe product specifications, provide methods for manufacturing and testing, and offer recommended safety practices. Development processes vary, but most prioritize transparency and inclusiveness, with development processes designed to seek opinions from a broad spectrum of interested parties. Accordingly, SDOs avoid placing any undue financial barriers to participation, such as

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(2), Plaintiff-Appellant and Defendant-Appellee both consented to the filing of this brief. Pursuant to Federal Rule of Appellate Procedure 29(a)(4), *amici* affirm that no counsel for a party authored this brief in whole or in part, and that no person or entity other than *amici*, their members, and their counsel made a monetary contribution intended to fund the preparation or submission of this brief.

conditioning voting on membership status or allowing a single interest group to exert disproportionate influence on the process. SDOs also typically offer a public review during standards development, allowing time for public comment and the availability of an appeal.

Standards provide guidance that can range from specialized areas of expertise, *e.g.*, ASTM E2311 (Standard Practice for QCM Measurement of Spacecraft Molecular Contamination in Space), to areas more broadly applicable, *e.g.*, NFPA 720 (Standard for the Installation of Carbon Monoxide (CO) Detection and Warning Equipment). And they cover fields as varied as psychological testing, *e.g.*, Standards for Educational and Psychological Testing; building design, *e.g.*, International Building Code; and toy safety, *e.g.*, ASTM F963 (Standard Consumer Safety Specification for Toy Safety).

Creating and updating standards is expensive. While thousands of expert and lay volunteers provide input, the SDOs themselves must cover the cost of salary and benefits paid to staff who oversee the process and assist in drafting the standards' text. Some SDOs employ technical experts to assist with standards development. SDOs also pay for meeting space to accommodate hundreds of participants. And they incur significant expenses in publishing various committee reports, collecting public comments, coordinating outreach and education efforts, and managing

information technology systems used for standards development.  SDOs incur still more costs in publishing the standards.

Standards represent a key category of works that the Copyright Clause and the Copyright Act protect.  The standards development process requires an investment of considerable time and effort.  Like other authors, SDOs recoup their investment through the copyrights they hold in those standards.  This process has also served the public because governments benefit from the private-sector investment and utilize the considerable expertise that the standard-setting process brings to bear, including through a process known as "incorporation by reference" or ("IBR").

SDOs can fund this considerable investment because they generate revenue from selling and licensing their standards to the professionals who use them in their work.  Copyright protection is what makes this possible.  For example, about 70% of ASTM's revenue is derived from the sale of copyrighted standards.  Although SDOs fund their work through such revenues, most SDOs make IBR'd standards available for read-only viewing for free and/or make copies available at minimal cost.

Like Thomson Reuters in this case, SDOs have a substantial interest in copyright law protecting their important works that exist side-by-side with

government-authored works, but are *not* authored by legislatures, judges, or the executive.

### *Description of Amicus Curiae*

ANSI is a not-for-profit membership organization that, for more than 100 years, has administered and coordinated the voluntary standardization system in the United States. ANSI facilitates the development of American National Standards ("ANS") by accrediting the procedures of SDOs. These SDOs work cooperatively to develop voluntary national consensus standards that are used in virtually every industry sector and in all aspects of daily life, such as toys, food safety, IT, and the built environment. ANSI accreditation signifies that a standards developer's procedures used for the development of ANS meet ANSI's essential requirements for openness, balance, consensus, and due process. These requirements help ensure that the resulting standards promote reliability, interoperability, safety, and quality. Each of the SDO *Amici* are among the approximately 240 SDOs accredited by ANSI and are representative of ANSI's broader SDO community.

The *Amici* SDOs are:

***American Society for Testing and Materials d/b/a/ ASTM International***. ASTM is a non-profit organization established in 1898 and headquartered in West Conshohocken, Pennsylvania. ASTM is dedicated to the development and publication of international voluntary consensus standards for materials, products,

systems, and services. ASTM has developed more than 12,500 standards and has more than 30,000 members worldwide. Through its standards, ASTM positively impacts public health and safety, consumer confidence, and overall quality of life.

