# United States Court of Appeals

*for the*

# Third Circuit

Case No. 25-2153

THOMSON REUTERS ENTERPRISE CENTRE GMBH;
WEST PUBLISHING CORP,

– v. –

ROSS INTELLIGENCE INC,

*Appellant.*

ON APPEAL FROM AN ORDER OF THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE IN CASE NO. L:20-CV-00613,
STEPHANOS BIBAS, CIRCUIT JUDGE

**BRIEF FOR *AMICI CURIAE* PROFESSORS SANDRA AISTARS,
ROBERT BRAUNEIS, MEGAN CARPENTER, KEVIN CASINI,
JON M. GARON, TIMOTHY T. HSIEH, JOSHUA KRESH, JAKE
LINFORD, PHILIPPA LOENGARD, LOREN E. MULRAINE,
SEAN A. PAGER, ERIC PRIEST, ZVI ROSEN, MARK F.
SCHULTZ AND BHAMATI VISWANATHAN IN SUPPORT
OF THOMSON REUTERS AND WEST PUBLISHING**

FELICITY S. KOHN
PRYOR CASHMAN LLP
*Attorneys for Amici Curiae*
Seven Times Square, 40th Floor
New York, New York 10036
(212) 421-4100
fkohn@pryorcashman.com

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................... iii

INTERESTS OF AMICUS CURIAE ...................................................... 1

INTRODUCTION ............................................................................... 3

ARGUMENT ...................................................................................... 4

I.  FAIR USE IS A FACT-SPECIFIC, HOLISTIC
    INQUIRY ................................................................................... 4

II.  WHERE ARTIFICIAL INTELLIGENCE IS TRAINED TO PERFORM THE
     SAME FUNCTION AS THE ORIGINAL WORK, THE FIRST FACTOR
     FAVORS THE PLAINTIFF ............................................................ 6

    A.  The First Factor Considers Whether the Original Work Has
        the Same Purpose as the Ultimate Use of the Secondary Work ................... 6

    B.  Training Artificial Intelligence to Create a Competing Product Is a
        Commercial Use That Weighs Against Fair Use ......................................... 10

    C.  The Claim that Ross Made "Non-Expressive Use" of Thomson Reuters'
        Headnotes Does Not Render Its Use Fair ...................................... 11

        1.  Ross's Claim to Have Copied the "Unprotected" Portion of the
            Headnotes Does Not Sanction Its Copying ......................................... 11

        2.  Intermediate Copying Is Not *Per Se* Protected Where the Output
            Is Non-Infringing ......................................................................... 13

    D.  The District Court Correctly Distinguished *Oracle*, *Sony*, and *Sega* ........... 15

        1.  *Oracle*, *Sony*, and *Sega* Are Distinguishable Because They
            Concern Functional Computer Code .................................................. 15

        2.  *Oracle*, *Sega*, and *Sony* Are Distinguishable Because They
            Concern Artificially Restraining Competition ...................................... 16

E. Fair Use Requires a Justification for the Copying ........................................19

III. WHERE COPYING IS UNDERTAKEN TO CREATE A COMPETING
PRODUCT, THE FOURTH FACTOR FAVORS THE PLAINTIFF .............20

A. The District Court Properly Identified the Relevant Markets .....................22

1. The Relevant Market for the Original Work Is Legal-Research
Platforms, Not Headnotes.....................................................................22

2. Ross's Use Harms the Derivative Market for Licensing
Copyrighted Works for Training Artificial Intelligence .....................25

B. The District Court's Fourth Factor Analysis Is Not Circular .......................27

C. Thomson Reuters' Refusal to License Its Headnotes to Ross Does Not
Alter the Fourth Factor Analysis ..................................................................28

CONCLUSION.........................................................................................................29

CERTIFICATE OF COMPLIANCE........................................................................30

# TABLE OF AUTHORITIES

**CASES**                                                                    **PAGE(s)**

*Am. Geophysical Union v. Texaco Inc.*,
    60 F.3d 913 (2d Cir. 1994) ................................................................10, 14, 27

*Am. Geophysical Union v. Texaco Inc.*,
    802 F. Supp. 1 (S.D.N.Y. 1992), *amended* (Oct. 26, 1992), *aff'd*,
    37 F.3d 881 (2d Cir. 1994), *order amended and superseded*, 60
    F.3d 913 (2d Cir. 1994) ...............................................................................12

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*,
    598 U.S. 508 (2023).............................................................................*passim*

*Assessment Techs. of Wis., LLC v. WIREdata, Inc.*,
    350 F.3d 640 (7th Cir. 2003) ........................................................................19

*Authors Guild, Inc. v. Google, Inc.*,
    804 F.3d 202 (2d Cir. 2015) .........................................................................25

*Authors Guild, Inc. v. HathiTrust*,
    755 F.3d 87 (2d Cir. 2014) ...........................................................................25

*Banks v. McDivitt*,
    2 F. Cas. 759 (C.C.S.D.N.Y. 1875) ..............................................................16

*Bartz v. Anthropic PBC*,
    787 F. Supp. 3d 1007 (N.D. Cal. 2025)..........................................................7

*Bellsouth Advert. & Publ'g Corp. v. Donnelley Info. Publ'g, Inc.*,
    999 F.2d 1436 (11th Cir. 1993) ....................................................................19

*Bleistein v. Donaldson Lithographing Co.*,
    188 U.S. 239 (1903)......................................................................................20

*Campbell v. Acuff-Rose Music, Inc.*,
    510 U.S. 569 (1994)...........................................................................*passim*

*Capitol Recs., LLC v. ReDigi Inc.*,
    910 F.3d 649 (2d Cir. 2018) .........................................................................10

*Castle Rock Ent., Inc. v. Carol Publ'g Grp., Inc.*,
  150 F.3d 132 (2d Cir. 1998) ............................................................5, 28

*Chapman v. Maraj*,
  No. 2:18-CV-09088-VAP-SSx, 2020 WL 6260021
  (C.D. Cal. Sept. 16, 2020)................................................................19

*Folsom v. Marsh*,
  9 F. Cas. 342 (CCD Mass. 1841).............................................4, 5, 7, 23

*Fox News Network, LLC v. TVEyes, Inc.*,
  883 F.3d 169 (2d Cir. 2018) .............................................9, 21, 27, 28

