# United States Court of Appeals

*for the*

# Third Circuit

Case No. 25-2153

THOMSON REUTERS ENTERPRISE CENTRE GMBH
and WEST PUBLISHING CORPORATION,

*Plaintiffs-Appellees,*

– v. –

ROSS INTELLIGENCE INC.,

*Defendant-Appellant.*

ON APPEAL FROM AN ORDER OF THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE IN NO. 1:20-CV-00613
HONORABLE STEPHANOS BIBAS, JUDGE

**BRIEF OF *AMICUS CURIAE* NEWS/MEDIA ALLIANCE
IN SUPPORT OF PLAINTIFFS-APPELLEES
THOMSON REUTERS ENTERPRISE CENTRE GMBH AND
WEST PUBLISHING CORPORATION AND AFFIRMANCE**

Regan A. Smith
NEWS/MEDIA ALLIANCE
4401 North Fairfax Drive,
  Suite 300
Arlington, Virginia 22203
(571) 366-1000

Jacqueline C. Charlesworth
Nicholas M. Medellin
FRANKFURT KURNIT KLEIN
  + SELZ PC
2029 Century Park East,
  Suite 2500N
Los Angeles, California 90067
(310) 579-9600

*Attorneys for Amicus Curiae News/Media Alliance*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1 and Local Appellate Rule 26.1.1, the News/Media Alliance, a non-profit organization, has no parent corporation, and no publicly held company owns 10% or more if its stock.

# TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES ..................................................................... iii

STATEMENT OF INTEREST OF *AMICUS CURIAE* ............................. 1

SUMMARY OF ARGUMENT .................................................................. 2

ARGUMENT ............................................................................................ 5

I.   N/MA's Members Depend on Copyright Law to Protect Original News Content and Support Journalists ............................................. 5

II.  Ross's Copying of Westlaw Headnotes to Produce a Competing Product Was Incompatible with Fair Use ........................................... 9

    A.   Ross's Copying Was Commercial and Not Transformative .......... 9

    B.   Earlier Technological Fair Use Precedents Are Not on Point .... 11

III. Ross's Unlicensed Use Usurped Thomson's Direct and Derivative Markets ............................................................................................... 15

CONCLUSION ....................................................................................... 22

# TABLE OF AUTHORITIES

## Cases

*Advance Local Media LLC v. Cohere, Inc.*,
    No. 1:25-cv-01305-CM, 2025 WL 3171892
    (S.D.N.Y. Nov. 13, 2025) ...................................................................... 20

*Andy Warhol Found. for the Visual Arts v. Goldsmith*,
    598 U.S. 508 (2023) ........................................................................... 4, 9

*Associated Press v. Meltwater U.S. Holdings, Inc.*,
    931 F. Supp. 2d 537 (S.D.N.Y. 2013) ...................................................... 7

*Authors Guild v. Google, Inc.*,
    804 F. 3d 202 (2d Cir. 2015) .................................................... 9, 11, 12

*Bartz v. Anthropic PBC*,
    787 F. Supp. 3d 1007 (N.D. Cal. 2025) ......................................... 10, 11

*Campbell v. Acuff-Rose Music, Inc.*,
    510 U. S. 569 (1994) ......................................................... 9, 15, 16, 21

*Castle Rock Ent., Inc. v. Carol Publ'g Grp., Inc.*,
    150 F.3d 132 (2d Cir. 1998) ................................................................ 16

*Dow Jones & Co. v. Perplexity AI, Inc.*,
    No. 1:24-cv-07984-KPF, 2025 WL 2416401
    (S.D.N.Y. Aug. 21, 2025) ..................................................................... 20

*Folsom v. Marsh*,
    9 F. Cas. 342 (No. 4,901) (C.C.D. Mass. 1841) ...................................... 9

*Fox News Network v. TVEyes, Inc.*,
    883 F.3d 169 (2d Cir. 2018) ................................................................ 15

*Google LLC v. Oracle America, Inc.*,
    593 U.S. 1 (2021) ......................................................................... 11, 12

*Hachette Book Grp., Inc. v. Internet Archive*,
    115 F.4th 163 (2d Cir. 2024) ............................................................... 21

*Harper & Row Publishers, Inc. v. Nation Enters.*,
471 U.S. 539 (1985) ........................................................................ 6, 15

*Int'l News Servs. v. Associated Press*,
248 U.S. 215 (1918) ............................................................................. 21

*Kadrey v. Meta Platforms, Inc.*,
788 F. Supp. 3d 1026 (N.D. Cal. 2025).................................. 10, 11, 21

*Perfect 10 v. Amazon.com, Inc.*,
508 F.3d 1146 (9th Cir. 2007)........................................................ 11, 12

*Salinger v. Colting*,
607 F.3d 68 (2d Cir. 2010) ................................................................. 21

*Salinger v. Random House, Inc.*,
811 F.2d 90 (2d Cir. 1987) ................................................................. 16

*Sega Enters. Ltd. v. Accolade, Inc.*,
977 F.2d 1510 (9th Cir. 1992)........................................................ 13, 14

*Sony Comput. Ent., Inc. v. Connectix Corp.*,
203 F.3d 596 (9th Cir. 2000)......................................................... 13, 14

