# United States Court of Appeals

*for the*

# Third Circuit

Case No. 25-2153

THOMSON REUTERS ENTERPRISE CENTRE GMBH; WEST PUBLISHING
CORP.,

*Plaintiffs-Appellees,*

– v. –

ROSS INTELLIGENCE INC.,

*Defendant-Appellant.*

ON APPEAL FROM AN ORDER OF THE UNITED STATES
DISTRICT COURT FOR THE DISTRICT OF DELAWARE

## BRIEF OF *AMICUS CURIAE* COPYRIGHT ALLIANCE
## IN SUPPORT OF PLAINTIFFS-APPELLEES

NANCY E. WOLFF
ELIZABETH SAFRAN
COWAN, DEBAETS, ABRAHAMS &
  SHEPPARD LLP
*Attorneys for Amicus Curiae*
  *Copyright Alliance*
60 Broad Street, 30th Floor
New York, New York 10004
(212) 974-7474

CP COUNSEL PRESS   (800) 4-APPEAL • (387937)

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *amicus curiae* the Copyright Alliance states that it does not have a parent corporation, and that no publicly held corporation owns 10% or more of *amicus*' stock.

Dated: November 26, 2025

COWAN, DEBAETS, ABRAHAMS & SHEPPARD LLP

By: /s/ Nancy E. Wolff
Nancy E. Wolff
60 Broad Street, 30th Floor
New York, NY 10004
Telephone: (212) 974-7474
Facsimile: (212) 974-8474

Counsel for *Amicus Curiae* The Copyright Alliance

# TABLE OF CONTENTS

Page(s)

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF CONTENTS ..................................................................................... ii

TABLE OF AUTHORITIES ............................................................................... iv

INTEREST OF *AMICUS CURIAE* .................................................................... 1

SUMMARY OF ARGUMENT ............................................................................. 3

ARGUMENT ......................................................................................................... 5

I.    APPELLANT'S ACTIONS ARE NOT
      ALLOWED UNDER COPYRIGHT LAW ................................................... 5

      A.    The District Court Correctly Found
            The West Headnotes To Be Copyrightable ........................................... 5

            i.    Over A Century Of Caselaw
                  Confirms Headnotes' Protection .................................................. 7

            ii.   The Selection, Coordination, And
                  Arrangement Of Headnotes Easily
                  Surpasses Copyrightability's
                  Famously Low Bar ..................................................................... 10

            iii.  Narrowing The Bounds Of Copyright Law
                  Will Reduce Creative Output And Economic
                  Incentives For Creators Far Beyond The
                  Subject Matter Of This Case ...................................................... 15

II.   NARROWING THE BOUNDS OF COPYRIGHT
      WOULD HAVE A DETRIMENTAL EFFECT
      ON RIGHTSHOLDERS' LIVELIHOODS ................................................ 17

III.  APPELLANT'S FAIR USE DEFENSE FAILS .......................................... 20

A.   *Authors Guild v. Google, Inc.* ("Google Books") ...............................21

B.   *Kelly v. Arriba Soft Corp.*......................................................................23

C.   *Google LLC v. Oracle Am., Inc.*...........................................................24

D.   Appellant's Infringement Is Not Justified Under
     The Fourth Fair Use Factor But Rather
     Undermines The Value Of Appellees' Works,
     Harming Its And Other Creators' Licensing Markets.........................26

CONCLUSION .....................................................................................................28

CERTIFICATION OF ADMISSION TO BAR .....................................................30

CERTIFICATE OF COMPLIANCE .....................................................................31

CERTIFICATE OF SERVICE ..............................................................................32

**Cases**                                                            **Page(s)**

*Alfred Bell & Co. v. Catalda Fine Arts*,
   191 F.2d 99 (2d Cir. 1951) ...................................................................12

*Am. Geophysical Union v. Texaco, Inc.*,
   60 F.3d 913 (2d Cir. 1994) ................................................................27

*Authors Guild v. Google, Inc.*,
   804 F.3d 202 (2d Cir. 2015) ......................................................21–22

*Bridgeman Art Library, Ltd. v. Corel Corp.*,
   36 F. Supp. 2d 191 (S.D.N.Y. 1999) ..............................................11

*Callaghan v. Myers*,
   128 U.S. 617 (1888)........................................................................8–9

*CCC Info. Servs., Inc. v. Maclean Hunter Mkt. Reps., Inc.*,
   44 F.3d 61 (2d Cir. 1994) ..................................................................17

*CDN Inc. v. Kapes*,
   197 F.3d 1256 (9th Cir. 1999) ..........................................................16

*Experian Info. Sols., Inc. v. Nationwide Mktg. Servs. Inc.*,
   893 F.3d 1176 (9th Cir. 2018) ..........................................................12

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
   499 U.S. 340 (1991).............................................................4, 10–11

*Fogerty v. Fantasy, Inc.*,
   510 U.S. 517 (1994).........................................................................19

*Folio Impressions, Inc. v. Byer California*,
   937 F.2d 759 (2d Cir. 1991) ............................................................16

*Google LLC v. Oracle Am., Inc.*,
   593 U.S. 1 (2021)...............................................................21, 24–25

*Gray v. Russell*,
   10 F. Cas. 1035 (C.C.D. Mass. 1839) ...................................................9

*Kelly v. Arriba Soft Corp.*,
   336 F.3d 811 (9th Cir. 2003) ...........................................21, 23–24

*Key Publ'ns, Inc. v. Chinatown Today Publ'g Enters., Inc.*,
   945 F.2d 509 (2d Cir. 1991) ...........................................................16

*Kitchens of Sara Lee, Inc. v. Nifty Foods Corp.*,
   266 F.2d 541 (2d Cir. 1959) ...........................................................17

*Kregos v. Associated Press*,
   937 F.2d 700 (2d Cir. 1991) ...........................................................16

*Lyons v. Am. Coll. of Veterinary Sports Med. & Rehab., Inc.*,
   997 F. Supp. 2d 92 (D. Mass. 2014) ...............................................17

*Metropolitan Reg'l Info. Sys., Inc. v. Am. Home Realty Network, Inc.*,
   888 F. Supp. 2d 691 (2012) ............................................................16

*Mon Cheri Bridals, Inc. v. Wen Wu*,
   383 F. App'x 228 (3d Cir. 2010) .....................................................11

