C.A. No. 25-2153

---

## IN THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

---

THOMSON REUTERS ENTERPRISE CENTRE GMBH
AND WEST PUBLISHING CORP.,

*Plaintiffs-Appellees*,

v.

ROSS INTELLIGENCE INC.,

*Defendant-Appellant.*

---

On Appeal from the United States District Court
for the District of Delaware (Wilmington)
D. Ct. No. 1:20-cv-00613-SB
The Honorable Stephanos Bibas, Circuit Judge, Sitting by Designation

---

## BRIEF OF DISNEY ENTERPRISES, INC., PARAMOUNT PICTURES CORPORATION, SONY PICTURES ENTERTAINMENT INC., UNIVERSAL CITY STUDIOS LLC, AND WARNER BROS. ENTERTAINMENT INC. AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLEES

---

David R. Singer
Julie A. Shepard
JENNER & BLOCK LLP
515 South Flower Street,
  Suite 3300
Los Angeles, CA 90071
(213) 239-5100

Adam G. Unikowsky
  *Counsel of Record*
Jonathan J. Marshall
JENNER & BLOCK LLP
1099 New York Avenue,
  NW, Suite 900
Washington, DC 20001
(202) 639-6000
aunikowsky@jenner.com

# DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure 26.1(a) and 29(a)(4)(A), undersigned counsel states:

- *Amicus curiae* Disney Enterprises, Inc., is a wholly owned, indirect subsidiary of The Walt Disney Company, a publicly held company. No publicly held company has 10% or greater ownership in The Walt Disney Company.

- *Amicus curiae* Paramount Pictures Corporation is a wholly owned subsidiary of Paramount Global, which is a wholly owned subsidiary of Paramount Skydance Corporation, a publicly held company. No publicly held company has 10% or greater ownership in Paramount Skydance Corporation.

- *Amicus curiae* Sony Pictures Entertainment Inc. is a wholly owned, indirect subsidiary of Sony Group Corporation, a publicly held company. No publicly held company has 10% or greater ownership in Sony Group Corporation.

- *Amicus curiae* Universal City Studios LLC is a wholly owned, indirect subsidiary of Comcast Corporation, a publicly held

company.  No publicly held company has 10% or greater owner-ship in Comcast Corporation.

- *Amicus curiae* Warner Bros. Entertainment Inc. is a wholly owned, indirect subsidiary of Warner Bros. Discovery, Inc., a publicly held company.  No publicly held company has 10% or greater ownership in Warner Bros. Discovery, Inc.

Dated:  November 26, 2025

*/s/ Adam G. Unikowsky*

Adam G. Unikowsky

*Counsel of Record for Amici Curiae*

# TABLE OF CONTENTS

DISCLOSURE STATEMENT ....................................................... i

TABLE OF AUTHORITIES .................................................... iv

IDENTITY AND INTEREST OF *AMICI CURIAE* ............................. 1

INTRODUCTION AND SUMMARY OF THE ARGUMENT .................. 5

ARGUMENT ....................................................... 10

I.    This Case Should Be Resolved by Applying Straightforward, Ordinary Principles of Copyright Law to the Facts ...................... 10

II.    Applying Well-Established Fair-Use Principles, Defendant's Use Was Not Fair ............................................................ 14

    A.    The First and Fourth Fair-Use Factors Promote the Development of Creative Works While Guarding Against Market Substitution................................. 14

    B.    Factor One Suggests No Fair Use Because Defendant Added No Expression to Westlaw Headnotes and Used Them for the Same Purpose as Plaintiffs ............................ 17

        1.    Defendant's use of the headnotes was not transformative ............................................. 17

        2.    "Intermediate copying" cases do not apply here ......... 25

    C.    Factor Four Suggests No Fair Use Because Defendant Created a Market Substitute for Plaintiffs' Product............ 27

CONCLUSION ........................................................... 34

CERTIFICATE OF COMPLIANCE ....................................... 35

CERTIFICATE OF SERVICE ............................................. 37

# TABLE OF AUTHORITIES

CASES

*ABC, Inc. v. Aereo, Inc.*, 573 U.S. 431 (2014) ..................................... 24

*American Geophysical Union v. Texaco Inc.*, 60 F.3d 913
 (2d Cir. 1994) ........................................................................... 31, 33

*American Society for Testing & Materials v.
 Public.Resource.org, Inc.*, 82 F.4th 1262 (D.C. Cir. 2023) ............. 12

*Andy Warhol Foundation for the Visual Arts
 v. Goldsmith*, 598 U.S. 508 (2023) .................................. 8, 12, 15-18,
                                                              20, 22-23, 25, 33

*Authors Guild v. Google, Inc.*, 804 F.3d 202
 (2d Cir. 2015) .............................................................. 16, 19, 25, 32

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
 448 F.3d 605 (2d Cir. 2006) ............................................................ 31

*Campbell v. Acuff-Rose Music*, 510 U.S. 569
 (1994) ......................................................... 7, 12, 14-17, 19-20, 32

*Castle Rock Entertainment v. Carol Publishing Group*,
 150 F.3d 132 (2d Cir. 1998) ............................................................ 31

*Dr. Seuss Enterprises v. ComicMix LLC*, 983 F.3d 443
 (9th Cir. 2020), *abrogated in part by Jack Daniel's
 Properties v. VIP Products*, 599 U.S. 140 (2023) ........................... 32

*Folsom v. Marsh*, 9 F. Cas. 342 (C.C.D. Mass. 1841)
 (No. 4901) ....................................................................................... 15

*Fox News Network v. TVEyes, Inc.*, 883 F.3d 169
 (2d Cir. 2018) .......................................................................... 30, 33

*Google LLC v. Oracle America, Inc.*, 593 U.S. 1 (2021) .......... 20-21, 26

*Hachette Book Group v. Internet Archive*, 115 F.4th 163
(2d Cir. 2024) ....................................................... 16-17, 32

