# United States Court of Appeals

*for the*

# Third Circuit

THOMSON REUTERS ENTERPRISE CENTRE GMBH;
WEST PUBLISHING CORP.,

*Plaintiff-Appellee*

⎯ v.⎯

ROSS INTELLIGENCE INC.,

*Defendant-Appellant*

ON APPEAL FROM AN ORDER OF THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF DELAWARE IN NO. 1:20-CV-00613,
HONORABLE STEPHANOS BIBAS, CIRCUIT JUDGE

**BRIEF FOR *AMICUS CURIAE* CENTER FOR ART LAW
IN SUPPORT OF PLAINTIFF-APPELLEE.**

Irina Tarsis
CENTER FOR ART LAW, INC.
195 Plymouth Street, Suite 36
Brooklyn, NY 11201
Tel: (917) 719-6815
*Counsel for Amicus Curiae
Center for Art Law, Inc.*

<u>**CORPORATE DISCLOSURE STATEMENT**</u>

Center for Art Law, Inc., a 501(c)(3) nonprofit organization, has no parent company. There is no publicly held corporation that holds 10% or more of Center for Art Law's stock.

*/s/ Irina Tarsis*
Irina Tarsis
CENTER FOR ART LAW, INC.
195 Plymouth Street, Suite 36
Brooklyn, NY 11201
Tel: (917) 719-6815

Counsel for *Amicus Curiae*
Center for Art Law, Inc.

Dated: November 26, 2025

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES.....................................................................................iii

STATEMENT OF IDENTIFICATION......................................................................1

SUMMARY OF ARGUMENT.................................................................................2

ARGUMENT...........................................................................................................4

    I. No blanket fair use exemption for AI training...................................................4

    II. Unauthorized use of visual works causes concrete harm to artists.................8

    III. Application of the four factors of fair use...................................................10

        A. Factor one: Purpose and character of the use..........................................10

        B. Factor two: Nature of the copyrighted work.............................................13

        C. Factor three: Amount and substantiality of use........................................14

        D. Factor four: Effect on the potential market..............................................16

    IV. Public interest............................................................................................19

        A. Public interest in AI development does not justify unchecked infringement................................................................................................20

        B. Public interest also lies in protecting creative labor.................................21

        C. Comparative frameworks show that balance is possible...........................21

CONCLUSION......................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Andersen v. Stability AI.,*
    44 F. Supp. 3d 956 (N.D. Cal. 2024). ............................................................7

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith,*
    598 U.S. 508 (2023). ........................................................5, 10, 11

*Bartz et al. v. Anthropic PBC.,*
    787 F. Supp. 3d 1007 (N.D. Cal., Oct. 15, 2025).................................14, 15

*Campbell v. Acuff-Rose Music, Inc.,*
    510 U.S. 569 (1994). ........................................................4, 5

*Harper & Row, Publishers, Inc. v. Nation Enter.,*
    471 U.S. 471 (1985). ..........................................4, 5, 14, 16, 19

*Kadrey v. Meta Platforms, Inc.,*
    788 F. Supp. 3d 1026 (N.D. Cal. 2025). ........................................12

*Robert Kneschke v. LAION e.V.,*
    Regional Court of Hamburg, Sept. 27, 2024, (Ger.). ........................6

*Sony Corp. of America v. Universal City Studios, Inc.,*
    464 U.S. 417 (1984). ........................................................4, 19, 21

*Stewart v. Abend,*
    495 U.S. 207 (1990). ........................................................13

**Statutes:**

17 U.S.C. § 107. ........................................................4, 10, 24

**Other Sources:**

Abraham Bell & Gideon Parchomovsky, *Propertizing Fair Use*,
   107 Va. L. Rev. 1255 (2021). ........................................................................4

Atreya Mathur, *AI-Generated Art and 'In the Style of' Controversies: Can Style Be
   Protected Under Copyright?*, ART & MUSEUM (Spring Issue 2025).
   ...............................................................................................................8

*Studio Ghibli v. OpenAI: Is This the Next U.S. Copyright Lawsuit to Drop?*,
   ChatGPT is Eating the World (March 28, 2025). ..........................................17

Complaint at 1, *Disney & Universal v. Midjourney*, No. 2:25-cv-04812 (C.D. Cal.
   filed June 11, 2025). ...................................................................................21

Copyright Alliance, *AI Copyright Infringement Cases: Insights From the Courts
   (2024).* ....................................................................................................7

*Copyright and Artificial Intelligence Part 3: Generative AI Training*, U.S.
   Copyright Office(May 2025). ..............................................................*passim*

*Copyright Office Releases Part 2 of Artificial Intelligence Report*, U.S. Copyright
   Office (Jan. 29, 2025). ................................................................................20

Christian Frank, *Rightsholders Take the Lead: GEMA v. OpenAI*, TaylorWessing
   (Nov. 11, 2025)....................................................................................18, 22

Directive (EU) 2019/790 of the European Parliament and of the Council of 17
   April 2019 on copyright and related rights in the Digital Single Market and
   amending Directives 96/9/EC and 2001/29/EC, 2019 O.J. (L 130) 92, arts.
   3-4, ....................................................................................................8, 21

