No. 25-2153

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

THOMSON REUTERS ENTERPRISE CENTRE GMBH and
WEST PUBLISHING CORPORATION,

*Plaintiffs-Appellees,*

v.

ROSS INTELLIGENCE INC.,
*Defendant-Appellant.*

On Appeal from an Order of the United States District Court for the
District of Delaware
Civil Action No. 20-613 (The Honorable Stephanos Bibas)

**BRIEF OF AMICUS CURIAE AI COALITION FOR DATA
INTEGRITY IN SUPPORT OF PLAINTIFFS-APPELLEES**

MANATT, PHELPS & PHILLIPS, LLP

Tod Cohen
One Embarcadero Center, 30th Floor
San Francisco, CA 94111
D (415) 291-7469 M (408) 410-8329
TCohen@manatt.com

Emily Whitely
7 Times Square
New York, NY 10036
D (212) 790-4500
Ewhitely@manatt.com

*Counsel for Amicus Curiae*
AI Coalition for Data Integrity

## DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Third Circuit Local Appellate Rule 26.1(b), Amicus Curie AI Coalition for Data Integrity discloses that it has no parent corporation, does not issue stock, and there is no publicly held corporation with a financial interest in the outcome of this proceeding.

# TABLE OF CONTENTS

DISCLOSURE STATEMENT ................................................................. 2

INTEREST OF AMICUS CURIAE ........................................................ 6

MISSION AND RATIONALE FOR SIGNATORIES' POSITION ........... 6

SUMMARY OF ARGUMENT ................................................................ 8

ARGUMENT ......................................................................................... 9

I.   WARHOL CONFIRMS THAT COMMERCIAL USES
     SERVING SUBSTANTIALLY THE SAME PURPOSE
     WEIGH SHARPLY AGAINST FAIR USE ..................................... 9

II.  ROSS'S USE INFLICTS CONCRETE MARKET HARM
     THROUGH DIRECT SUBSTITUTION, LICENSING-
     MARKET DESTRUCTION, AND MARKET DILUTION ............ 13

     A.   Direct Market Substitution and Core-Market
          Usurpation ........................................................................... 13

     B.   Unauthorized Derivative Uses and Licensing Markets ...... 14

     C.   Ross's Use Undermines an Established Licensing
          Market for AI-Training Data ............................................... 16

     D.   Market Dilution Is a Recognized and Compelling
          Copyright Harm in AI-Training Cases ................................ 18

     E.   Recent District Court Decisions Kadrey and Bartz
          Misapplied Warhol .............................................................. 21

III. AFFIRMING THE DISTRICT COURT PROTECTS
     COPYRIGHT'S INCENTIVE STRUCTURE AND THE
     EMERGING AI-LICENSING ECONOMY ................................... 24

CONCLUSION .................................................................................... 25

# TABLE OF AUTHORITIES

## CASES

*American Geophysical Union* v. *Texaco Inc.*,
  60 F.3d 913 (2d Cir. 1994) ...............................................................10

*Andy Warhol Foundation for the Visual Arts, Inc.* v. *Goldsmith*,
  598 U.S. 508 (2023).....................................................................8, 9

*Authors Guild, Inc. v. HathiTrust*,
  755 F.3d 87 (2d Cir. 2014) ...............................................................11

*Authors Guild v. Google, Inc.*
  804 F.3d 202 (2d Cir. 2015) .............................................................11

*Bartz v. Anthropic PBC*,
  787 F. Supp. 3d 1007 (N.D. Cal. 2025)........................................8, 21

*Campbell* v. *Acuff-Rose Music, Inc.*,
  510 U.S. 569 (1994)......................................................................15

*Castle Rock Entm't, Inc.* v. *Carol Publ'g Group, Inc.*
  150 F.3d 132 (2d Cir. 1998) .......................................................14, 15

*Hachette Book Group, Inc.* v. *Internet Archive*,
  115 F.4th 163 (2d Cir. 2024) .............................................................14

*Harper & Row, Publishers, Inc.* v. *Nation Enters.*,
  471 U.S. 539 (1985).......................................................13, 14, 22, 25

*Kadrey* v. *Meta Platforms, Inc.*
  788 F. Supp. 3d 1026 (N.D. Cal. 2025)........................................8, 17

*Princeton University Press* v. *Michigan Document Services, Inc.*,
  99 F.3d 1381 (6th Cir. 1996) .............................................................10

