No. 25-2153

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

THOMSON REUTERS ENTERPRISE CENTRE GMBH AND
WEST PUBLISHING CORPORATION,

*Plaintiffs-Appellees*

v.

ROSS INTELLIGENCE INC.,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the District of Delaware

## BRIEF FOR AMICUS JONATHAN IWRY IN SUPPORT OF
## PLAINTIFFS-APPELLEES AND AFFIRMANCE

Jonathan Iwry
10009 Ormond Road
Potomac, MD 20854
Tel: (301) 367-8992


*Attorney for Amicus
Jonathan Iwry*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Third Circuit Local Appellate Rule 26.1(b), Amicus Jonathan Iwry hereby certifies:

Jonathan Iwry is an individual with no financial interest in the outcome of the proceeding.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................ iii

IDENTITY AND INTEREST OF AMICUS CURIAE ............................. 1

INTRODUCTION AND SUMMARY OF ARGUMENT ......................... 2

ARGUMENT ...................................................................................... 5

I.    HEADNOTES THAT REFLECT EDITORIAL JUDGMENT IN
      CHARACTERIZING THE LAW ARE NO LESS EXPRESSIVE
      FOR HAVING FACTUAL SUBJECT MATTER. ................................... 5

II.   GRANTING FAIR USE TO ROSS'S COPYING OF
      WESTLAW'S HEADNOTES TO DEVELOP AN AI-ASSISTED
      COMMERCIAL LEGAL RESEARCH PRODUCT WOULD
      UNDERMINE LONGSTANDING INTERPRETATIONS AND
      PRINCIPLES OF COPYRIGHT LAW ...................................................... 9

      A.    Converting Headnotes Into a New Medium for Commercial
            Purposes Does Not Count as "Transformative" Under Fair Use
            Doctrine. ..................................................................................... 9

      B.    Training an AI Model Does Not Constitute a Distinct Purpose if
            the Objective Was to Develop a Similar Commercial Product. ......... 14

      C.    Failing to Acknowledge Market Harms for Copied Headnotes
            Disincentivizes Legal Researchers, and Creators in Other
            Markets, from Providing Socially Valuable Information and
            Creative Contributions. ................................................................ 16

III.  AFFIRMING LONGSTANDING COPYRIGHT PRINCIPLES,
      ESPECIALLY PROTECTION OF CREATIVE WORK, IS
      NECESSARY FOR PROMOTING A CULTURE OF
      ACCOUNTABILITY IN THE AI INDUSTRY. ...................................... 22

CONCLUSION ................................................................................. 24

CERTIFICATE OF COMPLIANCE ............................................... 25

CERTIFICATE OF SERVICE .......................................................... 26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Andy Warhol Found. For the Visual Arts, Inc. v. Goldsmith*,
 598 U.S. 508 (2023) ...................................................................9, 15

*Campbell v. Acuff-Rose Music, Inc.*,
 510 U.S. 569 (1994) ...........................................................10, 16, 17

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
 499 U.S. 340 (1991) ....................................................................5, 7

*Georgia v. Public.Resource.Org, Inc.*,
 590 U.S. 255 (2020) ..........................................................................18

*Hachette Book Grp., Inc. v. Internet Archive*,
 115 F.4th 163 (2d Cir. 2024) ...........................................................17

*Harper & Row, Publishers, Inc. v. Nation Enters.*,
 471 U.S. 539 (1985) ..........................................................................2

*Satava v. Lowry*,
 323 F.3d 805 (9th Cir. 2003) .............................................................5

*Sony Comput. Ent., Inc. v. Connectix Corp.*,
 203 F.3d 596 (9th Cir. 2000) ...........................................................19

**Statutes**

17 U.S.C. § 107(1) ...............................................................................9

Copyright Act ......................................................................................2

## IDENTITY AND INTEREST OF AMICUS CURIAE

Amicus is a Fellow at the Wharton Accountable AI Lab, a research center within the Wharton School of the University of Pennsylvania dedicated to advancing the responsible development and governance of artificial intelligence (AI). Amicus's work examines how AI intersects with foundational legal concepts and how law and regulation should evolve to promote accountability in the development and use of AI.

