**No. 25-2153**

# In The United States Court of Appeals For the Third Circuit

THOMSON REUTERS ENTERPRISE CENTRE GMBH and
WEST PUBLISHING CORPORATION,
Plaintiffs-Appellees,

v.

ROSS INTELLIGENCE INC.,
Defendant-Appellant.

*On Appeal from an Order of the United States
District Court for the District of Delaware
Civil Action No. 20-613 (The Honorable Stephanos Bibas)*

**CORRECTED JOINT APPENDIX
Volume 5 of 18 (Pages A1733 to A2286)**

Anne M. Voigts
Ranjini Acharya
PILLSBURY WINTHROP
SHAW PITTMAN
2400 Hanover Street
Palo Alto, CA 94304

Kayvan M. Ghaffari
PILLSBURY WINTHROP
SHAW PITTMAN
Four Embarcadero
Center, 22nd Floor
San Francisco, CA 94111

Yar R. Chaikovsky
WHITE & CASE
3000 El Camino Real
2 Palo Alto Square;
Suite 900
Palo Alto, CA 94306

Andy M. LeGolvan
WHITE & CASE
555 S Flower Street,
Suite 2700
Los Angeles, CA 90071

Mark S. Davies
Anna B. Naydonov
Kufere J. Laing
WHITE & CASE
701 Thirteenth Street, NW
Washington, DC 20005
(202) 626-3600
mark.davies@whitecase.com

*Counsel for Defendant-Appellant*

*(For Continuation of Appearances See Inside Cover)*

Miranda D. Means
KIRKLAND & ELLIS
200 Clarendon Street
Boston, MA 02116

Dale M. Cendali
Joshua L. Simmons
KIRKLAND & ELLIS
601 Lexington Avenue
New York, NY 10022
(212) 446-4800
dale.cendali@kirkland.com

*Counsel for Plaintiffs-Appellees*

i

Page

## TABLE OF CONTENTS

Page

**Volume 1 of 18**

Memorandum Opinion, dated
September 25, 2023
(Doc. 547)....................................................... A1

Memorandum Opinion, dated
February 11, 2025 (Doc. 770)........................ A35

Order, dated February 11, 2025 (Doc. 772) .... A58

Order, dated April 3, 2025 (Doc. 799) ............. A59

Memorandum Opinion, dated May 23, 2025
(Doc. 804)..................................................... A60

Order granting Petition for Permission to
Appeal, dated June 17, 2025 (Doc. 805) ...... A70

**Volume 2 of 18**

District Court Docket Entries ......................... A71

Complaint, dated May 6, 2020 (Doc. 1)........... A157

Appendix A -
Certificates of Registration (Doc. 1-1) ......... A174

Defendant and Counterclaimant Ross
Intelligence Inc.'s Amended Partial
Answer and Defenses and Amended
Counterclaims in Response to Plaintiffs'
Complaint and Demand for Jury Trial,
dated January 25, 2021 (Doc. 24)................ A502

Letter from Michael J. Flynn to the
Honorable Stephanos Bibas, dated
July 15, 2022 (Doc. 200).............................. A549

ii

**Page**

Defendant and Counterclaimant Ross
    Intelligence Inc.'s Second Amended
    Answer and Defenses and Amended
    Counterclaims in Response to Plaintiffs'
    Complaint and Demand for Jury Trial,
    dated September 14, 2022 (Doc. 225) .......... A557

Plaintiffs' Notice Of Lodging, dated
    December 22, 2022 (Doc. 257) ...................... A604

Declaration of Miranda D. Means in Support
    of Motion for Partial Summary Judgment,
    dated January 9, 2023 (Doc. 298)
    (Omitted)

    Exhibit 6 -
    Deposition of Barbara Frederiksen-Cross,
    dated November 11, 2022 (Doc. 298-1) ........ A607

**Volume 3 of 18**

    Exhibit 20 -
    Comparison of ROSS Bulk Memo
    Questions to Headnote and Headnote to
    Case Opinion (Doc. 298-1) ........................... A619

**Volume 4 of 18**

    Exhibit 20 (Continued) -
    Comparison of ROSS Bulk Memo
    Questions to Headnote and Headnote to
    Case Opinion (Doc. 298-1) ........................... A1171

**Volume 5 of 18**

    Exhibit 20 (Continued) -
    Comparison of ROSS Bulk Memo
    Questions to Headnote and Headnote to
    Case Opinion (Doc. 298-1) ........................... A1733

iii

**Page**

Declaration of Laurie Oliver in Support of
 Plaintiffs' Motions for Partial Summary
 Judgment, dated December 21, 2022
 (Doc. 304)....................................................... A1584

Declaration, dated September 14, 2023
 (Doc. 544)
 (Omitted)

 Exhibit 3 -
 Deposition Transcript of Kai Bond, dated
 May 10, 2023 (Doc. 544-1)............................ A1590

 Exhibit 8 -
 Deposition Transcript of Julian D'Angelo,
 dated May 3, 2023 (Doc. 544-1) ................... A1608

 Exhibit 25 -
 Deposition of Tomas Van Der Heijden,
 dated March 17, 2022 (Doc. 544-1).............. A1630

 Exhibit 26 -
 Deposition Transcript of Tomas Van Der
 Heijden, dated May 9, 2023 (Doc. 544-1) .... A1646

 Exhibit 43 -
 Scope of Coverage (Doc. 545-1).................... A1695

 Exhibit 44 -
 Defendant and Counterclaimant Ross
 Intelligence Inc.'s Response and Objection
 to Plaintiffs' Fifth Set of Interrogatories
 (Doc. 545-1)................................................. A1700

 Exhibits 50, 51, 53-55, 58 -
 Entirely Redacted (Doc. 545-1).................... A1718

iii

iv

**Page**

Declaration of Max Samels in Support of
    Thomson Reuters' Motions for Partial
    Summary Judgment (Nos. 1-6), dated
    August 31, 2023 (Doc. 546) .......................... A1730

Exhibits 83-87 -
Entirely Redacted (Doc. 546-1)..................... A1733

Exhibit 88 -
Left Intentionally Blank (Doc. 546-1) ......... A1743

Exhibit 89 -
2022 Legal Technology Survey Report
(Doc. 546-1)................................................. A1744

Exhibits 90-92 -
Entirely Redacted (Doc. 546-1)..................... A1761

Exhibit 93 -
The Real Impact of Using Artificial
Intelligence in Legal Research (Doc. 546-1)  A1767

Exhibits 94-104 -
Entirely Redacted (Doc. 546-1)..................... A1778

Memorandum Opinion, dated
    September 25, 2023 (Doc. 547) ..................... A1800

Memorandum Opinion, dated
    September 27, 2024 (Doc. 669) ..................... A1834

Order, dated September 27, 2024 (Doc. 670).. A1848

Second Declaration of Laurie Oliver in
    Support of Plaintiffs' Renewed Motions for
    Summary Judgment, dated
    October 1, 2024 (Doc. 679) .......................... A1850

v

**Page**

Plaintiffs' Brief in Support of Their Renewed
Motion for Partial Summary Judgment on
Fair Use, dated October 1, 2024 (Doc. 693)      A1856

Exhibits 1-18 -
Entirely Redacted (Doc. 695-1)....................      A1858

Exhibit 19 -
Exhibit 1 from the Deposition of Alan Cox,
dated November 2, 2022 (Doc. 695-1)..........      A1859

Exhibit 20 -
Exhibit 2 from the Deposition of Alan Cox,
dated November 2, 2022 (Doc. 695-1)..........      A1872

Exhibits 21-39 -
Entirely Redacted (Doc. 695-1)....................      A1874

Exhibit 40 -
Statement of Work II for Ross Bulk Memos
(Doc. 695-1)................................................      A1875

Exhibits 41, 42 -
Entirely Redacted (Doc. 695-1)....................      A1890

Exhibit 43 -
*HJS Development, Inc. v. Pierce County ex
rel. Dept. of...*, 148 Wash.2d 451 (2003)
(Doc. 695-1)................................................      A1891

Exhibits 44-76 -
Entirely Redacted (Doc. 695-1)....................      A1916

Exhibit 77 -
Westlaw is Suing Us. Our Response
(Doc. 695-1)................................................      A1917

Exhibit 78 -
ROSS Intelligence Facebook Pages
(Doc. 695-1)................................................      A1922

vi

**Page**

Exhibits 79, 80 -
Entirely Redacted (Doc. 695-1)................... A1927

Exhibit 81 -
Copyright Form TX (Doc. 695-1) ................ A1928

Exhibit 82 -
Copyright Certificate of Registration
(Doc. 695-1)................................................. A1933

Exhibit 83 -
Amended Notice of Deposition, dated
September 25, 2019, with Transcript
(Doc. 695-2)................................................. A1938

Exhibits 84-86 -
Entirely Redacted (Doc. 695-2)................... A2257

Exhibit 87 -
Notes (Doc. 695-2) ....................................... A2258

Exhibit 88 -
Westlaw Quick Reference Guide "West
Key Number System Numerical List of
Digest Topics" (Doc. 695-2) ......................... A2260

Exhibits 89-93 -
Entirely Redacted (Doc. 695-2)................... A2269

Exhibit 94 -
How is Natural Language Search
Changing the Face of Legal Research?
(Doc. 695-2)................................................. A2270

Exhibit 95 -
*Seymour v. Richardson*, 194 Va. 709 (1953)
(Doc. 695-2)................................................. A2274

Exhibit 96 -
Editorial Enhancements (Doc. 695-2) ......... A2281

vii

| | Page |
|---|---|
| Exhibit 97 -<br>Thomson Reuters Westlaw \| Headnotes<br>(Doc. 695-2)................................................ | A2284 |

**Volume 6 of 18**

| | |
|---|---|
| Exhibit 98 -<br>Thomson Reuters Westlaw \| Key Number<br>System (Doc. 695-2)..................................... | A2287 |
| Exhibits 99-100 -<br>Entirely Redacted (Doc. 695-2).................... | A2290 |
| Exhibit 101 -<br>Surprising Differences: An Empirical<br>Analysis of LexisNexis and West<br>Headnotes in the Written Opinions of the<br>2009 Supreme Court Term<br>(Doc. 695-2)................................................ | A2291 |
| Exhibit 102 -<br>Westlaw Precision 141E Education<br>(Doc. 695-2)................................................ | A2365 |
| Exhibit 103 -<br>Entirely Redacted (Doc. 695-2).................... | A2368 |

Declaration of Richard A. Leiter, for
Defendant/Counterclaimant, in Support of
Motion for Summary Judgment on its
Affirmative Defense of Fair Use and on
Plaintiffs' Claims for Copyright
Infringement, filed October 9, 2024
(Doc. 700)
(Omitted)

**viii**

**Page**

Exhibit B -
Report of Defendants' Expert Professor
Richard Leiter, J.D., dated August 1, 2022
(Doc. 700-1)................................................. A2369

Declaration of Joseph Marks, for Defendant/
Counterclaimant, in Support of Motion for
Summary Judgment on its Affirmative
Defense of Fair Use and on Plaintiffs'
Claims for Copyright Infringement, dated
October 1, 2024 (Doc. 701)
(Omitted)

Exhibit B -
Entirely Redacted (Doc. 701-1)..................... A2392

Declaration of Jimoh Ovbiagele in Support of
Defendant/Counterclaimant Ross
Intelligence Inc.'s Motion for Summary
Judgment on Its Affirmative Defense of
Fair Use, dated October 1, 2024 (Doc. 702)    A2394

Declaration of Jimoh Ovbiagele in Support of
Defendant Ross Intelligence Inc.'s Motion
for Summary Judgment on Plaintiffs'
Claims of Copyright Infringement, dated
October 1, 2024 (Doc. 703) ........................... A2412

Declaration of Alan J. Cox, for Defendant/
Counterclaimant, in Support of Motion for
Summary Judgment on its Affirmative
Defense of Fair Use, filed October 9, 2024
(Doc. 704)
(Omitted)

Exhibit A -
*Curriculum Vitae* of Alan J. Cox, Ph.D.
(Doc. 704-1)................................................. A2422

ix

**Page**

Exhibits B, C -
Entirely Redacted (Doc. 704-1)................... A2462

Declaration of Warrington S. Parker III, for
Defendant Ross Intelligence Inc., in
Support of Motion for Summary Judgment
as to Plaintiffs' Copyright Claims, filed
October 9, 2024 (Doc. 705)
(Omitted)

Exhibit 13 -
Excerpts of Deposition Transcript of Erik
Lindberg, dated March 22, 2022
(Doc. 705-1)................................................ A2466

Exhibit 15 (Part 1) -
Entirely Redacted (Doc. 705-2)................... A2484

Exhibit 15 (Part 2) -
Entirely Redacted (Doc. 705-2)................... A2486

Exhibit 26 -
Excerpts of Deposition Transcript of Tariq
Hafeez, dated May 26, 2022 (Doc. 705-2).... A2488

Exhibit 28 -
Excerpts of Deposition Transcript of
Christopher Cahn, dated May 12, 2022
(Doc. 705-7)................................................ A2532

Exhibit 29 -
Morae Global, Project Rose, Project
Protocol, TR-0178604, updated
November 19, 2017 (Doc. 705-7).................. A2559

Exhibit 30 -
Excerpts of Deposition Transcript of
Andrew Arruda, dated March 30, 2022
(Doc. 705-7)................................................ A2569

x

**Page**

Exhibit 31 -
Excerpts of Deposition Transcript of
Barbara Frederiksen-Cross, dated
November 11, 2022 (Doc. 705-7) ................... A2588

Exhibit 32 -
Research Subscriber Agreement
(Doc. 705-7) ................................................. A2603

Exhibit 33 -
Best Practices Guide for ROSS
Intelligence, TR-0045731, last revised
September 14, 2017 (Doc. 705-7) ................. A2608

Declaration of Jacob Canter, for Defendant/
Counterclaimant Ross Intelligence Inc., in
Support of Motion for Summary Judgment
on its Affirmative Defense of Fair Use,
dated October 1, 2024 (Doc. 708)
(Omitted)

Exhibit 1 -
Excerpts from the Transcript Deposition of
Dr. Isabelle Moulinier, dated July 1, 2022
(Doc. 708-1) ................................................. A2629

Exhibit 2 -
Excerpts from the Transcript Deposition of
Jimoh Ovbiagele, dated April 12, 2022
(Doc. 708-1) ................................................. A2661

Exhibit 7 -
Marketing Information from ROSS
(Doc. 708-3) ................................................. A2681

Exhibit 8 -
Westlaw Slide Decks (Doc. 708-3) ............... A2685

x

**Page**

Exhibit 9 -
West Publishing Turns 150 Slide Decks
(Doc. 708-3)..................................................... A2714

Exhibit 47 -
Artificial Intelligence & Westlaw, in 2022
(Doc. 708-9)..................................................... A2727

Exhibit 48 -
Statement of Work II for ROSS Bulk
Memos (Doc. 708-9)..................................... A2750

Ross Intelligence Inc.'s Brief in Response to
Plaintiffs' Motion for Partial Summary
Judgment on Direct Copyright
Infringement and Related Defenses, dated
November 4, 2024 (Doc. 723) ....................... A2765

Declaration of Jacob Canter, for Defendant
Ross Intelligence Inc., in Response to
Plaintiffs' Motion for Partial Summary
Judgment on Direct Copyright
Infringement and Related Defenses, dated
October 30, 2024 (Doc. 728)
(Omitted)

Exhibit 30 -
Entirely Redacted (Doc. 728-2).................... A2769

Plaintiffs' Opposition to Ross Intelligence
Inc.'s Renewed Motion for Summary
Judgment on Ross's Affirmative Defense of
Fair Use, dated October 30, 2024
(Doc. 730)..................................................... A2771

**xii**

**Page**

Declaration of Miranda D. Means, for
    Plaintiffs, in Opposition to Ross
    Intelligence Inc.'s Renewed Motion for
    Summary Judgment on Ross's Affirmative
    Defense of Fair Use, dated
    October 30, 2024 (Doc. 731)
    (Omitted)

    Exhibits 104-114 -
    Entirely Redacted (Doc. 731-1) .................... A2774

    Exhibit 115 -
    Webpage entitled "lexis.com Quick
    Reference Guide" (Doc. 731-1) ..................... A2775

    Exhibit 116 -
    Webpage entitled "The past, present, and
    future of legal research with generative
    AI" (Doc. 731-1) .......................................... A2792

    Exhibits 117-137 -
    Entirely Redacted (Doc. 731-1) .................... A2802

    Exhibit 138 -
    Webpage entitled "What is image
    compression?" (Doc. 731-1) ......................... A2803

Declaration of Miranda D. Means, for
    Plaintiffs, in Support Reply Brief in
    Support of their Renewed Motion for
    Partial Summary Judgment on Fair Use,
    dated November 13, 2024 (Doc. 740)
    (Omitted)

    Exhibit 139 -
    Entirely Redacted (Doc. 740-1) .................... A2812

xiii

**Page**

**Volume 7 of 18**
**(FILED UNDER SEAL)**

Complaint, dated May 6, 2020 (Doc. 1)........... A2813

    Appendix A -
    Certificates of Registration (Doc. 1-1) ......... A2830

Defendant and Counterclaimant Ross
    Intelligence Inc.'s Amended Partial
    Answer and Defenses and Amended
    Counterclaims in Response to Plaintiffs'
    Complaint and Demand for Jury Trial,
    dated January 25, 2021 (Doc. 24)................ A3158

Letter from Michael J. Flynn to the
    Honorable Stephanos Bibas, dated
    July 15, 2022 (Doc. 195).............................. A3205

    Exhibit A -
    Notes of Charles von Simson (Doc. 195-1) .. A3209

    Exhibit B -
    Defendant and Counterclaimant Ross
    Intelligence, Inc.'s Response to Plaintiffs
    Thomson Reuters Enterprise Centre
    GmbH and West Publishing Corporation's
    First Set of Requests for Admissions to
    Defendant Ross Intelligence, Inc., dated
    February 22, 2022 (Doc. 195-1) ................... A3211

    Exhibit C -
    Emails (Doc. 195-1) ..................................... A3291

    Exhibit D -
    Deposition Transcript of Charles von
    Simson, dated April 19, 2022 (Doc. 195-1).. A3300

**Page**

Exhibit E -
Emails (Doc. 195-1) ..................................... A3307

Defendant and Counterclaimant Ross
Intelligence Inc.'s Second Amended
Answer and Defenses and Amended
Counterclaims in Response to Plaintiffs'
Complaint and Demand for Jury Trial,
dated September 14, 2022 (Doc. 225) .......... A3310

Declaration of Miranda D. Means in Support
of Motion for Partial Summary Judgment,
dated January 9, 2023 (Doc. 298)
(Omitted)

Exhibit 6 -
Deposition of Barbara Frederiksen-Cross,
dated November 11, 2022 (Doc. 255-1) ........ A3357

Exhibit 20 -
Comparison of ROSS Bulk Memo
Questions to Headnote and Headnote to
Case Opinion (Doc. 255-1) ............................ A3369

**Volume 8 of 18
(FILED UNDER SEAL)**

Exhibit 20 (Continued) -
Comparison of ROSS Bulk Memo
Questions to Headnote and Headnote to
Case Opinion (Doc. 255-1) ............................ A3391

**Volume 9 of 18
(FILED UNDER SEAL)**

Exhibit 20 (Continued) -
Comparison of ROSS Bulk Memo
Questions to Headnote and Headnote to
Case Opinion (Doc. 255-1) ............................ A3971

xv

**Page**

Declaration of Laurie Oliver in Support of
 Plaintiffs' Motions for Partial Summary
 Judgment, dated December 21, 2022
 (Doc. 256)...................................................... A4334

Plaintiffs' Notice of Lodging, dated
 December 22, 2022 (Doc. 257)...................... A4340

Declaration, dated September 14, 2023
 (Doc. 544)
 (Omitted)

 Exhibit 3 -
 Deposition Transcript of Kai Bond, dated
 May 10, 2023 (Doc. 531-1)............................ A4343

 Exhibit 8 -
 Deposition Transcript of Julian D'Angelo,
 dated May 3, 2023 (Doc. 531-1) ................... A4361

 Exhibit 25 -
 Deposition of Tomas Van Der Heijden,
 dated March 17, 2022 (Doc. 531-1).............. A4383

 Exhibit 26 -
 Deposition Transcript of Tomas Van Der
 Heijden, dated May 9, 2023 (Doc. 531-1) .... A4399

 Exhibit 43 -
 Scope of Coverage (Doc. 532-1).................... A4448

 Exhibit 44 -
 Defendant and Counterclaimant Ross
 Intelligence Inc.'s Response and Objection
 to Plaintiffs' Fifth Set of Interrogatories,
 dated May 11, 2023 (Doc. 532-1) ................. A4453

xv

xvi

**Page**

Exhibit 50 -
ROSS Discussion Materials – Competitive
Analysis & Profiling, dated April 16, 2015
(Doc. 532-1)................................................ A4471

Exhibit 51 -
Emails (Doc. 532-1) ................................... A4483

Exhibit 53 -
Emails (Doc. 532-1) ................................... A4490

Exhibit 54 -
Summary of Various Pricing Plans
(Doc. 532-1)................................................ A4494

Exhibit 55 -
ROSS Discussion Materials – Competitive
Analysis & Profiling, dated April 16, 2015
(Doc. 532-1)................................................ A4498

Exhibit 58 -
Emails (Doc. 532-1) ................................... A4510

Exhibit 62 -
Powered by IBM Watson Application
Business Plan (Doc. 532-2) ......................... A4515

Exhibit 63 -
Emails (Doc. 532-2) ................................... A4518

Exhibit 73 -
Emails (Doc. 532-2) ................................... A4521

Exhibit 74 -
Emails (Doc. 532-2) ................................... A4526

Exhibit 78 -
Emails (Doc. 532-2) ................................... A4534

xvii

**Page**

**Volume 10 of 18**
**(FILED UNDER SEAL)**

Declaration of Max Samels in Support of
Thomson Reuters' Motions for Partial
Summary Judgment (Nos. 1-6), dated
August 31, 2023 (Doc. 533)
(Omitted)

Exhibit 83 -
Emails (Doc. 533-1) ..................................... A4537

Exhibit 84 -
ROSS Board Meeting Slides, dated
January 14, 2020 (Doc. 533-1) ..................... A4544

Exhibit 85 -
Why Users are Not Buying or Using
ROSS? (Doc. 533-1) ..................................... A4560

Exhibit 86 -
Income Statement (Doc. 533-1) ................... A4572

Exhibit 87 -
Thomson Reuters Legal Products and
Services (Doc. 533-1) ................................... A4576

Exhibit 88 -
Left Intentionally Blank (Doc. 533-1) ......... A4579

Exhibit 89 -
2022 Legal Technology Survey Report
(Doc. 533-1) ................................................. A4580

Exhibit 90 -
Artificial Intelligence & Westlaw
(Doc. 533-1) ................................................. A4597

xviii

**Page**

Exhibit 91 -
Thomson Reuters Global Brand Monitor –
Legal Business Unit Report (Doc. 533-1) ....   A4620

Exhibit 92 -
Positioning Guide: Key Value Prop
Statements (Doc. 533-1) ..............................   A4680

Exhibit 93 -
The Real Impact of Using Artificial
Intelligence in Legal Research (Doc. 533-1)   A4684

Exhibit 100 -
Thomson Reuters Westlaw Proposal
(Doc. 533-3) ...................................................   A4695

Exhibit 101 -
Thomson Reuters Westlaw Proposal
Update (Doc. 533-3) .....................................   A4712

Exhibit 102 -
Practical Law Overview (Doc. 533-3) ..........   A4726

Exhibit 103 -
WestlawNext Marketing (Doc. 533-3) .........   A4729

Exhibit 104 -
Thomson Reuters Proposal (Doc. 533-3) .....   A4730

Memorandum Opinion, dated
September 25, 2023 (Doc. 547) ....................   A4738

Memorandum Opinion, dated
September 27, 2024 (Doc. 669) ....................   A4772

Order, dated September 27, 2024 (Doc. 670) ..   A4786

Plaintiffs' Brief in Support of Their Renewed
Motion for Partial Summary Judgment on
Fair Use, dated October 1, 2024 (Doc. 673)   A4788

**xix**

**Page**

Declaration of Miranda D. Means, for
    Plaintiffs, in Support of Renewed Motions
    for Summary Judgment, dated
    October 1, 2024 (Doc. 678)
    (Omitted)

Exhibit 1 -
Excerpts from the Deposition of Khalid Al-
Kofahi, dated April 8, 2022 (Doc. 678-1) ..... A4790

Exhibit 2 -
Excerpts from the Deposition of Andrew
Arruda, dated March 30, 2022 (Doc. 678-2)    A4807

Exhibit 3 -
Excerpts from the Deposition of L. Karl
Branting, Ph.D., dated October 19, 2022
(Doc. 678-3) ................................................. A4827

Exhibit 4 -
Excerpts from the Deposition of
Christopher Cahn,  May 12, 2022
(Doc. 678-4) ................................................. A4835

Exhibit 5 -
Excerpts from the Deposition of Alan Cox,
dated November 2, 2022 (Doc. 678-5) .......... A4841

Exhibit 6 -
Excerpts from the Deposition of Tariq
Hafeez, dated May 26, 2022 (Doc. 678-6) .... A4860

Exhibit 7 -
Excerpts from the Deposition of Richard A.
Leiter, dated October 24, 2022 (Doc. 678-7)    A4873

**xx**

**Page**

Exhibit 8 -
Excerpts from the Deposition of Erik
Lindberg, dated March 22, 2022
(Doc. 678-8).................................................. A4891

Exhibit 9 -
Excerpts from the Deposition of James
Malackowski, dated November 4, 2022
(Doc. 678-9).................................................. A4904

Exhibit 11 -
Excerpts from the Deposition of Isabelle
Moulinier, dated July 1, 2022 (Doc. 678-11)   A4910

Exhibit 12 -
Excerpts from the Deposition of Laurie
Oliver, dated March 30, 2022 (Doc. 678-12)   A4919

Exhibit 13 -
Excerpts from the Deposition of Jimoh
Ovbiagele, dated April 12, 2022
(Doc. 678-13)................................................ A4927

Exhibit 14 -
Excerpts from the Deposition of Jimoh
Ovbiagele, dated May 2, 2023
(Doc. 678-14)................................................ A4949

Exhibit 15 -
Excerpts from the Deposition of Sean O.
Shafik, dated April 22, 2022 (Doc. 678-15) .   A4955

Exhibit 16 -
Excerpts from the Deposition of Tomas van
der Heijden, dated March 17, 2022
(Doc. 678-16)................................................ A4959

**xx**

**Page**

Exhibit 17 -
Excerpts from the Deposition of Charles
von Simson, dated April 19, 2022
(Doc. 678-17)................................................ A4987

Exhibit 18 -
Excerpts from the Deposition of Teri
Whitehead, dated April 18, 2022
(Doc. 678-18)................................................ A4991

Exhibit 19 -
Exhibit 1 from the Deposition of Alan Cox,
dated November 2, 2022 (Doc. 678-19)........ A4995

Exhibit 20 -
Exhibit 2 from the Deposition of Alan Cox,
dated November 2, 2022 (Doc. 678-20)........ A5008

Exhibit 21 -
Comparison of ROSS Bulk Memo
Questions to Headnote and Headnote to
Case Opinion (Doc. 678-21).......................... A5010

### Volume 11 of 18
### (FILED UNDER SEAL)

Exhibit 21 (Continued) -
Comparison of ROSS Bulk Memo
Questions to Headnote and Headnote to
Case Opinion (Doc. 678-21).......................... A5121

### Volume 12 of 18
### (FILED UNDER SEAL)

Exhibit 21 (Continued) -
Comparison of ROSS Bulk Memo
Questions to Headnote and Headnote to
Case Opinion (Doc. 678-21).......................... A5697

**xxii**

**Page**

Exhibit 22 -
Report of Defendants' Expert L. Karl
Branting, J.D., Ph.D., dated July 28, 2022
(Doc. 678-22)................................................ A5975

Exhibit 24 -
Opening Expert Report of Barbara
Frederiksen-Cross, dated August 1, 2022
(Doc. 678-24)................................................ A6015

Exhibit 25 -
Opening Expert Report of Jonathan L.
Krein, dated August 1, 2022 (Doc. 678-25) . A6067

Exhibit 28 -
Opening Expert Report of James E.
Malackowski, dated August 1, 2022
(Doc. 678-28)................................................ A6162

Exhibit 29 -
Rebuttal Expert Report of James E.
Malackowski, dated September 6, 2022
(Doc. 678-29)................................................ A6227

Exhibit 31 -
Defendant and Counterclaimant ROSS
Intelligence, Inc.'s Supplemental
Responses and Objections to Plaintiffs' Set
of Interrogatories, dated
September 14, 2022 (Doc. 678-31) ............... A6258

xxiii

**Page**

**Volume 13 of 18**
**(FILED UNDER SEAL)**

Exhibit 31 (Continued) -
Defendant and Counterclaimant ROSS
Intelligence, Inc.'s Supplemental
Responses and Objections to Plaintiffs' Set
of Interrogatories, dated
September 14, 2022 (Doc. 678-31) ............... A6281

Exhibit 33 -
Audio of August 22 Hearing (Doc. 678-33).. A6352

Exhibit 34 -
Excel File (Doc. 678-34) ............................. A6354

Exhibit 35 -
Excel File (Doc. 678-35) ............................. A6356

Exhibit 36 -
Best Practices Guide for ROSS
Intelligence, last revised on
September 18, 2017 (Doc. 678-36) ............... A6358

Exhibit 37 -
Project Rose - Project Protocol
(Doc. 678-37)............................................... A6378

Exhibit 38 -
Email from Tariq Hafeez to Andrew
Arruda, dated October 23, 2020
(Doc. 678-38)............................................... A6388

Exhibit 39 -
Westlaw Screenshots (Doc. 678-39)............. A6393

Exhibit 40 -
Statement of Work II for Ross Bulk Memos
(Doc. 678-40)............................................... A6400

xxiv

**Page**

Exhibit 44 -
Email Exchange between Teri Whitehead
and Thomas van der Heijden, dated
September 15, 2017 (Doc. 678-44) ............... A6415

Exhibit 46 -
Design Studio Notes (Doc. 678-46) .............. A6418

Exhibit 47 -
Spreadsheet "ROSS Data Spend –
Jan 1, 2017 to Present" (Doc. 678-47) ......... A6435

Exhibit 50 -
Email Exchange between Thomas
Hamilton and John R. Fernandez, dated
August 6, 2015 (Doc. 678-50) ....................... A6442

Exhibit 51 -
Email Exchange between Thomas
Hamilton and Melissa Pritchard, dated
September 25, 2015 (Doc. 678-51) ............... A6444

Exhibit 52 -
Email from Andrew Arruda to Andre
Garber, dated August 22, 2015
(Doc. 678-52) ................................................ A6448

Exhibit 54 -
Email Exchange between Andrew Arruda
to Andre Garber, dated
October 18-19, 2015  (Doc. 678-54) .............. A6450

Exhibit 55 -
[Slack] Notifications from the Ross Inc.
Team for February 16, 2015 (Doc. 678-55).. A6455

Exhibit 56 -
Updated Tasks in poweredbyross.com
(Doc. 678-56) ................................................ A6457

xxv

**Page**

Exhibit 57 -
Standard "ROSS Launch Partner" Pricing
List (Doc. 678-57) ........................................   A6459

Exhibit 58 -
Mapping Practice Areas with the New
Q&A Data  (Doc. 678-58) .............................   A6461

Exhibit 61 -
Email Exchange between Thomas
Hamilton and Shazina Razeen, dated
September 17-20, 2015 (Doc. 678-61) ..........   A6465

Exhibit 63 -
Presentation Outline for Fastcase
(Doc. 678-63) ................................................   A6470

Exhibit 64 -
Top 3 Product Goals for Q1 2019
(Doc. 678-64) ................................................   A6477

Exhibit 70 -
Document entitled "The Death of Westlaw
Contracts and Pricing" (Doc. 678-70) ..........   A6480

Exhibit 71 -
Email Exchange between Akash Venkat
and Tariq Hafee, dated
September 20, 2015 (Doc. 678-71) ...............   A6483

Exhibit 73 -
Document entitled "Westlaw is Suing Us.
Our Response:" (Doc. 678-73) ......................   A6486

Exhibit 74 -
Correspondence between Charles von
Simson and Jullian D'Angelo, dated
May 17, 2019 (Doc. 678-74).........................   A6491

xxvi

**Page**

Exhibit 76 -
Email from Andre Garber to Andrew
Arruda, dated July 21, 2015 (Doc. 678-76) .   A6494

Exhibit 78 -
ROSS Intelligence Facebook Pages
(Doc. 678-78)................................................   A6496

Exhibit 79 to Means Declaration -
Editorial Manual, Policies and Guidelines
for Headnoting (Doc. 678-79)........................   A6501

Exhibit 83 -
Amended Notice of Deposition, dated
September 25, 2019, with Transcript
(Doc. 678-83)................................................   A6776

Exhibit 85 to Means Declaration -
Diagram entitled "Bulk Memos – Process
for Clutch" (Doc. 678-85)..............................   A6778

Exhibit 86 to Means Declaration -
Email from Teri Whitehead to Saloni
Agara Dwarakanath, dated
October 24, 2017 (Doc. 678-86)....................   A6780

Exhibit 90 to Means Declaration -
Salesforce Opportunity Detail
(Doc. 678-90)................................................   A6783

Exhibit 91 to Means Declaration -
Modules (Doc. 678-91)..................................   A6785

### Volume 14 of 18
### (FILED UNDER SEAL)

Exhibit 91 to Means Declaration (Cont.) -
Modules (Doc. 678-91)..................................   A6859

**xxvii**

| | Page |
|---|---|

Exhibit 92 to Means Declaration - Document entitled "Vetting Customers – High Usage and Competitors" (Doc. 678-92)................................................. A6924

Exhibit 93 to Means Declaration - Article "How is Natural Language Search Changing The Face of Legal Research?" (Doc. 678-93)................................................. A6944

Exhibit 96 - Editorial Enhancements (Doc. 678-96) ....... A6946

Exhibit 97 - Thomson Reuters Westlaw | Headnotes (Doc. 678-97)................................................. A6949

Exhibit 98 - Thomson Reuters Westlaw | Key Number System  (Doc. 678-98)................................... A6952

Exhibit 99 to Means Declaration - Messages from Charles von Simson, dated June 4, 2019 (Doc. 678-99).......................... A6955

Exhibit 103 - Supplemental Expert Report of Dr. Jonathan L. Krein, dated August 11, 2024 (Doc. 678-103)............................................... A6957

Second Declaration of Laurie Oliver in Support of Plaintiffs' Renewed Motions for Summary Judgment, dated October 1, 2024 (Doc. 679) .......................... A6982

xxviii

**Page**

Declaration of Jimoh Ovbiagele in Support of
　Defendant/Counterclaimant Ross
　Intelligence Inc.'s Motion for Summary
　Judgment on Its Affirmative Defense of
　Fair Use, dated October 1, 2024 (Doc. 680)　A6988

Declaration of Alan J. Cox, for Defendant/
　Counterclaimant, in Support of Motion for
　Summary Judgment on its Affirmative
　Defense of Fair Use, filed October 9, 2024
　(Doc. 681)
　(Omitted)

　Exhibit A -
　*Curriculum Vitae* of Alan J. Cox, Ph.D.
　(Doc. 681-1)................................................　A7008

　Exhibit B -
　Expert Report of Alan J. Cox, Ph.D., dated
　August 1, 2022 (Doc. 681-1).........................　A7048

　Exhibit C -
　Expert Rebuttal Report of Alan J. Cox,
　Ph.D., dated September 6, 2022
　(Doc. 681-1)................................................　A7092

Declaration of Jimoh Ovbiagele in Support of
　Defendant Ross Intelligence Inc.'s Motion
　for Summary Judgment on Plaintiffs'
　Claims of Copyright Infringement, dated
　October 1, 2024 (Doc. 686) ..........................　A7107

**xxix**

**Page**

Declaration of Richard A. Leiter, for
    Defendant/Counterclaimant, in Support of
    Motion for Summary Judgment on its
    Affirmative Defense of Fair Use and on
    Plaintiffs' Claims for Copyright
    Infringement, filed October 9, 2024
    (Doc. 687)
    (Omitted)

Exhibit B -
Report of Defendants' Expert Professor
Richard Leiter, J.D., dated August 1, 2022
(Doc. 687-1)................................................... A7119

Declaration of Joseph Marks, for Defendant/
    Counterclaimant, in Support of Motion for
    Summary Judgment on its Affirmative
    Defense of Fair Use and on Plaintiffs'
    Claims for Copyright Infringement, dated
    October 1, 2024 (Doc. 689)
    (Omitted)

Exhibit B -
Report of Defendants' Expert L. Karl
Branting, J.D., Ph.D., dated July 28, 2022
(Doc. 689-1)................................................... A7142

Declaration of Jacob Canter, for Defendant/
    Counterclaimant Ross Intelligence Inc., in
    Support of Motion for Summary Judgment
    on its Affirmative Defense of Fair Use,
    dated October 1, 2024 (Doc. 690)
    (Omitted)

Exhibit 2 -
Excerpts from the Transcript Deposition of
Jimoh Ovbiagele, dated April 12, 2022
(Doc. 690-2)................................................... A7220

**xxix**

**xxx**

|  | Page |
|---|---|
| Exhibit 8 - <br> Westlaw Slide Decks (Doc. 690-4) ............... | A7240 |
| Exhibit 16 - <br> Chart (Doc. 690-10) .................................... | A7269 |

**Volume 15 of 18**
**(FILED UNDER SEAL)**

| | |
|---|---|
| Exhibit 16 (Continued) - <br> Chart (Doc. 690-10) .................................... | A7437 |

**Volume 16 of 18**
**(FILED UNDER SEAL)**

| | |
|---|---|
| Exhibit 16 (Continued) - <br> Chart (Doc. 690-10) .................................... | A8015 |
| Exhibit 47 - <br> Artificial Intelligence & Westlaw, in 2022 <br> (Doc. 690-27)................................................ | A8169 |
| Exhibit 48 - <br> Statement of Work II for ROSS Bulk <br> Memos (Doc. 690-27) ................................... | A8192 |
| Declaration of Warrington S. Parker III, for <br> Defendant Ross Intelligence Inc., in <br> Support of Motion for Summary Judgment <br> as to Plaintiffs' Copyright Claims, filed <br> October 9, 2024 (Doc. 691) <br> (Omitted) | |
| Exhibit 13 - <br> Excerpts of Deposition Transcript of Erik <br> Lindberg, dated March 22, 2022 <br> (Doc. 691-4)................................................ | A8207 |
| Exhibit 15 (Part 1) - <br> Summarization Manual (Doc. 691-7) .......... | A8225 |

**xxx**

**xxxi**

| | Page |
|---|---|
| Exhibit 15 (Part 2) - Summarization Manual (Doc. 691-8) .......... | A8382 |
| Exhibit 26 - Excerpts of Deposition Transcript of Tariq Hafeez, dated May 26, 2022 (Doc. 691-9).... | A8520 |
| Exhibit 30 - Excerpts of Deposition Transcript of Andrew Arruda, dated March 30, 2022 (Doc. 691-14)................................................ | A8564 |
| Declaration of Jacob Canter, for Defendant Ross Intelligence Inc., in Response to Plaintiffs' Motion for Partial Summary Judgment on Direct Copyright Infringement and Related Defenses, dated October 30, 2024 (Doc. 711) (Omitted) | |
| Exhibit 30 - Request for Admissions (Doc. 711-4)........... | A8583 |
| Ross Intelligence Inc.'s Brief in Response to Plaintiffs' Motion for Partial Summary Judgment on Direct Copyright Infringement and Related Defenses, dated October 30, 2024 (Doc. 713) ........................ | A8586 |
| Plaintiffs' Opposition to Ross Intelligence Inc.'s Renewed Motion for Summary Judgment on Ross's Affirmative Defense of Fair Use, dated October 30, 2024 (Doc. 716)..................................................... | A8590 |

**xxxii**

**Volume 17 of 18**
**(FILED UNDER SEAL)**

Declaration of Miranda D. Means, for
Plaintiffs, in Opposition to Ross
Intelligence Inc.'s Renewed Motion for
Summary Judgment on Ross's Affirmative
Defense of Fair Use, dated
October 30, 2024 (Doc. 718)
(Omitted)

Exhibit 107 -
Excerpts of Deposition Transcript of
Richard A. Leiter, dated October 24, 2022
(Doc. 718-4) .................................................. A8593

Exhibit 109 -
Excerpts of Deposition Transcript of
Isabelle Moulinier, dated July 1, 2022
(Doc. 718-6) .................................................. A8609

Exhibit 110 -
Excerpts of Deposition Transcript of
Tomas Van Der Heijden, dated
March 17, 2022 (Doc. 718-7) ........................ A8622

Exhibit 111 -
Excerpts of Deposition Transcript of
Laurie Oliver, dated March 30, 2022
(Doc. 718-8) .................................................. A8626

Exhibit 113 -
Rebuttal Expert Report of Dr. Jonathan L.
Krein, dated September 6, 2022
(Doc. 718-10) ................................................ A8633

Exhibit 115 -
Webpage entitled "lexis.com Quick
Reference Guide" (Doc. 718-12) ................... A8690

xxxiii

**Page**

Exhibit 116 -
Webpage entitled "The past, present, and
future of legal research with generative
AI" (Doc. 718-13) .......................................... A8707

Exhibit 135 -
WestlawNext WestSearch Technology
(Doc. 718-32)................................................ A8717

Declaration of Miranda D. Means, for
Plaintiffs, in Support Reply Brief in
Support of their Renewed Motion for
Partial Summary Judgment on Fair Use,
dated November 13, 2024 (Doc. 736)
(Omitted)

Exhibit 139 -
Excerpts of Deposition Transcript of Erik
Lindberg, dated March 22, 2022
(Doc. 736-1)................................................. A8722

Appendix A to Memorandum Opinion, dated
February 11, 2025 (Doc. 771)....................... A8726

**Volume 18 of 18**
**(FILED UNDER SEAL)**

Appendix A to Memorandum Opinion, dated
February 11, 2025 (Doc. 771) (Continued).. A9171

Case 1:20-cv-00613-SB   Document 546-1   Filed 09/14/23   Page 1 of 67 PageID #: 103240

# EXHIBIT 83

A1733

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

A1734

Case 1:20-cv-00613-SB   Document 546-1   Filed 09/14/23   Page 3 of 67 PageID #: 103242

# EXHIBIT 84

A1735

Case 1:20-cv-00613-SB   Document 546-1   Filed 09/14/23   Page 4 of 67 PageID #: 103243

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

A1736

Case 1:20-cv-00613-SB   Document 546-1   Filed 09/14/23   Page 5 of 67 PageID #: 103244

# **EXHIBIT 85**

A1737

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

Case 1:20-cv-00613-SB   Document 546-1   Filed 09/14/23   Page 7 of 67 PageID #: 103246

# **EXHIBIT 86**

A1739

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

A1740

# EXHIBIT 87

A1741

Case 1:20-cv-00613-SB   Document 546-1   Filed 09/14/23   Page 10 of 67 PageID #: 103249

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

A1742

Case 1:20-cv-00613-SB   Document 546-1   Filed 09/14/23   Page 11 of 67 PageID #: 103250

# EXHIBIT 88

## Intentionally Left Blank

A1743

Case 1:20-cv-00613-SB   Document 546-1   Filed 09/14/23   Page 12 of 67 PageID #: 103251

# EXHIBIT 89

A1744

Case 1:20-cv-00613-SB   Document 546-1   Filed 09/14/23   Page 13 of 67 PageID #: 103252



# 2022
# LEGAL
# TECHNOLOGY
## Survey Report

### COMBINED VOLUMES

| Vol. I | Online Research |
|---|---|
| Vol. II | Technology Basics & Security |
| Vol. III | Law Office Technology |
| Vol. IV | Marketing & Communication Technology |
| Vol. V | Litigation Technology & E-Discovery |

CONFIDENTIAL

TRCC-00014349

A1745

# 2022
# American Bar Association
# Legal Technology Survey Report

## Combined Volumes:

Vol. I: Online Research

Vol. II: Technology Basics & Security

Vol. III: Law Office Technology

Vol. IV: Marketing & Communication Technology

Vol. V: Litigation Technology & E-Discovery

**Edited by:**

Taylor Young | ABA Legal Technology Resource Center

**Sponsored by:**



A division of Reed Elsevier Inc.



A Thomson Reuters business



AMERICAN**BAR**ASSOCIATION
Legal Technology
Resource Center

CONFIDENTIAL

TRCC-00014350

A1746

## Disclaimer

The materials contained herein represent the opinions of the authors and editors and should not be construed to be those of either the American Bar Association or the ABA Legal Technology Resource Center unless adopted pursuant to the bylaws of the Association. Nothing contained herein is to be considered as the rendering of legal advice for specific cases, and readers are responsible for obtaining such advice from their own legal counsel. These materials and any forms and agreements herein are intended for educational and informational purposes only.

The products and services mentioned in this publication are under or may be under trademark or service mark protection. Product and service names and terms are used only for completeness of the survey report and with no intention of infringement. Use of a product or service name or term in this publication should not be regarded as affecting the validity of any trademark or service mark.

## Copyright Notice

© Copyright 2022 American Bar Association. All rights reserved. This report may not be reproduced in part or whole by any means without prior written permission of the publisher. For information, send your request by mail or email to:

Alexis Hart McDowell, Director
Copyrights & Contracts
American Bar Association
321 N. Clark Street
Chicago, IL 60654-7598
Email: copyright@americanbar.org

This publication and its contents are protected by copyright law. In addition, reference to the results of this survey in marketing materials, without the full context, would be inherently misleading. Accordingly, use of the results or content of this survey is strictly prohibited without the prior written permission of the American Bar Association. The American Bar Association policy does not permit endorsement of commercial products and nothing herein is intended to be and should not be interpreted as an endorsement of any product mentioned.

ISBN 978-1-61632-924-2

CONFIDENTIAL

## About the Survey Reports

*Methodology*

The American Bar Association Legal Technology Resource Center surveyed the legal profession from April through June 2022 on the use of technology in the profession. Staff of the Center developed a 289-question survey document which was divided into five separate survey questionnaires. The sample for the surveys was 35,615 ABA attorneys in private practice selected on a true $n_{th}$ name basis of ABA members in private practice.

An outside research firm distributed electronic invitations via email to $n_{th}$ selected ABA lawyer members in private practice for each the five questionnaires. The research firm received the following number of responses per questionnaire:

- Online Research: 318
- Technology Basics & Security: 311
- Law Office Technology: 331
- Marketing & Communication Technology: 322
- Litigation Technology & E-Discovery: 329

Specific results in the reports for which the total number of responses is less than 100 should be used with caution—and for informational purposes only.

*The Structure of the Report*

The 2022 ABA Legal Technology Survey Report is issued as a five-volume set of PDF files, with each PDF volume available for sale individually. They are also available as a combined version in a digital format. Each volume begins with a trend report, followed by charts and tables that appear in the same sequence as the questions appeared in the questionnaire.

This PDF contains the full contents of the five individual volumes. Volume numbers have been added to the page numbers at the bottom of each page and a combined index has been added at the end to aid in navigation.

*Additional Questions about the Survey*

If you have additional questions about the survey methodology, the exact wording of a specific question, availability of previous surveys, or other requests related to the survey, please email ltrc@americanbar.org. If you are interested in sponsoring future research by the Center, please email ltrc@americanbar.org.

CONFIDENTIAL

TRCC-00014352

A1748

*About the Legal Technology Resource Center*

The Legal Technology Resource Center is where legal professionals turn for technology information and resources. We educate the legal profession on technology use and trends through our research and educational outreach to law firms and bar associations.

We serve as a repository of technology resources and information through our website at www.lawtechnology.org and are at the forefront of emerging technology issues that impact the legal profession. The Center has performed research on the use of technology by the legal profession since the 1990s.

Taylor Young and the ABA Legal Technology Resource Center Board assisted in question development and other survey-related activities. Research USA prepared the trend reports and the executive summary and created the graphics and tables.

Email: ltrc@americanbar.org
Website: http://www.lawtechnology.org

CONFIDENTIAL

TRCC-00014353

A1749

## Table of Contents – All Volumes

### Online Research (Volume I - Page 10)

Table of Contents ............................................................................................. I-i

About the Survey Reports .............................................................................. I-ii

Trend Report .................................................................................................. I-iv

Demographics ................................................................................................. I-1

Demographics: Practice Areas ..................................................................... I-5

Demographics: Location ................................................................................ I-9

Legal Research: Generally ............................................................................ I-13

Legal Research: Formats .............................................................................. I-16

Use of Free Online Legal Research Resources ............................................ I-29

Use of Fee-Based Online Legal Research Resources ................................ I-40

Electronic Legal Research Away from the Office ........................................ I-51

Current Awareness ........................................................................................ I-55

Legal Analytics ............................................................................................... I-66

Artificial Intelligence .................................................................................... I-67

Index ................................................................................................................ I-72

### Technology Basics & Security (Volume II - Page 129)

Table of Contents ........................................................................................... II-i

About the Survey Reports ............................................................................. II-ii

Trend Report ................................................................................................. II-iv

Demographics ................................................................................................ II-1

Demographics: Practice Areas ..................................................................... II-5

Demographics: Location ................................................................................ II-9

CONFIDENTIAL

TRCC-00014354

A1750

Technology Budget & Goals ............................................................ II-12

Technology Training & Support ...................................................... II-26

Technology Information & Influencers ......................................... II-37

Security: Technology Policies ......................................................... II-41

Security: Security Tools ................................................................... II-43

Security: Security Breaches ........................................................... II-51

Security: Viruses/Spyware/Malware ............................................ II-53

Security: Physical Security Measures .......................................... II-55

Security: Backup .............................................................................. II-60

Index ................................................................................................. II-65

## Law Office Technology (Volume III - Page 229)

Table of Contents ............................................................................. III-i

About the Survey Reports .............................................................. III-ii

Trend Report ................................................................................... III-iv

Demographics ................................................................................. III-1

Demographics: Practice Areas ...................................................... III-5

Demographics: Location ................................................................ III-9

Primary Computer .......................................................................... III-12

Hardware ......................................................................................... III-15

E-books ............................................................................................ III-16

Software: Communications ........................................................... III-26

Software: Documents ..................................................................... III-28

Software: General Office ............................................................... III-30

Software: Legal-Specific ................................................................ III-33

Software: Use .................................................................................. III-35

Software: Satisfaction .................................................................... III-39

CONFIDENTIAL

TRCC-00014355

A1751

Software: Product Brand Names ................................................................. III-40

Electronic Fax .......................................................................................... III-45

Software: Web-Based Software & Services/Cloud Computing ......................... III-48

APIs/Third-Party Data Integrations ............................................................. III-60

Extranets ................................................................................................. III-62

Index ....................................................................................................... III-67

## Marketing & Communication Technology (Volume IV - Page 343)

Table of Contents .......................................................................................IV-i

About the Survey Reports ........................................................................... IV-ii

Trend Report ............................................................................................ IV-iv

Demographics ............................................................................................ IV-1

Demographics: Practice Areas ..................................................................... IV-5

Demographics: Location .............................................................................. IV-9

Websites ................................................................................................. IV-12

E-lawyering & Virtual Law Practices .......................................................... IV-26

Blogs........................................................................................................ IV-34

Social Media ............................................................................................ IV-40

Law Firm Marketing ................................................................................. IV-49

Email Use ................................................................................................ IV-70

Communication Technologies ..................................................................... IV-75

Index ...................................................................................................... IV-85

## Litigation Technology & E-Discovery (Volume V - Page 476)

Table of Contents ....................................................................................... V-i

About the Survey Reports ........................................................................... V-ii

Trend Report ............................................................................................ V-iv

CONFIDENTIAL

TRCC-00014356

A1752

Demographics ........................................................................................ V-1

Demographics: Practice Areas ........................................................... V-5

Demographics: Location ..................................................................... V-9

Courtroom Practice ............................................................................. V-12

Use of Mobile Devices in the Courtroom ....................................... V-14

Courtroom Training ............................................................................. V-20

Litigation Software: Availability ....................................................... V-24

Litigation Software: Use .................................................................... V-26

Litigation Software: Product Brand Names .................................... V-27

Litigation Software: Purchasing ....................................................... V-28

Litigation Software: Useful Features ............................................... V-31

Electronic Filing .................................................................................. V-34

Electronic Discovery .......................................................................... V-41

Index ...................................................................................................... V-56

CONFIDENTIAL

TRCC-00014357

A1753

# 2022 American Bar Association Legal Technology Survey Report

# Online Research

**Sponsored by**



a division of Reed Elsevier Inc.
www.lexisnexis.com



A Thomson Reuters business



**Joshua Poje, Research Specialist**
**Taylor Young, Research Specialist**

CONFIDENTIAL

TRCC-00014358

A1754

**2022 ABA Legal Technology Survey Report**                    **Online Research**

age group (36%), followed by respondents age 70 and older (30%).  Fifty-one percent of associates are from the 30-39 year old group, followed by respondents age 25-29 (20%).

Seventy percent of respondents are male, and 29% are female.  In terms of age, the gender gap is largest for respondents age 60 and older, with 80% of respondents being male, and 19% female. Among respondents under age 40, 56% are female and 44% are male.

### Research in the Law Firm

Overall, respondents report that an average of 18% of their work time is spent conducting legal research.  The percentages are 20% for solo respondents, 18% for firms of 100 or more attorneys, and 17% each for firms of 2-9 and 10-49 attorneys.

Respondents admitted to the bar less than 10 years (26%), associates (24%), respondents under age 40 (24%), and in general practice (20%), on average, spend the most amount of work time conducting legal research.

Respondents are asked how often they request legal research (both legal materials and non-legal materials that are case-related) from various categories of individuals.  The following table shows regular and occasional requests for legal research by respondents for survey years 2019-2022:

|  | 2022 | | 2021 | | 2020 | | 2019 | |
|---|---|---|---|---|---|---|---|---|
|  | Regularly | Occasionally | Regularly | Occasionally | Regularly | Occasionally | Regularly | Occasionally |
| Other firm lawyers | 37% | 25% | 32% | 27% | 34% | 23% | 31% | 27% |
| Firm law clerks/ summer associates | 19% | 26% | 14% | 25% | 13% | 24% | 16% | 24% |
| Firm paralegals | 8% | 26% | 7% | 21% | 9% | 21% | 10% | 17% |
| Firm librarians | 4% | 12% | 6% | 12% | 4% | 10% | 4% | 10% |
| Outside researchers | 2% | 8% | 2% | 9% | 2% | 8% | 2% | 10% |

Firms of 10-49 attorneys (51%, compared with 37% in 2021, 46% in 2020, and 52% in 2019) most often report regularly requesting legal research from other firm lawyers, followed by firms of 100 or more attorneys (40%, compared with 50% in 2021, 48% in 2020, and 54% in 2019), and 2-9 attorneys (30%, compared with 38% in 2021, 37% in 2020, and 28% in 2019), compared to 3% of solo firms.

Nineteen percent of respondents from all firm sizes report regularly requesting legal research from firm law clerks/summer associates: 26% from firms of 10-49 attorneys (compared with 13% in 2021, 21% in 2020, and 32% in 2019), 17% from firms of 2-9 attorneys (compared with 16% in 2021, 11% in 2020, and 14% in 2019), 16% from firms of 100 or more attorneys (compared with 22% in 2021, 14% in 2020, and 22% in 2019), and 3% of solo respondents.

CONFIDENTIAL                                        TRCC-00014367

A1755

**2022 ABA Legal Technology Survey Report**                    **Online Research**

Eight percent of respondents report regularly requesting legal research from firm paralegals: 9% from firms of 10-49 attorneys (compared with 8% in 2021, 10% in 2020, and 14% in 2019), 9% from firms of 100 or more attorneys (compared to 7% in 2021, 13% in 2020, and 12% in 2019, and 9% in 2018), 8% from firms of 2-9 attorneys (compared with 7% in 2021, 8% in 2020, and 10% in 2019), in contrast with 0% of solo respondents (compared with 7% in 2021, 6% in 2020, and 3% in 2019).

Overall, 4% of respondents report regularly requesting legal research from firm librarians. Fifteen percent of respondents from firms of 100 or more attorneys regularly request legal research from firm librarians in contrast with 0% each from firms of 2-9 and 10-49 attorneys, and 3% of solo respondents.

Solo respondents are the most likely to report *occasionally* requesting legal research from outside researchers (22%, compared with 17% in 2021, 15% in 2020, and 16% in 2019), followed by 12% of respondents from firms of 2-9 attorneys, and 3% each of respondents from firms of 10-49 and 100 or more attorneys.

### Research Formats

Respondents were asked how often they use particular formats for legal research. Respondents most frequently report using fee-based Internet/online services, followed by free Internet/online services, and print materials regularly for legal research. The following table shows respondents' regular and occasional usage of specific formats for their legal research for survey years 2019-2022:

| | 2022 | | 2021 | | 2020 | | 2019 | |
|---|---|---|---|---|---|---|---|---|
| | Regularly | Occasionally | Regularly | Occasionally | Regularly | Occasionally | Regularly | Occasionally |
| Fee-based Internet/ online services | 65% | 17% | 60% | 16% | 56% | 19% | 57% | 17% |
| Free Internet/ online services | 56% | 29% | 59% | 31% | 59% | 29% | 65% | 25% |
| Print materials | 35% | 33% | 37% | 34% | 40% | 31% | 44% | 32% |
| E-book[1] | 9% | 20% | 8% | 28% | 6% | 20% | * | * |
| Removable media | 5% | 15% | 8% | 19% | 7% | 18% | 6% | 17% |

---

[1] E-book reader was added to the 2020 questionnaire as a format for legal research.

CONFIDENTIAL                                             TRCC-00014368

A1756

Sixty-five percent of all respondents regularly use fee-based Internet/online services for legal research and 17% occasionally use this resource. Seven percent of respondents report that they never use fee-based online services for legal research.



Respondents from firms of 2-9 attorneys are the most likely to report that they regularly use fee-based Internet/online services for legal research (77%), and solo respondents are the least likely (45%).  Out of the leading primary practice areas, respondents who report the following as primary practice areas are the most likely to report regularly using Internet/online services that are fee-based: commercial litigation (88%), real estate litigation (86%), general practice (83%), litigation (82%), and personal injury (80%).

Respondents age 40-49 years old (87%, compared with 76% in 2021, 74% in 2020, and 75% in 2019) are the most likely to report regularly using fee-based online services for legal research, followed by 71% who are under age 40 (compared with 68% in 2021, 80% in 2020, and 74% in 2019), 70% of respondents age 50-59 years old (compared with 71% in 2021, 51% in 2020, and 57% in 2019), and 60% of respondents 60 years old and over (compared with 52% in 2021, 49% in 2020, and 51% in 2019).

CONFIDENTIAL                                                                    TRCC-00014369

A1757

**2022 ABA Legal Technology Survey Report**                                **Online Research**

Seven percent of respondents from firms of 2-9 attorneys report using print materials first when starting a research project, followed by 6% from firms of 10-49, 4% of solo attorneys, and 2% from firms of 100 or more attorneys.

### Use of Free Online Legal Research Resources

Ninety-one percent of all respondents report that they use free online resources to conduct legal research.



Respondents were asked how satisfied they are with particular features or characteristics of free online legal research resources. The following table shows respondents' level of satisfaction ("very" and "somewhat") with particular features or characteristics of free online legal research resources for years 2019-2022:

| | 2022 | | 2021 | | 2020 | | 2019 | |
|---|---|---|---|---|---|---|---|---|
| | Very satisfied | Somewhat satisfied | Very satisfied | Somewhat satisfied | Very satisfied | Somewhat satisfied | Very satisfied | Somewhat satisfied |
| Ability to ascertain credentials of author or publisher | 19% | 66% | 17% | 64% | 13% | 68% | 16% | 66% |
| Availability of advanced search options | 10% | 52% | 11% | 49% | 11% | 49% | 13% | 52% |
| Depth of coverage | 12% | 56% | 12% | 62% | 10% | 62% | 11% | 63% |
| Ability to search multiple databases simultaneously | 10% | 42% | 9% | 45% | 10% | 43% | 13% | 39% |
| User-friendliness | 19% | 59% | 18% | 61% | 16% | 59% | 19% | 57% |
| Citator system to verify if a case is still good law | 7% | 30% | 7% | 27% | 6% | 29% | 8% | 28% |

CONFIDENTIAL
                                                                        TRCC-00014379

A1758

**2022 ABA Legal Technology Survey Report**                    **Online Research**

The highest responses for five of the six characteristics are in the "somewhat satisfied" category: 66% with the ability to ascertain the credentials of the author or publisher, 59% are somewhat satisfied with user-friendliness, 56% with depth of coverage, 52% with the availability of advanced search options, and 42% with the ability to search multiple databases simultaneously.

Solo respondents are most likely to report being very satisfied with the following characteristic of free online legal research resources: ability to ascertain credentials of author or publisher (25%). Respondents from firms of 2-9 attorneys are most likely to report being very satisfied with the user-friendliness of free online legal research resources (32%), depth of coverage and ability to search multiple databases simultaneously (19% each), availability of advanced search options (17%), and citator system to verify if a case is still good law (12%).

Respondents who use free online resources were asked which free websites they use for legal research:

**Free Websites Used for Legal Research**

The following table shows the percentage of respondents who use the leading free websites for legal research by firm size for years 2021 and 2022:

|  | Solo | | 2-9 attorneys | | 10-49 attorneys | | 100 or more attorneys | |
|---|---|---|---|---|---|---|---|---|
|  | 2022 | 2021 | 2022 | 2021 | 2022 | 2021 | 2022 | 2021 |
| Government website | 63% | 68% | 57% | 61% | 62% | 68% | 68% | 63% |
| FindLaw | 67% | 49% | 55% | 67% | 59% | 59% | 52% | 55% |
| Cornell's Legal Information Institute | 50% | 43% | 52% | 44% | 53% | 70% | 59% | 69% |
| Google Scholar | 46% | 41% | 33% | 34% | 32% | 36% | 52% | 31% |
| Fastcase | 67% | 41% | 40% | 39% | 32% | 17% | 20% | 19% |
| Casetext | 13% | 13% | 15% | 30% | 24% | 15% | 29% | 21% |
| Casemaker | 38% | 21% | 10% | 20% | 14% | 17% | 5% | 3% |

CONFIDENTIAL                                                            TRCC-00014380

A1759

**2022 ABA Legal Technology Survey Report**                                    **Online Research**

Respondents who use free online resources to conduct legal research were asked which one free website they use most often for legal research.  The following chart shows the leading websites reported by respondents as used most often for legal research for years 2019-2022:



Thirty-three percent of respondents from firms of 2-9 attorneys report using government websites as the free website they use most often for legal research, followed by 30% from firms of 100 or more attorneys, and 19% from firms of 10-49 attorneys, in contrast with 0% of solo firms.

Twenty-nine percent of solo attorneys report Cornell's Legal Information Institute as the free website they use most often for legal research, followed by 25% from firms of 10-49 attorneys, 22% from firms of 2-9 attorneys, and 20% from firms of 100 or more attorneys.

Thirty-three percent of solo attorneys report FindLaw as the free website they use most often for legal research, followed by 21% from firms of 10-49 attorneys, 17% from firms of 100 or more, and 14% from firms of 2-9 attorneys.

Fifteen percent of attorneys from firms of 100 or more report Google Scholar as the free website they use most often for legal research, followed by 13% from firms of 10-49 attorneys, 9% from firms of 2-9 attorneys, and 8% of solo attorneys.

Twenty-five percent of respondents from solo firms report Fastcase as the free website they use most often for legal research, followed by 14% of respondents from firms of 2-9 attorneys, 11% of respondents from firms of 10-49, and 4% from firms of 100 or more attorneys.

Thirty-five percent of respondents report accessing free websites for legal research via a bar association (compared with 41% in 2021, and 47% in 2020 and 2019).  Solo firms are most likely to access free websites via a bar association (67%, compared with 58% in 2021, 64% in 2020, and 65% in 2019), followed by 40% from firms of 10-49 attorneys (compared with 32% in 2021, 34% in 2020, and 29% in 2019), 38% from firms of 2-9 attorneys (compared with 48% in 2021, 54% in 2020, and 51% in 2019), in contrast with 17% from firms of 100 or more attorneys.

CONFIDENTIAL                                                                                    TRCC-00014381

A1760

Case 1:20-cv-00613-SB   Document 546-1   Filed 09/14/23   Page 29 of 67 PageID #: 103268

# **EXHIBIT 90**

A1761

Case 1:20-cv-00613-SB   Document 546-1   Filed 09/14/23   Page 30 of 67 PageID #: 103269

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

A1762

# **EXHIBIT 91**

A1763

Case 1:20-cv-00613-SB   Document 546-1   Filed 09/14/23   Page 32 of 67 PageID #: 103271

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

A1764

Case 1:20-cv-00613-SB   Document 546-1   Filed 09/14/23   Page 33 of 67 PageID #: 103272

# EXHIBIT 92

A1765

# THIS EXHIBIT HAS BEEN
# REDACTED IN ITS ENTIRETY

A1766

Case 1:20-cv-00613-SB   Document 546-1   Filed 09/14/23   Page 35 of 67 PageID #: 103274

# EXHIBIT 93

A1767

Case 1:20-cv-00613-SB   Document 546-1   Filed 09/14/23   Page 36 of 67 PageID #: 103275

# The real impact of using artificial intelligence in legal research

A study conducted by the attorneys of the
National Legal Research Group, Inc.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

TRCC-00699600

A1768

# Executive Summary

- This study explores the effect that using artificial intelligence (A.I.)-powered legal research platforms has on the efficiency and quality of research results.

- The study compared attorneys using a traditional legal research platform, LexisNexis®, and Casetext CARA A.I. to complete actual legal research exercises.

- The study was conducted by 20 lawyers from the National Legal Research Group, the country's premier provider of legal research and writing services for law firms and attorneys. The attorney participants from the National Legal Research Group focus almost exclusively on legal research. These attorneys had an average of 25 years in practice.

- Attorneys using Casetext CARA A.I. search finished research projects on average 24.5% faster than attorneys using traditional legal research. For the average attorney, switching to Casetext and using CARA A.I. would save them 132-210 hours of legal research per year.

- Attorneys using Casetext CARA A.I. to search also found that their results were on average 21% more relevant than those found doing traditional legal research. Indeed, results found on Casetext were on average better in every dimension of relevance judged in the study, including legal relevance, factual relevance, similar parties, jurisdiction, and procedural posture.

- Nearly half (45%) of the attorneys believed they would have missed important or critical precedents if they had only done traditional legal research instead of also using Casetext CARA A.I. to find cases.

- Three quarters (75%) of the attorneys preferred their research experience on Casetext over LexisNexis®, even though it was only their first experience researching with Casetext.

- Every attorney in the study (100%) believed that, if they were to use another research system as their primary research tool, having access to Casetext as well would be helpful.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                          TRCC-00699601

A1769

**Table of contents**

Executive Summary                                                                                          1

Introduction                                                                                                    2

Methodology                                                                                                  3

Results                                                                                                          4

    1. Attorneys complete their research 24.5% faster using Casetext          4
CARA A.I. compared to LexisNexis®

        A. Attorneys with fewer years of experience showed even
greater efficiency gains by using Casetext CARA A.I. compared
to those with 20+ years in practice

        B. Attorneys who use CARA A.I. will save between 132 to 210          5
hours a year on legal research

    2. Attorneys using Casetext CARA A.I. ran 4.4x fewer searches          6

    3. Attorneys using Casetext CARA A.I. rated search results 20.8%          6
more relevant than those on LexisNexis®

    4. Nearly half of the attorneys (45%) believed they would miss          7
important cases if they didn't use Casetext CARA A.I.

    5. Overall, most attorneys preferred their experience researching          8
with Casetext CARA A.I. over LexisNexis®

    6. Attorneys who already use LexisNexis® or Westlaw would want to          9
have access to Casetext CARA A.I. as well

Conclusion                                                                                                    9

# Introduction

Conducting legal research online is a central and important task to most attorneys' everyday lives. The average lawyer spends somewhere between 16% to 35% of his or her time at work doing legal research.[1]

However, online legal research has changed little since its appearance more than two and a half decades ago. Today, as then, attorneys search for relevant case law and other authorities using keyword-driven search, whether through "natural language" searches or by using "terms and connectors" that add more specificity to one's searching. Moreover, while legal research platforms vary in some specifics of their algorithms, they all rely on some form of "wisdom of the crowd" to "boost" popular cases — those that have been cited to or downloaded the most. The limitations with this type of search are well known to the countless attorneys who have spent hours crafting long boolean strings in an attempt to find cases that, while less popular, are most relevant to the specific litigation at hand.

With the emergence of artificial intelligence (A.I.) technologies, including natural language processing and machine learning, it is now possible to search for and rank information in dramatically different ways. Instead of using only keywords to find results, computer systems can now read entire documents from a litigation record (like the complaint or a brief), and take into account the information therein to create a more targeted search. The results of such searches are also not ranked by "wisdom of the crowd," but instead by the "wisdom of your matter" — information extracted from a complaint or brief is used to rank search results

[1]American Bar Association, 2017 Legal Technology Survey Report, Vol. V: Online Research; Steven A. Lastres, Rebooting Legal Research in a Digital Age (2013), http://www.lxisnexis.com/documents/pdf/20130806061418_large.pdf

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                                          TRCC-00699602

A1770

by similarity to the facts, legal issues, and jurisdiction of the specific matter an attorney is working on.

This is precisely how Casetext CARA A.I., a matter-based legal research system, works. A researcher uploads a legal document to CARA A.I. and then enters a simple search query. CARA A.I. uses the information in the document to provide tailored search results, ranked by their relevance to the specific matter addressed in the document.

This study by the attorneys of the National Legal Research Group, Inc., tests whether and to what extent this new form of legal research makes a difference. In short, the answer is "yes": attorneys who used Casetext CARA A.I. performed their research tasks 24.5% faster and rated the relevance of their results 20.8% higher than their research on a traditional, keyword-driven legal research system (LexisNexis®). These results imply that, by using "wisdom of your matter" search technology instead of traditional "wisdom of the crowd," most attorneys will spend somewhere between 132 to 210 hours less a year on legal research, while also finding more relevant cases and providing better outcomes for clients.

## Methodology

The study was conducted by 20 attorneys from the National Legal Research Group (NLRG), the nation's leading provider of legal research and writing services to law firms big and small. The majority of the attorneys were very experienced, having on average 25.3 years in the legal profession. Because these attorneys focus exclusively on legal research in their roles at NLRG, they are specifically skilled at that task. The methodology for this study was originally designed by Casetext in consultation with NLRG.

Each attorney performed three diverse research exercises, covering a copyright dispute, an employment law issue, and an insurance coverage question. With each research exercise, the attorneys were given litigation materials from a real litigation (complaints or briefs), and were asked to review those materials to familiarize themselves with the litigation. They were then given a research task, such as "find ten cases that help address the application of the efficient proximate cause rule discussed in the memorandum in support of the motion for summary judgment."

Participants using CARA A.I. were able to upload the litigation materials they were given to CARA A.I. as part of their matter-based search. Some participants using Casetext CARA A.I. were given sample search terms (specifically, "copyright" for the copyright case, "employee independent contractor" for the employment case, and "proximate cause" for the insurance case), but most participants formulated their own search terms.

The attorneys involved were given a brief, 20-minute live or pre-recorded training, which provided instructions for conducting the study as well as how to use Casetext CARA A.I. for legal research. A brief introduction to LexisNexis® was provided; a basic familiarity with LexisNexis® was presumed although the participants had different levels of actual experience using that platform.

The attorneys completed each of the three research exercises, doing one or two using Casetext and the remaining one or two in LexisNexis®. The assignments were randomly distributed, so roughly the same number of research assignments of each type were completed using each tool. As a result, 60 distinct research assignments were completed

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                                    TRCC-00699603

A1771

over the course of this study, approximately thirty using Casetext and thirty using LexisNexis®.

During the research task, each attorney was asked to

- keep time of how long it took to complete each research task,

- record how relevant they believed each case result they found to be, both based on the case result's overall relevance and specifically on the result's relevance on the legal issues, factual issues, the similarities of the party to the dispute, the jurisdiction, and the procedural posture, and

- download their research histories from each platform.

Additionally, the participants were asked survey questions about their overall impressions of their research experiences on each tool immediately after they completed their research tasks. After all the responses were collected, Castext compiled the data and prepared this report.

## Results

### 1. Attorneys complete their research 24.5% faster using Casetext CARA A.I. compared to LexisNexis®

Across all three research exercises, researchers using Casetext CARA A.I. completed their research tasks on average 24.5% faster than on LexisNexis®. Although there was some slight variation between research projects, this result was consistent across research projects (the insurance topic was 20.5% faster on Casetext, while the employment topic was 28.7% faster on Casetext).





HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY    TRCC-00699604

A1772

## A. Attorneys with fewer years of experience showed even greater efficiency gains by using Casetext CARA A.I. compared to those with 20+ years in practice

The attorneys participating in the study had an overall average of 25.3 years of experience. Researchers with fewer years in practice tended to have a larger efficiency gain (researching 29.1% faster using Casetext CARA A.I. than on LexisNexis®) compared to those with more than twenty years legal experience (16.62%).





## B. Attorneys who use CARA A.I. will save between 132 to 210 hours a year on legal research

The impact of researching 24.5% faster is substantial for most attorneys. According to the American Bar Association's 2017 Legal Technology Survey, attorneys spend an average of 16.3% of their working hours conducting legal research; solo attorneys, 18.1%; younger attorneys, with 10 or fewer years of experience, 26%. According to a separate study, young associates (with less than two years of practice) at bigger firms spend 35% of their time conducting legal research.[2] Given that the average lawyer works for 66 hours a week for 50 weeks a year, attorneys switching to Casetext CARA A.I. could expect to save between 132 to 210 hours every year in legal research time.

**Number of hours saved per year, depending on percent of time doing legal research and average hours worked per year**

| | | Average hours worked each week over 50-week year (billable and non-billable) | | | | |
|---|---|---|---|---|---|---|
| | | 30 hours a week (1500 a year) | 40 hours a week (2000 a year) | 50 hours a week (2500 a year) | 60 hours a week (3000 a year) | 70 hours a week (3500 a year) |
| % time legal researching | 10% | 37 | 49 | 61 | 73 | 86 |
| | 15% | 55 | 73 | 92 | 110 | 129 |
| | 20% | 73 | 98 | 122 | 147 | 171 |
| | 25% | 92 | 122 | 153 | 184 | 214 |
| | 30% | 110 | 147 | 184 | 220 | 257 |
| | 35% | 129 | 171 | 214 | 257 | 300 |
| | 40% | 147 | 196 | 245 | 294 | 343 |
| | 45% | 165 | 220 | 276 | 331 | 386 |

[2] American Bar Association, 2017 Legal Technology Survey Report, Vol. V: Online Research.
[3] Steven A. Lastres, Rebooting Legal Research in a Digital Age (2013), http://www.lxisnexis.com/documents/pdf/20130806061418_large.pdf
[4] See, e.g. Career Igniter, How Many Hours A Week Does A Lawyer Work? (2018) (citing to survey of New York attorneys), https://www.careerigniter.com/questions/how-many-hours-a-week-does-a-lawyer-work/

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                         TRCC-00699605

A1773

## 2. Attorneys using Casetext CARA A.I. ran 4.4x fewer searches

To complete the research task of finding ten relevant cases, attorneys using LexisNexis® needed to run an average of 6.55 searches. By contrast, attorneys using Casetext CARA A.I. needed only an average of 1.5 searches to complete their research task. Attorneys using LexisNexis® thus required 337% more searches (or 4.4 times more searches) than attorneys using Casetext CARA A.I.



Comparing the search histories of the research assignments using Casetext CARA A.I. and LexisNexis® sheds light on why researchers using LexisNexis® needed to run more searches on LexisNexis®. Researchers using Casetext started by uploading the relevant legal document to CARA A.I. and adding simple searches (like "efficient proximate cause"), and usually found everything they needed with their first search. By contrast, attorneys using LexisNexis® ran increasingly complex searches throughout their research sessions in an attempt to find relevant results. Examples of these searches include:

- "efficient proximate cause" "chain of causation" /10 weather /10 wind or wind-driven /10 rain and Construction /5 defect defective

- copyright w/5 infringe or infringement or infringing w/20 song w/ 7 lyrics w/30 theme or syntax unique or phraseology or original

## 3. Attorneys using Casetext CARA A.I. rated search results 20.8% more relevant than those on LexisNexis®

The attorneys in the study rated the relevance of each of the cases they discovered through traditional searching on LexisNexis® and through searching with Casetext CARA A.I. The attorneys assigned an overall relevance score between 1 (not very relevant) to 5 (extremely relevant), as well as rating specific attributes of relevance (factual background, legal issues, similar parties, jurisdiction, and procedural posture) each on a scale of 1 to 5.

Overall, the attorney participants rated their Casetext CARA A.I. results on average 20.8% better than the ones obtained through searching on LexisNexis®. The attorneys also preferred the Casetext CARA A.I. results across every dimension of relevance.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                                    TRCC-00699606

A1774



## 4. Nearly half of the attorneys (45%) believed they would miss important cases if they didn't use Casetext CARA A.I.

The attorneys were surveyed afterwards about whether they would have "missed important cases had [they] only researched with LexisNexis®." Nine of the 20 survey participants chose "yes."



Some attorneys added comments that give color as to why they believe they might have missed cases without using CARA A.I.'s functionality. Most of the comments focused on the inefficiencies and other challenges with traditional Boolean searching. One attorney noted that "the A.I. function helped me to zero in on 10 relevant cases more quickly that when I just did straight Boolean searches for cases." Similarly, another participant noted that "Casetext places the researcher with a closer starting point to find relevant material because it allows instant entry into the authority on point, so that locating relevant decisions is not delayed by inefficient or non-optimal search strings."

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                        TRCC-00699607

A1775

That said, the majority of attorneys (11/20, or 55%) felt that they would not have missed important cases on LexisNexis®. One attorney explained that "[s]everal of my results with Lexis were certainly different than what came up with Casetext, but the most relevant cases appeared in both searches."

## 5. Overall, most attorneys preferred their experience researching with Casetext CARA A.I. over LexisNexis®

After completing their research exercises, the attorney participants were asked which research experience they preferred overall. Three quarters (75%) of the attorneys surveyed responded that they preferred the Casetext CARA A.I. experience.



Among the factors listed for why researchers preferred Casetext CARA A.I., there were a few consistent themes:

- **Ease of use and simplicity**
  "The search query was much more simple given the AI component"
  "It was easier to use and listed relevant cases"

- **Quality of search results**
  "The A.I. function on Casetext produced better lists of ranked relevant cases, thereby lessening the time it took to carry out [the research assignment]"
  "[Casetext] was much better. I was impressed with the cases that Casetext turned up."

- **Speed to finding relevant results**
  "Casetext required less search terms, less time, and less filtering than LexisNexis®. The material was comprehensible and well-formatted. It also took half the time to find relevant cases that were extremely relevant."
  "Nothing is more frustrating than expending a lot of time trying to find the relevant law"
  "Casetext was faster"

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                    TRCC-00699608

A1776

For those attorneys who chose LexisNexis®, the reasons listed were:

- "Familiarity with site; easier to toggle from case back to the search result list"
- "Easier to use and to know where I was"
- "Easier to go to the part of the case I was interested in"

## 6. Attorneys who already use LexisNexis® or Westlaw would want to have access to Casetext CARA A.I. as well

The attorneys at NLRG all use Westlaw primarily and LexisNexis® sometimes as their primary research tools. When asked whether they believed "that having access to Casetext as well as your primary research tool would be helpful," every attorney participant (100%) responded "yes."

One of the attorneys noted that he would want more than one tool for "cross-referencing"; "Casetext can help me find relevant cases more quickly, and CARA A.I. also helps me develop better search filters quickly to find the results I need if necessary." Other attorneys had similar comments, noting that Casetext CARA A.I. "seems to better focus the research," "does a really great job of finding relevant cases," would be "very useful for finding factually similar cases," is "a great tool to use to quickly zero in on the most relevant cases," and "was faster than Lexis and thus saved time and provided interesting additional information."

At least some attorneys are not ready to give up their current primary research tool entirely. One attorney noted that although Casetext CARA A.I. "would be helpful to have," he "know[s] Westlaw and it would be my primary tool at this point."

## Conclusion

Artificial intelligence, and specifically the ability to harness the information in the litigation record and tailor the search experience accordingly, substantially improves the efficacy and efficiency of legal research. Currently, Casetext CARA A.I. is the only legal research technology with that ability. In this study, lawyers leveraging A.I. technology were able to complete their research tasks 24.5% faster, receive results they believed to be 21% more accurate, and do so with 4.4 times fewer searches. These researchers were also able to do so with just twenty minutes of training and no previous research experience with Casetext CARA A.I. This demonstrates the substantial impact that leveraging advanced (but easy-to-use) artificial intelligence technology will have on attorney research quality.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                TRCC-00699609

A1777

Case 1:20-cv-00613-SB   Document 546-1   Filed 09/14/23   Page 46 of 67 PageID #: 103285

# EXHIBIT 94

A1778

Case 1:20-cv-00613-SB   Document 546-1   Filed 09/14/23   Page 47 of 67 PageID #: 103286

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

A1779

Case 1:20-cv-00613-SB   Document 546-1   Filed 09/14/23   Page 48 of 67 PageID #: 103287

# EXHIBIT 95

Case 1:20-cv-00613-SB   Document 546-1   Filed 09/14/23   Page 49 of 67 PageID #: 103288

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

A1781

Case 1:20-cv-00613-SB   Document 546-1   Filed 09/14/23   Page 50 of 67 PageID #: 103289

# **EXHIBIT 96**

A1782

Case 1:20-cv-00613-SB   Document 546-1   Filed 09/14/23   Page 51 of 67 PageID #: 103290

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

A1783

Case 1:20-cv-00613-SB   Document 546-1   Filed 09/14/23   Page 52 of 67 PageID #: 103291

# **EXHIBIT 97**

A1784

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

A1785

# **EXHIBIT 98**

A1786

Case 1:20-cv-00613-SB   Document 546-1   Filed 09/14/23   Page 55 of 67 PageID #: 103294

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

A1787

Case 1:20-cv-00613-SB   Document 546-1   Filed 09/14/23   Page 56 of 67 PageID #: 103295

# **EXHIBIT 99**

Case 1:20-cv-00613-SB   Document 546-1   Filed 09/14/23   Page 57 of 67 PageID #: 103296

# THIS EXHIBIT HAS BEEN
# REDACTED IN ITS ENTIRETY

A1789

Case 1:20-cv-00613-SB   Document 546-1   Filed 09/14/23   Page 58 of 67 PageID #: 103297

# EXHIBIT 100

A1790

Case 1:20-cv-00613-SB   Document 546-1   Filed 09/14/23   Page 59 of 67 PageID #: 103298

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

A1791

Case 1:20-cv-00613-SB Document 546-1 Filed 09/14/23 Page 60 of 67 PageID #: 103299

# **EXHIBIT 101**

A1792

Case 1:20-cv-00613-SB Document 546-1 Filed 09/14/23 Page 61 of 67 PageID #: 103300

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

A1793

Case 1:20-cv-00613-SB   Document 546-1   Filed 09/14/23   Page 62 of 67 PageID #: 103301

# EXHIBIT 102

A1794

Case 1:20-cv-00613-SB   Document 546-1   Filed 09/14/23   Page 63 of 67 PageID #: 103302

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

A1795

Case 1:20-cv-00613-SB   Document 546-1   Filed 09/14/23   Page 64 of 67 PageID #: 103303

# **EXHIBIT 103**

A1796

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

A1797

Case 1:20-cv-00613-SB   Document 546-1   Filed 09/14/23   Page 66 of 67 PageID #: 103305

# EXHIBIT 104

A1798

Case 1:20-cv-00613-SB   Document 546-1   Filed 09/14/23   Page 67 of 67 PageID #: 103306

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

A1799

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

THOMSON REUTERS ENTERPRISE
CENTRE GMBH and WEST PUBLISH-
ING CORP.,

        *Plaintiffs,*

        v.

ROSS INTELLIGENCE INC.,

        *Defendant.*

No. 1:20-cv-613-SB

---

Jack B. Blumenfeld, Michael J. Flynn, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Dale M. Cendali, Eric A. Loverro, Joshua L. Simmons, KIRKLAND & ELLIS LLP, New York, New York.

*Counsel for Plaintiffs*

David E. Moore, Bindu A. Palapura, Andrew L. Brown, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Gabriel M. Ramsey, Warrington Parker, Joachim B. Steinberg, Jacob Canter, Christopher J. Banks, Shira Liu, Margaux Poueymirou, Anna Z. Saber, CROWELL & MORING LLP, San Francisco, California; Mark A. Klapow, Lisa Kimmel, Crinesha B. Berry, CROWELL & MORING LLP, Washington, D.C.

*Counsel for Defendant*

---

### MEMORANDUM OPINION

September 25, 2023

---

A1800

BIBAS, *Circuit Judge*, sitting by designation.

Facts can be messy even when parties wish they were not. But summary judgment is proper only if factual messes have been tidied. Courts cannot clean them up.

Thomson Reuters, a media company, owns a well-known legal research platform, Westlaw. It alleges that Ross, an artificial intelligence startup, illegally copied important content from Westlaw. Thomson Reuters thus seeks to recover from Ross. Both sides move for summary judgment on a variety of claims and defenses. But many of the critical facts in this case remain genuinely disputed. So I largely deny Thomson Reuters's and Ross's motions for summary judgment.

## I. BACKGROUND

Many facts are disputed, but the basic story is not. Thomson Reuters's Westlaw platform compiles judicial opinions according to its Key Number System. That system organizes opinions by the type of law. Westlaw also adds "headnotes": short summaries of points of law that appear in the opinion. Each headnote is tied to a key number. Clicking on the headnote takes the user to the corresponding passage in the opinion. Clicking on the key number takes the user to a list of cases that make the same legal point. Westlaw has a registered copyright on its "original and revised text and compilation of legal material," which includes its headnotes and Key Number System. D.I. 255-7, at 8.

Ross Intelligence is a legal-research industry upstart. It sought to create a "natural language search engine" using machine learning and artificial intelligence. D.I. 310, at 4. It wanted to "avoid human intermediated materials." *Id.* Users would enter

2

A1801

questions and its search engine would spit out quotations from judicial opinions—no commentary necessary.

To leverage machine learning, Ross needed legal material to train the machine. At first, it tried to get a license to use Westlaw, but Thomson Reuters does not let users use Westlaw to develop a competing platform. So Ross turned to a third-party legal-research company, LegalEase Solutions. (LegalEase, in turn, hired a subcontractor, Morae Global. But the parties do not distinguish between LegalEase's and Morae's conduct, so I will refer only to LegalEase.)

Ross told LegalEase to create memos with legal questions and answers. The questions were meant to be those "that a lawyer would ask," and the answers were direct quotations from legal opinions. D.I. 310, at 4. The so-called Bulk Memo Project produced about 25,000 question-and-answer sets. Each memo had one question plus four to six answers and rated each answer's relevance. LegalEase created the memos both manually and, for a time, with the help of a text-scraping bot.

Ross says it converted the LegalEase memos into usable machine-learning training data. That involved first encoding the written language as numerical data and then running the data through a "Featurizer" that "performed various mathematical … calculations on the text." D.I. 272, at 8.

The core of this suit stems from the Bulk Memo Project. Thomson Reuters says the questions were essentially headnotes with question marks at the end. Ross admits that the headnotes "influence[d]" the questions but says lawyers ultimately drafted them, instead of copying them. D.I. 272, at 4–5. Though Thomson Reuters

3

A1802

contends that all 25,000 are copies, it has moved for summary judgment on just 2,830. It says LegalEase's copying of those 2,830 is undisputed because Ross's own expert admitted it.

Beyond the Bulk Memo Project, LegalEase provided Ross with two other relevant services. First, LegalEase sent Ross a list of 91 legal topics from Westlaw's Key Number System. Ross admits that it "considered" these topics when creating its own set of 38 topics that were used in an experimental "Classifier Project." D.I. 272, at 9–10. But it ultimately abandoned the Project. LegalEase also sent Ross 500 judicial opinions, including Westlaw's headnotes, key numbers, and other annotations. Ross says it did nothing with these opinions.

In this opinion, I address five summary-judgment motions. Thomson Reuters has moved for summary judgment on its copyright-infringement claim (limited to the 2,830 memos mentioned), and both sides have moved for summary judgment on Ross's fair-use defense. Thomson Reuters has also moved for summary judgment on its tortious-interference-with-contract claim, and Ross has counter-moved on its preemption defense to that claim.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if a reasonable jury could resolve it in favor of either side. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). And a fact is "material" if it "could affect the outcome." *Lamont v. New Jersey*,

A1803

637 F.3d 177, 181 (3d Cir. 2011). I view the facts in the light most favorable to the nonmovant. *Id.* at 179 n.1.

## II. COPYRIGHT INFRINGEMENT

A copyright-infringement claim has three elements: ownership of a valid copyright, actual copying, and substantial similarity. *See Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991); *Dam Things from Denmark v. Russ Berrie & Co.*, 290 F.3d 548, 561–62 (3d Cir. 2002). Here, all three elements are at least partly disputed. But the dispute over the second element is legal, so I can decide it now. And because Ross hired LegalEase to do the copying (if there was any), Thomson Reuters also couches its argument in terms of direct, contributory, and vicarious liability. So after addressing the three infringement elements, I will consider each of these liability theories as well.

### A. The parties still dispute breadth and validity of Westlaw's copyright

Ross bets a good chunk of its infringement defense on Westlaw's being registered as a compilation. Ross's theory is this: because Westlaw has just one copyright registration, comprising hundreds of thousands of headnotes and key numbers, copying a mere few thousand is not enough for infringement.

Ross's gamble does not pay off. A copyright in a compilation extends to the copyrightable pieces of that compilation. *Educ. Testing Servs. v. Katzman*, 793 F.2d 533, 538–39 (3d Cir. 1986) (abrogated on other grounds) ("The fact that a registrant denominates the material as a compilation does not in itself signify that the constituent material is not also covered by the copyright."). And when the author of a compilation presents facts through his own original words, "[o]thers may copy the underlying facts

5

A1804

from the publication, but not the precise words used to present them." *Feist*, 499 U.S. at 348. Plus, though a plaintiff must have a registration to bring a federal suit for infringement, it can sue on all protected components of that one registration. 2 David Nimmer, *Nimmer on Copyright* § 7.16(B)(5)(c) (2023).

The cases Ross cites are the exceptions that prove the rule. In those cases, the copyright holder owned *only* the compilation. In one case cited, the plaintiff had a compilation copyright in the organization and selection of state legal forms. *Ross, Brovins & Oehmke, P.C. v. Lexis Nexis Grp.*, 463 F.3d 478, 480 (6th Cir. 2006). Though the underlying entries were in the public domain, the organizer's exact selection and arrangement were copyrightable. *Id.* Even though the defendant copied and compiled 61% of the forms from the plaintiff's compilation, there was no infringement because the defendant's compilation was not the "same selection." *Id.* at 483. So in these cases, the plaintiffs owned "thin" copyrights: other than their selection and arrangement choices, none of their compilations' components were protectable.

Here, only the Key Number System aligns with the compilation caselaw: It is Westlaw's method of organizing and arranging judicial opinions. So Thomson Reuters could have a valid copyright in this method of arrangement but not in the underlying opinions. That said, to qualify for copyright protection, "the manner of rearranging" and organizing the unprotectable underlying works "must constitute more than a minimal contribution." Nimmer, *supra*, § 3.03(A). This "threshold for originality is low," but the parties dispute facts needed to figure out if the System clears the bar. *Id.* § 3.04(B)(2)(a).

6

A1805

Thomson Reuters alleges that employees make creative organizing decisions to update and maintain the System and that the System is unique among its competition. But Ross replies that the System is unoriginal because most of the organization decisions are made by a rote computer program and the high-level topics largely track "common doctrinal topics taught as law school courses." D.I. 310, at 3. And although Thomson Reuters's registered copyright could protect its Key Number System, the jury needs to decide its originality, whether it is in fact protected, and how far that protection extends.

By contrast, the headnotes are not aptly described by the compilation caselaw. Headnotes are just short written works, authored by Thomson Reuters, so they could receive standalone, individual copyright protection. *See* 17 U.S.C. §103. This distinguishes Thomson Reuters's copyright in its headnotes from the "thin," compilation-only copyrights in Ross's examples. So I must consider the alleged headnote copyright infringement at the level of each individual headnote, rather than at the level of the entire Westlaw compilation.

That said, Thomson Reuters's allegedly original expression in its headnotes still reflects uncopyrightable judicial opinions. So the strength of its copyright depends on how much the headnotes overlap with the opinions. Closely hewing differs from copying: If a headnote merely copies a judicial opinion, it is uncopyrightable. But if it varies more than "trivial[ly]," then Westlaw owns a valid copyright. *L. Batlin & Son, Inc. v. Snyder*, 536 F.2d 486, 490 (2d Cir. 1976).

A1806

The parties dispute how Thomson Reuters develops its headnotes and how closely those headnotes resemble uncopyrightable opinions. Thomson Reuters points to evidence that its headnotes are original representations of its attorney-editors' views—summarizing the most important case facts, highlighting key issues, and describing the holdings. Ross, though, presents evidence that Thomson Reuters's protocols required headnotes to "follow or closely mirror the language of judicial opinions." D.I. 272, at 13. This leaves a genuine factual dispute about how original the headnotes are. And this fact will serve double duty: it affects the strength and extent of Thomson Reuters's copyright, and it also goes to whether Ross was copying the headnotes or the opinions themselves.

In sum, I cannot decide the first element of Thomson Reuters's copyright infringement claim at summary judgment.

### B. As a matter of law, Ross actually copied at least portions of the Bulk Memos

Next, Thomson Reuters must show that Ross (or LegalEase) "actually copied" its copyrighted work. "Actual copying focuses on whether the defendant did, in fact, use the copyrighted work in creating his own." *Tanksley v. Daniels*, 902 F.3d 165, 173 (3d Cir. 2018). If Ross "truly created [its] work independently, then no infringement has occurred, irrespective of similarity." *Id.* There are two ways to show actual copying: Thomson Reuters can present direct evidence. Or it can present circumstantial evidence demonstrating that Ross or LegalEase had access to the copyrighted work and that their work contains similarities probative of copying. *See id.*

A1807

Thomson Reuters presents both. LegalEase admitted to copying at least portions of the headnotes directly. As for circumstantial evidence, Ross does not dispute that LegalEase had access to Westlaw, which included access to headnotes. Though the similarities between Thomson Reuters's and Ross's work might not be substantial (that is a jury question), no reasonable jury could say that the similarities are not at least probative of some copying. And while Ross argues that any copying that occurred was miniscule in the grand scheme of the compilation, that framing misses the mark for the reasons given above. So Thomson Reuters has satisfied the actual-copying element as a matter of law.

## C. Substantial similarity must go to the jury

The last element of direct infringement is substantial similarity. Substantial similarity asks whether "the ordinary observer, unless he set out to detect the disparities [in the two works], would be disposed to overlook them, and regard their aesthetic appeal as the same." *Id.* at 174 (alteration in original) (quoting *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.*, 274 F.2d 487, 489 (2d Cir. 1960) (Hand, J.)). In other words, I ask whether an ordinary person would view the two works as basically the same.

This case features several wrinkles in the substantial-similarity analysis. First, the Bulk Memos could appear similar to Thomson Reuters's headnotes because they share an underlying source: uncopyrightable judicial opinions. But I must determine whether Ross's work is substantially similar to Thomson Reuters's *protected* expression, not just the opinions. Second, we contextualize the ordinary-observer test. *See id.* at 172 n.3. And here, the ordinary consumers of both parties' products are lawyers.

9

A1808

So I should be attuned to differences a lawyer might notice that a layperson might not. Finally, the Third Circuit "has [generally] rejected the usefulness of experts in answering" the substantial-similarity question. *Id.* at 172. I thus do not give much weight to the parties' dueling expert reports on this issue.

Substantial similarity "is usually an extremely close question of fact, which is why … summary judgment has traditionally been disfavored in copyright litigation." *Id.* at 171 (internal quotation marks omitted). Thomson Reuters argues that it can overcome this presumption because Ross's expert allegedly made an "admission." But this so-called admission does not get Thomson Reuters over the summary-judgment line.

The "admission" goes as follows: Ross's expert compiled the 25,000-plus Bulk Memo questions. She then paired each question with the Westlaw headnote most like it and paired each headnote with the judicial opinion passage most like the headnote. Next, on a scale of one to five, she rated two things: the similarity between the question and the headnote and the similarity between the headnote and the judicial opinion passage. The "admission" Thomson Reuters refers to is the 2,830 instances in which a question was rated as a close match to a post-1927 headnote, but that headnote was rated as not a verbatim or near-verbatim copy of judicial opinion text. (Copyrighted works created before 1927 are in the public domain and are not protected.)

Ross disagrees, breaking the headnotes into three groups. First, it says Thomson Reuters did not identify 1,623 of these 2,830 headnotes in its supplemental response, so they are not part of the case. Second, and more substantively, Ross says 1,019 questions are nearly identical to judicial opinions. Finally, it says nothing about

10

A1809

the remaining 188 entries, other than that they make up a tiny fraction of Westlaw's compilation. I take each group in turn.

First, I agree that Thomson Reuters did not identify the 1,623 headnotes. In an earlier Order, I reminded Thomson Reuters of its burden to show infringement and told it to identify "what, precisely, was copied." D.I. 201, at 1. Its response identified thousands of allegedly copied headnotes. But these 1,623 headnotes were not among those specifically identified. Thomson Reuters argues that it identified the Bulk Memos in which these headnotes were copied and that they incorporate by reference the cases in which the headnotes appear. But that is not precise enough. Producing the cases with the allegedly copied headnotes was what prompted Ross's objection and my Order to be more specific in the first place. So Thomson Reuters is limited (for purposes of summary judgment) to the 1,207 headnotes specifically identified.

There are genuine factual disputes over the second group. In her report, the Ross expert said each of these 1,019 questions overlapped a great deal with a headnote and that the headnote was not identical to opinion text. But she did not—and could not—take a position on whether the headnotes and questions were "substantially similar" under the ordinary-observer test. And more specifically, the report does not pinpoint how much similarity came solely from Thomson Reuters's protected expression.

Plus, Ross offers contrary evidence for these 1,019 entries. It shows that either the judicial opinion text is identical to the headnote or that the opinion text is more similar to the Bulk Memo question than the headnote is to the question. This supports the contention that similarity between Ross's and Thomson Reuters's work

11

A1810

stems from uncopyrightable judicial opinions, rather than from Thomson Reuters's original expression.

Thomson Reuters objects that Ross did not disclose its expert's methodology. But substantial similarity is not especially scientific: the question boils down to "good eyes and common sense." *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 684 (2014). This makes Ross's mode of argument valid. Because both sides have lobbed conflicting expert reports (which I give little weight anyways) at each other and because a reasonable jury could agree with either side, I must send the question of substantial similarity for these 1,019 entries to the jury, where it typically belongs.

Finally, Ross does not object to the remaining 188 entries. Though substantial similarity is usually a close factual question, I will not review each of the 188 entries and make arguments for Ross. And for the reasons above, its reliance on Westlaw's copyright being solely in a compilation is misplaced. So each of these headnotes is substantially similar to its associated Bulk Memo question. But as noted above, whether this copying constitutes infringement depends on whether these headnotes are protected expression. And that rests on factual determinations the jury still must make. Plus, to recover from Ross, Thomson Reuters must win on one of its theories of liability and defeat Ross's fair-use defense.

### D. All of Thomson Reuters's theories of infringement liability must go to trial

*1. Direct liability.* Thomson Reuters's theory of Ross's direct liability is uncontested: Ross hosted copies of the Bulk Memos on its servers, copied the content into its machine-learning "portal," transmitted another copy to a different server, created

A1811

more copies on employees' computers, then processed and labeled them by copying parts into another document. D.I. 250, at 13. Simply hosting a copy on a server might not seem like copying, but it is. *See MAI Sys. Corp. v. Peak Comput. Inc.*, 991 F.2d 511 (9th Cir. 1993); Nimmer, *supra*, § 8.08(A).

The unstated premise of this theory is that Ross violated Westlaw's reproduction right by making copies of the Bulk Memos. So for Thomson Reuters to succeed on direct liability, LegalEase's Bulk Memos must be unauthorized copies of protected expression. For making a copy of a non-copy is not copyright infringement. But because whether the Bulk Memos copied protected expression depends on factual determinations the jury must make, I cannot resolve direct liability at summary judgment.

*2. Contributory liability.* For Ross to be contributorily liable, Thomson Reuters must show that Ross (1) knew LegalEase was infringing and (2) materially contributed to or induced that infringement. *See Leonard v. Stemtech Int'l Inc.*, 834 F.3d 376, 387 (3d Cir. 2016). The parties dispute both prongs.

At best, Thomson Reuters has strong evidence that Ross knew LegalEase was using Westlaw. But knowledge or even encouragement to use Westlaw is not enough. One might expect a legal-research project to be completed using Westlaw, but merely using the service is not infringement. Plus, Ross points to evidence that it did not know LegalEase was infringing and never specifically instructed LegalEase to use Westlaw. Thomson Reuters has not done enough to prove that Ross knew about and

13

A1812

materially contributed to LegalEase's infringement. So this is not proper for summary judgment.

Thomson Reuters tries to bridge the gap between use and infringement by arguing that LegalEase breached its Westlaw license and Ross knew it. Once LegalEase breached the license, Thomson Reuters says, everything it did on Westlaw was copyright infringement. So Ross's knowledge of LegalEase's breach confers on Ross knowledge of the infringement. This argument mangles the interaction between licenses and copyright infringement.

In many copyright cases, licenses are used as a defense. In cases involving a license defense, one party claims infringement, and the other side claims they had permission through the license. But if the side claiming permission exceeded the scope of the license, it can be liable for infringement. *MacLean Assocs, Inc. v. Wm. M. Mercer-Meidinger-Hansen, Inc.*, 952 F.2d 769, 779 (3d Cir. 1991). That said, the copyright owner's rights must still be infringed by the specific activity that exceeds the scope of the license. Otherwise, the owner must litigate the license violations as breach-of-contract claims. *See S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1088–90 (9th Cir. 1989).

Here, there is no real dispute that LegalEase and Ross's alleged copying was not protected by a license. Rather, the issue is whether their actions constitute infringement of Thomson Reuters's copyright protections. And the license issue is irrelevant to proving Ross's contributory liability for LegalEase's infringement. So I deny summary judgment on the contributory-liability theory.

14

A1813

*3. Vicarious liability.* For vicarious liability, Thomson Reuters must show that Ross had "(1) the right and ability to supervise or control the infringing activity; and (2) a direct financial interest in such activities." *Leonard*, 834 F.3d at 388. Taking the elements in reverse, Ross does not contest that it had a financial interest in the alleged copies—it used the Bulk Memos to train AI, its core product. But it does contest whether it could supervise LegalEase. The control element is a matter of "practical ability." *Id.* at 389. So the determination is often fact-intensive. Evidence needs to support a finding that the defendant was "in a position to police the direct infringer[]." *Id.* at 388 (quoting *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 262–63 (9th Cir. 1996)). Thomson Reuters has testimony saying that Ross dictated LegalEase's practices. But Ross pushes back with evidence that LegalEase was secretive and resisted micromanagement. Thus, whether Ross had the "practical ability" to control LegalEase's "infringing activity" remains a disputed factual question for the jury to resolve.

### III. FAIR USE MUST GO TO A JURY

The parties have cross-moved on Ross's fair-use defense. Fair use balances four factors: (1) the purpose and character of the use, (2) the nature of the copyrighted work, (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole, and (4) the effect of the use upon the potential market for the copyrighted work. 17 U.S.C. §107. The first and fourth factors are most important. *See Authors Guild v. Google, Inc.*, 804 F.3d 202, 213–14 (3d Cir. 2015).

Fair use is a mixed question of law and fact. Though applying the test "primarily involves legal work," it requires "determination of subsidiary factual questions" about

15

A1814

the copying or the marketplace. *Google LLC v. Oracle Am., Inc.*, 141 S. Ct. 1183, 1199–200 (2021). Here, all of this must go to a jury.

### A. The purpose and character of the use will be determined by contested facts

This first factor has two subparts: commerciality and transformativeness. *See Authors Guild*, 804 F.3d at 214, 218–19. (Bad faith is a minor subpart, also typically filed under this factor, and I will address it at the end.) Commercial use weighs against finding fair use, while transformative use weighs in favor. *Id.* at 218–20. And these considerations interact. "The more transformative the new work, the less will be the significance of … commercialism…." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994). Commerciality is straightforward: it asks whether the use was for profit. *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 562 (1985). Transformativeness is less so: "a transformative use is one that communicates something new and different from the original or expands its utility, thus serving copyright's overall objective of contributing to public knowledge." *Authors Guild*, 804 F.3d at 214.

Ross's uses were undoubtedly commercial. And one of its goals was to compete with Westlaw. Thomson Reuters contends that this commercial use weighs heavily against finding fair use. In support of this claim, it cites the Supreme Court's recent decision in *Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith*, 143 S. Ct. 1258 (2023). There, the Court determined that the use in question was not fair largely by emphasizing its commercial nature. *See id.* at 1279–80. But I decline to overread one decision, especially because the Court recognized that "use's transformativeness

16

A1815

may outweigh its commercial character" and that in *Warhol*, "both elements point[ed] in the same direction." *Id.* at 1280. Plus, just two terms ago, in a technological context much more like this one, the Court placed much more weight on transformation than commercialism. *Google*, 141 S. Ct. at 1204 ("[A] finding that copying was not commercial in nature tips the scales in favor of fair use. But the inverse is not necessarily true, as many common fair uses are indisputably commercial."). So I focus on transformativeness.

Thomson Reuters paints a black-and-white picture on transformativeness: Westlaw is a legal-research platform that synthesizes the law; Ross used Westlaw's syntheses to build a legal-research platform that also synthesizes the law. Ross, on the other hand, presents a more nuanced account: Westlaw headnotes and key numbers annotate opinions for users. Ross wanted to build a search engine that "avoids human intermediated materials," meaning a user would simply enter a query and get a responsive quotation from a judicial opinion, no clicking around or commentary needed. D.I. 272, at 1–3. Though Ross and Westlaw both help answer legal questions, Ross says it transformed the Westlaw headnotes beyond recognition.

Ross describes its process of transforming the Bulk Memos like this: First, it receives the Bulk Memos in its database. Then, it converts the plain-language entries into numerical data. Next, it feeds that data into its machine-learning algorithm to teach the artificial intelligence about legal language. The idea is that the artificial intelligence will be able to recognize patterns in the question-and-answer pairs. It

17

A1816

can then use those patterns to find answers not just to the exact questions fed into it, but to all sorts of legal questions users might ask.

Ross says that the caselaw on "intermediate copying" most appropriately reflects its use. In those cases, the users copied material to discover unprotectable information or as a minor step towards developing an entirely new product. So the final output—despite using copied material as an input—was transformative. In *Sega Enterprises Ltd. v. Accolade, Inc.*, 977 F.2d 1510 (9th Cir. 1992), the defendant copied Sega's copyrighted software. But it did so only to figure out the functional requirements to make games compatible with Sega's gaming console. *Id.* at 1522. That functional information was unprotected, so the copying was fair use. *Id.* at 1522–23.

Similarly, in *Sony Computer Entertainment Inc. v. Connectix Corp.*, 203 F.3d 596 (9th Cir. 2000), the defendant used a copy of Sony's software to reverse engineer it and create a new gaming platform on which users could play games designed for Sony's gaming system. *Id.* at 601. The court concluded that this was fair use for two reasons: the defendant created "a wholly new product, notwithstanding the similarity of uses and functions" between it and Sony's system, and the "final product [did] not itself contain infringing material." *Id.* at 606. The Supreme Court has cited these intermediate copying cases favorably, particularly in the context of "adapt[ing] the doctrine of fair use … in light of rapid technological change." *Google*, 141 S. Ct. at 1198 (cleaned up).

18

A1817

Thomson Reuters says the intermediate-copying cases are inapt. It argues that whereas in those cases, the copiers sought to "study functionality or create compatibility," here Ross simply sought to "train[] its AI" by "cop[ying] the creative decisions of West[law]'s attorney-editors precisely because it wanted to replicate them." D.I. 317, at 11. And it contends that Ross merely translated the headnotes into numerical data and that translation is "paradigmatic derivative work[]." D.I. 317, at 10.

But Ross says its AI studied the headnotes and opinion quotations only to analyze language patterns, not to replicate Westlaw's expression. So the translation was only a minor step in a broader, transformative use. *See Sega*, 977 F.2d at 1514–15, 1518–19 (holding that, though programmers wrote down and translated Sega's object code, these acts were a minor step towards a transformative use). If Ross's characterization of its activities is accurate, it translated human language into something understandable by a computer as a step in the process of trying to develop a "wholly new," albeit competing, product—a search tool that would produce highly relevant quotations from judicial opinions in response to natural language questions. This also means that Ross's final product would not contain or output infringing material. Under *Sega* and *Sony*, this is transformative intermediate copying.

So whether the intermediate-copying caselaw tells us that Ross's use was transformative depends on the precise nature of Ross's actions. It was transformative intermediate copying if Ross's AI only studied the language patterns in the headnotes to learn how to produce judicial opinion quotations. But if Thomson Reuters is right that Ross used the untransformed text of headnotes to get its AI to replicate and

19

A1818

reproduce the creative drafting done by Westlaw's attorney-editors, then Ross's comparisons to cases like *Sega* and *Sony* are not apt. Again, this is a material question of fact that the jury needs to decide.

Finally, the parties clash over whether Ross's use was in bad faith. But bad faith is at most a minor consideration in the fair use analysis. Indeed, the Supreme Court has expressed skepticism about whether it has any role to play at all. *Google*, 141 S. Ct. at 1204. And bad faith is particularly unimportant here. Thomson Reuters argues that Ross demonstrated bad faith by initially asking to license Westlaw, being denied, and then hiring LegalEase to illicitly gain access to it. But the Supreme Court has foreclosed this line of reasoning, explaining that "[i]f the use is otherwise fair, then no permission need be sought or granted. Thus, being denied permission to use a work does not weigh against a finding of fair use." *Campbell*, 510 U.S. at 585 n.18. So I can ignore bad faith. And the first fair use factor comes down to the jury's finding of transformativeness.

### B. The nature of the copyrighted work favors fair use, but factual questions remain

The second factor asks about the nature of the copyrighted work. The work gets more protection, and copies are less likely to be fair, if it is near the "core of intended copyright protection." *Id.* at 586. But "[t]he scope of fair use is greater when 'informational' as opposed to more 'creative' works are involved." *Hustler Mag. Inc. v. Moral Majority Inc.*, 796 F.2d 1148, 1153–54 (9th Cir. 1986). So although judges should not act as critics, we consider "whether the work was creative, imaginative, and original." *MCA, Inc. v. Wilson*, 677 F.2d 180, 182 (2d Cir. 1981). That said, "[t]he second factor

A1819

has rarely played a significant role in the determination of a fair use dispute." *Authors Guild*, 804 F.3d at 220.

The analysis for this factor mirrors much of my earlier discussion of the validity and strength of Thomson Reuters's copyright. As explained above, this depends largely on factual questions that the jury must decide, so I cannot resolve this factor at summary judgment.

But I note here that the Key Number System is far from the core of copyright. Even if the system involves making creative decisions about how to organize opinions and other material and is an original method of organization, it is merely a way to arrange "informational" material. So the system inherently involves significantly less creative or original expression than traditionally protected materials, such as literary works or visual art, and is much less "imaginative."

The headnotes are closer, but still not especially close to the core. "The law generally recognizes a greater need to disseminate factual works than works of fiction or fantasy." *Harper*, 471 U.S. at 563. And though editors may have made creative choices about which points of law to summarize, how to summarize them, and where to attach the headnote, those choices are constrained. In general, the headnotes will flag the most salient points of law, largely track the language of the opinion, and be placed at the beginning of a paragraph. This approach is akin to news reporting, which, though protected, must be carefully separated from the unprotected underlying facts. *See Author's Guild*, 804 F.3d at 220. So, although a jury must decide how closely headnotes reflect the language of judicial opinions and, in turn, precisely how much

21

A1820

protection they are afforded, they are not at the core of intended copyright protection. Thus, although an ultimate decision on factor two must wait until trial, this factor seems to favor fair use.

### C. The amount and substantiality of the copying depends on the nature of Ross's AI outputs

Third, I consider the amount of copying as well as whether the copying took the original work's "heart." *Campbell*, 510 U.S. at 589.

Defining the work at issue matters in determining the amount of copying done. If we define it at the level of each headnote, the copying was allegedly completed for some 25,000 headnotes. If we define it at the level of the compilation, however, the copying was less substantial, though headnotes likely represent the "heart" of Westlaw's expression.

And defining the use is again important because "even a small amount of copying may fall outside of the scope of fair use where the excerpt copied consists of the heart of the original work's creative expression." *Google*, 141 S. Ct. at 1205 (internal quotation marks omitted). Conversely, "copying a larger amount" can still be fair use "where the material copied captures little of the material's creative expression." *Id.* Plus, "[t]he 'substantiality' factor will generally weigh in favor of fair use where … the amount of copying was tethered to a valid, and transformative, purpose." *Id.* In particular, verbatim intermediate copying has consistently been upheld as fair use if the copy is "not reveal[ed] … to the public." *Authors Guild*, 804 F.3d at 221; *see also A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 638–640, 642 (4th Cir. 2009).

A1821

Here, the best definition is at the level of each headnote. As mentioned, the compilation registration also covers individually copyrightable materials. And each headnote counts. But the heart of each headnote is its original expression, not its link to the part of the opinion it summarizes. So if Ross's AI works the way that it says, it is likely fair use because it produces only the opinion, not the original expression. "It cannot be said that a revelation is 'substantial' in the sense intended by the statute's third factor if the revelation is in a form that communicates little of the sense of the original." *Authors Guild*, 804 F.3d at 223.

Yet this factor also requires jury fact-finding. How Ross's AI works and what output it produces remain disputed. The parties also fight over whether the use was "tethered to a valid … purpose." Westlaw says Ross copied far more than it needed. Ross says it needed a vast, diverse set of material to train its AI effectively. Though Ross need not prove that each headnote was strictly necessary, it must show that the scale of copying (if any) was practically necessary and furthered its transformative goals. So the third factor hinges on the answers to these disputed factual questions which the jury needs to resolve.

### D. I cannot yet determine the effect of the use upon the market for the work

Finally, factor four asks whether the use had a "meaningful or significant effect" on the value of the original or its potential market. *Authors Guild*, 804 F.3d at 224. And "[t]his inquiry must take account not only of harm to the original but also of harm to the market for derivative works." *Harper*, 471 U.S. at 568. Yet not all losses are created equal. I must also consider the "source of the loss." *Google*, 141 S. Ct. at

A1822

1206. Again, we come back to the fundamental premise that copyright protects expression. If the source of the loss is not that the original's expression is being appropriated, "the type of loss of sale envisioned above will generally occur in relation to interests that are not protected by the copyright." *Authors Guild*, 804 F.3d at 224.

And transformativeness feeds into this factor as well. "[T]he more the copying is done to achieve a purpose that differs from the purpose of the original, the less likely it is that the copy will serve as a satisfactory substitute for the original." *Id.* at 223 (citing *Campbell*, 510 U.S. at 591). Finally, in evaluating market impact, courts must pay special attention to "the realities of how technological works are created and disseminated." *Google*, 141 S. Ct. at 1199.

Here, those "realities" are disputed. Thomson Reuters claims three potential markets, but they boil down to two: the market for Westlaw itself as a legal research platform and the market for its data. It says Ross's plan all along was to create a substitute for Westlaw. And it says that this plan worked, as some Ross customers cancelled their Westlaw subscriptions. As for the market for its data, Thomson Reuters says there is a traditional licensing market and a burgeoning one for AI training data. It argues that it lost traditional licensing revenue because Ross obtained Westlaw content through LegalEase. And it suggests that there is a potential market for Westlaw's training data; after all, Ross paid LegalEase over a million dollars for the Bulk Memos. That burgeoning market would be harmed by copying like Ross's.

One fact is undisputed here: Ross and Thomson Reuters both compete in the market for legal research platforms. But that alone does not reveal whether Ross's AI

24

A1823

product is a substitute for Westlaw. Ross's use might be transformative, creating a brand-new research platform that serves a different purpose than Westlaw. If so, it is not a market substitute. Ross also argues that Thomson Reuters has never participated—and would never participate—in this market for its training data. Because a reasonable jury could find for either side on these factual market-impact questions, I cannot resolve them at summary judgment.

Finally, "we must take into account the public benefits the copying will likely produce." *Google*, 141 S. Ct. at 1206. And "we are free to consider the public benefit resulting from a particular use notwithstanding the fact that the alleged infringer may gain commercially." *Sega*, 977 F.2d at 1523. This "[p]ublic benefit need not be direct or tangible, but may arise because the challenged use serves a public interest." *Id.*

The parties provide competing narratives of public benefit. Ross's research platform might increase access to the law at a lower cost. Or it might just reduce the incentives for Thomson Reuters, and similarly situated entities, to create content like headnotes in the future.

Deciding whether the public's interest is better served by protecting a creator or a copier is perilous, and an uncomfortable position for a court. Copyright tries to encourage creative expression by protecting both. Here, we run into a hotly debated question: Is it in the public benefit to allow AI to be trained with copyrighted material?

The value of any given AI is likely to be reflected in the traditional factors: How transformative is it? Can the public use it for free? Does it discourage other creators

25

A1824

by swallowing up their markets? So an independent evaluation of the benefits of AI is unlikely to be useful yet, even though both the potential benefits and risks are huge. Suffice it to say, each side presents a plausible and powerful account of the public benefit that would result from ruling for it. So a jury must decide the fourth factor—and the ultimate conclusion on fair use.

## IV. TORTIOUS INTERFERENCE

Thomson Reuters's second claim is tortious interference with contract. It says Ross induced LegalEase to breach three contract provisions by (1) using Westlaw to build a competing product, (2) using a bot to scrape Westlaw content, and (3) sharing passwords.

Ross says these claims are preempted. Federal copyright law preempts "all legal … rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 … and come within the subject matter of copyright." 17 U.S.C. § 301(a). Section 106 protects the author's rights in reproduction, distribution for sale, public performance and display, and derivative works. *See id.* § 106.

Although preemption is an affirmative defense, I address it first. If any of the contract claims are preempted by copyright, I need not address their merits.

### A. Thomson Reuters's first tortious-interference claim is preempted, but the other two survive

As quoted above, federal copyright law preempts state claims that are "equivalent to" § 106 rights. The most common test—and the one I must apply—to determine equivalency is the "extra element" test. *See Dun & Bradstreet Software Servs., Inc. v.*

26

A1825

*Grace Consulting*, 307 F.3d 197, 217–18 (3d Cir. 2002). As its name suggests, that test asks whether the state-law claim has an element that a §106 claim would not. *Id.* at 217.

The test is easy to say but hard to apply. In some sense, every claim other than a state copyright claim has some extra element. For example, although almost every common law claim requires damages, §106 does not because federal law supplies statutory damages. But that alone does not make the claims meaningfully different. So courts have modified the test, asking whether the extra element makes the claim qualitatively different. *Id.* To avoid preemption, the "gravam[e]n" of the state claim must differ from one of the §106 rights. *Id.* at 218 (quoting *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693, 717 (2d Cir. 1992)).

Ross says tortious-interference claims are almost always preempted. Though it cites good authority for that argument, it takes that authority out of context. A tortious-interference claim that says something like, "You copied our work, thus interfering with our contracts to license that work" is preempted because it merely identifies one of the consequences of a §106 violation. But some of Thomson Reuters's claims are different. It brings some of its claims as tortious-interference claims—rather than as standard breach-of-contracts claims—solely because it seeks to hold Ross liable for the acts of a third party, LegalEase. So the preemption analysis should look more like it would with a typical breach-of-contract claim than with a claim that just identifies a consequence of copyright infringement.

27

A1826

To sum up, a claim is preempted if (1) the material is within the subject matter of copyright and (2) the gravamen of the claim is equivalent to a §106 right.

*The anti-competition claim is preempted.* Thomson Reuters's first tortious-interference claim concerns this provision:

> You may not sell, sublicense, distribute, display, store or transfer [West's] products or any data in [its] products in bulk or in any way that could be used to replace or substitute for [its] products in whole or in part or as a component of any material offered for sale, license or distribution to third parties.

D.I. 316, at 4 (alterations in original).

Thomson Reuters says Ross induced LegalEase to breach this provision by hiring it to create the Bulk Memos and other materials sent to Ross. Thomson Reuters does not contest that this covers material that is within the subject matter of copyright. But it says the rights implicated are different. Not so.

The gravamen of this claim is the same as that of Thomson Reuters's copyright claim. And the contract provision itself secures equivalent—indeed, sometimes identical—rights: The rights to sell, sublicense, distribute, and transfer are covered by §106(3). The right to display is covered by §106(5). The "in bulk" and "in any way that could be used to replace or substitute" phrases are incorporated in the fair-use analysis. And the "as a component of" language also tracks fair use and the derivative-work right under §106(2).

Though this contract provision is framed in terms of competition, it is focused on one potential competitive threat: copying. That concern is the domain of federal law. So this first claim is preempted by the Copyright Act.

28

A1827

Thomson Reuters tries to analogize its provision to the ones at issue in cases like *Altera Corp. v. Clear Logic, Inc.*, 424 F.3d 1079 (9th Cir. 2005), and *Wellness Publishing v. Barefoot*, No. 02–3773, 2008 WL 108889 (D.N.J. Jan. 9, 2008). But those cases involved restrictions on use. Restricting a user's use of copyrighted material is different from limiting the user's ability to copy it. The latter is covered, and thus preempted, by the Copyright Act.

*The anti-bot and password sharing claims are not preempted.* The two other tortious-interference claims involve Westlaw's anti-bot and password-sharing provisions:

> You may not run or install any computer software or hardware on [West's] products or network or introduce any spyware, malware, viruses, Trojan horses, backdoors or other software exploits.

> Your access to certain products is password protected. You are responsible for assigning the passwords and maintaining password security. Sharing passwords is strictly prohibited.

D.I. 316, at 4–5 (alteration in original).

These provisions are not equivalent to § 106 rights. Unlike the competition provision, they govern use and manipulation of the site. Using a bot to scrape content might copy material in bulk. And a claim based on the harm from that copying itself would be preempted. But a claim based on simply introducing malware, independent of that malware's goals, is not equivalent to any right in § 106. Likewise, a site might ban password sharing because they want to limit copying risk. But putting limits on access to the site is a separate restriction. Whether the material behind the password protection is copyrighted or not, the creator can protect the material for which it

29

A1828

charges users. Section 106 has nothing to say about that limit. So Thomson Reuters's second and third tortious-interference claims survive preemption.

### B. Thomson Reuters's two remaining tortious-interference claims are partially disputed

I now consider the two surviving tortious-interference claims on the merits. Thomson Reuters must prove five elements: (1) there was a contract between LegalEase and Westlaw, (2) Ross knew about the contract and its terms, (3) Ross's intentional act was a significant factor causing the breach, (4) Ross had no justification, and (5) the breach harmed Thomson Reuters. *See WaveDivision Holdings, LLC v. Highland Cap. Mgmt., L.P.*, 49 A.3d 1168, 1174 (Del. 2012). (Earlier in this case, the parties disputed whether Minnesota or Delaware law applied. But I need not address this choice-of-law question because Minnesota's tortious-interference elements are the same as Delaware's. So I address each element below under Delaware law.)

*1. There was a contract.* For both claims, there is no dispute that the first element is met—there was a contract between Westlaw and LegalEase. But three of the four remaining elements involve genuine factual disputes that remain for trial.

*2. It is unclear how much Ross knew.* To satisfy the second element, Ross must have had actual or imputed knowledge of the substance of the contract rights, even if it did not know about the exact terms. *WaveDivision*, 49 A.3d at 1176. There is substantial record evidence that Ross knew at least something about Westlaw's contracting practices: Ross itself tried to enter a contract with Westlaw. An investor sent Ross a copy of the Westlaw terms and conditions. A Ross executive posed as an individual

A1829

practitioner to see the terms of use. And there are email exchanges in which Ross executives discuss specific provisions of the contract.

But Ross's evidence introduces some ambiguity. It disputes the timeline, saying that much of Thomson Reuters's evidence comes from well after Ross dealt with LegalEase. And it says that although it saw the contracts Westlaw offered it, it never saw Westlaw's contract with LegalEase. Westlaw's agreements can be tailored, Ross says, and it only ever saw the Canadian, not United States, agreement. Thomson Reuters counters that the agreements are materially the same, publicly disclosed, and seldom if ever altered. Whether this evidence, taken together, rises to the level of knowledge of the substance of the anti-bot and password-sharing provisions is a jury question.

*3. Ross may have intentionally caused a breach.* Ross met the third element if it (1) intended to interfere or (2) intended to reach a result with knowledge that it would interfere with the contract, even if interference was not the main purpose. Restatement (Second) of Torts § 766 cmt. j (Am. L. Inst. 1965). Ross intended for LegalEase to produce the Bulk Memos. And it was likely aware that LegalEase was using Westlaw. But whether Ross knew LegalEase was breaching or going to breach by using a bot or sharing passwords is far less clear. As explained in the discussion of indirect liability, each side has evidence suggesting different levels of Ross's involvement, control, and knowledge. So this element too is unfit for summary judgment.

*4. Whether Ross acted without justification is a factual question.* Courts commonly refer to the fourth element as doing something "not … sanctioned by the rules of the

A1830

game." *Avaya Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354, 383 (3d Cir 2016) (internal quotations omitted). Thomson Reuters said Ross did that. According to Thomson Reuters, Ross first sought a license from Westlaw, but when that rule-abiding approach failed, it hired LegalEase to end-run Thomson Reuters's terms. Yet end-running or exploiting a loophole is not necessarily the same as violating the rules of the game. And whether Ross acted without justification largely depends on how it acted—which is a matter of dispute under the second and third elements. Plus, this element is typically a question of fact: Delaware law considers no less than seven factors, nearly all of which involve some underlying question of fact. *See WaveDivision*, 49 A.3d at 1174. So this element remains for trial.

*5. Thomson Reuters has shown harm.* The fifth element requires harm. Thomson Reuters says it lost subscription fees when LegalEase used a bot and shared passwords. If LegalEase did not have the help of a bot or multiple employees sharing one account, it would have had to buy more subscriptions or keep its subscriptions open for longer periods. This harm is distinct from the harm from copying: assuming copying was going to happen, Westlaw at least wanted to get paid while LegalEase did it. The bot and password sharing made the copying more efficient and cheaper, depriving Westlaw of fees. Ross does not contest this element, other than arguing that Thomson Reuters's damages here are the same as the damages it would get for its copyright infringement claim. That misses the mark, so there is no genuine dispute.

32

A1831

In sum, Thomson Reuters is entitled to partial summary judgment on the first and fifth elements of tortious interference by using a bot and sharing passwords, but elements two through four remain for trial.

## V. OTHER DEFENSES FAIL

Ross throws several other defenses at the wall, but none sticks. First, it no longer presses its First Amendment or first-sale defenses. Second, it raises laches. But laches does not apply to the copyright claim. *See Petrella*, 572 U.S. at 679. Plus, Thomson Reuters brought its tortious-interference claim promptly. Ross says that Thomson Reuters sat on its right to sue for years, but this is unsupported, and Ross cites no law saying that was too long.

Third, for its defenses of consent, waiver, estoppel, acquiescence, and license, Ross points to a fair-use provision in Westlaw's terms of use. That provision just begs the fair-use question but does not provide an independent defense. Fourth, Ross alleges tort of another, saying it was not a "substantial factor" in the harm that LegalEase allegedly caused. D.I. 318, at 20. But again that argument is the same as its argument against the elements of the tortious-interference claim. And it has presented no evidence specifically for this defense, so I will not repackage other evidence for it. Instead, Ross can focus on defeating the tortious-interference claim's elements directly.

Finally, Ross alleges lack of ownership because the headnotes are identical to public law. But Thomson Reuters has provided its registrations, and the extent of its expression is fully explored under the infringement and fair-use claims. Indeed, whether "lack of ownership" is even an affirmative defense is dubious—it seems to go to the first element of an infringement claim (ownership of a valid copyright). So I

33

A1832

A1833

grant summary judgment to Thomson Reuters on these miscellaneous affirmative defenses.

* * * * *

Thomson Reuters alleges that Ross copied protected aspects of Westlaw, both directly and indirectly through LegalEase. And Ross disputes almost all of Thomson Reuters's story. But it is not my role at summary judgment to sort through the evidence and tidy these factual messes. It is the jury's role at trial. So, with the small exceptions noted throughout this opinion, I deny both Ross's and Thomson Reuters's motions for summary judgment.

34

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

THOMSON REUTERS ENTERPRISE
CENTRE GMBH and WEST PUBLISH-
ING CORP.,

      *Plaintiffs*,

      v.

ROSS INTELLIGENCE INC.,

      *Defendant*.

No. 1:20-cv-613-SB

---

Jack B. Blumenfeld, Michael J. Flynn, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Dale M. Cendali, Eric A. Loverro, Joshua L. Simmons, KIRKLAND & ELLIS LLP, New York, New York.

      *Counsel for Plaintiffs.*

David E. Moore, Andrew L. Brown, Bindu A. Palapura, POTTER ANDERSON & COR-ROON LLP, Wilmington, Delaware; Warrington Parker, Christopher J. Banks, Joachim B. Steinberg, Jacob Canter, Anna Z. Saber, CROWELL & MORING LLP, San Francisco, California; Emily T. Kuwahara, Jordan Ludwig, CROWELL & MORING LLP, Los Angeles, California; Mark A. Klapow, Keith J. Harrison, Lisa Kimmel, Crinesha B. Berry, CROWELL & MORING LLP, Washington, D.C.; Ryan H. Seewald, CROWELL & MORING LLP, Denver, Colorado.

      *Counsel for Defendant.*

---

### MEMORANDUM OPINION

September 27, 2024

A1834

BIBAS, *Circuit Judge*, sitting by designation.

To make it to trial, litigants must substantiate their claims. Ross contends that Thomson Reuters violated and still violates antitrust laws, but Ross has not backed up its allegations with enough evidence. So I grant summary judgment to Thomson Reuters on those counterclaims.

## I. BACKGROUND

The antitrust issues here are just one part of a larger case. Thomson Reuters's Westlaw platform has an extensive collection of legal sources (including judicial opinions) and accompanying search tools to navigate them. D.I. 170 at 1–2. Ross tried to build a better legal search tool using artificial intelligence. *Id.* Thomson Reuters sued Ross for copyright infringement, alleging that Ross had used Thomson Reuters's intellectual property to build its search tool. Compl., D.I. 1 at 2–3. The copyright lawsuit is pending before me. D.I. 667.

Ross then brought these antitrust counterclaims. D.I. 24 at 42–44. This Court dismissed some of these claims, D.I. 170, but three counts survived to discovery on a theory that Westlaw ties its caselaw database to its search tools. Those counts now return on summary judgment: Count VI, 15 U.S.C. § 2 (Sherman Act), Count VII, 15 U.S.C. § 1 (Sherman Act), and Count VIII, California's Business and Professions Code § 17200 *et seq*. D.I. 24 at 42–44; D.I. 170 at 9, 12, 15; D.I. 519, 521, 523, 525, 527. The parties do not distinguish among the three counts in their summary-judgment briefing because all rise and fall on the same issues.

2

A1835

In this opinion, I resolve five summary-judgment motions and two motions to preclude or exclude expert opinions and testimony relevant only to the antitrust counterclaims. Thomson Reuters moved for summary judgment on five issues: separate products, market definition and power, statute of limitations, injunctive relief, and damages relating to testimony from Dr. Alan Cox. D.I. 519, 521, 523, 525, 527. Thomson Reuters also moved to preclude certain opinions of Ross's experts Dr. James Ratliff and Dr. Gillian Hadfield. D.I. 529. And Ross moved to exclude certain opinions of Thomson Reuters's expert Dr. Chad Syverson. D.I. 516.

I will grant summary judgment if there is "no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). I view facts in the light most favorable to Ross, the non-movant. *Lamont v. New Jersey*, 637 F.3d 177, 179 n.1 (3d Cir. 2011). I must enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## II. ROSS HAS FAILED TO SHOW THAT THOMSON REUTERS IS TYING SEPARATE PRODUCTS AND HAS FAILED TO DEFINE THE MARKETS FOR THEM

Ross's remaining antitrust counterclaims are all based on tying theories. Some tying arrangements violate antitrust law. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 461–62, 464 (1992). Tying occurs when a party will "sell one product but only on the condition that the buyer also purchases a different (or tied) product." *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5 (1958). Ross's theory is that Westlaw's caselaw database ("the public law database") is a product that many consumers want (the tying product), so Thomson Reuters decided to sell it only packaged

A1836

with the Westlaw search tools (the tied product) to ensure that those products also sell. D.I. 24 at 31–32. In other words, Ross claims that Thomson Reuters forces people to buy its Westlaw search tools if they want to use its caselaw database. Ross contends that this arrangement is both per se illegal under the Sherman Act and illegal under a rule-of-reason theory of liability. D.I. 554 at 7, 23; *see Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468, 475, 481–82 (3d Cir. 1992).

Under either theory, Ross must make two threshold showings before it may proceed with its arguments that Thomson Reuters violated antitrust law. First, Ross must show that the two products are separate. *Avaya Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354, 397 (3d Cir. 2016). Products that are not separate cannot be tied together. Second, Ross must define the relevant market before it can hope to show an improper use of power in that market. The relevant markets are different for per se and rule-of-reason claims. For a per se tying claim, Ross must define the tying product market. *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 513 (3d Cir. 1998). And for Ross's rule-of-reason arguments, it must define the tied product market. *Id.* at 519. Ross does neither.

**A. Ross has not shown that the two products are separate**

*(i) Legal principles*

To show that a seller is illegally tying two products, one must first show that the two products are separate. *Avaya*, 838 F.3d at 397. Whether products are separate is typically an issue of law to be resolved by a judge. Phillip E. Areeda & Herbert J. Hovenkamp, *Antitrust Law* (Lexis Online 2024) ¶ 1743c. The test for whether the two

A1837

products are distinct is whether there is "sufficient consumer demand so that it is efficient for a firm to [sell them separately]." *Eastman Kodak*, 504 U.S. at 462. "[N]o tying arrangement can exist unless there is a sufficient demand for the purchase of" the products separately. *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 21 (1984). The sufficient-demand requirement has teeth. "Idiosyncratic buyers" are not enough; we must look at what consumers generally want. Areeda & Hovenkamp ¶ 1744d. And, when looking at analogous markets, "if less than 20 percent of the tying item is sold unbundled in the competitive market analogue, then the items are a single product." *Id.*

The parties dispute what Ross must do to show sufficient consumer demand. Ross argues that it need not prove that people *actually* buy the products separately, only that independent markets *could* exist. D.I. 555 at 5. Ross points out the danger of "perversely immuniz[ing] the worst-case scenario of a successful tie by which a monopolist successfully leverages a monopoly in the tying product into a monopoly in the tied product." *Id.* at 8 (quoting Areeda & Hovenkamp ¶ 1745d). To avoid this unfair outcome, Ross says, I must "assess[] … what consumer demand would be at the costs and quality that would prevail if the items were separately provided." *Id.* at 9 (citing Areeda & Hovenkamp ¶ 1745d). To support its view, Ross also cites the ABA Model Jury Instructions in Civil Antitrust Cases on separate and distinct products. *Id.* at 9. But the Model Jury Instructions are not binding on courts. And though they do instruct the jury to "consider whether there would be separate demand for each [product] if they were offered separately," they further explain that "[t]he relevant issue is

5

A1838

whether there is sufficient demand from customers to induce sellers to provide them separately." D.I. 558-1, Ex. B at 26. So they do not make Ross's point.

Unsurprisingly, Thomson Reuters seeks a more concrete standard than Ross. It argues that Ross must show that consumers either "bought the items separately" or "requested or wanted the items separated." D.I. 583 at 5 (quoting Areeda & Hovenkamp ¶ 1743a). Thomson Reuters is mostly right.

I conclude that Ross must show at least one of three things to meet its burden on separate products: (1) that consumers "bought the items separately," (2) that consumers "requested or wanted the items separated," or (3) "that some customers would have requested or wanted the items separated but for" the fact that they were "intimidated not to make such requests or were deprived of the information that would have made them want the items separated." Areeda & Hovenkamp ¶ 1743a. So Ross must show (1), (2), or (3) to establish that "independent markets could exist." Areeda & Hovenkamp ¶1745d. But it has not.

### (ii) Ross fails to show separate products

The facts, taken in the light most favorable to Ross, do not make any of these three showings. Ross submits the following facts and arguments to attempt to show separate products.

### 1. Demand for public law separately

**Books.** Ross notes that Thomson Reuters used to sell its public-law database in books (rather than online) without the legal search tools that are now packaged with Westlaw. *Id.* at 12–13. True, historical market analogues can support a separate-

6

A1839

products finding. *See* Areeda & Hovenkamp ¶ 1744c2; *see also Kaufman v. Time Warner*, 836 F.3d 137, 142 (2d Cir. 2016) ("Relevant evidence of separate and distinct consumer demand for the tying product and the tied product is, *inter alia*, the history of the products being, or not being, sold separately … or the sale of products separately in similar markets."). And this is one reason why the previous judge in this case, Judge Stark, did not dismiss the tying claim. As he noted, "Plaintiffs' public law database was effectively sold as a stand-alone product in the form of books for decades before modern technology allowed plaintiffs to develop an online legal search tool." D.I. 170 at 8. But this is just one possible data point, and the bar is higher at summary judgment.

The idea behind historical market analogues is that they are evidence of consumer preferences from a time when the markets were competitive. *See* Areeda & Hovenkamp ¶ 1744c2. But the analogy to books suffers from two flaws. First, Ross is wrong that books were sold without search tools. True, books were sold without Westlaw's current technological capacity. But if we can analogize online legal databases to printed legal databases, we can also analogize online search tools to printed search tools: tables of contents, indices, and page numbers. So its database was not sold unbundled from search tools.

Second, "consumer preferences, production costs, and quality concerns … vary over time." *Id.* The evolution from book search tools (say, a table of contents) to Westlaw's digital search tools (say, Boolean search terms) is like how the horse-drawn carriage market evolved into the car market. Just as we no longer use horse-drawn

7

A1840

carriages for transportation (except for fun), few consumers want caselaw separated from the sophisticated search tools that make it digestible. A market for public law in book form used to exist, but that does not mean that a market for separate caselaw still exists in a world with more sophisticated search tools. Ross has not done enough to show that this market is a helpful analogue.

**Consumer requests for public-law databases.** Ross says that consumers asked to buy Westlaw's public-law database separately. D.I. 555 at 15. But that smidge of consumer demand is not enough. There must be "sufficient consumer demand so that it is efficient for a firm to" sell the two products separately. *Eastman Kodak*, 504 U.S. at 462. Ross cites emails from two law firms, Baker Hostetler and Skadden. D.I. 558-1, Ex. Q at 280–82; D.I. 558-1, Ex. R at 283–84. But the Baker Hostetler email chain does not ask about buying public law separately. D.I. 558-1, Ex. Q at 280–82. And the Skadden email alone is not enough to infer "sufficient consumer demand." *Eastman Kodak*, 504 U.S. at 462; D.I. 558-1, Ex. R at 283–84. Ross could have done more to try to develop the record during discovery, perhaps subpoenaing Skadden representatives. But it did not.

**APIs.** Ross also argues that Thomson Reuters's decision to make some Westlaw content available via application programming interfaces shows separate consumer demand for public law. D.I. 555 at 18–20. This also fails. These interfaces are "another method that customers use to access Thomson Reuters' platforms." D.I. 520 at 23. Some of them let customers search internal firm data and external Westlaw data through a single search. D.I. 555 at 19. But Ross admits that these are just interfaces;

8

A1841

they do not allow "independent access to [Thomson Reuters's] full U.S. public law database." *Id.* So this is not an example of selling public law separately. Ross submits evidence that Thomson Reuters is considering offering data products that include the public law. D.I. 558-2, Ex. EE at 83. But Thomson Reuters is not doing this yet, so it is unclear what, if any, demand there would be for this data.

### 2. *Demand for search tools separately*

**Consumer requests for Ross's search tool.** As evidence that consumers wanted to buy its search tool on its own, Ross points to an interrogatory response and depositions of its own employees. D.I. 558-1, Ex. S at 291; Ex. T at 309–11 (transcript 100:24–102:15); Ex. U at 323–37 (transcript 14:18–18:2); Ex. V. at 342–43 (transcript 155:5–156:22) (irrelevant because it discusses buying Ross as the company, not Ross's products); and Ex. W at 360–6 (transcript 269:23–271:11). But careful review of these transcripts shows that, at best, most employees gestured toward unspecified "customers" who wanted to buy Ross's search product without the public law. *See, e.g.*, D.I. 558-1, Ex. T. at 310–11 (transcript 101–02) (a former Ross employee acknowledging that he never actually sold the search tool separately and responding to a question about who wanted to buy Ross's search tool separately from the public law database with, "[t]here was a customer that came into the chat. There were customers that would come into the chat.").

These statements do not suggest many interested buyers nor allege a specific number of consumers, and the only one they name specifically is the U.S. Department of Justice. So even taking these statements as true, they do not show "sufficient consumer demand so that it is efficient for a firm to" sell the two products separately.

9

A1842

*Eastman Kodak*, 504 U.S. at 462. And Ross's argument that its "legal search tool received significant attention and praise" is irrelevant. D.I. 555 at 13.

**Westlaw's product tiers.** Ross also tries to find evidence of separate products in Westlaw's own sales. Ross argues that Westlaw's choice to offer different levels of search plans shows demand for buying the public law database and accompanying search tools separately. *Id.* at 17. But it does not matter that Westlaw offers three plans, each bundling its public-law collection with a different search tool. This shows demand for different levels of search-tool sophistication, not demand for a public-law database with no search tool at all or for a search tool on its own.

**West KM.** Ross's last point is that Thomson Reuters sells West KM separately, but that argument fails too. *Id.* at 21. As Ross itself explains, "West KM uses Westlaw's search technology to review the [customer] organization's own documents, promising an experience that mimics searching for public law on Westlaw." *Id.* So West KM is not a search tool for public law that is being sold separately from public law itself.

To sum up, Ross has failed to satisfy any of the three standards for showing distinct products. It has not shown any consumers "bought the items separately." Areeda & Hovenkamp ¶ 1743a. Nor has Ross adduced enough evidence that consumers "requested or wanted the items separate." *Id.* And Ross has made no effort to show that consumers would have asked for the items separated if they were not "intimidated not to make such requests or were deprived of the information that would have made them want the items separated." *Id.*

10

A1843

I thus grant Plaintiffs' Motion for Summary Judgment on Ross's Antitrust Counterclaims (No. 1) Separate Products [D.I. 519]. Without showing separate products, none of Ross's remaining antitrust counterclaims can proceed.

**B. Ross has not defined the markets**

Even if Ross's allegation of tying had not failed on separate products, it would still fail because Ross has not properly defined the market in which Thomson Reuters allegedly exercises excessive power, either on a per se tying theory or on a rule-of-reason theory.

*(i)  Legal principles*

At a minimum, Ross must define either the tying market or the tied market. For per se tying, Ross must show two threshold things about the market. First, it must "properly define[]" the tying product market. *Brokerage Concepts*, 140 F.3d at 513. That means defining both the product and the geography of the market. *Id.* Second, Ross must show that Thomson Reuters "possesses market power in the tying product market." *Town Sound*, 959 F.2d at 477. One cannot determine market power until after one defines the market. So a successful per se claim defines the tying market.

For a rule-of-reason tying theory, Ross need define only the market for the tied product. A rule-of-reason theory is more flexible than a per se theory, letting Ross "state some plausible theory of antitrust harm that does not depend implicitly on power leveraging." *Town Sound*, 959 F.2d at 486. To support a rule-of-reason theory, Ross must be able to show that the alleged tie affected "competition in the tied market." *Brokerage Concepts*, 140 F.3d at 511. So under this theory of liability, Ross need

11

A1844

not define the tying market. But it does need to define the *tied* market. "Before we can determine whether there was harm to competition in the tied market, that market must be defined." *Id.* at 519.

This requirement holds especially true for Ross's specific arguments. The "tying injury" alleged "depend[s] on a careful definition of the tied good market." *United States v. Microsoft Corp.*, 253 F.3d 34, 95 (D.C. Cir. 2001). Ross argues that it "has offered evidence of cognizable harm in the tied product market in the form of reduced innovation." D.I. 554 at 24. But I cannot assess that injury if it "takes place in a market that has not been defined." *Microsoft*, 253 F.3d at 95 (quoting *Jefferson Parish*, 466 U.S. at 29). Ross also argues that there was "foreclosure in the legal search tools market." D.I. 554 at 24. When "the theory is one of market foreclosure, [I] must examine the structure of the market supposedly foreclosed." *Town Sound*, 959 F.2d at 493.

Defining a market requires, at a minimum, "describing those groups of producers which, because of the similarity of their products, have the ability … to take significant amounts of business away from each other." *SmithKline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056, 1063 (3d Cir. 1978). "The outer boundaries of a product market are determined by evaluating which products would be reasonably interchangeable by consumers for the same purpose." *Brokerage Concepts*, 140 F.3d at 513.

To recap, Ross had to define the market for both its per se and rule-of-reason theory. The per se tying theory requires defining the tying market—the market for public law. And here, the rule-of-reason tying theory requires defining the tied market—the market for legal search tools.

12

A1845

*(ii) Ross failed to define either market*

Ross failed to define either the tying or tied product market. It tried to do that by relying on the expert opinion of Dr. Ratliff. But he spent just three short paragraphs defining the market for electronically searchable collections of U.S. law and six short paragraphs defining the market for legal search tools. D.I. 532-1, Ex. 33 at 73, 80–82. In these short paragraphs, he fails to analyze in any depth companies or products that are interchangeable with the products here. *Brokerage Concepts*, 140 F.3d at 513. This makes it difficult to understand the scope of the market he is attempting to interact with. His analysis is not enough.

In fact, his analysis is so lacking that I grant in part Plaintiffs' Motion to Preclude Dr. James Ratliff and Dr. Gillian Hadfield. D.I. 529. I exclude the section of Dr. Ratliff's opinion devoted to market definition under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592–93 (1993). To be admissible, qualified experts' opinions must be based on reliable methodology and must fit the facts of the case. *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000). Here, Dr. Ratliff essentially has no methodology for defining the relevant markets. He includes no math or economic modeling. He never analyzes potential competitors in any depth. All he does is make brief, conclusory assertions. That is not enough.

Ross fails to define the relevant product markets. Without defining them adequately, it cannot reach the issue of market power. So I grant Plaintiffs' Motion for Summary Judgment on Ross's Antitrust Counterclaims (No. 2) Market Definition and Market Power. D.I. 521.

13

A1846

A1847

### III. OTHER OUTSTANDING MOTIONS RELEVANT TO THE ANTITRUST COUNTERCLAIMS ARE MOOT

I need not reach Thomson Reuters's other summary-judgment motions, because granting summary judgment on either separate products or market definition alone resolves the outstanding antitrust counterclaims.

Turning to the expert motions, the portions of Plaintiffs' Motion to Preclude Dr. James Ratliff and Dr. Gillian Hadfield that I did not already exclude for failing to meet *Daubert* are moot. D.I. 529. These expert reports were submitted to further the antitrust counterclaims and no longer matter now that those counterclaims are resolved. For the same reason, Defendant's Motion to Exclude Certain Opinions of Plaintiffs and Counter Defendants' Expert Chad Syverson is moot too. D.I. 516. If either party tries to use these expert opinions in the copyright portion of this case, the parties may resubmit motions to exclude them.

**\* \* \* \* \***

For all these reasons, I grant summary judgment to Thomson Reuters on its motions on separate products and market definition and market power. I dismiss as moot the other motions on the antitrust counterclaims.

14

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

THOMSON REUTERS ENTERPRISE
CENTRE GMBH and WEST PUBLISH-
ING CORP.,

        *Plaintiffs,*

           v.

ROSS INTELLIGENCE INC.,

        *Defendant.*

No. 1:20-cv-613-SB

---

**ORDER**

For the reasons given in the accompanying opinion,

1. **I GRANT** Plaintiffs' Motion for Summary Judgment on Ross's Antitrust Counterclaims (No. 1) Separate Products (D.I. 519).

2. **I GRANT** Plaintiffs' Motion for Summary Judgment on Ross's Antitrust Counterclaims (No. 2) Market Definition and Power (D.I. 521).

3. Because I am granting summary judgment on Motions 1 and 2, **I DISMISS AS MOOT** Plaintiffs' Motion for Summary Judgment on Ross's Antitrust Counterclaims (No. 3) Statute of Limitations (D.I. 523).

4. Because I am granting summary judgment on Motions 1 and 2, **I DISMISS AS MOOT** Plaintiffs' Motion for Summary Judgment on Ross' Antitrust Counterclaims (No. 4) Injunctive Relief (D.I. 525).

5. Because I am granting summary judgment on Motions 1 and 2, **I DISMISS AS MOOT** Plaintiffs' Motion to Preclude Dr. Alan Cox and Motion for Summary Judgment on Ross's Antitrust Counterclaims (No. 5) Comcast (D.I. 527).

6. **I GRANT IN PART** Plaintiffs' Motion to Preclude Dr. James Ratliff and Dr. Gillian Hadfield. I exclude the portion of Dr. Ratliff's report that addresses market definition. **I DISMISS AS MOOT** the remainder of the motion because these experts are relevant only to the antitrust counterclaims which are now all resolved at summary judgment (D.I. 529).

A1848

A1849

7. Because the antitrust counterclaims are now all resolved at summary judgment, **I DISMISS AS MOOT** Defendant's Motion to Exclude Certain Opinions of Plaintiffs and Counter Defendants' Expert Chad Syverson (D.I. 516).

Dated: September 27, 2024

_____
UNITED STATES CIRCUIT JUDGE

A1849

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

THOMSON REUTERS ENTERPRISE )
CENTRE GMBH and WEST PUBLISHING )
CORPORATION, )
)
)
             Plaintiffs and )  C.A. No. 20-613 (SB)
             Counterdefendants, )
)
  v. )
)
ROSS INTELLIGENCE INC., )
)
             Defendant and )
             Counterclaimant. )

**SECOND DECLARATION OF LAURIE OLIVER IN SUPPORT OF PLAINTIFFS'
RENEWED MOTIONS FOR SUMMARY JUDGMENT**

A1850

I, Laurie Oliver, declare as follows:

1.        I am a lawyer and a U.S. Cases Editorial Manager for Thomson Reuters Holdings Inc., where I have worked for the past 31 years.    I submit this declaration to supplement the previous declaration I made in support of Plaintiffs' Motions for Summary Judgment.  The statements set forth in this declaration are based on my personal knowledge and my review of the contemporaneous documents referenced and attached hereto.

2.        During my time at Thomson Reuters, I have served as an attorney editor and have managed the creation of editorial enhancements, including West Headnotes and synopses, and the classification of West Headnotes within the West Key Number System ("Westlaw Content"). The team is comprised of 70 attorney-editors who summarize judicial opinions and 24 attorney-editors who are case classifiers, all of whom are lawyers and require extensive training to create Westlaw Content.

A.        **West Headnotes**

3.        The West Headnotes identify and synthesize key issues and holdings in judicial opinions.  Creating the West Headnotes requires numerous creative decisions by Thomson Reuters' attorney-editors.

4.        For instance, the attorney-editor decides whether to editorially enhance a judicial opinion in the first place, out of thousands of opinions decided each year.  The attorney-editor then needs to decide how many West Headnotes to write for which case passages.  To do that, attorney-editors must carefully read the underlying judicial opinion to figure out what the court meant and what West Headnotes would be most helpful to assist researchers in understanding the decision and rules of law.  The most important parts of an opinion or case passage are not always obvious, and there is discretion about which parts of the opinion to make into a West Headnote.

A1851

Moreover, the attorney-editor may look at a section of a judicial opinion and decide to make one headnote, several, or none. It is up to the judgment of the attorney-editor.

5.     The attorney-editor also has to decide *how* to write the West Headnote in a clear and concise way. To do that, they need to decide the specific wording of the West Headnote and which concepts to include or not include. As part of that decision, the attorney-editor may consider whether an analogous concept of law has been addressed in other judicial opinions using different language, and whether or how that affects the creation of a West Headnote in a different decision. There is no one way to do this, and different attorney-editors could draft the same West Headnote differently. The attorney-editor also has to decide where to link the West Headnote in the judicial opinion. Finally, an attorney-editor has to decide how to classify the West Headnote within the West Key Number System, as I describe in more detail below.

**B.     The West Key Number System**

6.     The West Key Number System indexes cases across hundreds of legal topics and, within those topics, specific legal issues. Each West Headnote is assigned one or more topics and a Key Number that corresponds to a legal issue within the case.

7.     The West Key Number System is constantly updated, with new editions being published each year. The hundreds of topics and subtopics in the West Key Number System have changed over time, as new topics are added or condensed. For example, issues involving summary judgment motions used to be classified under the topic, "Judgment." However, the procedural mechanism of summary judgment and related issues has grown big enough in recent years that Thomson Reuters' attorney-editors decided that it warranted its own topic, released last year. As new technologies or areas of the law develop, Thomson Reuters updates and adapts the West Key Number System. The process and development of the law is not exact, and there is no one way to organize it. Deciding how to organize the many topics and subtopics in the West

A1852

Key Number System and adapt them to the changing technological and legal landscape thus requires creativity and judgment.

8.      In particular, the process for creating the West Key Number System involves looking at where the law has expanded or stagnated and considering whether certain topics or subtopics currently cover multiple concepts that would be better treated separately, or whether we can combine concepts under a single topics.  We also consider West Headnotes that do not fit cleanly into the existing West Key Number System to determine if new issues should be included.

### C.      Classification within the West Key Number System

9.      After West Headnotes are written, the attorney-editor writing them preliminarily assigns them to one or more West Key Numbers.  After that, specialized attorney-editors called "case classifiers" review the headnote-writer's suggestion and assign West Key Numbers, which are the lowest subtopic within the West Key Number System hierarchy, to the West Headnotes.

10.      There are many different ways a West Headnote could be classified and sometimes multiple topics may be suitable.  Deciding how to classify the West Headnote within the West Key Number System is up to the judgment of the individual case classifier, who may base his or her decision in part on the initial recommendation based on the judgment of the attorney-editor.

Dated: October 1, 2024

_____
Laurie Oliver

A1853

## CERTIFICATE OF SERVICE

I hereby certify that on October 1, 2024, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on October 1, 2024, upon the following in the manner indicated:

| | |
|---|---|
| David E. Moore, Esquire<br>Bindu Palapura, Esquire<br>Andrew L. Brown, Esquire<br>POTTER ANDERSON & CORROON LLP<br>Hercules Plaza, 6th Floor<br>1313 North Market Street<br>Wilmington, DE  19801<br>*Attorneys for Defendant and Counterclaimant* | *VIA ELECTRONIC MAIL* |
| Mark A. Klapow, Esquire<br>Lisa Kimmel, Esquire<br>Crinesha B. Berry, Esquire<br>Matthew J. McBurney, Esquire<br>Keith J. Harrison, Esquire<br>CROWELL & MORING LLP<br>1001 Pennsylvania Avenue NW<br>Washington, DC  20004<br>*Attorneys for Defendant and Counterclaimant* | *VIA ELECTRONIC MAIL* |
| Jacob Canter, Esquire<br>Warrington Parker, Esquire<br>Anna Z. Saber, Esquire<br>Beatrice B. Nguyen, Esquire<br>CROWELL & MORING LLP<br>3 Embarcadero Center, 26th Floor<br>San Francisco, CA  94111<br>*Attorneys for Defendant and Counterclaimant* | *VIA ELECTRONIC MAIL* |

A1854

A1855

Emily T. Kuwahara, Esquire                    *VIA ELECTRONIC MAIL*
Jordan Ludwig, Esquire
CROWELL & MORING LLP
515 South Flower Street, 41st Floor
Los Angeles, CA 90071
*Attorneys for Defendant and Counterclaimant*

Ryan Henry Seewald, Esquire                   *VIA ELECTRONIC MAIL*
CROWELL & MORING LLP
1601 Wewatta Street, Suite 815
Denver, CO 80202
*Attorneys for Defendant and Counterclaimant*

*/s/ Michael J. Flynn*
_____
Michael J. Flynn (#5333)

2

A1855

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| THOMSON REUTERS ENTERPRISE CENTRE GMBH and WEST PUBLISHING CORPORATION, | ) ) ) ) ) | |
| Plaintiffs and Counterdefendants, | ) ) | C.A. No. 20-613 (SB) |
| | ) | **REDACTED - PUBLIC VERSION** |
| v. | ) ) | |
| ROSS INTELLIGENCE INC., | ) ) | |
| Defendant and Counterclaimant. | ) ) ) | |

## PLAINTIFFS' BRIEF IN SUPPORT OF THEIR RENEWED MOTION FOR PARTIAL SUMMARY JUDGMENT ON FAIR USE

OF COUNSEL:

Dale M. Cendali
Joshua L. Simmons
Eric A. Loverro
Jeremy King
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4800

Miranda D. Means
KIRKLAND & ELLIS LLP
200 Clarendon Street
Boston, MA 02116
(617) 385-7500

Yungmoon Chang
Allyn Belusko
KIRKLAND & ELLIS LLP
2049 Century Park East
Los Angeles, CA 90067
(310) 552-4200

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Michael J. Flynn (#5333)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
mflynn@morrisnichols.com

*Attorneys for Plaintiffs Thomson Reuters Enterprise Center GmbH and West Publishing Corporation*

Original filing date: October 1, 2024
Redacted filing date: October 8, 2024

A1856



Accordingly, this Court already found that ROSS actually copied Westlaw Content.  Op. 8–9.

## ARGUMENT

Summary judgment is proper where there is "no genuine dispute as to any material fact" and the movant "is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant informs the court "of the basis for its motion" and the matter "it believes demonstrate[s] the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Then, the non-moving party must present evidence establishing disputed issues as to material facts.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).

As fair use is "an affirmative defense," ROSS "bears the burden of proof."  *See Video Pipeline, Inc. v. Buena Vista Home Ent.*, 342 F.3d 191, 197 (3d Cir. 2003); *see also Dr. Seuss Enters., L.P. v. ComicMix LLC*, 983 F.3d 443, 459 (9th Cir. 2020) (same).  Courts routinely decide summary judgment in favor of the copyright holder where a defendant cannot meet this burden as a matter of law.  *See, e.g.*, *TD Bank N.A. v. Hill*, 928 F.3d 259, 278 (3d Cir. 2019) (commercial use of work that hurt market for the original was not fair use as a matter of law); *Wall Data Inc. v.*

11

A1857

Case 1:20-cv-00613-SB   Document 695-1   Filed 10/08/24   Page 1 of 80 PageID #: 152746

# EXHIBITS 1-18

## Redacted in their Entirety

A1858

Case 1:20-cv-00613-SB   Document 695-1   Filed 10/08/24   Page 2 of 80 PageID #: 152747

# EXHIBIT 19

A1859

11/1/22, 5:44 PM    Case 1:20-cv-00613-SB Document 695-1 Filed 10/08/24 Page 3 of 80 PageID #: 153748
Search Results | In New York, what is secondary liability with respect to copyright infringement and how is it establishe... | Westlaw...

THOMSON REUTERS
WESTLAW EDGE ○                      23575-003    History    Folders    My links    Notifications         Sign out

All content    | In New York, what is secondary liability with respect to |    All Federal         Search Tips
                                                                              Advanced

| Content types        Filters        ○ |

Set default

| Overview | 15 |

| Cases | 76 |

| Trial Court Orders | 20 |

| Statutes & Court Rules | 38 |

| Secondary Sources | 96 |

| Practical Law | 896 |

| Regulations | 38 |

| Public Records | |

| Administrative Decisions & Guidance | 10,000 |

| Arbitration Materials | 9,812 |

| Briefs | 86 |

| Expert Materials | 3,076 |

| Forms | 0 |

| Jury Verdicts & Settlements | 1,346 |

| Key Numbers | 10 |

| Proposed & Adopted Regulations | 1,148 |

| Proposed & Enacted Legislation | 672 |

| Trial Court Documents | 95 |

| All results | 27,399 |

## Cases (76)

WestSearch includes documents with concepts related to your terms for more thorough research.
To modify these results to just documents that include your precise terms, click here .

1 - 20            Relevance

☐ Select all items  •  No items selected                                    Related documents

☐    1.    **Arista Records LLC v. Lime Group LLC**
United States District Court, S.D. New York.  •  May 02, 2011  •  784 F.Supp.2d 398  •  2011 WL 1742029

E-COMMERCE - Intellectual Property. Business distributing file-sharing software induced **copyright infringement** of sound recordings.

Show synopsis

1 - 3 of 390 snippets

...Holdings:  The District Court, Kimba M. Wood, J., held that: (1)    record companies' collaboration with statistical expert did not render inadmissible expert's opinions regarding what percentage of shared files were not authorized for free distribution; (2)    under **New York** law, entire declaration of businesses's employee to record companies' counsel would not be stricken as arising out of improper ex parte communication; (3)    e-mail chains and Internet forum postings written in whole or part by business's employees were admissions by opponent constituting admissible non-hearsay; (4)    business induced **copyright**...

...Plaintiffs raise the following claims against LW, Lime Group, and Gorton:  (1) inducement of **copyright infringement**; (2) contributory **copyright infringement**;  (3) vicarious **copyright infringement**;  and (4) state common law **copyright infringement**...

...General principles that persons and corporations who participate in, exercise control over, or benefit from **copyright infringement** are jointly and severally **liable** as **copyright infringers** and that individuals with ability to supervise **infringing** activity or who personally participate in the activity are personally **liable** for **infringement**...

☐    2.    **Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.**
Supreme Court of the United States  •  June 27, 2005  •  545 U.S. 913  •  125 S.Ct. 2764

COPYRIGHTS - Software. Distributors of peer-to-peer file sharing software may be liable for users' **copyright infringement**

Show synopsis

1 - 3 of 282 snippets

...Although **secondary liability** for **copyright infringement** may not be imposed by presuming or imputing intent to cause **infringement** solely from the design or

COX
EXHIBIT 1

A1860

Case 1:20-cv-00613-SB   Document 695-1   Filed 10/08/24   Page 4 of 80 PageID #: 153749

distribution of a product capable of substantial lawful use, which the distributor knows is in fact used for **infringement**, this bar does not mean that a producer can never be held contributorily **liable**...

...Inducement **liability** for **copyright infringement** goes beyond encouraging a particular consumer to **infringe** a **copyright**, and the distribution of a product can itself give rise to **liability** where evidence shows that the distributor intended and encouraged the product to be used to **infringe**; in such a case, the culpable act is not merely the encouragement of **infringement**...

...Mere knowledge of **infringing** potential or of actual **infringing** uses would not be enough to subject to **copyright infringement liability** a distributor of a product capable of **infringing** uses, nor would ordinary acts incident to product distribution, such as offering customers technical support or product updates, support **liability** in themselves; instead, **liability**...

---

3.   **A&M Records, Inc. v. Napster, Inc.**

United States Court of Appeals, Ninth Circuit.  •  February 12, 2001  •  239 F.3d 1004  •  2001 WL 115033

INTELLECTUAL PROPERTY - Computers and Online Services. Transmission of digital audio files over Internet was not fair use of **copyrighted** musical works.

Show synopsis

1 - 3 of 246 snippets

...   Accordingly, we next address whether Napster is **secondarily liable** for the direct **infringement** under two doctrines of **copyright** law:  contributory **copyright infringement** and vicarious **copyright infringement**....

...Traditionally, one who, with knowledge of the **infringing** activity, induces, causes, or materially contributes to the **infringing** conduct of another, may be held **liable** as a contributory **copyright infringer**; **liability** exists if the defendant engages in personal conduct that encourages or assists the **infringement**....

...   See S. Rep. 105–190, at 40 (1998) ( "The limitations in subsections (a) through (d) protect qualifying service providers from **liability** for all monetary relief for direct, vicarious, and contributory **infringement**."), reprinted in Melville B. Nimmer & David Nimmer, Nimmer on **Copyright**:  Congressional Committee Reports on the Digital Millennium **Copyright** Act and Concurrent Amendments (2000);  see also Charles S. Wright, Actual Versus Legal Control:  Reading Vicarious **Liability**...

---

4.   **Arista Records LLC v. Usenet.com, Inc.**

United States District Court, S.D. New York.  •  June 30, 2009  •  633 F.Supp.2d 124  •  2009 WL 1873589

E-COMMERCE - Computers and Online Services. Operators of file distribution service engaged in conduct which allowed direct **infringement** of music **copyrights**.

Show synopsis

1 - 3 of 267 snippets

...Background:  Recording companies brought action against operators of file distribution service that made music available for download, alleging direct **infringement** of exclusive right of distribution, inducement of **copyright**

A1861

11/1/22, 5:44 PM    Case 1:20-cv-00613-SB  Search Results - In New York, what is secondary liability with respect to copyright infringement and how is it established... | Westlaw...

infringement, contributory **copyright infringement**,  and vicarious **copyright infringement**...

...Holdings:   The District Court, Harold Baer, Jr., J., held that: (1)  imposition of sanction precluding operators from asserting affirmative defense of protection under Digital Millennium **Copyright** Act's (DMCA) safe harbor provision was warranted for discovery abuse; (2)   operators actively engaged in conduct which allowed direct **infringement** of recording companies' **copyrights**; (3)  operators intended to induce or foster **copyright infringement** by its users on its services, as required for inducement of **infringement**...

...  Specifically, Plaintiffs brought this action alleging (1) direct **infringement** of the Plaintiffs' exclusive right of distribution under 17 U.S.C. §  106(3);  2  (2) inducement of **copyright infringement**;  (3) contributory **copyright infringement**;  and (4) vicarious **copyright infringement**...

---

5.  **Perfect 10, Inc. v. Amazon.com, Inc.**
United States Court of Appeals, Ninth Circuit.   •  December 03, 2007  •  508 F.3d 1146  •  2007 WL 4225819

E-COMMERCE - Computers and Online Services. Search engine's display of thumbnail images of **copyrighted** photographs on third-party websites was fair use.

Show synopsis

1 - 3 of 322 snippets

...Although the lines between direct **copyright infringement**, contributory **infringement**, and vicarious **liability** are not clearly drawn, in general, contributory **liability** is based on the defendant's failure to stop its own actions which facilitate third-party **infringement**, while vicarious **liability** is based on the defendant's failure to cause a third party to stop its directly **infringing**...

...Within the general rule that one **infringes** a **copyright** contributorily by intentionally inducing or encouraging direct **infringement**, there are two categories of contributory **liability**:  **liability** may be predicated on actively encouraging or inducing **infringement** through specific acts or on distributing a product distributees use to **infringe copyrights**...

...Operator of Internet search engine that indexed and organized third-party webpages substantially assisted third-party websites in distributing their **infringing** copies of **copyrighted** photographs to a worldwide market and assisted worldwide audience of users to access **infringing** materials, for purpose of **copyright** owner's contributory **infringement** claim, even if operator did not undertake any substantial promotional or advertising efforts to encourage visits to **infringing**...

---

6.  **Wolk v. Kodak Imaging Network, Inc.**
United States District Court, S.D. New York.  •  January 03, 2012  •  840 F.Supp.2d 724  •  2012 WL 11270

COPYRIGHTS - Internet. Internet service provider was shielded from **liability** under Digital Millennium **Copyright** Act (DMCA) safe harbor provision.

Show synopsis

1 - 3 of 236 snippets

A1862

11/1/22, 5:44 PM    Case 1:20-cv-00613-SB Document 695-1 Filed 10/08/24 Page 6 of 80 PageID #: 153751 Westlaw…

...To **establish** a claim of **copyright infringement** violative of **Copyright** Act, a plaintiff must **establish**: (1) ownership of a valid **copyright**, and (2) unauthorized copying or a violation of one of the other exclusive rights afforded **copyright** owners pursuant to the **Copyright** Act.    17 U.S.C.A. §  101 et seq....

...  While "[t]he **Copyright** Act does not expressly render anyone **liable** for **infringement** committed by another," it "does not preclude the imposition of **liability** for **copyright infringements** on certain parties who have not themselves engaged in the **infringing** activity."  ...

...There are five counts in the Complaint applicable to Photobucket:  Count I requesting a declaratory judgment that Photobucket has **infringed** on Wolk's **copyrights**, Count II requesting a permanent injunction preventing Photobucket from continuing to **infringe**, Count III alleging contributory **copyright infringement**, Count IV alleging vicarious **copyright infringement**...

☐    7.    **VHT, Inc. v. Zillow Group, Inc.**

United States Court of Appeals, Ninth Circuit.  •  March 15, 2019  •  918 F.3d 723  •  2019 WL 1216206

**COPYRIGHTS —** Online Services. Owner of real estate marketplace website did not directly **infringe copyrighted** photos that were displayed after property had sold.

Show synopsis

☐    1 - 3 of 272 snippets    ☐

...Holdings:  The Court of Appeals, McKeown, Circuit Judge, held that: (1) owner did not directly **infringe** photos that were displayed on its real property listing platform; (2)    owner did not directly **infringe** photos that were not displayed on its home design webpages; (3)    owner did not directly **infringe** non-searchable photos that were displayed on its home design webpages; (4) searchable functionality that was added to **copyrighted** photos displayed on home design webpages did not constitute fair use; (5)    owner was not **liable**...

...Owner of real estate marketplace website was not **liable** for **secondary copyright infringement** based on induced **infringement** with **respect** to photos displayed on its home design webpages, since website's generally applicable tools and messages for users to save more photos from its listing platform to home design webpages did not promote use of home design webpages specifically to **infringe**...

...Owner of real estate marketplace website was not **liable** for **secondary copyright infringement** based on vicarious **liability** theory with **respect** to photos displayed on its home design webpages, since owner did not have technical ability to screen out or identify allegedly **infringing** photos among many photos that users saved or uploaded daily to home design webpages....

☐    8.    **Capitol Records, LLC v. ReDigi Inc.**

United States District Court, S.D. New York.  •  March 30, 2013  •  934 F.Supp.2d 640  •  2013 WL 1286134

**COPYRIGHTS -** Music. First sale doctrine did not protect website operator's distribution of record company's **copyrighted** works.

Show synopsis

☐    1 - 3 of 212 snippets    ☐

A1863

11/1/22, 5:44 PM    Case 1:20-cv-00613-SB Document 695-1 Filed 10/08/24 Page 7 of 80 PageID #: 15375? Westlaw…

...In its Complaint, Capitol alleges multiple violations of the **Copyright** Act, 17 U.S.C. § 101, et seq., including direct **copyright infringement**, inducement of **copyright infringement**, contributory and vicarious **copyright infringement**, and common law **copyright**...

...Holdings: The District Court, Richard J. Sullivan, J., held that: (1) operator's unauthorized transfer of digital music files over internet was reproduction within meaning of **Copyright** Act; (2) operator's use of company's **copyrighted** music was fell outside fair use defense to **infringement**; (3) first sale doctrine did not protect operator's distribution of company's **copyrighted** works; (4) operator directly **infringed** company's distribution and reproduction rights;...

...To be **liable** for direct **copyright infringement**, a defendant must have engaged in some volitional conduct sufficient to show that it actively violated one of the plaintiff's exclusive rights; in other words, to **establish** direct **liability** under the **Copyright** Act, something more must be shown than mere ownership of a machine used by others to make illegal copies, and there must be actual **infringing**...

---

☐    9.    **Capitol Records, Inc. v. MP3tunes, LLC**

United States District Court, S.D. New York.  •  October 25, 2011  •  821 F.Supp.2d 627  •  2011 WL 5104616

**COPYRIGHTS -** Music. Online music service provider satisfied threshold requirements to qualify for safe harbor under DMCA.

Show synopsis

☐    1 - 3 of 282 snippets    ☐

...A party is contributorily **liable** for **copyright infringement** only if it (1) knew or had reason to know of the **infringement** and (2) materially contributed to the **infringement**....

...Digital Millennium **Copyright** Act (DMCA) seeks to balance the interests of **copyright** owners and online service providers by promoting cooperation, minimizing **copyright infringement**, and providing a higher degree of certainty to service providers on the question of **copyright infringement**.  17 U.S.C.A. § 512....

...To **establish** direct **copyright infringement**, a plaintiff must prove (1) ownership of a valid **copyright** and (2) unauthorized copying by a third party; additionally, a plaintiff must demonstrate compliance with provision of **Copyright** Act requiring preregistration or registration for United States **copyrights** as a prerequisite for suit.  17 U.S.C.A. § 411(a)....

---

☐    10.    **Capitol Records, LLC v. Escape Media Group, Inc.**

United States District Court, S.D. New York.  •  March 25, 2015  •  Not Reported in F.Supp.3d  •  2015 WL 1402049

Before the Court is the report and recommendation ("Report" or "R & R") of Magistrate Judge Sarah Netburn dated May 28, 2014, Dkt. No. 90, regarding Plaintiff EMI Music North America ("EMI")'s motion for summary judgment. EMI moved for summary judgment as to its First and Sixth Claims for federal and common law **copyright infringement**. By...

☐    1 - 3 of 425 snippets    ☐

A1864

11/1/22, 5:44 PM    Search Results | In New York, what is secondary liability with respect to copyright infringement and how is it established? | Westlaw…

…" **Secondary liability** for **copyright infringement** may be imposed on a party that has not directly **infringed** a **copyright**, but has played a significant role in direct **infringement** committed by others, for example by providing direct **infringers** with a product that enables **infringement**…

…Specifically, the Court recommends finding that Escape, as a matter of law, is not entitled to an affirmative defense under the Digital Millennium **Copyright** Act, and that summary judgment should be granted in favor of EMI on its claims for direct **infringement** of the right of performance under federal law, **secondary infringement** under federal law for both contributory and vicarious **infringement**, and direct and **secondary infringement**…

…While the elements of contributory and vicarious **copyright infringement** under **New York** common law are not explicitly delineated, the case law indicates that theories of **secondary liability** generally mirror federal law….

---

☐    11.    **UMG Recordings, Inc. v. Shelter Capital Partners LLC**
United States Court of Appeals, Ninth Circuit.   •   March 14, 2013   •   718 F.3d 1006   •   2013 WL 1092793

**COPYRIGHTS -** Music. Operator of a video-sharing website was entitled to safe harbor protection under the Digital Millennium **Copyright** Act.

Show synopsis

☐    1 - 3 of 240 snippets    ☐

…Operator of publicly accessible website that enabled users to share videos with other users did not have necessary right and ability to control **infringing** activity, and thus remained eligible for safe harbor protection from **copyright infringement** claims under Digital Millennium **Copyright** Act; although parties agreed that at times there was **infringing** material available on website, website operator promptly removed **infringing** material when it became aware of specific instances of **infringement**…

…13   Congress made a considered policy determination that the "DMCA notification procedures [would] place the burden of policing **copyright infringement** —identifying the potentially **infringing** material and adequately documenting **infringement** —squarely on the owners of the **copyright**."  …

…General knowledge of operator of publicly accessible website that enabled users to share videos with other users, that it hosted **copyrightable** material and that its services could be used for **infringement**, was insufficient to constitute a red flag providing actual notice of **infringing** activity, as required for website operator's safe harbor protection under Digital Millennium **Copyright** Act from recording company's **copyright infringement**…

---

☐    12.    **Krisko v. Marvel Entertainment, LLC**
United States District Court, S.D. New York.   •   July 21, 2020   •   473 F.Supp.3d 288   •   2020 WL 4194940

Show synopsis

Did complaint sufficiently allege that there was any injury in the forum to support specific personal jurisdiction? **No**

Legal issue: Personal Jurisdiction > Relates to or A…    More cases on this issue

https://1.next.westlaw.com/Search/Results.html?query=In New York%2C what is secondary liability with respect to copyright infringement and how is …    6/12

A1865

11/1/22, 5:44 PM    Search Results - In New York, what is secondary liability with respect to copyright infringement and how is it established - Westlaw…

**Material Facts**                                    Headnote 15

- Television theme was distributed all over world, including New York

- Copyright owner lived in Florida and did not allege non-speculative and direct New York-based injury to his intellectual property rights other than pure economic losses

**Causes of Action**
Copyright Infringement

**Motion Type**
Motion to Transfer or Change Venue > **Denied**  •  Motion to Dismiss for Lack of Personal Jurisdiction > **Granted**  •  Motion to Dismiss for Failure to State a Claim > …

1 - 3 of 156 snippets

…Holdings:  The District Court, Gregory H. Woods, J., held that: (1)    theme composer did not "transact business" in **New York** within meaning of **New York** long-arm statute; (2)    composer was never physically present in **New York**, and companies which distributed his theme through the airing of the show in **New**…

…**Copyright** owner, who alleged that composer of television show's theme music plagiarized his **copyright**, failed to allege that any **infringement** caused injury to person or property within **New York**, for purposes of **New York** long-arm statute; although television theme was distributed all over world, including **New**…

…Composer of television show's musical theme was never physically present in **New York**, and **New York** media companies which distributed his theme through the airing of the show in **New York** did not act as composer's agent, for purposes of **New York** long-arm statute, where composer's work was sold by his employer to **New**…

13.    **Sony Corp. of America v. Universal City Studios, Inc.**
Supreme Court of the United States  •  January 17, 1984  •  464 U.S. 417  •  104 S.Ct. 774

Owners of **copyrights** on television programs brought **copyright infringement** action against manufacturers of home videotape recorders.    The United States District Court for the Central District of California, 480 F.Supp. 429, denied all relief sought by **copyright** owners and entered judgment for manufacturers, and owners appealed.    The…

Show synopsis

1 - 3 of 493 snippets

…Anyone who trespasses into **copyright** owner's exclusive domain by using or authorizing use of the **copyrighted** work in one of the five ways set forth in the statute is an **infringer** of the **copyright**;  conversely, anyone who is authorized by **copyright** owner to use the **copyrighted** work in a way specified in the statute or who makes a fair use of the work is not an **infringer**…

…Decision in Kalem Co. v. Harper Brothers, which held that producer of an unauthorized film dramatization of a **copyrighted** book was **liable** for his sale of the motion picture to jobbers who in turn arranged for the commercial exhibition of the film did not **establish** a basis upon which to hold manufacturers of home videotape recorders **liable** to owners of **copyrights** on television programs for **copyright infringement**…

…Respondents argue that Kalem stands for the proposition that supplying the "means" to accomplish an **infringing** activity and encouraging that activity

A1866

11/1/22, 5:43 PM    Case 1:20-cv-00613-SB  Search Results in New York, what is secondary liability with respect to copyright infringement and how is it established | Westlaw… Document 695-1  Filed 10/08/24  Page 10 of 80 PageID #: 152755

through advertisement are sufficient to **establish liability** for **copyright infringement**....

Missing: ~~secondary liability~~ | Must include: secondary liability

---

☐    14.    **Gershwin Pub. Corp. v. Columbia Artists Management, Inc.**

United States Court of Appeals, Second Circuit.    •    May 24, 1971    •    443 F.2d 1159    •    14 A.L.R. Fed. 819

> Appeal from an order of the United States District Court for the Southern District of **New** York, Gus J. Solomon, J., 312 F.Supp. 581, granting summary judgment for the plaintiff and enjoining defendant from any future **infringement** of plaintiff's **copyright** in the musical composition 'Bess, You Is My Woman Now.' The Court of Appeals,...

Show synopsis

> ☐    1 - 3 of 45 snippets    ☐
>
> ...One who, with knowledge of **copyright infringing** activity, induces, causes or materially contributes to **infringing** conduct of another may be held **liable** as a "contributory" **infringer**.    17 U.S.C.A. §§ 1(e), 101....
>
> ...[1][2][3] Section 1(e) of the **Copyright** Act bestows upon the **copyright** proprietor 'the exclusive right * * * to perform the **copyrighted** work publicly for profit,' an interest which is protected by § 101 of the Act which holds accountable 'any person (who) shall **infringe** the **copyright**.'...
>
> ...Even in absence of employer-employee relationship one may be vicariously **liable** for **copyright infringement** if he has right and ability to supervise **infringing** activity and also has direct financial interest in such activities.    17 U.S.C.A. §§ 1(e), 101....

Missing: ~~respect~~ , ~~established~~ and ~~secondary liability~~ | Must include: respect, established, secondary liability, or all search terms

---

☐    15.    **Arista Records LLC v. Lime Group LLC**

United States District Court, S.D. New York.    •    May 25, 2010    •    715 F.Supp.2d 481    •    2010 WL 2291485

> E-COMMERCE - Intellectual Property. Business distributing file-sharing software induced **copyright infringement** of sound recordings.

Show synopsis

> ☐    1 - 3 of 293 snippets    ☐
>
> ...Holdings:   The District Court, Kimba M. Wood, J., held that: (1)   record companies' collaboration with statistical expert did not render inadmissible expert's opinions regarding what percentage of shared files were not authorized for free distribution; (2)   under **New York** law, entire declaration of businesses's employee to record companies' counsel would not be stricken as arising out of improper ex parte communication; (3)   e-mail chains and Internet forum postings written in whole or part by business's employees were admissions by opponent constituting admissible non-hearsay; (4)   business induced **copyright**...
>
> ...Plaintiffs raise the following claims against LW, Lime Group, and Gorton (1) inducement of **copyright infringement**;  (2) contributory **copyright**

A1867

11/1/22, 5:43 PM          Case 1:20-cv-00613-SB Document 695-1 Filed 10/08/24 Page 11 of 80 PageID #: 152756 Westlaw…

infringement; (3) vicarious **copyright infringement**; and (4) state common law **copyright infringement**...

...For the reasons stated below, the Court: (1) DENIES Defendants' motions to exclude evidence; 4 (2) GRANTS Plaintiffs' motion for summary judgment on the claim against LW of inducement of **copyright infringement**, and DENIES LW's motion for summary judgment on the claim; (3) DENIES the parties' cross-motions for summary judgment on the claim against LW of contributory **copyright infringement**; (4) DENIES LW's motion for summary judgment on the claim of vicarious **copyright**...

---

☐  16.  **Warner Records Inc. v. Charter Communications, Inc.**
United States District Court, D. Colorado.  •  April 15, 2020  •  454 F.Supp.3d 1069  •  2020 WL 1872387

**COPYRIGHTS** — Online Services. **Copyright** owners stated claim against ISP for vicarious **liability** for **copyright infringement**.
Show synopsis

☐  1 - 3 of 192 snippets  ☐

...Financial benefit, as element of claim for vicarious **liability** for **copyright infringement**, may be **established** by showing that users of **copyrighted** materials are attracted to a defendant's product because it enables **infringement**, and that use of the product for **infringement** financially benefits defendant; it exists when the availability of **infringing**...

...Record companies and music publishers that produced and distributed **copyrighted** commercial sound recordings and musical compositions sufficiently alleged Internet service provider's (ISP) direct financial interest in its customers' **infringing** activities, as required to state claim for vicarious **liability** for **copyright infringement**; allegations included that ISP drew **infringers** to its service by touting specific features of its service that were attractive to **copyright**...

...Record companies and music publishers that produced and distributed **copyrighted** commercial sound recordings and musical compositions sufficiently alleged Internet service provider (ISP) had both a legal right to stop or limit directly **infringing** conduct, as well as the practical ability to do so, as required to state claim for vicarious **liability** for **copyright infringement**; allegations included that ISP's own terms of service and policies expressly prohibited users from engaging in **copyright**...

---

☐  17.  **Sony Music Entertainment v. Cox Communications, Inc.**
United States District Court, E.D. Virginia, Alexandria Division.  •  June 02, 2020  •  464 F.Supp.3d 795  •  2020 WL 3121306

**COPYRIGHTS** — Music. Jury's award of statutory damages of $99,830.29 for each work **infringed** was not miscarriage of justice in record companies' **copyright infringement** action against ISP.
Show synopsis

☐  1 - 3 of 497 snippets  ☐

...Holdings: The District Court, Liam O'Grady, Senior District Judge, held that: (1) evidence of operators' direct **infringement liability** from distribution under **Copyright** Act presented question for jury; (2) evidence of operators' direct **infringement liability** from reproduction presented question for jury; (3)

A1868

11/1/22, 5:43 PM    Search Results | In New York, What is secondary liability with respect to copyright infringement and how is it established | Westlaw…

evidence of operators' right and ability to supervise **infringing** activity presented question for jury on claim of vicarious **liability**...

...The number of awards of statutory damages that a plaintiff may recover in any given **copyright infringement** action against a single defendant depends on the number of works that are **infringed**, not the number of **infringements**, and the number of individually **liable infringers** and is unaffected by the number of **infringements** of those works.    17 U.S.C.A. § 504(c)(1)....

...[39] Then, to solidify the idea that the number of **infringers** is also measured by the work **infringed**, Congress specifies that the " **infringer** is **liable** individually, or [ ] any two or more **infringers** are **liable** jointly and severally." § 504(c)(1)....

---

☐  18.  **Ellison v. Robertson**
United States Court of Appeals, Ninth Circuit.  •  February 10, 2004  •  357 F.3d 1072  •  2004 WL 235466

**COPYRIGHTS -** Internet. Fact issue existed as to whether ISP was eligible for **Copyright** Act's safe-harbor provisions.

Show synopsis

☐  1 - 3 of 128 snippets  ☐

...The court found that:  (1) the evidence failed to **establish** Ellison's claims of direct and vicarious **copyright infringement**;  (2) whether AOL was **liable** for contributory **copyright infringement** presented a triable issue of fact;  (3) the evidence showed that AOL met the threshold eligibility requirements of 17 U.S.C. §  512(i) for the safe harbor limitations from **liability**...

...One who, with actual or implied knowledge of **copyright infringing** activity, induces, causes, or materially contributes to **infringing** conduct of another may be **liable** as contributory **infringer**....

...  A defendant is vicariously **liable** for **copyright infringement** if he enjoys a direct financial benefit from another's **infringing** activity and "has the right and ability to supervise" the **infringing** activity....

Missing: ~~New York,~~ | Must include: New York,

---

☐  19.  **Perfect 10, Inc. v. Visa Intern. Service Ass'n**
United States Court of Appeals, Ninth Circuit.  •  July 03, 2007  •  494 F.3d 788  •  2007 WL 1892885

**COPYRIGHTS -** Internet. Payment processing by credit card companies did not constitute material contribution to **infringement**.

Show synopsis

☐  1 - 3 of 400 snippets  ☐

...Holdings:  The Court of Appeals, Milan D. Smith, Jr., Circuit Judge, held that: (1)   payment processing by credit card companies did not constitute material contribution to **infringement** by competing Internet websites that stemmed from failure to obtain license to distribute; (2)   payment processing by credit card companies did not induce competing Internet websites to **infringe copyrights**; (3)   credit card companies had not vicariously **infringed copyrights**...

https://1.next.westlaw.com/Search/Results.html?query=In New York%2C what is secondary liability with respect to copyright infringement and how i…    10/12

A1869

11/1/22, 5:43 PM    Search Results, In New York, what is secondary liability with respect to copyright infringement and how is it established? | Westlaw...

Case 1:20-cv-00613-SB   Document 695-1   Filed 10/08/24   Page 13 of 80 PageID #: 15275

...[12][13]    To be **liable** for contributory trademark **infringement**, a defendant must have (1) "intentionally induced" the primary **infringer** to **infringe**, or (2) continued to supply an **infringing** product to an **infringer** with knowledge that the **infringer** is mislabeling the particular product supplied....

...To be **liable** for contributory trademark **infringement** under Lanham Act, a defendant must have (1) intentionally induced the primary **infringer** to **infringe**, or (2) continued to supply an **infringing** product to an **infringer** with knowledge that the **infringer** is mislabeling the particular product supplied.   Lanham Act, § 32(1)(a), 15 U.S.C.A. § 1114(1)(a)....

Missing: ~~New York,~~ | Must include: New York,

|  | 20. | **Levine v. Landy** |
|---|---|---|

United States District Court, N.D. New York.   •   December 30, 2011   •   832 F.Supp.2d 176   •   2011 WL 6845886

**COPYRIGHTS -** Art and Architecture. Allegations by photographer stated contributory **copyright infringement** claim against defendant-publisher.

Show synopsis

1 - 3 of 173 snippets

...Holdings:  The District Court, David N. Hurd, J., held that: (1)    allegations stated claim for violation of the **Copyright** Act; (2)    photographer was prohibited from claiming statutory damages and attorney fees in connection with certain **infringement** claims under the **Copyright** Act; (3)    allegations stated contributory **copyright infringement** claim against publisher; (4)    unjust enrichment claim was preempted by **Copyright**...

...Although the **Copyright** Act does not expressly render anyone **liable** for **infringement** committed by another, the doctrines of **secondary liability** emerged from common law principles and are well **established** in copyright **infringement** law.   17 U.S.C.A. § 106....

...Photographer's claim for an accounting against publisher, under **New York** law, was preempted by the **Copyright** Act, with **respect** to photographs that were allegedly **copyrighted** and **infringed** by publisher, as claim was premised primarily on **copyright infringement**.   17 U.S.C.A. § 301(a)...

1 2 3 4                    20 per page ⌄

## Documents related to your search

**Secondary Sources**     Briefs     Trial Court Documents

### Liability as "vicarious" or "contributory" infringer under Federal Copyright Act

American Law Reports ALR Federal

https://1.next.westlaw.com/Search/Results.html?query=In New York%2C what is secondary liability with respect to copyright infringement and how i...    11/12

A1870

Case 1:20-cv-00613-SB Document 695-1 Filed 10/08/24 Page 14 of 80 PageID #: 15275

...A person **infringes** on **copyright** contributorily by inducing or encouraging direct **infringement**, and **infringes** vicariously by profiting from direct **infringement** while declining to exercise a right to stop or limit it; without a showing of a direct **copyright infringement**, **secondary liability**...

### 4.11[5][B]Individual Liability for the Conduct of Business Entities (Including the Potential Liability of Investors, Venture Capitalists, Officers, Directors and Owners)

E-Commerce and Internet Law

...54] The court further rejected Robertson's argument that he could not be held **secondarily liable** for MP3Tunes' **secondary liability**, noting other cases where individuals were held **secondarily liable** for their companies' **secondary liability**...

### 4.11[4][C]Right and Ability to Control and the Potential Applicability of the Sony Safe Harbor

E-Commerce and Internet Law

...Similarly, in UMG Recording, Inc. v. Escape Media Group, Inc.,[ 23] Judge Thomas Griesa of the Southern District of **New York** granted summary judgment for the record company plaintiffs in that case, holding that the entity that owned the online music service Grooveshark, whose employees had uploaded over 4,000 **infringing** sound recordings, had the ability to control its employees' **infringing** activity where internal emails **established** that senior executives directed employees to upload music files to "seed" the Grooveshark service and various employees testified that they were directed to and did upload **infringing**...


A1871

Case 1:20-cv-00613-SB   Document 695-1   Filed 10/08/24   Page 15 of 80 PageID #: 152760

# EXHIBIT 20

A1872



COX
EXHIBIT 2

Case 1:20-cv-00613-SB   Document 695-1   Filed 10/08/24   Page 17 of 80 PageID #: 152762

# EXHIBITS  1-
# Redacted in their Entirety

A1874

Case 1:20-cv-00613-SB   Document 695-1   Filed 10/08/24   Page 18 of 80 PageID #: 152763

# EXHIBIT 40

A1875

STATEMENT OF WORK II
FOR ROSS BULK MEMOS

This Statement of Work II incorporates and is made pursuant to the October 15, 2015 Master Services Agreement ("MSA") by and between ROSS Intelligence, Inc. ("ROSS"), a Delaware corporation and LegalEase Solutions, LLC ("Contractor") a Michigan limited liability company.

1. Definitions:  Terms and expressions not expressly defined in this Statement of Work, shall have the following meanings:

   1.1. "Case Law" means judicial decisions originating from a judicial or administrative body in the United States of America, or as otherwise prescribed in writing by ROSS and sent to Contractor.
   1.2. "Legal Research Question" means a question grounded in legal principles.
   1.3. "Memorandum or Memo" means a memorandum of law that answers a Legal Research Question.
   1.4. "Quote" means an independent paragraph excerpt from Case Law.
   1.5. "Reference List" means the list of Case Law included in the Memo.
   1.6. "Deficiency" means a reference quote that does not directly answer the ROSS question.

2. Additional Terms and Expressions: Additional capitalized terms and expressions have the meanings ascribed to them in the MSA.

3. Currency: Unless stated otherwise, all dollar figures in this Statement of Work are in United States dollars.

4. Term: Subject to the termination provisions of this Agreement, the term of this Statement of Work shall be for a period of three months commencing on September 19, 2017 and expiring on December 19, 2017 ("Initial Term"). Upon the expiration of the Initial Term, this Statement of Work shall renew with the prior written mutual consent of ROSS for successive three month periods ("Renewal Terms"), unless terminated pursuant to the terms of the Agreement. The terms Initial and Renewal Terms shall be collectively referred to as the "Term".

5. Description of Service:

5.1. Contractor agrees to provide ROSS with bulk Memos. Contractor agrees to meet the expectations for performance as set forth in this Statement of Work. Contractor's attorneys will research topics and Legal Research Questions from any Federal or State jurisdiction in the United States, without regard to any legal decisions, draft Memos, and compile the Memos in the format approved by ROSS.

5.2. Each Memo shall include a Legal Research Question and a Reference list with a target of at least four (4) and no more than six (6) Quotes.

5.3. Two (2) to four (4) Quotes in each Memo shall contain either a "great" or "good" independent answer to the Legal Research Question. A "great" Quote is one that contains an answer to all essential elements of the Legal Research Question while a "good" Quote is one that contains an answer to most essential elements of the Legal Research Question. The Contractor shall strive for four (4) "good" or "great" Quotes per question. However, if

ROSS-000175054

A1876

Contractor is only able to find 2 or 3 "good" or "great" Quotes, they shall only provide 2 or 3 "good" or "great" Quotes. Contractor shall strive to have more "great" than "good" Quotes.

5.4. One (1) Quote in each Memo shall contain a "topical" independent response to the Legal Research Question. A "topical" response is a response that answers and/or references limited components of a Legal Research Question but does not answer the essential elements of such Legal Research Question.

5.5. One (1) Quote in each Memo shall contain an "irrelevant" independent response to the Legal Research Question. An "irrelevant" response is a response that contains one or more keywords from the Legal Research Question but does answer and/or reference any elements of the Legal Research Question, either limited or essential.

5.6. Contractor shall label whether a Quote contains a response that is "great", "good", "topical" or "irrelevant" and double bracket and bold the specific component(s) of each such Quote that is "great", "good", "topical" or "irrelevant." Contractor shall also label which legal practice area each Quote falls under.

6. Changes: ROSS reserves the right to request changes, deletions, or additions as deemed necessary by ROSS and Contractor. ROSS' proposed changes shall become effective only by written agreement of Contractor.

7. Production/Delivery Schedule: Contractor agrees to draft ROSS questions and Memos pursuant to the Production Run schedule below. In the First Production Run of Memos, Contractor shall commence providing deliverables on October 19, 2017 and conclude on December 19, 2017, as outlined below. For the Subsequent Production Runs of Memos, Contractor shall provide 20,000 Memos in subsequent months to ROSS.

First Production Run

| Delivery Date | Amount of Memos |
|---|---|
| October 19, 2017 | 5,000 |
| November 19, 2017 | 10,000 |
| December 19, 2017 | 10,000 |

Subsequent Production Run

| Delivery Date | Amount of Memos |
|---|---|
| Month 1 | 20,000 |
| Month 2 | 20,000 |
| Month 3 | 20,000 |
| Month 4 | 15,000 |

8. Fee: ROSS shall pay Contractor pursuant to the schedule below:

| Reference Quotes | Price per Memo |
|---|---|

ROSS-000175055

A1877

| 4 Quotes + 1 topical and 1 irrelevant Quote | $26.17 |
|---|---|
| 3 Quotes + 1 topical and 1 irrelevant Quote | $24.55 |
| 2 Quotes + 1 topical and 1 irrelevant Quote | $21.00 |

Contractor shall provide a 5% volume discount to ROSS for any Memo purchase over 25,000 and a 15% volume discount for a total order of 100,000 Memos.

9. Payment: ROSS shall pay Contractor in advance at the beginning of each month for the following 30 days of expected output at a minimum $21.00 price per Memo (each, an "Advance Payment"). For clarity, the Advance Payment for the (i) first 5,000 Memos of the First Production Run due October 19, 2017 shall be $105,000 and shall be made on September 19, 2017; (ii) subsequent 10,000 Memos of the First Production Run due November 19, 2017 shall be $210,000 and shall be made on October 19, 2017 and (iii) final 10,000 Memos of the First Production Run due December 19, 2017 shall be $210,000 and shall be made on November 20, 2017. For any Subsequent Production Run, the Advance Payment shall be $420,000. If there is a difference between an Advance Payment amount and aggregate Memo cost during a Production Run pursuant to the Section 8 Fee schedule (the "Cost Difference"), Contractor shall provide ROSS a detailed accounting of such Cost Difference in a timely manner and ROSS shall pay such Cost Difference within seven (7) days receipt of such detailed accounting.

10. Delivery: Contractor shall deliver batched Memos via e-mail or FTP to ross@rossintelligence.com and via the ROSS Memo upload portal (the "Portal"). The Portal shall meet necessary specifications of speed and capacity to process daily batched Memo uploads.

11. Quality Assurance: Contractor shall ensure the Memos submitted follow the (i) quality control processes detailed in the LegalEase Solutions Quality Control Guide ("QCG") provided in Schedule A to this Statement of Work and the (ii) Quality Control Checklist provided in Schedule B to this Statement of Work. Contractor shall follow a staged quality control process. There will be 100% quality control for the first 2000 Memos, 75% for the next 10,000 Memos and 25% for the remaining Memos. If any of the Memos submitted do not meet the parameters prescribed in the QCG, ROSS shall inform Contractor of such Deficiencies within 14 days of receipt of the applicable Memos. If no such notice is received within the prescribed 14 days, the applicable Memos shall be deemed fully accepted by ROSS. A 15% penalty shall be charged to any Memo and/or batch of Memos that fail to meet the QCG requirements.

12. Reporting: Contractor shall email daily reports to ROSS which include the production totals, QCG results, and other requested information from ROSS.

13. Destruction of Memos: Contractor acknowledges that the Memos constitute Confidential Information and shall remove and destroy all Memos and copies of Memos in its

ROSS-000175056

A1878

possession within sixty (60) days of each Production Run and shall concurrently confirm to ROSS that such removal and destruction has occurred.

14. <u>Existing Agreements</u>: This Statement of Work is ancillary to existing agreements, including, but not limited to the MSA and prior Statements of Work.

Date: September 15, 2017

ROSS INTELLIGENCE, INC.

By: _____

Name: Andrew Arruda
Title: Chief Executive Officer


LEGALEASE LLC

By: _____

Name: Tariq Hafeez
Title: President

ROSS-000175057

A1879

Schedule A

# Quality Control Guide for ROSS Intelligence

Drafting Questions, Preparing Responsive Memorandum, and Quality Control Procedures

LegalEase Solutions LLC

ROSS-000175058

A1880



## TABLE OF CONTENTS

Overview ................................................................................................................ 2
    Introduction .................................................................................................... 2
    Audience ......................................................................................................... 2
    Objectives ....................................................................................................... 2
Legal Disclaimer ................................................................................................... 3
The LegalEase Ross Team and Process ................................................................ 4
    Attorneys ........................................................................................................ 4
    Quality Control Attorneys .............................................................................. 4
    Staged Quality Control Process ..................................................................... 4
    Production Expeditors .................................................................................... 5
    India and US Project Managers ..................................................................... 5
    ROSS Operations ........................................................................................... 5
The LegalEase ROSS Process Flowchart ............................................................. 6

Private and Confidential - Page 1 of 6

ROSS-000175059

A1881



## Overview

### Introduction

The LegalEase Solutions Quality Control Guide ("QCG") is the primary quality assurance resource and playbook for our attorneys. This QCG provides all the tools and resources needed for the drafting and delivery of ROSS Intelligence memos.

### Audience

The intended audience for this guide is our attorneys who prepare Ross memos. Additionally, this guide may be utilized by ROSS to review our internal process.

### Objectives

This guide:

- Identifies clear guidelines for attorneys to follow when designing, developing, and researching, drafting, and delivering ROSS memos.
- Describes quality control standards for ROSS memos.
- Describes quality control procedures and processes set in place for ROSS memo production.

ROSS-000175060

A1882

Case 1:20-cv-00613-SB   Document 695-1   Filed 10/08/24   Page 26 of 80 PageID #: 152771



**Legal Disclaimer**

This Quality Control Guide includes proprietary, confidential, and/or trade secret information. LegalEase considers this information to be a trade secret not subject to disclosure.

ROSS-000175061

A1883



**The LegalEase ROSS Team and Process**

We have organized a comprehensive team for this project. Leading the team for ROSS operations are Teri Whitehead, VP of Global Strategy and Gayathri Rajeev, Director of Operations in India. Teri and Gayathri will oversee operations and are available anytime to address and resolve any potential concerns.

**Attorneys.** Our team of attorneys will research topics and questions, draft the memos, and compile the memos in the ROSS approved format. We will ensure that our attorneys follow this QCG for drafting memos and utilize our internal associate work product checklists. The steps include:

i.    Using our LegalEase's creative process, to produce ROSS questions.
ii.   Research answers to questions.
iii.  Draft ROSS memorandum.

**Quality Control Attorneys.** We have allocated a minimum of 5 separate QC attorneys to independently review memos, ensuring that ROSS standards are met. These attorneys have a minimum of 3 years' experience in these positions. The QC team will be expanded as needed per the scope and requirements of this project. The QC team will follow the QC checklist setting out the steps to be followed in completing the process. These steps include:

i.    Review and confirm the grammar, question format, and citations.
ii.   Confirm and review short answer and legal analysis.
iii.  Review reference quotes for relevancy.
iv.   Confirm case law.
v.    Advise associates of errors and design action plan to avoid future errors.

**Staged Quality Control Process.** Our QC attorneys will follow LegalEase's staged quality control process. We have used this process with success on other large accounts with over 50,000 documents.

First Stage:
    100% QC of 2000 Memos. Our QC attorneys will QC 100% of the first 2000 memos.
Second Stage:
    75% for the next 10,000 memos. Our QC attorneys will QC 75% of the next 10,000 memos.
Third Stage:
    25% for the remaining memos. Our QC attorneys will QC 25% or more of the remaining memos.

Private and Confidential - Page 4 of 6

ROSS-000175062

A1884

Case 1:20-cv-00613-SB   Document 695-1   Filed 10/08/24   Page 28 of 80 PageID #: 152773



**Production Expeditors.** Our dedicated ROSS production expeditors will comply and follow ROSS' process on delivery, including the portal upload, data tracking, and logistics. These steps include:

    i.    Validate question originality.
    ii.    Upload memorandum to ROSS dedicated portal.
    iii.    Update internal LE production tracking sheet.
    iv.    Email production totals of attorneys and QC attorneys to Project Managers.
    v.    Update internal exception error tracking sheet.
    vi.    Update ROSS' completion tracking sheet.

**India and US Project Managers.** We have assigned to ROSS, three project managers. Our project managers will guarantee and ensure ROSS quality and processes. Having project managers in different time zones will provide round the clock attention and access.

The role of the PM's include:

    i.    Review production of attorneys, QC attorneys, production expeditors.
    ii.    Daily review protocol and process for efficiencies following LE model theory of constraints.
    iii.    Address any concerns.
    iv.    Email daily reports to LegalEase Operations detailing production, legal topics addressed, upload process production, improved efficiencies, and QC results.

**Ross Operations.** Teri Whitehead and Gayathri Rajeev will oversee all aspects of this project. Teri and Gayathri's role includes the following:

    i.    Address any concerns.
    ii.    Email daily reports to the ROSS team providing production totals, QC results, and other requested information.
    iii.    Host daily conference status calls with the ROSS Production team.

ROSS-000175063

A1885



The LegalEase ROSS Process Flowchart



Private and Confidential - Page 6 of 6

ROSS-000175064

A1886

Schedule 8

| | |
|---|---|
| Document ID | : ROSS Bulk QCC |
| Date of Issue | : 07.08.2017 |
| Periodic Review | : 09.15.2017 |
| Revision No | : |

# Quality Control Checklist for ROSS Intelligence

## LegalEase Solutions LLC

1

ROSS-000175065

A1887

Schedule 8

| Document ID | : ROSS Bulk QCC |
|---|---|
| Date of Issue | : 07.08.2017 |
| Periodic Review | : 09.15.2017 |
| Revision No | : |

## QUALITY CONTROL CHECKLIST FOR ROSS BULK MEMOS

### Attorney - ROSS Intelligence Checklist

| Description | Completed |
|---|---|
| 1. Draft ROSS questions following LegalEase Creative Process. | |
| 2. Research questions using online resources and accounts. | |
| 3. Label cases as great, good, topical, and irrelevant. | |
| 4. Confirm that great, and good quotes answer the question directly. | |
| 5. Add topical and irrelevant cases. | |
| 6. Confirm that the topical and irrelevant cases meet the criteria. | |
| 7. Confirm grammar correct throughout memo. | |
| 8. Confirm the font and space of the memo. | |
| 9. Follow file name convention. | |

### Review Attorney - ROSS Intelligence Checklist

| Description | QC 1 | QC 2 |
|---|---|---|
| Question should not be state specific. | | |
| Grammar check of question. | | |
| Quotes to be labeled correctly. GREAT – must contain **all** essential elements of the question. GOOD – contains **most** of the essential elements of the question. | | |

2

ROSS-000175066

A1888

Schedule B

| Document ID | : ROSS Bulk QCC |
| Date of Issue | : 07.08.2017 |
| Periodic Review | : 09.15.2017 |
| Revision No | : |

| | | | |
|---|---|---|---|
| | TOPICAL – foundation quote, background information.<br><br>IRRELEVANT– has no reference or relevance. | | |
| | Should label as Great Case 1, Great Case 2, and not Great Quote. | | |
| | Bracketed language **must** answer question.<br><br>Bracketed language may be up to a paragraph.<br><br>If necessary, you can double bracket separate sentences.<br><br>Bracketed language must be a sentence. Not just two words. | | |
| | Double Brackets, and Content in Bold. | | |
| | No red squiggly line. | | |
| | Confirm reference quote. Ensure Topical quote and Irrelevant quotes are added. | | |
| | Smartsheet updates. | | |
| | Double check the Form - Double Brackets for Quotes. No highlights. | | |
| | Memo number. | | |
| | Memo saved in correct format – naming convention. | | |

3

ROSS-000175067

A1889

# EXHIBITS  1-
# Redacted in their Entirety

A1890

Case 1:20-cv-00613-SB Document 695-1 Filed 10/08/24 Page 34 of 80 PageID #: 152779

# EXHIBIT 43

A1891

**HJS Development, Inc. v. Pierce County ex rel. Dept. of..., 148 Wash.2d 451 (2003)**

61 P.3d 1141

148 Wash.2d 451
Supreme Court of Washington,
En Banc.

HJS DEVELOPMENT, INC., Respondent,
v.
PIERCE COUNTY, acting through its
DEPARTMENT OF PLANNING AND LAND
SERVICES, Appellant.

No. 71430–4.
|
Argued Oct. 15, 2002.
|
Decided Jan. 23, 2003.

Subdivision developer sought review of county hearing examiner's decision to revoke site plan and preliminary plat approval. The Superior Court, Thurston County, Daniel J. Berschauer, J., reversed. County sought review. The Supreme Court, Smith, J. Pro Tem., held that: (1) preliminary subdivision plat is a "use" within the meaning of former county ordinance permitting hearing examiner to revoke or modify any permit, use, or activity; (2) statute which states that the process for dividing land is a matter of state concern and should be administered in a uniform manner by cities, towns, and counties throughout the state did not preempt the ordinance; (3) the ordinance did not conflict with statute requiring developer to submit final plat for approval within five years of the preliminary plat approval; and (4) revocation of plat was the only proper remedy for removal of trees and vegetation in violation of conditions of preliminary plat approval.

So ordered.

Madsen, J., dissented and filed opinion in which Sanders, J., joined.

West Headnotes (30)

[1]        **Zoning and Planning**
⟶Record

A petition for review by the superior court constitutes appellate review on the administrative record before the local jurisdiction's body or officer with the highest level of authority to make the final land use determination. West's RCWA 36.70C.020(1), 36.70C.130(1).

23 Cases that cite this headnote

[2]        **Zoning and Planning**
⟶Review of local authority or lower court

When reviewing a superior court's decision on a land use petition, the appellate court stands in the shoes of the superior court and reviews the administrative decision on the record of the administrative tribunal, not of the superior court.

31 Cases that cite this headnote

[3]        **Zoning and Planning**
⟶De novo review

On appeal of superior court decision overturning county hearing examiner's revocation of preliminary plat, the Supreme Court would review the record before the hearing examiner and review questions of law de novo to determine whether the land use decision was supported by fact and law.

42 Cases that cite this headnote

[4]        **Constitutional Law**
⟶Resolution of non-constitutional questions before constitutional questions

If a case can be decided on nonconstitutional grounds, an appellate court should decline to consider the constitutional issues.

8 Cases that cite this headnote

WESTLAW    © 2017 Thomson Reuters. No claim to original U.S. Government Works.                    1

Confidential                                                                                ROSS-000179468

A1892

**HJS Development, Inc. v. Pierce County ex rel. Dept. of..., 148 Wash.2d 451 (2003)**

61 P.3d 1141

[5]  **Zoning and Planning**
Tentative or preliminary approval

A preliminary subdivision plat was not a "site plan" or "permit" within the meaning of former county ordinance permitting hearing examiner to revoke or modify any site plan approval or permit; thus, the ordinance did not grant the hearing officer authority to revoke a preliminary plat.

Cases that cite this headnote

[6]  **Zoning and Planning**
Nature of power

An administrative tribunal, such as a county hearing examiner for subdivision plat applications, has only the authority granted it by statute or ordinance.

Cases that cite this headnote

[7]  **Municipal Corporations**
Construction and operation

Interpretation of local ordinances is governed by the same rules of construction as state statutes.

1 Cases that cite this headnote

[8]  **Statutes**
Construing together; harmony

In considering an undefined term, the court considers the statute as a whole to give meaning to the term in harmony with other statutory provisions.

1 Cases that cite this headnote

[9]  **Municipal Corporations**
Construction and operation
**Statutes**
Absence of Ambiguity; Application of Clear or Unambiguous Statute or Language

Rules of construction do not apply when the language of a statute or ordinance is clear and explicit.

3 Cases that cite this headnote

[10]  **Municipal Corporations**
Construction and operation
**Statutes**
Defined terms; definitional provisions

Definitions contained within a statute or ordinance control the meaning of words used in that act.

3 Cases that cite this headnote

[11]  **Municipal Corporations**
Construction and operation

Courts must reasonably construe ordinances with reference to their purpose.

1 Cases that cite this headnote

[12]  **Zoning and Planning**
Maps, plats, or plans; subdivisions

Preliminary subdivision plat is a not a "permit" or "activity" within the meaning of former county ordinance permitting hearing examiner to revoke or modify any permit, use, or activity granted pursuant to the county zoning code; a preliminary plat does not impact the land.

Confidential                                                                    ROSS-000179469

A1893

**HJS Development, Inc. v. Pierce County ex rel. Dept. of..., 148 Wash.2d 451 (2003)**

61 P.3d 1141

Cases that cite this headnote

[13]    **Statutes**
⬦ Conjunctive and disjunctive words

Ordinarily, the word "or" does not mean "and" unless there is clear legislative intent to the contrary.

6 Cases that cite this headnote

[14]    **Statutes**
⬦ Conjunctive and disjunctive words

Statutory phrases separated by the word "and" generally should be construed in the conjunctive.

1 Cases that cite this headnote

[15]    **Zoning and Planning**
⬦ Maps, plats, or plans; subdivisions

Preliminary subdivision plat is a "use" within the meaning of former county ordinance permitting hearing examiner to revoke or modify any permit, use, or activity granted pursuant to the county zoning code; although the right to subdivide land arises from final plat approval, approval of a preliminary plat begins the plat subdivision process, and without a preliminary plat, final plat approval may never be achieved.

2 Cases that cite this headnote

[16]    **Counties**
⬦ Legislative control of acts, rights, and liabilities

Counties have plenary police power to enact ordinances, but the power ceases when in conflict with general state law or when the legislature intended state law to be exclusive, unless there is room for concurrent jurisdiction. West's RCWA **Const. Art.** 11, **§ 11.**

Cases that cite this headnote

[17]    **Counties**
⬦ Legislative control of acts, rights, and liabilities

Whether there is room for county to exercise concurrent jurisdiction with state depends on legislative intent which is derived from analysis of the statute.

Cases that cite this headnote

[18]    **Counties**
⬦ Legislative control of acts, rights, and liabilities

Preemption of a county ordinance arises when the legislature has expressed its intent to preempt the field or that intent is manifest from necessary implication.

3 Cases that cite this headnote

[19]    **Counties**
⬦ Legislative control of acts, rights, and liabilities

If the legislature is silent on its intent to occupy a given field, courts ruling on preemption of a county ordinance may refer to the purposes of the particular legislative enactment and to facts and circumstances upon which the statute was intended to operate.

3 Cases that cite this headnote

WESTLAW    © 2017 Thomson Reuters. No claim to original U.S. Government Works.    3

Confidential

ROSS-000179470

A1894

**HJS Development, Inc. v. Pierce County ex rel. Dept. of..., 148 Wash.2d 451 (2003)**

61 P.3d 1141

[20]    **Municipal Corporations**
⬦⬩Presumptions and burden of proof

A heavy burden rests upon the party challenging the constitutionality of an ordinance.

2 Cases that cite this headnote

[21]    **Municipal Corporations**
⬦⬩Presumptions and burden of proof

Every    presumption    is    in    favor    of constitutionality of an ordinance.

2 Cases that cite this headnote

[22]    **Zoning and Planning**
⬦⬩Maps, plats, or plans; subdivisions

Statute which states that the process for dividing land is a matter of state concern and should be administered in a uniform manner by cities, towns, and counties throughout the state did not preempt former county ordinance permitting hearing examiner to revoke a preliminary subdivision plat; state platting laws are silent on revocation of a preliminary plat, the statute serves only as a guide to the intended effect of the operative sections, and local jurisdictions are solely responsible for preliminary plat and final plat approvals, and may adopt regulations or condition such approvals to mitigate problems caused by a development. West's RCWA 58.17.010, 58.17.100.

1 Cases that cite this headnote

[23]    **Zoning and Planning**
⬦⬩Maps, plats, or plans; subdivisions

Former county ordinance permitting hearing examiner to revoke subdivision plat does not conflict with statute requiring developer to submit final plat for approval within five years of the preliminary plat approval. West's RCWA 58.17.140.

Cases that cite this headnote

[24]    **Municipal Corporations**
⬦⬩Concurrent and Conflicting Exercise of Power by State and Municipality

Local jurisdictions may enact ordinances upon subjects already covered by state legislation if their enactment does not conflict with state legislation.

4 Cases that cite this headnote

[25]    **Municipal Corporations**
⬦⬩Conformity to constitutional and statutory provisions in general

An ordinance is constitutionally invalid on grounds of conflict with state law if the ordinance directly and irreconcilably conflicts with the statute. West's RCWA **Const**. **Art**. 11, **§ 11**.

3 Cases that cite this headnote

[26]    **Municipal Corporations**
⬦⬩Conformity to constitutional and statutory provisions in general

If a local ordinance and statute can be harmonized, no conflict will be found with state law.

3 Cases that cite this headnote

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.                4

Confidential

ROSS-000179471

A1895

HJS Development, Inc. v. Pierce County ex rel. Dept. of..., 148 Wash.2d 451 (2003)
61 P.3d 1141

[27] **Municipal Corporations**
⬦⬦Concurrent and Conflicting Exercise of Power by State and Municipality
**Municipal Corporations**
⬦⬦Ordinances permitting acts which state law prohibits

Unconstitutional conflict occurs when an ordinance permits what is forbidden by state law or prohibits what state law permits. West's RCWA **Const. Art.** 11, **§ 11**.

3 Cases that cite this headnote

[28] **Zoning and Planning**
⬦⬦Tentative or preliminary approval

Statute requiring developer to submit final plat for approval within five years of the preliminary plat approval does not grant an unqualified right to develop property without limitation for five years after preliminary plat approval, but sets a time limit for preliminary plats and still requires full compliance with conditions and requirements of preliminary plat approval before a final plat can be submitted for review and approval. West's RCWA 58.17.140.

2 Cases that cite this headnote

[29] **Zoning and Planning**
⬦⬦Tentative or preliminary approval

A county ordinance revoking a preliminary subdivision plat may be reconciled with state platting laws in circumstances under which revocation is necessary to protect the public health, safety and welfare; revocation of a preliminary plat is appropriate in those cases in which it is impossible to satisfy the conditions of approval because of knowing and deliberate violations of conditions.

1 Cases that cite this headnote

[30] **Zoning and Planning**
⬦⬦Tentative or preliminary approval

Revocation of preliminary subdivision plat was the only proper remedy for removal of trees and vegetation in violation of conditions of preliminary plat approval; the conditions imposed contemplated the public safety and welfare, the violation could not be remedied, and the developer could never comply with the conditions.

1 Cases that cite this headnote

**Attorneys and Law Firms**

**1143 *456 Bertha Fitzer, Jill Guernsey, Tacoma, Hillis Clark Martin & Peterson, George Kresovich, Seattle, for Appellant.

Davis, Wright, Tremaine, Stephen Rummage, Jessica Goldman, Seattle, James Kelly, Fox Island, for Respondent.

**Opinion**

SMITH, J.*

Appellant Pierce County seeks direct review of a Thurston County Superior Court **1144 judgment in favor of Respondent HJS Development, Inc., overturning a decision *457 of a Pierce County hearing examiner which revoked a preliminary plat under a local ordinance, former Pierce County Code 18.50.970 and 18.50.975. The Superior Court reasoned that the hearing examiner did not have authority to revoke Respondent's preliminary plat approval because state platting laws, chapter 58.17 RCW, preempt revocation powers of local jurisdictions on preliminary plat approvals.

*QUESTIONS PRESENTED*

The questions presented in this case are (1) whether the

Confidential

ROSS-000179472

A1896

HJS Development, Inc. v. Pierce County ex rel. Dept. of..., 148 Wash.2d 451 (2003)
61 P.3d 1141

Pierce County hearing examiner had the authority to revoke a preliminary plat approval under former Pierce County Code 18.50.970 and 18.50.975; (2) whether state laws, chapter 58.17 RCW—establishing procedures for approving subdivision plats—preempt local ordinances which permit a hearing examiner to revoke a preliminary plat approval; (3) whether revocation powers under the Pierce County Code conflict with RCW 58.17.140, which provides that a final plat meeting all requirements shall be submitted for approval within five years of preliminary plat approval; and (4) whether the decision by the Pierce County hearing examiner was clearly erroneous because he did not consider less harsh sanctions in enforcing conditions of the preliminary plat approval.

### STATEMENT OF FACTS

On December 30, 1994 Respondent Fox Ridge Investments[1] filed a complete application[2] for approval of preliminary plat and site plan for a 71–acre parcel on Fox Island in *458 unincorporated Pierce County.[3] In its proposal, Respondent requested permission to divide the parcel into a subdivision of 63 single-family residential lots to be served by private roads, on-site septic, and public water. Division I consisted of 42 lots. Division II consisted of 21 lots.[4] The plat is bisected by a road, Island Boulevard, and a substantial portion of Division I contains steep slopes, a mixture of coniferous and deciduous vegetation, and forests containing protected trees. Single-family residential homes are located below a portion of the steep slopes and near the proposed development site.[5]

At the time the plat application was filed on December 30, 1994 and prior to the effective date of the County's Comprehensive Plan, the local zoning laws, Rural–Residential Environment,[6] permitted one dwelling unit per acre.[7] On January 1, 1995 the property was rezoned R–10, which allowed a maximum residential density of .25 dwelling unit per acre.[8] Also in existence at the time of filing were local regulations, Gig Harbor Peninsula Development Regulations 18.50.970 and 18.50.990 which granted the hearing examiner the power to *revoke or modify any permit, use or activity granted pursuant to the Pierce County Code or allowed pursuant to the Underlying Zone ....*[9]

**1145 In the review process for the proposal, Respondent was required to submit a geotechnical report to the Development *459 Engineering Section.[10] In June 1997 Respondent submitted a report prepared by David Evans and Associates, Inc., which included a description

of the topography in Division I.[11] The report indicated the property contained steep slopes, with the steepest slopes occurring across the southern boundary with grades ranging from 30 percent to 87 percent, approximately 100 to 150 feet in height.[12] The geotechnical report also indicated that landslide and erosion hazards were moderate to severe where slopes exceeded 30 percent.[13] It therefore recommended a 50–foot setback and buffers from the top of the slopes and only allowing selective clearing.[14]

On December 3, 1997 the Pierce County environmental official, Charles F. Kleeberg, issued a mitigated determination of nonsignificance (MDNS).[15] No appeal was filed. In its findings of fact, the responsible official found that the project came within a landslide and erosion hazard area, as defined and regulated by Pierce County Code, chapter 21.14, "Geologically Hazardous Areas," and that relevant local ordinances[16] allowed approval of the proposal subject to conditions in order to mitigate any probable significant *460 adverse environmental impacts.[17] The responsible official concluded that Respondent's "proposal [did] not have a probable significant impact on the environment, and an Environmental Impact Statement (EIS) [was] not required under RCW 43.21C.030(2)(c), *only if the following conditions [were] met.*"[18] Of the 12 conditions specified in the MDNS, the following conditions are relevant to this appeal:

Condition (1) stated in part:[19]

The [Oregon White Oak Preservation] plan shall cause the preservation of not less than 80% of the Oregon White Oaks....
   Condition (6)(a) stated:[20]

The proposal shall comply with all recommendations contained with the June 1997 geotechnical report prepared for the development with the following modification:

   a. Clearing within the building setback area shall be limited to removal of dead and dangerous trees and reasonable topping, clearing, and limbing for the purposes of creating view areas. Clearing below the top of the steep slope located on Lots 3 through 29 shall be prohibited, except that the applicant may selectively top, limb, or remove trees within this area to enhance view. Prior to the removal of any vegetation within this area, the applicant shall submit a clearing plan for the area to the Resource Management Development Engineering Sections of the Pierce County

WESTLAW    © 2017 Thomson Reuters. No claim to original U.S. Government Works.    6

Confidential    ROSS-000179473

A1897

HJS Development, Inc. v. Pierce County ex rel. Dept. of..., 148 Wash.2d 451 (2003)
61 P.3d 1141

Planning and Land Services Department for review **1146 and approval. The purpose of the review shall be to ensure that vegetation removal in this area is strictly limited to only that reasonably necessary to provide for view areas within the lots and the removal of hazardous trees. Vegetation removal beyond this shall be prohibited.

....

*461 Condition (4) stated:[21]

The edge of the Oregon White Oak Preservation Area shall be clearly staked and flagged prior to and through the completion of site development and construction. Prior to final plat approval, signage denoting the Oak Preservation Area shall be erected along the boundary of the area. The type of spacing of the signage shall be determined by the Pierce County Planning and Land Services Department.

....

Condition (8) stated:[22]

The steep slope and building setback area shall be clearly shown and labeled on the face of the preliminary and final plat as "Slope Protection Area Easement."

Condition (9) stated:[23]

The following shall be placed on the face of the final plat:

> "The Slope Protection Area Easement appearing on this plat shall remain in its natural state. The intent of this area is to protect slope stability and prevent erosion. There shall be no clearing, grading, filling, or construction of any kind within this area, except as shown on plans or documents approved by the Director of Pierce County Planning and Land Services, and contained in the official files for this project. Removal of dead or dangerous trees may be permitted upon receiving written approval from the Pierce County Planning and Land Services Department."

....

Condition (11) stated in part:

In order to minimize erosion, changes in surface water runoff characteristics, and minimize impacts to aesthetics and the rural character of the site, vegetation removal from the site during site development phase of the proposal, shall be limited to those areas necessary for the construction of roads and utilities, creation of building pads, and view shed creation approved by the Pierce County Planning and Land Services Department. Except for the clearing discussed above, all lots *462 shall remain in their natural, vegetated state until the time of building permit issuance.

....

The Peninsula Advisory Commission (PAC) considered the proposed preliminary plat and heard public testimony at its January 14, 1998 meeting.[24] It recommended denial, citing concerns of storm water control, slope stability, and an incomplete application. However, it proposed two conditions in the event the hearing examiner approved the proposal.[25] The first condition required the applicant to conduct a study for frontage road improvements along Island Boulevard. The second required a 25–foot–wide perimeter buffer along the lot lines to act as a barrier to visibility, airborne particles, glare and noise impacts.

On February 5, 1998 a public hearing was held before Hearing Examiner Stephen K. Causseaux, Jr.[26] Fox Island residents raised concern about landslides in the area and submitted a geological report prepared by James P. Brazil, engineering geologist, on October 21, 1981, recommending against further tree or vegetation removal. The Pierce County Planning and Land Services Department (PALS), Hugh Taylor, presented a staff report on the proposed preliminary plat.[27] He described the proposal and discussed its restrictions on clearing, testifying that "the **1147 slopes, themselves are intended to stay in a natural, undisturbed state," and barring limbing for view enhancement and removing dangerous and dead trees, "the slope is off limits for development."[28] He further noted that the Oregon white oaks within the development area were protected under the county critical areas ordinance, and detailed the *463 plans for preservation of those trees.[29] In response, Joseph Quinn, attorney for Respondent, testified that clearing would stay within the limits and clearing and development would be done in accordance with the county's regulations and under the county's supervision.[30] He acknowledged the restrictions on development, stating that the developer would act responsibly and comply with conditions.[31]

On September 2, 1998 the hearing examiner issued a

Confidential                                                                ROSS-000179474

A1898

HJS Development, Inc. v. Pierce County ex rel. Dept. of..., 148 Wash.2d 451 (2003)
61 P.3d 1141

report and decision approving the preliminary plat, subject to specified conditions, including those recommended by the PAC and Planning Staff and all those required by the MDNS.[32]

Respondent applied for a site development permit for clearing in preparation for road construction in Division I on March 24, 1999.[33] On May 20, 1999 Pierce County approved the site development permit consistent with the conditions announced by the hearing examiner. The plan noted that the Oregon White Oak Preservation Area would be flagged and clearing would proceed in the designated areas. A provision in the site development plan required Respondent to notify the county 48 hours prior to beginning any construction at the site and prior to initiation of clearing.[34] Respondent and a county inspector conducted a preconstruction meeting reviewing requirements of the site development permit.

On April 18, 2000, Ray Clark, a county inspector, conducted an unscheduled site inspection.[35] He discovered that significant clearing had occurred. He believed the clearing did not comply with the limitations specified in the site *464 development plans.[36] He reported that many of the clearing limits had been disregarded, as evidenced by removal of trees from the steep slopes, buffer areas, and the oak protection areas. He testified that an estimated 150 trees were logged outside the approved plan, and stumps on the slopes measured from 18 inches to 2 ½ feet in diameter.[37] A subsequent investigation substantiated the report of violations, revealing that more than 200 stumps had been cut from the steep slope areas, many stumps had been burned and removed, and there were not sufficient erosion control methods.[38] With these reported violations, the PALS posted a stop work order and contacted the Department of Natural Resources (DNR).[39]

The DNR inspected the site and ultimately concluded that a forest practices permit was required for the west slope, but not for the other areas outside of this slope. Based upon this, the DNR issued a stop work order on May 8, 2000.[40] Pursuant to local development regulations and state law, PALS imposed a six-year Forest Practices Act of 1974 development moratorium.[41]

On May 17, 2000 PALS notified Respondent it would take action to revoke the preliminary plat because of the violations of site development regulations and preliminary plat conditions.[42] On May 26, 2000 Respondent **1148 filed a request to the hearing examiner to lift the moratorium. A public hearing on the revocation action and moratorium rescission was held on October 4, 2000.[43]

*465 At the hearing, County Planner Taylor and County Inspector Clark presented exhibits and photographs detailing the extent of the violations of conditions.[44] Mr. Taylor noted that the original conditions allowed some limbing and tree removal, but did not allow a clear-cut of the buffer or slope.[45] He concluded that approximately seven acres were removed from the top of the slopes. Respondent's attorney, Mr. Quinn, conceded in testimony that trees within the White Oak Preservation Area and trees on the steep slope were cut, but he disputed the extent and exact number of trees cut.[46] He asserted that, despite the fact that prohibited cutting occurred, removal of the trees did not violate the conditions because the approvals allowed for selective cutting and removal which did not negatively impact the stability of the present slope.

On November 13, 2000 the hearing examiner revoked the site plan and preliminary plat approvals and denied the request to rescind the moratorium.[47] In his decision, the hearing examiner concluded that[48]

> [t]he clearing of the 50–foot landslide and erosion hazard area buffer and the removal of numerous significant trees on the steep slopes below the top of the bank constitute intentional and flagrant violations of conditions of approval and mitigating measures set froth in the Mitigated Determination of Nonsignificance issued pursuant to SEPA [State Environmental Policy Act of 1971, chapter 43.21C RCW] review.... *These violations are especially egregious because the most significant issues associated with site plan and preliminary plat approval were concerned with protection of the steep slopes, the proper handling of storm water runoff, and the protection of homes below the slopes near the shoreline. The environmental official also imposed a number of mitigating measures addressing the preservation of vegetation on the slope and establishing an Oregon White Oak Preservation Area, all of which were agreed to by the applicant to avoid issuance of a Determination of *466 Significance and preparation of an Environmental Impact Statement.*
> (Emphasis added.)

Respondent filed a timely request for reconsideration on November 22, 2000.[49] In addition, Respondent requested that the hearing examiner reopen the proceedings or allow a rehearing pursuant to a local law and rule.[50] The hearing examiner denied the request on January 4, 2001.[51]

On January 24, 2001 Respondent filed an appeal in the Thurston County Superior Court under the Land Use Petition Act (LUPA), chapter 36.70C RCW, challenging the revocation and the moratorium.[52] Its appeal reiterated

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Confidential                                                                ROSS-000179475

A1899

**HJS Development, Inc. v. Pierce County ex rel. Dept. of..., 148 Wash.2d 451 (2003)**

61 P.3d 1141

the same arguments considered in the administrative hearing, and raised a new argument contending the hearing examiner exceeded his authority in revoking the preliminary plat.[53]

The Thurston County Superior Court, the Honorable Daniel J. Berschauer, granted the LUPA petition and presided over the bench trial on June 7, 2001.[54] He decided in favor of Respondent HJS Development, Inc., reversing the hearing examiner's decision revoking **1149 the preliminary plat.[55] The court reasoned that state statutes governing plats and subdivision of land preempted the local revocation ordinance under which Hearing Examiner Taylor proceeded in revoking Respondent's preliminary plat.[56] The *467 court invalidated the ordinance, ruling that it conflicts with state law, reasoning that if the Legislature intended to allow revocation of a preliminary plat, it would have expressly done so.[57] The court ruled, in the alternative, that the hearing examiner's decision was clearly erroneous because he did not consider other viable and less harsh legal options to enforce the conditions and require compliance.[58]

Appellant filed a notice of direct appeal with this court on August 7, 2001.[59] Review was granted on July 1, 2002.[60]

## DISCUSSION

### STANDARD OF REVIEW

[1] Judicial review of a land use decision proceeds under the Land Use Petition Act (LUPA).[61] A petition for review by the superior court constitutes appellate review on the administrative record before the local jurisdiction's body or officer with the highest level of authority to make the final determination.[62] Relief may be granted when the following standards set forth in LUPA are met:

(a) The body or officer that made the land use decision engaged in unlawful procedure or failed to follow a prescribed process, unless the error was harmless;

....

(c) The land use decision is not supported by evidence that is substantial when viewed in light of the whole record before the court;

*468 d) The land use decision is a clearly erroneous

application of the law to the facts;

(e) The land use decision is outside the authority or jurisdiction of the body or officer making the decision; or

(f) The land use decision violates constitutional rights of the party seeking relief.[63]

[2] [3] "When reviewing a superior court's decision on a land use petition, the appellate court stands in the shoes of the superior court."[64] "An appellate court reviews administrative decisions on the record of the administrative tribunal, not of the superior court."[65] We therefore review the record before the Pierce County hearing examiner and review questions of law de novo to determine whether the land use decision was supported by fact and law.[66]

### STATE AND LOCAL PLATTING AND SUBDIVISION PROCESSES

Development of real property in this state implicates both state statutes and local ordinances that impose subdivision and platting controls. The state statute, chapter 58.17 **1150 RCW, provides a general statutory scheme for regulating subdivision of land to ensure the orderly development of new areas for which new streets, sewers, drainage, and utilities will be needed.[67] The owner or developer initiates the subdivision process by filing a preliminary plat and a complete application for approval by the legislative *469 body of the city, town, or county.[68] A preliminary plat is a "neat and approximate drawing of a proposed subdivision showing the general layout of streets and alleys, lots, blocks, and other elements of a subdivision consistent with the requirements of [chapter 58.17 RCW]."[69] The local planning agency or designated official then considers whether the proposed plat complies with the local comprehensive plan and adopted specifications and standards, and makes recommendations to the local legislative body.[70]

Upon receipt of the recommendation, the legislative body conducts a public hearing on the plat application. In Pierce County the legislative body by ordinance has delegated to the hearing examiner the authority to review and decide plat applications.[71] Approval of a preliminary plat may be subject to conditions imposed by the hearing examiner.[72] Once approved, the owner or developer may begin development to prepare the final plat in compliance with the preliminary plat.[73]

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

Confidential

ROSS-000179476

A1900

**HJS Development, Inc. v. Pierce County ex rel. Dept. of..., 148 Wash.2d 451 (2003)**

61 P.3d 1141

### AUTHORITY TO REVOKE GRANTED BY LOCAL ORDINANCES

[4] [5] Respondent contends the dispositive issue in this case is whether the hearing examiner possessed the power to revoke the preliminary plat.[74] It argues that the local revocation ordinances under which the hearing examiner proceeded, former PCC 18.50.970 and .975, did not grant him authority to revoke the preliminary plat. Respondent asserts that the local ordinances, former PCC 18.50.970 stating that "[t]he Examiner may revoke or modify any site *470 plan approval or permit, and former PCC 18.50.975 providing that [t]he Examiner may revoke or modify any permit, use or activity granted pursuant to the Pierce County Zoning Code .... " do not include preliminary plats within their purview.[75]

Although the distinction between site plan approval and preliminary plat approval has been blurred with at least one Court of Appeals decision using the two terms interchangeably,[76] Respondent correctly notes **1151 that the county code treats the two as distinctly separate processes.

Former PCC 18.50.960 read in part: "Plats are exempt from all procedural requirements of the site plan review process; however, a plat when being reviewed during the preliminary plat review and approval process, shall be reviewed for consistency with the Gig Harbor Development Plan.... A plat is exempt from [the] site plan approval process .... "[77] This distinction is further supported by two proceedings: one in which the county hearing examiner in the revocation proceedings revoked "Division I of the Fox *471 Ridge site plan approval and preliminary plat,"[78] and the other in which the Court of Appeals, Division Two, vacated and voided rezone ordinances, site plan approval, and plat approval adopted by the City of Tacoma....[79] RCW 58.17.070 also treats the two terms distinctly, allowing processing of a preliminary plat application simultaneously with site plan applications.

[6] An administrative tribunal, such as the hearing examiner in this case, has only the authority granted it by statute or ordinance.[80] Based upon distinct treatment of the two processes, a site plan or permit is not a preliminary plat.[81] In this case, the local ordinance allowing revocation of site plans and permits did not grant the hearing officer authority to revoke a preliminary plat. Without more, the purported revocation of the preliminary plat would not be valid under former PCC 18.50.970.

[7] [8] [9] [10] [11] Interpretation of local ordinances is governed by the same rules of construction as state statutes.[82] In considering an undefined term, the court considers the statute as a whole to give meaning to the term in harmony with other statutory provisions.[83] Rules of construction do *472 not apply when the language is clear and explicit.[84] In interpreting statutes and ordinances, definitions contained within the act control the meaning of words used in that act.[85] Courts must reasonably construe ordinances with reference to their purpose.[86]

[12] Former PCC 18.50.975 provided for revocation of any permit, use or activity granted under the Pierce County Zoning Code. However, it did not expressly include preliminary plats as one of the three revocable categories. Respondent distinguishes preliminary plats from the three categories by reference to the definitions and derived meanings contained in former chapter 18.50 PCC.

In interpreting the three categories (permit, use or activity) listed in former PCC **1152 18.50.975, this court examines the definitions and meanings of those terms contained in the regulations.[87] The definition of "preliminary plat" (a representation of the proposed general layout) is not included in the meaning of "permit or activity." "Activity" is defined as any use conducted on a lot, tract or parcel of land,[88] and from the local development regulations, "permit[s]" take effect during the developmental phase of the property where some physical activity is involved.[89] In the context of zoning, "activity" has been used to characterize the types of *473 conduct or business occurring on the land,[90] while "permit[s]" under the county code relate to a governmentally approved activity such as a nonconforming use permit or a building permit.[91] A preliminary plat (a tentative representation of the details of a project) thus does not come within the meaning of an "activity" or "permit."

Former chapter 18.50 PCC defined "use" as follows:
> "Use" of property is the purpose or activity for which the land, or building thereon, is designed, arranged or intended, or for which it is occupied or maintained and shall include any manner of performance of such activity with respect to the performance standards of this Regulation. The word "use" also means the word "development."[92]

[13] [14] Under the first definition, a broad reading of "use" includes the definition of a preliminary plat. Construed broadly, "use" can be read to mean "the purpose ... for which the land, ... is designed, arranged, or intended.... "[93]

Confidential                                                     ROSS-000179477

A1901

**HJS Development, Inc. v. Pierce County ex rel. Dept. of..., 148 Wash.2d 451 (2003)**

61 P.3d 1141

A rough sketch of the proposed alleys, blocks, and streets would fit within such a reading. However, a further reading of the same sentence following the disjunctive clauses with the conjunctive "and" indicates that the definition of "use" "shall include any manner of performance of such activity with respect to the performance standards of this Regulation."[94] This last element of the definition contemplates involvement of some type of "activity" impacting the land. A preliminary plat does not impact ***474** the land in a similar manner as does "use" under the regulations.

The Pierce County Code further clarifies the meaning of the word by providing a second definition of "use."[95] Under the county code "development" or "use" shall mean:

> A. Any activity, other than normal agricultural activity which materially affect the existing condition of land or improvements, such as:
>
>> 1. Clear cutting of trees ...
>>
>> 2. Substantial excavation of deposits of earth ...
>>
>> 3. Construction, reconstruction or alteration of any improvement ...
>>
>> 4. Dumping or parking of any objects ...
>>
>> ****1153** 5. Commencement of any primary or substantial use of land and every change in its type of intensity.
>
> B. Any change in the legal relationship of persons to land which materially affects development, such as: the division of land into two or more parcels or units to facilitate separate transfer of title to each parcel unit.[96]

Under this definition, an activity materially affecting the condition of land is one that physically impacts it. Examples of "uses" listed in the definition—*cutting, excavation, construction, dumping,* and *parking*—represent physical actions occurring on the land. A preliminary plat, which is merely a drawing, does not physically impact the land in a similar manner as does a specific land use applied in this context.[97] This definition restricts the term "activity" to a physical activity to or upon the land. Part (B), however, departs from this limitation and expands the meaning of "use" to include conduct which is not physical.

[15] ***475** Part (B) of the definition becomes operative when a change in the legal relationship of persons to land

materially affects development, such as division of land. Respondent argues there was no such change in this case. A preliminary plat, it asserts, does not affect the division of land.[98] Subdivision of land occurs upon final plat approval, which is not guaranteed by approval of a preliminary plat.[99] It contends a preliminary plat has no effect on the legal relationship of developer to land which materially affects development. It asserts that preliminary plat approval is not a "use."

This argument is somewhat shortsighted in that it assumes preliminary plat approval and final plat approval are separate and distinct processes. The initial and essential step in obtaining final plat approval is receiving preliminary plat approval.[100] A preliminary plat application notifies the local government of the applicant's intention to follow plat subdivision procedures to gain final plat approval. Once receiving preliminary plat approval, an owner or developer may proceed to prepare detailed engineering drawings, construct improvements, and prepare the final plat in compliance with the terms and conditions of the approved preliminary plat.[101] Approval (with terms and conditions) of that application by the local government acknowledges the developer's reliance on that approval in undertaking the plat subdivision process. This approval creates a change in the legal relationship of the owner or developer to the land which materially affects development.[102] Although the right to subdivide land arises from final plat approval, approval of a preliminary plat begins the plat subdivision process. The right to subdivide land arises out of preliminary plat approval. Without a preliminary ***476** plat, final plat approval may never be achieved.[103] As indicated in the definition section of the ordinance, a preliminary plat approval for a subdivision is a "use."

This conclusion is consistent with the revocation ordinance. Former PCC 18.50.975 permits revocation of a *use,* but only when *granted pursuant to the Pierce County Zoning Code or Underlying Zoning.*[104] In this case, the applicable local zoning law was the Rural–Residential Environment, which specified the particular developments and uses permitted.[105] The zoning code divided permitted ****1154** developments and uses into three categories.[106] Like the statutory definition, Category (C)(1) expressly considered a subdivision a permitted "use" under the zoning code.[107]

We conclude that a preliminary plat is within the definition of a "use" and that the revocation ordinance granted the hearing examiner authority to revoke a preliminary plat. The Pierce County hearing examiner had the authority to revoke Appellant's preliminary plat.

---

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.                    11

Confidential                                                                      ROSS-000179478

A1902

HJS Development, Inc. v. Pierce County ex rel. Dept. of..., 148 Wash.2d 451 (2003)

61 P.3d 1141

### PREEMPTION

[16] [17] Our state constitution, article **XI**, **section 11**, allows a county, city or town to "make and enforce within its limits all such local police, sanitary, and other regulations *477 as are not in conflict with general laws."[108] Within this authority counties have plenary police power to enact ordinances, which ceases when in conflict with general state law or when the Legislature intended state law to be exclusive, unless there is room for concurrent jurisdiction.[109] Whether there is room for exercise of concurrent jurisdiction depends on legislative intent which is derived from analysis of the statute.[110]

[18] [19] Preemption arises when the Legislature has expressed its intent to preempt the field or that intent is manifest from necessary implication.[111] If the Legislature is silent on its intent to occupy a given field, we may refer to the purposes of the particular legislative enactment and to facts and circumstances upon which the statute was intended to operate.[112]

[20] [21] [22] In establishing the constitutional invalidity of an ordinance, a heavy burden rests upon the party challenging its constitutionality.[113] "Every presumption will be in favor of constitutionality."[114] This appeal places at issue the constitutional validity of a local ordinance, former PCC 18.50.975, which granted the Pierce County hearing examiner authority to revoke an approved preliminary plat. Former PCC 18.50.975 allowed revocation of permits, uses, and activities.[115] Respondent contends that grant of such authority impinges upon and violates the state platting laws, chapter 58.17 RCW, which call for land to be divided *478 in a uniform manner. The Thurston County Superior Court, Judge Berschauer, agreed, finding that RCW 58.17.010 expressly evidenced the Legislature's intent to preempt local jurisdictions from enacting conflicting legislation.[116] In support of a preemption conclusion, both Judge Berschauer and Respondent cited the following language in RCW 58.17.010 which sets out the purpose of the chapter: "The legislature finds the process by which land is divided is a matter of state concern and should be administered in a *uniform manner* **1155 by cities, towns, and counties throughout the state."[117]

Similar uniformity language was discussed in *City of Seattle v. Williams,* a case challenging a local traffic law. *Williams* provides some guidance in interpreting the word "uniform" in the preemption context and applied the concept of uniformity to a given field.[118] The question in *Williams* was whether two general statutes requiring uniformity of traffic laws preempted a city ordinance criminalizing driving under the influence (DUI) at a blood alcohol concentration (BAC) of .08 grams.[119] RCW 46.08.020 stated:

> The provisions of this title [Title 46 Motor Vehicles] relating to vehicles *shall be applicable and uniform* throughout this state and in all incorporated cities and towns and all political subdivisions therein and no local authority shall enact or enforce any law, ordinance, rule or regulation in conflict with the provisions of this title except and unless expressly authorized by law to do so and any laws, ordinances, rules or regulations in conflict with the provisions of this title are hereby declared to be invalid and of no effect. Local authorities may, however, adopt additional vehicle and traffic regulations which are not in conflict with the provisions of this title.
> (Emphasis added.)

*479 RCW 46.08.030 provided:

> The provisions of this title relating to the operation of vehicles *shall be applicable and uniform* upon all persons operating vehicles upon the public highways of this state, except as otherwise specifically provided.

(Emphasis added.)

Without a statutory definition of "uniform," in interpreting the statutes we employed the dictionary definition of the word, defining it to mean "marked by lack of variation, diversity, and marked by complete conformity to a rule or pattern or by similarity in salient detail or practice."[120] Incorporating this definition, we concluded the statutory scheme relating to motor vehicles must "lack variation," and that the Legislature intended the provisions of Title 46 to be uniformly applied throughout the state.[121] We additionally considered how the challenged ordinance establishing the offense at 0.08 grams of alcohol disrupted the uniform statewide application of state DUI laws which criminalized DUI at the 0.10 percent BAC level. We found that the ordinance, varying in salient detail from the state law on DUI, significantly undermined the uniformity requirement of both RCW 46.08.020 and RCW 46.08.030.

In *Williams* we concluded that the "uniform" language found in the statutes evidenced the Legislature's intent to create a statutory scheme with the same standards consistently applicable throughout the state. In this

Confidential                                                                                    ROSS-000179479

A1903

HJS Development, Inc. v. Pierce County ex rel. Dept. of..., 148 Wash.2d 451 (2003)

61 P.3d 1141

respect, the uniformity requirement preempted local legislative bodies from enacting ordinances inconsistent with the standards set out in state traffic laws. Because the challenged ordinance departed from the state DUI standard of .10 percent BAC, we concluded that the ordinance violated the statutory uniformity requirement, but we were "not saying that a municipality may never enact traffic laws for which there **\*480** is a statutory provision on the same subject,"[122] rejecting Respondent Williams' argument that the uniformity requirement of the state statutes preempts all ordinances directed against DUI.

Although *Williams* provides some guidance on the preemption issue in this case, it is, however, distinguishable. Unlike *Williams,* this case does not involve an ordinance that varied in detail from standards established by state laws. Relying on *Williams,* Respondent argues that state platting laws, specifically RCW 58.17.100, requiring only approval or disapproval of a **\*\*1156** preliminary plat,[123] preempts the revocation ordinance because it departs from the statutory scheme. Reliance on *Williams* for this proposition is misplaced.[124] In this case, the revocation ordinance does not depart from the state statutory scheme of uniformity. State platting laws are silent on revocation of a preliminary plat.

Located in the purpose section and having no operative force, the "uniform" language in RCW 58.17.010 serves only as a guide to the intended effect of the operative sections.[125] This means the process of dividing land in one county should "not vary" from another in which all local governments must follow the procedures specified in chapter 58.17 RCW. Because RCW 58.17.010 does not contain the "exclusivity" language identified in the *Williams* case, no meaning of "uniform" can be ascertained to preempt the entire field of dividing property. This court "will not interpret a statute to deprive a municipality of the power to legislate on a particular subject unless that clearly is the legislative intent." We do not interpret the purpose section of chapter 58.17 RCW to deprive a county of the power to revoke a preliminary plat because it is not clear under the **\*481** statute whether the Legislature intended such deprivation.[126]

Respondent's uniformity requirement argument is also undercut by the fact that local jurisdictions are solely responsible for preliminary plat and final plat approvals, and may adopt regulations or condition such approvals to mitigate problems caused by a development.[127] This court in *Isla Verde International Holdings v. City of Camas* and the Court of Appeals in *Norco Construction v. King County* have acknowledged the authority of local

governments to supplement state platting laws for the public health, safety, and welfare.[128] Under this authority, the challenged ordinance in this case was appropriately enacted to allow revocation of an approved "use" when that use is exercised against the public health, safety or general welfare.[129] The statutory scheme of chapter 58.17 RCW is designed to protect the public health, safety and general welfare. In recognition of this, the Legislature has left room for concurrent jurisdiction in matters relating to these interests.[130] Former PCC 18.50.975 providing for revocation of a preliminary plat was not preempted by RCW 58.17.010.

## CONFLICT

[23]  [24]  [25]  [26]  [27] We must decide whether there is a conflict between former PCC 18.50.975, allowing revocation of a preliminary plat, and RCW 58.17.140, providing that a final plat meeting all requirements of the chapter shall be submitted for approval within five years of the preliminary **\*482** plat approval. Local jurisdictions may enact ordinances upon subjects already covered by state legislation if their enactment does not conflict with state legislation.[131] This court will consider an ordinance to be constitutionally invalid on grounds of conflict if the ordinance "directly and irreconcilably conflicts with the statute."[132] If, however, the ordinance and statute can be harmonized, no conflict will be found.[133] Unconstitutional conflict occurs **\*\*1157** when an ordinance permits what is forbidden by state law or prohibits what state law permits.[134]

[28] Respondent interprets RCW 58.17.140 to unconditionally allow it five years following preliminary plat approval to comply with conditions and requirements. It asserts the Legislature chose this policy to bring preliminary plats within the arena of vested rights to instill certainty of the rules governing land development. Its vested right, Respondent contends, may only be extinguished upon a finding that the final plat as submitted does not conform to preliminary plat conditions or operative development regulations, and that revocation of the preliminary plat before five years has expired violates its vested right.[135]

Respondent misconstrues RCW 58.17.140. Its contention assumes that the provision grants it an unqualified right to develop its property without limitation for five years after preliminary plat approval. RCW 58.17.140 does not support such an assumption. The provision sets a time limit for preliminary plats.[136] It still requires full compliance with conditions and requirements of

Confidential

ROSS-000179480

A1904

**HJS Development, Inc. v. Pierce County ex rel. Dept. of..., 148 Wash.2d 451 (2003)**

61 P.3d 1141

preliminary plat approval before a final plat can be submitted for review and **\*483** approval.[137]

Respondent also misunderstands the concept of vested rights in the preliminary plat review and approval context. Its argument assumes that the doctrine confers without limitations or conditions a right to develop the land for five years after preliminary plat approval. The vesting doctrine has generally been applied in the preliminary plat context merely to confer the right to have an application for preliminary plat considered under ordinances and laws in effect at the time a completed application is filed.[138] Chapter 58.17 RCW is silent on revocation.

[29] Subdivision of land is both a local and statewide concern. State platting laws expressly charge local governments with the duty to ensure that the public interest is best served by approval of preliminary plats and final plats.[139] The Legislature has provided that local governments may adopt regulations for the public health, safety, and general welfare[140] in considering plat approval. When conditions of approval of a preliminary plat cannot be satisfied or are deliberately violated, remedial action, such as revocation, may be the only remedy. A revocation ordinance may be reconciled with state platting laws in circumstances under which revocation is necessary to protect the public health, safety and welfare. Revocation of a preliminary plat is appropriate in those cases in which it is impossible to satisfy the conditions of approval because of knowing and deliberate violations of conditions.

### DECISION BY HEARING EXAMINER

When reviewing a superior court's decision on a land use petition, we review the record of the administrative tribunal **\*484** and not the record of the superior court.[141] In this case we review the record before the Pierce County hearing examiner de novo to determine whether there was evidence to support the land use decision.[142]

[30] Respondent contends the hearing examiner's decision was erroneous because he did not consider whether Respondent could satisfy the requirements for final plat approval within the statutory time period of five years, and that less drastic remedial **\*\*1158** methods than revocation were available to enforce the violated or unfulfilled conditions. It argues that despite its removal of trees in the preservation area and on the steep slopes, the hearing examiner committed error by not determining whether removal of those trees jeopardized the public interest by negatively impacting the stability of the

slope.[143]

Respondent, however, cannot satisfy the requirements for final plat approval because it cannot meet the conditions of preliminary plat approval which specifically prohibited removal of trees and vegetation in specified areas. The conditions imposed contemplated the public safety and welfare. It is clear from the record that Respondent knowingly and deliberately violated conditions of preliminary plat approval which cannot be remedied. Respondent can never comply with the specified conditions of the plat approval because, among other reasons, the removed white oak trees cannot be restored to their original state. Monetary fines and remediation methods cannot correct the violations committed by Respondent. Revocation was the only proper remedy.

### *485 SUMMARY AND CONCLUSIONS

At issue in this case is the revocation of a preliminary plat under former Pierce County Code (PCC) 18.50.970 and 18.50.975. Respondent contends the Pierce County hearing examiner exceeded his authority in revoking its preliminary plat because the local revocation ordinance, allowing revocation of any *site plan permit or approval, permit, use,* or *activity,* did not include preliminary plats.

Site plans, permits, and activities do not come within the definition of a preliminary plat (a drawing of the proposed subdivision showing the general layout of streets and alleys, lots, and blocks). The definition of *use* under the ordinance, however, includes subdivisions. Because preliminary plat approval initiates the subdivision process, approval of a preliminary plat for a subdivision is a "use." The ordinance therefore granted the hearing examiner authority to revoke a preliminary plat.

Respondent contends that state platting laws, chapter 58.17 RCW, preempted enactment of any ordinance allowing revocation of preliminary plats. It erroneously relies on *City of Seattle v. Williams* to support its argument that the language in RCW 58.17.010, calling for land to be divided in a uniform manner, evidences the intent of the Legislature to preempt the field. *Williams* is distinguishable. Legislative intent is clear from the provisions at issue in that case, but not clear from the provision at issue in this case.

Respondent's uniformity requirement argument is also undercut by the fact that local jurisdictions are solely responsible for preliminary plat and final plat approvals, and may adopt regulations or conditions for those

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.    14

Confidential    ROSS-000179481

A1905

**HJS Development, Inc. v. Pierce County ex rel. Dept. of..., 148 Wash.2d 451 (2003)**

61 P.3d 1141

approvals. This court in *Isla Verde International Holdings v. City of Camas* and the Court of Appeals in *Norco Construction v. King County* have acknowledged the authority of local governments to supplement state platting laws for the public health, safety, and welfare. Under this authority the revocation ordinance, **\*486** former PCC 18.50.975, was properly enacted and not preempted by state platting laws.

Respondent claims there is a conflict between the revocation ordinance and RCW 58.17.140, which provides that a final plat meeting all requirements of the chapter shall be submitted for approval within five years of preliminary plat approval. Respondent misinterprets this provision as granting it an unqualified right to develop its property without limitation for five years after preliminary plat approval. The provision does nothing more than set a time limit for preliminary plats. No direct conflict exists because RCW 58.17.140 is silent on revocation.

The hearing examiner correctly decided revocation was the only remedy in this case because Respondent can never satisfy the conditions for final plat approval and conditions of preliminary plat approval. Respondent knowingly and deliberately violated conditions of preliminary plat approval which **\*\*1159** cannot be remedied. This particularly involved violation of prohibitions against removal of irreplaceable trees and vegetation in specified areas. Monetary fines and remediation methods cannot correct the violations committed by Respondent because the trees removed from the Oregon White Oak Preservation Area can never be restored to their original state.

We determine that the Pierce County Hearing Examiner had authority to revoke Respondent's preliminary plat under former PCC 18.50.975; that state platting laws do not preempt Pierce County from enacting the challenged revocation ordinance; that the revocation ordinance did not conflict with state platting laws; and that the hearing examiner correctly decided revocation was the only remedy.

ALEXANDER, C.J., IRELAND, OWENS, CHAMBERS, JJ., and BECKER J. Pro Tem., concur.

MADSEN, J. (dissenting).

The majority concludes that former Pierce County Code (PCC) 18.50.975 authorized revocation of HJS Development's preliminary plat approval **\*487** on the grounds that the developer failed to comply with conditions of preliminary plat approval. However, the county's former land use regulations applicable to this case contain no such authority, and therefore I respectfully dissent.

The majority first concludes, and I agree, that former PCC 18.50.970, concerning revocation of "any site plan approval or permit" did not apply to preliminary plats because under the county code neither of these terms encompasses preliminary plat approval.

Former PCC 18.50.975 provided for revocation or modification of "any permit, use or activity granted pursuant to the Pierce County Zoning Code or allowed pursuant to the Underlying Zoning which shall include, but not necessarily be limited to, site plans related to special zones or unclassified use permits." The majority says, and again I agree, that former PCC 18.50.975, insofar as it concerns revocation of any "permit" or any "activity," did not apply to preliminary plats. Majority at 1151. The majority then reasons, however, that the term "use" in former PCC 18.50.975 did encompass preliminary plat approval. Majority at 1152. The majority notes that former PCC 18.50.145U.1 defined " 'use' " as meaning " 'development,' " among other things. *Id.* at 1152. "Development," in turn, was defined in part as "[a]ny change in the legal relationship of persons to land which materially affects development, such as: the division of land into two or more parcels or units to facilitate separate transfer of title to each parcel or unit." Former PCC 18.50.145D.3(B). The majority says that preliminary plat approval creates a change in the legal relationship of the owner or developer to the land that materially affects development, and thus preliminary plat approval is a "use" within the meaning of former PCC 18.50.975. Majority at 1153. I disagree.

Until a final plat is approved and filed, it is illegal to transfer or sell, or advertise for transfer or sale, any lot, tract, or parcel. RCW 58.17.200 (providing that prosecuting attorney "shall commence an action to restrain and enjoin **\*488** further subdivisions or sales, or transfers, or offers of sale or transfer and compel compliance with all provisions of" chapter 58.17 RCW).[1] The majority itself acknowledges that the right to subdivide arises from final plat approval. Majority at 1153; *see* RCW 58.17.170 ("[w]hen the legislative body of the city, town or county finds that the subdivision proposed for final plat approval conforms to all terms of the preliminary plat approval, ... other applicable state

Confidential

ROSS-000179482

A1906

**HJS Development, Inc. v. Pierce County ex rel. Dept. of..., 148 Wash.2d 451 (2003)**

61 P.3d 1141

laws, and any [applicable] local ordinances," then it shall given final written approval "on the face of the plat"). And, "[f]inal approval *cannot* be granted if [the conditions to preliminary plat approval] are not met." *Friends of the Law v. King County,* 123 **Wash**.2d 518, 528, 869 P.2d 1056 (1994); *see also, e.g.,* 18 WILLIAM B. STOEBUCK, WASHINGTON PRACTICE: REAL ESTATE: PROPERTY LAW § 5.4, at 271 (1995) (an applicant's inability or unwillingness to meet conditions for dedications or public improvements appear to be causes for denial of plat approval).

**\*\*1160** Preliminary plat approval does not authorize subdivision of land. As the majority says, "approval of a preliminary plat *begins* the plat subdivision process." Majority at 1153 (emphasis added). The majority also says that "the right to subdivide land arises from *final plat approval.*" *Id.* (emphasis added). Thus, although preliminary plat approval is a significant stage in plat approval, in that it involves the actual decisions as to the terms and conditions of final plat approval, the majority itself necessarily recognizes that preliminary plat approval does not authorize subdivision.

Since there is no right to subdivide land merely upon preliminary plat approval, preliminary plat approval does not, and cannot, change the legal relationship of the owner or the developer to the land that materially affects development. Therefore, while preliminary plat approval is an important part of the approval process, it does not come **\*489** within the definition of "development" in former PCC 18.50.145D.3(B), and thus it not within the meaning of "use" in former PCC 18.50.145U.1. Preliminary plat approval therefore does not fall within the revocation authority stated in former PCC 18.50.975.

The majority's statement that its conclusion is consistent with former PCC § 18.50.975's limitation on revocation, i.e., that a use may be revoked only when granted pursuant to the county zoning code or underlying zoning, is also unfounded. The majority refers to the applicable zoning law specifying developments and uses permitted, noting that former PCC 18.50.185 divided them into three categories. Majority at 1153. The majority then says that former PCC 18.50.185(C)(1)² expressly considered a subdivision a permitted use under the zoning code, "[l]ike the statutory definition." Majority at 1153–1154.

However, while a subdivision may be a permitted use under the zoning code, the majority's equation of preliminary plat approval to a subdivision as the term is used in former PCC 18.50.185 suffers from the same flaw as its main analysis. That is, while a subdivision can involve land that has been divided into parcels for the transfer of title to each parcel, as the statutory definition of "development" in former PCC 18.50.145(D).3(B) contemplates, a preliminary plat cannot. Therefore, I do not find persuasive the majority's attempt to reinforce its conclusion by equating the zoning code to the ordinance's definition of "development."

Finally, I note that Pierce County maintains, in an argument directed at whether state law preempts any local ordinances respecting revocation, that the authority to revoke is implied in state law. It is not necessary to reach **\*490** the question of preemption, since the local ordinances did not, in any event, purport to authorize revocation of preliminary plat approval.

In contrast to the majority, I would hold that none of the express revocation provisions in Pierce County's former land use regulations applies to authorize revocation of HJS Development's preliminary plat approval. Accordingly, the superior court's decision should be affirmed.

SANDERS, J., concurs.

**All Citations**

148 Wash.2d 451, 61 P.3d 1141

Footnotes

\* Judge Charles Z. Smith is serving as a justice pro tempore of the Supreme Court pursuant to **Const**. **art**. IV, § 2(a).

1 Fox Ridge Investments filed the preliminary plat and site plan application. Respondent HJS Development, Inc., is the property owner. Both entities are the same party Respondent on this appeal.

2 Under RCW 58.17.033(2), [t]he requirements for a fully completed application shall be defined by local ordinance. Appellant acknowledges Respondent filed a complete application for plat approval.

3 Clerk's Papers at 37. The Gig Harbor Peninsula Development Regulations, which regulated development of all

Confidential ROSS-000179483

A1907

**HJS Development, Inc. v. Pierce County ex rel. Dept. of..., 148 Wash.2d 451 (2003)**

61 P.3d 1141

property on the Gig Harbor Peninsula in unincorporated Pierce County, former chapter 18.50 of the Pierce County Code, required proposed plats to be processed with a site plan in the Rural–Residential Environment.

4   *Id.*

5   Clerk's Papers at 181.

6   In 1989 the Pierce County Council amended the comprehensive plan and the Gig Harbor Peninsula Development Regulations and adopted the Rural–Residential Environment of the Gig Harbor Peninsula Comprehensive Plan which included essentially all of Fox Island.

7   The Pierce County Comprehensive Plan became effective on January 1, 1995.

8   Clerk's Papers at 37.

9   *Id.* at 249–50 (emphasis added).

10   *Id.* at 140, 198. Former PCC 21.14.030(c)(2), "Geologically Hazardous Areas" Ordinance states: "The development proposal may be approved, approved with conditions or denied based [upon] the Department's evaluation of the ability of the proposed mitigation measures to reduce risks associated with the erosion and landslide hazard area."

11   *Id.* (citing Administrative Record at 819).

12   *Id.*

13   *Id.* (citing Administrative Record at 822–23).

14   *Id.* (citing Administrative Record at 826–28). Appellant's brief cites the report in stating "Selective clearing is considered to be acceptable with the 50 foot BSBL [building setback and buffer line] for the purpose of creating lawns and landscaped areas. Selective clearing is defined herein to mean the removal of small trees, bushes and other low-lying vegetation and the removal of dead, diseased or dangerous trees. No trees greater than 36 inches in diameter at breast height (dbh) occurring within the BSBL or upon adjacent steep slopes shall be removed with the exception of dead, diseased or dangerous trees."

15   Clerk's Papers at 198.

16   *See id.* (noting former § PCC 21.14.030(c)(2)) "Geologically Hazardous Areas" and former PCC 21.20.080.D "Critical Areas and Natural Resource Land Authority and Purpose."

17   *Id.*

18   *Id.* at 201.

19   *Id.*

20   *Id.* at 202 (emphasis added).

21   *Id.*

22   *Id.*

Confidential   ROSS-000179484

A1908

**HJS Development, Inc. v. Pierce County ex rel. Dept. of..., 148 Wash.2d 451 (2003)**

61 P.3d 1141

23    *Id.* at 203–04.

24    *Id.* at 175.

25    *Id.* at 175–76.

26    *Id.* at 174–95.

27    Verbatim Report of Proceedings (VRP) of Recorded Hearing Before Hearing Examiner Stephen K. Causseaux, Jr. (Feb. 5, 1998) at 3–8.

28    VRP at 5.

29    *Id.*

30    *Id.* at 9–18.

31    *Id.*

32    Clerk's Papers at 174–95. The hearing examiner's decision adopted all of the MDNS mitigated measures as conditions of approval.

33    VRP (Oct. 4, 2000) at 6.

34    *Id.;* Clerk's Papers at 208.

35    Clerk's Papers at 208.

36    VRP (Oct. 4, 2000) at 6.

37    *Id.* at 128.

38    *Id.* at 18, App. C.

39    Clerk's Papers at 208.

40    *Id.*

41    *See* Title 18(h) PCC and chapter 76.09 RCW.

42    Clerk's Papers at 208. Two Fox Island residents also filed a petition for revocation of the preliminary plat.

43    *See* VRP (Oct. 4, 2000).

44    Clerk's Papers at 209.

45    *Id.*

Confidential

ROSS-000179485

A1909

**HJS Development, Inc. v. Pierce County ex rel. Dept. of..., 148 Wash.2d 451 (2003)**
61 P.3d 1141

46    Clerk's Papers at 212.

47    *Id.* at 231.

48    *Id.*

49    *Id.* at 64.

50    PCC 1.22.130 authorizes the examiner to "take such further action as is deemed proper"; Rule 1.11 of the Rules of Procedure for Hearings authorizes reopening of a hearing "for good cause shown" or in the "interest of justice."

51    Clerk's Papers at 70.

52    *Id.* at 4.

53    *Id.* at 79–124.

54    VRP (June 7, 2001).

55    The court did not address the moratorium issue. VRP (June 7, 2001) at 25–28.

56    VRP (June 7, 2001) at 104–06.

57    *Id.* at 106.

58    *Id.* at 109.

59    Notice of Appeal to Washington State Supreme Court, Number 71430–4 (Aug. 2, 2001).

60    Order Granting Review (July 1, 2002).

61    *See* RCW 36.70C.030 which provides specific exceptions; *Chelan County v. Nykreim,* 146 Wash.2d 904, 916–17, 52 P.3d 1 (2002).

62    *See Citizens to Preserve Pioneer Park v. City of Mercer Island,* 106 Wash.App. 461, 470, 24 P.3d 1079 (2001); RCW 36.70C.130(1), .020(1).

63    RCW 36.70C.130(1).

64    *Citizens,* 106 Wash.App. at 470, 24 P.3d 1079.

65    *King County v. Boundary Review Bd.,* 122 Wash.2d 648, 672, 860 P.2d 1024 (1993) (citing *Sherman v. Moloney,* 106 Wash.2d 873, 881, 725 P.2d 966 (1986); *Farm Supply Distribs., Inc. v. Wash. Utils. & Transp. Comm'n,* 83 Wash.2d 446, 448, 518 P.2d 1237 (1974); *Schmitt v. Cape George Sewer Dist. 1,* 61 Wash.App. 1, 4, 809 P.2d 217 (1991)).

66    *See City of Univ. Place v. McGuire,* 144 Wash.2d 640, 647, 30 P.3d 453 (2001); *Girton v. City of Seattle,* 97 Wash.App. 360, 363, 983 P.2d 1135 (1999) (citing *Boundary Review Bd.,* 122 Wash.2d at 672, 860 P.2d 1024; *Hilltop Terrace Homeowner's Ass'n v. Island County,* 126 Wash.2d 22, 29, 891 P.2d 29 (1995)).

Confidential    ROSS-000179486

A1910

**HJS Development, Inc. v. Pierce County ex rel. Dept. of..., 148 Wash.2d 451 (2003)**
61 P.3d 1141

67    *See* RCW 58.17.010; *Norco Const. Inc. v. King County,* 29 Wash.App. 179, 180, 627 P.2d 988 (1981).

68    *See* RCW 58.17.030, .070.

69    RCW 58.17.020(4).

70    RCW 58.17.100; *Norco Const. Inc.,* 29 Wash.App. at 180, 627 P.2d 988.

71    *See* RCW 58.17.100; PCC 16.08.020.

72    PCC 16.08.020.

73    *Norco Const. Inc.,* 29 Wash.App. at 181, 627 P.2d 988.

74    It is well established that if a case can be decided on nonconstitutional grounds, an appellate court should decline to consider the constitutional issues. *See Isla Verde Int'l Holdings, Inc. v. City of Camas,* 146 Wash.2d 740, 49 P.3d 867, 874 (2002); *State v. Speaks,* 119 Wash.2d 204, 207, 829 P.2d 1096 (1992).

75    Former PCC 18.50.970 and 18.50.975 (emphasis added). Standards for revocation established in the ordinance, former PCC 18.50.995, stated in part:
      Such revocation or modification shall be made on any one or more of the following grounds:
      ....
          D. That the permit or variance granted is being, or recently has been, exercised contrary to the terms or conditions of such approval, or in violation of any Statute, Resolution, Cod, Law or Regulation;
          E. That the use for which the approval was granted was so exercised as to be detrimental to the public health or safety, or so as to constitute a nuisance.

76    *See Burley Lagoon Improvement Ass'n v. Pierce County,* 38 Wash.App. 534, 540, 686 P.2d 503 (1984). In the city of Seattle, site plan permits are master use permits (MUPs) employed to streamline the regulatory review process. MUPs include a number or regulatory components such as environmental impact review, comprehensive plan review, and other use inquires. *See, e.g., Erickson & Assocs., Inc. v. McLerran,* 123 Wash.2d 864, 872 P.2d 1090 (1994). In the revocation hearing, the Pierce County Planning and Land Services Department requested the hearing examiner to consider revocation of the site plan for violations of the plat's conditions of approval. Clerk's Papers at 36.

77    Br. of Resp't (citing former PCC 18.50.960) (emphasis added).

78    Clerk's Papers at 231.

79    *Brister v. Council of Tacoma,* 27 Wash.App. 474, 476, 619 P.2d 982 (1980) (treating site plan and plat approval as separate processes). Although neither party defines site plan, it is unlikely to be confused with binding site plan. As defined by statute, a binding site plan is an alternative method in dividing land and exempted from the platting requirements of chapter 58.17 RCW. It is similar to a preliminary plat in that it requires a drawing to scale to subdivide land, but it is only applicable in three types of land uses: (1) commercially or industrially zoned property; (2) mobile home or travel trailer sites; and (3) condominium development. This case, involving single-family dwellings in a rural-residential zone, does not come within this definition.

80    *Lejeune v. Clallam County,* 64 Wash.App. 257, 270, 823 P.2d 1144 (1992).

81    *See McTavish v. City of Bellevue,* 89 Wash.App. 561, 565, 949 P.2d 837 (1998); *Brister,* 27 Wash.App. at 476, 619 P.2d 982.

82    *World Wide Video, Inc. v. City of Tukwila,* 117 Wash.2d 382, 392, 816 P.2d 18 (1991), *cert. denied,* 503 U.S. 986, 112 S.Ct. 1672, 118 L.Ed.2d 391 (1992).

Confidential                                                                                ROSS-000179487

A1911

**HJS Development, Inc. v. Pierce County ex rel. Dept. of..., 148 Wash.2d 451 (2003)**

61 P.3d 1141

83    *Heinsma v. City of Vancouver,* 144 **Wash**.2d 556, 563, 29 P.3d 709 (2001).

84    *State v. Villarreal,* 97 Wash.App. 636, 641, 642, 984 P.2d 1064 (1999); *McTavish v. City of Bellevue,* 89 Wash.App. 561, 565, 949 P.2d 837 (1998).

85    *Burley Lagoon Improvement Ass'n,* 38 Wash.App. at 536, 686 P.2d 503 (citing *N. Pac. Coast Freight Bureau v. State,* 12 **Wash**.2d 563, 122 P.2d 467 (1942)).

86    *Burley Lagoon Improvement Ass'n,* 38 Wash.App. at 537, 686 P.2d 503 (citing *State ex rel. Spokane United Rys. v. Dep't of Pub. Serv.,* 191 **Wash**. 595, 71 P.2d 661 (1937)).

87    *Burley Lagoon Improvement Ass'n,* 38 Wash.App. at 538, 686 P.2d 503.

88    Former PCC 18.50.145A.2.

89    Respondent contends "permits" under the code does not refer to or make mention of preliminary plats. Instead the code specifies "use permits" for "conditional use," "unclassified use," and "nonconforming use" of the property and "building permits" and "site development permits" for development of the property, citing former PCC 18.203.050, 18.10.221.010, 18.10.610(I, N), .630(C, D), .680(B), .700(A)(1), .145U.2; PCC 17A.10.070).

90    *King County v. Cent. Puget Sound Growth Mgmt. Hearings Bd.,* 142 **Wash**.2d 543, 554, 14 P.3d 133 (2000) ("preventing interference with agricultural activities by nearby non-agricultural land uses.").

91    *See* former PCC 18.203.050, 18.10.221.010, 18.10.610(I, N), .630(C, D), .680(B), .700(A)(1), .145U.2; PCC 17A.10.070.

92    Former PCC 18.50.145U.1, .145D.3.

93    *See id.*

94    Ordinarily, the word "or" does not mean "and" unless there is clear legislative intent to the contrary. *See State v. Tiffany,* 44 **Wash**. 602, 87 P. 932 (1906). Statutory phrases separated by the word "and" generally should be construed in the conjunctive. *See* 1A Norman J. Singer, *Statutes and Statutory Construction* § 21:14, at 179–81 (6th ed.2002).

95    Former PCC 18.50.145D.3.

96    *See id.*

97    *See, e.g., King County v. Cent. Puget Sound Growth Mgmt. Hearings Bd.,* 142 **Wash**.2d 543, 550, 14 P.3d 133 (2000); *Citizens for Mount Vernon v. City of Mount Vernon,* 133 **Wash**.2d 861, 947 P.2d 1208 (1997); *Christianson v. Snohomish Health Dist.,* 133 **Wash**.2d 647, 946 P.2d 768 (1997).

98    Br. of Resp't at 24.

99    *See* RCW 58.17.140, .150, .160, .170.

100   *See* RCW 58.17.170.

101   6 **WASH**. STATE BAR ASS'N, REAL PROPERTY DESKBOOK § 89.5(2) (1996).

102   *See Loveless v. Yantis,* 82 **Wash**.2d 754, 763, 513 P.2d 1023 (1973) (a preliminary plat approval constitutes a major action significantly affecting the environment, necessitating an environmental impact statement).

Confidential                                                                 ROSS-000179488

A1912

**HJS Development, Inc. v. Pierce County ex rel. Dept. of..., 148 Wash.2d 451 (2003)**

61 P.3d 1141

103    *See* RCW 58.17.170.

104    Former PCC 18.50.975 (emphasis added).

105    Clerk's Papers at 36; former PCC 18.50.180, .185.

106    "(A) Developments or uses permitted outright; (B) Development or uses permitted after administrative review and approval of a site plan by the Planning Department; and (C) Development or uses permitted after review and approval of a site plan by the Examiner after at least one public hearing." Former PCC 18.50.185.

107    Former PCC 18.50.185(C)(1) stated in part:
       1. Any use or activity which requires a public hearing or public meeting.... In the event any use or activity requires approval over and beyond the requirements of this Regulation and the Examiner has the authority to review the matter under the other Regulations or Code, the Examiner may consider the separate applications concurrently.... This Section shall be applicable, but not necessarily limited to, subdivisions....

108    CONST. art. XI, § 11.

109    *See Rabon v. City of Seattle,* 135 Wash.2d 278, 287, 957 P.2d 621 (1998); *Brown v. City of Yakima,* 116 Wash.2d 556, 559, 807 P.2d 353 (1991).

110    *Lenci v. City of Seattle,* 63 Wash.2d 664, 667–68, 388 P.2d 926 (1964) (citing *In re Iverson,* 199 Cal. 582, 250 P. 681 (1926)).

111    *Rabon,* 135 Wash.2d at 289, 957 P.2d 621; *Brown,* 116 Wash.2d at 560, 807 P.2d 353.

112    *Brown,* 116 Wash.2d at 560, 807 P.2d 353; *Lenci,* 63 Wash.2d at 669–70, 388 P.2d 926.

113    *Lenci,* 63 Wash.2d at 667–68, 388 P.2d 926 (citing *Letterman v. City of Tacoma,* 53 Wash.2d 294, 333 P.2d 650 (1958)).

114    *Id.* (citing *Winkenwerder v. City of Yakima,* 52 Wash.2d 617, 328 P.2d 873 (1958)).

115    Former PCC 18.50.975.

116    *See* VRP at 104 (June 7, 2001).

117    RCW 58.17.010 (emphasis added).

118    *City of Seattle v. Williams,* 128 Wash.2d 341, 359–60, 908 P.2d 359 (1995).

119    *Id.* at 347–48, 908 P.2d 359.

120    *Id.* at 349–50, 908 P.2d 359.

121    *Id.* at 363, 908 P.2d 359.

122    *Id.* at 353, 908 P.2d 359.

123    *See* RCW 58.17.100.

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.                22

Confidential                                                                                        ROSS-000179489

A1913

**HJS Development, Inc. v. Pierce County ex rel. Dept. of..., 148 Wash.2d 451 (2003)**
61 P.3d 1141

124    Br. of Resp't at 27.

125    *See Oliver v. Harborview Med. Ctr.,* 94 Wash.2d 559, 565, 618 P.2d 76 (1980).

126    *Trimen Dev. Co. v. King County,* 124 Wash.2d 261, 270, 877 P.2d 187 (1994); *Rabon v. City of Seattle,* 135 Wash.2d 278, 291, 957 P.2d 621 (1998).

127    *See* RCW 58.17.100, .110. *See also Isla Verde Int'l Holdings v. City of Camas,* 146 Wash.2d 740, 49 P.3d 867, 880 (2002) ( " [L]ocal governments have the authority to adopt regulations or to withhold plat approval if appropriate provisions have not been made ... "); *Norco Constr.,* 29 Wash.App. at 180, 627 P.2d 988.

128    *Id.*

129    Former PCC 18.50.995.

130    *See* RCW 58.17.100, .110 (allowing enactment of regulations for the public health, safety, and general welfare).

131    *Lenci,* 63 Wash.2d at 670, 388 P.2d 926.

132    *Heinsma,* 144 Wash.2d at 565, 29 P.3d 709 (citing *Brown,* 116 Wash.2d at 561, 807 P.2d 353).

133    *Heinsma,* 144 Wash.2d at 565, 29 P.3d 709.

134    *Rabon,* 135 Wash.2d at 292, 957 P.2d 621 (citing *Trimen Dev. Co.,* 124 Wash.2d at 269, 877 P.2d 187; *City of Bellingham v. Schampera,* 57 Wash.2d 106, 110–111, 356 P.2d 292 (1960)).

135    Br. of Resp't at 31, 32.

136    *See* RCW 58.17.140.

137    *Id.*

138    *Friends of the Law,* 123 Wash.2d at 522, 869 P.2d 1056; RCW 58.17.030.

139    *See* RCW 58.17.100, .110.

140    *See* RCW 58.17.110.

141    *Boundary Review Bd.,* 122 Wash.2d at 672, 860 P.2d 1024.

142    *See McGuire,* 144 Wash.2d at 647, 30 P.3d 453; *Girton,* 97 Wash.App. at 363, 983 P.2d 1135 (citing *Boundary Review Bd.,* 122 Wash.2d at 672, 860 P.2d 1024; *Hilltop Terrace Homeowner's Ass'n,* 126 Wash.2d at 29, 891 P.2d 29).

143    Clerk's Papers at 212–13.

1    Under RCW 58.17.205, an offer or agreement to sell, lease, or transfer a lot, tract, or parcel of land that is expressly conditioned on recording of the final plat is not subject to RCW 58.17.200's injunctive action.

WESTLAW    © 2017 Thomson Reuters. No claim to original U.S. Government Works.    23

Confidential                                                                                                                                ROSS-000179490

A1914

**HJS Development, Inc. v. Pierce County ex rel. Dept. of..., 148 Wash.2d 451 (2003)**

61 P.3d 1141

2    That code provision states in relevant part:
> "Developments or uses permitted after review and approval of a site plan by the Examiner after at least one public hearing are as follows:
> "1. Any use ... which requires a public hearing or public meeting according to any other law, ordinance, regulation, or Code.... This Section shall be applicable, but not necessarily limited to ... subdivisions...."
> Former PCC 18.50.185(C)(1).

---

**End of Document**                                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

---

Confidential                                                                                ROSS-000179491

A1915

Case 1:20-cv-00613-SB   Document 695-1   Filed 10/08/24   Page 59 of 80 PageID #: 152804

# EXHIBITS    -

# Redacted in their Entirety

A1916

Case 1:20-cv-00613-SB   Document 695-1   Filed 10/08/24   Page 60 of 80 PageID #: 152805

# EXHIBIT 77

A1917

# Westlaw is Suing Us. Our Response:

 **Andrew Arruda** [Follow]
May 7 · 5 min read

Yesterday, Westlaw filed a suit alleging that ROSS stole its proprietary data to fast-track our technology development. These allegations are false. We did nothing wrong. Below, we release internal communications, agreements, and work product related to Westlaw's claims. It saddens us to be writing this piece, taking away our focus from delivering useful features to our customers.

In 2017, we started work with a contractor called LegalEase to build datasets to train our artificial intelligence (AI) systems. We needed legal questions mapped directly to passages from case law that answer those questions. It was crucial that the passages mapped directly to case law in our database because we wanted to teach our system to give on-point answers directly from primary law.

In 2018, Westlaw filed a suit against LegalEase claiming that LegalEase gave us proprietary data in the form of headnotes, case summaries, and other editorial content. We never asked for or used proprietary data from Westlaw. Not only could we not map this proprietary data to the case law in our database, our technology does not attempt to generate editorialized answers; instead, it aims to recognize and extract answers directly from case law using machine learning. In fact, anyone that accesses our platform (which is freely accessible through our website) can readily see that we have no editorialized content. It has always been our view that the editorialized content approach, in addition to being fallible and difficult to quality-check, produces work that is stale the moment it is published. That is the old legal research playbook. We chose a new way.

In fact, when LegalEase did once send us unsolicited Westlaw content, we immediately told them to not include such proprietary information. You can see this in the emails provided below. The first email is from one of our engineers who discovered the data, alerting the project lead. He said, "…they [LegalEase] include a lot of what seems to be Westlaw headnotes, footnotes, and other stuff. If it's possible for them to send us cases without that it would be much better as that is added noise…". The second email is from our project lead to our primary contact at LegalEase about the unwanted data. We were very clear: "if you can send us cases without that extra info, that would be great. Thanks."



TR-0000587

A1918

5/7/2020 Case 1:20-cv-00613-SB   Document 695-1   Filed 10/08/24   Page 62 of 80 PageID #: 152807



As a part of its suit against LegalEase, Westlaw subpoenaed us for all communications, agreements, and work product related to the claim. Westlaw and their attorneys were unable to find any evidence that we used or benefited from Westlaw's data. Below you can read a complete copy of the statement of work related to this matter. No matter; we had to spend over a hundred thousand dollars to comply with this subpoena. As a young company, this was a financial blow, which we are sure was not lost on Westlaw's executive team.



TR-0000588

A1919



SEE FULL AGREEMENT HERE.

Fast forward to earlier this week: we received notification that Westlaw had settled with LegalEase. We thought this costly distraction was behind us, but today we are back to square one. We opened Law.com to learn that Westlaw had filed a suit against us. That Westlaw notified the press before us is disappointing.

Since the founding of ROSS Intelligence, we have had one mission: to democratize the law through better legal technology. We recognize that for decades the legal research market has been dominated by Westlaw — with its bloated, expensive, and unintuitive products that provide bad results. We knew there was a better, and more affordable, way. Over the last five years, we have made tremendous progress. We've spent over a million dollars building our database of primary law from data partners such as Casemaker and Fastcase. We've innovated new tools and better ways of searching. We've signed up thousands of lawyers and law firms. And we've partnered with companies like Clio and Bar Associations across the United States. By filing this lawsuit despite its lack of merit, Westlaw is interfering with our chances of securing more funding or merging with other companies, which we need to do in order to innovate and compete with Westlaw. This is not the first time Westlaw has used litigation as a weapon.

We were one of the first donors to the ABA's Center for Innovation because their mission deeply resonated with ours. They believed that the intersection of law and technology affords the profession a tremendous opportunity to reshape both the delivery of and access to legal services for the 21st century. We are asking our friends and supporters in the legal community to help us fight this unfair attack and allow us to continue building products lawyers love. We believe that better legal technology can enable better access to justice at its core.

So, here we are. A small company versus a juggernaut. David versus Goliath. This litigation epitomizes everything that is wrong with Westlaw's business practices. Having done nothing wrong, unless case law is copyrightable… Of course, it is well established that primary law is not copyrightable in the United States. As has long been held and as the Supreme Court reminded us last week, "no one can own the law" (*Georgia v. Public.Resource.Org, Inc.*, №18–1150, 590 U.S. ____ (2020)). Individuals must have free

TR-0000589

A1920

access to the law if American democracy is to survive. We will continue to fight for free access to the law and look forward to showing the world Westlaw's true colors.

**If you want to get involved in this fight, email us directly at thelawisfree@rossintelligence.com.**

Thank you for reading.

Andrew and Jimoh



https://medium.com/@AndrewArruda/hold-59effcd819b0   4/4

TR-0000590

A1921

Case 1:20-cv-00613-SB   Document 695-1   Filed 10/08/24   Page 65 of 80 PageID #: 152810

# EXHIBIT 78

A1922



TR-0001119

A1923

Westlaw: Stuck in years-long... ROSS Intelligence | Facebook



**Tim White** Does it has Internal Revenue Code, Treasury regulations, and IRS Rev. Rulings, Rev. Procs, and Tax Court Opinions?

26m

**Adam Robert Waldstein** Does it have overviews of foreign regulatory regimes like MiFID and the AIFMD?

1w

**Author**

**ROSS Intelligence** Hi Adam, at this time we do not have any documents outside of US case law and legislation (statutes and regulations).
Thanks for your question!

1d

**Marvin S. Robinson II** BOTH

1w

**Young Kim** I wish Ross took up Casetext AI challenge. Similar products, but the question remains? Who has the better product?

1w

**Hunter Tucker** What is it? lol

1w

**Daniel Anthony** Notice how no one's talking about Lexis.

5d                                    😂 1

**Larry Bell** I know Business and not law

5d

**Oscar Argüello** She is like.... but my firm uses west law.... should I... should I not.... should I..... I'm just.... why the hell not!

5d · Edited                            👍 1

**Heather Bastine Kinser** The main thing we use Lexis for is the public records feature- Skip tracing basically. Does this have a similar feature? Also Lexis has sample forms, we don't get them with our subscription but I think they would be helpful. Have those?

3d

**Author**

**ROSS Intelligence** Hi Heather, at this time we do not have skip tracing or sample forms on ROSS. I've shared your comment with the team so we can improve our product. Thank you!

1d

**Jake Petersen** Any actual users use this before?

1w

**Author**

**ROSS Intelligence** Here are some folks who've used ROSS! https://www.rossintelligence.com/case-studies

1w

**Carly Nuttall Gibson** Joe Gibson

2d

**Scott Phillips** I tried Ross. Not a fan. It was hard to get useable results. The search engine has a hard time with boolean search strings and their natural language inquiries suck.

1d

**Scott Phillips** ROSS Intelligence - See my email to Alex Abid, Thursday, June 25, 2020 on or about 12:10 PM. That was just relating to nonsensical problems importing and analyzing a garden variety pleading. We didn't even get to the search operator issues.

**ROSS Intelligence**
June 11 at 8:33 AM 🌐

↪ ROSS is excited to be a launch partner with OpenAI on their first commercial product: an API. https://bit.ly/30wNter

👍❤️ 15        2 Comments  2 Shares

↪ Share

**ROSS Intelligence**
May 26 at 9:53 AM 🌐

📅 Looking forward to joining LegalFuel and the Florida Bar at 2pm today to offer a free CLE on Legal Research and Profitability!

👍😮 5              3 Comments

↪ Share

English (US) · **Español** · Português (Brasil) · **Français (France)** · **Deutsch**

Privacy · Terms · Advertising · Ad Choices ▷ · Cookies · More ▾
Facebook © 2020

https://www.facebook.com/rossintelligence/posts/2524589887806098

2/4

TR-0001120

A1924



TR-0001121

A1925



TR-0001122

A1926

Case 1:20-cv-00613-SB   Document 695-1   Filed 10/08/24   Page 70 of 80 PageID #: 152815

# EXHIBITS   -8

## Redacted in their Entirety

A1927

# EXHIBIT 81

A1928

LIBRARY OF CONGRESS

*Copyright Office*
*of the United States*

WASHINGTON, D.C.

**THIS IS TO CERTIFY** that on April 8, 1981 a claim to copyright a work identified as **WESTLAW (BASIC DATA BASE FILE)** was registered under number **TXu 65-600.** This work was registered in accordance with provisions of the United States Copyright Law (Title 17 United States Code).

**THIS IS TO CERTIFY FURTHER**, that the attached is an additional certificate of this work.

**IN WITNESS WHEREOF,** the seal of this Office is affixed hereto on August 22, 2020.

Maria Strong
Acting United States Register of Copyrights and Director

By:    Jarletta Walls
Section Head
Records Research and Certification Section
Office of Public Records and Repositories

Use of this material is governed by the U.S. Copyright law 17 U.S.C. 101 et seq.

TR-0033982

A1929

Case 1:20-cv-00613-SB   Document 695-1   Filed 10/08/24   Page 73 of 80 PageID #: 152818

## Additional Certificate of Registration of a Claim to Copyright

This is to certify that the statements set forth in the attached have been made a part of the records of the Copyright Office with claim of copyright registered under number

In testimony whereof, the seal of this office is affixed hereto on

**TXu 65-600**

**August 22, 2020**

*Marie Strong*

Acting United States Register of Copyrights and Director

C-731 - 01/2020

TR-0033983

A1930

# FORM TX

**UNITED STATES COPYRIGHT OFFICE**

| REGISTRATION NUMBER |
|---|
| *T X u*     65-600 |
| TX       (TXU) |

| EFFECTIVE DATE OF REGISTRATION |
|---|
| APR 8 1981 |
| (Month)     (Day)     (Year) |

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE CONTINUATION SHEET (FORM TX/CON)**

**① Title**

**TITLE OF THIS WORK:**

WESTLAW (Basic Data Base File)

**PREVIOUS OR ALTERNATIVE TITLES:**

If a periodical or serial give: Vol...... No...... Issue Date .....................

**PUBLICATION AS A CONTRIBUTION:** (If this work was published as a contribution to a periodical, serial, or collection, give information about the collective work in which the contribution appeared.)

Title of Collective Work: ............................ Vol...... No...... Date ................. Pages.............

**② Author(s)**

**IMPORTANT:** Under the law, the "author" of a "work made for hire" is generally the employer, not the employee (see instructions). If any part of this work was "made for hire" check "Yes" in the space provided, give the employer (or other person for whom the work was prepared) as "Author" of that part, and leave the space for dates blank.

**1**

**NAME OF AUTHOR:** West Publishing Co.

Was this author's contribution to the work a "work made for hire"? Yes. X... No ...

**DATES OF BIRTH AND DEATH:**
Born.......... Died.........
(Year) (Year)

**AUTHOR'S NATIONALITY OR DOMICILE:**

Citizen of ..U..S..A.......... } or { Domiciled in ...................
(Name of Country) (Name of Country)

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK:**
Anonymous? Yes.... No X....
Pseudonymous? Yes...... No X....

If the answer to either of these questions is "Yes," see detailed instructions attached.

**AUTHOR OF:** (Briefly describe nature of this author's contribution)
Compilation, revisions, additions, etc.

**2**

**NAME OF AUTHOR:**

Was this author's contribution to the work a "work made for hire"? Yes...... No.

**DATES OF BIRTH AND DEATH:**
Born.......... Died..........
(Year) (Year)

**AUTHOR'S NATIONALITY OR DOMICILE:**

Citizen of.................. } or { Domiciled in...............
(Name of Country) (Name of Country)

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK:**
Anonymous? Yes...... No......
Pseudonymous? Yes..... No......

If the answer to either of these questions is "Yes," see detailed instructions attached.

**AUTHOR OF:** (Briefly describe nature of this author's contribution)

**3**

**NAME OF AUTHOR:**

Was this author's contribution to the work a "work made for hire"? Yes.... No..

**DATES OF BIRTH AND DEATH:**
Born.......... Died.........
(Year) (Year)

**AUTHOR'S NATIONALITY OR DOMICILE:**

Citizen of.................. } or { Domiciled in....................
(Name of Country) (Name of Country)

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK:**
Anonymous? Yes...... No......
Pseudonymous? Yes..... No......

If the answer to either of these questions is "Yes," see detailed instructions attached.

**AUTHOR OF:** (Briefly describe nature of this author's contribution)

**③ Creation and Publication**

**YEAR IN WHICH CREATION OF THIS WORK WAS COMPLETED:**

Year 1981

(This information must be given in all cases.)

**DATE AND NATION OF FIRST PUBLICATION:**

Date .....................
(Month) (Day) (Year)

Nation .....................
(Name of Country)

(Complete this block ONLY if this work has been published.)

**④ Claimant(s)**

**NAME(S) AND ADDRESS(ES) OF COPYRIGHT CLAIMANT(S):**

West Publishing Co.
P. O. Box 3526
50 W. Kellogg Boulevard
St. Paul, Minnesota 55165

**TRANSFER:** (If the copyright claimant(s) named here in space 4 are different from the author(s) named in space 2, give a brief statement of how the claimant(s) obtained ownership of the copyright.)

• Complete all applicable spaces (numbers 5-11) on the reverse side of this page
• Follow detailed instructions attached    • Sign the form at line 10

| DO NOT WRITE HERE |
|---|
| Page 1 of ..2.. pages |

TR-0033984

A1931

| | EXAMINED BY: DC<br>CHECKED BY: | APPLICATION RECEIVED:<br>APR 8 1981 | |
|---|---|---|---|
| | CORRESPONDENCE:<br>☑ Yes | DEPOSIT RECEIVED:<br>APR 8 1981 | FOR<br>COPYRIGHT<br>OFFICE<br>USE<br>ONLY |
| TXu  65-600 | DEPOSIT ACCOUNT<br>FUNDS USED:<br>☑ | REMITTANCE NUMBER AND DATE: | |

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED ADDITIONAL SPACE, USE CONTINUATION SHEET (FORM TX/CON)**

**PREVIOUS REGISTRATION:**

- Has registration for this work, or for an earlier version of this work, already been made in the Copyright Office?     Yes    No  X
- If your answer is "Yes," why is another registration being sought? (Check appropriate box)
  - ☐ This is the first published edition of a work previously registered in unpublished form.
  - ☐ This is the first application submitted by this author as copyright claimant.
  - ☐ This is a changed version of the work, as shown by line 6 of this application.
- If your answer is "Yes," give: Previous Registration Number .......................    Year of Registration ..........................

**⑤ Previous Registration**

**COMPILATION OR DERIVATIVE WORK:** (See instructions)

PREEXISTING MATERIAL: (Identify any preexisting work or works that this work is based on or incorporates.)
Copyright is not claimed as to any part of the original work prepared by a United
States Government officer or employee as part of that person's official duties.

MATERIAL ADDED TO THIS WORK: (Give a brief, general statement of the material that has been added to this work and in which copyright is claimed.)
Compilation of previously published case reports including but not limited to
opinions, synopses, syllabi or case law paragraphs, key number class, tables &
index digest with revisions & additions. Also included is training and descriptive
information and annotated citations.

**⑥ Compilation or Derivative Work**

**MANUFACTURERS AND LOCATIONS:** (If this is a published work consisting preponderantly of nondramatic literary material in English, the law may require that the copies be manufactured in the United States or Canada for full protection. If so, the names of the manufacturers who performed certain processes, and the places where these processes were performed must be given. See instructions for details.)

| NAMES OF MANUFACTURERS | PLACES OF MANUFACTURE |
|---|---|
| West Publishing Co. | P.O. Box Box 3526, 50 W. Kellogg Blvd.<br>St. Paul, Minnesota 55165 |

**⑦ Manufacturing**

**REPRODUCTION FOR USE OF BLIND OR PHYSICALLY-HANDICAPPED PERSONS:** (See instructions)

- Signature of this form at space 10, and a check in one of the boxes here in space 8, constitutes a non-exclusive grant of permission to the Library of Congress to reproduce and distribute solely for the blind and physically handicapped and under the conditions and limitations prescribed by the regulations of the Copyright Office: (1) copies of the work identified in space 1 of this application in Braille (or similar tactile symbols); or (2) phonorecords embodying a fixation of a reading of that work; or (3) both.

  a ☐ Copies and phonorecords          b ☐ Copies Only          c ☐ Phonorecords Only

**⑧ License For Handicapped**

**DEPOSIT ACCOUNT:** (If the registration fee is to be charged to a Deposit Account established in the Copyright Office, give name and number of Account.)

Name: West Publishing Co.
Account Number: DA 021970

**CORRESPONDENCE:** (Give name and address to which correspondence about this application should be sent.)
Name: West Publishing Co.
Address: PO Box 3526, 50 W. Kellogg Blvd.
(City) St. Paul, (State) Minnesota (ZIP) 55165 (Apt.)

**⑨ Fee and Correspondence**

**CERTIFICATION:** # I, the undersigned, hereby certify that I am the: (Check one)
☐ author ☐ other copyright claimant ☐ owner of exclusive right(s) ☑ authorized agent of    West Publishing Co.
(Name of author or other copyright claimant, or owner of exclusive right(s))
of the work identified in this application and that the statements made by me in this application are correct to the best of my knowledge.

Handwritten signature (X)  _Rufus K. Griscom_

Typed or printed name   Rufus K. Griscom          Date  1 April 1981

**⑩ Certification (Application must be signed)**

| | |
|---|---|
| MAIL CERTIFICATE TO | West Publishing Co.<br>(Name)<br>P. O. Box 3526, 50 W. Kellogg Blvd.<br>(Number, Street and Apartment Number)<br>St. Paul, Minnesota 55165<br>(City)  (State)  (ZIP code)<br>(Certificate will be mailed in window envelope) |

**⑪ Address For Return of Certificate**

* 17 U.S.C. § 506(e): Any person who knowingly makes a false representation of a material fact in the application for copyright registration provided for by section 409, or in any written statement filed in connection with the application, shall be fined not more than $2,500.

⚮ U.S. GOVERNMENT PRINTING OFFICE: 1979-281-421/4                    Mar. 1979-200,000

TR-0033985

A1932

Case 1:20-cv-00613-SB   Document 695-1   Filed 10/08/24   Page 76 of 80 PageID #: 152821

# EXHIBIT 82

A1933

Case 1:20-cv-00613-SB    Document 695-1    Filed 10/08/24    Page 77 of 80 PageID #: 152822



LIBRARY OF CONGRESS

*Copyright Office of the United States*

WASHINGTON, D.C.

**THIS IS TO CERTIFY** that on August 8, 2019 a claim to copyright a work identified as **GROUP REGISTRATION FOR AUTOMATED DATABASE TITLED "WESTLAWNEXT"; UNPUBLISHED UPDATES APRIL 1, 2019 THROUGH JUNE 30, 2019; REPRESENTATIVE CREATION DATE: JUNE 5, 2019; UPDATED DAILY** was registered under number **TXu 2-178-620.** This work was registered in accordance with provisions of the United States Copyright Law (Title 17 United States Code).

**THIS IS TO CERTIFY FURTHER,** that the attached is an additional certificate of this work.

**IN WITNESS WHEREOF,** the seal of this Office is affixed hereto on August 22, 2020.

Maria Strong
Acting United States Register of Copyrights and Director

By:    Jarletta Walls
Section Head
Records Research and Certification Section
Office of Public Records and Repositories

Use of this material is governed by the U.S. Copyright law 17 U.S.C. 101 et seq.

Page 1 of 2

TR-0034557

A1934

Additional Certificate (17 U.S.C. 706)

# Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, *United States Code*, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Marie Strong*

Acting United States Register of Copyrights and Director

**Registration Number**

## TXu 2-178-620

**Effective Date of Registration:**
August 08, 2019
**Registration Decision Date:**
February 04, 2020

## Title
_____

**Title of Work:**   Group Registration for automated database titled "WestlawNext", unpublished updates from April 1, 2019 through June 30, 2019; representative creation date: June 5, 2019; updated daily.

## Completion/Publication
_____

**Year of Completion:**   2019

## Author
_____

**Author:**   West Publishing Corporation
**Author Created:**   original and revised text and compilation of legal material
**Work made for hire:**   Yes
**Citizen of:**   United States
**Anonymous:**   No
**Pseudonymous:**   No

## Copyright Claimant
_____

**Copyright Claimant:**   Thomson Reuters Global Resources
Neuhofstrasse 1, 6340 Baar, Switzerland
**Transfer statement:**   By assignment

## Limitation of copyright claim
_____

**Material excluded from this claim:**   previously registered unpublished database
**Previously registered:**   Yes
**Basis of current registration:**   This is a changed version of the work.

**New material included in claim:**   daily updates of original and revised text and compilation of legal material

## Certification
_____

**Name:**   Rebecca Matzek

Page 1 of 2

A1935

**Date:**   August 05, 2019

**Copyright Office notes:**   Regarding limitation of claim: Registration does not extend to U.S. government works or government edicts that have been issued by any state, local, or territorial government, including legislative enactments, judicial decisions, administrative rulings, public ordinances, or similar types of official legal materials that have the force of law. 17 U.S.C. 105; Compendium 313.6(C)(2).

Regarding previous registration: Information added by CO from information provided by applicant.

Page 2 of 2

TR-0034559

A1936

**Registration #:**  TXu002178620
**Service Request #:**  1-7993872098

Thomson Reuters
Rebecca Matzek
610 Opperman Drive
St. Paul, MN 55164 0526

TR-0034560

A1937

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 1 of 431 PageID #: 152826

# EXHIBIT 83

A1938

EXHIBIT 57
WIT: _____
DATE: 10.10.19
LORI A. BALDWIN CSR, RPR, CRR

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

- - - - - - - - - - - - - - - - - - - - - - - - - - - -  x
   :

WEST PUBLISHING CORPORATION,
   :

     Plaintiff / Counterclaim-Defendant,
   :

   :   Civ No. 18-CV-01445 (DSD/ECW)

     v.
   :

LEGALEASE SOLUTIONS, LLC,
   :

     Defendant / Counterclaim-Plaintiff.
   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

## AMENDED NOTICE OF DEPOSITION

TO:    LegalEase Solutions, LLC
       c/o Amanda Cefalu, Esq.
       Kutak Rock LLP
       60 South Sixth Street, Suite 3400
       Minneapolis, MN 55402

**PLEASE TAKE NOTICE** that on **October 9, 2019**, at **9:00 a.m.,** at the offices of Kerr, Russell and Weber, PLC, 500 Woodward Avenue, Suite 2500, Detroit, MI 48226, Plaintiff and Counterclaim-Defendant West Publishing Corporation, by its attorneys, will take the deposition upon oral examination of Teri Whitehead. The deposition will be recorded by stenographer, will be conducted before a person authorized to administer oaths in accordance with Rule 28 of the Federal Rules of Civil Procedure, and will continue day to day until completed or otherwise adjourned or continued by agreement of counsel. The deposition may be also be recorded by a videographer. The deposition is being taken for purposes of discovery, use at trial, and such purposes as are permitted under the Federal Rules of Civil Procedure.

    You are invited to attend and cross-examine.

TR-0039539

A1939

Dated:    September 25, 2019

| | |
|---|---|
| Lora Mitchell Friedemann (#0259615) | Scott T. Lashway (*pro hac vice*) |
| Fredrikson & Byron, P.A. | Mara A. O'Malley (*pro hac vice*) |
| 200 South Sixth Street | Manatt, Phelps & Phillips, LLP |
| Suite 4000 | 177 Huntington Avenue |
| Minneapolis, MN 55402 | Boston, Massachusetts 02115 |
| (612) 492-7185 | (617) 646-1401 |
| *lfriedemann@fredlaw.com* | *SLashway@manatt.com* |
| | *MOMalley@manatt.com* |

*Attorneys for West Publishing Corporation*

### CERTIFICATE OF SERVICE

I, Mara A. O'Malley, hereby certify that a true copy of West Publishing Corporation's Notice of Deposition was served on September 25, 2019, by U.S. Mail and electronic mail upon counsel of record for LegalEase Solutions, LLC: Amanda Cefalu, Kutak Rock LLP, 60 South Sixth Street, Suite 3400, Minneapolis, MN 55402-4018, *amanda.cefalu@kutakrock.com*; and Kassem Dakhlallah, Hammoud, Daklallah & Associates PLLC, 6050 Greenfield Road, Suite 201, Dearborn, MI 48126, *kd@hdalawgroup.com*.

Mara A. O'Malley

TR-0039540

A1940

EXHIBIT 67
WIT: —
DATE: 10·10·19
LORI A. BALDWIN CSR, RPR, CRR

Volume 1

Pages 1 to 265

Exhibits 1 to 29

UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

WEST PUBLISHING

CORPORATION                              Civ No. 18-CV-01445 (DSD/ECW)

       Plaintiff/Counterclaim

       Defendant,

   -vs-

LEGALEASE SOLUTIONS, LLC,

       Defendant/Counterclaim-Plaintiff.

                          /

The Deposition of TARIK HAFEEZ,

Taken at 500 Woodward,

Detroit, Michigan,

Commencing at 9:00 a.m.,

Tuesday, December 18, 2018,

Before Shacara V. Mapp, CSR-9305.

TR-0039541

A1941

2

APPEARANCES:

MR. SCOTT T. LASHWAY

Holland & Knight

10 St. James Avenue

Boston, MA 02116

(617) 305-2119

scott.lashway@hklaw.com

     Appearing on behalf of the

Plaintiff/Counterclaim-Defendant.


MR. KASSEM M. DAKHLALLAH

Hammoud & Dakhlallah

6050 Greenfield Road

Suite 201

Dearborn, Michigan 48126

(313) 551-3038

kd@hdalawgroup.com

     Appearing on behalf of the

Defendant/Counterclaim-Plaintiff.


ALSO PRESENT:

- Videographer:  Neal Rogers

- Erik Lindberg

- Jeanpierre Juliano

TR-0039542

A1942

3

TABLE OF CONTENTS

Witness                                                      Page

TARIK HAFEEZ

EXAMINATION BY MR. LASHWAY:                                  8

EXAMINATION BY MR. DAKHLALLAH:                               259

INDEX TO EXHIBITS

Exhibit                                                      Page

HAFEEZ EXHIBIT 1                                             7

Notice of Rule 30(b)(6) Deposition of

LegalEase, LLC

HAFEEZ EXHIBIT 2                                             7

Michigan Dept. Of Consumer & Industry

Services Fax Sheet

HAFEEZ EXHIBIT 3                                             7

LARA Corporations LegalEase Filing

HAFEEZ EXHIBIT 4                                             57

Intelligence is the Ability to

Adapt to Change Packet

HAFEEZ EXHIBIT 5                                             72

Thomas Reuters Order Form

Order ID: Q-00105954

*[Handwritten margin notes: "2016 RULE 7 LEGAL RESEARCH WRITING WORK, PARTNERSHIP, CORPORATE COUNSEL 2016 EMAIL"]*

TR-0039543

A1943

4

INDEX TO EXHIBITS, Continued

Exhibit                                                          Page


HAFEEZ EXHIBIT 6                                                  76

Master Service Agreement

HAFEEZ EXHIBIT 7                                                  76

Statement of Work

HAFEEZ EXHIBIT 8                                                  76

Statement OF Work II for Ross Bulk Memos

HAFEEZ EXHIBIT 9                                                  77

Master Service Agreement from 8/10/17

HAFEEZ EXHIBIT 10                                                 77

Defendant/Counterclaim-Plaintiff Responses

to Plaintiff's First Set of Requests for

Admissions

HAFEEZ EXHIBIT 11                                                 77

First Amendment to Statement of Work

HAFEEZ EXHIBIT 12                                                 126

9/28/17 E-mail Subject: Minutes of Meeting

ROSS Bulk Project and ROSS Original

HAFEEZ EXHIBIT 13                                                 144

7/31/17 E-mail Subject: New West Law

Passwords-July 2017

TR-0039544

A1944

INDEX TO EXHIBITS, Continued

| Exhibit | Page |
|---|---|
| HAFEEZ EXHIBIT 14 | 149 |
| 7/26/17 E-mail Subject: ROSS-TC | |
| Tomas 7 26 17 | |
| HAFEEZ EXHIBIT 15 | 157 |
| Statement of Work II LegalEase | |
| Process Automation | |
| HAFEEZ EXHIBIT 16 | 183 |
| Master Service Agreement Effective 8/10/17 | |
| HAFEEZ EXHIBIT 17 | 205 |
| 8/18/17 E-mail Subject: WL Registration | |
| Keys | |
| HAFEEZ EXHIBIT 18 | 207 |
| 9/5/17 E-mail Subject: Ross Portal | |
| HAFEEZ EXHIBIT 19 | 213 |
| 9/15/17 E-mail Subject: Ross Bulk Project | |
| - LPO | |
| HAFEEZ EXHIBIT 20 | 216 |
| 9/15/17 E-mail Subject: Ross Bulk Project | |
| - LPO | |
| HAFEEZ EXHIBIT 21 | 221 |
| 9/18/17 E-mail Subject: LegalEase Bulk | |
| Memo Project Request | |

TR-0039545

A1945

6

INDEX TO EXHIBITS, Continued

| Exhibit | Page |
|---|---|
| HAFEEZ EXHIBIT 22 | 225 |
| 9/19/17 E-mail Subject: Ross Bulk | |
| Project-LPO | |
| HAFEEZ EXHIBIT 23 | 233 |
| 10/10/17 E-mail Subject: Permanent ID's | |
| Still | |
| Not Established | |
| HAFEEZ EXHIBIT 25 | 239 |
| 12/4/17 E-mail Subject: Ancillary Block | |
| HAFEEZ EXHIBIT 26 | 243 |
| Thomas Reuter Research Subscriber | |
| Agreement | |
| HAFEEZ EXHIBIT 27 | 243 |
| Thomson Reuters General Terms and | |
| Conditions | |
| HAFEEZ EXHIBIT 28 | 244 |
| Thomson Reuters Schedule A | |
| HAFEEZ EXHIBIT 29 | 245 |
| Westlaw Schedule A | |

TR-0039546

A1946

7

Detroit, Michigan

Tuesday, December 18, 2018

About 9:06 a.m.

*            *            *

HAFEEZ EXHIBIT 1

Notice of Rule 30(b)(6) Deposition of

LegalEase, LLC;

HAFEEZ EXHIBIT 2

Michigan Dept. Of Consumer & Industry

Services Fax Sheet;

and HAFEEZ EXHIBIT 3

LARA Corporations LegalEase Filing

WAS MARKED BY THE REPORTER

FOR IDENTIFICATION

THE VIDEOGRAPHER:  We are on the record. This is the video recorded deposition of Tariq Hafeez being taken in Detroit, Michigan.  Today is December 18, 2018 and the time is 9:06 a.m.  Will the attorneys please identify themselves and the court reporter please swear in the witness?

MR. LASHWAY:  Scott Lashway on behalf of the Plaintiff and counterclaim Defendant, West Publishing Corporation.

MR. JULIANO:  John Pierre Juliano from

TR-0039547

A1947

8

Thomson Reuters on behalf of West Publishing Corporation.

MR. LINDENBERG: Erik Lindenberg, Thomson Reuters on behalf of West Publishing Corporation.

MR. DAKHLALLAH: Kassem Dakhlallah on behalf of the witness, the 30(b)(6) witness in this case, Tariq Hafeez.

TARIK HAFEEZ,

having first been duly sworn, was examined and testified on his oath as follows:

EXAMINATION BY MR. LASHWAY:

Q. Mr. Hafeez, it's nice to meet you. As I just mentioned, I represent the Plaintiff and -- I'm sorry, the Plaintiff and Counterclaim Defendant, West Publishing Corp.

And, Mr. Dakhlallah represents you for purposes of today's deposition?

A. Yes, that's correct.   ___ NO.

Q. And does he represent LegalEase Solutions, LLC, the named Defendant and Counterclaim-Plaintiff as well?

A. Yes, he does.   ___ NO.

Q. Okay.

MR. LASHWAY: Kassem, just to go over some quick stipulations, are you -- since this is our first deposition in the case, are you okay with preserving

TR-0039548

A1948

all objections except to privilege and form until trial, and motions to strike reserved?

MR. DAKHLALLAH:  Sure.

BY MR. LASHWAY:

Q.   And Mr. Hafeez, we're going to request that you review the deposition transcript to ensure it's accurate, and review and sign the transcript.  Is that okay with you?

A.   Yes.

Q.   Have you ever been deposed before?

A.   No, I don't think so.

Q.   All right.  So let me go through a couple of ground rules for you, then, for today's purposes.

First, so far so good.  If you wait for me to finish my questions for you to answer, and then I will do my best to do the same so that the court reporter can accurately record what is being said.

In addition, you'll have to answer verbally.

A.   Yes.

Q.   So nods of the head or uh-huhs or uhn-uhns don't necessarily work.  If you don't understand a question of mine, I want you to ask me to clarify it.  If you answer a question, I'm going to understand that you understood the question.  Is that okay?

A.   Yes.

Q.   And if you need to take a break at all, please let me

TR-0039549

A1949

10

know.  The only thing I'll ask you to do unless your counsel instructs you otherwise, is to answer the question if there's one pending.

A.  Yes.

MR. LASHWAY:  One thing we're going to cover today, Kassem, is that the documents we received from you all in your production are not Bates numbered.  We've applied a code to them just to try to keep them straight on our side.  If you have any objections to that, just let us know.  Obviously, you'll get a copy of all the exhibits.

Mr. Hafeez, can you spell your name for the record, please?

A.  Sure.  Tariq, T-A-R-I-Q.  Last name, Hafeez, H-A, F like Frank, E-E-Z.

Q.  And what is your current residential address?

A.  7577 Embassy Drive, Canton Michigan, 48187.

Q.  And what is the current address for LegalEase Solutions, LLC?

A.  2373 South Main, Suite 150, Ann Arbor, Michigan, 48104.

Q.  Is there any reason today, that would impact your ability to provide truthful answers?

A.  No.

Q.  You're not taking any medications?

A.  No.

TR-0039550

A1950

11

Q. Not under the influence of any drugs or alcohol?

A. No.

Q. Are you an employee of LegalEase Solutions, LLC?

A. Yes.

*NO. LAID OFF OCT. 4.*

Q. So I'm going to ask you at some point, about another LegalEase entity. Are you okay if I use LegalEase to refer to LegalEase Solutions, LLC and then I'll differentiate if I need to?

A. Yes.

Q. What is your title at LegalEase? — *VP GLOBAL STRATEGY.*

A. I'm the president and cofounder.

Q. And, has that been your title since you first became employed?

A. I have also had the title of general counsel.

Q. And do you have that title today?

A. On occasion.

*→ WORK WITH CORPORATE CLIENTS ON DELIVERY*

Q. What does that mean?

A. So I represent myself as general counsel when it comes to legal matters of the company. And, I also go by president and cofounder.

Q. So when you need legal advice, you also assume the title of general counsel?

A. Yes.

Q. And do you make the decision when you're going to carry the title, general counsel?

TR-0039551

A1951

12

A.  Yes.

Q.  Have -- has there ever been another president or chief executive officer of LegalEase?

A.  Yes.  So Tariq Akbar is the CEO of LegalEase Solutions and also a cofounder.

Q.  Are there any other cofounders?

A.  No.

Q.  Okay.  Did you attend college?

A.  Yes.

Q.  Where?  Where did you obtain your degree?

A.  I got my bachelor's at the University of Michigan, Ann Arbor.  And I also got my BA degree in political science from Michigan as well.

Q.  What year did you graduate from college?

A.  I graduated 1999 from undergrad and 2002 from law school.

Q.  Do you have any other degrees?

A.  I do not.

Q.  Any other professional certifications?

A.  No.

Q.  What was your degree in undergrad?

A.  Political science.  And, there was a major called APTIS, Arabic, Persian, Turkish, Islamic Studies.

Q.  Did you, or have you ever taken any classes or formal instruction in coding or technology focused

TR-0039552

A1952

13

engineering, computer science, anything like that?

A.   No.

Q.   Do you view yourself as a technologist?

A.   No.

Q.   All right.  So do you currently hold an active bar license in Michigan?

A.   I do.

Q.   In any other jurisdictions?

A.   Nope, only in Michigan.

Q.   And are you currently practicing in Michigan?

A.   Yes.

Q.   Are you affiliated with a law firm?

A.   Yes.

Q.   What is the name of that law firm?

A.   It's called Fauson Bohn.

Q.   Can you --

A.   Spell it out for you?

Q.   Can you spell it for me?  Thanks.

A.   F-A-U-S-O-N B-O-H-N.

Q.   How long have you worked at Fauson?

A.   I would say between eight to nine years.

Q.   So that would take us back to around 2010?

A.   Yes.  Maybe 2000 -- yeah, it was either 2010 or 2011.

Q.   So let's start in 2002.  So did you take the bar exam in 2002?

TR-0039553

A1953

14

A. I did, yeah.

Q. And you passed?

A. I did.

Q. And where was your first position after law school?

A. It was actually in this building at the Law Firm of Dickinson Wright.

Q. And what were you doing there?

A. I was an associate in the commercial lending and corporate department.

Q. And how long did you work at that firm?

A. About two years.

Q. And was your responsibilities there the same during the two-year tenure?

A. Yes.

Q. And then, where did you go after you left Dickinson Wright?

A. I joined the Michigan Attorney General's Office in, I believe, April of 2004.

Q. And what was your title; and what were your responsibilities at the AG's office?

A. Sure. So my title was Assistant Attorney General and I was in the Child Support Enforcement Division.

Q. What were your responsibilities in that position?

A. It was a -- we were prosecuting individuals who had not paid child support. So it was a felony prosecution

*[handwritten margin notes: KIRKPATRICK & ASSOCIATES; ASSOCIATE; 6 MONTHS TO A YEAR; WLC]*

TR-0039554

A1954

that I went around the state charging and prosecuting people who did not pay child support.

Q.   How long were you at the AG's office for?

A.   I was there until June of 2005.

Q.   So --

A.   So barely over a year.

Q.   Okay.  And where did you go next?

A.   Then, I started LegalEase.  Well, actually, I -- I started working at LegalEase full time.  The LegalEase company was started a few months earlier, as far as the corporation goes.

Q.   And, you mentioned earlier, that you're the cofounder of LegalEase.  So was the company founded before your arrival?

A.   So both Tariq Akbar and I cofounded a company.  Came up with the idea at the end of 2014 and we incorporated it in February of '15.  But we still had our day jobs until June.

MR. DAKHLALLAH:  Tariq, you got your decades wrong.

THE WITNESS:  I'm sorry, I'm saying 2015.  I apologize.

We came up with the idea at the end of 2004.  And then, I -- we both left our jobs in June of 2005 to work at LegalEase or work on LegalEase full time.

TR-0039555

A1955

BY MR. LASHWAY:

Q. Okay. And where -- and how long were you at LegalEase exclusively before you returned to practicing at a law firm or in a similar capacity?

A. So I believe in November of 2006, I got a position at the University of Michigan Law School as a, essentially, a career counselor for the lawyers or for JDs, or for law students, I should say.

And, I took that position. I believe I joined around Thanksgiving of 2006, in that rough time frame. And, I was there until April or maybe March of 2008.

Q. Okay. And were you still at LegalEase during that time period?

A. Yes. So we still had the business, but I just wasn't working at it full time.

Q. And then, in 2008, did you take on any additional employment?

A. No. So I was working full time as a career counselor at U of M. And around April of '08, I resigned from that position to go back into LegalEase full time.

Q. Okay. And how long were you full time or exclusive at LegalEase before taking another position?

A. So in April of '08, I started LegalEase full time again. And I joined Fauson Bohn, which was the next

TR-0039556

A1956

position I took. If you just give me a second, I've got to think about the dates here.

Q. Take your time.

A. I'm skipping decades here. I don't want to do that.

I believe it was January of 2010 that I started working at Fauson Bohn. But it may have been 2011. I -- I would need to look at something to confirm that.

Q. During that time period in between University of Michigan and Fauson Bohn, you were exclusively working at LegalEase?

A. So, no. Actually, I was working at LegalEase, but I had also started a side law practice as well, under the name Hafeez Law, PLLC. And it was that practice that I folded into Fauson Bohn when I started with them.

Q. Okay. And what was Hafeez Law focused on? What was your practice there?

A. For the most part, whatever I could get. It was some estate planning, commercial litigation, landlord and tenant, some corporate.

Q. Was this the first time in your practice that you had litigated?

A. Other than commer -- other than the criminal litigation I had done at Fauson Bohn and some projects I had worked on at Dickinson.

*STARTED WDCU A PROJECT PAD FLAT FEE THEN OFFERED A POSITION*

TR-0039557



A1957

Q. Fair enough.

And then, either in January of '10 or January of 2011, you joined Fauson?

A. I did, yes.

Q. And since joining Fauson, have you had any other positions other than LegalEase?

A. No.

Q. And would you -- when you were working at Fauson, are you full time at LegalEase? How does that work? How did you juggle that?

A. Sure. So Fauson Bohn was a client of LegalEase, so they know about our business and continued to use our services. So they -- basically, we approach each other, I guess, and we said hey, I got this law practice, but I also have the business. I would like to keep one foot in the law but still run my business as well.

So we picked an arrangement where, initially, I think for the first maybe six to eight months, I was working there full time. And I was expected to be there, you know, 40 hours a week, and I was getting paid a salary.

And then, after about a six-month period, my LegalEase business started getting busy again where I wanted to get -- focus more time on the business. And

TR-0039558

A1958

19

essentially, I was -- I was treated as a, sort of, you know, eat what you kill.

So basically whatever I brought in, we had an arrangement where I would split the revenue with the firm. And there were no expectations of me other than that, you know, I'll continue to keep my license active and whatever work I get from a legal perspective will be done through the firm.

So it transitioned from being a full-time position in six months to being that scenario or situation which is how it's been ever since then.

Q. And are you paid a salary from LegalEase?

A. I am, yes.

Q. What's that salary based on? Is it a sentimental?

A. Yes. Currently, it's an actual salary. And it's -- that amount has fluctuated over the years.

Q. Okay. I'm going to hand to you, Mr. Hafeez, a document that has been marked already, as Exhibit 1.

Have you seen this document before?

A. I have, yes.

Q. When was the first time you saw it?

A. Whenever counsel forwarded it to me. I think back in November.

Q. And do you understand that this document is requesting a deposition of LegalEase, LLC as a 30(b)(6) witness?

TR-0039559

A1959

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 23 of 431 PageID #: 152848

A1960

TR-0039560

20

A.  Yes.

Q.  Do you understand what that means?

A.  Yes.

Q.  Have you gone through the topics listed at schedule A?

A.  I have.

Q.  And are you the person most knowledgeable to speak about each of those topics on behalf of LegalEase?

A.  Yes.

Q.  Is there anyone else at LegalEase or elsewhere, outside of the company, that would be knowledgeable about any of these particular topics?

A.  There definitely are certain people that would be knowledgeable about the particular topics, but I believe I would be a good representative for these topics.

Q.  So at some point today, we'll start talking about names.  But did you speak with any of those folks in preparation for today?

A.  I spoke to at least one -- one individual.

Q.  Who is that?

A.  Her name is Gayathri Rajeev.

Q.  Can you spell that for me?

A.  Sure.  It's G-A-Y-A-T-H-R-I.  Her last name is R-A-J-I-V [sic].

Q.  Where is Ms. Rajeev?

TR-0039561

A1961

A.   She is based out of Cochin, India.

Q.   Does she spend time here in Michigan, in connection with LegalEase?

A.   Not in Michigan, no.

Q.   What is her role at LegalEase?

A.   She is the director of operations in India.

Q.   Is she an employee of LegalEase?

A.   She's an employee of the India entity.

Q.   What entity is that?

A.   It is called LegalEase India Private -- LegalEase Solutions India Private Limited.

Q.   And are you a cofounder of that entity?

A.   No.

Q.   Okay.  Did you speak with anyone else to prepare for your testimony today, other than your counsel?

A.   No.

Q.   Did you review any documents in preparation for today?

A.   Yes.

Q.   Do you know if all those documents have been produced in this matter?

A.   Yes.

Q.   Did you do anything else to prepare for today's testimony?

A.   No.

Q.   Have you spoken with anyone other than your counsel and

TR-0039562

A1962

Ms. Rajeev about this deposition?

A.   In what -- I mean, I'm sorry, just in what sense?

Q.   In any sense.

A.   Yeah.  So I -- my wife knows I'm here, my kids know, my parents know.  My employees know.

Q.   Employees at LegalEase?

A.   Right.

Q.   Is that it?

A.   I think so.

Q.   Does Mr. Akbar know you're here?

A.   Yes.

Q.   Have you reviewed the pleadings, the complaint and the answer in this matter?

A.   Yes, I have.

Q.   Were you involved in collecting documents for purposes of discovery in the litigation?

A.   Yes.

Q.   Were you the person who is responsible for doing that?

A.   Yes.

Q.   Is there anyone else involved?

A.   Yes.

Q.   Who is that?

A.   So we had a -- our -- his title is Lead Technology.  He's sort of our IT guy in India.  His name is Hasan Faiz.  I'll spell that for you.

TR-0039563

A1963

23

Q. Thank you.

A. H -- yeah, we're going to have a lot of Indian names, so.

Q. I appreciate that.

A. H-A-S-A-N, Hasan. And his last name is Faiz, F-A-I-Z. He was the one who helped apply the search strings against our e-mail server and our Box server which is where we keep all of our documents.

Q. Okay.

A. As far as the setup of our E-discovery platform, which is Logical, we had another of our technology employees in India help with that. His name is Aditya, A-D-I-T-Y-A. I can't think of how to spell his last name --

Q. Okay.

A. -- because we just call him Adi. And, as far as review and tagging of the documents on the platform, it was primarily done by me. But I also had one of my attorneys in India do some initial review. And her name is Anitha, A-N-I-T-H-A. And her last name actually is just two letters, N-G.

Q. And is that how you say it, NG?

A. I've never called her by her last name.

Q. Okay.

A. So I don't know. I think it may actually be a longer

TR-0039564

A1964

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 28 of 431 PageID #: 152853

24

last name, but they customarily shortened it.

Q.  They shortened it?

A.  Yeah.

Q.  Okay.  So I'll go through the list here.  Are Mr. Faiz, Adi and Ms. -- I'm sorry?

A.  Anitha.

Q.  Yeah, Anitha.  Are they all employees of LegalEase?

A.  Yeah, they're all employees of India entity.

Q.  So you mentioned that you search strings.  But do you remember what the search strings was, what the search words were?

A.  I wrote it down on a notebook.  Would you like me to take a look and give you the exact search strings or would you like me to give it to memory?  Either way.

Q.  If you have it with you, great.  I'd love to hear what they are.

A.  Okay.

Q.  How long is the search string?  Why don't you get it out and we'll take a look at it.

A.  Yeah.

        MR. DAKHLALLAH:  Can we go off the record for one second?

        MR. LASHWAY:  Sure.

        THE VIDEOGRAPHER:  We are going off the record.  The time is 9:29 a.m.

TR-0039565

A1965

25

(Off the record at about 9:29 a.m.)

(On the record at about 9:33 a.m.)

THE VIDEOGRAPHER:  We are back on the record.

The time is 9:33 a.m.

BY MR. LASHWAY:

Q.  Mr. Hafeez, you had an opportunity to get a notepad out of your bag?

A.  I did, yes.

Q.  So can you explain to us what the search strings were that you used to search e-mail and the Box, again?

A.  Sure.  So the search strings we used were the words West Law, or Thomson Reuters, or Ross -- sorry, Ross Bulk Project, or Ross Intelligence, or Lexis, or Fraz Essa, F-R-A-Z-E-S-S-A, or Carolyn Rudberg, C-A-R-O-L-Y-N, R-U-D-B-E-R-G, or Cameron Tario, C-A-M-E-R-O-N, T-A-R-I-O.  That was it.

Q.  Anything else?

A.  No.

Q.  Was it limited by time?

A.  Yes, it was.

Q.  What was the time period?

A.  The date range we used was June 2017 through February 2018.

Q.  And why did you use that time period?

A.  That was the relevant time period for the Ross Bulk

TR-0039566

A1966

26

Project, which is what is at issue here.

Q. You mentioned e-mail. What kind of e-mail program or technology do you use, like G-mail?

A. We use Microsoft Exchange.

Q. Do you have your own Exchange server, or are you using the cloud version?

A. We -- I believe we are using the cloud version.

Q. Is that Microsoft Azure? Does that ring a bell?

A. Azure does not ring a bell in context of my understanding of our e-mail system, but what I do know is all of our employees in U.S. and India, LegalEase India, share a Microsoft Outlook Exchange platform. It seems to be cloud based.

Q. Okay. And do you have one e-mail address on that?

A. Me, personally?

Q. Yeah.

A. Myself?

Q. Yes.

A. Yes.

Q. Do the other employees and folks with LegalEase e-mail addresses have one e-mail address or multiple?

A. Each one has one e-mail address.

Q. How did you decide whose e-mail to search?

A. We -- we ran those search terms against the entire e-mail. The entire universe of e-mails on our Exchange

TR-0039567

A1967

27

is what I understand.

Q. So you didn't limit it to any custodians?

A. We did not.

Q. Do you know roughly how many people have LegalEase e-mail addresses, or how many e-mail accounts have existed on the cloud server?

A. During what time range?

Q. During this time period.

A. This time frame?

Q. Yeah, that you have mentioned.

A. Probably around close to, maybe 70 to 100 accounts during that time frame.

Q. How many employees did LegalEase have during that same time period?

A. So the LegalEase -- again, we're referring to LegalEase as the LLC, correct?

Q. Yes.  The LegalEase that is based here in Michigan.

A. Sure.  So at that time period, we roughly had about five employees.  And then, we had a number of U.S. based independent contractors as well.

Q. And how many employees did the India company have during the same time period?

A. During that time period, India had probably, 30 to 40 employees.  And it also had a number of independent contractors.

TR-0039568

A1968

Q. Do you know how many independent contractors the LegalEase Solutions, U.S., and the LegalEase Solutions, India had, respectively?

A. I don't have the exact number.

Q. You don't?

A. I can give you an approximate if that would be helpful.

Q. That would be great.

A. Okay. I think at the height when we had the most people, we had maybe about ten independent contractors in the U.S. But that number was brought down to maybe a handful, five or six through the time period we're talking about. I take that back. Maybe about fifteen in the U.S. all together, and brought it down to about five, five or six in the U.S.

Q. So the high-water mark was fifteen?

A. Yes.

Q. And then, how about in India?

A. In India, we had -- we had some independent contractors that worked out of our office and I believe that number may have been ten or fifteen.

Q. Okay. And your search would have collected e-mails from all of those folks?

A. It should have, yes.

Q. Is there any reason to think that it didn't?

A. No. Not -- I mean, not without looking at it closely,

TR-0039569

A1969

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 33 of 431 PageID #: 152858

29

no.

Q. And the Box account, is that one shared account across the LegalEase entity here in the U.S. and the LegalEase entity in India?

A. Yes.

Q. What kind of information is stored on the Box account?

A. Pretty much everything that we use to run our business as far as documents and information. So everything from client contracts to sales materials and pitches, to actual work product that we create for our clients.

Q. And for purposes of the work product, do you segregate the material by client or customer?

A. We do, yes.

Q. Okay. Is there like a folder that would be called Ross, for example?

A. Yes.

Q. And what did you do to search the Box account for responsive information?

A. Again, my understanding, we applied the search strings against the Box account and pulled relevant documents from the Box.

Q. So going back to your search string, is it your understanding that if someone just used the word Ross, it would not have been triggered because you only picked up Ross Bulk Project or Ross Intelligence?

TR-0039570

A1970

30

A.  That's probably correct, yes.

Q.  Did -- you mentioned a couple people that helped you perform this.  Is there anyone else?

A.  There may have been one additional person now that I think about it.  The gentleman's name is Muhammad, M-U-H-A-M-M-A-D.  Last name is Ansad, A-N-S-A-D.  He's with a company called Code Matrix.  He -- he may have had some involvement in compiling the documents, but my recollection and understanding is the previous gentleman I mentioned, Hasan Faiz was the primary person in charge of that.

Q.  Is Mr. Ansad one of the independent contractors you mentioned, that has a LegalEase e-mail address?

A.  I don't believe at that time, he had a LegalEase e-mail address.  He was brought in as an outside vendor, to help us develop the automation tool.  I don't think he had a LegalEase e-mail address at that time.

Q.  How many automation tools are there?

A.  So, we do have one for Ross.  We also developed one for another of our corporate clients.  Very different work, but the basic idea that we can automate some of our work load to make it more efficient.  Those are the two primary ones that I can think of.

Q.  And is that other customer that you just mentioned, are they involved in this litigation at all?

ANSAD
TECH
PERSON
ALONG
W/ TA

TR-0039571

A1971

A.   No, not at all.

Q.   They're not related to any of the allegations we've asserted?

A.   No.

Q.   And you said we -- you've developed one for Ross; is that right?

A.   I did say we developed one, but I'm thinking we developed -- I mean, we may have developed two for Ross.  And the reason there's two, there's two different types of work we were doing for Ross.  So there may have been two tools.

Q.   Okay.  So since -- I want to go backwards here for a minute.

So LegalEase Solutions, LLC in the U.S. was founded sometime in 2005; is that right?

A.   Yeah, I believe it was incorporated in 2005.

Q.   Okay.  I'm going to hand to you a document that's been marked as Exhibit 2.  Have you seen this document before?

A.   I have.

Q.   And is this the filing that LegalEase Solutions, LLC did and stamped February 8, 2005?

A.   Yes.

Q.   And is that your signature at the bottom of it?

A.   It is, yes.

TR-0039572

A1972

32

Q. All right. So when you testified earlier that you were cofounder, is this document related to the founding of LegalEase Solutions, LLC?

A. Yes. This is the articles organization that Tariq and I, Tariq Akbar and I, drafted to file the company.

Q. Okay.

A. But it only has my signature since I was the incorporator.

Q. Yeah. And Tariq Akbar is not identified on this page, right?

A. No, he is not.

Q. Did you know -- do you recall if there's any additional filings that you did with the Bureau of Commercial Services, or is this just the one page?

A. As far as the articles go, I believe this is just the one page. We would have filed annual statements.

Q. Okay. Do you see in the middle where it says article two?

A. Mm-hmm.

Q. And there's something that's scribbled out?

A. Mm-hmm.

Q. So I'll represent this to you that we just took this off of the internet. Off of the portal for the Michigan Department of Consumer and Energy Services.

Do you know who black lined over that text?

NMSDC
MINORITY
FLING

TR-0039573

A1973

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 37 of 431 PageID #: 152862

A. It was a long time ago, but my recollection is, when you file this initially with the state, the state can get very finicky about what type of purpose they'll accept if you're filing for a non-professional organization.

So my understanding was, the first time we filed it, they rejected it and they told us to remove certain language so that it wouldn't appear that we were providing professional legal services. What that language was that was removed, I don't know, but --

Q. That's my next question.

A. Yeah.

Q. Is, if you're able to see any of it? I see something about limited liability company, but I can't make out the rest of it.

Is there anything that refreshes your memory?

A. It does not.

Q. Okay.

A. But I'm pretty clear about the narrative I just mentioned which is, this was really just to get the articles filed so that LARA, or at the time, it was called Bureau of Commercial Services, would accept it.

Q. So it says that the company will provide legal support services to licensed attorneys. Do you see that?

A. Yes.

TR-0039574

A1974

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 38 of 431 PageID #: 152863

*[Handwritten annotations in margin: "CONSULTANT", "34", "Nov. FEB. 2016 LEAD, LE PREFEED PARTNER PROGRAM MARCH FEB - 2016 LEGAL RESERVE PARTNERSHIP CORPORATE WORK.", "557k SALARY + PLAN BONUSES", "95k"]*

Q.   What does that mean?

A.   So, we're not a law firm.  We're a -- and really, when we started the business, we were sort of a new type of legal services entity, sometimes referred to as LPO, legal process outsourcing.  But essentially, at this point, when we filed those articles, our goal for the business was to provide outsourcing support to lawyers about legal departments and law firms.  As an outsource supporting their staff, not as professional legal counsel.

Q.   And would the customer define the scope of those support services that you were going to provide, or did you have, at this point in time, in 2005, an understanding of what that work would involve?

A.   Again, I think we were primarily targeting law firms and in-house legal departments.

Q.   For what kind of work?

A.   The type of work that I think we would have back then, which was legal research and document review, deposition summaries.  Things that paralegals or, perhaps, younger associates would perform.

Q.   And the next sentence says this company will not engage in the practice or performance of professional services as defined in MCL 450.  Do you see that?

A.   Yes.

TR-0039575

A1975

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 39 of 431 PageID #: 152864

35

Q.  Is that getting to the point that you weren't going to be practicing law?

A.  That's correct.

Q.  All right.  Is LegalEase Solutions, LLC registered in any other jurisdictions in the United States?

A.  No, it's not.

Q.  And is the principal place of business for LegalEase the address you provided earlier?

A.  Yes.

Q.  At one point in time, the address listed was your home address; is that right?

A.  That's correct.

Q.  Why did that change?

A.  Well, we started the business out of my basement. Can't say it got much bigger than that, but we -- over the years, we moved to office space.  And up until about July, we were in an office space in Ann Arbor, which is a different address than the one I gave you. Because in July, we moved from that space to another unit or another space in Ann Arbor, which was more in line with what we needed at that time.

Q.  Okay.  I'm just going to quickly show you Exhibit 3.
So, this is another document I'll represent to you that we pulled offline.  Is this the same address that you provided to me earlier?

TR-0039576

A1976

36

A.   I may have misstated the street.  I may have said South Main Street and it's South State Street.  I apologize.

Q.   And who are the members of the LLC?

A.   There's two members, myself and Tariq Akbar.

Q.   Is Mr. Akbar here in the United States?

A.   He is currently in India.  He spends his time between India and the U.S.

Q.   And do you know what his address is here in the United States?

A.   I know what his legal address is, I believe.  I mean, yeah, I do know it.

Q.   What is it?

A.   300 Apple River Drive, Naperville, Illinois.  I believe it's 60564.  But I may be wrong on the ZIP Code there.

Q.   And is that a residential address or a business address?

A.   It's his sister's home, so that's where he stays when he comes to the U.S.

Q.   Okay.  So you and Mr. Akbar are the only members of the LLC?

A.   That's correct.

Q.   Is there a manager of the LLC?

A.   I believe we have it as a member of manage, so the two of us manage the business.

Q.   How did you initially capitalize LegalEase Solutions,

TR-0039577

A1977

LLC?

A.    Can you repeat the question?

Q.    Yeah, I'm sorry.  I'll rephrase it, too.

I was wondering how you initially capitalized LegalEase Solutions, LLC.  Did you borrow money?  Did you put your own money in?  Did you not need money?

MR. DAKHLALLAH:  I'm going to object.  That goes beyond the scope of this 30(b)(6) deposition, and really beyond the scope of discovery in this case.

I mean, I guess I'll allow it for now, but we're getting really far afield of what we're here to do today.

THE WITNESS:  When you say capitalized, I thought you meant how we actually spelled the name because the E is capitalized.  But as far as capitalization goes, it was family and friends.  Really family.  My parents gave me some money.  Tariq had some money that he broke out of his 401K.  That's how it started.

BY MR. LASHWAY:

Q.    And are you the cofounder of the LegalEase India --

A.    I'm not.

Q.    -- entity?

A.    No.

Q.    You're not?

TR-0039578

A1978

38

A.    No.

Q.    Is that just Mr. Akbar?

A.    It's not owned by either one of us.

Q.    Who owns that?

A.    It was owned by a now deceased, Mr. -- Mr. Wadood, W-A-D-O-O-D, and his wife, Fahti Mahl-Wadood, who are the sole shareholders of the India entity.

Q.    All right.  So the reason I was asking about capitalization is because I'm trying to understand the relationship between the two organizations, and I don't have an agreement between the two for any shared services or anything.  So can you help me understand the relationship between the two?

A.    The LegalEase Michigan, the Legalese you're referring to essentially would contract with LegalEase India for attorneys and would be invoiced for services provided.

Q.    So LegalEase Solutions, LLC, Michigan, would be invoiced by LegalEase Solutions India for services that India provides to Michigan?

A.    That's correct.

Q.    And you said that there will be a contract.  Is there a written?  Is it formal?  And how is this -- how is it documented?

A.    I didn't say there was a contract.  I think I just said invoice.

TR-0039579

A1979

39

But there was no contract. And I believe there is no contract between the two entities.

Q. There is no contract? I just want to understand.

A. I don't -- I don't believe so. Yeah, I don't believe there's any written agreement or service contracts between the two entities.

Q. All right. So with respect to the Ross Bulk Project, do you know what I'm referring to when I use that?

A. Yes, I am. I mean yes, I do.

Q. As I read the documents, LegalEase Solutions India was involved in whatever that project was; is that correct?

A. That's correct.

Q. And how is it that LegalEase Solutions India provided services in connection with that project, from a contractual perspective?

A. So the agreement with all of our clients, we'll talk about Ross, the contractual agreement is between the client and LegalEase Michigan, LLC. And then, we staff the work either with our U.S. -- either with LegalEase U.S. based employees or independent contractors, or with the employees or contractors of LegalEase India.

Q. And in connection with that, LegalEase India would charge LegalEase Michigan for use of LegalEase India services or employees or contractors?

A. Right.

TR-0039580

A1980

40

Q. And LegalEase Michigan would make payment to India?

A. That's correct.

Q. And would those payments be reflected in your Quick Books?

A. That's correct.

Q. Okay. And so, is Mr. Akbar the CEO of LegalEase India?

A. I think he represents himself to be CEO of both entities.

Q. How did it come that the two entities have similar names?

A. So when we started LegalEase Michigan, maybe a year later, Tariq Akbar's family incorporated the business in India and they stayed as the shareholders of the business. So although they are separate entities, we certainly have common management -- management.

Q. And I'm going to -- I'm not going to do well with this name, is it Mahmood? The owners of LegalEase India?

A. No, it's Wadood.

Q. Wadood?

A. Yeah.

Q. Thank you. And Ms. Wadood, is she related to Tariq Akbar?

A. She is.

Q. Okay. And how are they related?

A. She's his mother.

TR-0039581

A1981

Q.   Is that Ross?

A.   Yes.  Well, yeah, I guess Ross is both in California and Toronto so I'm not sure where they're incorporated.

Q.   You work mostly with the Pelawatte based personnel, though?

A.   They've switched back and forth, so I don't know where they spend most of their time.  So yeah, we work with both.  We work with Ross.  We have -- or I should correct that.  We worked with personnel both in Pelawatte and U.S.

Q.   Does anyone report directly to you?

A.   Yes.

Q.   Who are those people?

A.   Our VP for business development, Teri Whitehead.  She also goes by title of Global Strategy.  We also have -- we've had staff attorneys in the past.  We currently have one part-time staff attorney in the U.S.  She reports to me, as well.

Q.   How about during this time period in late 2017, during the Ross project?

A.   Yeah, we had one more staff attorney named Chris Schmidt, based out of Ann Arbor.  He reported to me.  I believe the others were independent contractors.  So we have Teri and Chris.

Q.   So what are Teri's responsibilities, or Ms. Whitehead's

TR-0039582

A1982

responsibilities, and how do they differ from what you do? Or, is there some overlap?

A.   There's some overlap. She's very focused on business development. And once we get a client, she's very. focused on bringing that client on board and being their account executive is really what she does.

*BD ATTORNEY SALES*

Q.   Was she the person that was the principal point of contact for the Ross project?

A.   She was, yes.

Q.   Both with Ross and with LegalEase India?

A.   Yes.

Q.   Is she an attorney?

A.   Yes, she is.

Q.   Do you know if she's licensed here in Michigan?

A.   Yes, she is.

Q.   Does she practice law?

A.   No, not that I know of.

Q.   Is she -- is she an employee?

A.   She is.

Q.   W-2 employee?

A.   Yes.

Q.   Okay. And who is Merin Sony?

A.   Merin is one of our attorneys in LegalEase India.

Q.   Does Merin spend time here in the U.S.?

A.   No.

TR-0039583

A1983

45

Q. So is she an employee of LegalEase Michigan or LegalEase India?

A. LegalEase India.

Q. Does she report to you?

A. I guess -- well, let me put it this way. I guess as a -- as the president of LegalEase Michigan, I sort of have a responsibility for our employees here, and also -- no, I don't have direct reports or responsibilities in India, but they would at least see me as a figurehead, that I am someone, I'm a top executive in the organization.

But she would not directly report to me. That would be Gayathri Rajeev, who would be the director of operations in India. All the employees reported to her.

Q. Got it. So Ms. Sony would report to her in connection with that?

A. Yes.

Q. And in terms of LegalEase Michigan, do you and Mr. Akbar each own 50 percent?

A. Yes, we do.

Q. So what does Mr. Akbar do as the CEO of LegalEase India? What are his responsibilities is what I'm trying to get at?

A. Sure. So Mr. Akbar is involved with sort of overseeing

TR-0039584

A1984

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 48 of 431 PageID #: 152873

46

recruitment, overseeing financial, both for the U.S. entity as well as the India entity, budgeting, forecasting, making sure there are pricing for projects and work is appropriate, looking at profitability. He also plays a role in business development as well, for LegalEase Michigan.

And ultimately, Gayathri would report to Tariq Akbar.

Q. Got it. Does he earn income from LegalEase Michigan?

A. He does. He's an employee of LegalEase Michigan.

Q. So he gets a W-2 as well?

A. Yes.

Q. And who is Jessica Sharp?

A. Jessica is an attorney that we had as part of our team. She was an independent contractor.

Q. What were her responsibilities?

A. During this particular time period, she was in charge of quality control for the Ross project. So she was doing a lot of reviewing of the Word product, making sure that it fit the standards. She was also training people on the work.

Q. Does that include quality control of the memos that were generated by the two --

A. Yeah.

Q. -- automated tools?

TR-0039585

A1985

A.   That's primarily what she was doing, was quality control of the memos and also training other attorneys to do the work.

Q.   So her job involved reviewing the memos, making sure they were formatted correctly?

A.   More than formatted.  I mean, formatting was one issue. The other issue was making sure that the substance of the memos, that the delineation of the cases were good, or topical or relevant or appropriate.

Q.   And did you need an attorney to do that work?

A.   I believe so, yeah.

Q.   There was judgment involved?

A.   Yes.

Q.   Is she still working with LegalEase, either Michigan or India?

A.   She's a -- she's still an independent contractor.

Q.   Is she here in Michigan?

A.   Yes, she is.

Q.   And you mentioned earlier, Muhammad Ansad?

A.   Mm-hmm, yes.

Q.   Is he at Code Matrix?

A.   Yes.

Q.   Is he here in the United States?

A.   No.

Q.   He's only in -- or he works in Kerala, India; is that

TR-0039586

A1986

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 50 of 431 PageID #: 152875

48

*Kuv*

right?

A.   I believe he has two offices, one in Kerala and one in another city.

Q.   Is that Bengaluru?

A.   Yes.

Q.   And what is the association of Mr. Ansad with, let's start with LegalEase Michigan?   .

A.   I don't believe Mr. Ansad has any direct relationship with Legalese Michigan.   .

Q.   Does he have a direct relationship with LegalEase India?

A.   Yes.  He was hired as a vendor.  And there is an agreement that LegalEase India entered in with Code Matrix.

*Not sure of his employment status.*

Q.   Yeah.  We're going to look at that in a little bit.

A.   Sure.

Q.   Now, is he an independent contractor of LegalEase India?

A.   So for the -- for the time period involved, anything involved in the Ross project, he was brought in just as a vendor.  So he was brought in to provide services specific to a date.

More recently, he has taken on some other roles within the company in terms of IT support, which he may be -- which he may be paid as an independent

TR-0039587

A1987

49

contractor for.

But during this relevant time period, he was just a vendor. We didn't know him. We only got to know him back in June or July of 2017.

Q. You didn't get to work with him previously?

A. No.

Q. Has LegalEase India worked with him previously?

A. No.

Q. You mentioned earlier, the way you produced documents was using a portal. Is that right? I forget the name of it, but you mentioned that name earlier.

A. During the deposition?

Q. Yeah.

A. I don't recall mentioning that. But yes, we refer to different things as portals or tools. So we may need to --

Q. Is that something that you all built?

A. I'm sorry, I did mention the portal, yes. We contracted with outside vendors to build our platforms and portals.

Q. Is it -- what I'm trying to understand is, do you own any discovery platform?

A. Oh, no. Is that what you're talking about?

Q. I could tell we were talking past each other.

A. Logic Colt is a based -- cloud-based discovery platform

TR-0039588

A1988

that we subscribe to.

Q. Okay. And Mr. Ansad was involved in building the automated tools for the Ross project, right?

A. Yes.

Q. Shopna Harris, does that name ring a bell?

A. Yes.

Q. Who is Ms. Harris?

A. She's another attorney at LegalEase India.

Q. Okay. Was she part of the QC process?

A. Yes, she was.

Q. Was she a W-2 employee? I guess they don't have W-2 employees.

A. She's an employee of LegalEase India.

Q. But not of LegalEase Michigan?

A. That's right.

Q. I'm not asking you here in your -- I'm not asking for a legal opinion here, but I want to understand the difference between an employee that we were talking about and independent contractor, for purposes of the Ross project, from an operational perspective.

A. Can you clarify that question?

Q. Yeah. So what I'm trying to understand is, what is the difference between an independent contractor for purposes of the Ross project, and an employee from a perspective of roles, responsibilities, functionality?

TR-0039589

A1989

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 53 of 431 PageID #: 152878

51

Not the difference that the law would --

A.   Sure.

Q.   -- draw between the two.

A.   On a very basic level, during this time period, we had a -- the largest project we ever had.  So we needed staff for the project.  But we knew this project wouldn't last forever, so instead of hiring employees, we went the route of hiring independent contractors which we look at as sort of temporary help.

So both on the U.S. side and India, we had independent contractors that were specific for this project.  And when this project was completed, we would -- we would terminate them.

Q.   And how did you decide to hire for this project between LegalEase Michigan and LegalEase India?

A.   It was essentially, where we could get adequate resources for the project.  We initially hired some independent contractors through Kelly Services in Michigan.  And to our surprise, those folks were not doing the work well enough.  The quality was not where we needed it to be.  So we started hiring more people in India.  We felt the quality was better there.

Q.   And was the quality not satisfactory from your perspective or did Ross complain about it?

A.   It may have been both, primarily from our perspective.

TR-0039590

A1990

52

So we had our QC team reviewing the work done by our contractors. If they found major errors in judgment in terms of how these cases were classified, for example, or repeat errors on formatting, then that would raise a red flag.

Q. Do you know when you first started to anticipate the need to scale your team for the Ross project?

A. I believe it was June of 2017. We got a communication e-mail from Ross Intelligence that they were looking to roll out this big project and that we were being considered for it.

Q. Did you review that e-mail in preparation for today?

A. I did not.

Q. Do you know if this was connection with any type of RFP process?

A. I'm just trying to think about that, how the project came to us. I don't believe there was a formal RFP. But what we were told was, they were looking at a few different vendors and they would like us to pitch the work or the project, submit a proposal for how we would handle a project of this size, for which we did that. And I believe it was in that time range, June or July 2017.

Q. You had been doing work for Ross previously, correct?

A. We have, yes.

TR-0039591

A1991

Q.  And was it of a similar nature in terms of Ross asking questions and LegalEase providing research?

A.  Yes.  So they were research memos that we were creating for them, that were similar.  They were similar, yes.

Q.  And were the -- have the memos been -- sorry.

Ross pays particular attention to the format of the memos that you provide to them, correct?

A.  Yes, that's correct.

Q.  And has the format of those memos ever changed since you began working with Ross?

A.  Yes.

Q.  Do you know when?

A.  So it may be helpful to delineate between the work that we had for Ross, going up to the bulk project.  Just so we can talk -- we know we're talking about the same thing.

We call the work that we had been doing at a steady state for Ross, we called that the Ross Original work.

Q.  Yeah.

A.  That original work had a particular format which it may have changed since they started working with us back in 2015.  But that format is distinct from the Ross Bulk memo format which is -- which also, we started the project with a format and it had some slight variations

TR-0039592

A1992

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 56 of 431 PageID #: 152881

A1993

ROLE -

REEGAGE CUSTOMERS

BUILD MIDDLEMAN
MIDDLEMAN BTWN
OPERATIONS / DELIVERY & CUSTOMER

OC. OVERSAW TO MAKE SURE
DELIVERY

TR-0039593

54

through the project.

Q. Based on Ross -- Ross's directive to you?

A. Based on Ross's directive to us, yeah.

Q. And how did they communicate generally with you, was it by e-mail? This is Ross. How did Ross communicate, generally, with you?

A. Ross was e-mail, but also phone calls. Called myself or Teri and talked to us.

Q. LegalEase is still providing services to other customers, correct?

A. That's correct.

Q. And do you have contracts for those services?

A. Yes.

Q. I've seen reference in some of your documents, referring to Spotify Associates. Does that ring a bell at all?

A. Spotify Associates?

Q. Yes.

A. We did do a project completely unrelated to Ross or this litigation for a company whose end client was Spotify.

Q. Was that also providing research memos with West Law data?

A. No, not at all. It was completely contract tagging, document review project.

TR-0039594

A1994

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 58 of 431 PageID #: 152883

VP. GLOBAL STRATEGY
→ PROMOTE SALES
→ OVERSAW
→ WORKING OPERATIONS &
DELIVERY

→ LE
- BLAME ANSA
- BLAME ME

→ IT WASNT MY DECISION

→ SALES → FINAL DECISION

Q DID YOU OVERSEE
THE ROSS PROJECT
→ TO WHAT DECREE.

TR-0039595

A1995

55

Q.   Did anyone ever tell West about West -- sorry.

Did anyone ever tell West about LegalEase India?

A.   That's kind of a broad question.  I don't know, I guess.  Are you talking about the sales reps that we were dealing with?

Q.   Anybody.

A.   Yeah, I don't know if they ever told the sales reps. We have had in the past, LegalEase India contract directly with Lexis.  And I don't know if we ever had with West Law.  It may have come in our direct contracts.

We have had in the past, LegalEase India contract with Lexis directly, for example.  So it's possible we have contracted directly with West Law, but I don't recall.

Q.   Do you not recall because you don't know, or you just don't remember sitting here today?

A.   I don't remember.  I looked at the West Law contracts for the past few years and they were all with the Michigan entity.  But I don't in the last ten years, if we had any contracts with West Law and India.

Q.   So -- so part of your website talks about legal intelligence.  Does that ring a bell?

A.   Yes.  So our website, just so you know, went through a

TR-0039596

A1996

56

major remodel.

Q. I saw that.

A. Just about a month ago. So that terminology is new terminology. It's not how we necessarily represented our services in the past.

Q. Yeah. And why did it change?

A. We're just trying to better market our services. We find that there is a need out there for either legal research services or content development that we have sort of labeled as legal intelligence, from a marketing standpoint.

Q. All right. So, but what is -- it's going to my point. What is legal intelligence for purposes of LegalEase Michigan?

A. Legal research, content development.

So, for example, we have, in the past, developed contracts or instructions for contracts, for some of the leading online legal -- online legal contract companies.

We've developed legal content for law firm's websites. We've developed multi-jurisdictional research memos for clients. So we thought that would all be encompassed under legal intelligence.

Q. So in that last example, how did you go about doing that?

TR-0039597

A1997

A.    The multi state?

Q.    Yeah.  How would you go about doing that?

A.    If a client had an initiative they're looking at in different states, we would have one of our attorneys go into West Law or Lexis and search case law or statutes for that particular question.

Q.    And prepare a 50-state survey?

A.    And prepare a memo or survey, yes.

Q.    One of the -- there's a couple different features or descriptions on your website.  One is contextualized databases.  Does that ring a bell?

A.    Again, it's a new website, so it rings a bell.  But I would have to see it to remember it.  Literally, it's about a month old.

Q.    It's not a great print out.

A.    Okay.

        MR. LASHWAY:  Can I just mark that quickly and let him see?

        HAFEEZ EXHIBIT 4

        Intelligence is the Ability to

        Adapt to Change Packet

        WAS MARKED BY THE REPORTER

        FOR IDENTIFICATION

BY MR. LASHWAY:

Q.    All right.  I'm going to hand to you what's been marked

TR-0039598

A1998

58

as Exhibit 4, which is our attempt to print part of your website, at least the text of it.  Understanding the format looks a little bit different.

A.  Okay.

Q.  Does this look like part of your website?

A.  Yeah, it does.

Q.  Okay.  So if you turn to the second page, the back of the first where it gives you kind of five buckets.

A.  Mm-hmm.

Q.  See, there's contextualized databases.  Do you know what that's referring to?

A.  I think what it refers to broadly is, we think we found a niche in the legal space.  We think we found a niche in the legal space where there's technology companies, legal -- legal tech companies like Ross that are looking for information or content that will help drive their technology.  So Ross is one example of that, where we produced research memos for them, that they would use to drive their technology.

We've had another client that is in a whole different space.  It's -- they're a contract analytics company, where they analyze contracts using artificial intelligence.  But there's still a piece of that that needs to be done by smart human beings.  So we've been able to help them develop their tool.

*TANLIQ HAFEEZ OVERSEES EVERYTHING EMAILS CONTRACTS* (handwritten margin note)

TR-0039599

A1999

So we look at that as part of our legal intelligence abilities, capabilities. The actual term, database, I don't know if it really fits what we do. We don't create databases. I mean, we use Excel. We have maybe internal databases that we use to manage our information, but we've never created a database for our client.

So really, I think what you're seeing here is sort of marketing finesse or whatever the term is, to make it look like nicer than normal or intricate or sophisticated of what we do.

Q. But this could be what your customers are doing, right? So for Ross, for example, they're working or they have built a database; isn't that right?

A. They built a research tool, yeah. I'm sure it's powered by a database, yeah.

But like I said, again, we've never gone into building of databases. We just feed them whatever content or information they need.

Another example on the database maybe, is we have a company that is an analytics firm and they compile data on qui tam lawsuits around the country.

So every time there is a news article about a qui tam case, we will summarize that article for them. They're building a database now for their platform that

TR-0039600

A2000

60

they believe will be valuable to their further -- to further their ends. But all we're doing is literally summarizing articles. It's high volume. It's good work, but we're no -- no way -- we're not in any way helping them build a database. We're just giving them the content for that database.

Q. And is that -- is that part of both, you know, the contextualized database but also the case summaries, digest and alerts, the example you just provided?

A. Well, the example I provided, yeah. That could fall within both. Could fall within both, yeah.

Q. Would the Ross project, both the original and the bulk fall into each of these categories? So work flow automation, database creation and curation, data training, case summaries, digest alerts, and contextualized databases?

A. I don't think Ross would fall within work flow automation just because the automation was for us, the internal team to get the work done faster. It was not something that was given to Ross. The only thing they were given was the actual work product.

Database creation and curation, again, I think this is marketing speak. We've never done database creation, but we've done curation. You know, so what we did for Ross, we considered curating

*NOT THAT I AM AWARE* [handwritten annotation]

TR-0039601

A2001

61

content.  What we did for the contract analyst company, we considered curating content.

Data training, I think it's marketing speak. We've never -- we don't have data scientists.  You know, we don't really have a real functional technologist in the company.  I certainly am not one. Tariq Akbar is more interested in that role and he does have an engineering background, but we don't do any data training.  Something we would like to do, perhaps.

Case summaries, digest, alerts; yes, we did that for other companies.  We have other corporate clients where we do case summaries or digest.  I guess what we did for Ross, could also fall within that.

And we just talked about contextualized databases.  We've never created databases for any of our clients.  I think it's really just an aspirational category for us.

Q.   Did you -- who drafted the website?

A.   One of our -- well, we have a team.  Tariq Akbar led the website revolt initiative, but there are a few other people, internal, that drafted it.

Q.   Do you see the bottom left where it says success story?

A.   Mm-hmm.

Q.   Leading AI company, 500 gigabytes of research curated and produced?

TR-0039602

A2002

62

A.  Mm-hmm.

Q.  And if you flip to the next page. That's here, sorry, page three. It goes on and says 90 days, training data, AI platform. Is that Ross?

A.  This is probably referring to Ross because of the 90 days is a very short project.

Q.  Are you performing some of these services today? So you mentioned the qui tam articles, but how about the legal research services?

A.  We provide legal research today, to law firms. Research memorandum on particular, as a law, that's one of our main stays for our law firm business, or the business that we provide. The services that we provide to law firms, a lot of it is legal research.

We also do have a handful of corporate clients that may request legal research on a particular issue from time to time.

Q.  How are you doing that legal research today?

A.  Today, we're using a Lexis platform.

Q.  Any other platforms?

A.  No, I believe it's all Lexis, currently.

Q.  Are you using Google at all?

A.  Yes, we're currently using Google.

Q.  Find law?

A.  Sorry?

TR-0039603

A2003

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 67 of 431 PageID #: 152892

63

Q.   Find law?

A.   No.  We pretty much have a 50-state good Lexis subscription which meets our needs.  And then, Google as needed.

Q.   Do you have access to West Law today?

A.   No.

Q.   Does anyone affiliated with LegalEase Michigan or LegalEase India have access to West Law?

A.   Not that I know of, no.

Q.   Would you know if they did?

A.   I -- yeah.  I mean, affiliated is a big -- is a --
     So we do not use West Law whatsoever, either here or in India.  We, meaning LegalEase India or LegalEase Michigan.  We don't use West Law at all since we were terminated.

Q.   Is Code Matrix or Mr. Ansan -- Ansad, does he have access to --

A.   I don't believe so, no.

Q.   -- to West Law?
     Do you know when LegalEase first came a customer of West?

A.   I don't have the exact date, but I know it's been about a decade.

Q.   Was that in 2008?

A.   Yep.

TR-0039604

A2004

64

Q. Were you involved in the initial contracting?

A. I probably was.

Q. Do you remember being involved?

A. I mean, vaguely, yeah. I remember anytime we had a research tool, that would be more in my domain than Tariq Akbar's domain. So I would do that.

Q. And when you first contracted with West to get access to West Law, do you remember why you needed access to West Law? Was this in connection with a particular project, or in connection with a business plan that you had envisioned?

A. I think kind of sort of the bread and butter of LegalEase has always been providing legal research to law firms and to corporate counsel. I believe we started off with Lexis when we first started the business.

And we probably looked at West Law just from a pricing standpoint, which was more competitive. And certain attorneys have preferences for West Law or Lexis. So that could have possibly been a reason for why we would have looked at West Law in '08.

Q. Did there become a preference for using West Law in connection with the Ross Original Project or the Ross Bulk Project?

A. I know for the Ross Bulk, it was a preference to use

*WESTRN ACCOUNT TARIQ'S DECISION*

TR-0039605

A2005

West Law.  I don't know for Ross Original, if there was a real preference one way or the other.

Q.  Do you know why there was a preference to use West Law for the Ross Bulk Project?

A.  Yes.

Q.  Why?

A.  For the Ross Bulk Project, in contrast to what we did for Ross in the original, where they would give us questions and we would answer them.  In Ross Bulk, they basically wanted us to write the questions and answer them.  We would brainstorm how we would do that in doing 20,000 of these memos.  And we realized that, or we thought that using the headnotes as the foundation for our questions would be helpful.

Now, we also did the same thing with Lexis.  But I think quite frankly, the pricing we got from West Law is much better.  So we said if we need to expand our licenses, let's go with West.  We're getting a good price for it, and we can use the headnotes as a foundation for coming up with the questions.

Q.  Do you know what the pricing was from Lexis that you got when you initially asked to expand the licenses in mid-2017?

A.  I don't remember the pricing.  I just know that we found West Law to be more competitive.

*[handwritten margin note: USING HEADNOTES AS A BASIS FOR QUESTIONS]*

TR-0039606

A2006

66

Q. Was there also a preference to use West Law because the quality of the headnotes?

A. So, like I said before, definitely the headnotes were key in our strategy of how we come up with questions and answers. Lexis has a similar service.

So I don't know, to be honest, whether we said substantively, West Law's headnotes were better than Lexis' equivalent of that. It came down to, I think, pricing.

And we also had a preference for West Law next. You know, a lot of our staff attorneys in the recent years, they preferred working at West Law over Lexis. So that may have also factored into it, but I think primarily, it was a cost thing. We got a better price on West Law.

Q. Were you involved in requesting the additional 20 licenses for West Law, in August of 2017?

A. I was involved in terms of, I remember having discussions about it, but I believe the first contract we had to up the number of licenses with West Law was signed by Teri Whitehead because I was out of town at that time.

Q. And is that dated August 1, 2017?

A. If I can take a look at the contract.

Q. Sure.

TR-0039607

A2007

67

A.   I don't know the exact date.

Q.   While I'm looking and pulling it out, do you -- did you review the order form granting the additional 20 licenses in August of 2017?

A.   I would have looked at it, yeah.

Q.   And would you have signed off on Ms. Whitehead in executing it?

A.   Yes.  I would have given her the go ahead to sign it.

*[handwritten margin note: SIGNED UPON HIS APPROVAL]*

Q.   What were those additional 20 licenses needed for?

A.   So as of August of 2017, we had not received confirmation that we got the project from Ross, for the bulk project, but we were anticipating we would be getting it.  So the idea was, let's start training people and let's do some sample memos and make sure that our team understands the process.

*[handwritten margin note: UNDER HIS DIRECTION]*

        And I believe, and I may be wrong, but I believe the August one was actually for ten additional licenses.  And then, we brought it up to 25.  But I may be wrong.  But I did take a look at it yesterday and I thought it was ten additional licenses.

Q.   And so, were the additional licenses in the first instance requested for purposes of training in advance of the Ross Bulk Project?

A.   Yes.

Q.   And was the intention for purposes of the Ross Bulk

TR-0039608

A2008

68

Project to do that work manually as you had done the Ross Original Project?

A.  Yes.

Q.  And at some point in time, that plan changed; is that right?

A.  Yes.

Q.  Why is that?

A.  So I believe in about -- so, let me back up a little bit.

One of the -- one of the hurdles in accomplishing this project in three months as we were provided the time frame, was not just the creation of the memos, but we also needed to submit the memos to Ross.  And Ross had, what we call the Ross portal in our e-mails.  But essentially, I believe it was like an FTP site or a site where we had to actually upload the final memos.

And, we had been uploading memos for Ross for the original project, so we knew how long it took to upload, you know, one or two, or ten or twenty memos. And when we were talking about the volume that we would need to be uploading on a daily basis for the bulk project would be 20,000 memos in three months.  You know, that's roughly 7,000 memos a month.

We calculated that we would need something

TR-0039609

A2009

69

like five or six people just to sit there and upload every night. And that seemed like it was a bigger pill to swallow. On top of hiring more attorneys, we also need people to be uploading.

At that time, our head of HR in India was a woman named Keerthi, K-E-E-R-T-H-I. Keerthi was tasked with finding these, we called them production support or something like that, they needed to essentially upload memos to Ross. Upload the final product to Ross. And she knew of a company called Code Matrix, and she knew Muhammad Ansad. And she said, you know, what, I know this guy, he's a technology whiz, he may have some ideas for us on how we can automate the process of uploading the final memos to Ross' portal.

And that's how Ansad -- refer to him as Ansad even though his name is Muhammad Ansad. That's how Ansad and Code Matrix was introduced to us. It was how do we upload the final memos to the Ross site in an efficient manner?

Q. But it grew into something else, isn't that right?

A. It grew into something else, yeah.

Q. Up until this point, the LegalEase Original, were you producing about five to six memos a week for the Ross project?

A. May have been a little bit more than that. I'm

A2010

thinking it may have been like -- it may have been a couple hundred a month.  Five or six a week sounds low, on the low end.  I think it was a little higher than that.

Q. And, do you remember in August of 2017, there was an issue raised about excessive use of West Law?

A. I mean, if you could refresh me the e-mail, I could take a look at it.  I do know that there was -- there were instances where Carolyn Rudberg or one of our account reps we call it, would mention that the usage is high.  So we were notified in that respect.

Q. Do you remember anything about those conversations from Ms. Rudberg as to what she meant by the usage was high?

A. I recall a conversation I had with her.  And the reason I recall it is because I e-mailed -- I put this in an e-mail.  Something to the effect of --

I don't remember if this was the August 2017, but it was a conversation I had with Carolyn Rudberg. She said your usage is very high.  You're one of the top users of West Law that we have, nationally.  Which, obviously, was a big -- came as a big surprise to me.

Q. Why were you surprised?

A. Because I had -- I was generally surprised we had, you know, at most, maybe 50, 60 people working on this project.  How could that usage have been higher than

TR-0039611

A2011

large multinational corporations you guys probably service?

So I was surprised by her assertion that the volume of our usage was in the top three or five, whatever she had mentioned.

Q.   And what was your reaction to that conversation or those conversations from the perspective of West Law licenses?

A.   I think one reaction was -- we had been working with Carolyn for at least a couple years, so we thought maybe she was trying to pressure us into -- well, not in a bad way, in a salesy [sic] way, pressure us to getting more licenses or do something more West Law. So we thought it may have been sort of that type of a statement.

But I don't recall at that time, doing anything proactive in terms of saying, what the heck is going on, why is the usage so high. I -- you know, because it came out in a conversation with Carolyn, I really wasn't documenting exactly what she meant by it. We sort of let it go. I thought it was sort of a sales speech by her or sales talk by her.

Q.   And at some point, in the fall of 2017, you increased the licenses for West Law to 50; is that correct?

A.   Yes. And my understanding is -- and this is what I

*[handwritten margin note:] DON'T RECALL CONVERSATION WITH CAROLYN*

TR-0039612

A2012

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 76 of 431 PageID #: 152901

72

think we also provided in our answers. We had an original contract for either 13 or 16 licenses, and that we added an additional 50 in the fall of '17, for a total of either 63 or 66 licenses was my understanding.

HAFEEZ EXHIBIT 5

Thomas Reuters Order Form

Order ID: Q-00105954

WAS MARKED BY THE REPORTER

FOR IDENTIFICATION

BY MR. LASHWAY:

Q.   So, I'm handing you Mr. Hafeez, a document that's been marked as Exhibit 5. Have you seen this document before?

A.   I have, yes.

Q.   And was this the order form that you signed? Or, I'm sorry. Yeah, that you signed with respect to an additional 50 licenses to West Law --

A.   Yes.

Q.   -- on October 4th of 2017?

A.   Yes.

Q.   Did you review this document before you signed it?

A.   Yes.

Q.   All right. So if you turn to the page that we've stamped 1427, do you see where it gets to quantity 50?

TR-0039613

A2013

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 77 of 431 PageID #: 152902

73

Q.   In the middle of the page, I'll just point to it.

A.   Yeah.  Yes, I do.

Q.   All right.  Why did you need 50 West Law licenses as of October 4, 2017?

A.   So, this would have been -- this would have been in preparation for the bulk project.  So we must have been notified by Ross that this project was a go and we did some projections on staffing and how many people we would need to be able to pull off this project for 20,000 memos.  And we were getting licenses to support the additional people we would need to do the actual work.

Q.   So if you turn to the next page, 1428, there's a list of names.  Do you see that, in the center column?

A.   Yeah.

Q.   It says SAP number in the left column.  Do you see that?

A.   Yes.

Q.   Is this a document that you produced or a document that West produced?

A.   I don't know who produced it, but -- I don't know who produced it.

Q.   When I use the word produced, I meant generated.  Is this a West document or is this a LegalEase document?

A.   I would think it's a West document because of I don't

*20,000 MEMOS*

TR-0039614

A2014

74

recognize what SAP number --

Q.  That's what I was going to ask you about.

A.  Yeah.

Q.  So, is LegalEase India using Quick Books as well, or do you know if they're using SAP?

A.  They're using a bookkeeping software.  I don't know if it's SAP.

Q.  Do you know who those names are in the center columns under first name, last name, and then there's an e-mail address?

A.  Yes.  Some of these are our actual employees.  Some of these are independent contractors.  And some of these are subcontractors of us, as well, of LegalEase India or LegalEase Michigan.

Q.  But almost all of them have at LegalEase Solutions dot com e-mail addresses; is that correct?

A.  That's correct.

Q.  So did you provide subcontractors or independent contractors with an at LegalEase Solutions --

A.  We did.

Q.  -- dot com e-mail address?

A.  We did, yes.

Q.  And why did you do that?

A.  It's always been our practice.  Whenever we have independent contractor or subcontractors work on a

TR-0039615

A2015

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 79 of 431 PageID #: 152904

75

project for LegalEase, that we would provide them with an e-mail address.

Q. And you see there are two names on here that have at Vakil Search dot com?

A. Yes.

Q. V-A-K-I-L search dot com?

A. Yes.

Q. Who is or what is Vakil Search?

A. Vakil Search is one of our subcontractors. They had a number of people or a number of contractors that helped us with this project.

Q. But there are only two of those e-mail addresses on here; is that correct?

A. Yeah. It's possible at this time they had transitioned into the project at, I believe -- for example, Kavya at Vakil Search dot com, she was one of the account leads for bringing people onto our project. So she may have been given this password to kind of get familiar with it. But at some point, she would have brought in some people and they would have been given LegalEase Solutions e-mail addresses, too.

Q. And would they have been given access to West Law?

A. Yes.

Q. Through this order form?

A. Yes, or -- yeah.

TR-0039616

A2016

76

Q. But through an order form with LegalEase Solutions, LLC, correct?

A. Yes.

Q. And if you go back to the first page, this is an order form with LegalEase Solutions; is that right?

A. That's right.

Q. And that's the Michigan entity?

A. That's right.

Q. It doesn't identify the India entity?

A. That's correct.

MR. LASHWAY: You guys want to take a break for just a minute? I'm just going to switch gears, or do you want to just keep going?

THE WITNESS: Can I take a restroom break?

MR. LASHWAY: Sure.

THE VIDEOGRAPHER: We are going off the record. The time is 10:49 a.m.

(Off the record at about 10:49 a.m.)

HAFEEZ EXHIBIT 6

Master Service Agreement;

HAFEEZ EXHIBIT 7

Statement of Work;

HAFEEZ EXHIBIT 8

Statement OF Work II for Ross Bulk Memos;

TR-0039617

A2017

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 81 of 431 PageID #: 152906

77

HAFEEZ EXHIBIT exhibit 18

Master Service Agreement from 8/10/17;

HAFEEZ EXHIBIT 10;

Defendant/Counterclaim-Plaintiff Responses to

Plaintiff's First Set of Requests for Admissions;

and

HAFEEZ EXHIBIT 11

First Amendment to Statement of Work

WAS MARKED BY THE REPORTER

FOR IDENTIFICATION

(On the record at about 11:02 a.m.)

THE VIDEOGRAPHER:  We are back on the record.

The time is 11:02 a.m.

BY MR. LASHWAY:

Q.   Mr. Hafeez, do you remember when you first contracted with Ross Intelligence?

A.   I believe it was October 2015.

Q.   I'm going to hand you a series of exhibits that been marked as Exhibit 6, 7 -- I'm missing one.  I'm going to hand you a series of exhibits that been marked 6, 7, 11 and 8.

MR. LASHWAY:  And Kassem, I'll get those to you.  That's 6.  I believe that's 7.

BY MR. LASHWAY:

Q.   Can you take a look at those for a minute?  Have you

TR-0039618

A2018

had a chance to look at those Mr. Hafeez?

MR. LASHWAY: This is 11. And this is -- let me take a look here.

THE WITNESS: 8.

MR. LASHWAY: 8. This is 8.

BY MR. LASHWAY:

Q. Okay. Are these all of the agreements that LegalEase Michigan has signed with Ross?

A. Yes, I believe so.

Q. There are no others?

A. So pertaining to the bulk project, these are the only agreements of the original project. We did have smaller projects that may have been documented in other memos with Ross that are not included in this set.

Q. Did they utilize West Law, those other projects?

A. I don't believe so.

Q. Did you look?

A. I -- I did not look. I'm speaking from my recollection here.

Q. Do you recall any of those projects, generally or specifically?

A. There's one -- there was one that was called Ross Variations, or we called it Ross Variations. And it was a variation of the bulk. It was a variation of, take a subset of the bulk work and do some rephrasing.

TR-0039619

A2019

79

I would have to take a look at the SOW for that, to get more particulars. But my understanding, or my recollection is that it was not involving West Law. It was sort of involving our attorneys to rephrase certain --

Q. Would that be rephrase -- I'm sorry, didn't mean to cut you off.

A. Yeah. You know what, I think I would say I need to look at the SOW. It was a small side project that was not reflected. I need to take a look at what the scope of the project was.

Q. And in terms of rephrasing, would it be rephrasing what you referred to as the memos?

A. It was not the whole memo. It was maybe one particular line item in the memo that we had to rephrase. But again, I think I would feel more comfortable if I can take a look at the SOW. And I honestly don't remember what the scope of that project was.

Q. Do you remember if the rephrasing was because Ross asked you to do that?

A. Yeah. Yeah.

The project was definitely at the request of Ross.

Q. Any other projects that you have with Ross that didn't fall under these agreements or the Ross Variations'

TR-0039620

A2020

project?

A.  I don't think so.

Q.  And the Ross Variations' project, do you remember, specifically what Ross wanted rephrased?

A.  I don't.

Q.  And where would that information -- where would the answer to that question be found?

A.  It would probably be in a proposal we submitted to Ross or in a project.

Q.  Okay.  So if you look at Exhibit 6, this is an October 15, 2015 agreement between Ross Intelligence, a Delaware Corporation, and what we've been referring to as LegalEase Michigan, is that correct?

A.  That's correct.

Q.  And if you open it up, it seems to say that the scope of the work would be set forth in a statement of work that would be appended?

        Am I generally understanding?

A.  Right.

Q.  And the fees for the work would be set forth in that statement of work; is that correct?

A.  Correct.

Q.  So if you turn to Exhibit 7, which is dated the same, October 15, 2015, is this the original statement of work that was appended to the master services agreement

TR-0039621

A2021

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 85 of 431 PageID #: 152910

81

that we just looked at?

A. Yes.

Q. Okay. And, if you go down to paragraph 7, it says services. Do you see that?

A. Yes.

Q. Contractor will provide answers to each question received from the company by consulting case law, legislation and/or secondary sources. Do you see that?

A. Yes.

Q. Now, some of those words in that paragraph have capitalized terms; is that right?

A. Yes.

Q. And they refer to the definitions set forth up above?

A. Yes.

Q. If you look at case law, what was your intention in agreeing to the statement of work for purposes of identifying case law as it's defined there? In other words, how were you going to do that?

A. We were going to find case law that would answer the questions that they were submitting to us, using West Law or Lexis.

Q. Were there any other means that you contemplated in terms of identifying case law for purposes of the services in paragraph 7?

A. No.

TR-0039622

A2022

Q.  And have you thought about polling judicial decisions directly from court houses?

A.  No.

Q.  And the same with respect to legislation and secondary sources.  Were you intending to rely on Lexis and West Law for purposes of providing those services?

A.  Yes.

Q.  And you see that legislation and secondary sources are --

A.  Capitalized terms?  Yes.

Q.  -- capitalized terms?

A.  Yes.

Q.  Now here, question means a written question to be answered by the contractor, right?  But answer means a written response by contractor to a question.  Do you see that?

A.  Question means -- yes.

Q.  Who was posing the questions to Legalese?

A.  So under this statement, the questions were coming from Ross.

Q.  Do you have any recollection as to what those questions were?

A.  I do.  They were primarily involving bankruptcy law. So they were questions related to the various chapters in bankruptcy and everything in between?

TR-0039623

A2023

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 87 of 431 PageID #: 152912

83

Q.   And do you recall, or can you provide me with an example of the type of question or the form of question that Ross was posing under the statement of work?

A.   I can say generally, they were one or two-sentence questions.  So they were not long paragraphs with questions.  They were questions, for example, can a chapter 11 trustee do X, Y, and Z?  Or, what are the debtors' rights with respect to a certain type of bankruptcy involving a certain issue?

So they were, for the most part, short questions that required us to then look at the bankruptcy code and case law to answer.

Q.   And that would include using your West Law licenses?

A.   Correct.

Q.   And at this point in time, do you recall, generally, how many West Law licenses you were using?

A.   We were probably within the licenses we had at that point, which may have been somewhere in the range of 16 is what I recall.

Q.   Okay.  And were all of those 16 licenses assigned to people here in the United States, in 2015?

A.   They were assigned between the U.S. and India.

Q.   Yeah, LegalEase India?

A.   I'm sorry, yes.

Q.   Do you see in paragraph 8, it says that each answer

TR-0039624

A2024

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 88 of 431 PageID #: 152913

84

file must be delivered to the following e-mail addresses, answers at Ross Intelligence dot com?

A.   Mm-hmm, yes.

Q.   Is that what you did with the answers, the answer file?

A.   We -- I think we initially were e-mailing it to this address.  And then, at some point, Ross developed a portal where they wanted us to upload the documents to.  So we -- we moved to that method at some point.  I don't remember when, exactly.

Q.   Did you identify when you were collecting documents, any of the answer files that had been submitted in accordance with the statement of work?

A.   Can you repeat the question?

Q.   Yeah.  Did you identify, when you were collecting documents, any of the answer files that you submitted in accordance with this statement of work?

         MR. DAKHLALLAH:  Do you mean in discovery?

         MR. LASHWAY:  Yeah.

         THE WITNESS:  Oh.

BY MR. LASHWAY:

Q.   When you were collecting documents for purposes of this case?

A.   No, we did not.

Q.   Did you look for them?

A.   We did not.

TR-0039625

A2025

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 89 of 431 PageID #: 152914

85

Q. Is answer file as it's defined here, used synonymously with memos that we read about later on, that we read about later on in e-mails?

A. Yes.

Q. One in the same?

A. Yes.

Q. And at paragraph 10, it says contractor shall return five to six completed answers to company each day.

A. Okay.

Q. You see that?

A. Yeah.

Q. So does that --

A. I think the volume may have increased. Sorry. I should have let you finish the question. Sorry.

Q. No, go ahead.

A. You had asked me how many were we doing per week.

Q. Yeah.

A. I think I mentioned five to six. I think that volume increased over time to maybe double that.

Q. Okay. And at this point in time, do you believe you were doing roughly, five to six per day.

A. At this point in time when we first entered the agreement, yes.

Q. At some point in time, did Ross come back to you and ask you for more?

TR-0039626

A2026

86

A. I believe the volume that they were expecting per day did increase from when we first started the project in October of 2015.

Q. Do you remember when?

A. I don't. It was -- to my recollection, it was a gradual increase, nothing like the bulk project where suddenly, I have this huge number of documents that may have been increased over period of time.

Q. And you mentioned earlier, that at least when it started, you were focused on bankruptcy --

A. Correct.

Q. -- bankruptcy topic, correct?

Did you remain focused on bankruptcy until 2017?

A. Ross had talked to us about possibly giving us other areas of law. At this time, they were giving us questions and we were answering them.

Q. Correct.

A. So I believe we may have dabbled in labor employment questions. We may have dabbled in immigration, but the vast majority was bankruptcy related.

Q. Did you do any work in intellectual property?

A. Yes, we did.

Q. And that was prior to the bulk project beginning?

A. Yes, that's correct.

TR-0039627

A2027

87

Q. Was intellectual property also one of your focuses from Ross, in addition to bankruptcy?

A. It was a focus area, but I don't think we got too much into it in terms of, I think we did a lot more in bankruptcy than we did in intellectual property. But it was a focus area that they had given us, yes.

Q. And do you know why Ross had you focus on bankruptcy and then intellectual property?

A. I don't know for certainty. They never really disclosed their business to us. They never told us what they were using it for. They never explained to us how they were using our data. A lot of it was assumptions and assumptions on our part.

But at this time, we saw that they were marketing Ross to certain bankruptcy law firms. And I think they had mentioned that, perhaps, they had a bankruptcy law firm as a client, so we thought they were building up this area of law for the customer.

Q. Do you know who that customer was?

A. I don't.

Q. Do you remember if they disclosed it to you?

A. They -- they would not have disclosed it to us. It would have been something we would have seen online or on the website. They kept -- they kept their clients very close in terms of telling us anything about the

TR-0039628

A2028

88

*NO. I DON'T RECALL.*

business.

Q.  You referenced to assumptions a minute ago as to what Ross was doing with the answer files.  What were those? *I DON'T RECALL.*

A.  Again, I'm not a technical person, as we established earlier.  But my understanding was how machine learning works.  We knew Ross was working in the machine learning AI space.  And that was, again, I don't know if that came directly from Ross, but on their website, they do a lot of marketing.  So clearly, that's the space they were in. *I AM NOT A TECHNIQUE*

Our assumption was, they are using IBM Watson's platform again.  This is all publicly available information to be able to answer legal questions in a simplistic manner.  And they need to train that platform on how a human being would answer a question, and we were the trainers.  We were essentially, giving them human responses to questions that would help the IBM Watson program be able to respond like a human being would respond. *NO. I DON'T KNOW #0 ROSS' TECHNOLOGY*

Q.  Ross was also focused on the content of the answer files; is that correct? *I BELIEVE SO*

A.  Can you explain what you mean by that?

Q.  The substantive answers to the questions posed.  They were focused on that as well, correct?

A.  I don't know what they -- I mean, I don't know what

TR-0039629

A2029

their focus was. I know what they required us to do, which was answer the question, but also provide the citation.

So they did want to make sure the case law citation was provided, was accurate and it was, you know, relevant to the question answered.

Q. And at this point in the Ross Original Project, is that what we're talking about here?

A. Yeah.

Q. For the Ross Original Project, were we -- were you and your team using West Law material to prepare the answer files?

A. We were searching case law and statutes and preparing answers, memos based on our research with that content, yeah.

Q. And the memos included quotes from cases that were accessed using West Law, correct?

A. Yes.

Q. And the answer was rated either great or good for purposes of the answer file for Ross to use; is that correct?

A. I believe that was for bulk. I don't think we had that rating for original.

Q. How long were these memos, typically, for this period where you were focused on the Ross Original Project?

TR-0039630

A2030

90

*I DONT [illegible]*

A.   How long were the actual memos?

Q.   Yes.

A.   The Ross Original memos were probably one to two pages. They were a little longer than the Ross Bulk memos. They comprised of the question that was being provided by the client. And then, we do a short answer and then we do a long answer. And then, we do what they call the reference list. And the reference list would -- was formatted in a particular way of how they wanted it formatted.

But the reference list was essentially, cite the case law we used in preparing the short and long answer. Cite meaning actually provide the pinpoint citation for that case law. And the reference list may have also had us identify the exact quote that we used from the case to come up with our answer. So the holding of the case or whatever relevant paragraph we saw in that case, we were then to provide that in the reference list.

Q.   Okay. So there is a short and a long answer in each answer file; is that correct?

A.   For the original Ross memo, yes.

Q.   And then, you mention a reference list. What is the reference list?

A.   So again, the reference list was something that was

TR-0039631

A2031

91

very specific to their requirements.  There's a very particular way to format it, indent it.  But essentially, it was listing the cases that we relied upon, or the statutes we relied upon, to answer the question, and provide the exact language from the case that we felt answered the question.

Q. And the reference list would be prepared using West Law?

A. Yes.

Q. And would it simply be Smith versus Jones with the West Law citation, or would it have additional information in it?

A. The reference, from my understanding would be the name of the case, the citation, whatever recorder we were citing to, and a quote, a language, a piece of language directly taken from the case.

Q. Would it include information taken from the headnotes?

A. No.

Q. Did Ross Original Project rely on the headnotes at all?

A. No.  It's possible our research would have used the headnotes to find the cases to answer the question, but it was not used as a starting point.

Q. And at the time when you were doing this Ross Original Project, did you understand that Ross Intelligence was building a legal research platform to be used by law

*IF YOU HAVE A SIMPLE CORRECT REVIEW*

*NO. I DID NOT FULLY UNDERSTAND WEST GOAL*

TR-0039632

A2032

92

firms?

A.   Yeah.

          MR. DAKHLALLAH:  Object.

          THE WITNESS:  Sorry.

          MR. DAKHLALLAH:  Objection as to form and
foundation.  Go ahead.

          THE WITNESS:  I mean, we -- we, again, like I
said, we never were told much about Ross's business
from Ross, but Ross was, and I believe, still is very
public about what their trying to do.  And that's how
we got that information.

BY MR. LASHWAY:

Q.   I'm going to try this again.  When you were performing
the Ross Original Project, did you understand that Ross
Intelligence was building the legal research platform
to be used by law firms?

A.   Again, my answer is, we knew what we saw out there,
that they were publicly talking about.  We didn't have
any information other than what we found on their
website or in their marketing pieces or PR pieces.

Q.   And what did you know at that point in time, that they
were publicly talking about?

A.   At the time, they were talking about, essentially
building an AI powered research tool that would answer
complex legal questions in a simple manner similar to

*[handwritten margin notes: "NOT THAT I CAN REVIEW.", "I DONT REVIEW HISTORY HAS"]*

TR-0039633

A2033

what an associate or paralegal could do for you at your office.

Q. At a law firm?

A. Yeah.

Q. Is that any different than what Thomson Reuters or West Publishing corporation provides to the market?

A. I don't know. I know West Law has AI powered products. I don't know if they're similar, different, the same.

Q. Is your understanding about what Ross is offering to the market, at the time of the Ross Original Project to be different from Thomson Reuters' projects, simply the technology that supports finding relevant law or statutes or other jurisprudence? I'm trying to understand what the difference is between the two, based on your understanding.

A. My understanding was they were doing something different. That's why they're getting all this buzz and raising money and they're being written up. So they're doing something unique and innovative that is distinct from what West was doing at the time, is my understanding.

    Again, all that is just my understanding from being somebody who reads articles and websites. Nothing that I knew from this project.

Q. So Mr. Arruda, the Chief executive officer of Ross

I DON'T KNOW

I WOULD HAVE TO SEE WHAT ROSS IS OFFERING 4 COMPARE

I DONT KNOW.

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 98 of 431 PageID #: 152923

94

Q. Intelligence didn't disclose to you what they were using the --

A. No.

Q. -- answer files for?

A. No. Mr. Arruda was always guarded about what they were doing as far as work.

Q. Was Mr. Arruda the principal point of contact in the LegalEase dealings for Ross?

A. No.

Q. Who was?

A. There were two Thomases. We called one Little Thomas and Big Thomas, I don't know why.

Q. Was one little and one big?

A. Probably not.

Q. I couldn't help but ask.

A. I was leading you to that question.

Initially, with the Ross Original, we had a Thomas [sic], T-O-M-A-S, Tomas. I don't remember his last name, but I'm sure I could refresh my memory at some point.

Q. Sure.

A. When we transitioned to the bulk project, there was another Thomas, vendor, something.

Q. He has a long name, correct?

A. Yes.

TR-0039635

A2035

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 99 of 431 PageID #: 152924

95

Q.   Long last name?

A.   Yes.

Q.   Mr. Arruda was the one who signed the original statement of work in the master services agreement, correct?

A.   That's correct.

Q.   Was Mr. Arruda involved in defining the scope of services that Ross was acting LegalEase to perform?

A.   Our primary conversations were with Thomas or Tomas. I don't think Mr. Arruda had much -- much to do with defining or explaining to us what they wanted us to do.

Q.   And at this point in time -- well, let me ask you first, is Tomas, T-O-M-A-S, Little or Big Thomas?

A.   I apologize, I don't remember.

Q.   Yeah.

A.   Just, you know, there were two Thomases. We thought it was funny.

Q.   Sure.

A.   But I don't remember which one is big or little.

Q.   And the Ross Original Project, that went on from 2015 and ended in early January of 2018?

A.   It ended in early 2018.

Q.   Is it still going?

A.   No. It ended in early 2018. Like early January, February, 2018. It ended.

TR-0039636

A2036

96

Q. And did it end by pursuant to the terms of the agreements that you had with Ross?

*I BECTEVR SO* [handwritten]

A. Yeah. I mean, it ended because they no longer needed the service. The SOW provided for them, the terms of service. They no longer needed it.

Q. Do you have any recollection as to when Ross informed you that they were terminating the agreement with you?

*NO* [handwritten]

A. For the original? I don't. I don't remember if -- I don't remember if it was like February or March. It was earlier in the year, probably the first quarter of the year.

Q. Would that be in an e-mail somewhere?

*— PERTTONS* [handwritten]

A. It probably would be, yeah.

Q. And, do you remember that Ross terminated the agreement because they no longer needed the services you were providing?

*I BELIEVE SO* [handwritten]

A. I mean, there's probably more defined language of why they terminated it, but it was not a quality issue. It was not a relationship issue. They just said we don't need this work, we're going to pause it for now.

*NOT THAT I CAN RECALL* [handwritten]

Q. Did you inform Ross of West's termination of your access to West Law?

A. I don't believe we -- no, we did not. Not at that time. We did not -- sorry. We did not inform Ross of that termination in January. We just kept working,

TR-0039637

A2037

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 101 of 431 PageID #: 152926

97

using Lexis.

Q.   While the Ross Original Project continued, were you also using Lexis in addition to West Law?

A.   I believe we still -- we did use Lexis in addition to West Law.

Q.   And Lexis was sufficient for purposes of that project?

A.   Yes.

Q.   And is it -- I think you testified earlier, but at some point, there was a preference you all showed to using West Law, correct?

A.   Yeah.  In general, we found that our staff attorneys on the U.S. side liked using West Law.  But that was not necessarily related to the Ross work.  It was just a preference that we saw come up more often than not.

Q.   How did -- how did Ross first come into contact with LegalEase?

A.   They actually found us online and they submitted a request on an online contact form.  And that's how we first got in touch with them.

Q.   Do you know if Ross was working with anyone else?  Did you have competition for providing the services to them?

A.   I recall there being phone calls mentioned that they had other providers, or that they might have other providers or they might use other providers.  In other

*[handwritten margin notes: "YES, I BELIEVE SO", "IBS", "I DON'T RECALL", "I BELIEVE SO"]*

TR-0039638

A2038

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 102 of 431 PageID #: 152927

98

words, they had other avenues to get the work done.

So yes, there was talk about there being other providers, but we had, again, no clear -- we had no visibility to who they were using, to that extent.

Q.   No one ever mentioned who else you were competing against for purposes of this work?

*I DONT RECALL*

A.   No, not that I can recall.

Q.   Is there anyone at LegalEase that might know that answer?

A.   Honestly, I don't think so.  Like I said, they were very closely guarded on how they ran their business.

Q.   Can you go back to Exhibit 6, which may be flipped over here?

A.   Sure.

Q.   Can you turn to page 7 at the top?  Do you see where the agreement requires LegalEase to represent and warrant that according to Roman numeral double I, all deliverables and any developments are free and clear of any plagiarism or appropriation?

*yes*

A.   Yes.

Q.   Did you think about that in consideration of your use of West Law when signing this agreement?

*TH SIGNED THIS AGMT. I DONT KNOW HIS INTENTIONS*

A.   I can't recall what I thought about that then.  But when I look at it now, it doesn't raise a red flag for me.

TR-0039639

A2039

Q. Sitting here today, it doesn't?

A. No.

Q. Why is that?

A. Because it's routine practice in legal research that you cite case law. We've done it for the last ten years.

Q. Is what you were doing with respect to preparing the answer files for machine learning client a typical practice for providing legal services, in your review?

A. The task we were asked to do which was a research memo, was routine. The formatting and the reference list and how they wanted that was different than what we had seen with our other clients, but the actual substance of the work was very similar to what we had done.

Q. So, just so I understand your answer; so the formatting was new to you all, but the project itself, fell within the scope of services you provide to others?

A. Yes.

Q. And what was the scope of services that Ross asked you to provide here, that you described as being routine?

A. Posing a legal question for which the allotted answer analysis and citations took place in case law issues was very similar to what we had done for other clients.

Q. And did you have other clients asking you to do this in five or six memos a day?

TR-0039640

A2040

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 104 of 431 PageID #: 152929

A.   No.

Q.   So was that new?

A.   The volume was new, yes.

Q.   And were you paid for these services at the rate, per 80 dollars per answer?

A.   I'm sorry, may I -- can I add to my previous answer?

Q.   Absolutely.

A.   Because we have had in the history of our businesses, certain clients that gave us high-volume work.  And with small businesses, that's always been a good problem to have.

So we did have a client at one point that asked us to do legal articles.  They weren't called legal memos, they were called legal articles, that they were going to publish on their website, about hundreds of different issues.  They were trying to build up their SCO traffic on their website.  So we had done projects similar to this, not like the bulk.

The bulk, for sure was made up from Heaven.  But for the regular original project, we had had similar volumes for other projects.  So it didn't really strike us as odd because we had done it similar for other peoples.

Q.   The volume was --

A.   The volume wasn't odd.

TR-0039641

A2041

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 105 of 431 PageID #: 152930

101

*NOT THAT I CAN RECALL*

Q. It was similar to other projects?

A. Yes.

Q. Was that project using West Law?

A. It's possible. I don't recall. It's back in 2009 or '10.

Q. And you mentioned that that other client was trying to drive some traffic to their website?

A. Yes, their website.

Q. What kind of traffic were they trying to drive?

A. They were trying to drive consumers who were looking for legal forms online.

Q. Why do you believe Ross cared so much about the word -- the formatting of the answer files for the original project?

A. Again, from a layperson's perspective, I'm envisioning that they're working off of a platform, IBM Watson. And for IBM Watson to be able to recognize or read our research, it has to be formatted in a certain way. That was my understanding, I think, and my team's understanding.

Q. And what was the, in your understanding, of the end result of why Ross needed this content loaded into their systems?

MR. DAKHLALLAH: Objection, asked and answered. Calls for speculation. Go ahead.

TR-0039642

A2042

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 106 of 431 PageID #: 152931

102

THE WITNESS: Yeah. I mean, again, we were never privy to how they were using the answers. But we -- our understanding was we were helping them. We were helping them train their platform.

BY MR. LASHWAY:

Q. And training of the platform was using information and data taken from West Law; is that right?

A. Training platform was answering legal questions like a human being would answer them by researching case law and statutes, presenting answers. We never were giving content to West Law. It was all to mimic -- not mimic. It was all to --

Again, our understanding was, they wanted to see how a human being would answer these questions.

Q. Did you ever have access to Ross's product?

A. No.

Q. So, at some point in time -- if you flip to Exhibit 11, there's an amendment to the original statement of work. Do you see that?

A. Mm-hmm, yes, I do.

Q. It's first amendment to statement of work. It's dated February 29, 2016?

A. Yes.

Q. What was the reason for this amendment?

A. So this is where the volume picked up. I was -- I had

*I DONT KNOW HOW ROSS USED OUR MEMOS*

TR-0039643

A2043

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 107 of 431 PageID #: 152932

miscalculated.  Seventy-five answers a week.  So we're looking at what, maybe 250, 300 per month.

So it's a reflection of additional volume and also a change in our payment terms.  We wanted to be paid in advance of the work being done.

Q.  Why is that?

A.  Cash flow.

Q.  Is that cash flow to help you manage the payment of the independent contractors and people that were performing some of the work?

A.  Yes.

Q.  And do you know, did Ross share with you, or do you know why Ross increased the answers from roughly 25 to 30, to 75 per week?

A.  No, they never shared with us.  We were just happy to have the work.

Q.  Did you ask?

A.  No, I don't think so.

Q.  Were you still being paid 80 dollars per answer?

A.  I believe so.

Q.  At this point in time, did you ask for additional licenses from West Law?

A.  I don't know.

Q.  Do you remember how you were getting this additional work completed?

TR-0039644

A2044

104

A.  Again, we were staffing it between the U.S. and India. And I don't know at this point, specifically, whether we needed -- we felt we needed to increase the number of licenses we had.

Q.  Were you limited to 75 answers per week, or were you able to get as much done as they would give you?

A.  I think we were -- I believe it was a soft limit. And I think at some times, we would try to do more if we could make more revenue until they decided hey, that's enough. So it wasn't hard as far as I remember.

Q.  So the more you did, the more you got paid?

A.  Right.

Q.  And Ross would provide you with as many questions as they could, and you would get that work done as quickly as you could?

A.  Right.

Q.  So, can you turn to what's been marked as Exhibit 8, now? Now, this document was produced this morning, to us. And, it's called Statement of Work, Roman numeral 2 for Ross Bulk memos, do you see that?

A.  Yes.

Q.  Now, does this relate to the Ross Bulk Project?

A.  It does.

Q.  Why is it dated October 15, 2015?

A.  It must have been a typo.

TR-0039645

A2045

MR. DAKHLALLAH: Hold on. Objection. That actually mischaracterizes the document. If you read the first sentence, it says it incorporates and is made pursuant to the October 2015 Master Service Agreement.

BY MR. LASHWAY:

Q. And did you find this document recently?

A. I did.

Q. Where did you find it?

A. I found it in my e-mail.

Q. How come it hadn't been found previously?

A. I was confused by that. It's a document that I would have expected to have come in using my search terms.

Q. All right. And is this the statement of work that governs the contractual relationship with Ross for purposes of the bulk project that we've been talking about?

A. Yes.

Q. All right. And if you flip to page 4, in accordance with your counsel's objection, is it dated September 25, 2015?

A. Yes.

Q. And Mr. Arruda signed this again, correct?

A. Yes.

Q. So he was still involved with respect to, at least the contractual aspect of it, is that right?

TR-0039646

A2046

106

A.   Yes.

Q.   How did this project come about?

A.   I think in -- so, I think in June of 2017, we had a call from, I believe it was Thomas, and he mentioned that they were looking to do this big project over the summer and that it was a very tight timeline. It was -- they were looking at very high volumes of work and would we be interested in bidding for it.

And, again, you know, this log of business, we were like, of course we will be interested. Of course we'll bid for it. At that point, we had no idea how we would actually do the work, but we started making some project plans on how we could actually do high volume.

Although, I don't think the actual numbers were finalized. There was always the potential of doing anywhere from 25,000 to 100,000 memos. So, you know, we thought we could probably handle doing 25,000. But if they wanted a 100,000 in three months, there was no way we were going to be able to do that, so.

But yeah, it was really a phone call. They said this is a project they have for the summer and are we interested in it and we said yes.

Q.   Was Thomas the one who had raised the idea of doing anywhere from 25,000 to 100,000 memos?

TR-0039647

A2047

A.   I believe it was Thomas that mentioned that this could be a much larger project because of the variable range they're looking to get done.

Q.   And did Thomas identify for you whether these memos were going to be focused on bankruptcy law, intellectual property law, or something else?

A.   Again, I don't know if I was on that phone call. But at some point, as we began discussing this project, it became clear that they were looking at multiple areas. That there was no restriction on which area we could look at.

Q.   But at some point, Ross was going to be providing you with the answers -- sorry, the questions to be answered and that would dictate what area of the law would be covered?

A.   For the bulk project, I believe. But if my recollection serves me correct, that we had a good understanding -- we had a good idea from the beginning that we would be writing our own questions and we could look at different areas of law. Like, they weren't saying they needed these to be in bankruptcy or intellectual property.

You know, come up with the questions and answer them in any area of law was the understanding we arrived at. I don't know if it was on the first phone

*[handwritten margin note: TANTQ WAS INVOLVED SMALL COMPANY I DON'T REMEMBER]*

TR-0039648

A2048

call or the second phone call but it's where we were heading towards.

Q. And were these initial phone calls all done by phone?

A. Yes.

Q. There was no e-mails?

A. I don't believe there were e-mails. I mean, there may be. There may have been, but I didn't come across any e-mails that laid out the scope of the project. I believe it was phone calls.

Q. And you said this was in June of 2017?

A. That's when I got the initial phone call, yeah.

Q. And was there a response deadline for you to provide a proposal to Ross for this -- for this new project?

A. There probably was. They wanted -- I mean, it was going to be a summer project. At least at that point, they were saying we want to get this done by the summer. So I'm assuming it was a very tight deadline that we needed to respond by. And I don't remember what date that was.

Q. Did you provide a written response to Ross?

A. I believe we sent them a proposal.

Q. What did it look like? Was it a formal response that identified how you could be of assistance to them?

A. It probably was a formal proposal response, yeah.

Q. Did you find that document in searching for materials

*[handwritten margin notes: "I DON'T RECALL", "RECALL WHAT TH SAID BUT NO DON'T RECALL"]*

TR-0039649

A2049

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 113 of 431 PageID #: 152938

109

in response to discovery here?

A.   I did not see anything like that when I was going through our logical discovery platform, but I would assume it exists.  I assume we responded to the request in written format.  And -- yeah, there must have been a proposal, but I haven't seen it recently.

Q.   Do you know, roughly, when you responded to Tomas and Ross with respect to their -- those initial conversations with the proposal?

*No*

A.   It probably would have been like end of June, early July.

Q.   Do you know when Ross first decided to hire you all?

*No.*

A.   I think they gave us a verbal commitment sometime in August, that we were going to be engaged, which is why we started adding people, start adding licenses and sort of staffing up for the project.  But yeah, as you can see, the actual contract wasn't signed until September.

Q.   And at that point in time, in the verb -- when you got the verbal commitment, were you being retained to produce, roughly 10,000 memos a month?

*I would have to see to more or remember*

A.   At that time, our understanding was they wanted us to do -- provide 25,000 memos within a three-month time span.

Q.   So roughly 7500 memos a month?

TR-0039650

A2050

A.   Right.

MR. DAKHLALLAH:  8300.

MR. LASHWAY:  Thanks.

BY MR. LASHWAY:

Q.   And, would -- was your plan to do that through the additional West Law licenses that you had discussed with West at that point in time, in August?

A.   Yes.

Q.   And, can you walk me through your thinking as to how additional West Law licenses were going to be able to generate the answer files that much more quickly, based on your two-year practice at that point?

A.   So I think we probably worked backwards, you know. How many of these memos can a person do per day divided by the number of memos we need per month? That gave us a number. And then, we had to then, factor in West Law licenses to be able to equip our attorneys to do the research.

Q.   And how many -- at that point in time, how many answer files were being prepared a day, by the contractors?

A.   At which point in time?

Q.   In August of 2017?

A.   In August, as far as I remember, the project was -- it was green lit, but we didn't have a contract to actually start producing. But we did start producing

THAT WAS OPERATIONS

TOWFIQ HAFEEZ DECISION

I DON'T UNDERS

TR-0039651

A2051

111

some memos to train our team to make sure we know what we're doing and make sure we figure out the logistics of it.

And we have created several hundred memos in August to prepare us for the actual start date in September.

Q.   Okay.  So let me go backwards from that.

The Ross Original Project, how many on average of client -- I'm sorry.

How many answer files on average did a contractor prepare, per day?

A.   I don't -- I don't remember, but I could guess.  It would be, you know, maybe we would be expecting four or five, or five or six of the Ross Original memos per day.

Q.   So prior to the bulk project, according to the statement of work amendment, you were to produce 75 answer files a week, correct?

A.   Mm-hmm.

Q.   And you were producing roughly 75 answer files a week or more, correct?

A.   Correct.

Q.   How many people did you have preparing those, with respect to the original project?

A.   It was not a very big team.  Maybe half a dozen people

*I DONT REMEMBER*

*6X*

*6*

*I DONT KNOW.*

*OPERATORS.*

TR-0039652

A2052

working on the Ross Original. And then, once bulk started, we probably started doing less original work so we could meet our deadlines for Ross Bulk.

Q. And were those, approximately, 12 individuals based here in the U.S., or were there contractors with? LegalEase India that was doing that work as well?

A. So there were -- sorry. There was half a dozen, more like six that were doing Ross Original, and probably five or six of them were in India. I think Jessica Sharp may have been doing QC on those, but the work was being done in India.

Q. Okay. So for the Ross Original product, in order to produce 75 memos a week, how many persons were doing that work, to accomplish that rate of production?

A. Like I said, I believe it was a team of five or six people.

Q. Okay.

A. Yeah.

Q. And so I'm clear, were those individuals here in the U.S., or were they in India?

A. They were in India.

Q. All of them?

A. There may have been a U.S. independent contractor, I don't remember. But the majority of them were in India.

TR-0039653

A2053

113

Q. And were you doing any of the work to prepare the answer files?

A. Was I doing any of the work?

Q. Yes.

A. No.

Q. Was Teri --

A. I'm sorry, I didn't mean to interrupt you.  Not that I recall.

Q. Was Teri Whitehead?

A. Not from a daily production standpoint, no.

Q. Okay.  And so, when you get the verbal commitment from Ross to produce the, roughly, 25,000 memos over the span of three months, that was in August of 2017, right?  At that point in time, what was your plan to increase the rate of generation of the answer files significantly, to get that project completed?

A. So, the Ross Bulk work as we begin to understand it, was not the same as Ross Original.  The -- first of all, when you're writing your own questions, it's easier to answer them.  So we knew that the actual research would not be as time consuming.  I think that was established fairly -- fairly early on that they would not be assigning us questions.  They would be looking at us to come up with questions and the answers for those questions.

TR-0039654

A2054

And the actual format of the memo was less burdensome. It was a shorter memo project. So we estimated that our production would be higher for the Ross Bulk because it was a shorter memo to produce.

*I BELIEVE SO YES.*

Q. And in August of 2017, when you were building the team to support the Ross Bulk Project, were those individuals based in India, or in the U.S.?

A. In August, I believe all the people we had lined up for the bulk memo project, as far as the actual doers, not talking about management or quality control, they were primarily in India.

I believe we had one or two independent contractors that were also producing bulk memos in the U.S., But the majority were in India.

Q. And was the bulk -- I'm sorry, was the Ross Original Project on going?

*YES. I BELIEVE SO*

A. At that time, it was, yeah. So we still had our team solely focused on original, and then we had to build this new team to focus on the Ross Bulk.

Q. And did Ross tell you why they needed such dramatic increase in the volume of answer files?

*NOT THAT I RECALL*

A. They did not.

Q. Did you ask? *I DONT RECALL*

A. We might have asked, sort of as casual, like, you know, but we were never told. Again, we were never told what

TR-0039655

A2055

they were, exactly doing with what we were creating for them.

You know, as I'm thinking about it, they may have said something to the effect that our tool is starting to gain traction and we want to, you know, take advantage of that. So there was something mentioned on some phone call, perhaps, that the tool was starting to gain traction and they were using this opportunity to -- to take it, you know, that much further, but that was never communicated to us in writing or we had no real insight knowledge of that. It was just something that was said in casual conversation.

Q. And, at this point in time when you contract through the statement of work 2, there was also anticipation that the 25,000 memos was just the first production run, correct? There was going to be a subsequent production run?

A. Right.

Q. And those subsequent production runs you had contemplated with Ross, providing 25,000 memos per month?

A. Yes.

Q. And you were paid by quote in each of the memos, correct? I'm looking at pages -- well, paragraph 8.

*I BELIEVE SO*

*I BELIEVE SO*

*I DON'T RECALL*

116

A.   Yes.

Q.   So the more West Law material you included, the more you were paid?

*I DONT READ WORDS HAVE TO SEE*

A.   If one would look at it, the more relevant quotes we were able to provide, the more we were paid.

Q.   And we spoke about this earlier, but for the Ross Bulk Project, the scope of each memo was turned from a logistical perspective in that you were able to phrase your own questions?

*I BELIEVE SO*

A.   That's correct.

Q.   And so, give me an example if you remember, how a particular individual would be assigned work on any given day.  Where did they begin?

*I DONT READ*

A.   Sure.  So, as part of our thinking on how to -- how to come up with 20,000 questions and answers, we gravitated towards the idea of using West Law headnotes as the basic starting point for categories of topics that we could address.

So, for example, we go to, you know, starting with A, abandonment or something like that.  And then, we would look at the subtopics under abandonment and then the sub-subtopics.  And then, we would say okay, well, let's create as many questions as we can around abandonment.

And some of these headnotes had very few

TR-0039657

A2057

117

subtopics, some had a lot of subtopics.  So the more subtopics there were, the more potential questions that we could phrase using the headnotes.

So, essentially, we were assigning attorneys topics and subtopics to go to and then create questions and answers on the topics and subtopics.

Q.  And, they would navigate in providing those answers using the headnote hyperlinks; is that right?

A.  Can you rephrase the question?

Q.  So they would use the headnote to frame the question *As I reprase*

for the answer file; is that right?

A.  They would use the headnote as a starting point to phrase a question for the memo.

Q.  And then, would they use the hyperlink that the headnote provided to the material in the case and to the cases and statutes cited under that headnote --

A.  Right.

Q.  -- for purposes of answering the question framed?  *I believe so*

A.  That would be the starting point, yes.  They would start out there and click on the hyperlink to come up with cases.  And then, they would review those cases to see if those cases were appropriate to use in the memo.

Q.  And -- I'm sorry, were you finished?

A.  Yeah.

Q.  And was one of the points to capture which cases and

TR-0039658

A2058

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 122 of 431 PageID #: 152947

statutes were associated with which headnotes?

A. No. We don't -- we -- no. We never had any use for the headnotes other than it was a convenient way for us to come up with topics and answers.

Q. And was one of the points to capture which cases and statutes were associated with the question that was framed?

A. I don't -- I don't understand that question.

Q. One of the pieces of information you sought to capture in the answer files was which cases and statutes were associated with the headnote used for framing the question; is that correct?

A. No. I mean, again, the purpose was to frame questions to which we could provide answers for which we could provide great quotes, good quotes. We didn't -- we didn't have to go through all the headnotes. In fact, we were never instructed by anyone to use headnotes. It was our own way of being able to piece this project together.

So we -- it was irrelevant to us how many headnotes we, for example, touched. If you could get 25,000 questions using five topics, we would be fine with that. So there was no intrinsic value to headnotes other than it was a starting point for us to frame questions and help our attorneys find case law

TR-0039659

A2059

that was relevant to those questions to answer them.

Q. How would the attorneys find case law that was relevant to answering the questions?

A. So they would click on a headnote, go to a specific headnote and that headnote would have a legal axiom or legal prohibition of law or whatever you want to call that, a statement of law. And if that headnote was something they could then answer the question.

So, let's say if the headnote was the finder of abandonment property has prima facia right to the property. Just making one up. The researcher might say well, we can frame that question, does the finder of abandonment of property have a prima facia right to that property.

Now, that's the question. Now, the researcher could say yes, they do have prima facia right or no, they don't have prima facia right.

That's how you do research. So you might find good case law under the headnotes, or you might go to one case under the headnotes and that case leads you to another case or other cases. So ultimately, the researcher has to find case law to answer the question that he or she just drafted. And then, not only find those case law, but then find quotes within those cases that, according to Ross' instructions, we would deem as

TR-0039660

A2060

120

great quotes or good quotes or topical quotes or relevant quotes.

Q. And to find those great quotes, good quotes, topical quotes, they would use the hyperlinks that allowed them to navigate into the case associated with that headnote?

*I BELIEVE SO*

A. Yes.

Q. And, the great quotes, good quotes, and topical quotes, those are categories that Ross instructed you to use?

*I BELIEVE S*

A. Yes. Yes.

Q. Qualifying the answer file; is that right?

A. I mean, you keep calling it answer file. We called it a memo. Each memo had distinct portions to it. It had a question, and then it had quotes from different cases, not the same case that, again, would answer that question greatly, goodly, topically, or irrelevant.

*TH WAS MY BOSS*

So the researcher would have to find different cases for each of those quotes and have to make a judgment on whether those quotes fall within one of those categories.

Q. And, the earlier statements of work refer to those as answer files.

A. Okay.

Q. That's why I'm using that language.

A. All right. We call them memos. Bulk memos and

TR-0039661

A2061

121

original memos.

Q. Okay. So for the bulk memos, they also included a reference list, correct? I'll have you take a look here at page one.

A. Okay.

Q. So it's definition 1.5.

A. Okay. Yeah.

Q. And so, that reference list here would be the case law that was referenced or used in the bulk memo; is that right?

A. I would have to take a look at a sample bulk memo which I know we provided. Do you have one handy that I can take a look at? I just don't recall -- with the originals, I know we had an actual reference list. I don't recall with the bulk memo, that we had an actual reference list separate from the quotes.

Q. Okay. So let's hold that. We can come to it after I show you one.

A. Okay.

Q. Why were they called bulk memos? Is that something that Ross used, or is that a LegalEase moniker?

A. I don't recall where that term came from. I don't know if it was something that LegalEase said hey, this is your bulk memo project. I think it may have come from the client. But the idea was, it was a significant

TR-0039662

A2062

large project.

Q.   And do you see in section 5.2 where it says that each memo shall include a legal research question and a reference list with a target of at least 4, no more than 6 quotes?

A.   Yes.

Q.   If you get to number paragraph 10, so earlier, we had talked about Ross creating a portal, do you remember that?

A.   Yes.

Q.   And so, there's an e-mail address listed here, Ross at Ross Intelligence dot com?

A.   Mm-hmm.

Q.   Is that the portal you used to provide the bulk memos?

A.   We -- the reason I'm pausing is, I know we used the e-mail at various times but they also had a portal where we uploaded the finished memos.  What I don't remember is like if we did bulk, like we sent them via e-mail and also by the portal or was the portal good enough.  But those are the two ways we would deliver the final memo to Ross.

Q.   So the first run was due on October 19th of 2017, of 10,000 memos.  Do you know if you met that requirement?

A.   It was actually 5,000 memos.  And yeah, we did.  So we broke it up, five; ten and ten.  So we did meet that

123

timeline.

Q. Okay. So I'm reading the wrong language, then. If you go to paragraph nine, can you help me understand? So you were paid in advance; is that right?

A. Yes.

Q. And so you were paid for the first 5,000 memos that you just referenced?

A. Yes.

Q. And those were due on October 19th, but you were paid a month in advance?

A. Yes.

Q. Is that right?

A. Yes.

Q. And then, the second run was -- was it 10,000 memos that were due on November 19th and you were paid a month in advance?

A. Yes.

Q. And then, the third launch was 10,000 memos due on December 19th and payment made on November 20th; is this right?

A. Yes.

Q. Okay. Did you meet all of those requirements in terms of the number of memos you provided?

A. Yes, we did.

Q. And did Ross pay you the amount due?

*I WOULD HAVE TO SEE CONTRACT*

*I BELIEVE SO*

TR-0039664

A2064

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 128 of 431 PageID #: 152953

124

A.   They did, yes.

Q.   And then it says, for any subsequent production run, the advance payment shall be 420,000.  Do you see that?

A.   Yes.

Q.   Is that because the subsequent production runs were anticipated to be 20,000 production memos a month?

A.   Yes.

Q.   Did you provide any subsequent production runs?

A.   No.

Q.   So in total, you provided to Ross, 25,000 memos?

A.   Yes.

Q.   Anything else?

A.   Not for this.

Q.   But the original project was still ongoing?

A.   Yes.

Q.   Were you still producing 75 memos a week on the original?

A.   I believe we did.  I believe we started because we needed to reallocate the bulk.  We weren't doing 75, but we were doing enough to keep Ross happy.

Q.   How did you pay the individuals who were doing the manual work?

A.   So some were paid -- so maybe we can break it down into the different types for individuals.

Q.   Sure.

TR-0039665

A2065

125

A.    The U.S. employees were paid as part of the W-2 compensation.  The India employees were paid as part of their salary because they're salaried employees in India.  In the U.S., we also had subcontracted with, I mentioned, Kelly Services.

Q.    Mm-hmm.

A.    So Kelly Services would take care of paying their employees or their however they classified them, and we would pay Kelly's invoice at the end of each month.  In the U.S., we also had 1099 contractors that didn't come from Kelly.  So they were paid -- it would be a payroll, but it was a 1099 payment.  So that's the U.S.

       And then, in India, like I mentioned, the salaried employees were paid.  Independent contractors were also paid -- they're equivalent of 1099 payments, but they're paid once a month for the work they did that month.

       And then, also in India, we had Kelly, like subcontractors that would be paid based on their invoice to us.

Q.    And --

A.    I'm sorry, I left out one other piece.  I'm sorry.

       In the U.S., we did also have -- so we had our employees.  We had our independent contractors.  We had our Kelly Services' contractors.  And that's right.

TR-0039666

A2066

126

That's all. Yeah, I thought I missed one.

Q. Okay. So that was how you paid them. What did you pay them?

A. For maybe -- by category? How do you want me to classify that because there's different categories?

Q. I just want to understand what your costs was for paying people to do this work?

A. Sure. For our independent contractors in the U.S., we paid an hourly rate of, I think 25 an hour. For our subcontractors in India, I believe we were able to negotiate a per memo flat rate. So I don't know. I don't recall the exact rate, but it was obviously less than what we were being paid, maybe half or less than half. But we tried to manage our costs by paying on a flat rate where we could. In the U.S., that wouldn't fly because Kelly wouldn't accept that. But in India, I believe we were able to establish flat rates with our contractors.

Q. Do you know what those flat rates were?

A. Not off the top of my head. But I do believe I saw SOWs with some of the contractors in India and production that would have had those prices laid out, or those rates laid out.

        HAFEEZ EXHIBIT 12

        9/28/17 E-mail Subject: Minutes of Meeting

TR-0039667

A2067

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 131 of 431 PageID #: 152956

127

ROSS Bulk Project and ROSS Original

WAS MARKED BY THE REPORTER

FOR IDENTIFICATION

BY MR. LASHWAY:

Q. I'm handing to you what has been marked as Exhibit 12.

Have you seen this e-mail before?

A. I probably -- I mean, yes. I don't know if this is the exact e-mail, but I've seen an e-mail like this before.

Q. So this is dated September 28, 2017; is that right?

A. Yes.

Q. And this is the minutes of a meeting that involved the Ross Bulk Project and Ross Original Project?

A. Yes.

Q. Was this an internal meeting or was this a meeting with Ross?

A. No, this looks like it's all just LegalEase.

Q. Okay. And, there is reference in here, to delivering 150 answers. Do you see that where it says 150-billable target on the original project?

A. Yes.

Q. And then, it references that of 132 because you were short 18. There was 41 that needs review?

A. Yes.

Q. What does it mean when it says there's 28 questions in the bank that are reviewed and ready for drafting?

TR-0039668

A2068

A.   My understanding, you know, we had -- when we had extra capacity, we would draft more memos and bank them.  So then, if we had a particular week or time period where we couldn't meet those targets, we would be able to pull those out of the bank.  But some of those memos in the bank may not have been quality controlled or QC'd, so we needed to review them before we used them as an actual product.

Q.   And for this project, these are the questions that Ross posed?

A.   For the original questions, yes, Ross posed those.

Q.   How would Ross share those questions with you?

A.   How would they share with us?  I believe there -- gosh.

I don't think it was something like e-mail.  I think it was under -- I guess it was either by e-mail or it was uploaded.

That's right, I'm sorry.  We had a Google sheet.  So Ross had a Google sheet where they would upload the questions for us.  We would go to that Google sheet and then retrieve those questions from there.

Q.   Did you locate that Google sheet for purposes of discovery in this case?

A.   I did not.

Q.   Do you still have access to it?

TR-0039669

A2069

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 133 of 431 PageID #: 152958

129

A.    I probably do, yes.

Q.    It's in a Google -- Google docs?

A.    Google docs, yep.

Q.    So there's conversation in here about a proposal to increase the production on the Ross Bulk Project.  Do you see that?

A.    Are you talking about number two?  No.

Q.    The heading two right before 1, 2, 3.  It says proposal to increase the production on the Ross Bulk Project. Do you see that?

A.    Oh, yes.

Q.    And number two says tests the drafting tool to see if we can increase production.

A.    Mm-hmm.

Q.    What was the drafting tool that's being referenced there?

A.    So this is the, what we've called automation tool or the, I guess, it's also been referred to the drafting tool.  It was a tool that -- so let's go back to Mr. Ansad in Code Matrix.

When we first approached Code Matrix, it was a way for us to develop and upload and finalize memos to Ross's portal without using manpower or limiting the amount of manpower.  As he got brought on to the project, he learned more about the actual process that

TR-0039670

A2070

130

was involved and he had some ideas around how he thought he could help us make our research more efficient and that's what was referred to as the drafting tool.

Q. And would that include automating part of the research process?

A. So the basic idea there was, instead of having an attorney go to a headnote and click on the head -- click on the topics, then subtopics. That tool would, essentially do some of that clicking for them. So they would have -- they would have cases relating to a certain topic as a starting point, as if somebody had gone in there before them and done that for them, if that makes any sense.

Q. I didn't follow you. Maybe you could give me another explanation.

A. Sure.

Q. So you said they would have cases relating to certain topics as a starting point, as if someone had gone in there before them?

A. Yeah. So again, I'll take my stupid abandonment property example. If I were assigned abandonment and I were to go first, so before I even started drafting the memo, I go on to headnotes and I click on abandonment and then I scroll down to a topic within -- a subtopic

*I AM NOT EXACTLY SURE HOW IT WORKED*

TR-0039671

A2071

131

within that topic. And I think hey, this is a good one for me to phrase a question with.

Sorry?

Q. Go ahead.

A. I thought you were looking at me.

Q. No. No.

A. Okay. So this is a good question for me to phrase -- this is a good headnote for me to phrase a question from. That requires multiple clicks and time where the attorney has to go log into West Law, click on the headnote, click on the topics, click on the subtopics.

What Ansad had proposed to us was, what if your associate could be armed with or have available to him or her, cases relating to a certain topic or subtopic that they could start working on immediately as opposed to having to go through that clicking.

So if my topic was abandonment of the vehicle, instead of me having to start from abandonment and click all the way through and find those cases relating to abandonment of the vehicle, the idea behind this tool was, I could log into the tool and I would have a list of cases relating to abandonment of the vehicle that I could start my research from.

Now, the tool did more than that. The tool helped generate the memos. So once I found the cases

TR-0039672

A2072

132

that I felt were appropriate, I could frame the question in the tool. I could answer the question in the tool, manually. It had like a little space for me to enter the question, enter the answer. It had -- I could click on which case that the tool had pulled into, that the tool had, which case I wanted to include in the memo and I could select if that was a good quote or a bad -- or, you know, a great, good, relevant, topical.

DEMO

And then, once I finished submitting those inputs on the tool, it would generate a word document that was in the exact format that Ross wanted in terms of the indentation and the highlighting. So that's how the tool was, sort of, more from being just an upload tool. And you might see references to it being called the upload tool because that's how we first started it, to a what we call a tool automation. It takes out some of the steps the attorney has to do manually to arrive at the final project.

Q. And some of those steps involve interacting with West Law?

A. Yes.

WE HTTS

Q. All right. So this is one of two tools that was built by Code Matrix; is that right?

A. Related to Ross, because we mentioned another tool?

TR-0039673

A2073

133

Q.    Related to Ross.

A.    Related to Ross. I believe they had a version of this for the original project and one for the bulk project.

Q.    So the tool you just described, was that used for the original project?

A.    It was worked on -- it was used on the original project for a period of time.

Q.    Was it also used in the bulk project?

A.    Yes.

Q.    And, would a human being have to log in to West Law using credentials provided by West Law?

A.    Yes.

Q.    And, where -- let me rephrase that.
      Was the tool a form of software that Code Matrix had built?

A.    The tool was comprised of code. So yes, I believe it was software.

Q.    Was there an application interface for the user?

A.    Was there an application interface meaning what? A way someone could log into the tool?

Q.    Meaning, if they were going to do research in West Law, were they using the tool or were they using West Law? What was the user interacting with?

A.    This is where it gets a little bit -- I don't know if the word complicated is correct, but the tool would

*[handwritten margin notes: "I DON'T RKMEME", "I BEUE'", "I DONT", "I AM NOT SURE."]*

TR-0039674

A2074

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 138 of 431 PageID #: 152963

134

provide an attorney with cases that were pulled from West Law, okay? Like we talked about. So cases relating to abandonment of a motor vehicle. The tool -- those cases would be hyperlinked.

So the attorney, when they would start working that day for their project, they would log into West Law using their own credentials. They would have these cases that were pulled by the tool to use as a starting point, but they would inevitably, have to go back on to West Law to finish their research unless the tool just happened to capture the right amount of cases and the perfect case law that fit for the memo that they were drafting.

Q. Okay.

A. And the tool was really not used for the purpose of drafting Ross Bulk memos. To a large extent, it was used in a different way. I can elaborate on that whenever you want, whenever you would like.

Q. No, go ahead.

A. Okay. So the tool was something that was developed for our own employees in India, LegalEase employees in India, the LegalEase employees in the U.S. I think we also gave access to our independent contractors, of the tool. But we never gave access of the tool to any of our subcontracted attorneys like Kelly attorneys or in

TR-0039675

A2075

135

India, there's a few different providers that we use. They were not given access to the tool. The vast majority of those 25,000 memos were drafted by those subcontracted entities that did not have the tool. We were using the tool for quality control and upload to the Ross portal

So the tool was -- although it was architected in a way that you could use it as a drafting tool for Ross Bulk, it was primarily being used by our QC team to QC the memos and then, to upload the final memos to -- to Ross.

Q. So if I understand you correctly, you said that the vast majority of the 25,000 memos that you produced for Ross were drafted by the subcontracted entities that didn't have access to the tool?

A. Yes.

Q. So what were those -- how were those subcontracted entities preparing the bulk memos?

A. So they were -- they were all given access to West Law. They were all given their own licenses attached to their LegalEase e-mail and they were doing the research directly from West Law.

And then, to sort of take the narrative all the way through, these various subcontractors would send us a batch of memos at the end of each day. We

TR-0039676

A2076

136

had, essentially, all of our U.S. and India employees that were working on the Ross Bulk Project, active QC, they would take these Word documents which is how we got them as Word documents and they would ingest them into the tool. The tool would be able to automatically flag formatting issues. It would also be able to flag if you only had three quotes when you actually needed to have a minimum of four quotes.

So it was very helpful in our QC team rejecting bad memos from the get-go, having the subcontractors do some re-work on those memos, re-submit it and then we would re-ingest it into the automation tool. And, our QC team would finalize it on the automation tool and then it would be sent over to -- to Ross.

Q.   All right. So I want to go backwards for a minute, so I understand this.

So there was a group of people that had access to the Code Matrix tool; is that right?

A.   Right. A limited group of people.

Q.   And this is the tool that you described as helping to drive efficiencies --

A.   That's correct.

Q.   -- and eliminating having to click on all the tools?

A.   That's correct.

TR-0039677

A2077

137

Q. So when they accessed West Law, when the human being accessed West Law using the West Law license --

A. Yes.

Q. -- where would the tool reside from an operational perspective? Would it be sitting on that human being's computer?

A. It was a cloud-based tool that you could log into.

Q. Okay. So you would log into West Law and then you would log into the cloud-based tool?

A. That's correct.

Q. And what hosted -- what was the service that hosted the cloud-based tool? Was it Amazon web services or something else?

A. I don't know the -- we have -- I mean, we do use Amazon. We use a few other cloud-based servers. I don't know exactly where that would be hosted on.

Q. So an individual would again, log into West Law, log into the tool?

A. That's correct.

Q. And if they wanted to use your example of abandonment which was an example that's used in some of your materials, would they first navigate to a headnote?

A. So the idea was they would first go to the tool, which would give them a number of cases relating to the abandonment of vehicles. That would serve as their

A2078

138

starting point.  So instead of having to go into West Law directly, they could look at these cases that were sort of curated for them and then only go into West Law as they needed to.

Q.  Okay.

A.  So they have ten cases, but they read the one case and then it cites another case they're more interested in, they click on there and it takes them to West Law.

Q.  How would the tool have collected those initial cases to allow the human to navigate there first?

A.  So my understanding is the tool was associated with a particular LegalEase license or West Law license.  And, in fact, I verified in the last couple days, that tool was using LegalEase 8 which is referenced in your complaint.  And Legalese 8 would then go in and find cases relating to a particular headnote and pull them into our automation tool.

Q.  And how would the tool know which headnote the human being wanted it to navigate to in the first instance?

A.  That, I don't know.  I think it was -- there was probably somebody on our team saying look, we need cases relating to these different headnotes and that the tool would then go in and get those cases from West Law using LegalEase 8.

Q.  And then, would those -- would the results of the

TR-0039679

A2079

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 143 of 431 PageID #: 152968

139

initial work from the tool populate in the tool?

A.  The cases would populate in the tool, yes.

Q.  All right.  And, the individual would frame the question using the tool?

A.  The tool had a static thought to them entering into the question based on the cases they're looking at.

Q.  And someone would have to type the question in?

A.  Right.

Q.  But the headnote would be in front of them?

A.  The case would be in front of them, yeah.  The cases related to the headnote would be in front of them.

Q.  And the headnote as well, right?

A.  The headnote probably would have been, yeah.

Q.  Otherwise, you wouldn't know which question to answer.

A.  Yeah.

Q.  So they would use that information, type in the question, and then there was another box or another field to then identify the cases?

A.  So visually, I think they would have on the one side of the screen, boxes for them to manually input the question and to be able to categorize the quotes from those cases as being, you know, from those four different topics or categories.

But, and then on the other side of the screen, it would actually have the cases listed.  I

TR-0039680

A2080

140

believe they had to copy and paste the appropriate sentences or quotations from the case on the right side of the screen and fit it into the box on the left side of the screen.

So it's making everything accessible to them, but they still had to discern if the case, A, answered the question that they had just framed.  If it didn't, then they would go out to West Law and look for other cases.  The case was perfect and on point, they still had to cut and paste the -- the appropriate sentence holding from the right-hand side to the left-hand side and then do the additional step of categorizing it as great, good, so on and so forth.

Q.  Now, I think I've asked you this, but I just want to be -- I just want to make sure I understood your answer. Would the tool using LegalEase 8 go into West Law and pull this information down so that when the user logged in to the tool, there was information available to them?

A.  That's correct.

Q.  So the user didn't have to deploy the tool, the tool was used with Legalese 8?

A.  That's correct.

Q.  Okay.  And so, the individuals who were doing the work to generate these 25,000 memos could, in effect, use

TR-0039681

A2081

the tool, but would have to go to West Law if they needed any additional information?

A.   Correct.

Q.   Okay.

A.   However, the sort of -- the irony of the tool was, that work flow we just talked about was barely used because we did not give the tool to our subcontractors. So when they were drafting the memos, they were drafting them as if the tool didn't exist. They were just going on to West Law and going through headnotes and framing the questions and drafting the memos.

And then, the tool would only be deployed by our team to do the Q run -- run a QC process through and then deliver it, the final memo uploaded to Ross.

Q.   And where are the 25,000 memos?

A.   We -- I'm sure we have copies of them. They were not -- they were not on the Box holder, so they didn't -- I believe they're on an internal server in India, where the actual memos were done, for QC to finalize. And each of the 25,000 memos were also sent to Ross. So Ross has a copy of each memo and I believe we have a copy somewhere

Q.   Of each memo?

A.   Of each memo.

Q.   They haven't been produced in this case, right?

TR-0039682

A2082

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 146 of 431 PageID #: 152971

142

A.   We did not produce them, no.

Q.   Is there a reason why?

A.   We felt the actual memos -- we produced sample memos, but we didn't -- we didn't think that the actual 25,000 memos were relevant to the production requests.

Q.   Were they -- were they not relevant or they weren't responsive?

A.   Sorry, not responsive.

Q.   No, I wasn't trying to pick.

A.   I think that's the word I used, yeah.  I think the sample set was responsive but not the entire set.

Q.   Do you have access to those 25,000 memos?

A.   I believe we do.

Q.   Would those memos show who prepared each one?

A.   I'm sure there is metadata which you could find who authored those memos, yes.

Q.   So we would see that the memos were prepared by the contractors not using the tool?

A.   Yes.

Q.   Do you know which contractors had access to the tool and which didn't?

A.   I could -- I mean, we could provide a list.  But I can tell you generally speaking, the vast majority of our memos were produced by subcontractors associated with a company called Clutch Group.  And Clutch Group did not

TR-0039683

A2083

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 147 of 431 PageID #: 152972

143

have access to them.

Similarly, Vakil produced maybe 5- or 6,000 memos. They also did not have access to the tool. Kelly Services, their contractors produced, maybe 2,000 memos. They did not have access to the tool.

The only ones having access to the tool were our LegalEase, either U.S. employees or India employees or our designated QC team which, we would have a list of those people.

Q. Clutch Group and Kelly had access to LegalEase Solutions dot com e-mail addresses; is that right?

A. Yes.

Q. And they had access to West Law licenses that had been provided to LegalEase Solutions, LLC?

A. Yes.

Q. Did anyone else have access to LegalEase 8 other than the tool?

A. It was also associated with one of our attorneys, Merin Sony, who you referenced earlier.

Q. She was the project manager for this?

A. Yes.

Q. Did she do any research for this herself, using West Law?

A. She probably did, but more in the role of QC, project manager.

TR-0039684

A2084

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 148 of 431 PageID #: 152973

144

Q.    Was she responsible for the operation of the tool?

A.    She wasn't responsible for the oversight of the tool, but the actual operation was sort of being managed by other people on the team.

Q.    Okay.

HAFEEZ EXHIBIT 13

7/31/17 E-mail Subject: New

West Law Passwords-July 2017

WAS MARKED BY THE REPORTER

FOR IDENTIFICATION

BY MR. LASHWAY:

Q.    I'm going to hand to you, Mr. Hafeez, what's been marked as Exhibit 13. I saw you check your watch, so we can take a break here, shortly.

A.    Yeah, I need a restroom break.

Q.    Okay. Have you seen this e-mail before?

A.    Yes, I have seen this e-mail before.

Q.    Okay. So do you see in the top e-mail -- and this is an e-mail from, is it Ms. Rajeev to you, Ms. Whitehead and Chris Schmidt?

A.    Yes.

Q.    Who is Chris Schmidt?

A.    He was one of our employees at the time.

Q.    Is he based here in the U.S.?

A.    Yes.

TR-0039685

A2085

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 149 of 431 PageID #: 152974

145

Q. He was one of the --

A. Staff attorneys.

Q. -- staff attorneys you mentioned earlier, right?

A. Yes.

Q. So I asked you earlier about the Spotify associates and this is the document you referred to?

A. Yes.

Q. Is that a separate project?

A. Yes.

Q. Did you need West Law passwords for the Spotify --

A. Nope.

Q. -- project?

A. Nope.

Q. And so, why is it that Ms. Rajeev was mentioning that none of the Spotify associates has West Law access?

A. The best of my recollection, we were transitioning these Aparma, Priyada, Anjusha, Sandesh, to bulk, the Spotify finished. So she's saying they don't have West Law access, they'll need West Law access to transition to this team, to the West Law team.

Q. Okay. And there's reference to Rohit. Do you see that?

A. Yes.

Q. Started working on the Ross pilot?

A. Mm-hmm.

TR-0039686

A2086

146

Q. So by this point in time, had you received the go from Ross to engage in the bulk project?

A. It could have been, I think I mentioned earlier, August, but it could have been late July that at least indication enough that we were ready to start investing some resource to figure it out.

Q. So that paragraph goes on and says we need seven accounts immediately if we are to work efficiently.

Do you see that.

A. Yes.

Q. Who are the seven accounts for at that time?

A. It seems like at least for now, Aparma, Priyada, Anjusha, Sandesh, and maybe Rinie and Visakh.

Q. Okay.

A. That's six accounts.

Q. And are they the Spotify associates identified in the first paragraph, or are they all contractors of LegalEase India?

A. They are either contractors, direct independent contractors or employees of India, LegalEase India.

Q. Okay.  So the next paragraph says that Ansad -- and is that referring to Mr. Ansad from Code Matrix?

A. Yes.

Q. -- is trying to automate the WL activity trying to help us to reduce WL log ins.  WL log ins, do you see that?

TR-0039687

A2087

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 151 of 431 PageID #: 152976

147

A.   Yes.

Q.   And WL is West Law?

A.   Yes.

Q.   Was he doing that in connection with the proposal to produce 25,000 memos in three months?

A.   Yes.

Q.   And why -- why was a focus to reduce West Law log ins?

A.   Again, I think we were trying to plan this whole project, how many people do we have, how many West Law log ins do we need.  So it was part of our planning process.

Q.   Was it also to reduce the amount of spend using West Law?

A.   Could have been, yes.

Q.   Did anyone look at the contractual terms between Legalese and West Law to see if you could automate the process for using West Law?

A.   We --

Q.   And I'll ask you not to divulge in any privileged information, of course.

A.   I do know that Gayathri Rajeev who sent this e-mail, she did look at the contract and that was something that was a concern for her, to make sure that we were doing everything according to the contract.

Q.   Did you ever consider whether automating West Law

TR-0039688

A2088

Q. activity was permitted or not permitted?

A. We did, yes.

Q. Did you propose the SOW to Ross, or did they propose it to you?

A. Good question. May I take a look at it? I -- it's one of the exhibits here, right?

Q. Yeah. So this would be, I think, Exhibit 11, which would be here.

A. I believe we took it upon ourselves to draft the SOW and it went to Ross to comment and edit and then it was finalized. So we did the first draft of the Ross based on what we had been told in our previous conversations on what they were looking for.

Q. And is that in consideration in your ability to automate the West Law activity?

A. No.

Q. It wasn't?

A. Well, I guess what -- well, is what in consideration?

So Ross never knew that we were using an automation tool on the back end. Ross had no part and play in that. They just logged in their memos within the time frame. I guess our time frame in how we could hit these targets and the pricing, I'm sure took into consideration that the Ross tool would help us save time on at least the upload portion that I had

TR-0039689

A2089

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 153 of 431 PageID #: 152978

149

mentioned and also the QC.

So yes, I think our pricing took into account, that the tool would be helpful.

Q. But you never explained to them how you were going to get all this work done?

A. No.

Q. They never asked?

A. They never asked, and we felt like that was our secret.

HAFEEZ EXHIBIT 14

7/26/17 E-mail Subject: ROSS -TC

Tomas 7 26 17

WAS MARKED BY THE REPORTER

FOR IDENTIFICATION

BY MR. LASHWAY:

Q. I'm handing you what's been marked as Exhibit 14. Is this -- have you seen this e-mail before?

A. Yes.

Q. And does this reflect Ms. Whitehead's notes from a telephone conference with Tomas at Ross as of, I guess, on July 26, 2017?

A. Yes.

Q. So in the first bullet, it reads, Ross is waiting for two things to quote on quote, close. Do you see that?

A. Mm-hmm, yes.

Q. Does that give you any better understanding as to when

TR-0039690

A2090

you had proposed the statement of work to Ross?

A.   Well, so this e-mail was dated end of July and it seems from the e-mail, and now that I think about it, yes, we -- Ross hadn't given us the green light yet.

As of this date, they were waiting for a couple things to close. And my understanding at this time, don't know where I got it from, it was a financing thing. They were looking for some financing to close on this project, so we had not been given the green light at the time of this e-mail, so we would not have probably drafted the SOW at this point.

Q.   So are you picking up on the fact that that bullet is, I take it, a financial close?

A.   Yes.

Q.   So you believe that Ross was waiting for finances on their end?

A.   Right.

Q.   In order to provide you the verbal commitment?

A.   Right.

Q.   And what is that? What does she mean, or do you recall anything in the conversation where she writes confidential?

A.   That was very much in tune with what -- or that was very much the pattern of Ross. They -- they didn't want to tell us much. You know, confidential was

TR-0039691

A2091

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 155 of 431 PageID #: 152980

151

something that they used quite a bit.

So obviously, we had to deal with the fact they didn't want to tell us exactly what was stopping them from giving us the green light. But Teri's take on it was some kind of financial issue.

Q. Did Tomas ever tell you not to inform West Law on the Ross project?

A. No.

Q. Did they ever tell anyone at LegalEase not to inform West Law of the project?

A. No.

Q. In the third bullet, it reads no other issues that they have, dot, dot, dot, portal process and it goes on. Do you see that sentence?

A. Yes.

Q. What does she mean when she wrote problem on those two things closing?

A. It seems like they're talking about some kind of Ross portal on their end, that they needed to -- again, speculation. I don't know what they meant. I don't know what Teri means, but it doesn't have to do, I know, with our automation tool or our portal. It's something on their end.

Q. The last bullet says ideally execute SOW in a few weeks. Do you see that?

TR-0039692

A2092

A. Yes.

Q. So wouldn't that suggest that the SOW had already been shared?

A. It's possible. Teri is -- like I said earlier in the conversation, she talked about development and she has -- when we get interest from a client on a project, one of the things we started doing more frequently following her lead is hey, if we can draft the SOW to get this project green lighted, so it's possible she had drafted or we had drafted an SOW based on the conversation we had up until then.

I don't know if it was drafted at this point or drafted later, but that was very much Teri's style, to say hey, look, let's give the client everything they need so we can hit the ground running.

Q. So I'm going to have you jump back to Exhibit 13 now, which is an e-mail from generally that same period of time. What was the concern with using Lexis, that's raised in this e-mail, the top e-mail?

A. Yep. I don't know other than we seem to have a consensus that West Law was more user friendly than Lexis.

Q. Is it because the automation tool that was being built by Code Matrix would work in West Law but not Lexis?

A. I don't know from that e-mail.

TR-0039693

A2093

153

Q. Do you know --

A. I don't know.

Q. -- otherwise?

A. I don't know otherwise, either.

Q. Did you ever use the automation tool?

A. I have seen it, I don't think I've ever used it for creation of a memo.

Q. Did you ever see it access West Law?

A. I never personally saw it access West Law.

Q. Was that done out of India?

A. Was what done?

Q. Using the tool to access West Law?

A. Primarily, yes. The associates were drafting memos from our side, were primarily India.

Q. Do you know how many times the automated tool that you've described, was used to access West Law?

A. No, I don't.

Q. Would Ms. Sony be the person that would know?

A. I mean, the access point to the -- to West Law was through her log in so the information is probably there. I don't think she would know herself.

Q. Was she the person that ran the automated tool?

A. I don't believe she ran the tool. I believe Ansad ran the tool.

Q. Ansad who is at Code Matrix?

TR-0039694

A2094

154

A.    Yes.

Q.    Does he have -- did -- all right.  So let me go backwards.

So I had asked you before where the tool resided from a code-based perspective.  Is Ansad the person that's responsible for that?

A.    Yes.

Q.    And does he control the tool?

A.    Yes.

Q.    And is the tool property of Code Matrix or LegalEase Michigan, or LegalEase India?

A.    So per the SOW with Code Matrix, the tool is property of LegalEase India, but Ansad was hired to create and implement the tool as well.

Q.    Was the Ross Bulk Project -- did it begin on or around September 19th?

A.    That's probably correct.

Q.    Do you remember at that time, approximately how many people you had working on the bulk project?

A.    I don't remember the number of people, no.

Q.    Can you guess, estimate?

A.    I could guess, maybe between our subcontract -- I think in September, we had maybe around nine or ten from Kelly.  But those numbers were also brought down when we weren't happy with their work.  And then, we had --

TR-0039695

A2095

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 159 of 431 PageID #: 152984

155

I think we had about 40 to 50 people working.

Q. Between Michigan and India?

A. Yeah.

Q. And do you remember looking at the payment terms earlier, Ross was advancing payment to you all; is that right?

A. Yes.

Q. Why were they advancing payment for that project but not for the original project?

A. So, I mean, we always ask for advance payments from any of our clients. And sometimes you get it, sometimes you don't. So it was not out of the ordinary for us to ask for advance payments.

I don't know if Ross Original was ever paid on advance or not. From the SOW, it seems like maybe not. So we always ask for advance payments. We've had other clients in the past give us advanced payments. And we still have clients give us advance payments. That was something we asked for and they agreed to it. Now, obviously from a cash flow standpoint, it was very helpful to have advance payments, but it was something we asked for and received.

Q. Okay. So, I'm going to hand you a document that's called Master Services Agreement that's been marked as Exhibit exhibit 18. Have you seen this document before?

TR-0039696

A2096

156

A. I have, yes.

Q. Do you know if this is the final version of the agreement with Code Matrix?

A. I don't know if it's the one I've seen. I've seen this draft, but I've also seen the signed one. So I don't know if there's any changes between those two.

Q. Do you know if you produced the signed version in this case?

A. Yeah, we did. I was able to get it yesterday on the platform.

Q. Was there ever concern at LegalEase about referencing Ross in this agreement?

A. There may have been. I don't -- I don't know. There may have been because in general, with our subcontractors and vendors, we didn't want them to know the client name.

Q. Why is that?

A. For a variety of reasons. One, we felt we had a confidentiality obligation to the client. One, we didn't want our subcontractors or vendors to go directly to Ross.

Q. Could they have done that here, you think?

A. They could have, yes.

Q. Do you see down below, in the scope of work in this draft that says research on West Law and Lexis?

TR-0039697

A2097

157

A.    Can you point to what page you're talking about?

Q.    I'm sorry, page one.  You know what, you have a different version of what I'm looking at.  Hold on a second.

A.    Oh, you're looking at the statement?

Q.    Yeah.  I'll give you that, too.  Put them all together. We can take a lunch break here in just a minute.

HAFEEZ EXHIBIT 15

Statement of Work II LegalEase

Process Automation

WAS MARKED BY THE REPORTER

FOR IDENTIFICATION

MR. DAKHLALLAH:  Which exhibit is this?

MR. LASHWAY:  I believe we're up to 17.  Oh, 15.

BY MR. LASHWAY:

Q.    So there's the statement of work.

A.    Okay.

Q.    Is this the document you were referencing when you mentioned that you've seen other documents or is there something else?  This one is not signed.

A.    No, I seen a signed one.

Q.    Okay.  Do you see at the bottom on scope of work, it says research on West Law and Lexis?

A.    Mm-hmm, yes.

TR-0039698

A2098

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 162 of 431 PageID #: 152987

158

Q. So it was the intention at least of August 7th to have Code Matrix perform research on West Law?

A. Let me take a look at what's meant here by research.

I -- again, my understanding of this and this is not the version I looked at is, we're asking them to understand, not actually conduct research on West Law and Lexis for purposes of producing memos, but find out more about West Law and Lexis to see how they can -- how automation could help with either of those platforms.

Q. And when it references design and develop a web portal, is that the web portal to the tool?

A. Yes.

Q. And then it's -- it speaks to, I think something you were just mentioning, activity automation engine to gather data from West Law?

A. Mm-hmm.

Q. Does that accurately reflect what the tool ultimately did?

A. Yes.

Q. And then, there was a document processing engine. Is that processing material that was taken from West Law?

A. No. I believe that process engine is the tool would then, based on the inputs provided by the attorney, would generate a Word document that would be formatted

TR-0039699

A2099

159

according to Ross specifications.

Q. According to the input into the automation tool?

A. Right.

Q. And then, the next one is activity automation for LegalEase's client's portal. Do you see that?

A. Yeah, I see that. I don't know what that means.

Q. Could that be referenced to automating the process to upload --

A. Could be.

Q. -- to the Ross portal which is referenced up top in paragraph one?

A. Could be, yes. Because like I said before, there was no tool that we made, provided to Ross or provided Ross access to.

Q. And the final bullet is integration of functionality into existing LE portal. Do you see that on the bottom of page one there?

A. Yes.

Q. I think that's referring to the LegalEase portal.

A. So, I think something important for me to clarify here, we use the word portal interchangeably. You have the automation tool, right? -- that we talked about, which had different uses, some for doing the actual work, some for QC, some for uploading. All that was -- all that is included in the automation tool.

TR-0039700

A2100

There was a separate LE LegalEase portal that we were discussing with Ansad to develop, which was just a dashboard for the client to be able to see the status of the project. Like at any given time, how many memos have we uploaded.

So I believe that LE portal may just be researching the information dashboard that we wanted Ansad to develop for the client, so the client would have access to an information dashboard to know what the progress on the project was, which was completely distinct from the automation tool.

Q. And was the client in that answer, Ross?

A. Right. Yes.

Q. So Ross could go into this dashboard and see where you are with respect to the project objective of 25,000 memos?

A. Yes.

Q. Okay. I think we're going to run out of tape, so why don't we just take a break now?

THE VIDEOGRAPHER: We are going off the record. The time is 1:00 p.m.

(Off the record at about 1:00 p.m.)

(On the record at about 1:42 p.m.)

THE VIDEOGRAPHER: We are back on the record, the time is 1:42 p.m.

TR-0039701

A2101

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 165 of 431 PageID #: 152990

161

BY MR. LASHWAY:

Q.    Mr. Hafeez, I stapled the exhibits so that they were --

A.    Thank you.

Q.    Yeah, sorry about that.

So if you could go back to Exhibit 15, it should be somewhere by the bottom.  I organized them for you.

So just prior to lunch, we were talking about a dashboard that Code Matrix had built for Ross to view the project objective?

A.    That's correct, yes.

Q.    And did they, in fact, build that?

A.    I believe so, yes.

Q.    In addition to the status of where LegalEase was with respect to meeting the 25,000-memo target, what other information was shared with Ross?

A.    My recollection is really, it was just a fancy dashboard for them to know where we stood with the timeline for the memos, or how close we were to completing the project.

To my recollection, there was no other information.  It was really just a timetable for them to see progress on the project.

Q.    So why would you need a dashboard as opposed to just an

TR-0039702

A2102

162

e-mail to say we've produced X number of the 25,000?

A.   As part of just more of a marketing thing.  We just wanted to impress them, that we -- we had something that they could track their progress as opposed to just giving them an e-mail spreadsheet.

Q.   And would they have to log into the dashboard?  Ross, would Ross have to log into the dashboard?

A.   Yeah, I don't know if it was a log in or just a link that they could just pop up, but they had access.  They were given access to that, to the dashboard.

Q.   How often did you report on your results or your status of the project to Ross?

A.   I believe Teri had regular scheduled calls with Thomas, so she would update him on progress probably on a weekly basis.  I don't recall any kind of a project report or, you know, something that we would send over to Ross.  And then, the dashboard was another tool we communicated progress.

Q.   Who is the person most knowledgeable about the dashboard and what it conveyed?  Is that you?  Is it Teri?  Someone else?

A.   Probably Ansad who developed it.  Teri might know some more about it as well.

Q.   Was Ansad responsible for maintaining the dashboard?

A.   Yes.

TR-0039703

A2103

163

Q.   Is Code Matrix based in the U.S.?

A.   Not that I know of.

Q.   Do you know if they have any representatives in the United States?

A.   Not that I know of.  I don't think they do.

Q.   Does Mr. Ansad or any Code Matrix employees spend time in the United States?

A.   Not that I know of.

Q.   Did you ever meet anyone from Code Matrix here in the United States?

A.   No.

Q.   Have you ever met Mr. Ansad?

A.   I met him, I believe, one time.

Q.   Where was that?

A.   In India.

Q.   Was that for purposes of this project?

A.   No.  Actually, I met him just a couple months ago.  Not related to this project at all.

Q.   Does Mr. Ansad know about this litigation?

A.   He does.

Q.   Did you tell him about it?

A.   Yes.

Q.   Does Code Matrix have any affiliation or association with Ross?

A.   No, not that I know of.

TR-0039704

A2104

164

Q.    Do you know if they know about one another?

A.    I'm pretty sure Ross does not know about Code Matrix. Code Matrix may know about Ross.

Q.    And if you look at Exhibit 15, there's a reference to Ross in the project scope, isn't that right?  On page one.

A.    On page one?

Q.    I'm sorry.  Page one, scope of services.  There's a reference to Ross.

A.    Oh, okay.  Yes.

      So Code Matrix does know about Ross, but Ross does not know about Code Matrix as far as I know.

Q.    All right.  So, can you turn to page two, which is paragraph five which is the solution, proposed solution.  Do you see that paragraph?

A.    Yes.

Q.    So it says in the first paragraph, that to achieve what they described just above will be developing different components.  Do you see that?

A.    Yes.

Q.    And this is, the wheel would be Code Matrix developing different components for LegalEase?

A.    Yes.  I see it there.

Q.    All right.  So this agreement, though, is with LegalEase Solutions Michigan; is that right?

TR-0039705

A2105

165

A.　Yeah, it looks like it is.

Q.　Why -- why is this with the Michigan LegalEase and not the India LegalEase?

A.　I don't know.　But I don't think this agreement was ever executed.　The one that I've seen is between LegalEase India and Code Matrix.

Q.　So if you go back to paragraph five on page two, it identifies two types of searches performed by the activity automation engine.　Do you see that?

A.　Yes.

Q.　And so, the first one, as I understand it, is a type of search that will be based on legal questions provided by Ross; is that right?

A.　That's correct.

Q.　And it explains that the activity automation engine will run a search on West Law and will list out the search results to be pulled up on a platform to be developed by Code Matrix.

Now, I inserted some language into what I was reading there, but does that accurately describe what --

A.　Yeah.　Yes, I believe so.

Q.　And was that ultimately done?　What -- did Code Matrix build such a tool?

A.　Yes, they did.

TR-0039706

A2106

Q.    Okay.  And that tool was used to run a search in West Law; is that right?

A.    Right.

Q.    Would that have used LegalEase 8 West Law account?

A.    Yes.  Yes, that's my understanding, yeah.

Q.    And it would provide the search results from West Law in a platform for a human person to review; is that right?

A.    Right, the automation tool.

Q.    How would that tool know what search to run?

A.    So, for the question-based queries, it would be using natural based on the question and it would also be using -- I can't remember what's called natural language and, what's the other type of search?

Q.    Boolean?  Boolean?

A.    Boolean, yes.

The fact that the SOW that we do have executed has a flow chart which shows that -- which search strings will be used based on the actual questions being provided by that client.  But it was natural language and Boolean.

Q.    And would it use KeyCite numbers?

A.    KeyCite numbers meaning headnote numbers or no?

Q.    So, do you know if there's a difference between a headnote and a KeyCite number?

TR-0039707

A2107

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 171 of 431 PageID #: 152996

167

A.  I know cases are characterized by headnotes, and I am familiar with KeyCites.  I don't recall how they are connected but I don't -- yeah.  I know they're there, I'm not sure how they're interrelated to KeyCites and headnotes.

Q.  Okay.  So my question was, would the search that was run by this activity automation engine use KeyCite numbers?

A.  I don't know.  My understanding is there was two types of searches that this automation engine ran.

Q.  Right.

A.  One was -- there was two questions.  One was the question provided and it would run a natural language search and Boolean with that question language.

However, when there's a topic assigned, it's possible it was using either the headnote number or the key -- or for purposes of this conversation, I'm not sure what a KeyCite is, but it might have been using a headnote or a KeyCite similar to run that search.

Q.  Okay.  So the second part of the answer was related to the second type of search, right?

A.  Yeah.

Q.  So focusing on the first type of search --

A.  Yeah.

Q.  -- would that activity automation utilize KeyCite

TR-0039708

A2108

numbers?

A. Not really. I think it would be using the actual question with natural language and Boolean.

Q. And so, who would take the question posed by Ross and input it into the automation? I'm sorry, the activity automation engine?

A. That would be Ansad, I would imagine.

Q. So he would physically load the tool each time they needed to run a search in West Law?

A. I don't know how he did it.

Q. And so, we don't know if he used KeyCite numbers?

A. We don't.

Q. And what about same question, but did he use headnotes? So for purposes of running for the first search --

A. Yeah.

Q. -- the activity automation engine, did he use headnotes?

A. If I could look at the flow chart and the executed SOW, I could see that it's mentioned in there, but I don't have any knowledge in terms of what's in the SOW.

Q. Okay. And who would know that?

A. Ansad would.

Q. Anybody at LegalEase?

A. It's possible -- it's possible Gayathri might know. I don't -- but Ansad is the one really running the tool.

TR-0039709

A2109

169

Q. Would Teri Whitehead know that?

A. I don't know that she would know.

Q. For this first search that we're focused on, where would the results be generated for Ansad? Physically, where did the results reside?

A. So, my understanding is we had a local machine server, like a physical server which wherein the results would reside.

Q. And that local server was sitting --

A. In India, in the office in Cochin.

Q. And would that be the LegalEase India office or the Code Matrix office?

A. I believe -- I believe it was in the LegalEase India office.

Q. So would Ansad be sitting in the LegalEase India office to -- when he was using the activity automation engine?

A. I know he had come to the office at intervals, but I don't know that he needed to be there physically. I don't know that the physical machine was connected. The internet cloud to his machine, don't know how that was connected. But Ansad didn't work out of our office, he -- he came as needed.

Q. And he was also based out of, is it Kerala?

A. So he's based in Cochin.

Q. Cochin.

TR-0039710

A2110

A.   Which is a city in Kerala.  And he's also got an office in Bengaluru.

Q.   Is his office in Cochin, near the office, the LegalEase India office?

A.   I don't know.

Q.   So, I'm just trying to understand the process here.  So I don't mean to belabor this, but Ross would pose, in August of -- well, let's say September of 2017, Ross would pose questions for purposes of this first form of search, correct?

A.   Right.

Q.   And you testified earlier, that some of those questions were focused on bankruptcy.  Some were focused on intellectual property?

A.   Right.

Q.   And do you know where Ross -- how Ross generated those questions?

A.   We don't.

Q.   How did -- and Ross -- Ross conveyed those questions to LegalEase using some sort of legal -- I'm sorry, some sort of Google doc?

A.   Right, that's correct.

Q.   And how would the automated -- the activity automation engine then be used to transform those questions into a search to be performed at West Law?

TR-0039711

A2111

A. I don't know. I mean, it's possible Ansad was given access to the Google sheet to get questions from there. I don't know for sure.

Q. Okay. And after the activity automation engine was used to search West Law and it would list out the search results reading from here, what was the next step for purposes of advancing the memos?

A. Are we talking about the original or the bulk?

Q. This is the search here that's described as number one under paragraph five.

A. Number one. So the question you're asking is what would happen after this piece of it is done by Code Matrix or by the tool?

Q. Yeah. Code Matrix or the tool, yeah.

A. I think I had mentioned earlier that the cases would be on one side of the screen and then there would be boxes for the attorney to read the cases and then fill in the question that they're deriving from the questions in the case. The answer -- sorry, not the answer. The questions, and then to select the actual quotes that they felt like answered the question.

Q. Okay.

A. So that would be done by the associate as they're looking at those cases.

Q. And that would be using the platform that's described

TR-0039712

A2112

here, developed by Code Matrix that would have the search results in it?

A.   Right.

Q.   Okay.  Then, there's a second activity automation engine functionality; is that right?  That's the one that's identified in paragraph two?

A.   Yes.

Q.   Okay.  And is this -- and paragraph two relates to the bulk, the Ross Bulk Project?

A.   Let me just read this real quick.

Q.   Okay.  Great.

A.   Yes.  So this looks like it's talking about the automation -- sorry, the Ross Bulk Project.

Q.   Okay.  And, the purpose of this was to list the contents under a particular topic provided in West Law; is that right?

A.   Right.

Q.   And is that particular topic a KeyCite number?

A.   Again, I thought of it in my mind as topics and subtopics under headnotes.  I don't know if that's the same as a KeyCite.  But I don't know.

Q.   You don't know what that's referencing when it reads under a particular topic, provided in West Law?

A.   Yeah.  I -- my thought was that's a topic or subtopic under a headnote.  That would be used to compile cases

TR-0039713

A2113

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 177 of 431 PageID #: 153002

173

from that particular topic or subtopic.

Q.   But you don't know if it references, or if that's relating to a KeyCite number or headnote?

A.   I don't know.

Q.   Who would know that?

A.   Ansad would.  Besides him, Gayathri might know.  And another attorney named Leo, who was testing out the tools to see if it was functional or not, so he might know.

Q.   Okay.  How would LegalEase or Code Matrix identify the question to be answered using the process described in number two?

        MR. DAKHLALLAH:  Objection, that's a compound question.

        THE WITNESS:  Or maybe you need to rephrase the question.

BY MR. LASHWAY:

Q.   How would Legalese identify the question to be answered using the process described in number two?

A.   So I recall that with the bulk memos, there was no question being answered.  The question was -- the question was being developed by the associate along with the answer.  So if the associate had case law or cases related to a certain topic that was being pulled from this tool, they would then either use that --

TR-0039714

A2114

174

either use the case law, or as we had spoken about earlier, pulled up an actual headnote or subtopic of a headnote, they would use that primarily as a way to formulate a question.

Q.  Would they use the text of the headnote to formulate a question?

A.  They would use that to start to formulate a question.

Q.  And would they use the KeyCite number in the topic associated with that, to help formulate the question?

A.  Again, I don't recall what a KeyCite is in the context that we're talking about today.  If you want to show me what a KeyCite looks like, it might be a very quick fix.  And I'm not trying to be evasive, I just don't know what a KeyCite is related to headnotes as we're doing this deposition.

But they would create questions based on the data that was pulled, which may have included more than the cases.  It may have included the topic or subtopic, that the cases were organized under there.

Q.  And during this course of the bulk project, did Ross ever provide any instructions as to the questions that they wanted answered?

A.  No.

Q.  So -- so you could generate 25,000 memos on whatever topics you were so inclined, from West Law?

TR-0039715

A2115

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 179 of 431 PageID #: 153004

175

A.   Yes.  The only thing that they specifically said don't -- not to do is they did not want state specific questions and answers.  So they wanted questions and answers that were not state specific.

Q.   So they didn't want anything related -- they didn't want anything that was identifying the jurisdiction for the answer, they wanted something more holistic?

A.   Right.  And they specifically said state.  So, yeah.  So they didn't want under Michigan law such and such applicable.  They just wanted, you know, if it was such and such applicable under something else.

Q.   Do you know why?

A.   I have no idea.

Q.   They didn't explain it?

A.   No.

Q.   Did they care about the difference between state and federal courts?

A.   No.  They were fine with us using case law from either.

Q.   And they didn't want you to differentiate between when answering between a state court answer and a federal court answer?

A.   No.

Q.   How about with respect to answers that involve statutes?  Did they want you to identify a state statute versus a federal statute?

TR-0039716

A2116

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 180 of 431 PageID #: 153005

176

A.   No.

Q.   Okay.  So, you were asking me a question earlier about KeyCite numbers.  And what I'm trying to understand is why in this draft agreement, there is reference to a particular topic provided in West Law.  And I'm trying to understand, what is the topic that's provided in West Law that this is talking about?

A.   So again, in my understanding and, you know, going back to the example of where you have a headnote for abandoned property, within that, you may have ten other subtopics or maybe a hundred subtopics under abandoned property.  One of those subtopics or either a sub-subtopic would serve as a potential topic to create a question and answer from.

Q.   So, if I was to try and describe the difference between the two, so what you had just described I think relates to KeyCite numbers.

A.   Okay.

Q.   Headnotes is what's generated at the top of a case to summarize a case that a --

A.   Oh, oh.

Q.   -- that associates that text to the KeyCite number system.

A.   Oh, okay.

Q.   Does that make sense?

TR-0039717

A2117

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 181 of 431 PageID #: 153006

177

A. So is the headnote more of the editorial from somebody at West that's summarizing a case --

Q. Correct.

A. -- and linking it to a KeyCite?

Q. Correct.

So if I'm correct, does that help answer what this is referring to as a particular topic provided in West Law?

A. I don't --

Q. Hold on. You think I should know this stuff.

So let me rephrase. When I was using the word KeyCite, I should be using the phrase key number system.

A. Okay.

Q. So a key number system would say admiralty law and then there would be subtopics underneath that.

A. Yes. Yes.

Q. Does this ring a bell?

A. Yes.

Q. Okay. And then, the headnote is exactly what you described, I think the editorial.

A. Yes.

Q. Okay. So what is this referring to? Is this referring to a key number or a --

A. It's referring -- so now that we've clarified what key

TR-0039718

A2118

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 182 of 431 PageID #: 153007

178

number is, I believe it's referring to finding topics using key numbers.

Q.  Okay.

A.  Yeah.

Q.  And so, as I'm reading this, it says after the question is added to the proposed portal, do you see that?  This is the next paragraph down under activity automation engine to fetch data from.

A.  Number two?  We're talking about number two, right?

Q.  Yeah, number two.  The second paragraph in number two.

A.  Oh, okay.  Sorry.

Q.  That's all right.

So I was asking, it reads, after the question is added to the proposed portal; do you see that?

A.  Mm-hmm, yes.

Q.  Who -- who adds the question to the proposed portal?

A.  So maybe if we back up a little bit, it'll help answer the question.  We were using key numbers as a way to help come up with questions and answers for these memos and as a way to help make sure that we weren't having people answer the same question or provide the same, you know, memo multiple times.

So it was a good way for us to organize a project for our internal purposes.  So we had somebody tracking here's how many memos we need done this month

TR-0039719

A2119

and let's make sure we create memos based on these key numbers. And some of these memos can be drafted by Team A. Some of these memos can be drafted by Team B. So, it was a way for us to organize the project and make sure that we were not, you know, duplicating the work, the products.

So there was a project plan or there was an evolving project plan of who or which teams would be assigned to which key number to create questions and answers. I'm sorry, to create memos. And I believe that person would have been Merin Sony, primarily. Now, how that went to Ansad to run through the automation tool? I don't know. Perhaps she had a spread sheet that he was using, but the key numbers were being used to help organize a project.

Q. And so, would one person be assigned admiralty law for example?

A. Right.

Q. One would be assigned bankruptcy law?

A. Right.

Q. Where is that project plan?

A. I haven't -- I did not see it in the initial discovery that we produced. I don't know if it was an actual project plan like, you know, it may have been a series of e-mails or spread sheets, but it's something that

TR-0039720

A2120

I'm sure I could -- we could find it.

Q. And -- and the key numbers were also used to pull down the data, right; that would be used to generate the memos for the team to review?

A. The key numbers would be used to produce -- you mean the case law, the cases that would come under those key numbers?

Q. Yes.

A. Yes. I believe that's part of how the automation tool worked.

Q. And, as I'm reading this in paragraph two, so once the case law was pulled down from the key numbers, they would send the data to the team for review; is that right?

A. Yeah. So the way this was -- the way it was supposed to work was, the attorney who was responsible for a certain topic like admiralty law or a certain subtopic under admiralty law would have cases in that portal that they could use to generate the memos.

Q. Well, wouldn't the -- wouldn't the team -- wouldn't the activity automation engine automatically generate the memos for their review?

A. No. Pulling the cases was only one piece of it. Then, reading the cases and pulling the language that answers the question. Or, actually, first of all, coming up

TR-0039721

A2121

181

with a question, then answering the question and then categorizing the answer, all that was done manually. The tool wasn't that smart.

Q.   So this says once they review, they can send this information to Ross portal with minimal human effort. Do you see that?

A.   Right.  But again, this is an unexecuted statement of work that looks like it was drafted by Code Matrix.  So I don't know.

Q.   Is that not correct, then?

A.   No.  The idea was to increase efficiency, but when an outline was involved in creating these memos, it takes human decision making on what particular sentences in the case best answer the question.  And going one step beyond to actually determining whether or not that answer is great, or good, or topical.  And then, you always need to find an irrelevant quote as well.  So all that takes judgment by the attorney doing the work. That part could not be automated.

Q.   But the part that was automated according to your testimony, I believe, is the tool pull down West Law data --

A.   Yes.

Q.   -- into a tool?

A.   Yes.

TR-0039722

A2122

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 186 of 431 PageID #: 153011

182

Q.   That didn't require human interaction?

A.   That's correct.

Q.   You touched on this before, but the LegalEase ultimately owned the copyright on the application and service that was developed by Code Matrix; is that right?

A.   Yes.

Q.   And does LegalEase have a copy of the application, and the code base?

A.   We -- we had a copy of the code to which we provided to you, but the application is no longer alive.  It's no longer being hosted anywhere.

Q.   And the code that you provided to me, does that cover both search functionality one and search functionality two as described in this draft agreement that we've been looking at?

A.   We had asked -- we had asked for the code for the bill to be provided and that's where -- I didn't review the code myself, so I can't answer yes or no.  But the intent was to provide you with the code for the application.

Q.   Did you get that code from Code Matrix?

A.   Yes.

Q.   And, you paid in Indian currency for this project; is that right?

TR-0039723

A2123

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 187 of 431 PageID #: 153012

183

A. That's correct.

Q. And was the approximate payment to Code Matrix about 2500 dollars, U.S. dollars; understanding there's an exchange rate that's involved?

A. Again, these -- these numbers seem to reflect one -- the numbers that I saw on the executed copy. It was around 150 or 160 rupee, 160,000 in rupees, which would translate to about 25- to maybe 3,000 bucks, U.S. dollars.

Q. What -- who, just because I'm confused a little bit here. Who prepared the actual memo? Was it a human was it a tool?

A. Human being.

Q. Okay.

        HAFEEZ EXHIBIT 16

        Master Service Agreement Effective 8/10/17

        WAS MARKED BY THE REPORTER

        FOR IDENTIFICATION

BY MR. LASHWAY:

Q. So I'm handing you what's been marked as Exhibit 16. And you'll see on the bottom, what I would call scratch on a contract. Do you see that?

A. Yes.

Q. Is -- do you know if this is the executed version of the agreement?

TR-0039724

A2124

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 188 of 431 PageID #: 153013

184

A. I believe this is the executed agreement, yes.

Q. And is that Mr. Ansad's scratch at the bottom?

A. Or actually --

Q. Or is that Ms. Rajeev's?

A. I thought I had seen one. I do remember seeing this signature on each page. But I thought I had seen one with Ansad having signed it as well.

Q. Okay. And do you know if the scratch on the bottom of the page is Ms. Rajeev's? I'll just represent to you, it looks similar --

A. Yeah.

Q. -- based on page 11.

A. Yeah. I don't know her signature independently, but compared to what's signed on page 11 or page --

Q. Page 19.

A. Yeah, looks like it might be.

Q. Yeah. Now, the date on the back page is December 8th of 2017. Do you see that?

A. Yeah. Yeah.

Or actually, in India they write it the other way around.

Q. Or is that August 12, 2017?

A. It could be that it's August.

Q. That's actually what I was going to ask you.

A. Okay.

TR-0039725

A2125

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 189 of 431 PageID #: 153014

185

Q. So, do you believe this was signed in August of 2017?

A. That would make sense.  It would be signed at that time.

Q. Now, this is now with LegalEase Michigan, right?

A. That's correct.

Q. Do you know why, between the draft that we were looking at and the execution of this document, there was a change in who was signing it?

A. No, not at all.

Q. Okay.  And is this addressed for LegalEase Solutions India Private Limited at 47 College Road in -- is it Chennai?

A. Mm-hmm, Chennai.

Q. India?  Is that their address?

A. That's the corporate address.

Q. Okay.

A. But it's not where the office is.

Q. Where is the office?

A. Cochin.

Q. Okay.  Do you know the address there?

A. Not off the top of my head.

Q. Can you spell Cochin for us?

A. Yes, so it's C-O-C-H-I-N.

Q. And do you see that there is -- if you go down, it says ground floor AC prime rose near regional passport

TR-0039726

A2126

office.  Is that Cochin?

A.    That's how Cochin is spelled, yeah.

Q.    Okay.  Who made the decision to share LegalEase 8 with Code Matrix?

A.    I don't know, but I would imagine it was -- it probably would have been Gayathri.

Q.    Were you aware of that decision?

A.    I don't think I was.

Q.    Okay.  At what point in time did you become aware of it?

A.    Actually, the -- as far as the specifics about LegalEase 8 being assigned to Merin and then being assigned to Code Matrix, I only became aware of that yesterday as I was preparing for this deposition because I wanted to understand better, the story behind LegalEase 8.  So yeah, I just learned about it recently.

Q.    And LegalEase 8 was identified in our complaint, right?

A.    Yes.

Q.    If you go to page 13, this is a statement of work.  Do you see that?

A.    Yes.

Q.    And it says that it's pursuant to a master services agreement dated August 10th?

A.    Mm-hmm.

TR-0039727

A2127

Q. I assume that is relating back to page one which has the 10th of August date and a signature line?

A. Yes.

Q. Okay.

A. That's my understanding.

Q. If you turn to page -- or, to the next page, page two, I guess, which is Bates stamped 8939.

A. Mm-hmm.

Q. So it says phase one. And it says the first phase will start with a pilot using the Lexis Nexus platform. Do you see that?

A. Yes.

Q. Once successful and there are no untoward consequences, it will be replicated in West Law. Do you see that?

A. Yes.

Q. What would be an untoward LexisNexis consequence?

A. I don't know what that means? It could be the platform wasn't able to pull cases from LexisNexis or there was some kind of a -- if LexisNexis doesn't do that anymore, that would be some kind of untoward consequence. But I didn't write this contract so I'm not sure what's meant there actually.

Q. Did LegalEase ask LexisNexis to test the activity automation tool on its platform?

A. No, I don't think they were ever -- ever formally asked

TR-0039728

A2128

them, no.

Q.  How about informally?

A.  We did have some conversations with LexisNexis reps on -- they had some kind of a -- they had some kind of a database that was provided to tech providers if they wanted to do something kind of out of the ordinary that's not within the usual parameters of their LexisNexis research tool.  So there was some conversations with Lexis around that, but it didn't seem feasible, so we didn't pursue that angle any further.

Q.  Why was it then -- why was it to be tested in Lexis, but then replicated in West Law?

A.  I think that -- I think the idea was we wanted to be able to use both platforms for the automation tool.  But I think at this time, we may have already realized that West Law licenses were more competitive, so we wanted to go with West Law as opposed to Lexis.

Q.  Do you see the second paragraph of paragraph two on page 8939 which begins with service provider?

A.  Yeah, sorry.

Q.  And is the service provider under the statement of work, Code Matrix?

A.  Yes.

Q.  So it reads that Code Matrix shall ensure that the

TR-0039729

A2129

189

activity automation developed for the process is not in violation of the usage policies of the legal databases used in no untoward consequences arise as a result of the same.  Did I read that correctly?

A.   Yes.

Q.   And legal database is a defining term, right?

A.   Right.

Q.   And is it defined as the online legal research platform such as West Law and Lexis?

A.   Yes.

Q.   Why is it that LegalEase was requiring Code Matrix to ensure that the activity automation would not violate West Law's usage policies?

A.   Well, because it was a concern of ours.  Again, we had reached out to Code Matrix for a completely different thing which was uploading memos to the portal, Ross portal.  And Code Matrix pitched us this idea that we could develop a tool to help automate the process and make it more efficient.  But in the back of our minds, we always realized that we had to be careful that we were not doing anything to violate our terms and agreements with West Law or Lexis.

So as much as Ansad wanted to sell us this product, we were also cautious about it as well.  And didn't want something that he could produce that would

TR-0039730

A2130

get us in trouble.

Q.   Did anyone ask West Law about whether the activity automation would violate its usage policies?

A.   We did not seek that opinion from West Law, no.

Q.   Why not?

A.   We didn't really have a route to do that.  The only communication interface we had with West Law was customer service reps.  I guess we could have asked the customer service reps to escalate it, but we didn't.

Q.   If you go down to the next section, which is talking about the two types of searches, do you see that?

A.   Mm-hmm.

Q.   So this first search is based on legal question assigned, right?

A.   Mm-hmm, yes.

Q.   If you look at bullet four, doesn't that say that the activity automation engine will generate the document in the desired format, not the human being?

A.   I mean, it says after LegalEase team approves search results.  Which doesn't -- it doesn't detail what that actual process is, but like I said before, this is by no means an automated process.  The attorneys still have to isolate the appropriate sentences and then categorize them and provide an irrelevant code and the topical code.  So there's no way the tool would do all

TR-0039731

A2131

191

that in one go.

Q. But then, the generation of the memo or the answer file would be automated, right?

A. It would, yeah, based on the input from the attorney, it would spit out a document that was formatted per Ross's requirements.

Q. Okay. So if you go to the next page, page 16, this is talking about --

A. It's page 16 or 15?

Q. Yes, page 16. Thank you, sorry.

Now page two there, search based on topic assigned, that's focused on the Ross Bulk Project; is that correct?

A. That's correct.

Q. All right. Can you read those six bullets there?

A. Sure. The activity automation -- sorry.

Q. Oh, you don't have to read them out loud. You can read them to yourself.

A. I thought you wanted me to read them out loud. Okay.

Q. All right. So, did you read that?

A. I did.

Q. Okay. So in the heading for -- or the introduction of paragraph two, it says search based on topic assigned. Do you see that? And topic assigned is a defined term?

A. Yes.

TR-0039732

A2132

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 196 of 431 PageID #: 153021

192

Q. All right. So can you go back to the definitions at the beginning of statement of work? And can you actually read this one out loud?

A. Sure.

Q. 1.6, the definition of topic assigned.

A. Topic assigned means a main topic of West's key number system which is assigned by LegalEase.

Q. Okay. So if you go through those six bullets you just read, and starting with number one, the activity automation engine pulled all of the case law from West Law available under the topic assigned; is that right?

A. Yeah. According to this, yes, that's right.

Q. And then, the case law -- I'm sorry, the results will include case law from the subtopics under the main topic assigned; is that right?

A. Yes.

Q. So then, the third bullet talks about the LegalEase team approving of the search results.

A. Right. Again, I think that's the same language where it's using approval as a very broad definition, you know. But like I mentioned before, there was absolutely human manual work involved at this point. There was no such thing as just saying ooh, the automation engine got everything right and let's submit it. This was a process.

TR-0039733

A2133

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 197 of 431 PageID #: 153022

193

Q. Do you know how many cases are -- fall under any key number?

A. I think when you're -- do I know? No, I don't know. But I think on West Law, when you click on key numbers, you do get a drop down that shows how many cases there are.

Q. Associated with that key number?

A. Right.

Q. And, is it your testimony that the LegalEase team, human beings, would approve of the search results or the case law that was assigned to the key number topic?

A. No. There was no such thing as approval of the results that the engine pulled. The LegalEase team was simply using those cases and starting point to drop the memos.

Q. But this says that the activity automation engine will send this information to document generation engine and the document will be created based on the desired format. Do you see that?

A. Right. But that's after the team has done their manual work. Like I mentioned, once -- once the codes were pulled out and characterized and the topical, relevant and irrelevant quote were identified, then that would be submitted, and the tool would generate a Word document in the format that Ross wanted.

Q. So is -- you had testified earlier that it would be

TR-0039734

A2134

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 198 of 431 PageID #: 153023

194

helpful to see a flow chart that was in the signed agreement?

A.   Yes.

Q.   Is this the flow chart that you wanted to see?

A.   Yeah.  Yes.

Q.   Where does it say that a human being prepares the memo?

A.   So I wasn't testifying to that particular -- I said the flow chart would be helpful to look at the process.

But again, I go back to what I've said over and over again here which is the team approves being broadly -- this is a broad statement.  There was a lot that went under LegalEase's team approval.  And it's been sort of characterized the same way throughout this document and also in the flow chart.

But again, my testimony is very clear that in no way, shape or form, did LegalEase just take what the tool developed and generate a memo out of it.  It required actual human, legal judgment on every single memo.

Q.   All right.  So I appreciate that, and you've testified to that.  But my question was a little different, which was, where in this process does it speak to a human being preparing the memo?

A.   So my con -- my response would be when the process talks about LegalEase team approves the search results,

TR-0039735

A2135

it's actually talking about all those steps I outlined.

Q. And then, it doesn't say a human would send the information to the document generation engine, it says the activity automation would, right?

A. Right. Once the document was created and approved by an attorney, they would hit a button like submit and the engine would then spit out a memo and a Word document.

Q. Is this -- do you know if this is the contract that governed the relationship with Code Matrix, the one we were just looking at?

A. I recall seeing one that was signed by Ansad as well. I can't be a hundred percent sure, but this looks very similar to one I looked at as well, in preparation for the deposition.

Q. And this is the one signed by LegalEase India, right?

A. Yeah.

Q. Did Ross pay LegalEase Michigan?

A. Yes.

Q. And who paid Code Matrix?

A. I don't know if that was paid through LegalEase Michigan or LegalEase India. But it probably was paid by LegalEase Michigan.

Q. Did Code Matrix provide monthly and weekly reports as to the progress of performing their services?

TR-0039736

A2136

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 200 of 431 PageID #: 153025

196

A.   Code Matrix was -- was providing some sort of updates by e-mail or otherwise.  I would imagine that they were being provided, yes.

Q.   Were they -- were they shared with you?

A.   I may have been on -- I may have been on the e-mails, but I don't -- I don't recall any specific e-mail or document, but it would make sense that we would be getting some kind of report from them.

Q.   Okay.  Can you go back to page 13 of Exhibit 15? Sixteen, I'm sorry.  Exhibit 16.  This is the statement of work with Code Matrix.

A.   Okay.

Q.   Do you see in the definition of activity -- activity automation engine, it speaks to a software program?

A.   Yes.

Q.   That will strictly adhere to the activities performed by humans and mimic human patterns.  Do you see that?

A.   Yes.

Q.   And it goes on to say including the time taken to upload or download data, it will not allow for any upscale or rapid copying or usage of data from any third-party databases or sites?

A.   Yes.

Q.   Who drafted that?

A.   I believe the statement of work was drafted by Gayathri

TR-0039737

A2137

Rajeev.

Q.  That's a LegalEase India --

A.  Yes.

Q.  -- person?

And why was it important for the activities to mimic human patterns?

A.  I think that the essence of automation, the way we understood it was doing what a human being could do, just doing it more efficiently.  So it wasn't -- it wasn't going outside of the scope, how the information was supposed to be used or retrieved.  It was just doing it in a more efficient manner.

And I believe that definition was something that Ansad had, I guess, educated us on.  Automation is separate from other terms you might hear out there like a bot or scraping.  This is something that was done purely to make human effort more efficient.

Q.  Okay.  So my question was a little bit different.  My question was, why was it important for the activity, the automated activity, to mimic human patterns?  And it goes on right to say including the time taken to upload or download data.

A.  I don't know, but it could be that they wanted to make sure that it wasn't raising any flags.

Q.  Raising flags at West Law?

TR-0039738

A2138

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 202 of 431 PageID #: 153027

198

A. Right.

Q. Raising flags as to whether or not an automated program was being used to access West Law?

A. Could be, yeah.

Q. And, or raising any flags as to whether an automated program was downloading data from West Law?

A. Yes. That could be part of that concern expressed here.

Q. Do you know if it was?

A. I don't know because I didn't draft this.

Q. And you didn't sign it, right?

A. I didn't sign it.

Q. Did you authorize the signing of this?

A. No. This particular document, I didn't author or review this as far as I can remember.

Q. Did LegalEase Michigan authorize the use of the Code Matrix automated tools that are described in definition 1.1?

A. Yes, by using it. I mean, we did use it, so.

Q. Used it in connection with West Law licenses granted to LegalEase Michigan, right?

A. Yes. Yes.

Q. And so, for those purposes, was that one of the reasons why we -- Code Matrix and LegalEase wanted to mimic human patterns with respect to -- yeah, I'm going to

TR-0039739

A2139

start again.

Was the use of LegalEase 8 by Code Matrix one of the reasons why LegalEase and Code Matrix wanted the automated engine to mimic human patterns?

A.   Like I testified before, I don't know for sure because I didn't draft this, but that would seem to be a good conjecture as to why that was there.

Q.   You -- you were assigned LegalEase 8, correct?

A.   Sorry.  I was assigned LegalEase 8?

Q.   LegalEase Michigan was assigned a license called LegalEase 8; is that right?

A.   I thought it was -- I -- what I was told by Gayathri was LegalEase 8 was assigned to Merin, that Merin was using and that was also used by Code Matrix.

Q.   Let me rephrase this.  So LegalEase Michigan had a license to use West Law that it called LegalEase 8, correct?

A.   Amongst other licenses?  I mean, you're focusing on LegalEase 8.  We had multiple licenses.

So you're saying did we have LegalEase 8 along with other licenses?  Yes.

Q.   One of them was LegalEase 8?

A.   One of them was LegalEase 8, yes.

Q.   Yeah.

A.   You made it sound like we were specifically assigning

TR-0039740

A2140

200

LegalEase 8 to LegalEase Michigan, which was not the case.

Q. And LegalEase 8 was assigned by West Law to Merin Sony; is that correct?

A. That's -- that's what I was told, yes.

Q. And Merin Sony provided the credentials to use the license to West Law called LegalEase 8 to Code Matrix?

A. It was either Merin or somebody provided that from our team in India too. I don't know if it was actually Merin.

Q. And the activity automation that's defined in this statement of work used LegalEase 8; is that correct?

A. Yes.

Q. What does it mean, if you go to page 17 of the statement of work, that at the top of page 17 in that first box on the flow chart, do you see that?

A. On page 17, the first box?

Q. Yeah, the first box?

A. Okay.

Q. What does it mean when it says the managing associate to assign them to individual associates?

A. So again, we had multiple group of people working on the projects. So I read that as different associates were being assigned to different topics.

Q. Based on the search engine pulling out the cases under

TR-0039741

A2141

the assigned topic, right?  Which would be step two on the flow chart?

A. Yeah.  From this flow chart, it seems like once the case is related to a topic or subtopic were pulled, then they would he be assigned to an associate by the managing associate.

Q. And then, the next is, this box four is this box that introduces the word approved that we've talked about?

A. That's right.

Q. Okay.  That would be the step that would follow step three in the actual process used at LegalEase?

A. Yes.

Q. The automated tool -- I'm sorry.  The activity automation engine was then used to upload the resulting memo or answer file into the Ross portal; is that right?

A. Right.

Q. How would you access the Ross portal?

A. I don't know.  I don't know if it was through the e-mail address that was provided earlier by Ross, or there was some way, we may have an FTP upload.  I believe it was an FTP upload site.  So instead of having someone manually uploading memos to the FTP site, this tool was able to just upload them directly from the platform.

TR-0039742

A2142

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 206 of 431 PageID #: 153031

202

Q.   And do you know if that would happen simultaneous with a completion of the memo or is this something that would run overnight?

A.   I think it was -- I think it was not simultaneous.  You know, it was memos completed and then there was a process to upload them on to the Ross portal at the end of each day.

Q.   At the end of each day?

A.   Yeah.

Q.   Were you involved in preparing a document that became known as the Best Practices Guide for Ross Intelligence?

A.   Not -- not really.  That was not something that I -- I may have reviewed it at some point, but I was not involved in drafting it, no.

Q.   Are you aware of whether or not the contract that you had with West strictly prohibited the sharing of passwords?

A.   I am aware that the contract had terminology or language prohibiting the sharing of passwords, yes.

Q.   Just wanting to understand your answer.  So you focused on the terminology in the contract.  Do you know if West strictly prohibiting the sharing of passwords?

A.   Yes.  Based on my reading of the contract, I understand that West prohibits the sharing of passwords.

TR-0039743

A2143

203

Q.   And is it your position in this case that you were granted permission to share passwords?

A.   So I think there is an ambiguity on what's meant by sharing the passwords because this is something that came out, even in the termination letter from West. We've always -- we've taken the position and we feel that it's the right position, that there is nothing prohibiting us from assigning licenses to our team whether it was comprised of employees, independent contractors or subcontractors as long as they were working for us, on a project, we had the right to assign -- we have the right to get licenses on their behalf.

So if that's what you call sharing passwords, we do have a difference of opinion on that issue. If you're talking about passwords being shared as in Tariq Hafeez has LegalEase 12, and then I give it to Tariq Akbar to use because we don't have enough passwords, enough licenses, that type of sharing, password sharing, I understand is not allowed.

Does that make sense? I mean, there -- I'm not being evasive here. Like, I really feel like that term password sharing was conflated to mean two different things. The former, I feel we are entitled to. The latter, I agree we're not entitled to based on

TR-0039744

A2144

204

the terms and conditions.

Q. What about LegalEase 8 being assigned to Merin Sony but being used by Code Matrix? Would that be permitted in your view, or would that be prohibited?

A. So, I mean, without getting into what LegalEase 8 did in terms of how -- you know, the data it was getting from West Law or any of that, just a simple act of saying Merin's password -- Merin's user name or password can be used by a different user. That was something that we were allowed to do. And we, in fact, went to our customer and said hey, I need to assign the customer license to somebody else for whatever reason, somebody left the team and we have a new team member or this team member is no longer working on the project.

So the ability to transfer licenses between people, if we had 20 licenses and 20 people, we could transfer them as required. So that simple act of transferring a license from one to the other, I don't believe was violating the contract.

Q. But the licenses were assigned to credentials, right; which were assigned to LegalEase user names?

A. Right.

Q. So why not just go back to West Law and say we need to reassign this --

A. Right.

TR-0039745

A2145

Q. -- license to this user name?

A. I don't -- I don't know why that wasn't done, to be honest. Because we had done that in other cases where we had requested of Cameron or Fraz to reassign licenses to other people on the team. I don't know why we didn't do the same with Merin.

Q. Do you ever -- do you remember being notified by West at some point in time that there was simultaneous usage on an account?

A. I remember the issue being raised at some point, yes.

          HAFEEZ EXHIBIT 17

          8/18/17 E-mail Subject: WL Registration Keys

          WAS MARKED BY THE REPORTER

          FOR IDENTIFICATION

BY MR. LASHWAY:

Q. I'm handing you what's been marked as Exhibit 17, Mr. Hafeez. Have you seen this e-mail before?

A. I don't think I've seen this exact e-mail because I wasn't included on it. And I didn't review it when I -- but yeah, I haven't seen it.

Q. And --

A. I have not seen it, but I do see it now, I guess.

Q. And you didn't review it --

A. No.

Q. -- in preparation for today?

TR-0039746

A2146

A.   No.

Q.   Do you see at the top where Mr. Tario from Thomson Reuters writes to Ms. Merin?  I'm sorry, Ms. Sony that he received a notification about simultaneous usage on the account?

A.   Yes.

Q.   And then, he instructs her, please make sure only each assigned user receives their assigned registration key?

A.   Yes.

Q.   And he reminds her that password sharing is not allowed under the terms of your contract, right?

A.   Yes.

Q.   Did Ms. Sony alert anyone, or you?  Let me rephrase this.

          Did Ms. Sony alert you as to this concern raised by Mr. Tario?

A.   I don't think she raised it directly to me, but I do recall Gayathri, at some point raising the concern that password sharing was something that we needed to be careful about, ongoing.

Q.   Do you know why Ms. Sony, after receiving this notification allowed the West Law license assigned to her to be used by Code Matrix?

A.   I don't know why.

TR-0039747

A2147

207

HAFEEZ EXHIBIT 18

9/5/17 E-mail Subject: Ross Portal

WAS MARKED BY THE REPORTER

FOR IDENTIFICATION

BY MR. LASHWAY:

Q.  Handing you what's been marked as Exhibit 18, Mr. Hafeez. And this is the top e-mail from Teri Whitehead to Mr. Ansad dated September 5, 2017. Do you see that?

A.  Yes.

Q.  Do you recall this e-mail exchange?

A.  Yes, I've reviewed this e-mail before.

Q.  Did you review it in preparation for today?

A.  Yes.

Q.  Do you see in the second e-mail down, dated [sic] at 5:36 p.m., that Mr. Ansad writes, I don't think they will be able to track our usage as I'm not creating a boat software?

A.  Yes. We had a laugh about that yesterday, too.

Q.  Did he mean bot software?

A.  He meant a bot software, I think.

Q.  And when he says I don't think they will be able to track our usage, is he referring to West Law?

A.  Actually, I think he means -- I think he's referring to Ross because the e-mail before, Teri was very concerned that Ross would find out that we're using an automation

TR-0039748

A2148

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 212 of 431 PageID #: 153037

208

tool.  Not that we weren't allowed to but Tony just -- Teri just did not want Ross to know we were using an automation tool to get the work done faster.

Q. Do you know why?

A. She never gave us any real reason.  I mean, the next -- the second sentence of that e-mail, she says Ross is temperamental, nervous and constantly thinking someone will steal their business.  That alone is a reason for them to run.

I mean we -- we wanted to keep this client on long term.  We were hoping to get, you know, additional launches of the project.  We don't want to do anything that might rock the boat.

I think Teri wanted us to know if Ross thought we were using an automation tool, they might not be happy about that or would be concerned about that.

Q. And do you know if Ross was concerned about them stealing the business of West?

A. Not -- no.  I have no reason to indicate that that was a concern of theirs at all.

Q. If the bulk project was loading data on a nightly basis through an FTP, why would we be concerned about Ross tracking IP addresses?

A. Could you repeat the question?

TR-0039749

A2149

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 213 of 431 PageID #: 153038

209

Q. Yes. So I think you testified earlier that you thought the results of the bulk project were being loaded nightly through an FTP?

A. Mm-hmm.

Q. Is that right?

A. Right.

Q. Why is it that LegalEase is concerned that Ross is tracking user IP addresses?

A. I don't -- I don't know how the two are related together. I mean, again, we were not concerned about Ross as far as uploading memos to their -- to their portal. That's what we were being paid to do, is to create work product and deliver to them.

My read of this e-mail was, perhaps Teri was concerned that Ross would somehow pick up on the fact that we were using some kind of automation engine for which she didn't want them to know about because it wasn't relevant to them and she -- that's how I read this e-mail. Had nothing to do with the fact that we were FTP completing the work product to Ross.

Q. But how would Ross know or be concerned about user IP addresses in connection with your reading of the e-mail?

A. I really don't know, but to be honest, Teri doesn't know anything about IP addresses. So I don't know what

TR-0039750

A2150

Case 1:20-cv-00613-SB    Document 695-2    Filed 10/08/24    Page 214 of 431 PageID #: 153039

210

she meant by this.

But my read, and knowing Teri, she was concerned that Ross would know that we're using an automation tool. She didn't want them to know.

Q. Who is Keerthi as referenced in the first sentence of her e-mail address?

A. Keerthi was our -- she was the HR head in India. She was the one originally had been tasked with hiring people to upload the finished memos on to the Ross portal. And she was the one who knew Muhammad Ansad at Code Matrix and said let me get him in and see if we can help us with this.

Q. Do you know what problem Ms. Whitehead is referring to when she said Keerthi has not had a problem in the past night?

A. I don't, but she was involved in making sure the finished memos are uploaded to the Ross portal. So probably referring to that.

Q. Keerthi was doing that work?

A. She was overseeing that work.

Q. Was one of the concerns that Ross would be aware that you were using individuals not affiliated with LegalEase Michigan, in performing their work?

A. Oh, that could be true. That could be it. We didn't want Ross to know that we were subcontracting the work

TR-0039751

A2151

out.

Q. Why is that?

A. Well, if they knew that we didn't have the manpower ourselves to do it and if we were subcontracting it out, they may have gone directly to one of those companies, so we want to keep the business.

Q. So is it possible that that's what Ms. Whitehead is referring to --

A. Yeah.

Q. -- when she's concerned about --

A. It's possible.

Q. -- Ross tracking user IP addresses and seeing India IP addresses pop you?

A. Yeah, that could be it, too.

Q. Where is Keerthi's IP address?

A. She's based out of our Cochin -- she was based out of our Cochin office.

Q. And who is it -- it's not available here. Do you know who is it that should be -- or can -- I'm sorry.

Ms. Whitehead writes, if you could shadow Keerthi's IP address, that would be on. Do you know who she wants shadowing Keerthi's IP address? Do you understand my question?

A. I think you're asking me who does Teri want to shadow Keerthi's IP address.

Q.   Yeah.

A.   And it looks like from the e-mail exchange she's having a conversation with Ansad.

Q.   So she wants Code Matrix shadowing Keerthi's IP address for purposes of uploading to the Ross portal?

A.   That's what it -- I mean, that could be it, yes.

Q.   Do you know if that's it?

A.   I don't know for sure.

Q.   Is there any other reading that you can think of, to that statement?

A.   I mean, I really don't know.  I mean, I don't even know if this e-mail is to Ansad, but it seems like it is from the chain.  But it sounds like here, Teri is telling Ansad to shadow Keerthi's IP address so that Ross doesn't get nervous about something.

Q.   Yeah, if you look on the back, there's another e-mail from Ansad to Teri talking about deploying tomorrow. Does that give you any additional context as to that statement?

A.   Again, nothing more than Teri is nervous about Ross, and -- no.  I really don't know what you're getting at to be honest.  Like I said, we were nervous about Ross. And we wanted to keep the client.  This had, to my knowledge, nothing to do with the work product.  It just has something to do with Ross finding out that,

TR-0039753

A2153

maybe Ansad was in the picture. Maybe they didn't want -- maybe she didn't want Ross to know Ansad was working with us and they wanted Keerthi to be the person who is always uploading memos. I don't know.

Q. Was Ross aware of LegalEase India?

A. Ross was aware that we have people working outside of the U.S. on the project.

Q. Were they aware of LegalEase India?

A. I don't know.

Q. Do you know if they --

A. I mean, they were aware of the fact that we have an India office and people in India, but I don't know if they knew LegalEase India was called LegalEase India Private because we didn't have any contract between the two. But they were aware of the India outfit, yes.

Q. Okay. Do you know how many consultants you ended up retaining through -- is it -- I'm going to get it wrong again, Vakil Search?

A. I don't know the number. I don't know the number.

Q. Was it more than two?

A. Yes.

HAFEEZ EXHIBIT 19

9/15/17 E-mail Subject: Ross Bulk Project -LPO

WAS MARKED BY THE REPORTER

FOR IDENTIFICATION

TR-0039754

A2154

214

BY MR. LASHWAY:

Q.   I'm going to hand to you, a document that's been marked as Exhibit 19, Mr. Hafeez.  I'm going to start with the same question.

     Do you recall seeing this e-mail before?

A.   I think I've seen this e-mail or a copy of something similar to this e-mail.

Q.   And I'll reference to you that there's a number of attachments to it, that I've excluded for purposes of this deposition to save down on some paper.

A.   Okay.

Q.   I'll ask you about some credentials.  So do you know if Vakil Search used these two LegalEase 32 and LegalEase 33 West Law credentials to access West Law.

A.   My understanding what can I -- sorry.  What I remember is that yes, when we were first on boarding Vakil, this e-mail was sent to the two account managers, Kavya and I can't pronounce the other name, but the two account managers.  And this was for -- this was us sort of getting them acquainted with the project.

     When they came on to the project, they actually had their own West Law accounts that they had -- that they had separately contracted for.  So they may have used these two accounts just to play around with the project, but they didn't use it long term.

TR-0039755

A2155

Q. They had their own West Law licenses to use?

A. I agree -- I believe so, yeah.

Q. And did they use them for the Ross projects?

A. Yes.

Q. And was Vakil Search involved in the Ross Original?

A. No, they were just provided for the Ross Bulk.

Q. Okay. And I think I asked you this, but you don't -- do you recall how many contractors came in to assist --

A. From Vakil?

Q. -- on the Ross project from Vakil?

A. I don't.

Q. All right. So Teri, Ms. Whitehead, writes that Vakil can only use these credentials on Saturday and Sunday. And if on weekends they have to do so before 9:00 a.m. IST and after 6:00 p.m. IST. Do you see that?

A. Yes.

Q. What is IST?

A. India Standard Time.

Q. And, is that because these credentials were used -- being used by other people during the other periods of time?

A. That's what it seems, yeah. That seems to be the case.

Q. Would that be password sharing that was restricted under the contract?

A. Yes.

TR-0039756

A2156

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 220 of 431 PageID #: 153045

216

HAFEEZ EXHIBIT 20

9/15/17 E-mail Subject: Ross Bulk Project - LPO

WAS MARKED BY THE REPORTER

FOR IDENTIFICATION

BY MR. LASHWAY:

Q.   I'm handing you what's been marked as Hafeez 20.  Have you seen this e-mail exchange before?

A.   Yes.

Q.   Did you review this e-mail in connection with today's deposition?

A.   Not in connection with today's deposition but I've seen this before.

Q.   And who is Clutch Group?

A.   Clutch Group is another entity that we subcontracted the memo drafting to.

Q.   Where is Clutch Group based?

A.   Well, they are based, primarily, out of India.  I don't recall if the contracting entity was in the U.S. or India, but the people that were staffed through the Clutch Group were all in India.

Q.   Did you contract with them through the United States, do you remember?

A.   We had an SOW with them.  I don't know if it was through LegalEase India or LegalEase Michigan, but they were definitely a core component of ours through labor

TR-0039757

A2157

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 221 of 431 PageID #: 153046

217

on this project.

Q. Okay. Do you remember how many contractors Clutch Group offered you in connection with the Ross project?

A. I think we had upwards of 30 or plus people from Clutch Group on the project.

Q. Is that total or is that at any given time?

A. At any given time, I'd say.

Q. And did Clutch Group have its own West Law licenses?

A. No.

Q. So they were only using your West Law license?

A. Right.

Q. So in this, similar to the last e-mail, I'll have you kind of look half way down, half way down the page.

A. Mm-hmm.

Q. So Ms. Whitehead writes similarly that they can use the following two credentials to West Law on Saturday and Sunday, and if on weekdays, please let --

A. Mm-hmm, yes.

Q. -- LegalEase know before 9:00 and 6:00. And that's LegalEase 8. Do you see that?

A. Yes.

Q. And that's also the license that was being used by Code Matrix, correct?

A. Correct.

Q. Who is Munsula?

TR-0039758

A2158

A.   She is another one of our U.S. employees.

Q.   Is she employed through LegalEase Michigan?

A.   Yes.

Q.   Is she a W-2 employee?

A.   Yes.

Q.   Is she still employed?

A.   No.  In fact, I may have missed mentioning her when we were talking about employees beforehand, but she was an administrative assistant at LegalEase.

Q.   Was she a lawyer?

A.   She is not a lawyer.

Q.   But yet, she was assigned a West Law license at some point?

A.   Yes.

Q.   And did she ever do any research on -- using West Law?

A.   I don't think she did research, no.

Q.   And, is the reason why Clutch Group could use these two West Law licenses during these restricted periods of time because they -- because the West Law licenses were being used by others during those periods of time?

A.   Yes.

Q.   And is this an example of password sharing that you believe would violate the terms of the contract?

A.   Yes.

Q.   Did anyone from West ever authorize either this

TR-0039759

A2159

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 223 of 431 PageID #: 153048

219

password sharing or the prior version that we looked at in Exhibit 19?

A. No.

Q. Was this same activity in terms of sharing passwords being used with Lexis?

A. I don't know.

Q. There's a reference in an e-mail from around the same time, the same day to an LPO, with capitals. Do you know what LPO stands for?

A. Yes.

Q. What is that?

A. Legal -- legal process outsourcing. Sorry. I'm feeling kind of faint over here.

Q. No, that's okay. Do you want to take a break?

A. Maybe -- maybe I can get after this question if you don't mind.

Q. Yeah. So LPO stands for, legal processing --

A. Processing outsourcing.

Q. Outsourcing. Okay.

And does that describe Clutch Group?

A. Yes.

Q. Does it describe Vakil Search?

A. Yes.

Q. Does it describe -- let me get their name, Morae Global Corporation?

TR-0039760

A2160

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 224 of 431 PageID #: 153049

220

A.   Yes.  So Clutch Group was actually -- Morae Global owns the Clutch Group.

Q.   Got it.

A.   So the agreement with Morae may have included the Clutch Group.

Q.   Okay.  And so, Morae Global was a Delaware corporation, and that agreement was signed with LegalEase Michigan?

A.   That's -- yeah, that's correct.

Q.   Yeah.  Okay.

Are there any other legal process outsourcers?

A.   That we used on this project?

Q.   Yeah.

A.   So we have the Clutch Group.

No.  As far as I can recall it, those are the main -- those are the only ones.

Q.   So, at any given time, do you recall specifically or generally, how many contractors were working on the Ross project that had access to West Law?

A.   So at any given time, we had upwards of -- let me put it this way.  During the bulk project, for those three months, we probably had at least 70 plus people working on Ross at any given time.  And sometimes, it would fluctuate up and down, but 70 -- 60 to 70 is probably the right number of people who were working on the

TR-0039761

A2161

221

project.

Q. And do you know what the high water mark was?

A. I don't.

Q. Do you remember at one point in time in mid-September, having a conversation with Tariq Akbar about where Ross's payment should be directed?

A. It's ringing a bell, but I'd have to see the e-mail about that.

Q. Actually, do you want to take a break because you said that you were feeling --

A. Yeah, can I take a two-minute break?

Q. That's great.  We can take a break while I find this document.

THE VIDEOGRAPHER:  We're going off the record.  The time is 3:13 p.m.

(Off the record at about 3:13 p.m.)

HAFEEZ EXHIBIT 21

9/18/17 E-mail Subject: LegalEase Bulk Memo Project Request

WAS MARKED BY THE REPORTER

FOR IDENTIFICATION

(On the record at about 3:28 p.m.)

THE VIDEOGRAPHER:  We are back on the record. The time is 3:28 p.m.

MR. LASHWAY:  Did you get the document I left

TR-0039762

A2162

on your keyboard?

MR. DAKHLALLAH:  This one?

MR. LASHWAY:  Yeah.

BY MR. LASHWAY:

Q.  So this is an e-mail -- I'm sorry, Exhibit 21 Mr. Hafeez.  It's an e-mail between you and -- an e-mail exchange between you and Mr. Akbar; is that right? September 18th of 2017?

A.  Mm-hmm, yes.

Q.  So I was asking you right before break, if you recalled having a conversation about where Ross was going to direct payment.  And, does this e-mail refresh your memory as to where Ross was to direct payment with respect to the bulk project?

A.  Is there something on the other side, too, or no?

Q.  I'm sorry?

A.  Is there something on the other side as well?

Q.  Well, yeah, it's a two-page e-mail.  There's -- well, let's just start at the bottom.  You write to a Tomas van der Heijden.  Do you see that, with a copy to Mr. Akbar?

A.  Mm-hmm.

Q.  And you directed Ross to make payments in connection with the Ross Bulk, to a Chase account?

A.  Mm-hmm, yes.

TR-0039763

A2163

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 227 of 431 PageID #: 153052

223

Q. Okay. Now, is that a different account than what was used for the Ross Original Project?

A. No.

Q. It was the same account?

A. Oh, let me check.

Q. Yeah, the second paragraph of that e-mail is what I want you to focus on.

A. Okay. Yeah.

So we have two accounts at Chase. And we were asking to get paid to the account that was different than the account that was taking the payments for Ross Original.

Q. Was there any reason for that?

A. The only thing I can recall is -- I think Tariq Akbar had some sensitivity to Neha, who was working on our finance team knowing how large the payment was for this particular piece. Neha, N-E-H-A.

But it really didn't matter because everything was accounted for. So I'm not sure, but I remember having this exchange with Tariq Akbar. So it had something to do with not having our -- some of our staff know the amount of payment for this project.

Q. Sorry for that interruption. Do you want to finish your answer?

A. Yeah, just to elaborate. We had two business accounts

TR-0039764

A2164

224

for LegalEase, with Chase.  There was some sensitivity to Neha, who was one of our finance associates, knowing the numbers coming in.  But as you can see from my e-mail to Tariq Akbar, I said she's going to see the Quick Books entries anyhow, so really, what's the point?

Q.  Okay.

A.  But, yeah.

Q.  So that's -- that's what this e-mail exchange is about?

A.  Yes.  Nothing more.

Q.  Are these Chase accounts here in the U.S.?

A.  Yes.

Q.  Are those your operating accounts for LegalEase Michigan?

A.  Yes.  And I think in this past summer, we had some fraudulent activity on one of the accounts, so we shut one account down and now we only have one account.

Q.  And do you know if it's this account that you shut down?

A.  I don't know.

Q.  Did someone gain access to the account without authorization?

A.  Yeah.  We had some charges on our debit cards and bank cards that weren't adding up.

Q.  Do you know if you signed an agreement with Clutch

TR-0039765

A2165

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 229 of 431 PageID #: 153054

225

Group, or the Morae Global Communications?

A.   I would imagine we had.  I don't know.  It would probably have been me, but it could have been somebody else, probably Tariq Akbar or Teri.

Q.   Okay.  But do you recall signing an agreement with them?

A.   I don't personally recall, no.

HAFEEZ EXHIBIT 22

9/19/17 E-mail Subject: Ross Bulk Project-LPO

WAS MARKED BY THE REPORTER

FOR IDENTIFICATION

BY MR. LASHWAY:

Q.   I'm handing you what's been marked as Exhibit 22.  Have you seen this e-mail exchange before?

A.   Yes, I've seen this before.

Q.   At the top on page 2, which we've put a stamp on, 7297 in that top e-mail from September 19th of 2017.  Do you see that there's a reference to an NDA?

A.   Yes.

Q.   A non-disclosure agreement.  Do you know if that's a separate agreement that LegalEase had with Ross?

A.   I believe this NDA is in reference to -- we had an NDA with Morae.  So I believe the NDA is referring to the Morae NDA.

Q.   Okay.  And was that a separate agreement with Morae?

TR-0039766

A2166

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 230 of 431 PageID #: 153055

226

A.  Yes.

Q.  And do you know why Mr. Akbar was concerned that LegalEase doesn't use the Ross name more than required with the LPOs?

A.  Yeah, the same reason I mentioned before. We didn't want our subcontractor to go out there and try to get business for themselves with Ross. We also felt that we had a confidentiality agreement with Ross and that we didn't want to expose information about them to our clients, to our -- to our subs.

Q.  This is -- the way you wrote this is, it was a concern that related to using of the Ross name as opposed to the scope of the project or anything like that. So was there a concern related to using the Ross name in connection with the LPOs, in particular?

A.  Again, like I said, we don't want -- we don't want Clutch Group to go directly to Ross.

Q.  Did Clutch Group know about Ross at this point in time?

A.  I don't think so.

Q.  Do you know if Ross is referenced in the Morae slash Clutch Group statement of work?

A.  I don't think it is, but don't know for sure.

Q.  And I'm sorry, I just asked you this, but I'll ask again. Did you ultimately sign an agreement with Morae slash Clutch Group, to perform services in connection

TR-0039767

A2167

227

with the Ross Bulk Project?

A. Yes. Well, I don't know if it was me, personally, but someone did from LegalEase.

Q. And have you seen that document recently?

A. No.

Q. Did you look for it in connection with the requests for documents?

A. I don't recall looking for it. I don't know if it's in there or not.

Q. Would you be surprised if I represented to you that there was at least a draft of a statement of work produced by LegalEase in this matter with Morae Global that was called statement of work two for Ross Intelligence Bulk Memos?

A. I thought we had kept Ross' name out from the SOWs, but it sounds like we kept it in.

Q. So, and I can show you the document, but I'm just trying to speed this along.

A. Mm-hmm, sure.

Q. But if my representation is correct in terms of that draft document, does that change your memory at all, with respect to Mr. Akbar's concern about using the Ross name, that is set forth in that September 19th e-mail?

A. I mean, again, I think TA -- we refer to him as TA,

TR-0039768

A2168

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 232 of 431 PageID #: 153057

228

Tariq Akbar did not want us to use the name Ross more than we needed to. That's really all I can think of right now.

Q. All right. And then, the next e-mail, later that same day, there was a comment from Ms. Whitehead in response to your e-mail saying that some of the documents have Ross all over them. Do you see that?

A. On the e-mail?

Q. I'm sorry, so this is the e-mail on page 1 of Exhibit 22. The bottom e-mail, she wrote, also need to assign revisions to BPG and other documents sent, period, which have Ross all over them, period. Do you see that?

A. Mm-hmm, yes.

Q. What's BPG?

A. I believe that's the Best Practices Guide.

Q. And, is that a guide that references Ross and Ross Intelligence in the project?

A. It's a guide that provides instructions on how the project is to be done. And, I don't recall if Ross is specifically mentioned in there or not. I think, perhaps it was initially and then we took it out later, subsequently.

But the basic idea was, we didn't want more people than needed to know, that Ross was our client.

TR-0039769

A2169

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 233 of 431 PageID #: 153058

229

We did a bad job of that, but that was the basic extent of it.

Q. Was one of the concerns that you didn't want Ross to know that you had these third parties working on the Ross Bulk Project?

A. I don't know.

Q. You don't know if that's one of the reasons for Mr. Akbar's concerns?

A. I don't know his reasons.

Q. Would Mr. Akbar be the only person that can speak to that?

A. Yes.

Q. The next paragraph in that same e-mail references memos in a zip file that, is it Rajesh sent?  Do you see that?

A. Yes.

Q. Who is -- is it Rajesh?  Did I pronounce that right?

A. Mm-hmm, yes.

Q. Who is Rajesh?

A. He's one of the attorneys at LegalEase India.

Q. And Ms. Whitehead mentioned she can't open either and she asked someone, or she asked you to convert the RAR file to a zip file.  Do you see that?

A. Yes.

Q. Is a RAR file a way of packaging and compressing data?

TR-0039770

A2170

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 234 of 431 PageID #: 153059

230

A.   Yes.

Q.   And, do you know why Rajesh is using a RAR file instead of a zip file?

A.   I don't know.  I don't -- really don't know what this e-mail is talking about in terms of any particular information.

Q.   Are you familiar with RAR files versus zip files?

A.   Yeah.  I know RAR files are specifically for larger productions or are larger in a sense.

Q.   So would it suggest that that file was of some significant size for purposes of needing to be compressed versus using a zip file?

A.   Yes.

Q.   Do you have a copy of that RAR file, still?

A.   I really have no idea.

Q.   Did you look?

A.   No.  I mean, I didn't specifically look.  If it was in our -- if it was tagged by our extraction our system, then it would be there.  But I didn't look for it.

Q.   Did anyone view the Box account manually to see if there are any documents responsive to the discovery in this matter?

A.   No, we just did it using the key word search.

Q.   Do you know how Morae slash Clutch Group provided memos to LegalEase, in connection with the Ross Bulk Project?

TR-0039771

A2171

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 235 of 431 PageID #: 153060

231

A. I don't recall if they were e-mailed to us or -- yeah, I don't recall how they were delivered.

Q. If they were e-mailed to you, would you still have those e-mails?

A. We should have those e-mails, yes.

Q. Does LegalEase Michigan or LegalEase India have any document retention policy?

A. I don't know for LegalEase India. And for LegalEase Michigan, I don't recall if we have one or not, or if we ever had one.

Q. Do you know if any of the information that would be otherwise called for in discovery in this matter has been deleted between June of 2017 and today?

A. I don't believe anything was deleted.

Q. Do you know if Code Matrix or LegalEase still has the data that was resulted from the automated activity tool when it was deployed in West Law?

A. The actual case itself? I don't know the status of that.

Q. Who would -- I'm sorry, did I cut you off?

A. No.

Q. Who would know whether that information still exists?

A. I think Ansad would be the best person. Ansad at Code Matrix.

Q. Code Matrix.

TR-0039772

A2172

232

And is Ansad the cofounder of Code Matrix?

A. I don't know.

Q. I'll represent to you that his signature block says CEO and cofounder.

A. Okay. I don't know.

Q. But you don't know otherwise?

A. I don't know.

Q. Is he related to anyone at LegalEase India?

A. Not that I know of.

Q. And, are there any other family members of Mr. Akbar that are working for LegalEase India?

A. There is recently a business development person that was hired in India, back in May or June of 2018. She's a relative of Mr. Akbar, but apart from that, no.

Q. The HR manager is not related to Mr. Akbar?

A. Keerthi?

Q. Yeah, Keerthi.

A. No.

Q. What was the process that LegalEase used to assign West Law licenses to users?

A. I believe we had one or two individuals who were responsible for that task. I know Gayathri Rajeev was involved in that. She may have had -- she may have had somebody else working with her on that, but they maintained a spread sheet, I believe.

TR-0039773

A2173

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 237 of 431 PageID #: 153062

233

Q. When West Law licenses were assigned by West Law, were they assigned according to the information LegalEase provided to them?

A. I would believe so.  Yes, for the most part.

HAFEEZ EXHIBIT 23

10/10/17 E-mail Subject: Permanent ID's Still Not Established

WAS MARKED BY THE REPORTER

FOR IDENTIFICATION

BY MR. LASHWAY:

Q. I'm handing you Mr. Hafeez, what's been marked as Exhibit 23.  And I'm going to ask -- start again with, have you seen this e-mail exchange before?

A. Yes, I've seen these before.

Q. Okay.  So in the back, I'm a couple pages in, the page that's marked 3079 at the bottom, do you see that?

A. Mm-hmm.

Q. So, if I'm reading this right, you're writing to Fraz Essa and Cam Tario at Thomson Reuters, to explain that Cameron sent you temp IDs earlier today, but they were sent for the wrong individuals.  Do you see that?  This is the October exhibit 18, 2017 e-mail.

A. Yeah.

Q. Why did -- or do you know why Cameron got the assignment for these new West Law licenses wrong?

TR-0039774

A2174

234

A. I think they're talking about two different things here. I think we had purchased ten new IDs, it looks like from the e-mail, for the people that were going to be using those IDs, those IDs were not active. For some reason, they hadn't come through, so Cameron gave us temporary IDs, is how I'm reading it.

Q. Okay.

A. I don't know why the temporary IDs don't match the people that we needed the licenses for.

Q. But the list you're providing here, which is different from the list on the next page?

A. It looks like it's different, yes.

Q. Yeah. And are you correcting in the 6:52 p.m. e-mail, are you correcting Cameron and saying no, these are the people who need the additional ten West Law licenses?

A. It looks like that's what I'm doing, yeah.

Q. Okay. And Christopher Chan who is the second one in your list, do you see that, C-A-H-N?

A. Mm-hmm.

Q. He's actually an employee of Clutch Group, right?

A. Yes.

Q. And were you ultimately given licenses for your list of ten?

A. From what the e-mail string looks like, I wrote to Chris on October 10th at 10:07 a.m., that all permanent

TR-0039775

A2175

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 239 of 431 PageID #: 153064

235

IDs were set up and the team should have received the e-mails from West Law. So from what I can tell here, it was.

Q. Okay. And I'm confused by this e-mail string, too. So that's -- that's why I brought it up.

So if you jump forward to page 3075, 3-0-7-5, at the bottom, do you see an e-mail from you to Chris Chan and Ms. Whitehead with a copy to others at 11:50 p.m.?

A. Yes.

Q. And you see where you wrote, don't worry that the names don't match your users, this list was created by our West Law rep and you are authorized to use these temporary accounts?

A. Yes.

Q. Now, that list is the initial list from Cam Tario to you, that's a few pages prior, correct?

A. Yeah, it looks like he sent us a list on Monday, October 9th.

Q. All right. Does this ultimately get resolved with Cam Tario correctly assigning the West Law licenses to the individuals in your 6:52 p.m. e-mail that we looked at a minute ago? In other words, does he update the list as you so desire?

A. It seems like in the e-mail chain, yes. I think that

TR-0039776

A2176

would have been the case.

Q. Who is Scarborough Law. Does that ring a bell?

A. Yes.

Q. And, do you know who that is?

A. Yes. Scarborough was one additional LPO we had reached out to, to see if they could help us out with a project but ultimately, we did not end up using them. They're also based out of India.

Q. Any reason why you didn't use them?

A. I think it was just they didn't have the right people, the quality wasn't good.

Q. And who is -- I think you mentioned these folks, but Kelly Services? Do you know who they are?

A. Yes.

Q. And is Kelly Services another LPO?

A. No.

Q. Who is Kelly Services?

A. Kelly Services is a, I believe, a publicly traded staffing company. They do -- they place attorneys and paralegals, as part of what they do, to law firms and corporations. And we contacted them to help us place some JDs for help on a project.

Q. And this is the bulk project?

A. Yes.

Q. And did you ever retain Kelly Services in connection

237

Q. with the Ross Bulk Project?

A. We did.

Q. And were they here in the U.S.?

A. Yes.

Q. And, where were those particular consultants based?

A. They were, I believe, in the Detroit area. They were working -- they were allowed to work from home. And, yeah, they were Metro Detroit based as far as I can recall.

Q. And -- I'm sorry.

A. As far as I can recall.

Q. And did they use West Law licenses provided by LegalEase, or did they have their own?

A. I believe we also -- we also obtained licenses on their behalf.

Q. So they would have used licenses that were assigned to LegalEase?

A. Right.

Q. Okay. Would each of the folks staffed in this matter have a LegalEase e-mail address?

A. They would have, yes.

Q. And would the West Law license be assigned to that LegalEase e-mail address?

A. It should have been, yeah.

Q. Do you remember at some point in time, you had raised

TR-0039778

A2178

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 242 of 431 PageID #: 153067

238

questions as to ancillary charges that were charged by West to LegalEase?

A.   Yes.

Q.   And you explained that some of the users went out of plan?

A.   Yes.

Q.   Were you surprised to learn that?

A.   Yes.

Q.   Why?

A.   Because we had provided instructions and training on only -- only accessing resources that were available to our subscription and not going outside of the plan.

Q.   In connection with that, were you provided detailed information explaining where you went out of plan and where the costs were generated?

A.   We were, yes.

Q.   And did you ever pay that amount due?

A.   It went to a collection agency.  And then, we did pay that collection agency.  We resolved the matter.

Q.   You have paid that now?

A.   Yes.

Q.   Do you know, in total, how much money you had been paid by Ross in connection with the Ross Original Project?

A.   I don't have a number on me, no.

Q.   Can you estimate for me?

TR-0039779

A2179

239

A.    Not really.

Q.    Is it more than a hundred thousand dollars?

A.    Yes.

Q.    Is it more than a million dollars?

A.    No, I don't think so.

Q.    How about in connection with the Ross Bulk Project, do you know how much Ross has paid LegalEase in connection with that work?

A.    Yeah.  That's easier because it's laid out in the SOW. I believe it came out to about a half -- half a million dollars.

Q.    And are you performing any services for Ross today?

A.    No.

Q.    At some point in time, do you recall Mr. Tario raising an issue with you as to needing clarification on usage issues before any new passwords could be granted?

A.    I don't.

        HAFEEZ EXHIBIT 24

        11/28/17 E-mail Subject: Ancillary Block

        WAS MARKED BY THE REPORTER

        FOR IDENTIFICATION

            MR. LASHWAY:  You've got to staple it.  I'm sorry about that.

BY MR. LASHWAY:

Q.    I'm handing you what has been marked as Exhibit 24.

TR-0039780

A2180

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 244 of 431 PageID #: 153069

240

Have you seen that before?

A. Yes, I do recall this e-mail now.

Q. And, does this refresh your memory as to whether Mr. Tario had alerted you to usage e-mails with respect to using West Law?

A. Yeah. I mean, I guess now, it's clear he brought it -- brought that up. I don't recall having a conversation with him on that, or for any e-mails, but it's possible.

Q. So you don't recall having any conversations with Mr. Tario about usage issues at the end of November of 2017?

A. No. I do recall having a conversation with him after it was determined in the contract and me trying to figure out what happened and he had brought up the usage issues, but I don't recall this particular instance of it.

Q. Okay. And is this in connection, this e-mail exchange, is this in connection with your request for a discount because two of the licenses weren't working? Or let me rephrase that.

Is this e-mail exchange in connection with your request for a discount because two pop-up warnings related to ancillary charges in your opinion, didn't notify the user that they were going out of plan?

TR-0039781

A2181

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 245 of 431 PageID #: 153070

241

A.   Yeah, I think we had a discussion about why we had overage charges and why there was no warning -- warning for the accounts that they were going out of plan.  So that's the context of this e-mail exchange.

Q.   Okay.  And you don't have any memory as to the first e-mail where Mr. Tario writes, regarding the rest, I need your help to clarify a couple of things with respect to the usage issues?

A.   No, I don't.

Q.   Okay.

          HAFEEZ EXHIBIT 25

          12/4/17 E-mail Subject: Ancillary Block

          WAS MARKED BY THE REPORTER

          FOR IDENTIFICATION

BY MR. LASHWAY:

Q.   I'm handing you what's been marked as Exhibit 25, Mr. Hafeez.  Do you recall seeing this e-mail before?

A.   Yes, I do.  I mean, I don't recall this e-mail, but I know it's mine because it's from me.  But yes, I -- can see this is an e-mail exchange between me and Mr. Tario.

Q.   And do you recall a back and forth as to questions about Clutch Group having access to LegalEase's West Law licenses?

A.   From the e-mail, it seems like we had a conversation

TR-0039782

A2182

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 246 of 431 PageID #: 153071

242

about -- or an e-mail exchange around that, yes.

Q.   And do you recall what Mr. Tario shared with you in connection with that conversation?

A.   Again, I don't have any recollection, but just based on the e-mail, it looks like we were kind of addressing a few different issues at the same time; trying to address the issue about the ancillary block issue and then he's bringing up the usage issues again.  And then, he's independently asking about the Clutch Group, who is the Clutch Group?  And I responded to that.

Q.   Is there any reason why the Best Practices Guide for Ross Intelligence would have been updated in February of 2018?

A.   It shouldn't have been.

Q.   At that point in time, had your work seized?

A.   The bulk project completed in December.  We had no other bulk work.

Q.   Actually, hold on one second.

So if there -- if there was a memo created -- I'm sorry, a Best Practices Guide for Ross Intelligence created after December of 2017, would it have been applicable to the Ross Bulk Project?

A.   It would not have.  The only thing I can think -- I mean, it's possible someone on our team decided to update it in case we got further, for the launches of

TR-0039783

A2183

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 247 of 431 PageID #: 153072

243

it based on the learning we had from the project. That's a possibility. But there's no active work going on after December.

    HAFEEZ EXHIBIT 26

    Thomas Reuter Research Subscriber Agreement

    WAS MARKED BY THE REPORTER

    FOR IDENTIFICATION

BY MR. LASHWAY:

Q.    What I'm handing you, Mr. Hafeez, is a document that's been marked Exhibit 26. It's called the Research Subscriber Agreement. And it's a document that's we produced in this matter. Have you seen this document before?

A.    I don't think I have. This doesn't look familiar. I've seen the terms and conditions, general terms and conditions, but I don't think I've seen this.

    HAFEEZ EXHIBIT 27

    Thomson Reuters General Terms and Conditions

    WAS MARKED BY THE REPORTER

    FOR IDENTIFICATION

BY MR. LASHWAY:

Q.    I'm handing you what's been marked as Exhibit 27 now, Mr. Hafeez. Are these the terms and conditions that you were just referencing?

A.    Yes.

TR-0039784

A2184

Q.   And you've seen those -- this document before?

A.   Yes.

Q.   Okay.  Do you know if Exhibit 26 and Exhibit 27 are a part of the contract terms that are referred to in the complaint in this matter, between LegalEase Michigan and West?

A.   I was familiar with the recent general terms and conditions, don't know if I knew that the research subscription agreement was part of the other form as well.

Q.   But you are familiar that the general terms and conditions in Exhibit 27 is part of the contractual terms between West and LegalEase?

A.   Yeah, if these are the same ones I remember from the other form, yes.

          HAFEEZ EXHIBIT 28

          Thomson Reuters Schedule A

          WAS MARKED BY THE REPORTER

          FOR IDENTIFICATION

BY MR. LASHWAY:

Q.   Handing you what's been marked as Exhibit 28.  Have you seen this document before?  It's Bates stamped WPC 1489?

A.   I don't think I have.

Q.   This is called the West Law schedule A.  Do you see

A2185

that?

A.   Mm-hmm.

Q.   And it shows prices for use of West Law?

A.   Okay.

Q.   You've never seen it before?

A.   I can't say I've never seen it before, but it's not ringing a bell right now.

Q.   Okay.

            HAFEEZ EXHIBIT 29

            Westlaw Schedule A

            WAS MARKED BY THE REPORTER

            FOR IDENTIFICATION

BY MR. LASHWAY:

Q.   I'm handing you a document that's marked as Exhibit Hafeez 29.  Have you seen this document before?

A.   Is this the same thing you provided me earlier?

Q.   It might be different, I don't know.

A.   It looks exactly the same.  But no, again, I don't recall seeing this.

Q.   Are you familiar with the functionality at West Law that allows a user to download data from West Law?

A.   I don't understand the question.

Q.   Are you aware that West Law offers a feature that allows you to download West Law content from West Law, using that feature?  It's a download function.

TR-0039786

A2186

246

A.    Yes.

Q.    And you're aware of that?

A.    Yes.

Q.    Why didn't the automated tool utilize that functionality?

A.    I don't know.

Q.    I'm going to hand to you what's been marked as Exhibit 10.

      MR. LASHWAY:  Oh, I'm missing a page here.

BY MR. LASHWAY:

Q.    Have you seen this document before?

A.    Yes.

Q.    And are these LegalEase's responses to West's written discovery requests?

A.    They appear to be, yes.

Q.    Were you involved in responding to the discovery requests?

A.    Yes.

Q.    And, I'll have you turn to page 12.

A.    The last page?

Q.    Yeah.

A.    Okay.

Q.    And, is that your signature block?  I'm sorry, is that your signature --

A.    Yes.

TR-0039787

A2187

Q.  Electronically?

A.  Yes.

Q.  As to the answers?

A.  Yes.

Q.  And your counsel as to the objections?

A.  Yes.

Q.  And so, you're certifying that these requests are true and accurate?

A.  Yes.

Q.  Did you do so under the penalties of pain and perjury?

A.  I don't know.  I mean, that's in the court rules.

Q.  Well, let me just have you look at paragraph -- I'm sorry, page 12 just above your signature.  It just says I hereby certify that the discovery requests are true and accurate.  Do you see that?

A.  Yes, I signed the document.  Yes.  It doesn't say pain and perjury.  Yes, I did sign it and that's my name.

Q.  If you go to page 10 and 11, do you see in response to interrogatory number 8, there is a chart that starts out on 10 and expands on to 11?

A.  Mm-hmm.

Q.  What is the column titled Associate, mean?

A.  It appears that the associate is the name of the account holder.

Q.  Okay.  And are those persons affiliated with LegalEase

TR-0039788

A2188

248

Michigan or LegalEase India?

A.   So some are -- some are LegalEase India, some are LegalEase U.S., some are independent contractors, some are subcontractors.

Q.   Okay.  On page 11, there is a subheading that says independent contractors.

A.   Mm-hmm.

Q.   It actually is repeated twice.  What's the difference between those individuals listed in the associate column and the associates listed above?

A.   I believe the independent contractors refer to the Clutch Group and Vakil individuals.

Q.   Okay.  So is the second group of people the Clutch Group?  This starts with LegalEase 34 and ends with LegalEase 37.

A.   I can't -- I can't say for sure if that's just the Clutch Group or some -- or also anybody else.

Q.   I'm trying to understand the organization of the chart.

A.   Mm-hmm.

Q.   So, I'm not trying to catch you or anything here.  But is there a difference between the first set of people where there's a right-hand column identified as assigned to, and then what I -- as I'm reading it, the two additional groups of people that are set forth on page 11 under independent contractors?

TR-0039789

A2189

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 253 of 431 PageID #: 153078

249

A. What I can tell is the -- for the most part, it seems like the top column, the associate before you hit the independent contractors, on page 11, those are all either LegalEase employees or people we had working in our office, sort of independent contractors. And then, the names that come below independent contractors seem to be Clutch, as far as I can tell.

Q. And then, the final group of independent contractors, would that be --

A. They look like they're also Clutch because there's -- like in that final, if you look at LegalEase 20 on page 12, Christopher Cahn, he is Clutch. Saloni, I believe is Clutch as well. So I can't differentiate whether these are just Clutch or Clutch and Vakil. It seems like it may be both.

Q. Do you have any further understanding of that, or is that --

A. Yeah, I mean, it looks like everything above independent contractors were LegalEase India employees or people working as contractors onsite. And the names underneath that seem to me to be Clutch and/or Vakil.

Q. Do you remember providing an interview in July of 2015 where you referenced machine learning and artificial intelligence customer of LegalEase?

A. Are you talking about the infamous podcast?

TR-0039790

A2190

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 254 of 431 PageID #: 153079

250

Q.   Yes.

A.   Yes.

Q.   Why is it infamous?

A.   Because it was a bad podcast, too.

Q.   Were you referencing -- were those comments that are cited to in the complaint, referencing Ross Intelligence?

A.   They were.

Q.   And when you said in the podcast that they were feeding this client with data, was that referencing West Law data?

A.   No, it was referencing the memos.

Q.   That contained West Law information?

A.   Yes.

Q.   In connection with the two Ross projects, did you use any other third party's West Law licenses?

A.   Sorry, can you repeat the question?

Q.   Yeah.  In connection with performing work for the Ross Original and the Ross Bulk Projects, did you utilize any West Law licenses that were granted to other third parties?

A.   My understanding was Vakil had their own West Law accounts that they used for the project.  So they used them to create the memos that we used for our client, yes.  But we didn't have direct access to those

TR-0039791

A2191

accounts.  Vakil had those accounts.

Q. Were there any other third parties that had their own West Law accounts they used for the project?

A. Not that I can think of, no.

Q. Do you recall asserting in this litigation that a West Law representative provided approval for the practice of sharing West Law passwords to third-party contractors?

A. Yes.

Q. Who is that West Law representative?

A. That was Fraz Essa.

Q. Do you know when Fraz Essa provided the approval that you referenced?

A. May I look in my notebook?

Q. Sure.

A. There's an e-mail dated September 25th.

Q. Of 2017?

A. Yes.

Q. Is there any other basis for that allegation?

A. The -- the order form also provides for use by the brad, the product, by employees and also the category of contractors.

Q. This is the order form with West Law?

A. Yes.

Q. Are you claiming any damages through your counterclaims

TR-0039792

A2192

252

brought against West in this matter?

A. Yes.

Q. What are those damages?

A. There were damages involved with having to switch to Lexis and not being able to use West Law at the completion or at the end of the project.

I think more significantly, we lost any future work with Ross because of this litigation. It's a business loss.

Q. So the first category, having to use Lexis and not being able to use West Law, I understood your testimony earlier that the Ross Bulk Project ended in December of 2017; is that right?

A. Right.

Q. And termination of your West Law access occurred in mid-January of 2018?

A. Right.

Q. So how did termination of West Law access result in harmed connection with that theory of damages?

A. We had other -- I mean, we were using West Law for -- we were using it as a tool for other legal research projects after -- after the bulk was completed. We had our law firm clients and other clients.

Q. Have you produced documents in connection with those projects if you're seeking damages in connection with

TR-0039793

A2193

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 257 of 431 PageID #: 153082

253

them?

A.   We have not, no.

Q.   Are you going to seek damages in this matter in connection with those other projects?

A.   We may.  But the damages are -- for those particular damages, is the cost of having to find other suitable research tools like Lexis.  The business loss is the more significant damage.

Q.   If you're able to use Lexis, why would you lose business if you didn't have access to West Law?

MR. DAKHLALLAH:  Objection, it mischaracterizes his testimony.

THE WITNESS:  So on the -- on the first issue, there was a time period where we had to scramble to find other -- to get other research tools activated, so we lost some business as a result of having suddenly lost our access to West Law.

BY MR. LASHWAY:

Q.   Did you have an agreement with Lexis in January of 2018?

A.   I believe we had an ongoing contract with Lexis, but we needed additional users for Lexis because of the West Law termination.

Q.   And so, in terms of quantifying your damages, would it be the amount of those additional Lexis subscriptions?

TR-0039794

A2194

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 258 of 431 PageID #: 153083

254

A.    That would be part of it, yes.

Q.    Is there -- what else is there?

A.    There could be business loss from the projects we weren't able to take because we didn't have -- there was a business loss from projects we weren't able to take because there was a gap between us having access to research tools and then getting new Lexis accounts.

Q.    All right.  So I -- I'm trying to get granular here, so I understand what your claim is.

But if you have access to Lexis at the time and prior to West Law terminates access, why is there a gap that would cause harm to LegalEase?

A.    Because the accounts we already had with Lexis were already being used on other projects.  So we had new projects coming in and we didn't have enough licenses for those projects, so we had to get additional licenses to be able to take on those projects.

Q.    So would that -- were there any projects that you weren't able to secure Lexis licenses for, that you lost?

A.    There may have been, I don't know.  I don't know, specifically, which projects and how many there were.

Q.    What kind of work would be -- I'm sorry, let me start this again.

What work would LegalEase be focused on that

TR-0039795

A2195

was dependent on its access to West Law?

A. We do brief fighting for attorneys. We do research memos for attorneys. We do research memos for corporate clients. For all those types of projects, we would need access to West Law or Lexis.

Q. And you had access to Lexis in -- on January 1st of 2018?

A. I believe we did, yes.

Q. And did you have access to Lexis on January 19th of 2018?

A. We should have, yes.

Q. Okay. So the second category as I understood it was that, you loss future work with Ross because of litigation; is that right?

A. Yes.

Q. And why is that?

A. Well, when we received our notification that we were being sued by West Law or West Publishing, we did inform Ross that we were under a lawsuit and that they could take a look at the lawsuit, it's available online. And subsequent to that, they made a decision not to continue business with us.

Q. Did you speak with someone at Ross in connection with notifying them of the lawsuit?

A. We had a conversation with Andrew Arruda about the

TR-0039796

A2196

256

lawsuit.

Q. I'm sorry, with whom?

A. Andrew Arruda, it's the CEO of Ross Intelligence.

Q. Was anybody else on the phone?

A. On their end or my end?

Q. Either.

A. I believe it was myself, Tariq Akbar, and Teri. And I believe it was just Andrew on their side.

Q. Ross didn't have any of their lawyers involved?

A. No, not at that time.

Q. Did you speak with -- have you spoke with Ross subsequent to that conversation?

A. No.

Q. At that point in time, the Ross contract had been terminated already, correct?

A. At that point in time, the Ross Original work had been terminated, but there was still the Ross Bulk work that we were hoping to get second or third launch for. We were hoping to get additional Ross bulk work. We had not been told that that work would not continue forward until the lawsuit.

Q. Had you been told previously that the work wasn't going to continue forward?

A. We were never told. We were never told that we would not get more work of the bulk project eventually. We

TR-0039797

A2197

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 261 of 431 PageID #: 153086

257

just -- we didn't know about the timing.  So we were under the impression that there would be an opportunity to have a second or third bite at the apple.

Q. Have you had any communications with anyone else concerning this litigation?

A. We have not discussed litigation with any of our other clients.

Q. And in connection with the Ross conversation, is there any of those in writing?

A. The post-lawsuit conversations?

Q. Yeah.

A. I don't think so.  I don't believe so.  But if there were, there would be e-mails, but I believe it was just the phone call with Andrew.  And soon thereafter, they hired their own counsel.

Q. Have you spoken with that counsel?

A. I believe our counsel at Kutak Rock has had conversation with -- with them, and perhaps Kassem has. I don't know.

Q. Do you know who's representing Ross?

A. I don't remember the firm name.

Q. Do you know if it's someone in Toronto or California?

A. I don't remember.

MR. LASHWAY:  Why don't we just go off the record here?  I'm just going to go through things

TR-0039798

A2198

quickly and we can be almost done.  I want to talk to my client for a moment.

MR. DAKHLALLAH:  Sure.

THE VIDEOGRAPHER:  We're going off the record.  The time is 4:33 p.m.

(Off the record at about 4:33 p.m.)

(On the record at about 4:38 p.m.)

THE VIDEOGRAPHER:  We are back on the record.  The time is 4:38 p.m.

BY MR. LASHWAY:

Q.   Now, Mr. Hafeez, you've referenced your handwritten notes a couple of times.  Did you prepare those notes?

A.   I prepared them, yes.

Q.   They weren't prepared by your counsel in anyway?

A.   No.

Q.   Do they reflect your review of the documents in preparation for today?

A.   They just reflect some points and some notes I wanted to make sure I remembered.

Q.   Okay.  So, those notes along with, I would say a significant amount of additional documents have been, I believe, are called for for production in the case.  We're going to continue the deposition understanding that we have some time remaining, and I'll ask the videographer to disclose that here, pending our

TR-0039799

A2199

conversations with your counsel as to the production of that information, all of which we've talked about today. We'll follow up with a letter asking for the production of that material, and then we'll have a conversation with your counsel as to how to try to complete the deposition.

Otherwise, I don't have any additional documents or questions for today.

MR. DAKHLALLAH: All right. I have some re-direct.

EXAMINATION BY MR. DAKHLALLAH:

Q. Mr. Hafeez, do you recall testifying --

MR. LASHWAY: So just before you start, can we just have a time stamp on that?

THE VIDEOGRAPHER: Yeah, you've been on the record for 6:14.

MR. LASHWAY: Thank you. Sorry to interrupt.

MR. DAKHLALLAH: All right.

BY MR. DAKHLALLAH:

Q. Mr. Hafeez, do you recall testifying earlier about some texts from an e-mail that you guess was a red flag of some kind?

A. Yes.

Q. Do you remember that?

A. Yes.

TR-0039800

A2200

Case: 25-2153   Document: 156-5   Page: 504   Date Filed: 01/02/2026

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 264 of 431 PageID #: 153089

260

Q. Okay. You actually don't know why anyone would have written anything in an e-mail, correct?

A. Correct.

Q. You were just guessing?

A. Right, I was guessing.

Q. And so, whenever you testified in this deposition about what somebody might have been thinking or what somebody might have meant about something they put in an e-mail, that's just a guess?

A. That's correct.

Q. All right. Now, you had been asked several times during this deposition about West Law data or West Law material appearing in memos. Do you remember that?

A. Yes.

Q. That was actually asked several times.

A. Yes.

Q. Okay. Do you believe that West Law owns the actual text of court decisions?

A. No, I don't.

Q. Would that -- would it be fair to say that that's a determination for the court to make in this case?

A. That would be a fair statement.

Q. Now, as -- as an attorney, do you actually have any reason to agree with the premise that West Law owns the text of anything that you put in any memo that you

TR-0039801

A2201

261

produced, that is a subject matter of this case?

MR. LASHWAY: Objection.

THE WITNESS: No.

BY MR. DAKHLALLAH:

Q. Now, there was discussion related to KeyCites in this case. Do you remember that line of questioning?

A. Yes.

Q. Now, KeyCites were never given to Ross at any point in anything that you gave them as a deliverable, correct?

A. No.

Q. And they were, in fact, never given to anyone by you in anyway, correct?

A. Correct.

Q. And, the KeyCites themselves, never ended up in any draft of any memo whether in the course of preparing the work product or in a final version of any memo that you were creating for Ross, correct?

A. Correct. The KeyCites were not used verbatim in any of the memos.

Q. And neither were the headnotes?

A. Correct.

Q. And, in fact, the only thing that ever found its way into a memo that was delivered as part of your deliverables to anyone in this case was the actual text of the court decisions themselves, right?

TR-0039802

A2202

A. Correct.

Q. And there was never any treatises that were produced by anybody for or on behalf of West Law that found its way into any of your memos, correct?

A. Correct. It was case law and statutes.

Q. All right. Thank you.

MR. LASHWAY: All right. So subject to my earlier recitation, we'll continue the deposition and we'll follow up with your counsel by letter.

THE WITNESS: Okay.

MR. LASHWAY: Thank you, very much.

THE VIDEOGRAPHER: This concludes today's deposition. We are off the record at 4:44 p.m.

(The videotaped deposition was concluded at 4:44 p.m.)

TR-0039803

A2203

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 267 of 431 PageID #: 153092

263

C E R T I F I C A T E

I, Tariq Hafeez, do hereby certify that I have read the foregoing transcript of my testimony, and further certify under the pains and penalties of perjury that said transcript (with/without) suggested corrections is a true and accurate record of said testimony.

Dated at _____, this ____ day of _____, 2019.

_____

TR-0039804

A2204

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 268 of 431 PageID #: 153093

264

SUGGESTED CORRECTIONS

RE: West Publishing Corporation vs. LegalLease Solutions, LLC

WITNESS: Tarik Hafeez, Vol. I

The above-named witness wishes to make the following changes to the testimony as originally given:

PAGE   LINE       SHOULD READ              REASON

TR-0039805

A2205

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 269 of 431 PageID #: 153094

265

CERTIFICATE OF NOTARY


STATE OF MICHIGAN    )

                     ) SS

COUNTY OF MACOMB     )

I, Shacara V. Mapp, Certified Shorthand Reporter, a Notary Public in and for the above county and state, do hereby certify that the above deposition was taken before me at the time and place hereinbefore set forth; that the witness was by me first duly sworn to testify to the truth, and nothing but the truth; that the foregoing questions asked and answers made by the witness were duly recorded by me stenographically and reduced to computer transcription; that this is a true, full and correct transcript of my stenographic notes so taken; and that I am not related to, nor of counsel to either party, nor interested in the event of this cause.


_____

Shacara V. Mapp, CSR-9305

Notary Public,

Macomb County, Michigan

My Commission expires:  07-25-2024


TR-0039806

A2206

266

D I S C L A I M E R

This transcript in any format is a confidential communication between Doris O. Wong Associates, Inc., a professional court reporting firm, and the parties to this matter and their counsel. Any reproduction or distribution of this transcript without the express permission of the parties is a violation of this confidentiality. To fulfill any request to the court reporter for an additional copy or copies from persons or entities without standing in this matter will require the consent of the parties and/or counsel and/or a court order for such delivery.

TR-0039807

A2207

EXHIBIT 73
WIT: _____
DATE: 10·10·19
LORI A. BALDWIN CSR, RPR, CRR

| | |
|---|---|
| From: | Aditya Lokanandi |
| Sent: | Thursday, July 20, 2017 7:15 AM EDT |
| To: | Teri Whitehead; Tariq Akbar; Tariq Hafeez; Gayathri Rajeev; Merin Sony |
| Subject: | RE: Ross Bulk Memo Production Metrics - Update - July 19 |
| Attachments: | Sample Tracking Sheet.xlsx, Ross Project Flowchart August.pdf, Ross Project Flowchart September.pdf, Ross Project Flowchart October.pdf |

Hi,

Each headnote within an sub-topic in WESTLAW is unique. As we would be working based on the headnotes, Project Manager can assign each attorney an headnote( on a weekly bases). We can create these ID's using a simple Excel (I have included one such sheet for sample) we can replicate the sheet to a Smartsheet. Using this unique ID I have tried to build a process.

I have designed the process for all the three months as the numbers vary from month to month. Please find attached the process flow for the ROSS Project based on the number shared in the earlier emails.

Below is the basic principle in which I feel we can carry out the process.

**For the month of August:**

15 memos* 16 associates = 240 headnotes per day as a team

| AUGUST | |
|---|---|
| PER DAY | 240 Headnotes |
| PER WEEK | 1200 Headnotes (240 * 5 days per week) |
| Merin has to Assign | 10 topics every week to ensure we have a minimum of 1200 headnotes |
| | the first 10 topics in WESTLAW have 1110 headnotes |

**By the above math we will complete: 15*16*21days= 5040 memos**

**For the month of September:**

23 memos* 24 associates = 552 headnotes per day as a team

| SEPTEMBER | |
|---|---|
| PER DAY | 550 Headnotes |
| PER WEEK | 2760 Headnotes (550 * 5 days per week) |
| Merin has to Assign | 25-30 topics per week to ensure we have a minimum of 2760 headnotes for the associates to work on |
| | This would cover about 100-130 topics |

**By the above math we will complete: 23*24*19 days= 10,488 memos**

BATES0319

TR-0039808

A2208

**For the month of October:**

23 memos* 21 associates = 472 headnotes per day as a team

|  | OCTOBER |
|---|---|
| PER DAY | 472 Headnotes |
| PER WEEK | 2360 Headnotes |
| Merin has to Assign | 21-25 topics per week to ensure we have a minimum of 2360 headnotes for the associates to work on |
|  | This would cover about 80-100 topics |

**By the above math we will complete: 23*21*21 days= 10,143 memos**

The crux of this calculation is tracking of the topic and headnote shouldn't be duplicated.



Aditya Lokanandi
Product Manager
Tel: +91 4428361098  Mob: +91 8939302877
Email: aditya.lokanandi@legaleasesolutions.com

**LegalEase Solutions LLC**
*The future of law*
Website | Lawstore



NOTICE OF CONFIDENTIALITY - THIS MESSAGE IS INTENDED ONLY FOR THE ADDRESSEES. It may contain privileged, confidential or proprietary information. Any unauthorized disclosure, use, copying or distribution of the contents of this message or the taking of any action on the contents of this message is strictly prohibited. If you received this electronic mail transmission in error, please promptly notify the sender LegalEase Solutions LLC at +1 (734) 619-6302 and delete the original and all copies from your system. NOTICE OF NO ATTORNEY-CLIENT PRIVILEGE - LegalEase Solutions LLC("LegalEase") provides legal support service exclusively to licensed United States, and Canadian attorneys. All services provided by LegalEase are restricted to licensed United States and/or Canadian attorneys and are not meant for use by non-attorneys. By submitting a project to LegalEase, you ("Client") represent the following: that you are a licensed United States or Canadian attorney, qualified and fit to practice law in one of the 50 states of the United States, or provinces and territories of Canada respectively; that you will independently exercise your professional judgment in reviewing any legal products or services provided to you by LegalEase; that no attorney-client privilege is formed between you and LegalEase; that you are in no way delegating your obligations and duties as a licensed attorney to LegalEase; and that you fully understand that LegalEase is not engaged in the practice of law, legal representation, or rendering legal advice.

**From:** Gayathri Rajeev
**Sent:** Thursday, July 20, 2017 8:09 AM
**To:** Tariq Hafeez <tariq.hafeez@legaleasesolutions.com>; Teri Whitehead <teri.whitehead@legaleasesolutions.com>; Tariq Akbar <tariq.akbar@legaleasesolutions.com>
**Cc:** Merin Sony <merin.sony@legaleasesolutions.com>; Aditya Lokanandi <aditya.lokanandi@legaleasesolutions.com>
**Subject:** Re: Ross Bulk Memo Production Metrics - Update - July 19

BATES0320

TR-0039809

A2209

Thanks, TH.

Please see my answers to your comments. Would like inputs from all as our current plan is to roll out the project on August 1st.

Thanks,



Gayathri Rajeev
Manager Operations (India)

Tel: +91 0484 2803684/85 | Mob: +91 9446479265
Email: gayathri.rajeev@legaleasesolutions.com

LegalEase Solutions LLC
*The future of law*



**Website | Lawstore**

NOTICE OF CONFIDENTIALITY - THIS MESSAGE IS INTENDED ONLY FOR THE ADDRESSEES. It may contain privileged, confidential or proprietary information. Any unauthorized disclosure, use, copying or distribution of the contents of this message or the taking of any action on the contents of this message is strictly prohibited. If you received this electronic mail transmission in error, please promptly notify the sender LegalEase Solutions LLC at +1 (734) 619-6302 and delete the original and all copies from your system.

NOTICE OF NO ATTORNEY-CLIENT PRIVILEGE - LegalEase Solutions LLC("LegalEase") provides legal support service exclusively to licensed United States, and Canadian attorneys. All services provided by LegalEase are restricted to licensed United States and/or Canadian attorneys and are not meant for use by non-attorneys. By submitting a project to LegalEase, you ("Client") represent the following: that you are a licensed United States or Canadian attorney, qualified and fit to practice law in one of the 50 states of the United States, or provinces and territories of Canada respectively; that you will independently exercise your professional judgment in reviewing any legal products or services provided to you by LegalEase; that no attorney-client privilege is formed between you and LegalEase; that you are in no way delegating your obligations and duties as a licensed attorney to LegalEase; and that you fully understand that LegalEase is not engaged in the practice of law, legal representation, or rendering legal advice.

**From:** Tariq Hafeez
**Sent:** Thursday, July 20, 2017 4:51:35 AM
**To:** Gayathri Rajeev; Teri Whitehead; Tariq Akbar
**Cc:** Merin Sony; Aditya Lokanandi
**Subject:** Re: Ross Bulk Memo Production Metrics - Update - July 19

Gayathri,

BATES0321

TR-0039810

A2210

Thanks for sharing this. It's very very helpful.

I have some comments and notes--please review and let me know your thoughts (and other team members feel free to do the same).

Thanks



Tariq Hafeez, Esq.
Co-founder/President

Tel: 734-274-2005 | Fax: 734-468-0102
Email: tariq.hafeez@lgles.com

LegalEase Solutions LLC
The future of law

Website | Lawstore



NOTICE OF CONFIDENTIALITY - THIS MESSAGE IS INTENDED ONLY FOR THE ADDRESSEES. It may contain privileged, confidential or proprietary information. Any unauthorized disclosure, use, copying or distribution of the contents of this message or the taking of any action on the contents of this message is strictly prohibited. If received in error, please promptly notify the sender and delete the original and all copies from your system.

LegalEase Solutions LLC provides legal support services exclusively to licensed United States attorneys. All services provided by LegalEase Solutions LLC are restricted to licensed US attorneys and are not meant for use by non-attorneys. By submitting a project to LegalEase Solutions LLC ("LegalEase"), you ("Client") represent the following: that you are a licensed United States attorney, qualified and fit to practice law in one of the 50 states of the United States; that you will independently exercise your professional judgment in reviewing any legal products or services provided to you by LegalEase; that no attorney-client privilege is formed between you and LegalEase; that you are in no way delegating your obligations and duties as a licensed attorney to LegalEase; and that you fully understand that LegalEase is not engaged in the practice of law, legal representation, or rendering legal advice.

BATES0322

TR-0039811

A2211

**From:** Gayathri Rajeev
**Sent:** Wednesday, July 19, 2017 12:51 PM
**To:** Teri Whitehead; Tariq Hafeez; Tariq Akbar
**Cc:** Merin Sony; Aditya Lokanandi; Gayathri Rajeev
**Subject:** Ross Bulk Memo Production Metrics - Update - July 19

Teri, TH, Sir, Aditya, Merin,

Attached is the revised/ updated production metrics.

Immediate requirements/concerns  [August]

1. We require 19 Attorneys – Available 16 – Need 3 more
2. QC Attorneys – We need 11, 4 to start with. This cannot be freshers. We still have not decided who can be pulled from the other teams. Needs to be determined ASAP.
3. Production Expeditors – Immediate requirement 9 – We have 2-3 ready; on the lookout for 7 [ Can Chennai help?]
4. Infrastructure: Immediate requirement for 10 laptops; 4-10 tables and Chairs
5. Search Engines: Should be able to manage with the 10 extra WL and the 3 Lexis accounts which allow multiple access.
6. Broadband: Have initiated the process of increasing the speed to 10 Mbps.
7. Once we get started in August, will start planning for September. Higher numbers in September.

Thanks,

Gayathri Rajeev
Manager Operations (India)

Tel: +91 0484 2803684/85 | Mob: +91 9446479265
Email: gayathri.rajeev@legaleasesolutions.com



LegalEase Solutions LLC
*The future of law*

Website | Lawstore



NOTICE OF CONFIDENTIALITY - THIS MESSAGE IS INTENDED ONLY FOR THE ADDRESSEES. It may contain privileged, confidential or proprietary information. Any unauthorized disclosure, use, copying or distribution of the contents of this message or the taking of any action on the contents of this message is strictly prohibited. If you received this electronic mail transmission in error, please promptly notify the sender LegalEase Solutions LLC at +1 (734) 619-6302 and delete the original and all copies from your system.

NOTICE OF NO ATTORNEY-CLIENT PRIVILEGE - LegalEase Solutions LLC("LegalEase") provides legal support service exclusively to licensed United States, and Canadian attorneys. All services provided by LegalEase are restricted to licensed United States and/or Canadian attorneys and are not meant for use by non-attorneys. By submitting a project to LegalEase, you ("Client") represent the following: that you are a licensed United States or Canadian attorney, qualified and fit to practice law in one of the 50 states of the United States, or provinces and

BATES0323

TR-0039812

A2212

A2213

territories of Canada respectively; that you will independently exercise your professional judgment in reviewing any legal products or services provided to you by LegalEase; that no attorney-client privilege is formed between you and LegalEase; that you are in no way delegating your obligations and duties as a licensed attorney to LegalEase; and that you fully understand that LegalEase is not engaged in the practice of law, legal representation, or rendering legal advice.

BATES0324

TR-0039813

EXHIBIT 76
WIT:
DATE: 10.10.19
LORI A. BALDWIN CSR, RPR, CRR

| From: | Teri Whitehead |
|---|---|
| Sent: | Tuesday, September 19, 2017 1:02 PM EDT |
| To: | Tariq Hafeez |
| Subject: | Re: ROSS BULK PROJECT - LPO |

Yes. This an old email chain that was prior to the chain.

Also, need to assign revisions to BPG and other documents sent. Which have ROSS all over them.

Can you please look at the memos and zip file that Rajesh sent, that is urgent. I cannot open either. If you can convert the RAR file to a zip file, I will also review. Thank you.
Teri



Teri Whitehead
Vice President of Global Strategy
Tel: 248 925 0530 | Fax: 734 468 0102
Email: teri.whitehead@legaleasesolutions.com

LegalEase Solutions LLC
The future of law
Website | Lawstore



NOTICE OF CONFIDENTIALITY - THIS MESSAGE IS INTENDED ONLY FOR THE ADDRESSEES. It may contain privileged, confidential or proprietary information. Any unauthorized disclosure, use, copying or distribution of the contents of this message or the taking of any action on the contents of this message is strictly prohibited. If you received this electronic mail transmission in error, please promptly notify the sender LegalEase Solutions LLC at +1 (734) 619-6302 and delete the original and all copies from your system. NOTICE OF NO ATTORNEY-CLIENT PRIVILEGE - LegalEase Solutions LLC("LegalEase") provides legal support service exclusively to licensed United States, and Canadian attorneys. All services provided by LegalEase are restricted to licensed United States and/or Canadian attorneys and are not meant for use by non-attorneys. By submitting a project to LegalEase, you ("Client") represent the following: that you are a licensed United States or Canadian attorney, qualified and fit to practice law in one of the 50 states of the United States, or provinces and territories of Canada respectively; that you will independently exercise your professional judgment in reviewing any legal products or services provided to you by LegalEase; that no attorney-client privilege is formed between you and LegalEase; that you are in no way delegating your obligations and duties as a licensed attorney to LegalEase; and that you fully understand that LegalEase is not engaged in the practice of law, legal representation, or rendering legal advice.

From: Tariq Hafeez
Sent: Tuesday, September 19, 2017 12:51:16 PM
To: Teri Whitehead
Subject: Re: ROSS BULK PROJECT - LPO

Teri,

Can we remove the Ross Bulk Project name from the Subject line of the emails with our LPO contacts. TA expressed concern that we don't use the Ross name more than required with our LPOs, notwithstanding the NDA in place.

Thanks

BATES5167

TR-0039814

A2214



Tariq Hafeez, Esq.
Co-founder/President
Tel: 734-274-2005 | Fax: 734-468-0102
Email: tariq.hafeez@lgles.com

LegalEase Solutions LLC
*The future of law*
Website | Lawstore



NOTICE OF CONFIDENTIALITY - THIS MESSAGE IS INTENDED ONLY FOR THE ADDRESSEES. It may contain privileged, confidential or proprietary information. Any unauthorized disclosure, use, copying or distribution of the contents of this message or the taking of any action on the contents of this message is strictly prohibited. If received in error, please promptly notify the sender and delete the original and all copies from your system.

LegalEase Solutions LLC provides legal support services exclusively to licensed United States attorneys. All services provided by LegalEase Solutions LLC are restricted to licensed US attorneys and are not meant for use by non-attorneys. By submitting a project to LegalEase Solutions LLC ("LegalEase"), you ("Client") represent the following: that you are a licensed United States attorney, qualified and fit to practice law in one of the 50 states of the United States; that you will independently exercise your professional judgment in reviewing any legal products or services provided to you by LegalEase; that no attorney-client privilege is formed between you and LegalEase; that you are in no way delegating your obligations and duties as a licensed attorney to LegalEase; and that you fully understand that LegalEase is not engaged in the practice of law, legal representation, or rendering legal advice.

**From:** Teri Whitehead
**Sent:** Tuesday, September 19, 2017 12:46 PM
**To:** Saloni Agara Dwarakanath
**Cc:** Merin Sony; Gayathri Rajeev; Tariq Hafeez; Tariq Akbar; Ross Leads
**Subject:** Re: ROSS BULK PROJECT - LPO

Excellent.

I will circle back with our team lead to confirm her availability.

Thank you,
Teri



Teri Whitehead
Vice President of Global Strategy
Tel: 248 925 0530 | Fax: 734 468 0102

BATES5168

TR-0039815

A2215



Email: teri.whitehead@legaleasesolutions.com

**LegalEase Solutions LLC**
The future of law
**Website | Lawstore**

NOTICE OF CONFIDENTIALITY - THIS MESSAGE IS INTENDED ONLY FOR THE ADDRESSEES. It may contain privileged, confidential or proprietary information. Any unauthorized disclosure, use, copying or distribution of the contents of this message or the taking of any action on the contents of this message is strictly prohibited. If you received this electronic mail transmission in error, please promptly notify the sender LegalEase Solutions LLC at +1 (734) 619-6302 and delete the original and all copies from your system. NOTICE OF NO ATTORNEY-CLIENT PRIVILEGE - LegalEase Solutions LLC("LegalEase") provides legal support service exclusively to licensed United States, and Canadian attorneys. All services provided by LegalEase are restricted to licensed United States and/or Canadian attorneys and are not meant for use by non-attorneys. By submitting a project to LegalEase, you ("Client") represent the following: that you are a licensed United States or Canadian attorney, qualified and fit to practice law in one of the 50 states of the United States, or provinces and territories of Canada respectively; that you will independently exercise your professional judgment in reviewing any legal products or services provided to you by LegalEase; that no attorney-client privilege is formed between you and LegalEase; that you are in no way delegating your obligations and duties as a licensed attorney to LegalEase; and that you fully understand that LegalEase is not engaged in the practice of law, legal representation, or rendering legal advice

**From:** Saloni Agara Dwarakanath <saloni.dwarakanath@clutchgroup.com>
**Sent:** Tuesday, September 19, 2017 12:41:55 PM
**To:** Teri Whitehead
**Cc:** Merin Sony; Gayathri Rajeev; Tariq Hafeez; Tariq Akbar; Ross Leads
**Subject:** RE: ROSS BULK PROJECT - LPO

Hello Teri,

Thank you for sending across the credentials for Thomson Reuters Westlaw; the team is now comfortable with the user interface.

It would be great if you could set up a training call to validate our understanding. We also had a couple of questions based on the training materials that were sent across earlier.

We will be available until 6 PM IST (8:30 AM EST) on Wednesday and any time that would work for you on Thursday and Friday this week.

Looking forward to your response.

Thanks,
**Saloni Agara Dwarakanath** / Senior Associate – Legal Services
saloni.dwarakanath@clutchgroup.com / C: 888-432-0328

**ClutchGroup**
A MORAE GLOBAL BUSINESS
www.clutchgroup.com | www.moraeglobal.com



CLUTCH GROUP AND MORAE LEGAL MERGE TO FORM
MORAE GLOBAL   Read press release

BATES5169

TR-0039816

A2216

**From:** Saloni Agara Dwarakanath
**Sent:** Tuesday, September 19, 2017 12:44 PM
**To:** 'Teri Whitehead' <teri.whitehead@legaleasesolutions.com>; Jyothi Prasad Bislehalli <prasad.bislehalli@clutchgroup.com>; Priti Parekh <Priti.Parekh@clutchgroup.com>
**Cc:** Joy Saphla <joy.saphla@moraeglobal.com>; Chad Fennell <chad.fennell@clutchgroup.com>; 'Merin Sony' <merin.sony@legaleasesolutions.com>; 'Gayathri Rajeev' <gayathri.rajeev@legaleasesolutions.com>; 'Tariq Hafeez' <tariq.hafeez@legaleasesolutions.com>; 'Tariq Akbar' <tariq.akbar@legaleasesolutions.com>
**Subject:** RE: ROSS BULK PROJECT - LPO

Hello Teri,

Please find the below group email for future correspondence –

Ross.Leads@clutchgroup.com

Thanks,
**Saloni Agara Dwarakanath** / Senior Associate – Legal Services
saloni.dwarakanath@clutchgroup.com / C: 888-432-0328



ClutchGroup
A MORAE GLOBAL BUSINESS
www.clutchgroup.com | www.moraeglobal.com

CLUTCH GROUP AND MORAE LEGAL MERGE TO FORM

MORAE
GLOBAL

**From:** Saloni Agara Dwarakanath
**Sent:** Monday, September 18, 2017 8:26 PM
**To:** 'Teri Whitehead' <teri.whitehead@legaleasesolutions.com>; Jyothi Prasad Bislehalli <prasad.bislehalli@clutchgroup.com>; Priti Parekh <Priti.Parekh@clutchgroup.com>
**Cc:** Joy Saphla <joy.saphla@moraeglobal.com>; Chad Fennell <chad.fennell@clutchgroup.com>; Merin Sony <merin.sony@legaleasesolutions.com>; Gayathri Rajeev <gayathri.rajeev@legaleasesolutions.com>; Tariq Hafeez <tariq.hafeez@legaleasesolutions.com>; Tariq Akbar <tariq.akbar@legaleasesolutions.com>
**Subject:** RE: ROSS BULK PROJECT - LPO

Of course, Teri. We will get the group email done first thing tomorrow morning and communicate the email address to you.

Thanks,
**Saloni Agara Dwarakanath** / Senior Associate – Legal Services
saloni.dwarakanath@clutchgroup.com / C: 888-432-0328

BATES5170

TR-0039817

A2217



## ClutchGroup

A MORAE GLOBAL BUSINESS
www.clutchgroup.com | www.moraeglobal.com

CLUTCH GROUP AND MORAE LEGAL MERGE TO FORM

MORAE GLOBAL    Read press release

**From:** Teri Whitehead [mailto:teri.whitehead@legaleasesolutions.com]
**Sent:** Monday, September 18, 2017 8:23 PM
**To:** Saloni Agara Dwarakanath <saloni.dwarakanath@clutchgroup.com>; Jyothi Prasad Bislehalli <prasad.bislehalli@clutchgroup.com>; Priti Parekh <Priti.Parekh@clutchgroup.com>
**Cc:** Joy Saphla <joy.saphla@moraeglobal.com>; Chad Fennell <chad.fennell@clutchgroup.com>; Merin Sony <merin.sony@legaleasesolutions.com>; Gayathri Rajeev <gayathri.rajeev@legaleasesolutions.com>; Tariq Hafeez <tariq.hafeez@legaleasesolutions.com>; Tariq Akbar <tariq.akbar@legaleasesolutions.com>
**Subject:** Re: ROSS BULK PROJECT - LPO

Saloni, thank you.

Joythi, requested that I copy your entire team on this project. One more ask, can you create a group email account for us to correspond? It will be easier for us to use that email, rather than risk excluding anyone from your team by emails. Thank you.

Teri



Teri Whitehead
Vice President of Global Strategy
Tel: 248 925 0530  Fax: 734 468 0102
Email: teri.whitehead@legaleasesolutions.com

LegalEase Solutions LLC
*The future of law*
**Website | Lawstore**

NOTICE OF CONFIDENTIALITY - THIS MESSAGE IS INTENDED ONLY FOR THE ADDRESSEES. It may contain privileged, confidential or proprietary information. Any unauthorized disclosure, use, copying or distribution of the contents of this message or the taking of any action on the contents of this message is strictly prohibited. If you received this electronic mail transmission in error, please promptly notify the sender LegalEase Solutions LLC at 1 (734) 619-6302 and delete the original and all copies from your system. NOTICE OF NO

BATES5171

TR-0039818

A2218

ATTORNEY-CLIENT PRIVILEGE – LegalEase Solutions LLC ("LegalEase") provides legal support service exclusively to licensed United States and Canadian attorneys. All services provided by LegalEase are restricted to licensed United States and or Canadian attorneys and are not meant for use by non-attorneys. By submitting a project to LegalEase, you ("Client") represent the following: that you are a licensed United States or Canadian attorney, qualified and fit to practice law in one of the 50 states of the United States, or provinces and territories of Canada respectively; that you will independently exercise your professional judgment in reviewing any legal products or services provided to you by LegalEase; that no attorney-client privilege is formed between you and LegalEase; that you are in no way delegating your obligations and duties as a licensed attorney to LegalEase; and that you fully understand that LegalEase is not engaged in the practice of law, legal representation, or rendering legal advice.

**From:** Saloni Agara Dwarakanath <saloni.dwarakanath@clutchgroup.com>
**Sent:** Monday, September 18, 2017 9:10 AM
**To:** Teri Whitehead; Jyothi Prasad Bislehalli; Priti Parekh
**Cc:** Joy Saphla; Chad Fennell; Merin Sony; Gayathri Rajeev; Tariq Hafeez; Tariq Akbar
**Subject:** RE: ROSS BULK PROJECT - LPO

Sure, Teri. I will be the point of contact for any correspondence.

Resending the response as I received an email delivery failure notification. Apologies if this was already received.

Thanks,
Saloni Agara Dwarakanath / Senior Associate – Legal Services
saloni.dwarakanath@clutchgroup.com / C: 888-432-0328



A MORAE GLOBAL BUSINESS
www.clutchgroup.com | www.moraeglobal.com

**From:** Teri Whitehead [mailto:teri.whitehead@legaleasesolutions.com]
**Sent:** Monday, September 18, 2017 6:09 PM
**To:** Saloni Agara Dwarakanath <saloni.dwarakanath@clutchgroup.com>; Jyothi Prasad Bislehalli <prasad.bislehalli@clutchgroup.com>; Priti Parekh <Priti.Parekh@clutchgroup.com>
**Cc:** Joy Saphla <joy.saphla@moraeglobal.com>; Merin Sony <merin.sony@legaleasesolutions.com>; Gayathri Rajeev <gayathri.rajeev@legaleasesolutions.com>; Tariq Hafeez <tariq.hafeez@legaleasesolutions.com>; Tariq Akbar <tariq.akbar@legaleasesolutions.com>; Chad Fennell <chad.fennell@clutchgroup.com>
**Subject:** Re: ROSS BULK PROJECT - LPO

Excellent.  Question.  Is there one point person that our team could correspond?



Teri Whitehead
Vice President of Global Strategy

BATES5172

TR-0039819

A2219

Tel: 248 925 0530 · Fax: 734 468 0102
Email: teri.whitehead@legaleasesolutions.com

**LegalEase Solutions LLC**
*The future of law*
**Website | Lawstore**

NOTICE OF CONFIDENTIALITY - THIS MESSAGE IS INTENDED ONLY FOR THE ADDRESSEES. It may contain privileged, confidential or proprietary information. Any unauthorized disclosure, use, copying or distribution of the contents of this message or the taking of any action on the contents of this message is strictly prohibited. If you received this electronic mail transmission in error, please promptly notify the sender LegalEase Solutions LLC at +1 (734) 619-6302 and delete the original and all copies from your system. NOTICE OF NO ATTORNEY-CLIENT PRIVILEGE - LegalEase Solutions LLC("LegalEase") provides legal support service exclusively to licensed United States, and Canadian attorneys. All services provided by LegalEase are restricted to licensed United States and/or Canadian attorneys and are not meant for use by non-attorneys. By submitting a project to LegalEase, you ("Client") represent the following: that you are a licensed United States or Canadian attorney, qualified and fit to practice law in one of the 50 states of the United States, or provinces and territories of Canada respectively; that you will independently exercise your professional judgment in reviewing any legal products or services provided to you by LegalEase; that no attorney-client privilege is formed between you and LegalEase; that you are in no way delegating your obligations and duties as a licensed attorney to LegalEase; and that you fully understand that LegalEase is not engaged in the practice of law, legal representation, or rendering legal advice.

**From:** Saloni Agara Dwarakanath <saloni.dwarakanath@clutchgroup.com>
**Sent:** Monday, September 18, 2017 8:32:37 AM
**To:** Jyothi Prasad Bislehalli; Teri Whitehead; Priti Parekh
**Cc:** Joy Saphla; Merin Sony; Gayathri Rajeev; Tariq Hafeez; Tariq Akbar; Chad Fennell
**Subject:** RE: ROSS BULK PROJECT - LPO

Hello Teri,

Thank you for sending across the training materials to us. Looking forward to working with you and your team.

Regards,
**Saloni Agara Dwarakanath** / Senior Associate – Legal Services
saloni.dwarakanath@clutchgroup.com / C: 888-432-0328

**ClutchGroup**
A MORAE GLOBAL BUSINESS
www.clutchgroup.com | www.moraeglobal.com

CLUTCH GROUP AND MORAE LEGAL MERGE TO FORM

 Read press release

**From:** Jyothi Prasad Bislehalli
**Sent:** Monday, September 18, 2017 5:53 PM
**To:** Teri Whitehead <teri.whitehead@legaleasesolutions.com>; Priti Parekh <Priti.Parekh@clutchgroup.com>

BATES5173

TR-0039820

A2220

**Cc:** Joy Saphla <joy.saphla@moraeglobal.com>; Merin Sony <merin.sony@legaleasesolutions.com>; Gayathri Rajeev <gayathri.rajeev@legaleasesolutions.com>; Tariq Hafeez <tariq.hafeez@legaleasesolutions.com>; Tariq Akbar <tariq.akbar@legaleasesolutions.com>; Saloni Agara Dwarakanath <saloni.dwarakanath@clutchgroup.com>; Chad Fennell <chad.fennell@clutchgroup.com>
**Subject:** RE: ROSS BULK PROJECT - LPO

Hello Teri:

Hope you had a nice weekend.

I would like to introduce Saloni to this group who is our Lead on this project. And, Chad Fennell (whom you all know from Project 99a) - is a US licensed attorney, will be the SME for our team. Request you to keep them copied on all communication for this project.

We will be using WL credentials today and tomorrow after 6:00PM IST to train our team. We will be ready for project training this Wednesday (09/20/2017). Please let me know the date and time that works best for your team and I will circulate the invite along with Go To Meeting details for screen-share.

Many thanks,
Jyothi

**Jyothi Prasad** / Associate Director – Legal Services
prasad.bislehalli@clutchgroup.com / C: 91 99866 38314



ClutchGroup
A MORAE GLOBAL BUSINESS
www.clutchgroup.com | www.moraeglobal.com

**From:** Teri Whitehead [mailto:teri.whitehead@legaleasesolutions.com]
**Sent:** Sunday, September 17, 2017 6:48 PM
**To:** Priti Parekh <Priti.Parekh@clutchgroup.com>; Jyothi Prasad Bislehalli <prasad.bislehalli@clutchgroup.com>
**Cc:** Joy Saphla <joy.saphla@moraeglobal.com>; Merin Sony <merin.sony@legaleasesolutions.com>; Gayathri Rajeev <gayathri.rajeev@legaleasesolutions.com>; Tariq Hafeez <tariq.hafeez@legaleasesolutions.com>; Tariq Akbar <tariq.akbar@legaleasesolutions.com>
**Subject:** RE: ROSS BULK PROJECT - LPO

Excellent.
This week we will provide proposed time and dates for ROSS specific training.
Prior to that, please confirm when your team has become (or will become) comfortable and familiar with Westlaw and have had an opportunity to study our materials.
Thank you.

BATES5174

TR-0039821

A2221

Teri

**From:** Jyothi Prasad Bislehalli <prasad.bislehalli@clutchgroup.com>
**Sent:** Saturday, September 16, 2017 3:12:10 AM
**To:** Teri Whitehead; Priti Parekh
**Cc:** Joy Saphla; Merin Sony; Gayathri Rajeev; Tariq Hafeez; Tariq Akbar
**Subject:** RE: ROSS BULK PROJECT - LPO

Thank you, Teri.

Merin, great to connect with you via email. We look forward to working with you on this assignment.

Guidance documents looks very good and we will let you know, if there are any questions as we start to review them. As requested, just wanted to let you know that we will be using the below WL credentials on weekdays but will be sure to use them within the stipulated time.

Many thanks,
Jyothi

**Jyothi Prasad** / Associate Director – Legal Services
prasad.bislehalli@clutchgroup.com / C: 91 99866 38314



A MORAE GLOBAL BUSINESS
www.clutchgroup.com | www.moraeglobal.com



CLUTCH GROUP AND MORAE LEGAL MERGE TO FORM

**From:** Teri Whitehead [mailto:teri.whitehead@legaleasesolutions.com]
**Sent:** Saturday, September 16, 2017 2:37 AM
**To:** Jyothi Prasad Bislehalli <prasad.bislehalli@clutchgroup.com>; Priti Parekh
<Priti.Parekh@clutchgroup.com>
**Cc:** Joy Saphla <joy.saphla@moraeglobal.com>; Merin Sony <merin.sony@legaleasesolutions.com>;
Gayathri Rajeev <gayathri.rajeev@legaleasesolutions.com>; Tariq Hafeez
<tariq.hafeez@legaleasesolutions.com>; Tariq Akbar <tariq.akbar@legaleasesolutions.com>
**Subject:** ROSS BULK PROJECT - LPO

Greetings!
This email is in furtherance of the discussions we had with you on the ROSS Bulk memo project.

Allow me first to introduce you to our ROSS team lead, Merin Sony. She leads our entire process including quality control. She has also organized this correspondence and attachments.

BATES5175

TR-0039822

A2222

Please find attached the Best Practices Guide (BPG), Quality Control Guide (QCG), Checklist and instructions, sample memo, and template.

**Best Practices Guide (BPG)** provides the step by step process of drafting and reviewing the memos.
**Quality Control Guide (QCG)** provides instructions on reviewing the memos.
**Checklist and instructions** is a handy doc setting out the checklists and instructions provided in the BPG and QCG for quick reference.

You may use the following West Law (WL) credentials. Kindly note that you may use the credentials on Saturday and Sunday, and if you wish to use on weekdays, please let us you will need to do so before 9 AM IST and after 6 PM IST.

1.  Username: LegalEase8
Password: Lgles$#2017

2.  Username: MoonSaleh
Password: Legalease2017

3.

The following are a few links to West Law videos that would help you to get an understanding of the required WL process:
Introduction to Thomson Reuters Westlaw
Using the Key Number System & Headnotes on Westlaw
Using KeyCite on Westlaw

We look forward to working with you.

Teri

Teri Whitehead
Vice President of Global Strategy
Tel: 248 925 0530 | Fax: 734 468 0102
Email: teri.whitehead@legaleasesolutions.com

BATES5176

TR-0039823

A2223

LegalEase Solutions LLC
*The future of law*
**Website** | **Lawstore**

NOTICE OF CONFIDENTIALITY - THIS MESSAGE IS INTENDED ONLY FOR THE ADDRESSEES. It may contain privileged, confidential or proprietary information. Any unauthorized disclosure, use, copying or distribution of the contents of this message or the taking of any action on the contents of this message is strictly prohibited. If you received this electronic mail transmission in error, please promptly notify the sender LegalEase Solutions LLC at +1 (734) 619-6302 and delete the original and all copies from your system. NOTICE OF NO ATTORNEY-CLIENT PRIVILEGE - LegalEase Solutions LLC("LegalEase") provides legal support service exclusively to licensed United States, and Canadian attorneys. All services provided by LegalEase are restricted to licensed United States and/or Canadian attorneys and are not meant for use by non-attorneys. By submitting a project to LegalEase, you ("Client") represent the following: that you are a licensed United States or Canadian attorney, qualified and fit to practice law in one of the 50 states of the United States, or provinces and territories of Canada respectively; that you will independently exercise your professional judgment in reviewing any legal products or services provided to you by LegalEase; that no attorney-client privilege is formed between you and LegalEase; that you are in no way delegating your obligations and duties as a licensed attorney to LegalEase; and that you fully understand that LegalEase is not engaged in the practice of law, legal representation, or rendering legal advice.

CONFIDENTIALITY AND LEGAL SERVICES DISCLAIMER: This email and any files transmitted with it are confidential, may be subject to legal privilege, and are intended solely for the use of the individual or entity to which they are addressed. If you are not an intended recipient of this email, please notify the sender immediately and delete this email and any attachments. Morae Global Corporation (collectively, with its subsidiaries, **"Morae Global"**) is not a law firm, and does not provide legal advice or otherwise engage in the practice of law. The services performed by Morae Global for its clients are delivered under the direction and supervision of licensed attorneys or their agents in furtherance of the legal services that those attorneys are providing to their clients.

CONFIDENTIALITY AND LEGAL SERVICES DISCLAIMER: This email and any files transmitted with it are confidential, may be subject to legal privilege, and are intended solely for the use of the individual or entity to which they are addressed. If you are not an intended recipient of this email, please notify the sender immediately and delete this email and any attachments. Morae Global Corporation (collectively, with its subsidiaries, "Morae Global") is not a law firm, and does not provide legal advice or otherwise engage in the practice of law. The services performed by Morae Global for its clients are delivered under the direction and supervision of licensed attorneys or their agents in furtherance of the legal services that those attorneys are providing to their clients.

CONFIDENTIALITY AND LEGAL SERVICES DISCLAIMER: This email and any files transmitted with it are confidential, may be subject to legal privilege, and are intended solely for the use of the individual or entity to which they are addressed. If you are not an intended recipient of this email, please notify the sender immediately and delete this email and any attachments. Morae Global Corporation (collectively, with its subsidiaries, "Morae Global") is not a law firm, and does not provide legal advice or otherwise engage in the practice of law. The services performed by Morae Global for its clients are delivered under the direction and supervision of licensed attorneys or their agents in furtherance of the legal services that those attorneys are providing to their clients.

CONFIDENTIALITY AND LEGAL SERVICES DISCLAIMER: This email and any files transmitted with it are confidential, may be subject to legal privilege, and are intended solely for the use of the individual or entity to which they are addressed. If you are not an intended recipient of this email, please notify the sender immediately and delete this email and any attachments. Morae Global Corporation (collectively, with its subsidiaries, "Morae Global") is not a law firm, and does not provide legal advice or otherwise engage in the practice of law. The services performed by Morae Global for its clients are delivered under the direction and supervision of licensed attorneys or their agents in furtherance of the legal services that those attorneys are providing to their clients.

BATES5177

TR-0039824

A2224

BATES5178

TR-0039825

A2225



EXHIBIT 79
WIT: _____
DATE: 10·10·19
LORI A. BALDWIN CSR, RPR, CRR

| | |
|---|---|
| Document ID | : ROSS Original |
| Date of Issue | : |
| Periodic Review | : 02.12.18 |
| Revision No | : 6 |

# Best Practices Guide for ROSS Intelligence

Drafting Questions and responsive memos for ROSS Original

**LegalEase Solutions LLC**

Last revised: 02.12.18

BATE4968

TR-0039826

A2226



| Document ID | : ROSS Original |
| Date of Issue | : |
| Periodic Review | : 02.12.18 |
| Revision No | : 6 |

# Contents

Part I ............................................................................................................... 3

  Overview ........................................................................................... 3

  Introduction ...................................................................................... 3

  Audience ........................................................................................... 3

  Objectives......................................................................................... 3

  Legal Disclaimer .............................................................................. 3

Part II .............................................................................................................. 4

  Framing Questions........................................................................... 4

Westlaw ......................................................................................................... 4

LEXIS ............................................................................................................. 8

Part III ............................................................................................................ 10

2

Last revised: 02.12.18

BATE4969

TR-0039827

A2227

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 291 of 431 PageID #: 153116



| | |
|---|---|
| Document ID | : ROSS Original |
| Date of Issue | : |
| Periodic Review | : 02.12.18 |
| Revision No | : 6 |

## Part I

### Overview
The LegalEase Solutions Best Practices Guide aims to set out the framing of questions and responsive memos that meet the standards and requirements of ROSS Intelligence.

### Introduction
The LegalEase Solutions Best Practices Guide is the primary resource and playbook for our attorneys. This Practice Guide provides all the tools and resources needed for the drafting and delivery of ROSS Intelligence memos.

### Audience
The intended audience for this guide is our full-time, part-time, and subcontracted attorneys who prepare Ross memos. Additionally, this guide may be utilized by ROSS to review our internal process.

### Objectives

This guide:
- Identifies clear guidelines for attorneys to follow when designing, developing, researching, drafting, and delivering ROSS memos.
- Promotes uniformity of the process to be followed by the team.
- Lay out checklists to ensure quality assurance of the memos at different stages.
- Describes best practices and standards for ROSS memos.

### Legal Disclaimer

3

Last revised: 02.12.18

BATE4970

TR-0039828

A2228



| | |
|---|---|
| Document ID | : ROSS Original |
| Date of Issue | : |
| Periodic Review | : 02.12.18 |
| Revision No | : 6 |

This Best Practices Guide includes proprietary, confidential, and/or trade secret information. LegalEase considers this information to be a trade secret not subject to disclosure.

**Part II**

**Framing Questions**

You may be assigned a West Law (WL)/Lexis topic to frame questions. An easy way of framing questions is to rely on the head notes. However, note that the head notes are proprietary and you should not copy paste them in the question.

Westlaw

Given below are screenshots to frame questions using Westlaw:

1) Headnote Search  - Click on the assigned Key Numbers.

4

Last revised: 02.12.18

BATE4971

TR-0039829

A2229





| | |
|---|---|
| Document ID | : ROSS Original |
| Date of Issue | : |
| Periodic Review | : 02.12.18 |
| Revision No | : 6 |

Here, the topic assigned is Abandoned and lost property.

Last revised: 02.12.18

BATE4972

TR-0039830

A2230





2)  Click on a key number topic.



Home > West Key Number System

# 1 ABANDONED AND LOST PROPERTY

- I. ABANDONMENT, k1-k9
    + 1 Nature and elements
    4 Evidence and questions for jury
    5 Operation and effect
- II. FINDING LOST GOODS, k10-k13
    10 In general; loss of property
    11 Rights and liabilities of finder as to owner
    12 Title and rights of finder as to third persons
    13 Title and rights of finders inter se

3)  Clicked on #4 Evidence and questions for jury.

- I. ABANDONMENT, k1-k9
    + 1 Nature and elements
    4 Evidence and questions for jury
    5 Operation and effect
- II. FINDING LOST GOODS, k10-k13
    10 In general; loss of property
    11 Rights and liabilities of finder as to owner

Last revised: 02.12.18

BATE4973

TR-0039831

A2231



| | |
|---|---|
| Document ID | : ROSS Original |
| Date of Issue | : |
| Periodic Review | : 02.12.18 |
| Revision No | : 6 |

4)  Got this...

← 4 Evidence and questions for jury (78)     Add to Favorites

Jurisdiction: All Federal   Change

1 - 78                                          Sort by: Topic then Date  ▼

☐ Select all items    No items selected

1 ABANDONED AND LOST PROPERTY 415
  1 Abandonment 290
    1 ← 4 Evidence and questions for jury 78

☐  1. **Cheffins v. Stewart**
United States Court of Appeals, Ninth Circuit.   June 8. 2016   825 F.3d 588

Headnote: Under Nevada law, abandonment of property may be inferred from acts done

Document Preview: COPYRIGHTS - Art and Architecture. Mobile replica of 16th-century Spanish galleon was not protected b

☐  2. **Recovery Ltd. Partnership v. Wrecked and Abandoned Vessel, S.S. CENTRAL AMERICA**
United States District Court, E.D. Virginia, Norfolk Division.   August 11, 2015   120 F.Supp.3d 500

Headnote: In order for the law of finds to be applied to property lost at sea, the treasure-hunter must establish abandonment of t
bar to proving such abandonment is high.

Document Preview: MARITIME LAW - Salvage. Law of salvage applied to artifacts recovered from historic shipwreck.

5)  Clicked on Cheffins case.

Last revised: 02.12.18

BATE4974

TR-0039832

A2232



| | |
|---|---|
| Document ID | : ROSS Original |
| Date of Issue | : |
| Periodic Review | : 02.12.18 |
| Revision No | : 6 |

ABANDONED AND LOST PROPERTY 415
- 1I Abandonment 290
- 1—4 Evidence and questions for jury 78

**1. Cheffins v. Stewart**

United States Court of Appeals, Ninth Circuit.   June 8, 2016   825 F.3d 588

Headnote: Under Nevada law, abandonment of property may be inferred from acts done.

Document Preview: COPYRIGHTS - Art and Architecture. Mobile replica of 16th-century Spanish galleon was not pr

**2. Recovery Ltd. Partnership v. Wrecked and Abandoned Vessel, S.S. CENTRAL AM**

United States District Court, E.D. Virginia, Norfolk Division.   August 11, 2015   120 F.Supp.3d 500

Headnote: In order for the law of finds to be applied to property lost at sea, the treasure-hunter must establish abandor

6) Which pulls up the exact headnote on point. As well as ton of others...

**12 Abandoned and Lost Property**
Under Nevada law, abandonment of property may be inferred from acts done.

**13 Federal Courts**
Any error was harmless as to district court's failure to give jury instruction lost profits and punitive damages, which failure was based on district cour determination that such damages were unduly speculative, in action for conversion under Nevada law, relating to destruction of mobile replica of 16th-century Spanish galleon, built from used school bus, where jury foun favor of defendant on the conversion claim brought by mobile replica's creators, so that there were no damages to be awarded.

7) From that headnote, I am going to make the statement a question.

So – headnote 12 - "Under Nevada law, abandonment of property may be inferred from acts done."
Convert to a question, "May abandonment of property under Nevada Law be inferred from acts done?"

LEXIS
Given below are screenshots to frame questions using Lexis:

Last revised: 02.12.18

BATE4975

TR-0039833

A2233



| | |
|---|---|
| Document ID | : ROSS Original |
| Date of Issue | : |
| Periodic Review | : 02.12.18 |
| Revision No | : 6 |

1) Log on to your account and go to the main screen.



(3) Select the assigned Key Topic

Last revised: 02.12.18

BATE4976

TR-0039834

A2234

Case: 25-2153   Document: 156-5   Page: 538   Date Filed: 01/02/2026

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 298 of 431 PageID #: 153123



| | |
|---|---|
| Document ID | : ROSS Original |
| Date of Issue | : |
| Periodic Review | : 02.12.18 |
| Revision No | : 6 |



**Part III**

Last revised: 02.12.18

BATE4977

TR-0039835

A2235



| Document ID | : ROSS Original |
|---|---|
| Date of Issue | : |
| Periodic Review | : 02.12.18 |
| Revision No | : 6 |

**Drafting Memorandum**

1. ROSS is an artificially intelligent attorney to help attorneys power through legal research. LegalEase is helping ROSS by answering legal issues through memorandum ("Memo") and thus contributing to their databank.

2. As of now, the focus is on Labor and Employment cases.

3. ROSS Smart Sheet (SS) shows the question number, the associate that question is assigned to, and 3 "date" fields: 1st draft, 1st review; 2nd draft, 2nd review, 3rd draft, 3rd review. The reviewer enters the notes in the review column. Never enter a date in review column. It is exclusively for the reviewer.

4. The SS has a column titled Notes where you can enter the concerns encountered while drafting. The reviewer shall look into the concerns and enter the revisions/suggestions in the column.

5. When you complete the work, please be sure to update the 1st Drafts column with the date of completion. Whenever you are asked to revise the draft remember to enter the date in 2nd draft/3rd draft.

6. Use the LE tool to draft memos. Each associate is provided a separate log in credential to access the tool. Once you complete drafting, assign the memo for review.

7. Enter the time taken for the memos in Zoho.

8. The allocated time to draft a memo is 40 minutes, and the target is 10 memos per day which would be revisited based on the team's progress with drafting.

9. The main difference of ROSS memo with LRW memo is that in ROSS Memos, after the Memo section, there is a Reference List Section ("RL Section") that references the footnotes provides in the memo. This section is equally important.

10. The format of RL section is revised from the client sample. There will be mention of an Issue, Cases referring to that issue with docket number and the relevant quotes relied to draft. The RL section, sample format looks like:

Issue:
Case 1:
Quote 1:

Last revised: 02.12.18

BATE4978

TR-0039836

A2236



| | |
|---|---|
| Document ID | : ROSS Original |
| Date of Issue | : |
| Periodic Review | : 02.12.18 |
| Revision No | : 6 |

11. Earlier the whole memo was drafted in Times New Roman, with font size 12 and single spaced. For footnotes use the Word automatic pre-sets. It will be:
Font: Calibri 10pts
Alignment: left
Outline level: body
Indents left/right: 0". Special: none
"Spacing" 0pts before, 10pts after. Line spacing: Multiple at 1.15.

12. With the use of automation tool, the requirement for font and space specifications are no longer followed after confirming with the client.

13. File name convention: "[Zoho id] - ROSS Memo – [Question #]

14. Building and formatting the memo.

a. Begin by researching the question. When using WL Next to "Copy with reference" BE SURE the format it copies with is "Standard."  That should automatically give you a good cite when you paste it. Use "copy Advanced" when using Lexis.

b. Log in to the LE tool and choose "Create" and "Original."



c. Enter Memo number, Timesheet id (Zoho id that remains same for a given month is entered in place of timesheet id), and the Question. Assign the question to the person drafting the memo.



Last revised: 02.12.18

BATE4979

TR-0039837

A2237



| | |
|---|---|
| Document ID | : ROSS Original |
| Date of Issue | : |
| Periodic Review | : 02.12.18 |
| Revision No | : 6 |

d.  After entering all the required fields, including Practise Area, submit the question to the person drafting the memo.



e.  Once the question is assigned the same gets displayed on the dash board. Use "Prepare" to draft the memo.



f.  Insert foot notes for each sentence.



g.  Build Reference List (RL) using "New" tab.

Last revised: 02.12.18

BATE4980

TR-0039838

A2238



Document ID      : ROSS Original
Date of Issue     :
Periodic Review   : 02.12.18
Revision No        : 6



h.  For adding different Quotes from the same case, add "A."



i.  Once you complete drafting the memo, submit it for review.

j.  If the memo "question" asks a yes or no question, make sure the "short answer" answers it – Yes. No.

k.  The short answer and conclusion should directly answer the question, and should not include phraseology such as 'may'. Make sure to spell out directly the inconsistencies in the law and/or different viewpoints (e.g. majority view/ minority view). E.g. "The majority view of the federal courts is that there is no private right of action for damages based on a violation of the discharge injunction".

l.  **The long answer should include analysis**, and connect the question to the relevant case law found. **Do not copy paste passages** from the reference list provided into the Long Answer.

m.  Each quote in the reference list should directly and independently answer the question. Foundational or conclusion quotes that do not answer the question directly should be avoided.

n.  If a quote is included in the reference list the assumption is that it is a case on point. So, there is no need to include the phrase "case on point" in the memo body.

14

Last revised: 02.12.18

BATE4981

TR-0039839

A2239



| Document ID | : ROSS Original |
|---|---|
| Date of Issue | : |
| Periodic Review | : 02.12.18 |
| Revision No | : 6 |

o.  As you build a rough RL section, move the quotes around and take notes until it is in a logical order that will answer the question.

p.  Cite the quotes, and authority of cases. Unlike the usual memo format that uses in-text citations, here footnotes are inserted for referencing the citations.

q.  Use Bluebook to resolve any citation issues.

r.  Note that pinpoint citation is no longer used in ROSS memo. For e.g. *In re Story*, 536 B.R. 279, 283 (Bankr. E.D. Mo. 2015) will be entered as *In re Story*, 536 B.R. 279.

s.  Do not over-state the law or unnecessarily repeat it.

t.  **NEVER cite an unpublished case that cites to a published case.** Especially when all or substantially all of the quoted language comes from the published case the lower court is quoting itself.  **Instead, just cite the published case**.

u.  As you create issue statements, use those in the memo and RL sections in the same order.

v.  Ensure that every footnote in the Long Answer is reflected in the Reference List.

w.  If there are multiple quotes from one case related to the same issue in the Reference List, please include all of them under your entry for that case.

x.  Each case, which is mentioned in the Long and Short Answer, must be included in the Reference List.  This means that there will be no cases mentioned in the Long and Short Answer sections of the memo, which are not also listed at least once in the Reference List.

y.  Each issue, which is listed in the Reference List, must have listed below it every case related to it, with the accompanying docket number and quote.  A new entry into the Reference List would now look like this:

Issue: Can a chapter 11 bankruptcy petition be summarily dismissed for absence of debtor's good faith?
Case 1:
Quote 1:

Quote 2:

Quote 3:

Case 2:
Quote 1:

Last revised: 02.12.18

BATE4982

TR-0039840

A2240



| | |
|---|---|
| Document ID | : ROSS Original |
| Date of Issue | : |
| Periodic Review | : 02.12.18 |
| Revision No | : 6 |

Case 3:
Quote 1:

Quote 2:

> z. Ensure that where the long answer cites case X, which is directly citing case Y, 2 entries are made into the Reference List. For example:

For example:
The sentence in the Long Answer is:

*The court observed that generally, a lien secures an underlying obligation, and "a lien on a homestead is a division of property."*

And the quote is footnoted to Bakken v. Helgeson, but in fact Bakken v. Helgeson was just repeating that quote as it was found in Charlson v. Charlson, 374 N.W.2d 473, 476 (Minn.App.1985).
Then in the Reference List you would actually have two entries for this one footnote. They would look like this:

**Issue: Under Minnesota law, how is a marital lien perceived?**
Case 1: Bakken v. Helgeson, 785 N.W.2d 791.
Quote 1: But marital liens, such as appellant's, are not judgment liens; they are a method of distributing property in a dissolution proceeding. "A lien on a homestead is a division of property." Charlson v. Charlson, 374 N.W.2d 473, 476 (Minn.App.1985). A lien is "an encumbrance on property as security for the payment of debt." Minn.Stat. § 514.99, subd. 1(b) (2008). A marital lien is personal property, though it is not an estate or an interest in the parcel of real property itself. Granse & Assocs. v. Kimm, 529 N.W.2d 6, 8 (Minn.App.1995), review denied (Minn. Apr. 27, 1995). A district court's use of a marital lien to divide property must have "an acceptable basis in fact and principle." Rohling v. Rohling, 379 N.W.2d 519, 522-23 (Minn.1986) (approving marital lien that did not mature for 15 years)"

Case 2: Charlson v. Charlson, 374 N.W.2d 473.
Quote 2: "A lien on a homestead is a division of property."

> aa. When you quote the same case, same paragraph more than once in the memo, the RL need only have the paragraph appears once in each issue section it applies to.

> bb. IF you cite Case A (cite is in the footnotes) AND Case A has directly quoted Case B in the quote we are using, THEN the footnote must cite Case A (citing Case B), AND the RL in the relevant section must have the full entry and paragraph of Case A and full entry and paragraph of Case B. Eg, the direct quote we use from Case A has quotes within it from Case B.
> IF Case A paraphrases or references Case B BUT does not directly quote Case B, THEN only cite Case A in the footnotes and RL.

16

Last revised: 02.12.18

BATE4983

TR-0039841

A2241

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 305 of 431 PageID #: 153130



| Document ID | : ROSS Original |
|---|---|
| Date of Issue | : |
| Periodic Review | : 02.12.18 |
| Revision No | : 6 |

cc. In RL section, while the quotes are copy-pasted, make sure the page numbers and footnotes in the judgment are deleted.

dd. Check over the entire memo to make sure that there are no stray lines or odd spaces.

ee. Confirm that the Reference List starts on a new page. Insert page break if necessary.

ff. Complete all Smart sheet fields.

gg. Attorney Checklist

| Description | Completed |
|---|---|
| 1. Draft ROSS questions following LegalEase Creative Process | |
| 2. Research questions using online resources and accounts. | |
| 3. Confirm that the cases cited are good law. | |
| 4. Insert relevant reference quotes. | |
| 5. Confirm that each reference quote answers the question. | |
| 6. Draft legal analysis using LegalEase legal analysis method. | |
| 7. Confirm grammar correct throughout memo. | |
| 8. Confirm the font and space of the memo. | |

15. Quality Control

a. The associate shall do a quick Quality Control (QC) of the memo before submitting for review. The self QC involves checking spelling, grammar, alignment, and formatting.

Last revised: 02.12.18

BATE4984

TR-0039842

A2242



| Document ID | : ROSS Original |
|---|---|
| Date of Issue | : |
| Periodic Review | : 02.12.18 |
| Revision No | : 6 |

b.  QC team will take up the memo from the tool and complete the review.

c.  QC associate must cross check the question in SS with the question in the memo.

d.  QC associate must review the grammar and style of the question to make sure that it corresponds to ROSS format.

e.  The cases and quotes used in the RL must be cross checked for precision.

f.  The citations must be reviewed to make sure that they correspond to the ROSS requirements.

g.  The Question and Short Answer (SA) must be compared to make sure that the SA follows the language of the question per ROSS requirement.

h.  The memo must be reviewed to make sure that the question and answer corresponds to the law provided in RL.

i.  The RL numbering must be reviewed to avoid oversights.

j.  The QC team must get back to the associate with the errors encountered to make sure that the same errors are not repeated.

### Review Attorney's Checklist

| Description | Completed |
|---|---|
| 1. Validate ROSS questions following LegalEase Creative Process | |
| 2. Confirm that the cases cited are good law. | |
| 3. Confirm relevant reference quotes. | |
| 4. Confirm that each reference quote answers the question. | |
| 5. Validate legal analysis using LegalEase legal analysis method. | |
| 6. Confirm grammar correct throughout memo. | |

16. Uploading Memos

Last revised: 02.12.18

BATE4985

TR-0039843

A2243



| Document ID | : ROSS Original |
| Date of Issue | : |
| Periodic Review | : 02.12.18 |
| Revision No | : 6 |

a.  The final memo will be uploaded to ROSS portal by the reviewer.

b.  The reviewer must update the Smart sheet with his/her initials and date of upload.

c.  Once uploaded the memo cannot be retrieved. So, he reviewer must double check the memo before uploading.

Last revised: 02.12.18

BATE4986

TR-0039844

A2244

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 308 of 431 PageID #: 153133

CONFIDENTIAL



EXHIBIT 80
WIT: ___
DATE: 10-10-19
LORI A. BALDWIN CSR, RPR, CRR

# Best Practices Guide for ROSS Intelligence

Drafting Memorandum, Quality Control, and Portal Upload

LegalEase Solutions LLC

00284

00291

TR-0039845

A2245

CONFIDENTIAL



*providing the legal edge*

## Best Practices on Drafting Memorandums for ROSS Intelligence

1. ROSS is an artificially intelligent attorney to help attorneys power through legal research. LegalEase is helping ROSS by answering legal issues through memorandum ("Memo") and thus contributing to their databank.

2. As of now, the focus is on Bankruptcy law and cases.

3. The questions will be assigned in the Smartsheet (SS).

4. ROSS SS shows the question number, the associate that question is assigned to, and then has 3 "date" fields: 1st draft, 1st review; 2nd draft, 2nd review, 3rd draft, 3rd review. The reviewer enters the notes in the review column. Never enter a date in review column. It is exclusively for the reviewer.

5. The SS has a column titled Notes where you can enter the concerns encountered while drafting. The reviewer shall look into the concerns and enter the revisions/suggestions in the column.

6. When you complete the work, and email the drafts to the US team, please be sure to update the 1st Drafts column with the date you did the draft. Whenever you are asked to revise the draft remember to enter the date in 2nd draft/3rd draft.

7. Also, upload the drafts in the "ROSS Intelligence" folder in Box with the date you did the work. We keep monthly folders for the work.

8. Assign the project to your name in the bill4time. The project name will be the question number provided by the client. For Example: ROSS Memo 1, 2, 3 etc.

9. Billable time. Note that each draft has been allocated 2 billable hours. For most of you, this means 3-4 labor hours.

10.    The main difference with the usual memos is that in ROSS Memos, after the Memo section, there is a Reference List Section ("RL Section") that references the footnotes provides in the memo. This section is equally important.



00285

00291

TR-0039846

A2246

CONFIDENTIAL



*providing the legal edge*

11.    The format of RL section is revised from the client sample. There will be mention of an Issue, Cases referring to that issue with docket number and the relevant quotes relied to draft. The RL section, sample format looks like:

**Issue:**
Case 1:
Docket Number:
    Quote 1:

12. The whole memo is drafted in Times New Roman, with font size 12 and single spaced. For footnotes use the Word automatic pre-sets. It will be:
Font: Calibri 10pts
Alignment: left
Outline level: body
Indents left/right: 0". Special: none
"Spacing" 0pts before, 10pts after. Line spacing: Multiple at 1.15.

13.    File name convention: "[bill4time id] ROSS Memo – [Question #] [date][associate initials].

14.    Building and formatting the memo.

a. Opening the ROSS template, use the save as option and rename the template following the naming convention mentioned above.

b. Begin by researching the question. When using WL Next to "Copy with reference" BE SURE the format it copies with is "Standard."  That should automatically give you a good cite when you paste it.

c. If the memo "question" asks a yes or no question, make sure the "short answer" answers it – Yes. No.

d. The short answer and conclusion should directly answer the question, and should not include phraseology such as 'may'. Make sure to spell out directly the inconsistencies in the law and/or different viewpoints (e.g. majority view/ minority view). E.g. "The majority view of the federal courts is that there is no private right of action for damages based on a violation of the discharge injunction".



TR-0039847

A2247

CONFIDENTIAL



e. **The long answer should include analysis**, and connect the question to the relevant case law found. **Do not copy paste passages** from the reference list provided in the Long Answer.

f. Each quote in the reference list should directly and independently answer the question. Foundational or conclusory quotes that do not answer the question directly should be avoided.

g. If a quote is included in the reference list the assumption is that it is a case on point. So, there is no need to include the phrase "case on point" in the memo body.

h. As you build a rough RL section, move the quotes around and take notes until it is in a logical order that will answer the question.

i. Cite the quotes, authority of cases and statutes. Unlike the usual memo format that uses in-text citations, here footnotes are inserted for referencing the citations.

j. Use Bluebook to resolve any citation issues.

k. Note that pinpoint citation is no longer used in ROSS memo. For e.g. *In re Story*, 536 B.R. 279, 283 (Bankr. E.D. Mo. 2015) will be entered as *In re Story*, 536 B.R. 279.

l. Do not over-state the law or unnecessarily repeat it. This helps in minimizing the work in RL section.

m. Refresh your knowledge regarding the hierarchy of authorities. Bankruptcy is a federal statute. Therefore, federal law will generally control. District courts in the federal system are trial courts. Then the courts of appeal (circuit courts), and in the apex, the Supreme Court.

n. **NEVER cite an unpublished case that cites to a published case.** Especially when all or substantially all of the quoted language comes from the published case the lower court is quoting itself. **Instead, just cite the published case.**

o. As you create issue statements, use those in the memo and RL sections in the same order.

p. Ensure that every footnote in the Long Answer is reflected in the Reference List.



00287

00291

TR-0039848

A2248

CONFIDENTIAL



*providing the legal edge*

q. If there are multiple quotes from one case related to the same issue in the Reference List, please include all of them under your entry for that case.

r. Each case, which is mentioned in the Long and Short Answer, must be included in the Reference List.  This means that there will be no cases mentioned in the Long and Short Answer sections of the memo, which are not also listed at least once in the Reference List.

s. Each issue, which is listed in the Reference List, must have listed below it every case related to it, with the accompanying docket number and quote.  A new entry into the Reference List would now look like this:

Issue: Can a chapter 11 bankruptcy petition be summarily dismissed for absence of debtor's good faith?
Case 1:
Docket Number:
    Quote 1:

    Quote 2:

    Quote 3:

Case 2:
Docket Number:
    Quote 1:

Case 3:
Docket Number:
    Quote 1:

    Quote 2:

t. Ensure that where the long answer cites case X, which is directly citing case Y, 2 entries are made into the Reference List. For example:

For example:
The sentence in the Long Answer is:

*Generally, a lien secures an underlying obligation, and "a lien on a homestead is a division of property."*

And the quote is footnoted to *Bakken v. Helgeson*, but in fact *Bakken v. Helgeson* was just repeating that quote as it was found in *Charlson v. Charlson*, 374 N.W.2d 473, 476



A2249

CONFIDENTIAL



*providing the legal edge*

(Minn.App.1985).
Then in the Reference List you would actually have two entries for this one footnote. They would look like this:

**Issue: Under Minnesota law, how is a marital lien perceived?**
Case 1: *Bakken v. Helgeson,* 785 N.W.2d 791, 794-95 (Minn. Ct. App. 2010)
Docket Number: xyz

> Quote 1: But marital liens, such as appellant's, are not judgment liens; they are a method of distributing property in a dissolution proceeding. "A lien on a homestead is a division of property." *Charlson v. Charlson,* 374 N.W.2d 473, 476 (Minn.App.1985). A lien is "an encumbrance on property as security for the payment of debt." Minn.Stat. § 514.99, subd. 1(b) (2008). A marital lien is personal property, though it is not an estate or an interest in the parcel of real property itself. *Granse & Assocs. v. Kimm,* 529 N.W.2d 6, 8 (Minn.App.1995), *review denied* (Minn. Apr. 27, 1995). A district court's use of a marital lien to divide property must have "an acceptable basis in fact and principle." *Rohling v. Rohling,* 379 N.W.2d 519, 522-23 (Minn.1986) (approving marital lien that did not mature for 15 years)"

Case 2: *Charlson v. Charlson,* 374 N.W.2d 473, 476 (Minn.App.1985).
Docket Number: xyz

> Quote 2: "A lien on a homestead is a division of property."

u. When you quote the same case, same paragraph more than once in the memo, the RL need only have the paragraph appears once in each issue section it applies to.

v. IF you cite Case A (cite is in the footnotes) AND Case A has directly quoted Case B in the quote we are using, THEN the footnote must cite Case A (citing Case B), AND the RL in the relevant section must have the full entry and paragraph of Case A and full entry and paragraph of Case B. Eg, the direct quote we use from Case A has quotes within it from Case B.
IF Case A paraphrases or references Case B BUT does not directly quote Case B, THEN only cite Case A in the footnotes and RL.

w. In RL section, while the quotes are copy-pasted, please make sure the page numbers and footnotes in the judgment are deleted.

x. Confirm that all quotes over 15 words are indented .5 on both the right and left margins, i.e. block indent.

y. Check over the entire memo to make sure that there are no stray lines or odd spaces.

z. Confirm that the Reference List starts on a new page. Insert page break if necessary.



00289

00291

TR-0039850

A2250

CONFIDENTIAL



*providing the legal edge*

aa.    Complete all Smartsheet fields

15.    ROSS Portal Upload

a. Associate entrusted with the upload is assigned a username and password to access ROSS Portal.

b. Make sure to login to the portal midday and check the Assigned Questions.

c. Find the corresponding question in SS; you can use "Ctrl f ctrl v" function in SS. Also, try to break down the question to a few words if the initial search with all words is not giving any result.

d. Confirm if the draft is finalized. Final draft will have "gtg" along with other comments in SS.

e. Check the box with memo number and see if the final doc is present. Final doc will have only Memo number, and no initials (for e.g. 22501-ROSS-Memo 2319).

f. Download and save the final to your desktop.

g. Take up the assigned question and select upload.

h. Copy paste the Short Answer, Long Answer, and Conclusion in the respective boxes.

i. Upload the memo.

j. Select Answer (Reference List) Tab.

k. Select "Add Answer".

l. Copy paste Case name, Docket number, citation, and Quote in the boxes that appear and submit.

m. Click "Add Answer" again to enter next quote.

n. If a case has more than one quote in RL make sure to select "Add Answer" and enter the case name, citation, docket number, and quote again. Note that only one quote of the case will be entered at a given time, and the process needs to be repeated to enter all the quotes. For e.g. if a case has three quotes, select "Add Answer" and enter the case name, citation, docket number, and first quote. Then, repeat the



TR-0039851

A2251

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 315 of 431 PageID #: 153140

CONFIDENTIAL

*providing the legal edge*

process by selecting "Add Answer" and entering the case name, citation, docket number, and second quote, and again repeat the process for entering the third quote.

o. After entering all cases, and all quotes in RL, submit the page to ROSS' Brain. Once submitted, the question disappears from the dashboard, so make sure to thoroughly check that all entries are correct and they reflect the entries in the final doc.

16.    Following the above practice tips will surely make your work more efficient and less time consuming.

\*\*\*\*



LEGALEASE
SOLUTIONS LLC

00291                                                                                    00291

TR-0039852

A2252

CONFIDENTIAL

EXHIBIT ___85___
WIT: _____
DATE: _10·10·19_
LORI A. BALDWIN CSR, RPR, CRR

**From:** Tomas van der Heijden <tomas@rossintelligence.com>
**Sent:** Thursday, December 14, 2017 10:22 AM EST
**To:** Teri Whitehead <teri.whitehead@legaleasesolutions.com>
**Subject:** Re: ROSS Classifier Update

Max tells me the bug has been fixed in the app so those practice areas that you said were "exhausted" should now be showing up again. Give it about 20 minutes though for the fix to go into effect.

Also, what are you basing the 65,000 number on? We have a target of 1,500-2,000 "positive" cases per practice area. But the total number that have been uploaded into the app is closer to 140,000 (as many will be negatives).

Tomas

On Thu, Dec 14, 2017 at 10:07 AM, Teri Whitehead<teri.whitehead@legaleasesolutions.com> wrote:
> Not as painful as keeping track of all cases reviewed.  :-(
>
> Our Cochin team always goes way way above and beyond...
>
> Thank you for the update. I will share.
>
> **From:** Tomas van der Heijden <tomas@rossintelligence.com>
> **Sent:** Thursday, December 14, 2017 10:04:44 AM
> **To:** Teri Whitehead
> **Subject:** Re: ROSS Classifier Update
>
> Sounds painful. I think I let you know before that Max can pull those analytics easily for you via computer script on a daily basis. These are the stats as of this morning:
>
> **Total cases reviewed: 10365**
>
> administrative -> 504
> admiralty -> 911
> antitrust -> 581
> banking-and-finance -> 601
> business-and-corporate -> 161
> civil-rights -> 385
> civil-procedure -> 1324
> commercial -> 0
> communication -> 956
> constitutional -> 51
> construction -> 50
> employee-benefits-and-executive-compensation -> 49
> energy -> 51
> entertainment-and-sports -> 20
> environment -> 20
> estate-planning -> 642
> family -> 50
> government -> 51
> health -> 34
> immigration -> 30
> insurance -> 371
> medical -> 141
> municipal -> 897
> native-american -> 843
> pension-and-retirement -> 708
> privacy-and-data-security -> 717
> product-liability -> 144
> real-property -> 23
> securities -> 0
> technology -> 30
> transportation -> 20
>
> **Total number of positively labelled cases: 6140**
>
> administrative -> 404
> admiralty -> 628
> antitrust -> 377
> banking-and-finance -> 441
> business-and-corporate -> 20

0015751

TR-0039853

A2253

CONFIDENTIAL

civil-rights -> 315
civil-procedure -> 549
commercial -> 0
communication -> 755
constitutional -> 41
construction -> 23
employee-benefits-and-executive-compensation -> 14
energy -> 36
entertainment-and-sports -> 7
environment -> 17
estate-planning -> 372
family -> 48
government -> 15
health -> 14
immigration -> 17
insurance -> 245
medical -> 61
municipal -> 261
native-american -> 544
pension-and-retirement -> 247
privacy-and-data-security -> 518
product-liability -> 133
real-property -> 6
securities -> 0
technology -> 19
transportation -> 13

Max is looking into the "exhausted cases" issue you highlighted. Looks like a front-end bug.

On Thu, Dec 14, 2017 at 9:59 AM, Teri Whitehead<teri.whitehead@legaleasesolutions.com> wrote:
By hand... Yes.

I need to understand our efficiency. In order to review 65,000 cases, we have to have daily targets. Their individual count may be off a few.  But, general number this gives me insight on our progress to report.

From: Tomas van der Heijden
Sent: Thursday, December 14, 9:56 AM
Subject: Re: ROSS Classifier Update
To: Teri Whitehead

Hi Teri - thanks, Max will look into this. I don't understand though, how are you tracking this, manually? The app doesn't have tracking capabilities.

On Thu, Dec 14, 2017 at 9:52 AM, Teri Whitehead <teri.whitehead@legaleasesolutions.com> wrote:

Hi Tomas,

Our ROSS team has the prepared the following update. We have exhausted the number of available cases in a few fields, as noted.

Total ROSS Classifier cases reviewed: 7024.

Civil Procedure - 1250
Native American - 700
Communication - 650
Municipal - 515
Privacy and Data security - 504
Pension and Retirement - 500
Estate Planning - 500
Admiralty - 520
Administrative - 500
Civil Rights - 385
Business and corporate - 156
Insurance - 197 (no cases available now)
Antitrust - 49 (no cases available now)
Banking and finance - 598 (no cases available now)

TR-0039854

A2254

CONFIDENTIAL

Please let me know if you have any questions.

Thank you,
Teri

--
Best,
**Tomas van der Heijden**
**Head of Legal Research**
ROSS
+1 416 809 4176
tomas@ROSSIntelligence.com
Website | LinkedIn | Twitter | Blog

--
Best,
**Tomas van der Heijden**
**Head of Legal Research**

**ROSS**

+1 416 809 4176
tomas@ROSSIntelligence.com
Website | LinkedIn | Twitter | Blog

--
Best,
**Tomas van der Heijden**
**Head of Legal Research**

**ROSS**

+1 416 809 4176
tomas@ROSSIntelligence.com
Website | LinkedIn | Twitter | Blog

0015751

TR-0039855

A2255

EXHIBIT 86
WIT: _____
DATE: 10.10.19
LORI A. BALDWIN CSR, RPR, CRR

**From:** Teri Whitehead <teri.whitehead@legaleasesolutions.com>
**Sent:** Monday, January 15, 2018 11:12 AM EST
**To:** Tariq Hafeez <tariq.hafeez@legaleasesolutions.com>; Tariq Akbar <tariq.akbar@legaleasesolutions.com>; Gayathri Rajeev <gayathri.rajeev@legaleasesolutions.com>; Merin Sony <merin.sony@legaleasesolutions.com>
**CC:** Sales <sales@legaleasesolutions.com>; Marketing <marketing@legaleasesolutions.com>
**Subject:** ROSS New Project - February 5th

Hi,

Call with Tomas.

- ROSS would like us to test out their platform *and* compare it with other providers, i.e. Westlaw and Lexis. (See also emails on Westlaw). I advised that we may be transitioning from Westlaw as they are more costly and do NOT have the breadth of cases that Lexis. We have found on many many occasions missing case law. Tomas agreed.
- Start of the first week of February. This was supposed to start January 17th... but, the ROSS engineers are behind.
- Once our test of the platform (which I presume is a product ROSS sells) is complete, we would do quarterly updates.

Thank you,
Teri

Teri Whitehead
Vice President of Global Strategy
Tel: 248.925.0530 | Fax: 734.488.0102
Email: teri.whitehead@legaleasesolutions.com

**LegalEase Solutions LLC**
*The future of law*
Website | Lawstore

NOTICE OF CONFIDENTIALITY - THIS MESSAGE IS INTENDED ONLY FOR THE ADDRESSEES. It may contain privileged, confidential or proprietary information. Any unauthorized disclosure, use, copying or distribution of the contents of this message or the taking of any action on the contents of this message is strictly prohibited. If you received this electronic mail transmission in error, please promptly notify the sender LegalEase Solutions LLC at +1 (734) 619-6202 and delete the original and all copies from your system. NOTICE OF NO ATTORNEY-CLIENT PRIVILEGE - LegalEase Solutions LLC("LegalEase") provides legal support services exclusively to licensed United States and Canadian attorneys. All services provided by LegalEase are restricted to licensed United States and/or Canadian attorneys and are not meant for use by non-attorneys. By submitting a project to LegalEase, you ("Client") represent the following: that you are a licensed United States or Canadian attorney, qualified and fit to practice law in one of the 50 states of the United States, or provinces and territories of Canada respectively; that you will independently exercise your professional judgment in reviewing any legal products or services provided to you by LegalEase; that no attorney-client privilege is formed between you and LegalEase; that you are in no way delegating your obligations and duties as a licensed attorney to LegalEase; and that you fully understand that LegalEase is not engaged in the practice of law, legal representation, or rendering legal advice.

VOL 013 - BATES13095

TR-0039856

A2256

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 320 of 431 PageID #: 153145

# EXHIBITS 8 -8

# Redacted in their Entirety

A2257

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 321 of 431 PageID #: 153146

# EXHIBIT 87

A2258

A2259

|  | Legal Ease - another LPO - end client Ross International - leverages IBM etc. congnitive process - for no need to leverage a law firm or LPO to be engaged - to train the system to this kind of work. |
|  | very basic level of LR |
|  | putting it in memorandum format |
|  | font/ spaces  etc - refer protocol / blue book formating is followed |
|  |  |
|  | case note - not full proof (prepared by the editor of TR)- refer it |
| Head note | convert the head note in a question retaining all points in head note. |
|  | go to the para where the head note is taken from |
|  | copy para - put citation - bold the line refered in Head note - put **[[]]** around it too and bold it. |
|  | Great Label at the beginning of para with : |
|  | Put case on on the top ex - |
|  |  |
|  | Q: Is Writ manadaums an extraordinary remedy? |
| Format: | Case 1: Waymo LLC v. Uber Techs, Inc., 2017 WL 401806 |
| Great quote | Great label: Para ... |
|  |  |
|  | Case 2:Gulftream Aerospace |
|  | Great Quote |
| Format topical quote: | Search - "mandamus" and "extraordinary" |
|  |  |
|  | those cases which are not directly answering should be copied- as the topical quote must not answer the question directly. |
|  | Topical |
| Irrelevant Quote | Will have terms of the question but dosent answer the question. |
|  |  |
| General | Do not discuss a particular state statue whether in the question or the Quote. |

TR-0178588.xlsx

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 323 of 431 PageID #: 153148

# EXHIBIT 88

A2260



THOMSON REUTERS

# WESTLAW™

# West Key Number System®

## Numerical List of Digest Topics

| | | | | | |
|---|---|---|---|---|---|
| 1 | Abandoned and Lost Property | 31 | Appearance | 70 | Carriers |
| 2 | Abatement and Revival | 34 | Armed Services | 71 | Cemeteries |
| 4 | Abortion and Birth Control | 35 | Arrest | 72 | Census |
| 5 | Absentees | 36 | Arson | 73 | Certiorari |
| 6 | Abstracts of Title | 37 | Assault and Battery | 74 | Champerty and Maintenance |
| 7 | Accession | 38 | Assignments | 75 | Charities |
| 8 | Accord and Satisfaction | 40 | Assistance, Writ of | 76 | Chattel Mortgages |
| 9 | Account | 41 | Associations | 76A | Chemical Dependents |
| 10 | Account, Action on | 42 | Assumpsit, Action of | 76D | Child Custody |
| 11 | Account Stated | 43 | Asylums and Assisted Living Facilities | 76E | Child Support |
| 11A | Accountants | 44 | Attachment | 76H | Children Out-of-Wedlock |
| 12 | Acknowledgment | 45 | Attorney and Client | 78 | Civil Rights |
| 13 | Action | 46 | Attorney General | 79 | Clerks of Courts |
| 14 | Action on the Case | 47 | Auctions and Auctioneers | 80 | Clubs |
| 15 | Adjoining Landowners | 48 | Audita Querela | 81 | Colleges and Universities |
| 15A | Administrative Law and Procedure | 48A | Automobiles | 82 | Collision |
| 16 | Admiralty | 48B | Aviation | 83 | Commerce |
| 17 | Adoption | 49 | Bail | 83H | Commodity Futures Trading Regulation |
| 18 | Adulteration | 50 | Bailment | 83T | Common Interest Communities |
| 19 | Adultery | 51 | Bankruptcy | 84 | Common Lands |
| 20 | Adverse Possession | 52 | Banks and Banking | 85 | Common Law |
| 21 | Affidavits | 54 | Beneficial Associations | 89 | Compromise and Settlement |
| 23 | Agriculture | 55 | Bigamy | 90 | Confusion of Goods |
| 24 | Aliens, Immigration, and Citizenship | 56 | Bills and Notes | 91 | Conspiracy |
| 25 | Alteration of Instruments | 58 | Bonds | 92 | Constitutional Law |
| 25T | Alternative Dispute Resolution | 59 | Boundaries | 92B | Consumer Credit |
| 26 | Ambassadors and Consuls | 60 | Bounties | 93 | Contempt |
| 27 | Amicus Curiae | 61 | Breach of Marriage Promise | 95 | Contracts |
| 28 | Animals | 63 | Bribery | 96 | Contribution |
| 29 | Annuities | 64 | Bridges | 96H | Controlled Substances |
| 29T | Antitrust and Trade Regulation | 65 | Brokers | 97C | Conversion and Civil Theft |
| 30 | Appeal and Error | 66 | Building and Loan Associations | 98 | Convicts |
| | | 67 | Burglary | 99 | Copyrights and Intellectual Property |
| | | 69 | Cancellation of Instruments | | |

For assistance using Westlaw Classic , call **1-800-WESTLAW** (1-800-937-8529).

For free reference materials, visit **store.westlaw.com /westlaw/guides**.

**THOMSON REUTERS WESTLAW**

Thomson Reuters Westlaw comprises industry leading online research, print products, software, tools, and services that help legal professionals perform their work faster and more efficiently, every day.



TR-0179847

A2261

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 100 | Coroners | 136 | Dower and Curtesy | 178 | Food | 220 | Internal Revenue |
| 101 | Corporations and Business Organizations | 141 | Easements | 179 | Forcible Entry and Detainer | 221 | International Law |
| | | 142 | Ejectment | | | 222 | Interpleader |
| 102 | Costs | 143 | Election of Remedies | 180 | Forfeitures | 223 | Intoxicating Liquors |
| 103 | Counterfeiting | 144 | Elections | 181 | Forgery | 224 | Joint Adventures |
| 104 | Counties | 145 | Electricity | 183 | Franchises | 226 | Joint Tenancy |
| 105 | Court Commissioners | 146 | Embezzlement | 184 | Fraud | 227 | Judges |
| | | 148 | Eminent Domain | 185 | Frauds, Statute of | 228 | Judgment |
| 106 | Courts | 149 | Entry, Writ of | 186 | Fraudulent Conveyances | 229 | Judicial Sales |
| 107 | Covenant, Action of | 149E | Environmental Law | | | 230 | Jury |
| 108 | Covenants | 149T | Equitable Conversion | 187 | Game | 231 | Justices of the Peace |
| 108A | Credit Reporting Agencies | | | 188 | Gaming | 231E | Kidnapping |
| | | 150 | Equity | 189 | Garnishment | 231H | Labor and Employment |
| 110 | Criminal Law | 151 | Escape | 190 | Gas | | |
| 111 | Crops | 152 | Escheat | 191 | Gifts | 233 | Landlord and Tenant |
| 113 | Customs and Usages | 154 | Estates in Property | 192 | Good Will | 234 | Larceny |
| | | 156 | Estoppel | 193 | Grand Jury | 237 | Libel and Slander |
| 114 | Customs Duties | 157 | Evidence | 195 | Guaranty | 238 | Licenses |
| 115 | Damages | 158 | Exceptions, Bill of | 196 | Guardian and Ward | 239 | Liens |
| 116 | Dead Bodies | 159 | Exchange of Property | 197 | Habeas Corpus | 240 | Life Estates |
| 117 | Death | | | 198 | Hawkers and Peddlers | 241 | Limitation of Actions |
| 117G | Debt, Action of | 160 | Exchanges | | | 242 | Lis Pendens |
| 117T | Debtor and Creditor | 161 | Execution | 198H | Health | 245 | Logs and Logging |
| 118A | Declaratory Judgment | 162 | Executors and Administrators | 200 | Highways | 246 | Lost Instruments |
| | | | | 201 | Holidays | 247 | Lotteries |
| 119 | Dedication | 163 | Exemptions | 202 | Homestead | 248 | Malicious Mischief |
| 120 | Deeds | 164 | Explosives | 203 | Homicide | 249 | Malicious Prosecution |
| 122A | Deposits and Escrows | 165 | Extortion and Threats | 205 | Husband and Wife | | |
| | | | | 205H | Implied and Constructive Contracts | 250 | Mandamus |
| 123 | Deposits in Court | 166 | Extradition and Detainers | | | 251 | Manufactures |
| 124 | Descent and Distribution | 167 | Factors | 206 | Improvements | 252 | Maritime Liens |
| | | 168 | False Imprisonment | 207 | Incest | 253 | Marriage |
| 125 | Detectives and Security Guards | 169 | False Personation | 208 | Indemnity | 256 | Mayhem |
| | | 170 | False Pretenses | 209 | Indians | 257 | Mechanics' Liens |
| 126 | Detinue | 170A | Federal Civil Procedure | 210 | Indictment and Information | 257A | Mental Health |
| 129 | Disorderly Conduct | | | | | 258A | Military Justice |
| 130 | Disorderly House | 170B | Federal Courts | 211 | Infants | 259 | Militia |
| 131 | District and Prosecuting Attorneys | 171 | Fences | 212 | Injunction | 260 | Mines and Minerals |
| | | 172 | Ferries | 213 | Innkeepers | 265 | Monopolies |
| 132 | District of Columbia | 174 | Fines | 216 | Inspection | 266 | Mortgages |
| 133 | Disturbance of Public Assemblage | 175 | Fires | 217 | Insurance | 267 | Motions |
| | | 176 | Fish | 218 | Insurrection and Sedition | 268 | Municipal Corporations |
| 134 | Divorce | 177 | Fixtures | | | | |
| 135 | Domicile | | | 219 | Interest | | |
| 135H | Double Jeopardy | | | | | | |

TR-0179848

A2262

**WESTLAW CLASSIC** QUICK REFERENCE GUIDE

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 269 | Names | 313 | Process | 344 | Salvage | 379 | Torts |
| 271 | Ne Exeat | 313A | Products Liability | 345 | Schools | 380 | Towage |
| 272 | Negligence | 314 | Prohibition | 346 | Scire Facias | 381 | Towns |
| 273 | Neutrality Laws | 315 | Property | 347 | Seals | 382T | Trademarks |
| 274 | Newspapers | 315H | Prostitution | 348 | Seamen | 384 | Treason |
| 275 | New Trial | 315P | Protection of Endangered Persons | 349 | Searches and Seizures | 385 | Treaties |
| 276 | Notaries | | | | | 386 | Trespass |
| 277 | Notice | 315T | Public Amusement and Entertainment | 349A | Secured Transactions | 387 | Trespass to Try Title |
| 278 | Novation | | | | | 388 | Trial |
| 279 | Nuisance | 316E | Public Assistance | 349B | Securities Regulation | 390 | Trusts |
| 280 | Oath | 316H | Public Contracts | | | 391 | Turnpikes and Toll Roads |
| 281 | Obscenity | 317 | Public Lands | 350 | Seduction | | |
| 282 | Obstructing Justice | 317A | Public Utilities | 350H | Sentencing and Punishment | 392 | Undertakings |
| 283 | Officers and Public Employees | 318 | Quieting Title | | | 392T | Unemployment Compensation |
| | | 319 | Quo Warranto | 351 | Sequestration | | |
| 284 | Pardon and Parole | 319H | Racketeer Influenced and Corrupt Organizations | 352 | Set-Off and Counterclaim | 393 | United States |
| 285 | Parent and Child | | | | | 394 | United States Magistrates |
| 286 | Parliamentary Law | | | 353 | Sheriffs and Constables | | |
| 287 | Parties | 320 | Railroads | | | 395 | United States Marshals |
| 288 | Partition | 321 | Rape | 354 | Shipping | | |
| 289 | Partnership | 322 | Real Actions | 355 | Signatures | 396 | Unlawful Assembly |
| 290 | Party Walls | 323 | Receivers | 356 | Slaves | 396A | Urban Railroads |
| 291 | Patents | 324 | Receiving Stolen Goods | 356A | Social Security and Public Welfare | 398 | Usury |
| 294 | Payment | | | | | 399 | Vagrancy |
| 295 | Penalties | 325 | Recognizances | 357 | Sodomy | 400 | Vendor and Purchaser |
| 296 | Pensions | 326 | Records | 358 | Specific Performance | | |
| 297 | Perjury | 327 | Reference | 359 | Spendthrifts | 401 | Venue |
| 298 | Perpetuities | 328 | Reformation of Instruments | 360 | States | 402 | War and National Emergency |
| 300 | Pilots | | | 361 | Statutes | | |
| 302 | Pleading | 330 | Registers of Deeds | 362 | Steam | 403 | Warehousemen |
| 303 | Pledges | 331 | Release | 363 | Stipulations | 404 | Waste |
| 305 | Possessory Warrant | 332 | Religious Societies | 365 | Submission of Controversy | 405 | Water Law |
| 306 | Postal Service | 333 | Remainders | | | 406 | Weapons |
| 307 | Powers | 334 | Removal of Cases | 366 | Subrogation | 407 | Weights and Measures |
| 307A | Pretrial Procedure | 335 | Replevin | 367 | Subscriptions | | |
| 308 | Principal and Agent | 336 | Reports | 368 | Suicide | 408 | Wharves |
| 309 | Principal and Surety | 337 | Rescue | 369 | Sunday | 409 | Wills |
| 310 | Prisons | 338 | Reversions | 370 | Supersedeas | 410 | Witnesses |
| 311 | Private Roads | 339 | Review | 371 | Taxation | 411 | Woods and Forests |
| 311H | Privileged Communications and Confidentiality | 340 | Rewards | 372 | Telecommunications | 413 | Workers' Compensation |
| | | 341 | Riot | 373 | Tenancy in Common | | |
| | | 342 | Robbery | 374 | Tender | 414 | Zoning and Planning |
| | | 343 | Sales | 375 | Territories | 450 | Merit Systems Protection |
| | | | | 378 | Time | | |

TR-0179849

A2263

### Searching by West Topic and Key Number

When you have identified a topic and key number associated with the legal issue you are researching, you can run a Terms and Connectors search using that topic and key number to quickly retrieve cases involving the same legal issue. A topic and key number search does not require a field-restricted format; that is, you do not need to include a field name or abbreviation as part of your search request. For example, to search for cases with headnotes classified under topic 343 (Sales) and key number 255 (Parties; Privity), type **343k255**.

To narrow your search, add search terms. For example, the query **343k255 /p contract** retrieves cases with headnotes classified under topic 343 and key number 255 that also contain the term *contract* in the same digest paragraph.

### Topic field searching

You can also retrieve cases with headnotes classified under a specific West digest topic by using a topic field (to) restriction in your Terms and Connectors search. In addition to the topic name and number, the topic field contains the hierarchical classification information, key number, and text of the related key line. For example, to retrieve cases with headnotes classified under topic 409 (Wills), type **to(409)** or **to(wills)**. The broader search is **to(wills)** because it retrieves cases in which the term *wills* is mentioned in the key line or other levels of the hierarchy, even if the headnotes are not classified under topic 409. To narrow your search, add search terms; for example, type **to(409) /p "condition subsequent"**.

### Using the West Key Number Digest (Custom Digest)

The West Key Number Digest, also called the Custom Digest, contains the complete topic and key number outline used by West attorney-editors to classify headnotes. The West Key Number Digest helps you identify topic and key numbers related to your issue and retrieve cases with headnotes classified under those topic and key numbers.

To access the West Key Number Digest, click **Key Numbers** at the top of any page, then click **West Key Number Digest Outline** under *Browse Key Numbers*. (Alternatively, click **Custom Digest** at a case law database Search page.) To browse the digest, click the plus (**+**) and minus (**−**) symbols.

In addition to browsing the West Key Number Digest for relevant topic and key numbers, you can also search for them using the Search for Key Numbers feature.

To use the Search for Key Numbers feature, complete these steps:

1. Click **Key Numbers** at the top of any page. A page is displayed that contains the *Search for Key Numbers* text box.

2.  Type your terms, e.g., **family and medical leave**, in the text box.

3. To change the jurisdiction from which you retrieve case headnotes, click **Change Jurisdiction**, then select the check boxes next to the jurisdictions you want and click **Done**.

4. Click **Search**. A list of topic and key numbers is displayed.

5. Click a topic and key number to view the headnotes classified under that topic and key number. Or select the check boxes next to one or more topic and key numbers and click **Search Selected** to view the headnotes classified under those topic and key numbers.

TR-0179850

A2264

10/15/2024

**WESTLAW CLASSIC** QUICK REFERENCE GUIDE

## Digest Topics by Specialty

### Alternative Dispute Resolution

| | |
|---|---|
| 25T | Alternative Dispute Resolution |
| 76D | Child Custody |
| 217 | Insurance |
| 231H | Labor and Employment |
| 233 | Landlord and Tenant |
| 289 | Partnership |
| 354 | Shipping |

### Antitrust

| | |
|---|---|
| 29T | Antitrust and Trade Regulation |

### Bankruptcy

| | |
|---|---|
| 51 | Bankruptcy |
| 117T | Debtor and Creditor |
| 163 | Exemptions |
| 202 | Homestead |
| 349A | Secured Transactions |

### Business and Other Organizations

| | |
|---|---|
| 41 | Associations |
| 52 | Banks and Banking |
| 54 | Beneficial Associations |
| 65 | Brokers |
| 66 | Building and Loan Associations |
| 70 | Carriers |
| 71 | Cemeteries |
| 75 | Charities |
| 80 | Clubs |
| 81 | Colleges and Universities |
| 83T | Common Interest Communities |
| 101 | Corporations and Business Organizations |
| 108A | Credit Reporting Agencies |
| 145 | Electricity |
| 167 | Factors |
| 190 | Gas |
| 213 | Innkeepers |
| 217 | Insurance |
| 224 | Joint Adventures |
| 289 | Partnership |
| 317A | Public Utilities |
| 320 | Railroads |
| 332 | Religious Societies |
| 345 | Schools |
| 372 | Telecommunications |
| 396A | Urban Railroads |

### Civil Procedure–Federal Cases

| | |
|---|---|
| 2 | Abatement and Revival |
| 13 | Action |
| 25T | Alternative Dispute Resolution |
| 48 | Audita Querela |
| 96 | Contribution |
| 106 | Courts |
| 115 | Damages |
| 118A | Declaratory Judgment |
| 135 | Domicile |
| 143 | Election of Remedies |
| 156 | Estoppel |
| 157 | Evidence |
| 158 | Exceptions, Bill of |
| 170A | Federal Civil Procedure |
| 170B | Federal Courts |
| 197 | Habeas Corpus |
| 212 | Injunction |
| 222 | Interpleader |
| 227 | Judges |
| 228 | Judgment |
| 230 | Jury |
| 241 | Limitation of Actions |
| 250 | Mandamus |
| 311H | Privileged Communications and Confidentiality |
| 314 | Prohibition |
| 319 | Quo Warranto |
| 334 | Removal of Cases |
| 378 | Time |
| 394 | United States Magistrates |
| 410 | Witnesses |

### Civil Procedure– State Cases

| | |
|---|---|
| 2 | Abatement and Revival |
| 13 | Action |
| 21 | Affidavits |
| 25T | Alternative Dispute Resolution |
| 30 | Appeal and Error |
| 31 | Appearance |
| 44 | Attachment |
| 48 | Audita Querela |
| 73 | Certiorari |
| 96 | Contribution |
| 105 | Court Commissioners |
| 106 | Courts |
| 115 | Damages |
| 118A | Declaratory Judgment |
| 123 | Deposits in Court |
| 135 | Domicile |
| 143 | Election of Remedies |
| 150 | Equity |
| 156 | Estoppel |
| 157 | Evidence |
| 158 | Exceptions, Bill of |
| 161 | Execution |
| 189 | Garnishment |
| 197 | Habeas Corpus |
| 212 | Injunction |
| 222 | Interpleader |
| 227 | Judges |
| 228 | Judgment |
| 230 | Jury |
| 231 | Justices of the Peace |
| 241 | Limitation of Actions |
| 242 | Lis Pendens |
| 250 | Mandamus |
| 267 | Motions |
| 271 | Ne Exeat |
| 275 | New Trial |
| 277 | Notice |
| 287 | Parties |
| 302 | Pleading |
| 307A | Pretrial Procedure |
| 311H | Privileged Communications and Confidentiality |
| 313 | Process |
| 314 | Prohibition |
| 319 | Quo Warranto |
| 322 | Real Actions |
| 327 | Reference |
| 334 | Removal of Cases |
| 339 | Review |
| 346 | Scire Facias |
| 351 | Sequestration |
| 352 | Set-Off and Counterclaim |
| 363 | Stipulations |
| 370 | Supersedeas |
| 378 | Time |
| 388 | Trial |
| 401 | Venue |
| 410 | Witnesses |

### Commercial Law

| | |
|---|---|
| 29T | Antitrust and Trade Regulation |
| 38 | Assignments |
| 51 | Bankruptcy |
| 52 | Banks and Banking |
| 56 | Bills and Notes |
| 70 | Carriers |
| 76 | Chattel Mortgages |
| 92B | Consumer Credit |
| 95 | Contracts |
| 117T | Debtor and Creditor |

West Key Number System **5**

TR-0179851

A2265

| 186 | Fraudulent Conveyances |
| 219 | Interest |
| 278 | Novation |
| 294 | Payment |
| 303 | Pledges |
| 343 | Sales |
| 349A | Secured Transactions |
| 403 | Warehousemen |

**Communications**

| 92 | Constitutional Law |
| 99 | Copyrights and Intellectual Property |
| 237 | Libel and Slander |
| 306 | Postal Service |
| 311H | Privileged Communications and Confidentiality |
| 372 | Telecommunications |

**Criminal Justice**

| 18 | Adulteration |
| 19 | Adultery |
| 35 | Arrest |
| 36 | Arson |
| 37 | Assault and Battery |
| 55 | Bigamy |
| 63 | Bribery |
| 67 | Burglary |
| 76A | Chemical Dependents |
| 91 | Conspiracy |
| 96H | Controlled Substances |
| 98 | Convicts |
| 103 | Counterfeiting |
| 110 | Criminal Law |
| 129 | Disorderly Conduct |
| 130 | Disorderly House |
| 131 | District and Prosecuting Attorneys |
| 133 | Disturbance of Public Assemblage |
| 135H | Double Jeopardy |
| 146 | Embezzlement |

| 149E | Environmental Law |
| 151 | Escape |
| 164 | Explosives |
| 165 | Extortion and Threats |
| 166 | Extradition and Detainers |
| 168 | False Imprisonment |
| 169 | False Personation |
| 170 | False Pretenses |
| 174 | Fines |
| 175 | Fires |
| 180 | Forfeitures |
| 181 | Forgery |
| 184 | Fraud |
| 193 | Grand Jury |
| 197 | Habeas Corpus |
| 198H | Health |
| 203 | Homicide |
| 207 | Incest |
| 209 | Indians |
| 210 | Indictment and Information |
| 211 | Infants |
| 218 | Insurrection and Sedition |
| 231E | Kidnapping |
| 234 | Larceny |
| 248 | Malicious Mischief |
| 256 | Mayhem |
| 273 | Neutrality Laws |
| 281 | Obscenity |
| 282 | Obstructing Justice |
| 284 | Pardon and Parole |
| 297 | Perjury |
| 310 | Prisons |
| 311H | Privileged Communications and Confidentiality |
| 315H | Prostitution |
| 315P | Protection of Endangered Persons |
| 319H | Racketeer Influenced and Corrupt Organizations |
| 321 | Rape |

| 324 | Receiving Stolen Goods |
| 337 | Rescue |
| 341 | Riot |
| 342 | Robbery |
| 349 | Searches and Seizures |
| 350 | Seduction |
| 350H | Sentencing and Punishment |
| 357 | Sodomy |
| 368 | Suicide |
| 384 | Treason |
| 396 | Unlawful Assembly |
| 399 | Vagrancy |
| 406 | Weapons |
| 410 | Witnesses |

**Education**

| 81 | Colleges and Universities |
| 345 | Schools |

**Employment Law**

| 78 | Civil Rights |
| 81 | Colleges and Universities |
| 104 | Counties |
| 198H | Health |
| 231H | Labor and Employment |
| 268 | Municipal Corporations |
| 283 | Officers and Public Employees |
| 345 | Schools |
| 356A | Social Security and Public Welfare |
| 360 | States |
| 381 | Towns |
| 392T | Unemployment Compensation |
| 393 | United States |
| 413 | Workers' Compensation |

**Energy**

| 145 | Electricity |
| 190 | Gas |
| 260 | Mines and Minerals |

| 317A | Public Utilities |
| 362 | Steam |
| 402 | War and National Emergency |

**Environmental Law**

| 23 | Agriculture |
| 145 | Electricity |
| 149E | Environmental Law |
| 260 | Mines and Minerals |
| 279 | Nuisance |
| 405 | Water Law |
| 414 | Zoning and Planning |

**Estate Planning**

| 17 | Adoption |
| 75 | Charities |
| 76H | Children Out-of-Wedlock |
| 124 | Descent and Distribution |
| 136 | Dower and Curtesy |
| 154 | Estates in Property |
| 162 | Executors and Administrators |
| 191 | Gifts |
| 220 | Internal Revenue |
| 226 | Joint Tenancy |
| 240 | Life Estates |
| 298 | Perpetuities |
| 307 | Powers |
| 333 | Remainders |
| 338 | Reversions |
| 371 | Taxation |
| 373 | Tenancy in Common |
| 390 | Trusts |
| 409 | Wills |

**Family Law**

| 4 | Abortion and Birth Control |
| 17 | Adoption |
| 19 | Adultery |
| 55 | Bigamy |
| 61 | Breach of Marriage Promise |
| 76D | Child Custody |
| 76E | Child Support |

A2266

| 76H | Children Out-of-Wedlock |
| 134 | Divorce |
| 136 | Dower and Curtesy |
| 196 | Guardian and Ward |
| 205 | Husband and Wife |
| 207 | Incest |
| 211 | Infants |
| 253 | Marriage |
| 285 | Parent and Child |
| 315P | Protection of Endangered Persons |
| 350 | Seduction |

**Financial Institutions**

| 52 | Banks and Banking |
| 66 | Building and Loan Associations |
| 92B | Consumer Credit |
| 108A | Credit Reporting Agencies |
| 217 | Insurance |

**Government**

| 64 | Bridges |
| 81 | Colleges and Universities |
| 104 | Counties |
| 132 | District of Columbia |
| 200 | Highways |
| 268 | Municipal Corporations |
| 316E | Public Assistance |
| 316H | Public Contracts |
| 345 | Schools |
| 360 | States |
| 375 | Territories |
| 381 | Towns |
| 393 | United States |
| 405 | Water Law |

**Health**

| 76A | Chemical Dependents |
| 96H | Controlled Substances |
| 198H | Health |

| 257A | Mental Health |
| 315P | Protection of Endangered Persons |

**Immigration and Citizenship**

| 24 | Aliens, Immigration, and Citizenship |

**Insurance**

| 217 | Insurance |
| 356A | Social Security and Public Welfare |
| 392T | Unemployment Compensation |
| 413 | Workers' Compensation |

**Intellectual Property**

| 29T | Antitrust and Trade Regulation |
| 99 | Copyrights and Intellectual Property |
| 291 | Patents |
| 382T | Trademarks |

**International Issues**

| 24 | Aliens, Immigration, and Citizenship |
| 26 | Ambassadors and Consuls |
| 114 | Customs Duties |
| 221 | International Law |
| 385 | Treaties |
| 402 | War and National Emergency |

**Juvenile Justice**

| 211 | Infants |

**Legal Services**

| 12 | Acknowledgement |
| 25T | Alternative Dispute Resolution |
| 45 | Attorney and Client |
| 46 | Attorney General |
| 79 | Clerks of Courts |
| 105 | Court Commissioners |
| 106 | Courts |
| 131 | District and Prosecuting Attorneys |
| 227 | Judges |

| 231 | Justices of the Peace |
| 276 | Notaries |
| 327 | Reference |
| 394 | United States Magistrates |

**Maritime Law**

| 16 | Admiralty |
| 82 | Collision |
| 172 | Ferries |
| 252 | Maritime Liens |
| 300 | Pilots |
| 344 | Salvage |
| 348 | Seamen |
| 354 | Shipping |
| 405 | Water Law |
| 408 | Wharves |

**Medicaid**

| 198H | Health |

**Medicare**

| 198H | Health |

**Military Law**

| 34 | Armed Services |
| 258A | Military Justice |
| 259 | Militia |
| 402 | War and National Emergency |

**Products Liability**

| 145 | Electricity |
| 164 | Explosives |
| 178 | Food |
| 190 | Gas |
| 313A | Products Liability |

**Professional Malpractice**

| 11A | Accountants |
| 45 | Attorney and Client |
| 65 | Brokers |
| 198H | Health |
| 211 | Infants |
| 257A | Mental Health |
| 272 | Negligence |
| 332 | Religious Societies |
| 345 | Schools |

**Real Property**

| 6 | Abstracts of Title |
| 7 | Accession |
| 15 | Adjoining Landowners |
| 20 | Adverse Possession |
| 59 | Boundaries |
| 65 | Brokers |
| 66 | Building and Loan Associations |
| 83T | Common Interest Communities |
| 84 | Common Lands |
| 108 | Covenants |
| 119 | Dedication |
| 120 | Deeds |
| 141 | Easements |
| 142 | Ejectment |
| 148 | Eminent Domain |
| 149 | Entry, Writ of |
| 149T | Equitable Conversion |
| 154 | Estates in Property |
| 171 | Fences |
| 177 | Fixtures |
| 179 | Forcible Entry and Detainer |
| 206 | Improvements |
| 233 | Landlord and Tenant |
| 238 | Licenses |
| 239 | Liens |
| 242 | Lis Pendens |
| 257 | Mechanics' Liens |
| 266 | Mortgages |
| 272 | Negligence |
| 288 | Partition |
| 290 | Party Walls |
| 311 | Private Roads |
| 315 | Property |
| 315T | Public Amusement and Entertainment |
| 317 | Public Lands |
| 318 | Quieting Title |

TR-0179853

A2267

322 Real Actions

330 Registers of Deeds

338 Reversions

358 Specific Performance

386 Trespass

387 Trespass to Try Title

400 Vendor and Purchaser

405 Water Law

414 Zoning and Planning

**Securities and Commodities Regulations**

83H Commodity Futures Trading Regulation

160 Exchanges

349B Securities Regulation

**Taxation**

83 Commerce

104 Counties

220 Internal Revenue

223 Intoxicating Liquors

238 Licenses

268 Municipal Corporations

345 Schools

371 Taxation

381 Towns

**Torts**

37 Assault and Battery

45 Attorney and Client

48A Automobiles

48B Aviation

52 Banks and Banking

70 Carriers

78 Civil Rights

97C Conversion and Civil Theft

115 Damages

117 Death

145 Electricity

164 Explosives

168 False Imprisonment

178 Food

179 Forcible Entry and Detainer

184 Fraud

190 Gas

198H Health

213 Innkeepers

233 Landlord and Tenant

237 Libel and Slander

249 Malicious Prosecution

272 Negligence

279 Nuisance

313A Products Liability

315T Public Amusement and Entertainment

320 Railroads

350 Seduction

354 Shipping

379 Torts

386 Trespass

404 Waste

406 Weapons

**Transportation**

16 Admiralty

48A Automobiles

48B Aviation

64 Bridges

70 Carriers

82 Collision

83 Commerce

172 Ferries

200 Highways

320 Railroads

348 Seamen

354 Shipping

391 Turnpikes and Toll Roads

396A Urban Railroads

405 Water Law

**Unemployment Compensation**

392T Unemployment Compensation

© 2012 Thomson Reuters. All rights reserved. Published 8/12. L-352461.

The trademarks used herein are the trademarks of their respective owners. West trademarks are owned by West Publishing Corporation.



TR-0179854

A2268

# EXHIBITS 8  -
# Redacted in their Entirety

A2269

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 333 of 431 PageID #: 153158

# EXHIBIT 94

A2270

ROSS    Features    Coverage    Pricing    Customers    About Us    Blog                    Log In

## How is Natural Language Search Changing The Face of Legal Research?

By Stergios Anastasiadis    -    April 8, 2019    -    Legal Research

In order to understand how ROSS's A.I. is changing legal research, it's important to understand machine learning, natural language processing, and other A.I. basics. From that basis, we can more meaningfully discuss how those systems are being deployed to improve legal research. In this post, we're going to discuss the fundamentals of natural language search and how it improves legal queries and legal search results in ROSS.

ROSS's natural language processing (NLP) allows lawyers to phrase their research queries the way they would phrase a question to a colleague. Having a system that understands and can leverage the semantic and syntactic context of your query will improve your legal research questions and search results.

A query optimized with the help of NLP will surface the most accurate and relevant decisions because the system was assessed with the prior queries that yielded the best legal search results. Since the system has analyzed all relevant case law, assistance from optimized queries will deliver high recall (the percentage of relevant decisions returned ) and high precision (the percentage of total decisions returned that are relevant).

The four areas that drive NLP are speech recognition, understanding, generation, and speech synthesis.

- Natural language understanding (NLU) is narrower in purpose than NLP, focusing primarily on machine reading comprehension: getting the computer to comprehend what a body of text really means. After all, if a machine cannot comprehend the content, it cannot process it.
- Natural language generation (NLG) is another subset of NLP. NLG turns data into narratives and reports expressed in easy-to-read language.
- Speech Recognition (SR) understands or transcribes spoken language
- and Speech Synthesis (SS) into easy-to-read narratives and reports.

The system allows NLP queries to be typed into a search engine, spoken aloud with voice search or posed as a question to a digital assistant. The goal is to make interactions feel exactly like interactions among humans.

A great overview can be found in this Medium article, "Chapter 9: Natural Language Processing" by Madhu Sanjeevi. The article provides a good understanding of the moving parts without getting bogged down in technical details.

Now let's dig into how ROSS makes this happen.

The complex world of Language, Linguistics, Terms, Expansions and Simplifications is outlined nicely by Jocelyn D'Souza in a great 3

A2271

minute read: "A dive into Natural Language Processing".

The lawyer enters a query to find relevant cases. The NLP system interprets the query and "matches" it with legal text.

As you type, your query is processed instantly on three levels:

- Syntax – understanding the grammar of the text
- Semantics – understanding the meaning of the text
- Pragmatics – understanding the context of the text

In milliseconds, the system undertakes the three-level processing and it assesses:

1. **Language representations**: representing the meaning of words at the word, phrase, sentence, and passage level. This potentially makes matching a lot easier.
2. **Linguistic features**: alternatives are used to help with query complexity. A "major" category is noun vs. verb, but also person and number, plurality, tense.
3. **Term suggestions**: legal term suggestions specifically help users write better queries that incorporate legal context.
4. **Expansions**: query expansion provides alternate queries to users based on a global analysis, using some form of thesaurus. This can be combined with legal term suggestions.
5. and **Simplifications**: gives users feedback on their queries that attempt to eliminate complexity.

ROSS is including 1,2,4 and 5 with "Term suggestions" coming soon. "Expansion" will be treated using the same model as with "Term suggestions" but automated on behalf of the user.

A simple overview of the way Google applies this thinking to its search can be found in the "Google Inside Search" blog.

Before you hit **"Ask the Question?"** button it's also helpful to understand how data is stored and retrieved.

The system contains millions of legal decisions and hundreds of millions of passages that have already been processed by machine learning algorithms. The ingestion of legal data happens daily. The algorithms are trained against a corpus of queries and legal decisions. Once the algorithms meet acceptable statistical thresholds, they are then let loose to perform searches against the millions of decisions and hundreds of millions of passages.

These algorithms are usually referred to as ranking and retrieval algorithms. In the example below all the lightly colored boxes assemble the graph used to narrow down from your query to nodes displayed in the answer cards at the bottom of the illustration. They are fast, accurate and reliable algorithms.

As the tree is traversed, the query is used on each node to create a score, making its way down to the leaf nodes. Each leaf node gets a final score, thus completing the ranking process. The system then returns the top leaf nodes based on their final score. This is called retrieval.

Now hit the **"Ask the Question?"** button. The query is submitted and voila, the ranking and retrieval algorithms do their magic by analyzing decisions and other data in milliseconds.

It's an enormous win when lawyers can use their familiar speaking or writing muscles to retrieve authoritative decisions quickly, comprehensively, and accurately.   When NLP is done right, it's a powerful tool for legal research.

**Stergios Anastasiadis**

Stergios is the Head of Engineering at ROSS. 25 years in the tech industry, angel investor and wants to make the tech startup community a continued success.

## Popular Articles

A2272

9/26/2024 Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 336 of 431 PageID #: 153161



**ROSS NEWS**

**Enough.**

**ROSS NEWS**

**Announcement**

**AI AND THE LAW**

**ROSS partners with OpenAI for the launch of its API**

ROSS is working with OpenAI to refine their first commercial product. What does that mean for AI and legal tech?

**ROSS**

🐦 Twitter

📘 Facebook

💼 LinkedIn

© ROSS Intelligence, Inc. 2014–2020

**Company**

About Us

Careers

Terms of Service

Privacy Policy

**Product**

Features

Coverage

Pricing

Academic Access

Why ROSS

What is AI

**Resources**

Contact Us

FAQ + Support

Blog

Made in Webflow

A2273

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 337 of 431 PageID #: 153162

# EXHIBIT 95

A2274

Seymour v. Richardson, 194 Va. 709 (1953)

75 S.E.2d 77

194 Va. 709

*Supreme Court of Appeals of Virginia*

RALPH SEYMOUR AND

BURFORD BUICK CORPORATION

v.

LUCILLE S. RICHARDSON, ADMINISTRATRIX

OF THE ESTATE OF HENRY

CLOPTON RICHARDSON, DECEASED.

Record No. 4044.

|

March 9, 1953.

**\*709** Present, All the Justices.

**Synopsis**

Action for personal injuries, revived after death of plaintiff in name of his administratrix. The Circuit Court, Elizabeth City County, entered judgment for plaintiff. Defendants brought error. The Supreme Court of Appeals, Buchanan, J., held that in injuries action brought in name of administratrix after injured person's death no recovery could be had for mental anguish, pain or suffering of such person.

Reversed and remanded for new trial on damages.

West Headnotes (10)

**[1]**    **Abatement and Revival** 🔑 Actions for personal injuries

2  Abatement and Revival
2V  Death of Party and Revival of Action
2V(A)  Abatement or Survival of Action
2k58  Actions and Proceedings Which Abate
2k58(1)  Actions for personal injuries

Statute giving right of revival of personal injury action where injured plaintiff dies pending action, grants such right irrespective of cause of injured person's death. Code 1950, § 8–640.

4 Cases that cite this headnote

**[2]**    **Abatement and Revival** 🔑 Proceedings after continuance or revival

**Death** 🔑 Suffering of deceased

2  Abatement and Revival
2V  Death of Party and Revival of Action
2V(B)  Continuance or Revival of Action
2k77  Proceedings after continuance or revival
117  Death
117III  Actions for Causing Death
117III(H)  Damages or Compensation
117k80  Elements of Compensation
117k82  Suffering of deceased

If plaintiff in personal injury action dies pending such action as result of such injuries, pleadings upon revival must be amended and case proceeded with as if brought under wrongful death statutes and in such event there can be no recovery for mental anguish, pain or suffering of decedent. Code 1950, §§ 8–633, 8–634, 8–640.

3 Cases that cite this headnote

**[3]**    **Action** 🔑 Nature and elements of cause of action and suspension of remedies

**Action** 🔑 Accrual of cause of action

13  Action
13I  Grounds and Conditions Precedent
13k1  Nature and elements of cause of action and suspension of remedies
13  Action
13IV  Commencement, Prosecution, and Termination
13k61  Accrual of cause of action

A "cause of action" accrues to a person when that person first comes to a right to bring action and consists of act or omission constituting violation of duty but differs from a "right of action" which is the right to bring suit.

6 Cases that cite this headnote

**[4]**    **Death** 🔑 Constitutional and statutory provisions

117  Death
117III  Actions for Causing Death
117III(A)  Right of Action and Defenses
117k9  Constitutional and statutory provisions
(Formerly 361k212.1)

It must be presumed that legislature had in mind a distinction between cause of action and right of action when it enacted statute providing that no recovery can be had for mental anguish, pain

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.                    1

A2275

**Seymour v. Richardson, 194 Va. 709 (1953)**

75 S.E.2d 77

or suffering in prosecution of cause of action for personal injuries after death of injured person. Code 1950, § 8–628.1.

3 Cases that cite this headnote

**[5]    Death** 🗝 Constitutional and statutory provisions

117   Death
117III   Actions for Causing Death
117III(A)   Right of Action and Defenses
117k9   Constitutional and statutory provisions
      (Formerly 361k212.1)

It must be presumed that legislature knew when it enacted provision excluding recovery for mental anguish, pain or suffering in prosecution of action for personal injuries after death of injured person, that provisions existed for revival of actions brought by plaintiff who later died and if that death resulted from wrongful act, no recovery could be had in revived action for mental anguish, pain and suffering of decedent. Code 1950, §§ 8–628.1, 8–640.

8 Cases that cite this headnote

**[6]    Abatement and Revival** 🗝 Actions for personal injuries
**Death** 🗝 Suffering of deceased

2   Abatement and Revival
2V   Death of Party and Revival of Action
2V(A)   Abatement or Survival of Action
2k58   Actions and Proceedings Which Abate
2k58(1)   Actions for personal injuries
117   Death
117III   Actions for Causing Death
117III(H)   Damages or Compensation
117k80   Elements of Compensation
117k82   Suffering of deceased

Statute providing for survival of injuries action but excluding recovery for mental anguish, pain or suffering of injured person, applies to right of revival of actions for injuries whether begun by injured person or by his personal representative. Code 1950, §§ 8–628.1, 8–640.

2 Cases that cite this headnote

**[7]    Statutes** 🗝 Construing together;  harmony

**Statutes** 🗝 Conflict

361   Statutes
361III   Construction
361III(E)   Statute as a Whole;  Relation of Parts to Whole and to One Another
361k1155   Construing together;  harmony
      (Formerly 361k207)
361   Statutes
361III   Construction
361III(E)   Statute as a Whole;  Relation of Parts to Whole and to One Another
361k1157   Conflict
      (Formerly 361k207)

Where inconsistent and irreconcilable provisions are found in statutes, they must be construed so as to give effect to latest expression of legislative intent.

**[8]    Death** 🗝 Suffering of deceased

117   Death
117III   Actions for Causing Death
117III(H)   Damages or Compensation
117k80   Elements of Compensation
117k82   Suffering of deceased

Where passenger injured in automobile collision brought action for injuries but died pending trial and action was revived in name of administratrix, there could be no recovery for mental anguish, pain and suffering of passenger. Code 1950, § 8–628.1.

**[9]    Appeal and Error** 🗝 Evidence

30   Appeal and Error
30XVIII   Determination and Disposition of Cause
30XVIII(J)   Course and Conduct of Further Proceedings in Lower Court
30k4832   New Trial
30k4837   Evidence
      (Formerly 30k1214)

Where case was remanded for new trial on question of damages only, evidence as to odor of alcohol on breath of tort-feasor would be irrelevant on such trial.

**[10]    Trial** 🗝 Statements as to Facts, Comments, and Arguments

388   Trial

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.                    2

A2276

Seymour v. Richardson, 194 Va. 709 (1953)

75 S.E.2d 77

388V   Arguments and Conduct of Counsel
388k113   Statements as to Facts, Comments, and Arguments
388k114   In general

In personal injury action revived in name of injured administratrix, statement of administratrix' counsel to jury that administratrix asks application of golden rule was improper, for function of jury is to decide according to evidence rather than how its members might wish to be treated.

6 Cases that cite this headnote

VIRGINIA REPORTS SYNOPSIS

Error to a judgment of the Circuit Court of Elizabeth City county. Hon. Frank A. Kearney, judge presiding.

*Reversed and remanded.*

The opinion states the case.

VIRGINIA REPORTS HEADNOTES AND CLASSIFICATION

(1) Damages — Revived Action for Personal Injuries — Recovery for Pain and Suffering of Decedent Prohibited.
1. Where decedent brought an action for personal injuries but died prior to trial from a cause unrelated to the injuries, and the action was revived, recovery for mental anguish, pain and suffering was prohibited by Code 1950, section 8-628.1. That section removes this element of the cause of action. It applies whether the action is begun by the injured person in his lifetime and revived (as has been long allowed by section 8-640), or is begun by his personal representative after his death.
(2) Argument of Counsel — Improper to Ask Jury to Apply Golden Rule.
2. It is improper for counsel in closing argument to ask the jury to apply the Golden Rule. The function of a jury is to decide according to the evidence, not according to how its members might wish to be treated.
END OF VIRGINIA REPORTS HEADNOTES AND CLASSIFICATION

**Attorneys and Law Firms**

**\*\*77** *James, Richardson and James,* for plaintiffs in error.

**\*\*78** *Hall and Martin,* for defendant in error.

**Opinion**

JUDGE: BUCHANAN

BUCHANAN, J., delivered the opinion of the court.

On November 25, 1950, Henry C. Richardson was injured in a collision between an automobile in which he was riding and one driven by Ralph Seymour and owned by Burford Buick Corporation. On April 11, 1951, Richardson brought an action **\*710** for damages against Seymour and the corporation. On November 9, 1951, before the case was tried, Richardson died of a heart attack, not related to the injuries received in the accident. On January 26, 1952, the action was revived in the name of Richardson's administratrix and thereafter was tried by a jury which returned a verdict for the plaintiff for $10,000, on which the court entered the judgment to which this writ of error was granted.

It is not disputed that the evidence was sufficient to establish that the accident was due to the negligence of Seymour, and the liability of the defendants is not now at issue. The main question on this appeal is whether the mental anguish, pain and suffering of the decedent, Richardson, were proper elements of damage. Over the objection of the defendants the court admitted evidence of those elements, instructed the jury that it was proper to take them into consideration and refused an instruction offered by the defendants that they were not proper elements of damage.

The defendants contend that recovery for mental anguish, pain and suffering is expressly prohibited by section 8-628.1 of the Code, as follows:

'No cause of action for injuries to person or property shall be lost because of the death of the person liable for the injury. No cause of action for injuries to person or property shall be lost because of the death of the person in whose favor the cause of action existed, provided, however, in such action no recovery can be had for mental anguish, pain or suffering, \* \* \*.'

This section was added to the Code by Acts 1950, chapter 481, page 948, entitled 'AN ACT *to amend the Code of 1950 by adding a section numbered 8-628.1 to provide for the survival*

A2277

**Seymour v. Richardson, 194 Va. 709 (1953)**

75 S.E.2d 77

*of certain actions.*' By Acts 1952, chapter 378, page 671, a proviso was added limiting the time for bringing action. Code, Section 8-628.1, 1952 Cum. Supp.

The trial court held that section 8-628.1 does not apply where an injured person brings suit and thereafter, prior to trial, dies from a cause not connected with his injuries, as was the case here; but that it applies only where the person injured dies from a cause unrelated to his injuries without having brought suit therefor. The court was of opinion that section 8-640, applied to the situation in this case, where the action was commenced by Richardson himself.

**\*711**  Section 8-640 of the Code provides that 'the right of action' under sections 8-633 and 8-634 (which are the statutes giving a right of action for death by wrongful act, neglect or default), shall not abate by the death of the defendant; and that when an action for damages is brought by a person injured by another's wrongful act, neglect or default, and the injured person dies pending the action, the action shall not abate but may be revived in the name of his personal representative.

Section 8-640 is the present form of section 2906 of the Code of 1887, as amended. The original section 2906 provided that if a person injured by the wrongful act, neglect or default of another bring suit and then die pending the action, 'and his death is caused by such wrongful act, neglect or default, ' his action might be revived in the name of his personal representative, and the pleadings should thereupon be amended to conform to an action under the wrongful death statutes. By an amendment made in 1894, Acts 1893-94, chapter 88, page 83, the quoted words and the provision for amending the pleadings were omitted from the statute, and in *Birmingham v. Chesapeake &c. R. Co.,* 98 Va. 548, 37 S.E. 17, decided in 1900, it was held that the object of the amendment was not to make all actions for personal injuries revivable, but to give a right of revival in cases where the person  **\*\*79**  injured died pending the action 'without regard to the cause of death,' which right of revival did not exist before the amendment 'except in those cases where the plaintiff died as a result of the injuries.'

Section 2906 of the 1887 Code, as amended by the 1894 act, and as revised, became section 5790 of the Code of 1919. The Revisors' Note to that section explained that it was not intended by the revision to change the holding in the *Birmingham* case, and the legislature was requested to make the needed changes. This was done by Acts 1920, chapter 26, page 27, amending section 5790 to make it read as section

8-640 does now, except for the final sentence of the act, with which we are not presently concerned. [1]

> [1]  Section 5790 was again amended by Acts 1928, chapter 446, page 1141, by adding a sentence in practically the same language (except that it contained the words 'not resulting in death') as the second sentence inserted in section 5786 by Acts 1926, chapter 507, page 858, now the second sentence of section 8-633.

The Revisors also added this note to section 5790: 'For a personal injury not resulting in death, for which no action is  **\*712**  brought by the injured party in his lifetime, no provision is now, or has ever been made, and it simply dies as at common law.' See also *Anderson v. Hygeia Hotel Co.,* 92 Va. 687, 24 S.E. 269; 1 Am. Jur., Abatement and Revival, § 133, p. 92.

**[1]**   **[2]**   Section 8-640, as noted above, gives a right of revival in cases where the plaintiff dies pending the action, without regard to the cause of death. *Birmingham v. Chesapeake &c. R. Co., supra.* In such case if death resulted from the injury, the pleadings are required to be amended, and the case proceeded with as if brought under the death by wrongful act statutes. In that event there could be no recovery for the mental anguish, pain or suffering of the decedent. *Virginia Iron &c. Co. v. Odle's Adm'r,* 128 Va. 280, 309, 105 S.E. 107, 116; 5 Mich. Jur., Death by Wrongful Act, § 16, p. 629.

But the plaintiff argues that since her decedent's death did not result from the injury and since the action brought by him was revived in her name as his personal representative, she prosecutes his action and is entitled to recover the same damages as he would have been entitled to recover, which would have included his pain and suffering. See *Norfolk &c. Ry. Co. v. Marpole,* 97 Va. 594, 600, 34 S.E. 462, 464; 5 Mich. Jur., Damages, § 30, p. 519. In support of her contention she cites *Anderson v. Hygeia Hotel Co., supra.*

In that case an injured plaintiff claimed that the revival provision in what was then section 2906 of the 1887 Code (now § 8-640) caused the limitation of his action to be five years under section 2927 of the 1887 Code (now § 8-24). In holding that a one-year limitation applied, the court said that the legislature in enacting the death by wrongful act statutes 'plainly did not intend to continue or cause to survive his [plaintiff's] right of action for the injury, but to substitute

A2278

**Seymour v. Richardson, 194 Va. 709 (1953)**

75 S.E.2d 77

for it and confer upon his personal representative a new and original right of action.' 92 Va. at p. 691, 24 S.E. at p. 271. It was further said that if the effect of the statute was to cause the 'right of action' of the injured person to survive, the suit by his personal representative would be to recover damages for the injury the deceased had sustained and the detriment caused to his estate; that there would be the same elements of damage for the consideration of the jury, and the evidence 'would mainly relate to and the damages be for the physical and mental suffering **\*713** of the deceased and the injury and loss generally sustained by him and his estate. \* \* \*.' 92 Va. at p. 693, 24 S.E. at p. 271.

[3] The *Anderson* case, however, was dealing with the effect of the statutes of limitation on the *right* of action. 'It is frequently the case that more or less confusion arises from a failure to distinguish between the cause and the right of action. 'A cause of action is said to accrue to any person when that person first comes to a right to bring an action. There is, however, an obvious distinction between a cause of action and a right, though a cause of action generally confers a right. \* \* \*.'' *Lewis' Adm'r v. Glenn, Trustee,* 84 Va. 947, 979, 6 S.E. 866, 882. *Mercer v. Richmond,* **\*\*80** 152 Va. 736, 744, 148 S.E. 803, 805. In the latter case the question was whether the sixty-day notice of injury required by city ordinance to be given before a suit could be maintained related to the date of the injury or to the qualification of the personal representative of the injured person whose death resulted from the injury. The court said that it agreed with the principle stated in the *Anderson* case, and other cases cited, that the *right of action* which accrued to the administrator upon the death of his intestate was entirely different from the right of action which accrued to the injured party, but that the right of action referred to in those cases 'is entirely different from the cause of action.'

'A right of action is the right to bring suit in a case and may be taken away by the running of the Statute of Limitations, through an estoppel, or by other circumstances which do not affect the cause of action.' 1 Am. Jur., Actions, § 3, p. 405.

'The cause of action means the act or omission constituting the violation of duty complained of.' *State v. Jarrett,* 90 W.Va. 180, 110 S.E. 568, 569. Black's Law Dict., De Luxe Ed., p. 293.

'The cause of action contemplated by our statute is not the death itself, but the tort which produces the death, and this is the same cause of action for decedent's injuries, and, as

such, subject to its infirmities as an actionable cause.' *Street v. Consumers Min. Corp.,* 185 Va. 561, 572, 39 S.E.2d 271, 275.

In *Hoffman v. Stuart,* 188 Va. 785, 791, 51 S.E.2d 239, 242, after referring to the holding in *Anderson v. Hygeia Hotel Co., supra,* we said:

'It is made plain in the later cases of *Brammer v. Norfolk &c. R. Co.,* 107 Va. 206, 57 S.E. 593; *Virginia Elec., &c. Co. v.* **\*714** *Decatur,* 173 Va. 153, 3 S.E.2d 172 (dissenting opinion 4 S.E.2d 294); and *Street v. Consumers Mining Corp.,* 185 Va. 561, 39 S.E.2d 271, 167 A.L.R. 886, that it is the *cause* of action of the injured person that the personal representative prosecutes.'

[4] It must be presumed that the legislature had these distinctions in mind when it enacted section 8-628.1 of the Code and in it provided that 'No cause of action for injuries to person or property shall be lost because of the death of the person in whose favor the cause of action existed, provided, however, in such action no recovery can be had for mental anguish, pain or suffering, \* \* \*.'

[5] It must also be presumed that the legislature knew that in section 8-640 provision had already been made for revival of the action brought by a plaintiff who afterwards died, and that if death resulted from the wrongful act, no recovery could be had in the revived action for the mental anguish, pain or suffering of the decedent.

[6] [7] We can find no warrant, therefore, for the view that into the comprehensive language of section 8-628.1 there must be read an exception making it inapplicable to actions brought by the injured person and applicable only to cases where the injured person had brought no action. That section provides in effect that 'no cause of action' for injury shall be lost (as it would have been at common law) because of the death of the person injured, but in an action for damages for the injury there shall be no recovery for mental anguish, pain or suffering. If it had been the legislative purpose to exclude from the rule thus laid down, actions that had been brought during the life of the deceased and revived in the name of his personal representative under section 8-640, it would have been easy to provide for that. On the contrary, the statute as written deals with the *cause of action* and takes away an element of the cause of action whether the action therefor is begun by the injured person in his lifetime or by his personal representative after his death, as a condition of allowing the right of action for that cause to survive.

WESTLAW  © 2024 Thomson Reuters. No claim to original U.S. Government Works.  5

A2279

**Seymour v. Richardson, 194 Va. 709 (1953)**

75 S.E.2d 77

Section 8-640, permitting the revival of an action for personal injuries brought by the injured person in his lifetime, does not deal with elements of damage belonging to the revived action. Section 8-628.1 does **\*\*81** deal with those elements to the extent of excluding mental anguish, pain and suffering therefrom. **\*715** The latter, which is also the later, section must, we think, be given the scope covered by its broad language and be held to apply to the right of revival of actions for injuries, whether begun by the injured person or by his personal representative. Where inconsistent and irreconcilable provisions are found in statutes they must be construed so as 'to give effect to the latest expression of the legislative intent. ' *Williamson v. Wellman,* 156 Va. 417, 430, 158 S.E. 777, 781.

 **[8]**    To give the language of section 8-628.1 its natural effect makes uniform the rule as to mental anguish, pain or suffering in suits prosecuted by personal representatives, whether under the death by wrongful act statutes or for injuries which did not cause the death; and avoids the illogic of allowing damages for those elements in an action brought by the injured person and revived in the name of his personal representative, but not in an action for the same cause if brought originally by his personal representative.

 **[9]**    Our conclusion is that the case should be remanded for a new trial only on the question of damages, which makes it unnecessary to discuss the assignment of error relating to the amount of the judgment. On such trial evidence as to an odor

of alcohol on the breath of Seymour, the driver, which is the subject of defendants' assignment of error No. 2, would be irrelevant.

 **[10]**    However, that part of the closing argument of plaintiff's counsel which is the basis for assignment of error No. 6, was improper and should not be repeated. This was the argument objected to:

'All Mrs. Richardson asks you gentlemen to do when you retire to your jury room is to apply the Golden Rule. 'Do unto her as you wish that you would be done.''

The important rule so attempted to be invoked was designed to regulate the conduct of men among themselves before they bring their controversy to a jury. The function of the jury is to decide according to the evidence, not according to how its members might wish to be treated. *Lorillard Co. v. Clay,* 127 Va. 734, 752, 104 S.E. 384, 390.

The judgment below is reversed and the case remanded for a new trial on the question of damages to be determined consistently with this opinion.

*Reversed and remanded.*

**All Citations**

194 Va. 709, 75 S.E.2d 77

---

**End of Document**                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2024 Thomson Reuters. No claim to original U.S. Government Works.                    6

A2280

# EXHIBIT 96

A2281



## Find the information you need faster

Westlaw attorney editors analyze, categorize, and summarize the law, creating editorial enhancements to help you research more efficiently – and with greater accuracy. For more than 100 years, Thomson Reuters Westlaw has provided these proprietary editorial processes that continue to evolve and incorporate the latest technology.

## Zero in on your legal issue with the Key Number System

The Key Number System is the master classification system of U.S. law. For over 100 years, West Topic and Key Numbers have offered attorneys a convenient way to zero-in on a particular legal issue and quickly find on-point cases. Attorney editors identify, summarize, and assign a Topic and Key Number from the Key Number System to each legal issue in a published opinion so you can easily hone in on a specific point of law.

- Easily find relevant cases that address a specific point of law in any jurisdiction
- Find cases stating or applying a legal concept, even if those search terms aren't in the opinion
- Search by Key Number to retrieve cases or use a Key Number found in a relevant case to find cases discussing the same issue



The Key Number system is the master classification system of U.S. las and widely regarded as the cornerstone of effective legal research.

## Mitigate risk with KeyCite

Instantly see whether your case, statute, regulation, or administrative decision is still good law with KeyCite, which indicates negative treatment directly on the face of the document and on a result list. And now with KeyCite Overruling Risk on Westlaw Edge, you can see when a point of law in your case has been implicitly undermined based on its reliance on an overruled or otherwise invalid prior decision.

- Quickly access citing references, negative treatment and other information related to your selected document
- Monitor the status of your document and get automatic updates when KeyCite information changes
- Know immediately when a case has an appeal pending in federal court with KeyCite's exclusive Federal Notice of Appeal KeyCite flag



KeyCite flags rulings that have been overruled.

## Save time with Headnotes

With Headnotes you can quickly identify and understand what a case stands for and whether it's relevant to your legal issue. Attorney editors identify the important issues of law in a case and then write a short description summarizing the facts, holding, and reasoning being applied so you can determine the case's relevance. Rather than reading through every case in your results list to determine whether it's applicable to your specific issue, you can easily pinpoint the cases that match your facts and desired outcome to build the strongest argument.

- Ensure you haven't missed any relevant authority
- Quickly jump to the parts of the opinion you're most interested in
- Understand the application of law to facts



Use the headnotes for more detail and insights on a case or ruling.

## Better understand the law with Notes of Decisions

Notes of Decisions connect brief summaries of important cases to the statute or regulation they interpret so you can quickly understand the most current interpretation of the law. Notes of Decisions are curated, summarized, and classified by attorney editors so that you can feel confident you understand how cases have interpreted or applied a statute or regulation for a precise issue.



A2282



- Quickly understand the most current interpretation of the law as well as historic interpretations
- Avoid the need to manually search caselaw for references to a statute or regulation
- Understand the current legal standard and interpretation of your statute or regulation

Westlaw Edge Editorial Enhancements Notes on Decisions give an experts insight into decisions.

### Quickly find the most relevant statute using the **Indexes**

Westlaw is also the only online provider of alphabetical Indexes for statutes in all 50 states and the District of Columbia, USCA, and the CFR. With 20 million references categorized by topic, our online Indexes allow researchers to quickly find the most relevant statutes and regulations without running a search.

For more than 125 years, we provide the best Indexes by standardizing popular names, terms, and concepts across all jurisdictions. We gather related references under a single topic and apply terms of art and terms of general application, in conjunction with local terms and colloquial phrases. We even add terms that don't appear at all in the text of a statute. Because of this extensive process, you can quickly find what you are looking for, regardless of your familiarity with the law in any jurisdiction.

Find all the federal regulations or for any state using indexes.

### Featured articles and insights



ARTICLE

**The expertise behind your legal research**

Read more →



ARTICLE

**Using the West Key Number System**

Read more →



ARTICLE

**Why you need KeyCite**

Read more →



A2283

# EXHIBIT 97

A2284



A2285

9/24/2024 Case 1:20-cv-00613-SB    Document 695-2    Filed 10/08/24    Page 349 of 431 PageID #: 153174



A2286