***International Association of Plumbing & Mechanical Officials***. Founded in 1926, IAPMO is a not-for-profit membership organization dedicated to providing minimum requirements and standards for the protection of public health, safety, and welfare. IAPMO coordinates the development of plumbing and mechanical codes and standards such as the *Uniform Plumbing Code* ("UPC") and the *Uniform Mechanical Code* ("UMC") through a consensus standards development process accredited by ANSI. This process brings together volunteers representing varied viewpoints and interests to achieve consensus on plumbing and mechanical issues. IAPMO codes are used by jurisdictions in the United States and abroad.

***International Code Council, Inc.*** ICC is a non-profit membership association dedicated to building safety. The International Codes, or I-Codes, published by ICC, provide one set of comprehensive and coordinated model codes covering all disciplines of construction including structural safety, plumbing, fire prevention and energy efficiency. All fifty states and the District of Columbia have adopted certain I-Codes at the state or other jurisdictional levels. Federal agencies including the Architect of the Capitol, General Services Administration, National

Park Service, Department of State, U.S. Forest Service and the Veterans Administration also use I-Codes for the facilities that they own or manage.

*National Electrical Manufacturers Association.* NEMA is the association of electrical equipment manufacturers, founded in 1926. NEMA sponsors the development of and publishes over 700 standards relating to electrical products and their use. NEMA's member companies manufacture a diverse set of products focused on end-user markets in the grid, industrial, mobility and built environment sectors, including transformers, inverters, factory automation and control systems, building controls and electrical systems components, lighting systems, electric vehicle motors, and medical diagnostic imaging systems.

*The National Fire Protection Association, Inc.* is a self-funded non-profit devoted to reducing the risk of death, injury, and property and eco-nomic loss due to fire, electrical, and related hazards. NFPA has been developing standards since it was founded in 1896. Today, NFPA's principal activity is the development and publication of over 300 standards in the areas of fire, electrical, and building safety. NFPA's flagship work is the National Electrical Code, which is the world's leading standard for electrical safety and provides the benchmark for safe electrical design, installation, and inspection to protect people and property from electrical hazards.

*ULSE Inc.* UL is an independent, not-for-profit standards developer dedicated to promoting safe living and working environments since the founding of its parent

Underwriters Laboratories Inc. in 1894. UL's standards provide a critical foundation for the safety system in the United States and around the world, while also promoting innovation and environmental sustainability. With over 120 years of experience and the development of over 1,500 standards, UL advances a safer, more sustainable world.

## I.    INTRODUCTION

ROSS undeniably copied thousands of privately-authored headnotes and summaries for its own commercial benefit without obtaining a license from the author of those works.  Like standards authored by standards development organizations ("SDOs"), Thomson Reuters' headnotes are creative, privately-authored works that advance public knowledge by translating complex material into structured, comprehensible guidance.  These are precisely the kinds of expressive works that copyright protects.

ROSS now seeks to excuse its misappropriation of another's work by mischaracterizing Thomson Reuters' works as unworthy of copyright protection and misapplying the government edicts doctrine.  ROSS Br. at 2.  Both arguments are wrong.

First, ROSS misunderstands the nature of what the Copyright Clause and the Copyright Act protect by attempting to cast the headnotes at issue as "facts" or "data" *about* cases.  Br. 24, 33, 44.  Wrong.  Copyright protection extends to all original works of authorship—whether artistic, technical, or analytical—that involve "at least some minimal degree of creativity."  *Feist Publications, Inc. v. Rural Telephone Service Co.*, 499 U.S. 340, 345 (1991).  There is no doubt Thomson Reuters' headnotes are copyrightable and creative, important works.

1

Second, ROSS offers a rule that misreads precedent and contravenes clear Supreme Court precedent defining the bounds of the "government edicts doctrine." In *Georgia v. Public.Resource.Org, Inc.*, the Supreme Court explained government edicts doctrine is "a straightforward rule *based on the identity of the author*," 590 U.S. 255, 263 (2020) (emphasis added), assessed by asking "whether the author of the work is a judge or legislator" acting "in the course of his judicial or legislative duties." *Id.* at 276. ROSS turns this rule on its head and would have this Court vitiate *privately*-authored works simply because the subject matter is judicial opinions. That is not the rule.

Misapplication of copyright law and the government edicts doctrine to materials that help individuals understand the law, unsupported by precedent or public policy, would reward profiteers like ROSS at the public's expense.