*Google LLC v. Oracle America, Inc.*,
  593 U.S. 1 (2021).................................................................15, 16, 17

*Harper & Row Publishers, Inc. v. Nation Enters.*,
  471 U.S. 539 (1985).................................................................7, 16, 28

*Warner Bros. Ent. Inc. v. RDR Books*,
  575 F. Supp. 2d 513 (S.D.N.Y. 2008) .........................................21, 22

*Kadrey v. Meta Platforms, Inc.*,
  788 F. Supp. 3d 1026 (N.D. Cal. 2025)........................................*passim*

*Los Angeles News Serv. v. Reuters Television Int'l Ltd.*,
  149 F.3d 987 (9th Cir. 1998) ..............................................................14

*Ringgold v. Black Ent. Television, Inc.*,
  126 F.3d 70 (2d Cir. 1997) .............................................................27, 28

*Romanova v. Amilus Inc.*,
  138 F.4th 104 (2d Cir. 2025) ................................................................20

*Sega Enterprises Ltd. v. Accolade, Inc.*,
  977 F.2d 1510 (9th Cir. 1992) .....................................................13, 15, 18

*Sony BMG Music Ent. v. Tenenbaum*,
  660 F.3d 487 (1st Cir. 2011).................................................................6

*Sony Computer Entertainment, Inc. v. Connectix Corp.*,
  203 F.3d 596 (9th Cir. 1999) ......................................................15, 18

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
  464 U.S. 417 (1984)...................................................................................6

*Sundeman v. The Seajay Soc'y, Inc.*,
  142 F.3d 194 (4th Cir.1998) ....................................................................19

*Thompson Reuters Enter. Centre GMBH v. Ross Intel. Inc.*,
  765 F. Supp. 3d 382 (D. Del. 2025)....................................7, 10, 15, 22

*Tiffany Design, Inc. v. Reno-Tahoe Specialty, Inc.*,
  55 F. Supp. 2d 1113 (D. Nev. 1999)......................................11, 12, 14

*Toho Co., Ltd. v. William Morrow & Co.*,
  33 F. Supp. 2d 1206 (C.D. Cal. 1998) .............................................21

*Walt Disney Prods. v. Filmation Assocs.*,
  628 F. Supp. 871 (C.D. Cal. 1986) ....................................................13

*Walter v. Univ. Books, Inc.*,
  602 F.2d 859 (9th Cir. 1979) .............................................................13

## STATUTES AND RULES

17 U.S.C. § 107.............................................................................................5

17 U.S.C. § 107(1) ......................................................................................6

17 U.S.C. § 107(4) ....................................................................................20

## OTHER AUTHORITIES

1 Nimmer on Copyright § 2A.03 (2025) ...............................................15

4 Nimmer on Copyright § 13F.08 (2025) .............................................21

Voedisch, Bill, "Westlaw: An Early History" (2015) ...........................23

## INTERESTS OF THE AMICUS CURIAE

Amici are scholars and professors whose research focuses on copyright law. Amici have no direct interest in the outcome of this litigation.[1] Amici are listed in alphabetical order:

**Sandra Aistars**, Distinguished Counselor in Residence & Professor of Law, IPPI: The IP Policy Institute, The University of Akron School of Law

**Robert Brauneis**, Michael J. McKeon Professor of Intellectual Property Law, Co-Director of the Intellectual Property Program, The George Washington University Law School

**Megan Carpenter**, Dean and Professor of Law, Franklin Pierce School of Law, University of New Hampshire

**Kevin Casini**, Lecturer, Quinnipiac University School of Law

**Jon M. Garon**, Associate Dean for Technology and Innovation, Director, Goodwin Program for Society, Technology, and the Law, Shepard Broad College of Law, Nova Southeastern University

**Timothy T. Hsieh**, Associate Professor of Law, Oklahoma City University School of Law

---

[1]  All parties have consented to the filing of this brief.  No counsel for a party to this appeal has authored this brief in whole or in part.  No party or party's counsel has contributed money that was intended to fund preparing or submitting this brief. The brief was funded almost exclusively by the Amici Curiae, with additional contributions made by The IP Policy Institute of the University of Akron.

**Joshua Kresh**, Research Professor & Executive Director, The IP Policy Institute, the University of Akron School of Law

**Jake Linford**, Associate Dean for Academic Affairs, Loula Fuller & Dan Myers Professor, Florida State University College of Law

**Philippa Loengard**, Executive Director of the Kernochan Center for Law, Media and the Arts and Lecturer in Law, Columbia Law School

**Loren E. Mulraine**, Professor of Law, Director of Music and Entertainment Law Studies, Belmont University College of Law

**Sean A. Pager**, Professor of Law; Associate Director, Intellectual Property, Information & Communications Law Program (IPIC), Michigan State University College of Law

**Eric Priest**, Professor of Law, University of Oregon School of Law

**Zvi Rosen**, Associate Professor of Law, Franklin Pierce School of Law, University of New Hampshire

**Mark F. Schultz**, Goodyear Tire & Rubber Company Endowed Chair in Intellectual Property Law, Faculty Chair, IPPI: The IP Policy Institute, The University of Akron School of Law

**Bhamati Viswanathan**, Fellow, Columbia Law School, Kernochan Center for Law, Media and the Arts, Senior Visitor, University of Cambridge Faculty of Law

## **INTRODUCTION**

Use of AI in otherwise infringing activity does not transmute that action into fair use. Ross Intelligence Inc. ("Ross") used headnotes prepared by Thomson Reuters Enterprise Centre GMBH and West Publishing Corp. (together "Thomson Reuters") to make a legal research database that competes directly with Westlaw.[2] In a well-reasoned opinion, Judge Stephanos Bibas, sitting by designation below, held that this was not a fair use of copyrighted material, since Ross took this action in order to create a market substitute for the work it was copying.

Ross and its amici argue that Judge Bibas misapplied the law on fair use. This amicus brief is intended to clarify the underlying legal tenets and confirm that Judge Bibas correctly applied them in his holding below. It makes no difference that the headnotes express facts (albeit creatively); if all defendants could excuse their unauthorized copying by claiming to be seeking the facts contained therein, the exception would swallow copyright law whole. Nor, as Ross and its amici argue, is its use fair because it engaged only in "intermediate copying," creating no infringing output. The law is clear that copyright holders have the right to control reproduction, irrespective of whether the separate rights to distribute the work or create derivative works therefrom are infringed.