*Thomson Reuters Enter. Centre GmbH v. Ross Intel. Inc.*,
No. 1:20-cv-00613-SB (D. Del. Feb. 11, 2025), Dkt. No. 770...... *passim*

*Wainwright Sec., Inc. v. Wall St. Transcript Corp.*,
558 F.2d 91 (2d Cir. 1977) ................................................................. 21

## Statutes and Rules

17 U.S.C. § 107(1) ................................................................................. 9

17 U.S.C. § 107(3) ............................................................................... 21

17 U.S.C. § 107(4) ............................................................................... 16

Fed. R. App. P. 29(a)(2) ........................................................................ 1

Fed. R. App. P. 29(a)(4)(E) ................................................................... 1

iv

## Other Authorities

Alexandra Bruell, *Amazon to Pay New York Times at Least $20 Million a Year in AI Deal*, WALL ST. J. (July 30, 2025), https://tinyurl.com/NMAWSJBruell ................................................. 18

Alexandra Bruell, Sam Schechner, & Deepa Seetharaman, *OpenAI, WSJ Owner News Corp Strike Content Deal Valued at Over $250 Million*, WALL ST. J. (May 22, 2024), https://tinyurl.com/NMAWSJBruellSchechner ................................. 18

*Announcing Comet Plus Launch Partners*, PERPLEXITY (Oct. 1, 2025), https://tinyurl.com/NMAPerplexity.................................................... 19

Charlotte Tobitt, *FT, Atlantic, Axel Springer and Fortune Get Behind AI Start-Up's Per-Use Compensation Plan*, PRESS GAZETTE (Aug. 7, 2024), https://tinyurl.com/NMAPressGazette .................................... 19

Daniel Thomas & Madhumita Murgia, *Axel Springer's OpenAI Deal Sets New Template for Media Ties with Big Tech*, FIN. TIMES (Dec. 15, 2023), https://tinyurl.com/NMAFinTimes.................................... 18

*Expanding Particle's Publisher and Visual Content Partnerships,* PARTICLE (Oct. 23, 2024), https://tinyurl.com/NMAParticle .............. 19

Jessica Davies, *Condé Nast and Hearst Strike Amazon AI Licensing Deals for Rufus*, DIGIDAY (July 10, 2025), https://tinyurl.com/NMADigidayDavies .............................................. 18

Mark Stenberg, *OpenAI Is Paying Dotdash Meredith At Least $16 Million to License Its Content*, ADWEEK (Nov. 18, 2024), https://tinyurl.com/NMAAdweek......................................................... 18

Matt O'Brien, *Google Signs Deal with AP to Deliver Up-to-Date News through Its Gemini AI Chatbot*, ASSOCIATED PRESS (Jan. 15, 2025), https://tinyurl.com/NMAAPOBrien...................................................... 18

Melissa De Witte, *Stanford Scholars Are Helping Journalists Do Investigative Journalism through Data*, STANFORD REP. (Oct. 15, 2018), https://tinyurl.com/NMAStanfordRep........................................ 5

*No Censorship Here*, THE GUARDIAN (captured on Nov. 3, 2025),
https://tinyurl.com/NMAGuardian .......................................................... 7

*OpenAI Signs Multi-Year Content Partnership with Condé Nast*, THE
GUARDIAN (Aug. 20, 2024),
https://tinyurl.com/NMAGuardianAug2024 ...................................... 18

Paula Felps, *Dow Jones' Factiva Platform Helps Publishers Get Paid,
Stay Protected in the AI Era*, INT'L NEWS MEDIA ASS'N (June 10,
2025), https://tinyurl.com/NMAINMA; ................................................ 8

Peter Osnos, *These Journalists Spent Two Years and $750,000 Covering
One Story*, THE ATLANTIC (Oct. 2, 2013),
https://tinyurl.com/NMAAtlantic .......................................................... 6

*ProRata AI Signs Partnership with More than 500 Publications, Giving
Gist.ai One of the Largest Licensed Content Libraries in Generative
AI Search*, BUSINESS WIRE (June 6, 2025),
https://tinyurl.com/NMABusinessWireJun2025 ............................... 19

*ProRata Announces Gist.ai, New AI Search Engine Based Entirely on
High-Quality Licensed Content*, BUSINESS WIRE (Dec. 9, 2024),
https://tinyurl.com/NMABusinessWireDec2024 ................................ 19

Rick Merritt, *What is Retrieval-Augmented Generation, aka RAG?*,
NVIDIA (Jan. 31, 2025), https://tinyurl.com/NMANvidia ................... 3

Sara Fischer, *Dow Jones Starts Paying Publishers for Content Used for
AI Summaries*, AXIOS MEDIA TRENDS (Nov. 18, 2025),
https://tinyurl.com/NMAAxiosMediaTrends ...................................... 19

Sara Fischer, *Exclusive: The Atlantic, Vox Media ink licensing, product
details with OpenAI*, AXIOS (May 29, 2024),
https://tinyurl.com/NMAAxiosFischer2 .............................................. 18

Sara Fischer, *Scoop: Meta Strikes Multi-year AI Deal with* Reuters,
AXIOS (Oct. 25, 2024), https://tinyurl.com/NMAAxiosFischer .......... 18