*Pantone, Inc. v. A.I. Friedman, Inc.*,
   294 F. Supp. 545 (S.D.N.Y. 1968) .................................................17

*Reader's Digest Ass'n, Inc. v. Conservative Digest, Inc.*,
   821 F.2d 800 (D.C. Cir. 1987) .......................................................16

*Real View, LLC v. 20-20 Techs., Inc.*,
   683 F. Supp. 2d 147 (D. Mass. 2010) .............................................16

*Sarony v. Burrow-Giles Lithographic Co.*,
   17 F. 591 (C.C.S.D.N.Y. 1883) .......................................................8

*SHL Imaging, Inc. v. Artisan House, Inc.*,
   117 F. Supp. 2d 301 (S.D.N.Y. 2000), ...........................................16

*Thomson Reuters Enter. Ctr. GMBH v. Ross Intel. Inc.*,
    765 F. Supp. 3d 382 (D. Del. 2025)......................................................4, 6, 14, 25

*VHT, Inc. v. Zillow Grp., Inc.*,
    918 F.3d 723 (9th Cir. 2019) .............................................................22

*West Publ'g Co. v. Mead Data Cent., Inc.*,
    799 F.2d 1219 (8th Cir. 1986) ................................................. passim

*Wheaton v. Peters*,
    33 U.S. 591 (1834).............................................................9

**Constitutional Provisions, Statutes, and Rules**

17 U.S.C. § 101 ................................................................7–8

17 U.S.C. § 103 ................................................................7

**Legislative History**

H.R. Rep. No. 105-551, pt. 2 (1998)........................................20

**Other Sources**

*AI content licensing deals: Where OpenAI, Microsoft, Google, and others
    see opportunity*, CBInsights (July 19, 2024),
        https://www.cbinsights.com/research/ai-content-licensing-deals/ ....................26

*AI Licensing for Creative Works*, Copyright Alliance,
        https://copyrightalliance.org/artificial-intelligence-copyright/licensing/...........27

Andrew A. Toole, Ph.D., et al. *Intellectual Property and the U.S. Economy:
    Third Edition*, USPTO,
        https://www.uspto.gov/sites/default/files/documents/uspto-ip-us-economy-
        third-edition.pdf ................................................................19

Brief for Appellant, *Thomson Reuters Enter. Ctr. GMBH v. Ross
    Intelligence Inc.*,
    No. 25-2153 (3d Cir. Sept. 22, 2025) ....................................... passim

Brief for Appellees, *Thomson Reuters Enter. Ctr. GMBH v. Ross
Intelligence Inc.*,
No. 25-2153 (3d Cir. Nov. 19, 2025)....................................................8

Brief of Copyright Law Professors as *Amici Curiae* In Support Of Appellant,
25-2153 (3d Cir. Sept. 29, 2025) .......................................................13

Brief of The Computer & Communications Industry Association, Chamber
of Progress, and NetChoice In Support Of Appellant Ross Intelligence,
Inc. and Reversal,
25-2153 (3d Cir. Sept. 29, 2025) ..............................................24–25

*Copyright Industries in the U.S. Economy 2024 Report*, IIPA (Feb. 2025),
https://www.iipa.org/files/uploads/2025/02/IIPA-Copyright-Industries-in-
the-U.S.-Economy-Report-2024_ONLINE_FINAL.pdf.....................................3

Dashveenjit Kaur, *Content creators strike gold in AI content licensing boom*,
T_HQ (Jan. 15, 2025),
https://techhq.com/news/content-creators-strike-gold-in-ai-content-
licensing-boom/..................................................................26

*Delaware*, Copyright Alliance,
https://copyrightalliance.org/resources/states/delaware/ ..........................18–19

*From Innovation to Employment: The Economic Impact of IP*, U.S. Chamber
of Commerce (Apr. 8, 2025),
https://www.uschamber.com/intellectual-property/from-innovation-to-
employment?state=de ...........................................................18

Mattias Rattzén, *Location Is All You Need: Copyright Extraterritoriality and
Where to Train Your AI*,
26 Colum. Sci. & Tech. L. Rev. 175, 201 (2024)...............................26

*Research Integrity*, STM,
https://stm-assoc.org/what-we-do/strategic-areas/research-integrity/ ...............15

*The Future of Digital Publishing: How AI Content Licensing Platforms Are
Changing the Game*, 3D Issue (Sept. 1, 2025),
https://www.3dissue.com/the-future-of-digital-publishing-how-ai-
content-licensing-platforms-are-changing-the-game/ ................................26–27

vii

Pursuant to Federal Rule of Appellate Procedure 29(b), *amicus curiae* the Copyright Alliance respectfully submits this brief in support of Plaintiffs-Appellees Thomson Reuters Enterprise Centre GMBH ("Thomson Reuters") and West Publishing Corporation ("West," collectively with Thomson Reuters, "Appellees"). This brief is submitted with consent of all parties.[1]

## INTEREST OF *AMICUS CURIAE*

The Copyright Alliance is dedicated to promoting and protecting the ability of creative professionals to earn a living from their creativity. It is a nonprofit, nonpartisan 501(c)(4) public interest and educational organization and represents the copyright interests of over two million individual creators and over 15,000 industry leading organizations across the entire spectrum of creative industries, including authors, songwriters, musical composers and recording artists, graphic and visual artists, photographers, journalists, filmmakers, and software developers. The Copyright Alliance's membership encompasses these individual creators and innovators, creative union workers, and small businesses, as well as the organizations and corporations that support and invest in them. The livelihoods of

---

[1] Pursuant to Federal Rule of Appellate Procedure 29, no counsel for any party authored this brief in whole or in part, and no party or counsel for any party made a monetary contribution intended to fund the preparation or submission of this brief. Only *amicus curiae* or their counsel made such a monetary contribution that was intended to fund preparing or submitting this brief. Pursuant to Fed. R. App. P. 29(a), all parties consented to the filing of this amicus curiae brief.

this diverse array of creators and companies depend on the exclusive rights guaranteed by copyright law.