*Harper & Row, Publishers v. Nation Enterprises*,
471 U.S. 539 (1985) ......................................................... 16

*Kadrey v. Meta Platforms*, 788 F. Supp. 3d 1026
(N.D. Cal. 2025) ................................................................ 11

*Murphy v. Millennium Radio Group*, 650 F.3d 295
(3d Cir. 2011) .................................................................... 31

*Romanova v. Amilus Inc.*, 138 F.4th 104 (2d Cir. 2025) ................... 25

*Salinger v. Colting*, 607 F.3d 68 (2d Cir. 2010) ................................. 12

*Salinger v. Random House, Inc.*, 811 F.2d 90 (2d Cir. 1987)............. 31

*Sega Enterprises. v. Accolade, Inc.*, 977 F.2d 1510
(9th Cir. 1992) ................................................................... 25

*Sony Computer Entertainment v. Connectix Corp.*,
203 F.3d 596 (9th Cir. 2000) ........................................... 25

*Sony Corp. of America v. Universal City Studios*,
464 U.S. 417 (1984) ......................................................... 14

*Stewart v. Abend*, 495 U.S. 207 (1990) ................................................. 4

*Video Pipeline v. Buena Vista Home Entertainment*,
342 F.3d 191 (3d Cir. 2003)................................................21, 28-29

*Worldwide Church of God v. Philadelphia Church of God*,
227 F.3d 1110 (9th Cir. 2000) ........................................ 30

**STATUTES**

17 U.S.C. § 102(a) ................................................................... 13

17 U.S.C. § 107(1) ........................................................ 7, 15, 17

17 U.S.C. § 107(4) ............................................... 9, 16, 27, 29

**RULES**

Fed. R. App. P. 29(a)(4)(E) ..................................................... 1

**OTHER AUTHORITIES**

H.R. Rep. No. 94-1476 (1976) ............................................. 13

## IDENTITY AND INTEREST OF *AMICI CURIAE*[1]

*Amicus curiae* **Disney Enterprises, Inc.**, and its subsidiaries and affiliates (collectively, Disney) have, for 100 years, fueled the American engine of innovation and delighted audiences around the world by investing in and fostering human creativity, producing some of the greatest motion pictures, television shows, and fictional characters of all time, and bringing those characters and worlds to life in theme parks enjoyed by families around the globe.  Disney owns copyrights and other intellectual-property rights in and to a broad array of motion pictures, television shows, characters, artwork, scripts, musical compositions, sound recordings, books, and more.

*Amicus curiae* **Paramount Pictures Corporation**, a global producer and distributor of filmed entertainment since 1912, is an iconic brand with an extensive library of motion pictures, which include such

---

[1] All parties have consented to the filing of this brief.  Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *amici* state that no party's counsel authored this brief in whole or in part; that no party or party's counsel contributed money that was intended to fund preparing or submitting this brief; and that no person or entity other than *amici* or their counsel contributed money that was intended to fund preparing or submitting this brief.

classics as *Titanic*, *Forrest Gump*, and *The Godfather*, and well-known franchises such as *Mission: Impossible* and *Transformers*.

*Amicus curiae* **Sony Pictures Entertainment Inc.** (SPE) is a subsidiary of Tokyo-based Sony Group Corporation. SPE's global operations encompass motion-picture production, acquisition, and distribution; television production, acquisition, and distribution; television networks; digital-content creation and distribution; operation of studio facilities; and development of new entertainment products, services, and technologies.

*Amicus curiae* **Universal City Studios LLC** (Universal) is a subsidiary of NBCUniversal Media, LLC, one of the world's leading media and entertainment companies in the development, production, and marketing of entertainment, news, and information to a global audience. Universal is the source of many of the world's most beloved films and franchises, and works with leading content creators around the world to distribute and market their films to Universal's global audience.

*Amicus curiae* **Warner Bros. Entertainment Inc.** (WBEI) is a subsidiary of Warner Bros. Discovery, Inc. WBEI is a leading global media and entertainment company that creates, produces, and distributes

premium content and interactive experiences from some of the world's most recognized brands and franchises. WBEI and its affiliates have, for more than a century, delivered stories and experiences that inspire and entertain audiences worldwide.

*Amici* own extensive libraries of copyrights, including some of the most popular motion pictures and television programs of all time. *Amici* spend substantial time and money creating these works and do so on the promise and incentives afforded by the Copyright Act, which grants copyright owners the exclusive rights to develop businesses around their works. *Amici*, therefore, have a strong interest and a wealth of experience and expertise in the appropriate development and application of copyright-law principles—including the fair-use defense invoked in this case—having litigated for generations as both plaintiffs and defendants in copyright cases. *Amici* have also seen firsthand how the faithful application of longstanding copyright-law principles in cases involving new technologies has consistently enabled the nation's creative ecosystem to thrive. Indeed, *amici* themselves frequently develop and rely upon pioneering technologies. *Amici* are, accordingly, uniquely well positioned to offer this Court important perspective on the fair-use issues in this case.

By allowing limited use of copyrighted material where "rigid application of the copyright statute . . . would stifle the very creativity which that law is designed to foster," *Stewart v. Abend*, 495 U.S. 207, 236 (1990) (internal quotation marks omitted), the fair-use doctrine adds to the universe of creativity and respects the free-speech interests of creators and observers alike. But if the doctrine's contours are not properly guarded, it can become a license for infringers who add no creative spark to profit from the protected works of others.