*Firefly FAQ for Adobe Stock Contributors,* Adobe (last updated Sep. 16, 2025).
   ...............................................................................................................22

Kyle Chayka, *Is A.I. Art Stealing from Artists?*, The New Yorker (Feb. 10, 2023) ...........................................................................................8

*GEMA ruling against Open AI*, Landgericht München I (Nov. 11, 2025). ......18, 22

Glynn S. Lunney, Jr., *Transforming Fair Use*, 14 N.Y.U. J. Intell. Prop. & Ent. L. 169 (2024). ...........................................4

H.R. Rep. No. 94-1476. .........................................................................5

Jeremy Gray, *Shutterstock Made $104 Million Licensing Assets to AI Devs Last Year*, PetaPixel (Jun. 4, 2024). ...................................................22

Jörn Poltz & Friederike Heine, *OpenAI Used Song Lyrics in Violation of Copyright Laws, German Court Says*, Reuters (Nov. 11, 2025). ..................................18

Matthias Bastian, *Vox Media and The Atlantic Sign Licensing Agreements with OpenAI*, The Decoder (May 29, 2024). .......................................23

Press Release, Judge Kallert, *Judgment GEMA v. Open AI*, Landgericht München I [Munich I Reg'l Ct.] (Nov. 11, 2025). ..........................................18

*Runway Partners With Getty Images to Build Enterprise Ready AI Tools*, Runway (Dec. 4, 2023). ......................................................................23

Sara Fischer, *Exclusive: The Atlantic, Vox Media Ink Licensing, Product Deals with OpenAI*, Axios (May 29, 2024). ................................................23

Todd Spangler, *News Corp Inks OpenAI Licensing Deal Potentially Worth More Than $250 Million*, Variety (May 22, 2024, 2:14PM). ................................22

*U.S. Copyright Office Issues Final Report on AI*, Ascap (May 16, 2025)....2, 13, 16

*What Visual and Graphic Artists Should Know about Copyright*, U.S. Copyright Office (last visited Oct. 26, 2025). .............................................13

## STATEMENT OF IDENTIFICATION

Center for Art Law, Inc. (the "Center") founded in 2009, is an independent research and educational nonprofit dedicated to fostering a vibrant arts and law community. The Center addresses issues involving cultural heritage, artists' rights, intellectual property, restitution, artificial intelligence ("AI") and copyright, among several other areas at the intersection of art and law. It publishes research, scholarship, and commentary, hosts educational programming and webinars, and convenes artists, scholars, and legal professionals to deepen understanding of the legal frameworks that shape the visual arts world. The Center is committed to promoting artists' rights, fostering ethical practices, and helping artists preserve their professional and creative autonomy.

Amici have no direct interest in the outcome of this litigation. In addition, in accordance with FRAP 29(a)(4)(E): (i) No party's counsel authored this brief in whole or in part. This brief was supervised and edited by **Irina Tarsis**, Founder of the Center for Art Law, and authored by **Atreya Mathur**, Director of Legal Research at the Center for Art Law;[1] (ii) No party or party's counsel contributed money that was intended to fund the preparation or submission of this brief; and (iii) No person contributed money that was intended to fund the preparation or submission of this brief.

---

[1] *Amicus Curiae* gives sincere gratitude to Rebecca Bennett, Vivianne Diaz, Josie Goettel, Lauren Stein and Kamée Payton for their invaluable work on this Brief.

# SUMMARY OF ARGUMENT

Amici respectfully submit that the unauthorized use of copyrighted visual works in AI systems poses significant and concrete harm to artists. Illustrators, photographers, painters, and designers face infringement of their creative autonomy, threats to licensing and market opportunities, and loss of the value of their labor and distinctive styles when their works are incorporated into AI datasets without consent, attribution, or compensation. It is also important to note that copyright infringement may occur at various stages of AI development, whether it is at the training stage or with the AI-generated output.[2]

In evaluating the use of copyrighted works in connection with AI, courts should consider the four statutory fair use factors, with particular attention to the first factor (the purpose and character of the use) and the fourth factor (the effect on the potential market). Under the first factor, the mere appropriation of copyright protected content for training an AI model, without adding new expression, meaning, or insight, is not inherently transformative. Training that involves indexing, cataloging, or extracting aesthetic elements does not itself create new authorship or transform the underlying work in a meaningful way. Under the fourth factor, ingestion of copyrighted works for AI training can pose significant risks to the licensing and commercial markets for visual works. By reproducing or

---

[2] *U.S. Copyright Office Issues Final Report on AI*, Ascap (May 16, 2025), https://www.ascap.com/news-events/articles/2025/05/copyright-office-ai-report-3.

generating outputs that may act as functional or stylistic substitutes for original creations, AI output can undercut demand for commissioned works, licensed content, and style-specific artistic labor.

Protecting artists' rights serves the public interest. AI technology can provide significant benefits to society, from expanding creative tools to advancing education and innovation. However, these public benefits for technological advancement cannot justify the unauthorized use of copyrighted works. AI can coexist with a robust and fair creative ecosystem, but only if artists' rights are respected. Licensing, contracts, and collaborative agreements offer mechanisms for AI companies to advance responsibly while ensuring that human authors and creators are compensated, recognized, and able to continue producing original works. Taking works without consent to train AI models or to produce substitute outputs undermines both the rights of artists and the broader public interest.