*Ringgold v. Black Entertainment Television, Inc.*,
  126 F.3d 70 (2d Circ. 1997).........................................................15, 16

*Thomson Reuters Enter. Ctr. GmbH* v. *Ross Intel. Inc.*,
  765 F. Supp. 3d 382 (D. Del. 2025).............................................10, 13

*Twin Peaks Prods., Inc.* v. *Publications Int'l, Ltd.*,
  996 F.2d 1366 (2d Cir. 1993) ...........................................................15

*Video Pipeline, Inc.* v. *Buena Vista Home Entertainment, Inc.*,
  342 F.3d 191 (3d Cir. 2003) .............................................................10

## STATUTES

17 U.S.C. *et seq.*....................................................................................19, 21, 22, 25

## OTHER AUTHORITIES

Ariel Zilber*, Top news sites suffer drastic drop in web traffic since Google added AI search — with some plunging 40%*, New York Post (July 1, 2025). https://nypost.com/2025/07/01/business/google-ai-pummeling-news-sites-as-traffic-dips-across-the-board/.................................................20, 22

Elliot Jones, *Foundation models in the public sector* (October 12, 2023), https://www.adalovelaceinstitute.org/evidence-review/foundation-models-public-sector/ .................................................................................11

Kevin Schaul et al., *Inside the secret list of websites that make AI like ChatGPT sound smart***,** Washington Post (April 19, 2023). https://www.washingtonpost.com/technology/interactive/2023/ai-chatbot-learning/ ..............................................................................................20

U.S. Copyright Office, Copyright and Artificial Intelligence, Part 3: Generative AI Training (Pre-Pub. May 9, 2025),...................................11, 17, 19

**INTEREST OF AMICUS CURIAE**

The AI Coalition for Data Integrity ("AICDI" or "the Coalition") is a multi-stakeholder, cross-industry organization dedicated to promoting legal and ethical artificial intelligence ("AI") development by advocating for transparency, proper attribution, and fair licensing in the use of data for AI. AICDI's membership includes AI developers, technology companies, content creators, academic researchers, trade associations, and public interest groups, all united by the conviction that a robust, trustworthy AI ecosystem depends on the integrity and responsible stewardship of data.

AICDI's mission is to foster an environment where innovation in AI can flourish alongside strong safeguards for data quality, legal certainty, and ethical use. The Coalition believes that transparency in AI training data, clear attribution of sources, and fair licensing practices are essential pillars for building public trust, ensuring the reliability of AI outputs, and maintaining the United States' leadership in AI innovation. AICDI actively engages with policymakers, industry, and the public to advance these principles, recognizing that responsible data practices benefit not only developers and rights holders, but also society at large.

## Mission and Rationale for Signatories' Position

The signatories to this brief listed below join together to protect the critical licensing markets for AI training data, that represent a significant and emerging revenue stream for content creators, publishers,

aggregators, and copyright holders. The ability to control and monetize the use of their works for AI training is essential to sustaining creative industries and incentivizing innovation. The diversity of the coalition, spanning publishers, labor organizations, photographers, writers, musicians, technology companies, and content aggregators, demonstrates the broad impact of the legal principles at issue. By participating in this amicus brief, these organizations seek to ensure that courts recognize the economic and policy importance of licensing markets, and the need for a fair legal framework that supports both technological advancement and the rights of creators.

Representatives from the following organizations have signed on to this brief in support of the Coalition's position:

- Digital Media Licensing Association
- IGGY Ventures
- Music Arts Coalition
- NAVA
- Open Market Institute
- SAG-AFTRA
- Transparency Coalition
- Writers Guild of America East
- Writers Guild of America West
- Yelp
- Association of Medical Illustrators
- Pro Sound Effects
- Association of Independent Music Publishers

These organizations join as amici to underscore the importance of transparency, integrity, and the protection of licensing markets in AI

data practices. Their participation should not be construed as agreement with every statement or position expressed in this brief. Each organization reserves its own views on specific issues and supports this filing solely to advance the broader principles outlined herein.

## SUMMARY OF ARGUMENT

The District Court correctly held that Ross Intelligence's unlicensed use of Thomson Reuters's Westlaw headnotes to train a competing legal-research tool is not fair use. Ross's copying was commercial and served the same purpose as Thomson Reuters's editorial work to help lawyers locate and understand relevant case law, which placed its use squarely on the disfavored side of the Supreme Court's *Warhol* analysis.