Amicus files this brief because the questions presented—whether editorial works such as headnotes are protectable, and whether copying curated, expressive materials to train a commercial AI model is fair use—will set foundational precedent for AI systems that rely on copyrighted works. As an appellate decision that addresses the legality of nonpublic, intermediate copying for AI training, the Court's ruling will shape the environment in which developers, researchers, and creators operate.

Amicus has no financial interest in either party. Amicus has a strong interest in supporting efforts to ensure that copyright continues to protect and prioritize the creative human intellectual labor that the AI industry depends on—and that a lack of conceptual clarity regarding the nature of this new technology does not erode legal principles that are

1

intended to promote responsible innovation and creative and intellectual progress.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Copyright exists to promote the cultivation of valuable creative and intellectual work for the benefit of the public. It does so by protecting creators and rightsholders from having their contributions appropriated and exploited by others. *Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 558 (1985). Machine learning is at risk of becoming a new vehicle for such appropriation. If copying expressive works at commercial scale and diffusing them into model weights were automatically insulated from liability on the theory that the output is not a verbatim reproduction, or that training an AI constitutes a purpose distinct from that of the copied works, the result would be a predictable loophole: any competitor could ingest thousands of copyrighted works, increase their own product's value, and then claim noninfringement. That would erode the market incentives that the Copyright Act seeks to promote.

In assessing the copyrightability of Westlaw's headnotes, the Court should affirm the expressive nature of the headnotes, as defined by

existing doctrine. The fact that Westlaw's headnotes are about factual subject matter does not strip them of protection. If defendants could sidestep the idea-expression distinction simply by pointing to the opacity or statistical nature of their models—by saying, in effect, that everything inside the model is just numbers and probabilities, so no expressive content remains—the scope of protectable expression in any creative industry that could be used for AI training would shrink to almost nothing. Any sufficiently sophisticated copying that involved laundering protected elements through layers of weighted numerical representations could be framed as being outside the scope of copyright.

The internal processing of expressive content by an AI system does not thereby count as transforming that expressive content for fair use purposes. The model's encoding of the headnotes' content might take a numerical form, but what it encodes is still the rightsholder's expressive judgments and organization, which ROSS copied to provide a substitutive service. The fact that ROSS intended to use the headnotes to train an AI system does not give ROSS's copying a distinct purpose; their ultimate goal was to produce a commercial product to compete with the party whose work had been copied. ROSS seeks to defend its copying

by emphasizing, in isolation, an intermediate step that involved using AI to achieve what was ultimately the same purpose that Thomson Reuters had in making its headnotes available via Westlaw.

Clarifying these points will not foreclose legitimate AI uses of copyrighted works. It will, however, prevent third parties from evading the basic principles and purpose of copyright by appealing to the technical opacity of their systems. And it will ensure that when courts undertake the transformative use and market harm inquiries in AI training cases under factors one and four of fair use, they do so with a clear view of what is really being done and what is really at stake.

By finding for Thomson Reuters, the Court would promote a culture of accountability in AI development rather than obstructing innovation. It would signal that whatever social and economic benefits AI ultimately delivers should be built on terms that acknowledge, rather than exploit, the contributions of the human creators whose work makes those systems possible. And it would ensure that AI development remains grounded in an appropriate recognition of the value of creative human judgment, reinforcing that courts—not AI developers—continue to define the boundary between unprotectable facts and protected expressive choices.

# ARGUMENT

## I.    HEADNOTES THAT REFLECT EDITORIAL JUDGMENT IN CHARACTERIZING THE LAW ARE NO LESS EXPRESSIVE FOR HAVING FACTUAL SUBJECT MATTER.