## II.   ARGUMENT

### A. COPYRIGHT LAW PROTECTS THOMSON REUTERS' WORKS.

The Constitution expressly declares the Founders' goal of "promot[ing] the Progress of Science and useful Arts," and empowers Congress to further this goal "by securing for limited Times to Authors . . . the exclusive Right to their respective Writings." U.S. Const. art. 1, § 8, cl. 8. As the Supreme Court long recognized:

> The economic philosophy behind the clause empowering Congress to grant patents and copyrights is the conviction that encouragement of individual effort by personal gain is the best way to advance public

2

welfare through the talents of authors and inventors in 'Science and useful Arts.' Sacrificial days devoted to such creative activities deserve rewards commensurate with the services rendered.

*Mazer v. Stein*, 347 U.S. 201, 219 (1954); *see also Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 558 (1985) ("[T]he Framers intended copyright itself to be the engine of free expression. By establishing a marketable right to the use of one's expression, copyright supplies the economic incentive to create and disseminate ideas."). Thus, "[t]he immediate effect of our copyright law is to secure a fair return for an 'author's' creative labor. But the ultimate aim is, by this incentive, to stimulate [the creation of useful works] for the general public good." *Twentieth Century Music Corp. v. Aiken,* 422 U.S. 151, 156 (1975).

Copyright protection has always extended to works that, like Thomson Reuters' headnotes, combine technical precision and intellectual creativity. Headnotes are the product of skilled attorney-editors who select, synthesize, and articulate the governing legal principles from judicial opinions. Their expressive choices—what issues to highlight, how to describe them, and how to classify them within a coherent system—reflect human judgment and creativity, not mechanical transcription. Such original expression lies at the core of what copyright protects.

It also serves the public. Incentivizing such creativity furthers public knowledge in important areas like judicial opinions. Without the ability to rely on

3

copyright protection, authors like Thomson Reuters and the SDOs could not recoup their significant investment in creating and updating these important works.

## B. ROSS MISAPPLIES *BANKS* AND THE GOVERNMENT EDICTS DOCTRINE, BOTH OF WHICH ARE INAPPLICABLE TO PRIVATELY-AUTHORED WORKS.

### 1. The Supreme Court Has Long Recognized Privately-Authored Works on Legal Subjects Are Copyrightable.

ROSS simply misapplies *Banks* and neglects the context for that decision. *Amici* write here to provide the Court with the full legal context, which starts with three cases from the 19th century.

First, in *Wheaton v. Peters*, 33 U.S. (8 Pet.) 591 (1834), a Supreme Court reporter claimed copyright in his annotated collections of opinions. Although the bulk of the *Wheaton* opinion addressed whether the plaintiff complied with the prerequisites for copyright protection set forth in the Copyright Act of 1790, in the final sentence of the majority opinion the Court stated that "no reporter has or can have any copyright *in the written opinions delivered by this court*; and that the judges thereof cannot confer on any reporter any such right." *Id.* at 668 (emphasis added). But no part of the opinion addressed the availability of copyright protection for privately-authored works or the creation of legal tools to aid in finding and understanding legal opinions.

4

Second, in *Banks v. Manchester*, 128 U.S. 244 (1888), an Ohio statute required the court reporter to "secure a copyright, for the use of the state, for each volume of the reports so published," 128 U.S. at 245, and the state purported to grant the court reporter the exclusive right to publish the reports "so far as the said state of Ohio can confer the same," *id.* at 247.  The Supreme Court held that the court reporter "was not the author . . . of the syllabus, the statement of the case, or the decision or opinion of the court.  The state, therefore, could not become the assignee of [the court reporter], as such author . . . ." *Id.* at 252.  The *Banks* court went to great lengths to limit the scope of its holding, stating that "[w]hether the state could take out a copyright for itself, or could enjoy the benefit of one taken out by an individual for it, as the assignee of . . . the author of a book, is a question not involved in the present case, and we refrain from considering it, and from considering any other question than the one above indicated." *Id.* at 253.

Third, in *Callaghan v. Myers*, 128 U.S. 617 (1888), the official reporter for the Supreme Court of Illinois sought copyright protection for certain reports of the Supreme Court of Illinois that included headnotes, annotations, and other explanatory materials written by the reporter in addition to the opinions of the court.  The defendant argued that the official reporter's headnotes and annotations formed part of the law of Illinois and that all of the work done in his official capacity was public property and not copyrightable. *Id.* at 623.