---

[2] The claims by Thomson Reuters include various elements of its database, including headnotes, but they will be referred to collectively as "headnotes" for the sake of brevity.

Ross and its amici are also mistaken on the law regarding the fourth factor. Courts should be extremely wary of finding no market harm where the infringer sets out to create a directly infringing product. Nor is there anything circular in finding market harm based on lost licensing fees for AI training, as a vibrant and rapidly developing market exists for such use. The fact that Thomson Reuters elected not to license its works for such use does not alter the analysis. Declining to license one's works to a competitor is a copyright holder's prerogative.

In sum, Ross copied elements of Thomson Reuters' copyrighted database for the purpose of training its AI to create a competing one without paying a licensing fee. That is quintessentially unfair.

## ARGUMENT

## I.    FAIR USE IS A FACT-SPECIFIC, HOLISTIC INQUIRY

"[F]air use is an affirmative defense, and [the proponent] bears the burden to justify its taking...." *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 547 n.21 (2023).

Section 107 of the Copyright Act, enacted in 1976, codified the common law doctrine of fair use, which traces its origins as far back as Justice Story's opinion in *Folsom v. Marsh*, 9 F. Cas. 342 (No. 4,901) (CCD Mass. 1841). *See Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 576 (1994). In *Folsom v. Marsh*, Justice Story counseled courts to "look to the nature and objects of the selections made,

the quantity and value of the materials used, and the degree in which the use may prejudice the sale, or diminish the profits, or supersede the objects, of the original work." 9 F. Cas. at 348. Drawing on that foundation, Section 107 sets out four non-exclusive fair use factors: "(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107.

The fair use factors "are not meant to be applied mechanically but to contribute to a holistic inquiry: whether the secondary work is likely to substitute for the original work in the marketplace and therefore undermine the incentive to create." *Kadrey v. Meta Platforms, Inc.*, 788 F. Supp. 3d 1026, 1037 (N.D. Cal. 2025); *see Campbell*, 510 U.S. at 577 ("The task [of making a fair use determination] is not to be simplified with bright-line rules, for the statute, like the doctrine it recognizes, calls for case-by-case analysis."); *Castle Rock Ent., Inc. v. Carol Publ'g Grp., Inc.*, 150 F.3d 132, 146 (2d Cir. 1998) ("As we have noted, the four statutory fair use factors are non-exclusive and serve only as a guide to promote the purposes underlying the copyright law.").

From a holistic perspective, Judge Bibas correctly found that copying a copyrighted work for the commercial purpose of creating a superseding one – even where the superseding work itself is not infringing – falls outside the bounds of fair use under established legal principles. The fact that the copying was done for the claimed purpose of training new technology, namely, non-generative artificial intelligence, does not change those settled principles of copyright law. *See Sony BMG Music Ent. v. Tenenbaum*, 660 F.3d 487, 501 (1st Cir. 2011) ("The Supreme Court has expressly instructed that courts apply the Copyright Act to new technologies.") (citing *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417 (1984)) (noting that "from its beginning, the law of copyright has developed in response to significant changes in technology," and that should new rules be required, it is Congress, not the courts, who fashion them).

## II. WHERE ARTIFICIAL INTELLIGENCE IS TRAINED TO PERFORM THE SAME FUNCTION AS THE ORIGINAL WORK, THE FIRST FACTOR FAVORS THE PLAINTIFF

### A. The First Factor Considers Whether the Original Work Has the Same Purpose as the Ultimate Use of the Secondary Work

"The first fair use factor is 'the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes.'" *Warhol*, 598 U.S. at 527 (quoting 17 U.S.C. § 107(1)). "This factor considers the reasons for, and nature of, the copier's use of an original work," with the primary aim of assessing "whether the new work merely 'supersede[s] the

objects' of the original creation . . . ('supplanting' the original)" – which weighs against a finding of fair use – "or instead adds something new, with a further purpose or different character." *Id.* at 528 (quoting *Campbell*, 510 U.S. at 579 (quoting *Folsom*, 9 F. Cas. at 348 and *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 562 (1985))). "The use of an original work *to achieve a purpose that is the same as, or highly similar to, that of the original work* is more likely to substitute for, or 'supplant,' the work," and thus not to be deemed fair use. *Id.* (emphasis added).

Judge Bibas correctly applied this principle, finding that "Ross took the headnotes to make it easier to develop a competing legal research tool. So Ross's use is not transformative." *Thompson Reuters Enter. Centre GMBH v. Ross Intel. Inc.*, 765 F. Supp. 3d 382, 399 (D. Del. 2025). More specifically, the purpose of Thomson Reuters' headnotes and of the work produced by Ross as a result of its copying was the same – to direct users to relevant portions of judicial opinions. *Id.* at 398.[3]

---

[3] The decisions in *Bartz v. Anthropic PBC*, 787 F. Supp. 3d 1007 (N.D. Cal. 2025) and *Kadrey v. Meta Platforms, Inc.*, 788 F. Supp. 3d 1026 (N.D. Cal. 2025) are both distinguishable on the ground that they concern generative AI, which can write its own text and be put to myriad uses, whereas Ross's non-generative AI platform has only one use, namely, to compete directly with Westlaw. *See Bartz*, 787 F. Supp. 3d at 1022 (distinguishing the district court's decision in the instant case on the basis that Ross's platform is "not generative AI (AI that writes new content itself)," but "[r]ather, what was trained – using a proprietary system for

(continued…)