Sara Fischer & Kerry Flynn, *Microsoft Looks to Build AI Marketplace
for Publishers,* AXIOS (Sept. 23, 2025),
https://tinyurl.com/NMAAxiosFischerFlynn ...................................... 20

Sara Guaglione, *Amazon and the New York Times' AI Deal Signals a New Wage of Publisher Partnerships*, DIGIDAY (June 2, 2025), https://tinyurl.com/NMADigidayGuaglione .......................................... 8

Sarah Perez, *People Inc. Forges AI Licensing Deal with Microsoft as Google Traffic Drops*, TECHCRUNCH (Nov. 4, 2025), https://tinyurl.com/NMATechCrunch ................................................. 19

Sam Quigley, *News/Media Alliance Announces AI Licensing Partnership with ProRata*, NEWS/MEDIA ALLIANCE (Mar. 26, 2025), https://tinyurl.com/NMAQuigley ....................................................... 19

*The Cost of a Journalism Story*, MYNEWSDESK (Sept. 6, 2018), https://tinyurl.com/NMAMyNewsDesk ................................................. 6

*TIME and OpenAI Announce Strategic Content Partnership*, TIME (June 27, 2024), https://tinyurl.com/NMATimeJun2024 .............................. 18

*TollBit Licensing Platform*, TOLLBIT (last visited Nov. 22, 2025), https://tinyurl.com/NMATollbit .......................................................... 20

Will Allen & Simon Newton, *Introducing Pay Per Crawl: Enabling Content Owners to Charge AI Crawlers for Access,* CLOUDFLARE (July 1, 2025), https://tinyurl.com/NMACloudflare ............................ 20

Winston Cho, *OpenAI Inks Deal with Hearst, Marking Another Major Media Partnership*, THE HOLLWOOD REPORTER (Oct. 8, 2024), https://tinyurl.com/NMATHRCho ...................................................... 18

Yunfan Gao, et al., *Retrieval-Augmented Generation for Large Language Models: A Survey*, SHANGHAI INST. FOR INTEL. AUTONOMOUS SYS. 1 (Mar. 27, 2024), https://tinyurl.com/NMAGaoetal ............................... 3

## STATEMENT OF INTEREST OF *AMICUS CURIAE*[1]

The News/Media Alliance ("N/MA") is a nonprofit organization representing over 2,200 publishers in the United States, ranging from the largest news and magazine publishers in the country to hyperlocal newspapers, and from digital-only outlets to papers that have printed news since the nation's founding. As the leading voice for the industry, N/MA advocates for laws and policies that allow high-quality journalism to thrive, including a balanced interpretation of the fair use exception to copyright. In submitting this brief in support of Plaintiffs-Appellees Thomson Reuters Enterprise Centre GmbH and West Publishing Corp. (together, "Thomson"), N/MA seeks to highlight the concerns of news organizations that depend upon the ability to sell and monetize news content to support the journalists who create it.

---

[1] All parties have consented to the filing of this brief. Fed. R. App. P. 29(a)(2). No counsel for any party authored this brief in whole or in part, and no person or entity other than amicus curiae News/Media Alliance or its counsel contributed money intended to fund the preparation or submission of this brief. Fed. R. App. P. 29(a)(4)(E).

## SUMMARY OF ARGUMENT

News companies rely on revenue from the stories they publish to pay the journalists who research and write those stories. When news reporting or other copyrighted material is taken and used without permission to develop a competing product—as Ross Intelligence Inc. ("Ross") did here—it undermines the ability of publishers to create and disseminate original content, including quality online journalism. To allow this type of unauthorized competitive use would be contrary to copyright law's purpose to promote human creativity—especially when applied to the news, which is foundational to informed societies and healthy democracies.

After extensive consideration of the record on summary judgment, including individual review of thousands of Westlaw headnotes, the court below held that Ross's appropriation of over 2,000 of Thomson's copyrighted headnotes to develop a competing offering was not a fair use. Mem. Op. at 23, *Thomson Reuters Enter. Centre GmbH v. Ross Intel. Inc.*, No. 1:20-cv-00613-SB (D. Del. Feb. 11, 2025), Dkt. No. 770 ("D. Ct. Op."). That one may not copy another's copyrighted content to produce a product that seeks to displace the market for that very content is an

essential tenet of fair use and should be upheld.  A contrary decision in this case could be interpreted by developers of generative AI and other machine learning systems as permission to make unauthorized use of all types of content, including news reporting and other media content, to create directly competing products.

N/MA members' concerns about Ross's fair use defense are magnified by the wide deployment of retrieval-augmented generation ("RAG") technology, through which AI companies scrape external content sources—often third-party websites—to supplement and assist in generating the output of AI products that rely on large language models ("LLMs").[2]  LLMs, which are trained as of a fixed point in time, cannot provide accurate and timely responses about current events or otherwise reference fresh content without accessing and reproducing actual, up-to-

---

[2] *See, e.g.*, Rick Merritt, *What Is Retrieval-Augmented Generation, aka RAG?*, NVIDIA (Jan. 31, 2025), https://tinyurl.com/NMANvidia ("[RAG] is a technique for enhancing the accuracy and reliability of generative AI models with information fetched from specific and relevant data sources. In other words, it fills a gap in how LLMs work .... [W]hen users need authoritative, source-grounded answers rather than broad knowledge alone, RAG can provide the necessary depth and accuracy."); Yunfan Gao, et al., *Retrieval-Augmented Generation for Large Language Models: A Survey*, SHANGHAI INST. FOR INTEL. AUTONOMOUS SYS. 1, 2 (Mar. 27, 2024), https://tinyurl.com/NMAGaoetal (describing question about recent news as "a typical application of RAG").

date news sources—a problem that RAG addresses by copying current news from publishers' websites and delivering it to AI companies' own users.