The Copyright Alliance's members rely heavily on copyright law to protect and commercialize their works, which in turn incentivizes the creation of new works and promotes the progress of the arts. The Copyright Alliance and its members have a strong interest in ensuring the proper application of copyright law and ensuring that copyright cases are decided correctly. Specifically, it has a strong interest in the proper application of copyright law in this instance, where defendant-appellant Ross Intelligence Inc. ("Ross" or "Appellant") attempts to frame its willful and unlawful reproduction and distribution of Appellees' copyrighted content as necessary to the development of artificial intelligence ("AI") instead of a shortcut to creating a competitive commercial product. Appellant's attempt to cast aside longstanding precedent to misrepresent Appellees' headnotes (the "West Headnotes") as non-copyrightable would have critically damaging consequences for the Copyright Alliance's members across many creative industries, including, but not limited to, photography, publishing, and the visual arts. Allowing Appellant's view to prevail would extensively harm creative professionals and undermine the very purpose of copyright.

The Copyright Alliance submits this amicus brief in support of Appellees and to address the broad-reaching legal and practical consequences of Appellant's

infringing conduct and misleading attempt to sanction it under the law. Appellant's activity threatens wide swaths of creative industries and the livelihoods of authors and book publishers, as well as many other types of creative professionals.[2] Permitting Appellant to take and reproduce Appellees' copyrighted headnotes without authorization for purposes of a competing product would undermine existing licensing markets and strip creators and rightsholders of their statutory rights to control and commercialize their copyrighted works. The Copyright Alliance also submits this brief to underscore policy issues that support Judge Bibas's correct reading of the law and proper rejection of the manufactured narrowing of copyright law that Appellant advances in defense of its unauthorized copying and reproduction of copyright-protected works.

## SUMMARY OF ARGUMENT

The Copyright Alliance fully supports the decision of the District Court in finding that the West Headnotes are protected by copyright law and that Appellant's unauthorized taking and copying of those Headnotes does not qualify as a fair use under Section 107 of the Copyright Act.

The District Court correctly rejected Appellant's argument that Appellees'

---

[2] Creative industries employ millions and significantly contribute to the U.S. economy, often outperforming key industrial sectors. *See generally, e.g.*, *Copyright Industries in the U.S. Economy 2024 Report*, IIPA (Feb. 2025), https://www.iipa.org/files/uploads/2025/02/IIPA-Copyright-Industries-in-the-U.S.-Economy-Report-2024_ONLINE_FINAL.pdf.

headnotes are not protectable under copyright. *See Thomson Reuters Enter. Ctr. GMBH v. Ross Intel. Inc.*, 765 F. Supp. 3d 382, 392–94 (D. Del. 2025).[3] Notwithstanding Appellant's mischaracterization of the West Headnotes as merely parroted quotations from the public domain judicial opinions taken as their source, they are in fact independently created and the product of deliberate and creative selection and arrangement of the opinions' key passages, by West's highly trained attorney-editors. With this understanding, courts have, for centuries, recognized headnotes, including the West Headnotes, as quintessentially copyrightable. Originality's purposely low bar, whereby a work need only be "independently created" by its author and "possess[] . . . [a] minimal degree of creativity," *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345 (1991), is easily met. The Headnotes are independently authored by West's attorney-editors, via a process requiring creative choices as to selection and phrasing of case passages.

A decision in favor of Appellant would contravene longstanding precedent, threaten the value and import of Westlaw's contribution to the legal community, and jeopardize other creators and industries whose works contain original selection, coordination, and arrangement from underlying source material.

---

[3] Unless otherwise specified, internal citations and quotations are omitted from all case citations herein.

Authors, journalists, photographers, cinematographers, editors, publishers, anthologists, and more would face the loss of protection for their works that, like the West Headnotes, derive from underlying factual or otherwise unprotectable material. This should not be.

Moreover, the fact remains that there is value to such works. Appellant should not be permitted to strip such value through its attempted rewriting of basic, established tenets of copyright, particularly where uses of the type it made are freely negotiable and licensable, including in AI contexts. This Court must uphold the law and, in so doing, reject a ruling authorizing Appellant's infringement.

## ARGUMENT

## I. APPELLANT'S ACTIONS ARE NOT ALLOWED UNDER COPYRIGHT LAW

Appellant's copying and reproduction of the West Headnotes constitutes infringement under the Copyright Act.

### A. The District Court Correctly Found The West Headnotes To Be Copyrightable.

Appellees' headnotes are copyrightable. Although Appellant spills much ink attempting to assert otherwise, its claims about copyrightability are a transparent attempt to evade liability by misrepresenting both the nature of the headnotes as well as fundamental copyright tenets that have long recognized their

protection. Specifically, Appellant argues that the West Headnotes "are nothing more than excerpts from judicial opinions" that merely parrot "individual facts about a particular judicial opinion," with the only "originality or creativity" therein deriving from that "of the authoring judge." (Brief for Appellant, *Thomson Reuters Enter. Ctr. GMBH v. Ross Intelligence Inc.*, No. 25-2153 (3d Cir. Sept. 22, 2025) (Dkt 28) ("Ross Br.") at 24.) Per Appellant's view, the headnotes therefore lack the requisite originality to merit copyright protection. *Id.* at 24–28.

This is, however, a deliberate and inaccurate oversimplification based on Appellant's mischaracterization of the West Headnotes, as to both their substance and purpose. Although some headnotes do directly excerpt from judicial passages, many—as evidenced by the 2,243 examples considered by the District Court, *Thomson Reuters Enter.*, 765 F. Supp. 3d at 395—do not. Rather, the West Headnotes discern and summarize important points of an opinion, based on the West attorney-editors' judgment and creative choices, to clarify key aspects of law. Further, all headnotes, whether clarifying summaries or selected quotes, serve to emphasize and organize key parts of an opinion. As any first-year law student could attest, the creative selection, coordination, and arrangement that goes into crafting and organizing headnotes for a judicial opinion serves an important purpose beyond the opinion itself: discerning and amalgamating the crucial points of the opinion, in a searchable, condensed, and ordered manner specifically geared

toward assisting legal practitioners' and the public's review and understanding of the law.

> i.    Over A Century Of Caselaw Confirms Headnotes' Protection.