This case involves works that summarize specific points in judicial opinions that Plaintiffs' attorney-editors selected and drafted for their perceived utility to legal researchers. Though *amici*, by contrast, own copyrights in highly creative works such as movies and television shows, *amici* are concerned with some of the sweeping arguments advanced by Defendant ROSS Intelligence and its own *amici*. Defendant suggests that because its alleged infringement involved an artificial intelligence (AI) model, its use should be deemed transformative under a novel, AI-specific principle it asks this Court to announce. *See* Appellant's Br. 40-42. But copyright law was designed to accommodate the ever-evolving

technological landscape, and there is no basis for departing from enduring fair-use principles in the AI context.

Applying time-honored copyright principles, the fair-use inquiry here is straightforward. As a shortcut in the process of creating a legal-research product that would compete directly with Plaintiffs' Westlaw tool, Defendant copied Westlaw headnotes and put them to a use indistinguishable from Plaintiffs' use. Defendant's conduct was not fair use, and holding otherwise would undermine fundamental copyright principles and create needless uncertainties in an otherwise well-settled body of law.

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

The question before this Court is whether to apply longstanding fair-use principles in analyzing Defendant's conduct, or whether instead to accept Defendant's and its *amici*'s unsupported invitation to create a new rule categorically deeming copying for purposes of AI "training" to be fair use. If the Court applies customary fair-use principles, this case is straightforward. Defendant added nothing creative to Plaintiffs' copyrighted material—no commentary, criticism, or new information—and it

used Plaintiffs' copyrighted works in order to create a market substitute for Plaintiffs' existing product.

Defendant asks this Court to modify fair-use doctrine so that Defendant—and future infringers—receive the benefit of an unprecedented, AI-specific version of the fair-use defense under which the use of copyrighted material in connection with an AI-related service is almost automatically deemed transformative. The Court should decline that invitation and adhere to traditional fair-use principles. A departure from those principles would not only produce the wrong answer in this case, but would also unsettle copyright law more broadly, to the potential detriment of companies, including *amici*, that have both built their businesses around highly valuable copyrights and that also rely on the fair-use doctrine in developing creative works. It would also chill incentives to continue investing in and creating the movies and television shows that delight audiences worldwide and fuel the engine of the American entertainment industry. Disrupting fair-use law would affect not only *amici* but also the larger ecosystem of businesses in the creative-arts economy that rely on copyright law to protect their investments.

The fair-use doctrine serves copyright law's aims by recognizing that, even without the authorization of the copyright owner, allowing a limited amount of "breathing space within the confines of copyright" serves the same ideals: promoting creativity, knowledge, and art. *Campbell v. Acuff-Rose Music*, 510 U.S. 569, 579 (1994). When applied properly, the fair-use doctrine facilitates investment in, and a thriving market for, creativity and commentary alike.

Defendant attempts to leverage the AI aspect of this case to justify departures from ordinary fair-use principles, *see* Appellant's Br. 40-42, but no such departures are warranted. Like countless other infringers through the years, Defendant claims that its commercial exploitation of Plaintiffs' works is transformative—and thus fair use—despite serving the same core purpose as the original work. Under established fair-use principles, such invocations of the defense fail.

Under the first fair-use factor, courts consider "the purpose and character of the use, including whether such use is of a commercial nature." 17 U.S.C. § 107(1). As to that factor, Defendant's use of Westlaw headnotes was for commercial purposes, and there was nothing transformative about the use. Use is transformative when "the purpose of the

use is distinct from the original, for instance, because the use comments on, criticizes, or provides otherwise unavailable information about the original." *Andy Warhol Found. for the Visual Arts v. Goldsmith*, 598 U.S. 508, 544-45 (2023). Merely inserting an original work into a machine-learning model to create a perfect market substitute does none of these things.[2]

Defendant's reliance on so-called "intermediate copying" cases is unavailing. Those cases—all involving functional software rather than expressive works—hold that copying is sometimes fair use when necessary to create a competing product that can interoperate with existing products in the marketplace. Here, however, as the district court concluded, Defendant's copying may have saved time and money, but it was not "reasonably necessary to achieve the user's new purpose." D. Ct. Doc. 770, at 19 (Opinion) (internal quotation marks omitted). Fair-use doctrine exists to promote creativity, not to provide cost savings for market entrants. Indeed, a holding suggesting that saving time and money are

---

[2] *Amici* do *not* suggest that a one-for-one market substitute is necessarily required to defeat a fair-use defense. That simply happens to be the factual scenario in this particular case. Courts are equipped to consider market harm on a case-by-case basis, mindful of the context in which any specific claim arises.

suggestive of "fair use" would cast doubt on copyright owners' exclusive rights and wreak havoc on the entire creative ecosystem. It would harm not only companies that have built their businesses around copyrighted movies and television shows—which require massive investments of time and money, not to mention commercial risk—but also the creators, performers, crew, and adjacent businesses and employees who support the motion-picture industry.

As to the fourth fair-use factor—"the effect of the use upon the potential market for or value of the copyrighted work," 17 U.S.C. § 107(4)—this case is similarly straightforward. The copyrighted work here (Westlaw headnotes) has value as part of Plaintiffs' overall Westlaw package, and thus Defendant's singular focus on whether there exists a market for the headnotes *standing alone* is misguided. Nor does it matter whether Plaintiffs have in the past actively marketed the headnotes. This Court should reaffirm the bedrock principle, on which copyright owners rely, that creators have the right to license—or not license—their intellectual property as they see fit, and a copyright owner's business decision not to offer a license does not transform unlicensed copying into fair use.

This Court should abstain from announcing new, broad rules for AI-related uses of copyrighted material that would distort fair-use principles; upend settled expectations as to the operation of copyright law that have long underpinned investment in the development of creative works; and provide a windfall for commercial actors who seek profits from the creative labors of others. Copyright law—including fair-use doctrine—was designed to be forward looking and accommodate new technologies, and it does not require modification based on the advent of AI. *Amici* recognize that there are a multitude of new AI technologies that may raise fact-intensive questions under the Copyright Act. The Court should decline Defendant's invitation to adopt unrecognized, sweeping theories that may distort future litigation presenting those questions. This case is easily resolved using established fair-use principles, and future courts can apply those same principles to future fact patterns as they arise.