Amici respectfully submit that a careful, fact-specific, case-by-case approach to fair use in AI training is essential. Such an approach protects visual artists from concrete material and market harms, ensures proper consideration of the statutory factors for fair use, and reinforces that technological innovation and public benefit can coexist with the ethical and lawful treatment of creative works.

# ARGUMENT

## I.    No blanket fair use exemption for AI training

Fair use under 17 U.S.C. § 107 is a narrow, equitable doctrine requiring courts to consider four statutory factors in any particular case.[3] A blanket fair use exemption would mean that these factors would not be applied, and any use of copyrighted works for AI training, regardless of purpose, scope, or market impact, would automatically be deemed lawful. Such an approach would effectively create a judicially crafted exception that Congress never authorized, undermining the Copyright Act's text and purpose. "Congress 'eschewed a rigid, bright-line approach to fair use.'[4] A court is to apply an 'equitable rule of reason' guided by four statutorily prescribed factors."[5]

The Supreme Court has consistently rejected categorical rules in fair use analysis, reaffirming that a nuanced approach is needed in determining these cases.[6] "These factors are not necessarily the exclusive determinants of the fair use inquiry, and do not mechanistically resolve fair use issues; 'no generally applicable

---

[3] *See Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577 (1994). *See also*, 17 U.S.C. § 107; Glynn S. Lunney, Jr., *Transforming Fair Use*, 14 N.Y.U. J. Intell. Prop. & Ent. L. 169 (2024); Abraham Bell & Gideon Parchomovsky, *Propertizing Fair Use*, 107 Va. L. Rev. 1255 (2021).

[4] *See Harper & Row, Publishers, Inc. v. Nation Enter.*, 471 U.S. 539, 471 (1985). *See also*, S*ony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 449 n. 31. (1984).

[5] *Id.*

[6] *See Harper & Row* 471 U.S. 539.

definition is possible, and each case raising the question must be decided on its own facts.'"[7] "'[T]he endless variety of situations and combinations of circumstances that can arise in particular cases precludes the formulation of exact rules in the statute.' The statutory factors do, however, provide substantial guidance to courts undertaking the proper fact-specific inquiry."[8] A blanket exemption would take away this principle and usher systemic infringement across creative industries, including visual arts.

Moreover, the argument that AI training is inherently transformative misstates the law. Transformation requires adding "new expression, meaning, or message."[9] As the Court clarified in *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, a mere change in medium or function does not suffice when the secondary use serves the same purpose as the original.[10]

The U.S. Copyright Office, *Report on Copyright and Artificial Intelligence, Part 3: Generative AI Training (2025)* (Copyright Office Report, Part 3) reinforces this conclusion in the sense that the use of AI models could result in either transformative or non-tranformative output. "Because generative AI models may simultaneously serve transformative and nontransformative purposes, restrictions

---

[7] *See id. See also*, H.R.Rep. No. 94-1476, at 65.
[8] H.R.Rep. No. 94-1476, at 66. *See Harper & Row, Publishers, Inc.,* 471 U.S. 539..
[9] *Campbell*, 510 U.S. at 579.
[10] *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 523 (2023).

on their outputs can shape the assessment of the purpose and character of the use."[11] This reiterates that a fair-use analysis should be fact specific based on the deployment and the use of AI.

The dangers of a blanket fair use exemption are also not hypothetical; they are already manifesting in ongoing disputes and practices. If courts were to adopt a categorical rule that any use of copyrighted works for AI training is fair use, it would legitimize the very conduct that is now the subject of widespread litigation and regulatory concern.

Consider the LAION-5B dataset, which contains over five billion images scraped from the internet without permission from rights holders. These images were used to train AI models like Stable Diffusion (released in 2022), enabling outputs that replicate the styles of individual artists. When creators discovered their works in these datasets through tools like "have I been trained?," they faced refusals for removal.[12] A blanket exemption would transform this unauthorized mass copying from a contested practice into a legally sanctioned one, stripping artists of any recourse.

---

[11]*Copyright and Artificial Intelligence Part 3: Generative AI Training*, U.S. Copyright Office, 46 (May 2025), https://www.copyright.gov/ai/Copyright-and-Artificial-Intelligence-Part-3-Generative-AI-Training-Report-Pre-Publication-Version.pdf.

[12] *See Robert Kneschke v. LAION e.V.*, 310 O 227/23, Judgment (Hamburg Regional Court, Sept. 27, 2024). .

Similarly, the class-action lawsuit filed by visual artists Sarah Andersen, Kelly McKernan, and Karla Ortiz against Stability AI, Midjourney, and DeviantArt underscores the stakes.[13] Judge Orrick allowed core copyright claims to proceed, noting that Stable Diffusion may infringe "by design."[14] If courts were to declare AI training categorically fair use, these infringement claims, and the rights they seek to protect, would disappear overnight, leaving artists powerless against wholesale appropriation.

The scale of AI-related infringement is not limited to visual art. Over thirty lawsuits are pending against AI companies for unauthorized ingestion of copyrighted music and books, including suits by major record labels against AI music platforms and media companies against OpenAI and Anthropic.[15] A blanket exemption would not only extinguish these claims but also signal to the creative industries that mass copying is permissible, accelerating the infringement of creative content.