Ross's conduct also threatens the rapidly developing market for licensing copyrighted works as AI-training data. By ignoring a refused license and taking Thomson Reuters's proprietary content to power a direct competitor, Ross undermines existing licensing practices and accelerates market dilution, which are both core harms under the Copyright Act's fair use fourth factor.

Recent district court decisions, including *Kadrey* v. *Meta Platforms, Inc.* and *Bartz* v. *Anthropic*, do not support Ross's position. 788 F. Supp. 3d 1026 (N.D. Cal. 2025); 787 F. Supp. 3d 1007 (N.D. Cal. 2025). Those cases misapplied *Warhol* by treating AI training as inherently transformative and failed to address the licensing-market and dilution harms that are central here.

Finally, market dilution is recognized by courts and the Copyright Office as valid and often decisive evidence of copyright harm, particularly in the AI context. Ross's use presents exactly the type of substitution, licensing-market disruption, and dilution that the fair use fourth factor is meant to capture. The district court's judgment should be affirmed.

## ARGUMENT

### I. WARHOL CONFIRMS THAT COMMERCIAL USES SERVING SUBSTANTIALLY THE SAME PURPOSE WEIGH SHARPLY AGAINST FAIR USE

The Supreme Court's decision in *Andy Warhol Foundation for the Visual Arts, Inc.* v. *Goldsmith* makes clear that the first fair-use factor does not turn on whether a use is technically sophisticated or "innovative," but on whether the secondary use serves a "further purpose or different character" from the original and how that purpose interacts with commercial exploitation. 598 U.S. 508, 532–33 (2023). *Warhol* held that the Andy Warhol Foundation's licensing use did not favor fair use because the infringing work served the same basic purpose as the original photograph.

That reasoning applies with full force here. Ross used Thomson Reuters's copyrighted Westlaw headnotes to build a legal research tool that serves the same function for the same audience: helping lawyers find and understand relevant judicial opinions. Judge Bibas found that Ross "built its competing product using Bulk Memos, which in turn were built

from Westlaw headnotes," and that Ross's tool was "not generative AI," but a system "to spit[] back judicial opinions that have already been written," just as Westlaw does. *Thomson Reuters Enter. Ctr. GmbH* v. *Ross Intel. Inc.,* 765 F. Supp. 3d 382, 398 (D. Del. 2025). Under *Warhol*, such a directly competitive, commercial use that preserves the original work's basic purpose is paradigmatically non-transformative. 598 U.S. at 522–23.

This approach is consistent with longstanding precedent. In *American Geophysical Union* v. *Texaco Inc.*, the Second Circuit rejected fair use where Texaco scientists photocopied journal articles so they could read and use them in research, which was found to be the same "intrinsic purpose" as the originals. 60 F.3d 913, 923 (2d Cir. 1994). Similarly, in *Princeton University Press* v. *Michigan Document Services, Inc.*, the Sixth Circuit held that a copy shop's coursepacks were not fair use because, even though they altered format and convenience, they served the same purpose as the books themselves, which was student reading. 99 F.3d 1381, 1387–88 (6th Cir. 1996). Further, in *Video Pipeline, Inc.* v. *Buena Vista Home Entertainment, Inc.*, the Third Circuit held that movie trailers reposted by a rival retailer were non-transformative because both parties used them to promote and sell the same movies. 342 F.3d 191, 199–200 (3d Cir. 2003).

Here, Ross's conduct fits squarely in that line. It did not engage in commentary, criticism, scholarship, or reverse engineering. It used

Thomson Reuters's creative editorial work product to shortcut the investment needed to build a competing research platform. That is exactly the kind of commercial, same-purpose use that *Warhol* says weighs against fair use, especially where, as here, the products compete in the same market. *See* 598 U.S. at 522–23.