In arguing that headnotes such as Westlaw's do not meet the criteria for copyrightability, ROSS attempts to frame Westlaw's headnotes as raw facts about the law as opposed to creative expressive content. ROSS Br. 27. Copyright protects expressions, not general ideas or statements of fact. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 350 (1991). Under the "merger" doctrine, a copyrighted work cannot be protected if the underlying idea can be expressed in only one way. *Satava v. Lowry*, 323 F.3d 805, 812 n.5 (9th Cir. 2003). ROSS equates the headnotes with mere restatements of judicial opinions and asserts that editors do not creatively choose a holding because they are merely identifying a relevant fact. ROSS Br. 27.

This is a facile characterization of what editors do. Editors at Westlaw and elsewhere are inevitably faced with decisions about which aspects of an opinion to emphasize, which to omit, and what words to use to best capture the heart of their subject matter. Headnotes are not themselves written opinions; they are particular characterizations of opinions that reflect editorial discretion about how best to present and

portray the content of those opinions to readers. Such exercises of judgment might be about matters of fact, but that does not make them any less expressive in nature.

When it comes to legal editorial work in particular, the clearest demonstration of the power of editorial judgment in describing the law can be found in the practice of litigation. Two statements of facts describing the same underlying events often differ meaningfully, because the lawyer's craft includes choosing which facts to foreground, how to present them, how to draw connections, and how to frame their significance. That is why the market values their work so highly: litigators perform creative interpretive work whose underlying inputs— the raw facts—are freely available to both sides.

The claim that summaries of factual or legal materials are themselves factual in nature (and therefore unprotectable) is contrary to the lived reality of the legal profession. If factual summaries were purely factual in copyright's sense, every competent litigator's statement of facts would converge toward the same neutral description. They do not. They diverge, often in persuasive and decisive ways. Such differences should

count as ample evidence of the power of editorial judgment, even with regard to descriptions of the law.

Headnotes might involve a much lower degree of artfulness, but they nonetheless reflect particular creative judgments about how to offer the reader a perspective on the law—judgments about the relative importance of various aspects of a given opinion. Such choices are specific and distinctive enough to satisfy the low creativity threshold for copyright. *Feist*, 499 U.S. at 345.

It is true that Westlaw's headnotes describe legal holdings, which are themselves facts about what courts have decided. But copyright carefully distinguishes between unprotectable facts and the protected expression used to convey those facts. *Feist*, 499 U.S. at 350. Headnotes often reflect expressive choices of this kind: what to include, which aspects of the judgment to emphasize, and how to phrase legal propositions in a way that is maximally useful to readers. These are a large part of what makes headnotes valuable as content for human readers—or, for that matter, as material for an AI system. ROSS's model was not learning the law in the abstract; it was learning from the way Westlaw's editors had chosen to *characterize* and *present* the law.

Allowing ROSS to reclassify these expressive judgments as mere facts would dissolve the idea-expression distinction by collapsing expressions *about* facts into the facts themselves. That move would not merely be doctrinally incorrect; it would destabilize incentives in the very markets copyright is designed to sustain. If valuable editorial work can be freely appropriated so long as it concerns factual subject matter, editors (including those in legal research) will not be able to enjoy the confidence they deserve that the law will protect their expressive labor.

Permitting defendants to collapse this distinction—to characterize expressive choices as non-expressive simply because they concern factual subject matter—would erode the core of copyright protection in technically demanding domains where the public depends on subject matter expertise. If expressive choices can be redefined as facts about the law, that opens the door for third parties to misappropriate legal research without fear of repercussions.

As AI systems continue to rely on human editorial judgment to understand legal and other factual materials, it is essential that the idea-expression distinction not be interpreted so as to collapse protectable expressive work into mere "ideas." Doing so would undermine

accountability in AI development. This Court can resolve the present case narrowly by reaffirming that the law does continues to protect copyright in the expressive framing of factual or legal information, even where the underlying facts or holdings remain in the public domain.

## II.   GRANTING FAIR USE TO ROSS'S COPYING OF WESTLAW'S HEADNOTES TO DEVELOP AN AI-ASSISTED COMMERCIAL LEGAL RESEARCH PRODUCT WOULD UNDERMINE LONGSTANDING INTERPRETATIONS AND PRINCIPLES OF COPYRIGHT LAW.