5

The Supreme Court rejected the argument that the reporter's works were uncopyrightable in their entirety, holding that:

> although there can be no copyright in the opinions of the judges, or in the work done by them in their official capacity as judges, (*Banks v. Manchester*, *ante*, 36,) yet there is no ground of public policy on which a reporter who prepares a volume of law reports, of the character of those in this case, can, in the absence of a prohibitory statute, be debarred from obtaining a copyright for the volume which will cover the matter which is the result of his intellectual labor.

*Id.* at 647. Thus, even in a case where the author was paid by the state to create the official reports of the Supreme Court of Illinois, the United States Supreme Court concluded that there was not a prohibition on the reporter's obtaining copyright protection for his contributions. Indeed, the Supreme Court distinguished its holding in *Callaghan* from the earlier decision in *Wheaton*.

> Therefore, the only matter in Wheaton's Reports which could have been the subject of the copyrights in regard to which the jury trial was directed was the matter not embracing the written opinions of the court, namely, the title-page, table of cases, head-notes, statements of facts, arguments of counsel, and index. Such work of the reporter, which may be the lawful subject of copyright, comprehends also the order of arrangement of the cases, the division of the reports into volumes, the numbering and paging of the volumes, the table of the cases cited in the opinions, (where such table is made,) and the subdivision of the index into appropriate, condensed titles, involving the distribution of the subjects of the various head-notes, and cross-references, where such exist.

*Id.* at 649.

ROSS acknowledges that *Callaghan* recognizes copyright protection for "explanatory materials" while ignoring its express recognition of copyright protection for privately-authored headnotes and syllabi. ROSS Br. at 4-5. Ironically, ROSS's single sentence reference to the *Callaghan* decision illustrates the art of accurately distilling a legal decision that Thomson Reuters performs in its creation of headnotes. *Id.* By selectively omitting the essential and highly relevant holding that headnotes and syllabi *are* copyrightable when prepared by a private author, ROSS's summary incorrectly suggests that the Supreme Court left open the question of whether copyright can subsist in such works. The decision in *Callaghan* definitively answered that question and confirmed that headnotes and syllabi are copyrightable when they are not authored by a judge.

### 2. The Supreme Court Recently Affirmed the Inapplicability of the Government Edicts Doctrine to Privately-Authored Works.

Fast-forward to 2020 and the Supreme Court explained this history, reaffirmed *Callahan* and set the boundaries of the government edicts doctrine in *Georgia v. Public.Resource.Org.* The Court explained that even where the reporter's explanatory materials "mirrored the judge-made materials" the copyright interest in privately-authored "headnotes, syllabi, table of contents, and the like" were maintained because the reporter "had no authority to speak with the force of law." *Georgia*, 590 U.S. at 264-65.

In *Georgia v. Public.Resource.Org, Inc.*, the Supreme Court held that the government edicts doctrine was a "straightforward rule based on the identity of the author," 590 U.S. at 263, holding that "*officials empowered to speak with the force of law cannot be the authors* of—and therefore cannot copyright—the works they create in the course of their official duties." *Id.* at 259 (emphasis added) (explaining that the "limitation on copyright protection for certain government work product [is] rooted in the Copyright Act's 'authorship' requirement"); *id.* at 263, 270, 276. But the Supreme Court explained that this limitation on copyright "does not apply . . . to works created by government officials (or *private parties*) who lack the authority to make or interpret the law[.]" *Id.* at 265 (emphasis added).

In analyzing the trio of 19th century Supreme Court precedent, *Georgia* made clear that *Wheaton* and *Banks* did not hold that official reporters of the United States Supreme Court and Ohio Supreme Court, respectively, were noncopyrightable because they were "the law." *Georgia*, 590 U.S. at 264. Instead, the *Wheaton* and *Banks* decisions make clear that it is "*work done by the judges*" that is not copyrightable. *Id.* (emphasis added).

Following *Georgia*, multiple district courts have correctly rejected attempts to read a broader rule or "animating principle" that "no one can own the law" into *Georgia's* holding. *Contra* ROSS Br. at 28. These courts instead have observed that *Georgia* expressly rejected a rule that would "require[] federal courts to pick out

8

the subset of judicial and legislative materials that independently carry the force of law." *National Fire Protection Ass'n, Inc. v. UpCodes, Inc.*, 753 F. Supp. 3d 933, 950 (C.D. Cal. Aug. 23, 2024) (quoting *Georgia*, 590 U.S. at 274 n.4); *Facility Guidelines Inst., Inc. v. UpCodes, Inc.,* 677 F. Supp. 3d 955, 964 (E.D. Mo. June 15, 2023) ("Because FGI is a private entity that lacks the authority to make or interpret the law, the government edicts doctrine does not apply.").