Ross and its amici protest that Ross's copying was for a distinct purpose, not to summarize judicial opinions to aid researchers, but rather to train its AI model. *See, e.g.*, Brief of Copyright Law Professors (Dkt. 40) (hereinafter, "Law Profs. Br.") at 4-5. But controlling principles of copyright law mandate taking into consideration the ultimate use made of the secondary work. The Supreme Court's recent *Warhol* opinion underscores that fact. There, the question was whether the Warhol Foundation's licensing of a print created by Andy Warhol from a photograph taken by Lynn Goldsmith was fair use. Although Warhol had copied the photograph for the purpose of creating a new work of art, it was the ultimate use to which the resulting work was put – namely, the Warhol Foundation's licensing it to a magazine to illustrate an article about Prince – that was relevant to the fair use analysis. *Warhol*, 598 U.S. at 511. In that case, the original photograph was used to illustrate magazine articles about Prince, and the resulting work created by Warhol was used to illustrate a magazine article about Prince, so their purposes were the same and the use was not transformative. *Id*. That is directly analogous to the facts of the instant case. Had Ross used its AI database for some other purpose, the fair use analysis might be different. But here, Ross

---

finding court opinions in response to a given legal topic – was a competing AI tool for finding court opinions in response to a given legal topic"); *Kadrey*, 788 F. Supp. 3d at 1044 ("The purpose of Meta's copying was to train its LLMs, which are innovative tools that can be used to generate diverse text and perform a wide range of functions.").

offers its AI database to consumers for the purpose of conducting legal research. Both Thomson Reuters' headnotes and Ross's AI platform help researchers identify relevant portions of judicial opinions. Accordingly, the headnotes and Ross's "copying use of [them] share substantially the same purpose," *Warhol*, 598 U.S. at 509, and the first factor weighs heavily against a finding of fair use.

Ross's amici further argue, in a variation on that same theme, that the district court wrongly conflated Ross's use of Thomson Reuters' headnotes with the use of Ross's database made by its end users. *See Brief for Authors Alliance, Inc.* (Dkt. 47) (hereinafter "AA Br.") at 5-7. That is incorrect for the reasons articulated above and confirmed by fair use case law analyzing the use of services made by their end users. For instance, in *Fox News v. TVEyes*, the Second Circuit considered the use made by TVEyes' clients in evaluating whether its use – copying Fox News broadcasts and providing clips thereof to its clients – was fair. *See Fox News Network, LLC v. TVEyes, Inc.*, 883 F.3d 169, 178 (2d Cir. 2018) (finding no fair use where "clients of TVEyes use Fox's news broadcasts for the same purpose that authorized Fox viewers use those broadcasts – the purpose of learning the information reported"). Likewise, in evaluating whether ReDigi's service enabling users to sell digital music files they had purchased was fair use, the court considered not only ReDigi's copying to create the new service, but also its users' sale of the reproductions in direct competition with the music publishers'

copyrighted works.  *See Capitol Recs., LLC v. ReDigi Inc.*, 910 F.3d 649, 662 (2d Cir. 2018).  The use of Ross's database made by its end users is squarely relevant to whether its copying of Thomson Reuters headnotes to create that database was fair use.

### B.   Training Artificial Intelligence to Create a Competing Product Is a Commercial Use That Weighs Against Fair Use

Judge Bibas also held there is no dispute that Ross's use is commercial, 765 F. Supp. 3d at 397, which also militates in favor of a finding for Thomson Reuters on the first factor.  *See Warhol*, 598 U.S. at 532-33.  This analysis does not change because Ross is not directly monetizing Thomson Reuters' headnotes.  As the Second Circuit held in *Texaco*, "Texaco's [unlawful] photocopying [of the plaintiff's copyrighted articles] could be regarded simply as another 'factor of production' utilized in Texaco's efforts to develop profitable products. Conceptualized in this way, it is not obvious why it is fair for Texaco to avoid having to pay at least some price to copyright holders for the right to photocopy the original articles."  *Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 922 (2d Cir. 1994).  The same analysis applies to Ross's copying.

**C.    The Claim that Ross Made "Non-Expressive Use" of Thomson Reuters' Headnotes Does Not Render Its Use Fair**

**1.    Ross's Claim to Have Copied the "Unprotected" Portion of the Headnotes Does Not Sanction Its Copying**

Ross's amici argue that its copying was transformative because it was done to obtain the unprotected correlation between the headnote and the judicial opinion. *See* Law Prof. Br. at 6. Put differently, the claim is that the non-expressive component of the headnotes was copied, and that is fair use. *Id*. This argument misstates the law. The Copyright Act does not permit copying of protectable material simply because the copier asserts that the reason is to obtain the "factual" material therein. Such an exception would swallow the fundamental rule of copyright protection, namely, that a copyright owner may prevent others from reproducing its work without authorization.

A court was faced with this precise argument in *Tiffany Design, Inc. v. Reno-Tahoe Specialty, Inc.*, 55 F. Supp. 2d 1113, 1123–24 (D. Nev. 1999), and properly rejected it. There, the defendant scanned the plaintiff's photograph of the Las Vegas strip, then excerpted out several buildings and inserted those into its own non-infringing image, attempting to defend its conduct by contending that its intent was only to access the uncopyrightable components – the "facts" of the buildings – from the image. The court gave this argument the back of its hand, declining to adopt "Defendant's novel argument that a copyrighted photograph or

its derivative image can be reduced to its factual (i.e., uncopyrightable) components through the use of computer manipulation." *Id.* at 1123–24. This is precisely what Ross's amici contend it has done here, arguing that using the headnotes for AI training purposes reduced the copyrightable headnotes to their factual components. *Id.*; *cf.* Law Prof. Br. at 6 ("ROSS therefore made a 'nonexpressive use' of Thomson's headnotes – a use not for the purpose of distributing or otherwise capitalizing on the headnotes' expressive content, but rather a use of the facts, ideas, or other unprotected elements they contain."). The argument is incorrect here, as it was in *Tiffany Design*.

Texaco made a similar argument in *American Geophysical Union v. Texaco Inc.*, namely, that the copying was done internally for the purpose of scientists referencing the facts in the plaintiff's copyrighted articles. *See Am. Geophysical Union v. Texaco Inc.*, 802 F. Supp. 1, 15 (S.D.N.Y. 1992) (noting Texaco's argument that "the principal purpose of the copying is to state reported facts accurately"), *amended* (Oct. 26, 1992), *aff'd*, 37 F.3d 881 (2d Cir. 1994), *order amended and superseded*, 60 F.3d 913 (2d Cir. 1994). But Texaco's claim that it copied to obtain the facts underlying the expressive content did not render its unauthorized reproduction fair use. The same analysis applies here.