Enabling AI companies to divert users away from legitimate subscription-based or ad-supported publisher sites to competing services under the guise of "fair use" will destroy a rapidly growing market through which media outlets license website content and earn revenue from the AI developers that depend upon that content. It will also diminish news organizations' ability to support and pay the journalists who report the news.

N/MA urges this Court to reject Ross's claim of fair use and uphold the core principle of the Supreme Court's recent ruling in *Andy Warhol Foundation for the Visual Arts v. Goldsmith*, 598 U.S. 508 (2023) ("*Warhol*"), that the unauthorized exploitation of a copyrighted work to compete with the copyright owner's own market is incompatible with fair use.

## ARGUMENT

**I.    N/MA's Members Depend on Copyright Law to Protect Original News Content and Support Journalists**

Although this case arises out of the legal world, Ross's assertion that its unlicensed use of Thomson's headnotes to train its competing legal research tool could have significantly broader ramifications, especially for news publishers.  N/MA members' business models and continued ability to produce reliable content rely heavily on copyright law to protect their investment in quality journalism.  Without copyright protection—and the ability to earn revenue—there would be no business model.

While anyone is free to write an original account of the facts, reliable journalism is expensive: publishers have to invest in editorial, operational, security, and legal support for their reporters.  Publishers employ and pay journalists to produce investigative reporting, lifestyle, business, and opinion coverage, among other types of content, in addition to a steady, accurate stream of breaking news addressing local, national, and global events.[3]

---

[3] *See, e.g.*, Melissa De Witte, *Stanford Scholars Are Helping Journalists Do Investigative Journalism through Data*, STANFORD REP. (Oct. 15,

As the Supreme Court has explained:

> In our haste to disseminate news, it should not be forgotten that the Framers intended copyright itself to be the engine of free expression. By establishing a marketable right to the use of one's expression, copyright supplies the economic incentive to create and disseminate ideas.

*Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 558 (1985).

To support and make news content available to online readers, news organizations employ a variety of monetization strategies, including advertising, subscriptions (including through the use of metered or "smart" paywalls), licensing and syndication deals, monetary

---

2018), https://tinyurl.com/NMAStanfordRep ("[I]t can cost newsrooms up to $300,000 and six months of a reporter's time to do a deep dive into public interest issues like crime and corruption. In one case, it cost a newsroom $487,000 to produce an investigative series on local police shootings."); *The Cost of a Journalism Story*, MYNEWSDESK (Sept. 6, 2018), https://tinyurl.com/NMAMyNewsDesk (estimating the cost of detailed or investigative news story at $400 to $12,000, general news story at $100 to $4,500, and filler story at $50 to $300 each); Peter Osnos, *These Journalists Spent Two Years and $750,000 Covering One Story*, THE ATLANTIC (Oct. 2, 2013), https://tinyurl.com/NMAAtlantic ("We conservatively estimate the cost of this coverage [of the dangers of acetaminophen] at $750,000; it could be more. This covers the reporters, news applications and web developers, editors, video production, social media and PR, travel, legal review, … etc.").

contributions from readers,[4] and affiliate revenue (*e.g.*, payments earned from links to products or services). In some cases, websites make copyrighted content publicly available without a paywall, ensuring that broad communities have easy access to valuable journalism without requiring a subscription. But that content, too, generates value for the publisher, directly or indirectly, often through digital advertising, and user access is subject to website terms of use.

For these reasons, copyright protection plays an integral role in sustaining online journalism. "Investigating and writing about newsworthy events occurring around the globe is an expensive undertaking and enforcement of the copyright laws permits [news organizations] to earn the revenue that underwrites that work." *Associated Press v. Meltwater U.S. Holdings, Inc.,* 931 F. Supp. 2d 537, 553 (S.D.N.Y. 2013) ("Permitting Meltwater to take the fruit of AP's labor for its own profit, without compensating AP, injures AP's ability to perform this essential function of democracy.").

---

[4] *See, e.g.*, *No Censorship Here*, THE GUARDIAN (captured on Nov. 3, 2025), https://tinyurl.com/NMAGuardian ("Being funded by ordinary people guarantees our editorial freedom. Please support us today: no amount is too small, and it takes only 37 seconds." (emphasis omitted)).

Just as publishers adapted from print to the digital environment, news organizations are updating their licensing and partnership strategies to account for the rise of generative AI—including to accommodate RAG uses that query online articles to generate extracts, substitutional summaries, and other responses derived from copyrighted content. By N/MA's count, in the past few years, copyright holders have entered into over 100 licenses with AI developers, ranging from Dow Jones's Factiva, a preexisting research and news database tool, to tech companies like Amazon, which licenses content from news publishers for Alexa and other AI products.[5]   In addition to those of which N/MA is aware, there are undoubtedly many more licensing arrangements through which news and other content has been made available to AI developers  that have not been made public.