The independent selection, coordination, and arrangement that goes into creating a headnote is exactly the type of creativity copyright law protects. Indeed, for decades courts, applying copyright law, have recognized the distinct insights and originality that headnotes provide and explicitly protected the West Headnotes as copyrightable. *See West Publ'g Co. v. Mead Data Cent., Inc.*, 799 F.2d 1219, 1244 (8th Cir. 1986). Recognizing the "minimal" threshold for originality required for a work to merit copyright protection (as discussed *infra* in Section 1.A.ii.), courts have acknowledged that "West's arrangement" of cases, inclusive of its "prepar[ation]" of headnotes for each opinion "is a copyrightable aspect of its compilation of cases." *Id.* at 1222–23. Such view comports with "the face of the Copyright Act," which instructs that it "is possible for an arrangement of pre-existing materials to be an independently produced work of intellectual creation," considering Section 103's definition of "'the subject matter of copyright [to] . . . include[] compilations and derivative works.'" *Id.* at 1223–24 (citing 17 U.S.C. § 103).[4] "An arrangement of opinions in a case reporter, no less than a compilation

---

[4] The Act in turn defines a "compilation," as "a work formed by the *collection and assembling* of preexisting materials or of data that are selected, coordinated, or

and arrangement of Shakespeare's sonnets," therefore "qualif[ies] for copyright protection." *Id.* at 1224.

Indeed, courts' recognition of the originality of headnotes and analogous material dates to at least the nineteenth century. Notwithstanding Appellant's reductive history that focuses only on the threshold precedent that judicial opinions themselves are not copyrightable (Ross Br. at 28–30), ample caselaw indeed recognizes protection for original material *created from* judicial opinions. (*See* Brief for Appellees, *Thomson Reuters Enter. Ctr. GMBH v. Ross Intelligence Inc.*, No. 25-2153 (3d Cir. Nov. 19, 2025) (Dkt. 89) at 26–27.) Although "no reporter has or can have any copyright in the written opinions of a court," courts have long recognized that the same reporter "c[ould still] copyright [] his own individual work—the head-notes, the statement of the case, analysis or summary of the arguments of counsel, the index, etc." *Sarony v. Burrow-Giles Lithographic Co.*, 17 F. 591, 596 (C.C.S.D.N.Y. 1883), *aff'd*, 111 U.S. 53 (1884).

The Supreme Court has recognized this principle, addressing the circumstance of a plaintiff that held copyrights for volumes of reports from the Supreme Court of Illinois, which in addition to court opinions, included material original to the reporter, such as headnotes. *Callaghan v. Myers*, 128 U.S. 617

---

arranged in such a way that the resulting work as a whole constitutes an original work of authorship." 17 U.S.C. § 101 (emphasis added).

(1888). Affirming the trial court's finding that the Plaintiff's copyrights were valid, the Court indicated its agreement that an original arrangement of judicial opinions is copyrightable where it derives from the exertion of "labor, talent, [or] judgment . . . ." *Id.* at 662. The Court stressed that

> the order of arrangement of the cases, the division of the reports into volumes, the numbering and paging of the volumes, the table of the cases cited in the opinions, (where such table is made,) and the subdivision of the index into appropriate, condensed titles, involving the distribution of the subjects of the various head-notes, and cross-references, where such exist

were all to be "comprehend[ed]" within "the lawful subject of copyright." *Id.* at 649.

Other courts have offered similar instruction, clarifying the limits of *Wheaton v. Peters*, 33 U.S. 591 (1834) and its progeny to an underlying judicial opinion or other unprotectable endeavors, like a particular pagination method: "it was as little doubted by the court, that [the Plaintiff in *Wheaton*] had a copyright in his own marginal notes, and in the arguments of counsel as prepared and arranged in his work," even though he could not claim copyright in the opinion itself. *Gray v. Russell*, 10 F. Cas. 1035, 1039 (C.C.D. Mass. 1839). While Appellant is correct that no one can "own the law" insofar as judicial opinions are concerned, "reporters' explanatory materials," including headnotes selecting and arranging summaries and quotes from said opinions, "*are* copyrightable." (Ross

Br. at 2, 4–5 (emphasis added).)

<ol type="i" start="2"><li>The Selection, Coordination, And Arrangement Of Headnotes Easily Surpasses Copyrightability's Famously Low Bar.</li></ol>

As stated, the law has long protected headnotes, including the West Headnotes, as copyrightable, notwithstanding Appellant's self-serving representations to the contrary. Such protection is rooted in touchstone principles of copyright law, namely, copyright's originality requirement. Serving to gatekeep copyright's "idea/expression or fact/expression dichotomy," originality helps ensure that authors do not receive copyright protection in underlying facts or ideas, which shall remain available for public use. Accordingly, per the originality requirement, copyright protection extends only to those components of a work that are an author's original expression.

Originality itself is a famously low bar. *Feist*, 499 U.S. at 362 (originality "is not a stringent standard"). Requiring "only that [a] work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity," the "requisite level of creativity is extremely low; even a slight amount will suffice. The vast majority of works make the grade quite easily, as they possess some creative spark . . . ." *Id.* at 345. Ultimately, the works that cannot clear this low bar are those that "do not owe their origin to an act of authorship," *id.* at 347, such as a telephone directory organized in an unoriginal and inevitable alphabetical manner, *id.* at 362–63, or

color transparencies of public domain paintings. *Bridgeman Art Library, Ltd. v. Corel Corp.*, 36 F. Supp. 2d 191, 195–97 (S.D.N.Y. 1999).

"Factual compilations, on the other hand, may possess the requisite originality," as

> [t]he compilation author typically chooses which facts to include, in what order to place them, and how to arrange the collected data so that they may be used effectively by readers. These choices as to selection and arrangement, so long as they are made independently by the compiler and entail a minimal degree of creativity, are sufficiently original . . . .