## ARGUMENT

## I. This Case Should Be Resolved by Applying Straightforward, Ordinary Principles of Copyright Law to the Facts.

This case involves AI, though, as the district court was careful to note, the case does not involve *generative* AI—*i.e.*, AI "that writes new content itself." Opinion 17; *see* Opinion 19. Nonetheless, because

Defendant is developing a product that, it claims, incorporates AI, Defendant asks this Court to depart from an ordinary fair-use analysis, suggesting that its use here was transformative because it "us[ed] outdated technology as a base to invent a modern tool that progresses the sciences."  Appellant's Br. 34.  Defendant even urges this Court to make sweeping pronouncements about the operation of copyright law in the AI space, asserting that "[t]here 'is no serious question' that transforming prose into data to train a machine learning model has a 'further purpose' and 'different character' than the text itself" and that such use is "'highly transformative.'"  *Id.* at 42 (quoting *Kadrey v. Meta Platforms*, 788 F. Supp. 3d 1026, 1044 (N.D. Cal. 2025)).  Defendant's *amici* make similar pronouncements.  *See, e.g.*, CCIA et al. Br. 12 ("Training an AI-powered search engine is an entirely different purpose . . . ."); Copyright Professors' Br. 4-11 (trumpeting the transformative nature of AI uses); Goebel & Ullman Br. 9-11 (same).

This Court should reject any invitation to fashion a new common law of fair use applicable to so-called "AI cases" alone.  As the Supreme Court has recently warned, adopting an "overbroad concept of transformative use . . . would narrow the copyright owner's exclusive right to create

11

derivative works." *Andy Warhol*, 598 U.S. at 529. Rather, the fair-use analysis should proceed according to well-established copyright principles applied to the specific details of the use at issue.

Moreover, fair-use analysis is inherently fact intensive. *See Am. Soc'y for Testing & Materials v. Public.Resource.org, Inc.*, 82 F.4th 1262, 1267 (D.C. Cir. 2023); *Salinger v. Colting*, 607 F.3d 68, 80-81 (2d Cir. 2010). The doctrine's development is therefore ill served by the types of broad pronouncements Defendant seeks. And particularly "[b]ecause the AI landscape is changing rapidly," Opinion 19, this Court should be wary of announcing principles that would govern swaths of AI cases. *See Campbell*, 510 U.S. at 577 (fair-use inquiry "is not to be simplified with bright-line rules, for the statute, like the doctrine it recognizes, calls for case-by-case analysis").

Defendant and its *amici* focus on the purported transformative nature of Defendant's use—arguing, for instance, that a fair-use finding is all but required here because Defendant "train[ed] its new AI model" with the Westlaw headnotes. Copyright Professors Br. 4. In their view, the transformativeness of Defendant's use was so significant as to render the commercial aspect of that activity almost irrelevant. *See, e.g.*, *id.* at 14-

15.  In effect, Defendant and its *amici* ask this Court to eschew the customary holistic fair-use analysis and announce that if copying occurs for purposes of advancing technology, it *must* be transformative, and hence it *must* be fair.

But copyright law has never worked that way.  Copyright-law principles have endured—from their common-law origins to the modern Copyright Act—because they are forward looking.  Indeed, in enacting the 1976 Act, Congress explicitly stated that it wished to protect works fixed in media both "now known or later developed."  17 U.S.C. § 102(a); *see* H.R. Rep. No. 94-1476, at 51 (1976) (noting Congress's intent to accommodate "new expressive methods").  Thus, while Defendant seeks shelter behind the fact that its competing product involves purportedly novel machine-learning technology, that does not alter the copyright principles in play.  There is no "novel technology" exception to copyright law, and there is no thumb on the fair-use scale for commercially motivated copying just because the competing product in some sense incorporates AI.

Invocation of AI as inherently transformative is not the first—and will not be the last—time that infringers try to leverage new technology

to attack the foundations of copyright law. This Court should not be the first to reward such a gambit.

## II.    Applying Well-Established Fair-Use Principles, Defendant's Use Was Not Fair.

The district court correctly applied established fair-use principles to conclude that factors one and four of the fair-use analysis—the most important factors—favor Plaintiffs and ultimately demand the conclusion that Defendant's conduct was not fair use. This Court should reaffirm that even when emerging technology is at issue, those principles govern.

### A.    The First and Fourth Fair-Use Factors Promote the Development of Creative Works While Guarding Against Market Substitution.

The "goal of copyright" is "to promote science and the arts." *Campbell*, 510 U.S. at 579. Copyright law grants creators certain exclusive rights to their works with the "ultimate aim . . . to stimulate artistic creativity for the general public good." *Sony Corp. of Am. v. Universal City Studios*, 464 U.S. 417, 432 (1984). The fair-use doctrine serves copyright law's aims by recognizing that, even without the authorization of the copyright owner, allowing a limited amount of "breathing space within the

confines of copyright" serves the same ideals: promoting creativity, knowledge, and art. *Campbell*, 510 U.S. at 579.