Under a blanket fair use mantra, visual artists, photographers, and designers would irrevocably lose control over their works, licensing markets would collapse, and the economic value of artistic labor would erode. Given the differences in

---

[13] *See Andersen v. Stability AI*, 744 F. Supp. 3d 956 (N.D. Cal. 2024).
[14] *Id.* at 969.
[15] *See* Copyright Alliance, *AI Copyright Infringement Cases: Insights From the Courts* (2024), https://copyrightalliance.org/ai-copyright-infringement-cases-insights/.

copyright protections available in the United States and abroad, Section 107 is a safety valve between the interests of the innovators and legitimate copyright holders. Internationally, the EU's Directive on Copyright in the Digital Single Market (EU 2019/790) permits text-and-data mining but requires opt-outs, demonstrating that innovation can coexist with rights protection.[16] U.S. law lacks such exceptions; courts must ensure that §107 remains a fact-specific inquiry, not a free pass for AI developers.

## II.    Unauthorized use of visual works causes concrete harm to artists

The unauthorized ingestion of visual works for AI training imposes tangible harm on artists and the creative economy. Creative works are the direct product of individual expression. When such works are indiscriminately copied into large-scale datasets without consent or compensation, artists lose control over how their creations are used and monetized. When that happens, the balance that copyright seeks to maintain between creators and the public is disrupted. Copyright exists to protect that balance by ensuring that those who create can also benefit from their creative contributions.

The harm is not theoretical. Visual artists increasingly find their distinctive styles and compositions replicated in AI-generated outputs that are commercially

---

[16] Directive (EU) 2019/790 of the European Parliament and of the Council of 17 April 2019 on copyright and related rights in the Digital Single Market and amending Directives 96/9/EC and 2001/29/EC, 2019 O.J. (L 130) 92, arts. 3-4, https://eur-lex.europa.eu/eli/dir/2019/790/oj/eng.

marketed as substitutes for their own work.[17] Models trained on unlicensed data can reproduce an artistic signature approach so closely that outputs become indistinguishable from the original creator's expression. This not only dilutes artistic identity but also disrupts established markets for artists and any commission-based labor.

Moreover, the unlicensed use of works for AI training distorts the creative economy in ways that threaten both emerging and established artists. For early-career artists, the ability to build reputation and income through style, originality, and recognition is essential. When an AI system can mimic their signature approach instantaneously, it becomes difficult for them to sustain a livelihood through licensing or commissions. Established artists such as the beloved Studio Ghibli likewise face devaluation when their art becomes part of a dataset that anyone can access indirectly through generative systems. The cumulative effect is a chilling one: when the economic incentives to create disappear, cultural diversity and artistic experimentation could also decline. The Copyright Office has also stated:

> The copying involved in AI training threatens significant potential harm to the market for or value of copyrighted works. Where a model

[17] Kyle Chayka, *Is A.I. Art Stealing from Artists?*, The New Yorker (Feb. 10, 2023), https://www.newyorker.com/culture/infinite-scroll/is-ai-art-stealing-from-artists; *See generally,* Atreya Mathur, *AI-Generated Art and 'In the Style of' Controversies: Can Style Be Protected Under Copyright?*, ART MUSEUM, 74–75 (Spring Issue 2025).

can produce substantially similar outputs that directly substitute for works in the training data, it can lead to lost sales. Even where a model's outputs are not substantially similar to any specific copyrighted work, they can dilute the market for works similar to those found in its training data, including by generating material stylistically similar to those works.[18]

This once again shows the impact and harm to artists and copyrighted works due to infringement or copying at the training stage.

## III. Application of the four factors of fair use

Fair use under 17 U.S.C. § 107 requires courts to apply a fact-specific, equitable analysis guided by four statutory factors.[19] In the context of AI training, each factor weighs heavily against a categorical fair use defense.

### A. Factor one: Purpose and character of the use

The first factor examines why and how the work was used, focusing on two key considerations: (1) whether the use is transformative, and (2) whether it is commercial. Transformation requires adding "new expression, meaning, or message" to the original work, not merely repurposing it for a different technological function. A change in medium or utility does not suffice when the secondary use serves the same expressive purpose as the original.[20]

---

[18] See U.S. Copyright Off., *supra* note 11, at 73.
[19] 17 U.S.C. § 107.
[20] *See Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 523–24 (2023).

AI training typically involves indexing, cataloging, and extracting aesthetic features from copyrighted works to enable outputs that mimic original styles. These processes do not create new authorship or alter the expressive character of the underlying work; they simply repurpose creative content for algorithmic modeling. Mere ingestion for pattern recognition is not transformative; it does not add new meaning or message.

The Copyright Office Report, Part 3 emphasizes that fair use in AI contexts is highly fact-specific: While some uses of copyrighted works in AI training may be transformative, the extent to which these uses are fair depends on "what works were used, from what source, for what purpose, and with what controls on the outputs — all of which can affect the market."[21] And as the Supreme Court has reaffirmed in *Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith*, fair use does not extend to secondary uses that share the same commercial purpose as the original and merely draw upon the expressive or aesthetic value of the copyrighted work.[22]

> [T]he first factor asks "whether and to what extent" the use at issue has a purpose or character different from the original . . . The larger the difference, the more likely the first factor weighs in favor of fair use. A use that has a further purpose or different character is said to be

---

[21] U.S. Copyright Off., *supra* note 11, at 107.