Amici, in support of Ross argue that Ross's use must be transformative because Ross's copying is not evident in the final product it offered to consumers. *E.g.*, Dkt. No. 37 at 15-16. But that is an overly narrow approach to the fair use analysis which the Copyright Office has rejected. *See* U.S. Copyright Office, Copyright and Artificial Intelligence, Part 3: Generative AI Training (Pre-Pub. May 9, 2025), pp. 36-37 ("while it is important to identify the specific act of copying during development, compiling a dataset or training alone is rarely the ultimate purpose. Fair use must also be evaluated in the context of the overall use.") If adopted, such an approach could also amount to a license to steal for other AI companies, because foundational models pre-trained or trained on copyrighted works may rarely if ever be exposed directly to an end user. *See* Elliot Jones, *Foundation models in the public sector* (October 12, 2023), https://www.adalovelaceinstitute.org/evidence-review/foundation-models-public-sector/ (last accessed Nov. 25, 2025). Courts must still inquire whether the ultimate purpose of the copying use is substantially the same as the copyrighted work, as the district court did here.

For similar reasons, the use of copyrighted works to facilitate AI generation does not align with *Authors Guild v. Google, Inc.; Authors Guild, Inc. v. HathiTrust*, or other technological cases in which the copying was found to be transformative. 804 F.3d 202 (2d Cir. 2015); 755 F.3d 87 (2d Cir. 2014). In each of those cases, the use of the copyrighted work or works did not aim to capitalize on authorship—such as to provide an indexing service or enable interoperability. By contrast, the purpose of Ross's copying was to exploit the expressive content of the works, thus supplanting an obvious licensing market for those works (as discussed below).

*Additionally,* even for new technologies, wholesale copying must be "reasonably necessary" to achieve a genuinely different purpose before it can be justified. *Warhol*, 598 U.S. at 532. Ross cannot make that showing. It could have hired attorneys and editors to author its own headnotes, as Thomson Reuters did, or built a system solely from public-domain opinions, as other research tools have done. Ross instead copied Westlaw's headnotes because it was faster and cheaper, and not because there was no other way to innovate. That is not the "reasonable necessity" *Warhol* contemplates. *See id.*

Under *Warhol* and traditional fair-use doctrine, Ross's commercial use of Westlaw headnotes for the same legal-research purpose, aimed at the same customer base, pushes the first factor decisively against fair use. Judge Bibas applied that framework, concluding that Ross's use "was not

transformative" and that Ross sought to "compete with Westlaw by developing a market substitute." There is no doctrinal basis to disturb that conclusion.

## II. ROSS'S USE INFLICTS CONCRETE MARKET HARM THROUGH DIRECT SUBSTITUTION, LICENSING-MARKET DESTRUCTION, AND MARKET DILUTION

The fourth factor, the "effect of the use upon the potential market for or value of the copyrighted work," remains "undoubtedly the single most important element of fair use." *Harper & Row, Publishers, Inc.* v. *Nation Enters.*, 471 U.S. 539, 566 (1985). Ross's conduct fails this factor in three fatal ways: (i) direct substitution in Thomson Reuters's core market, (ii) usurpation of derivative and licensing markets, including AI-training licenses, and (iii) broader market dilution arising from AI-powered substitutes.

### A. Direct Market Substitution and Core-Market Usurpation

This case centers on Thomson Reuters's flagship product: the Westlaw legal-research platform built on its editorial headnotes and key number taxonomy. Judge Bibas found that Ross used Westlaw-derived Bulk Memos to train an AI-driven research tool "to compete with Westlaw," and that Ross's use harms "the potential market for AI training data." *Thomson Reuters*, 765 F.Supp.3d at 398, 400.

That harm is the kind of core-market usurpation the Supreme Court treated as decisive in *Harper & Row*, where The Nation's unauthorized use of excerpts from President Ford's memoir destroyed the

publisher's exclusive serialization license with Time. 471 U.S. at 567–69. The Court held that the lost license and the substitutionary effect on Time's market were powerful evidence against fair use. Likewise, in *Princeton University Press*, the Sixth Circuit held that commercial coursepacks usurped the publishers' own coursepack-licensing market, squarely defeating the fourth factor. 99 F.3d at 1388–90.

More recent appellate authority follows the same path. For instance, in *Hachette Book Group, Inc.* v. *Internet Archive*, the Second Circuit held that Internet Archive's free digital lending program created "competing substitute[s]" for publishers' e-book and library-license markets and therefore failed the fourth factor. 115 F.4th 163, 190 (2d Cir. 2024).

Here, Ross's system is engineered to induce Westlaw customers to switch to a cheaper service built from Thomson Reuters's own expression. That is direct, core-market substitution and precisely the harm factor four is designed to flag and prevent. *See Harper & Row*, 471 U.S. at 566.