### A.   Converting Headnotes Into a New Medium for Commercial Purposes Does Not Count as "Transformative" Under Fair Use Doctrine.

ROSS argues that its use of copied material was justified as a matter of fair use. ROSS Br. 39–54. The first fair use factor considers whether the secondary use of the copied material differs sufficiently in purpose and character from the original. 17 U.S.C. § 107(1). As part of this factor, courts consider whether the use of the copied material was "transformative" and whether it was commercial in nature. *Andy Warhol Found. For the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 529–31 (2023). If the purpose of ROSS's use is similar to the original purpose of the headnotes, and if ROSS's use is commercial in nature, that counts against fair use under this factor. *Id.* at 532–33.

9

One of ROSS's principal fair use arguments is its apparent claim that its use of Westlaw's headnotes is "transformative" (and thus has a distinct purpose and character) because it involved "transforming legal memoranda into a machine-readable language" rather than displaying the headnotes verbatim in the final product. ROSS Br. 44. The word "apparent" is appropriate here because even though the district court rejected this argument, ROSS continues to use talk of transformation throughout its appellate brief to describe what it did with Westlaw's headnotes: ROSS describes preparing the headnotes for "transformation into machine readable data," *id.* at 12, and provides a detailed explanation as to how the memos were "transformed into 'numerical representations'" in training its model, *id.*

That argument collapses under even minimal scrutiny. The term "transformative" has a settled meaning in copyright law. The Supreme Court has repeatedly held that transformation requires repurposing the original work to serve a new expression, meaning, or message—i.e., a genuinely different creative purpose. *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994). A work is not transformed merely because it is carried through a different format or implemented through a new

technology. The question is what the use accomplishes, not the mechanism by which the defendant processes the work.

The process described in ROSS's brief boils down to converting the text of the headnotes into numerical representations with magnitudes and directions in an abstract mathematical space, also known as "vectors." This is intended to distill statistical features embedded in the language of the headnotes. The goal of doing so is to teach the AI system to get better at generating useful prompts based on the content of that language.

But at bottom, this is no different from translating the headnotes into a different natural language. Indeed, vectors function as a type of statistical language within programs like the one used by ROSS. The particular medium in which the content of those headnotes is carried is irrelevant to the question of what purpose those headnotes were intended to serve. Fair use doctrine is clear in using "transformative" to refer to a secondary work having a distinct purpose or defining function from that of the original work. This is a specific and normatively significant use of "transformative" that differs from the technical, nominal way in which the headnotes could be described as having been transformed by being

11

translated into a new mathematical language. A headnote by any other numerical representation is still a headnote.

Every digital use of text involves numerical representation. A scanned PDF and a set of vector embeddings are different encodings of the same content. No particular form of digital presentation or transmission by itself changes the work's expressive contribution. A French translation of an English treatise might be useful to French speakers, but it is not transformative in the fair use sense if it is sold as a substitute for the original. Likewise, a database that stores headnotes as vectors in a high-dimensional representation space is not thereby engaged in a fundamentally different purpose from a database that stores them as text.

Converting the expressive content of Westlaw's headnotes into vectors so that a model can learn from them does not alter the nature of that content. ROSS is still using the headnotes' expressive judgments to enrich its own product. If mere re-encoding were enough to make a use transformative, any mass digital processing of text would automatically qualify, simply because computers work with numbers. That would

collapse the transformative-use inquiry in any case where digital technology—let alone AI—is involved.

The purpose of ROSS's use of the headnotes was the same as the original purpose for which they were created: to create a commercially viable legal research tool. Indeed, ROSS used the headnotes specifically for the purpose of competing with the owners of those very headnotes. ROSS's use of the headnotes does not have a distinct purpose, and the fact that it was converted into a new format does nothing to change the fundamental character of the material they copied.