In sum, where the author (like Thomson Reuters) is a private party, copyrightability is not affected by whether the copyrighted text carries the force of law. *Georgia,* 590 U.S. at 276 ("Instead of examining whether given material carries 'the force of law,' we ask only whether the author of the work is a judge or a legislator."). Therefore, ROSS's government edicts argument fails.

### 3. The 2,243 Headnotes That Are the Subject of the Summary Judgment Decision Are Copyrightable Because They Are Creative Works Authored by a Private Party.

ROSS suggests that because the headnotes and the judicial opinion share the same subject matter, the text of the headnotes are constrained by "the law itself." ROSS Br. at 26. ROSS argues that permitting Thomson Reuters to maintain copyright protection would effectively give West a monopoly over the law. *Id.* at 27. As an initial matter, ROSS's argument ignores the district court's determination that the at-issue headnotes are different from underlying judicial decisions. Thomson Reuters Br. at 22. Moreover, ROSS's rule would render such discussions

9

of legal decisions or the law uncopyrightable. Accordingly, the Court should reject ROSS's application of the government edicts doctrine to the 2,243 headnotes at issue.

The government edicts doctrine turns on who is the author of the work: the government or a private party. This straightforward rule forecloses ROSS's argument that headnotes are "the law" and are therefore categorically uncopyrightable. Thomson Reuters is a private party. And, as the author of works that are sufficiently creative, Thomson Reuters's "copyright protection [in its works] is both instant and automatic." *Id.* at 275; 17 U.S.C. § 201(a).

## III. CONCLUSION

*Amici* respectfully ask the Court to reject ROSS's misapplication of copyright law and affirm in favor of Thomson Reuters.

Dated: November 26, 2025

Stanley J. Panikowski
DLA PIPER LLP (US)
4356 Executive Drive, Suite 1100
San Diego, CA 92201
Tel: (858) 677-1400
stanley.panikowski@us.dlapiper.com

*/s/ J. Kevin Fee*

J. Kevin Fee
Jane W. Wise
DLA PIPER LLP (US)
500 8th Street NW
Washington, DC 20004
Tel: (202) 799-4000
kevin.fee@us.dlapiper.com
jane.wise@us.dlapiper.com

*Counsel for Amicus Curiae*

**CERTIFICATE OF ADMISSION TO BAR**

Pursuant to Local Rule 28.3(d) and Local Rule 46.1(e), I hereby certify that I,

J. Kevin Fee, am admitted as an attorney and member in good standing of the bar of

the United States Court of Appeals for the Third Circuit.

Dated: November 26, 2025                    */s/ J. Kevin Fee*
                                            J. Kevin Fee
                                            DLA PIPER LLP (US)
                                            500 8th Street NW
                                            Washington, DC 20004
                                            Tel: (202) 799-4000
                                            kevin.fee@us.dlapiper.com

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g) and Local Rule 31.1, I certify the following:

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 3,543 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in Times New Roman 14-point font using Microsoft Word for Microsoft 365.

3.     This brief complies with the electronic filing requirements of Local R. 31.1(c) because the text of the electronic brief is identical to the text in the paper copies and because Windows Defender Antivirus Version 1.1.19600.3 was run on the file containing the electronic version of this brief and no viruses were detected.

Dated: November 26, 2025

*/s/ J. Kevin Fee*
J. Kevin Fee
DLA PIPER LLP (US)
500 8th Street NW
Washington, DC 20004
Tel: (202) 799-4000
kevin.fee@us.dlapiper.com

**CERTIFICATE OF SERVICE**

I certify that, on November 26, 2025, I caused this brief to be served on all counsel of record listed on the CM/ECF Service List.

Dated: November 26, 2025

*/s/ J. Kevin Fee*

J. Kevin Fee
DLA PIPER LLP (US)
500 8th Street NW
Washington, DC 20004
Tel: (202) 799-4000
kevin.fee@us.dlapiper.com