### 2.    Intermediate Copying Is Not *Per Se* Protected Where the Output Is Non-Infringing

To the extent that Ross's amici intend to posit that where the output (or end product distributed to consumers) is non-infringing, intermediate copying is protected as fair use (*see* Law Prof. Br. at 6), that argument is also incorrect.  It is tantamount to saying that the copyright holder has no right to prevent intermediate copying so long as the resulting work is not infringing.  But that contravenes the established rule that a copyright holder has the right to control the reproduction of its work, irrespective of whether that work, or a derivative infringing work, is distributed to the public (which are separate rights under § 106).  As the Ninth Circuit stated in *Sega Enterprises Ltd. v. Accolade, Inc.*, "Section 501 provides that '[a]nyone who violates any of the exclusive rights of the copyright owner as provided by sections 106 through 118 ... is an infringer of the copyright.' On its face, that language unambiguously encompasses and proscribes 'intermediate copying.'"  977 F.2d 1510, 1518 (9th Cir. 1992); *see also Walter v. Univ. Books, Inc.*, 602 F.2d 859, 864 (9th Cir. 1979) (holding that "blueprints" or other intermediate reproductions can constitute infringing copies under the Copyright Act); *Walt Disney Prods. v. Filmation Assocs.*, 628 F. Supp. 871, 877 (C.D. Cal. 1986) (holding that intermediate materials created during production—such as scripts, storyboards, story reels, models, and designs—are actionable copies, even if they are only preliminary steps toward a finished product).

- 13 -

It follows that copying for internal purposes, even where there is no infringing output, is not *per se* fair use either, as Ross's amici suggest (as that would be the equivalent of divesting the copyright holder of the right to preclude intermediate copying). Once again looking to *Tiffany Design, Inc.*, the court held the "intermediate copying" of the aerial photograph was not fair use, as "the uncontrolled use of scanned images to create directly competitive products" is "inherently exploitative." 55 F. Supp. 2d at 1123-24 (citing *Los Angeles News Serv. v. Reuters Television Int'l Ltd.*, 149 F.3d 987, 994 (9th Cir. 1998)). Likewise, in *Texaco*, the Second Circuit held that Texaco's internal copying of the plaintiff's copyrighted articles for its scientists' reference was not fair use, even though the outputs (new scientific works) were decidedly non-infringing. 60 F.3d at 931. It bears noting that even in *Kadrey*, a case relied upon by Ross and its amici, Judge Chhabria specifically clarified that "this ruling does not stand for the proposition that Meta's use of copyrighted materials to train its language models is lawful. It stands only for the proposition that these plaintiffs made the wrong arguments and failed to develop a record in support of the right one" – namely, that copying in service of creating a market substitute is not fair use, even if the output is not directly infringing, as is the case here. *Kadrey*, 788 F. Supp. 3d at 1036-37.

**D.  The District Court Correctly Distinguished *Oracle*, *Sony*, and *Sega***

Nor can Ross rely on *Google LLC v. Oracle America, Inc*., 593 U.S. 1 (2021), *Sony Computer Entertainment, Inc. v. Connectix Corp*., 203 F.3d 596 (9th Cir. 1999), or *Sega Enterprises Ltd. v. Accolade, Inc*., 977 F.2d 1510 (9th Cir. 1992), to support its fair use claim for "intermediate copying" of Thomson Reuters' headnotes, as Judge Bibas correctly held.

**1.  *Oracle*, *Sony*, and *Sega* Are Distinguishable Because They Concern Functional Computer Code**

Judge Bibas correctly distinguished all three cases on the basis that they concern intermediate copying of computer code, which "almost always serve[s] functional purposes." *Thomson Reuters*, 765 F. Supp. 3d at 398.  He reasoned, again correctly, that as a result, "the fair use considerations for [computer] programs do not always apply to cases about copying written words," like this one. *Id*.

A fundamental tenet of copyright law is that it "attempts to avoid monopolization of functional activities."  1 Nimmer on Copyright § 2A.03 (2025). That creates an inherent tension regarding the protection of computer code, which "itself can be conceptualized as 'a part of a machine,' namely the component that instructs a computer how to operate."  *Id*.; *see, e.g., Oracle*, 593 U.S. at 34 (acknowledging that "the Sun Java API is inseparably bound to those task-

implementing lines"). In particular, courts are loathe to permit companies to leverage copyrights in functional computer code to restrain competition, which is the explanatory theme unifying the *Oracle*, *Sony*, and *Sega* cases, as discussed below.

By contrast, headnotes – while based on facts – are purely expressive. As a result, they are closer than functional computer code to the core of copyright protection. *See Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 547 (1985) (discussing the protection merited by nonfiction works, even "compilation[s] of pure fact"). That headnotes are protected by copyright law as literary works has long been recognized by the courts. Appellee's Brief (Dkt. 89) at 26-27; *Banks v. McDivitt*, 2 F. Cas. 759, 761 (C.C.S.D.N.Y. 1875) (copying index and citations verbatim from notes on court rules found infringing). Nor is there a risk that protection of such purely expressive works will enable the copyright holder to monopolize what is essentially a functional component of a product. For that reason, Judge Bibas rightly concluded that the fair use considerations for software differ from those for purely expressive works like the headnotes at issue here.

## 2. *Oracle*, *Sega*, and *Sony* Are Distinguishable Because They Concern Artificially Restraining Competition

*Oracle, Sega,* and *Sony* are further distinguishable because all concern a company's attempt to misuse copyright in something inherently functional or

otherwise non-copyrightable to restrain competition. Although Ross appears to recognize that and tries to map the same narrative onto Thomson Reuters, the starkly different facts of these cases make clear why Ross's argument fails.

*Oracle* concerned whether Google's use of Oracle's copyrighted Java application programming interfaces ("APIs") in its Android operating system constituted fair use. The APIs enabled programmers to use the Java language, which they already knew, to build certain functions into new programs designed for Google's mobile platform. *Oracle*, 593 U.S. at 9. The Court's finding of fair use was explicitly informed by its concern that "[c]opyright on largely functional elements of software that have become an industry standard gives a copyright holder anti-competitive power." *Id*. at 32. Further, the Court was swayed by the fact that the value in Oracle's APIs "derive[d] from the value that those who do not hold copyrights, namely, computer programmers, invest[ed] of their own time and effort to learn the API's system," not from any intrinsic value of the APIs themselves. *Id*. at 28-29. That is not the case with regard to Thomson Reuters' headnotes. Judicial opinions are accessible and available to all, and Thomson Reuters' assertion of copyright in its headnotes was no impediment to Ross to creating its own. Moreover, the value of Thomson Reuters' headnotes lies in the copyrighted work, not in the investment made by others to learn them. The reasoning underlying the *Oracle* decision is inapposite.