---

[5] Paula Felps, *Dow Jones' Factiva Platform Helps Publishers Get Paid, Stay Protected in the AI Era*, INT'L NEWS MEDIA ASS'N (June 10, 2025), https://tinyurl.com/NMAINMA; Sara Guaglione, *Amazon and The New York Times' AI Deal Signals a New Wave of Publisher Partnerships*, DIGIDAY (June 2, 2025), https://tinyurl.com/NMADigidayGuaglione.

## II.   Ross's Copying of Westlaw Headnotes to Produce a Competing Product Was Incompatible with Fair Use

### A.   Ross's Copying Was Commercial and Not Transformative

The central question under the first fair use factor—which considers the purpose and character of the use, including whether it is commercial—is "whether the new work merely 'supersede[s] the objects' of the original creation," or is instead can be considered transformative, because it "adds something new, with a further purpose or different character." *Campbell v. Acuff-Rose Music, Inc.*, 510 U. S. 569, 579 (1994) (quoting *Folsom v. Marsh*, 9 F. Cas. 342, 348 (No. 4,901) (C.C.D. Mass. 1841) (Story, J.)); *see also* 17 U.S.C. § 107(1) (first fair use factor); *Warhol*, 598 U.S. at 528 (same).   The unauthorized commercial use of a copyrighted work for the same purpose as the copied work points squarely against fair use:

> A use that shares the purpose of a copyrighted work, by contrast, is more likely to provide "the public with a substantial substitute for matter protected by the [copyright owner's] interests in the original wor[k or derivatives of [it]," … which undermines the goal of copyright.

*Warhol*, 598 U.S. at 531-32 (quoting *Authors Guild v. Google, Inc.*, 804 F. 3d 202, 207 (2d Cir. 2015) ("*Google Books*")).

9

Ross copied and exploited Thomson's Westlaw headnotes to create a legal research product to compete with Thomson's Westlaw product. *See* D. Ct. Op. at 16 (Ross admitted its use was commercial), D. Ct. Op. at 17 (explaining that Ross "spits back relevant judicial opinions that have already been written …. That process resembles how Westlaw uses headnotes and key numbers to return a list of cases with fitting headnotes."). Applying the standards of the Supreme Court, the court below correctly ruled that Ross's use of Thomson's copyrighted works was substitutional and not transformative. Ross did not add new meaning or a further purpose to the West headnotes, but instead exploited them for their intrinsic value to develop its competing product. *See* D. Ct. Op. at 22 (Ross "meant to compete with Westlaw by developing a market substitute").

Ross's purpose in copying to build a non-generative AI product to compete directly with Westlaw sharply distinguishes this case from the recent pretrial rulings in *Bartz v. Anthropic PBC*, 787 F. Supp. 3d 1007 (N.D. Cal. 2025) and *Kadrey v. Meta Platforms, Inc.*, 788 F. Supp. 3d 1026 (N.D. Cal. 2025), both of which concerned unlicensed copying of materials to train generative AI models. Unlike in this case, the plaintiffs in *Bartz*

and *Kadrey* failed to develop a record establishing that defendants' copying of books was designed to yield, or did yield, competing output. *See Bartz*, 787 F. Supp. 3d at 1021; *Kadrey*, 788 F. Supp. 3d at 1044-45. Even so, the *Kadrey* court expressly recognized that such a record could overcome a finding of "transformativeness" under the first factor. *Kadrey*, 788 F. Supp. 3d at 1051 (observing "it's easy to imagine a situation in which a secondary use is highly transformative but the secondary user nonetheless loses on fair use because allowing people to engage in that kind of use would have too great an effect on the market for the original work"). Here, there is no dispute that Ross was harvesting Westlaw headnotes to develop a competing product.

## B. Earlier Technological Fair Use Precedents Are Not on Point

Citing *Google Books*, along with *Perfect 10 v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007) and *Google LLC v. Oracle America, Inc.*, 593 U.S. 1 (2021) ("*Oracle*"), Ross asserts that "[t]ime and again, courts have held that using outdated technology as a base to invent a modern tool that progresses the sciences is fair use." Ross Br. at 34. Even if this were an accurate description of copyright law (it is not), Ross misses the mark. Thomson's headnotes are not "outdated technology," but copyrighted

expression. It was that expression—not any particular technology—that made them valuable to Ross.

The earlier technological use cases on which Ross seeks to rely are not on point. Unlike in *Google Books, Perfect 10* and *Oracle*, Ross's copying did not facilitate a transformative utilitarian purpose—such as searchability or interoperability—that was independent of the expression contained in the works Ross appropriated. This distinguishes Ross's copying from the uses found to be fair use in the other contexts.

In *Google Books*, for example, Google's full-text copying of books allowed users to locate search terms within books; at the same time, Google had implemented strict limits to avoid exploiting the expressive content of the books. *Google Books*, 804 F.3d at 218. In *Perfect 10*, Google copied online images and displayed thumbnail versions to users, which served as electronic links from which users could access full-size versions from the hosting websites—again, a functional use. *Perfect 10*, 508 F.3d at 1165. In *Oracle*, Google copied Oracle's Java command structure so that Java-trained programmers could more easily write programs for Android phones, once more evincing a utilitarian purpose. *Oracle*, 593

U.S. at 30. None of these fair use decisions involved exploitation of the copied content to offer a product that competed with that content itself.