*Feist*, 499 U.S. at 348. For works resulting from the selection and arrangement of underlying facts, originality "does not require that facts be presented in an innovative or surprising way," but simply that their selection and arrangement not be "so mechanical or routine as to require no creativity whatsoever." *Id.* at 362; *see also Mon Cheri Bridals, Inc. v. Wen Wu*, 383 F. App'x 228, 234 (3d Cir. 2010) ("[O]nly an unmistakable dash of originality need be demonstrated, high standards of uniqueness in creativity are dispensed with."). Likewise, "the mere borrowing of elements from previous works will not defeat copyrightability as long as the author has devised a new version of the work or has otherwise rearranged or transformed it so as to have made an original contribution." *Mon Cheri Bridals, Inc.*, 383 F. App'x at 234. In practice, "[l]ittle more is involved in this requirement" than "that [a work] be independently created" with "'a

prohibition of actual copying,'" even where independent creation inheres in the selective arrangement of preexisting material. *West Publ'g Co.*, 799 F.2d at 1223 (quoting *Alfred Bell & Co. v. Catalda Fine Arts,* 191 F.2d 99, 102–103 (2d Cir. 1951)). Ultimately, for works meriting copyright owing to their selection or arrangement of underlying material, "not a great deal of creativity in selection or arrangement is required." *Experian Info. Sols., Inc. v. Nationwide Mktg. Servs. Inc.*, 893 F.3d 1176, 1182–83 (9th Cir. 2018). Such works must merely surpass originality's low hurdle.

In the present instance, the West Headnotes derive from the selection, coordination, and arrangement of portions of public domain source material, specifically, judicial opinions. However, far from merely "parroting" and redistributing the opinions or their "raw facts" (Ross Br. at 25), the Headnotes convey the creative judgment and intellectual labor of West's attorney-editors. They must review a judicial opinion and discern its key passages and principles within the context of both the opinion and the legal practice area within which it is situated. For a quote, this means selecting the particular passage that best exemplifies a concept. For a summary, this means crafting it in particular language standardized across cases within the West headnote system, which assists users in finding the same judicial concept in a streamlined manner across Westlaw. Accordingly, the West Headnotes are more than a regurgitated opinion bearing

the "West" stamp, but, through their careful selection, coordination, and arrangement, as well as independent creation, they facilitate users' searches on the platform, including by standardizing and coordinating the presentation of the legal principles their review uncovers. This purpose is borne out in many ways, including assisting users who may, for example, have found a useful case that is situated in the wrong jurisdiction and wish to track it, through use of the West Headnotes, to the correct one. As headnote users well know, access to the West Headnotes, as filtered and digested by editors from a raw opinion, provides expanded, distinguishable insights and utility in addition to that opinion. The Headnotes can only do so by virtue of West's editors' analysis, categorization, and summation of the law.

Nor can Appellant or its *amici* reasonably claim that the Headnotes' originality diminishes simply because they derive from factual material. Claiming that "[t]he phrasing of headnotes is [] constrained by the need for accuracy" ignores the creativity and judgment that still, necessarily, informs their crafting. (*See* Brief of Copyright Law Professors as *Amici Curiae* In Support Of Appellant, 25-2153 (3d Cir. Sept. 29, 2025) (Dkt. 40) at 15–16.) In the same way that a biographer is not relegated to one mode of expression in conveying the factual background of his subject's life, here, too, the West Headnotes may be expressed in one of any number of ways, from the selection of the passage meriting

excerpting, the particular language chosen to explain an often dense legal concept, and the crafting of headnotes to fit within the overall Headnote and Key Number System. *See Thomson Reuters Enter.*, 765 F. Supp. 3d at 393 ("There are many possible, logical ways to organize legal topics by level of granularity. It is enough that Thomson Reuters chose a particular one.")

Appellant's reductive view also ignores the complex framework within which the Headnotes operate and the creativity required to craft and situate them therein. Specifically, users of the Headnotes system may cross-reference them through clickable links for other "cases that cite" a particular headnote, as well as via Westlaw's particular Key Number System, which aggregates other cases from within or across jurisdictions addressing similar issues. Headnotes are therefore conceived of and crafted within this broader system, yet another layer informing editors' selection, coordination, and arrangement of passages of opinions. Although Appellant attempts to simplify the value of a headnote by claiming it is little more than a "parroted" excerpt of the underlying opinion (Ross Br. at 46), the West Headnotes are so much more: they provide a shorthand to quickly review and comprehend a case, which may prove invaluable to a range of practitioners, including novice lawyers unaccustomed to parsing the dense text of a legal opinion, scholars trying to understand how historic cases apply today, and practicing lawyers seeking a broad, up-to-date context of the legal framework of

a particular subject matter. Thus, it is evident that the West Headnotes are sufficiently original owing to the selection, coordination, and arrangement of their underlying material.

iii. Narrowing The Bounds Of Copyright Law Will Reduce Creative Output And Economic Incentives For Creators Far Beyond The Subject Matter Of This Case.

To reverse and ultimately narrow the breadth of copyrightability as it applies to works requiring the selection, coordination, and arrangement of preexisting source material, would upend longstanding precedent, harming millions of creators and hundreds of industries. Such outcome would threaten any work built on the selection, coordination, and arrangement of factual information to provide context and insights. Examples abound: biographies that select, coordinate, and arrange the facts of their subjects' lives, textbooks and journals that select and arrange particular medical, scientific, or historic facts,[5] and photographs that through the photographer's eye select and compose natural scenes, ordinary objects, and subjects. For all such works, the sum is greater than its parts; such compilations yield something new and beneficial to the public,

_____

[5] Publishers that focus on science, technology, and medicine fields include members of the International Association of Scientific, Technical & Medical Publishers, which contributes significantly to maintaining the integrity of the scientific record, even though such works may not bear significant authorial "personality." *See Research Integrity*, STM, *https://stm-assoc.org/what-we-do/strategic-areas/research-integrity/* (last visited Nov. 26, 2025).

something protectable out of the building blocks of their unprotectable source material.