The statutory fair-use factors—particularly the first and fourth—reflect this goal. Under the first factor, courts consider "the purpose and character of the use, including whether such use is of a commercial nature." 17 U.S.C. § 107(1). The first factor asks a "central" question: whether the use is made to "merely 'supersede[] the objects' of the original creation or instead add[] something new, with a further purpose or different character, altering the first with new expression, meaning, or message." *Campbell*, 510 U.S. at 579 (citation omitted) (quoting *Folsom v. Marsh*, 9 F. Cas. 342, 348 (C.C.D. Mass. 1841) (No. 4901) (Story, Circuit Justice)). As the Supreme Court has explained, on the one hand, "a use that has a distinct purpose is justified because it furthers the goal of copyright, namely, to promote the progress of science and the arts, without diminishing the incentive to create." *Andy Warhol*, 598 U.S. at 531. On the other, a use "that shares the purpose of a copyrighted work" is "more likely to provide 'the public with a substantial substitute for matter protected by the [copyright owner's] interests in the original wor[k] or derivatives of [it],' which undermines the goal of copyright." *Id.* at 531-

32 (alterations in original) (citation omitted) (quoting *Authors Guild v. Google, Inc.*, 804 F.3d 202, 207 (2d Cir. 2015)).  The first fair-use factor thus "relates to the problem of substitution—copyright's bête noire." *Id.* at 528.

Market substitution likewise lies at the heart of the fourth fair-use factor: "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4).  This factor requires consideration of "whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market for the original." *Campbell*, 510 U.S. at 590 (alteration in original) (internal quotation marks omitted).  The fourth factor favors a fair-use finding where the secondary work "does not materially impair the marketability of the work which is copied." *Harper & Row, Publishers v. Nation Enters.*, 471 U.S. 539, 567 (1985) (internal quotation marks omitted).  And it weighs against fair use where "the second work . . . *usurps* the market for the first by offering a competing substitute." *Hachette Book Grp. v. Internet Archive*, 115 F.4th 163, 189 (2d Cir. 2024) (internal quotation marks omitted).  Courts have thus repeatedly recognized the interrelatedness of the first and fourth factors and their joint

16

focus on market substitution. *See, e.g.*, *Andy Warhol*, 598 U.S. at 536 n.12 (recognizing the "obvious" and "positive association between the two factors"); *Hachette Book Grp.*, 115 F.4th at 189.

### B. Factor One Suggests No Fair Use Because Defendant Added No Expression to Westlaw Headnotes and Used Them for the Same Purpose as Plaintiffs.

Defendant claims that the first fair-use factor weighs in its favor because its use of Westlaw headnotes was "spectacularly transformative." Appellant's Br. 35. But accepting Defendant's overbroad claim—that the use of AI somehow serves as a fair-use trump card, *see id.* at 40-42—would be contrary to the established case-specific and holistic nature of the fair-use inquiry. Defendant's arguments, if accepted by this Court, would inject significant uncertainty into copyright law, to the detriment of copyright owners.

#### 1. *Defendant's use of the headnotes was not transformative.*

The first factor tasks a court with examining "the purpose and character of the use." 17 U.S.C. § 107(1). This factor focuses on whether the alleged use of copyrighted material is "transformative" and on the commercial nature of that use. *See Andy Warhol*, 598 U.S. at 531; *Campbell*, 510 U.S. at 579.

As explained above, a use may qualify as transformative if the "purpose of the use is distinct from the original," such as when the use "comments on" or "criticizes" the original. *Andy Warhol*, 598 U.S. at 544-45. Copyright law sometimes protects such transformative use under the fair-use doctrine because it promotes the purposes of copyright law—adding to the universe of knowledge, art, and expression.

For two reasons, Defendant's use of Westlaw headnotes was not transformative. First, Defendant wished to create a commercial legal-research tool that connects legal questions to relevant judicial decisions, just like Plaintiffs' product. To create that product, Defendant needed a work that summarized key points in judicial opinions, which is exactly what Westlaw's headnotes do. So Defendant copied the headnotes. *See* D. Ct. Doc. 547, at 2-4. The purpose of Defendant's use of the headnotes was virtually identical to Plaintiffs' use: to connect legal questions with judicial opinions for the purpose of providing a legal-research tool.

Second, as the district court explained, the result of Defendant's copying was a product that competes directly with Plaintiffs' product. Opinion 22. Defendant's use cannot be considered fair when the ultimate purpose of that use was part of a scheme to "supersede[] the object[] of

the original creation," *Campbell*, 510 U.S. at 579 (internal quotation marks omitted), and create "a market replacement for it," *id.* at 591.

Defendant's arguments to the contrary distort established fair-use law. Defendant claims that its use of Westlaw headnotes was transformative because it "makes possible new forms of research." Appellant's Br. 41 (quoting *Authors Guild*, 804 F.3d at 209). This assertion is doubtful: as the district court observed, Defendant sought to "develop a competing legal research tool," Opinion 19, not to invent previously unseen forms of research. But more fundamentally, use does not become fair merely because copying facilitates development of a new product with purported commercial advantages. Just as would-be filmmakers may not create an unlicensed *Star Wars* Episode X or *Breaking Bad* Season 6 merely by claiming that there is market demand for them, Defendant cannot copy Plaintiffs' intellectual property merely by asserting that copying would facilitate the creation of a new legal-research product.

The essence of fair use is the creation of *expression* that is meaningfully different—in purpose and character—than the original expression being copied. Courts consider whether "the copier's use fulfill[s] the objective of copyright law to stimulate creativity for public illumination."

*Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 29 (2021) (alteration in original) (internal quotation marks omitted).  For example, Andy Warhol's "Soup Cans series use[d] Campbell's copyrighted work for an artistic commentary on consumerism, a purpose that [wa]s orthogonal to advertising soup."  *Andy Warhol*, 598 U.S. at 539.  Similarly, "a parody can be transformative because it comments on the original or criticizes it, for '[p]arody needs to mimic an original to make its point.'"  *Google v. Oracle*, 593 U.S. at 30 (alteration in original) (quoting *Campbell*, 510 U.S. at 580-81).