[22] *Andy Warhol Foundation*, 598 U.S. at 511, 532–33 ("If an original work and a secondary use share the same or highly similar purposes, and the secondary use is of a commercial nature, the first factor is likely to weigh against fair use, absent some other justification for copying.").

"transformative," but that too is a matter of degree…To preserve the copyright owner's right to prepare derivative works… "any other form in which a work may be recast, transformed, or adapted," the degree of transformation required to make "transformative" use of an original work must go beyond that required to qualify as a derivative.[23]

Ingesting expressive visual works into machine learning datasets is no different; it appropriates the creative substance of the original without meaningful transformation, enabling commercial outputs that replicate or displace the very works copyright seeks to protect.

The cases in which courts have found fair use involved narrow contexts and strong safeguards. For example, in *Kadrey*, the court upheld fair use for Meta's training of large language models (LLMs) using copyrighted works, and found that Meta's use was "highly transformative" because the purpose of the copying was to train LLMs, which serve different functions than the original works.[24] However, this decision was narrowly tailored to the specific facts of the case. The court emphasized that the plaintiffs failed to present sufficient evidence of market harm or infringement by Meta's LLMs, leading to a ruling in favor of Meta.[25] This confirms that transformation is not inherent in AI training; it depends on context,

---

[23] *Id.* at 510.

[24] *Kadrey v. Meta Platforms, Inc.*, 788 F. Supp. 3d 1026, (N.D. Cal. 2025).

[25] *Id.* at 1035 (finding fair use in a highly fact-specific context where the plaintiffs presented no evidence of market harm; "Given the state of the record, the Court has no choice but to grant summary judgment to Meta on the plaintiffs' claim that the company violated copyright law by training its models with their books.").

and needs to be decided based on facts on a case-by-case-basis. Wholesale ingestion of visual works without consent rarely meets this standard.

Factor one does not grant AI developers a presumption of fair use. Courts must weigh both purpose and character, considering whether the use genuinely adds new expression and whether it is commercial. Mere indexing or training does not constitute transformation, and commercial exploitation amplifies the need for a rigorous, case-by-case analysis.

### B.    Factor two: Nature of the copyrighted work.

The second factor considers the type of work used and its position within the spectrum of copyright protection. Courts afford the strongest protection to highly creative, expressive works, such as visual art, because they lie at the core of copyright's purpose. Copyright protects original works of authorship, including original pictorial, graphic, and sculptural artwork. A work is original if it is independently created and sufficiently creative.[26] Creative works are also closer to the core of intended copyright protection. Courts have stated that, "[t]he use of a fictional work is less likely to be deemed fair than the use of factual works."[27] Visual artworks including illustrations, photographs, paintings, and graphic designs, are therein prime examples of originality and creativity that are protected.

---

[26] *What Visual and Graphic Artists Should Know about Copyright*, U.S. Copyright Office (last visited Oct. 26, 2025), https://www.copyright.gov/engage/visual-artists/.
[27] *Stewart v. Abend*, 495 U.S. 207, 237 (1990).

The Copyright Office has also stated, "[t]he use of highly creative works, like art or music, is less likely to be considered fair use."[28] The Authors Guild Initial Comment as mentioned in the Copyright Office Report, Part 3 reiterates the same notion. "The second factor would weigh against fair use where the works are highly creative and closer to the heart of copyright. As such, training on books for instance would weigh against fair use, whereas perhaps the use of functional and standard code would weigh in favor of fair use."[29]

AI training practices disproportionately target highly creative works, scraping millions of images from artists without consent. This amplifies the weight of factor two against fair use. Visual art and creative works reflect unique expression, making wholesale ingestion particularly disfavored under this factor.[30]

## C.     Factor three: Amount and substantiality of use.

The third factor considers how much of the original work was taken and whether the portion used was qualitatively significant. Courts have long held that copying entire works weighs heavily against fair use, particularly when the works are creative or editorial. Courts have held that verbatim copying of expressive content weighs against fair use.[31]

---

[28] Ascap, *supra* note 2. *See also,* U.S. Copyright Off., *supra* note 11.
[29] U.S. Copyright Off., *supra* note 11, at 53.
[30] *See Bartz et al. v. Anthropic PBC,* 787 F. Supp. 3d 1007 (N.D. Cal., Oct. 15, 2025).
[31] *See Harper & Row, Publishers, Inc. v. Nation Enter.*, 471 U.S. 539, 564–65 (1985). ("The Nation took what was essentially the heart of the book. The fact that

AI systems do not rely on selective excerpts or minimal portions; they ingest entire works, often millions at a time, to train models. This is not incidental copying but systematic reproduction at scale. Unlike traditional fair use scenarios, where limited quotations serve commentary or criticism, AI training requires full images, complete texts, and entire compositions to extract patterns and stylistic features. Such comprehensive copying goes far beyond what courts have historically tolerated under fair use.