## B. Unauthorized Derivative Uses and Licensing Markets

Copyright injury under factor four is not confined to pure substitution. Long before AI, courts recognized that unauthorized derivative works that occupy plausible licensing markets inflict cognizable harm.

First, *Castle Rock Entm't, Inc.* v. *Carol Publ'g Group*, *Inc.* held that an unlicensed Seinfeld trivia book infringed the "potential market" for "derivative works," even though the rights holder had never created or

14

licensed such a book. 150 F.3d 132, 145–46 (2d Cir. 1998). The court emphasized that the fourth factor protects not only existing revenue streams but also "traditional, reasonable, or likely to be developed markets," including those that the copyright owner "would in general develop or license others to develop." *Id.* (quoting *Campbell* v. *Acuff-Rose Music, Inc.*, 510 U.S. 569, 592 (1994)). AI-training licenses are exactly the sort of derivative market a data owner would "in general develop or license others to develop." *Castle Rock*, 150 F.3d at 145. Ross's unlicensed training use invades that market.

Further, *Twin Peaks Prods., Inc.* v. *Publications Int'l, Ltd.*, likewise held that a summary guide to the television series Twin Peaks harmed the derivative market by displacing demand for licensed companion books and materials. 996 F.2d 1366, 1377–78 (2d Cir. 1993). The summaries did not literally replace the show and contained some commentary, yet they occupied a market that the copyright owner was entitled to control. *Id.* Ross's conduct is even more aggressive. Ross did not comment on or critique Thomson Reuters's work, but rather it used that work as raw material for a competing research tool. If unauthorized episode summaries can invade the market for licensed companion guides, a rival legal-research platform trained on Westlaw headnotes plainly intrudes upon the market for licensed editorial datasets.

Finally, *Ringgold* v. *Black Entertainment Television, Inc.* demonstrates that even narrow or incidental uses can harm licensing

markets. 126 F.3d 70, 80–81 (2d Cir. 1997). There, the Second Circuit held that using a copyrighted poster as background set dressing in a television episode caused cognizable market harm because it interfered with the plaintiff's ability to license artworks for film and television sets. *Id.* The market for licensing decorative artwork was modest but real, and such interference weighed against fair use.

The analogy here is straightforward. Headnote creators may license their data, including for AI and analytics uses. Ross approached Thomson Reuters for an AI-training license, was refused because it was a direct competitor, and then obtained derivative Westlaw content through an intermediary instead. Ross's unauthorized use fills exactly the role a paid license would have played. That sort of licensing displacement is textbook fourth-factor market harm. *Id.*

Taken together, these cases establish a clear rule: market harm exists whenever an unauthorized use occupies, interferes with, or substitutes for a legitimate licensing or derivative market the copyright holder is entitled to exploit, even if the secondary work differs in format, medium, or degree of verbatim copying. Ross's use fits that rule precisely.

## C. Ross's Use Undermines an Established Licensing Market for AI-Training Data

The Supreme Court has repeatedly emphasized that fair use factor four protects both current markets and "potential markets" that creators of original works would in general develop or license others to develop.

*Warhol*, 598 U.S. at 511 n.3. That principle is not speculative here. Thomson Reuters may, if it so chooses, license its curated datasets for analytics and AI applications and my build contractual regimes around that use. It declined Ross's request for a training license precisely because Ross was a direct competitor.

If a competitor can demand a license, be refused, copy anyway through an intermediary, and still invoke fair use, then the AI-training licensing market is effectively destroyed. No rational developer will pay for training rights if it can instead rely on a fair use theory that ignores the rights holder's refusal, especially where the developer's product competes directly with the rights holder's own offerings. That is the very outcome Congress meant to avert by elevating market harm in factor four.

Recent AI-specific authorities underscore the legitimacy of AI-training licensing markets. The U.S. Copyright Office's Part 3 report on generative AI explains that using copyrighted works to train AI models "may implicate copyright owners' exclusive rights" and that licensing is an appropriate and emerging market response for such uses. U.S. Copyright Office, Copyright & Artificial Intelligence, Pt. 3 (2025). The report further notes that unlicensed training that enables downstream substitution can "reduce demand" for copyrighted works and that courts assessing fair use should take seriously the availability of licensing markets when evaluating factor four. *Id.*

*Kadrey,* a case on which Ross relies heavily, actually reinforces this point. 788 F. Supp. 3d at 1060. Judge Chhabria recognized that, in AI-training cases, "market dilution will often cause plaintiffs to decisively win the fourth factor—and thus win the fair use question overall," but granted Meta's motion only because the plaintiffs "presented no meaningful evidence on market dilution at all." *Id.* at 1055, 1060.