If courts accepted the notion that conversion into a new medium amounts to transformation, the doctrine would be rendered incoherent. Any copier could claim fair use merely by routing expressive works through a technical pipeline. Copyright protection would shrink in proportion to the sophistication of the infringer's technology. That is the opposite of what fair use is meant to do: it protects socially valuable reworkings that pursue a meaningfully different purpose, not acts that reproduce the same function through a new technical wrapper. Redefining transformation as medium-conversion would create a tech-

13

specific exception with no grounding in the goals or principles of copyright.

The district court correctly applied the established doctrine. Affirming its analysis would prevent distortion of the transformative use standard through conceptually confused redefinitions anchored in technologically intensive but irrelevant non-legal references to "transformation." This Court should make sure to protect the intended meaning of "transformative" in copyright so as to prevent technical language from other fields from being used to wear down or obfuscate the meaning of legally operative terms. Talk of technical manipulation or conversion of data has nothing to do with the question of whether that content has been given a new expressive purpose. The court should explicitly affirm that even when faced with means of copying that involve complex computational transformations, what matters for transformativeness is not the form of the secondary use, but its function.

### B.    Training an AI Model Does Not Constitute a Distinct Purpose if the Objective Was to Develop a Similar Commercial Product.

To the extent that ROSS does seem to acknowledge that transformativeness has to do with the purpose of the use, ROSS asserts

that it did indeed give the headnotes a new purpose by using them to develop an AI model. ROSS Br. 46. In other words, ROSS claims that its purpose for copying the headnotes was to train an AI. But that framing omits what is arguably the most important fact: the only reason ROSS trained the AI to begin with was to produce a commercial legal-research tool that performs the same function as the one whose expressive content it copied. The training step was not an independent purpose. It was only an intermediate mechanism for pursuing a directly competitive end. Copyright law focuses on the ultimate purpose of the secondary use, not the technical steps by which that purpose is achieved.

ROSS's own business model confirms this. The lower court noted that ROSS was developing a commercial legal-research product intended to substitute for, and compete directly against, the products that include Westlaw's headnotes. When the secondary user employs copyrighted expression to create a product that serves largely the same purpose as the original, the use is not transformative. *Warhol*, 598 U.S. at 532–33. Training an AI is simply a means to that same competitive purpose.

The Court must not allow AI platforms to use the training of their models as a magic wand to escape accountability for improper copying,

15

especially when their immediate goal is to outcompete the very parties whose work they are appropriating. This is not to say that AI training could *never* count as a distinct purpose—especially if done in order to develop models with broader applications and social benefits. This is more plausible with regard to generative AI, a relatively new, extremely advanced form of multipurpose AI with wide-ranging applications. This case involves non-generative machine learning, and not only that, but a model that was being used specifically as part of a legal research tool for commercial purposes. To describe the purpose of ROSS's use of the headnotes as training an AI leaves out a crucial detail by failing to mention what the AI training process was itself intended for: a commercially viable legal research product that could compete with Westlaw.

### C.    Failing to Acknowledge Market Harms for Copied Headnotes Disincentivizes Legal Researchers, and Creators in Other Markets, from Providing Socially Valuable Information and Creative Contributions.

In assessing the fourth factor regarding fair use, courts consider the likely effect of the copying on the market for the original, and also for any derivative works. *Campbell*, 510 U.S. at 590 (1994). ROSS attempts to frame the market harm analysis as being specific to a market for

headnotes as a way of arguing that no serious market harm was inflicted upon Thomson Reuters. ROSS Br. 48. Courts must identify the relevant market that the copier harmed, *Hachette Book Grp., Inc. v. Internet Archive*, 115 F.4th 163, 189 (2d Cir. 2024), including "both the market for the original work and the market for any derivative works the rightsholder might develop," *id.* (citing *Campbell*, 510 U.S. at 590). ROSS claims that "for purposes of copyright law, ROSS did not 'use' Westlaw—it used headnotes." ROSS Br. 49. More accurately, ROSS used headnotes that were *part of Westlaw* and belonged to Thomson Reuters. Headnotes are not sold à la carte; they are integral components of the legal research products that lawyers actually buy. Their expressive value is embedded in the overall product Westlaw sells, and they help constitute the economic value of that product. ROSS's use targets that market directly by employing Thomson Reuters' expressive editorial judgments to build a competing tool, which threatens to divert the revenue stream those judgments help generate. Copyright protects that revenue stream because it protects the expressive elements that create it. Because headnotes are inseparable from the legal-research products that Thomson Reuters sells, the relevant market is the market for those

17

products as a whole, not a hypothetical market for headnotes sold separately.