*Sega* and *Sony* also turned on assertion of copyright to block access to functional elements of the plaintiffs' products, which in turn inhibited competition. To create compatible products, the defendants had no choice but to reverse engineer the plaintiffs' computer programs to identify the functional elements within them. *Sega* explicitly conditioned its fair use finding on such reverse engineering being "the *only* means of gaining access to those unprotected aspects of the program…," 977 F.2d at 1520 (emphasis added), a justification reiterated by *Sony* when confronted with a similar question. 203 F.3d at 602 ("Where disassembly is the *only way to gain access to the ideas and functional elements embodied in a copyrighted computer program* and where there is a legitimate reason for seeking such access, disassembly is a fair use of the copyrighted work, as a matter of law.") (emphasis in original). As in *Oracle*, it appeared that Sega and Sony were attempting to leverage their copyrights in functional elements of their products to stifle competition. Moreover, the defendants had a clear justification for the copying, as it was the only way to access the functional elements of the programs to develop compatible products.

Ross attempts to import the same analysis into this case (Appellant's Br. at 2), but none of the competitive constraints present in *Oracle*, *Sony*, or *Sega* apply. Here, not only is there no functional element of the headnotes to access as they are purely expressive, but copying them is not necessary to create a competing

database.  Ross had access to the judicial opinions, and Thomson Reuters' assertion of copyright in its headnotes in no way impaired Ross's ability to draft its own headnotes and use them to train its competing AI database.  Westlaw's competitors produce their own headnotes, seemingly without too much of an issue – they simply have to bear the cost of doing so.  Nor has Ross offered any other justification for its copying.  That alone is sufficient basis to affirm the district court's determination that Ross's conduct is not shielded by fair use.[4]

### E.    Fair Use Requires a Justification for the Copying

The Supreme Court's ruling in *Warhol* "made clear that *Campbell*'s requirement of justification is not applicable only in cases of claimed parody, but

---

[4] Apparently recognizing that the computer code cases are inapposite for the reasons identified by Judge Bibas, Ross's amici cite to other intermediate copying cases finding fair use.  *See* AA Br. at 11-12.  But this proves nothing other than that fair use requires a fact-intensive analysis, and in certain circumstances intermediate copying may be fair use – just as in certain circumstances otherwise infringing outputs will be deemed to be fair use.  The cited cases are readily distinguishable. *See Bellsouth Advert. & Publ'g Corp. v. Donnelley Info. Publ'g, Inc.,* 999 F.2d 1436 (11th Cir. 1993) (no infringement where defendant did not copy selection and arrangement of competitor's directory, the only element in which competitor had a copyright); *Sundeman v. The Seajay Soc'y, Inc.,* 142 F.3d 194 (4th Cir.1998) (intermediate copies were made to preserve the integrity of fragile seventy-year-old manuscript and to authenticate the work); *Assessment Techs. of Wis., LLC v. WIREdata, Inc.,* 350 F.3d 640 (7th Cir. 2003) (uncopyrightable data was only accessible by copying copyrighted database, unlike here where judicial opinions are publicly available without copying any component of Westlaw); *Chapman v. Maraj,* No. 2:18-CV-09088-VAP-SSx, 2020 WL 6260021, at *10 (C.D. Cal. Sept. 16, 2020) (primary purpose of defendant's copying was private experimentation).

applies generally to all claims of fair use." *Romanova v. Amilus Inc.*, 138 F.4th 104, 112 (2d Cir. 2025); *Warhol*, 598 U.S. at 531-32 (noting the importance to the first factor of a "justification" for the copying of the original); *Campbell*, 510 U.S. at 580 (analyzing the "justification for the particular copying done" in determining fair use). As the Court held in *Campbell*, if copying is done "merely to avoid the drudgery of working up something fresh" – as appears to be the case here – "the claim to fairness in borrowing from another's work diminishes accordingly." *Campbell*, 510 U.S. at 579. The absence of justification here is glaring precisely because the judicial opinions for which Ross claims to need headnotes were free and accessible to all, laying bare that the copying was done merely to spare the effort and expense of Ross's having to draft its own headnotes. These circumstances bring to mind Justice Holmes' comment that "[o]thers are free to copy the original" – here, the judicial opinions themselves – but "[t]hey are not free to copy the copy." *Bleistein v. Donaldson Lithographing Co.*, 188 U.S. 239 (1903). It is the latter that Ross did, without justification, and for the purpose of creating a "superseding" product. The first factor favors Thomson Reuters.

## III. WHERE COPYING IS UNDERTAKEN TO CREATE A COMPETING PRODUCT, THE FOURTH FACTOR FAVORS THE PLAINTIFF

"The fourth fair use factor is 'the effect of the use upon the potential market for or value of the copyrighted work.'" *Campbell*, 510 U.S. at 590 (quoting 17

U.S.C. § 107(4)).   The fundamental question in analyzing the fourth factor is whether the copying is done to create a work that would substitute for the original or potential derivative works "that creators of original works would in general develop or license others to develop." *Id.* at 592-93 (noting the relevant harm under the fourth factor is "market substitution"); *TVEyes*, 883 F.3d at 179 (the fourth factor "focuses on whether the copy brings to the marketplace a competing substitute for the original, or its derivative, so as to deprive the rights holder of significant revenues because of the likelihood that potential purchasers may opt to acquire the copy in preference to the original"); *Warner Bros. Ent. Inc. v. RDR Books*, 575 F. Supp. 2d 513, 551 (S.D.N.Y. 2008) (encyclopedia of *Harry Potter* novels was not fair use where it would have a substantial market impact on two companion books to the novels as well as "the market for derivative works that Rowling is entitled or likely to license"); *Toho Co., Ltd. v. William Morrow & Co.*, 33 F. Supp. 2d 1206, 1217 (C.D. Cal. 1998) (reaching similar conclusion regarding compendium of the *Godzilla* films).   Under the fourth factor, "[t]he proper focus is limited to whether defendant's use supplants potential commercial opportunities that rightly belong to plaintiff. These vistas may include markets plaintiff has made plans to enter as well as some it has not contemplated."   4 Nimmer on Copyright § 13F.08 (2025).