Ross next attempts to defend its exploitation of Thomson's works by deeming its use "intermediate copying" equivalent to that found to be fair in the reverse engineering cases *Sega Enterprises Ltd. v. Accolade, Inc.*, 977 F.2d 1510 (9th Cir. 1992) ("*Sega*") and *Sony Computer Entertainment, Inc. v. Connectix Corp.*, 203 F.3d 596 (9th Cir. 2000) ("*Sony*"). Ross Br. at 44-46. This approach falls flat. To start, *Sega* expressly rejected the position that copiers get a free pass "on the basis of [at] what stage of the alleged infringer's work" the unauthorized copies are used. *Sega*, 977 F.2d at 1518. In both of these cases, unlike here, the defendant copied and reverse engineered the plaintiff's software in order to create a complementary product of its own making. *See Sega*, 977 F.2d at 1522 ("Accolade copied Sega's software solely in order to discover the functional requirements for compatibility …. [T]here is no evidence in the record that Accolade sought to avoid performing its own creative work."); *Sony*, 203 F.3d at 606 (defendant's Sony-compatible virtual console did not exploit any of Sony's copyrighted material).

13

Also unlike here, in both *Sega* and *Sony* the court determined that the copying at issue was necessary to achieve interoperability with the defendants' products, a functional and therefore transformative purpose. *Sony*, 203 F.3d at 606; *Sega*, 977 F.2d at 1522. By contrast, in the current case, Ross did not need to copy Thomson's headnotes to develop a freestanding product—it could have trained its system on publicly available court decisions. Ross's surprising assertion that "the fact that [it] could have copied holdings directly from an opinion is of no import," Ross Br. at 46, contradicts the core justification for the fair use findings in *Sega* and *Sony*. The district court was correct to reject Ross's misplaced "intermediate copying" defense.

Regardless of the technology involved, the mere fact that a company like Ross may find copying original works without permission useful or efficient to develop a new product does not in itself justify the taking, especially when the product is meant to displace the appropriated material. In the case of news publishers, a contrary rule that would allow developers to take and resell news content at will in the name of fair use would undermine the industry.

14

## III. Ross's Unlicensed Use Usurped Thomson's Direct and Derivative Markets

The market for Thomson's Westlaw headnotes is both direct—they are licensed to end user researchers—and derivative, since they can also be licensed for machine learning or generative AI purposes should Thomson so choose.

Ross appropriated and used Thomson's copyrighted headnotes to develop a legal research tool that would serve as a market substitute for the content it took.  This in itself weighs heavily—even decisively—against fair use.  As the Supreme Court has instructed, the fourth fair use factor of market harm "is undoubtedly the single most important element of fair use." *Harper & Row*, 471 U.S. at 566; *accord Campbell*, 510 U.S. at 574.  Where the infringer has "usurped a function for which [the copyright holder] is entitled to demand compensation," the fair use test favors the copyright holder. *Fox News Network v. TVEyes, Inc.*, 883 F.3d 169, 181 (2d Cir. 2018).  Here, Ross took Thomson's works for the very purpose of usurping Thomson's market.

Still more, Ross undercut a second market belonging to Thomson, namely, the derivative market for licensing of its headnotes to other developers for machine learning and AI purposes.  D. Ct. Op. at 22

(Ross failed to establish that Thomson's derivative market for licensing of training data was unaffected).  As set forth in the Copyright Act, it is not just existing markets that must be considered under the critical fourth fair use factor of market harm, but also potential markets.  17 U.S.C. § 107(4) (court to consider "the effect of the use upon the potential market for or value of the copyrighted work"); *Campbell*, 510 U.S. at 590.  The fourth factor inquiry "must take account not only of harm to the original but also of harm to the market for derivative works."  *Campbell*, 510 U.S. at 590.

Even if a copyright owner declines to grant a license for a particular use (as occurred here), this does not negate that potential market, as the copyright owner should remain free to accept a different offer in the future.  *Salinger v. Random House, Inc.*, 811 F.2d 90, 99 (2d Cir. 1987) (explaining copyright owner who declines to license is still "entitled to protect his *opportunity*" to do so because he has the right to "change his mind" (emphasis in original)); *Castle Rock Ent., Inc. v. Carol Publ'g Grp., Inc.*, 150 F.3d 132, 145-46 (2d Cir. 1998) (holding fourth factor favored plaintiff even though plaintiff had "little if any interest in exploiting" its

market for derivatives as copyright law "must respect that creative and economic choice").

A declaration that Ross's appropriation of Thomson's works was a fair use would thus undermine Thomson's copyright interests in two markets. In addition to a decline in sales to direct users, Thomson could also face resistance from legitimate licensees who would be reluctant to compete with Ross's unsanctioned and royalty-free competing use.

The district court's determination that the fourth fair use factor favored Thomson should be upheld. As the court explained, regardless of Thomson's choices as to how to use or license its headnotes, "the effect on [Thomson's] *potential* market for AI training is enough" to reject Ross's claim that there was no cognizable harm to Thomson under the fourth factor. D. Ct. Op. at 22 (emphasis in original). The court's recognition of Thomson's derivative market for AI licensing was not only correct but critical to publishers that are now participating, or seek to participate, in that growing market.