To comprehensively name and list all works susceptible to the bullseye of a narrowed originality framework would impermissibly stretch the confines of this brief. Works that owe their originality to the selection, coordination, and arrangement of underlying elements are manifold, deriving from industries as distinct as the computer sciences, *see Real View, LLC v. 20-20 Techs., Inc.*, 683 F. Supp. 2d 147, 152–53 (D. Mass. 2010), to the fashion industry. *See Folio Impressions, Inc. v. Byer California*, 937 F.2d 759, 764–65 (2d Cir. 1991). Databases, *Metropolitan Reg'l Info. Sys., Inc. v. Am. Home Realty Network, Inc.*, 888 F. Supp. 2d 691, 710 (2012), magazine covers, *Reader's Digest Ass'n, Inc. v. Conservative Digest, Inc.*, 821 F.2d 800, 806 (D.C. Cir. 1987), and product photos all fall within this list, *SHL Imaging, Inc. v. Artisan House, Inc.*, 117 F. Supp. 2d 301, 310–11 (S.D.N.Y. 2000), a ruling favoring Appellant risking the loss of their creators' copyrights and livelihoods. The same outcome would face the following diverse industries and works: *CDN Inc. v. Kapes*, 197 F.3d 1256, 1260 (9th Cir. 1999) (wholesale price guides for collectible coins); *Key Publ'ns, Inc. v. Chinatown Today Publ'g Enters., Inc.,* 945 F.2d 509, 514 (2d Cir. 1991) (compilation of businesses); *Kregos v. Associated Press*, 937 F.2d 700, 706–07 (2d Cir. 1991) (selection of statistical categories on baseball pitching form);

*Kitchens of Sara Lee, Inc. v. Nifty Foods Corp.*, 266 F.2d 541, 544–45 (2d Cir. 1959) (food photographs); *Lyons v. Am. Coll. of Veterinary Sports Med. & Rehab., Inc.*, 997 F. Supp. 2d 92, 109–10 (D. Mass. 2014) (medical articles, resources, and websites); *CCC Info. Servs., Inc. v. Maclean Hunter Mkt. Reps., Inc.*, 44 F.3d 61, 67 (2d Cir. 1994) (car valuation compendium); *Pantone, Inc. v. A.I. Friedman, Inc.*, 294 F. Supp. 545, 547-48 (S.D.N.Y. 1968) (color matching system). All such works rely on copyright's recognition of the originality, even if minimal, inhering in the selection, coordination, and arrangement of underlying content into a new work.

The ripple effects of narrowing originality, as advocated by the Appellant, would be resounding. Consider, for example, the doctor who relies on a particular scientific journal or compendium, or the lawyer, who uses the West Headnotes as part of their everyday practice. Creators, and those who make use of their works, rely on the judiciary upholding and recognizing the creativity behind these works' selection, coordination, and arrangement. Favoring Appellant's misguided, legally unsupported view and overturning the District Court's holding recognizing the copyrightability of the West Headnotes would, accordingly, devastate entire swaths of creative and research communities.

## II.    NARROWING THE BOUNDS OF COPYRIGHT WOULD HAVE A DETRIMENTAL EFFECT ON RIGHTSHOLDERS' LIVELIHOODS

Appellant's distorted and disingenuous theory of copyrightability is also

bad policy, as it would devastate creators across numerous creative industries. Far from representing a narrow holding pertaining to a niche legal product, should Appellant's theory prevail, copyrightability, and the avowedly minimal bar originality sets for the selection, coordination, and arrangement of underlying material, would be waylaid. As a result, a broad number of the Copyright Alliance's membership and other creators would be hampered, including countless photographers, authors, filmmakers, publishers, editors, and reporters, all of whom rely on originality's well-established low threshold to protect their works. By and large, this is a community already struggling to make ends meet, even while creative industries uphold a major section of the U.S. economy.

Recent studies bear out the significant contributions that creative industries make to the U.S. economy. A 2025 U.S. Chamber of Commerce study underscores the crucial role intellectual property plays in fueling local job growth "by encouraging innovation, attracting investment, and supporting small businesses, which leads to increased employment opportunities." *From Innovation to Employment: The Economic Impact of IP*, U.S. Chamber of Commerce (Apr. 8, 2025), https://www.uschamber.com/intellectual-property/from-innovation-to-employment?state=de. In Delaware alone, intellectual property contributes to 33,106 or 5.1 percent of all jobs and $4.2 billion or 4.3 percent of Delaware's GDP. *Id.*; *see also Delaware*, Copyright Alliance,

https://copyrightalliance.org/resources/states/delaware/ (last visited Nov. 26, 2025). Likewise, the latest U.S. Patent and Trademark Office study notes that IP-intensive industries account for at least 63 million U.S. jobs, or 44 percent of all U.S. employment. Andrew A. Toole, Ph.D., et al., *Intellectual Property and the U.S. Economy: Third Edition*, USPTO, at iii https://www.uspto.gov/sites/default/files/documents/uspto-ip-us-economy-third-edition.pdf.

Juxtaposing this outsized economic contribution with the fraught reality facing many creators struggling to make a living emphasizes the real-world toll that a ruling in favor of Appellant would have. Depriving rightsholders of protection, in turn, would chill the creation of new works by disincentivizing creators from engaging in their creative professions, ultimately harming the public by providing fewer works for their benefit. This outcome is entirely antithetical to the purpose of copyright law. In addition to economic gains, copyright serves the fundamental purpose of stimulating creation to benefit the country's shared wealth of knowledge and culture. *See Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 527 (1994) ("[C]opyright law ultimately serves the purpose of enriching the general public through access to creative works . . . ."). For creators, who sustain their pursuits from the monetary returns enabled by copyright, losing protection for their works looms large. Without confidence in the protection of works involving the

selection, coordination, and arrangement of underlying source material, creators will lose needed incentive to create them. Ultimately, this harm will be borne by the public, which will be deprived of the music, art, writing, peer-reviewed research, and performance that is possible when creators and artists are able to monetize their rights and financially support their work. *See* H.R. Rep. No. 105-551, pt. 2 at 35 (1998) ("Throughout our history, the ability of individual members of the public to access and to use copyrighted materials has been a vital factor in the advancement of America's economic dynamism, social development, and educational achievement.").

A holding deeming the West Headnotes uncopyrightable based on a narrowing of originality will ultimately diminish the constitutional and congressional directives endowing creators with a limited monopoly over their works—including those deriving from selection, coordination, and arrangement of underlying content. Setting the threshold for originality higher than that minimal bar which has been recognized by court after court, jurisdiction after jurisdiction, would disincentivize and chill creation.