Defendant's copying was not transformative in that sense.  The "original work and . . . secondary use" here "share the same or highly similar purposes."  *Andy Warhol*, 598 U.S. at 532.  The principal use to which Defendant put the Westlaw headnotes was creating "Bulk Memos," which are "lawyers' compilations of legal questions with good and bad answers."  Opinion 3.  The purpose served by the Westlaw headnotes in these memos was to connect legal questions to key language in judicial opinions in order to assist legal researchers.  That is exactly the same thing Plaintiffs use Westlaw headnotes to do in their own legal-research tool: identify key language in judicial opinions to assist legal researchers.  Although Defendant was free to read and copy the underlying judicial

opinions and create its own system of headnotes, Defendant instead copied Westlaw headnotes for the purpose of facilitating development of its own commercial product. Whatever the benefits of that new commercial *product*, that type of *copying*—which saves time and money, but does not "stimulate creativity for public illumination," *Google v. Oracle*, 593 U.S. at 29 (internal quotation marks omitted)—fails to satisfy traditional fair-use principles.

An example from the film industry illustrates the point. In *Video Pipeline v. Buena Vista Home Entertainment*, 342 F.3d 191 (3d Cir. 2003), the copyright defendant put "clip previews"—two-minute segments of a movie—on a website without permission. *Id.* at 194. The defendant claimed that its copying was "transformative" because "the original works have an aesthetic and entertainment purpose while the clip previews serve only to provide information about the movies to internet users or as advertisements for the company's retail web site clients." *Id.* at 198. This Court disagreed, emphasizing that the copying did not "add significantly" to the "original expression." *Id.* at 199-200. In other words, the mere fact that a defendant's copying might be *useful* for some purpose does not imply that the use is *transformative* for purposes of the fair-use

doctrine. In this regard, what is true for movies is also true for Westlaw. AI may be a useful technology, but that is an insufficient basis to deem copying transformative.

Nor should this Court hold, as Defendant proposes, that the relevant "use" of the works here for purposes of the fair-use inquiry is "transforming legal memoranda into a machine-readable language." Appellant's Br. 44. This attempt to smuggle in an AI-specific transformativeness rule is inconsistent with ordinary fair-use principles. When analyzing the first fair-use factor, courts must examine the *ultimate* purpose of the defendant's use of the copyrighted material—not focus myopically on the most immediate act of copying itself. In *Andy Warhol*, for example, both the original work and the copy were "portraits of Prince used in magazines to illustrate stories about Prince." 598 U.S. at 535. The Supreme Court held that this use was not "transformative" because the *ultimate* purpose was to put the work in a magazine, even if the immediate act of copying may have added a "new meaning or message." *Id.* at 540. Or, to illustrate the point a different way, suppose a person created a digital, pirated copy of a film and inputted it into a video-editing program for purposes of distributing an unlicensed, edited version of the film.

Could the filmmaker claim that the copying was "transformative" merely because the immediate purpose of the copying was to create a digital copy to be inserted into a video-editing tool?  Of course not.  If the ultimate purpose of the copying is not transformative, the first factor weighs against fair use.  That common-sense conclusion does not change merely because Defendant touts its product as AI-based.

Here, Defendant claims that it used the Westlaw headnotes in a different manner than Plaintiffs—Defendant used them as input into a machine-learning model, whereas Plaintiffs used them as part of a cus-tomer-facing legal-research tool.  *See* Opinion 20-21.  That claim is incor-rect: Plaintiffs *also* used Westlaw content to develop proprietary algo-rithms.  Appellees' Br. 47.  And even if Defendant's claim were true, *Andy Warhol* teaches that Defendant's argument misunderstands the concept of a transformative use.  Just as the ultimate reason for the copy in *Andy Warhol* was to display an image of the musical artist known as "Prince," the ultimate reason for Defendant's copying was to create a customer-facing legal-research tool.  *See* 598 U.S. at 535, 540.  And it makes no difference to the end consumer that the Westlaw headnote was trans-formed by some unseen technological process into a consumer-facing

product that serves the same purpose of identifying key language in judicial opinions. *Cf. ABC, Inc. v. Aereo, Inc.*, 573 U.S. 431, 446 (2014) (rejecting the suggestion that "technological differences . . . concern[ing] the behind-the-scenes way in which [the alleged infringer] delivers television programming to its viewers' screens" should make a difference in the copyright analysis).

Finally, the goal of promoting innovation cannot justify Defendant's copying. Defendant claims that the district court's consideration of the commercial nature of Defendant's conduct as weighing against fair use "leaves no room for . . . innovation" because all unauthorized use of Westlaw headnotes "would result in building a legal research platform." Appellant's Br. 46-47. But one can easily imagine many ways to use Westlaw headnotes without creating a competing legal-research platform. For example: quoting an illustrative headnote in an article critiquing the quality of Westlaw headnotes, or making a movie about a law firm in which a Westlaw headnote incidentally appears on someone's computer monitor. And at any rate, intellectual-property owners like Plaintiffs enjoy the exclusive right to decide whether, and to what extent, to license that intellectual property in order to facilitate competing or

complementary legal-research platforms.  Defendant cannot evade that principle merely by characterizing its product as "innovative."  Appellant's Br. 46.

>    2.    *"Intermediate copying" cases do not apply here.*

As just demonstrated, the "original work and . . . secondary use" here "share the same or highly similar purposes."  *Andy Warhol*, 598 U.S. at 532.  Accordingly, if "the secondary use is of a commercial nature, the first factor is likely to weigh against fair use, absent some other justification for copying."  *Id.* at 532-33; *see also Romanova v. Amilus Inc.*, 138 F.4th 104, 112 (2d Cir. 2025) ("[T]he would-be fair user of another's work must have justification for the taking." (quoting *Authors Guild*, 804 F.3d at 215)).  There is no such justification here.