At this time, artists and rights holders cannot meaningfully opt out of these practices. Datasets like LAION-5B and others scrape works indiscriminately from online sources, leaving creators with no mechanism to restrict use or limit portions. Even when opt-out tools exist or are made available, it is difficult to determine whether they are effective or whether the requested removals have actually been implemented. This lack of control emphasizes the inequity of treating wholesale ingestion as fair use.

The copying is not only quantitative but qualitative. AI systems target the most expressive elements of a work because these features enable the model to replicate distinctive artistic styles. Courts have recognized that taking the "heart" of a work weighs against fair use even when the amount copied is small;[32] here, the

_____

even a small portion was used does not necessarily mean that the taking was insubstantial.").

[32] *Id.* at 140–41.

entire expressive core is appropriated. Recent decisions also highlight this concern. For example, courts have stated that "piracy of otherwise available copies is inherently, irredeemably infringing even if the pirated copies are immediately used for the transformative use and immediately discarded."[33] This reiterates that mass ingestion of entire works, especially without authorization, cannot be reconciled with the equitable nature of fair use. Factor three will therein necessarily require a case-specific assessment of how such ingestion fits within the fair-use framework.

### D. Factor four: Effect on the potential market.

The fourth factor, the effect of the use upon the potential market for or value of the copyrighted work, is "undoubtedly the most important element of fair use."[34] Courts consider not only actual market harm but also whether widespread adoption of the challenged use would impair the market for the original or its derivatives. In the context of AI training, this factor likely weighs decisively against fair use.

Generative AI systems ingest copyrighted works to extract patterns and stylistic elements, enabling outputs that often serve as functional substitutes for original creations. These outputs compete directly in the same markets such as illustration, photography, and design, where human artists traditionally license their work. As the Copyright Office warns: "Making commercial use of vast troves of copyrighted works to produce expressive content that competes with them in

---

[33] *Bartz,* 787 F. Supp. 3d at 1031.
[34] *Harper & Row*, 471 U.S. at 471.

existing markets, especially where this is accomplished through illegal access, goes beyond established fair use boundaries."[35]

AI training involves wholesale copying of entire works, not selective excerpts. This comprehensive ingestion enables models to reproduce stylistic "signatures,"[36] diminishing demand for original works and disrupting established licensing channels. The Copyright Office echoed stakeholder concerns, quoting public comments such as: "unlicensed AI ingestion of copyrighted works should not constitute fair use when the AI output supplants or competes commercially with the human-created works it was trained on."[37]

This position reflects a broad consensus among creators: when AI outputs displace human-authored works, the Constitutional incentive to create is undermined. Unchecked scraping and replication threaten the viability of creative professions. Artists, illustrators, and designers rely on licensing revenue and commissions to sustain their work. If generative models can produce near-identical substitutes without compensation or attribution, the incentive to create diminishes, reducing cultural diversity and innovation.

---

[35] U.S. Copyright Off., *supra* note 11, at 53; Ascap *supra* note 2.
[36] *See Studio Ghibli v. OpenAI: Is This the Next U.S. Copyright Lawsuit to Drop?*, ChatGPT is Eating the World, (March 28, 2025), https://chatgptiseatingtheworld.com/2025/03/28/ghibli-studios-v-openai-is-this-next-u-s-copyright-lawsuit-to-drop/.
[37] U.S. Copyright Off., *supra* note 11, at 33 n. 196 (citing Marsha Blackburn Initial Comments).

Foreign courts have also begun to confront similar claims. In November 2025, the Munich Regional Court ruled in favor of GEMA, the German collecting society for musical performing and mechanical reproduction rights, in a lawsuit against OpenAI. The court found that the use of copyrighted song lyrics in training OpenAI language model and reproducing them in ChatGPT outputs violated authors' exploitation rights.[38] The court held that both the memorisation in the language models and the reproduction of the song lyrics constituted infringements of copyright law.[39] "The court observed that 'memorization' is recognized in information-technology research: large language models do not merely extract information from the training dataset during training; they may also adopt training data in their post-training parameters."[40] The decision demonstrates a growing international consensus that the wholesale ingestion of creative works for model

---

[38] Press Release, Judge Kallert, *Judgment GEMA v. Open AI,* Landgericht München I [Munich I Reg'l Ct.] (Nov. 11, 2025), https://ifrro.org/resources/documents/General/German_Court_OpenAI_Memory_Output_Infringe_Copyright_NOV25.pdf. *See GEMA Ruling Against Open AI*, Landgericht München I (Nov. 11, 2025), https://www.justiz.bayern.de/gerichte-und-behoerden/landgericht/muenchen-1/presse/2025/11.php. *See also*, Jörn Poltz & Friederike Heine*, OpenAI Used Song Lyrics in Violation of Copyright Laws, German Court Says*, Reuters (Nov. 11, 2025), https://www.reuters.com/world/german-court-sides-with-plaintiff-copyright-case-against-openai-2025-11-11/.
[39] *Id.*
[40] *See* Christian Frank, *Rightsholders Take the Lead: GEMA v. OpenAI*, TaylorWessing (Nov. 11, 2025), https://www.taylorwessing.com/en/insights-and-events/insights/2025/11/gema-v-openai.

training is not inherently transformative, and that respect for authors' rights is compatible with technological progress and innovation.