Here, by contrast, Thomson Reuters has a well-established licensing practice for its data, Ross attempted to license and was refused, and Ross then used Thomson Reuters's content anyway to build a substitutive product. That is precisely the evidence Kadrey contemplated but lacked. *See id.*

### D. Market Dilution Is a Recognized and Compelling Copyright Harm in AI-Training Cases

Modern AI systems introduce large-scale market dilution, a form of market harm that traditional cases only glimpsed. When a model is trained on copyrighted content and then used to produce outputs or services that function as substitutes, whether that be research answers, legal analysis, or synthetic text, the model can flood the market with competing outputs at minimal marginal cost. Even if no single AI output is a perfect substitute for the original, the cumulative effect can erode demand for the underlying works and diminish their economic value.

Courts and policymakers now recognize this danger. For instance, in *Kadrey*, the court found Meta's use "highly transformative" and, on

that record, concluded that the fourth factor favored Meta. 788 F. Supp. 3d at 1057. But it underscored that this result turned on the plaintiffs' evidentiary failure, not on a rejection of dilution as a theory. Judge Chhabria cautioned that LLM training is uniquely capable of "market dilution" because models can generate "literally millions of secondary works" far faster than human authorship, and he warned that market-dilution evidence will cause plaintiffs to win the fair use question overall. *Id.* at 1055. He nevertheless ruled for Meta only because the plaintiffs "presented no meaningful evidence on market dilution at all." *Id.* at 1060.

Ross's case presents the type of meaningful evidence *Kadrey* envisioned. *Id.* Ross trained a legal-research engine that competes directly with Westlaw, using Thomson Reuters's own editorial content as fuel. Every firm or lawyer that reduces or cancels a Westlaw subscription because Ross offers a cheaper, AI-driven substitute built from Westlaw's headnotes is an instance of the cumulative dilution *Kadrey* described. *See id.* That is tangible, not hypothetical, harm to the "potential market for or value of" Thomson Reuters's work under the fundamental principles of Copyright Law. 17 U.S.C. § 107(4).

The Copyright Office's Part 3 report likewise recognizes that generative AI can "substantially diminish the value of original works" by enabling widespread substitution and that this is classic fourth factor harm, because the statute explicitly directs courts to consider both the "potential market" and the "value" of the work.

Emerging data on AI's market effects on web publishers' works support the Copyright Office's dilution observations. For example, Google's AI models were trained, in part, using content from news sites including the New York Times, Los Angeles Times, Washington Post, and Forbes. *See* Kevin Schaul et al., *Inside the secret list of websites that make AI like ChatGPT sound smart*, Washington Post (April 19, 2023). https://www.washingtonpost.com/technology/interactive/2023/ai-chatbot-learning/ (last accessed Nov. 25, 2025). After Google introduced its AI search feature, those news sites suffered a drastic drop in web traffic, with some decreasing as much as 40%. *See* Ariel Zilber*, Top news sites suffer drastic drop in web traffic since Google added AI search — with some plunging 40%*, New York Post (July 1, 2025). https://nypost.com/2025/07/01/business/google-ai-pummeling-news-sites-as-traffic-dips-across-the-board/ (last accessed Nov. 25, 2025).

Nor is dilution a doctrinal novelty. As discussed in Section II.B above, *Castle Rock, Twin Peaks,* and *Ringgold* all involved situations where unauthorized uses undermined derivative or licensing markets without producing identical copies of the original product. What AI changes is the scale in that it can turn a finite set of copyrighted works into a high-volume substitute for the original service. And when, as here, a competitor uses proprietary editorial data to build and sell an AI-driven research platform that competes with the rights holder's own product, it

is exactly the type of harm that existing fair-use precedent treats as weighing heavily against the defense.