ROSS and its supporters suggest that, as a matter of public policy, finding in favor Thomson Reuters would reduce access to legal information and thereby interfere with access to justice. ROSS Br. 23. The repeatedly lean on the assertion that "no one can own the law." ROSS Br. 2, 28 (citing *Georgia v. Public.Resource.Org, Inc.*, 590 U.S. 255, 259 (2020)). Both aspects of that argument—like ROSS's argument regarding the idea-expression distinction and the merger doctrine—rest on a conflation of the law itself with access to a particular private party's *chosen characterization* of the law.

As discussed earlier, the idea-expression distinction exists precisely to mediate this boundary. The public is and must remain free to read judicial opinions, to extract the legal rules they embody, to analyze or criticize them, and to build tools that work directly with those public materials. Nothing in Thomson Reuters' position, or in the district court's decision, threatens that baseline. What is at issue here is something different: whether ROSS may freely appropriate Westlaw's particular exercises of editorial judgment in organizing, digesting, and expressing

the law—and then use that appropriation as a shortcut to compete in the same market.

Headnotes are not the law. They are a privately created interface to the law. They reflect a particular perspective on what matters in each case and how judicial opinions should be framed. That is why users pay for them. That the public needs access to the law does not entail that every would-be competitor is entitled to claim Westlaw's editorial choices for themselves.

ROSS reminds the Third Circuit that copyright, when considering market harm under fair use, does not protect against "some" economic loss resulting from competition, nor does it confer a right to "monopoly." ROSS Br. 47 (quoting *Sony Comput. Ent., Inc. v. Connectix Corp.*, 203 F.3d 596, 607 (9th Cir. 2000)). In doing so, ROSS seems to be suggesting that Thomson Reuters has a monopoly on legal research tools. But Westlaw is hardly the only product of its kind available to those in the legal profession. The market already contains multiple competing vendors, each with its own editorial enhancements. Competition is robust precisely because each entrant can invest in differentiated, value-adding editorial work without fear that a rival will immediately appropriate it.

19

It ensures that new entrants can compete by creating their own
characterizations and summaries rather than free riding on their
competitors' efforts.

To protect a company's interest in the market for its product is to
preserve fair competition by preventing rivals from appropriating
another publisher's expressive editorial work instead of creating their
own. Weakening protection would do the opposite of what ROSS
suggests: it would consolidate the market around larger actors who can
absorb uncompensated expropriation, while discouraging smaller
publishers and innovators who cannot survive if their editorial products
can be copied wholesale under the guise of training an AI system.

Indeed, weakening protection for rightsholders here would
undercut the very policy goals ROSS invokes. If firms that invest in high-
quality legal research and editorial work know that any competitor can
ingest their curated outputs, vectorize them, and use them to bootstrap
a rival service, the rational response is to cut back on that investment.
Over time, that reduces the availability of well-maintained, professional
research tools—and thus degrades, rather than enhances, the ecosystem
of services through which lawyers, judges, and the public navigate the

law. A doctrine of access to law that silently erodes the incentive to create and maintain the tools we actually use to access it would be self-defeating.

Fair use already accommodates genuine public-interest uses of copyrighted works: commentary, criticism, scholarship, non-substitutive search, accessibility, and so on. What ROSS seeks is something different: a judicially sanctioned right to appropriate a competitor's valuable editorial work as raw material for a directly substitutive commercial service, under the banner of access to information. This Court should reject that invitation. Protecting Thomson Reuters' headnotes in this case would not reduce public access to the law. On the contrary, it would preserve the existing market incentives to create and sustain the high-quality research tools through which users can realistically find and engage with the law—and it would avoid setting a precedent that would make all forms of creative labor more vulnerable to uncompensated exploitation by AI platforms.