"In addition to evaluating the particular actions of the alleged infringer, the fourth factor examines 'whether unrestricted and widespread conduct of the sort engaged in by the defendant ... would result in a substantially adverse impact on the potential market for the original.'" *RDR Books*, 575 F. Supp. 3d at 549 (quoting *Campbell*, 510 U.S. at 590). "Since fair use is an affirmative defense, its proponent would have difficulty carrying the burden of demonstrating fair use without favorable evidence about relevant markets." *Campbell*, 510 U.S. at 590.

## A.    The District Court Properly Identified the Relevant Markets

Judge Bibas properly identified the relevant market for the original work, the Westlaw database, as legal-research platforms, and a relevant derivative market as data to train legal AIs. *Thompson Reuters*, 765 F. Supp. 3d at 400. Ross and its amici object to both but are wrong on the law.

### 1.    The Relevant Market for the Original Work Is Legal-Research Platforms, Not Headnotes

Ross and its amici argue strenuously that the district court identified the wrong market in its fourth factor analysis because what Ross copied was not the whole of the Westlaw database, but only the headnotes. The relevant market for the original work, they contend, is the market for headnotes, which does not exist. But as Thomson Reuters points out in its brief, the registered work is Westlaw, not just the headnotes. Appellee's Br. at 44. To the extent these headnotes predate

Westlaw, they were part of West's National Reporter System, which served the same function in a less interactive manner.[5]

In considering whether Ross's copying was undertaken to create a substitute for the original work (i.e., Westlaw), the appropriate market is the one for legal-research platforms, not only the portion of Westlaw copied by Ross. Otherwise, anyone who copied less than the entirety of a copyrighted work would contend that the appropriate market was for the small piece copied (e.g., a portion of a novel, a few scenes of a film, or piece of a photograph) and could thereby evade liability. That cannot be correct. Indeed, Justice Story, in his seminal opinion in *Folsom v. Marsh*, held the same:

> It is certainly not necessary, to constitute an invasion of copyright, that the whole of a work should be copied, or even a large portion of it, in form or in substance. If so much is taken, that the value of the original is sensibly diminished, or the labors of the original author are substantially to an injurious extent appropriated by another, that is sufficient, in point of law, to constitute a piracy pro tanto.

9 F. Cas. at 348. In sum, the question is whether the copying of some portion of the original work was undertaken to create a new work that would substitute for the original. Here, the copying of Thomson Reuters' headnotes – part of its

---

[5] In the beginning Westlaw was only headnotes, and full case text was only added several years later. Voedisch, Bill, "Westlaw: An Early History" (2015). Legal Publishing. 1. https://scholarship.law.umn.edu/publishing/1

Westlaw database – was undertaken in order to create a competing legal-research database, thereby tilting the fourth factor in favor of Thomson Reuters.

Nor is it relevant that the product Ross made through its copying is not infringing, as it is nevertheless designed to compete with the copyrighted work of which the headnotes are a part. By way of example, in *Kadrey*, Judge Chhabria expressly endorsed the principle that if the product created as a result of unauthorized copying competes in the plaintiff's market and makes it less likely that people will purchase its work, harm cognizable under the fourth factor has occurred. *See Kadrey*, 788 F. Supp. 3d at 1054 ("To be sure, it would be easier to conclude that the market for copied books would be harmed by an LLM that is capable of regurgitating those books or generating substantially similar text. But less similar outputs, such as books on the same topics or in the same genres, can still compete for sales . . . And by taking sales from those books, or by flooding stores and online marketplaces so that some of those books don't get noticed and purchased, those outputs would reduce the incentive for authors to create—the harm that copyright aims to prevent."). Put differently, where Ross has copied Thomson Reuters' headnotes in service of making a competing database that obviates the need for Thomson Reuters' headnotes, fourth factor market harm for the original work has occurred.

It is on this basis that the *Google Books* and *HathiTrust* cases heavily relied upon by Ross and its amici should be distinguished.  In both cases, the Second Circuit concluded that copying works to enable searching them did not create substitutes for the original works at issue.  *See Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 100 (2d Cir. 2014) ("[T]he full-text search function does not serve as a substitute for the books that are being searched.") (citation omitted).  In *Authors Guild v. Google, Inc.*, the Second Circuit considered whether the provision of snippets of a few lines of text containing the search terms would change the analysis in *HathiTrust* and concluded it would not precisely because those snippets would not serve as an effective substitute for the original works.  804 F.3d 202, 224 (2d Cir. 2015) ("[W]e conclude that the snippet function does not give searchers access to effectively competing substitutes.").  By contrast, Ross's database was designed to perform the same function as the Westlaw database and compete directly with it, *see* Appellee's Br. at 53, rendering *Google Books* and *HathiTrust* inapposite.

### 2. Ross's Use Harms the Derivative Market for Licensing Copyrighted Works for Training Artificial Intelligence

A growing market exists for training AI with copyrighted works, fueled by significant financial investments, ongoing negotiations, and the emergence of

industry standards.[6] Key partnerships highlight this fast-growing market.  By way of example, Reddit announced a content licensing deal with Google for $60 million a year.[7] Reddit subsequently unveiled its partnership with OpenAI granting OpenAI access to Reddit's Data API.[8] Thomson Reuters, Icertis, and Accenture formed a collaboration to enhance legal workflows using AI licensing of Thomas Reuters' vast store of data and intelligence.[9] Free Law Project and the Civil Rights Litigation Clearinghouse secured a grant to explore AI-driven legal tools and make legal processes more accessible.[10] LexisNexis and Harvey teamed up to integrate generative AI technology with legal content, aiming to improve legal research and workflows.[11] The growing market is also evident in Wiley's AI licensing strategy, which reported $40 million in AI licensing revenue for the 2025 fiscal year, reflecting the increasing value of data for AI training as a commodity.[12] Against

---

[6] https://scholarlykitchen.sspnet.org/2024/10/15/licensing-scholarly-content-llms/