Indeed, news publishers have been especially active in the AI licensing market, both for training and RAG uses. Publishers have negotiated licensing deals with leading AI platforms, including OpenAI,

Meta, Google and Amazon.[6]  Publishers have also licensed content to

smaller companies and startups.  For example, the AI-based search

engine Prorata.ai has reached deals with several hundred news outlets,

including Axel Springer, Lee Enterprises, *The Atlantic* and many more

---

[6] *See, e.g.*,  Alexandra Bruell, *Amazon to Pay New York Times at Least $20 Million a Year in AI Deal*, WALL ST. J. (Jul. 30, 2025), https://tinyurl.com/NMAWSJBruell; Jessica Davies, *Condé Nast and Hearst Strike Amazon AI Licensing Deals for Rufus*, DIGIDAY (Jul. 10, 2025), https://tinyurl.com/NMADigidayDavies; Matt O'Brien, *Google Signs Deal with AP to Deliver Up-to-Date News through Its Gemini AI Chatbot*, ASSOCIATED PRESS (Jan. 15, 2025), https://tinyurl.com/NMAAPOBrien; Mark Stenberg, *OpenAI Is Paying Dotdash Meredith At Least $16 Million to License Its Content*, ADWEEK (Nov. 18, 2024), https://tinyurl.com/NMAAdweek; Sara Fischer, *Scoop: Meta Strikes Multi-year AI Deal with Reuters*, AXIOS (Oct. 25, 2024), https://tinyurl.com/NMAAxiosFischer; Winston Cho, *OpenAI Inks Deal With Hearst, Marking Another Major Media Partnership*, THE HOLLYWOOD REPORTER (Oct. 8, 2024), https://tinyurl.com/NMATHRCho; *OpenAI Signs Multi-Year Content Partnership with Condé Nast*, THE GUARDIAN (Aug. 20, 2024), https://tinyurl.com/NMAGuardianAug2024; *TIME and OpenAI Announce Strategic Content Partnership*, TIME (Jun. 27, 2024), https://tinyurl.com/NMATimeJun2024; Sara Fischer, *Exclusive: The Atlantic, Vox Media ink licensing, product deals with OpenAI*, AXIOS (May 29, 2024), https://tinyurl.com/NMAAxiosFischer2; Alexandra Bruell, Sam Schechner, & Deepa Seetharaman, *OpenAI, WSJ Owner News Corp Strike Content Deal Valued at Over $250 Million*, WALL ST. J. (May 22, 2024), https://tinyurl.com/NMAWSJBruellSchechner; Daniel Thomas & Madhumita Murgia, *Axel Springer's OpenAI Deal Sets New Template for Media Ties with Big Tech*, FIN. TIMES (Dec. 15, 2023), https://tinyurl.com/NMAFinTimes.

18

through an umbrella licensing framework organized by the News/Media Alliance.[7] Dow Jones has entered into AI licensing deals with over 7,500 publishing partners for its Factiva smart summary product.[8] These are but a few examples; the licensing landscape is expanding rapidly, with other AI developers also pursuing content deals.[9] Still other ventures are

---

[7] *See, e.g., ProRata AI Signs Partnership with More than 500 Publications, Giving Gist.ai One of the Largest Licensed Content Libraries in Generative AI Search*, BUSINESS WIRE (June 6, 2025), https://tinyurl.com/NMABusinessWireJun2025; Sam Quigley, *News/Media Alliance Announces AI Licensing Partnership with ProRata*, NEWS/MEDIA ALLIANCE (Mar. 26, 2025), https://tinyurl.com/NMAQuigley; *ProRata Announces Gist.ai, New AI Search Engine Based Entirely on High-Quality Licensed Content*, BUSINESS WIRE (Dec. 9, 2024), https://tinyurl.com/NMABusinessWireDec2024; Charlotte Tobitt, *FT, Atlantic, Axel Springer and Fortune Get Behind AI Start-Up's Per-Use Compensation Plan*, PRESS GAZETTE (Aug. 7, 2024), https://tinyurl.com/NMAPressGazette.

[8] Sara Fischer, *Dow Jones Starts Paying Publishers for Content Used for AI Summaries*, AXIOS MEDIA TRENDS (Nov. 18, 2025), https://tinyurl.com/NMAAxiosMediaTrends.

[9] *See, e.g.*, Sarah Perez, *People Inc. Forges AI Licensing Deal with Microsoft as Google Traffic Drops*, TECHCRUNCH (Nov. 4, 2025), https://tinyurl.com/NMATechCrunch; *Expanding Particle's Publisher and Visual Content Partnerships,* PARTICLE (Oct. 23, 2024), https://tinyurl.com/NMAParticle; *Announcing Comet Plus Launch Partners*, PERPLEXITY (Oct. 1, 2025), https://tinyurl.com/NMAPerplexity.

exploring voluntary collective licensing and other structures to facilitate efficient AI licensing at scale.[10]

AI developers copy news content for AI products that compete with N/MA's members.[11]  An outcome in this case that fails to recognize the market harm resulting from AI companies' exploitation of copyrighted content without permission or compensation to create competing products could threaten crucial licensing markets for news publishers, including rapidly expanding markets for training and RAG uses.  As the

---

[10] *See, e.g.,* Sara Fischer & Kerry Flynn, *Microsoft Looks to Build AI Marketplace for Publishers,* AXIOS (Sept. 23, 2025), https://tinyurl.com/NMAAxiosFischerFlynn; Will Allen & Simon Newton, *Introducing Pay Per Crawl: Enabling Content Owners to Charge AI Crawlers for Access,* CLOUDFLARE (July 1, 2025) https://tinyurl.com/NMACloudflare; *TollBit Licensing Platform*, TOLLBIT (last visited Nov. 22, 2025), https://tinyurl.com/NMATollbit.