## III. APPELLANT'S FAIR USE DEFENSE FAILS

Appellant's copying is neither for a transformative purpose, nor does it constitute fair use. Claiming that its use of Appellees' copyrighted works is "spectacularly transformative," Appellant argues that "[t]ime and again, courts have

held that using outdated technology as a base to invent a modern tool that progresses the sciences is fair use." (Ross Br. at 34–35.) However, the transformative nature and purpose of the uses in Appellant's cases are in no way analogous to the use and underlying technology at present, which Appellant situates, to attempt to strengthen its argument, within the framework of generative AI. Yet, Appellant cites to cases dealing with fundamentally different technology than generative AI—Google's search function, *Authors Guild v. Google, Inc.*, 804 F.3d 202, 206 (2d Cir. 2015), search engines' thumbnail images' display, *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 818–19 (9th Cir. 2003), and specific computer declaring code, *Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 38–39 (2021), which courts have candidly acknowledged "test[ed] the boundaries of fair use," *Authors Guild*, 804 F.3d at 206, and may have come out differently had any one of several factors varied.

## A.    *Authors Guild v. Google, Inc.* **("Google Books")**

Appellant's claim that its "AI legal search engine is at least as transformative as the search tool in *Google Books*" is patently false. (Ross Br. at 41.) *Google Books* is clearly distinguishable because it involved a completely different purpose for the use of the copyrighted materials—to provide information location services to drive readers to the relevant source material. The Second Circuit agreed with the district court's ruling that Google's digitization and subsequent use of the copyrighted works was fair use. Concluding that Google's use was transformative, the appellate

court held that "Google's making of a digital copy to provide a search function . . . augments public knowledge by making available information *about* [p]laintiffs' books without providing the public with a substantial substitute for matter protected by the [p]laintiffs' copyright interests in the original works or derivatives of them." 804 F.3d at 207.

Significantly, the decision made clear that the case "tests the boundaries of fair use"—a position that the Ninth Circuit agreed with—and may have come out differently had any one of several factors varied. *Id.* at 206; *see also VHT, Inc. v. Zillow Grp., Inc.*, 918 F.3d 723, 743 (9th Cir. 2019) ("We agree with the Second Circuit's observation that the copyright dispute over the Google Books search engine 'tests the boundaries of fair use.'"). First, the Second Circuit explained that the fair use analysis would have been different if the purpose of Google's scanning of literary works was to substitute for the original works. *Authors Guild*, 804 F.3d at 222 ("Google has constructed the snippet feature in a manner that substantially protects against its serving as an effectively competing substitute for Plaintiffs' books."); *id.* at 226 ("The program does not allow access in any substantial way to a book's expressive content."). In other words, it was critical that Google used the books to provide information *about* the works and to serve as a pointer for readers by helping readers "identify and locate" the original works. *Id.* at 217. By contrast, Appellant cannibalized Appellees' copyrighted works for the purpose of establishing

a rival platform in an overt attempt to usurp Westlaw's market.

**B.**    ***Kelly v. Arriba Soft Corp.***

Appellant also cites to the Ninth's Circuit's decision in *Arriba* as a case that supports a finding of fair use, but it ignores the major distinction that in *Arriba* there was no risk of supplanting the market for the original. In that case, Arriba Soft was sued for copyright infringement for copying the plaintiff's photographs from the Internet and then displaying smaller, lower resolution "thumbnail" copies of the photographs on the search results page of its visual search engine. The court held that Arriba Soft's reproduction of the plaintiff's photos as thumbnail images qualified as fair use because the thumbnail images served an entirely different purpose than the original images. Specifically, the court held that the plaintiff's photographs were artistic works that were "intended to inform and to engage the viewer in an aesthetic experience," in contrast to Arriba's use, which the court found was "unrelated to any aesthetic purpose" but instead offered a way "to help index and improve access to images on the internet and their related web sites." 336 F.3d at 818–19.

Here, by contrast, both the Westlaw Headnotes and Appellant's competing material serve the same purpose, which "seriously weakens" Appellant's fair use claim. *Id.* at 819. The court ruled in favor of fair use in *Arriba* because "[t]he thumbnails do not stifle artistic creativity because they *are not used for illustrative*

*or artistic purposes* and therefore *do not supplant the need for the originals*." *Id.* at 820 (emphasis added). This is very different from Appellant's use that clearly "supplant[s] the need for the original [*i.e.*, the ingested work]." *Id*.

### C. *Google LLC v. Oracle Am., Inc.*

Appellant and its *amici* also liken the unauthorized use of Appellees' copyrighted works to that which was found to be fair use in the Supreme Court's *Google v. Oracle* decision. (Ross Br. at 33; Brief of The Computer & Communications Industry Association, Chamber of Progress, and NetChoice In Support Of Appellant Ross Intelligence, Inc. and Reversal, 25-2153 (3d Cir. Sept. 29, 2025) (Dkt. 37) ("CCIA Br.") at 9–11.) However, the decision in *Google v. Oracle* is expressly limited to the specific type of computer declaring code at issue in that case and cannot be applied to past or future fair use analyses outside of that specific context. *See* 593 U.S. at 40 (the Court was clear that its decision "do[es] not overturn or modify [its] earlier cases" involving fair use). It is widely recognized that *Google v. Oracle* has a very limited application—and is simply inapplicable when the work being used is a traditional copyrighted work (*e.g.*, a literary work).

Significantly, the Court was careful to distinguish computer code from expressive works that have no functional elements that may impact a factor-two analysis, stating that "computer programs differ from books, films, and many other 'literary works' in that [software] programs almost always serve functional

purposes." *Id.* at 21; *see also id.* at 28–29 (explaining that the declaring computer code at issue was, "if copyrightable at all, further than are most computer programs (such as the implementing code) from the core of copyright" and "inherently bound together with uncopyrightable ideas"). When considering the circumstances surrounding Appellant's use of Appellees' expressive works of authorship, the instant case is easily distinguishable from the software-specific facts of *Google v. Oracle*.

Appellant's *amici* argue that like Google, Appellant "created a new system," which it claims should result in a finding of transformative fair use. (CCIA Br. at 10). In comparing the development of Appellant's competing legal research tool to the innovation at issue in *Google v. Oracle*, *amici* ignore the limited application of *Google v. Oracle* and misrepresent the scope of the fair use doctrine. Moreover, if creative progress and innovation, standing alone, were the only litmus test for fair use, very few uses would not qualify. In reality, the fair use test is a much more nuanced and complex doctrine. Again, Appellant cannibalized Appellees' copyrighted works for the purpose of establishing a rival platform in an overt attempt to usurp Westlaw's market. Where, as here, the use does not have a "further purpose or different character" from the plaintiff's and caused direct harm to its market, *Thomson Reuters Enter.*, 765 F. Supp. 3d at 397–98, it is not transformative and cannot be fair use.