Defendant's principal justification for copying appears to be that copying was *necessary* for Defendant to enter the legal-research market and create a competing platform.  *See* Appellant's Br. 44-46.  In so arguing, Defendant relies on so-called "intermediate copying" cases.  *Id.* at 44-45 (citing, *inter alia*, *Sony Comput. Ent. v. Connectix Corp.*, 203 F.3d 596 (9th Cir. 2000), and *Sega Enters. v. Accolade, Inc.*, 977 F.2d 1510 (9th Cir. 1992)).

Those "intermediate copying" cases, however, address a very different scenario. These cases do not stand for the proposition that copying is fair use whenever it is a mere "intermediate" step in the process of creating a product and a copy of the underlying work is not reproduced in the end product itself. Instead, these cases stand for a more modest proposition: that in some circumstances, it is impossible to enter a market—specifically a highly technical one—without the ability to interoperate with existing products, and sometimes learning how to facilitate such interoperability requires some level of copying code from those existing products as a preliminary step. *Google v. Oracle* rested on similar reasoning: in finding that Google's copying of Java's application programming interface (or API) was fair, the Supreme Court emphasized that "shared interfaces are necessary for different programs to speak to each other," and that copying was fair "only insofar as needed to allow programmers to call upon those tasks without discarding a portion of a familiar programming language and learning a new one." 593 U.S. at 30-31. In other words, Google needed to copy to ensure that its software functioned properly—and it copied no more.

This Court should not extend the "intermediate copying" cases to fact patterns like the one here, where there was no apparent obstacle to Defendant creating all the inputs for its machine-learning model through its own effort, using material freely available in the public domain. As the district court correctly observed, "[t]here is nothing that [Plaintiffs] created that [Defendant] could not have created for itself or hired [a third party] to create for it without infringing [Plaintiffs'] copyrights." Opinion 23. "Necessity" becomes relevant in fair-use cases only when there is *true* need, not just where copying offers an economically advantageous shortcut. Finding "necessity" here would stretch the "necessity" concept far beyond its breaking point: there was no need to reverse-engineer the Westlaw headnotes to extract their non-copyrightable elements, as the non-copyrightable judicial opinions exist in plain sight. As such, the so-called "intermediate copying" cases bear no relevance to the facts of this case.

## C.     Factor Four Suggests No Fair Use Because Defendant Created a Market Substitute for Plaintiffs' Product.

The fourth fair-use factor is the effect of the alleged infringer's use on "the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). This factor weighs heavily against fair use where the defendant

has created a market substitute to compete with the copyright owner's work. Here, as the district court stated, Defendant "meant to compete with Westlaw by developing a market substitute." Opinion 21.

In arguing to the contrary, Defendant first asserts that the "relevant market" must be gerrymandered around part of the Westlaw product and then proceeds to narrowly define that market as the market for headnotes, standing alone. Appellant's Br. 48-50. Defendant then concludes that there are no existing or potential markets for headnotes, divorced from Plaintiffs' broader offering. *Id.* at 50-51. No step of this reasoning comports with ordinary fair-use principles or any rational application of well-established fair-use jurisprudence.

First, the relevant question as to factor four is not whether there is (or could be) a market for headnotes themselves. Under the Copyright Act's plain text, this factor "directs [courts] to consider 'the effect of the use upon the . . . *value* of the copyrighted work,' not only the effect upon the 'market,' however narrowly that term is defined." *Video Pipeline*, 342 F.3d at 202 (second alteration in original). That principle dictates the outcome here: copying Westlaw headnotes to create a legal-research platform competing with Westlaw naturally has a negative effect on the value

of the headnotes, which are a core component of the Westlaw offering. *See* Opinion 22.

More broadly, constraining the fair-use analysis to a standalone market for the headnotes would make little sense. Defendant's proposed analysis is much like asking whether there is a market for half of a movie. Regardless of whether such a market exists, copyright law prohibits that form of piracy. *See Video Pipeline*, 342 F.3d at 202 (no fair use where defendant streamed "clip previews" on the internet).

The fact that Plaintiffs are not separately licensing the headnotes portion of the Westlaw product is irrelevant. In conducting a fair-use analysis, courts do not merely assess whether the copyright owner happens to be licensing a product for a particular use at a particular time, but instead look to potential markets as well. The Copyright Act's text makes clear that not just actual but *potential* derivative markets must be considered. *See* 17 U.S.C. § 107(4) (directing courts to consider "the effect of the use upon the potential market for or value of the copyrighted work"). Here, the premium Defendant apparently placed on Westlaw headnotes substantiates the headnotes' value—both potential and actual—in the rapidly developing market of AI-based legal-research tools.

Defendant tries to fabricate legal significance from Plaintiffs' refusal to extend a license to use the headnotes for the creation of a competing product, arguing that this proves the headnotes lack any value in an "AI training data market." Appellant's Br. 51. This contention improperly attempts to divorce the fair-use defense from its creativity-protecting purpose and wield it to chip away at creators' rights. A copyright holder's considered decision to retain exclusive control over its own intellectual property does not disprove the existence of a potential derivative market or otherwise transform copying into fair use. *See Fox News Network v. TVEyes, Inc.*, 883 F.3d 169, 180 (2d Cir. 2018) (explaining that it is "of no moment that [Defendant] allegedly approached [Plaintiffs] for a license but was rebuffed," for "the failure to strike a deal satisfactory to both parties does not give [Defendant] the right to copy [Plaintiffs'] copyrighted material without payment"); *see also, e.g., Worldwide Church of God v. Phila. Church of God,* 227 F.3d 1110, 1119 (9th Cir. 2000) ("Even an author who had disavowed any intention to publish his work during his lifetime [i]s entitled to protection of his copyright, first, because the relevant consideration was the 'potential market' and, second, because he has the right to change his

mind." (citing *Salinger v. Random House, Inc.*, 811 F.2d 90, 99 (2d Cir. 1987))); *Castle Rock Ent. v. Carol Publ'g Grp.*, 150 F.3d 132, 145-46 (2d Cir. 1998) ("Although [Plaintiff] has evidenced little if any interest in exploiting this market for derivative works . . . , the copyright law must respect that creative and economic choice.").