Given these considerations, the effect on the market will ultimately turn on a fact-specific inquiry into whether the challenged use supplants an existing or reasonably foreseeable market for the original or its derivatives.

## IV. Public interest

The public interest in technological innovation is undeniable. Artificial intelligence offers transformative benefits across education, healthcare, and creative industries. Courts have long recognized that fair use serves the public interest by promoting access to knowledge and fostering progress.[41] But public interest is not a one-sided equation. Copyright law itself embodies a public interest in sustaining creative ecosystems by incentivizing authorship. As the Supreme Court has explained, "The monopoly created by copyright… serves the purpose of inducing creation."[42] In this context, public interest is best understood as requiring a balanced approach that supports technological progress, while preserving the creative incentives copyright is meant to protect. Further, comparative frameworks and licensing show that is possible and already happening.

---

[41] *See* S*ony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 464 U.S. 417, 429 (1984).
[42] *See Harper & Row, Publishers, Inc. v. Nation Enter.*, 471 U.S. 539, 558 (1985).

## A. Public interest in AI development does not justify unchecked infringement.

It may be argued that large-scale data scraping and model training serve the public interest by enabling technological advancement and innovation. While Amici recognize that AI has significant social and economic value, these benefits do not necessitate the uncompensated use of copyrighted works. The public interest in innovation does not override the equally vital public interest in protecting creative labor and maintaining a fair and lawful marketplace for expressive works. As the U.S. Copyright Office has affirmed, "existing principles of copyright law are flexible enough to apply to this new technology," and any categorical exemption for AI developers "would undermine rather than further the Constitutional goals of copyright."[43] The Copyright Clause envisions a balance between incentivizing creativity and promoting the progress of knowledge. That balance is not achieved by permitting wholesale appropriation under the banner of technological progress.

In other words, the Constitutional balance between promoting progress and safeguarding authors' rights cannot be discarded merely because a new technology claims public benefit.

---

[43] *Copyright Office Releases Part 2 of Artificial Intelligence Report*, U.S. Copyright Office (Jan. 29, 2025), https://www.copyright.gov/newsnet/2025/1060.html.

**B.    Public interest lies in protecting creative labor.**

The public interest in access to technology cannot eclipse the public interest in sustaining creative professions. Artists produce works that enrich our culture, community, and commerce. If their rights are taken away, the incentive to create diminishes, reducing the diversity and quality of creative works available to the public. Copyright law reflects this balance: it promotes progress by granting exclusive rights, not by permitting wholesale appropriation; "the Court must balance the encouraging and rewarding of authors to create new works with the public good."[44] Unchecked scraping threatens this. As Disney and Universal argued in their lawsuit against Midjourney, generative AI systems that exploit copyrighted IP "threaten to upend the bedrock incentives of U.S. copyright law."[45]

The proper course is not to suspend copyright protection, but to ensure that the transformative potential of AI develops within the framework of lawful use, fair licensing, and respect for authors' rights. Public benefit and copyright protection are not opposing but rather complementary interests.

**C.    Comparative frameworks show that balance is possible.**

International regimes demonstrate that innovation can coexist with rights protection. The EU's DSM Directive permits text-and-data mining but imposes

---

[44] *See Sony Corp.*, 464 U.S. at 429.
[45] *See* Complaint at 1, *Disney & Universal v. Midjourney*, No. 2:25-cv-04812 (C.D. Cal. filed June 11, 2025).

conditions: Article 3 allows Text and Data Mining (TDM) for scientific research by research organizations, and Article 4 permits broader TDM only if rights holders have not opted out in a machine-readable way.[46] These provisions reflect a legislative judgment that technological progress should not override creative control. It is important to note that even within the EU, where TDM exceptions have been introduced, recent case law indicates that such exceptions do not automatically shield large-scale AI training from infringement liability.[47] As an example, the Regional Court of Munich ruled in favor of GEMA, finding that OpenAI's memorization and reproduction of protected song lyrics in ChatGPT outputs constituted copyright infringement.[48] None of the TDM exceptions applied in this instance, concluding that the unauthorized use of song lyrics in model training and output generation fell outside the scope of permissible text and data mining, and amounted to infringement.[49] This illustrates that exceptions like TDM can allow innovation while protecting rights, but they are applied on a fact-specific basis and do not provide blanket immunity for unauthorized use.

Also, importantly, licensing is not only possible, but is already happening at scale. Adobe's Firefly model was trained on licensed Adobe Stock images and public domain content, and Adobe compensates contributors through a bonus

---

[46] Directive (EU) 2019/790, arts. 3-4.
[47] *GEMA Ruling Against Open AI*, *supra* note 39.
[48] Frank, *supra* note 41.
[49] *Id.*

program.[50] Shutterstock has signed multi-year licensing deals with OpenAI, Meta, Amazon, and Apple, generating over $104 million in revenue from lawful data licensing.[51] Getty Images has partnered with AI firms like Runway to provide curated, fully licensed datasets for generative video models.[52] OpenAI has also secured agreements with major publishers, including News Corp ($250M+),[53] *The Atlantic*, Vox Media,[54] and the *Financial Times*,[55] to lawfully access text and image data for model training. These examples demonstrate that AI innovation does not require uncompensated infringement or appropriation; it can be built and thrive within a framework of negotiated licenses that respect creators' rights.