### E. Recent District Court Decisions Kadrey and Bartz Misapplied Warhol

*Kadrey* and *Bartz v. Anthropic PBC*, on which Ross greatly relies, have generated substantial commentary in the AI and copyright communities. 788 F. Supp. 3d 1026; 787 F. Supp. 3d 1007. But neither provides a sound basis for allowing fair use in this case. Each misapplied *Warhol* adopted an overly permissive view of "transformative" AI training and failed to grapple with core forms of market harm that the Copyright Act clearly recognizes. Properly understood, these decisions reinforce why Ross's use is not fair use, rather than supporting Ross's position.

Both courts accepted the premise that AI training is inherently "transformative," often analogizing model training to human learning. 788 F. Supp. 3d at 1044; 788 F. Supp. 3d at 1024. That framing sidestepped the Supreme Court's direction in *Warhol* that transformative use is not established by technological novelty, nor by describing a system as "learning" in a general sense. *Warhol* requires a concrete assessment of ultimate purpose: whether the secondary use employs copyrighted expression for a meaningfully different function than the original. 598 U.S. at 532–33. AI training does not satisfy that standard simply because the model's architecture appears sophisticated. Unlike human readers,

AI systems ingest exact copies of expressive works at scale, store statistical representations of their expressive content, and retain the capacity to reproduce or approximate those works. Treating this process as inherently transformative ignores *Warhol*'s instruction that copying must be justified by a genuinely new purpose, not by the mere fact that a machine, rather than a person, performs the copying. *See id.*

Equally important, both *Kadrey* and *Bartz* treated the asserted transformative use as nearly dispositive, despite *Warhol*'s guidance that transformation is only a subfactor within factor one and cannot overwhelm the other statutory factors. *See id.* at 528–29. By doing so, the courts discounted the possibility of harm to core licensing markets and derivative markets. That approach departs from the Supreme Court's repeated statements that market harm remains "undoubtedly the single most important element of fair use," *Harper & Row*, 471 U.S. at 566, and that even substantial transformative value does not eliminate the author's right to exploit traditional, reasonable, or likely-to-develop licensing markets.

Neither *Kadrey* nor *Bartz* confronted this principle. Both courts found fair use despite the absence of any analysis of how unlicensed AI training affects established or emerging licensing markets for training data, including those already functioning in fields like legal research, journalism, music, video, books, and software development. *See* 788 F. Supp. 3d at 1046; 788 F. Supp. 3d at 1033. Nor did they meaningfully

assess dilution-based harm, the erosion of value and demand for the original works through AI-powered substitutes. Instead, both decisions treated the training stage as categorically insulated from downstream substitution, a view inconsistent with both economic reality and longstanding derivative-market precedent.

Even so, *Kadrey* included a critical acknowledgment that reinforces the analysis here. Judge Chhabria noted that dilution-based harm is real, actionable, and likely to be decisive once plaintiffs produce evidence that AI systems diminish the value of the underlying works by enabling large-scale substitute outputs. 788 F. Supp. 3d at 1060. He emphasized that the plaintiffs in *Kadrey* failed only because they "presented no meaningful evidence" on dilution. *Id.* Far from rejecting dilution or licensing-market harm, *Kadrey* signaled that these harms will often defeat fair use when supported by a developed factual record.

That is precisely the posture of this case. Ross's use actionable harms that *Kadrey* and *Bartz* failed to address, namely the taking of protected editorial content to avoid licensing, the disruption of a well-established market for AI-training licenses, and the creation of a directly competing product that dilutes demand for the original service. Where *Kadrey* and *Bartz* rested on incomplete records and an unduly expansive view of transformation, this case rests on a full record that fits squarely within *Warhol*'s limits and the Copyright Act's core protections.

## III. AFFIRMING THE DISTRICT COURT PROTECTS COPYRIGHT'S INCENTIVE STRUCTURE AND THE EMERGING AI-LICENSING ECONOMY

Copyright's bargain is familiar but newly salient in the AI context. Creators and investors bear substantial upfront costs to produce expressive and informational works. In exchange, the law grants exclusive rights to control how those works are used, including in new technological environments, and to decide whether and on what terms to license those uses. That framework has accommodated photocopiers, digital search, and mass digitization initiatives such as Google Books without halting innovation. See, e.g., *Google Books,* 804 F.3d 202.

The AI-training market is one more iteration of that same story. AICDI's members already license data for AI training and analytics, and those licenses have become a meaningful and growing revenue stream. If this Court were to endorse Ross's theory that a commercial competitor may copy core editorial content after being refused a license and still claim fair use, the consequences would be severe. Creators who invest in curated, high-value datasets would lose effective control over how those datasets shape the next generation of AI tools, and rational developers would be pressured to free-ride on unlicensed copies rather than participate in emerging licensing markets.