There is more at stake here than just legal publishing. A ruling that blesses ROSS's copying on policy grounds would inevitably be invoked in disputes involving artists, writers, musicians, and other creators whose

works are being used to train AI systems. It might look, in the short term, like a way to check a large company in favor of a smaller rival. But the longer-term effect would be to normalize a pattern in which any entity that assembles a valuable corpus of creative or analytic work can have it ingested and repurposed for automation without permission or compensation. The weight of the precedent set by a ruling in favor of ROSS would be borne almost entirely, and overwhelmingly, by entrepreneurs and individual creators—precisely the actors least able to defend themselves in court.

**III. AFFIRMING LONGSTANDING COPYRIGHT PRINCIPLES, ESPECIALLY PROTECTION OF CREATIVE WORK, IS NECESSARY FOR PROMOTING A CULTURE OF ACCOUNTABILITY IN THE AI INDUSTRY.**

Perhaps the most important policy reason to find in Thomson Reuters' favor is the Court's interest in promoting legal accountability and maintaining the integrity of copyright itself. Although this case involves a relatively narrow and fact-specific use of AI, its implications reach far beyond the particular model ROSS developed. Courts are now beginning to confront questions about how longstanding copyright principles should apply to large-scale automated copying. The question is not whether AI is valuable, but whether the principles that have

governed the use of copyrighted expression for decades apply with equal force when the copier is an AI developer. They do. New technologies have always been required to conform to established doctrine; the law should not now grant an implicit exemption simply because the copier hides behind a more complex or technically demanding process.

This case therefore arrives at a critical moment. The Court's decision will help determine whether foundational principles of authorship and fair competition continue to stand in an AI-dominated landscape, or whether an exception for AI platforms will ultimately take root. Allowing unauthorized copying of expressive works merely because the material has been laundered through an elaborate set of statistical filters would undermine licensing markets, erode the incentives that support expert editorial work, and encourage developers to rely on opacity and litigation risk rather than legitimate acquisition of data.

A consistent application of settled doctrine will promote responsible AI innovation (and innovation in creative markets generally) by maintaining incentives that are effective and rules that are clear. Developers may build innovative (and lucrative) AI systems within a stable IP licensing regime; what they may not do is convert expressive

works into functionally substitutive outputs without permission and then call the process transformative merely because it occurs inside a multilayer model.

The Court thus has an opportunity to reaffirm a basic principle: copying is copying, even when performed in connection with an advanced AI system. Upholding that principle will reinforce the rule of law, prevent the emergence of an unintentional AI industry carve-out, and ensure that the rapid development of AI occurs alongside, rather than at the expense of, the legal principles that sustain creative and intellectual progress.

## <u>CONCLUSION</u>

For these reasons, the Court should affirm the district court's summary judgment that Thomson Reuters' headnotes are copyrightable and that ROSS's use of those works for AI training is not fair use.

Dated:  November 26, 2025

Respectfully submitted,

*/s/ Jonathan Iwry*

Jonathan Iwry
10009 Ormond Road
Potomac, MD 20854
Tel: (301) 367-8992

*Attorney for Amicus Curiae*

24

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 5(c)(1), because, excluding the parts of the document exempted by Fed. R. App. P. 32(f): this document contains 5,254 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because: this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font Century Schoolbook font.

I am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

The electronic copy of this brief has been virus scanned and no virus was detected.

The text in the electronic brief is identical to the text in the paper copies.


Dated:  November 26, 2025          */s/ Jonathan Iwry*
                                    Jonathan Iwry

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the appellate CM/ECF system on November 19, 2025. All counsel of record are registered CM/ECF users and service will be accomplished by the CM/ECF system.

Dated: November 26, 2025          */s/ Jonathan Iwry*
                                  Jonathan Iwry