[7] https://blog.google/inside-google/company-announcements/expanded-reddit-partnership/

[8] https://redditinc.com/blog/reddit-and-oai-partner

[9] https://www.thomsonreuters.com/en/press-releases/2025/september/thomson-reuters-icertis-and-accenture-announce-strategic-partnership-to-deliver-ai-powered-contract-intelligence-for-connected-business-operations

[10] https://free.law/2025/09/25/clearinghouse

[11] https://www.lawnext.com/2025/06/legal-ai-platform-harvey-to-get-lexisnexis-content-and-tech-in-new-partnership-between-the-companies.html

[12] https://www.publishersweekly.com/pw/by-topic/industry-news/financial-reporting/article/98033-wiley-reports-big-jump-in-profits-in-fiscal-2025.html

this backdrop, there is no doubt that Ross's copying of Thomson Reuters' headnotes without authorization harmed its market for licensing its works for the same use.

### B.    The District Court's Fourth Factor Analysis Is Not Circular

Ross and its amici warn of the danger of circularity in the fourth factor analysis. But Judge Bibas' analysis does not fall prey to any circularity. The risk of circularity in the fourth factor arises where a plaintiff alleges harm from the lost revenue it would have earned just from the defendant's copying – in other words, the argument goes that the defendant infringed by not licensing the use, and the harm is the lost licensing fee from the defendant's use. If that were sufficient to tilt the fourth factor in favor of the plaintiff, it would always be in the plaintiff's favor, as the infringement suit is predicated on the defendant's failure to pay. However, as courts have long held, the "vice of circularity" can be avoided "by considering 'only traditional, reasonable, or likely to be developed markets' when considering a challenged use upon a potential market." *Ringgold v. Black Ent. Television, Inc.*, 126 F.3d 70, 81 (2d Cir. 1997); *see TVEyes, Inc.*, 883 F.3d at 180 (same) (quoting *Texaco*, 60 F.3d at 930).

*Ringgold*, for instance, addressed whether defendant BET's unauthorized use of plaintiff Faith Ringgold's quilt in an episode of its television show was fair use. The Second Circuit specifically addressed circularity in the fourth factor and

concluded there was none where Ringgold identified a potential market for licensing her quilts for film and television and provided an example of such a licensing request, which she turned down. *Ringgold*, 126 F.3d at 81. Where there is evidence of a market for use like the defendant's, even if the plaintiff has not yet participated in that market, there is no risk of circularity in finding market harm based on the defendant's failure to pay the "customary price." *Id*. (quoting *Harper & Row*, 471 U.S. at 562). Similarly, in *TVEyes*, the Second Circuit found that the "success of TVEyes' business model demonstrates that deep-pocketed consumers are willing to pay well" for TVEyes' service – distributing clips of Fox News content – evidencing that it "should be willing to pay Fox for the right to offer the content." 883 F.3d at 180. In sum, where a market exists or is readily established for the kind of licensing at issue, as is the case here, that evades any risk of circularity (where only the defendant's lost licensing payment is at issue) and weighs heavily against a finding of fair use.

### C.    Thomson Reuters' Refusal to License Its Headnotes to Ross Does Not Alter the Fourth Factor Analysis

Thomson Reuters' rejection of Ross' licensing negotiations does not argue against the existence of an extant or likely to develop market or otherwise alter the fourth factor analysis. It is the copyright holder's prerogative whether to license its works for a particular use. Electing not to license does not convert unlicensed use into fair use. For example, in *Castle Rock Entertainment, Inc. v. Carol Publishing*

*Group, Inc.*, the court addressed whether the defendant's creation of a *Seinfeld* trivia book, which copied a substantial amount of the show, was fair use. In analyzing the fourth factor, the Second Circuit found that "[a]lthough Castle Rock has evidenced little if any interest in exploiting this market for derivative works based on *Seinfeld,* such as by creating and publishing *Seinfeld* trivia books . . ., the copyright law must respect that creative and economic choice." 150 F.3d at 145-46. Here, Thomson Reuters' decision not to license its headnotes to Ross does not bolster Ross's fair use defense.

## <u>CONCLUSION</u>

For the foregoing reasons, Amici respectfully submit that the Court should find the first and fourth fair use factors support Thomson Reuters and affirm the ruling of the district court below on Ross's fair use defense.

DATED: November 26, 2025                    Respectfully submitted,

PRYOR CASHMAN LLP

*  s/ Felicity S. Kohn*
Felicity S. Kohn
7 Times Square
New York, New York 10036
(212) 421-4100
fkohn@pryorcashman.com

*Counsel for Amici Curiae*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because the brief contains 6,492 words, excluding the parts of the brief exempt by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word Version 2510 in 14-point Times New Roman font.

Pursuant to Third Circuit Local Appellate Rule 31.1(c), I hereby certify that the text of the electronic brief is identical to the text in the paper copies, and the brief was scanned for viruses using CrowdStrike and no viruses were detected.

Dated:  November 26, 2025

Respectfully submitted,

*s/ Felicity S. Kohn*
Felicity S. Kohn
Pryor Cashman LLP
Seven Times Square 40th Floor
New York, New York 10036
(212) 421-4100
fkohn@pryorcashman.com

*Attorneys for Amici Curiae*

## <u>CERTIFICATE OF BAR ADMISSION</u>

Pursuant to Third Circuit Local Appellate Rule 28.3(d), I certify that I am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

Dated:  November 26, 2025

Respectfully submitted,

*<u>s/ Felicity S. Kohn</u>*
Felicity S. Kohn
Pryor Cashman LLP
Seven Times Square 40th Floor
New York, New York 10036
(212) 421-4100
fkohn@pryorcashman.com

*Attorneys for Amici Curiae*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 26th day of November 2025, the foregoing

Amicus Curiae Bref was filed with the Clerk of the Court for the United States

Court of Appeals for the Third Circuit through the appellate CM/ECF system.

Dated:    November 26, 2025

Respectfully submitted,

*s/ Felicity S. Kohn*
Felicity S. Kohn
Pryor Cashman LLP
Seven Times Square 40th Floor
New York, New York 10036
(212) 421-4100
fkohn@pryorcashman.com

*Attorneys for Amici Curiae*