[11] *See, e.g., Dow Jones & Co. v. Perplexity AI, Inc.*, No. 1:24-cv-07984-KPF, 2025 WL 2416401, at *1 (S.D.N.Y. Aug. 21, 2025) ("Perplexity's search engine relies on a [RAG] database, comprised of 'content from original sources,' to provide answers to users …. The 'publicly available content' that Perplexity sources includes 'articles, websites, and journals[ ]' that the 'AI compan[y] deem[s] trustworthy[,]' and the RAG technology 'tells the LLM exactly which original content to turn into its 'answer.'"); *Advance Local Media LLC v. Cohere, Inc.,* No. 1:25-cv-01305-CM, 2025 WL 3171892, at *2, *9 (S.D.N.Y. Nov. 13, 2025) (summarizing allegations that "Cohere makes a copy of the article before incorporating it into its response" and "competes with Publishers in the marketplace").

court observed in the *Kadrey* case—and to state the obvious— "[a]n LLM that could generate accurate information about current events might be expected to greatly harm the print news market." *Kadrey*, 788 F. Supp. 3d at 1053. N/MA's members urge this Court to uphold the district court's finding of market harm under factor four.[12]

---

[12] Nor do the two other fair use factors—factor two, the nature of the work copied, or factor three, the amount of the work copied—alter the fair use outcome in this case.

Ross seems to suggest that copyright does not extend to works that convey facts. *See* Ross Br. at 28-30. But there is no *carte blanche* to appropriate a work merely because it contains factual information. News stories, for example, are protected by copyright even though they describe facts. *See, e.g.*, *Wainwright Sec., Inc. v. Wall St. Transcript Corp.*, 558 F.2d 91, 95 (2d Cir. 1977) (recognizing even though news story includes factual information, copyright protects "'the particular form or collocation of words in which the writer has communicated it'" (quoting *Int'l News Servs. v. Associated Press*, 248 U.S. 215, 234 (1918)), *abrogated on other grounds by Salinger v. Colting*, 607 F.3d 68 (2d Cir. 2010); *Hachette Book Grp., Inc. v. Internet Archive*, 115 F.4th 163, 187 (2d Cir. 2024) ("While the Works in Suit include both fiction and nonfiction books, even the nonfiction books contain original expression 'close[] to the core of intended copyright protection.'" (quoting *Campbell*, 510 U.S. at 586)).

Nor does the third factor, the amount copied, favor Ross, where it copied thousands of headnotes in their entirety. D. Ct. Op. at 12, 21. Furthermore, factor three directs the court to consider "the amount and substantiality of the portion [of the work] used," not whether the copied material was made available to the public. 17 U.S.C. § 107(3).

## CONCLUSION

N/MA respectfully urges this Court to reject Ross's fair use argument and affirm the judgment below.

Respectfully submitted,

/s/ Jacqueline C. Charlesworth

| | |
|---|---|
| Regan A. Smith | Jacqueline C. Charlesworth |
| NEWS/MEDIA ALLIANCE | Nicholas M. Medellin |
| 4401 North Fairfax Drive, Suite 300 | FRANKFURT KURNIT KLEIN + SELZ PC |
| Arlington, Virginia 22203 | 2029 Century Park East, Suite 2500N |
| (571) 366-1000 | Los Angeles, CA 90067 |
| regan@newsmediaalliance.org | (310) 579-9600 |
| | jcharlesworth@fkks.com |

*Attorneys for Amicus Curiae News/Media Alliance*

Dated: November 26, 2025

## CERTIFICATE OF COMPLIANCE WITH FEDERAL RULE OF APPELLATE PROCEDURE 32(a) AND LOCAL RULE 31.1

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), I certify the following:

I am a member of the bar of this court.

This brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because this brief contains 4,402 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii) of the Federal Rules of Appellate Procedure.

This brief complies with the typeface requirements of Rule 32(a)(5) of the Federal Rules of Appellate Procedure and the type style requirements of Rule 32(a)(6) of the Federal Rules of Appellate Procedure because this brief has been prepared in a proportionally spaced typeface using the 2008 version of Microsoft Word in 14 point Century Schoolbook font.

This brief complies with the electronic filing requirements of Local Rule 31.1(c) because the text of this electronic brief is identical to the text of the paper copies, and the Vipre Virus

Protection, version 3.1 has been run on the file containing the electronic version of this brief and no viruses have been detected.

<u>/s/ Jacqueline C. Charlesworth</u>
Jacqueline C. Charlesworth

Dated: November 26, 2025