**D.    Appellant's Infringement Is Not Justified Under The Fourth Fair Use Factor But Rather Undermines The Value Of Appellees' Works, Harming Its And Other Creators' Licensing Markets.**

Appellant's infringement of Appellees' works impedes Appellees' ability to license them, including within the rapidly emerging licensing markets for the type of use made by Appellant. *See, e.g.*, Mattias Rattzén, *Location Is All You Need: Copyright Extraterritoriality and Where to Train Your AI*, 26 Colum. Sci. & Tech. L. Rev. 175, 201 (2024) (noting the "commercial market for training data that is rapidly growing" and citing examples such as "Hazy," a public marketplace for synthetic data, as well as OpenAI and other developers' licensing agreements with "content producers and aggregators like Associated Press, Axel Springer, Financial Times, Reddit, Vox Media and Shutterstock, among others"); *see also AI content licensing deals: Where OpenAI, Microsoft, Google, and others see opportunity*, CBInsights (July 19, 2024), https://www.cbinsights.com/research/ai-content-licensing-deals/.

AI-related markets are indeed emerging as a crucial source for creators' revenue streams. Providing a new and significant market for their works, creators "now have the opportunity to participate actively and profit from AI development." Dashveenjit Kaur, *Content creators strike gold in AI content licensing boom*, T_HQ (Jan. 15, 2025), https://techhq.com/news/content-creators-strike-gold-in-ai-content-licensing-boom/; *see also The Future of Digital Publishing: How AI Content*

*Licensing Platforms Are Changing the Game*, 3D Issue (Sept. 1, 2025), https://www.3dissue.com/the-future-of-digital-publishing-how-ai-content-licensing-platforms-are-changing-the-game/ ("AI content licensing platforms are emerging as a crucial layer on top of existing digital infrastructure" wherein "publishers and creators control which of their works are used by AI systems, how those works are attributed, and how revenue flows back to the original rights holders."); *AI Licensing for Creative Works*, Copyright Alliance, https://copyrightalliance.org/artificial-intelligence-copyright/licensing/ (last visited Nov. 26, 2025).

 As evidenced by the demand stemming from and driving these emerging markets, there is intrinsic value in creative works deriving from the selection, coordination, and arrangement of factual content. Such works include headnotes, but also photographs, video clips, short films, drone footage, as well as scientific, educational, and medical journals and articles. Performing the essential function of compiling and conveying factual content, these works uphold, as discussed *supra*, entire industries and fields. Although such content may not be personality-laden, individualistic expression, it nevertheless remains both valuable and copyrightable. *Cf. Am. Geophysical Union v. Texaco, Inc.*, 60 F.3d 913, 925 n.11 (2d Cir. 1994). Here, Appellant's decision to use the West Headnotes emphasizes their particular value. With access to the same judicial opinions underlying the

Headnotes, Appellant could have simply taken language therein to build its product. Instead, it chose to copy from Appellees due to the West Headnotes' value in highlighting key aspects of caselaw.

Upholding protection for the West Headnotes and the many other works compiling factual source material, maintains their continued creation. Incentivizing and rewarding creators through the ability to control derivative uses and licensing for their works sustains industries and creative communities, and in Appellees' case allows them to continue to demonstrate a particular means of expression and utility derivable from judicial opinions. Allowing Appellant to steal the Headnotes, however, would deprive creators, including Appellees, of the value of their work. As with any narrowing of the purposely broad parameters of originality, such outcome would ultimately disincentivize their creation. Ironically this will only serve to reduce the numbers of such works that exist in the first place, including for AI training. Such outcome is antithetical to the "innovation" and "American lead in AI development" that Appellant claims it champions. (Ross Br. at 3.)

## CONCLUSION

To accept Appellant's self-serving misrepresentations of well-settled law would threaten virtually every creative industry that relies on copyright. Accordingly, the Copyright Alliance, as *amicus curiae*, respectfully requests that the

Court affirm the judgment below in favor of Appellees.

Dated: November 26, 2025

COWAN DEBAETS ABRAHAMS &
SHEPPARD LLP

/s/ Nancy E. Wolff
Nancy E. Wolff
Elizabeth Safran
60 Broad Street, 30th Floor
New York, New York 10004
Tel.: (212) 974-7474
Fax: (212) 974-8474
nwolff@cdas.com
esafran@cdas.com

*Counsel for Amicus Curiae*
*The Copyright Alliance*

# CERTIFICATION OF ADMISSION TO BAR

I, Nancy, E Wolff, hereby certify as follows:

1.      I am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

2.      Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that the foregoing is true and correct.

Dated:  November 26, 2025          */s/ Nancy E. Wolff*
                                   Nancy E. Wolff, Esq.

                                   *Counsel for Amicus Curiae*
                                   *The Copyright Alliance*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this Brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 29(a)(5) and Circuit Rule 32-1 because it contains 6,348 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), as counted by Microsoft® Word for Windows (Version 2402), the word processing software used to prepare this brief.

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared using Microsoft® Word for Windows (Version 2402) in in a proportionally spaced typeface, 14-point Times New Roman font.

This brief complies with the electronic filing requirements of Local Rule 31.1(c) because the text of this electronic brief is identical to the text of the paper copies, and a virus detection program the Vipre Virus Protection, version 3.1 was run on the file containing the electronic version of this brief and no viruses have been detected.

Dated: November 26, 2025           /s/ Nancy E. Wolff
                                      Nancy E. Wolff

                                      *Counsel for Amicus Curiae*
                                      *The Copyright Alliance*

## CERTIFICATE OF SERVICE

I, Nancy E. Wolff, hereby certify that on November 26, 2025, a true and correct complete copy of the foregoing Brief for The Copyright Alliance as *Amicus Curiae* in Support of Plaintiffs-Appellees Thomson Reuters Enterprise Centre GMBH and West Publishing Corporation was timely filed in with the Clerk of Court using the appellate CM/ECF system, which will send notifications to all counsel registered to receive electronic notices.

/s/ Nancy E. Wolff
Nancy E. Wolff

*Counsel for Amicus Curiae*
*The Copyright Alliance*