To be sure, a risk of circular reasoning arises when potential markets are considered: after all, one can always say that the very fact that the defendant copied, rather than paid for a license, is a sign that a potential market exists for the license the copier failed to obtain. *See Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 930-31 (2d Cir. 1994). To guard against the "vice of circular reasoning," *id.* at 931, courts "look to 'the impact on potential licensing revenues for traditional, reasonable, or likely to be developed markets,'" *Murphy v. Millennium Radio Grp.*, 650 F.3d 295, 308 (3d Cir. 2011) (quoting *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 614 (2d Cir. 2006)); *see Am. Geophysical Union*, 60 F.3d at 930. Here, the district court concluded that the "potential derivative market" for "data to train legal AIs" is not just traditional, reasonable, or likely to be developed, but "obvious." Opinion 22. Defendant does not seriously dispute that reasoning; instead, it merely argues

that Plaintiffs have not, historically, licensed headnotes. Appellant's Br. 51. That observation falls far short of establishing a basis for reversal of the district court's well-reasoned analysis.

Cases rejecting copyright holders' claims regarding potential markets involve fundamentally different fact patterns. For example, the Second Circuit has held that "the ability to view small fragments of books pertaining to particular search terms did not 'provide a significant substitute for the purchase of the [actual] book[s].'" *Hachette Book Grp.*, 115 F.4th at 190 (alterations in original) (quoting *Authors Guild*, 804 F.3d at 224-25). And the same was true for "the ability to search the text of a book to determine whether it includes select words." *Id.*; *see also, e.g.*, *Dr. Seuss Enters. v. ComicMix LLC*, 983 F.3d 443, 460 (9th Cir. 2020) (copyright owner not entitled to market where "copyist's work fills a market that the copyright owner will likely avoid, as is true for 'a lethal parody' or 'a scathing theater review'" (quoting *Campbell*, 510 U.S. at 591-92)), *abrogated in other part by Jack Daniel's Props. v. VIP Prods.*, 599 U.S. 140 (2023).

But in cases like this one—where Defendant "meant to compete with Westlaw by developing a market substitute," Opinion 22, with

similar purpose and character to the original—the case law consistently holds that the potential licensing market for derivative uses is cognizable in the factor-four analysis.[3]  And critically, this authority highlights the first and fourth fair-use factors' twin focus on market substitution—the "bête noire" that copyright law disfavors. *Andy Warhol*, 598 U.S. at 528. That makes this an easy fair-use case under well-established precedent.

---

[3] *See, e.g.*, *TVEyes*, 883 F.3d at 180 ("Since the ability to re-distribute Fox's content in the manner that TVEyes does is clearly of value to TVEyes, it (or a similar service) should be willing to pay Fox for the right to offer the content."); *Am. Geophysical Union*, 60 F.3d at 924-25 (recognizing a market for photocopying licenses for scientific articles where "purpose of [photocopying] is . . . the same purpose for which additional subscriptions are normally sold, or . . . for which photocopying licenses may be obtained").

## CONCLUSION

The judgment of the district court should be affirmed.

Dated:  November 26, 2025

Respectfully submitted.

 /s/ Adam G. Unikowsky

Adam G. Unikowsky
  *Counsel of Record*
Jonathan J. Marshall
JENNER & BLOCK LLP
1099 New York Avenue, NW,
  Suite 900
Washington, DC 20001
(202) 639-6000
aunikowsky@jenner.com

David R. Singer
Julie A. Shepard
JENNER & BLOCK LLP
515 South Flower Street,
  Suite 3300
Los Angeles, CA 90071
(213) 239-5100

*Counsel for Amici Curiae
  Disney Enterprises, Inc.,
  Paramount Pictures Corporation,
  Sony Pictures Entertainment Inc.,
  Universal City Studios LLC, and
  Warner Bros. Entertainment Inc.*

# CERTIFICATE OF COMPLIANCE

I am a member of the Bar of this Court.

I hereby certify that this brief complies with the word limit set forth in Federal Rule of Appellate Procedure 29(b)(5) because, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), this brief contains **6,485** words.

I further certify that this brief complies with the typeface requirements set forth in Federal Rule of Appellate Procedure 32(a)(5)(A) and with the type-style requirements set forth in Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared using 14-point Century Schoolbook font in Microsoft Office Word 365.

I further certify that the text of this electronic brief is identical to the text in the paper copies that will be submitted to the Clerk.

I further certify that this electronic filing was scanned for viruses using CrowdStrike Falcon, a commercial virus-scanning program (version 7.30.20202), and, according to the virus-scanning program, this filing is free of viruses.

Dated:  November 26, 2025          /s/ Adam G. Unikowsky
                                   Adam G. Unikowsky

                                   *Counsel of Record for Amici Curiae*
                                     *Disney Enterprises, Inc.,*
                                     *Paramount Pictures Corporation,*
                                     *Sony Pictures Entertainment Inc.,*
                                     *Universal City Studios LLC, and*
                                     *Warner Bros. Entertainment Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on this day, I caused the foregoing document to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Third Circuit using the appellate CM/ECF system.

I further certify that all participants in the case are registered CM/ECF users and that service will be effected through the CM/ECF system.

Dated:  November 26, 2025          /s/ Adam G. Unikowsky
                                   Adam G. Unikowsky

                                   *Counsel of Record for Amici Curiae*
                                     *Disney Enterprises, Inc.,*
                                     *Paramount Pictures Corporation,*
                                     *Sony Pictures Entertainment Inc.,*
                                     *Universal City Studios LLC, and*
                                     *Warner Bros. Entertainment Inc.*