[50] *Firefly FAQ for Adobe Stock Contributors*, Adobe, (last updated Sept. 16, 2025), https://helpx.adobe.com/stock/contributor/help/firefly-faq-for-adobe-stock-contributors.html.

[51] Jeremy Gray, *Shutterstock Made $104 Million Licensing Assets to AI Devs Last Year*, PetaPixel (June 4, 2024), https://petapixel.com/2024/06/04/shutterstock-made-104-million-licensing-assets-to-ai-devs-last-year/.

[52] *Runway Partners With Getty Images to Build Enterprise Ready AI tools*, Runway (Dec. 4, 2023), https://runwayml.com/news/runway-partners-with-getty-images.

[53] Todd Spangler, *News Corp Inks OpenAI Licensing Deal Potentially Worth More Than $250 Million*, Variety (May 22, 2024, 2:14PM), https://variety.com/2024/digital/news/news-corp-openai-licensing-deal-1236013734/.

[54] Sara Fischer, *Exclusive: The Atlantic, Vox Media Ink Licensing, Product Deals with OpenAI*, (May 29, 2024), https://www.axios.com/2024/05/29/atlantic-vox-media-openai-licensing-deal.

[55] Matthias Bastian, *Vox Media and The Atlantic Sign Licensing Agreements with OpenAI*, The Decoder (May 29, 2024), https://the-decoder.com/vox-media-and-the-atlantic-signed-licensing-agreements-with-openai/.

The Copyright Office has also, for example, stated that developing licensing frameworks have the potential to facilitate lawful AI training, and it recommends allowing the licensing market to continue to develop without government intervention at this time, saying "effective licensing options can ensure that innovation continues to advance without undermining intellectual property rights."[56] This shows that a licensing regime is not only feasible but actually taking hold. Yet companies continue to infringe and scrape protected and copyrighted material. Thus, courts must continue to weigh the four statutory fair use factors on a case-by-case basis to prevent creating a rule that allows for rampant infringement despite this clear and viable alternative that balances access to content with respect for creators' rights.

The public interest is ultimately best served by a framework that fosters both innovation and creativity. Courts need not choose between technological progress and creative rights. Licensing practices and international models prove that coexistence is achievable. A principled, case-specific application of § 107 ensures that AI development advances without dismantling the incentives that sustain creativity and copyright.

---

[56] U.S. Copyright Off., *supra* note 11, at 107.

## CONCLUSION

For the foregoing reasons, Amici respectfully urge this Court to reaffirm that there is no blanket fair use exemption for AI training. Courts must undertake a rigorous, fact-specific analysis under 17 U.S.C. §107, carefully weighing each of the statutory factors in context. This approach protects the rights and livelihoods of artists, preserves licensing markets, and prevents the wholesale appropriation of expressive works. Moreover, it ensures that technological innovation does not come at the expense of creative labor, cultural diversity, and the economic ecosystem that sustains authorship. AI development can and should coexist with ethical treatment of creators, through consent, licensing, and collaborative frameworks that respect both the law and the broader public interest in fostering original, human-created works. Upholding this balance is essential to preserving the Constitutional purpose of copyright: to promote the progress of the arts and sciences by incentivizing the creation of original works.

Respectfully submitted,

*/s/ Irina Tarsis*

Irina Tarsis, Esq.
CENTER FOR ART LAW, INC.
195 Plymouth Street, Suite 36
Brooklyn, NY 11201

*Counsel for Amicus Curiae*
*Center for Art Law, Inc.*

Dated: November 26, 2025

# CERTIFICATE OF COMPLIANCE

I certify that this document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 5,552 words. This document also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Google Docs in Times New Roman font size 14.

This brief complies with the e-filing requirements of Local Rule 31.1(c) because the text of this electronic brief is identical to the text of the paper copies.

*/s/ Irina Tarsis*
Irina Tarsis
CENTER FOR ART LAW, INC.
195 Plymouth Street, Suite 36
Brooklyn, NY 11201
Tel: (917) 719-6815
*Counsel for Amicus Curiae*
*Center for Art Law, Inc.*

Dated: November 26, 2025

## CERTIFICATION OF ADMISSION TO BAR

I, Irina Tarsis, certify as follows:

1. I am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

2. Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that the foregoing is true and correct.

*/s/ Irina Tarsis*
Irina Tarsis, Esq.
CENTER FOR ART LAW, INC.
195 Plymouth Street, Suite 36
Brooklyn, NY 11201

Counsel for *Amicus Curiae*
Center for Art Law, Inc.

Dated: November 26, 2025

**CERTIFICATE OF FILING AND SERVICE**

I certify that on this 26th day of November 2025, the foregoing Amicus Curiae Brief was filed through the CM/ECF system, served upon counsel of record for Appellant and Appellee through the CM/ECF system, and seven hardcopy briefs will be properly served on the Court within three days of electronic filing.

*/s/ Irina Tarsis*
Irina Tarsis, Esq.
CENTER FOR ART LAW, INC.
195 Plymouth Street, Suite 36
Brooklyn, NY 11201

Counsel for *Amicus Curiae Authors*
Center for Art Law, Inc.

Dated: November 26, 2025