Affirming the District Court will not halt AI innovation. It applies the same ground rules that have governed prior waves of technology: innovators may build products using public-domain materials,

commission their own content, or license the content they need, but they may not take a competitor's protected expression, over objection, and use it as the engine of a substitutive commercial product.

The Third Circuit's decision here will be the first appellate ruling squarely addressing AI training on proprietary editorial data used to power a directly competing service. Upholding Judge Bibas's careful, evidence-driven application of *Warhol* and factor four will provide a clear and principled path forward: AI developers remain free to innovate, but not by appropriating competitors' editorial investments and collapsing the very markets the Copyright Act exists to protect.

## CONCLUSION

Ross's use of Thomson Reuters's editorial content is exactly the kind of commercial, substitutive copying that *Warhol*, *Harper & Row,* and decades of fair-use precedent forbid. The record shows direct market substitution, disruption of established licensing channels, and dilution of the value of Thomson Reuters's curated dataset, which are precisely the harms Congress placed at the center of the fourth factor. Nothing in *Kadrey* or *Bartz* changes that analysis; those decisions turned on discounting emerging licensing markets and evidentiary gaps that are not present here. Upholding the District Court's careful application of Warhol will reinforce copyright's incentive structure, preserve the growing market for AI-training licenses, and ensure that innovation proceeds without eroding the legal frameworks that sustain the creation

of high-value editorial content. The judgment should therefore be affirmed.

November 26, 2025    Respectfully submitted,


        MANATT, PHELPS & PHILLIPS, LLP

        By: s/ Tod Cohen
        Tod Cohen
        One Embarcadero Center
        30th Floor
        San Francisco, CA 94111
        tcohen@manatt.com
        (415) 291-7400

        Emily Whitely
        7 Times Square
        New York, NY 10036
        ewhitely@manatt.com
        (212) 790-4500

        *Counsel for Amicus Curiae*
        Artificial Intelligence Coalition for Data Integrity

## Certificate of Compliance
## for Briefs with Type-Volume Limit

1.      This **Brief of Amicus Curiae** complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(g) and the word limit of Rule 28(e)(2) because, excluding the parts of the document exempted by Rule 32(f), this document contains **4,487** words (within the 6,500 words permitted)

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Rule 32(a)(6) because this document has been prepared in a proportionally spaced typeface using the Microsoft Word (version Microsoft for Microsoft Word 365 MSO) word processing program in 14-point Century Schoolbook.

November 26, 2025           Respectfully submitted,


MANATT, PHELPS & PHILLIPS, LLP

By: s/ Tod Cohen
Tod Cohen
One Embarcadero Center
30th Floor
San Francisco, CA 94111
tcohen@manatt.com
(415) 291-7400

*Counsel for Amicus Curiae*
Artificial Intelligence Coalition for Data Integrity

## Electronic Document Certificate

1. Pursuant to Third Circuit Local Rule of Appellate Procedure 31.1, this **Brief of Amicus Curiae** has identical text to that in the paper copies.

2. A virus detection program was run on the electronic brief through Meta Data Assistant, Version 5, and no virus was detected.

November 26, 2025

MANATT, PHELPS & PHILLIPS, LLP

By: s/ Tod Cohen
Tod Cohen
One Embarcadero Center
30th Floor
San Francisco, CA 94111
tcohen@manatt.com
(415) 291-7400

Emily Whitely
7 Times Square
New York, NY 10036
ewhitely@manatt.com
(212) 790-4500

*Counsel for Amicus Curiae*
Artificial Intelligence Coalition for Data Integrity

## Certificate of Bar Admission

Pursuant to Third Circuit Local Rule of Appellate Procedure 28.3(d), Tod Cohen, whose name appears on this brief, is an attorney admitted to the Bar of the Third Circuit.

November 26, 2025        Respectfully submitted,

By: <u>s/ Tod Cohen</u>
Tod Cohen
MANATT, PHELPS & PHILLIPS, LLP
One Embarcadero Center
30th Floor
San Francisco, CA 94111
tcohen@manatt.com
(415) 291-7400
*Counsel for Amicus Curiae*
Artificial Intelligence Coalition for Data Integrity