No. 25-2153

# In The United States Court of Appeals For the Third Circuit

THOMSON REUTERS ENTERPRISE CENTRE GMBH and
WEST PUBLISHING CORPORATION,
Plaintiffs-Appellees,

v.

ROSS INTELLIGENCE INC.,
Defendant-Appellant.

*On Appeal from an Order of the United States
District Court for the District of Delaware
Civil Action No. 20-613 (The Honorable Stephanos Bibas)*

**CORRECTED JOINT APPENDIX
Volume 6 of 18 (Pages A2287 to A2812)**

Anne M. Voigts
Ranjini Acharya
PILLSBURY WINTHROP
SHAW PITTMAN
2400 Hanover Street
Palo Alto, CA 94304

Yar R. Chaikovsky
WHITE & CASE
3000 El Camino Real
2 Palo Alto Square;
Suite 900
Palo Alto, CA 94306

Mark S. Davies
Anna B. Naydonov
Kufere J. Laing
WHITE & CASE
701 Thirteenth Street, NW
Washington, DC 20005
(202) 626-3600
mark.davies@whitecase.com

Kayvan M. Ghaffari
PILLSBURY WINTHROP
SHAW PITTMAN
Four Embarcadero
Center, 22nd Floor
San Francisco, CA 94111

Andy M. LeGolvan
WHITE & CASE
555 S Flower Street,
Suite 2700
Los Angeles, CA 90071

*Counsel for Defendant-Appellant*

*(For Continuation of Appearances See Inside Cover)*

Miranda D. Means
KIRKLAND & ELLIS
200 Clarendon Street
Boston, MA 02116

Dale M. Cendali
Joshua L. Simmons
KIRKLAND & ELLIS
601 Lexington Avenue
New York, NY 10022
(212) 446-4800
dale.cendali@kirkland.com

*Counsel for Plaintiffs-Appellees*

i

Page

## TABLE OF CONTENTS

Page

**Volume 1 of 18**

Memorandum Opinion, dated
September 25, 2023
(Doc. 547) ........................................................ A1

Memorandum Opinion, dated
February 11, 2025 (Doc. 770) ........................ A35

Order, dated February 11, 2025 (Doc. 772) .... A58

Order, dated April 3, 2025 (Doc. 799) ............. A59

Memorandum Opinion, dated May 23, 2025
(Doc. 804) ........................................................ A60

Order granting Petition for Permission to
Appeal, dated June 17, 2025 (Doc. 805) ...... A70

**Volume 2 of 18**

District Court Docket Entries ......................... A71

Complaint, dated May 6, 2020 (Doc. 1) ........... A157

Appendix A -
Certificates of Registration (Doc. 1-1) ......... A174

Defendant and Counterclaimant Ross
Intelligence Inc.'s Amended Partial
Answer and Defenses and Amended
Counterclaims in Response to Plaintiffs'
Complaint and Demand for Jury Trial,
dated January 25, 2021 (Doc. 24) ................ A502

Letter from Michael J. Flynn to the
Honorable Stephanos Bibas, dated
July 15, 2022 (Doc. 200) .............................. A549

ii

|  | Page |
|---|---|
| Defendant and Counterclaimant Ross Intelligence Inc.'s Second Amended Answer and Defenses and Amended Counterclaims in Response to Plaintiffs' Complaint and Demand for Jury Trial, dated September 14, 2022 (Doc. 225).......... | A557 |
| Plaintiffs' Notice Of Lodging, dated December 22, 2022 (Doc. 257)...................... | A604 |
| Declaration of Miranda D. Means in Support of Motion for Partial Summary Judgment, dated January 9, 2023 (Doc. 298) (Omitted) | |
| Exhibit 6 - Deposition of Barbara Frederiksen-Cross, dated November 11, 2022 (Doc. 298-1)........ | A607 |

**Volume 3 of 18**

| Exhibit 20 - Comparison of ROSS Bulk Memo Questions to Headnote and Headnote to Case Opinion (Doc. 298-1)........................... | A619 |

**Volume 4 of 18**

| Exhibit 20 (Continued) - Comparison of ROSS Bulk Memo Questions to Headnote and Headnote to Case Opinion (Doc. 298-1)........................... | A1171 |

**Volume 5 of 18**

| Exhibit 20 (Continued) - Comparison of ROSS Bulk Memo Questions to Headnote and Headnote to Case Opinion (Doc. 298-1)........................... | A1733 |

iii

**Page**

Declaration of Laurie Oliver in Support of
    Plaintiffs' Motions for Partial Summary
    Judgment, dated December 21, 2022
    (Doc. 304) ................................................... A1584

Declaration, dated September 14, 2023
    (Doc. 544)
    (Omitted)

    Exhibit 3 -
    Deposition Transcript of Kai Bond, dated
    May 10, 2023 (Doc. 544-1) ........................... A1590

    Exhibit 8 -
    Deposition Transcript of Julian D'Angelo,
    dated May 3, 2023 (Doc. 544-1) ................... A1608

    Exhibit 25 -
    Deposition of Tomas Van Der Heijden,
    dated March 17, 2022 (Doc. 544-1) .............. A1630

    Exhibit 26 -
    Deposition Transcript of Tomas Van Der
    Heijden, dated May 9, 2023 (Doc. 544-1) .... A1646

    Exhibit 43 -
    Scope of Coverage (Doc. 545-1) .................... A1695

    Exhibit 44 -
    Defendant and Counterclaimant Ross
    Intelligence Inc.'s Response and Objection
    to Plaintiffs' Fifth Set of Interrogatories
    (Doc. 545-1) ................................................. A1700

    Exhibits 50, 51, 53-55, 58 -
    Entirely Redacted (Doc. 545-1) .................... A1718

iv

| | Page |
|---|---|
| Declaration of Max Samels in Support of Thomson Reuters' Motions for Partial Summary Judgment (Nos. 1-6), dated August 31, 2023 (Doc. 546) | A1730 |
| Exhibits 83-87 - Entirely Redacted (Doc. 546-1) | A1733 |
| Exhibit 88 - Left Intentionally Blank (Doc. 546-1) | A1743 |
| Exhibit 89 - 2022 Legal Technology Survey Report (Doc. 546-1) | A1744 |
| Exhibits 90-92 - Entirely Redacted (Doc. 546-1) | A1761 |
| Exhibit 93 - The Real Impact of Using Artificial Intelligence in Legal Research (Doc. 546-1) | A1767 |
| Exhibits 94-104 - Entirely Redacted (Doc. 546-1) | A1778 |
| Memorandum Opinion, dated September 25, 2023 (Doc. 547) | A1800 |
| Memorandum Opinion, dated September 27, 2024 (Doc. 669) | A1834 |
| Order, dated September 27, 2024 (Doc. 670) | A1848 |
| Second Declaration of Laurie Oliver in Support of Plaintiffs' Renewed Motions for Summary Judgment, dated October 1, 2024 (Doc. 679) | A1850 |

v

| | Page |
|---|---|
| Plaintiffs' Brief in Support of Their Renewed Motion for Partial Summary Judgment on Fair Use, dated October 1, 2024 (Doc. 693) | A1856 |
| Exhibits 1-18 - Entirely Redacted (Doc. 695-1) | A1858 |
| Exhibit 19 - Exhibit 1 from the Deposition of Alan Cox, dated November 2, 2022 (Doc. 695-1) | A1859 |
| Exhibit 20 - Exhibit 2 from the Deposition of Alan Cox, dated November 2, 2022 (Doc. 695-1) | A1872 |
| Exhibits 21-39 - Entirely Redacted (Doc. 695-1) | A1874 |
| Exhibit 40 - Statement of Work II for Ross Bulk Memos (Doc. 695-1) | A1875 |
| Exhibits 41, 42 - Entirely Redacted (Doc. 695-1) | A1890 |
| Exhibit 43 - *HJS Development, Inc. v. Pierce County ex rel. Dept. of...*, 148 Wash.2d 451 (2003) (Doc. 695-1) | A1891 |
| Exhibits 44-76 - Entirely Redacted (Doc. 695-1) | A1916 |
| Exhibit 77 - Westlaw is Suing Us. Our Response (Doc. 695-1) | A1917 |
| Exhibit 78 - ROSS Intelligence Facebook Pages (Doc. 695-1) | A1922 |

vi

**Page**

Exhibits 79, 80 -
Entirely Redacted (Doc. 695-1).................... A1927

Exhibit 81 -
Copyright Form TX (Doc. 695-1) ................. A1928

Exhibit 82 -
Copyright Certificate of Registration
(Doc. 695-1)................................................. A1933

Exhibit 83 -
Amended Notice of Deposition, dated
September 25, 2019, with Transcript
(Doc. 695-2)................................................. A1938

Exhibits 84-86 -
Entirely Redacted (Doc. 695-2).................... A2257

Exhibit 87 -
Notes (Doc. 695-2) ....................................... A2258

Exhibit 88 -
Westlaw Quick Reference Guide "West
Key Number System Numerical List of
Digest Topics" (Doc. 695-2) .......................... A2260

Exhibits 89-93 -
Entirely Redacted (Doc. 695-2).................... A2269

Exhibit 94 -
How is Natural Language Search
Changing the Face of Legal Research?
(Doc. 695-2)................................................. A2270

Exhibit 95 -
*Seymour v. Richardson*, 194 Va. 709 (1953)
(Doc. 695-2)................................................. A2274

Exhibit 96 -
Editorial Enhancements (Doc. 695-2) ......... A2281

**Page**

Exhibit 97 -
Thomson Reuters Westlaw | Headnotes
(Doc. 695-2).................................................... A2284

**Volume 6 of 18**

Exhibit 98 -
Thomson Reuters Westlaw | Key Number
System (Doc. 695-2)..................................... A2287

Exhibits 99-100 -
Entirely Redacted (Doc. 695-2)..................... A2290

Exhibit 101 -
Surprising Differences: An Empirical
Analysis of LexisNexis and West
Headnotes in the Written Opinions of the
2009 Supreme Court Term
(Doc. 695-2)................................................... A2291

Exhibit 102 -
Westlaw Precision 141E Education
(Doc. 695-2)................................................... A2365

Exhibit 103 -
Entirely Redacted (Doc. 695-2)..................... A2368

Declaration of Richard A. Leiter, for
    Defendant/Counterclaimant, in Support of
    Motion for Summary Judgment on its
    Affirmative Defense of Fair Use and on
    Plaintiffs' Claims for Copyright
    Infringement, filed October 9, 2024
    (Doc. 700)
    (Omitted)

**viii**

**Page**

Exhibit B -
Report of Defendants' Expert Professor
Richard Leiter, J.D., dated August 1, 2022
(Doc. 700-1)................................................ A2369

Declaration of Joseph Marks, for Defendant/
Counterclaimant, in Support of Motion for
Summary Judgment on its Affirmative
Defense of Fair Use and on Plaintiffs'
Claims for Copyright Infringement, dated
October 1, 2024 (Doc. 701)
(Omitted)

Exhibit B -
Entirely Redacted (Doc. 701-1)..................... A2392

Declaration of Jimoh Ovbiagele in Support of
Defendant/Counterclaimant Ross
Intelligence Inc.'s Motion for Summary
Judgment on Its Affirmative Defense of
Fair Use, dated October 1, 2024 (Doc. 702)    A2394

Declaration of Jimoh Ovbiagele in Support of
Defendant Ross Intelligence Inc.'s Motion
for Summary Judgment on Plaintiffs'
Claims of Copyright Infringement, dated
October 1, 2024 (Doc. 703) ........................... A2412

Declaration of Alan J. Cox, for Defendant/
Counterclaimant, in Support of Motion for
Summary Judgment on its Affirmative
Defense of Fair Use, filed October 9, 2024
(Doc. 704)
(Omitted)

Exhibit A -
*Curriculum Vitae* of Alan J. Cox, Ph.D.
(Doc. 704-1)................................................ A2422

ix

                                                       **Page**

Exhibits B, C -
Entirely Redacted (Doc. 704-1)....................   A2462

Declaration of Warrington S. Parker III, for
    Defendant Ross Intelligence Inc., in
    Support of Motion for Summary Judgment
    as to Plaintiffs' Copyright Claims, filed
    October 9, 2024 (Doc. 705)
    (Omitted)

Exhibit 13 -
Excerpts of Deposition Transcript of Erik
Lindberg, dated March 22, 2022
(Doc. 705-1)................................................   A2466

Exhibit 15 (Part 1) -
Entirely Redacted (Doc. 705-2)....................   A2484

Exhibit 15 (Part 2) -
Entirely Redacted (Doc. 705-2)....................   A2486

Exhibit 26 -
Excerpts of Deposition Transcript of Tariq
Hafeez, dated May 26, 2022 (Doc. 705-2)....   A2488

Exhibit 28 -
Excerpts of Deposition Transcript of
Christopher Cahn, dated May 12, 2022
(Doc. 705-7)................................................   A2532

Exhibit 29 -
Morae Global, Project Rose, Project
Protocol, TR-0178604, updated
November 19, 2017 (Doc. 705-7)..................   A2559

Exhibit 30 -
Excerpts of Deposition Transcript of
Andrew Arruda, dated March 30, 2022
(Doc. 705-7)................................................   A2569

x

**Page**

Exhibit 31 -
Excerpts of Deposition Transcript of
Barbara Frederiksen-Cross, dated
November 11, 2022 (Doc. 705-7) .................. A2588

Exhibit 32 -
Research Subscriber Agreement
(Doc. 705-7) ................................................ A2603

Exhibit 33 -
Best Practices Guide for ROSS
Intelligence, TR-0045731, last revised
September 14, 2017 (Doc. 705-7) ................ A2608

Declaration of Jacob Canter, for Defendant/
Counterclaimant Ross Intelligence Inc., in
Support of Motion for Summary Judgment
on its Affirmative Defense of Fair Use,
dated October 1, 2024 (Doc. 708)
(Omitted)

Exhibit 1 -
Excerpts from the Transcript Deposition of
Dr. Isabelle Moulinier, dated July 1, 2022
(Doc. 708-1) ................................................ A2629

Exhibit 2 -
Excerpts from the Transcript Deposition of
Jimoh Ovbiagele, dated April 12, 2022
(Doc. 708-1) ................................................ A2661

Exhibit 7 -
Marketing Information from ROSS
(Doc. 708-3) ................................................ A2681

Exhibit 8 -
Westlaw Slide Decks (Doc. 708-3) ............... A2685

x

**xi**

| | Page |
|---|---|

Exhibit 9 -
West Publishing Turns 150 Slide Decks
(Doc. 708-3).................................................. A2714

Exhibit 47 -
Artificial Intelligence & Westlaw, in 2022
(Doc. 708-9).................................................. A2727

Exhibit 48 -
Statement of Work II for ROSS Bulk
Memos (Doc. 708-9)..................................... A2750

Ross Intelligence Inc.'s Brief in Response to
Plaintiffs' Motion for Partial Summary
Judgment on Direct Copyright
Infringement and Related Defenses, dated
November 4, 2024 (Doc. 723) ....................... A2765

Declaration of Jacob Canter, for Defendant
Ross Intelligence Inc., in Response to
Plaintiffs' Motion for Partial Summary
Judgment on Direct Copyright
Infringement and Related Defenses, dated
October 30, 2024 (Doc. 728)
(Omitted)

Exhibit 30 -
Entirely Redacted (Doc. 728-2)..................... A2769

Plaintiffs' Opposition to Ross Intelligence
Inc.'s Renewed Motion for Summary
Judgment on Ross's Affirmative Defense of
Fair Use, dated October 30, 2024
(Doc. 730)..................................................... A2771

**xii**

                                                          **Page**

Declaration of Miranda D. Means, for
    Plaintiffs, in Opposition to Ross
    Intelligence Inc.'s Renewed Motion for
    Summary Judgment on Ross's Affirmative
    Defense of Fair Use, dated
    October 30, 2024 (Doc. 731)
    (Omitted)

    Exhibits 104-114 -
    Entirely Redacted (Doc. 731-1).................... A2774

    Exhibit 115 -
    Webpage entitled "lexis.com Quick
    Reference Guide" (Doc. 731-1) .................... A2775

    Exhibit 116 -
    Webpage entitled "The past, present, and
    future of legal research with generative
    AI" (Doc. 731-1) ......................................... A2792

    Exhibits 117-137 -
    Entirely Redacted (Doc. 731-1).................... A2802

    Exhibit 138 -
    Webpage entitled "What is image
    compression?" (Doc. 731-1) ......................... A2803

Declaration of Miranda D. Means, for
    Plaintiffs, in Support Reply Brief in
    Support of their Renewed Motion for
    Partial Summary Judgment on Fair Use,
    dated November 13, 2024 (Doc. 740)
    (Omitted)

    Exhibit 139 -
    Entirely Redacted (Doc. 740-1).................... A2812

xiii

**Page**

**Volume 7 of 18**
**(FILED UNDER SEAL)**

Complaint, dated May 6, 2020 (Doc. 1)........... A2813

Appendix A -
Certificates of Registration (Doc. 1-1)......... A2830

Defendant and Counterclaimant Ross
Intelligence Inc.'s Amended Partial
Answer and Defenses and Amended
Counterclaims in Response to Plaintiffs'
Complaint and Demand for Jury Trial,
dated January 25, 2021 (Doc. 24)................ A3158

Letter from Michael J. Flynn to the
Honorable Stephanos Bibas, dated
July 15, 2022 (Doc. 195).............................. A3205

Exhibit A -
Notes of Charles von Simson (Doc. 195-1) .. A3209

Exhibit B -
Defendant and Counterclaimant Ross
Intelligence, Inc.'s Response to Plaintiffs
Thomson Reuters Enterprise Centre
GmbH and West Publishing Corporation's
First Set of Requests for Admissions to
Defendant Ross Intelligence, Inc., dated
February 22, 2022 (Doc. 195-1) ................... A3211

Exhibit C -
Emails (Doc. 195-1) ..................................... A3291

Exhibit D -
Deposition Transcript of Charles von
Simson, dated April 19, 2022 (Doc. 195-1).. A3300

**Page**

Exhibit E -
Emails (Doc. 195-1) .................................... A3307

Defendant and Counterclaimant Ross
    Intelligence Inc.'s Second Amended
    Answer and Defenses and Amended
    Counterclaims in Response to Plaintiffs'
    Complaint and Demand for Jury Trial,
    dated September 14, 2022 (Doc. 225) .......... A3310

Declaration of Miranda D. Means in Support
    of Motion for Partial Summary Judgment,
    dated January 9, 2023 (Doc. 298)
    (Omitted)

Exhibit 6 -
Deposition of Barbara Frederiksen-Cross,
dated November 11, 2022 (Doc. 255-1) ........ A3357

Exhibit 20 -
Comparison of ROSS Bulk Memo
Questions to Headnote and Headnote to
Case Opinion (Doc. 255-1) ........................... A3369

**Volume 8 of 18**
**(FILED UNDER SEAL)**

Exhibit 20 (Continued) -
Comparison of ROSS Bulk Memo
Questions to Headnote and Headnote to
Case Opinion (Doc. 255-1) ........................... A3391

**Volume 9 of 18**
**(FILED UNDER SEAL)**

Exhibit 20 (Continued) -
Comparison of ROSS Bulk Memo
Questions to Headnote and Headnote to
Case Opinion (Doc. 255-1) ........................... A3971

xv

|  | Page |
|---|---|
| Declaration of Laurie Oliver in Support of Plaintiffs' Motions for Partial Summary Judgment, dated December 21, 2022 (Doc. 256) ................................................... | A4334 |
| Plaintiffs' Notice of Lodging, dated December 22, 2022 (Doc. 257) ...................... | A4340 |
| Declaration, dated September 14, 2023 (Doc. 544) (Omitted) |  |
| Exhibit 3 - Deposition Transcript of Kai Bond, dated May 10, 2023 (Doc. 531-1) ............................ | A4343 |
| Exhibit 8 - Deposition Transcript of Julian D'Angelo, dated May 3, 2023 (Doc. 531-1) ................... | A4361 |
| Exhibit 25 - Deposition of Tomas Van Der Heijden, dated March 17, 2022 (Doc. 531-1) .............. | A4383 |
| Exhibit 26 - Deposition Transcript of Tomas Van Der Heijden, dated May 9, 2023 (Doc. 531-1) .... | A4399 |
| Exhibit 43 - Scope of Coverage (Doc. 532-1) .................... | A4448 |
| Exhibit 44 - Defendant and Counterclaimant Ross Intelligence Inc.'s Response and Objection to Plaintiffs' Fifth Set of Interrogatories, dated May 11, 2023 (Doc. 532-1) ................. | A4453 |

xvi

**Page**

Exhibit 50 -
ROSS Discussion Materials – Competitive
Analysis & Profiling, dated April 16, 2015
(Doc. 532-1)................................................. A4471

Exhibit 51 -
Emails (Doc. 532-1) ..................................... A4483

Exhibit 53 -
Emails (Doc. 532-1) ..................................... A4490

Exhibit 54 -
Summary of Various Pricing Plans
(Doc. 532-1)................................................. A4494

Exhibit 55 -
ROSS Discussion Materials – Competitive
Analysis & Profiling, dated April 16, 2015
(Doc. 532-1)................................................. A4498

Exhibit 58 -
Emails (Doc. 532-1) ..................................... A4510

Exhibit 62 -
Powered by IBM Watson Application
Business Plan (Doc. 532-2) .......................... A4515

Exhibit 63 -
Emails (Doc. 532-2) ..................................... A4518

Exhibit 73 -
Emails (Doc. 532-2) ..................................... A4521

Exhibit 74 -
Emails (Doc. 532-2) ..................................... A4526

Exhibit 78 -
Emails (Doc. 532-2) ..................................... A4534

**Page**

**Volume 10 of 18**
**(FILED UNDER SEAL)**

Declaration of Max Samels in Support of
   Thomson Reuters' Motions for Partial
   Summary Judgment (Nos. 1-6), dated
   August 31, 2023 (Doc. 533)
   (Omitted)

Exhibit 83 -
Emails (Doc. 533-1) ...................................... A4537

Exhibit 84 -
ROSS Board Meeting Slides, dated
January 14, 2020 (Doc. 533-1) ...................... A4544

Exhibit 85 -
Why Users are Not Buying or Using
ROSS? (Doc. 533-1) ...................................... A4560

Exhibit 86 -
Income Statement (Doc. 533-1) .................... A4572

Exhibit 87 -
Thomson Reuters Legal Products and
Services (Doc. 533-1) .................................... A4576

Exhibit 88 -
Left Intentionally Blank (Doc. 533-1) ......... A4579

Exhibit 89 -
2022 Legal Technology Survey Report
(Doc. 533-1) .................................................. A4580

Exhibit 90 -
Artificial Intelligence & Westlaw
(Doc. 533-1) .................................................. A4597

xviii

Page

Exhibit 91 -
Thomson Reuters Global Brand Monitor –
Legal Business Unit Report (Doc. 533-1).... A4620

Exhibit 92 -
Positioning Guide: Key Value Prop
Statements (Doc. 533-1).............................. A4680

Exhibit 93 -
The Real Impact of Using Artificial
Intelligence in Legal Research (Doc. 533-1)   A4684

Exhibit 100 -
Thomson Reuters Westlaw Proposal
(Doc. 533-3).................................................... A4695

Exhibit 101 -
Thomson Reuters Westlaw Proposal
Update (Doc. 533-3)...................................... A4712

Exhibit 102 -
Practical Law Overview (Doc. 533-3) .......... A4726

Exhibit 103 -
WestlawNext Marketing (Doc. 533-3) ......... A4729

Exhibit 104 -
Thomson Reuters Proposal (Doc. 533-3) ..... A4730

Memorandum Opinion, dated
September 25, 2023 (Doc. 547) .................... A4738

Memorandum Opinion, dated
September 27, 2024 (Doc. 669) .................... A4772

Order, dated September 27, 2024 (Doc. 670).. A4786

Plaintiffs' Brief in Support of Their Renewed
Motion for Partial Summary Judgment on
Fair Use, dated October 1, 2024 (Doc. 673)   A4788

**xix**

**Page**

Declaration of Miranda D. Means, for
Plaintiffs, in Support of Renewed Motions
for Summary Judgment, dated
October 1, 2024 (Doc. 678)
(Omitted)

Exhibit 1 -
Excerpts from the Deposition of Khalid Al-
Kofahi, dated April 8, 2022 (Doc. 678-1) ..... A4790

Exhibit 2 -
Excerpts from the Deposition of Andrew
Arruda, dated March 30, 2022 (Doc. 678-2)    A4807

Exhibit 3 -
Excerpts from the Deposition of L. Karl
Branting, Ph.D., dated October 19, 2022
(Doc. 678-3).................................................. A4827

Exhibit 4 -
Excerpts from the Deposition of
Christopher Cahn,  May 12, 2022
(Doc. 678-4).................................................. A4835

Exhibit 5 -
Excerpts from the Deposition of Alan Cox,
dated November 2, 2022 (Doc. 678-5).......... A4841

Exhibit 6 -
Excerpts from the Deposition of Tariq
Hafeez, dated May 26, 2022 (Doc. 678-6).... A4860

Exhibit 7 -
Excerpts from the Deposition of Richard A.
Leiter, dated October 24, 2022 (Doc. 678-7)    A4873

xx

**Page**

Exhibit 8 -
Excerpts from the Deposition of Erik
Lindberg, dated March 22, 2022
(Doc. 678-8)................................................. A4891

Exhibit 9 -
Excerpts from the Deposition of James
Malackowski, dated November 4, 2022
(Doc. 678-9)................................................. A4904

Exhibit 11 -
Excerpts from the Deposition of Isabelle
Moulinier, dated July 1, 2022 (Doc. 678-11)   A4910

Exhibit 12 -
Excerpts from the Deposition of Laurie
Oliver, dated March 30, 2022 (Doc. 678-12)   A4919

Exhibit 13 -
Excerpts from the Deposition of Jimoh
Ovbiagele, dated April 12, 2022
(Doc. 678-13)................................................. A4927

Exhibit 14 -
Excerpts from the Deposition of Jimoh
Ovbiagele, dated May 2, 2023
(Doc. 678-14)................................................. A4949

Exhibit 15 -
Excerpts from the Deposition of Sean O.
Shafik, dated April 22, 2022 (Doc. 678-15) .   A4955

Exhibit 16 -
Excerpts from the Deposition of Tomas van
der Heijden, dated March 17, 2022
(Doc. 678-16)................................................. A4959

xx

xxi

**Page**

Exhibit 17 -
Excerpts from the Deposition of Charles
von Simson, dated April 19, 2022
(Doc. 678-17).................................................. A4987

Exhibit 18 -
Excerpts from the Deposition of Teri
Whitehead, dated April 18, 2022
(Doc. 678-18).................................................. A4991

Exhibit 19 -
Exhibit 1 from the Deposition of Alan Cox,
dated November 2, 2022 (Doc. 678-19)........ A4995

Exhibit 20 -
Exhibit 2 from the Deposition of Alan Cox,
dated November 2, 2022 (Doc. 678-20)........ A5008

Exhibit 21 -
Comparison of ROSS Bulk Memo
Questions to Headnote and Headnote to
Case Opinion (Doc. 678-21).......................... A5010

**Volume 11 of 18**
**(FILED UNDER SEAL)**

Exhibit 21 (Continued) -
Comparison of ROSS Bulk Memo
Questions to Headnote and Headnote to
Case Opinion (Doc. 678-21).......................... A5121

**Volume 12 of 18**
**(FILED UNDER SEAL)**

Exhibit 21 (Continued) -
Comparison of ROSS Bulk Memo
Questions to Headnote and Headnote to
Case Opinion (Doc. 678-21).......................... A5697

**xxii**

**Page**

Exhibit 22 -
Report of Defendants' Expert L. Karl
Branting, J.D., Ph.D., dated July 28, 2022
(Doc. 678-22)................................................. A5975

Exhibit 24 -
Opening Expert Report of Barbara
Frederiksen-Cross, dated August 1, 2022
(Doc. 678-24)................................................. A6015

Exhibit 25 -
Opening Expert Report of Jonathan L.
Krein, dated August 1, 2022 (Doc. 678-25) .  A6067

Exhibit 28 -
Opening Expert Report of James E.
Malackowski, dated August 1, 2022
(Doc. 678-28)................................................. A6162

Exhibit 29 -
Rebuttal Expert Report of James E.
Malackowski, dated September 6, 2022
(Doc. 678-29)................................................. A6227

Exhibit 31 -
Defendant and Counterclaimant ROSS
Intelligence, Inc.'s Supplemental
Responses and Objections to Plaintiffs' Set
of Interrogatories, dated
September 14, 2022 (Doc. 678-31) ............... A6258

**xxiii**

**Page**

**Volume 13 of 18**
**(FILED UNDER SEAL)**

Exhibit 31 (Continued) -
Defendant and Counterclaimant ROSS
Intelligence, Inc.'s Supplemental
Responses and Objections to Plaintiffs' Set
of Interrogatories, dated
September 14, 2022 (Doc. 678-31) ............... A6281

Exhibit 33 -
Audio of August 22 Hearing (Doc. 678-33).. A6352

Exhibit 34 -
Excel File (Doc. 678-34) .............................. A6354

Exhibit 35 -
Excel File (Doc. 678-35) .............................. A6356

Exhibit 36 -
Best Practices Guide for ROSS
Intelligence, last revised on
September 18, 2017 (Doc. 678-36) ............... A6358

Exhibit 37 -
Project Rose - Project Protocol
(Doc. 678-37)............................................... A6378

Exhibit 38 -
Email from Tariq Hafeez to Andrew
Arruda, dated October 23, 2020
(Doc. 678-38)............................................... A6388

Exhibit 39 -
Westlaw Screenshots (Doc. 678-39)............. A6393

Exhibit 40 -
Statement of Work II for Ross Bulk Memos
(Doc. 678-40)............................................... A6400

xxiv

**Page**

Exhibit 44 -
Email Exchange between Teri Whitehead
and Thomas van der Heijden, dated
September 15, 2017 (Doc. 678-44) ............... A6415

Exhibit 46 -
Design Studio Notes (Doc. 678-46) .............. A6418

Exhibit 47 -
Spreadsheet "ROSS Data Spend –
Jan 1, 2017 to Present" (Doc. 678-47) ......... A6435

Exhibit 50 -
Email Exchange between Thomas
Hamilton and John R. Fernandez, dated
August 6, 2015 (Doc. 678-50) ....................... A6442

Exhibit 51 -
Email Exchange between Thomas
Hamilton and Melissa Pritchard, dated
September 25, 2015 (Doc. 678-51) ............... A6444

Exhibit 52 -
Email from Andrew Arruda to Andre
Garber, dated August 22, 2015
(Doc. 678-52) ............................................... A6448

Exhibit 54 -
Email Exchange between Andrew Arruda
to Andre Garber, dated
October 18-19, 2015  (Doc. 678-54) .............. A6450

Exhibit 55 -
[Slack] Notifications from the Ross Inc.
Team for February 16, 2015 (Doc. 678-55).. A6455

Exhibit 56 -
Updated Tasks in poweredbyross.com
(Doc. 678-56) ............................................... A6457

xxiv

xxv

**Page**

Exhibit 57 -
Standard "ROSS Launch Partner" Pricing
List (Doc. 678-57) ........................................    A6459

Exhibit 58 -
Mapping Practice Areas with the New
Q&A Data  (Doc. 678-58) .............................    A6461

Exhibit 61 -
Email Exchange between Thomas
Hamilton and Shazina Razeen, dated
September 17-20, 2015 (Doc. 678-61) ..........    A6465

Exhibit 63 -
Presentation Outline for Fastcase
(Doc. 678-63)................................................    A6470

Exhibit 64 -
Top 3 Product Goals for Q1 2019
(Doc. 678-64)................................................    A6477

Exhibit 70 -
Document entitled "The Death of Westlaw
Contracts and Pricing" (Doc. 678-70) ..........    A6480

Exhibit 71 -
Email Exchange between Akash Venkat
and Tariq Hafee, dated
September 20, 2015 (Doc. 678-71) ...............    A6483

Exhibit 73 -
Document entitled "Westlaw is Suing Us.
Our Response:" (Doc. 678-73) ......................    A6486

Exhibit 74 -
Correspondence between Charles von
Simson and Jullian D'Angelo, dated
May 17, 2019 (Doc. 678-74).........................    A6491

xxvi

**Page**

Exhibit 76 -
Email from Andre Garber to Andrew
Arruda, dated July 21, 2015 (Doc. 678-76) .   A6494

Exhibit 78 -
ROSS Intelligence Facebook Pages
(Doc. 678-78)...............................................   A6496

Exhibit 79 to Means Declaration -
Editorial Manual, Policies and Guidelines
for Headnoting (Doc. 678-79)......................   A6501

Exhibit 83 -
Amended Notice of Deposition, dated
September 25, 2019, with Transcript
(Doc. 678-83)...............................................   A6776

Exhibit 85 to Means Declaration -
Diagram entitled "Bulk Memos – Process
for Clutch" (Doc. 678-85)............................   A6778

Exhibit 86 to Means Declaration -
Email from Teri Whitehead to Saloni
Agara Dwarakanath, dated
October 24, 2017 (Doc. 678-86)...................   A6780

Exhibit 90 to Means Declaration -
Salesforce Opportunity Detail
(Doc. 678-90)...............................................   A6783

Exhibit 91 to Means Declaration -
Modules (Doc. 678-91)................................   A6785

### Volume 14 of 18
### (FILED UNDER SEAL)

Exhibit 91 to Means Declaration (Cont.) -
Modules (Doc. 678-91)................................   A6859

xxvii

**Page**

Exhibit 92 to Means Declaration -
Document entitled "Vetting Customers –
High Usage and Competitors"
(Doc. 678-92)................................................. A6924

Exhibit 93 to Means Declaration -
Article "How is Natural Language Search
Changing The Face of Legal Research?"
(Doc. 678-93)................................................. A6944

Exhibit 96 -
Editorial Enhancements (Doc. 678-96) ....... A6946

Exhibit 97 -
Thomson Reuters Westlaw | Headnotes
(Doc. 678-97)................................................. A6949

Exhibit 98 -
Thomson Reuters Westlaw | Key Number
System  (Doc. 678-98).................................. A6952

Exhibit 99 to Means Declaration -
Messages from Charles von Simson, dated
June 4, 2019 (Doc. 678-99).......................... A6955

Exhibit 103 -
Supplemental Expert Report of Dr.
Jonathan L. Krein, dated August 11, 2024
(Doc. 678-103)............................................... A6957

Second Declaration of Laurie Oliver in
Support of Plaintiffs' Renewed Motions for
Summary Judgment, dated
October 1, 2024 (Doc. 679) .......................... A6982

**xxviii**

**Page**

Declaration of Jimoh Ovbiagele in Support of
  Defendant/Counterclaimant Ross
  Intelligence Inc.'s Motion for Summary
  Judgment on Its Affirmative Defense of
  Fair Use, dated October 1, 2024 (Doc. 680)    A6988

Declaration of Alan J. Cox, for Defendant/
  Counterclaimant, in Support of Motion for
  Summary Judgment on its Affirmative
  Defense of Fair Use, filed October 9, 2024
  (Doc. 681)
  (Omitted)

  Exhibit A -
  *Curriculum Vitae* of Alan J. Cox, Ph.D.
  (Doc. 681-1)..................................................    A7008

  Exhibit B -
  Expert Report of Alan J. Cox, Ph.D., dated
  August 1, 2022 (Doc. 681-1).........................    A7048

  Exhibit C -
  Expert Rebuttal Report of Alan J. Cox,
  Ph.D., dated September 6, 2022
  (Doc. 681-1)..................................................    A7092

Declaration of Jimoh Ovbiagele in Support of
  Defendant Ross Intelligence Inc.'s Motion
  for Summary Judgment on Plaintiffs'
  Claims of Copyright Infringement, dated
  October 1, 2024 (Doc. 686) ..........................    A7107

**xxix**

                                                                        **Page**

Declaration of Richard A. Leiter, for
   Defendant/Counterclaimant, in Support of
   Motion for Summary Judgment on its
   Affirmative Defense of Fair Use and on
   Plaintiffs' Claims for Copyright
   Infringement, filed October 9, 2024
   (Doc. 687)
   (Omitted)

   Exhibit B -
   Report of Defendants' Expert Professor
   Richard Leiter, J.D., dated August 1, 2022
   (Doc. 687-1)................................................   A7119

Declaration of Joseph Marks, for Defendant/
   Counterclaimant, in Support of Motion for
   Summary Judgment on its Affirmative
   Defense of Fair Use and on Plaintiffs'
   Claims for Copyright Infringement, dated
   October 1, 2024 (Doc. 689)
   (Omitted)

   Exhibit B -
   Report of Defendants' Expert L. Karl
   Branting, J.D., Ph.D., dated July 28, 2022
   (Doc. 689-1)................................................   A7142

Declaration of Jacob Canter, for Defendant/
   Counterclaimant Ross Intelligence Inc., in
   Support of Motion for Summary Judgment
   on its Affirmative Defense of Fair Use,
   dated October 1, 2024 (Doc. 690)
   (Omitted)

   Exhibit 2 -
   Excerpts from the Transcript Deposition of
   Jimoh Ovbiagele, dated April 12, 2022
   (Doc. 690-2)................................................   A7220

**xxix**

**xxx**

|  | Page |
|---|---|

Exhibit 8 -
Westlaw Slide Decks (Doc. 690-4) ............... A7240

Exhibit 16 -
Chart (Doc. 690-10) .................................... A7269

**Volume 15 of 18**
**(FILED UNDER SEAL)**

Exhibit 16 (Continued) -
Chart (Doc. 690-10) .................................... A7437

**Volume 16 of 18**
**(FILED UNDER SEAL)**

Exhibit 16 (Continued) -
Chart (Doc. 690-10) .................................... A8015

Exhibit 47 -
Artificial Intelligence & Westlaw, in 2022
(Doc. 690-27)............................................... A8169

Exhibit 48 -
Statement of Work II for ROSS Bulk
Memos (Doc. 690-27) ................................... A8192

Declaration of Warrington S. Parker III, for
Defendant Ross Intelligence Inc., in
Support of Motion for Summary Judgment
as to Plaintiffs' Copyright Claims, filed
October 9, 2024 (Doc. 691)
(Omitted)

Exhibit 13 -
Excerpts of Deposition Transcript of Erik
Lindberg, dated March 22, 2022
(Doc. 691-4)................................................. A8207

Exhibit 15 (Part 1) -
Summarization Manual (Doc. 691-7) .......... A8225

**xxx**

**xxxi**

**Page**

Exhibit 15 (Part 2) -
Summarization Manual (Doc. 691-8) .......... A8382

Exhibit 26 -
Excerpts of Deposition Transcript of Tariq
Hafeez, dated May 26, 2022 (Doc. 691-9).... A8520

Exhibit 30 -
Excerpts of Deposition Transcript of
Andrew Arruda, dated March 30, 2022
(Doc. 691-14)................................................. A8564

Declaration of Jacob Canter, for Defendant
Ross Intelligence Inc., in Response to
Plaintiffs' Motion for Partial Summary
Judgment on Direct Copyright
Infringement and Related Defenses, dated
October 30, 2024 (Doc. 711)
(Omitted)

Exhibit 30 -
Request for Admissions (Doc. 711-4)........... A8583

Ross Intelligence Inc.'s Brief in Response to
Plaintiffs' Motion for Partial Summary
Judgment on Direct Copyright
Infringement and Related Defenses, dated
October 30, 2024 (Doc. 713) ........................ A8586

Plaintiffs' Opposition to Ross Intelligence
Inc.'s Renewed Motion for Summary
Judgment on Ross's Affirmative Defense of
Fair Use, dated October 30, 2024
(Doc. 716)..................................................... A8590

**xxxii**

**Volume 17 of 18**
**(FILED UNDER SEAL)**

Declaration of Miranda D. Means, for
Plaintiffs, in Opposition to Ross
Intelligence Inc.'s Renewed Motion for
Summary Judgment on Ross's Affirmative
Defense of Fair Use, dated
October 30, 2024 (Doc. 718)
(Omitted)

Exhibit 107 -
Excerpts of Deposition Transcript of
Richard A. Leiter, dated October 24, 2022
(Doc. 718-4) ................................................. A8593

Exhibit 109 -
Excerpts of Deposition Transcript of
Isabelle Moulinier, dated July 1, 2022
(Doc. 718-6) ................................................. A8609

Exhibit 110 -
Excerpts of Deposition Transcript of
Tomas Van Der Heijden, dated
March 17, 2022 (Doc. 718-7) ........................ A8622

Exhibit 111 -
Excerpts of Deposition Transcript of
Laurie Oliver, dated March 30, 2022
(Doc. 718-8) ................................................. A8626

Exhibit 113 -
Rebuttal Expert Report of Dr. Jonathan L.
Krein, dated September 6, 2022
(Doc. 718-10) ............................................... A8633

Exhibit 115 -
Webpage entitled "lexis.com Quick
Reference Guide" (Doc. 718-12) ................... A8690

xxxiii

Page

Exhibit 116 -
Webpage entitled "The past, present, and
future of legal research with generative
AI" (Doc. 718-13) .......................................... A8707

Exhibit 135 -
WestlawNext WestSearch Technology
(Doc. 718-32).................................................. A8717

Declaration of Miranda D. Means, for
Plaintiffs, in Support Reply Brief in
Support of their Renewed Motion for
Partial Summary Judgment on Fair Use,
dated November 13, 2024 (Doc. 736)
(Omitted)

Exhibit 139 -
Excerpts of Deposition Transcript of Erik
Lindberg, dated March 22, 2022
(Doc. 736-1)................................................... A8722

Appendix A to Memorandum Opinion, dated
February 11, 2025 (Doc. 771)...................... A8726

**Volume 18 of 18**
**(FILED UNDER SEAL)**

Appendix A to Memorandum Opinion, dated
February 11, 2025 (Doc. 771) (Continued).. A9171

Case 1:20-cv-00613-SB　Document 695-2　Filed 10/08/24　Page 350 of 431 PageID #: 153175

# EXHIBIT 98

A2287



A2288



A2289

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 353 of 431 PageID #: 153178

# EXHIBITS    -
## Redacted in their Entirety

A2290

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 354 of 431 PageID #: 153179

# EXHIBIT 101

A2291

LAW LIBRARY JOURNAL Vol. 109:4 [2017-27]

# Surprising Differences: An Empirical Analysis of LexisNexis and West Headnotes in the Written Opinions of the 2009 Supreme Court Term[*]

Peter A. Hook[**] and Kurt R. Mattson[***]

*The number of headnotes assigned by LexisNexis and West are empirically examined for opinions of the 2009 Supreme Court Term. Additionally,* Citizens United *is examined in detail to determine the overlap of headnote-worthy language. Discrepancies in the number of headnotes assigned and disagreement as to headnote-worthy language call into question the rigor with which headnotes are created.*

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 558
What Are Headnotes? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 559
  What to Call These Systems? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 560
Historical Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 562
  West's National Reporter System . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 562
  Key Number System . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 563
  The Advent of LexisNexis and Computerized Legal Search . . . . . . . . . . . . . . 563
Related Literature . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 564
  Vendor Claims as to Their Headnote Process . . . . . . . . . . . . . . . . . . . . . . . . . 564
    West . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 564
    LexisNexis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 565
  Commentators' Thoughts as to What the Systems Are Designed to Do . . . . . 566
  Holdings Versus Dicta . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 568
Case Corpus . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 569
Number of Headnotes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 570
  Headnotes per Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 570
  Headnotes per Page . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 570
  Headnotes per Line . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 572
  Regression Analysis Results . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 572
Greatest Differences . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 576

---

   * © Peter A. Hook and Kurt R. Mattson, 2017.

   ** Assistant Professor, School of Information Sciences, Wayne State University, Detroit, Michigan. Trained as an attorney, Peter was an academic law librarian for ten years. Peter was a LexisNexis Student Associate while in law school at the University of Kansas from August 1995 until May 1997.

   *** President of Union Legal Research, Phoenix, Arizona. Trained as an attorney, Kurt is a former law firm librarian. Kurt worked for Pike & Fischer, Inc., a subsidiary of BNA (now Bloomberg BNA) as a legal editor from 1989 to 1990 and for Thomson West (formerly West Publishing) from 1990 until 2008 in product development, sales, and marketing. He has been an employee of LexisNexis from 2009 to the present as an author, editorial, and marketing consultant with the A.S. Pratt & Sons imprint.

A2292

558                    LAW LIBRARY JOURNAL          Vol. 109:4  [2017-27]

Idiosyncratic Differences . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 577
     *Corcoran v. Levenhagen* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 578
     *United States v. Juvenile Male* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 579
     LexisNexis Compared with Lawyers' Edition . . . . . . . . . . . . . . . . . . . . . . . . . 581
Agreement in Headnote-Worthy Opinion Language . . . . . . . . . . . . . . . . . . . . . 581
Conclusions and Future Work . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 585
Appendixes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 611

## Introduction

¶1 Headnotes are important.[1] They continue to be one of the main ways[2] that legal researchers engage with the massive body of case law[3] in the United States to marshal arguments for legal advocacy, advising, and scholarship. As one publisher-supplied component of the rule of law in the United States, they contribute to the stability, social justice, and economic growth[4] of the country by making case law usable. Headnotes are vendor-described, atomistic statements of discrete concepts[5] of law found in judicial opinions. They are supplied by two competing legal publishers (and vendors of their online legal platforms)—LexisNexis and Thomson Reuters (formally Thomson/West, formally West Publishing, and hereinafter West). They are not primary source content but important finding aids to the primary source content that are judicial opinions. However, the two publishers show surprising differences in how they assign headnotes, as illustrated by an empirical review of the headnotes assigned to the written opinions of the 2009 Term of the United States Supreme Court. The differences between the two vendors are found in (1) the number of headnotes assigned to each case, and (2) the identification of opinion language that merits a headnote.

---

1. *See* John O. McGinnis & Steven Wasick, *Law's Algorithm*, 66 Fla. L. Rev. 991, 1003 (2014) ("[T]echnology that makes precedent broadly available improves performance" of a distributed approach to legal ordering such as the common law, case-based system.).

2. See the amount of room their explanation continues to occupy in legal research textbooks, hornbooks, and nutshells: J.D.S. Armstrong & Christopher A. Knott, Where the Law Is: An Introduction to Advanced Legal Research 107–14 (4th ed. 2013); Stephen M. Barkan et al., Fundamentals of Legal Research 38, 78–104 (9th ed. 2009); Morris L. Cohen & Kent C. Olson, Legal Research in a Nutshell 60, 83–88 (12th ed. 2016); Kent C. Olson, Principles of Legal Research 250–64 (2d ed. 2015); Amy E. Sloan, Basic Legal Research: Tools and Strategies 96–122 (5th ed. 2012).

3. As of June 2012, both LexisNexis and Westlaw databases contained eleven million cases. Susan Nevelow Mart, *The Case for Curation: The Relevance of Digest and Citator Results in Westlaw and Lexis,* 32 Legal Reference Servs. Q. 13, 14 (2013) [hereinafter Mart, *Case for Curation*]. In March 2009, Westlaw contained "approximately nine million cases." In March 2010, LexisNexis contained an estimated 9.7 million cases. Susan Nevelow Mart, *Relevance of Results Generated by Human Indexing and Computer Algorithms: A Study of West's Headnotes and Key Numbers and LexisNexis's Headnotes and Topics*, 102 Law Libr. J. 221, 223, 2010 Law Libr. J. 13, ¶ 4 [hereinafter Mart, *Relevance*].

4. *Shrink Wrap: Why the History of Economic Growth Should Be All About Recessions*, Economist (Apr. 8, 2017), http://www.economist.com/news/finance-and-economics/21720311-faster -growth-not-due-bigger-booms-less-shrinking-history [https://perma.cc/Q5KJ-5TAX] ("Before the modern era, elites would fight between themselves for the spoils of growth and send the economy back to square one through wars, corruption and the like. Respect for courts to resolve disputes prevents this from happening."); *see also Order in the Jungle*, Economist (Mar. 13, 2008), http://www .economist.com/node/10849115 [https://perma.cc/6QCD-G8JZ].

5. They are decidedly not only for "holdings" as was originally written. See *infra* ¶¶ 26–28 below on holdings and dicta.

## What Are Headnotes?

¶2 To critically analyze and evaluate the assignment of headnotes by LexisNexis and West, it is important to articulate with specificity what they are and include. "Headnotes, or syllabi, are brief summaries of the points of law, usually accompanied by relevant facts bearing on that point of law. . . . Each headnote represents a point of law extracted from the case, and the number of headnotes varies from case to case."[6] Headnotes serve three main purposes: (1) They allow "the reader to grasp relatively quickly the legal issues discussed within the opinion"[7] (overview function). (2) They help the reader to quickly locate the issues described in the headnote paragraphs by including bracketed numbers ("[1]") that specify where in the opinion a particular headnote derives the basis for its summary[8] (intra-case location function). (3) And finally, headnotes allow a researcher to identify topically similar cases that have also been marked-up, assigned headnotes, and integrated within the larger categorization scheme[9] (digest function). This is why we refer to them as headnote systems.

¶3 Prior to computer-assisted legal research, a researcher typically started by referencing a multivolume printed digest. Digests contain all of the cases assigned headnotes with particular topics for a particular jurisdiction; they are organized alphabetically by top-level controlled vocabulary topics. Sometimes digests are regional. Sometimes they cover a particular level of the federal judiciary or, in the case of the General and Decennial digests, all West-headnoted U.S. case law. These digests reproduce the headnote summaries from the indexed cases.[10] In this manner, a user obtains topical access to what is otherwise only a chronological and jurisdictional organization of case law.[11] Prior to the introduction of the LexisNexis categorization system, most legal researchers used West's Key Number System.

¶4 The Key Number System is an alphanumeric categorization system that contains more than 400 top-level topics. These top-level topics are also assigned topic numbers[12] such as "92 Constitutional Law." Beyond the top-level topic, West assigns key numbers that drill down numerous levels of the hierarchy and contain a large amount of specificity. The end result are key numbers that look like 92k1018.[13] This key number represents six levels of the hierarchy in West's taxonomy: (1) 92 Constitutional Law, (2) VI Enforcement of Constitutional Provisions, (3) C Determination of Constitutional Questions, (4) 3 Presumptions and

---

6. BARKAN ET AL., *supra* note 2, at 38.

7. *Id.*

8. *Id.*

9. *Id.*

10. *See id.* at 78, 95.

11. *See* CHRISTOPHER G. WREN & JILL ROBINSON WREN, THE LEGAL RESEARCH MANUAL: A GAME PLAN FOR LEGAL RESEARCH AND ANALYSIS 6 (2d ed. 1986); Paul Callister, *Thinking Like a Research Expert: Schemata for Teaching Complex Problem-Solving Skills*, 28 LEGAL REFERENCE SERVS. Q. 31, 40 tbl.4 (2009) [hereinafter Callister, *Thinking*]; Paul D. Callister, *Time to Blossom: An Inquiry into Bloom's Taxonomy as a Hierarchy and Means for Teaching Legal Research Skills*, 102 LAW LIBR. J. 191, 203 tbl. 3, 210 fig. 6, 2010 LAW LIBR. J. 12 [hereinafter Callister, *Time to Blossom*]; Christopher G. Wren & Jill Robinson Wren, *The Teaching of Legal Research,* 80 LAW LIBR. J. 7, 35 matrix A (1988).

12. In cases of expansion or renumbering, sometimes topic numbers are followed by letters: 231H Labor and Employment. A pure numerical organization lacks the ability to change (hospitality) and still keep topics in alphabetical order without resorting to decimals.

13. *See, e.g.,* Citizens United v. Fed. Election Comm'n, 130 S. Ct. 876, 878 (2010).

A2294

Construction as to Constitutionality, (5) 1006 Particular Issues and Applications, and (6) 1018 Freedom of speech, expression, and press.[14] At its inception in 1908, the Key Number System had 77,000 unique topics.[15] There has been relatively little change in the overall number of unique topics since. In 2007, the Key Number System had "109,183 lines, of which 90,429 are postable [capable of receiving headnote content], and the remaining 18,754 are structural lines in the hierarchy."[16]

¶5 Use of the headnote systems has changed dramatically since the introduction of online, hypertext legal search platforms. In 1999,[17] LexisNexis was able to retrospectively introduce a headnote categorization system for its body of online case law to compete with the West Key Number System.[18] It remains available exclusively online with no analog to print digests or headnote paragraphs in printed case reporters. Currently, LexisNexis includes approximately 16,000 topics in its categorization system.[19] Some commentators assert that these topics are assigned, in part, by automated, patented, and algorithmic systems rather than exclusively by human editors and human decision making.[20]

¶6 Today's online research environment offers several distinct advantages in the use of headnote systems. The first is the easy display of all levels of the nested hierarchy that accompanies each topic assigned to a headnote.[21] The online world also allows for easy and comprehensive updating of topics that have been renumbered or reorganized.[22] Finally, the online world allows for hyperlinked access to all other cases assigned similar headnotes with further customizable refinements such as jurisdictional restraints or the inclusion of additional key words.

## What to Call These Systems?

¶7 In the literature, the topical organizations of headnote content are often called classifications.[23] It is worth referencing definitions from the information science community to add clarity as to how these systems should be discussed. "Cat-

14. *Id.* (viewed on Westlaw). This is an example of the hierarchical richness and specificity of the West Key Number System.

15. William W. Marvin, West Publishing Co.: Origin, Growth, Leadership 80 (1969).

16. Daniel P. Dabney, *The Universe of Thinkable Thoughts: Literary Warrant and West's Key Number System*, 99 Law Libr. J. 229, 236, 2007 Law Libr. J. 14, ¶ 33 (referencing a "nonpublic database maintained by West for the purpose of managing the Key Number System").

17. Mart, *Case for Curation, supra* note 3, at 14. Prior to 1999, LexisNexis published few cases in print.

18. During the time that Peter Hook was a LexisNexis student associate in law school (August 1995 until May 1997), he would quietly recommend to close friends that they print their cases from Westlaw. This was due to the competitive advantage that West enjoyed at the time in being the only main legal database company that provided headnotes. For law students printing cases for studying and research, Westlaw's headnotes conferred the advantages of the overview and intra-case location functions discussed above.

19. Mart, *Relevance, supra* note 3, at 224, ¶ 6.

20. *Id.* at 224–25, ¶ 7; Mart, *Case for Curation, supra* note 3, at 20–21.

21. Barkan et al., *supra* note 2, at 93; Patrick Charles, *West Topic and Key Numbers: Focusing on the Basic Structure*, 18 Perspectives: Teaching Legal Res. & Writing 130 (2010).

22. Charles, *supra* note 21, at 132.

23. *See* West's Analysis of American Law: With Key Number Classifications (2011) ("In the practice of the department, only classification inside the literary warrant is called "classification." West editors refer to classification outside the literary warrant as providing "library references."); Dabney, *supra* note 16, at 244, ¶ 70; F. Allan Hanson, *From Key Words to Key Numbers: How Automation Has Transformed the Law*, 94 Law Libr. J. 563, 570, 2002 Law Libr. J. 36, ¶ 20.

A2295

egorization is the process of dividing the world into groups of entities whose members are in some way similar to each other."[24] In contrast, "[c]lassification . . . involves the orderly and systematic assignment of each entity to one and only one class within a system of mutually exclusive and nonoverlapping classes."[25] The Library of Congress Classification System, used to put call numbers on the spines of books, is a true classification system. Books on a shelf are placed in one, and only one, location.[26] The fact that both LexisNexis and West frequently assign headnote paragraphs to more than one topic, by definition makes these categorization systems rather than classification systems.

¶8 It is also worthwhile to identify whether the two competing categorization systems are controlled vocabularies, taxonomies, and thesauri. A controlled vocabulary is "an authoritative list of terms to be used in indexing (human or automated)."[27] Both systems are controlled vocabularies. Otherwise, they would not be as effective at gathering related case law and would be mere indexes of every word used in judicial opinions. However, they are not static. For example, the West Key Number System has evolved over time to incorporate changes in legal terminology and usage. For instance, in 2003, the controlled vocabulary topic of Master and Servant[28] was updated and merged with Labor Relations to form the new controlled vocabulary topic of Labor and Employment.[29]

¶9 A taxonomy is "a controlled vocabulary with a hierarchical structure."[30] As evidenced by the multipart, hierarchical topical organization displayed with each headnote (in the online world), both categorization systems are taxonomies. Furthermore, a thesaurus is a taxonomy that contains syndetic structure reflecting relationships between terms: broader terms and narrower terms (hierarchical relationships), *see also* references (associative relationships), and *use/used for* statements (equivalency relationships).[31] The latter sometimes are called an entry vocabulary pointing the user to the preferred term. Additionally, terms in a thesaurus often carry scope notes ("brief explanations of how the term should be used in indexing") and term history notes.[32] It is unknown whether the LexisNexis categorization system is a thesaurus. While it is likely that LexisNexis has thesaurus content that it uses in-house, it is not available to the end user. West, on the other hand, makes available its thesaurus in the semi-annual book, *West's Analysis of American Law: With Key Number Classifications*.[33] The 1994 edition of this work includes scope notes at the outset of each of the top-level topic categories ("Subjects Included") as well as *see also* references ("Subjects Excluded and Covered by Other

24. Elin K. Jacob, *Classification and Categorization: A Difference that Makes a Difference*, 52 Libr. Trends 515, 518 (2004).

25. *Id.* at 522.

26. This assumes that multiple copies of the book are not classed in different locations. The multiple assignment of call numbers to one work is possible in online, virtual call number browsing systems and may be useful to the user.

27. *About Taxonomies & Controlled Vocabularies*, Taxonomies & Controlled Vocabularies SIG, http://www.taxonomies-sig.org/about.htm [https://perma.cc/R64S-CUQG].

28. Dabney, *supra* note 16, at 240, ¶ 51.

29. *See* 1 Eleventh Decennial Digest pt. 1, V–VII (2005); *id.* pt. 2, IV–VI.

30. *About Taxonomies & Controlled Vocabularies*, *supra* note 27.

31. *Id.*

32. *Id.*

33. West's Analysis of American Law: With Key Number Classifications, *supra* note 23.

A2296

562                                    LAW LIBRARY JOURNAL                    Vol. 109:4  [2017-27]

Topics").[34] There are also scope notes and *see also* references for some specific key numbers.[35]

## Historical Background

¶10 To empirically analyze the two competing headnote systems, it is important to understand how they evolved historically and in response to what stimuli. This, coupled with commentators' observations about the two systems, has informed the focus of the empirical study and the methodologies used herein.

### West's National Reporter System

¶11 When the number of cases increases dramatically and becomes overwhelming to use and navigate, this leads to new technologies for "abridgement and synthesis."[36] In the late nineteenth to early twentieth centuries, the technological response to the burgeoning amount of case law was the National Reporter System and the Key Number System.[37] Around 1870, and around the age of eighteen, John B. West began selling office supplies and medical and legal publications out of St. Paul, Minnesota, for the D.D. Merrill Book Store.[38] In 1872, he struck out on his own and became a full-time seller of law-related books.[39] In 1876, joined by his brother Horatio, John B. West & Co. launched a weekly legal newspaper named the *Syllabi*. This publication planted the seed that became the National Reporter System.[40]

¶12 The *Syllabi* provided excerpts, and soon full text, of Minnesota court decisions long before they were available in the official state reports.[41] The *Syllabi* was expanded to include cases from Wisconsin, and subsequently other states in the region, and became the *North Western Reporter*.[42] Nationwide subscriptions to and interest in the *North Western Reporter* allowed West Publishing Company to create and publish the *Federal Reporter* in 1880 (covering federal circuit and district court opinions), and the *U.S. Supreme Court Reporter* in 1882.[43] "These three Reporters were all edited under a *uniform* plan of headnotes and indexing which added greatly to the convenience of the user and which was not to be found in the separate State Reports."[44] Soon after, in 1888, case law from all jurisdictions within the United States was collected, indexed, headnoted, and included in a series of reporters that cumulatively became known as the National Reporter System.[45]

---

34. WEST'S ANALYSIS OF AMERICAN LAW: WITH KEY NUMBER CLASSIFICATIONS (1994).

35. *Id.* at 730 (Injunction "138.54. Schools; colleges and universities. *Excludes school desegregation, see Schools 13(20), and interscholastic and intercollegiate associations, see Schools 183 and Colleges and Universities 15.*").

36. McGinnis & Wasick, *supra* note 1, at 1002.

37. *Id.* at 1003–06.

38. MARVIN, *supra* note 15, at 25–26; *see also* Robert M. Jarvis, *John B. West: Founder of the West Publishing Company*, 50 AM. J. LEGAL HIST. 1 (2010).

39. MARVIN, *supra* note 15, at 27.

40. *Id.* at 30–32.

41. *Id.* at 30–35.

42. *Id.* at 36–38.

43. *Id.* at 39, 61.

44. *Id.* at 39.

45. *Id.* at 39, 42–49.

A2297

### Key Number System

¶13 Digests were soon created to allow topical exploration of this chronological collection of case law. This process began as West's *Monthly Index* in 1886, which became the *American Digest* in 1887.[46] Aided by the purchase of competing digests that were at a comparative economic disadvantage with West because West already had case law content used to produce its reporters,[47] West created the *Century Digest* in 1897,[48] followed by the first *Decennial Digest* in 1908. The Key Number System was developed by John A. Mallory and introduced in 1908[49] in the first *Decennial Digest.*[50] "This was the critical innovation from West . . . . It gave lawyers the ability to identify a discrete topic that was relevant to their case and then pull up a heretofore unavailable amount of case law on that topic."[51]

### The Advent of LexisNexis and Computerized Legal Search

¶14 The process of using computerized information retrieval systems to research the law began in the late 1950s[52] when a computer was used to produce an index to the Pennsylvania health statutes to find and replace the outdated term "retarded child."[53] The genesis of LexisNexis was a 1964 working group of the Ohio Bar Association that was formed to adopt a computerized legal information system.[54] It commissioned the creation of a system that would eventually become LexisNexis.[55] As LexisNexis originally did not have any editorial value-added material such as abstracts to allow users to quickly ascertain the relevance of a returned document, it pioneered in 1970 the "keyword-in-context (KWIC) format, where the search term was highlighted and displayed with leading and following lines (much like the snippets giving the results of a current search engine)."[56] Initially, LexisNexis dedicated computer terminals were seen as a finding aid to cases that would then be read or photocopied out of traditional law books.[57] To compete, West introduced its own computerized search platform in 1975.[58] Until 1978, the Westlaw platform was limited to searching only West's editorial headnotes of cases and, unlike LexisNexis, did not include the full text of legal documents.[59] In 1999, when

---

46. *Id.* at 47–48; James H. Wyman, *Freeing the Law: Case Reporter Copyright and the Universal Citation System,* 24 Fla. St. U. L. Rev. 217, 229 (1996).

47. Marvin, *supra* note 15, at 68–70.

48. *Id.* at 73.

49. Dabney, *supra* note 16, at 245, ¶ 81.

50. Marvin, *supra* note 15, at 28.

51. McGinnis & Wasick, *supra* note 1, at 1005.

52. Jon Bing, *Let There Be LITE: A Brief History of Legal Information Retrieval*, 1 Eur. J.L. & Info. Tech. (2010) [hereinafter Bing, *Let There Be LITE*], http://ejlt.org/article/view/15/20; Jon Bing, *Performance of Legal Text Retrieval Systems: The Curse of Boole*, 79 Law Libr. J. 187 (1987); K. Tamsin Maxwell & Burkhard Schafer, *Concept and Context in Legal Information Retrieval, in* Jurix: The Twenty-First Annual Conference 63, 63–72 (2008); William G. Harrington, *A Brief History of Computer-Assisted Legal Research*, 77 Law Libr. J. 543 (1985).

53. Bing, *Let There Be LITE, supra* note 52.

54. *Id.*; Wyman, *supra* note 46, at 230–32.

55. Bing, *Let There Be LITE, supra* note 52; Harrington, *supra* note 52, at 545.

56. Bing, *Let There Be LITE, supra* note 52.

57. *Id.*

58. *Id.*

59. *Id.*

A2298

LexisNexis began to retrospectively introduce headnotes, both LexisNexis and Westlaw offered full text, headnotes, and a related categorization scheme.[60]

## Related Literature

¶15 The literature that informs this empirical study falls into three categories: (1) the publishers' own claims as to their headnote practices; (2) other literature empirically evaluating LexisNexis and West products and commentary as to the headnote systems; and (3) a discussion of "holding" versus "dicta," which applies to the subsequent analysis as to what content is given headnote treatment.

### Vendor Claims as to Their Headnote Process

¶16 To analyze and critique the assignment of headnotes by both major publishers of case law, it is useful to survey what the publishers themselves claim about their headnotes. It is legitimate to analyze whether each publisher is living up to its stated aims and intent with its headnoting.

### West

¶17 In its marketing materials, West promotes its long history as being the primary digest system for U.S. case law.[61] West also claims that "[t]he Key Number System makes legal research easier, more accurate, and more relevant."[62] "Easier" is appropriate as one needs a digest system for topical access into what is otherwise only a chronological ordering of case law per a given jurisdiction.[63] "More accurate" and "more relevant" are much greater claims and appear similar to two information retrieval terms of art, "precision" and "recall." While "more accurate" and "more relevant" are not explicitly proven in the marketing assertion, context supplies some understanding of the claim. From the language immediately following the claim, one may infer that accuracy and relevance stem from the digest function of the West headnote system and the ability to view the full outline of West's hierarchical controlled subjects to discover the applicable divisions and elements of particular areas of the law. "The Key Number System is both an index you use to find opinions relevant to whatever legal problem you are working on and an outline of issues important in the law. This means that it will not only help you find the cases you want, but it will also help you identify the issues you need to consider in the first place!"[64]

¶18 West enumerates the steps used in creating its headnote system:

- A court issues an opinion in a case.
- A copy of the case is obtained by West, where . . . trained attorney editors read the case and pick out the points of law addressed in the case.

---

60. Mart, *Case for Curation, supra* note 3, at 14.

61. "The logical organization of legal materials is essential to the maintenance of a legal system based on precedent. For more than 100 years, the legal community has relied on the Topic and Key Number System's organization of case law to locate that precedent." Thomson Reuters Westlaw, [*Topic and Key Number Overview],* https://lawschool.westlaw.com/marketing/display/RE/24 [https://perma .cc/8MBP-JFLR].

62. *Id.*

63. *See* WREN & WREN, *supra* note 11, at 6; Callister, *Thinking, supra* note 11, at 40 tbl.4; Callister, *Time to Blossom, supra* note 11, at 203 tbl.3, 210 fig.6; Wren & Wren, *supra* note 11, 35 matrix A.

64. Thomson Reuters Westlaw, *supra* note 61.

A2299

- Written as a short, concise paragraph, these are called headnotes. . . .
- The headnotes are then passed along to attorney editors who are experts in figuring out where points of law belong in the huge Key Number System "outline."
- These "Classifiers" find the correct location on the outline, and assign at least one Key Number to the headnote. . . .
- Then the West Digests take over. Digests are arranged alphabetically by Topic and then numerically by Key Number. There are regional, federal, state, chronological and topical digests. All cases dealing with a legal concept in the jurisdiction, time period, or topical area covered by a Digest are grouped together. . . . On Westlaw, all Key Numbers are hyperlinked to cases addressing the same issue in any jurisdiction. All you have to do is know which Key Number describes the problem or point of law on which you would like to find cases. The rest has all been done for you![65]

¶19 By its own admission, West glosses "points of law" for inclusion in its headnotes and not necessarily only holdings. West also has long emphasized its frequent use of alternative terms in its headnotes,[66] to standardize topics and keywords and make them more findable. For example, the headnote to *Ravell v. United States* uses "spectator" to refer to a woman attending an air show, even though the opinion never uses this word.[67] One commentator notes that "editors take the legal concepts from a case [and] summarize the concept in the editor's own language[.]"[68] Sometimes, the editor's own language is the "exact language of the court."[69]

### LexisNexis

¶20 LexisNexis asserts in its promotional and marketing literature that its headnotes "reflect the language of the court."[70] "We never editorialize headnotes, which could lead to a misinterpretation of points of law."[71] LexisNexis goes on to encourage its users to "[g]et the vital information you need from attorney-editors who write headnotes in the language of the court, ensuring reliable information and no misinterpretation."[72] This fidelity to the actual language of the court also appears as a selling point in LexisNexis's instructional materials geared toward law students: "Lexis headnotes provide a more detailed overview of the legal issues discussed. You'll understand the court's assessment of each issue, as actual case language is used in each headnote."[73] LexisNexis also promotes the overview and intra-case

---

65. *Id.*; *see also How a Slip Opinion Becomes a Reported Case*, 15 Password: Newsl. Power West-law User 7, 7–9 (1995) (bullets added).

66. *How a Slip Opinion Becomes a Reported Case*, *supra* note 65, at 7–9.

67. Ravell v. United States, 855 F. Supp. 300, 300 (C.D. Cal. 1992). For a similar example of a trademark case about matchbook covers, but never using "matchbook" or "match covers" in the language of the case, see Kenneth H. Ryesky, *From Pens to Pixels: Text-Media Issues in Promulgating, Archiving, and Using Judicial Opinions Accessing the Law*, 4 J. App. Prac. & Process 353, 382–83 (2002).

68. Mart, *Relevance*, *supra* note 3, at 223, ¶ 5.

69. *Id.* at 223 n.13.

70. LexisNexis, *LexisNexis Case Law*, https://www.lexisnexis.com/en-us/products/caselaw.page [https://perma.cc/UYU9-9AQC].

71. *Id.*

72. *Id.*

73. LexisNexis, Preparing to Succeed in Class (2011), http://www.lexisnexis.com/documents/lawschooltutorials/20110728015017_large.pdf [https://perma.cc/KK62-TN3G]; LexisNexis, Lexis-Nexis Headnotes: How to Use the *More Like This Headnote* and *Retrieve All Headnotes* Features (2005), http://www.lexisnexis.com/documents/LawSchoolTutorials/20070430111658_small.pdf [https://perma.cc/84AG-42WC] ("LexisNexis Headnotes show the key legal points of a case. Each LexisNexis Headnote is written by a LexisNexis legal editor, *drawing directly from the language of the court*.").

location functions of its headnotes by stating that they allow a researcher to "[d]etermine if a case merits deeper analysis by quickly accessing the key legal issues and points of law material to a case."[74] Furthermore, LexisNexis promotes the digest function of its headnote system when it states that its headnotes allow a user to "[f]ind other relevant authority with headnotes that help direct you to other important cases related to your legal question."[75]

¶21 LexisNexis's emphasis on how its fidelity to the court's language avoids creating misleading headnotes obliquely implies that West's headnotes may suffer from this problem. We are not aware of any empirical research that demonstrates this is indeed a problem. If such research existed, it would probably be featured in LexisNexis promotional materials. LexisNexis also emphasizes the role of the attorney-editor in the creation of its headnotes. In an online brochure that features the twenty-nine steps of the LexisNexis editorial process, steps 20 through 25 ("Case Enhancements") are:

> 20. Headnote attorney-editors read both published and unpublished cases for identification and analysis of legal issues.
> 21. Attorney-editors craft a case-law summary for each case, which includes a concise synopsis, an overview of relevant legal facts and pertinent authorities, and a statement of the case outcome.
> 22. Attorney-editors identify the issues or points of law that are material to the resolution of the case and create stand-alone headnotes for each statement of authority.
> 23. Every headnote is assigned the most on-point classifications from our legal topic digest. Classifications provide instructive headings for the material rules of law and are a powerful research tool for relevant subject matter.
> 24. Case summaries, headnotes and classifications are quickly updated in the database.
> 25. Work is sampled and audited for quality review. Results are monitored.[76]

Steps 22 and 23 provide the language with which LexisNexis headnotes may be evaluated based on the corporation's own claims. To what extent do their headnotes gloss the "issues or points of law that are material to the resolution of the case" and contain each statement of authority?

### Commentators' Thoughts as to What the Systems Are Designed to Do

¶22 Support is found for both sides of the issue as to whether headnotes should use the actual language of the court opinion:

---

74. *LexisNexis Case Law*, *supra* note 70.

75. *Id.*

76. LᴇxɪsNᴇxɪs, Cᴀsᴇ Lᴀᴡ & Sʜᴇᴘᴀʀᴅ's Eᴅɪᴛᴏʀɪᴀʟ Pʀᴏᴄᴇss (2013), http://www.lexisnexis.com/pdf/LexisNexis_Case_Law_Shepards_29_Step_Editorial_Process.pdf [https://perma.cc/3GQJ-F6W9]; *see also* Shawn Nevers, *LexisNexis Headnotes*, Hᴜɴᴛᴇʀ's Qᴜᴇʀʏ (Sept. 18, 2009), http://huntersquery.byu.edu/wordpress/index.php/2009/09/lexisnexis_headnotes/ [https://perma.cc/7LJZ-DZ7P]:

> "[T]he editor reads the case and manually chooses the classifications. He or she has a tool much like an index that has all of the classifications listed there (topics and subtopics). For each point of law in the case that the editor chooses to include as a headnote, he or she then selects the most relevant subtopic/topic. Often they are given more than one as obviously they can not be hammered into only one subtopic. If the language does not fit any current topics, then the editor can request a new one created and a committee of editors makes that decision, but that is very rare. Once the editor has chosen the language and matched the topics, the secondary editors then check that to make sure it is correct." (quoting e-mail from Michael Morton, LexisNexis Regional Account Manager, to Shawn Nevers).

A2301

> Because the headnotes are not the actual judicial opinions, and because by design they abbreviate the information set forth in full by the opinion, and because they reflect the style of the digestor and not that of the person writing the opinion, vital data from the opinion can be omitted from its headnotes; or worse yet, the headnote can inaccurately represent the gist of the opinion.[77]

This provides some support to LexisNexis's marketing claims for incorporating the actual language of the court opinion. However, the same commentator also supports West's practice of using its own language to gloss headnotes to use more common key words and phrases: "[a] skilled professional case digestor who writes headnotes can enhance the utility of his or her employer's publication by helping the researcher find the information sought."[78]

¶23 There is an interesting discussion as to what extent these headnote categorization schemes influence the law itself: more specifically, whether they limit the ability to research the law and to even develop new rationales and arguments outside the bounds of traditional topic categories.[79]

> [T]he Key Number system, while detailed, could never actually cover every possible topic created by legal events. As a result, lawyers trained to use (rather than critically examine) the West Key Number System would feel pressure to wedge the facts from their case into arguments that could be developed from within the Key Topic system.[80]

"The essence of a classification scheme is to be a closed list of the salient ideas in the literature it serves, and when the system, by omitting an idea, implies that the idea is not sufficiently salient to be included, it can be an obstacle to considering the idea."[81] Dabney references the inability to use the Topic and Key Number System to research concepts related to feminist jurisprudence as one area of the law hampered by the language of the categorization system.[82]

¶24 Only a little empirical work has compared the two categorization systems. Mart did an empirical analysis as to the return of relevant results between the two vendors' platforms using both the digest and citator tools available on each platform. She started with a dataset of headnotes from ten marquee cases that significantly developed the law.[83] Subsequently, she repeated her study on a larger corpus of ninety important federal and state cases and obtained the following results:

> For digests, Key Number results had a higher percentage of relevant results than either digest function available on Lexis . . . . For citators, . . . Lexis's Shepard's algorithm produced slightly more relevant results than Westlaw's KeyCite algorithm, but the overlap in cases between the two systems is still very small. The differences in the result sets for digest and citator systems illustrate the fact that no one system or type of resource returns comprehensive results.[84]

¶25 We are not aware of any study that directly compares the number of headnotes and their qualities assigned by LexisNexis and West for the same body of cases. Presumably, however, each company has performed such an analysis to gain competitive intelligence on its competitor.

---

77. Ryesky, *supra* note 67, at 382.
78. *Id.* at 382.
79. Dabney, *supra* note 16, at 236–39, ¶¶ 31–44.
80. McGinnis & Wasick, *supra* note 1, at 1006.
81. Dabney, *supra* note 16, at 236, ¶ 31.
82. *Id.* at 239, ¶ 46.
83. Mart, *Relevance*, *supra* note 3, at 240–47, ¶¶ 35–48.
84. Mart, *Case for Curation*, *supra* note 3, at 15.

Case: 25-2153   Document: 156-6   Page: 52   Date Filed: 01/02/2026

ase 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 366 of 431 PageID #: 1531!

### Holdings Versus Dicta

¶26 Relevant to our inquiry is an exploration of holding and dicta, what their conflation might mean for the practice of law in the United States, and how their conflation might be abetted by the headnoting process. Stinson notes two general groupings of definitions of the "holding" of a case: (1) (the more limited) "a holding is limited to the facts plus outcome"; and (2) (the more expansive) "a holding includes the rationale or reasoning a court employs to reach a particular result."[85] Dicta is then defined as everything else in a case that is not a holding. As only holdings are obligated to be followed by lower courts in a multitiered, common-law system, Stinson surveys the problems that result when dicta is mistakenly elevated to a holding and vice versa. This includes a lessening of (1) the accuracy of opinions (whether they are actually correct), (2) judicial authority, and (3) legitimacy of the common-law system.[86] As relates to the U.S. Supreme Court, with its abundance of law clerks and small numbers of written opinions issued each year, the Court "sets broad policy, which invites espousing dicta that would be unnecessary if the Court's sole function were to narrowly resolve litigant's disputes."[87] The problem is exacerbated by the typical length of a Supreme Court written opinion.[88]

¶27 One of the three reasons Stinson gives for the conflation of holdings and dicta is the increasing reliance on "the *words* found in judicial opinions rather than the underlying components of those judicial decisions—facts, issues, holdings, and outcomes."[89] The distillation of holding from dicta can be difficult, and it is often easier to quote language from an opinion rather than succinctly summarize the holding. An additional reason that Stinson gives for preference for quotations from an opinion rather than a careful untangling of holding and dicta is that "electronic legal research encourages a focus on individual screens and snippets of text rather than documents as a whole; this devalues the significance of legal principles in favor of facts and rules taken out of context."[90]

¶28 LexisNexis, with its professed fidelity to the language of the court used for its headnote content, might be complicit with this trend of relying on quoted language rather than a careful parsing of holding from dicta. Stinson cites Doyle in noting that the development of full-text retrieval "minimized the assistance to be gained from editorial judgment."[91] This editorial judgment might support the West approach of more careful editorialized headnotes that summarize concepts rather than merely giving applicable language from the court opinion. Alternatively, advocates in our adversarial legal system want quick access to applicable snippets of language from opinions to marshal arguments most favorable for their clients. In other words, attorneys might welcome a certain degree of muddling of holding and dicta to advance the interests of their clients. Of course, this might be a structural flaw in our common law, adversarial process.

---

85. Judith M. Stinson, *Why Dicta Becomes Holding and Why It Matters,* 76 Brook. L. Rev. 219, 223–24 (2010).

86. *Id.* at 223–33.

87. *Id.* at 221.

88. *Id.* at 222.

89. *Id.* at 246.

90. *Id.* at 253.

91. *Id.* at 254 (quoting John Doyle, *WESTLAW and the American Digest Classification Scheme*, 84 Law Libr. J. 229, 229–30 (1992)).

A2303

## Case Corpus

¶29 Opinions at the U.S. Supreme Court level were chosen for our study because it is assumed that they garner the most careful and thorough editorial treatment from each of the publishers. For the sake of completeness, we decided to examine the entire output of the written opinions of one term of the Court. The 2009 Term was chosen (October 5, 2009, through October 3, 2010) because this was the most recent term in which all of the opinions appeared in their bound form in the *United States Reports* when we began work on this article in January 2016. The bound and presumed final version of the *United States Reports* was important because it was the neutral source of line numbering for comparisons of the two publishers' versions of the cases and the location of their headnote placement within each case. The fact that over five years had elapsed since the final written opinion was issued also gave the two publishers plenty of time to make changes and otherwise correct errors (if any) in their editorial enhancements of the cases. This assured that the analysis was conducted on more or less final products.

¶30 The authoritative listing of written opinions come from two sources. The first is the list of slip opinions hosted on the Supreme Court's website ("2009 Term Opinions of the Court"). However, it appears that these lists are not maintained on the Court's website once the relevant opinions are published in the bound volumes of the *United States Reports*. Because of this, we obtained the listing using the Internet Archive's Wayback Machine for the appearance of the Court's website on August 28, 2010.[92] This listing was confirmed using the data contained in the *Supreme Court Database*.[93] Consequently, the relevant corpus for this analysis was eighty-seven written case opinions[94] that have been given headnote treatment by at least

---

92. *Way Back Machine*, Internet Archive, https://web.archive.org/web/20100828092509/http://www.supremecourt.gov/opinions/slipopinions.aspx (U.S. Supreme Court's website captured on Aug. 28, 2010).

93. *The Supreme Court Database,* Washington Univ. Law, http://supremecourtdatabase.org/ (last visited Nov. 10, 2017). As to the list of "2009 Term Opinions of the Court" and the *Supreme Court Database*, there were two discrepancies. The *Supreme Court Database* included with its listing of written opinions one case that was a sentence-long dismissal pursuant to Rule 46 rather than a written opinion, Pottawattamie Cty. v. McGhee, 558 U.S. 1103 (2010). Conversely, the "2009 Term Opinions of the Court" included one case not included in the *Supreme Court Database* for the 2009 Term, Weyhrauch v. United States, 561 U.S. 476 (2010) ("R-" number: 87): "R: Sequential number assigned by the Reporter of Decisions after the particular case was issued." *Column Header Definitions,* Sup. Ct. of the U.S., http://www.supremecourt.gov/opinions/definitions.aspx [https://perma.cc/GE7L-T9SG]. This was a one-paragraph per curiam decision that did not garner any headnote treatment from either publisher because it merely vacated the lower court ruling consistent with a companion case in the same 2009 Term, Skilling v. United States, 561 U.S. 358 (2010). The *Supreme Court Database* had two other errors: the citations given for two cases were to subsequent treatments of the cases and not the original opinions in the 2009 Term that merited headnote treatment from at least one of the publishers: Thaler v. Haynes, 559 U.S. 43 (2010) ("R-" number: 23), *reh'g den.*, 559 U.S. 1088 (*Supreme Court Database* citations were to the "rehearing denied" memorandum decision). *United States v. Juvenile Male*, 560 U.S. 558 (2010) ("R-" number: 67), contained a certified question to the Montana State Supreme Court necessary to address a potential issue of mootness related to a juvenile sex offender. The case was subsequently resolved by *United States v. Juvenile Male*, 564 U.S. 932 (2011). The *Supreme Court Database* citations were to the subsequent and final opinion.

94. Several other listed opinions were memorandum decisions with no substantive treatment by the court and no headnotes assigned by the publishers: Briscoe v. Virginia, 559 U.S. 32 (2010) ("R-" number: 21), one-sentence order vacating and remanding for "further proceedings not inconsistent with the opinion, Melendez-Diaz v. Massachusetts, 557 U. S. 305 (2009)"; Kiyemba v. Obama, 559 U.S. 131 (2010) ("R-" number: 27), dismissed because change of circumstances surrounding prisoners at

A2304

one of the two publishers. These eighty-seven opinions were downloaded from Lexis Advance and Westlaw in Microsoft Word format. For Westlaw, the option to display the topic and key numbers with the expanded hierarchy was chosen.

### Number of Headnotes

¶31 The metric collected for each written opinion was the total number of headnotes assigned to each case by each publisher. Thus, the unit of analysis for comparison was the entire written opinion. One author populated a spreadsheet with the count numbers for each publisher for each of the written cases of the 2009 Term. (See appendix A.) This was made relatively easy as the headnotes are numbered in each publisher's version of the opinions and the total was obtained by looking at the last numbered headnote. The spreadsheet entries of the numbers per case were then confirmed by the other author. Data was collected for the total number of headnotes assigned by West and LexisNexis, as well as the *Lawyers' Edition*, which is a different categorization scheme also owned and maintained by LexisNexis and given with the LexisNexis case opinions. The total number of headnotes given by both publishers to the eighty-seven cases is surprisingly close given the variances discussed below—1063 for LexisNexis, 1063 for *Lawyers' Edition*, and 929 for Westlaw. (See table 1.)

### Headnotes per Case

¶32 The total number of headnotes assigned, divided by the eighty-seven cases, resulted in a per case average (arithmetic mean) for LexisNexis of 12.22 headnotes per case and West, 10.68. The similarity of these two averages belies vast differences between the two publishers, as discussed below. The range of the number of headnotes assigned by LexisNexis was 0 to 51. The range of the number of headnotes assigned by West was 1 to 36. In terms of statistical central tendency, some of these differences were captured by the median and mode number of headnotes assigned to the eighty-seven cases by the two publishers. (See table 1.) The median number of headnotes assigned per case by LexisNexis was eleven and nine for West. This means, by definition, half of the LexisNexis cases had fewer than eleven headnotes, and half had more. For West, half of the cases had fewer than nine headnotes, and half had more. The mode number, the most frequently occurring number of headnotes assigned per case, for LexisNexis was two and eleven (tie with six instances each) and eight for West (nine instances).

### Headnotes per Page

¶33 Opinion page counts were calculated to evaluate how well the number of headnotes correlated with the number of opinion pages. The impetus for the analysis was to see whether a correlation suggested that either publisher used page length as an algorithmic prompt for a target number of headnotes. Page counts excluded the syllabus and started from the language that announced which Justice authored the opinion: "Justice _____ delivered the opinion of the Court" or, when applicable,

---

Guantanamo Bay resulted in no lower court having addressed the new legal issues; Sullivan v. Florida, 560 U.S. 181 (2010) ("R-" number: 51), dismissed as improvidently granted; Robertson v. United States *ex rel.* Watson, 560 U.S. 272 (2010) ("R-" number: 57), dismissed as improvidently granted.

A2305

Case: 25-2153   Document: 156-6   Page: 55   Date Filed: 01/02/2026

ase 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 369 of 431 PageID #: 1531!

Vol. 109:4 [2017-27]   AN EMPIRICAL ANALYSIS OF LEXISNEXIS AND WEST HEADNOTES   571

**Table 1**

Headnote Count Comparisons

| | LexisNexis | Lawyers' Edition | West |
|---|---|---|---|
| Total Headnotes | 1063 | 1063 | 929 |
| Average (Mean) Number of Assigned Headnotes per Case | 12.22 | 12.22 | 10.68 |
| Median Number of Assigned Headnotes per Case | 11 | 11 | 9 |
| Mode Amount of Assigned Headnotes per Case | 2 (6 instances) 11 (6 instances) | 6 (6 instances) 11 (6 instances) | 8 (9 instances) |
| Range | 0–51 | 0–51 | 1–36 |
| *Citizens United v. Fed. Election Comm'n* (Case with Most LexisNexis Headnotes) | 51 | 51 | 24 |
| *Skilling v. United States* (Case with Most West Headnotes) | 41 | 41 | 36 |
| *McDonald v. City of Chicago* (Case with Greatest Disparity in the Number of Headnotes) | 18 | 18 | 1 |
| Number of Cases Each Publisher Assigned the Greater Number of Headnotes. (Note: Three cases had an equal number of headnotes.) | 47 of 87 cases | n/a | 37 of 87 cases |

"Per Curiam." The last page of the opinion contained the line "*It is so ordered*" or "*Affirmed.*" The math to determine the overall number of opinion pages was conducted automatically using a populated Excel spreadsheet: ("U.S. Reports Opinion Ends Page" minus U.S. "Reports Opinion Begins Page") + 1. (The plus one was used to avoid one-page opinions registering as having zero page lengths.) The number of pages per opinion in the corpus is given in appendix B.

¶34 Lexis averaged 0.70 headnotes per page (1063 headnotes/1521 total pages). West averaged 0.61 headnotes per page (929 headnotes/1521 total pages). Linear regression analysis was conducted using Microsoft Excel for each of the vendors relative to the total page counts for each of the eighty-seven cases in the corpus.[95] The independent variable or predictor variable $(x)$[96] was the number of pages, and the dependent variable or predicted variable $(y)$[97] was the number of headnotes assigned by each vendor. The results are discussed in the Regression Analysis Results section below.

---

95. *See generally* Conrad Carlberg, Regression Analysis: Microsoft Excel (2016). For an additional tutorial on how to conduct such an analysis, see Janice H. Hammond, *Quantitative Methods Online Course: Regression Section* (2010), Harvard Bus. Publ'g for Educators, https://cb.hbsp .harvard.edu/cbmp/product/6012-HTM-ENG [https://perma.cc/DQK2-HV8U].

96. Carlberg, *supra* note 95, at 130.

97. *Id.*

A2306

572                    LAW LIBRARY JOURNAL            Vol. 109:4  [2017-27]

### Headnotes per Lines

¶35 Line counts per opinion were calculated to evaluate how well the number of headnotes supplied by each publisher correlated with the number of lines in the Court's opinions. The impetus for the analysis was to see whether a correlation suggested that either publisher used the number of lines in an opinion as an algorithmic prompt for a target number of headnotes. The applicable volumes of the *United States Reports* were downloaded from the Supreme Court's website. The entire volumes were opened in the original PDF format and saved as Microsoft Word files. Additionally, continuous line numbering was enabled so each line within the volume had a distinct line number. Opinions of the Court excluded the syllabus and started from the language that announces which Justice authored the opinion: "Justice _____ delivered the opinion of the Court" or, when applicable, "Per Curiam." The last line of the opinion was the line "*It is so ordered*" or "*Affirmed.*" The math to determine the overall number of lines of the opinion was conducted automatically in a populated Excel spreadsheet: ("U.S. Reports Opinion of the Court Line Number Ends" minus "U.S. Reports Opinion of the Court Line Number Begins") + 1. The number of lines per opinion in the corpus is given in appendix B.

¶36 Lexis averaged 0.016 headnotes per line (1063 headnotes/64,950 total lines). West averaged 0.014 headnotes per line (929 headnotes/64,950 total lines). Correlation analysis (linear regression) was conducted using Microsoft Excel for each of the vendors relative to the total number of lines for each of the eighty-seven cases. The independent variable ($x$) was the total number of lines per opinion, and the dependent variable ($y$) was the number of headnotes assigned by each vendor per opinion. The results are discussed in the Regression Analysis Results section below.

### Regression Analysis Results

¶37 In addition to number of pages per opinion and total number of lines per opinion, two other variables were captured in the linear regression analysis: the number of majority votes and the date the opinion was released. We speculated that one or both vendors might use the voting counts as an algorithmic prompt for a target number of headnotes. Less divisive opinions with a larger number of majority votes were hypothesized to receive fewer headnotes. In the regression analysis, the number of majority votes (ranging from 5 to 9) was the independent variable ($x$), and the number of headnotes was the dependent variable ($y$). Additionally, as more controversial cases are often released later in the year, this might be another algorithmic prompt as to a target number of headnotes used by one or both publishers. It was speculated that the later an opinion was released, the greater number of headnotes it would have. In the linear regression analysis, the date was the independent variable ($x$), and the number of assigned headnotes was the dependent variable ($y$). These additional variables are also set out in appendix B.

¶38 Table 2 shows the results of the linear regression analysis conducted using Microsoft Excel for each of the variables discussed above. As to the correlation coefficient, values range between −1 and 1.[98] Perfectly correlated items have a value of either 1 or −1. Completely uncorrelated items have a value of zero.[99] With LexisNexis, there is a strong, positive correlation between number of headnotes per opinion and

---

98. *Id.* at 30–32.
99. *Id.*

**Figure 1**

Number of LexisNexis Headnotes per Number of Opinion Pages



number of pages per opinion. As the number of opinion pages goes up, so does the number of headnotes assigned. (See figure 1.) There is also a moderate correlation between the number of West headnotes assigned and the number of opinion pages. (See figure 2.) In this instance, the two are more correlated than not correlated. However, the greater correlation coefficient strength as to LexisNexis (0.708) than West (0.527) for this phenomenon makes it more likely that LexisNexis uses an algorithmically suggested number of headnotes based on the length of an opinion (total number of opinion pages) than does West. Alternatively, this might be a result of LexisNexis using more of the exact language of the Court—more language (longer opinions) equating to more headnotes. The results are similar as to the number of headnotes assigned per number of lines in the opinion. As might be expected, the correlation improves marginally (a few decimal places for LexisNexis [0.708 to 0.714]), which is probably due to the increased specificity that the count of lines represents over the count of pages. However, the results are (or are almost) the exact same for both publishers when compared to the correlations for number of opinion pages.

¶39 As to the remaining variables analyzed, the correlation coefficients are very weak and, in the case of the number of Justices signing the opinion, statistically unreliable.[100] As pertains to the 2009 Supreme Court Term, there is almost no correlation

---

100.  *See* T-test results in table 2.

A2308

**Table 2**

Correlation Analysis Results

| | Headnotes per Number of Opinion Pages | | Headnotes per Number of Opinion Lines | | Headnotes per Number of Majority Votes | | Headnotes per Date of the Opinion | |
|---|---|---|---|---|---|---|---|---|
| | Lexis-Nexis | West | Lexis-Nexis | West | Lexis-Nexis | West | Lexis-Nexis | West |
| Correlation Coefficient[a] | 0.708 | 0.527 | 0.714 | 0.527 | -0.100 | -0.082 | 0.349 | 0.210 |
| Slope of the Regression Line[b] | 0.717 | 0.425 | 0.016 | 0.009 | -0.553 | -0.361 | 0.043 | 0.021 |
| Standard Error of the Slope of the Regression Line[c] | 0.078 | 0.074 | 0.002 | 0.002 | 0.595 | 0.474 | 0.0127 | 0.011 |
| t-ratio (slope of the regression line/ standard error of the slope of the regression line)[d] | 9.192 | 5.724 | 9.406 | 5.719 | -0.930 | -0.761 | 3.434 | 1.979 |
| Degrees of Freedom[e] | 85 | 85 | 85 | 85 | 85 | 85 | 85 | 85 |
| T-test (probability of sample slope of the regression line when actual population slope of the regression line equals zero)[f] | 1.101 | 7.63 | 4.07 | 7.788 | 0.823 | 0.776 | 0.000461 | 0.026 |
| y-Intercept of the Regression Line[g] | -0.309 | 3.247 | 0.246 | 3.642 | 16.283 | 13.331 | -1737.69 | -827.093 |
| Standard Error of the y-Intercept[h] | 1.512 | 1.449 | 1.436 | 1.388 | 4.470 | 3.565 | 509.596 | 423.305 |
| R[i] | 0.501 | 0.278 | 0.510 | 0.278 | 0.010 | 0.007 | 0.122 | 0.044 |
| Standard Error of Estimate[j] | 6.259 | 5.994 | 6.203 | 5.995 | 8.817 | 7.031 | 8.304 | 6.898 |
| F-Ratio[k] | 85.409 | 32.766 | 88.471 | 32.711 | 0.865 | 0.580 | 11.792 | 3.917 |
| Sum of Squares for the Regression[l] | 3345.438 | 1177.187 | 3404.209 | 1175.757 | 67.264 | 28.661 | 813.177 | 186.382 |
| Sum of Squares for the Residual[m] | 3329.413 | 3053.802 | 3270.642 | 3055.231 | 6607.587 | 4202.327 | 5861.674 | 4044.607 |
| Observations | 87 | 87 | 87 | 87 | 87 | 87 | 87 | 87 |

a. CARLBERG, *supra* note 95, at 29–57.

b. *Id.* at 107; *see also LINEST Function*, MICROSOFT CORP., https://support.office.com/en-us/article/LINEST -function-84d7d0d9-6e50-4101-977a-fa7abf772b6d [https://perma.cc/78XT-379F].

c. CARLBERG, *supra* note 95, at 109–14.

d. *Id.* at 112.

e. *Id.* at 13, 112.

f. *Id.* at 109–14.

g. *Id.* at 107.

h. *Id.* at 109–14.

i. *Id.* at 117–19.

j. *Id.* at 120–21.

k. *Id.* at 129–48.

l. *Id.* at 125–29.

m. *Id.*

A2309

**Figure 2**

Number of West Headnotes per Number of Opinion Pages



(for either publisher) between the number of headnotes assigned and the number of Justices that join the majority opinion. Even though the regression line slopes in the anticipated negative direction—more headnotes assigned when fewer Justices join the majority—the extremely low correlation coefficient rejects the hypothesis that more headnotes would be assigned when more Justices are dissenting (an indication of controversial opinions). Though a dataset of eighty-seven cases is not too small from which to draw statistical inferences,[101] conducting the same analysis on ten or twenty years of Supreme Court cases would be more dispositive. Additionally, there is a weak correlation, for both publishers, as to the number of headnotes assigned and when in the Term opinions are released. The higher correlation coefficient for LexisNexis (0.349) than for West (0.210) indicates that LexisNexis is more likely to use the timing of an opinion release (later in the Term cases being viewed as more significant and thus more headnote worthy) to suggest that more headnotes are merited. (However, opinions released later in the Term are longer, which is the reason they garner more headnote treatment from LexisNexis.) Again, conducting the same analysis over a larger dataset might be more informative. As to the 2009 Term, results might have been skewed by the very controversial case of *Citizens United v.*

---

101.  CHARLES WHEELAN, NAKED STATISTICS: STRIPPING THE DREAD FROM THE DATA 135 (2013) ("As a rule of thumb, the sample size must be at least 30 for the central limit theorem to hold true.").

576                    LAW LIBRARY JOURNAL              Vol. 109:4 [2017-27]

*Federal Election Commission*,[102] which was released comparatively early in the term (Jan. 21, 2010). Chronologically, it was the nineteenth of the eighty-seven opinions released that year. (See appendix B. See appendix C for an example of the rich topical and procedural information supplied for each case in the Supreme Court database.)

### Greatest Differences

¶40 Ideally, one publisher would consistently assign more headnotes than the other. This would mean that each publisher consistently identified headnote-worthy language, and one of them consistently found more headnote-worthy language in each of the cases based on its own criteria. The differing numbers could then be nicely attributed to different philosophies of headnoting. However, this is not the case. Each publisher assigned more headnotes per case than the other almost an equal number of times: forty-seven times LexisNexis assigned more headnotes than West, and thirty-seven times West assigned more headnotes than LexisNexis. Only in three cases did each publisher assign an equal number of headnotes.[103] If headnote assignment was a science rather than an art, there should be many more instances in which each publisher assigned the same number of headnotes or that one publisher consistently assigned the same ratio of a greater number than the other publisher. In other words, if "issues or points of law that are material to the resolution of the case"[104] (LexisNexis) and "points of law"[105] (West) could be consistently and accurately identified each time, there would not be the disparities seen in the data. It is important to note that LexisNexis also claims to give headnote treatment to each statement of authority.[106] A priori, this suggests that LexisNexis would consistently assign more headnotes than West. It does not. Tables 3 through 6 reveal the greatest disparities in the number of headnotes assigned and the resulting ratios for each publisher. The fact that in numerous instances one publisher assigned multiples of headnotes compared to the other (frequently five or six times as many) further indicates that headnote assignment is an art and not a science.

¶41 *McDonald v. Chicago*[107] offers the starkest contrast, with eighteen Lexis-Nexis headnotes and only one West headnote (a ratio of 1:18, as displayed in tables 3 and 4). In this one instance, West headnotes only the holding of the case—merely enunciating the overarching legal principle on which the case stands in one headnote. Given the significant constitutional issues addressed in *McDonald*, West's choice is puzzling. Surely the *McDonald* opinion states more than one *point of law* worthy of a headnote assignment that would interest West's users. All three functions of headnotes (overview, intra-case location, and digest) might be improved by more than one headnote being assigned. In contrast, LexisNexis offers eighteen "issues or points of law that are material to the resolution of the case" or statements

---

102.  Citizens United v. Fed. Election Comm'n, 558 U.S. 310 (2010).

103.  United States v. Marcus, 560 U.S. 258 (2010) (seven headnotes assigned by both LexisNexis and West); Holland v. Florida, 560 U.S. 631 (2010) (fourteen headnotes assigned by both LexisNexis and West); Kawasaki Kisen Kaisha Ltd. v. Regal-Beloit Corp., 561 U.S. 89 (2010) (seventeen headnotes assigned by both LexisNexis and West).

104.  LexisNexis, *supra* note 76.

105.  Thomson Reuters Westlaw, *supra* note 61.

106.  LexisNexis, *supra* note 76.

107.  561 U.S. 742 (2010).

A2311

Vol. 109:4 [2017-27]    AN EMPIRICAL ANALYSIS OF LEXISNEXIS AND WEST HEADNOTES    577

**Table 3**

Greatest Total Differences in Headnote Numbers: LexisNexis Greater Than West

| Rank | Case Name | United States Reports Citation | Supreme Court Reporter Citation | United States Supreme Court Reports—Lawyers' Edition Citation | Total Number LexisNexis Headnotes | Total Number West Headnotes | Absolute Difference | Difference Ratio |
|------|-----------|-------------------------------|--------------------------------|--------------------------------------------------------------|-----------------------------------|-----------------------------|---------------------|------------------|
| 1 | Citizens United v. Fed. Election Comm'n | 558 U.S. 310 | 130 S. Ct. 876 | 175 L. Ed. 2d 753 | 51 | 24 | 27 | 1:2.13 |
| 2 | Holder v. Humanitarian Law Project | 561 U.S. 1 | 130 S. Ct. 2705 | 177 L. Ed. 2d 355 | 29 | 11 | 18 | 1:2.64 |
| 3 | McDonald v. City of Chicago | 561 U.S. 742 | 130 S. Ct. 3020 | 177 L. Ed. 2d 894 | 18 | 1 | 17 | 1:18 |
| 3 | Carachuri-Rosendo v. Holder | 560 U.S. 563 | 130 S. Ct. 2577 | 177 L. Ed. 2d 68 | 25 | 8 | 17 | 1:3.13 |
| 3 | Carr v. United States | 560 U.S. 438 | 130 S. Ct. 2229 | 176 L. Ed. 2d 1152 | 20 | 3 | 17 | 1:6.67 |
| 3 | Abbott v. Abbott | 560 U.S. 1 | 130 S. Ct. 1983 | 176 L. Ed. 2d 789 | 26 | 9 | 17 | 1:2.89 |
| 7 | Astrue v. Ratliff | 560 U.S. 586 | 130 S. Ct. 2521 | 177 L. Ed. 2d 91 | 16 | 3 | 13 | 1:5.33 |
| 7 | Samantar v. Yousuf | 560 U.S. 305 | 130 S. Ct. 2278 | 176 L. Ed. 2d 1047 | 29 | 16 | 13 | 1:1.81 |
| 7 | Mac's Shell Serv., Inc. v. Shell Oil Prods. Co. | 559 U.S. 175 | 130 S. Ct. 1251 | 176 L. Ed. 2d 36 | 18 | 5 | 13 | 1:3.6 |
| 10 | Christian Legal Soc. Chapter of Univ. of Cal., Hastings Coll. of Law v. Martinez | 561 U.S. 661 | 130 S. Ct. 2971 | 177 L. Ed. 2d 838 | 25 | 13 | 12 | 1:1.92 |
| 10 | Dillon v. United States | 560 U.S. 817 | 130 S. Ct. 2683 | 177 L. Ed. 2d 271 | 18 | 6 | 12 | 1:3 |

of authority for its users to use and discover in reading *McDonald*.[108] In this instance, the LexisNexis headnotes offer more of the component building blocks that went into the holding. Presumably, these building blocks greatly interest advocates who might want to marshal them as legal arguments in their own briefs.

### Idiosyncratic Differences

¶42 A few noteworthy idiosyncratic differences appear in the way headnotes were assigned. This includes the two instances in which West assigned headnotes and LexisNexis did not, as well as the two instances in which the number of LexisNexis headnotes did not equal the number of Lawyers' Edition headnotes.

---

108.  LexisNexis, *supra* note 76.

**Table 4**

Greatest Ratio Differences in Headnote Numbers: LexisNexis Greater Than West

| Rank | Case Name | United States Reports Citation | Supreme Court Reporter Citation | United States Supreme Court Reports—Lawyers' Edition Citation | Total Number LexisNexis Headnotes | Total Number West Headnotes | Absolute Difference | Difference Ratio |
|---|---|---|---|---|---|---|---|---|
| 1 | McDonald v. City of Chicago | 561 U.S. 742 | 130 S. Ct. 3020 | 177 L. Ed. 2d 894 | 18 | 1 | 17 | 1:18 |
| 2 | Carr v. United States | 560 U.S. 438 | 130 S. Ct. 2229 | 176 L. Ed. 2d 1152 | 20 | 3 | 17 | 1:6.67 |
| 3 | New Process Steel, L.P. v. NLRB | 560 U.S. 674 | 130 S. Ct. 2635 | 177 L. Ed. 2d 162 | 13 | 2 | 11 | 1:6.5 |
| 4 | Astrue v. Ratliff | 560 U.S. 586 | 130 S. Ct. 2521 | 177 L. Ed. 2d 91 | 16 | 3 | 13 | 1:5.33 |
| 5 | NRG Power Mktg., LLC v. Me. Pub. Util. Comm'n | 558 U.S. 165 | 130 S. Ct. 693 | 175 L. Ed. 2d 642 | 10 | 2 | 8 | 1:5 |
| 6 | Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA | 559 U.S. 573 | 130 S. Ct. 1605 | 176 L. Ed. 2d 519 | 9 | 2 | 7 | 1:4.5 |
| 7 | Mac's Shell Serv., Inc. v. Shell Oil Prods. Co. | 559 U.S. 175 | 130 S. Ct. 1251 | 176 L. Ed. 2d 36 | 18 | 5 | 13 | 1:3.6 |
| 8 | Kucana v. Holder | 558 U.S. 233 | 130 S. Ct. 827 | 175 L. Ed. 2d 694 | 14 | 4 | 10 | 1:3.5 |
| 9 | Carachuri-Rosendo v. Holder | 560 U.S. 563 | 130 S. Ct. 2577 | 177 L. Ed. 2d 68 | 25 | 8 | 17 | 1:3.13 |
| 10 | Dillon v. United States | 560 U.S. 817 | 130 S. Ct. 2683 | 177 L. Ed. 2d 271 | 18 | 6 | 12 | 1:3 |

### Corcoran v. Levenhagen

¶43 In only two instances, one publisher assigned headnotes in a case in which the other did not. *Corcoran v. Levenhagen*,[109] the first opinion of the Term, is a per curiam decision that corrects appellate error. A convicted murderer appealed his state conviction on five separate grounds for federal habeas relief. The federal district judge granted relief on one of those grounds without hearing the other four. The court of appeals reversed without analyzing the other four grounds of the original habeas petition. The Supreme Court reversed, stating that the case should have either been remanded to the district court for consideration of the four other grounds in the original habeas petition or the court of appeals should have explained why such a remand was unnecessary. West created one headnote (unitary for the whole opinion without a bracketed indicator designating a specific part of the opinion) encompassing the holding of this two-page opinion. LexisNexis offered no headnote treatment,

---

109.  558 U.S. 1 (2010) ("R-" number: 1).

A2313

Vol. 109:4  [2017-27]    AN EMPIRICAL ANALYSIS OF LEXISNEXIS AND WEST HEADNOTES    579

**Table 5**

Greatest Total Differences in Headnote Numbers: West Greater Than LexisNexis

| Rank | Case Name | United States Reports Citation | Supreme Court Reporter Citation | United States Supreme Court Reports—Lawyers' Edition Citation | Total Number LexisNexis Headnotes | Total Number West Headnotes | Absolute Difference | Difference Ratio |
|---|---|---|---|---|---|---|---|---|
| 1 | Alabama v. North Carolina | 560 U.S. 330 | 130 S. Ct. 2295 | 176 L. Ed. 2d 1070 | 4 | 21 | 17 | 1:5.25 |
| 2 | Graham v. Florida | 560 U.S. 48 | 130 S. Ct. 2011 | 176 L. Ed. 2d 825 | 12 | 25 | 13 | 1:2.08 |
| 3 | Renico v. Lett | 559 U.S. 766 | 130 S. Ct. 1855 | 176 L. Ed. 2d 678 | 9 | 21 | 12 | 1:2.33 |
| 4 | Perdue v. Kenny A. | 559 U.S. 542 | 130 S. Ct. 1662 | 176 L. Ed. 2d 494 | 15 | 25 | 10 | 1:1.67 |
| 5 | Salazar v. Buono | 559 U.S. 700 | 130 S. Ct. 1803 | 176 L. Ed. 2d 634 | 11 | 20 | 9 | 1:1.82 |
| 6 | Berghuis v. Smith | 559 U.S. 314 | 130 S. Ct. 1382 | 176 L. Ed. 2d 249 | 6 | 13 | 7 | 1:2.17 |
| 6 | Milavetz, Gallop & Milavetz, P.A. v. United States | 559 U.S. 229 | 130 S. Ct. 1324 | 176 L. Ed. 2d 79 | 10 | 17 | 7 | 1:1.7 |
| 6 | South Carolina v. North Carolina | 558 U.S. 256 | 130 S. Ct. 854 | 175 L. Ed. 2d 713 | 6 | 13 | 7 | 1:2.17 |
| 6 | McDaniel v. Brown | 558 U.S. 120 | 130 S. Ct. 665 | 175 L. Ed. 2d 582 | 2 | 9 | 7 | 1:4.5 |
| 10 | Granite Rock Co. v. Teamsters | 561 U.S. 287 | 130 S. Ct. 2847 | 177 L. Ed. 2d 567 | 8 | 14 | 6 | 1:1.75 |
| 10 | Conkright v. Frommert | 559 U.S. 506 | 130 S. Ct. 1640 | 176 L. Ed. 2d 469 | 2 | 8 | 6 | 1:4 |
| 10 | Maryland v. Shatzer | 559 U.S. 98 | 130 S. Ct. 1213 | 175 L. Ed. 2d 1045 | 12 | 18 | 6 | 1:1.5 |
| 10 | Hollingsworth v. Perry | 558 U.S. 183 | 130 S. Ct. 705 | 175 L. Ed. 2d 657 | 4 | 10 | 6 | 1:2.5 |

which presumably was an oversight. Perhaps the need for headnote treatment could not easily be machine spotted or generated. Regardless, practitioners who might otherwise rely on *Corcoran*'s holding to combat similar errors in the appellate courts receive no help from LexisNexis in finding it.

### *United States v. Juvenile Male*

¶44 *United States v. Juvenile Male*[110] is a short, per curiam decision that certifies a question to the Montana Supreme Court necessary to address a potential issue of mootness related to a juvenile sex offender case. The case was resolved in a subsequent

---

110.  560 U.S. 558 (2010) ("R-" number: 67).

LAW LIBRARY JOURNAL    Vol. 109:4 [2017-27]

**Table 6**

Greatest Ratio Differences in Headnote Numbers: West Greater Than LexisNexis

| Rank | Case Name | United States Reports Citation | Supreme Court Reporter Citation | United States Supreme Court Reports— Lawyers' Edition Citation | Total Number LexisNexis Headnotes | Total Number West Headnotes | Absolute Difference | Difference Ratio |
|---|---|---|---|---|---|---|---|---|
| 1 | United States v. Juvenile Male | 560 U.S. 558 | 130 S. Ct. 2518 | 177 L. Ed. 2d 64 | 0 | 1 | 1 | 1:Infinite |
| 1 | Corcoran v. Levenhagen | 558 U.S. 1 | 130 S. Ct. 8 | 175 L. Ed. 2d 1 | 0 | 1 | 1 | 1:Infinite |
| 3 | Alabama v. North Carolina | 560 U.S. 330 | 130 S. Ct. 2295 | 176 L. Ed. 2d 1070 | 4 | 21 | 17 | 1:5.25 |
| 4 | McDaniel v. Brown | 558 U.S. 120 | 130 S. Ct. 665 | 175 L. Ed. 2d 582 | 2 | 9 | 7 | 1:4.5 |
| 5 | Conkright v. Frommert | 559 U.S. 506 | 130 S. Ct. 1640 | 176 L. Ed. 2d 469 | 2 | 8 | 6 | 1:4 |
| 6 | Bobby v. Van Hook | 558 U.S. 4 | 130 S. Ct. 13 | 175 L. Ed. 2d 255 | 2 | 7 | 5 | 1:3.5 |
| 7 | Hollingsworth v. Perry | 558 U.S. 183 | 130 S. Ct. 705 | 175 L. Ed. 2d 657 | 4 | 10 | 6 | 1:2.5 |
| 7 | Thaler v. Haynes | 559 U.S. 43 | 130 S. Ct. 1171 | 175 L. Ed. 2d 1003 | 2 | 5 | 3 | 1:2.5 |
| 7 | Wellons v. Hall | 558 U.S. 220 | 130 S. Ct. 727 | 175 L. Ed. 2d 684 | 2 | 5 | 3 | 1:2.5 |
| 10 | Renico v. Lett | 559 U.S. 766 | 130 S. Ct. 1855 | 176 L. Ed. 2d 678 | 9 | 21 | 12 | 1:2.33 |
| 10 | Wilkins v. Gaddy | 559 U.S. 34 | 130 S. Ct. 1175 | 175 L. Ed. 2d 995 | 3 | 7 | 4 | 1:2.33 |
| 10 | Michigan v. Fisher | 558 U.S. 45 | 130 S. Ct. 546 | 175 L. Ed. 2d 410 | 3 | 7 | 4 | 1:2.33 |
| 10 | Wong v. Belmontes | 558 U.S. 15 | 130 S. Ct. 383 | 175 L. Ed. 2d 328 | 3 | 7 | 4 | 1:2.33 |

Supreme Court Term.[111] The one West headnote (assigned without specific reference in the text of the opinion) is a long, complicated, procedural headnote. The scenario in the case, while unusual, might usefully guide future litigation involving when a federal court may appropriately certify a question to a state supreme court. Ideally, these types of cases are adequately collected under Topic and Key Number 170bk30117, "Federal Courts, particular questions." As LexisNexis did not assign this case a headnote, only a search using Boolean terms or natural language (either by the user or behind the scenes by LexisNexis) will uncover this case. Perhaps the lack of a

---

111.  United States v. Juvenile Male, 564 U.S. 932 (2011).

A2315

traditional paper digest frees LexisNexis from the mindset of giving headnotes to small, mostly procedural cases like this one. However, it might be better practice to err on the side of assigning headnotes to all Supreme Court written opinions.

### Lexis Advance Compared with *Lawyers' Edition*

¶45 Except for two cases,[112] Lexis assigned the same number of headnotes to both its Lexis Advance and *Lawyers' Edition* versions. In fact, the headnote paragraph language is usually identical for both versions, and they both gloss the exact same language from the opinion. Thus, their headnote indicators are almost always side by side in the text of the opinion. However, each version of LexisNexis headnote treatment has different topic assignments as each draws from a unique taxonomy. In *Bobby v. Van Hook*, *Lawyers' Edition* has one headnote prior to the start of the Lexis Advance headnotes. However, the remaining two headnotes in both editions use the same language and gloss the same points. Similarly, in *Ontario v. Quon*, Lexis Advance headnotes one and two are combined in *Lawyers' Edition* headnote one. The remaining headnotes use identical headnote language and gloss the same language from the opinion. We have no explanation for why two of the eighty-seven cases vary in this way.

### Agreement in Headnote-Worthy Opinion Language

¶46 As revealed by a case study of *Citizens United*, there are significant differences in the opinion language that garners headnote treatment from each publisher; and, in some cases, there is a surprising lack of overlap in the opinion language that is assigned headnotes by each publisher. To evaluate this, we used line numbers to map each publisher's headnotes to the exact portion of the opinion language glossed by each headnote.[113] We began by parsing the opinion into its outline form (I,II,III; A,B,C; 1,2,3; etc.) and correlating these segments with the line numbering. Neutral line numbering from the *United States Reports* facilitated the ability to determine with precision where each publisher's headnotes began and ended and to compare them. (See tables 7–9.)

¶47 The operative assumption was that a headnote began where indicated in the text and ended where either the next headnote began or the specific section or subsection in the opinion ended. These are identified in table 9 as the columns "Headnote Line Number Start" and "Headnote Line Number End." A more specific, discerning, and limited line number range was also associated with each headnote based on the language of the opinion as well as the language of the headnote paragraph. This range derived from a smaller section of the opinion as reflected in the two columns in table 9 labeled "Headnote Line Number Specific Start" and "Headnote Line Number Specific End." Both line number parsings,

---

112. *Bobby v. Van Hook*, 558 U.S. 4, (2009), has two Lexis Advance and three *Lawyers' Edition* headnotes; *Ontario v. Quon*, 560 U.S. 746 (2010), has seven Lexis Advance and six *Lawyers' Edition* headnotes.

113. The opinion was downloaded as a PDF file from the online version of the bound volumes of the *United States Reports*, https://www.supremecourt.gov/opinions/boundvolumes.aspx (last visited Nov. 10, 2017). Pages that did not contain the actual opinion of the Court were deleted. This included syllabus and heading information, and all concurring and dissenting opinions that were not the opinion of the Court in any part. Next, the PDF file was converted to a Microsoft Word document, and the continuous line numbering feature was enabled.

general and more specific, were manually completed for each of the seventy-five combined headnotes assigned to *Citizens United*.

¶48 This intensive headnote study involving *Citizens United* provides an illustrative case study of the differences and vagaries of headnote assignments by LexisNexis and West. The simplest explanation would have been if all twenty-four West headnotes glossed the same portions of opinion language as twenty-four of the fifty-one LexisNexis headnotes and the remaining twenty-seven LexisNexis headnotes covered portions of the opinion not covered by West. Unfortunately, the correspondence mapping is not so simple. (See table 7.)

¶49 In thirty-two instances, LexisNexis deems portions of opinion language headnote worthy and West does not. In six instances, West deems portions of the opinion language headnote worthy and LexisNexis does not. In fourteen instances, both LexisNexis and West deem opinion language headnote worthy (thus, twenty-eight implicated headnotes—fourteen from each publisher). This agreement is encouraging as it suggests that both publishers interpret the same the legal propositions objectively as headnote worthy. However, the differences suggest a certain amount of arbitrariness that is difficult to explain. Also, on three different instances, the correlation between headnotes was 2:1, not 1:1. In other words, the opinion language covered by two West headnotes was glossed by one LexisNexis headnote and vice versa. This suggests a divergence in the size of the headnote-able unit. It should also be noted that headnote equivalency used in this study is based on overlap in the opinion language glossed. Generally, equivalency based on similar content meaning has not been examined. However, if substantially similar headnotes can be drawn from diverse sections of an opinion, this reduces the efficacy of (or at least muddles) the intra-case location function for headnotes.

¶50 Table 8 shows the variance of headnote assignments broken down by opinion section per the outline format. LexisNexis assigns headnotes to six subsections (0, IB, IID, IIIB2, IVC, and V) that West does not. The same is not true in reverse: West assigns no headnotes to sections that LexisNexis likewise does not. Section 0, or the introductory section, provides a brief overview of the case and a concise holding of the opinion. Arguably, the language providing the concise holding of the opinion is headnote worthy: "The Government may regulate corporate political speech through disclaimer and disclosure requirements, but it may not suppress that speech altogether." LexisNexis glosses this exact language with a headnote. While not headnoting this specific language, West does cover these points of law in two separate and lengthier headnotes from language much later in the opinion (headnotes 21 and 23). It is assumed that most discrete sections should have some headnote-worthy language, or else why do they exist? On the other hand, when sections merely refute portions of a party's argument that are dispositively made moot in another section, maybe those sections do not produce any headnote-worthy language (see subsection IID).

A2317

**Table 7**

Headnote Equivalency Between LexisNexis and West in *Citizens United*

| Opinion Part (0 indicates introductory section) | LexisNexis Headnote Number | West Headnote Number | Notes About the Equivalency | Number of LexisNexis Headnotes Without West Equivalents | Number of West Headnotes Without LexisNexis Equivalents | Number of Incidences When Publishers' Headnotes Are Equivalent | Number of Implicated Headnotes That Do Not Map 1 to 1 |
|---|---|---|---|---|---|---|---|
| 0 | 1 | No equivalency | | 1 | | | |
| I.B | 2 | No equivalency | | 1 | | | |
| II.A | No equivalency | 1 - 2 | | | 2 | | |
| II.A | 3 | 3 | | | | 1 | |
| II.B | 4 | 5 | | | | 1 | |
| II.B | No equivalency | 4 | | | 1 | | |
| II.C | 5 | No equivalency | | 1 | | | |
| II.C | 6 | 6 | | | | 1 | |
| II.D | 7 | No equivalency | | 1 | | | |
| II.E | 8 | No equivalency | | 1 | | | |
| II.E | No equivalency | 7 | | | 1 | | |
| II.E | 9 | 8 | | | | 1 | |
| II.E | 10 | 9 | | | | 1 | |
| II.E | 11 | 10 | | | | 1 | |
| II.E | 12–14 | No equivalency | | 3 | | | |
| III | 15 | No equivalency | | 1 | | | |
| III | 16 | 11 | | | | 1 | |
| III | 17 | 12 | LexisNexis headnote 17 is broader than West headnote 12 and incorporates what arguably should be a separate distinct headnote. | | | 1 | |
| III | 18 | 13 | | | | 1 | |
| III | 19– 21 | No equivalency | | 3 | | | |
| III.A.1 | 22 | No equivalency | | 1 | | | |
| III.A.1 | 23 | 14 | | | | 1 | |
| III.B.1 | 24–32 | No equivalency | | 9 | | | |
| III.B.1 | 33 | 15 | | | | 1 | |
| III.B.1 | 34 | No equivalency | | 1 | | | |
| III.B.2 | 35 | No equivalency | | 1 | | | |

A2318

584                    LAW LIBRARY JOURNAL          Vol. 109:4  [2017-27]

| Opinion Part (o indicates introductory section) | LexisNexis Headnote Number | West Headnote Number | Notes About the Equivalency | Number of LexisNexis Headnotes Without West Equivalents | Number of West Headnotes Without LexisNexis Equivalents | Number of Incidences When Publishers' Headnotes Are Equivalent | Number of Implicated Headnotes That Do Not Map 1 to 1 |
|---|---|---|---|---|---|---|---|
| III.C | 36 | 16, 17 | LexisNexis headnote 36 incorporates the same opinion language as two separate West headnotes, 16 & 17, plus an additional legal proposition. | | | | 3 |
| | 37 | No equivalency | | 1 | | | |
| | 38 | 18 | Exact same headnote paragraph text both taken verbatim from the opinion language. | | | 1 | |
| | 39 | 19 | Exact same headnote paragraph text both taken verbatim from the opinion language. | | | 1 | |
| | No equivalency | 20 | | | 1 | | |
| | 40 | 21 | | | | 1 | |
| III.D | 41, 42 | 22 | West headnote 22 incorporates the same opinion language as two separate Lexis headnotes, 41 & 42. | | | | 3 |
| IV.A | 43, 44 | 23 | West headnote 23 incorporates the same opinion language as two separate Lexis headnotes, 43 & 44. | | | | 3 |
| | 45–47 | No equivalency | Lexis headnotes the supporting rationales. | 3 | | | |
| IV.B | 48–49 | No equivalency | | 2 | | | |
| | No equivalency | 24 | | | 1 | | |
| IV.C | 50 | No equivalency | | 1 | | | |
| V | 51 | No equivalency | | 1 | | | |
| | | | Total: | 32 | 6 | 14 | 9 |

A2319

## Conclusions and Future Work

¶51 The data make clear that headnote assignments are far from scientific. In fact, they appear somewhat arbitrary, at least based on the discrepancies described in this article.  Further study is warranted.  Perhaps we will next examine cases from lower federal courts and state appellate courts to see whether the differences are even starker. We hypothesize that the lesser amount of editorial scrutiny given these cases is likely to create even more differences between LexisNexis's and West's headnote assignments. We also would like to compare (1) the average word count of each publisher's headnote statements; (2) the number of hierarchical levels in each publisher's categorization system; (3) the extent to which headnote language is taken from the court opinion itself; and (4) the number of multiple categories assigned to each headnote.

**Table 8**

Section-by-Section Assignment of Headnotes in *Citizens United*

| Opinion Part (0 indicates introductory section) | *U.S Reports* Page Number Section Starts | Line Number Section Starts | Headnote Number or Range of Headnote Numbers (LexisNexis) | Headnote Number or Range of Headnote Numbers (West) | Number of LexisNexis Headnotes | Number of West Headnotes | Notes About the Section |
|---|---|---|---|---|---|---|---|
| 0 | 318 | 1 | 1 | n/a | 1 | 0 | High-level summary of the case and a concise statement of the holding. |
| I | 319 | 66 | n/a | n/a | 0 | 0 | No content. Just outline section designator. |
| I.A | 319 | 67 | n/a | n/a | 0 | 0 | Factual background section. No headnote treatment expected. |
| I.B | 320 | 107 | 2 | n/a | 1 | 0 | Statement of the applicable statutory and regulatory law. |
| I.C | 321 | 142 | n/a | n/a | 0 | 0 | Procedural background section. No headnote treatment expected. |
| II | 322 | 185 | n/a | n/a | 0 | 0 | One-sentence statement as to what Section II is about. |
| II.A | 322 | 190 | 3 | 1 - 3 | 1 | 3 | Statutory interpretation as to whether the applicable *Hillary* video was an "electioneering communication." |
| II.B | 324 | 254 | 4 | 4–5 | 1 | 2 | Analysis as to whether *Hillary* video is the functional equivalent of express advocacy. |
| II.C | 326 | 311 | 5–6 | 6 | 2 | 1 | Rejecting the argument that video-on-demand should be treated differently from other forms of advocacy. |
| II.D | 327 | 353 | 7 | n/a | 1 | 0 | Addressing winning party's argument to create an exception for nonprofit organizations. Rendered moot by more expansive, ultimate holding. |
| II.E | 329 | 434 | 8–14 | 7–10 | 7 | 4 | Analysis as to whether it is appropriate to revisit free speech precedents. |

| Opinion Part (0 indicates introductory section) | U.S Reports Page Number Section Starts | Line Number Section Starts | Headnote Number or Range of Headnote Numbers (LexisNexis) | Headnote Number or Range of Headnote Numbers (West) | Number of LexisNexis Headnotes | Number of West Headnotes | Notes About the Section |
|---|---|---|---|---|---|---|---|
| III | 336 | 707 | 15–21 | 11–13 | 7 | 3 | Section explains how the applicable law burdens the free speech of commercial entities. |
| III.A | 342 | 901 | n/a | n/a | 0 | 0 | No content. Just outline section designator. |
| III.A.1 | 342 | 902 | 22–23 | 14 | 2 | 1 | Analysis of past cases addressing the constitutionality of restrictions on corporate and union political speech. |
| III.A.2 | 345 | 1019 | n/a | n/a | 0 | 0 | Lengthy section discussing past Supreme Court precedent, *Buckley* and *Bellotti*. |
| III.A.3 | 347 | 1115 | n/a | n/a | 0 | 0 | Stating applicable portions of the past Supreme Court case, *Austin*. |
| III.B | 348 | 1137 | n/a | n/a | 0 | 0 | Noting conflicting lines of precedent and the past rationales used for upholding corporate spending limits that will be addressed in subsequent sections. |
| III.B.1 | 349 | 1168 | 24–34 | 15 | 11 | 1 | Analysis and rejection of *Austin*'s anti-distortion rationale. |
| III.B.2 | 356 | 1440 | 35 | n/a | 1 | 0 | Rejecting the anticorruption or appearance of corruption argument. |
| III.B.3 | 361 | 1632 | n/a | n/a | 0 | 0 | Rejecting the shareholder-protection rationale argued by the government. |
| III.B.4 | 362 | 1667 | n/a | n/a | 0 | 0 | Dismissing the need to address the issue of foreign corporations having undue influence in the national political process. |
| III.C | 362 | 1681 | 36–40 | 16–21 | 5 | 6 | Application of stare decisis and overturning *Austin*. |
| III.D | 365 | 1784 | 41–42 | 22 | 2 | 1 | Overruling *McConnell*. |
| IV | 366 | 1805 | n/a | n/a | 0 | 0 | No content. Just outline section designator. |
| IV.A | 366 | 1806 | 43–47 | 23 | 5 | 1 | Upholding BCRA's disclaimer and disclosure provisions. |
| IV.B | 367 | 1862 | 48–49 | 24 | 2 | 1 | Upholding disclaimer and disclosure provisions as to broadcast advertisements. |
| IV.C | 371 | 1990 | 50 | n/a | 1 | 0 | Simple one-paragraph section explaining that BCRA's disclaimer and disclosure requirements are constitutional based on the rationales given in the previous two subsections. |
| V | 371 | 1999 | 51 | n/a | 1 | 0 | Policy argument about not chilling new forms of speech and new forums. |
| | | | | Totals: | 51 | 24 | |

A2321

Vol. 109:4 [2017-27]   AN EMPIRICAL ANALYSIS OF LEXISNEXIS AND WEST HEADNOTES   587

**Table 9**

Headnotes Paragraph Language from Both Vendors in Citizens United

(LexisNexis headnote language reprinted with the permission of LexisNexis;
West headnote language used with permission of Thomson Reuters.)

| Opinion Part | Headnote Company (LexisNexis (L) or Westlaw (W)) | Company's Headnote Number | Headnote Line Number Start (Explicit from bracket indicator.) | Headnote Line Number Specific Start (Inference from opinion language.) | Headnote Line Number Specific End (Inference from opinion language). | Headnote Line Number End (Explicit from end of section or sub-section or start of next bracketed headnote section.) | Headnote Paragraph | Comments |
|---|---|---|---|---|---|---|---|---|
| 0 | L | 1 | 61 | 61 | 64 | 64 | The Government may regulate corporate political speech through disclaimer and disclosure requirements, but it may not suppress that speech altogether. | Major holding of the opinion. |
| I.B | L | 2 | 121 | 121 | 133 | 141 | An electioneering communication is defined as any broadcast, cable, or satellite communication that refers to a clearly identified candidate for federal office and is made within 30 days of a primary or 60 days of a general election. 2 U.S.C.S. § 434(f)(3)(A). The Federal Election Commission's regulations further define an electioneering communication as a communication that is "publicly distributed." 11 C.F.R. § 100.29(a)(2) (2009). In the case of a candidate for nomination for President, publicly distributed means that the communication can be received by 50,000 or more persons in a state where a primary election is being held within 30 days. 11 C.F.R. § 100.29(b)(3)(ii). | Mere statement of the applicable statutory and regulatory law. |

588                              LAW LIBRARY JOURNAL                    Vol. 109:4 [2017-27]

| Opinion Part | Headnote Company (LexisNexis (L) or Westlaw (W)) | Company's Headnote Number | Headnote Line Number Start (Explicit from bracket indicator.) | Headnote Line Number Specific Start (Inference from opinion language). | Headnote Line Number Specific End (Inference from opinion language). | Headnote Line Number End (Explicit from end of section or sub-section or start of next bracketed headnote section.) | Headnote Paragraph | Comments |
|---|---|---|---|---|---|---|---|---|
| II.A | W | 1 | 191 | 191 | 197 | 234 | Supreme Court would consider contention of nonprofit corporation that its film, regarding a candidate seeking nomination as a political party's candidate in the next Presidential election, did not qualify as an "electioneering communication" under federal statute prohibiting corporations from using their general treasury funds to make independent expenditures for electioneering communications within 30 days of a primary election or 60 days of general election for federal office, though nonprofit corporation raised the contention for the first time before the Supreme Court, where the district court had addressed it in its decision granting summary judgment to Federal Election Commission (FEC) with respect to nonprofit corporation's claims for declaratory and injunctive relief. Federal Election Campaign Act of 1971, §§ 304(f)(3)(A)(i), 316(b)(2), 2 U.S.C.A. §§ 434(f)(3)(A)(i), 441b(b)(2); 11 C.F.R. § 100.29(a)(2), (b)(3)(ii). | Significant contextualizing language added. |

| Opinion Part | Headnote Company (LexisNexis (L) or Westlaw (W)) | Company's Headnote Number | Headnote Line Number Start (Explicit from bracket indicator.) | Headnote Line Number Specific Start (Inference from opinion language.) | Headnote Line Number Specific End (Inference from opinion language.) | Headnote Line Number End (Explicit from end of section or sub-section or start of next bracketed headnote section.) | Headnote Paragraph | Comments |
|---|---|---|---|---|---|---|---|---|
| II.A | W | 2 | 191 | 199 | 220 | 234 | Nonprofit corporation's film regarding a candidate seeking nomination as a political party's candidate in the next Presidential election, which the nonprofit corporation wished to distribute on cable television through video-on-demand, was an "electioneering communication," for purposes of federal statute prohibiting corporations from using their general treasury funds to make independent expenditures for electioneering communications within 30 days of a primary election or 60 days of general election for federal office; the film was a cable communication that referred to a clearly identified candidate for federal office, and distribution through video-on-demand could allow the communication to be received by 50,000 persons or more. Federal Election Campaign Act of 1971, §§ 304(f)(3)(A)(i), 316(b)(2), 2 U.S.C.A. §§ 434(f)(3)(A)(i), 441b(b)(2); 11 C.F.R. § 100.29(a)(2), (b)(3)(ii), (b)(7)(i)(G), (b)(7)(ii). | Significant contextualizing language added. |
| II.A | W | 3 | 235 | 245 | 249 | 253 | Prolix laws chill speech, for First Amendment purposes, for the same reason that vague laws chill speech, i.e., people of common intelligence must necessarily guess at the law's meaning and differ as to its application. U.S.C.A. Const. Amend. 1. | |

A2324

590                                    LAW LIBRARY JOURNAL                    Vol. 109:4 [2017-27]

| Opinion Part | Headnote Company (LexisNexis (L) or Westlaw (W)) | Company's Headnote Number | Headnote Line Number Start (Explicit from bracket indicator.) | Headnote Line Number Specific Start (Inference from opinion language). | Headnote Line Number Specific End (Inference from opinion language). | Headnote Line Number End (Explicit from end of section or sub-section or start of next bracketed headnote section.) | Headnote Paragraph | Comments |
|---|---|---|---|---|---|---|---|---|
| II.A | L | 3 | 241 | 241 | 251 | 253 | The First Amendment does not permit laws that force speakers to retain a campaign finance attorney, conduct demographic marketing research, or seek declaratory rulings before discussing the most salient political issues of our day. Prolix laws chill speech for the same reason that vague laws chill speech: people of common intelligence must necessarily guess at the law's meaning and differ as to its application. The Government may not render a ban on political speech constitutional by carving out a limited exemption through an amorphous regulatory interpretation. | |
| II.B | L | 4 | 266 | 266 | 271 | 309 | The functional-equivalent test for an "electioneering communication" is objective: a court should find that a communication is the functional equivalent of express advocacy only if it is susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate. | |

A2325

| Opinion Part | Headnote Company (LexisNexis (L) or Westlaw (W)) | Company's Headnote Number | Headnote Line Number Start (Explicit from bracket indicator.) | Headnote Line Number Specific Start (Inference from opinion language). | Headnote Line Number Specific End (Inference from opinion language). | Headnote Line Number End (Explicit from end of section or sub-section or start of next bracketed headnote section.) | Headnote Paragraph | Comments |
|---|---|---|---|---|---|---|---|---|
| II.B | W | 5 | 256 | 266 | 271 | 309 | The test for determining whether a communication is functionally equivalent to express advocacy for the election or defeat of a candidate, for purposes of federal statute barring corporations from using general treasury funds to make independent expenditures that expressly advocate the election or defeat of a candidate, through any form of media, in connection with certain qualified federal elections, is an objective test, under which a court should find that a communication is the functional equivalent of express advocacy only if it is susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate. Federal Election Campaign Act of 1971, § 316, 2 U.S.C.A. § 441b. | Significant contextualizing language added. |

| Opinion Part | Headnote Company (LexisNexis (L) or Westlaw (W)) | Company's Headnote Number | Headnote Line Number Start (Explicit from bracket indicator.) | Headnote Line Number Specific Start (Inference from opinion language.) | Headnote Line Number Specific End (Inference from opinion language.) | Headnote Line Number End (Explicit from end of section or sub-section or start of next bracketed headnote section.) | Headnote Paragraph | Comments |
|---|---|---|---|---|---|---|---|---|
| II.B | W | 4 | 256 | 273 | 280 | 309 | Nonprofit corporation's film regarding a candidate seeking nomination as a political party's candidate in the next Presidential election, which the nonprofit corporation wished to distribute on cable television through video-on-demand, was functionally equivalent to express advocacy for or against a specific candidate, for purposes of federal statute barring corporations from using general treasury funds to make independent expenditures that expressly advocate the election or defeat of a candidate, through any form of media, in connection with certain qualified federal elections; the film was, in essence, a feature-length negative advertisement that urged viewers to vote against the candidate, and in light of its historical footage, interviews with persons critical of candidate, and voiceover narration, the film would be understood by most viewers as an extended criticism of the candidate's character and her fitness for the office of the Presidency. Federal Election Campaign Act of 1971, § 316, 2 U.S.C.A. § 441b. | Significant contextualizing language added. |
| II.C | L | 5 | 336 | 336 | 339 | 351 | Courts are bound by the First Amendment. A court must decline to draw, and then redraw, constitutional lines based on the particular media or technology used to disseminate political speech from a particular speaker. | |
| II.C | W | 6 | 336 | 347 | 349 | 351 | First Amendment standards must give the benefit of any doubt to protecting rather than stifling speech. U.S.C.A. Const. Amend. 1. | |

A2327

| Opinion Part | Headnote Company (LexisNexis (L) or Westlaw (W)) | Company's Headnote Number | Headnote Line Number Start (Explicit from bracket indicator.) | Headnote Line Number Specific Start (Inference from opinion language.) | Headnote Line Number Specific End (Inference from opinion language.) | Headnote Line Number End (Explicit from end of section or sub-section or start of next bracketed headnote section.) | Headnote Paragraph | Comments |
|---|---|---|---|---|---|---|---|---|
| II.C | L | 6 | 347 | 347 | 349 | 351 | First Amendment standards must give the benefit of any doubt to protecting rather than stifling speech. | |
| II.D | L | 7 | 425 | 425 | 426 | 432 | First Amendment freedoms need breathing space to survive. | |
| II.E | L | 8 | 437 | 437 | 439 | 460 | Political speech is speech that is central to the meaning and purpose of the First Amendment. | |
| II.E | W | 7 | 448 | 448 | 455 | 455 | Nonprofit corporation did not waive, for purposes of direct review by Supreme Court of decision of three-judge district court panel granting summary judgment to Federal Election Commission (FEC) in nonprofit corporation's action for declaratory and injunctive relief, its facial constitutional challenge, on grounds of violation of First Amendment protection of political speech, to federal statute prohibiting corporations from using their general treasury funds to make independent expenditures for electioneering communications within 30 days of a primary election or 60 days of general election for federal office, though in the district court the corporation had stipulated to the dismissal of the count in its complaint asserting the facial challenge and had proceeded on another count asserting an as-applied constitutional challenge, where the district court panel had addressed the facial challenge by noting that nonprofit corporation could prevail in the facial challenge only if the Supreme Court overruled controlling precedent. U.S.C.A. Const. Amend. 1; Federal Election Campaign Act of 1971, 316, 2 U.S.C.A. § 441b. | Significant contextualizing language added. |

A2328

594                                    LAW LIBRARY JOURNAL              Vol. 109:4  [2017-27]

| Opinion Part | Headnote Company (LexisNexis (L) or Westlaw (W)) | Company's Headnote Number | Headnote Line Number Start (Explicit from bracket indicator.) | Headnote Line Number Specific Start (Inference from opinion language.) | Headnote Line Number Specific End (Inference from opinion language.) | Headnote Line Number End (Explicit from end of section or sub-section or start of next bracketed headnote section.) | Headnote Paragraph | Comments |
|---|---|---|---|---|---|---|---|---|
| II.E | W | 8 | 457 | 460 | 462 | 488 | The Supreme Court's practice permits review of an issue not pressed below, so long as it has been passed upon. | |
| II.E | L | 9 | 457 | 460 | 462 | 488 | United States Supreme Court practice permits review of an issue not pressed below so long as it has been passed upon. | |
| II.E | W | 9 | 489 | 492 | 496 | 503 | Once a federal claim is properly presented on appeal, a party can make any argument in support of that claim; parties are not limited to the precise arguments they made below. | |
| II.E | L | 10 | 492 | 492 | 496 | 504 | For purposes of United States Supreme Court review, once a federal claim is properly pre-sented, a party can make any argument in support of that claim; parties are not limited to the precise arguments they made below. | |
| II.E | W | 10 | 504 | 504 | 510 | 705 | The distinction between facial constitutional challenges and as-applied constitutional chal-lenges goes to the breadth of the remedy employed by the court, not what must be pleaded in a complaint. | |

A2329

| Opinion Part | Headnote Company (LexisNexis (L) or Westlaw (W)) | Company's Headnote Number | Headnote Line Number Start (Explicit from bracket indicator.) | Headnote Line Number Specific Start (Inference from opinion language.) | Headnote Line Number Specific End (Inference from opinion language.) | Headnote Line Number End (Explicit from end of section or sub-section or start of next bracketed headnote section.) | Headnote Paragraph | Comments |
|---|---|---|---|---|---|---|---|---|
| II.E | L | 11 | 504 | 504 | 515 | 522 | The distinction between facial and as-applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge. The distinction is both instructive and necessary, for it goes to the breadth of the remedy employed by a court, not what must be pleaded in a complaint. The parties cannot enter into a stipulation that prevents the court from considering certain remedies if those remedies are necessary to resolve a claim that has been preserved. | |
| II.E | L | 12 | 522 | 522 | 524 | 683 | Once a case is brought, no general categorical line bars a court from making broader pronouncements of invalidity in properly "as-applied" cases. | |
| II.E | L | 13 | 683 | 683 | 686 | 701 | First Amendment standards must eschew the open-ended rough-and-tumble of factors, which invites complex argument in a trial court and a virtually inevitable appeal. | |
| II.E | L | 14 | 701 | 701 | 703 | 705 | A statute which chills speech can and must be invalidated where its facial invalidity has been demonstrated. | |
| III | L | 15 | 709 | 709 | 710 | 824 | See U.S. Const. amend. I. | This headnote merely indicates that the First Amendment right to free speech has been quoted. |
| III | W | 11 | 817 | 824 | 826 | 833 | First Amendment has its fullest and most urgent application to speech uttered during a campaign for political office. U.S.C.A. Const. Amend. 1. | |

596                              LAW LIBRARY JOURNAL          Vol. 109:4 [2017-27]

| Opinion Part | Headnote Company (LexisNexis (L) or Westlaw (W)) | Company's Headnote Number | Headnote Line Number Start (Explicit from bracket indicator.) | Headnote Line Number Specific Start (Inference from opinion language). | Headnote Line Number Specific End (Inference from opinion language). | Headnote Line Number End (Explicit from end of section or sub-section or start of next bracketed headnote section.) | Headnote Paragraph | Comments |
|---|---|---|---|---|---|---|---|---|
| III | L | 16 | 824 | 824 | 833 | 833 | The First Amendment has its fullest and most urgent application to speech uttered during a campaign for political office. Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by the United States Constitution. | |
| III | L | 17 | 834 | 834 | 839 | 846 | Political speech must prevail against laws that would suppress it, whether by design or inadvertence. Laws that burden political speech are subject to strict scrutiny, which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest. | This headnote combines two different propositions and probably should be two separate headnotes. |
| III | W | 12 | 834 | 836 | 839 | 846 | Laws that burden political speech are subject to strict scrutiny for a violation of the First Amendment, which level of scrutiny requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest. U.S.C.A. Const. Amend. 1. | |
| III | W | 13 | 847 | 847 | 853 | 899 | Premised on mistrust of governmental power, the First Amendment stands against attempts to disfavor certain subjects or viewpoints, and prohibited, too, are restrictions distinguishing among different speakers, allowing speech by some but not others. U.S.C.A. Const. Amend. 1. | |

A2331

| Opinion Part | Headnote Company (LexisNexis (L) or Westlaw (W)) | Company's Headnote Number | Headnote Line Number Start (Explicit from bracket indicator.) | Headnote Line Number Specific Start (Inference from opinion language.) | Headnote Line Number Specific End (Inference from opinion language.) | Headnote Line Number End (Explicit from end of section or sub-section or start of next bracketed headnote section.) | Headnote Paragraph | Comments |
|---|---|---|---|---|---|---|---|---|
| III | L | 18 | 847 | 847 | 853 | 857 | Premised on mistrust of governmental power, the First Amendment stands against attempts to disfavor certain subjects or viewpoints. Prohibited, too, are restrictions distinguishing among different speakers, allowing speech by some but not others. | |
| III | L | 19 | 858 | 858 | 869 | 888 | Quite apart from the purpose or effect of regulating content, the Government may commit a constitutional wrong when by law it identifies certain preferred speakers. By taking the right to speak from some and giving it to others, the Government deprives the disadvantaged person or class of the right to use speech to strive to establish worth, standing, and respect for the speaker's voice. The Government may not by these means deprive the public of the right and privilege to determine for itself what speech and speakers are worthy of consideration. The First Amendment protects speech and speaker, and the ideas that flow from each. | This headnote replicates an entire paragraph from the opinion. It contains multiple propositions and probably should be divided into two or more headnotes. This represents particularly sloppy headnoting. |
| III | L | 20 | 888 | 888 | 893 | 895 | There are certain governmental functions that cannot operate without some restrictions on particular kinds of speech. By contrast, it is inherent in the nature of the political process that voters must be free to obtain information from diverse sources in order to determine how to cast their votes. | |
| III | L | 21 | 896 | 896 | 898 | 899 | There is no basis for the proposition that, in the context of political speech, the Government may impose restrictions on certain disfavored speakers. | |

A2332

598                    LAW LIBRARY JOURNAL        Vol. 109:4 [2017-27]

| Opinion Part | Headnote Company (LexisNexis (L) or Westlaw (W)) | Company's Headnote Number | Headnote Line Number Start (Explicit from bracket indicator.) | Headnote Line Number Specific Start (Inference from opinion language). | Headnote Line Number Specific End (Inference from opinion language). | Headnote Line Number End (Explicit from end of section or sub-section or start of next bracketed headnote section.) | Headnote Paragraph | Comments |
|---|---|---|---|---|---|---|---|---|
| III.A.1 | L | 22 | 904 | 904 | 905 | 931 | First Amendment protection extends to corporations. | |
| III.A.1 | W | 14 | 928 | 931 | 933 | 1017 | Political speech does not lose First Amendment protection simply because its source is a corporation. U.S.C.A. Const. Amend. 1. | |
| III.A.1 | L | 23 | 931 | 931 | 945 | 1017 | Political speech does not lose First Amendment protection simply because its source is a corporation. The identity of the speaker is not decisive in determining whether speech is protected. Corporations and other associations, like individuals, contribute to the discussion, debate, and the dissemination of information and ideas that the First Amendment seeks to foster. The United States Supreme Court has thus rejected the argument that political speech of corporations or other associations should be treated differently under the First Amendment simply because such associations are not "natural persons." | Lengthy headnote that could be unpacked into several different headnotes or stated more succinctly. |
| III.B.1 | L | 24 | 1174 | 1174 | 1176 | 1193 | If the First Amendment has any force, it prohibits Congress from fining or jailing citizens, or associations of citizens, for simply engaging in political speech. | |

A2333

| Opinion Part | Headnote Company (LexisNexis (L) or Westlaw (W)) | Company's Headnote Number | Headnote Line Number Start (Explicit from bracket indicator.) | Headnote Line Number Specific Start (Inference from opinion language). | Headnote Line Number Specific End (Inference from opinion language). | Headnote Line Number End (Explicit from end of section or sub-section or start of next bracketed headnote section.) | Headnote Paragraph | Comments |
|---|---|---|---|---|---|---|---|---|
| III.B.1 | L | 25 | 1194 | 1194 | 1204 | 1212 | Political speech is indispensable to decision-making in a democracy, and this is no less true because the speech comes from a corporation rather than an individual. The worth of speech does not depend upon the identity of its source, whether a corporation, an association, a union, or an individual. The concept that Government may restrict the speech of some elements of United States society in order to enhance the relative voice of others is wholly foreign to the First Amendment. | Lengthy headnote that could be unpacked into several different headnotes or stated more succinctly. |
| III.B.1 | L | 26 | 1212 | 1212 | 1220 | 1232 | The premise has been rejected that the Government has an interest in equalizing the relative ability of individuals and groups to influence the outcome of elections. The skyrocketing cost of political campaigns cannot sustain a governmental prohibition. The First Amendment's protections do not depend on the speaker's financial ability to engage in public discussion. | |
| III.B.1 | L | 27 | 1232 | 1232 | 1236 | 1241 | The rule that political speech cannot be limited based on a speaker's wealth is a necessary consequence of the premise that the First Amendment generally prohibits the suppression of political speech based on the speaker's identity. | |

A2334

600                                    LAW LIBRARY JOURNAL          Vol. 109:4 [2017-27]

| Opinion Part | Headnote Company (LexisNexis (L) or Westlaw (W)) | Company's Headnote Number | Headnote Line Number Start (Explicit from bracket indicator.) | Headnote Line Number Specific Start (Inference from opinion language). | Headnote Line Number Specific End (Inference from opinion language). | Headnote Line Number End (Explicit from end of section or sub-section or start of next bracketed headnote section.) | Headnote Paragraph | Comments |
|---|---|---|---|---|---|---|---|---|
| III.B.1 | L | 28 | 1241 | 1241 | 1247 | 1248 | State law grants corporations special advantages—such as limited liability, perpetual life, and favorable treatment of the accumulation and distribution of assets. This does not suffice, however, to allow laws prohibiting speech. It is rudimentary that a state cannot exact as the price of those special advantages the forfeiture of First Amendment rights. | |
| III.B.1 | L | 29 | 1249 | 1249 | 1257 | 1285 | It is irrelevant for purposes of the First Amendment that corporate funds may have little or no correlation to the public's support for the corporation's political ideas. All speakers, including individuals and the media, use money amassed from the economic marketplace to fund their speech. The First Amendment protects the resulting speech, even if it was enabled by economic transactions with persons or entities who disagree with the speaker's ideas. | |
| III.B.1 | L | 30 | 1285 | 1285 | 1287 | 1346 | The United States Supreme Court has consistently rejected the proposition that the institutional press has any constitutional privilege beyond that of other speakers. | |
| III.B.1 | L | 31 | 1346 | 1346 | 1352 | 1356 | The Framers may have been unaware of certain types of speakers or forms of communication, but that does not mean that those speakers and media are entitled to less First Amendment protection than those types of speakers and media that provided the means of communicating political ideas when the Bill of Rights was adopted. | |

A2335

| Opinion Part | Headnote Company (LexisNexis (L) or Westlaw (W)) | Company's Headnote Number | Headnote Line Number Start (Explicit from bracket indicator.) | Headnote Line Number Specific Start (Inference from opinion language.) | Headnote Line Number Specific End (Inference from opinion language.) | Headnote Line Number End (Explicit from end of section or sub-section or start of next bracketed headnote section.) | Headnote Paragraph | Comments |
|---|---|---|---|---|---|---|---|---|
| III.B.1 | L | 32 | 1356 | 1356 | 1357 | 1396 | Ideas may compete in the marketplace without Government interference. | |
| III.B.1 | W | 15 | 1393 | 1397 | 1398 | 1439 | First Amendment protects the right of corporations to petition legislative and administrative bodies. U.S.C.A. Const. Amend. 1. | |
| III.B.1 | L | 33 | 1397 | 1397 | 1398 | 1433 | The First Amendment protects the right of corporations to petition legislative and administrative bodies. | |
| III.B.1 | L | 34 | 1434 | 1434 | 1439 | 1439 | When Government seeks to use its full power, including the criminal law, to command where a person may get his or her information or what distrusted source he or she may not hear, it uses censorship to control thought. This is unlawful. The First Amendment confirms the freedom to think for ourselves. | |

A2336

602                    LAW LIBRARY JOURNAL                    Vol. 109:4  [2017-27]

| Opinion Part | Headnote Company (LexisNexis (L) or Westlaw (W)) | Company's Headnote Number | Headnote Line Number Start (Explicit from bracket indicator.) | Headnote Line Number Specific Start (Inference from opinion language). | Headnote Line Number Specific End (Inference from opinion language). | Headnote Line Number End (Explicit from end of section or sub-section or start of next bracketed headnote section.) | Headnote Paragraph | Comments |
|---|---|---|---|---|---|---|---|---|
| III.B.2 | L | 35 | 1616 | 1616 | 1628 | 1630 | When Congress finds that a problem exists, a court must give that finding due deference, but Congress may not choose an unconstitutional remedy. If elected officials succumb to improper influences from independent expenditures; if they surrender their best judgment; and if they put expediency before principle, then surely there is cause for concern. A court must give weight to attempts by Congress to seek to dispel either the appearance or the reality of these influences. The remedies enacted by law, however, must comply with the First Amendment; and, it is United States law and tradition that more speech, not less, is the governing rule. An outright ban on corporate political speech during the critical pre-election period is not a permissible remedy. | Lengthy headnote that could be unpacked into several different headnotes or stated more succinctly. |
| III.C | W | 16 | 1683 | 1683 | 1685 | 1695 | Supreme Court precedent is to be respected by the Court unless the most convincing of reasons demonstrates that adherence to it puts the Court on a course that is sure error. | |
| III.C | W | 17 | 1683 | 1685 | 1690 | 1695 | Beyond workability, the relevant factors in deciding whether to adhere to the principle of stare decisis include the antiquity of the precedent, the reliance interests at stake, and whether the decision was well reasoned. | |

| Opinion Part | Headnote Company (LexisNexis (L) or Westlaw (W)) | Company's Headnote Number | Headnote Line Number Start (Explicit from bracket indicator.) | Headnote Line Number Specific Start (Inference from opinion language.) | Headnote Line Number Specific End (Inference from opinion language.) | Headnote Line Number End (Explicit from end of section or sub-section or start of next bracketed headnote section.) | Headnote Paragraph | Comments |
|---|---|---|---|---|---|---|---|---|
| III.C | L | 36 | 1683 | 1683 | 1693 | 1698 | United States Supreme Court precedent is to be respected unless the most convincing of reasons demonstrates that adherence to it puts the Court on a course that is sure error. Beyond workability, the relevant factors in deciding whether to adhere to the principle of stare decisis include the antiquity of the precedent, the reliance interests at stake, and of course whether the decision was well reasoned. The Court has also examined whether experience has pointed up the precedent's shortcomings. | This headnote incorporates the same opinion language as the two separate proceeding West headnotes, plus an additional proposition. |
| III.C | L | 37 | 1698 | 1698 | 1699 | 1700 | The United States Supreme Court has not hesitated to overrule decisions offensive to the First Amendment. | |
| III.C | W | 18 | 1696 | 1700 | 1702 | 1703 | Stare decisis is a principle of policy and not a mechanical formula of adherence to the latest decision. | |
| III.C | L | 38 | 1700 | 1700 | 1702 | 1709 | Stare decisis is a principle of policy and not a mechanical formula of adherence to the latest decision. | |
| III.C | W | 19 | 1704 | 1709 | 1711 | 1760 | When neither party defends the reasoning of a precedent, the principle of adhering to that precedent through stare decisis is diminished. | |
| III.C | L | 39 | 1709 | 1709 | 1711 | 1776 | When neither party defends the reasoning of a precedent, the principle of adhering to that precedent through stare decisis is diminished. | |

A2338

| Opinion Part | Headnote Company (LexisNexis (L) or Westlaw (W)) | Company's Headnote Number | Headnote Line Number Start (Explicit from bracket indicator.) | Headnote Line Number Specific Start (Inference from opinion language). | Headnote Line Number Specific End (Inference from opinion language). | Headnote Line Number End (Explicit from end of section or sub-section or start of next bracketed headnote section.) | Headnote Paragraph | Comments |
|---|---|---|---|---|---|---|---|---|
| III.C | W | 20 | 1762 | 1763 | 1766 | 1775 | With respect to stare decisis, reliance interests are important considerations in property and contract cases, where parties may have acted in conformance with existing legal rules in order to conduct transactions. | |
| III.C | W | 21 | 1776 | 1779 | 1780 | 1782 | Government may not, under the First Amendment, suppress political speech on the basis of the speaker's corporate identity; overruling *Austin v. Michigan Chamber of Commerce*, 494 U.S. 652, 110 S.Ct. 1391, 108 L.Ed.2d 652. U.S.C.A. Const. Amend. 1. | |
| III.C | L | 40 | 1776 | 1776 | 1782 | 1782 | *Austin v. Michigan Chamber of Commerce*, 494 U.S. 652 (1990), is overruled. The United States Supreme Court returns to the principle that the Government may not suppress political speech on the basis of the speaker's corporate identity. No sufficient governmental interest justifies limits on the political speech of nonprofit or for-profit corporations. | |

A2339

Vol. 109:4  [2017-27]    AN EMPIRICAL ANALYSIS OF LEXISNEXIS AND WEST HEADNOTES    605

| Opinion Part | Headnote Company (LexisNexis (L) or Westlaw (W)) | Company's Headnote Number | Headnote Line Number Start (Explicit from bracket indicator.) | Headnote Line Number Specific Start (Inference from opinion language). | Headnote Line Number Specific End (Inference from opinion language). | Headnote Line Number End (Explicit from end of section or sub-section or start of next bracketed headnote section.) | Headnote Paragraph | Comments |
|---|---|---|---|---|---|---|---|---|
| III.D | W | 22 | 1786 | 1786 | 1804 | 1804 | Federal statute barring corporations from using general treasury funds to make independent expenditures that expressly advocate the election or defeat of a candidate, through any form of media, in connection with certain qualified federal elections, and, as amended by Bipartisan Campaign Reform Act of 2002 (BCRA), barring corporations from using general treasury funds to make independent expenditures for electioneering communications within 30 days of a primary election or 60 days of general election for federal office, violated First Amendment political speech rights of nonprofit corporation that wished to distribute on cable television, through video-on-demand, a film regarding a candidate seeking nomination as a political party's candidate in the next Presidential election; overruling *McConnell v. Federal Election Com'n*, 540 U.S. 93, 124 S.Ct. 619, 157 L.Ed.2d 491. U.S.C.A. Const. Amend. 1; Federal Election Campaign Act of 1971, § 316, 2 U.S.C.A. § 441b. | Significant contextualizing language added with very little actual language of the Court. |
| III.D | L | 41 | 1788 | 1788 | 1793 | 1795 | Overruling *Austin v. Michigan Chamber of Commerce*, 494 U.S. 652 (1990), effectively invalidates not only § 203 of the Bipartisan Campaign Reform Act of 2002, but also 2 U.S.C.S. § 441b's prohibition on the use of corporate treasury funds for express advocacy. Section 441b's restrictions on corporate independent expenditures are therefore invalid. | |

A2340

606                     LAW LIBRARY JOURNAL              Vol. 109:4 [2017-27]

| Opinion Part | Headnote Company (LexisNexis (L) or Westlaw (W)) | Company's Headnote Number | Headnote Line Number Start (Explicit from bracket indicator.) | Headnote Line Number Specific Start (Inference from opinion language.) | Headnote Line Number Specific End (Inference from opinion language.) | Headnote Line Number End (Explicit from end of section or sub-section or start of next bracketed headnote section.) | Headnote Paragraph | Comments |
|---|---|---|---|---|---|---|---|---|
| III.D | L | 42 | 1795 | 1795 | 1797 | 1804 | The United States Supreme Court overrules the part of *McConnell v. Federal Election Comm'n*, 540 U.S. 93 (2003), that upheld the extension under § 203 of the Bipartisan Campaign Reform Act of 2002 of 2 U.S.C.S. § 441b's restrictions on corporate independent expenditures. | |
| IV.A | W | 23 | 1807 | 1807 | 1826 | 1860 | Provisions of Bipartisan Campaign Reform Act of 2002 (BCRA) requiring televised electioneering communications funded by anyone other than a candidate to include a disclaimer identifying the person or entity responsible for the content of the advertising, and requiring any person spending more than $10,000 on electioneering communications within a calendar year to file a disclosure statement with the Federal Election Commission (FEC), did not violate First Amendment protection of political speech, as applied to a nonprofit corporation that wished to distribute on cable television, through video-on-demand, a film regarding a candidate seeking nomination as a political party's candidate in the next Presidential election, and that wished to run three advertisements for the film. U.S.C.A. Const. Amend. 1; Federal Election Campaign Act of 1971, §§ 304(f)(1, 2), 318(a)(3), (d)(2), 2 U.S.C.A. §§ 434(f)(1, 2), 441d(a)(3), (d)(2). | |

A2341

| Opinion Part | Headnote Company (LexisNexis (L) or Westlaw (W)) | Company's Headnote Number | Headnote Line Number Start (Explicit from bracket indicator.) | Headnote Line Number Specific Start (Inference from opinion language). | Headnote Line Number Specific End (Inference from opinion language). | Headnote Line Number End (Explicit from end of section or sub-section or start of next bracketed headnote section.) | Headnote Paragraph | Comments |
|---|---|---|---|---|---|---|---|---|
| IV.A | L | 43 | 1809 | 1809 | 1819 | 1819 | Under § 311 of the Bipartisan Campaign Reform Act of 2002, 2 U.S.C.S. § 441d, televised electioneering communications funded by anyone other than a candidate must include a disclaimer that "_____ is responsible for the content of this advertising." 2 U.S.C.S. § 441d(d)(2). The required statement must be made in a clearly spoken manner, and displayed on the screen in a clearly readable manner for at least four seconds. 2 U.S.C.S. § 441d(d)(2). It must state that the communication is not authorized by any candidate or candidate's committee; it must also display the name and address (or Web site address) of the person or group that funded the advertisement. 2 U.S.C.S. § 441d(a)(3). | |
| IV.A | L | 44 | 1819 | 1819 | 1826 | 1826 | Under § 201 of the Bipartisan Campaign Reform Act of 2002, 2 U.S.C.S. § 434, any person who spends more than $10,000 on electioneering communications within a calendar year must file a disclosure statement with the Federal Election Commission. 2 U.S.C.S. § 434(f)(1). That statement must identify the person making the expenditure, the amount of the expenditure, the election to which the communication was directed, and the names of certain contributors. 2 U.S.C.S. § 434(f)(2). | |

| Opinion Part | Headnote Company (LexisNexis (L) or Westlaw (W)) | Company's Headnote Number | Headnote Line Number Start (Explicit from bracket indicator.) | Headnote Line Number Specific Start (Inference from opinion language). | Headnote Line Number Specific End (Inference from opinion language). | Headnote Line Number End (Explicit from end of section or sub-section or start of next bracketed headnote section.) | Headnote Paragraph | Comments |
|---|---|---|---|---|---|---|---|---|
| IV.A | L | 45 | 1827 | 1827 | 1836 | 1838 | Disclaimer and disclosure requirements may burden the ability to speak, but they impose no ceiling on campaign-related activities and do not prevent anyone from speaking. These requirements are subjected to exacting scrutiny, which requires a substantial relation between the disclosure requirement and a sufficiently important governmental interest. | |
| IV.A | L | 46 | 1838 | 1838 | 1843 | 1853 | Disclosure can be justified based on a governmental interest in providing the electorate with information about the sources of election-related spending. This interest has been applied in rejecting facial challenges to §§ 201 and 311 of the Bipartisan Campaign Reform Act of 2002, 2 U.S.C.S. §§ 434 and 441d. | |
| IV.A | L | 47 | 1853 | 1853 | 1857 | 1860 | As-applied challenges to 2 U.S.C.S. §§ 434 and 441d are be available if a group can show a reasonable probability that disclosure of its contributors' names will subject them to threats, harassment, or reprisals from either Government officials or private parties. | |
| IV.B | L | 48 | 1869 | 1869 | 1872 | 1888 | Federal Election Commission regulations do not exempt communications that propose a commercial transaction from the disclaimer and disclosure requirements in §§ 201 and 311 of the Bipartisan Campaign Reform Act of 2002, 2 U.S.C.S. §§ 434 and 441d. 72 Fed. Reg. 72901 (2007). | |

A2343

| Opinion Part | Headnote Company (LexisNexis (L) or Westlaw (W)) | Company's Headnote Number | Headnote Line Number Start (Explicit from bracket indicator.) | Headnote Line Number Specific Start (Inference from opinion language). | Headnote Line Number Specific End (Inference from opinion language). | Headnote Line Number End (Explicit from end of section or sub-section or start of next bracketed headnote section.) | Headnote Paragraph | Comments |
|---|---|---|---|---|---|---|---|---|
| IV.B | W | 24 | 1874 | 1879 | 1882 | 1988 | Three advertisements for non-profit corporation's film regarding a candidate seeking nomination as a political party's candidate in the next Presidential election, which film the nonprofit corporation wished to distribute on cable television through video-on-demand shortly before primary election, were "electioneering communications," for purposes of provisions of Bipartisan Campaign Reform Act of 2002 (BCRA) requiring televised electioneering communications funded by anyone other than a candidate to include a disclaimer identifying the person or entity responsible for the content of the advertising; the advertisements referred to the candidate by name and contained pejorative references to her candidacy. Federal Election Campaign Act of 1971, § 318(a)(3), (d)(2), 2 U.S.C.A. § 441d(a)(3), (d)(2); 11 C.F.R. § 100.29. | Significant contextualizing language added with very little actual language of the Court. |
| IV.B | L | 49 | 1888 | 1888 | 1891 | 1988 | Identification of the source of campaign advertising may be required as a means of disclosure, so that the people will be able to evaluate the arguments to which they are being subjected. | Underlying rationale for the constitutionality of the disclaimer provision of BCRA. |
| IV.C | L | 50 | 1993 | 1993 | 1995 | 1997 | No constitutional impediment is found to the application of the disclaimer and disclosure requirements of the Bipartisan Campaign Reform Act of 2002 to a movie broadcast via video-on-demand. | |

| Opinion Part | Headnote Company (LexisNexis (L) or Westlaw (W)) | Company's Headnote Number | Headnote Line Number Start (Explicit from bracket indicator.) | Headnote Line Number Specific Start (Inference from opinion language). | Headnote Line Number Specific End (Inference from opinion language). | Headnote Line Number End (Explicit from end of section or sub-section or start of next bracketed headnote section.) | Headnote Paragraph | Comments |
|---|---|---|---|---|---|---|---|---|
| V | L | 51 | 2039 | 2039 | 2044 | 2051 | The First Amendment underwrites the freedom to experiment and to create in the realm of thought and speech. Citizens must be free to use new forms, and new forums, for the expression of ideas. The civic discourse belongs to the people, and the Government may not prescribe the means used to conduct it. | Concluding rhetorical flourish as to the high-level rationale for the holding in the opinion. |

A2345

## Appendix A

### Headnote Counts for the 2009 Term

| R- | Case Name | United States Reports Citation | Supreme Court Reporter Citation | United States Supreme Court Reports—Lawyers' Edition Citation | Total Number LexisNexis Headnotes | Total Number West Headnotes | Absolute Difference | Difference Ratio |
|---|---|---|---|---|---|---|---|---|
| 92 | Sears v. Upton | 561 U.S. 945 | 130 S. Ct. 3259 | 177 L. Ed. 2d 1025 | 8 | 6 | 2 | 1:1.33 |
| 91 | McDonald v. Chicago | 561 U.S. 742 | 130 S. Ct. 3020 | 177 L. Ed. 2d 894 | 18 | 1 | 17 | 1:18 |
| 90 | Christian Legal Soc. Chapter of Univ. of Cal., Hastings Coll. of Law v. Martinez | 561 U.S. 661 | 130 S. Ct. 2971 | 177 L. Ed. 2d 838 | 25 | 13 | 12 | 1:1.92 |
| 89 | Bilski v. Kappos | 561 U.S. 593 | 130 S. Ct. 3218 | 177 L. Ed. 2d 792 | 15 | 16 | 1 | 1:1.07 |
| 88 | Free Enter. Fund v. Public Co. Accounting Oversight Bd. | 561 U.S. 477 | 130 S. Ct. 3138 | 177 L. Ed. 2d 706 | 25 | 21 | 4 | 1:1.19 |
| 86 | Black v. United States | 561 U.S. 465 | 130 S. Ct. 2963 | 177 L. Ed. 2d 695 | 6 | 3 | 3 | 1:2 |
| 85 | Skilling v. United States | 561 U.S. 358 | 130 S. Ct. 2896 | 177 L. Ed. 2d 619 | 41 | 36 | 5 | 1:1.14 |
| 84 | Magwood v. Patterson | 561 U.S. 320 | 130 S. Ct. 2788 | 177 L. Ed. 2d 592 | 6 | 3 | 3 | 1:2 |
| 83 | Granite Rock Co. v. Teamsters | 561 U.S. 287 | 130 S. Ct. 2847 | 177 L. Ed. 2d 567 | 8 | 14 | 6 | 1:1.75 |
| 82 | Morrison v. Nat'l Austl. Bank Ltd. | 561 U.S. 247 | 130 S. Ct. 2869 | 177 L. Ed. 2d 535 | 27 | 22 | 5 | 1:1.23 |
| 81 | Doe v. Reed | 561 U.S. 186 | 130 S. Ct. 2811 | 177 L. Ed. 2d 493 | 12 | 8 | 4 | 1:1.5 |
| 80 | Monsanto Co. v. Geertson Seed Farms | 561 U.S. 139 | 130 S. Ct. 2743 | 177 L. Ed. 2d 461 | 11 | 10 | 1 | 1:1.1 |
| 79 | Kawasaki Kisen Kaisha Ltd. v. Regal-Beloit Corp. | 561 U.S. 89 | 130 S. Ct. 2433 | 177 L. Ed. 2d 424 | 17 | 17 | 0 | 1:1 |
| 78 | Rent-A-Center, W., Inc. v. Jackson | 561 U.S. 63 | 130 S. Ct. 2772 | 177 L. Ed. 2d 403 | 11 | 6 | 5 | 1:1.83 |
| 77 | Holder v. Humanitarian Law Project | 561 U.S. 1 | 130 S. Ct. 2705 | 177 L. Ed. 2d 355 | 29 | 11 | 18 | 1:2.64 |
| 76 | Dillon v. United States | 560 U.S. 817 | 130 S. Ct. 2683 | 177 L. Ed. 2d 271 | 18 | 6 | 12 | 1:3 |
| 75 | Schwab v. Reilly | 560 U.S. 770 | 130 S. Ct. 2652 | 177 L. Ed. 2d 234 | 18 | 13 | 5 | 1:1.38 |
| 74 | Ontario v. Quon | 560 U.S. 746 | 130 S. Ct. 2619 | 177 L. Ed. 2d 216 | 7 | 11 | 4 | 1:1.57 |
| 73 | Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Protection | 560 U.S. 702 | 130 S. Ct. 2592 | 177 L. Ed. 2d 184 | 14 | 18 | 4 | 1:1.29 |

A2346

| R- | Case Name | United States Reports Citation | Supreme Court Reporter Citation | United States Supreme Court Reports—Lawyers' Edition Citation | Total Number LexisNexis Headnotes | Total Number West Headnotes | Absolute Difference | Difference Ratio |
|---|---|---|---|---|---|---|---|---|
| 72 | New Process Steel, L. P. v. NLRB | 560 U.S. 674 | 130 S. Ct. 2635 | 177 L. Ed. 2d 162 | 13 | 2 | 11 | 1:6.5 |
| 71 | Holland v. Florida | 560 U.S. 631 | 130 S. Ct. 2549 | 177 L. Ed. 2d 130 | 14 | 14 | 0 | 1:1 |
| 70 | Dolan v. United States | 560 U.S. 605 | 130 S. Ct. 2533 | 177 L. Ed. 2d 108 | 17 | 8 | 9 | 1:2.13 |
| 69 | Astrue v. Ratliff | 560 U.S. 586 | 130 S. Ct. 2521 | 177 L. Ed. 2d 91 | 16 | 3 | 13 | 1:5.33 |
| 68 | Carachuri-Rosendo v. Holder | 560 U.S. 563 | 130 S. Ct. 2577 | 177 L. Ed. 2d 68 | 25 | 8 | 17 | 1:3.13 |
| 67 | United States v. Juvenile Male | 560 U.S. 558 | 130 S. Ct. 2518 | 177 L. Ed. 2d 64 | 0 | 1 | 1 | 1:Infinite |
| 66 | Krupski v. Costa Crociere S. p. A. | 560 U.S. 538 | 130 S. Ct. 2485 | 177 L. Ed. 2d 48 | 5 | 8 | 3 | 1:1.6 |
| 65 | Hamilton v. Lanning | 560 U.S. 505 | 130 S. Ct. 2464 | 177 L. Ed. 2d 23 | 16 | 12 | 4 | 1:1.33 |
| 64 | Barber v. Thomas | 560 U.S. 474 | 130 S. Ct. 2499 | 177 L. Ed. 2d 1 | 4 | 6 | 2 | 1:1.5 |
| 63 | Carr v. United States | 560 U.S. 438 | 130 S. Ct. 2229 | 176 L. Ed. 2d 1152 | 20 | 3 | 17 | 1:6.67 |
| 62 | Levin v. Commerce Energy, Inc. | 560 U.S. 413 | 130 S. Ct. 2323 | 176 L. Ed. 2d 1131 | 15 | 12 | 3 | 1:1.25 |
| 61 | Berghuis v. Thompkins | 560 U.S. 370 | 130 S. Ct. 2250 | 176 L. Ed. 2d 1098 | 16 | 18 | 2 | 1:1.13 |
| 60 | Alabama v. North Carolina | 560 U.S. 330 | 130 S. Ct. 2295 | 176 L. Ed. 2d 1070 | 4 | 21 | 17 | 1:5.25 |
| 59 | Samantar v. Yousuf | 560 U.S. 305 | 130 S. Ct. 2278 | 176 L. Ed. 2d 1047 | 29 | 16 | 13 | 1:1.81 |
| 58 | Jefferson v. Upton | 560 U.S. 284 | 130 S. Ct. 2217 | 176 L. Ed. 2d 1032 | 2 | 1 | 1 | 1:2 |
| 56 | United States v. Marcus | 560 U.S. 258 | 130 S. Ct. 2159 | 176 L. Ed. 2d 1012 | 7 | 7 | 0 | 1:1 |
| 55 | Hardt v. Reliance Standard Life Ins. Co. | 560 U.S. 242 | 130 S. Ct. 2149 | 176 L. Ed. 2d 998 | 11 | 6 | 5 | 1:1.83 |
| 54 | United States v. O'Brien | 560 U.S. 218 | 130 S. Ct. 2169 | 176 L. Ed. 2d 979 | 8 | 6 | 2 | 1:1.33 |
| 53 | Lewis v. City of Chicago | 560 U.S. 205 | 130 S. Ct. 2191 | 176 L. Ed. 2d 967 | 10 | 12 | 2 | 1:1.2 |
| 52 | American Needle, Inc. v. Nat'l Football League | 560 U.S. 183 | 130 S. Ct. 2201 | 176 L. Ed. 2d 947 | 17 | 16 | 1 | 1:1.06 |
| 50 | United States v. Comstock | 560 U.S. 126 | 130 S. Ct. 1949 | 176 L. Ed. 2d 878 | 21 | 16 | 5 | 1:1.31 |
| 49 | Graham v. Florida | 560 U.S. 48 | 130 S. Ct. 2011 | 176 L. Ed. 2d 825 | 12 | 25 | 13 | 1:2.08 |

A2347

Vol. 109:4  [2017-27]     AN EMPIRICAL ANALYSIS OF LEXISNEXIS AND WEST HEADNOTES          613

| R- | Case Name | United States Reports Citation | Supreme Court Reporter Citation | United States Supreme Court Reports—Lawyers' Edition Citation | Total Number LexisNexis Headnotes | Total Number West Headnotes | Absolute Difference | Difference Ratio |
|---|---|---|---|---|---|---|---|---|
| 48 | Abbott v. Abbott | 560 U.S. 1 | 130 S. Ct. 1983 | 176 L. Ed. 2d 789 | 26 | 9 | 17 | 1:2.89 |
| 47 | Hui v. Castaneda | 559 U.S. 799 | 130 S. Ct. 1845 | 176 L. Ed. 2d 703 | 13 | 7 | 6 | 1:1.86 |
| 46 | Renico v. Lett | 559 U.S. 766 | 130 S. Ct. 1855 | 176 L. Ed. 2d 678 | 9 | 21 | 12 | 1:2.33 |
| 45 | Salazar v. Buono | 559 U.S. 700 | 130 S. Ct. 1803 | 176 L. Ed. 2d 634 | 11 | 20 | 9 | 1:1.82 |
| 44 | Stolt-Nielsen S. A. v. AnimalFeeds Int'l Corp. | 559 U.S. 662 | 130 S. Ct. 1758 | 176 L. Ed. 2d 605 | 19 | 24 | 5 | 1:1.26 |
| 43 | Merck & Co. v. Reynolds | 559 U.S. 633 | 130 S. Ct. 1784 | 176 L. Ed. 2d 582 | 17 | 16 | 1 | 1:1.06 |
| 42 | Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA | 559 U.S. 573 | 130 S. Ct. 1605 | 176 L. Ed. 2d 519 | 9 | 2 | 7 | 1:4.5 |
| 41 | Perdue v. Kenny A. | 559 U.S. 542 | 130 S. Ct. 1662 | 176 L. Ed. 2d 494 | 15 | 25 | 10 | 1:1.67 |
| 40 | Conkright v. Frommert | 559 U.S. 506 | 130 S. Ct. 1640 | 176 L. Ed. 2d 469 | 2 | 8 | 6 | 1:4 |
| 39 | United States v. Stevens | 559 U.S. 460 | 130 S. Ct. 1577 | 176 L. Ed. 2d 435 | 9 | 14 | 5 | 1:1.56 |
| 38 | Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co. | 559 U.S. 393 | 130 S. Ct. 1431 | 176 L. Ed. 2d 311 | 5 | 9 | 4 | 1:1.8 |
| 37 | Padilla v. Kentucky | 559 U.S. 356 | 130 S. Ct. 1473 | 176 L. Ed. 2d 284 | 14 | 13 | 1 | 1:1.08 |
| 36 | Jones v. Harris Assocs. L.P. | 559 U.S. 335 | 130 S. Ct. 1418 | 176 L. Ed. 2d 265 | 16 | 10 | 6 | 1:1.6 |
| 35 | Berghuis v. Smith | 559 U.S. 314 | 130 S. Ct. 1382 | 176 L. Ed. 2d 249 | 6 | 13 | 7 | 1:2.17 |
| 34 | Graham Cty. Soil & Water Conservation Dist. v. United States ex rel. Wilson | 559 U.S. 280 | 130 S. Ct. 1396 | 176 L. Ed. 2d 225 | 9 | 8 | 1 | 1:1.13 |
| 33 | United Student Aid Funds, Inc. v. Espinosa | 559 U.S. 260 | 130 S. Ct. 1367 | 176 L. Ed. 2d 158 | 22 | 26 | 4 | 1:1.18 |
| 32 | Milavetz, Gallop & Milavetz, P.A. v. United States | 559 U.S. 229 | 130 S. Ct. 1324 | 176 L. Ed. 2d 79 | 10 | 17 | 7 | 1:1.7 |
| 31 | Bloate v. United States | 559 U.S. 196 | 130 S. Ct. 1345 | 176 L. Ed. 2d 54 | 11 | 5 | 6 | 1:2.2 |
| 30 | Mac's Shell Serv., Inc. v. Shell Oil Prods. Co. | 559 U.S. 175 | 130 S. Ct. 1251 | 176 L. Ed. 2d 36 | 18 | 5 | 13 | 1:3.6 |
| 29 | Reed Elsevier, Inc. v. Muchnick | 559 U.S. 154 | 130 S. Ct. 1237 | 176 L. Ed. 2d 18 | 15 | 9 | 6 | 1:1.67 |

A2348

614                              LAW LIBRARY JOURNAL          Vol. 109:4 [2017-27]

| R- | Case Name | United States Reports Citation | Supreme Court Reporter Citation | United States Supreme Court Reports—Lawyers' Edition Citation | Total Number LexisNexis Headnotes | Total Number West Headnotes | Absolute Difference | Difference Ratio |
|---|---|---|---|---|---|---|---|---|
| 28 | Johnson v. United States | 559 U.S. 133 | 130 S. Ct. 1265 | 176 L. Ed. 2d 1 | 10 | 8 | 2 | 1:1.25 |
| 26 | Maryland v. Shatzer | 559 U.S. 98 | 130 S. Ct. 1213 | 175 L. Ed. 2d 1045 | 12 | 18 | 6 | 1:1.5 |
| 25 | Hertz Corp. v. Friend | 559 U.S. 77 | 130 S. Ct. 1181 | 175 L. Ed. 2d 1029 | 8 | 10 | 2 | 1:1.25 |
| 24 | Florida v. Powell | 559 U.S. 50 | 130 S. Ct. 1195 | 175 L. Ed. 2d 1009 | 7 | 9 | 2 | 1:1.29 |
| 23 | Thaler v. Haynes | 559 U.S. 43 | 130 S. Ct. 1171 | 175 L. Ed. 2d 1003 | 2 | 5 | 3 | 1:2.5 |
| 22 | Wilkins v. Gaddy | 559 U.S. 34 | 130 S. Ct. 1175 | 175 L. Ed. 2d 995 | 3 | 7 | 4 | 1:2.33 |
| 20 | Hemi Grp., LLC v. City of N.Y. | 559 U.S. 1 | 130 S. Ct. 983 | 175 L. Ed. 2d 943 | 7 | 4 | 3 | 1:1.75 |
| 19 | Citizens United v. Fed. Election Comm'n | 558 U.S. 310 | 130 S. Ct. 876 | 175 L. Ed. 2d 753 | 51 | 24 | 27 | 1:2.13 |
| 18 | Wood v. Allen | 558 U.S. 290 | 130 S. Ct. 841 | 175 L. Ed. 2d 738 | 4 | 3 | 1 | 1:1.33 |
| 17 | South Carolina v. North Carolina | 558 U.S. 256 | 130 S. Ct. 854 | 175 L. Ed. 2d 713 | 6 | 13 | 7 | 1:2.17 |
| 16 | Kucana v. Holder | 558 U.S. 233 | 130 S. Ct. 827 | 175 L. Ed. 2d 694 | 14 | 4 | 10 | 1:3.5 |
| 15 | Wellons v. Hall | 558 U.S. 220 | 130 S. Ct. 727 | 175 L. Ed. 2d 684 | 2 | 5 | 3 | 1:2.5 |
| 14 | Presley v. Georgia | 558 U.S. 209 | 130 S. Ct. 721 | 175 L. Ed. 2d 675 | 6 | 9 | 3 | 1:1.5 |
| 13 | Hollingsworth v. Perry | 558 U.S. 183 | 130 S. Ct. 705 | 175 L. Ed. 2d 657 | 4 | 10 | 6 | 1:2.5 |
| 12 | NRG Power Mktg., LLC v. Me. Pub. Util. Comm'n | 558 U.S. 165 | 130 S. Ct. 693 | 175 L. Ed. 2d 642 | 10 | 2 | 8 | 1:5 |
| 11 | Smith v. Spisak | 558 U.S. 139 | 130 S. Ct. 676 | 175 L. Ed. 2d 595 | 5 | 8 | 3 | 1:1.6 |
| 10 | McDaniel v. Brown | 558 U.S. 120 | 130 S. Ct. 665 | 175 L. Ed. 2d 582 | 2 | 9 | 7 | 1:4.5 |
| 9 | Mohawk Indus., Inc. v. Carpenter | 558 U.S. 100 | 130 S. Ct. 599 | 175 L. Ed. 2d 458 | 11 | 8 | 3 | 1:1.38 |
| 8 | Alvarez v. Smith | 558 U.S. 87 | 130 S. Ct. 576 | 175 L. Ed. 2d 447 | 4 | 6 | 2 | 1:1.5 |
| 7 | Union Pac. R. Co. v. Locomotive Eng'rs & Trainmen Gen. Comm. of Adjustment, Cent. Region | 558 U.S. 67 | 130 S. Ct. 584 | 175 L. Ed. 2d 428 | 21 | 20 | 1 | 1:1.05 |
| 6 | Beard v. Kindler | 558 U.S. 53 | 130 S. Ct. 612 | 175 L. Ed. 2d 417 | 5 | 4 | 1 | 1:1.25 |

A2349

| R- | Case Name | *United States Reports* Citation | *Supreme Court Reporter* Citation | *United States Supreme Court Reports—Lawyers' Edition* Citation | Total Number LexisNexis Headnotes | Total Number West Headnotes | Absolute Difference | Difference Ratio |
|---|---|---|---|---|---|---|---|---|
| 5 | *Michigan v. Fisher* | 558 U.S. 45 | 130 S. Ct. 546 | 175 L. Ed. 2d 410 | 3 | 7 | 4 | 1:2.33 |
| 4 | *Porter v. McCollum* | 558 U.S. 30 | 130 S. Ct. 447 | 175 L. Ed. 2d 398 | 7 | 4 | 3 | 1:1.75 |
| 3 | *Wong v. Belmontes* | 558 U.S. 15 | 130 S. Ct. 383 | 175 L. Ed. 2d 328 | 3 | 7 | 4 | 1:2.33 |
| 2 | *Bobby v. Van Hook* | 558 U.S. 4 | 130 S. Ct. 13 | 175 L. Ed. 2d 255 | 2 | 7 | 5 | 1:3.5 |
| 1 | *Corcoran v. Leven-hagen* | 558 U.S. 1 | 130 S. Ct. 8 | 175 L. Ed. 2d 1 | 0 | 1 | 1 | 1:Infinite |

616                              LAW LIBRARY JOURNAL            Vol. 109:4 [2017-27]

**Appendix B**

Additional Information for the 2009 Term

| R- | Case Name | United States Reports Citation | Date Decided | Start Page (Opinion of the Court) United States Reports | End Page (Opinion of the Court) United States Reports | United States Reports Pages ((End Page – Start Page) +1) | Total Number of Lines ((End Number – Start Number) +1) | Vote Count |
|---|---|---|---|---|---|---|---|---|
| 92 | Sears v. Upton | 561 U.S. 945 | 6/29/2010 | 945 | 956 | 12 | 493 | 5-2 |
| 91 | McDonald v. City of Chicago | 561 U.S. 742 | 6/28/2010 | 748 | 791 | 44 | 1966 | 5-4 |
| 90 | Christian Legal Soc. Chapter of Univ. of Cal., Hastings Coll. of Law v. Martinez | 561 U.S. 661 | 6/28/2010 | 667 | 698 | 32 | 1448 | 5-4 |
| 89 | Bilski v. Kappos | 561 U.S. 593 | 6/28/2010 | 597 | 613 | 17 | 716 | 9-0 |
| 88 | Free Enter. Fund v. Public Co. Account-ing Oversight Bd. | 561 U.S. 477 | 6/28/2010 | 483 | 514 | 32 | 1413 | 5-4 |
| 86 | Black v. United States | 561 U.S. 465 | 6/24/2010 | 467 | 474 | 8 | 337 | 9-0 |
| 85 | Skilling v. United States | 561 U.S. 358 | 6/24/2010 | 367 | 415 | 49 | 2170 | 9-0 |
| 84 | Magwood v. Pat-terson | 561 U.S. 320 | 6/24/2010 | 323 | 343 | 21 | 903 | 5-4 |
| 83 | Granite Rock Co. v. Teamsters | 561 U.S. 287 | 6/24/2010 | 291 | 314 | 24 | 1011 | 7-2 |
| 82 | Morrison v. National Austr. Bank Ltd. | 561 U.S. 247 | 6/24/2010 | 250 | 273 | 24 | 1047 | 8-0 |
| 81 | Doe v. Reed | 561 U.S. 186 | 6/24/2010 | 190 | 202 | 13 | 543 | 8-1 |
| 80 | Monsanto Co. v. Geertson Seed Farms | 561 U.S. 139 | 6/21/2010 | 144 | 166 | 23 | 984 | 7-1 |
| 79 | Kawasaki Kisen Kaisha Ltd. v. Regal-Beloit Corp. | 561 U.S. 89 | 6/21/2010 | 93 | 112 | 20 | 849 | 6-3 |
| 78 | Rent-A-Center, W., Inc. v. Jackson | 561 U.S. 63 | 6/21/2010 | 65 | 76 | 12 | 494 | 5-4 |
| 77 | Holder v. Humani-tarian Law Project | 561 U.S. 1 | 6/21/2010 | 7 | 40 | 34 | 1466 | 6-3 |
| 76 | Dillon v. United States | 560 U.S. 817 | 6/17/2010 | 819 | 831 | 13 | 565 | 7-1 |
| 75 | Schwab v. Reilly | 560 U.S. 770 | 6/17/2010 | 774 | 795 | 22 | 975 | 6-3 |
| 74 | Ontario v. Quon | 560 U.S. 746 | 6/17/2010 | 750 | 765 | 16 | 694 | 9-0 |
| 73 | Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Protection | 560 U.S. 702 | 6/17/2010 | 707 | 733 | 27 | 1212 | 8-0 |
| 72 | New Process Steel, L.P. v. NLRB | 560 U.S. 674 | 6/17/2010 | 676 | 688 | 13 | 570 | 5-4 |

A2351

Vol. 109:4 [2017-27]   AN EMPIRICAL ANALYSIS OF LEXISNEXIS AND WEST HEADNOTES   617

| R- | Case Name | United States Reports Citation | Date Decided | Start Page (Opinion of the Court) United States Reports | End Page (Opinion of the Court) United States Reports | United States Reports Pages ((End Page – Start Page) +1) | Total Number of Lines ((End Number – Start Number) +1) | Vote Count |
|---|---|---|---|---|---|---|---|---|
| 71 | Holland v. Florida | 560 U.S. 631 | 6/14/2010 | 634 | 654 | 21 | 906 | 7-2 |
| 70 | Dolan v. United States | 560 U.S. 605 | 6/14/2010 | 607 | 621 | 15 | 615 | 5-4 |
| 69 | Astrue v. Ratliff | 560 U.S. 586 | 6/14/2010 | 588 | 598 | 11 | 462 | 9-0 |
| 68 | Carachuri-Rosendo v. Holder | 560 U.S. 563 | 6/14/2010 | 566 | 582 | 17 | 755 | 9-0 |
| 67 | United States v. Juvenile Male | 560 U.S. 558 | 6/7/2010 | 559 | 562 | 4 | 132 | 9-0 |
| 66 | Krupski v. Costa Crociere S. p. A. | 560 U.S. 538 | 6/7/2010 | 541 | 557 | 17 | 723 | 9-0 |
| 65 | Hamilton v. Lanning | 560 U.S. 505 | 6/7/2010 | 508 | 524 | 17 | 732 | 8-1 |
| 64 | Barber v. Thomas | 560 U.S. 474 | 6/7/2010 | 476 | 492 | 17 | 712 | 6-3 |
| 63 | Carr v. United States | 560 U.S. 438 | 6/1/2010 | 441 | 458 | 18 | 789 | 6-3 |
| 62 | Levin v. Commerce Energy, Inc. | 560 U.S. 413 | 6/1/2010 | 417 | 433 | 17 | 745 | 9-0 |
| 61 | Berghuis v. Thompkins | 560 U.S. 370 | 6/1/2010 | 373 | 391 | 19 | 793 | 5-4 |
| 60 | Alabama v. North Carolina | 560 U.S. 330 | 6/1/2010 | 334 | 358 | 25 | 1090 | 6-3 |
| 59 | Samantar v. Yousuf | 560 U.S. 305 | 6/1/2010 | 308 | 326 | 19 | 843 | 9-0 |
| 58 | Jefferson v. Upton | 560 U.S. 284 | 5/24/2010 | 284 | 295 | 12 | 463 | 7-2 |
| 56 | United States v. Marcus | 560 U.S. 258 | 5/24/2010 | 260 | 267 | 8 | 313 | 7-1 |
| 55 | Hardt v. Reliance Standard Life Ins. Co. | 560 U.S. 242 | 5/24/2010 | 244 | 256 | 13 | 564 | 9-0 |
| 54 | United States v. O'Brien | 560 U.S. 218 | 5/24/2010 | 221 | 235 | 15 | 633 | 9-0 |
| 53 | Lewis v. City of Chicago | 560 U.S. 205 | 5/24/2010 | 208 | 217 | 10 | 441 | 9-0 |
| 52 | Am. Needle, Inc. v. Nat'l Football League | 560 U.S. 183 | 5/24/2010 | 186 | 204 | 19 | 851 | 9-0 |
| 50 | United States v. Comstock | 560 U.S. 126 | 5/17/2010 | 129 | 150 | 22 | 936 | 7-2 |
| 49 | Graham v. Florida | 560 U.S. 48 | 5/17/2010 | 52 | 82 | 31 | 1323 | 6-3 |
| 48 | Abbott v. Abbott | 560 U.S. 1 | 5/17/2010 | 5 | 22 | 18 | 767 | 6-3 |
| 47 | Hui v. Castaneda | 559 U.S. 799 | 5/3/2010 | 801 | 813 | 13 | 520 | 9-0 |
| 46 | Renico v. Lett | 559 U.S. 766 | 5/3/2010 | 769 | 779 | 11 | 469 | 6-3 |
| 45 | Salazar v. Buono | 559 U.S. 700 | 4/28/2010 | 705 | 722 | 18 | 774 | 5-4 |
| 44 | Stolt-Nielsen S. A. v. AnimalFeeds Int'l Corp. | 559 U.S. 662 | 4/27/2010 | 666 | 687 | 22 | 986 | 5-3 |

A2352

| R- | Case Name | United States Reports Citation | Date Decided | Start Page (Opinion of the Court) United States Reports | End Page (Opinion of the Court) United States Reports | United States Reports Pages ((End Page – Start Page) +1) | Total Number of Lines ((End Number – Start Number) +1) | Vote Count |
|---|---|---|---|---|---|---|---|---|
| 43 | Merck & Co. v. Reynolds | 559 U.S. 633 | 4/27/2010 | 637 | 654 | 18 | 772 | 9-0 |
| 42 | Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA | 559 U.S. 573 | 4/21/2010 | 576 | 605 | 30 | 1344 | 7-2 |
| 41 | Perdue v. Kenny A. | 559 U.S. 542 | 4/21/2010 | 546 | 560 | 15 | 634 | 5-4 |
| 40 | Conkright v. Frommert | 559 U.S. 506 | 4/21/2010 | 509 | 522 | 14 | 591 | 5-3 |
| 39 | United States v. Stevens | 559 U.S. 460 | 4/20/2010 | 464 | 482 | 19 | 809 | 8-1 |
| 38 | Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co. | 559 U.S. 393 | 3/31/2010 | 395 | 416 | 22 | 962 | 5-4 |
| 37 | Padilla v. Kentucky | 559 U.S. 356 | 3/31/2010 | 359 | 375 | 17 | 724 | 7-2 |
| 36 | Jones v. Harris Assocs. L.P. | 559 U.S. 335 | 3/30/2010 | 338 | 353 | 16 | 712 | 9-0 |
| 35 | Berghuis v. Smith | 559 U.S. 314 | 3/30/2010 | 319 | 333 | 15 | 633 | 9-0 |
| 34 | Graham Cty. Soil & Water Conservation Dist. v. United States ex rel. Wilson | 559 U.S. 280 | 3/30/2010 | 283 | 302 | 20 | 896 | 7-2 |
| 33 | United Student Aid Funds, Inc. v. Espinosa | 559 U.S. 260 | 3/23/2010 | 263 | 279 | 17 | 729 | 9-0 |
| 32 | Milavetz, Gallop & Milavetz, P.A. v. United States | 559 U.S. 229 | 3/8/2010 | 231 | 253 | 23 | 976 | 9-0 |
| 31 | Bloate v. United States | 559 U.S. 196 | 3/8/2010 | 198 | 215 | 18 | 769 | 7-2 |
| 30 | Mac's Shell Serv., Inc. v. Shell Oil Prods. Co. | 559 U.S. 175 | 3/2/2010 | 177 | 195 | 19 | 820 | 9-0 |
| 29 | Reed Elsevier, Inc. v. Muchnick | 559 U.S. 154 | 3/2/2010 | 157 | 171 | 15 | 642 | 8-0 |
| 28 | Johnson v. United States | 559 U.S. 133 | 3/2/2010 | 135 | 145 | 11 | 449 | 7-2 |
| 26 | Maryland v. Shatzer | 559 U.S. 98 | 2/24/2010 | 100 | 117 | 18 | 759 | 9-0 |
| 25 | Hertz Corp. v. Friend | 559 U.S. 77 | 2/23/2010 | 80 | 97 | 18 | 753 | 9-0 |
| 24 | Florida v. Powell | 559 U.S. 50 | 2/23/2010 | 53 | 64 | 12 | 517 | 7-2 |
| 23 | Thaler v. Haynes | 559 U.S. 43 | 2/22/2010 | 44 | 49 | 6 | 256 | 9-0 |
| 22 | Wilkins v. Gaddy | 559 U.S. 34 | 2/22/2010 | 34 | 40 | 7 | 265 | 9-0 |
| 20 | Hemi Grp., LLC v. City of N.Y. | 559 U.S. 1 | 1/25/2010 | 4 | 18 | 15 | 616 | 5-3 |

A2353

Vol. 109:4 [2017-27]        AN EMPIRICAL ANALYSIS OF LEXISNEXIS AND WEST HEADNOTES        619

| R- | Case Name | United States Reports Citation | Date Decided | Start Page (Opinion of the Court) United States Reports | End Page (Opinion of the Court) United States Reports | United States Reports Pages ((End Page – Start Page) +1) | Total Number of Lines ((End Number – Start Number) +1) | Vote Count |
|---|---|---|---|---|---|---|---|---|
| 19 | Citizens United v. Fed. Election Comm'n | 558 U.S. 310 | 1/21/2010 | 318 | 372 | 55 | 2376 | 5-4 |
| 18 | Wood v. Allen | 558 U.S. 290 | 1/20/2010 | 293 | 305 | 13 | 535 | 7-2 |
| 17 | South Carolina v. North Carolina | 558 U.S. 256 | 1/20/2010 | 259 | 276 | 18 | 743 | 5-4 |
| 16 | Kucana v. Holder | 558 U.S. 233 | 1/20/2010 | 236 | 253 | 18 | 752 | 9-0 |
| 15 | Wellons v. Hall | 558 U.S. 220 | 1/19/2010 | 220 | 226 | 7 | 271 | 5-4 |
| 14 | Presley v. Georgia | 558 U.S. 209 | 1/19/2010 | 209 | 216 | 8 | 294 | 7-2 |
| 13 | Hollingsworth v. Perry | 558 U.S. 183 | 1/13/2010 | 184 | 199 | 16 | 655 | 5-4 |
| 12 | NRG Power Mktg., LLC v. Me. Pub. Util. Comm'n | 558 U.S. 165 | 1/13/2010 | 167 | 177 | 11 | 452 | 8-1 |
| 11 | Smith v. Spisak | 558 U.S. 139 | 1/12/2010 | 141 | 156 | 16 | 654 | 9-0 |
| 10 | McDaniel v. Brown | 558 U.S. 120 | 1/11/2010 | 121 | 136 | 16 | 667 | 9-0 |
| 9 | Mohawk Indus., Inc. v. Carpenter | 558 U.S. 100 | 12/8/2009 | 103 | 114 | 12 | 506 | 9-0 |
| 8 | Alvarez v. Smith | 558 U.S. 87 | 12/8/2009 | 89 | 97 | 9 | 370 | 8-1 |
| 7 | Union Pac. R. Co. v. Locomotive Eng'rs & Trainmen Gen. Comm. of Adjustment, Cent. Region | 558 U.S. 67 | 12/8/2009 | 71 | 86 | 16 | 686 | 9-0 |
| 6 | Beard v. Kindler | 558 U.S. 53 | 12/8/2009 | 55 | 63 | 9 | 360 | 8-0 |
| 5 | Michigan v. Fisher | 558 U.S. 45 | 12/7/2009 | 45 | 50 | 6 | 199 | 7-2 |
| 4 | Porter v. McCollum | 558 U.S. 30 | 11/30/2009 | 30 | 44 | 15 | 612 | 9-0 |
| 3 | Wong v. Belmontes | 558 U.S. 15 | 11/16/2009 | 15 | 28 | 14 | 545 | 9-0 |
| 2 | Bobby v. Van Hook | 558 U.S. 4 | 11/9/2009 | 4 | 13 | 10 | 396 | 9-0 |
| 1 | Corcoran v. Levenhagen | 558 U.S. 1 | 10/20/2009 | 2 | 3 | 2 | 56 | 9-0 |

A2354

620                                LAW LIBRARY JOURNAL          Vol. 109:4 [2017-27]

## Appendix C

### Subject Information from Supreme Court Database

| R- | Case Name | Issue Area | Issue | Authority for Decision 1 & 2 | Legal Provisions Considered by the Court | Legal Provision Supplement |
|---|---|---|---|---|---|---|
| 92 | *Sears v. Upton* | Criminal Procedure | right to counsel | judicial review (state level); federal common law | constitutional amendment | Sixth Amendment (right to counsel) |
| 91 | *McDonald v. City of Chicago* | Criminal Procedure | miscellaneous criminal procedure | judicial review (state level) | constitutional amendment | Second Amendment |
| 90 | *Christian Legal Soc. Chapter of Univ. of Cal., Hastings Coll. of Law v. Martinez* | First Amendment | free exercise of religion | judicial review (state level) | constitutional amendment | First Amendment (free exercise of religion) |
| 89 | *Bilski v. Kappos* | Economic Activity | patents and copyrights: patentability of computer processes | statutory construction | infrequently litigated statutes | infrequently litigated statutes |
| 88 | *Free Enter. Fund v. Public Co. Accounting Oversight Bd.* | Miscellaneous | executive authority vis-a-vis Congress or the states | judicial review (national level); statutory construction | Constitution | Art. II, § 1 (executive power) |
| 86 | *Black v. United States* | Criminal Procedure | extra-legal jury influences: jury instructions (not necessarily in criminal cases) | federal common law | no legal provision | no legal provision |
| 85 | *Skilling v. United States* | Criminal Procedure | statutory construction of criminal laws: fraud | statutory construction; judicial review (national level) | infrequently litigated statutes | infrequently litigated statutes |
| 84 | *Magwood v. Patterson* | Criminal Procedure | habeas corpus | statutory construction | federal statute | 28 U.S.C. §§ 2241-2255 (habeas corpus) |
| 83 | *Granite Rock Co. v. Teamsters* | Unions | arbitration (in the context of labor-management or employer-employee relations) | statutory construction | federal statute | Labor-Management Relations Act |
| 82 | *Morrison v. Nat'l Austr. Bank Ltd.* | Economic Activity | federal or state regulation of securities | statutory construction; federal common law | federal statute | Securities Act of 1933, the Securities and Exchange Act of 1934, or the Williams Act |

A2355

| R- | Case Name | Issue Area | Issue | Authority for Decision 1 & 2 | Legal Provisions Considered by the Court | Legal Provision Supplement |
|---|---|---|---|---|---|---|
| 81 | *Doe v. Reed* | Privacy | Freedom of Information Act and related federal or state statutes or regulations | judicial review (state level) | constitutional amendment | First Amendment (speech, press, and assembly) |
| 80 | *Monsanto Co. v. Geertson Seed Farms* | Economic Activity | natural resources - environmental protection | statutory construction | federal statute | National Environmental Policy Act |
| 79 | *Kawasaki Kisen Kaisha Ltd. v. Regal-Beloit Corp.* | Economic Activity | liability, other than as in sufficiency of evidence, election of remedies, punitive damages | statutory construction | federal statute | Interstate Commerce, as amended |
| 78 | *Rent-A-Center, W., Inc. v. Jackson* | Unions | arbitration (in the context of labor-management or employer-employee relations) | statutory construction | infrequently litigated statutes | infrequently litigated statutes |
| 77 | *Holder v. Humanitarian Law Project* | First Amendment | federal or state internal security legislation: Smith, Internal Security, and related federal statutes | statutory construction; judicial review (national level) | infrequently litigated statutes | infrequently litigated statutes |
| 76 | *Dillon v. United States* | Criminal Procedure | statutory construction of criminal laws: sentencing guidelines | statutory construction | infrequently litigated statutes | infrequently litigated statutes |
| 75 | *Schwab v. Reilly* | Economic Activity | bankruptcy (except in the context of priority of federal fiscal claims) | statutory construction | federal statute | Bankruptcy Code, Bankruptcy Act or Rules, or Bankruptcy Reform Act of 1978 |
| 74 | *Ontario v. Quon* | Criminal Procedure | search and seizure (other than as pertains to vehicles or Crime Control Act) | judicial review (state level) | constitutional amendment | Fourth Amendment |
| 73 | *Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Protection* | Due Process | due process: Takings Clause, or other non-constitutional governmental taking of property | judicial review (state level) | constitutional amendment | Fifth Amendment (Takings Clause) |

A2356

| R- | Case Name | Issue Area | Issue | Authority for Decision 1 & 2 | Legal Provisions Considered by the Court | Legal Provision Supplement |
|---|---|---|---|---|---|---|
| 72 | *New Process Steel, L.P. v. NLRB* | Judicial Power | judicial review of administrative agency's or administrative official's actions and procedures | statutory construction | federal statute | National Labor Relations Act, as amended |
| 71 | *Holland v. Florida* | Civil Rights | indigents: inadequate representation by counsel | statutory construction | federal statute | 28 U.S.C. §§ 2241-2255 (habeas corpus) |
| 70 | *Dolan v. United States* | Judicial Power | judicial administration: jurisdiction or authority of federal district courts or territorial courts | statutory construction | infrequently litigated statutes | infrequently litigated statutes |
| 69 | *Astrue v. Ratliff* | Attorneys | attorneys' and governmental employees' or officials' fees or compensation or licenses | statutory construction | federal statute | Equal Access to Justice Act |
| 68 | *Carachuri-Rosendo v. Holder* | Civil Rights | deportation | statutory construction | federal statute | Immigration and Naturalization, Immigration, Nationality, or Illegal Immigration Reform and Immigrant Responsibility Acts, as amended |
| 67 | *United States v. Juvenile Male* | Civil Rights | juveniles | Supreme Court supervision of lower federal or state courts or original jurisdiction | infrequently litigated statutes | infrequently litigated statutes |
| 66 | *Krupski v. Costa Crociere S. p. A.* | Judicial Power | judicial administration: untimely filing | statutory construction | court rules | Federal Rules of Civil Procedure, including Appellate Procedure, or relevant rules of a circuit court Judicial Code, and admiralty rules |

A2357

| R- | Case Name | Issue Area | Issue | Authority for Decision 1 & 2 | Legal Provisions Considered by the Court | Legal Provision Supplement |
|---|---|---|---|---|---|---|
| 65 | *Hamilton v. Lanning* | Economic Activity | bankruptcy (except in the context of priority of federal fiscal claims) | statutory construction | federal statute | Bankruptcy Code, Bankruptcy Act or Rules, or Bankruptcy Reform Act of 1978 |
| 64 | *Barber v. Thomas* | Criminal Procedure | statutory construction of criminal laws: sentencing guidelines | statutory construction | infrequently litigated statutes | infrequently litigated statutes |
| 63 | *Carr v. United States* | Criminal Procedure | statutory construction of criminal laws: miscellaneous | statutory construction | infrequently litigated statutes | infrequently litigated statutes |
| 62 | *Levin v. Commerce Energy, Inc.* | Federalism | federal preemption of state court jurisdiction | federal common law; statutory construction | infrequently litigated statutes | infrequently litigated statutes |
| 61 | *Berghuis v. Thompkins* | Criminal Procedure | Miranda warnings | judicial review (state level) | constitutional amendment | Fifth Amendment (Miranda warnings) |
| 60 | *Alabama v. North Carolina* | Economic Activity | natural resources - environmental protection | statutory construction | other | interstate compact |
| 59 | *Samantar v. Yousuf* | Economic Activity | liability, other than as in sufficiency of evidence, election of remedies, punitive damages | statutory construction | infrequently litigated statutes | infrequently litigated statutes |
| 58 | *Jefferson v. Upton* | Criminal Procedure | habeas corpus | statutory construction | federal statute | 28 U.S.C. §§ 2241–2255 (habeas corpus) |
| 56 | *United States v. Marcus* | Criminal Procedure | Federal Rules of Criminal Procedure | statutory construction; federal common law | court rules | Federal Rules of Criminal Procedure, or relevant rules of a circuit court |
| 55 | *Hardt v. Reliance Standard Life Ins. Co.* | Attorneys | attorneys' and governmental employees' or officials' fees or compensation or licenses | statutory construction; federal common law | federal statute | Employee Retirement Income Security Act, as amended |
| 54 | *United States v. O'Brien* | Criminal Procedure | statutory construction of criminal laws: firearms | statutory construction | infrequently litigated statutes | infrequently litigated statutes |

A2358

| R- | Case Name | Issue Area | Issue | Authority for Decision 1 & 2 | Legal Provisions Considered by the Court | Legal Provision Supplement |
|---|---|---|---|---|---|---|
| 53 | *Lewis v. City of Chicago* | Civil Rights | employment discrimination: on basis of race, age, religion, illegitimacy, national origin, or working conditions. | statutory construction | federal statute | Civil Rights Act of 1964 (Title VII) |
| 52 | *American Needle, Inc. v. Nat'l Football League* | Economic Activity | antitrust (except in the context of mergers and union antitrust) | statutory construction | federal statute | Sherman Act |
| 50 | *United States v. Comstock* | Federalism | national supremacy: miscellaneous | judicial review (national level) | Constitution | Art. I, § 8, ¶ 18 (Necessary and Proper Clause) |
| 49 | *Graham v. Florida* | Criminal Procedure | cruel and unusual punishment, non-death penalty | judicial review (state level) | constitutional amendment | Eighth Amendment (cruel and unusual punishment) |
| 48 | *Abbott v. Abbott* | Civil Rights | juveniles | statutory construction | other | treaty |
| 47 | *Hui v. Castaneda* | Economic Activity | liability, governmental: tort or contract actions by or against government or governmental officials other than defense of criminal actions brought under a civil rights action. | statutory construction | infrequently litigated statutes | infrequently litigated statutes |
| 46 | *Renico v. Lett* | Criminal Procedure | habeas corpus | statutory construction | federal statute | 28 U.S.C. §§ 2241–2255 (habeas corpus) |
| 45 | *Salazar v. Buono* | First Amendment | establishment of religion (other than as pertains to Parochiaid:) | judicial review (national level) | constitutional amendment | First Amendment (establishment of religion) |
| 44 | *Stolt-Nielsen S. A. v. AnimalFeeds Int'l Corp.* | Economic Activity | arbitration (other than as pertains to labor-management or employer-employee relations | statutory construction | infrequently litigated statutes | infrequently litigated statutes |

A2359

| R- | Case Name | Issue Area | Issue | Authority for Decision 1 & 2 | Legal Provisions Considered by the Court | Legal Provision Supplement |
|---|---|---|---|---|---|---|
| 43 | *Merck & Co. v. Reynolds* | Economic Activity | federal or state regulation of securities | statutory construction | federal statute | Securities Act of 1933, the Securities and Exchange Act of 1934, or the Williams Act |
| 42 | *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA* | Civil Rights | debtors' rights | statutory construction; federal common law | infrequently litigated statutes | infrequently litigated statutes |
| 41 | *Perdue v. Kenny A.* | Attorneys | attorneys' and governmental employees' or officials' fees or compensation or licenses | statutory construction | federal statute | Civil Rights Attorney's Fees Awards |
| 40 | *Conkright v. Frommert* | Economic Activity | Employee Retirement Income Security Act | statutory construction | federal statute | Employee Retirement Income Security Act, as amended |
| 39 | *United States v. Stevens* | First Amendment | First Amendment, miscellaneous | judicial review (national level) | infrequently litigated statutes | infrequently litigated statutes |
| 38 | *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.* | Judicial Power | Federal Rules of Civil Procedure including Supreme Court Rules, application of the Federal Rules of Evidence, Federal Rules of Appellate Procedure in civil litigation, Circuit Court Rules, and state rules and admiralty rules | statutory construction | court rules | Federal Rules of Civil Procedure, including Appellate Procedure, or relevant rules of a circuit court Judicial Code, and admiralty rules |
| 37 | *Padilla v. Kentucky* | Criminal Procedure | right to counsel | judicial review (state level) | constitutional amendment | Sixth Amendment (right to counsel) |
| 36 | *Jones v. Harris Assocs. L.P.* | Economic Activity | federal or state regulation of securities | statutory construction; federal common law | infrequently litigated statutes | infrequently litigated statutes |
| 35 | *Berghuis v. Smith* | Criminal Procedure | extra-legal jury influences: voir dire (not necessarily a criminal case) | judicial review (state level) | constitutional amendment | Sixth Amendment (other provisions) |

A2360

| R- | Case Name | Issue Area | Issue | Authority for Decision 1 & 2 | Legal Provisions Considered by the Court | Legal Provision Supplement |
|---|---|---|---|---|---|---|
| 34 | *Graham Cty. Soil & Water Conservation Dist. v. United States* ex rel. *Wilson* | Economic Activity | liability, governmental: tort or contract actions by or against government or governmental officials other than defense of criminal actions brought under a civil rights action. | statutory construction; statutory construction | federal statute | Federal False Claims Act |
| 33 | *United Student Aid Funds, Inc. v. Espinosa* | Economic Activity | bankruptcy (except in the context of priority of federal fiscal claims) | statutory construction; statutory construction | federal statute | Bankruptcy Code, Bankruptcy Act or Rules, or Bankruptcy Reform Act of 1978 |
| 32 | *Milavetz, Gallop & Milavetz, P. A. v. United States* | Attorneys | commercial speech, attorneys | statutory construction | federal statute | Bankruptcy Code, Bankruptcy Act or Rules, or Bankruptcy Reform Act of 1978 |
| 31 | *Bloate v. United States* | Criminal Procedure | speedy trial | statutory construction | infrequently litigated statutes | infrequently litigated statutes |
| 30 | *Mac's Shell Serv., Inc. v. Shell Oil Prods. Co.* | Economic Activity | antitrust (except in the context of mergers and union antitrust) | statutory construction | infrequently litigated statutes | infrequently litigated statutes |
| 29 | *Reed Elsevier, Inc. v. Muchnick* | Economic Activity | patents and copyrights: copyright | statutory construction | infrequently litigated statutes | infrequently litigated statutes |
| 28 | *Johnson v. United States* | Criminal Procedure | statutory construction of criminal laws: assault | statutory construction | infrequently litigated statutes | infrequently litigated statutes |
| 26 | *Maryland v. Shatzer* | Criminal Procedure | Miranda warnings | judicial review (state level) | constitutional amendment | Fifth Amendment (Miranda warnings) |
| 25 | *Hertz Corp. v. Friend* | Judicial Power | miscellaneous judicial power, especially diversity jurisdiction | statutory construction; statutory construction | infrequently litigated statutes | infrequently litigated statutes |
| 24 | *Florida v. Powell* | Criminal Procedure | Miranda warnings | judicial review (state level) | constitutional amendment | Fifth Amendment (Miranda warnings) |

A2361

| R- | Case Name | Issue Area | Issue | Authority for Decision 1 & 2 | Legal Provisions Considered by the Court | Legal Provision Supplement |
|---|---|---|---|---|---|---|
| 23 | *Thaler v. Haynes* | Criminal Procedure | extra-legal jury influences: voir dire (not necessarily a criminal case) | federal common law | no legal provision | no legal provision |
| 22 | *Wilkins v. Gaddy* | Civil Rights | liability, civil rights acts | statutory construction | federal statute | Reconstruction Civil Rights Acts (42 U.S.C. § 1983) |
| 20 | *Hemi Grp., LLC v. City of N.Y.* | Economic Activity | federal or state consumer protection: typically under the Truth in Lending; Food, Drug and Cosmetic; and Consumer Protection Credit Acts | statutory construction; federal common law | federal statute | Racketeer Influenced and Corrupt Organizations Act |
| 19 | *Citizens United v. Fed'l Election Comm'n* | First Amendment | campaign spending | judicial review (national level) | constitutional amendment | First Amendment (speech, press, and assembly) |
| 18 | *Wood v. Allen* | Criminal Procedure | habeas corpus | statutory construction | federal statute | 28 U.S.C. §§ 2241–2255 (habeas corpus) |
| 17 | *South Carolina v. North Carolina* | Interstate Relations | non-real property dispute between states | federal common law | no legal provision | no legal provision |
| 16 | *Kucana v. Holder* | Civil Rights | deportation | statutory construction | federal statute | Immigration and Naturalization, Immigration, Nationality, or Illegal Immigration Reform and Immigrant Responsibility Acts, as amended |
| 15 | *Wellons v. Hall* | Criminal Procedure | discovery and inspection (in the context of criminal litigation only, otherwise Freedom of Information Act and related federal or state statutes or regulations) | federal common law | no legal provision | no legal provision |

A2362

Case: 25-2153    Document: 156-6    Page: 112    Date Filed: 01/02/2026

Case 1:20-cv-00613-SB    Document 695-2    Filed 10/08/24    Page 426 of 431 PageID #: 1532!

| R- | Case Name | Issue Area | Issue | Authority for Decision 1 & 2 | Legal Provisions Considered by the Court | Legal Provision Supplement |
|---|---|---|---|---|---|---|
| 14 | *Presley v. Georgia* | Criminal Procedure | extra-legal jury influences: voir dire (not necessarily a criminal case) | judicial review (state level) | constitutional amendment | Sixth Amendment (other provisions) |
| 13 | *Hollingsworth v. Perry* | Judicial Power | judicial administration: jurisdiction or authority of federal district courts or territorial courts | statutory construction | infrequently litigated statutes | infrequently litigated statutes |
| 12 | *NRG Power Mktg., LLC v. Me. Pub. Util. Comm'n* | Economic Activity | federal and some few state regulation of public utilities regulation: electric power | statutory construction; federal common law | federal statute | federal power |
| 11 | *Smith v. Spisak* | Criminal Procedure | cruel and unusual punishment, death penalty | judicial review (state level); federal common law | constitutional amendment | Eighth Amendment (cruel and unusual punishment) |
| 10 | *McDaniel v. Brown* | Criminal Procedure | habeas corpus | federal common law | no legal provision | no legal provision |
| 9 | *Mohawk Indus., Inc. v. Carpenter* | Judicial Power | judicial administration: untimely filing | federal common law | infrequently litigated statutes | infrequently litigated statutes |
| 8 | *Alvarez v. Smith* | Judicial Power | mootness | judicial review (state level); federal common law | Constitution | Art. III, § 2, ¶ 1 (case or controversy requirement) |
| 7 | *Union Pac. R. Co. v. Locomotive Eng'rs & Trainmen Gen. Comm. of Adjustment, Cent. Region* | Unions | labor-management disputes: employee discharge | statutory construction | federal statute | Railway Labor |
| 6 | *Beard v. Kindler* | Criminal Procedure | habeas corpus | statutory construction | federal statute | 28 U.S.C. §§ 2241–2255 (habeas corpus) |
| 5 | *Michigan v. Fisher* | Criminal Procedure | search and seizure (other than as pertains to vehicles or Crime Control Act) | judicial review (state level); federal common law | constitutional amendment | Fourth Amendment |
| 4 | *Porter v. McCollum* | Criminal Procedure | habeas corpus | federal common law | no legal provision | no legal provision |
| 3 | *Wong v. Belmontes* | Civil Rights | indigents: inadequate representation by counsel | judicial review (state level) | constitutional amendment | Sixth Amendment (right to counsel) |

A2363

Case: 25-2153    Document: 156-6    Page: 113    Date Filed: 01/02/2026

ase 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 427 of 431 PageID #: 1532!

Vol. 109:4 [2017-27]        AN EMPIRICAL ANALYSIS OF LEXISNEXIS AND WEST HEADNOTES                629

| R- | Case Name | Issue Area | Issue | Authority for Decision 1 & 2 | Legal Provisions Considered by the Court | Legal Provision Supplement |
|---|---|---|---|---|---|---|
| 2 | *Bobby v. Van Hook* | Civil Rights | indigents: inadequate representation by counsel | judicial review (state level) | Constitution | Art. VI, § 2 (Supremacy Clause) |
| 1 | *Corcoran v. Leven-hagen* | Judicial Power | judicial administration: Supreme Court jurisdiction or authority on appeal or writ of error, from federal district courts or courts of appeals | Supreme Court supervision of lower federal or state courts or original jurisdiction | no legal provision | no legal provision |

A2364

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 428 of 431 PageID #: 153253

# EXHIBIT 102

A2365



A2366

9/30/2024 Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 430 of 431 PageID #: 153255



Contact us · Live chat · Training and support · Improve Westlaw Precision/Report an error · Transfer My Data · Pricing guide · Sign out
1-800-REF-ATTY (1-800-733-2889)

THOMSON REUTERS

Westlaw Precision. © 2024 Thomson Reuters   Accessibility · Privacy · Supplier terms

Thomson Reuters is not providing professional advice

A2367

Case 1:20-cv-00613-SB   Document 695-2   Filed 10/08/24   Page 431 of 431 PageID #: 153256

# EXHIBIT

## Redacted in their Entirety

A2368

Case 1:20-cv-00613-SB   Document 700-1   Filed 10/09/24   Page 13 of 101 PageID #: 153467

# EXHIBIT B

A2369

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| THOMSON REUTERS ENTERPRISE CENTRE GMBH and WEST PUBLISHING CORPORATION, | Case No. 1:20-cv-00613-SB |
| Plaintiffs, | |
| v. | |
| ROSS INTELLIGENCE INC., | |
| Defendant. | |

**REPORT OF DEFENDANTS' EXPERT
PROFESSOR RICHARD LEITER, J.D.**

1

A2370

## **TABLE OF CONTENTS**

I.      **INTRODUCTION**

II.     **QUALIFICATIONS**

III.    **MATERIALS CONSIDERED**

IV.     **SUMMARY OF OPINIONS**

V.      **THE FORMATION OF THE WEST KEY NUMBER AND HEADNOTE SYSTEM**

VI.     **THE INFLUENCE OF DIGESTS PREDATING WEST'S *THE AMERICAN DIGEST***

VII.    **THE ADOPTION OF THE INDEXING SYSTEM BY OTHER DIGESTS**

VIII.   **THE EVOLUTION OF THE WEST INDEX SYSTEM**

IX.     **THE EVOLUTION OF THE SUB-TOPICS**

2

A2371

## I.    INTRODUCTION

1.      My name is Professor Richard Leiter.  I have been retained by Defendant ROSS Intelligence, Inc. ("ROSS") to explore and opine on the origin and development of the West Digest and Key Number System.  Particularly, I was asked to explore and opine on how the system originated, where it originated from, how it came to be known as the "West" Digest and Key Number System, and how the system developed.  My hourly rate to prepare this report and to testify at deposition and trial is $400 per hour.  My compensation is not dependent upon the outcome of this case.  I have never been retained as an expert or testified in federal or state court as an expert.  The matters referenced in this report are based upon my personal knowledge, and if called upon as a witness, I could testify completely as to these matters.

## II.    QUALIFICATIONS

2.      I am the Director of the Schmid Law Library and Professor of Law at the University of Nebraska College of Law.  I have held this position since 2000.  From 1986 to 1988, I worked as a Public Services Librarian also at University of Nebraska College of Law.  Prior to these positions, I was the Associate Dean of Information Technology & Services and Professor of Law at Howard University School of Law.  I also held the position of Library Director and Associate Professor at Regent University School of Law.  I have held other positions as reflected in my curriculum vitae, attached hereto as Exhibit 1.

3.      Over my career, I have taught courses relating to legal research.  The class that I currently teach is called Advanced Legal Research.  Its purpose is to provide an advanced exposure to the tools of legal research: the nature of and philosophies surrounding organization and production of the materials themselves.  *See* Exhibit 1 for a list of additional classes that I have taught.

4.      I have written on issues pertaining to law libraries, legal research, and legal information technology.  My book, *National Survey of State Laws*, is in its eighth edition, and it was named An Outstanding Resource by the New York Public Library.  The seventh edition, published by WM S Hein & Co., Inc., was released in January 2016 along with a database that contains all

3

A2372

editions.  In 2003, it won the prestigious Andrews Bibliographical Award from the American Association of Law Libraries and has been cited three times by the United States Supreme Court. *See* Exhibit 1 for a list of my publications.

5.      I received a Bachelors of Arts Degree from the University of California, Santa Cruz.  I received a J.D. from Southwestern University School of Law.  I received a Masters in Library and Information Science from the University of Texas, Austin.

6.      I reserve the right to respond to any evidence or information Plaintiffs West Publishing Corporation and Thomson Reuters Enterprise Centre GmbH ("Plaintiffs") may present concerning the subject matter of this report or any additional information provided by Plaintiffs following this report.  It may be necessary for me to revise or supplement this report, or submit a supplemental or responsive report, based on any supplemental or responsive report of Plaintiffs, and I reserve the right to do so.

7.      I may be asked to present demonstrative evidence at trial, and I reserve the right to do so.

## I.      MATERIALS CONSIDERED

8.      In forming my opinions, I have considered, in addition to my knowledge and experience referenced in my Curriculum Vitae, documents provided to me in the course of this litigation, including pleadings, non-confidential documents produced by the parties, as well as publicly available information.  The materials which I considered in forming the opinions set forth in this report are cited directly in this report and are the documents listed in Exhibit 2.

## II.      SUMMARY OF OPINIONS

9.      I have concluded that the system we know today as the West Digest and Key Number system was developed by Benjamin Vaughan Abbott and Austin Abbott ("the Abbotts") in the early Nineteenth Century after extensive study of existing treatises, case reporters and digests.  The Abbotts intentionally avoided creating anything, but rather adopted one of a few different pre-existing systems of organizing the law which system was, in their view, a practical, utilitarian

4

LEITER EXPERT REPORT                                                CASE: 1:20-cv-00613-SB

A2373

method of indexing the law, as expressed at the time by the courts so that judicial opinions could be located.

10.    The Abbotts brother' system was expressed in two digests published in the first half of the Nineteenth Century, the New York Digest, and the American Digest.  Both were well regarded and well established.  Following the publication of the Abbott brother digests, the West Publishing Company began publishing its flagship publication, the National Reporter System that endeavored to publish comprehensively cases from every jurisdiction in the United States. John B. West, founder of West Publishing Company, realized the need for an index to the volumes of cases his company was publishing, and in the 1889 acquired the American Digest System, and systematically indexed and digested every existing case that West published using the index system that the Abbotts adopted.  In addition to adopting the Abbotts' index system, West proselytized that system seeking to have it adopted as a universal standard classification system. To that end, West published manuals containing, not only the classification system itself, but a detailed description of how it should be applied and used by every reporter, indexer, and digester of case law. In its own words, West offered the digest system to competitors and any publisher who endeavored to publish American Case Law.

### III.    THE FORMATION OF THE WEST KEY NUMBER AND HEADNOTE SYSTEM

11.    In 1826, Chancellor James Kent wrote that the indiscriminate publication of cases was leading the law into chaos.[1]  This was at a time when there were less than 1,000 volumes of the law published.  Why did he make this statement about the state of American common law?  It is a universal presumption that even though information is a critical resource for all of civilization, if it cannot be found, it is virtually worthless.[2]  At the time that Kent made this general complaint, the publication of case law followed the then tradition of our legal system that relied almost entirely

---

[1] James Kent, "Of Reports of Judicial Decisions," *in Commentaries on American Law Vol. 1* (1826).  In Lecture XXI, "Of Reports of Judicial Decisions," Kent makes a compelling case for restraint in the publication of judicial decisions, but also for a systematic indexing and organization of them.  *Id.* at 439.

[2] U.S. Nat'l. Comm'n on Libraries and Informational Science, *A Comprehensive Assessment of Public Information Dissemination, Final Report Vol. 1* at 1-18 *et seq.* (2001).

5

LEITER EXPERT REPORT                                              CASE: 1:20-cv-00613-SB

A2374

on individual lawyers, judges, and commercial publishers to publish the decisions of the courts. This method of publication functioned adequately at the time because the reporters (both individuals and publishers) were able to selectively report court opinions that were deemed worthy of inclusion in the reports and were able to edit opinions for clarity, annotate them when the editors felt it was necessary, or simply exclude opinions that the reporters considered aberrant, wrong, or poorly reasoned for one reason or another. Judges themselves could decide which of their opinions were to be published and which should be withheld because they may set a precedent that the judge did not agree with, or for any numbers of reasons simply did not want made public. Sometimes these were cases decided "on the facts, not on the law."

12.      In addition to this system of publication, there were the "reception statutes"[3] that influenced the publication of judicial opinions. At the beginning of United States' history, there was generally an aversion to using or relying on the cases of England, from whom the United States had recently won independence. Thus, many states passed what became known as "reception statutes," that instructed courts to use the opinions of American cases instead of English cases whenever possible. The reception statutes also encouraged states to publish the opinions of their courts in order to build a corpus of case law for lawyers to use that was distinct from English law. Interestingly, even though the reception statutes generally required states to publish their own case law, the states at the time were sparsely populated and there was relatively little litigation, which meant that there were not enough cases decided each year to accumulate hard bound volumes of reports. Important cases were variously reported in any number of privately published reporters and periodicals.[4] It was generally understood that the opinions of the courts were public record, but there was a dearth of official case reporters published at the time. The federal government eventually made

---

[3] Kent C. Olsen, Morris L. Cohen & Robert C. Berring, *How to Find the Law* at 17 (9th ed. 1989)

[4] *See generally* West Publishing Co., Preface to *The Federal Cases Comprising Cases Argued and Determined in the Circuit and District Courts of the United States*, Book 1 (1894) for a discussion of the process by which the cases for the set were compiled.

6

A2375

provisions for the publication of the opinions of the U.S. Supreme Court, but none was made for the publication of federal Circuit or District Courts.[5]

13.     During the early history of the United States, a number of private commercial publishers exploited the void and produced a number of reporters.[6] The federal courts relied on various individuals, including some who were informally designated by local courts, to compile and publish their reports which resulted in an informal set known as the U.S. Circuit Court of Appeals Reports. Throughout the Nineteenth Century, as a result of the reception statutes, the increasing population, and resulting commercial activity, the numbers of lawsuits that came before the courts increased. However, since these cases were primarily published in annual compilations, the indexing was primitive and usually confined to single volumes or small runs produced by the named reporter.[7] American Law Reports ("ALR")[8] was the first commercial venture that capitalized on the small volume of opinions by producing a national reporter that published leading cases from all jurisdictions, including ones that had national importance. The ALR began as a series of three reporters, collectively known as the Trinity Series, and was a multi-jurisdictional set of reporters that was able to serve the needs of lawyers and judges of the time by reporting cases in timely fashion with a system of access that facilitated case law research.[9]

---

[5] The reasons for the lack of publication of the Federal Courts was partly due to their lack of general jurisdiction through most of the Nineteenth Century. *See generally* Edwin Surrency, *History of the Federal Courts* (1st ed. 1987); *see also Review essay of The Federal Reporter published in* THE N.Y. TIMES, Oct. 2, 1880, at 8.

[6] Morris L. Cohen & Robert C. Berring, *How to Find the Law* at 20-22 (8th ed. 1983).

[7] Authors of the early nominatives developed special interests; thus, we find reporters called *Jones' Evidence Cases, Smith's Commerce Cases*, and *Rowe, Interesting Cases*, plus many more that include reporters on maritime law, family law, and other topics, each named after the special interests of their respective authors. The value of these reporters relied heavily upon the expertise of the reporter to select the most important, useful, and valuable cases from among the much larger volume of cases being decided by the judges. *See generally* Cohen, *supra* note 6 at "Chapters 3 & 4" for an excellent summary of the process. Comparatively, today, it is my understanding that West editors are trained in broad indexing across many topics and not have similar specialized subject matter expertise.

[8] In addition to ALR, there were others including William M. McMinney & N. Noyes Greene, *Annotated Cases American and English: Containing the Most Important Cases Selected from the Current American, Canadian, and English Report* (1906-1911); William M. McMinney & N. Noyes Greene, *Annotated Cases American and English: Containing the Most Important Cases Selected from the Current American, Canadian, and English Report* (1912-1918)); Lawyers' Co-operative Publishing Co., *The Lawyer's Reports Annotated (1888-1905)* Vol. 1-70 (1906).

[9] Access was facilitated by a combination of indexes and digests.

LEITER EXPERT REPORT                                   CASE: 1:20-cv-00613-SB

A2376

14.     Around the turn of the Twentieth Century, there were also a number of calls to streamline the numbers of opinions in the canon of case law.  The Restatements were the result of such an attempt.[10] A Restatement is an attempt to reduce settled case law in an area of the law to basic principles, with comments and illustrations, by the best minds in the legal profession.  Treatises, it can be argued, were an even earlier attempt to summarize and streamline access to the laws of the courts.   In England they made their appearance in the late 1700s in correlation with improvements in case reporting.[11]    In America, law evolved from Lord Blackstone's *Commentaries on the Laws of England* (1765-1770), to James Kent's *Commentaries on American Law* (1826-1830), to American treatises.   "Nobody ever again wrote a book like Kent's *Commentaries*, because nobody needed one.  Kent gave way to the treatises of Story and Greenleaf in his own day, and in the next century, to the mega treatises of Corbin, Powell, Scott, Wigmore, and Williston."[12]  The law moved from all-inclusive national treatises to specialized topics.  There was a tremendous need to simplify American case law with its many jurisdictions and specialties

---

[10] Thomas H. Reynolds , B. P. Crum, Royal A. Gunnison & John Mason Ross, *Report of the Special Committee on Reports and Digests*, 2 A.B.A. J. 618 (1916); "Minutes of the Nineteenth Annual Meeting,", *Association of American Law Schools* 48 at 117-119 (Dec. 29-31, 1921).  There were many other calls for simplification of the case law over the years; for example, the American Bar Association Committee on Classification and Restatement of the Law was organized at least by 1919.  *See* Urban A. Lavery, *Finding the Law: Legal Classification in America - 1880-1940*, 25 A.B.A. J. 383, 383 n. 2 (1939).

During the 1920s, the American Law Institute led this effort to simplify the case law.  The American Law Institute was organized on February 23rd, 1923. The organization meeting was attended by the Chief Justice of the United States Supreme Court, as well as other representatives of the Supreme Court, representatives of the United States Circuit Courts of Appeals, the highest courts of a majority of the States, the Association of American Law Schools, the American and State Bar Associations, and the National Conference of Commissioners on Uniform State Laws. The meeting was held in response to an invitation issued by a voluntary committee, of which Mr. Elihu Root was chairman, on the vote a Permanent Organization for the Improvement of the Law, the Committee having prepared a report recommending the establishment of an American Law Institute.  *See* Introduction to Restatement (First) of Contracts n. 2 (Am. L. Inst. 1932).

"The Committee on the Establishment of a Permanent Organization for the Improvement of the Law," led by Elihu Root, George Wickersham, and William Draper Lewis reported to the members of the legal profession that the "law is unnecessarily uncertain and complex," and as a result, there is a "general dissatisfaction with the administration of justice."  *See The Story of ALI*, AMERICAN LAW INSTITUTE, https://www.ali.org/about-ali/story-line/ (last visited Jun. 6, 2022).

[11]  See Richard A. Danner, *Oh, the Treatise!*, 111 MICH. L. REV. 821, 825 (2013).

[12] John H. Langbein, Chancellor Kent and the History of Legal Literature, 93 COLUM. L.REV. 547, 597 (1993).

8

LEITER EXPERT REPORT                                    CASE: 1:20-cv-00613-SB

A2377

for the legal profession.  By the 1920s, the idea of classifying and indexing (called "digesting") case law by legal topics came to predominate.[13]

15.    Neither the idea of digesting case law by legal topic nor the implementation of such indexing was created by West Publishing Company.  Instead, the genesis of the Westlaw legal topic digesting system is the direct result of the work of Benjamin and Austin Abbott, both New York attorneys.[14]  They "spent the leisure of two years in careful analysis of the best treatises on every branch of law, and drawing up a concise and sharply defined outline of what each title in the Digest should contain."[15]  What resulted from the Abbotts' work was the *New York Digest*[16] that classified and indexed cases by legal topic.

16.    To be sure, the Abbotts also did not create the indexing system represented in the *New York Digest*.  Others had already adopted or suggested this method as a means by which to organize case law.[17]  However, in their two years of analysis, it became clear to the Abbotts that the organizing principle for the cases had to be the text of the cases.  The Abbotts concluded that those treatises that indexed cases by legal topic and principle had the most utility in terms of what they wished to accomplish, which was to provide a means for lawyers, courts, and academics to locate judicial opinions.  Without an ability to locate cases, the common law, which is reliant on judicial opinions for its development, cannot be found, and therefore cannot be employed to influence and direct the development and course of the common law.

---

[13] Lavery, *supra* note 10 at 383 n. 3.  At the time of Lavery's Article, there were an estimated 1.75 million cases, with 25,000 cases being added every year.  It was estimated that the American Digest at that time contained seven million headnotes.  *Id.*

[14] *See* "Benjamin Vaughan Abbott," 3 GREEN BAG 1, 1 (1891) (Benjamin Vaugh Abbott spent a year at Harvard Law School and finished his education in New York in 1852).

[15] *Id.*

[16] Benjamin Vaughan Abbott & Austin Abbott, *Digest of New York Statutes and Reports from the Earliest Period to the Year 1860* (1864).

[17] *See* Section VI *infra*.

9

A2378

17.     The Abbotts followed up the *New York Digest* with the *United States Digest* in 1867 (covering the period of organization of the government to 1867).[18] This was followed by the *United States Digest* (the "New Series") (covering the period from the organization of the United States government to 1884).[19]

18.     In 1889, West Publishing Company acquired the *United States Digest*, "including the Abbotts' scheme of classification and arrangement."[20]   One of those who had worked with the Abbotts and who continued to work with West (and indeed headed West's classification system) was John Mallory.[21]

19.     With John Mallory at the head, and the Abbotts' classification system, West embarked on the effort of reclassifying all cases, in two digests produced at nearly the same time: *The Century Digest* (including cases from the "earliest times" to 1897)[22] and *The Decennial Digest* (from 1897 to 1906).[23] *The Century Digest* and *Decennial Digest* constituted the *American Digest System*.

20.     The following theorem evolved to help organize a "superstructure" of the classification system that would be used in West's new *Century Edition* and *First Decennial Digest*, originally formulated as:

> Law is the effort of society to protect PERSONS, including
> CORPORATIONS, in their rights and relations, to guard them in
> their PROPERTY, enforce their CONVEYANCES and
> CONTRACTS, and redress or punish their WRONGS  and

---

[18] Benjamin Vaughan Abbott & Austin Abbott, *Digest of the Reports of the United States Courts, and of the Acts of Congress, from the Organization of the Government to the Year* (1867-1880).

[19] Benjamin Vaughan Abbott, *Abbott's National Digest: A Digest of the Reports of the United States Courts* (1886).

[20] Frederick C. Hicks, *Materials and Methods of Legal Research* at 203 (1923).

[21] *Id.*

[22] West Publishing Co., *Century Edition of the American Digest: A Complete Digest of All Reported American Cases from the Earliest Times to 1896* (1897) ("*Century Digest*").

[23] West Publishing Co., *Decennial Edition of the American Digest: A Complete Digest of All Reported Cases from 1897 to 1906* (1908) ("*First Decennial Digest*").

10

A2379

CRIMES, by means of judicial REMEDIES, administered by the
civil arm of GOVERNMENT.[24]

21.    This theorem of these ten capitalized concepts was further reduced to seven categories: PERSONS, PROPERTY, CONTRACTS, TORTS, CRIMES, REMEDIES and GOVERNMENT (*i.e.*, all existing judicial opinions would fall under one of these seven categories).[25]  The seven categories were then split into 34 divisions, which were in turn divided into the 412 topics that constitute West's topic and key number system.[26]

22.    West undertook this effort for the same reasons the Abbotts created the *New York Digest*. Cases needed to be ordered using legal labels that a lawyer would employ, so that the judicial opinions could be found and utilized by lawyers, jurists, and legal scholars.  John Mallory, who led West's efforts to create its index was quite explicit on this point.

> The digester attempts to select for the alphabetically arranged titles
> such brief and appropriate designations, descriptive of the contents,
> *as will naturally occur to the lawyer* in search of the matters
> inserted thereunder; and the attempt to accomplish this difficult
> task is supplemented by the insertion of many titles containing
> simply cross-references to the titles preferred by the digester.[27]

23.    The utilitarianism that was Mallory's goal is captured in the following Mallory statement, "What is aimed at is not a classification satisfactory to an analytical jurist, but one useful to a

---

[24] West Publishing Co., *American Digest Classification Scheme: A Logical Analysis of the Law for the Use of Indexers and Digest Makers* at 1 (2nd ed. 1898)  This theorem and in-depth explanation are repeated in West Publishing Co., *American Digest Classification Scheme: A Logical Analysis of the Law for the Use of Indexers and Digest Makers at iii* (3rd ed. 1901); West Publishing Co., *American Digest Main Heads and Subdivisions of Classification Scheme: A Logical Analysis of the Law for the Use of Indexers and Digest Makers* at iii (4th ed. 1904); and West Publishing Co., *American Digest Main Heads of Classification Scheme: A Logical System of the Law for the Use of Indexers and Digest Makers* at iii (5th ed. 1916).

[25] *Id.*  Benjamin Vaughn Abbott came up with the theorem before 1880.  *See Correspondence*, 22 ALB. L. J. 179, 179, (1880) (letter to the editor by Benjamin V. Abbott titled "Uniform Indexes.").  "In formulating the American Digest Classification Scheme, the categories described [by Abbott] were taken as a basis."  John A. Mallory, *The Theory of the American Digest Classification Scheme*, 1 AM. L. SCH .REV. 184, 188 (1904). *See also* John Doyle, *WESTLAW and the American Digest Classification Scheme,* 84 LAW. LIBR. J. 229-32 (1992).

[26] *Id*. at 5-11. *See also* Hicks, *supra* note 20. Today, the topic and key number system has been reduced to 363 topics. *See* fn. 45, *infra*.

[27] Mallory, *supra* note 25 at 186 (emphasis added).

11

A2380

practicing lawyer."[28] The utilitarianism was, in fact, the *raison d'etre* for the adoption of the classification system, and the selling point for it to be adopted generally:

> The selection of titles for heads, and the distribution among them of the contents of the digest, are controlled chiefly by considerations of practical convenience and usage, arising from the nature and use of digests as books of reference, in which lawyers look for precedents relating to specific subjects under heads to which they have become accustomed. Scientific or technical accuracy in the use of terms as such titles, and logical division and arrangement of the matter, are subordinated to these practical considerations; and any philosophical analysis of the law would be inapplicable to a digest; the contents of which are mere fragments of the subject-matter, arranged under heads in alphabetical order. [29]

By comparison, any classification system that was based on a "creative" approach would necessarily not be utilitarian and would have minimal, if any, efficacy.

## IV.    THE INFLUENCE OF DIGEST PREDATING WEST'S *THE AMERICAN DIGEST*

24. West Publishing in its own publications acknowledged that its system of indexing and digesting was a widely used standard system.[30] The roots of the West indexing system are found by comparing prior digests and treatises to the West indexing system, even as it exists today.

25. Table No. 1 at Exhibit 3 measures the number of first-order subtopics for *contracts* and second-order subtopics for *contracts, performance* contained in each of the early digests and compared to West's topic and key number system today. When comparing the number of first-order sub topics and second-order sub topics, the structure of the modern digest as expressed in the Westlaw topic and key number system was laid down by the early Abbotts' Digests, at least as to the first-order subtopic under *contracts*.[31] Furthermore, taking sample second-order topics from *performance* under *contracts*, I find that all 35 of those second-order topics trace their origins to the earliest digests.[32]

---

[28] *Id.* at 185 (quoting *Wambaugh's Study of Cases*, §§ 115, 118).
[29] *American Digest Main Heads and Subdivisions*, *supra* note 24.
[30] *Id.*
[31] *See* Exhibit 3.
[32] *Id.*

12

A2381

26.     But the Abbotts' system is not the only place to find the West indexing system.  As noted, the Abbotts did not create their indexing system *tabula rasa*.  Casebooks and digests from the Abbotts era reflect similarities in concept and organization.

27.     West's contribution was to extend the existing indexing system to a wider number of cases, which proved a useful addition to locating legal opinions.

## V.     THE ADOPTION OF THE INDEXING SYSTEM BY OTHER DIGESTS

28.     What West did was take a pre-existing system and expand it over a broader reach of case law.  Its contribution was to encompass "all" United States judicial opinions.  Indeed, that was one of the central keys to West's success.  Prior to its acquisition of the Abbott indexing system, West collected cases and sold in reporters a greater volume than any of its competitors, and therefore the index it acquired from the Abbotts naturally provided a means of application to a greater number of judicial opinions.  West also had a comparative advantage over other digest producers (such as those that only provided an index) as West already had collected a large body of cases for publication in the National Reporter System.[33]  West could market digests at what would be a loss for other digest companies who were only producing digests and not case reporters.[34]

29.     Following the publication of the *American Digest*, West systematically marketed its index to lawyers, the ABA, and other digest makers and indexers.  West's stated goal was to obtain universal adoption of what West now calls its proprietary classification system.  To that end, West marketed its Digest to the ABA in 1897.  The next year, at its next annual meeting, the ABA publicly endorsed the system and encouraged all indexers and digesters to use this same system, emphasizing the utilitarianism of the system.[35]

---

[33] William W. Marvin, *West Publishing Company: Origins, Growth, Leadership* at 69 (1969).
[34] *Id.*
[35] *Id.*

13

LEITER EXPERT REPORT                                    CASE: 1:20-cv-00613-SB

A2382

30.    And that is just what happened.  In West's own words, "innumerable smaller indexes and digests" used West's classification system.[36]  Indeed, West's own manual explaining its system is subtitled, "For the Use of Indexers and Digest Makers,"[37] and encourages others to take up its system.  According to West, this would promote uniformity for American attorneys across the legal research process.  Indeed, Bancroft-Whitney used the West classification system in its *1920-1923 California Digest Supplement*.

> We have had over a hundred requests for it, and it has been formally adopted by the Lawyers' Co-operative Publishing Co. and by the Bancroft-Whitney Co. for use in the digests to be hereafter published by them.  It has been followed, with credit duly given, in a number of late State Digests, and has been taken as a basis for the indexes of the current State Reports in a number of states.  This wide-spread use will tend rapidly to establish this system as the standard in this country-a position which its intrinsic excellence well deserves.[38]

*31.*    For example, for *contracts* the organization and concepts of Bancroft-Whitney's supplement are identical to *West's First Decennial Digest.* [39]

---

[36] *Id.* .

[37] *American Digest, Main Heads of Classification*, *supra* note 24.

[38] *Id.*

[39] Comparison of "Contracts" from Bancroft, *California Digest of Official Report (Series 3 & 4)* (revised in 1997) to *First Decennial Digest*, *supra* note 23.

14

A2383



**Figure No. 1: Comparison of Contracts Section of the *First Decennial Digest* and the Bancroft-Whitney *California Digest Supplement***

32.    In fact, West boasted of Bancroft-Whitney's utilization of the West classification system, which Bancroft-Whitney adopted by at least 1906.[40]  It was still in use when West Publishing Group bought Bancroft-Whitney, in 1996.[41]

33.    Bancroft-Whitney did not stand alone.  West had competitors, and some of them persisted for nearly a century.  They too adopted the West index system [42] as did innumerable smaller digests

---

[40] *See First Decennial Digest*, *supra* note 23; *see also* Figure 1.
[41] *See Chodos v. West Publishing Co*, 292 F.3d 992,1994 (9th Cir. 2002).
[42] *See* Michael O. Eshleman, A History of the Digests, 110 LAW LIBR. J. 235,245, comparing the *General Digest*, published by the Lawyers' Co-operative Publishing Company, to the *United States Digest*.

15

A2384

A2385

and indexes, and various states such as New Jersey, Massachusetts, Missouri, Kentucky, Washington, California, Virginia and West Virginia, and Illinois.[43]   Thus, West freely allowed competitors to use the indexing system.  In fact, in the introduction to the Fourth Edition of the *American Digest*, West specifically notes that other publishers and jurisdictions have "generally adopted" the West indexing system.[44]

## VI.   THE EVOLUTION OF THE WEST INDEX SYSTEM

34.     The West index (or categorization) system, now known as the topic and key number system, had 412 top-level topics at its comprehensive digest level inception with the *Century Digest*.  The fifty volumes that comprise the *Century Digest* were published between 1897 to 1904.  As of the date of the report, there are now only 363 top-level topics.[45]   Over seventy-six percent (76%) of the 412 top-level topics of the *Century Digest* are either exactly the same as or only slightly renamed from the 363 in use today.[46]

---

[43]  *First Decennial Digest*, *supra* note 23 at vii.

[44] *Id.*

[45] *See* Table 2 at Exhibit 4 (showing evolution of topics from 1892 to present and identifying when new top level topic were added, discontinued, renamed, or revised); Although Westlaw currently lists top-level topics 1-414 on its website, not every number is accounted for (*e.g.*, there is no top-level topic number 3, 7, 19, to name a few).  By counting the number of key numbers listed, I determined that there are currently 363 topics used by Westlaw.

[46] *Id.*; *see also* Figure 2.

16



**Figure No. 2: Comparison of Topics from the *Century Digest* and Topics from Present Day**

35.     The overwhelming majority of top-level topics used in the *Century Digest,* are still in use today without having changed a single word or letter.  Specifically, 282 or 68% (two-thirds) remain unchanged.[47]  This includes common doctrinal topics taught as law school courses (Contracts, Criminal Law, Property, and Torts), fact specific topics (Bridges, Fish, Pilots, and Sunday), as well as more obscure legal doctrines and procedures (Audita Querela, Detinue, Lis Pendens, and Supersedeas).[48]

36.     Furthermore, thirty-two (32) of the original *Centennial Digest* top-level topics, or another 8% of the original 412, are still in existence today and have been only slightly renamed because the law has changed as to how these concepts are referenced.[49]  For instance: Master and Servant

---

[47] See Table 3 of Exhibit 5 (showing *Century Digest* Topics and their present-day equivalent).
[48] *Id.*
[49] Table 2 at Exhibit 4, *supra* note 45.

17

LEITER EXPERT REPORT                                                    CASE: 1:20-cv-00613-SB

A2386

became Principle and Agent; War changed to War and National Defense and then again to War and National Emergency; and Intoxicating Liquors became Alcoholic Beverages.[50]  Additionally, ninety-eight (98) or 24% of the 412 top-level topics of the *Century Digest* were subsequently merged into other top-level topics.  For instance, Abduction, Affray, Blasphemy, Common Scold, Dueling, Embracery, Fornication, Miscegenation, Piracy, and Prize Fighting all were subordinated under Criminal Law.[51]

37.    There are a few incidences in which top-level digest topics have been added because Congress or the States adopted new statutory regimes.  In other words, new laws created rights, criminal penalties, and/or causes of action that did not exist previously.  Examples include Racketeer Influenced and Corrupt Organizations (RICO), Unemployment Compensation, and Workmen's Compensation.[52]

38.    Like with the original topics, the indexing of these new legal regimes followed the same utilitarian approach because one cannot veer from established legal concepts when indexing the cases.  Classifying cases related to RICO, unemployment compensation, or workmen's compensation without utilizing the standard words that reflect these concepts would render the exercise futile.

## VII.    THE EVOLUTION OF THE SUB-TOPICS

39.    According to West, below the 363 top-level topics currently in use, there are over 100,000 sub-topics.[53]  Over time, the sub-topics have expanded.  Daniel Dabney, West's chief taxonomist, explains how the system expands in a 2013 video: when the increase in cases on a topic start

---

[50] *Id.*
[51] Table 3 at Exhibit 5, *supra* note 47.
[52] Table 2 at Exhibit 4, *supra* note 45.
[53] *West's Analysis of American Law 2021 Edition: Guide to the American Digest System* (2021).

18

A2387

making the system unwieldy, new lines, or even an amalgamation of several areas into a new topic, are added.[54]  The process is utilitarian, and driven by the changes in the cases themselves.

40.    To understand this evolution,, one can look at one West topic, "99 Copyright and Intellectual Property."[55]

41.    The phrase, "In general," occurs the most frequently as a key number as it is the mechanism to allow non-postable lines (not capable of receiving headnote treatment) to become postable (capable of receiving headnote treatment).[56]  For instance, the topic string 99 Copyrights and Intellectual Property > XVI. Actions and Judicial Proceedings k931-k1080 > (C) Evidence k991-k1060 > 3 Weight and sufficiency k1031-k1060, does not become postable and does not receive headnote treatment until the next level of the hierarchy is added: 99 Copyrights and Intellectual Property > XVI. Actions and Judicial Proceedings k931-k1080 > (C) Evidence k991-k1060 > 3 Weight and sufficiency k1031-k1060 > k1031 In general.

42.    When this occurs, the topic string is almost always followed with greater hierarchical depth such as: 99 Copyrights and Intellectual Property > XVI. Actions and Judicial Proceedings k931-k1080 > (C) Evidence k991-k1060 > 3 Weight and sufficiency k1031-k1060 > k1032 Validity, ownership, and duration of rights.

43.    The topic "Copyrights" has expanded from 85 lines (lines refer to the number of lines of indexing and each line is counted even if it is not original or unique) at its inception in 1899 to 773 lines at present.  This is an increase by 9 times.  However, this increase in specificity is tempered

---

[54] *Video: Dan Dabney on Reclassifying Headnotes in the Key Number System*, THOMSON REUTERS \ LEGAL CURRENT, https://www.legalcurrent.com/dan-dabney-on-reclassifying-headnotes-in-the-key-number-system/ (last visited Mar. 24, 2022).

[55] The Topic Name is misleading as the other commonly included intellectual property topics, Patents and Trademarks, are each their own top-level West topics.

[56] Daniel Dabney, former chief taxonomist at West, is on the record stating that there are 18,754 "structural lines in the hierarchy" that are not postable.  Daniel P. Dabney, *The Universe of Thinkable Thoughts: Literary Warrant and West's Key Number System*, 99 Law Libr. J 229, 236 ¶ 33 (In 2007, the key number system had "109,183 lines, of which 90,429 are postable, and the remaining 18,754 are structural lines in the hierarchy.").  This means that there must be a similar amount of "In general" key numbers embedded within the current 363 top-level topics of the West topic and key number system.

19

A2388

by an interesting phenomenon of reuse, repetition, and interplay between doctrinal, procedural, and fact-based topics.  Often the exact same concepts (whether factual, doctrinal, or procedural) are reused in slightly different contexts.  For instance, we see the same, eleven specific topical instantiations applied to numerous different contexts within the topic, Copyrights and Intellectual Property:

> In general
> Books and other literary works
> Musical works and accompanying words
> Dramatic works and accompanying music
> Choreographic works and pantomimes
> Pictorial, graphic, and sculptural works
> Clothes, fabrics, and jewelry; fashion designs
> Motion pictures and other audiovisual works
> Sound recordings and phonorecords
> Architectural works
> Computer-related works

44.     These eleven topics are applied to and repeated in different contexts such as:

99 Copyrights and Intellectual Property > II. Protected Subject Matter > (B) Copyrightable Subject Matter > 2 Particular Subject Matter as Copyrightable (k251-k310)

> In general (k251)
> Books and other literary works (k252)
> Musical works and accompanying words (k256)
> Dramatic works and accompanying music (k257)
> Choreographic works and pantomimes (k260)
> Pictorial, graphic, and sculptural works (k261)
> Clothes, fabrics, and jewelry; fashion designs (k269)
> Motion pictures and other audiovisual works (k270)
> Sound recordings and phonorecords (k275)
> Architectural works (k278)
> Computer-related works (k296)

99 Copyrights and Intellectual Property > VII. Violation of Rights > (B) Copyright Infringement > 2 Infringement of Particular Works (k571-k610)

> In general (k571)
> Books and other literary works (k572)
> Musical works and accompanying words (k578)
> Dramatic works and accompanying music (k584)
> Choreographic works and pantomimes (k585)
> Pictorial, graphic, and sculptural works (k586)

20

A2389

Clothes, fabrics, and jewelry; fashion designs (k592)
Motion pictures and other audiovisual works (k593)
Sound recordings and phonorecords (k599)
Architectural works (k600)
Computer-related works (k601)

99 Copyrights and Intellectual Property > VIII. Defenses and Permitted Uses > (C) Fair Use (k741-k780)

In general (k755)
Books and other literary works (k756)
Musical works and accompanying words (k757)
Dramatic works and accompanying music (k758)
Choreographic works and pantomimes (k759)
Pictorial, graphic, and sculptural works (k760)
Clothes, fabrics, and jewelry; fashion designs (k761)
Motion pictures and other audiovisual works (k762)
Sound recordings and phonorecords (k763)
Architectural works (k764)
Computer-related works (k765)

99 Copyrights and Intellectual Property > XVI. Actions and Judicial Proceedings > (C) Evidence > 3 Weight & Sufficiency (k1031-k1060) > 1042 Violations of Rights > 1044 – Copyright Infringement >  – (3) Infringement of particular works

In general (k1044(–4))
Books and other literary works (k1044(–5))
Musical works and accompanying words (k1044(–6))
Dramatic works and accompanying music (k1044(–7))
Choreographic works and pantomimes (k1044(–8))
Pictorial, graphic, and sculptural works (k1044(–9))
Clothes, fabrics, and jewelry; fashion designs (k1044(–10))
Motion pictures and other audiovisual works (k1044(–11))
Sound recordings and phonorecords ((k1044(–12))
Architectural works (k1044(–13))
Computer-related works  ((k1044(–14))

45.     While currently, the topic and key number system has about 90,500 of lines capable of receiving headnote assignments, much of this is repetitive.  For instance, a procedural/evidentiary

21

A2390

topic such as "Presumptions, inferences, and burden of proof" may be found repeated in numerous different contexts:

- 17 Adoption > V. Evidence, k321-k340 > k322 **Presumptions, inferences, and burden of proof**

- 78 Civil Rights > III. Federal Remedies in General, k1301-k1500 > k1400 **Presumptions, inferences, and burdens of proof.**

- 78 Civil Rights > IV. Remedies Under Federal Employment Discrimination Statutes, k1501-k1700 > k1534 **Presumptions, inferences, and burdens of proof.**

- 92 Constitutional Law > XXVII. Due Process, k3840-k4849 > (H) Criminal Law, k4500-k4849 > 5. Evidence and Witnesses, k4650-k4699 > k4653 **Presumptions, inferences, and burden of proof**

- 110 Criminal Law > XVII. Evidence, k304-k572 > (B) **Presumptions and Inferences**, k305-k325; (C) **Burden of Proof**, k326-k336.

- 343 Sales > XI Actions, k2401-k2900 > (C) **Presumptions, Inferences, and Burden of Proof**, k2601-k2660.

46.     The evolution of the sub-topics, like the evolution and expansion of the top-level topics is driven by utilitarian functionality.  As the number of cases within a sub-topic increase, there is a need to expand the number of sub-topics to prevent the indexing system from becoming too unwieldly.  Important to this expansion is that the expansion is done in a logical way and utilitarian in nature.  In fact, because utilitarianism is necessary, any attempt to expand the number of sub-topics in a "creative" way would negate the purpose of the indexing system—using the terminology used by the cases so that users of the index can find the relevant cases.

Executed at Lincoln, Nebraska, on this 1st day of August, 2022.

_____
Professor Richard A. Leiter

22

A2391

Case 1:20-cv-00613-SB   Document 701-1   Filed 10/09/24   Page 3 of 56 PageID #: 153576

# EXHIBIT B

A2392

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

A2393

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| THOMSON REUTERS ENTERPRISE CENTRE GMBH and WEST PUBLISHING CORPORATION, | ) ) ) ) | |
| Plaintiffs/Counterdefendants, | ) ) ) | C.A. No. 20-613-SB **JURY TRIAL DEMANDED** |
| v. | ) ) | **PUBLIC VERSION** |
| ROSS INTELLIGENCE INC., | ) ) | |
| Defendant/Counterclaimant. | ) | |

### DECLARATION OF JIMOH OVBIAGELE IN SUPPORT OF DEFENDANT/COUNTERCLAIMANT ROSS INTELLIGENCE INC.'S MOTION FOR SUMMARY JUDGMENT ON ITS AFFIRMATIVE DEFENSE OF FAIR USE

OF COUNSEL:

Warrington S. Parker III
Joachim B. Steinberg
Jacob Canter
CROWELL & MORING LLP
3 Embarcadero Ctr., 26th Floor
San Francisco, CA 94111
Tel: (415) 986-2800

Keith J. Harrison
Crinesha B. Berry
CROWELL & MORING LLP
1001 Pennsylvania Avenue NW
Washington, DC 20004
Tel: (202) 624-2500

Dated: October 1, 2024
11790067 / 20516.00001

Public Version Dated: October 9, 2024

David E. Moore (#3983)
Bindu A. Palapura (#5370)
Andrew L. Brown (#6766)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE  19801
Tel:  (302) 984-6000
dmoore@potteranderson.com
bpalapura@potteranderson.com
abrown@potteranderson.com

*Attorneys for Defendant/Counterclaimant*
*ROSS Intelligence, Inc.*

A2394

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| THOMSON REUTERS ENTERPRISE CENTRE GMBH and WEST PUBLISHING CORPORATION, | ) ) ) ) | |
| Plaintiffs/Counterdefendants, | ) ) | C.A. No. 20-613-SB |
| v. | ) ) ) | **PUBLIC VERSION** |
| ROSS INTELLIGENCE INC., | ) ) | |
| Defendant/Counterclaimant. | ) | |

### DECLARATION OF JIMOH OVBIAGELE IN SUPPORT OF DEFENDANT/COUNTERCLAIMANT ROSS INTELLIGENCE INC.'S MOTION FOR SUMMARY JUDGMENT ON ITS AFFIRMATIVE DEFENSE OF FAIR USE

I, Jimoh Ovbiagele, declare as follows:

1. I submit this Declaration in Support of Defendant/Counterclaimant ROSS Intelligence Inc.'s ("ROSS") Motion for Summary Judgment on Its Affirmative Defense of Fair Use. I have personal knowledge of the facts set forth below and, if called to testify, I could and would testify competently to the below.

2. I was the Chief Technology Officer and co-founder of ROSS until December 2020, and currently am the Board Director of ROSS. I was responsible for the creation of the ROSS legal search engine. My current employment is as the founder and Chief Executive Officer of Bench IQ.

3. For purposes of this declaration, the opinions I have reached are based on my education, experience, training testing, and tenure at ROSS.

### I. The ROSS Platform

4. ROSS's legal search engine was trained on legal questions and judicial case-excerpt answers to these questions, and ratings of the relevance of the answers to the questions all

A2395

A2396

contained in memorandum. ROSS's legal search engine was not trained on and could not make use of any pre-existing or external system for organizing or indexing cases or portions of cases.

5.      ROSS's legal research platform does not capture or retain the actual expression of text from the questions and answers from its training data. ROSS's ranking algorithm does not ingest or create any (1) categorization of cases by subject matter or legal practice area, (2) summarization of case law or judicial opinions, or (3) organizational scheme of cases. Rather, the ranking algorithm learned the relationship between queries and answers, irrespective of the particular legal content of individual queries and answers. ROSS's legal search engine took the language of judicial opinions and turned them into statistical measurements for the purpose of creating a legal search engine free of human intermediated content. ROSS built the tool so that the search results were driven by a machine-based analysis of the text.

6.      ██████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████

7.      ROSS collected this training data through a process that began with the preparation by third-party contract attorneys of memoranda comprising legal questions, judicial case-excerpt answers to these questions, and ratings of the relevance of the answers to the questions. ███████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
█████████████████████████████████████.

2

8. █████████████████████████████████████████
████████████████████████████████████████

9. ████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
███████████████████████████.

10. ███████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
███████████████████████████.

11. ███████████████████████████████████████
████████████████████████████████████████
███████.

12. ███████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████.

13. ███████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

A2397

███████████████████████████████████████████████████████████

████████████████████████████

## II.   Content Added to ROSS

14.   The ROSS judicial documents were obtained from a company called Casemaker, created and maintained independently of the ranking process. ██████████████████████████

████████████████████  The judicial opinions from Casemaker included no copyrights from Plaintiffs, including without limitation no headnotes, key numbers, synopses, any information reflecting or representing the key number system, any information reflecting links of any kind between headnotes and case passages, or anything else that covers what Plaintiffs have called in this case the "Westlaw Content."

15.   █████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████

16.   █████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████

17.   █████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████

18.   █████████████████████████████████████████████████

████████████████████████████████████████████████████████

A2398

A2399

19.

████████████████████████████████████████████████

5



A2400



A2401



8

A2402



20.     LegalEase was directed to include four to six question-answer pairs on each of the memos, and LegalEase in fact did this based on the many memos that I have reviewed.

21.     The memos that ROSS received from LegalEase were word documents. Most of the filenames for these word documents did not contain a legal topic. The few to the contrary contained only a generic legal topic that would be seen commonly in documents used in the practice of law.

22.

A2403

23. ████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████.

24. ████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████.

25. ████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████.

26. ████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████.

A2404

27.

28.

29.

A2405

███████████████████████████████████████████

████████████████

30.    The ROSS ranking algorithm required a training set containing questions and answers that were representative of the range of language and expressions that users of the ROSS system could be expected to pose to the system. The purpose of developing a large training set was to ensure that the ranking algorithm was trained on better and worst answers to a full range of representative question types. Questions in different areas of law are often expressed using different language, so this diversity of language and expressions can be achieved by developing questions for diverse cases, as was done by ROSS. It is unnecessary for these cases to be representative of the underlying substantive law since the ranking algorithm can make use of only the linguistic relationship between questions and answers, not their legal content. The ordering of such questions and answers did not matter. This is particularly the case given that the ROSS system was designed to rely on natural language search and not to rely on any structured organization of judicial opinions or associated taxonomies.

31.    West key numbers were not and could not be used in training ROSS's ranking model because every one of the features used by the ROSS ranking model is derived solely from the text of a question and a candidate answer. The key number system also could not be used in training ROSS's ranking model for the same reason.

32.    Moreover, through the training process, any system or organization representing all or a portion of the key number system would have been eliminated at the following steps: when certain question-answer pairs were discarded, when a random selection of 80% of the remaining question-answer pairs were chosen for training, when the question-answer pairs were featurized, when the numerical features were used to train.

A2406

33.    Neither the Bulk Memos nor the ROSS source code used for training the ROSS ranking model used any of the following elements as data for training the ranking model: West key numbers, topics, West headnotes themselves, case synopses, components or parts of the selection, organization, and arrangement of the West key number system, hyperlinks or relationships between headnotes and locations in judicial opinions, hyperlinks or relationships between West key numbers and headnotes, or the entirety of particular judicial opinions including any purported editorial enhancements contained in such opinions. Further, none of this information was used in pre-processing of data relating to search queries or in any other data processing or software component in ROSS's production platform or source code.

34.    I have no personal knowledge of how LegalEase created the memos, though I know that Plaintiffs believed they used Westlaw. To the extent LegalEase copied any of the above Westlaw Content when creating the memos, it would have been solely for the purpose of creating the memos that ROSS used.

35.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮

## III.    The Classifier Project

36.    ROSS completed experiments with its technology to see whether and how it could improve. One type of technology that ROSS experimented on was technology that could be used to classify cases into different categories, such as civil procedure or bankruptcy, before being search.

37.    As part of ROSS's experimentation with its classifier technology, ROSS engaged LegalEase to review a body of cases provided by ROSS and to confirm the assignment of those

A2407

cases to one of the 38 legal topics on ROSS's list of topics. The list of 38 legal topics were the following: (1) Administrative; (2) Admiralty & Maritime; (3) Antitrust; (4) Banking & Finance; (5) Bankruptcy; (6) Business & Corporate; (7) Civil Procedure; (8) Civil Rights; (9) Commercial; (10) Communications; (11) Constitutional; (12) Construction; (13) Criminal; (14) Employee Benefits & Executive Compensation; (15) Energy; (16) Entertainment & Sports; (17) Environment; (18) Estate Planning; (19) Family; (20) Government; (21) Health; (22) Immigration; (23) Insurance; (24) Intellectual Property; (25) International Trade; (26) Labor & Employment; (27) Medical; (28) Military; (29) Municipal; (30) Native American; (31) Pensions & Retirement Benefits; (32) Privacy & Data Security; (33) Product Liability; (34) Real Property; (35) Securities; (36) Tax; (37) Technology; (38) Transportation. ROSS chose to use this list of 38 legal topics because, as I understand, they represent how practice areas in the United States legal system are generally classified. Attached as Exhibits A and B are true and correct copies of two documents reflecting these topics. *See* Exhibit A (ROSS-003452875) at 7-8 (█████████████████ ███████████ ); Exhibit B (ROSS-010128683) (███████████████████ ██████████████████████████████ ).

38. LegalEase provided this assistance from only December 18, 2017, to December 27, 2017. During this time, LegalEase contract attorneys reviewed the cases and would indicate whether the case was labeled correctly. ████████████████████████████ ██████████████

39. As part of this process, LegalEase also provided to ROSS 500 judicial opinions via email. ROSS did not want these and we rejected them. These 500 cases were not used as part of any of ROSS's experiments and were also never used for training our tool.

14

A2408

A2409

40.     The experiments that we ran at ROSS on regarding classification technology did not produce results that led to the deployment of any different or new technology. Because of this, ROSS did not pursue any classification projects for the tool and no classification technology made it into the ROSS search tool.

## IV.     The Business of ROSS

41.     ROSS licensed its legal research platform to users. I co-founded ROSS because I know that the market for legal services needs to improve, and I believe that making legal research cheaper, easier, and faster can be one way to accomplish this.

42.      I know that the market for legal services needs to improve through first-hand knowledge. My mother wanted to divorce my father when I was younger, but she was unable to pay a lawyer to do so.

43.     ROSS used the memos to create its legal search tool so that it could license this tool to the public. We retained LegalEase to complete one step in this process. Our statement of work for LegalEase to complete this project, and all of our communications with LegalEase, are consistent that the goal of this project was to create the memos.

44.     ROSS did not use the memos for any other purpose. ROSS did not sell or license the memos to any party for any purpose, and ROSS never attempted to do this either. ROSS also never sold or had the intent to sell AI training data.

## V.     Documents

45.     Attached to this declaration as **Exhibit 3** is a true and correct copy of a document ROSS produced in this litigation that bears the Bates No. ROSS-010129852. This is a true and correct copy of an article written about me and authored by Stephanie Francis Ward and that was posted on September 1, 2016.

15

46.     Attached hereto as **Exhibit 5** is a true and correct copy of a document ROSS produced in this litigation that bears the Bates No. ROSS-001397429. This is a true and correct copy of an article written about ROSS and published on the BBC website on May 17, 2016.

47.     Attached hereto as **Exhibit 6** is a true and correct copy of a document ROSS produced in this litigation that bears the Bates No. ROSS-023175123. This is a true and correct copy of marketing material that ROSS created.

48.     Attached hereto as **Exhibit 10** is a true and correct copy of a document ROSS produced in this litigation that bears the Bates No. ROSS-003487253. This is a true and correct copy of a report prepared by the American Bar Association in 2016 about the future of legal services in the United States.

49.     Attached hereto as **Exhibit 11** is a true and correct copy of a document ROSS produced in this litigation that bears the Bates No. ROSS-023179081. ███████████████ ████████████████████████████████ ROSS designated this document as confidential.

50.     Attached hereto as **Exhibit 12** is a true and correct copy of a document ROSS produced in this litigation that bears the Bates No. ROSS-003515560. This is a true and correct copy of marketing material prepared by ROSS.

51.     Attached hereto as **Exhibit 13** is a true and correct copy of a document ROSS produced in this litigation that bears the Bates No. ROSS-009542437. This is a true and correct copy of an email describing for customers how to use the ROSS platform and what the platform does.

16

A2410

52.     Attached hereto as **Exhibit 49** is a true and correct copy of a document ROSS produced in this litigation that bears the Bates No. ROSS-000000001. This is a true and correct copy of a memo that ROSS received from LegalEase as part of the Bulk Memo Project.

53.     Attached hereto as **Exhibit 61** is a true and correct copy of a document ROSS produced in this litigation that bears the Bates No. ROSS-010128683. ███████████

████████████████████████████████████████████

████████████████████████████████     This document has been designated confidential.

54.     Attached hereto as **Exhibit 63** is a true and correct copy of a document ROSS produced in this litigation that bears the Bates No. ROSS-000197949. ███████████

████████████████████████████████     The document has been designated confidential.

55.     Attached hereto as **Exhibit 64** is a true and correct copy of a document ROSS produced in this litigation that bears the Bates No. ROSS-009721314. ███████████

████████████████████████████████     Inc. The document has been designated confidential.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed in Toronto, Canada, on the 1st of October, 2024.

_____/s/ Jimoh Ovbiagele_____
Jimoh Ovbiagele

17

A2411

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| THOMSON REUTERS ENTERPRISE CENTRE GMBH and WEST PUBLISHING CORPORATION, | ) ) ) | |
| | ) | C.A. No. 20-613-SB |
| Plaintiffs/Counterdefendants, | ) | |
| | ) | |
| v. | ) | **PUBLIC VERSION** |
| | ) | |
| ROSS INTELLIGENCE INC., | ) | |
| | ) | |
| Defendant/Counterclaimant. | ) | |

**DECLARATION OF JIMOH OVBIAGELE IN SUPPORT OF DEFENDANT ROSS
INTELLIGENCE INC.'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS'
CLAIMS OF COPYRIGHT INFRINGEMENT**

I, Jimoh Ovbiagele, declare as follows:

1. I submit this Declaration in Support of Defendant/Counterclaimant ROSS Intelligence Inc.'s ("ROSS") Motion for Summary Judgment Plaintiffs' claims of copyright infringement. I have personal knowledge of the facts set forth below and, if called to testify, I could and would testify competently to the below.

2. I was the Chief Technology Officer and co-founder of ROSS until December 2020, and currently am the Board Director of ROSS. I was responsible for the creation of the ROSS legal search engine. My current employment is as the founder and Chief Executive Officer of Bench IQ.

3. For purposes of this declaration, what is set forth below is based on my personal knowledge, my education, experience, training testing, and tenure at ROSS.

**I.    The ROSS Platform**

4. ROSS's legal search engine was trained on legal questions and judicial case-excerpt answers to these questions, and ratings of the relevance of the answers to the questions all

A2412

A2413

contained in memorandum. ROSS's legal search engine was not trained on and could not make use of any pre-existing or external system for organizing or indexing cases or portions of cases.

5.      ROSS's legal research platform does not capture or retain the actual expression of text from the questions and answers from its training data. ROSS's ranking algorithm (note: it is also sometimes referenced as the model or legal search engine) does not ingest or create any (1) categorization of cases by subject matter or legal practice area, (2) summarization of case law or judicial opinions, or (3) organizational scheme of cases. Rather, the ranking algorithm learned the relationship between queries and answers, irrespective of the particular legal content of individual queries and answers. ROSS's legal search engine took the language of judicial opinions and turned them into statistical measurements for the purpose of creating a legal search engine free of human intermediated content. ROSS built the tool so that the search results were driven by a machine-based analysis of the text.

6.      ████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████

7.      ████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

A2414

████████████████████████████████████████████  ████████████

███████████████████████████████████████ .

8.    █████████████████████████████████████████████

████████████████████████████████████████████████ .”

██████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████

9.    ████████████████████████████████████████████

███████████████████████████████████████████████

█████

10.   ████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████

██    ████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████ .”

3

A2415

## II.   Content Added to ROSS

12.    The ROSS judicial documents were obtained from a company called Casemaker, created and maintained independently of the ranking process. ROSS had approximately ███████ cases from Casemaker. The judicial opinions from Casemaker included no copyrights from Plaintiffs, including without limitation no headnotes, key numbers, synopses, any information reflecting or representing the key number system, any information reflecting links of any kind between headnotes and case passages, or anything else that covers what Plaintiffs have called in this case the "Westlaw Content."

13.    ████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████

██   ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████

██   ████████████████████████████████

████████████████████████████████████████

████████████████████████

██   ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

4

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

██   ██████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████

18.     LegalEase was directed to include four to six question-answer pairs on each of the memos, and LegalEase in fact did this based on the many memos that I have reviewed. █████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

19.     The memos that ROSS received from LegalEase were word documents. Most of the filenames for these word documents did not contain a legal topic. The few to the contrary contained only a generic legal topic that would be seen commonly in documents used in the practice of law.

20.     ███████████████████████████████████████████████

███████████████████████████████████████████████.

21.     The ROSS ranking algorithm required a training set containing questions and answers that were representative of the range of language and expressions that users of the ROSS system could be expected to pose to the system. The purpose of developing a large training set was to ensure that the ranking algorithm was trained on better and worst answers to a full range of representative question types. Questions in different areas of law are often expressed using different language, so this diversity of language and expressions can be achieved by developing

5

A2416

questions for diverse cases, as was done by ROSS. It is unnecessary for these cases to be representative of the underlying substantive law since the ranking algorithm only made use of the linguistic relationship between questions and answers, not their legal content. The ordering of such questions and answers did not matter. This is particularly the case given that the ROSS system was designed to rely on natural language search and not to rely on any structured organization of judicial opinions or associated taxonomies.

22.     West key numbers were not and could not be used in training ROSS's ranking model because every one of the features used by the ROSS ranking model is derived solely from the text of a question and a candidate answer. The key number system also could not be used in training ROSS's ranking model for the same reason.

23.     ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ████████████████████████████████.

24.     Neither the Bulk Memos nor the ROSS source code used for training the ROSS ranking model used any of the following elements as data for training the ranking model: West key numbers, topics, West headnotes themselves, case synopses, components or parts of the selection, organization, and arrangement of the West key number system, hyperlinks or relationships between headnotes and locations in judicial opinions, hyperlinks or relationships between West key numbers and headnotes, or the entirety of particular judicial opinions including any purported editorial enhancements contained in such opinions. Further, none of this information

6

A2417

was used in pre-processing of data relating to search queries or in any other data processing or software component in ROSS's production platform or source code.

25. I have no personal knowledge of how LegalEase created the memos. I believe to the extent LegalEase used Westlaw it was solely for the purpose of creating the memos that ROSS used.

26. ███████████████████████████████████████
████████████████████████████████████████
██████████████████

## III. The Classifier Project

27. ROSS completed experiments with its technology to see whether and how it could improve. One type of technology that ROSS experimented on was technology that could be used to classify cases into different categories, such as civil procedure or bankruptcy, before being search.

28. As part of ROSS's experimentation with its classifier technology, ROSS engaged LegalEase to review a body of cases provided by ROSS and to confirm the assignment of those cases to one of the 38 legal topics on ROSS's list of topics. The list of 38 legal topics were the following: (1) Administrative; (2) Admiralty & Maritime; (3) Antitrust; (4) Banking & Finance; (5) Bankruptcy; (6) Business & Corporate; (7) Civil Procedure; (8) Civil Rights; (9) Commercial; (10) Communications; (11) Constitutional; (12) Construction; (13) Criminal; (14) Employee Benefits & Executive Compensation; (15) Energy; (16) Entertainment & Sports; (17) Environment; (18) Estate Planning; (19) Family; (20) Government; (21) Health; (22) Immigration; (23) Insurance; (24) Intellectual Property; (25) International Trade; (26) Labor & Employment; (27) Medical; (28) Military; (29) Municipal; (30) Native American; (31) Pensions & Retirement

A2418

Benefits; (32) Privacy & Data Security; (33) Product Liability; (34) Real Property; (35) Securities; (36) Tax; (37) Technology; (38) Transportation. ROSS chose to use this list of 38 legal topics because, as I understand, they represent how practice areas in the United States legal system are generally classified. Attached as Exhibits A and B are true and correct copies of two documents reflecting these topics. *See* Exhibit A (ROSS-003452875) at 7-8 (███████████████████ ███████████████████████████████████████████████████████████████ ████████████████████████████).

29.     LegalEase provided this assistance in December 2017. During this time, LegalEase contract attorneys reviewed the cases and would indicate whether the case was labeled correctly. ██████████████████████████████████████

30.     ████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████

31.     The experiments that we ran at ROSS on regarding classification technology did not produce results that led to the deployment of any different or new technology. Because of this, ROSS did not pursue any classification projects for the tool and no classification technology made it into the ROSS search tool.

## IV.     The Business of ROSS

32.     ROSS licensed its legal research platform to users. I co-founded ROSS because I know that the market for legal services needed to improve, and I believe that making legal research cheaper, easier, and faster can be one way to accomplish this.

8

A2419

33.     I knew that the market for legal services needed to improve through first-hand knowledge. My mother wanted to divorce my father when I was younger, but she was unable to pay a lawyer to do so.

34.     ROSS used the memos to create its legal search tool so that it could license this tool to the public. We retained LegalEase to complete one step in this process. Our statement of work for LegalEase to complete this project, and all of our communications with LegalEase, are consistent that the goal of this project was to create the memos.

35.     ROSS did not use the memos for any other purpose. ROSS did not sell or license the memos to any party for any purpose, and ROSS never attempted to do this either. ROSS also never sold or had the intent to sell AI training data.

## V.     Documents

36.     Attached hereto as **Exhibit 1** is a true and correct copy of an article titled, "Jimoh Ovbiagele: Putting AI in Law Practice (September 1, 2016), ROSS-010129852.

37.     Attached hereto as **Exhibit 2** is a true and correct copy of Memorandum #1234, ROSS-000176800.

38.     Attached hereto as **Exhibit 3** is a true and correct copy of Memorandum #431, ROSS-003299205.

39.     Attached hereto as **Exhibit 4** is a true and correct copy of the Master Services Agreement (October 15, 2015), ROSS-003411169.

40.     Attached hereto as **Exhibit 5** is a true and correct copy of the Statement of Work (October 15, 2015), ROSS-000251670.

41.     Attached hereto as **Exhibit 6** is a true and correct copy of the Statement of Work II For ROSS Bulk Memos (September 15, 2017), ROSS-003332368.

A2420

42.     Attached hereto as **Exhibit 7** is a true and correct copy of an email from Akash Venkat re Legal Research Inquiry (September 20, 2015), ROSS-010164290.

43.     Attached hereto as **Exhibit 8** is a true and correct copy of a ROSS presentation, ROSS-023179081.

44.     Attached hereto as **Exhibit 9** is a true and correct copy of Memorandum #1, ROSS-000319308.

45.     Attached hereto as **Exhibit 10** is a true and correct copy of the LPO Classification Spreadsheet, ROSS-010128683.

46.     Attached hereto as **Exhibit 11** is a true and correct copy of an email From Teri Whitehead re Classifier Part II (December 22, 2017), ROSS-000197949.


I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed in Toronto, Canada, on the 1st of October, 2024.


_____*/s/ Jimoh Ovbiagele*_____
Jimoh Ovbiagele

A2421

Case 1:20-cv-00613-SB   Document 704-1   Filed 10/09/24   Page 1 of 48 PageID #: 153973

# EXHIBIT A

A2422

**Alan J. Cox**
Independent Economic Consultant
Outside Affiliate, NERA Economic Consulting

755 Silver Crest Ct.
Lafayette, CA
dralancox@gmail.com
(925) 297-7437

Alan Cox is an economist specializing in consulting and testifying in litigated matters involving Antitrust, Intellectual Property, Securities and other contested matters.  He has extensive experience testifying in Federal court, state court, US and international arbitrations and utility commissions.  He holds a Ph.D. in Economic Analysis and Policy from the Haas School of Business at the University of California at Berkeley where he specialized in industrial organization, antitrust and regulation.  He also holds an M.A. in Economics from the University of British Columbia, specializing in natural resource economics, including energy.  His previous positions include Visiting Economist at M.I.T.'s Energy Laboratory.

Dr. Cox's experience includes calculating damages in a wide variety of matters, including contract disputes, disagreements over lease terms, terminations of franchise agreements, and disputes over contracts for delivery of fuel oil.  He has calculated damages involving contract disputes over IP licensing agreements and for the alleged infringement of semiconductor process and design patents, patents in the biotechnology, electronic devices, software, and other industries.

Antitrust issues on which he has testified include allegations of price fixing, price manipulation, attempts to monopolize, Robinson-Patman matters, the competitiveness of crude oil and product pipeline services, allegations of anti-competitive licensing, and the competitive consequences of mergers.  He has examined and provided economic advice on a wide array of competition issues including vertical restraints in gasoline retailing and the economic costs of restraints imposed on a "dominant" telecommunications carrier.  He has been included in the *Who's Who of Competition Lawyers and Economists* by the Global Competition Review.

In intellectual property matters, Dr. Cox has testified on appropriate remedies a wide variety of patent, trade secret and trademark issues involving the semiconductor, biotechnology, telecommunications, consumer product and other industries.  He has also testified on trademark, copyright and trade secret matters.  He has also testified in matters related to standards and patent pools.

In Securities matters, he has testified in class action fraud cases, including on materiality, causation and damages in Section 10 and 11 matters.  His testimony has also included the valuation of restricted stocks, options, bonds, preferred shares in venture-capital backed firms, goodwill and the appropriate valuation of physical assets.  He has also testified on unjust enrichment from alleged insider trading.  He has calculated harm due to alleged inappropriate investments, backdating, breach of contract, and banking practices.

A2423

Alan J. Cox

## Education

**University of California, Berkeley**
Ph.D., Business Administration, Economic Analysis and Policy Program, 1989
Major Fields: Industrial Organization, Finance, Econometrics

**University of British Columbia**
M.A., Economics, 1978

**York University, Toronto**
B.S., Environmental Science, 1976

## Professional Experience

2020-          **Outside Affiliate**

               **NERA Economic Consulting**
2018-2019      Managing Director

2016-2018      Chair of NERA's Global Intellectual Property Practice

2001-2015      Managing Director/Senior Vice President

1988-2001      Senior Analyst, Senior Consultant, Vice President

               **Law & Economics Consulting Group, Inc.**
1989-1994      Senior Vice President, Vice President, and Senior Economist

               **University of California, Berkeley**
1983-1989      Research Assistant

               **Minimax Research Corporation**
1985-1986      Economist

               **Massachusetts Institute of Technology**
1978-1981      Visiting Economist

               **University of British Columbia**
1978           Research Associate

               **Geological Survey of Canada**
1975           Field Party Leader, Western Arctic

2

A2424

Alan J. Cox

## Teaching Experience

1994-1995    **St. Mary's College of California** Visiting Lecturer, Graduate School of Management.

1989         **Northeastern University** Adjunct Lecturer, Graduate School of Management

1984-1985    **University of California, Berkeley** Teaching Assistant.

## Expert Testimony, Affidavits, and Reports
(Clients underlined)

*Antitrust*

*In Re Korean Ramen Antitrust Litigation,* U.S. District Court for the Northern District of California, San Francisco Division, Case No. 3:13-cv-04115-WHO
*Trial testimony* on December 12-13, 2018, *Deposition* on September 27, 2017, *Reply Expert Report* dated August 18, 2017, *Supplemental Expert Report* dated July 21, 2017, *Reply Declaration* dated November 2, 2016, *Deposition testimony* on October 7, 2016 and *Declaration* of Alan J. Cox dated August 24, 2016 on behalf of Defendants <u>Nongshim Co., Ltd.</u>, <u>Nongshim America, Inc.</u>, <u>Ottogi Co. Ltd</u> and <u>Ottogi America, Inc.</u> responding in opposition to Motions by Direct Purchaser Plaintiffs and Indirect Purchaser Plaintiffs for Class Certification relating to the sales of Korean ramen products in the United States by Defendants.

*Trendsettah USA, Inc. and Trend Settah, Inc. v. <u>Swisher International, Inc</u>.*, USDC Case No. 8:14-CV-01664-JDS
*Trial Testimony* March 24 and 29, 2016, *Supplemental Expert Report* dated December 18, 2015, *Deposition* on December 17, 2015 and *Expert Report* dated December 11, 2015 on behalf of defendant Swisher International, Inc. evaluating economic issues related to defendant's alleged anticompetitive conduct and alleged breach of contract.

*In re NCAA Student-Athlete Name and Likeness Licensing Litigation*, USDC for the Northern District of California Case No. 09-cv-1967-CW
*Expert Report* on September 25, 2013 on behalf of defendant, <u>Electronic Arts, Inc.</u> responding to plaintiffs' Third Consolidated Amended Class Action Complaint alleging an anticompetitive conspiracy to license and sell the names, images, and likeness of current and former student-athletes. *Deposition* on April 4, 2013 and *Declaration of Alan J. Cox Regarding Class Certification*, dated March 14, 2013, on behalf of defendant, <u>Electronic Arts, Inc</u>*.,* responding to plaintiffs' expert's class certification report regarding collegiate video games.

*Granite Gaming Group I, LLC, et al. v. <u>The Fremont Street Experience LLC</u>, et al.*, District Court for Clark County, Nevada, Case No. A609440
*Deposition* on September 25, 2012 and *Expert Report* dated August 31, 2012 on behalf of defendants on liability issues regarding loss of sales due to defendants' alleged competitive operation of portable bars outside and in front of plaintiffs' casinos.

3

A2425

Alan J. Cox

*Caltex Plastics, Inc. v. Berry Plastics Corporation*, USDC for the Central District of California Case No. CV10-0l462 JAK (RZX)
*Expert Report* dated May 15, 2012 on behalf of defendant regarding plaintiff's allegations of price discrimination under the Robinson-Patman Act and unfair competition.

International Centre for Dispute Resolution Arbitration, Washington State, *Expert Report*, *Rebuttal Report*, *Deposition* and *Testimony* on behalf of claimants regarding damages resulting from anticompetitive behavior, breach of contract, trade secret theft and other issues related to building materials.

American Arbitration Association, *Deposition* and *Testimony*, Palo Alto.  Alleged price discrimination in legacy DRAM products.

*In re Application of San Pablo Bay Pipeline Company LLC for Approval of Tariffs for San Joaquin Valley Crude Oil Pipeline* (Application No. 08-09-024 before the Public Utilities Commission of the State of California).
*Testimony and Cross Examination* during a hearing on May 18, 2010, *Rebuttal testimony* on April 15, 2010 and *Direct testimony* on behalf of Chevron Products Company regarding the market power of San Pablo Bay Pipeline Company, a division of Shell Oil, dated November 16, 2009.

*All American Semiconductor, Inc. v. Hynix Semiconductor, Inc., et al., Case No. C 07-01200 PJH; DRAM Claims Liquidation Trust, By Its Trustee, Wells Fargo Bank, N.A. v. Hynix Semiconductor, Inc., et al., Case No. C 07-1381 PJH; Edge Electronics, Inc. v. Hynix Semiconductor, Inc., et al., Case No. C 07-01207 PJH; Jaco Electronics, Inc. v. Hynix Semiconductor, Inc., et al., Case No. C 07-01212 PJH; Sun Microsystems, Inc., et al. v. Hynix Semiconductor, Inc., et al., Case No. C 06-01665 PHJ; UNISYS Corporation v. Hynix Semiconductor, Inc., et al., Case No. C 06-02915 PJH*
*Deposition* on April 22, 2008 and *Expert Report* dated March 7, 2008 on liability arising from alleged participation in a price fixing cartel on behalf of defendant, Nanya Technology Corporation.

*In re DRAM Antitrust Litigation, MDL No. 1486*
*Deposition* on October 20, 2006 and *Expert Report* dated October 2, 2006 on behalf of defendant, Nanya Technology Corporation.

*Visa USA Inc. v. First Data Corp., Inc.,* Case No. C 02-1786-JSW
*Deposition* dated August 26, 2005 and *Expert Rebuttal Report* dated June 2, 2005.

*E. & J. Gallo Winery v. EnCana Corporation, et al.,* Case No. CV F 03-5412 AWI LJO
*Deposition* on May 21, 2009, *Revised Rebuttal Report* (in light of Ninth Circuit rulings on the impact of the Filed Rate Doctrine) to *Rebuttal Expert Report* of June 24, 2005 on liability and damages on allegations of price manipulation in natural gas marketing in Northern California, dated April 1, 2009, *Deposition* dated July 15, 2005, *Rebuttal Expert Report* dated June 24, 2005, and *Expert Report* dated May 31, 2005.

*Unirex Corporation v. Sharp Electronics Corporation, and Sharp Electronics Corporation v. Unirex Corporation,* Case No.  CV-03-5521-DSF

4

A2426

Alan J. Cox

*Expert Report* dated December 1, 2004, on the estimation of damages due to alleged price discrimination in microwave ovens.

*Passive Components, Inc. v. Samsung Electro-Mechanics America, Inc., et al.,* Orange County Superior Court Case No. 03CC05745
*Declaration* dated July 7, 2004.

*Merger of Crowley Maritime Corporation and Yukon Fuel Company*
*Economic Expert Report* dated March 4, 2004 on Competition in the Delivery of Refined Petroleum Products to Western Alaska from Anchorage and Seattle. *Presentation to the Assistant Attorney General of Alaska.*

*Lassen Tour & Travel, Inc. v. Discovery Group Corporation and Bravo Travel*
*Expert Report* dated November 21, 2003.

*In re Application of SFPP, L.P. pursuant to Commission Resolution No. O-0043 [Rate Setting]* (Application No. 03-02-027 before Public Utilities Commission of State of California)
*Expert Report* "Competitive Aspects of SFPP's Operations in California," dated July 28, 2003 prepared for SFPP, L.P.

*High Country Linens, Inc. v. Greg Block, et al.*
*Expert Report* dated July 26, 2002.

*Process Specialties, Inc. v. Sematech, Inc.,* Case No. CIV-5-00-414 FCD PAN
*Declaration in Opposition to Sematech, Inc.'s Motion to Exclude the Testimony of Alan J. Cox* dated November 15, 2002, *Update to Expert Report* dated May 31, 2002, *Declaration* dated May 31, 2001, *Deposition Testimony* dated March 28, 2001, and *Expert Report* dated March 2, 2001.

*The Intimate Bookshop, Inc. v. Barnes & Noble, Inc., et al.*
*Deposition* dated November 6, 2001 and *Expert Report* dated October 5, 2001 for defendant, Borders Group, Inc.

*In re SFPP, L.P. for Authority to Justify Its Rates for Intrastate Transportation of Refined Petroleum Products on the Basis of Market Factors*
*Testimony and Cross Examination* before the California Public Utilities Commission on December 10, 2003 and February 1, 2001 and *Rebuttal Testimony* dated January 16, 2001 on behalf of Kinder Morgan Energy Partners, L.P.

*American Booksellers Association, Inc. v. Barnes & Noble, et al.*
*Declaration* in Support of Motion for Summary Judgment dated January 16, 2001, *Testimony* dated December 27 and 28, 2000 and *Expert Report* for defendant Borders Group, Inc. dated December 1, 2000.

5

A2427

Alan J. Cox

*ARCO Products Company, Mobil Oil Corp. and Texaco Refining and Marketing, Inc. v. SFPP, Inc.*
*Testimony* and *Cross-examination* on October 23, 2000 before the California Public Utilities Commission on behalf of <u>SFPP, L.P.</u> to examine the competitiveness of SFPP's rates charged on its Sepulveda Line and its Watson Station charge in Los Angeles.

*In re SFPP, L.P. in support of application for market-based rate setting authority.*
*Testimony* and *Cross examination* before the Federal Energy Regulatory Commission (FERC) on behalf of <u>SFPP, L.P.</u> in Washington, D.C. June 13, 2000.

*In re SFPP, L.P. for Authority to Justify Its Rates for Intrastate Transportation of Refined Petroleum Products on the Basis of Market Factors.*
*Report* dated March 15, 2000 prepared for <u>SFPP, L.P.</u> in support of an application of market-based rates for its refined petroleum product pipelines within California.

*In re <u>SFPP, L.P.</u> in support of application for market-based rate setting authority.*
*Testimony* and *Cross-examination* before the Federal Energy Regulatory Commission (FERC) on behalf of <u>SFPP, L.P.</u> in Washington, D.C., February 11-15, 2000.

*ARCO Products Company, Mobil Oil Corp. and Texaco Refining and Marketing, Inc. v. <u>SFPP, Inc.</u>*
*Prepared Direct Testimony* dated January 21, 2000 submitted to the California Public Utilities Commission on behalf of <u>SFPP, L.P.</u> to examine the competitiveness of SFPP's rates charged on its Sepulveda Line and its Watson Station in Los Angeles.

<u>*Western Wireless Corporation and WWC Holding Co. Inc., dba Cellular One* v. Consolidated Telephone Cooperative</u>
Western Wireless provides local access using wireless technology in rural areas.  Service to its customers was interrupted for several weeks through actions by ILEC.  *Deposition* dated November 3, 1999.  *Expert Report* dated September 23, 1999 assessing competitive consequences of ILEC behavior and the damages resulting from the disconnection of numbers.

*In re <u>SFPP, L.P.</u> in support of application for market-based rate setting authority.*
*Surrebuttal Testimony*, exhibit and work papers dated October 25, 1999.  SFPP *Answering Testimony,* exhibits and work papers dated May 17, 1999 in support of application.  *Affidavit* submitted to FERC on March 16, 1999 describes protestor's documents reviewed and why they are relevant to a market power analysis.

*In re <u>SFPP, L.P.</u> in support of application for Market Power Determination.*
*Expert Report* filed on behalf of *Santa Fe Pacific Pipelines (SFPP)* for a determination that the prices that SFPP can charge for transportation of product on one of its pipelines are governed by market forces. *Report* dated December 31, 1997 submitted to the Federal Energy Regulatory Commission.

*ARCO Products Company, Mobil Oil Corporation and Texaco Refining and Marketing Inc. v. SFPP, L.P.*, on behalf of <u>Santa Fe Pacific Pipelines, (SFPP)</u> a petroleum products pipeline company.
*Cross-examined* January 14-15, 1998.  Submitted *Report* "Competitive Aspects of Santa Fe Pacific Pipeline's Operations in California" to the California Public Utilities Commission, dated November 26, 1997.

A2428

Alan J. Cox

*Alumax Inc. v. Hot Metal Molding, Inc., et al.*
*Deposition* taken.  *Expert Report* written on behalf of Alumax on the appropriate methodology to apply in defining technology markets.  This was undertaken with reference to Alumax' patents used in parts manufacture using a semi solid process.  *Report* was filed on April 17, 1998.
*GST Tucson Lightwave, Inc. v. Brooks Fiber Communications of Tucson, Inc.*
*Expert witness* and *Rebuttal reports* submitted, and *Deposition* taken in a matter in which plaintiff alleged an attempt to monopolize certain telephone services in the Tucson area, June 1997.

*Luanne Foley v. California Reporting Alliance, Truck Insurance Exchange, et al.*
*Affidavit* submitted to Los Angeles Superior Court on behalf of defendants and Farmers Group on market power issues and the ability of the California Report Alliance to fix prices, October 1995.

*The City of Long Beach, et al. v. Standard Oil of California, et al.*  Reserved Pipeline Claims on behalf of Chevron, Mobil and Texaco.
Testimony before the California Public Utilities Commission on the competitive structure of the crude oil transportation industry in support of market-based pricing.

*Proposed merger between Southern California Edison and San Diego Gas and Electric*, before the California Public Utilities Commission, June 1990.
*Testimony* on behalf of the Division of Ratepayer Advocates of the California Public Utilities Commission on the competitive impact of proposed merger on bulk power markets and on transmission access.

### Intellectual Property

*Sinco Technologies Pte Ltd. v. Sinco Electronics (Dongguan) Co. Ltd., et al.*  NDCA  Case No. 3:17-cv-05517, *Rebuttal Report* dated January 9, 2020 on behalf of plaintiffs, regarding damages due to the misuse of Sinco Technologies' trademark.  *Deposition*, Feb. 5, 2020.

*FOX Factory, Inc., v. SRAM, LLC, and Sandleford Limited*, U.S.D.C. for the District of Colorado Case Nos. 1:18-cv-00127-WJM-NYW and 1:18-cv-00130-WJM-NYW, Filed: October 11, 2017.
*Rebuttal Report* dated January 25, 2019 on behalf of defendants, SRAM, LLC and Sandleford Limited regarding purported reasonable royalty damages experienced by FOX, if any, from the alleged patent infringements by defendants.

*TC Technology LLC v. Sprint Corporation and Sprint Spectrum, L.P.,* USDC for the District of Delaware Case No. 1:16-cv-00153-UNA, Filed: March 10, 2016.
*Deposition* November 20, 2018, Expert *Rebuttal Report* dated October 22, 2018 regarding economic issues regarding purported reasonable royalty damages.

*ZF Micro Devices, Inc., et al. v. TAT Capital Partners, LTD., etc., et al,* Santa Clara County Superior Court Case No. 1-09-CV 134970, Filed: February 17, 2009.
*Deposition* on September 14, 2018 on behalf of TAT Capital Partners, LTD regarding damages due to breach of fiduciary duty and conspiracy related to tortious activities.

7

A2429

Alan J. Cox

*Thomas Davidson, et al. v. Apple, Inc.,* U.S.D.C. for the Northern District of California Case No. 5:16-cv-4942-LHK, Filed: August 27, 2016.
*Deposition* on May 9, 2019, *Expert Rebuttal Report* dated February 15, 2019, *Declaration in Support of Defendant's Opposition to Amended Motion for Class Certification* dated December 6, 2018, *Declaration* in Support of Defendant's Opposition to Motion for Class Certification dated February 9, 2018, on behalf of defendant, Apple Inc. related to economic issues and sale of Apple smartphones in the U.S.

*Amgen Inc. and Amgen Manufacturing Limited v. Sandoz Inc., Sandoz International GMBH, Sandoz GMBH, and LEK Pharmaceuticals D.D.,* USDC for the Northern District of California, San Francisco Division, Case 3:16-cv-02581, Filed: May 12, 2016.
*Deposition* on October 6, 2017, *Supplemental Expert Report* dated October 2, 2017and *Expert Report* dated July 28, 2017 regarding lost profits and reasonable royalty damages for alleged patent infringements by Sandoz defendants.

*C.R. Bard, Inc. and Bard Peripheral Vascular, Inc. v. AngioDynamics, Inc.,* U.S.D.C. for the District of Delaware, Case No. 1:15-cv-00218-SLR-SRF, Filed: March 10, 2015
*Trial testimony* March 6-7, 2019, *Deposition* dated December 13, 2017, *Reply to Supplemental Expert Report* dated December 6, 2017, *Reply Expert Report* dated December 1, 2017, *Expert Report* dated September 1, 2017 on behalf of C.R. Bard, Inc. and Bard Peripheral Vascular, Inc. ("Bard") regarding reasonable royalties and lost profits damages experienced by Bard as a result of alleged patent infringements by AngioDynamics, Inc.

*The Regents of the University of California and Becton, Dickinson and Company v. Affymetrix, Inc. and Life Technologies Corp.,* U.S. District Court for the Southern District of California Case No. 3:17- cv-01394-H-NLS.
*Deposition* dated February 27, 2019, *Expert Report* dated December 7, 2018 regarding the need for a permanent injunction, lost profits damages, and reasonable royalty damages for the alleged patent infringement by Defendants, *Deposition* on September 22, 2017, *Declaration* in Support of Plaintiff, Becton, Dickinson and Company's Motion for Preliminary Injunction to enjoin sales of allegedly infringing brilliant polymers used in flow cytometry, dated July 12, 2017.

*EON Corp. IP Holdings, LLC v. Apple Inc.,* USDC for the Northern District of California, San Francisco Division Case No. 3:14-CV-05511-WHO
*Expert Report* dated March 15, 2017 on behalf of Defendant, Apple Inc., regarding reasonable royalty damages experienced by EON Corp. as a result of an alleged patent infringement by Apple Inc.

*In the Matter of:  Certain Network Devices, Related Software and Components Thereof (I)*
U.S. International Trade Commission Investigation No. 337-TA-944 Enforcement Proceedings
*Testimony* before the U.S. International Trade Commission on April 5, 2017, *Rebuttal Witness Statement* dated February 27, 2017, *Deposition* on February 6, 2017, *Supplemental Rebuttal Expert Report* on February 4, 2017 and *Rebuttal Report* on February 1, 2017 on behalf of respondent Arista Networks, Inc., regarding proposed penalty due to alleged non-compliance with a Cease and Desist Order issued in the underlying 944 investigation.

*Telesocial Inc. v. Orange S.A., et al.,* USDC for the Northern District of California Case No. 3:14-cv-0398-JD

A2430

Alan J. Cox

*Deposition* on December 22, 2016 and *Expert Report* dated December 12, 2016, on behalf of defendant Orange S.A., responding to plaintiff's expert's report with regard to alleged damages incurred by plaintiff due to defendant's alleged misappropriation of trade secrets.

<u>AI-Daiwa, Ltd</u>*. v. Apparent, Inc., et al.,* US District Court for the Northern District of California Case No. CV13-04156(VC)
*Deposition* on August 14, 2015 and *Expert Rebuttal Report* dated July 29, 2015 on behalf of claimant AI-Daiwa, Ltd. regarding damages due to claimant's alleged breach of contract.

*Comcast Cable Communications, LLC, et al. v. <u>Sprint Communications Company L.P., et al.</u>,* US District Court for the Eastern District of Pennsylvania Case No. 2:12-cv-00859-JD
*Deposition* on April 1, 2016, *Expert Report* dated July 15, 2015 on behalf of defendants Sprint Communications Company L.P., Sprint Spectrum L.P., and Nextel Operations, Inc. ("Sprint") regarding the purported reasonable royalty damages experienced by Comcast due to Sprint's alleged infringement of Comcast's patent.

<u>Sprint Communications Company L.P.</u>*, et al. v. Comcast Cable Communications LLC, et al*., US District Court for the Eastern District of Pennsylvania Case No. 2:12-cv-00859-JD
*Direct Trial Testimony* and *Cross-Examination* in the Eastern District of Pennsylvania on February 9 and 10, 2017, *Deposition* on April 1, 2016, *Reply Expert Report* dated July 29, 2015 and *Expert Report* filed on June 17, 2015, on behalf of counterclaim-plaintiffs <u>Sprint Communications Company L.P.</u> and <u>Sprint Spectrum L.P.</u> ("Sprint") regarding reasonable royalty damages experienced by Sprint due to Comcast's alleged infringement of Sprint's patents.

*GSI Technology, Inc. v. United Memories, Inc. and <u>Integrated Silicon Solution, Inc</u>.,* US District Court for the Northern District of California, San Jose Division Case No. 5:13-cv-1081-PSG
*Direct Testimony* and *Cross-Examination* on November 18, 2015.  *Deposition* on July 14, 2015 and *Expert Report* filed June 11, 2015 on behalf of defendant Integrated Silicon Solution, Inc. regarding damages due to defendants' alleged misappropriation of proprietary information and trade secrets.

International Chamber of Commerce Case, *Rebuttal Expert Report* on valuation of IP related to smartphones.

*XimpleWare Corp. v. <u>Versata Software, Inc</u>., et al*., US District Court for the Northern District of California Case Nos. 3:13-cv-05160-SI and 5:13-cv-05161-PSG
*Expert Report* filed February 6, 2015 regarding damages arising out of defendants' copyright infringement.

*Mobile Telecommunications Technologies, LLC. v. T-Mobile USA and <u>T-Mobile US, Inc</u>.,* USDC for the Eastern District of Texas, Marshal Division
*Deposition* on January 21, 2015, *Expert Report* filed on January 20, 2015 on behalf of <u>T-Mobile USA</u>, Inc. regarding reasonable royalty damages due to defendants' alleged patent infringement.

*Church & Dwight Co. v. <u>SPD Swiss Precision Diagnostics GmbH</u>, et al.,* US District Court for the S.D. of New York Case No. 14 Civ. 00585 (AJN)

9

A2431

Alan J. Cox

*Direct Testimony* and *Cross-Examination* on April 29, 2015, *Deposition* on January 13, 2015 and *Expert Report* filed December 1, 2014 on behalf of defendant SPD Swiss Precision regarding damages arising out of defendant's alleged false advertising.

*Nippon Steel* & *Sumitomo Metal Corporation v. POSCO and POSCO America Corporation*, US District Court for the District of New Jersey Case No. 2:12-cv-02429-DMC-MF
*Deposition* on February 13, 2015, *Expert Report* filed November 25, 2014 on behalf of Nippon regarding reasonable royalty damages due to defendants' alleged patent infringement.

*Cell and Network Selection LLC, v. MetroPCS Communications, Inc., et al.*, USDC for the Eastern District of Texas, Tyler Division Case No. 6:13-CV-0404
*Deposition* on October 21, 2014, *Expert Report* filed on September 12, 2014 on behalf of T-Mobile USA, Inc. regarding reasonable royalty damages due to defendants' alleged patent infringement.

*Adaptix, Inc. v. AT&T, Inc., et al.*, USDC for the Northern District of California, San Jose Division Case No. 6:12-cv-01778
*Experts Report* filed on August 27, 2014 on behalf of AT&T, Inc. and HTC Corporation. *Expert Report* filed on August 27, 2014 on behalf of Verizon Wireless and HTC Corporation.

Nortel Bankruptcy: Simultaneous proceedings in the United States Bankruptcy Court for the District of Delaware *Nortel Networks Inc., et al.*, 5 Debtors., Chapter 11 Case No.: 09-10138(KG) and the Ontario Superior Court of Justice (Commercial Division) *In the Matter of a Plan of Compromise or Arrangement of Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Global Corporation, Nortel Networks International Corporation and Nortel Networks Technology Corporation Application Under the Companies' Creditors Arrangement Act, R.S.C. 1985, C. C-36, As Amended*
*Deposition* on March 26, 2014, *Reply Expert Report* (co-authored with Mark L. Berenblut) on February 28, 2014, and *Expert Report* (Co-authored with Mark L. Berenblut) on January 24, 2014.

*Catch a Wave Technologies, Inc. v. Sirius XM Radio, Inc.*, USDC for the Northern District of California, Case No. 3:12-cv-05791-WHA
*Reply Report* on behalf of defendant dated February 14, 2014 regarding alleged infringement of patent and reasonable royalty damages.

*EON Corp IP Holdings LLC v. Sensus USA, Inc., et al.*, USDC Case No. CV12-1011JST
*Reply Expert Report on Damages* dated January 22, 2014, on behalf of defendants HTC America, Inc., Motorola Mobility LLC, Sprint Spectrum L.P. and United States Cellular Corporation regarding damages suffered as a result of alleged patent infringements by defendants.

*Bayer Healthcare, LLC v. Sergeant's Pet Care Products, Inc.*, USDC for the Southern District of New York, Case No. 13-cv-2501 (JSR)
*Expert Report* on June 21, 2013, on behalf of plaintiff regarding lost sales and profits of plaintiff's production and sale of flea and tick products due to defendant's alleged false advertisement under the Lanham Act.

10

A2432

Alan J. Cox

*Aevoe Corp. v. AE Tech. Co., Ltd., et al.*, USDC for the District of Nevada, Las Vegas Division, Case No. 2:12-cv-00053-GMN-RJJ
*Expert Report* dated June 28, 2013 and *Declaration* dated October 30, 2012 on behalf of plaintiff regarding calculation of lost profits and reasonable royalty damages based on defendants' sales of infringing products after injunction had been issued.

*L-3 National Security Solutions, Inc. v. Innovative Wireless Technologies, Inc.*, USDC Case No. 1:12-CV-00059 (LMB/TRJ)
*Deposition* on September 18, 2012, *Expert Rebuttal Reports* on behalf of plaintiff and on behalf of counterclaimant/defendant, both dated August 13, 2012 and *Expert Report* dated June 29, 2012 on behalf of plaintiff regarding lost sales and profits of plaintiff's underground mine emergency communication system due to defendant's alleged interference, breach of contract and alleged false advertisement under the Lanham Act.

*Point 4 Data Corporation and Dynamic Concepts, Inc. v. Tri-State Surgical Supply & Equipment, Ltd., et al.*, USDC (E.D.N.Y.) Case No. 11-cv-0726 (RJD)
*Trial testimony* on August 15, 2018, *Expert Report* dated August 20, 2012, *Rebuttal Expert Report* dated April 20, 2012 and *Expert Report* dated November 30, 2011 on behalf of plaintiffs regarding economic damages as a result of alleged copyright infringement by defendants.

*Life Technologies Corporation and Applied Biosystems, LLC v. Biosearch Technologies, Inc. and Eurofins MWG Operon Inc.*, USDC for the Northern District of California Case No. 3:12-cv-00852-WHA (JCS)
*Deposition* on August 30, 2012 and *Expert Report* dated August 3, 2012 on behalf of plaintiffs regarding damages suffered as a result of alleged patent infringements by defendants.

*Gen-Probe Incorporated v. Becton, Dickinson and Company,* USDC Case Nos. 09-CV-2319 BEN (NLS) and 10-CV-0602 BEN (NSL)
*Deposition* on June 15, 2012, *Expert Rebuttal Report* on May 29, 2012 on behalf of defendant regarding lost profits, price erosion and reasonable royalty damages from alleged patent infringement, and *Expert Report* on May 7, 2012 on behalf of defendant regarding whether plaintiff's alleged inventions achieved "commercial success" indicative of a non-obvious advance over prior art processes and caps.

*FormFactor, Inc. v. Micro-Probe Incorporated and David Browne*, USDC Case No. CV10-03095 PJH
*Deposition* on May 25, 2012 and *Expert Rebuttal Report* dated May 18, 2012 on behalf of defendants regarding unjust enrichment damages to plaintiff from alleged conspiracy and misappropriation of trade secrets.

*In the Matter of:  Certain DC-DC Controllers and Products Containing the Same,*
U.S. International Trade Commission Investigation No. 337-TA-698
*Testimony* on March 2, 2012, *Rebuttal Witness Statement* dated January 12, 2012, *Deposition* on December 27, 2011 and *Expert Report* on December 2, 2011 on behalf of enforcement complainants, RichTek Technology Corporation and RichTek USA regarding economic benefits to respondent as a result of respondent's non-compliance with Consent Order and respondent's ability to pay fine, and on the need for a general exclusion order.

11

A2433

Alan J. Cox

*Oracle America, Inc. v. Google Inc.*, USDC, Northern District of California, San Francisco, Case No. CV 10-03561 (WHA).
*Supplemental Expert Report* dated February 17, 2012, *Deposition* on October 26, 2011 and *Expert Reply Report* dated October 3, 2011 on behalf of defendant regarding damages to plaintiff from alleged infringement of a copyright claim.

*J. Myatt,* District Court, Boulder County, Colorado Case No. 2010cv1025
*Deposition* on September 16, 2011 and *Expert Report* dated August 6, 2011.

*Rawlings Sporting Goods Company, Inc. v. Under Armour, Inc. and AMPAC Enterprises, Inc.*, USDC, Western District of Washington at Seattle, Case No. 10-cv-0933 MJP
*Expert Report* dated June 10, 2011.  Unauthorized use of trademarked sportswear.

*International Fireproof Technology, Inc., et al. v. Flame Seal products, Inc., et al.*, USDC for the Southern District of Texas, Houston Division Case No. 2011-cv-419
*Trial testimony* on May 20 and 23, 2011, *Deposition* on May 11, 2011 and *Expert Report* dated April 19, 2011.  False claims.

*Pegasus Imaging Corporation v. Northrop Grumman Corporation, et al.*, USDC (Middle District of Florida, Tampa Division) Court Case No. 8:07-cv-01937
*Deposition* on July 2, 2010 and *Rebuttal Expert Report* dated June 3, 2010 on behalf of defendants regarding economic damages allegedly suffered by plaintiff as a result of defendants' breach of license agreement and copyright infringement.

*BlueGem Security, Inc. v. Trend Micro Incorporated*, USDC (C.D. Cal) Case No. CV09-01492 ODW (FFMx)
*Trial testimony* on September 28, 2010, *Deposition* on August 27, 2010 and *Expert Report* on March 30, 2010 on behalf of defendant regarding damages arising out of defendant's alleged infringement of plaintiff's technology.

Japan Commercial Arbitration Association, Tokyo, *Testimony* and *Report* for an American pharmaceutical company in a dispute with a Japanese development partner regarding technology and patent licensing.

*MedImmune, LLC v. PDL Biopharma, Inc.*, USDC (N.D. Cal) Case No. CV 08 5590 JF
*Deposition* on October 7, 2010, *Expert Rebuttal Report* on September 15, 2010, *Expert Report* on August 23, 2010 and *Expert Report* on February 16, 2010, on behalf of defendant/counterclaimant regarding reasonable royalties owed for plaintiff's/counter defendant's alleged patent infringement.

*Ricardo Alfonso Leon, et al. v. Jose Francisco Leon, et al.*, Los Angeles County Superior Court Case No. BC 376704, related to Case No. BP 069765
*Deposition* on August 21, 2009, on behalf of plaintiffs, assessing of damages for misappropriated assets.

*Tarlton Pauley Morton v. Peter Morton, et al.*, Los Angeles County Superior Court Case No. BC 364390
*Deposition* on March 16, 2009, regarding valuation of "Hard Rock" trademark.

12

A2434

Alan J. Cox

*Lite-On IT Corp. and Lite-On (USA) International, Inc.* v. Toshiba Corporation, USDC (C.D. Cal) Case No. CV07-4758 GPS (AJWx)
*Deposition* on November 19, 2008, *Rebuttal and Supplemental Expert* Report, dated November 7, 2008 and *Expert Report* on damages resulting from alleged fraud, dated October 7, 2008.

*Silicon Image, Inc. v. Analogix Semiconductor, Inc.*, USDC (N.D. Cal) Case No. C 07-00635 JCS
*Deposition* on September 19, 2008 and *Rebuttal Report* dated August 8, 2008, on behalf of defendant, Analogix, on damages as a result of alleged patent infringement, misappropriation and intentional interference with contractual relations and unfair competition.

*Ajaxo, Inc. and K.C. Multimedia, Inc. v. Bank of America Technology and Operations, Inc., Bank of America Corporation, Bank of America National Association and Allen Tam*, USDC (E.D. Cal) Case No. 2:07-cv-945 GEB GGH
*Rebuttal Report*, dated August 8, 2008 on behalf of defendant, Bank of America, on damages relating to alleged copyright infringement.

*Applera Corporation – Applied Biosystems Group v. Illumina Inc., Solexa, Inc. and Stephen Macevicz, et al.*, USDC (N.D. Cal) Case No. 07 CV 02845 WHA
*Trial testimony* on January 21, 2009, *Supplemental Rebuttal Expert Report,* dated October 3, 2008, *Deposition testimony* on June 24, 2008, *Expert Rebuttal Report*, dated June 13, 2008 and *Expert Report,* dated May 30, 2008, on behalf of plaintiff, Applera Corporation - Applied Biosystems Group, on damages relating to the misappropriation of patents by defendants.

*The Board of Trustees of the Leland Stanford Junior University and Litton Systems, Inc. v. Tyco International, et al.,* USDC (C.D. Cal) Case No. Cv-00-10584-TJH-(RCx)
*Deposition* on June 5, 2008 and *Expert Report* dated May 20, 2008, on behalf of defendant Pirelli S.p.A., on reasonable royalty damages as a result of alleged patent infringement by Pirelli.

*3Com Corporation v. Realtek Semiconductor Corporation,* Case No. CV-03-2177VRW
*Trial testimony* on April 2, 2008, *Deposition* on November 6, 2007, and *Expert Rebuttal Report*, regarding reasonable royalty damages due to defendant's alleged infringement of patents dated October 19, 2007.

*Interface, Inc. v. Shaw Industries, Inc., Mohawk Industries, Inc. and Collins & Aikman Floor Coverings, Inc.,* USDC (N.D. Georgia) Case No. 4:05 CV-0189-HLM, 4:05-CV-0190-HLM, and 4:05-CV-0191-HLM
*Deposition* on December 13-14, 2007, *Expert Surrebuttal Report,* dated October 29, 2007 and *Expert Report,* dated September 13, 2007, on behalf of plaintiff regarding damages arising from infringement of patent on carpet design.

JAMS Arbitration, San Francisco, *Expert Rebuttal Report, Supplemental Expert Rebuttal Report* and *Testimony* on behalf of a law firm, regarding quantification of damages resulting from alleged malpractice due to allowing a Japanese patent to lapse.

13

A2435

Alan J. Cox

*OMAX Corp. v. Flow International Corp.*, Case No. CV 04-2334-RSL
*Deposition* on June 7-8, 2007, *Expert Rebuttal Report* dated April 13, 2007 and *Expert Report* dated March 2, 2007.

*Certain Incremental Dental Positioning Adjustment Appliances and Methods of Producing Same* Matter before the International Trade Commission
*Expert Report* on August 25, 2006 and *Deposition,* September 15, 2006 regarding patent infringement in tooth straightening devices on behalf of Orthoclear, Inc.

*Align Technology, Inc. v. Orthoclear, Inc. and Orthoclear Holdings, Inc*.
*Deposition* dated June 26, 2006 and *Expert Report* dated May 28, 2006. Trademark, trade dress, passing off and patent infringement damages in tooth straightening devices.

*Synopsys, Inc. v. Magma Design Automation, Inc*.
*Expert Report* dated March 20, 2006 regarding damages arising out of ownership dispute and infringement of patent in chip design software.

*BIO-RAD Laboratories, Inc. v. Applera Corporation and Applied Biosystems*, USDC (N.D. Cal) Case No. C02-5946 JM
*Expert Report* dated October 10, 2005, on behalf of defendants, Applera Corporation and Applied Biosystems, regarding reasonable royalty damages arising from the alleged infringement of a patent relating to DNA sequencing technology and damages arising from alleged trademark infringement.

*GlobespanVirata v. Texas Instruments and Stanford University*, Case No. 03-2954
*Trial testimony*, January 24-26, 2006 in New Jersey District Court on patent infringement claims, *Deposition* dated November 28, 2005 and *Expert Report* dated October 5, 2005.

*LML Payment Systems v. Telecheck, et al*.
*Deposition* dated September 29, 2005 and *Expert Report* dated August 12, 2005.

*Nissim Corporation v. ClearPlay, Inc., et al*.
*Deposition* dated September 1, 2005 and *Expert Report* dated July 13, 2005.

*Beckman Coulter, Inc. v. Applera Corporation,* Case No. CV 02-624 AHS
*Expert Report* dated May 20, 2005 and *Deposition* dated June 17, 2005.

*O2 Micro International Ltd. v. Sumida Corporation and Taiwan Sumida Electronics, Inc., Case No. 2:03 CV-007-TJW*
*Deposition* on April 19, 2005 and *Expert Report* dated March 25, 2005.

*Rodeo Marketing Company and Wyoming West Designs LLC v. Coors Brewing Company (Case No. CIV F-3-5280)*
*Deposition* dated January 7, 2005 and *Expert Report* dated December 10, 2004, on damages and unjust enrichment due to trademark infringement.

14

A2436

Alan J. Cox

*Sanyo Energy (USA) v. BYD Company Ltd.,* Case No. 02-CV-1900B JMA
*Deposition* dated March 25, 2004 and *Expert Rebuttal Report* dated March 12, 2004.

*FCI USA, Inc. and FCI Americas Technology, Inc. v. Hon Hai Precision Industry, Co., Ltd. and Foxconn Electronics, Inc.,* Case No. C-01-1192 CRB
*Direct Testimony* dated February 5, 2004 before the Northern District of California in San Francisco, *Deposition* dated October 31, 2003, *Supplemental Expert Report* dated October 24, 2003 and *Expert Report* dated October 3, 2003.

*Stephen Key Design, LLC v. Lego Systems, Inc.,* Case No. C-01-26-8 MJJ
*Deposition* dated October 14, 2003, *Rebuttal Report* dated August 11, 2003 and *Expert Report* dated June 26, 2003.

*O2 Micro International Ltd. v. Monolithic Power Systems,* Case Nos. CV-00-4071 CW (EDL) and CV-01-3995 CW
*Testimony* on July 13, 2005, *Deposition* dated January 26, 2004 and *Expert Rebuttal Report* dated December 3, 2004 on Alleged Trade Secret Misappropriation. *Deposition* dated June 27, 2003, *Rebuttal Report* dated June 11, 2003, *Expert Report* dated May 27, 2003.

*Larkspur Data Resources, Inc. v. Trust Administrators, et al.*
*Deposition* dated August 29, 2002, *Rebuttal Report* dated August 16, 2002 and *Expert Report* dated August 2, 2002.

*Callaway Golfball Company v. Dunlop Slazenger Group Americas, Inc., d/b/a Maxfli,* USDC (District of Delaware) Case No. 01-669 RRM
*Rebuttal testimony* dated August 11, 2004, *Testimony* on August 3, 2004, *Depositions* dated February 23, 2004 and January 26, 2004, *Expert Rebuttal Report* dated December 12, 2003 and *Expert Report* dated July 26, 2002. Alleged theft of trade secrets and false advertising.

*Dioptics Medical Products, Inc. v. The Cooper Companies, Inc.*
*Depositions* dated December 5, 2002 and September 11, 2002, *Rebuttal Report* dated September 25, 2002 and *Expert Report* dated July 17, 2002.

*Intel Corporation v. Broadcom Corporation,* Case No. 00-796-RRM
*Trial testimony* dated December 11, 2001, *Deposition Testimony* dated November 27, 2001 and *Expert Report* dated October 31, 2001.

*Mattel, Inc. v. Walking Mountain Productions, Tom Forsythe, et al.*
*Deposition* dated June 29, 2001 and *Expert Report* dated April 30, 2001.

*Australia Vision Services Pty. Ltd. v. Dioptics Medical Products, Inc. and Henry Lane,* Case No. C-01-20356 JW
*Expert Report* dated December 6, 2001 and *Declaration* dated May 12, 2000 to estimate damages for patent infringement and counter claims.

15

A2437

Alan J. Cox

*Northern Telecom Limited v. Samsung Electronics, Co., Ltd.*
*Declaration* in opposition to Northern Telecom's motion to exclude evidence pursuant to Federal Rules of Evidence 408, 402 and 403, December 19, 1997.

*Alumax Inc. v. Hot Metal Molding, Inc. et al.*
*Deposition* taken.  *Expert Report* dated April 17, 1998 on behalf of Alumax on the appropriate methodology to apply in defining technology markets.  This was undertaken with reference to Alumax' patents used in parts manufacture using a semi solid process.

**Securities**

*In Re Heckmann Corporation Securities Litigation*, USDC for the District of Delaware, Case No. 1:10-cv-00378-LPS-MPT
*Deposition* on February 12, 2013 and January 18, 2013 *Declaration* in Support of Defendants' Brief in Opposition to Plaintiffs' Motion for Class Certification on economic issues related to the certifiability of a purported class of shareholders of Heckmann stock.

*James S. Tyler, Jr., Trust v. Solaicx, etc., et al.*, Santa Clara County Superior Court Case No. 111-CV-194167
*Analysis* presented on May 22 and 24, 2012 at Mediation Conference on behalf of defendants regarding damages to plaintiff from alleged breach of fiduciary duty and breach of contract pertaining to private equity re-capitalization transaction.

*John Chamberlain et al. v. Reddy Ice Holdings, Inc. et al.*, USDC, Eastern District of Michigan, Case No. 2:08-cv-13451.
*Rebuttal Expert Report* on April 20, 2012 and *Expert Report* on March 2, 2012 on behalf of Reddy Ice Holdings, Inc. regarding the appropriateness of certifying a putative class in a securities fraud matter.

*Veronica Gutierrez, et al.  v. Wells Fargo & Company, et al.,* USDC (N.D. Cal) Case No. C 07-05923 WHA (JCSx)
*Trial testimony* on May 7, 2010, *Deposition* on February 5, 2010 and *Expert Report* dated January 27, 2010 on behalf of defendant, in response to plaintiffs' experts' calculation of damages allegedly suffered as a result of defendant's methods of charging overdraft fees on its customers' checking accounts.

*Mike Alexandros, et al. v. KOR Electronics, Inc., et al.*, Orange County Superior Court Case No. 06-CC-07881
*Trial testimony* on January 27, 2010, d*eposition testimony* on April 29, 2009, regarding damages to minority shareholder plaintiffs as a result of alleged fraud and breach of fiduciary duty by controlling shareholder defendants.

*In re REMEC Incorporated Securities Litigation, et al.*, USDC (S.D. Cal) Case No. 04 CV 1948 JM (AJB)
*Deposition* on March 11, 2009, *Expert Rebuttal Report,* dated February 3, 2009, *Expert Report*, dated December 23, 2008 and Declaration in Support of Defendants' Motion for Summary Judgment or, Alternatively, Partial Summary Judgment, regarding loss causation and reliance, dated September 22, 2008.

16

A2438

Alan J. Cox

*In re Textainer Financial Services Corporation, et al.*, San Francisco County Superior Court Case No. CGC 05-440303.
*Deposition* on damages due to alleged breach of fiduciary duty dated February 6, 2008.

*Securities and Exchange Commission v. Alexander J. Yaroshinsky, Sofia K. Yaroshinsky, and Victor E. Zak*, USDC (S.D. N.Y.) Case No. 06cv2401
*Expert Rebuttal Report*, on behalf of defendants, regarding the materiality of alleged inside information dated December 1, 2007.

American Arbitration Association, Los Angeles.  Testimony on materiality, unjust enrichment from insider trading and harm to reputation as a result of withholding of material information for a commercial bank.

*Securities and Exchange Commission v. Jeremy R. Lent, et al.*
*Expert Report* dated July 31, 2006.

*Capital Ventures International v. Network Commerce Inc. et al.,* Case No. C 01-0675L
*Deposition* dated June 30, 2006, *Rebuttal Report* dated April 19, 2006 and *Expert Report* dated March 20, 2006.

*In re Novastar Financial, Inc. Securities Litigation*
*Declaration* dated June 26, 2006.

*NZMP (USA), Inc. et al. v. Richard D. Marconi, et al.*
*Deposition* dated June 11, 2006 and *Expert Report* dated May 15, 2006.

*Securities and Exchange Commission v. TenFold Corporation, et al.,* Case No. 2:03-CV-00442 TC
*Expert Report* dated June 3, 2005, *Expert Rebuttal Report* dated June 17, 2005 and *Deposition* dated July 19, 2005.

*Norwood Resources, Ltd. v. Encana Corporation and Texalta Resources, Inc.*
*Deposition* dated June 15, 2005 and *Expert Report* dated March 25, 2005.

*United States v. Richard H. Hawkins*
*Expert Report* dated December 6, 2004 on materiality, liability and damages arising from an alleged improper recognition of revenues.

*Sierra National Insurance Holdings, Inc. v. Credit Lyonnais S.A., et al.,* Case Nos. 99-02829, CV-01-01339, and CV-02-5983 AHM (CWx)
*Deposition* dated October 13-14, 2004, *Rebuttal Report* dated August 23, 2004 and *Expert Report* dated July 12, 2004 by Alan Cox, David Fishbaum (Mercer Oliver Wyman) and Craig Merrill.

*In re Providian Financial Corporation Securities Litigation,* Case No. C-01-3952-CRB
*Expert Report* dated May 22, 2004.

17

A2439

Alan J. Cox

*Tonga Trust Fund* v. *J.D. Bogdonoff, Wellness Technologies, Inc., Conrad Noriega, Services International Corporation, Donald Kaplan, Michael D. Mansfield, Giandomenico (John) A. Rende, and Field Logan & Co.,* Case No. 02-2654-MJJ
*Expert Report* dated November 21, 2003.

*Nicor Inc. Securities Litigation*
*Report* dated October 1, 2003 on Damage Calculations Under Various Damage Theories.

*Terayon Communication Systems, Inc. Securities Litigation*
*Expert Rebuttal Report* dated September 8, 2003.

*Dusan Equipment Corporation* v. *Travelers Property Casualty*
*Expert Report* dated June 4, 2003.

*PSINet, Inc. Securities Litigation*
*Deposition* dated January 9, 2003 and *Expert Report* dated December 6, 2002.

*Robert F. Flood v. Bessemer Trust Company, et al.*
*Deposition* dated November 27, 2002.

*Jason Stanley, et al. v. Safeskin Corporation, et al.*
*Deposition* dated June 27, 2002, *Supplemental Expert Report* dated June 5, 2002 and *Expert Report* dated May 15, 2002.

*Nanogen, Inc. v. Donald D. Montgomery and CombiMatrix Corp.*
*Rebuttal report* dated May 6, 2002 and *Expert Report* dated April 8, 2002.

*Kaaren Yarborough v. PeopleSoft, Inc., et al.*
*Testimony* dated August 8, 2001 and January 9, 2001, and *Expert Report* dated October 9, 2000.

*Michael Carabetta v. Novadigm, Inc., Albion Fizgerald, and Wallace Ruiz*
*Testimony* on August 10, 2001 and *Expert Report* on behalf of Novadigm, Inc., July 8, 2001.

Arbitration before the National Association of Securities Dealers, Inc.
*Testimony* in the matter of estimated damages due to raiding and taking of intellectual property in a raiding dispute between investment banks.

*Danis v. USN Communications, Inc., et al.*
*Testimony* dated August 23, 2000 and *Expert Report* dated August 1, 2000.  Report discussed Section 11, 12 and 10(b)5 damage issues arising out of an IPO of a telecommunications reseller.

*Barbara Rosen, et al. v. Macromedia, Inc., et al.*
*Declaration* dated April 22, 1999 in Opposition to Plaintiffs' Motion for Class Certification.

18

A2440

Alan J. Cox

*Elliott Miller v. NTN Communications, Inc*.
*Deposition* taken on December 17, 1998, *Rebuttal Report* dated November 6, 1998 and *Initial Report* dated October 23, 1998.  The report addressed issues of market efficiency, materiality, and reliance issues in a 10b-5 class action.

*Interactive Networks, Inc. v. NTN Communications, Inc*.
*Testimony* on behalf of NTN Communications, Inc.  *Deposition* given on the impact of alleged statements on the ability of plaintiff to make a seasoned offering, April 1996.

### Class Certification

*Ivan and Melanie Kail, Barry Garfinkel, Frederick Sharp v. Wolf Appliance*, United States District Court for the Eastern District of New York.
*Deposition* on April 17, 2019, *Expert Rebuttal Report* dated March 7, 2019 on behalf of defendant, Wolf Appliance, Inc. Expert rebuttal of proposed damages methodology and class certification regarding Wolf ovens in the U.S.

*Vicky Maldonado, et al. v. Apple Inc., et al.,* U.S.D.C. for the Northern District of California, San Francisco Division Case No. 3:16-cv-04067-WHO
*Deposition* on April 15, 2019, *Declaration and Expert Report in Support of Defendants' Opposition to Class Certification* dated April 8, 2019 on behalf of Apple Inc., AppleCare Service Company, Inc. and Apple CSC Inc. in rebuttal to Plaintiffs' Economic Expert report on class certification related to Apple service plans for iPhones and iPads in the U.S.

*In Re Korean Ramen Antitrust Litigation,* U.S. District Court for the Northern District of California, San Francisco Division, Case No. 3:13-cv-04115-WHO
*Trial testimony* on December 12-13, 2018, *Deposition* on September 27, 2017, *Reply Expert Report* dated August 18, 2017, *Supplemental Expert Report* dated July 21, 2017*, Reply Declaration* dated November 2, 2016, *Deposition testimony* on October 7, 2016 and *Declaration* of Alan J. Cox dated August 24, 2016 on behalf of Defendants Nongshim Co., Ltd., Nongshim America, Inc., Ottogi Co. Ltd and Ottogi America, Inc. responding in opposition to Motions by Direct Purchaser Plaintiffs and Indirect Purchaser Plaintiffs for Class Certification relating to the sales of Korean ramen products in the United States by Defendants.

*Fabrienne English, et al. v. Apple Inc., Applecare Service Company, Inc. and Apple CSC Inc.*, US District Court for the Northern District of California Case No. 3:14-cv-01619-WHO.
*Deposition*, September 25, 2015 and *Expert Report*, September 9, 2015 in rebuttal to Plaintiffs' Economic Expert report on class certification related to Apple service plans for iPhones.

*In re NCAA Student-Athlete Name and Likeness Licensing Litigation*, USDC for the Northern District of California Case No. 09-cv-1967-CW
*Expert Report* on September 25, 2013 on behalf of defendant, Electronic Arts, Inc. responding to plaintiffs' Third Consolidated Amended Class Action Complaint alleging an anticompetitive conspiracy to license and sell the names, images, and likeness of current and former student-athletes. *Deposition* on April 4, 2013 and *Declaration of Alan J. Cox Regarding Class Certification*, dated March 14, 2013, on

19

A2441

Alan J. Cox

behalf of defendant, <u>Electronic Arts, Inc</u>*.,* responding to plaintiffs' expert's class certification report with regard to collegiate video games.

*Adrienne Moore, et al. v. <u>Apple, Inc</u>*., US District Court for the Northern District of California, San Jose Division Case No. 5:14-cv-02269-LHK
*Expert Report* filed on June 12, 2015, on behalf of defendant, Apple Inc. Class certification rebuttal related to lost text messages sent to former iPhone owners who had used Apple's iMessage service.

<u>*Melvin Gene Snow, et al*</u>*. v. Lenscrafters, Inc., et al.*
*Declaration* on class certification issues*, January 29, 2007.*

<u>*Bulk (Extruded) Graphite Products*</u> *Antitrust Litigation*
*Expert Report* on class certification issues, dated September 21, 2005.

### Contract Disputes

<u>*Major Brands, Inc.*</u> *v. Mast-Jägermeister US, Inc., et al.,* U.S.D.C. for the Eastern District of Missouri Eastern Division, Case No. 4:18-cv-00423-HEA
*Reply Report* dated December 4, 2020,  *Deposition* dated September 2, 2020, *Initial Expert Report* dated November 1, 2019 on behalf of plaintiff <u>Major Brands, Inc.</u> regarding damages suffered by Major Brands as a result of the alleged wrongful termination of the Distribution Agreement and the alleged wrongful actions by the defendants.

*Cypress Insurance Company, as subrogee of Microsoft Corporation, v. <u>SK hynix America, Inc</u>.,* USDC, for the Western District of Washington at Seattle Case No. 2:17-cv-00467-RAJ, Filed: March 23, 2017.
*Trial testimony* on March 19, 2019, *Deposition* dated October 10, 2018, *Rebuttal Expert Report* dated September 25, 2018, *Initial Expert Report* dated September 4, 2018 regarding economic issues related to an alleged breach of a supply agreement for DRAM chips between SK Hynix America and Microsoft Corporation.

<u>*Major Brands, Inc*</u>*. v. Diageo North America, Inc., et al.,* Missouri Circuit Court Case No. 1322-CC00534
*Deposition* on May 28, 2014 and *Expert Report* on May 8, 2014 regarding calculation of lost profits as a result of wrongful termination of a distribution agreement.

International Chamber of Commerce Arbitration, London. *Expert Rebuttal Report* and *Testimony*, on behalf of respondent, on damages due to alleged misappropriation of trade secrets in solar arrays.

<u>*Pioneer Drive, LLC*</u> *v. Nissan Diesel America, Inc., et al.*, USDC (District of Montana, Missoula Division) Case No. CV 08-115-M-DWM
*Expert Report* dated October 1, 2009, on behalf of plaintiff, regarding damages suffered due to defendants' alleged breach of joint venture agreement.

*Dong Ah Tire & Rubber Co. Ltd., v. Glasforms, Inc., v. CTG International, Inc. and Taishan Fiberglass, Inc., et al.*, USDC (N.D. Cal) Case No. C06-03359 JF(RS) (Consolidated with Case No. C06-00213 JF(RS))

20

A2442

Alan J. Cox

*Trial testimony* on September 10, 2009, *Deposition* on April 28, 2009, *Expert Rebuttal Report*, dated October 10, 2008, on behalf of third-party defendants CTG International, Inc. and Taishan Fiberglass, Inc., rebutting plaintiff's expert's report claiming commercial damages for recall costs, lost profits, and costs to repair reputation due to third-party defendants' supplying allegedly defective fiberglass.

*Crowley Marine Services, Inc.* v. *Alaska Village Electric Cooperative, Inc.,* Case No. 3:06-CV-00054-TMB.
*Expert Report* dated July 24, 2006.

*ZF Micro Solutions, Inc. v. National Semiconductor Corp.*
*Testimony* on June 7, 2004 and *Deposition* dated April 26, 2004.

American Arbitration Association, Washington, D.C. *Expert Report*, *Deposition Testimony* and *Cross-examination* on alleged failure to perform on best effort contract for the delivery of a cancer drug.

*AMP, Inc. v. Raychem Corp.*
*Deposition* dated March 23, 1999 and *Expert Report* dated December 15, 1998 estimates the potential growth in sales of Halar-insulated LAN cable for the purpose of demonstrating lost sales as a result of a breach of contract.

Arbitration. *Report* and *Testimony* on the role of spot markets in an arbitration over the value of uranium in a royalty dispute. Submitted, case settled in May 1994.

**Other**

*New York Shipping Ass'n, Inc., et al.* v. *Int'l Longshoremen's Ass'n, AFL-CIO et al.*, USDC for the District of New Jersey Case No. 10-cv-6261 (DRD) (MAS)
*Report* dated October 4, 2011 on the economic damages sustained by plaintiffs as a result of work stoppage.

*In the matter of:* *City of Dana Point v. Commissioner of Internal Revenue*, United States Tax Court
*Report* "Percent of California Cities that Used Independent Contractors as Instructors of Recreational Classes of the Type Offered by Dana Point in 2004*,"* dated April 11, 2011.

*Expedia, Inc. and Expedia Italy S.r.l.*
*Report* on behalf of Expedia to Italian consumer protection authorities on certain aspects of Expedia's interaction with credit card system dated December 27, 2010.

*Prediwave Corporation v. Jimmy Li and Fu Sze Shing*
*Declaration* dated April 25, 2005 in Opposition to Defendants' Motions for Summary Judgment.

*Melvin Holler v. Metabolife, Inc., et al.*
*Deposition* on April 29, 2009*, Rebuttal Report* dated July 6, 2004 and *Expert Report* dated June 14, 2004.

21

A2443

Alan J. Cox

*Michael Goldstein, et al. v. Metabolife International, Inc., et al.*
*Deposition* dated July 25, 2003, *Rebuttal Report* dated June 2, 2003 and *Expert Report* dated
May 19, 2003.

*Samsung Semiconductor, Inc. v. Advanced MP Technology*
*Testimony* before the Superior Court of the State of California for the County of San Francisco dated
March 10, 2003 and *Deposition* dated January 15, 2003.

*In re Superstill Technology, Inc., Debtor.  Ridgewood Waterpure Corporation v. VPP Technology, Inc.,*
*et al*.
*Declaration* in Opposition to VPP's Motion for Summary Judgment dated July 12, 2002.

*Michael G. Sherman v. Master Protection Corp*.
*Expert testimony* dated August 16, 2000 to evaluate damages from a breach of contract and tying claims
in a franchising case.

*Bryant Cragun v. DOES 1-50, inclusive*.
*Declaration* in support of application for temporary restraining order dated January 27, 2000.
Discussion of economics and financial impact of defamatory Internet postings and press releases.

*Traverso v. Eller Media*
*Report* dated October 23, 1998 places value on option rights that were extinguished by the option writer.


# LITIGATION CONSULTING EXPERIENCE

*Antitrust*

*In Re TFT-LCD (Flat Panel) Antitrust Litigation*, M-07-1827 SI, MDL No. 1827 (N.D. Cal 2d)
Amended Complaint filed March 2, 2011) consultation on behalf of Epson.

*John Bahl v. Metabolife International, Inc., et al.*
Provided economic analysis of the claims that Metabolife had been accused of conspiring with its
distributors to fix prices for Metabolife 356, its epehdrine-based weight loss product.

*The City of Long Beach, et al. v. Standard Oil of California, et al.,* on behalf of defendants Shell Oil and
Exxon.
Provided detailed analysis of the supply and demand of crude oil in California in a case alleging
conspiracy to hold down the price of heavy crude.

*Tucson Electric Power v. Southern California Edison* on behalf of Southern California Edison.  Conducted
antitrust analysis of the Southwestern bulk power market in the context of proposed merger that Edison
was alleged to have disrupted.

A2444

Alan J. Cox

*State of Florida v. Ross Labs on behalf of Ross Labs*.
Demand, pricing and performance analysis in the infant formula industry in price fixing cases.

*City of Long Beach v. Unocal California Pipeline Company (UNOCAP),* on behalf of UNOCAP.
Undertook study of the competitiveness of crude oil transportation services in California.

*Anderson, et al. v. Texaco Refining and Marketing,* on behalf of Texaco Refining and Marketing.  Case involved pricing of wholesale gasoline to lessee-operated gasoline stations in San Diego and Los Angeles.

*In re Catfish Antitrust Litigation,* USDC (N.D. Mississippi).
Undertook statistical analysis of data on the price of frozen pond-raised catfish to different classes buyers in order to show that behavior of prices was so fundamentally different that a single class was inappropriate.

### Intellectual Property

HondaJet, a subsidiary of Honda Motors
Valuation of a patent portfolio for tax purposes.

A major manufacturer of semiconductors
Assisted manufacturer in its patent licensing negotiations.

*Genicon Sciences Corp. v. Regents of the University of California, et al*.
Undertook research in preparation for providing expert testimony in a dispute over assignment of ownership of a patent for metallic blood probes.

*Micron Technology, Inc. v. Mosel Vitelic, Inc*.
Managed research assessing damages in semiconductor patent infringement suits and countersuits. Participated in writing reports.

*Northern Telecom Ltd. v. Samsung Electronics,* on behalf of Samsung.  Responsible for estimating reasonable royalty on patent for etching semiconductors.  Submitted affidavits in support of various motions.

*Advanced Micro Devices v. Intel,* on behalf of Intel.
Arbitration on terms of cross-licensing agreement for semiconductor products.  Estimated impact of cross-licensing agreements on prices and sales of microprocessors.

*TDM Partners v. IBM,* on behalf of IBM.
Supervised research on factors that contribute to failure of new product introduction.

23

A2445

Alan J. Cox

### Telecommunications

*In the Matter of the Joint Application of Pacific Telesis Group and SBC Communications Inc. for SBC to Control Pacific Bell.*
Assisted in the preparation of testimony on the extent to which merger-related efficiencies would be passed on to telephone ratepayers by competitive forces.

*Bell Atlantic, et al. v. American Telephone and Telegraph.*
Assisted in evaluating the competitive consequences of the merger between McCaw Cellular and AT&T.

*OPTUS v. Telecom Australia.*
Undertook analysis of Telecom Australia's alleged dominance and anticompetitive behavior in Australian cellular markets.

*United States of America v. Western Electric Company, Inc. and American Telephone and Telegraph, Inc.*
Assisted in undertaking analysis of the welfare losses due to the MFJ restrictions on the RBOCs.

*Fred Dillet dba Telcom v. GTE.*
Damage expert for defendant in cellular dealer termination matter.

### Energy Industry

*Investigation into Electric Power Competition,* before the Pennsylvania Public Utility Commission, Docket No. I-940032, on behalf of PECO Energy Company.
Assisted in preparation of position papers on the impact of retail wheeling.

*Pacific Gas & Electric 1993 General Rate Case,* on behalf of Division of Ratepayer Advocates of the California Public Utilities Commission.
Provided economic and statistical analysis of proposed new methodology for allocating transmission and distribution costs.

Application by Trans Power New Zealand, Ltd., to the Commerce Commission for Authorization of Restrictive Trade Practices on behalf of Mercury Energy, the distribution company in Auckland. Assisted in the preparation and writing of a report and testimony on the appropriate method of charging for the use of the national electric transmission grid in New Zealand.

*Nevada Cogeneration Associates # 1, a General Partnership, and Nevada Cogeneration Associates #2, a General Partnership v. Nevada Power Company.*
Undertook financial and damage analysis in a dispute on payments to an independent power producer, on behalf of Nevada Power.

A2446

Alan J. Cox

### *Securities/Financial Industry/Valuation*

*In the Matter of the Joint Application of Pacific Telesis Group and SBC Communications Inc. for SBC to Control Pacific Bell.*
Assisted in the preparation of rebuttal testimony on the stock market's assessment of the merger benefits.

*H. K. Porter Company, Inc. and the Committee of Unsecured Creditors of H. K. Porter Company, Inc. v. Thomas Mellon Evans, et al.*
Undertook analysis and wrote report on the appropriate return to utilize in determining the adequacy of a fund to finance asbestos settlements in a bankruptcy proceeding.

*Roberds Securities Litigation.*
Assisted in estimating damages in 10(b)-5 claim and in analysis of stock price movements.

*Burns, Philp Food, Inc. v. Rykoff-Sexton.*
Undertook a review of valuations of brand equity in connection with an alleged fraudulent conveyance.

*Fischer & Porter Co. and Elsag Bailey Process Automation N.V. v. Moorco International, Inc.*
Undertook analysis of stock prices to determine financial impact of alleged interference with a proposed merger.

<u>Resolution Trust Corporation</u> *v. Michael Milken, et al.,* on behalf of the Resolution Trust Corp.
Provided detailed analysis of role of Drexel Burnham's high yield department in the junk bond market.

*Resolution Trust Corp. v. Roy, et al.,* <u>on behalf of</u> <u>defendant officers and directors</u>.
Provided analytic support for expert testimony on behalf of officers and directors of a failed thrift in Hagerstown, Maryland.

*Consolidated Capital Securities Litigation* in support of defendant officers in a securities fraud litigation.
Provided analysis in support of expert testimony on the riskiness of Real Estate Investment Trusts.

Valuation of pension fund investment in energy service company.
Assisted Coopers & Lybrand valuation practice in valuation and provision of advice on prospects for energy-related investment made by pension fund.

### *Other*

*Sindy E. Johnson v. Apple Computer, Inc.*
Econometric and statistical analysis of salary histories to determine the effect, if any, of gender on salary plus bonus.

*American Airlines v. Northwest Airlines.*
Case involved allegation by American that fare management software was based upon stolen intellectual property.  Assisted in critiquing plaintiff's damages model.

25

A2447

Alan J. Cox

*Northrop Corp. v. The Queen in Right of Canada.*
Developed preliminary damage estimate <u>on behalf of Government of Canada</u> on alleged misappropriation of trade secrets in market for reconditioning F-5 jet fighters.

# PUBLICATIONS

"The Damages Testimony in VLSI Technologies v. Intel,"  Guest Post on Patently-O, March 19, 2021. [Guest Post by Alan Cox: The Damages Testimony in VLSI Technologies v. Intel | Patently-O (patentlyo.com)](patentlyo.com)

David S. Almeling, et al., *Disputed Issues in Awarding Unjust Enrichment Damages in Trade Secret Cases*, 19 Sedona Conf. J. 667 (2018).

"The Limitations of Analytical Approach to Reasonable Royalty," published April 13, 2017 in *Law360*. Dr. Cox offers a rebuttal to a previously published *Law360 article, "*Determining Reasonable Royalties with Analytical Approach." He provides a detailed counterargument explaining that the analytical approach is inappropriate for the valuation of intellectual property and that it is especially ill-suited for complex products.

"Using Citation Analysis to Value Patents," published in *Financier Worldwide* Magazine January 2016 Issue.

"Misuse of Patent Citation Analysis in *Finjan v. Blue Coat,"* published October 7, 2015 in *Law360*. Dr. Cox provides an overview of how to assess patent values using quantitive data on number of forward citations received by a patent.

Article, "Off the Wagon," published February 6, 2015 in *Commercial Dispute Resolution* magazine. The article discusses the analysis used to calculate damages based on lost profits to Major Brands due to both the alleged breach of contract by Diageo and tortious interference by the competing distributor.

"The Demise of Junk Science and the 25% Rule," column published in *IPLaw360*, 29 July 2010, with Stephen Rusek.  It discusses the use of the so-called 25 Percent Rule which the writers point out has no rational, scientific, or business basis.  This lack of principal combined with the *ad hoc* manner in which the purported rule is implemented can also give wildly unpredictable results.

"Three Cases Reshaping Patent Licensing Practice," article published in *Managing Intellectual Property*, 1 March 2010, with Dr. Elizabeth M. Bailey and Dr. Gregory K. Leonard.

"Compensatory Damages Issues in Patent Infringement Cases: A Handbook for Federal District Court Judges."  Participation, with committee members, which included legal practitioners, trial judges, damages experts, and academics, in the development of a handbook for trial courts to consult on procedural practices that may be helpful in the management and adjudication of damages issues in patent cases.  20 January 2010.

26

A2448

Alan J. Cox

"2 Economists' Take On i4i V. Microsoft," column published in *Law360*, 23 November 2009, with Mario Lopez, reviewing the damages raised in the CAFC's hearings in the I4I case and the appropriate standards for estimating damages in patent infringement cases.

"Intellectual Property Rights Protection in China: Economic Damages Still Need Improving," Oliver Wyman Journal, pp. 93-94, Spring 2009, with Kristina Sepetys.

"Intellectual Property Rights Protection in China:  Trends in Litigation and Economic Damages," working paper, 13 February 2009, with Kristina Sepetys (English and Chinese versions).

"Intellectual Property Rights Protections Emerging in China: System Far from Perfect," Executive Counsel, pp. 42-45, July/August 2006, with Kristina Sepetys.

"Intellectual Property Rights Protection in China: Litigation, Economic Damages, and Case Strategies," Thompson/West (197 Supp. 4), pp. 401-421, 2006, with Kristina Sepetys.

"Intellectual Property Rights Protection in China: Litigation, Economic Damages, and Case Strategies," *Economic Approaches to Intellectual Property Policy, Litigation, and Management,* (White Plains: National Economic Research Associates, 2005), *pp*. 293-313 with Kristina Sepetys.

"The Frequently Forgotten Benefits of Price Discrimination," *Economics of Antitrust - New Issues, Questions, and Insights*, ed. Dr. Lawrence Wu (White Plains: National Economic Research Associates, 2004), 99-107.

"A Better Consumer Survey for Better Damages," *IP Value Commentator*, (April 2003).

"Mergers, Acquisitions, Divestitures, and Applications for Market-Based Rates in a Deregulating Electric Utility Industry," *The Electricity Journal* 12, No. 4, and (May 1999): 27-36.

"Relevant Markets and the Economics of Market Power in Intellectual Property Related Antitrust Matters," Presentation to the Practising Law Institute's "Intellectual Property Antitrust" program held at the Sheraton Palace Hotel in San Francisco, CA on July 15-16, 1999.

"Mergers in Regulated Industries:  The Uses and Abuses of Event Studies." *Journal of Regulatory Economics*; 14:281-304 (1998), (1998 Kluwer Academic Publishers) with Jonathan Portes.

"Linking Stock Prices and Mergers," *Public Utilities Fortnightly*, (June 1998) with Jonathan Portes.

"Winning Consumers: A Strategy for Developing New Products is the Key to Competitiveness," Energy, Vol. XXIII, no. 3:11, June 1998, with James R. Forcier.

"New Product Development and Pricing for Competitive Electricity Markets," presented at the Electric Power Research Institute's Conference "Pricing Energy in a Competitive Market," Washington, D.C., 19 June 1998, and at the 17th Annual Conference of the Advanced Workshop in Regulation and Competition, Vergennes, Vermont, 28 May 1998, with James R. Forcier.

27

A2449

Alan J. Cox

"Wind Power in California:  A Case Study of Targeted Tax Subsidies." *Regulatory Choices, A Perspective on Developments in Energy Policy*, R. J. Gilbert, ed., (Berkeley, University of California Press, 1991) with C. Blumstein and R. Gilbert.

"An Economic Evaluation of the Costs and Benefits of Diablo Canyon." *Regulatory Choices, A Perspective on Developments in Energy Policy,* R. Gilbert, ed., (Berkeley, University of California Press, 1991) with R.J. Gilbert.

"A Review of the Energy Productivity Center's Least-Cost Energy Strategy Study." prepared for the Electric Power Research Institute, MIT Energy Laboratory Energy Model Analysis Program, E.R. Berndt, M. Manove and D.O. Wood, eds., EPRI Report EPRI-EA-2753, 1983.

"Homeostatic Utility Control." *IEEE Transactions on Power Apparatus and Systems*, Vol. PAS-99, No. 3, May/June 1980, with J. L. Kirtley, Jr., H.R. Outhred, F.H. Pickel, F.C. Schweppe, and R. D. Tabors.

"Economic Modeling of Energy from Burning Wood Waste at British Columbia Pulp and Paper Mills." *Energy Policy Modeling:  United States and Canadian Experiences*, 1980, W.T. Ziemba *et al.*, eds. (Hingham, MA, Martinus Nijhoff Press, 1980) with J. F. Helliwell.

"Estimation of Logging Costs and Timber Supply Curves from Forest Inventory Data." *The Forestry Chronicle*, August 1979, pp. 144-147, with E. R. Berndt and P. H. Pearse.
"Wood Wastes as an Energy Source for the British Columbia Pulp and Paper Industry:  Economic Implications and Institutional Barriers." *Energy Policy, The Global Challenge*, P.N. Nemetz, ed., 1979, (Montreal, Institute of Research in Public Policy) with J. F. Helliwell.

"Electricity Pricing and Electricity Supply:  The Influence of Utility Pricing on Electricity Production by Pulp and Paper Mills." *Resources and Energy*, Vol. 2, pp. 51-74, 1979, with J. F. Helliwell.

"Simulation Analysis of Energy Production in the British Columbia Pulp and Paper Industry."  MIT Energy Laboratory working paper MIT-EL79-009.  Also, in *Simulation, Modeling and Decision in Energy Systems, Conference Proceedings,* 1978.

## PRESENTATIONS AND WORKING PAPERS

Panelist for Webinar *TCL v. Ericsson* FRAND Decision: Legal Implications LIVE Webcast, September 07, 2018, The Knowledge Group, LLC.

Panelist, "Settling Trade Secret Disputes," webinar hosted by the Intellectual Property Owners Association IP Chat Channel on January 30, 2018.  Joining Dr. Cox were Victoria Cundiff of Paul Hastings and Barbara Reeves, mediator and arbitrator at JAMS.

Dr. Cox led a panel discussion on "Reasonable Royalty in FRAND" at the 2017 National Technology Law Conference in Taipei, Taiwan.  The conference, presented by the National Chiao Tung University School of Law, was held on 25-26 October 2017.

28

A2450

Alan J. Cox

October 13, 2017, invited speaker at the 6th Annual US-China Intellectual Property Summit co-hosted by Loyola Law School, The Berkeley Center for Law and Technology, and China Renmin University IP Academy. Dr. Cox spoke on "New Trends in IP Litigation, Courts, and Enforcement."

Dr. Cox addressed a conference on "Economics in IP and IP in Economics" held at Renmin University in Beijing on 14-15 July 2016. He discussed issues on the appropriate calculation of damages in IP matters and related issues in antitrust. Dr. Cox also appeared as an expert invited by the USPTO and met with the judges of the Jiangsu and Guangdong High Courts.

Panelist at a video webcast titled "Preparing for an Exit: Private Company Valuation," hosted by Expert Webcast on April 28, 2016. Dr. Cox discussed techniques and considerations in the valuation of Intellectual Property.

Invited speaker at the *Eighth Annual International Legal Alliance Summit & Awards*, organized by Leaders League, in New York City on June 24, 2015. Dr. Cox participated in an expert insights session entitled "International IP Trends: Litigation & Prosecution, IP Wars."

July 22, 2015, Panelist on "Meeting the Challenge of Patent Valuation" at the CPIP's Summer Institute in Patent Law, Beaver Creek CO, sponsored by Center for the Protection of Intellectual Property, George Mason University School of Law.

Keynote Speaker, at the *2014 International Symposium on Damages for Patent Infringement*, hosted by the Taiwan Intellectual Property Training Academy (TIPA): Taipei, Taiwan on October 24, 2014. Dr. Cox presented "Determining Patent Damages: Lessons and Challenges from the US" and served as a panelist in a session entitled "Damage Calculation of Patent Infringement in Taiwan: Observations on Development in Recent Years."

Program Co-chair, "Litigating Patent Damages: Strategic Issues for Proving and Refuting Damages Claims," hosted by Law Seminars International, San Francisco May 29-30, 2014. Dr. Cox also took part on a panel and discussed issues raised in *CMU v. Marvell*: Foreign Sales and the use of the Analytical Method as an alternative to the Hypothetical Negotiation, including products made and sold outside the U.S. in the royalty base.

"Intangibles: The Challenge of Understanding Value Creation within Multinational Enterprises." In this NERA seminar, held in Paris on 12 December 2013, Dr. Cox and NERA colleagues, Dr. Emmanuel Llinares and Vice President Sébastien Gonnet discussed how to identify and map intangibles within multinational enterprises (MNEs), and presented the economic framework for intangibles valuation.

Presentation to Gibson Dunn & Crutcher, LLP titled "Determining Whether a Stock (or Stocks) Traded Efficiently and the Deutsche Bank Decision," in San Francisco on December 4, 2013. Discussed issues involved in Securities 10b5 cases as they relate to efficient markets and explored the US District Court's interesting decision in *Deutsch Bank*.

Presentation to Latham & Watkins, LLP titled "Determining Whether a Stock (or Stocks) Traded Efficiently," in San Francisco on October 15, 2013.

29

A2451

Alan J. Cox

Participation, in *Economics Analysis of Business Disputes*, seminar hosted by NERA in Tokyo on July 19, 2013.  Dr. Cox and Economists from NERA's Japan and US offices examined recent economic analyses in complex business disputes and litigation in Japan and the United States.  Dr. Cox presented "Trends in Patent Litigation in the United States:  Consequences for Global Companies."

Presentation to Haynes and Boone, LLP titled "Patent Trolls or Patent Angels: Who are They and How Do They Affect Innovation?" in Dallas, Texas on June 12, 2013.

Participation in the *IP Strategy Summit: Enforcement*, hosted by IGlobal Forum in Washington, DC on 29-30 May 2013.  "Standard Essential Patents (SEPS) and Your Enforcement Strategy," moderated by NERA colleague, Dr. David Blackburn, and panelists Dr. Alan Cox, Paul Michel, retired Chief Judge of the Federal Circuit and Laura Beth Miller of Brinks Hofer Gibson & Lion discussed the current SEPs landscape in light of recent disputes among smartphone technology owners, the recent RAND decision in the *Microsoft v. Motorola* case and trends in both federal courts and the US International Trade Commission.  Dr. Cox also took part on a panel entitled "International Enforcement: Globalization and Your IP," which covered intellectual property enforcement issues in China, India and Europe.

Dr. Cox was invited to be a panelist on the IPO IP Chat Channel webinar on "FRAND Determined: Judge Robart's Decision in "*Microsoft v. Motorola/Google,*" on May 9, 2013.  Joining Dr. Cox were William Coats of Greenberg Traurig and Sandy Block of IBM.

"Effective Responses to Patent Trolls:  We Can Cross That Bridge."  Alan Cox and Bob Skitol of Drinker Biddle were joined by Cynthia Bright, Esq. of Hewlett-Packard Company, Michelle Lee, Director, USPTO Silicon Valley; and Fiona Scott Morton, Professor, Yale School of Management at NERA/DrinkerBiddle hosted luncheon conference on May 8, 2013 in East Palo Alto.  Dr. Cox discussed effective responses to patent infringement claims and threats of such claims from patent assertion entities.

Presentation to Winston & Strawn LLP titled "The Use of Comparable Licenses" with NERA colleague Anne Gron, Ph.D. in Chicago on May 1, 2013.

Presentation to Steptoe & Johnson LLP titled "Rigorous Economic Basis for Calculating and Proving IP Damages" in Washington, DC on April 12, 2013.

Dr. Cox was invited to address the course in "Intellectual Property Legal Practice" at Beijing University School of Law on 3 March 2013.  The course, managed by the Beijing office of King & Wood Mallesons, is designed to enable students to master the basic theory and practices of intellectual property law.  Dr. Cox discussed issues of intellectual property valuation, damages assessment, and possible anticompetitive uses of intellectual property incorporated into standards.

Participation, in the 2012 *Cross-Border IPR Dispute Resolution Conference*, hosted by ASCo: Seoul, Korea on October 17-18, 2012.  NERA sponsored this conference, where Dr. Cox led a master class entitled "IPR Negotiation:  Effective Calculation of Patent Damages and Negotiation Tactics."

A2452

Alan J. Cox

Presentation, a GIL 2012:  The Global Community of Growth, Innovation and Leadership, hosted by the GIL Community: San Jose, California.  Dr. Cox gave a presentation on "Developments in IP Protection in China" on September 12, 2012.

Presentation to Latham & Watkins, LLP titled "Current Use of Economic Analyses in Class Certification in Securities Fraud Matters" with NERA colleague Stefan Boettrich in New York City on January 17, 2012.

Participation in "The Lifecycle of a US 'Class Action' Lawsuit: What Chinese Companies Need to Know," hosted by Marsh: Beijing, China, November 1, 2011.

"Recent trends in US patent litigation and the impact on non-US companies" presentation at the 8th Annual Asia-Pacific IP Forum in, Kowloon, Hong Kong on September 29, 2011.

"International Trends in Securities Fraud Litigation and the Impact on Chinese Companies," presentation with NERA colleague Mark Berenblut, hosted by the Hong Kong Society of Financial Analysts on September 27, 2011 in Hong Kong.  Dr. Cox discussed the economics of damages claims in lawsuits alleging securities fraud by directors and officers of companies listed on the US and other stock exchanges.

"Comparables:  the use and misuse of benchmark royalty rates for patent damages," hosted by Dewey LeBeouf, San Francisco on July 12, 2011.  Dr. Cox addressed the role of licenses and industry benchmarks in the determination of reasonable royalties.

Panelist at the "Stanford IP Seminar for Intellectual Property Judges from The People's Republic of China," hosted by Stanford Law School May 23-27, 2011.  Dr. Cox and co-panelist, USDC for the Northern District of California, Elizabeth D. Laporte, Magistrate Judge, discussed current United States intellectual property law and patent damages.

"Licensing and Litigating Reasonable Royalties for the Patents in Technical Standards," hosted by the Austin Chapter of Licensing Executives Society (LES) on May 31, 2011.  Dr. Cox discussed the difficulties in defining a Fair, Reasonable, and Non-Discriminatory (FRAND) royalty, an issue that often results in litigation.

"Implications of Recent Legal Developments on the Handling of Patent Cases in the Trial Court."  Dr. Cox discussed the evolving standards in damages estimation at the patent litigation presentation to the District Judicial Council for the Southern District of California on April 25, 2011 in Dana Point, CA.

"Unlocking *Uniloc*:  Meeting the Court's New Evidentiary Standards for Reasonable Royalties," one of a series of roundtable discussions hosted by NERA in San Francisco on March 3 and Palo Alto, California on March 4, 2011.

Moderator, "*Uniloc v. Microsoft*:  A Key New Ruling for Patent Damages," expert analysis telebriefing hosted by Law Seminars International on January 21, 2011.

A2453

Alan J. Cox

Presentation to Allen and Overy LLP and to Ashurst LLP titled "The Simple Economics of Reasonable Royalties for Patents Incorporated into a Technical Standard," in London on December 6, 2010.

"Trends in Intellectual Property Protection and Antitrust Enforcement in China," seminar hosted by NERA in San Francisco on November 3, 2010.

Presentation at Foley & Lardner LLP's "Eye on China Roundtable Series," by Dr. Cox with Victor Xue, Executive Vice-President, US-China Green Energy Council and Catherine Sun, Managing Partner, Foley & Lardner Shanghai Offices, titled "IP Enforcement in China 2010:  Myth or Reality?" given in Palo Alto on November 1, 2010.

Silicon Valley Chapter of Licensing Executives Society, Panelist, "Licensing and Litigating Reasonable Royalties for the Patents in Technical Standards," September 22, 2010.

"Tips for Determining 'Reasonable' Royalties: The impact of recent case law on the economic analysis." Presentations at conference on "Legal Issues in Software Development," sponsored by Law Seminars International on June 16, 2010, in Seattle, WA.

Presentation to ZTE Corporation on June 4, 2010 in Shenzhen, China on patent infringement damage calculations in the United States.

Presentation to the Supreme People's Court of the People's Republic of China, including Chief Justice Kong Xiangiun, on May 26, 2010.  Dr. Cox, together with NERA colleague, Dr. Fei Deng, discussed the methods used in the United States to calculate damages in patent, trade secret, and trademark infringement litigation.  They also discussed antitrust issues related to intellectual property.

"Infringement Decisions and Judgments:  Important Lessons from High Profile Cases," presented at the 2nd Annual Anti-Monopoly & Competition Law Summit held May 25-27 in Beijing.  Dr. Cox discussed the differing treatment of *Intel* in jurisdictions around the world.

Panelist, "Trade Secret Remedies—Getting Creative," one-hour webinar hosted by the Intellectual Property Owners Association IP Chat Channel on April 1, 2010.

"Using Economics to Accurately Valuate IP," presentation with colleagues, Stephen Rusek and Dr. Mario Lopez, given at the Fenwick & West LLP Mountain View office on February 25, 2010.

"Damage Quantification in Patent Litigation:  Putting the 'Reasonable' in Reasonable Royalty Rate Determinations," seminar hosted by NERA in Toronto, Canada on December 9, 2009.  Dr. Cox and colleague, Mark Berenblut discussed patent valuation and reasonable royalties.

"Groundhog Day: Recurring Themes on Reasonable Royalties in Recent IP Damage Cases," NERA working paper, December 7, 2009, with colleagues Dr. Elizabeth M. Bailey and Dr. Gregory K. Leonard.

"Economic Basis for Damages Awards in United States Patent Litigation," a lecture on damages in patent infringement matters given at the University of Washington, School of Law, on October 20, 2009.

A2454

Alan J. Cox

"Damages and Economic Analysis of Liability in International Context," presented by Dr. Alan Cox at the ABTL's 36th Annual Conference, "Lost in Translation:  Cross-Border Litigation Tactics and Strategies."  The conference took place at The Broadmoor, Colorado Springs, CO on October 1-4, 2009.

Moderator, "Trying Damages in a Patent Case:  The Impact of Some Recent Decisions," teleconference organized by Law Seminars International on September 29, 2009.  Dr. Cox, joined by colleagues Dr. David Blackburn (NERA); Richard F. Cauley of Wang, Hartmann; James W. Morando of Farrella Braun, and Darin W. Snyder of O'Melveny & Myers, discussed trends in Federal Circuit patent damages decisions.

"Entire Market Value Rule and Apportionment in Calculating Patent Damages."  Presentation with Gregory Leonard given at Latham & Watkins LLP in San Francisco, CA on August 6, 2009.

"Impact of Patent Purchase and Patent Reform on Enforcement Damages," presented by Dr. Alan Cox at the ICAP / Ocean Tomo 2009 IP Markets Conference and Patent Auction held in Chicago, IL on July 22-23, 2009.

"Patent Damages," a conference presented by Law Seminars International on April 20, 2009 in San Francisco, CA, co-chaired by Alan Cox and Alexander Brainerd, Esq., Sonnenschein Nath & Rosenthal LLP.

"Antitrust and Intellectual Property Economics and Litigation in China" seminar, sponsored by NERA Economics Consulting.  Dr. Cox, with Fei Deng and Gregory Leonard presented an overview of recent trends in the Chinese business and legal climate in Washington, D.C. on April 16, 2009, and in San Francisco on April 23, 2009.

"Hot Topics in Copyright Trademark and Patent Law."  Session organized and moderated at the ABA's 24th Annual Intellectual Property Conference in Arlington, VA: "The Supreme Court's Effect on patent Licensing and Litigation Practice," on April 4, 2009.

"Trends in Damage Awards for Intellectual Property Infringement in the People's Republic of China." Presentation to the American Society of International Law at its March 25, 2009 annual meeting in Washington, D.C.  Dr. Cox discussed the status of judicial enforcement of intellectual property rights and the impact of revisions in the Patent Law.

"Shareholder Class Action Litigation – Recent Trends."  Presentation to the Arizona Chapter of the National Association of Corporate Directors Institute, on March 3, 2009 in Scottsdale, Arizona.  Dr. Cox discussed recent trends in shareholder class action litigation and the ways in which Board members can be on top of this issue.

"Basic Economic Analysis in Securities Class Action," a lecture on damages in securities fraud matters given at the University of Washington, School of Law, on February 25, 2009.

"An Economic View on Current Issues in Reasonable Royalty Analyses," Presentation to Wilson Sonsini Goodrich & Rosati, Palo Alto, California on January 29, 2009.

33

A2455

Alan J. Cox

"A Short Course in Economics:  Lecture 1, Supply and Demand," at O'Melveny & Myers LLP of San Francisco on January 28, 2009.

"Antitrust Problems in Standard-Setting" presented at the conference on China's Antimonopoly Law and Regulation on Abuse of Intellectual Property Rights, hosted by the China Society for World Trade Organization Studies under MOFCOM, on April 27, 2008 in Beijing, China.

Panelist, "Recent Antitrust Enforcement Activity in the Payment Card Industry:  A TransAtlantic View," telephone Brownbag Program hosted by The Financial Services Committee of the American Bar Association Section of Antitrust Law on February 22, 2008 in Washington, DC.

"Trends in Securities Class Actions and Issues in Subprime Litigation," a conference presented by the Oregon State Bar Regulations Section in Portland, Oregon on January 16, 2008.

"Innovative Strategies for Litigating Class Action Suits," a conference presented by Law Seminars International on November 12-13, 2007 in Los Angeles, California.  Presentation by Alan Cox entitled "Role of Expert Testimony – Economic Experts:  Strategies to employ experts, when and how to effectively use them."

"Standards Bodies & Patent Pools – Key Legal and Business Developments," a conference presented by Law Seminars International on October 11-12, 2007, in Arlington, VA.  Dr. Alan Cox delivered a presentation entitled "Tips for Determining 'Reasonable' Royalties," with Gil Ohana, Esq., of Wilmer, Cutler, Pickering, Hale and Door LLP.

"Standard Setting, Market Power and Intellectual Property Value" given in Portland, Oregon on April 26, 2005; Seattle, Washington on April 27, 2005 and in San Francisco on April 28, 2005.

"Key Issues Facing Boards of Directors: The Revolution in SEC Disclosure & Enforcement," Presentation co-hosted by the Directors Roundtable and Bingham McCutchen for boards of directors and their advisors at a session in Santa Clara, CA on March 4, 2004.

"Key Issues Facing Boards of Directors: The Revolution in SEC Disclosure & Enforcement," Presentation co-hosted by the Directors Roundtable and Akin, Gump, Strauss, Hauer & Feld for boards of directors and their advisors at a session in San Francisco, CA on January 13, 2004.

"Advanced IP Licensing Transactions - Business and Legal Issues," Law Seminars International Comprehensive Workshop.  A presentation by Alan Cox about Valuing Intellectual Property, held in Seattle, WA on January 12, 2004.

"Key Issues Facing Boards of Directors: The Revolution in SEC Disclosure & Enforcement," Presentation co-hosted by the Directors Roundtable and Dorsey & Whitney for boards of directors and their advisors at a session in Seattle, WA on December 11, 2003.

A2456

Alan J. Cox

"An Advanced Workshop on Calculating & Proving Patent Damages - Recent Developments and New Tools for Success," A conference presented by Law Seminars International on November 12, 2003 in Seattle, WA, co-chaired by Alan Cox and F. Ross Boundy, Esq. of Christensen O'Connor Johnson Kindness, LLC.  Presentation entitled "The Basic Economics of Damages Calculation in Intellectual Property Litigation."

"Showing Up When It's Over: Claiming Rates in Shareholder Class Actions," Presentation prepared by Marcia Mayer and Svetlana Starykh given by Alan Cox at the Practising Law Institute conference "Securities Litigation & Enforcement Institute 2003" on October 2, 2003 in San Francisco, CA.

"Calculating and Proving IP Damages - Recent developments, new tools for success," Law Seminars International Advanced Workshop.  Program Co-Chairs were Phillip A. Beutel of NERA and Michael R. Levinson of Seyfarth Shaw. Cox Speech entitled, "The Basic Economics of Damages Calculation in Intellectual Property Litigation," given at the Mid-America Club in Chicago, IL on April 22, 2003.

"Calculating and Proving IP Damages," Law Seminars International Advanced Workshop.  Program Co-Chair with Philip J. McCabe, Esq. (Kenyon & Kenyon).  Speech entitled, "The Basic Economics of Damages Calculation in Intellectual Property Matters," given at the Grand Hyatt San Francisco on January 13, 2003.

"Basic Economics of Rigorous Intellectual Property Damages Calculation," Presentation with Kenneth Train and Christian Dippon given at Marsh in San Francisco, CA on December 3, 2002.

"Economic Damages in Securities Fraud Matters," NERA Luncheon Seminars with Adam Werner given at the Fifth Avenue Suites Hotel in Portland, OR on November 19, 2002 and at the W Hotel in Seattle, WA on November 20, 2002.

"Basic Economics of Rigorous Intellectual Property Damages Calculation," Presentation with Kenneth Train and Christian Dippon given at Covington & Burling, LLP in San Francisco, CA on November 11, 2002.

"Basic Economic Analysis in Securities Class Action," Presentation given at Skadden, Arps, Slate, Meagher & Flom, LLP in San Francisco, CA on October 30, 2002.

"Key Issues Facing Boards of Directors: The Revolution in SEC Disclosure & Enforcement," Presentation co-hosted by the Directors Roundtable and the Directors Roundtable Business School Council event for boards of directors and their advisors at a session in Seattle, WA on September 24, 2002, in Chicago, IL on October 1, 2002 and in Santa Clara, CA and San Francisco, CA on October 2, 2002.

"Basic Economic Analysis in Securities Class Action," Presentation given to Marsh FINPRO in San Francisco, CA on September 18, 2002.

"Basic Economic Analysis in Securities Class Action," Presentation given to Marsh Risk & Insurance Services in San Diego, CA on September 17, 2002.

35

A2457

Alan J. Cox

"Basic Economic Analysis in Securities Class Action," Presentation given to Marsh FINPRO in Los Angeles, CA on September 13, 2002.

"Trends in Intellectual Property Litigation and the Impact of Litigation on Valuations," Presentation given to Marsh Seminar on "Managing IP Risks and Rewards" in Montreal, Canada on June 19, 2002.

"Materiality and Damages in Securities Fraud Cases," Presentation given to Gray, Cary, Ware & Freidenrich Securities Litigation Partners' Meeting given at the Marriott San Diego Del Mar in San Diego, CA on June 8, 2002.

"Testing Market Efficiency," Presentation given to the Securities Litigation Sub-Committee of the Colorado Bar Association at Holland & Hart, LLP in Denver, CO on April 17, 2002.

"Trends in Intellectual Property Litigation," Presentation with Jesse David given to the Licensing Executives Society, Silicon Valley Chapter, hosted by Cadence Design Systems, Inc. in San Jose, CA on March 27, 2002.

"Using an Economic Expert in Commercial Litigation," Speech given to Gibson, Dunn & Crutcher in Palo Alto, CA on March 20, 2002.

"IP Damages: Getting and Paying the Right Amount," Speech given at the American Conference Institute's 7th National Advanced Forum on "Litigating Patent Disputes" held in San Francisco, CA on February 28-March 1, 2002.

"Standard Setting, Market Power and IP Value," Speech given at Weil, Gotshal & Manges in Redwood City, CA on February 13, 2002.

"Trends in Litigation" How Claims and Losses Are Valued," Speech at the American Bankers Association Insurance Risk Management Annual Conference in San Diego, CA on February 4, 2002.

"Intellectual Property Risk Management: The Costly Consequences of Incomplete Valuation," Speech given at the 26th CRIMS Conference held in Ottawa, Ontario on September 9-12, 2001.

"Challenging the Efficient Market Assumption in Securities Class Action Matters," Speech presented to Holland & Hart in Denver, CO on September 12, 2001.

"Economic Analysis in Securities Fraud Cases," Speech delivered to Morrison & Foerster, San Francisco, CA on July 25, 2001.

"Valuation of Intellectual Property and Securities Class Action Damage Estimation at NERA," Workshop presentation to the Marsh Technology Group Annual meeting in Vancouver, Canada on June 19, 2001.

A2458

Alan J. Cox

"Bursting Bubbles and Stampeding Herds: Was That Stock Trading in an Efficient Market?"  Speech presented to Shearman & Sterling, San Francisco, CA on May 23, 2001, O'Melveny & Meyers, Los Angeles, CA on May 30, 2001, Gray, Cary, Ware & Freidenrich, San Diego, CA on June 6, 2001, Latham & Watkins, San Francisco, CA on June 26, 2001, Baker & McKenzie, San Diego, CA on July 18, 2001.

"A Cautionary Tale: IP Valuation in Court," Course sponsored by the Milken Institute and The Patent & License Exchange, Inc. (pl-x) at the Milken Institute in Santa Monica, CA on January 19, 2001.

"Risk and Intellectual Property," Talk with Lloyd Elam of Marsh, Canada before the Risk and Insurance Management Society (RIMS) Ottawa, Canada Chapter on October 11, 2000.

"Economic Analysis Applied to Litigation and Business Risk Assessment in a Changing Economy," Talk given to Marsh Los Angeles "Hot Topics" Session on August 8, 2000.

"NERA and Intellectual Property Valuations," Breakfast seminar presented by the Marsh Canada Technology Group, *Emerging Risks & Emerging Solutions*, Saskatoon, Saskatchewan, Canada on June 14, 2000 and in Calgary, Alberta, Canada on June 16, 2000.

"Using an Expert in Commercial Litigation," Presentation for the ABA National Program, "Winning the Business Jury Trial" held in San Francisco, CA on May 19, 2000.

"Recent Trends in Securities Litigation and Test of Whether a Stock is Traded Efficiently," Speech before the Securities Litigation Practice Group of Gibson, Dunn & Crutcher, LLP in San Diego, CA on March 24, 2000.

"Securities Class Action Damage Analysis Trends in Litigation & Limits," Presentation to the Marsh & McLennan Company in San Francisco on January 27, 2000.

"Bursting Bubbles and Stampeding Herds: Was That Stock Trading in an Efficient Market?"  Guest speaker for seminar entitled, "Balancing Disclosure and Litigation Risks for Public Companies (Or Soon-To-Be Public Companies)" hosted by The Securities Litigation Practice Group of Alston & Bird, LLP in Atlanta, GA on September 16, 1999.

"Using Surveys to Determine Damages in Patent Infringement Cases," NERA seminar on Damage Estimation in Intellectual Property held in Palo Alto, CA on October 21, 1998 and in San Francisco, CA on December 9, 1998.

"Antitrust and Intellectual Property Market Definition" seminar delivered to the Intellectual Property Antitrust Program of the Practising Law Institute, San Francisco, California, July 17, 1997.  Published in "Intellectual Property Antitrust 1997," Practising Law Institute 1997.

"Mergers in Regulated Industries: The Uses and Abuses of Event Studies" presented to the 10th Annual Western Conference of the Rutgers University Advanced Workshop in Regulation and Competition: Network Industries in Transition, San Diego, California, July 9, 1997.

37

A2459

Alan J. Cox

"Privatization:  Canada and the USA" speech delivered at the Laurier University Chancellor's Symposium Trends in Global Trade and Finance:  Privatization, Toronto, Canada, June 18, 1997.

"Antitrust and Intellectual Property Market Definition" seminar delivered to the Intellectual Property Antitrust Program of the Practising Law Institute, San Francisco, CA, July 29, 1996.   Published in "Intellectual Property Antitrust 1996," Practising Law Institute 1996.

"Economic Considerations in Evaluating Utility Mergers," presentation to NARUC Staff Subcommittee on Management Analysis winter meeting, January 24, 1994.

"Passenger Transport Subsidies — the Case for Government Funding, Central or Local," presentation sponsored by Chapman, Tripp, Sheffield, Young, Barristers and Solicitors, for Transit New Zealand National Conference, Masterton, New Zealand, December 4, 1992. Proceedings published by Transit New Zealand.

"Modeling the Effects of Household Characteristics on Telephone Usage and Class of Service Choice," presented to 16th Annual Telecommunications Policy Research Conference, Airlie House, Virginia, October 1988; and to the International Telecommunications Conference, Cambridge, Massachusetts, June 29 - July 1, 1988.

"Modeling the Effects of Household Characteristics on Telephone Usage and Class of Service Choice," International Telecommunications Conference, Cambridge, Massachusetts, June 29-July 1, 1988.

"The Prospects for Some Alternative Energy Technologies in the United States and Canada," Massachusetts Institute of Technology, Industrial Liaison Program, presentation to Elf-Aquitaine Management, Paris, France, April 1981; and to Italian Department of Energy, Rome, Italy, April 1981.

"The Prospects for Some Alternative Energy Technologies in the United States and Canada," Massachusetts Institute of Technology, Industrial Liaison Program, presentation to Elf-Aquitaine Management, Paris, France, April 1981; and to the Italian Department of Energy, Rome, Italy, April 1981.

"The Economics and Regulation of Distributed Power Systems in the Utility Grid: Photovoltaics," invited paper to the 1981 Eastern Economics Association Meetings, Philadelphia, MIT Energy Laboratory Working Paper No. MIT-EL81-014-WP, 1981.

"The Impact on Photovoltaic Worth of Utility Rates and of Specific Market, Financial and Policy Variables," with T.L. Dinwoodie, MIT Energy Laboratory Report No. MIT-EL80-025, 1980.

"The Economics of Photovoltaics in the Commercial, Institutional and Industrial Sectors," Fourteenth IEEE Photovoltaic Specialists Conference Proceedings and MIT Energy Laboratory Working Paper No. MIT-EL80-008-WP, 1980, with T.L. Dinwoodie.
"The Use of Wood Wastes for Cogeneration in British Columbia's Pulp and Paper Industry," Proceedings, Cogeneration Workshop, Electric Power Research Institute, Palo Alto, California, 1979.

38

A2460

Alan J. Cox

"Simulation Analysis of Energy Production in the British Columbia Pulp and Paper Industry," MIT Energy Laboratory Working Paper MIL-EL79-009.  Also, in Simulation, Modeling and Decision in Energy Systems, Conference Proceedings, 1978.

39

A2461

Case 1:20-cv-00613-SB   Document 704-1   Filed 10/09/24   Page 41 of 48 PageID #: 154013

A2462

# EXHIBIT B

Case 1:20-cv-00613-SB   Document 704-1   Filed 10/09/24   Page 42 of 48 PageID #: 154014

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

A2463

# EXHIBIT C

A2464

A2465

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

Case 1:20-cv-00613-SB   Document 705-1   Filed 10/09/24   Page 225 of 242 PageID #: 154251

# EXHIBIT 13

A2466

HIGHLY CONFIDENTIAL

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

_____

THOMSON REUTERS ENTERPRISE

CENTRE GMBH and WEST PUBLISHING

CORPORATION,

    Plaintiffs/Counterdefendants,

vs.                                Case No.

ROSS INTELLIGENCE INC.,            C.A. No. 20-613-LPS

    Defendant/Counterclaimant.

_____

          ** HIGHLY CONFIDENTIAL **


    VIDEOTAPED DEPOSITION OF ERIK LINDBERG

       Tuesday, March 22, 2022

        9:00 a.m. (Central)


PLACE:  Veritext Legal Solutions

      150 South Fifth Street

      Suite 1775

      Minneapolis, Minnesota


Reported By:

Christine K. Herman, RPR, CRR

JOB No. 5129633

                             Page 1

A2467

HIGHLY CONFIDENTIAL

A P P E A R A N C E S


ON BEHALF OF THE PLAINTIFFS/COUNTERDEFENDANTS

AND THE WITNESS

          KIRKLAND & ELLIS LLP

          By:  Joshua L. Simmons, Esquire

          Eric Loverro, Esquire

          601 Lexington Avenue

          Floor 50

          New York, New York 10022

          Phone: (212)446-4989

          Email: joshua.simmons@kirkland.com

                  eric.loverro@kirkland.com


ON BEHALF OF THE DEFENDANT/COUNTERPLAINTIFF:

          CROWELL & MORING LLP

          By:  Joachim B. Steinberg, Esquire

          Jacob Canter, Esquire

          3 Embarcadero Center

          26th Floor

          San Francisco, California 94111

          Phone: (415)986-2800

          Email:  jsteinberg@crowell.com

                  jcanter@crowell.com


ALSO PRESENT:  Dave Young, Videographer

                                    Page 2

A2468

HIGHLY CONFIDENTIAL

INDEX:

                                              PAGE:

WITNESS:   ERIK LINDBERG

Examination by Mr. Steinberg . . . . . . . . .     8

Examination by Mr. Simmons . . . . . . . . . .   198

Further Examination by Mr. Steinberg . . . . .   203


EXHIBITS:


Exhibit 1   Notice of Deposition  . . . . . . .    10

Exhibit 2   Amended Notice of Thomson Reuters     10

Exhibit 3   Amended Notice of West Publishing     10

Exhibit 4   Email String . . . . . . . . . . .    31

            TR-0001965 - TR-0001971

Exhibit 5   Email String . . . . . . . . . . .    35

            TR-0002322 - TR-0002324

Exhibit 6   Email String . . . . . . . . . . .    36

            TR-0002571 - TR-0002572

Exhibit 7   Email String . . . . . . . . . . .    41

            TR-0002635 - TR-0002636

Exhibit 8   January 4, 2018 letter to . . . . .    45

            Tariq Hafeez from Mark Haddad

Exhibit 9   Email String . . . . . . . . . . .    57

            TR-0037823 - TR-0037833


                                              Page 3

A2469

HIGHLY CONFIDENTIAL

Exhibit 10   Email String . . . . . . . . . . .   63

             TR-0037754 - TR-0037758

Exhibit 11   Email String . . . . . . . . . . .   67

             TR-0179804 - TR-0179810

Exhibit 12   Email String . . . . . . . . . .    73

             TR-0001912 - TR-0001913

Exhibit 13   Supplemental Response to . . . . .   76

             Interrogatory Number 1

Exhibit 14   Email, ROSS-000204366 - 67 . . . .   85

Exhibit 15   Memorandum #12 . . . . . . . . . .   86

Exhibit 16   Memorandum #38 . . . . . . . . . .   89

Exhibit 17   Email String . . . . . . . . . . .   92

             TR-0001952 - TR-0001958

Exhibit 18   Email String . . . . . . . . . . .   101

             LEGALEASE-00100520 - 21

Exhibit 19   Project Rose - Project Protocol     102

Exhibit 20   LegalEase Solutions, LLC Response   106

             To Request For Proposal From Ross

Exhibit 21   Response to Ross Request . . . . .   109

             For Proposal

Exhibit 22   Memorandum #537  . . . . . . . . .   113

Exhibit 23   USB Drive containing spreadsheets   141

Exhibit 24   Native Document Placeholder  . . .   141

             TR-0465998

Exhibit 25   Spreadsheet  . . . . . . . . . . .   142

Page 4

A2470

HIGHLY CONFIDENTIAL

Exhibit 26   Native Document Placeholder  .  .  .   152

            TR-0306715

Exhibit 27   Spreadsheet  .  .  .  .  .  .  .  .  .  .  .   155

Exhibit 28   Native Document Placeholder  .  .  .   155

            TR-0038824

Exhibit 29   Email String .  .  .  .  .  .  .  .  .  .  .   159

            TR-0002016 - TR-0002017

Exhibit 30   Email String .  .  .  .  .  .  .  .  .  .  .   162

            TR-0038692 - TR-0038696

Exhibit 31   Email String .  .  .  .  .  .  .  .  .  .  .   184

            TR-0179811 - TR-0179820

Page 5

A2471

HIGHLY CONFIDENTIAL

P R O C E E D I N G S

THE VIDEOGRAPHER:  Good morning.  We're going on the record at 9:07 a.m. on March 22nd, 2022.

Please note that the microphones are sensitive and may pick up whispering, private conversations or cellular interference.  Please turn off all cell phones and place them away from the microphones, because they can interfere with the deposition audio.

Audio and video recording will continue to take place unless all parties agree to go off the record.

This is Media Unit 1 of the video-recorded deposition of Erik Lindberg, taken by counsel for the defendants, in the matter of Thomson Reuters Enterprise Centre GmbH and West Publishing Corporation vs. ROSS Intelligence Incorporated, Case No. 20-613-LPS.

This case is filed in the United States District Court, For the District of Delaware.  This deposition is happening at the offices of Veritext in Minneapolis.

My name is Dave Young.  I'm the

Page 6

A2472

HIGHLY CONFIDENTIAL

videographer.  Our court reporter is Christine Herman.  We are both representing Veritext Legal Solutions.

I am not related to any party in this action, nor an I financially interested in the outcome

Counsel will now state their appearances and affiliations for the record.  If there are any objections to this proceeding, please state them at the time of your appearance, beginning with the noticing attorney.

MR. STEINBERG:  Joachim Steinberg from Crowell & Moring on behalf of Defendant, ROSS Intelligence Incorporated.

MR. CANTER:  Jacob Canter from Crowell & Moring on behalf of defendant, ROSS Intelligence Incorporated.

MR. SIMMONS:  My name is Joshua Simmons. With me is Eric Loverro.  We are from Kirkland & Ellis.  We are representing the plaintiffs in this matter, as well as the witness.

THE VIDEOGRAPHER:  Will the court reporter please swear in the witness, and then we can proceed.

Whereupon,

Page 7

A2473

HIGHLY CONFIDENTIAL



ERIK LINDBERG,

a witness in the above-entitled matter,

after having been first duly sworn,

deposes and says as follows:

EXAMINATION

Page 8

A2474

HIGHLY CONFIDENTIAL



Page 18

Veritext Legal Solutions
866 299-5127

A2475

HIGHLY CONFIDENTIAL



Page 31

A2476

HIGHLY CONFIDENTIAL



Page 116

HIGHLY CONFIDENTIAL



Page 117

A2478

HIGHLY CONFIDENTIAL



Page 118

A2479

HIGHLY CONFIDENTIAL



Page 119

Veritext Legal Solutions
866 299-5127

A2480

HIGHLY CONFIDENTIAL

CERTIFICATE

Be it known that I took the deposition of ERIK LINDBERG on the 22nd day of March, 2022;

That I was then and there a Notary Public in and for the County of Anoka, State of Minnesota, and that by virtue thereof, I was duly authorized to administer an oath;

That the witness, before testifying, was by me first duly sworn to testify the whole truth and nothing but the truth relative to said cause;

That the testimony of said witness was recorded in shorthand by me and was reduced to typewriting under my direction;

That the cost of the original transcript has been charged to the party noticing the deposition, unless otherwise agreed upon by Counsel, and that copies have been made available to all parties at the same cost, unless otherwise agreed upon by Counsel;

That I am not related to any of the parties hereto nor interested in the outcome of the action;

That the reading and signing of the deposition by the witness and the Notice of Filing were reserved.

WITNESS MY HAND AND SEAL this 5th day of April, 2022.

_____

Christine K. Herman, RPR, CRR

Page 208

A2481

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| THOMSON REUTERS ENTERPRISE CENTRE GMBH and WEST PUBLISHING CORPORATION, | C.A. No. 20-613-LPS |
| Plaintiffs, Counterdefendants, | |
| v. | |
| ROSS INTELLIGENCE INC., | |
| Defendant, Counterclaimant. | |

**PLAINTIFFS THOMSON REUTERS ENTERPRISE CENTER GMBH
AND WEST PUBLISHING CORPORATION'S NOTICE OF ERRATA
FOR THE DEPOSITION OF ERIK LINDBERG**

I, the undersigned, do hereby declare that I read the deposition transcript of Erik Lindberg

dated March 22, 2022 and that to the best of my knowledge, said testimony is true and accurate,

with the exception of the following changes listed below:

| Page | Line | Original Text | Replacement Text | Reason |
|---|---|---|---|---|
| | | | | |

A2482

Case 1:20-cv-00613-SB   Document 705-1   Filed 10/09/24   Page 242 of 242 PageID #: 154268

| Page | Line | Original Text | Replacement Text | Reason |
|------|------|---------------|------------------|--------|



Dated:  April 29, 2022

Erik Lindberg

A2483

Case 1:20-cv-00613-SB   Document 705-2   Filed 10/09/24   Page 3 of 230 PageID #: 154271

# EXHIBIT 15

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

A2485

Case 1:20-cv-00613-SB   Document 705-2   Filed 10/09/24   Page 3 of 230 PageID #: 154271

# EXHIBIT 15

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

A2487

Case 1:20-cv-00613-SB   Document 705-2   Filed 10/09/24   Page 187 of 230 PageID #: 154455

# EXHIBIT 26

A2488

Case 1:20-cv-00613-SB   Document 705-2   Filed 10/09/24   Page 188 of 230 PageID #: 154456

A2489

1

HIGHLY CONFIDENTIAL

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

IN RE MATTER OF:                )
                                )
THOMSON REUTERS                 )   C.A. No. 20-613(LPS)
ENTERPRISE CENTRE GMBH          )
and WEST PUBLISHING             )
CORPORATION,                    )
                                )
    Plaintiffs and              )
    Counterdefendants,          )
                                )
VS.                             )
                                )
ROSS INTELLIGENCE,              )
INC.,                           )
                                )
    Defendant and               )
    Counterclaimant.            )
                                )

ORAL AND VIDEOTAPED DEPOSITION
OF
TARIQ HAFEEZ
MAY 26, 2022

A2490

2

ORAL AND VIDEOTAPED DEPOSITION OF
TARIQ HAFEEZ, produced as a witness at the
instance of the Plaintiff and
Counterdefendants and duly sworn, was taken in
the above-styled and numbered cause on
May 26, 2022, from 9:07 a.m. to 4:11 p.m.,
before KATERI A. FLOT-DAVIS, CSR, CCR, in and
for the State of Texas, reported by machine
shorthand, pursuant to the Federal Rules of
Civil Procedure and the provisions stated on
the record herein.

A2491

Thomson Reuters vs
Ross Intelligence                    Highly Confidential                    Tariq Hafeez

3

A P P E A R A N C E S


FOR THE PLAINTIFF:

JOSHUA SIMMONS, ESQ
ERIC LOVERRO, ESQ.
Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10077
joshua.simmons@kirkland.com
eric.loverro@kirkland.com


FOR THE DEFENDANT:

WARRINGTON PARKER, ESQ.
CRINISHA BERRY, ESQ.
GABRIEL RAMSEY, ESQ.
Crowell & Moring LLP
3 Embarcadero Center
26th Floor
San Francisco, California 94111
wparker@crowell.com
cberry@crowell.com
gramsey@crowell.com


FOR THE WITNESS TARIQ HAFEEZ:

TARIK D. TURFE, ESQ.
Hammoud Dakhlallah & Associates
6050 Greenfield
Ste. 201
Dearborn, Michigan 48126
tt@hdalawgroup.com


Also Present:
Kimberly Villalobos, Videographer

A2492

Thomson Reuters vs
Ross Intelligence                    Highly Confidential                    Tariq Hafeez

4

INDEX


                                                    PAGE



Appearances.......................      3




TARIQ HAFEEZ


    Examination by Mr. Simmons..........    20

    Examination by Mr. Parker...........   181

    Examination by Mr. Simmons..........   322

    Examination by Mr. Parker...........   353

    Examination by Mr. Simmons..........   357




Signature and Changes...................   359

Reporter's Certificate..................   361

A2493

Thomson Reuters vs
Ross Intelligence                    Highly Confidential                    Tariq Hafeez

5

                                EXHIBITS


NO.                  DESCRIPTION                          PAGE


Exhibit 1      Subpoena to Testify at
               Deposition in a Civil
               Action for LegalEase
               Solutions, LLC c/o
               Tariq Hafeez............        22


Exhibit 2      Settlement Agreement,
               Bates Stamped
               TR-0035897..............        35


Exhibit 3      Best Practices Guide for
               ROSS Intelligence,
               last revised on
               September 18, 2017
               Bates Stamped
               LEGALEASE-00078065.......       57


Exhibit 4      Email from Adityka
               Lokanandi to Teri
               Whitehead, et al., dated
               July 20, 2017, Subject:
               Ross Bulk Memo Production
               Metrics - Update - July 19,
               Bates Stamped
               R-LEGALEASE-00050718......      73

A2494

Thomson Reuters vs
Ross Intelligence                         Tariq Hafeez
                          Highly Confidential

6

Exhibit 5     Email from Teri Whitehead
              to Saloni Agari
              Dwarakanath, dated
              10/24/2017, Subject:
              Good/Great Quotes
              Bates Stamped
              TR-0073545................   82


Exhibit 6     Morae Global Project Rose
              Project Protocol, updated
              November 19, 2017,
              Bates Stamped
              TR-0178604...............   91


Exhibit 7     Email from Merin Sony to
              Tario Cameron, dated
              August 21, 2017, Subject:
              WL Registration Keys,
              Bates Stamped
              LEGALLEASE-00067320.......   94


Exhibit 8     Consent Judgment and
              Stipulated Permanent
              Injunction...............   116


Exhibit 9     Letter to Tariq Akbar from
              Andrew Arruda, Re: Notice
              of Indemnifiable Claim and
              Demand for Indemity from
              LegalEase Solutions LLC,
              Bates Stamped
              LEGALEASE-00171823........   123

A2495

Thomson Reuters vs
Ross Intelligence                    Highly Confidential                    Tariq Hafeez

7

Exhibit 10    Email from Tariq Hafeez
              to KD; MN, dated June 9,
              2021, Subject: LegalEase
              Position on Indemnification
              Request, Bates Stamped
              LEGALEASE-00171828.......    126


Exhibit 11    Email from Akash Venkat to
              Thomas, dated September 21,
              2015, Subject: Legal
              Research Inquiry,
              Bates Stamped
              ROSS-003277880...........    140


Exhibit 12    Email from Tariq Hafeez to
              Teri Whitehead, dated
              January 17, 2018, Subject:
              Westlaw Termination,
              Bates Stamped
              R-LEGALEASE-00101636.....    145


Exhibit 13    Email from Tomas
              Van der Heijden to Teri
              Whitehead, dated
              September 12, 2017,
              Subject: Sample Memos +
              SOW, Bates Stamped
              ROSS-000176146...........    164


Exhibit 14    Email from Tomas van der
              Heijden to Teri Whitehead,
              dated November 13, 2017,
              Subject: Lengthy
              Paragraphs-ROSS Bulk Memos,
              Bates Stamped
              ROSS-000204366...........    169

A2496

Thomson Reuters vs
Ross Intelligence                    Highly Confidential                    Tariq Hafeez

8

Exhibit 15    Email from Teri Whitehead
              to Tomas van der Heijden,
              Dated December 22, 2017,
              Subject: Classifier
              Part II, Bates Stamped
              ROSS-000197949............   174


Exhibit 16    Email from Thomas Hamilton
              to Tariq Hafeez, dated
              July 15, 2015, Subject:
              Outsourcing Legal
              Research, Bates Stamped
              ROSS-02301823............   180


Exhibit 17    Master Service Agreement,
              dated October 15, 2015,
              Bates Stamped
              TR-0038909...............   185


Exhibit 18    Statement of Work, dated
              October 15, 2015,
              Bates Stamped
              TR-0038921...............   187


Exhibit 19    Email from Thomas Hamilton
              to Andrew Arruda, dated
              January 4, 2016, Subject:
              Questions for January,
              Bates Stamped
              ROSS-010157007............   189

A2497

Thomson Reuters vs
Ross Intelligence                    Highly Confidential                    Tariq Hafeez

9

Exhibit 20      Email from Andrew Arruda
                to Tariq Hafeez, dated
                April 21, 2016, Subject:
                ROSS/LegalEase,
                Bates Stamped
                ROSS-000201544...........   190


Exhibit 21      Email from Teri Whitehead
                to Tomas van der Heijden,
                dated July 24, 2016,
                Subject: Revised Memos
                977, 1032, 1091, 1208, 1336,
                1391, 1422, 1471, 1486,
                1492, 1234, Bates Stamped
                ROSS-000176798...........   194


Exhibit 22      Memorandum #1234,
                Bates Stamped
                ROSS-000176800...........   194


Exhibit 23      Email from Andrew Arruda to
                Teri Whitehead, dated
                September 14, 2016, Subject:
                Ross, Bates Stamped
                ROSS-000197791...........   196


Exhibit 24      Email from Andrew Arruda to
                Teri Whitehead, dated
                February 10, 2017, Subject:
                LegalEase Solutions and
                ROSS-Q1 2017 Meeting,
                Bates Stamped
                ROSS-000201630............   199

A2498

Thomson Reuters vs
Ross Intelligence

Highly Confidential

Tariq Hafeez

10

Exhibit 25     Email from Teri Whitehead to
               Tomas van der Heijden, dated
               June 13, 2017, Subject:
               ROSS Scale-Up Query,
               Bates Stamped
               ROSS-000197671.............  204


Exhibit 26     Email from Teri Whitehead to
               Tomas van der Heijden, dated
               June 23, 2017, Subject:
               LegalEase ROSS RFP,
               Bates Stamped
               ROSS-000304847.............  209


Exhibit 27     Email from Teri Whitehead to
               Tomas van der Heijden,
               dated June 27, 2017, Subject:
               Revised Proposal,
               Bates Stamped
               ROSS-000176758.............  211


Exhibit 28     Response to Ross Request for
               Proposal, LegalEase
               Solutions June 27, 2017,
               ROSS-000176759.............  211


Exhibit 29     Email from Teri Whitehead to
               Andrew Arruda, et al.,
               dated July 7, 2017, Subject:
               LegalEase Quality Control
               Guide for ROSS Bulk Memos,
               Bates Stamped
               ROSS-000176768.............  213

A2499

Thomson Reuters vs
Ross Intelligence                    Highly Confidential                    Tariq Hafeez

11

Exhibit 30    Quality Control Guide for
              ROSS Intelligence,
              Bates Stamped
              ROSS-000176770.............    213


Exhibit 31    Email from Aditya
              Lokanandi to Teri Whitehead
              dated July 20, 2017,
              Subject: Ross Bulk Memo
              Production Metrics-Update
              July 19, Bates Stamped
              TR-0039879................    220


Exhibit 32    Excel spreadsheet
              Bates Stamped
              R-LEGALEASE-00140064.......    221


Exhibit 33    Email from Merin Sony to
              Rejitha R, dated July 20,
              2017, Subject: ROSS Bulk
              Memo-July 21, 2017,
              Bates Stamped
              R-LEGALEASE-00050673.......    225


Exhibit 34    Email from Aditya
              Lokanandi to Tariq Akbar,
              dated July 26, 2017,
              Subject: MOM-Discussion on
              ROSS Activity Automation,
              Bates Stamped
              R-LEGALEASE-00067492.......    229

A2500

Thomson Reuters vs
Ross Intelligence                          Highly Confidential                          Tariq Hafeez

Exhibit 35    Email from Merin Sony to
              Muhammed Ansad, dated
              July 31, 2017, Subject:
              ROSS Process Automation
              Meeting with Ansad,
              Bates Stamped
              R-LEGALEASE-00067463.......   231


Exhibit 36    Strategic Alliance
              Agreement Between LegalEase
              and Morae Global
              Corporation, dated August
              31, 2017, Bates Stamped
              TR-0039933.................   236


Exhibit 37    Email from Aditya
              Lokanandi to Muhammed Ansad,
              dated September 6, 2017,
              Subject: Activity
              Automation Tool Updated,
              Bates Stamped
              R-LEGALEASE-00067493.......   239


Exhibit 38    Email from Tomas van der
              Heijden to Teri Whitehead,
              dated September 15, 2017,
              Subject: Final SOW,
              Bates Stamped
              ROSS-000304769.............   242

A2501

Thomson Reuters vs
Ross Intelligence

Highly Confidential

Tariq Hafeez

13

Exhibit 39   Email from Tomas van der
             Heijden to Teri Whitehead,
             dated September 22, 2017,
             Subject: Questions
             Variation Task,
             Bates Stamped
             ROSS-000198151............    243


Exhibit 40   Email from Keerthi
             Ravindran to Ansad, dated
             September 24, 2017, Subject:
             ROSS Bulk Tool/Zoho,
             Bates Stamped
             R-LEGALEASE-00049399.....    245


Exhibit 41   Best Practices Guide for
             ROSS Intelligence, last
             Revised on September 18,
             2017, Bates Stamped
             TR-0039860...............    247


Exhibit 42   Email from Muhammed Ansad to
             Aditya Lokanandi, et al.,
             dated September 26, 2017,
             Subject: Technical
             Understanding of the Tool,
             Bates Stamped
             TR-0039885...............    248


Exhibit 43   LegalEase Login webpage,
             Bates Stamped
             R-LEGALEASE-00154874......    249

A2502

Thomson Reuters vs
Ross Intelligence                    Highly Confidential                    Tariq Hafeez

14

Exhibit 44   Email from Rohit Baben to
             Merin Sony, dated
             November 9, 2017, Subject:
             Framing Questions using
             Lexis headnotes,
             Bates Stamped
             R-LEGALEASE-00067565.....   268


Exhibit 45   Email from Teri Whitehead to
             Christopher Cahn, dated
             10/3/2017, Subject: Clutch
             Topics, Bates Stamped
             TR-0048605..............   270


Exhibit 46   Email from Teri Whitehead to
             Christopher Cahn, dated
             10/3/2017, Subject: Bulk
             Project-Macro Enabled
             Templates, Bates Stamped
             TR-0048620..............   273


Exhibit 47   Email from Moon Saleh to
             Christopher Cahn, dated
             10/4/2017, Subject: Best
             Practices Guide-Minimum
             Topics, Bates Stamped
             TR-0048725..............   274


Exhibit 48   Westlaw webpage,
             Bates Stamped
             TR-0048727..............   274

A2503

Thomson Reuters vs
Ross Intelligence                    Highly Confidential                         Tariq Hafeez

15

Exhibit 49     Statement of Work II for
               Bulk Memos Project,
               Bates Stamped
               R-LEGALEASE-00048772......    283

Exhibit 50     Kelly Services, Inc.,
               Frame Agreement, dated
               October 11, 2017,
               Bates Stamped
               R-LEGALEASE-00048728......    284

Exhibit 51     LegalEase Solutions
               Appropriate Use of Westlaw
               Accounts/User Agreement,
               dated October 4, 2017,
               Bates Stamped
               TR-0049195...............    285

Exhibit 52     Email from Leo Kuriakose to
               Tariq Akbar, dated
               October 26, 2017, Subject:
               Ross-Tool-Update 10.07.2017,
               Bates Stamped
               R-LEGALEASE-00028693......    287

Exhibit 53     Email from Leo Kuriakose to
               Tariq Akbar, dated October
               16, 2017, Subject: Drafting
               Tool Update:10.14.2017,
               Bates Stamped
               R-LEGALEASE-00029691.......    288

A2504

Thomson Reuters vs
Ross Intelligence                              Tariq Hafeez

Highly Confidential

16

Exhibit 54     Email from Rejitha R to
               Gayathri Rajeev, dated
               October 20, 2017,
               Bates Stamped
               R-LEGALEASE-00048928.....    290

Exhibit 55     Email from Leo Kuriakose
               to Ansad, dated October
               26, 2017, Subject:
               Minutes of the Meeting
               Held on 10.26.2017
               Regarding ROSS Tool,
               Bates Stamped
               R-LEGALEASE-00067404......   290

Exhibit 56     Email from Rejitha R to
               Leo Kuriakose, dated
               November 1, 2017, Subject:
               Concerns Regarding
               Ross Tool, Bates Stamped
               R-LEGALEASE-00048929.....    291

Exhibit 57     Email from Leo Kuriakose
               to Anjusha Puthanpurayil,
               Dated November 8, 2017,
               Subject: Framing Questions
               Using Lexis headnotes,
               Bates Stamped
               R-LEGALEASE-00049260.....    292

Exhibit 58     Best Practices Guide for
               ROSS Intelligence,
               Bates Stamped
               R-LEGALEASE-00049652.....    292

A2505

Thomson Reuters vs
Ross Intelligence                           Highly Confidential                           Tariq Hafeez

17

Exhibit 59     Email from Jyothi to Chad
               Fennell, dated 11/11/2017,
               Subject: Additional topics,
               Bates Stamped
               TR-0091408................   297


Exhibit 60     Email from Merin Sony to
               SHaris Forward, dated
               11/15/2017, Subject: ROSS
               Tool Update 11.14.2017,
               Bates Stamped
               TR-0098206................   300


Exhibit 61     Statement of Work for ROSS
               Classifier, dated October
               15, 2015, Bates Stamped
               LEGALEASE-00108391........   303


Exhibit 62     Email from Teri Whitehead
               to Joy Saphla, dated
               12/7/2017, Subject: ROSS
               Report, Bates Stamped
               TR-0135110................   305


Exhibit 63     LegalEase Solutions LLC
               Phase I Legal ArReas
               Covered document,
               Bates Stamped
               TR-0135113................   305

A2506

Thomson Reuters vs
Ross Intelligence                          Highly Confidential                          Tariq Hafeez

18

Exhibit 64    Email from Tomas van der
              Heijden to Teri Whitehead,
              dated December 14, 2017,
              Subject: ROSS Classifier
              Update, Bates Stamped
              ROSS-000235965...........    310

Exhibit 65    Email from Tomas van der
              Heijden to Teri Whitehead,
              dated April 10, 2018,
              Subject: SOW, Bates Stamped
              ROSS-000247118............    311

Exhibit 66    LegalEase Solutions LLC,
              Statement of Work, dated
              October 15, 2015,
              Bates Stamped
              ROSS-000247119............    312

Exhibit 67    LegalEase Statement LLC
              Statement of Work,
              dated October 15, 2015,
              Bates Stamped
              ROSS-000241438............    314

Exhibit 68    Memorandum #1234,
              Bates Stamped
              ROSS-000176800............    335

A2507

Thomson Reuters vs
Ross Intelligence                    Highly Confidential                    Tariq Hafeez

19

          P R O C E E D I N G S

          THE VIDEOGRAPHER:  We are on the
record on May 26th, 2022, at 9:07 a.m.,
Eastern Time, for the remote video
deposition of Mr. Tariq Hafeez, in the
matter of Thomson Reuters Enterprise
Centre GMBH, et al., versus ROSS
Intelligence, Incorporated.
          My name is Kimberly Villalobos and
I am the videographer and document tech.
          All present will be noted on the
stenographic record.
          Will the court reporter please
swear in the witness.
          (Witness sworn.)
          MR. SIMMONS:  So let's start by
getting appearances on the record.
          I'm Joshua Simmons from Kirkland &
Ellis.  I represent the plaintiffs.
          And along with me is Eric Loverro
from our offices, as well.
          MR. PARKER:  Warrington Parker,
representing ROSS Intelligence.
          With me is Crinisha Berry.

A2508

20

MR. TURFE:  And Tarik Turfe

representing the witness, Mr. Tariq

Hafeez.

TARIQ HAFEEZ,

having been first duly sworn, testified as

follows:

EXAMINATION



A2509

Case 1:20-cv-00613-SB   Document 705-2   Filed 10/09/24   Page 209 of 230 PageID #: 154477



A2510

Case 1:20-cv-00613-SB   Document 705-2   Filed 10/09/24   Page 210 of 230 PageID #: 154478



A2511



A2512

Case 1:20-cv-00613-SB   Document 705-2   Filed 10/09/24   Page 212 of 230 PageID #: 154480



A2513

Case 1:20-cv-00613-SB    Document 705-2    Filed 10/09/24    Page 213 of 230 PageID #: 154481



A2514

Case 1:20-cv-00613-SB   Document 705-2   Filed 10/09/24   Page 214 of 230 PageID #: 154482



A2515

Case 1:20-cv-00613-SB   Document 705-2   Filed 10/09/24   Page 215 of 230 PageID #: 154483



A2516

Case 1:20-cv-00613-SB   Document 705-2   Filed 10/09/24   Page 216 of 230 PageID #: 154484



A2517

Case 1:20-cv-00613-SB   Document 705-2   Filed 10/09/24   Page 217 of 230 PageID #: 154485



A2518

Case 1:20-cv-00613-SB   Document 705-2   Filed 10/09/24   Page 218 of 230 PageID #: 154486



A2519

Case 1:20-cv-00613-SB   Document 705-2   Filed 10/09/24   Page 219 of 230 PageID #: 154487



A2520

Case 1:20-cv-00613-SB   Document 705-2   Filed 10/09/24   Page 220 of 230 PageID #: 154488



A2521



A2522

Case 1:20-cv-00613-SB   Document 705-2   Filed 10/09/24   Page 222 of 230 PageID #: 154490



A2523

Case 1:20-cv-00613-SB   Document 705-2   Filed 10/09/24   Page 223 of 230 PageID #: 154491



A2524



227

A2525



Case 1:20-cv-00613-SB   Document 705-2   Filed 10/09/24   Page 226 of 230 PageID #: 154494



266

A2527



A2528

Case 1:20-cv-00613-SB   Document 705-2   Filed 10/09/24   Page 228 of 230 PageID #: 154496



A2529

361

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

IN RE MATTER OF:            )
                           )
THOMSON REUTERS            )   C.A. No. 20-613(LPS)
ENTERPRISE CENTRE GMBH     )
and WEST PUBLISHING        )
CORPORATION,               )
                           )
    Plaintiffs and         )
    Counterdefendants,     )
                           )
VS.                        )
                           )
ROSS INTELLIGENCE,         )
INC.,                      )
                           )
    Defendant and          )
    Counterclaimant.       )
                           )


REPORTER'S CERTIFICATION
DEPOSITION
OF
TARIQ HAFEEZ
MAY 24, 2022


        I, Kateri A. Flot-Davis, Certified

Shorthand Reporter in and for the State of

Texas, hereby certify to the following:

    That the witness, TARIQ HAFEEZ, was duly

sworn by the officer and that the transcript

of the oral deposition is a true record of the

testimony given by the witness;

A2530

Thomson Reuters vs
Ross Intelligence

Tariq Hafeez

Highly Confidential

362

There was a request for examination and signature of the witness to the deposition transcript.  The original transcript was sent for review on _____ to the witness or to the attorney for the witness for examination, signature and return to me by _____;

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Certified to by me this ___ of _____ ,_____.

_____
Kateri A. Flot-Davis
Texas CSR No. 8462
Expiration Date: 12-31-22

A2531

Case 1:20-cv-00613-SB   Document 705-7   Filed 10/09/24   Page 1 of 97 PageID #: 156508

# EXHIBIT 28

A2532

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

THOMSON REUTERS ENTERPRISE CENTRE   §
GMBH and WEST PUBLISHING             §
CORPORATION,                         §
                                     §   C.A. No. 20-613-SB
     Plaintiffs/Counterdefendants,   §
                                     §
vs.                                  §
                                     §
ROSS INTELLIGENCE, INC.,             §
                                     §
     Defendant/Counterclaimant,      §

HIGHLY CONFIDENTIAL

PURSUANT TO PROTECTIVE ORDER

VIDEO-RECORDED ORAL DEPOSITION OF

CHRISTOPHER CAHN

AS CORPORATE REPRESENTATIVE OF

MORAE GLOBAL CORPORATION

Houston, Texas

Thursday, May 12, 2022

(REPORTED REMOTELY)

REPORTED BY:

Linda Russell, CSR

JOB NO:  210749

A2533

Case 1:20-cv-00613-SB   Document 705-7   Filed 10/09/24   Page 3 of 97 PageID #: 156510
HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 2

CAHN - MORAE GLOBAL

May 12, 2022

9:06 a.m.

DEPOSITION OF CHRISTOPHER CAHN, conducted via Zoom, taken before Linda Russell, Certified Court Reporter No. 2965, pursuant to the Federal Rules of Civil Procedure for the United States District Court pertaining to the taking of depositions, in the City of Houston, Texas, commencing at 9:06 a.m. Central Time, on May 12, 2022.

A2534

Case 1:20-cv-00613-SB   Document 705-7   Filed 10/09/24   Page 4 of 97 PageID #: 156511
HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 3

                          CAHN - MORAE GLOBAL

    A P P E A R A N C E S

    (All parties appearing remotely)


    ON BEHALF OF PLAINTIFFS/COUNTERDEFENDANTS:
         ERIC LOVERRO, ESQ.
         MIRANDA MEANS, ESQ.
         Kirkland & Ellis
         601 Lexington Avenue
         New York, New York 10022


    ON BEHALF OF DEFENDANT/COUNTERCLAIMANT:
         WARRINGTON PARKER, ESQ.
         JACOB CANTER, ESQ.
         GABRIEL RAMSEY, ESQ.
         Crowell & Moring
         3 Embarcadero Center
         San Francisco, California 94111


    ON BEHALF OF THE WITNESS:
         MONIKA DZIEMIANCZUK, ESQ.
         Locke Lord
         2800 JPMorgan Chase Tower
         600 Travis
         Houston, Texas 77002


    ALSO PRESENT:
         Darryl Russell, Videographer
         Bill Thomas, Exhibit Operator

A2535

Case 1:20-cv-00613-SB   Document 705-7   Filed 10/09/24   Page 5 of 97 PageID #: 156512
HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 4

                              I N D E X

                                                          Page
      CHRISTOPHER CAHN
            BY MR. PARKER                                   10
            BY MR. LOVERRO                                 127
            BY MR. PARKER                                  219
            BY MR. LOVERRO                                 229
      CERTIFICATE                                          232
      ERRATA SHEET                                         234


                          EXHIBITS MARKED

        No.           Description                         Page

      Exhibit 1       Defendant ROSS Intelligence,         12
                      Inc.'s Notice of Deposition
                      Subpoena to Morae Global
                      Corporation

      Exhibit 2       Statement of Work II for Bulk        24
                      Memos Project - MORAE_00012755

      Exhibit 3       Email - MORAE_00003043               33

      Exhibit 4       Email - MORAE_00032863               36

      Exhibit 5       Email - MORAE_00025712               40

      Exhibit 6       Email - MORAE_00025351               43

      Exhibit 7       ROSS Bulk Instructions &             44
                      Checklist - Bulk Memos - 6
                      quotes.  MORAE_00025374

      Exhibit 8       Quality Control Guide for ROSS       52
                      Intelligence, Quality Control
                      Procedures in Drafting
                      Questions, and Preparing
                      Responsive Memorandum -
                      MORAE_0045723

      Exhibit 9       Best Practices Guide for ROSS        59
                      Intelligence, Drafting
                      Questions, Preparing Responsive
                      Memorandum, and Quality Control
                      Procedures - MORAE_00025353

A2536

Case: 25-2153   Document: 156-6   Page: 286   Date Filed: 01/02/2026

Case 1:20-cv-00613-SB   Document 705-7   Filed 10/09/24   Page 6 of 97 PageID #: 156513
HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 5

| Exhibit 10 | Email – MORAE_00025100 | 71 |
|---|---|---|
| Exhibit 11 | Email – MORAE_00011538 | 74 |
| Exhibit 12 | Email – MORAE_00025035 | 76 |
| Exhibit 13 | Email – MORAE_00001938 | 80 |
| Exhibit 14 | Email – MORAE _00027590 | 82 |
| Exhibit 15 | Email – MORAE_00024969 | 83 |
| Exhibit 16 | Email – MORAE_00033849 | 84 |
| Exhibit 17 | Email – MORAE_00012097 | 90 |
| Exhibit 18 | Email – MORAE_00012630 | 92 |
| Exhibit 19 | Email – MORAE_00001622 | 94 |
| Exhibit 20 | Appropriate Use of Westlaw Accounts/User Agreement – MORAE_00001625 | 94 |
| Exhibit 21 | Exhibit A–User Agreement – MORAE_00032612 | 96 |
| Exhibit 22 | Email – MORAE_00030511 | 97 |
| Exhibit 23 | Excel spreadsheet that was attached to Exhibit 22 | 97 |
| Exhibit 24 | Email – MORAE _00027350 | 102 |
| Exhibit 25 | Excel spreadsheet that was attached to Exhibit 24 | 102 |
| Exhibit 26 | Email – MORAE_00024599 | 103 |
| Exhibit 27 | Email – MORAE_00030402 | 104 |
| Exhibit 28 | Email – MORAE_00000845 | 105 |
| Exhibit 29 | Excel spreadsheet | 106 |
| Exhibit 30 | Email – MORAE _00002170 | 108 |
| Exhibit 31 | Excel spreadsheet, Project Rose | 108 |

A2537

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 6

| | | | |
|---|---|---|---|
| Exhibit 32 | Email - MORAE _00015346 | 110 |
| Exhibit 33 | Excel Spreadsheet | 111 |
| Exhibit 34 | Email - MORAE_00014065 | 112 |
| Exhibit 35 | Excel spreadsheet | 112 |
| Exhibit 36 | Excel spreadsheet | 113 |
| Exhibit 37 | Email - MORAE _00014058 | 113 |
| Exhibit 38 | Email - MORAE-0038838 | 115 |
| Exhibit 39 | Email - MORAE_00002677 | 116 |
| Exhibit 40 | Email - MORAE_00000606 | 117 |
| Exhibit 41 | Document beginning with Phase I Legal Areas covered - MORAE_00000609 | 118 |
| Exhibit 42 | Email - MORAE _00000404 | 119 |
| Exhibit 43 | Excel spreadsheet that's attached to Exhibit 42 | 121 |
| Exhibit 44 | MP4 file | 122 |
| Exhibit 45 | Email - MORAE_00000855 | 123 |
| Exhibit 46 | -Document with Title "International Law" - MORAE_00000863 | 124 |
| Exhibit 47 | Email - MORAE_00030575 | 125 |
| Exhibit 48 | Memorandum #2 - MORAE_00030600 | 126 |
| Exhibit 49 | Email - MORAE_00024996 | 147 |
| Exhibit 50 | Statement of Work II for Bulk Memos Project - MORAE_00024891 | 154 |
| Exhibit 51 | Email - LEGALEASE-00093075 | 167 |
| Exhibit 52 | Project Rose -- Project Protocol - LEGALEASE-00093076 | 168 |

A2538

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 7

| | | |
|---|---|---|
| Exhibit 53 | Email – MORAE_00003413 | 178 |
| Exhibit 54 | Memorandum #537 – ROSS-003300843 | 182 |
| Exhibit 55 | Republic of Philippines v. Marcos, 818 F.2d 1473 (1987) – TR-0549927 | 185 |
| Exhibit 56 | Email – LEGALEASE-00098288 | 202 |
| Exhibit 57 | Letter re: LegalEase Solutions, LLC Bulk Memo Status Report – MORAE_00002664 | 205 |
| Exhibit 58 | Email – MORAE_00002662 | 206 |
| Exhibit 59 | Excel spreadsheet | 210 |
| Exhibit 60 | Excel spreadsheet | 211 |
| Exhibit 61 | Excel spreadsheet | 213 |
| Exhibit 62 | Excel spreadsheet | 213 |

A2539

Case 1:20-cv-00613-SB   Document 705-7   Filed 10/09/24   Page 9 of 97 PageID #: 156516
HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 8

CAHN - MORAE GLOBAL

P-R-O-C-E-E-D-I-N-G-S

THE VIDEOGRAPHER:  My name is Darryl Russell, I am the legal videographer in association with TSG Reporting, Incorporated.

Due to the severity of COVID-19, and following the practice of social distancing, I will not be in the same room with the witness, instead I will record this videotaped deposition remotely.  The reporter, Linda Russell, also will not be in the same room and will swear the witness remotely.

Do all parties stipulate to the validity of this video-recording and remote swearing and that it will be admissible in the courtroom as if it had been taken following Rule 30 of the Federal Rules of Civil Procedures and in the State's rules where this case is pending?

Counsel, please state your name for the record, whom you represent, and that you agree.

MR. PARKER:  Warrington Parker on behalf of ROSS Intelligence.  So stipulated.

MR. LOVERRO:  Eric Loverro on behalf

A2540

Case 1:20-cv-00613-SB   Document 705-7   Filed 10/09/24   Page 10 of 97 PageID #: 156517
HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 9

CAHN - MORAE GLOBAL

of Plaintiffs.  So stipulated.

THE VIDEOGRAPHER:  Thank you.

This is the start of media labeled Number 1 of the video-recorded 30(b)(6) deposition of Christopher Cahn in the matter of Thomson Reuters Enterprise Centre GmbH, et al. versus ROSS Intelligence, Incorporated, in the United States District Court, District of Delaware, Number 20-613.

This deposition is being held remotely on May 12th, 2022.  The time is approximately 9:06 a.m.  My name is Darryl Russell, I am the legal video specialist with TSG Reporting, Incorporated, New York.  The court reporter is Linda Russell, in association with TSG Reporting.  The exhibit operator is Bill Thomas, also with TSG Reporting.

Will the court reporter please swear in the witness.

CHRISTOPHER CAHN, having sworn or affirmed to tell the truth, the whole truth and nothing but the truth was examined and testified as follows:

A2541



CAHN - MORAE GLOBAL



CAHN - MORAE GLOBAL

Page 62



CAHN - MORAE GLOBAL

Page 63

A2544



CAHN - MORAE GLOBAL

Page 64



CAHN - MORAE GLOBAL

Page 65

A2546



CAHN - MORAE GLOBAL



CAHN - MORAE GLOBAL





CAHN - MORAE GLOBAL

Page 75



CAHN - MORAE GLOBAL

Page 108

A2551



CAHN - MORAE GLOBAL

Page 109



CAHN - MORAE GLOBAL

CAHN - MORAE GLOBAL

CAHN - MORAE GLOBAL





CAHN - MORAE GLOBAL

Page 232

CERTIFICATE

STATE OF TEXAS      )
                    )
COUNTY OF HARRIS    )

          I, LINDA RUSSELL, a Certified Court Reporter within and for the State of Texas, do hereby certify:

          That CHRISTOPHER CAHN, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by such witness.

          I certify that review of the transcript by the deponent was not requested.

          I certify that the amount of time used by each party at the deposition is as follows:

          MR. PARKER    -    02:53:47

          MR. LOVERRO   -    01:44:53

          I further certify that I am not related to any of the parties to this action by blood or marriage; and that I am in no way interested in the outcome of this matter.

               (Signature on following page)

A2557

Case 1:20-cv-00613-SB   Document 705-7   Filed 10/09/24   Page 27 of 97 PageID #: 156534

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 233

IN WITNESS WHEREOF, I have hereunto set my hand this 24th day of May, 2022.

_____
LINDA RUSSELL, Texas CSR #2965
Expiration Date:  4/30/2023

TSG Reporting, Inc.
Firm Registration No. 615
228 E. 45th Street, Suite 810
New York, New York 10017
(212) 702-9580

A2558

Case 1:20-cv-00613-SB   Document 705-7   Filed 10/09/24   Page 28 of 97 PageID #: 156535

# EXHIBIT 29

A2559





| Updated | 19 November 2017 | |
|---|---|---|
| Version | | |
| Document Classification | | |
| Status | | |
| Author | | |

All rights reserved.  No part of this document may be reproduced, stored in a retrieval system, or transmitted, in any form or by any means, electronic, mechanical, photocopying, recording, or otherwise, without the prior written permission of Morae Global.

Confidential

MORAE_00011843
TR-0178604

A2560



2

Confidential

MORAE_00011844
**TR-0178605**

A2561



1. INTRODUCTION

Confidential

MORAE_00011845
**TR-0178606**

A2562



4

Confidential

MORAE_00011846
**TR-0178607**

A2563

Case 1:20-cv-00613-SB   Document 705-7   Filed 10/09/24   Page 33 of 97 PageID #: 156540



Confidential

MORAE_00011847
**TR-0178608**

A2564



6

Confidential

A2565

Case 1:20-cv-00613-SB   Document 705-7   Filed 10/09/24   Page 35 of 97 PageID #: 156542



7

Confidential

MORAE_00011849
**TR-0178610**

A2566



2

8



-- End of Document --

9

Confidential

MORAE_00011851
TR-0178612

A2568

# EXHIBIT 30

A2569

Case 1:20-cv-00613-SB   Document 705-7   Filed 10/09/24   Page 39 of 97 PageID #: 156546

A2570

1

VOLUME 1
PAGES:  1-311
EXHIBITS:  See Index


UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE


_____
                                )
THOMSON REUTERS ENTERPRISE      )
CENTRE GMBH and WEST            )
PUBLISHING CORPORATION,         )
                                )
        Plaintiffs and          ) C.A. No. 20-613 (LPS)
        Counterdefendants,      )
                                )
   v.                           )  HIGHLY CONFIDENTIAL
                                )
ROSS INTELLIGENCE, INC.,        )
                                )
        Defendant and           )
        Counterclaimant.        )
                                )
_____)



VIDEOTAPED DEPOSITION of ANDREW ARRUDA

- CONDUCTED BY VIDEOCONFERENCE -

Wednesday, March 30, 2022

9:06 a.m. Pacific Daylight Time



Michelle Keegan, RMR, CRR

Lexitas

508-478-9795 ~ 508-478.0595 (Fax)

www.LexitasLegal.com


A2571

2

A P P E A R A N C E S:


KIRKLAND & ELLIS LLP
By:  Dale Cendali, Esq.
By:  Eric Loverro, Esq.
601 Lexington Avenue
New York, New York 10022
Phone:  (212) 226-4800
Email:  dale.cendali@kirkland.com
Email:  eric.loverro@kirkland.com
Counsel for Plaintiffs Thomson Reuters and West
Publishing


CROWELL & MORING LLP
By:  Warrington Parker, Esq.
3 Embarcadero Center, 26th Floor
San Francisco, California 94111
Phone:  (415) 986-2800
Email:  wparker@crowell.com
Counsel for Defendant ROSS Intelligence, Inc.


CROWELL & MORING LLP
By:  Crinesha B. Berry, Esq.
1001 Pennsylvania Avenue NW
Washington, D.C. 20004
Phone:  (202) 624-2500
Email:  cberry@crowell.com
Counsel for Defendant ROSS Intelligence, Inc.


Also Present:
  Adrian Beltran, Videographer

A2572

3

INDEX

Videotaped Deposition of:                    Page

ANDREW ARRUDA

  By Ms. Cendali                               9


EXHIBITS

No.                                          Page

Exhibit 1   [Proposed] Stipulated Protective     17
            Order, in USDC, District of
            Delaware, 20-613 (LPS), 27 pages
            without Bates numbering

Exhibit 2   Andrew Arruda LinkedIn profile       26
            pages

Exhibit 3   December 2018 and January 2019       71
            e-mail chain, Bates-numbered
            ROSS-003487472 through -7474

Exhibit 4   Document titled "Powered by IBM      102
            Watson Application
            Executive Summary,"
            Bates-numbered ROSS-003705907
            through -5908

Exhibit 5   Declaration of Andrew Arruda, in     113
            USDC, District of Minnesota,
            18-cv-01445, three pages without
            Bates numbering

Exhibit 6   Facebook pages, Bates-numbered       115
            TR-0001119 through -1122

Exhibit 7   Andrew Arruda tweet,                 122
            Bates-numbered TR-0001735

Exhibit 8   Document titled "The Death of        126
            Westlaw Contracts and Pricing,"
            Bates-numbered TR-0000695
            through -696

A2573

4

EXHIBITS (continued)

Exhibit 9    ROSS tweet, Bates-numbered        128
             TR-0001253

Exhibit 10   Andrew Arruda tweet,              129
             Bates-numbered TR-0001733

Exhibit 11   Andrew Arruda tweet,              131
             Bates-numbered TR-0001734

Exhibit 12   ROSS Intelligence, Inc. Detailed  133
             Capitalization Table, 13 pages,
             each Bates-numbered
             ROSS-010106819

Exhibit 13   1/7/20 e-mail, Bates-numbered     135
             ROSS-009584733 through -4735

Exhibit 14   Reprint of PowerPoint slides      150
             titled "ROSS Board Meeting,
             January 14, 2020,"
             Bates-numbered ROSS-003715393
             through -5406

Exhibit 15   April 2020 e-mail chain,          184
             Bates-numbered FASTCASE_084268
             through -84270

Exhibit 16   ROSS document, "Announcement By   217
             The Founders," Bates-numbered
             TR-0037677 through -37680

Exhibit 17   "[Slack] Notifications from the   225
             Ross Inc team for Feb 16th,
             2015," Bates-numbered
             ROSS-003391075

Exhibit 18   6/6/15 e-mail, Bates-numbered     226
             ROSS-009585472

Exhibit 19   October 2015 e-mail chain,        231
             Bates-numbered ROSS-003390881
             through -0884

A2574

5

EXHIBITS (continued)

| | | |
|---|---|---|
| Exhibit 21 | "Terms of Service, ROSS Intelligence Inc, Last Modified: April 28, 2020," Bates-numbered TR-0001142 through -1153 | 235 |
| Exhibit 22 | "Terms of Service, ROSS Intelligence Inc, Last Modified: June 15, 2020," Bates-numbered TR-0001154 through -1165 | 241 |
| Exhibit 24 | August 2015 e-mail chain, Bates-numbered ROSS-009559997 through -9998 | 246 |
| Exhibit 25 | September 2015 e-mail chain, Bates-numbered ROSS-003389728 through -9730 | 251 |
| Exhibit 26 | September 2015 e-mail chain, Bates-numbered ROSS-010164415 through -4417 | 256 |
| Exhibit 27 | October 2015 e-mail chain, Bates-numbered ROSS-000203449 through -3467 | 269 |
| Exhibit 29 | Document with heading "mpdm-thomas--findingjimoh--maxisakov--tomasvdh-1: 2016-12-26," Bates-numbered ROSS-009637509 | 304 |
| Exhibit 31 | September 2015 e-mail chain, Bates-numbered ROSS-003610162 through -0165 | 298 |
| Exhibit 32 | 10/11/15 e-mail, Bates-numbered ROSS-003610547 | 301 |
| Exhibit 34 | "Westlaw is Suing Us.  Our Response:" Bates-numbered TR-0000587 through -590 | 274 |
| Exhibit 39 | September 2015 e-mail chain, Bates-numbered ROSS-009547818 through -7823 | 260 |

A2575

6

EXHIBITS (continued)


Exhibit 41   September 2015 e-mail chain,      265
             Bates-numbered ROSS-023018635

Exhibit 48   8/14/20 e-mail, Bates-numbered    188
             ROSS-010186032 through -033

Exhibit 49   Reprint of PowerPoint slides,     198
             titled "ROSS Q3 Board Meeting,"
             Bates-numbered ROSS-010106832
             through -6840

Exhibit 50   Undated redlined "Letter of       209
             Intent for the Acquisition of
             ROSS Intelligence, Inc.,"
             Bates-numbered ROSS-010272041
             through -046



REQUESTS FOR INFORMATION FROM WITNESS

           Page      Line

           195        21


REQUESTS FOR PRODUCTION

           Page      Line

            13        23
            17         4
            21         5
            24        25
            29         2
            48         8
            71         9
            80        13
            92         8
           110        24
           125         2
           125        22
           127        15
           134        22
           160         5

A2576

7

REQUESTS FOR PRODUCTION (continued)

```
        Page      Line

        169        11
        195        22
        203        25
        208        17
        211        12
        217         5
        231        23
        245        14
```

A2577

8

P R O C E E D I N G S

THE VIDEOGRAPHER:  Good morning, everyone. We are on the record on March 30, 2022, at approximately 9:06 a.m. Pacific Time, for the remote video deposition of Andrew Arruda in the matter of Thomson Reuters Enterprise Centre, GmbH, et al., versus ROSS Intelligence, Inc.

My name is Adrian Beltran, and I am the videographer for today.

Will counsel please introduce themselves for the record, beginning with the party noticing this proceeding.

MS. CENDALI:  I'm Dale Cendali of Kirkland & Ellis.  And with me is my colleague, Eric Loverro, also from Kirkland & Ellis.  We are counsel for Thomson Reuters and West Publishing.

MR. PARKER:  This is Warrington Parker appearing on behalf of ROSS Intelligence.

THE VIDEOGRAPHER:  Thank you, counsel.  If that is all -- I forgot to mention also I will be the document technician for today's deposition.

Now will the court reporter please swear in the witness.

MS. CENDALI:  Just to be clear, is there anyone else present on the line or video?

A2578

MR. PARKER:  Crinesha Berry from Crowell & Moring is on the line.  She is not going to say anything at all.  She is just watching the deposition.

THE VIDEOGRAPHER:  Okay.  Thank you.  Now will the court reporter swear in the witness, please.  Thank you all.

ANDREW ARRUDA,

having been satisfactorily identified and duly sworn by the Notary Public, was examined and testified as follows:



A2579



A2580



A2581





271

272





310

STATE OF CALIFORNIA

I, Michelle Keegan, Registered Merit Reporter and Certified Shorthand Reporter for the State of California, do hereby certify that ANDREW ARRUDA, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record, to the best of my ability, of the testimony given by the witness.

I further certify that I am neither related to or employed by any of the parties in or counsel to this action, nor am I financially interested in the outcome of this action.

In witness whereof, I have hereunto set my hand and seal this 11th day of April, 2022.

_____

Michelle Keegan, CSR No. 13632

A2586

**Signature and Errata Sheet**
**March 30, 2022 Deposition of Andrew Arruda**
*Thomson Reuters Enterprise Centre GMBH and West Publishing Corporation v. ROSS*
*Intelligence Inc.*

    I, Andrew Arruda, have reviewed the attached transcript of my March 30, 2022 deposition testimony and certify, pursuant 28 U.S.C. § 1746 that the attached transcript is my true and correct testimony during that deposition, subject to the corrections shown below.

| Page/Line | Now Reads | Correction | Reason |
|---|---|---|---|
|  |  |  |  |

Executed on May 10, 2022, at San Francisco, CA.



/s/

SFACTIVE-906583926.1

A2587

Case 1:20-cv-00613-SB   Document 705-7   Filed 10/09/24   Page 57 of 97 PageID #: 156564

# EXHIBIT 31

A2588

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

THOMSON REUTERS ENTERPRISE   )
CENTRE GMBH and WEST         )
PUBLISHING CORPORATION,      )
                             )
          Plaintiffs,        )
                             )
     vs.                     ) No. 1:20-cv-00613-UNA
                             )
ROSS INTELLIGENCE INC.,      )
                             )
          Defendant.         )
_____)

VIDEO-RECORDED DEPOSITION OF

BARBARA FREDERIKSEN-CROSS, at Regus Center,

1050 SW Sixth Avenue, Suite 1100, Portland,

Oregon, commencing at 9:21 a.m. PST, on

Friday, November 11, 2022, before

Marla Sharp, RPR, CLR, CCRR, CA CSR 11924,

OR CSR 17-0446, WA CSR 3408.

A2589

THOMSON REUTERS ENTERPRISE CENTRE GMBH v
ROSS INTELLIGENCE INC.                         Barbara Frederiksen-Cross

2

APPEARANCES OF COUNSEL:

FOR THE PLAINTIFFS

          KIRKLAND & ELLIS LLP
          BY:  JOSHUA L. SIMMONS, ESQ.
               ERIC LOVERRO, ESQ.
          601 Lexington Avenue
          New York, New York 10022
          212-226-4800
          joshua.simmons@kirkland.com
          eric.loverro@kirkland.com


FOR THE DEFENDANT

          CROWELL & MORING LLP
          BY:  GABRIEL M. RAMSEY, ESQ.
          3 Embarcadero Center, 26th Floor
          San Francisco, California 94111
          415-986-2800
          gramsey@crowell.com

          BY:  CRINESHA B. BERRY, ESQ.
          1001 Pennsylvania Ave NW
          Washington, DC 20004
          202-624-2500
          cberry@crowell.com


ALSO PRESENT:

          Rick Majewski, videographer

A2590

THOMSON REUTERS ENTERPRISE CENTRE GMBH v                    Barbara Frederiksen-Cross
ROSS INTELLIGENCE INC.

3

                              I N D E X

EXAMINATION                                              PAGE

BARBARA FREDERIKSEN-CROSS

      BY MR. SIMMONS                                        7

      (afternoon session)                                191


                      DEPOSITION EXHIBITS

EXHIBIT              DESCRIPTION                         PAGE

Exhibit 1    Curriculum vitae (19 pages, not             49
             Bates stamped)

Exhibit 2    Exhibit to Frederiksen-Cross               109
             Surrebuttal Report: Case Citations
             Containing Lexis References
             (18 pages, not Bates stamped,
             highly confidential, attorneys'
             eyes only)

Exhibit 3    7-20-17 e-mail to Rejitha R and            129
             others from Merin Sony (1 page,
             Bates No. R-LEGALEASE-00050673,
             confidential)

Exhibit 4    7-21-17 e-mail to Teri Whitehead           131
             and others from Merin Sony (1 page,
             Bates Nos. LEGALEASE-00059362)

Exhibit 5    Best Practices Guide for ROSS              143
             Intelligence (19 pages, Bates No.
             LEGALEASE-00078065)

Exhibit 6    Westlaw citation, Chetfins v.              153
             Stewart, 825 F.3d 588 (2016)
             (14 pages, not Bates stamped)

Exhibit 7    Excerpt from deposition of                 157
             Christopher Cahn (5 pages, not
             Bates stamped)

A2591

THOMSON REUTERS ENTERPRISE CENTRE GMBH v                    Barbara Frederiksen-Cross
ROSS INTELLIGENCE INC.

4

                              I N D E X
                             (continued)


                        DEPOSITION EXHIBITS


 EXHIBIT               DESCRIPTION                    PAGE

 Exhibit 8    Project Rose - Project Protocol         163
              (9 pages, Bates Nos.
              LEGALEASE-00093066 -
              LEGALEASE-00093074)

 Exhibit 9    Spreadsheet (Bates No. TR-0178588)      174

 Exhibit 10   Bulk Memos - Process for Clutch         180
              (1 page, Bates No. MORAE_00011129,
              confidential)

 Exhibit 11   10-24-17 e-mail to Saloni Agara         184
              Dwarakanath and others from Teri
              Whitehead (2 pages, Bates Nos.
              MORAE_00003413 - MORAE_00003414,
              confidential)

 Exhibit 12   Ross Intelligence:  Workflow            191
              Diagram (1 page, not Bates stamped)

 Exhibit 13   5-26-22 excerpt of deposition of        197
              Tariq Hafeez (2 pages, not Bates
              stamped)

 Exhibit 14   Exhibit N to opening expert report      230
              (5 pages, not Bates stamped, highly
              confidential, attorneys' eyes only)

 Exhibit 15   8-1-22 Expert Report of Barbara         237
              Frederiksen-Cross (51 pages, not
              Bates stamped, confidential, highly
              confidential, attorneys' eyes only)

 Exhibit 16   11-11-22 screenshot from Westlaw re     239
              Harper & Row Publishers, Inc. v.
              Nation Enterprises (1 page, not
              Bates stamped)

A2592

THOMSON REUTERS ENTERPRISE CENTRE GMBH v                    Barbara Frederiksen-Cross
ROSS INTELLIGENCE INC.

5

I N D E X
(continued)


DEPOSITION EXHIBITS

| EXHIBIT | DESCRIPTION | PAGE |
|---------|-------------|------|
| Exhibit 17 | 9-6-22 Rebuttal Report of Barbara Frederiksen-Cross (47 pages, not Bates stamped, confidential, highly confidential, attorneys' eyes only) | 281 |
| Exhibit 18 | Norkin v. U.S. Fire Ins. Co., 237 Cal.App.2d 435 (1965) (3 pages, not Bates stamped) | 284 |
| Exhibit 19 | Chart beginning with "Headnote to Casetext" (1 page, not Bates stamped) | 294 |
| Exhibit 20 | Native Excel spreadsheet | 314 |
| Exhibit 21 | PDF of spreadsheet | 315 |
| Exhibit 22 | Statement of Work II for ROSS Bulk Memos (17 pages, ROSS-003332368 - ROSS003332381, confidential) | 341 |
| Exhibit 23 | West Key Number chart (2 pages, not Bates stamped) | 346 |

A2593

THOMSON REUTERS ENTERPRISE CENTRE GMBH v
ROSS INTELLIGENCE INC.

Barbara Frederiksen-Cross

6

PORTLAND, OREGON

FRIDAY, NOVEMBER 11, 2022

9:21 A.M. PST

- - -

THE VIDEOGRAPHER:  We are now on the record.  My name is Rick Majewski, and I'm the videographer retained by Lexitas for this video deposition for the United States District Court for the District of Delaware, Case No. 1:20-cv-00613-UNA.

Today's date is November 11th, 2022, and the time is 9:21 a.m.  This deposition is being held at 1050 Southwest Sixth Ave, Suite 1100, Portland, Oregon 97204, in the matter of Thomas [sic] Reuters Enterprise Center GmbH, et al., versus ROSS Intelligence Inc.  The deponent is Barbara Frederiksen-Cross.

All counsels will be noted on the stenographic record.

Would all counsels please identify themselves.

MR. SIMMONS:  My name is Joshua Simmons. With me is Eric Loverro.  We are from the law firm of Kirkland & Ellis.  And we represent the plaintiffs.

A2594



MR. RAMSEY:  This is Gabe Ramsey with Crinesha Berry for Crowell & Moring for ROSS Intelligence.

THE VIDEOGRAPHER:  The court reporter is Marla Sharp and will now swear in the witness.

BARBARA FREDERIKSEN-CROSS,

having been first duly sworn,

was examined and testified as follows:

EXAMINATION

BY MR. SIMMONS:

A2595

Case 1:20-cv-00613-SB   Document 705-7   Filed 10/09/24   Page 65 of 97 PageID #: 156572



343

A2596

352

CERTIFICATE OF CERTIFIED SHORTHAND REPORTER

I, Marla Sharp, certified shorthand reporter in the State of Oregon, hereby certify:

That the foregoing video-recorded deposition of BARBARA FREDERIKSEN-CROSS was taken before me on November 11, 2022, at the time set forth therein, at which time the witness was duly sworn by me;

That the testimony of the witness and all colloquy and objections made at the time of the deposition were recorded stenographically by me and thereafter transcribed, said transcript being a true copy of my shorthand notes thereof;

That review of the transcript was neither requested nor waived before completion of the deposition; ( ) that the witness has failed or refused to approve the transcript.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney of any of the parties.

In witness whereof, I have subscribed my name and signature this date, November 14, 2022.

*Marla Sharp*
_____
Marla Sharp
RPR, CLR, CCRR, CA CSR 11924,
OR CSR 17-0446, WA CSR 3408

A2597

**Signature and Errata Sheet**
**November 11, 2022 Deposition of Barbara Frederiksen-Cross**
***Thomson Reuters Enterprise Centre GMBH and West Publishing Corporation v. ROSS***
***Intelligence Inc.***

I, Barbara Frederiksen-Cross, have reviewed the attached transcript of my November 11, 2022 deposition testimony and certify, pursuant 28 U.S.C. § 1746 that the attached transcript is my true and correct testimony during that deposition, subject to the corrections shown below.

| Page/Line | Now Reads | Correction | Reason |
|---|---|---|---|
| 8:2 | litigation contexts for | litigation contexts, for | Clarity |
| 43:12 | LegalEASE | LegalEase | Grammatical error |
| 43:18 | LegalEASE | LegalEase | Grammatical error |
| 48:7 | LegalEASE | LegalEase | Grammatical error |
| 48:11 | LegalEASE | LegalEase | Grammatical error |
| 49:4 | Ross | ROSS | Grammatical error |
| 49:4 | LegalEASE | LegalEase | Grammatical error |
| 49:8 | Exhibit C.  I think it was Exhibit C. | Appendix C. I think it was Appendix C. | I misspoke |
| 69:8 | Wilford | Wilfred | Spelling |
| 95:3 | note | | Clarity/repetitive |
| 104:21 | LegalEASE | LegalEase | Grammatical error |
| 105:3 | LegalEASE | LegalEase | Grammatical error |
| 105:15 | LegalEASE | LegalEase | Grammatical error |
| 105:23 | LegalEASE | LegalEase | Grammatical error |
| 105:24 | LegalEASE | LegalEase | Grammatical error |
| 112:4 | LegalEASE | LegalEase | Grammatical error |
| 112:5 | LegalEASE | LegalEase | Grammatical error |
| 112:8 | LegalEASE | LegalEase | Grammatical error |

1

A2598

| 113:15 | LegalEASE | LegalEase | Grammatical error |
| 113:21 | compare | comparison | Transcription error |
| 114:6 | acrost | across | Spelling |
| 116:12 | LegalEASE | LegalEase | Grammatical error |
| 116:24 | LegalEASE | LegalEase | Grammatical error |
| 124:4 | originated | original | Transcription error |
| 124:17 | LegalEASE | LegalEase | Grammatical error |
| 129:14 | LegalEASE | LegalEase | Grammatical error |
| 130:14 | LegalEASE | LegalEase | Grammatical error |
| 130:17 | LegalEASE | LegalEase | Grammatical error |
| 133:19 | LegalEASE | LegalEase | Grammatical error |
| 134:12 | LegalEASE | LegalEase | Grammatical error |
| 134:17 | LegalEASE | LegalEase | Grammatical error |
| 134:22 | LegalEASE | LegalEase | Grammatical error |
| 135:2 | LegalEASE | LegalEase | Grammatical error |
| 136:4 | LegalEASE | LegalEase | Grammatical error |
| 136:12 | LegalEASE | LegalEase | Grammatical error |
| 136:21 | LegalEASE | LegalEase | Grammatical error |
| 136:21 | LegalEASE | LegalEase | Grammatical error |
| 137:4 | LegalEASE | LegalEase | Grammatical error |
| 137:17 | LegalEASE | LegalEase | Grammatical error |
| 137:25 | LegalEASE | LegalEase | Grammatical error |
| 139:18 | LegalEASE | LegalEase | Grammatical error |
| 140:25 | LegalEASE | LegalEase | Grammatical error |

A2599

| 141:23 | LegalEASE | LegalEase | Grammatical error |
|---|---|---|---|
| 142:5 | LegalEASE | LegalEase | Grammatical error |
| 143:24 | LegalEASE | LegalEase | Grammatical error |
| 147:21 | LegalEASE | LegalEase | Grammatical error |
| 150:20 | LegalEASE | LegalEase | Grammatical error |
| 159:7 | LegalEASE | LegalEase | Grammatical error |
| 159:16 | LegalEASE | LegalEase | Grammatical error |
| 160:2 | LegalEASE | LegalEase | Grammatical error |
| 160:18 | LegalEASE | LegalEase | Grammatical error |
| 160:22 | LegalEASE | LegalEase | Grammatical error |
| 174:9 | Ross | ROSS | Grammatical error |
| 177:18 | LegalEASE | LegalEase | Grammatical error |
| 184:2 | LegalEASE | LegalEase | Grammatical error |
| 187:24 | LegalEASE | LegalEase | Grammatical error |
| 192:23 | LegalEASE | LegalEase | Grammatical error |
| 193:1 | LegalEASE | LegalEase | Grammatical error |
| 193:7 | LegalEASE | LegalEase | Grammatical error |
| 193:19 | LegalEASE | LegalEase | Grammatical error |
| 193:24 | LegalEASE | LegalEase | Grammatical error |
| 194:1 | LegalEASE | LegalEase | Grammatical error |
| 194:9 | LegalEASE | LegalEase | Grammatical error |
| 195:24 | LegalEASE | LegalEase | Grammatical error |
| 196:18 | LegalEASE | LegalEase | Grammatical error |
| 197:2 | LegalEASE | LegalEase | Grammatical error |

A2600

| 197:18 | LegalEASE | LegalEase | Grammatical error |
|---|---|---|---|
| 197:23 | LegalEASE | LegalEase | Grammatical error |
| 198:4 | LegalEASE | LegalEase | Grammatical error |
| 198:9 | LegalEASE | LegalEase | Grammatical error |
| 198:15 | LegalEASE | LegalEase | Grammatical error |
| 199:1 | LegalEASE | LegalEase | Grammatical error |
| 202:20 | LegalEASE | LegalEase | Grammatical error |
| 203:7 | LegalEASE | LegalEase | Grammatical error |
| 203:10 | LegalEASE | LegalEase | Grammatical error |
| 203:11 | LegalEASE | LegalEase | Grammatical error |
| 203:17 | LegalEASE | LegalEase | Grammatical error |
| 204:6 | LegalEASE | LegalEase | Grammatical error |
| 204:17 | Ross | ROSS | Grammatical error |
| 206:8 | LegalEASE | LegalEase | Grammatical error |
| 207:14 | Ross | ROSS | Grammatical error |
| 207:25 | LegalEASE | LegalEase | Grammatical error |
| 213:8 | Clear Case | Fastcase | Transcription error/misspoke |
| 213:21 | in | and | Transcription error |
| 226:15 | sys | system | Clarify term of art |
| 226:15 | admin | administrator | Clarify term of art |
| 245:18 | to the comparant | in the comparison | Transcription error |
| 270:24 | LegalEASE | LegalEase | Grammatical error |
| 273:20 | LegalEASE | LegalEase | Grammatical error |

4

A2601

| 293:17 | verbatim in | verbatim and | Transcription error |
|---|---|---|---|
| 326:10 | LegalEASE | LegalEase | Grammatical error |
| 326:10 | LegalEASE | LegalEase | Grammatical error |
| 326:25 | LegalEASE | LegalEase | Grammatical error |
| 334:20 | dispatch of evidence | dispatch of packets | Transcription error |
| 340:24 | LegalEASE | LegalEase | Grammatical error |
| 341:4 | LegalEASE | LegalEase | Grammatical error |
| 341:7 | LegalEASE | LegalEase | Grammatical error |
| 341:10 | LegalEASE | LegalEase | Grammatical error |
| 342:21 | LegalEASE | LegalEase | Grammatical error |
| 343:2 | LegalEASE | LegalEase | Grammatical error |
| 343:6 | LegalEASE | LegalEase | Grammatical error |
| 345:6 | LegalEASE | LegalEase | Grammatical error |
| 345:22 | LegalEASE | LegalEase | Grammatical error |

Executed on December 22, 2022, at Hubbard, Oregon

Barbara A. Frederiksen-Cross

5

A2602

Case 1:20-cv-00613-SB   Document 705-7   Filed 10/09/24   Page 72 of 97 PageID #: 156579

# EXHIBIT 32

A2603



**Research Subscriber Agreement**

HIGHLY CONFIDENTIAL

WPC-0001449
**TR-0002808**

A2604

A2605

HIGHLY CONFIDENTIAL

WPC-0001450
TR-0002809

A2606

HIGHLY CONFIDENTIAL

WPC-0001451

**TR-0002810**

A2606

A2607

HIGHLY CONFIDENTIAL

Case 1:20-cv-00613-SB   Document 705-7   Filed 10/09/24   Page 77 of 97 PageID #: 156584

# EXHIBIT 33

A2608

# Best Practices Guide for ROSS Intelligence

▮▮▮▮▮▮

Last revised on September 14, 2017.

Document ID      : ▮▮▮▮▮▮
Date of Issue    : 08.07.17
Periodic Review  : 09.14.2017
Revision No      : ▮

Confidential

MORAE_00025353
TR-0045731

A2609

Case 1:20-cv-00613-SB   Document 705-7   Filed 10/09/24   Page 79 of 97 PageID #: 156586



Document ID
Date of Issue    : 08.07.17
Periodic Review    : 09.14.2017
Revision No    : ▮

# Contents



2

Confidential

MORAE_00025354
**TR-0045732**

A2610

Document ID : 
Date of Issue     : 08.07.17
Periodic Review   : 09.14.2017
Revision No       : ■

**Part I**



3

Confidential

MORAE_00025355

**TR-0045733**

A2611

Document ID     :
Date of Issue   : 08.07.17
Periodic Review : 09.14.2017
Revision No     :

**Part II**



4

Confidential

MORAE_00025356
**TR-0045734**

A2612

Case 1:20-cv-00613-SB   Document 705-7   Filed 10/09/24   Page 82 of 97 PageID #: 156589



Confidential

MORAE_00025357

**TR-0045735**

A2613



Confidential

MORAE_00025358

**TR-0045736**

A2614

Document ID        :
Date of Issue      : 08.07.17
Periodic Review    : 09.14.2017
Revision No        : █



Confidential

MORAE_00025359
**TR-0045737**

A2615

Document ID        :
Date of Issue      : 08.07.17
Periodic Review    : 09.14.2017
Revision No        :



8

Confidential

MORAE_00025360

**TR-0045738**

A2616

Document ID :
Date of Issue : 08.07.17
Periodic Review : 09.14.2017
Revision No :



Confidential

MORAE_00025361
TR-0045739

A2617

Document ID        :
Date of Issue      : 08.07.17
Periodic Review    : 09.14.2017
Revision No        : █



Confidential

MORAE_00025362

**TR-0045740**

A2618

Document ID      :
Date of Issue    : 08.07.17
Periodic Review  : 09.14.2017
Revision No      :



Confidential

MORAE_00025363
**TR-0045741**

A2619



**Part III**

Confidential

MORAE_00025364

TR-0045742

A2620

Document ID :
Date of Issue    : 08.07.17
Periodic Review  : 09.14.2017
Revision No      : ■



Confidential

MORAE_00025365
**TR-0045743**

A2621

Case 1:20-cv-00613-SB Document 705-7 Filed 10/09/24 Page 91 of 97 PageID #: 156598

Document ID :
Date of Issue : 08.07.17
Periodic Review : 09.14.2017
Revision No :



Confidential

MORAE_00025366
TR-0045744

A2622



Document ID        :
Date of Issue      : 08.07.17
Periodic Review    : 09.14.2017
Revision No        : ▮

Confidential

MORAE_00025367

**TR-0045745**

A2623

Document ID        :
Date of Issue      : 08.07.17
Periodic Review    : 09.14.2017
Revision No        : ▪



Confidential

MORAE_00025368

**TR-0045746**

A2624

Document ID        :
Date of Issue      : 08.07.17
Periodic Review    : 09.14.2017
Revision No        :



Confidential

MORAE_00025369

**TR-0045747**

A2625

Document ID   :
Date of Issue   : 08.07.17
Periodic Review   : 09.14.2017
Revision No   : ■



Confidential

MORAE_00025370

TR-0045748

A2626

Document ID      :
Date of Issue    : 08.07.17
Periodic Review  : 09.14.2017
Revision No      : █



Confidential

MORAE_00025371

**TR-0045749**

A2627

Document ID
Date of Issue      : 08.07.17
Periodic Review    : 09.14.2017
Revision No        : █



Confidential

MORAE_00025372
**TR-0045750**

A2628

Case 1:20-cv-00613-SB   Document 708-1   Filed 10/10/24   Page 1 of 52 PageID #: 156697

# EXHIBIT 1

A2629

HIGHLY CONFIDENTIAL

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

_____

THOMSON REUTERS ENTERPRISE

CENTRE GMBH and WEST

PUBLISHING CORPORATION,

                    Plaintiffs,

vs.                              C.A. NO. 20-613-LPS

ROSS INTELLIGENCE INC.,

                    Defendant.

_____

VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF

ISABELLE MOULINIER, 30(b)(6) REPRESENTATIVE FOR

THOMSON REUTERS ENTERPRISE CENTRE GMBH

HIGHLY CONFIDENTIAL

DATE:   July 1, 2022

TIME:   9:07 a.m.

PLACE:  150 South Fifth Street, Suite 1775

        Minneapolis, MN 55402

JOB NO.:  SF 5264242

REPORTED BY: Dawn Workman Bounds, CSR

                                              Page 1

A2630

HIGHLY CONFIDENTIAL

                        A P P E A R A N C E S
ON BEHALF OF PLAINTIFFS and WITNESS:
        JOSHUA SIMMONS, ESQUIRE
        ROMA LOPES, ESQUIRE
        Kirkland & Ellis
        601 Lexington Avenue
        New York, NY 10022
        212.446.4800
        joshua.simmons@kirkland.com
        roma.lopes@kirkland.com

ON BEHALF OF DEFENDANT:
        GABRIEL M. RAMSEY, ESQUIRE
        KEVIN CACABELOS, ESQUIRE
        Crowell & Moring LLP
        3 Embarcadero Center, 26th Floor
        San Francisco, CA  94111
        415.986.2800
        gramsey@crowell.com
        kcacabelos@crowell.com



ALSO PRESENT:

        BRIAN CICCONE, VIDEOGRAPHER

                                            Page  2

A2631

HIGHLY CONFIDENTIAL

```
                        I N D E X

WITNESS:  ISABELLE MOULINIER                      PAGE

EXAMINATION BY MR. RAMSEY.........................    5

EXAMINATION BY MR. SIMMONS........................  143

EXHIBITS MARKED/REFERRED TO

Exhibit 1  Defendant Ross Intelligence Inc.'s

            Amended Notice of 30(b)(6) Deposition

            to Plaintiff Thomson Reuters Enterprise

            Centre GMBH..............................    6


Exhibit 2  Master Thesis "Explaining Relationships

            Between Entities"........................   87

Exhibit 3  Dynamic_System_Overview.pdf...............  109
```

TIME ON THE RECORD:

Mr. Ramsey - 3 hours, 8 minutes

Mr. Simmons - 1 minute

                                              Page  3

Veritext Legal Solutions
866 299-5127

A2632

HIGHLY CONFIDENTIAL

P R O C E E D I N G S

THE VIDEOGRAPHER:  Good morning.  We are going on the record at 9:07 a.m. Central Daylight Time on July 1, 2022.  This is Media Unit Number 1 of the video-recorded deposition of Isabelle Moulinier, taken by counsel for defendant in the matter of Thomson Reuters Enterprise, et al. versus Ross Intelligence Inc., filed in the United States District Court for the District of Delaware, Case Number 20-613-LPS.

This deposition is being taken in Minneapolis, Minnesota.  My name is Brian Ciccone representing Veritext Legal Solutions, and I am the videographer.  The court reporter is Dawn Bounds also from Veritext Legal Solutions.

Will the attorneys please note their appearances for the record.

MR. RAMSEY:  This is Gabriel Ramsey joined by my colleague Kevin Cacabelos of Crowell & Moring.  We represent the Defendant Ross Intelligence.

MR. SIMMONS:  I am Joshua Simmons.  With me is Roma Lopes.  We're from Kirkland & Ellis, and we represent the Plaintiffs as well as the witness.

THE VIDEOGRAPHER:  Thank you.

Will the court reporter please swear in the witness.

Page 4

A2633

HIGHLY CONFIDENTIAL



(Witness sworn.)

THE VIDEOGRAPHER:  You may proceed.

ISABELLE MOULINIER,

having been first duly sworn, testified as follows:

EXAMINATION

Page  5

A2634



Page 10

Veritext Legal Solutions
866 299-5127

A2635

HIGHLY CONFIDENTIAL



Page 11

A2636

HIGHLY CONFIDENTIAL



Page 15

A2637

HIGHLY CONFIDENTIAL



Page 30

A2638

HIGHLY CONFIDENTIAL



Page 61

A2639

HIGHLY CONFIDENTIAL



Page 62

A2640

HIGHLY CONFIDENTIAL



Page  63

A2641



Page 70

HIGHLY CONFIDENTIAL



Page 71

Veritext Legal Solutions
866 299-5127

A2643

HIGHLY CONFIDENTIAL



Page 72

A2644



Page 73

A2645

HIGHLY CONFIDENTIAL



Page  74

A2646

HIGHLY CONFIDENTIAL



Page 75

A2647

HIGHLY CONFIDENTIAL



Page 76

A2648

HIGHLY CONFIDENTIAL



Page 77

A2649

HIGHLY CONFIDENTIAL



Page 78

Veritext Legal Solutions
866 299-5127

A2650

HIGHLY CONFIDENTIAL



Page 88

A2651

HIGHLY CONFIDENTIAL



Page  92

A2652

HIGHLY CONFIDENTIAL



Page 126

A2653

HIGHLY CONFIDENTIAL



Page 127

A2654

HIGHLY CONFIDENTIAL



Page 128

A2655

HIGHLY CONFIDENTIAL

REPORTER'S CERTIFICATE

STATE OF MINNESOTA    )
                      ) ss.
COUNTY OF HENNEPIN    )

I hereby certify that I reported the deposition of ISABELLE MOULINIER, 30(b)(6) REPRESENTATIVE FOR THOMSON REUTERS ENTERPRISE CENTRE GMBH, on the 1st day ofJuly, 2022, in Minneapolis, Minnesota, and that the witness was by me first duly sworn to tell the whole truth;

That the testimony was transcribed by me and is a true record of the testimony of the witness;

That the cost of the original has been charged to the party who noticed the deposition, and that all parties who ordered copies have been charged at the same rate for such copies;

That I am not a relative or employee or attorney or counsel of any of the parties, or a relative or employee of such attorney or counsel;

That I am not financially interested in the action and have no contract with the parties, attorneys, or persons with an interest in the action that affects or has a substantial tendency to affect my impartiality;

That the right to read and sign the deposition by the witness was not waived.

WITNESS MY HAND AND SEAL THIS 20th day of July, 2022.

Dawn Workman Bounds, CSR 6129
Notary Public, Hennepin County, Minnesota
My commission expires January 31, 2024

Page 144

A2656

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| THOMSON REUTERS ENTERPRISE CENTRE GMBH and WEST PUBLISHING CORPORATION,<br><br>       Plaintiffs, Counterdefendants,<br><br>   v.<br><br>ROSS INTELLIGENCE INC.,<br><br>       Defendant, Counterclaimant. | C.A. No. 20-613-SB |

**PLAINTIFFS THOMSON REUTERS ENTERPRISE CENTER GMBH
AND WEST PUBLISHING CORPORATION'S NOTICE OF ERRATA
FOR THE DEPOSITION OF ISABELLE MOULINIER**

I, the undersigned, do hereby declare that I read the deposition transcript of Isabelle

Moulinier dated July 1, 2022 and that to the best of my knowledge, said testimony is true and

accurate, with the exception of the following changes listed below:

| Page | Line | Original Text | Replacement Text | Reason |
|---|---|---|---|---|
| 8 | 10 | other hand per the e-mail address. | other hand per the e-mail we sent. | Transcription error |
| 15 | 9 | different types of contents. | different types of content. | Transcription error |
| 16 | 11 | for the full text of the opinion | and the full text of the opinion | Transcription error |
| 18 | 2 | different types of questions that might enter. | different types of questions that might be entered. | Transcription error |
| 19 | 4-5 | WIN is natural -- WIN queries. West Is Natural type of... | WIN, Westlaw is natural, queries. | Transcription error |
| 22 | 14 | first-year search results | first layer search results | Transcription error |
| 22 | 18-19 | a feature called WIN Is Natural, | a feature called WIN, Westlaw Is Natural, | Transcription error |

A2657

| Page | Line | Original Text | Replacement Text | Reason |
|---|---|---|---|---|
| 24 | 13-14 | as well as our results that we get | as well as other results that we get | Transcription error |
| 25 | 4 | which is not related to WestSearch | which is not related to WestSearch Plus | Misspoke/clarification |
| 28 | 13 | and why my team | and while my team | Transcription error |
| 35 | 3 | In general term, yes | In general terms, yes | Transcription error |
| 36 | 1 | popular name | popular names | Transcription error |
| 36 | 18 | it's not our type that we want | it's not the type that we want | Transcription error |
| 39 | 4 | as a set of roles | as a set of rules | Transcription error |
| 39 | 18 | a case title, AVB | a case title, A v. B | Transcription error |
| 39 | 19-20 | AVBC, and AVBC is not a | A v. B C, and A v. B C is not a | Transcription error |
| 39 | 22 | AVB, but also | A v. B, but also | Transcription error |
| 41 | 12 | The way we define | The way we defined | Transcription error |
| 42 | 3 | in Thomson Reuters when | at Thomson Reuters when | Transcription error |
| 47 | 13 | the computer program, in a sense; | the computer programming sense; | Transcription error |
| 49 | 13-14 | headnotes, which on the display appear at the top of the page are | headnotes, which on the display appear at the top of the page, are | Transcription error |
| 52 | 6 | this result in addition to | these results in addition to | Transcription error |
| 53 | 5-6 | There may be one too many key number per headnote. | There may be one to many key numbers per headnote. | Transcription error |
| 55 | 6 | We have a site store | We have a side store | Transcription error |
| 55 | 7 | with headnote as the key numbers | with headnotes and the key numbers | Transcription error |
| 58 | 2 | of candidate | of candidates | Transcription error |
| 58 | 13 | find by citation. | found by citation. | Transcription error |
| 58 | 20 | other candidate | other candidates | Transcription error |
| 59 | 19 | and application truncates | and the application truncates | Transcription error |
| 60 | 20 | a fixed formula like WIN-add for | a fixed formula like WIN had for | Transcription error |
| 60 | 23 | that we judge top key numbers | that we judge to be the top key numbers | Transcription error/misspoke |
| 61 | 17 | algorithm | algorithms | Transcription error |
| 61 | 20 | not the measuring algorithm | not the learning algorithm | Transcription error |

A2658

| Page | Line | Original Text | Replacement Text | Reason |
|---|---|---|---|---|
| 63 | 6 | That's the one that was one algorithm | That's the one – that was one algorithm | Transcription error |
| 69 | 13-14 | combination of entity | combination of entities | Transcription error |
| 71 | 12 | that are relating to | that relate to | Transcription error |
| 73 | 19-21 | We had a team of product managers who work on Westlaw as well as contractors I believe identify legal topic | We had a team of product managers who work on Westlaw, as well as contractors, I believe, identify legal topic | Punctuation |
| 74 | 1 | returned as those are very responsive documents. Those | returned as: those are very responsive documents; those | Punctuation |
| 74 | 6-9 | and we add a general topic as well as a smaller version of the topic. We add a list of documents that add grade. We also add a list of key numbers that add grade | and we had a general topic as well as a smaller version of the topic. We had a list of documents that had grades. We also had a list of key numbers that had grades | Transcription error |
| 76 | 6 | with customers had | with customers, had | Transcription error |
| 77 | 2 | focused on opinion | focused on opinions | Transcription error |
| 77 | 14 | Edge apart from WestSearch is Westlaw Next | Edge apart from WestSearch Plus is Westlaw Next | Misspoke/clarification |
| 78 | 16-17 | have a new version of the feature either this year for release or trains at the end of last year | have a new version of the feature trained either this year for release or at the end of last year | Missoke/clarification |
| 79 | 14 | assembled by SME; | assembled by SMEs; | Transcription error |
| 81 | 12 | add features based | had features based | Transcription error |
| 82 | 12 | example's | examples | Transcription error |
| 83 | 1 | SVM's | SVMs and | Transcription error/clarification |
| 83 | 4 | and feature value | and feature values | Transcription error |
| 83 | 15 | I add a document | I had a document | Transcription error |
| 84 | 6 | values with the weights | values with weights | Transcription error |
| 84 | 20 | machinery | machine learning | Transcription error |
| 91 | 6 | people name | names of people | Clarification |

A2659

| Page | Line | Original Text | Replacement Text | Reason |
|---|---|---|---|---|
| 93 | 17-18 | by the algorithm by the solution builder or the scientist | by the algorithm, by the solution builder, or the scientist | Punctuation |
| 93 | 22 | have the property of being able to end all categorical | have the property of being able to handle categorical | Transcription error |
| 94 | 16 | on a document or a documents-only | and documents | Transcription error |
| 97 | 1 | at least headnote data | at least on headnote data | Transcription error |
| 98 | 18 | vectoral | vectorial | Transcription error |
| 99 | 24 | machining | maching learning | Transcription error |
| 105 | 1 | acquiring and refine the data and that data is fit | acquiring and refining the data to be fit | Transcription error/misspoke |
| 106 | 13-14 | not 10 thousands | not tens of thousands | Transcription error |
| 108 | 24 | 10 thousand | tens of thousands | Transcription error |
| 116 | 19 | Only of name | Only by name | Transcription error |
| 116 | 20 | IBM Community Services | IBM API Services | Misspoke/clarification |
| 119 | 5-7 | identifying phrases and synonyms potentially or related term and run against the indices | identifying phrases, and synonyms potentially, or related terms, and running them against the indices | Transcription error |
| 119 | 22 | documents that's | document that is | Transcription error |
| 120 | 2 | more likely | more like this | Transcription error |
| 120 | 21 | more likely search | more like this search | Transcription error |
| 123 | 14 | expended list | expanded list | Transcription error |
| 125 | 24-25 | text presumption and burden of proof | text "presumption and burden of proof " | Transcription error |
| 127 | 6 | function compare | function compares | Transcription error |
| 130 | 14 | organize | organizes | Transcription error |
| 130 | 18 | first tool that people can go to a manual search engine | first tool that people can go to, a manual search engine, | Punctuation |
| 132 | 2 | the tech nodes | the top nodes | Transcription error |
| 136 | 8 | product trace | product release | Transcription error |
| 138 | 21 | viables | variables | Transcription error |

Dated:  August 19, 2022

_____
Isabelle Moulinier

A2660

# EXHIBIT 2

A2661

Case 1:20-cv-00613-SB   Document 708-1   Filed 10/10/24   Page 34 of 52 PageID #: 156730

A2662

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

_____

THOMSON REUTERS ENTERPRISE )

CENTRE GMBH and WEST           )

PUBLISHING CORPORATION,      )

          Plaintiffs and ) C.A. No. 20-613

     Counterdefendants  ) (LPS)

v.                           )

ROSS INTELLIGENCE, INC.,   ) HIGHLY CONFIDENTIAL

          Defendant and  )

     Counterclaimant. )

_____)

--- This is the transcript of the videotaped Deposition of, JIMOH OVBIAGELE, taken at the offices of Regus - Toronto Airport Corporate Centre, Mississauga, Ontario, Canada, on the 12th day of April, 2022.

          ------------

REPORTED BY:  Helen Martineau, CSR

VIDEOGRAPHER:  Bruno Silva

A2663

2

A P P E A R A N C E S:

FOR THE PLAINTIFF:

KIRKLAND & ELLIS LLP

PER:  Joshua L. Simmons, Esq.

& Eric Loverro, Esq.

601 Lexington Avenue

New York, New York

Tel. (212) 446-4989

Email:    joshua.simmons@kirkland.com

eric.loverro@kirkland.com


FOR THE DEFENDANT:

CROWELL & MORING LLP

PER:  Warrington Parker, Esq.

& Jacob Canter, Esq.

3 Embarcadero Center, 26th Floor

San Francisco, California

94111

Tel.   (415) 365-7234

Email:    wparker@crowell.com

jcanter@crowell.com

A2664

3

INDEX OF EXHIBITS

NO./ DESCRIPTION                                    PAGE

1    Plaintiff's 30(b)(6) Notice to          11
     ROSS.

2    Document entitled "Statement of         115
     Work II of ROSS bulk memos";
     Bates numbered TR-0000568 to
     581.

3    Slack conversation, dated               147
     June 15th, 2017; Bates numbered
     ROSS-009637399 to 7400.

4    Email exchange, top email from          150
     Thomas Van Der Heijden to Andrew
     Arruda, and others, dated
     September 15th, 2017; Bates
     numbered ROSS-009558474 to 8475.

5    Email exchange, top email from          175
     Jimoh Ovbiagele to Andrew
     Arruda, and others, dated August
     4, 2017; Bates numbered
     ROSS-003537612 to 7613.

A2665

4

INDEX OF EXHIBITS

NO./ DESCRIPTION                                    PAGE

6     Email exchange, to email from          196
      Andrew Arruda to Thomas
      Hamilton, and others, dated
      July 29th, 2015; Bates numbered
      ROSS-003334354.

7     Email exchange, top email from         199
      Thomas Hamilton to Shazina
      Razeen, dated September 20,
      2015; Bates numbered
      ROSS-003610162 to 0165.

8     Slack Notifications from the           203
      ROSS Inc. team for February 16,
      2015; Bates numbered
      ROSS-003391075.

9     Email from Asana to Jimoh             207
      Ovbiagele, dated June 6, 2015,
      re: Updated tasks; Bates
      numbered ROSS-009585472.

10    Email exchange, top email from        213
      Thomas Hamilton to Andre Arruda,
      and others, dated
      September 25th, 2015; Bates
      numbered ROSS-003389728 to 9730.

A2666

5

INDEX OF EXHIBITS

NO./ DESCRIPTION                                    PAGE

11   Email exchange, top email from          215

     Thomas Hamilton to Andrew

     Arruda, dated September 29,

     2015; Bates numbered

     ROSS-010164415 to 4417.

12   Slack conversation dated May 17,         228

     2019; Bates numbered

     ROSS-003718400 to 8406.

A2667

6

                    PRODUCTION REQUESTS


   PRODUCTION REQUESTS are denoted by P/R

and are found on the following Page/Line:

                    94/12;

                    100/23;

                    109/14;

                    232/17.

A2668

7

-- Upon commencing at 9:20 a.m.

THE VIDEOGRAPHER:  Good morning.  We are going on the record at 9:20 a.m. on April 12th, 2022.  This is media unit number one of the video deposition of Jimoh Ovbiagele in the matter of Thomson Reuters Enterprise Centre GmbH et al. versus ROSS Intelligence Inc., case number CA-20-613(LPS), filed in the United States District Court of Delaware.

This deposition is being held at Regus, Toronto Airport Corporate Centre, 2425 Matheson, 8th Floor, Mississauga, Ontario, L4W 5K4.

My name is Bruno Silva, CLVS, on behalf of Philadelphia, and I am a videographer. The court reporter is Helen Martineau on behalf of Philadelphia.

Will counsel please introduce yourselves followed by the court reporter swearing in the witness.

MR. SIMMONS:  Joshua Simmons from Kirkland & Ellis, and with me is Eric Loverro. We represent the plaintiffs in this matter.

MR. PARKER:  And I'm Warrington Parker and with me is Jacob Canter and we represent the

A2669



defendant.

THE VIDEOGRAPHER:  Would the court reporter please swear in the witness.

JIMOH OVBIAGELE:  AFFIRMED.

CROSS-EXAMINATION BY MR. SIMMONS:

A2670

THOMSON REUTERS vs
ROSS INTELLIGENCE

Highly Confidential

Jimoh Ovbiagele
April 12, 2022

38

A2671

THOMSON REUTERS vs
ROSS INTELLIGENCE       Highly Confidential       Jimoh Ovbiagele
April 12, 2022



A2672

THOMSON REUTERS vs
ROSS INTELLIGENCE

Highly Confidential

Jimoh Ovbiagele
April 12, 2022

42



A2673

116



A2674

THOMSON REUTERS vs
ROSS INTELLIGENCE

Highly Confidential

Jimoh Ovbiagele
April 12, 2022



A2675

THOMSON REUTERS vs
ROSS INTELLIGENCE

Highly Confidential

Jimoh Ovbiagele
April 12, 2022

132



A2676

THOMSON REUTERS vs
ROSS INTELLIGENCE

Highly Confidential

Jimoh Ovbiagele
April 12, 2022

133



A2677

241

REPORTER'S CERTIFICATE

I, HELEN MARTINEAU, CSR, Certified Shorthand Reporter, certify;

That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was put under oath by me;

That the testimony of the witness and all objections made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That the foregoing is a true and accurate transcript of my shorthand notes so taken. Dated this 19th day of April, 2022.

_____

PER:  HELEN MARTINEAU

CERTIFIED SHORTHAND REPORTER

A2678

**Signature and Errata Sheet**
**April 12, 2022 Deposition of Jimoh Ovbiagele**
*Thomson Reuters Enterprise Centre GMBH and West Publishing Corporation v. ROSS*
*Intelligence Inc.*

I, Jimoh Ovbiagele, have reviewed the attached transcript of my April 12, 2022 deposition testimony, and certify, pursuant to 28 U.S.C. § 1746 that the attached transcript is my true and correct testimony during that deposition, subject to the corrections shown below.

| Page/Line | Now Reads | Correction | Reason |
|---|---|---|---|
| 15:14 | did | didn't | Transcription error |
| 15:22 | Ross | ROSS | Correct spelling |
| 21:02 | "sic" | Delete "sic" | Transcription error |
| 21:24 | "about" | "about what" | Transcription error |
| 23:18 | and | of | Transcription error |
| 26:08 | "your" | Delete "your" | Clarification |
| 28:05 | Ross | ROSS | Correct spelling |
| 32:01 | Hayden | Heijden | Correct spelling |
| 32:05 | Hayden | Heijden | Correct spelling |
| 32:08 | Hayden | Heijden | Correct spelling |
| 32:11 | Hayden | Heijden | Correct spelling |
| 32:16 | Ross | ROSS | Correct spelling |
| 32:23 | Ross | ROSS | Correct spelling |
| 35:19 | Ross | ROSS | Correct spelling |
| 52:25 | That | where | Clarification |
| 55:09 | Ross | ROSS | Correct spelling |
| 56:02 | Ross | ROSS | Correct spelling |
| 61:24 | starts | start | Transcription error |

A2679

| 81:09 | Ross | ROSS | Correct spelling |
|---|---|---|---|
| 109:14-17 | *Bolded text* | *Text should not be bold* | Bold text indicates deponent speaking but that is not the case |
| 157:03 | Thomas | Tomas | Correct spelling |
| 215:10 | if | is | Transcription error |

Executed on May 25, 2022, at 579 Transversal 1a 501, Bogotá, Bogotá 110231, Colombia.

_____

A2680

# EXHIBIT 7

A2681

ROSS    Features    Coverage    Pricing    Customers    About Us    Blog    Log In    **Sign Up**

# A Labor and Employment Lawyer Replaces Westlaw and Lexis for Caselaw Research

"Legal research was intimidating and time consuming, and it required a lot of forethought before even getting started. With ROSS, it's a simple, intuitive process that allows me to use plain language in searches and pinpoint what I'm looking for … People should just try it out; I think they'll love it."

**Renate Walker**
Seyfarth Shaw LLP



## About

Renate Walker is an associate in the Labour and Employment department of Seyfarth Shaw LLP's Atlanta office where she advises and represents clients in a broad range of employment-related matters, including discrimination, harassment, retaliation, and wage and hour actions. Prior to her legal career, Renate was a human resources professional for nearly ten years.

## Goals

Complete complex legal research assignments efficiently--in terms of both time and cost.

## Approach

After using ROSS, Renate's uses for LexisNexis and Westlaw to review statutes. The nuts and bolts of her research – case law – is handled by ROSS. This transition hasn't required any adjustments because "it's extremely intuitive and user friendly." Whereas traditional law firm search engines require hours of hands-on training, Renate tells us all that was required for ROSS training was a video conference since the system itself is so simple to use.

## Flexibility to Research Without Per-Query Charges

Renate first started using ROSS in 2018, and has found it to be an essential tool to her practice. Whereas traditional legal search engines require lawyers to think through Boolean logic carefully before entering a query, ROSS performs well on plain-language searches—drastically cutting down time spent searching and freeing up time for legal analysis. Rather than charging for every search (including those searches that include typos or formatting errors), the ROSS system does not charge per search. This gives Renate peace of mind and flexibility when researching legislation and precedents for clients: "the fact that I can run as many searches as I want and not have to worry about racking up charges because I put something in the wrong set of quotation marks, or need to move a parenthesis, is just fantastic." This sensitivity to cost and delivery of real-time solutions gives Renate's clients confidence in the counsel they've selected and helps retain and attract clients with the same type of cost sensitivities.

## Researching Novel Legal Issues With Confidence

Renate admits that one of the most frustrating parts of legal research is the unknown – knowing that you need case law on a certain topic, but not knowing if it's ever been addressed by the courts. Typically, the research process begins broadly with hundreds of cases returned which requires hours of sifting through materials, opening and closing browser tabs, and keeping a pad and paper by your side to remember which cases are relevant and which cases are not.

Renate tells us, "when you've narrowed down your search, but aren't retrieving any relevant hits, you can spin your wheels and end up without an answer after a few hours." For example, while researching the applicability of certain provisions of the Federal Arbitration Act to transportation workers in a given jurisdiction, the standard law-firm search engines returned hits that took hours to sift through, with the result that no express case had addressed Renate's clients' circumstances.

Using ROSS, Renate was able to confirm in minutes that there wasn't any precedent in case law that could be relied upon (or distinguished) for her client. This sort of efficiency – in terms of both time and cost – is the most important factor in deciding which search engine to use, and which makes ROSS so attractive. In Renate's words, "legal research was intimidating and time consuming, and it required a lot of forethought before even getting started. With ROSS, it's a simple, intuitive process that allows me to use plain language in searches and pinpoint what I'm looking for … people should just try it out, I think they'll love it."

TR-0000512

A2682

5/6/2020 Case 1:20-cv-00613-SB   Document 708-3   Filed 10/10/24   Page 3 of 46 PageID #: 156761

## Spreading the Word to Colleagues

In the short amount of time that Renate's been using ROSS, word of its capabilities has already spread through her office. Renate tells us that a fellow associate saw her using ROSS on her desktop one day and inquired about the platform. After using ROSS, Renate's colleague didn't hesitate to sing its praises and recommend it to other members of the firm. Unlike traditional search tools that require extensive training, her colleague could get set up after watching a training video from the comfort of her office.

## The ROSS Advantage Over Legacy Platforms

One of the most prominent examples of how ROSS gives Renate an edge over other lawyers was when she was asked to update educational materials for a client teaching employment law. Specifically, she needed verification over non-compete covenants in employment agreements for a specific jurisdiction. Renate tells us that it is exceptionally difficult to narrow down broad searches like that using LexisNexis or Westlaw, but with ROSS, her plain language query returned answers immediately. Renate asked ROSS, "what factors do courts consider in determining whether or not non-compete agreements are enforceable in "X" jurisdiction" and it immediately pulled up the section of the case that listed all the factors she needed in responding to her client.

The ROSS team is excited to be partnering with innovative international law firms like Seyfarth Shaw LLP who recognize the value of investing in AI technology early to enhance their client service delivery in terms of time and cost reduction. We look forward to sharing additional details of how AI is transforming Seyfarth Shaw LLP's law practice.

> ❝
>
> ## Client Recommends ROSS
>
> "Legal research was intimidating and time consuming, and it required a lot of forethought before even getting started. With ROSS, it's a simple, intuitive process that allows me to use plain language in searches and pinpoint what I'm looking for ... people should just try it out, I think they'll love it."
>
> **Renate Walker**
> Seyfarth Shaw LLP

## Other Case Studies

ROSS Intelligence ("ROSS") builds AI-driven products to augment lawyers cognitive abilities.





TR-0000513

A2683

5/6/2020 Case 1:20-cv-00613-SB　Document 708-3　Filed 10/10/24　Page 4 of 46 PageID #: 156762

A2684



"ROSS is so highly intuitive and easy to use that we were able to introduce it into our workflow seamlessly. Right away that led to a healthy and productive re-evaluation of how we approached legal research at the firm." "It's like going from a rotary phone to an iPhone."

**Luis Salazar**
Salazar Law LLP

→



"I had a colleague doing research, and he'd tell me about issues he had. I'd say 'well, did you use ROSS?' He would then log in while I was standing there, we would ask his question and ROSS would return answers that were clearer than anything he returned by using traditional legal research methods."

**Matt Blaine**
Davison, Eastman, Muñoz & Paone

→



"As a lawyer, I just want relevance. It's the 'Google mentality.' I want to type my query in one search bar and get relevant results. ROSS is better than other platforms at getting me closer, faster."

**Chad Van Horn**
Van Horn Law Group

→

**ROSS**



🐦 Twitter

📘 Facebook

🔗 LinkedIn

© ROSS Intelligence, Inc. 2014–2020

**Company**

About Us

Careers

Terms of Service

Privacy Policy

**Product**

Features

Coverage

Pricing

Academic Access

**Resources**

Contact Us

FAQ + Support

Blog

TR-0000514

# EXHIBIT 8

A2685

Case 1:20-cv-00613-SB   Document 708-3   Filed 10/10/24   Page 6 of 46 PageID #: 156764



# THOMSON REUTERS
# WESTLAW™

Wayne Chang

Candidate for Director, Westlaw Litigation Product Management
October 23, 2020



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                    TRCC-00686613

A2686



Who am I?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

TRCC-00686614

A2687



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

TRCC-00686615

A2688



Career History

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

TRCC-00686616

A2689



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                    TRCC-00686617

A2690



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

TRCC-00686618

A2691



TRCC-00686619

A2692



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

TRCC-00686620

A2693



Improving Westlaw for Litigators

THOMSON REUTERS

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

TRCC-00686621

A2694



Shrink the Haystack



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

TRCC-00686623

A2696



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

TRCC-00686624

A2697



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

A2698



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

TRCC-00686626

A2699





HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

TRCC-00686629

A2702



Improving Citing References

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

TRCC-00686630

A2703



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                    TRCC-00686631

A2704



Improving Citing References

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                    TRCC-00686632

A2705



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                         TRCC-00686633

A2706

### Workflows in Westlaw



22                                                                                      THOMSON REUTERS

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                    TRCC-00686634

A2707



Workflows in Westlaw

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                    TRCC-00686635

A2708



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

TRCC-00686636

A2709



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                              TRCC-00686637

A2710



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

TRCC-00686638

A2711

### How Do We Do This?



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                                    TRCC-00686639

A2712



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                    TRCC-00686640

A2713

Case 1:20-cv-00613-SB   Document 708-3   Filed 10/10/24   Page 34 of 46 PageID #: 156792

# EXHIBIT 9

A2714



A2715

# West Publishing Turns 150

## Commemorating 150 Years of Customer-Driven Innovation

August 2022

THOMSON REUTERS®

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

TRCC-00608822

A2716

THOMSON REUTERS®

TRCC-00608823

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Case 1:20-cv-00613-SB   Document 708-3   Filed 10/10/24   Page 37 of 46 PageID #: 156795



A2717

THOMSON REUTERS®

TRCC-00608824

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Case: 25-2153   Document: 156-6   Page: 467   Date Filed: 01/02/2026

A2718

Document: 156-6   Page: 467   Date Filed: 01/02/2026

THOMSON REUTERS®

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

TRCC-00608825

Case 1:20-cv-00613-SB   Document 708-3   Filed 10/10/24   Page 39 of 46 PageID #: 156797



A2719

THOMSON REUTERS®   TRCC-00608826

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



A2720

Case 1:20-cv-00613-SB    Document 708-3    Filed 10/10/24    Page 41 of 46 PageID #: 156799

A2721

TRCC-00508828

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Case: 25-2153   Document: 156-6   Page: 471   Date Filed: 01/02/2026

A2722

Document: 156-6   Page: 471   Date Filed: 01/02/2026

THOMSON REUTERS®

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

TRCC-00608829

Case 1:20-cv-00613-SB   Document 708-3   Filed 10/10/24   Page 43 of 46 PageID #: 156801



A2723

TRCC-00608830

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Case 1:20-cv-00613-SB    Document 708-3    Filed 10/10/24    Page 44 of 46 PageID #: 156802

TRCC-00608831

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



A2724

Case 1:20-cv-00613-SB   Document 708-3   Filed 10/10/24   Page 45 of 46 PageID #: 156803

TRCC-00608832

A2725

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

A2725

A2726

Case: 25-2153   Document: 156-6   Page: 475   Date Filed: 01/02/2026

THOMSON REUTERS®

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

TRCC-00608833

Case 1:20-cv-00613-SB   Document 708-9   Filed 10/10/24   Page 135 of 172 PageID #: 159398

# EXHIBIT 47

A2727



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

TRCC-00194937

A2728



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

A2730

Case 1:20-cv-00613-SB   Document 708-9   Filed 10/10/24   Page 139 of 172 PageID #: 159402



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

TRCC-00194940

A2731



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

A2732

Case 1:20-cv-00613-SB   Document 708-9   Filed 10/10/24   Page 141 of 172 PageID #: 159404



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

TRCC-00194942

A2733



A2734

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

TRCC-00194943

A2734



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

TRCC-00194944

A2735



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

A2736



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

## Editorial Quality Matters for AI Performance



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

## Editorial Quality Matters for AI Performance



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

A2739



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

TRCC-00194949

A2740



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

TRCC-00194950



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                    TRCC-00194951



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

TRCC-00194952

A2743



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



AI in Thomson Reuters Products

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

TRCC-00194955

A2746



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

TRCC-00194956



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

TRCC-00194958

A2749

Case 1:20-cv-00613-SB   Document 708-9   Filed 10/10/24   Page 158 of 172 PageID #: 159421

# EXHIBIT 48

A2750

STATEMENT OF WORK II
FOR ROSS BULK MEMOS

This Statement of Work II incorporates and is made pursuant to the October 15, 2015 Master Services Agreement ("MSA") by and between ROSS Intelligence, Inc. ("ROSS"), a Delaware corporation and LegalEase Solutions, LLC ("Contractor") a Michigan limited liability company.

1. Definitions:  Terms and expressions not expressly defined in this Statement of Work, shall have the following meanings:

    1.1. "Case Law" means judicial decisions originating from a judicial or administrative body in the United States of America, or as otherwise prescribed in writing by ROSS and sent to Contractor.

    1.2. "Legal Research Question" means a question grounded in legal principles.

    1.3. "Memorandum or Memo" means a memorandum of law that answers a Legal Research Question.

    1.4. "Quote" means an independent paragraph excerpt from Case Law.

    1.5. "Reference List" means the list of Case Law included in the Memo.

    1.6. "Deficiency" means a reference quote that does not directly answer the ROSS question.

2. Additional Terms and Expressions: Additional capitalized terms and expressions have the meanings ascribed to them in the MSA.

3. Currency: Unless stated otherwise, all dollar figures in this Statement of Work are in United States dollars.

4. Term: Subject to the termination provisions of this Agreement, the term of this Statement of Work shall be for a period of three months commencing on September 19, 2017 and expiring on December 19, 2017 ("Initial Term"). Upon the expiration of the Initial Term, this Statement of Work shall renew with the prior written mutual consent of ROSS for successive three month periods ("Renewal Terms"), unless terminated pursuant to the terms of the Agreement. The terms Initial and Renewal Terms shall be collectively referred to as the "Term".

5. Description of Service:

5.1. Contractor agrees to provide ROSS with bulk Memos. Contractor agrees to meet the expectations for performance as set forth in this Statement of Work. Contractor's attorneys will research topics and Legal Research Questions from any Federal or State jurisdiction in the United States, without regard to any legal decisions, draft Memos, and compile the Memos in the format approved by ROSS.

5.2. Each Memo shall include a Legal Research Question and a Reference list with a target of at least four (4) and no more than six (6) Quotes.

5.3. Two (2) to four (4) Quotes in each Memo shall contain either a "great" or "good" independent answer to the Legal Research Question. A "great" Quote is one that contains an answer to all essential elements of the Legal Research Question while a "good" Quote is one that contains an answer to most essential elements of the Legal Research Question. The Contractor shall strive for four (4) "good" or "great" Quotes per question. However, if

TR-0000568

A2751

Contractor is only able to find 2 or 3 "good" or "great" Quotes, they shall only provide 2 or 3 "good" or "great" Quotes. Contractor shall strive to have more "great" than "good" Quotes.

5.4. One (1) Quote in each Memo shall contain a "topical" independent response to the Legal Research Question. A "topical" response is a response that answers and/or references limited components of a Legal Research Question but does not answer the essential elements of such Legal Research Question.

5.5. One (1) Quote in each Memo shall contain an "irrelevant" independent response to the Legal Research Question. An "irrelevant" response is a response that contains one or more keywords from the Legal Research Question but does answer and/or reference any elements of the Legal Research Question, either limited or essential.

5.6. Contractor shall label whether a Quote contains a response that is "great", "good", "topical" or "irrelevant" and double bracket and bold the specific component(s) of each such Quote that is "great", "good", "topical" or "irrelevant." Contractor shall also label which legal practice area each Quote falls under.

6. Changes: ROSS reserves the right to request changes, deletions, or additions as deemed necessary by ROSS and Contractor. ROSS' proposed changes shall become effective only by written agreement of Contractor.

7. Production/Delivery Schedule: Contractor agrees to draft ROSS questions and Memos pursuant to the Production Run schedule below. In the First Production Run of Memos, Contractor shall commence providing deliverables on October 19, 2017 and conclude on December 19, 2017, as outlined below. For the Subsequent Production Runs of Memos, Contractor shall provide 20,000 Memos in subsequent months to ROSS.

First Production Run

| Delivery Date | Amount of Memos |
| --- | --- |
| October 19, 2017 | 5,000 |
| November 19, 2017 | 10,000 |
| December 19, 2017 | 10,000 |

Subsequent Production Run

| Delivery Date | Amount of Memos |
| --- | --- |
| Month 1 | 20,000 |
| Month 2 | 20,000 |
| Month 3 | 20,000 |
| Month 4 | 15,000 |

8. Fee: ROSS shall pay Contractor pursuant to the schedule below:

| Reference Quotes | Price per Memo |
| --- | --- |

TR-0000569

A2752

| | |
|---|---|
| 4 Quotes + 1 topical and 1 irrelevant Quote | $26.17 |
| 3 Quotes + 1 topical and 1 irrelevant Quote | $24.55 |
| 2 Quotes + 1 topical and 1 irrelevant Quote | $21.00 |

Contractor shall provide a 5% volume discount to ROSS for any Memo purchase over 25,000 and a 15% volume discount for a total order of 100,000 Memos.

9. Payment: ROSS shall pay Contractor in advance at the beginning of each month for the following 30 days of expected output at a minimum $21.00 price per Memo (each, an "Advance Payment"). For clarity, the Advance Payment for the (i) first 5,000 Memos of the First Production Run due October 19, 2017 shall be $105,000 and shall be made on September 19, 2017; (ii) subsequent 10,000 Memos of the First Production Run due November 19, 2017 shall be $210,000 and shall be made on October 19, 2017 and (iii) final 10,000 Memos of the First Production Run due December 19, 2017 shall be $210,000 and shall be made on November 20, 2017. For any Subsequent Production Run, the Advance Payment shall be $420,000. If there is a difference between an Advance Payment amount and aggregate Memo cost during a Production Run pursuant to the Section 8 Fee schedule (the "Cost Difference"), Contractor shall provide ROSS a detailed accounting of such Cost Difference in a timely manner and ROSS shall pay such Cost Difference within seven (7) days receipt of such detailed accounting.

10. Delivery: Contractor shall deliver batched Memos via e-mail or FTP to ross@rossintelligence.com and via the ROSS Memo upload portal (the "Portal"). The Portal shall meet necessary specifications of speed and capacity to process daily batched Memo uploads.

11. Quality Assurance: Contractor shall ensure the Memos submitted follow the (i) quality control processes detailed in the LegalEase Solutions Quality Control Guide ("QCG") provided in Schedule A to this Statement of Work and the (ii) Quality Control Checklist provided in Schedule B to this Statement of Work. Contractor shall follow a staged quality control process. There will be 100% quality control for the first 2000 Memos, 75% for the next 10,000 Memos and 25% for the remaining Memos. If any of the Memos submitted do not meet the parameters prescribed in the QCG, ROSS shall inform Contractor of such Deficiencies within 14 days of receipt of the applicable Memos. If no such notice is received within the prescribed 14 days, the applicable Memos shall be deemed fully accepted by ROSS. A 15% penalty shall be charged to any Memo and/or batch of Memos that fail to meet the QCG requirements.

12. Reporting: Contractor shall email daily reports to ROSS which include the production totals, QCG results, and other requested information from ROSS.

13. Destruction of Memos: Contractor acknowledges that the Memos constitute Confidential Information and shall remove and destroy all Memos and copies of Memos in its

TR-0000570

A2753

A2754

possession within sixty (60) days of each Production Run and shall concurrently confirm to ROSS that such removal and destruction has occurred.

14. Existing Agreements: This Statement of Work is ancillary to existing agreements, including, but not limited to the MSA and prior Statements of Work.

Date: September ___15___, 2017

ROSS INTELLIGENCE, INC.

By: _____

Name: Andrew Arruda
Title: Chief Executive Officer

LEGALEASE LLC

By: _____

Name: Tariq Hafeez
Title: President

TR-0000571

Schedule A

# Quality Control Guide
# for ROSS Intelligence

Drafting Questions, Preparing Responsive
Memorandum, and Quality Control
Procedures

LegalEase Solutions LLC

TR-0000572

A2755



## TABLE OF CONTENTS

Overview ............................................................................................................ 2
    Introduction ................................................................................................. 2
    Audience ...................................................................................................... 2
    Objectives .................................................................................................... 2
Legal Disclaimer ............................................................................................... 3
The LegalEase Ross Team and Process .......................................................... 4
    Attorneys ..................................................................................................... 4
    Quality Control Attorneys ............................................................................ 4
    Staged Quality Control Process .................................................................. 4
    Production Expeditors .................................................................................. 5
    India and US Project Managers ................................................................... 5
    ROSS Operations ........................................................................................ 5
The LegalEase ROSS Process Flowchart .......................................................... 6

Private and Confidential - Page 1 of 6

TR-0000573

A2756



## Overview

### Introduction

The LegalEase Solutions Quality Control Guide ("QCG") is the primary quality assurance resource and playbook for our attorneys. This QCG provides all the tools and resources needed for the drafting and delivery of ROSS Intelligence memos.

### Audience

The intended audience for this guide is our attorneys who prepare Ross memos. Additionally, this guide may be utilized by ROSS to review our internal process.

### Objectives

This guide:

- Identifies clear guidelines for attorneys to follow when designing, developing, and researching, drafting, and delivering ROSS memos.
- Describes quality control standards for ROSS memos.
- Describes quality control procedures and processes set in place for ROSS memo production.

Private and Confidential - Page 2 of 6

TR-0000574

A2757



**Legal Disclaimer**

This Quality Control Guide includes proprietary, confidential, and/or trade secret information. LegalEase considers this information to be a trade secret not subject to disclosure.

TR-0000575

A2758



**The LegalEase ROSS Team and Process**

We have organized a comprehensive team for this project. Leading the team for ROSS operations are Teri Whitehead, VP of Global Strategy and Gayathri Rajeev, Director of Operations in India. Teri and Gayathri will oversee operations and are available anytime to address and resolve any potential concerns.

**Attorneys.** Our team of attorneys will research topics and questions, draft the memos, and compile the memos in the ROSS approved format. We will ensure that our attorneys follow this QCG for drafting memos and utilize our internal associate work product checklists. The steps include:

    i.     Using our LegalEase's creative process, to produce ROSS questions.
    ii.    Research answers to questions.
    iii.   Draft ROSS memorandum.

**Quality Control Attorneys.** We have allocated a minimum of 5 separate QC attorneys to independently review memos, ensuring that ROSS standards are met. These attorneys have a minimum of 3 years' experience in these positions. The QC team will be expanded as needed per the scope and requirements of this project. The QC team will follow the QC checklist setting out the steps to be followed in completing the process. These steps include:

    i.     Review and confirm the grammar, question format, and citations.
    ii.    Confirm and review short answer and legal analysis.
    iii.   Review reference quotes for relevancy.
    iv.   Confirm case law.
    v.    Advise associates of errors and design action plan to avoid future errors.

**Staged Quality Control Process.** Our QC attorneys will follow LegalEase's staged quality control process. We have used this process with success on other large accounts with over 50,000 documents.

First Stage:
    100% QC of 2000 Memos. Our QC attorneys will QC 100% of the first 2000 memos.
Second Stage:
    75% for the next 10,000 memos. Our QC attorneys will QC 75% of the next 10,000 memos.
Third Stage:
    25% for the remaining memos. Our QC attorneys will QC 25% or more of the remaining memos.

TR-0000576

A2759



**Production Expeditors.** Our dedicated ROSS production expeditors will comply and follow ROSS' process on delivery, including the portal upload, data tracking, and logistics. These steps include:

i.   Validate question originality.
ii.  Upload memorandum to ROSS dedicated portal.
iii. Update internal LE production tracking sheet.
iv.  Email production totals of attorneys and QC attorneys to Project Managers.
v.   Update internal exception error tracking sheet.
vi.  Update ROSS' completion tracking sheet.

**India and US Project Managers.** We have assigned to ROSS, three project managers. Our project managers will guarantee and ensure ROSS quality and processes. Having project managers in different time zones will provide round the clock attention and access.

The role of the PM's include:

i.   Review production of attorneys, QC attorneys, production expeditors.
ii.  Daily review protocol and process for efficiencies following LE model theory of constraints.
iii. Address any concerns.
iv.  Email daily reports to LegalEase Operations detailing production, legal topics addressed, upload process production, improved efficiencies, and QC results.

**Ross Operations.** Teri Whitehead and Gayathri Rajeev will oversee all aspects of this project. Teri and Gayathri's role includes the following:

i.   Address any concerns.
ii.  Email daily reports to the ROSS team providing production totals, QC results, and other requested information.
iii. Host daily conference status calls with the ROSS Production team.

TR-0000577

A2760

Case 1:20-cv-00613-SB   Document 708-9   Filed 10/10/24   Page 169 of 172 PageID #: 159432



## The LegalEase ROSS Process Flowchart



Private and Confidential - Page 6 of 6

TR-0000578

A2761

Schedule B

| | |
|---|---|
| Document ID | : ROSS Bulk QCC |
| Date of Issue | : 07.08.2017 |
| Periodic Review | : 09.15.2017 |
| Revision No | : |

# Quality Control Checklist for ROSS Intelligence

## LegalEase Solutions LLC

1

TR-0000579

A2762

Schedule B

| | |
|---|---|
| Document ID | : ROSS Bulk QCC |
| Date of Issue | : 07.08.2017 |
| Periodic Review | : 09.15.2017 |
| Revision No | : |

## QUALITY CONTROL CHECKLIST FOR ROSS BULK MEMOS

### Attorney - ROSS Intelligence Checklist

| Description | Completed |
|---|---|
| 1. Draft ROSS questions following LegalEase Creative Process. | |
| 2. Research questions using online resources and accounts. | |
| 3. Label cases as great, good, topical, and irrelevant. | |
| 4. Confirm that great, and good quotes answer the question directly. | |
| 5. Add topical and irrelevant cases. | |
| 6. Confirm that the topical and irrelevant cases meet the criteria. | |
| 7. Confirm grammar correct throughout memo. | |
| 8. Confirm the font and space of the memo. | |
| 9. Follow file name convention. | |

### Review Attorney - ROSS Intelligence Checklist

| Description | QC 1 | QC 2 |
|---|---|---|
| Question should not be state specific. | | |
| Grammar check of question. | | |
| Quotes to be labeled correctly.<br><br>GREAT – must contain **all** essential elements of the question.<br><br>GOOD – contains **most** of the essential elements of the question. | | |

2

TR-0000580

A2763

Schedule B

Document ID     : ROSS Bulk QCC
Date of Issue   : 07.08.2017
Periodic Review : 09.15.2017
Revision No     :

| | | |
|---|---|---|
| TOPICAL – foundation quote, background information. IRRELEVANT – has no reference or relevance. | | |
| Should label as Great Case 1, Great Case 2, and not Great Quote. | | |
| Bracketed language **must** answer question. Bracketed language may be up to a paragraph. If necessary, you can double bracket separate sentences. Bracketed language must be a sentence. Not just two words. | | |
| Double Brackets, and Content in Bold. | | |
| No red squiggly line. | | |
| Confirm reference quote.  Ensure Topical quote and Irrelevant quotes are added. | | |
| Smartsheet updates. | | |
| Double check the Form - Double Brackets for Quotes.  No highlights. | | |
| Memo number. | | |
| Memo saved in correct format – naming convention. | | |

3

TR-0000581

A2764

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| THOMSON REUTERS ENTERPRISE CENTRE GMBH and WEST PUBLISHING CORPORATION, | ) ) ) | |
| | ) | C.A. No. 20-613-SB |
| Plaintiffs/Counterdefendants, | ) ) | |
| | ) | **JURY TRIAL DEMANDED** |
| v. | ) ) | |
| ROSS INTELLIGENCE INC., | ) ) | **PUBLIC VERSION** |
| Defendant/Counterclaimant. | ) ) | |

### ROSS INTELLIGENCE INC.'S BRIEF IN RESPONSE TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON DIRECT COPYRIGHT INFRINGEMENT <u>AND RELATED DEFENSES</u>

<div style="display:flex">
<div>

OF COUNSEL:

Warrington S. Parker III
Joachim B. Steinberg
Jacob Canter
CROWELL & MORING LLP
3 Embarcadero Ctr., 26th Floor
San Francisco, CA 94111
Tel: (415) 986-2800

Keith J. Harrison
Crinesha B. Berry
CROWELL & MORING LLP
1001 Pennsylvania Avenue NW
Washington, DC 20004
Tel: (202) 624-2500

Dated: October 30, 2024
11852935 / 20516.00001
Public Version Dated: November 4, 2024

</div>
<div>

David E. Moore (#3983)
Bindu A. Palapura (#5370)
Andrew L. Brown (#6766)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE 19801
Tel: (302) 984-6000
dmoore@potteranderson.com
bpalapura@potteranderson.com
abrown@potteranderson.com

*Attorneys for Defendant/Counterclaimant ROSS Intelligence, Inc.*

</div>
</div>

A2765

submit ▮▮▮ headnotes as part of the filtration process, this somehow converts them *ipso facto* into admissions of copyright infringement. Nothing could be further from the truth. Plaintiffs are essentially arguing for unfounded adverse inferences. Those ▮▮▮ headnotes are those where there is an open question of fact as to whether they are original or not, let alone infringed. There is no question as to those that were submitted for filtration, as they are not original as a matter of law. But ROSS is entitled to a trial on the ▮▮▮ where Plaintiffs have shirked their burden of production on originality. The same is true for the 2,830 identified by Ms. Frederickson-Cross (1,207 of which have only been asserted), as Plaintiffs cannot use this to support originality and material appropriation. That is not the way the burden of proof works. The headnotes are independently not copyrighted, so there is no presumption of originality. The burden  remains with the Plaintiffs and they have failed to meet the burden for summary judgment.

The big questions in determining whether summary judgment can be granted as to copyright infringement are whether (1) the Westlaw headnotes contain sufficient originality to be copyrightable, (2) whether there was actual copying and (3) whether ROSS copied that original content. As the Court correctly noted in its prior summary judgment decision, there is a genuine factual dispute about how original the headnotes are. D.I. 547 at 8.  Since then, nothing has changed. Plaintiffs offer no additional evidence that the headnotes are copyrightable compared to the judicial opinions, nor has it offered evidence as to either element of copying.

Indeed, even the copyrightability example used by Plaintiffs (D.I. 675 at 2) demonstrates that the memo question was derived from the judicial opinion and *not* the headnote:

| Headnote Text | Judicial Text | Memo Question |
|---|---|---|
| ███████████ | ██████████ | █████████ |
| █████████ | █████████████ | ████████ |
| ██████████ | ████████████ | ███████████ |
| ██████████ | █████████ ███ | ██████████ |
| ██████████ | | ████ ██████ |

A2766

(finding that copying of the selection of 5,000 premium baseball cards such that "both works [were] acknowledged to be substantially the same" was infringement of the entire compilation).

For *each* of the asserted copyrighted works, this infringement analysis requires proof of ownership of a valid copyright, actual copying, and a side-by-side analysis to determine if there was material appropriation. *Tanksley*, 902 F.3d at 173-74. Thus, Plaintiffs must either prove (i) they own a valid copyright in the headnotes as derivative works and ROSS infringes because it copied the words of individual headnotes and took the protectable elements not found in the public domain and/or (ii) they own a valid copyright in the selection and arrangement of the compilation headnotes and ROSS actually copied the selection and arrangement of the headnotes as whole. Plaintiffs fail under either theory.

As to individual headnotes as individual works, ███████████████████████ ███████████████████████████████████████████. *See* D.I. 675 at 5-6, FN 3 (████████████████████████████████████████). Indeed, Plaintiffs do not even attempt to address the headnotes as individual works, providing no analysis comparing them to memo questions and judicial opinions. Nevertheless, ROSS briefly addresses the headnotes as individual works to show this theory fails.

Alternatively, as a part of a compilation, the headnotes (along with other aspects of Westlaw, including the WKNS) can only be infringed if Plaintiffs demonstrate that ROSS took sufficient enough of the protectable elements of the selection and arrangement of the compilations *as a whole* to constitute infringement. In addition to failing to demonstrate actual copying of these alleged compilations, Plaintiffs simply do not accuse ROSS of taking enough to constitute material appropriation, and thus infringement.

Following the principles expressed in the Legal Standard section, for example,

18

A2767

judgment on originality, Plaintiffs have the burden to prove there is no genuine dispute that they offered something "recognizably its own" to each of the headnotes such that they are original. *L. Batlin*, 536 F.2d at 490; *see also Gerlach-Barklow*, 23 F.2d at 161.[4] This, they have not done.

With respect to the 2,830 bulk memos questions that were identified by Ms. Frederiksen-Cross, as an initial matter, this Court found previously (D.I. 547 at 11) that 1,623 of the headnotes *have never been asserted* against ROSS. Plaintiffs were ordered by the Court to specifically identify headnotes that were allegedly infringed. D.I. 201, at 1. In response, Plaintiffs, in their Third Supplemental Response to ROSS's First Interrogatory, identified ▮▮▮ headnotes that ROSS allegedly copied (SOF at 11), which did not include the 1,623 headnotes. D.I. 547 at 11. Plaintiffs still recognize that the universe of accused headnotes is only ▮▮▮ headnotes. D.I. 675 at 5. Removing these 1,623 headnotes leaves only ▮▮▮ headnotes at issue.

For these remaining ▮▮▮ headnotes, there is still a factual dispute as to the originality of these headnotes, as an expert cannot opine on (or even address) originality, as this Court previously ruled. D.I. 547 at 12; *see also Paul Morelli*, 200 F. Supp. 2d at 486-87. Plaintiffs do nothing to demonstrate that there is no genuine dispute as to the originality of these ▮▮▮ headnotes and a reasonable factfinder could find they are not copyrightable. Indeed, ROSS submitted some of them for filtration as not original, which Plaintiffs do not address. D.I. at 637.

Similarly, in their Opening Brief, Plaintiffs offer nothing to demonstrate that they own a valid copyright in the asserted ▮▮▮ headnotes. Instead, Plaintiffs try to both shift the burden and prove an affirmative fact by arguing in the negative. For ▮▮▮ of the headnotes, Plaintiffs rely on the belief that that were purportedly "omitted" from ROSS's list of "unprotectable"

---

[4] Like the Shakespeare example, the Scholar cannot have a copyright merely by identifying a single quote from Shakespeare; instead, he must add something of his own and then demonstrate what that something is. *Worth* also recognized the trivia facts themselves are not copyrightable. 827 F.2d at 570.

23

A2768

Case 1:20-cv-00613-SB    Document 728-2    Filed 11/06/24    Page 115 of 210 PageID #: 208475

# EXHIBIT 30

A2769

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| THOMSON REUTERS ENTERPRISE CENTRE GMBH and WEST PUBLISHING CORPORATION, | ) ) ) | |
| | ) | |
| Plaintiffs and Counterdefendants, | ) ) | C.A. No. 20-613 (SB) |
| | ) | |
| v. | ) | **REDACTED - PUBLIC VERSION** |
| | ) | |
| ROSS INTELLIGENCE INC., | ) | |
| | ) | |
| Defendant and Counterclaimant. | ) ) | |

**PLAINTIFFS' OPPOSITION TO ROSS INTELLIGENCE INC.'S
RENEWED MOTION FOR SUMMARY JUDGMENT ON
<u>ROSS'S AFFIRMATIVE DEFENSE OF FAIR USE</u>**

OF COUNSEL:

Dale M. Cendali
Joshua L. Simmons
Eric A. Loverro
Jeremy King
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4800

Miranda D. Means
KIRKLAND & ELLIS LLP
200 Clarendon Street
Boston, MA 02116
(617) 385-7500

Yungmoon Chang
Allyn Belusko
KIRKLAND & ELLIS LLP
2049 Century Park East
Los Angeles, CA 90067
(213) 680-8400

Original filing date: October 30, 2024
Redacted filing date: November 6, 2024

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Michael J. Flynn (#5333)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
mflynn@morrisnichols.com

*Attorneys for Plaintiffs and
Counterdefendants Thomson Reuters
Enterprise Center GmbH and West Publishing
Corporation*

A2771

decision not to saturate the markets with variations of the original." *Castle Rock Ent., Inc. v. Carol Publ'g Grp.*, 150 F.3d 132, 145–46 (2d Cir. 1998) (finding that even where the copyright holder has "evidenced little if any interest in exploiting [a] market for derivative works ..., the copyright law must respect that creative and economic choice."). The Ninth, Sixth, and Eleventh Circuits are all in accord. *See*, *e.g.*, *Monge*, 688 F.3d 1164, 1181 (9th Cir. 2012) (finding plaintiff had right to control delayed future markets even where he disavowed intent to enter them); *Worldwide Church of God v. Phila. Church of God, Inc.*, 227 F.3d 1110, 1119 (9th Cir. 2000) (same); *Balsley v. LFP, Inc.*, 691 F.3d 747, 761 (6th Cir.) (finding adverse market effects even where plaintiffs "have no present intention of exploiting the market"); *Pac. & S. Co., Inc. v. Duncan*, 744 F.2d 1490, 1496 (11th Cir. 1984) ("Copyrights protect owners who immediately market a work no more stringently than owners who delay before entering the market."). There is no reason to believe the Third Circuit would not follow this sound approach, and ROSS cites none.[15]

*Finally*, lacking any evidence to counter the overwhelming, undisputed evidence showing that a market for Westlaw Content as AI training data is likely to develop, ROSS insists that "AI training data should not be the focus" of the Court's factor four analysis. Mot. 39. In particular, ROSS claims that the Court should not look at the "intermediary step" in the process of the alleged infringement to determine market harm, claiming that in *Sony* and *Sega* the Second Circuit looked at the effect on the market for video games, not software development. Mot. 39. This makes no

---

[15] ROSS cites two cases that are inapposite. First, it cites *Cambridge University Press v. Patton*, where the Eleventh Circuit, "**absent evidence to the contrary**" inferred from the fact that the plaintiff had not licensed the work at issue that it did not think there would be enough of such use to make a license available for that use. 769 F.3d 1232, 1277 (11th Cir. 2014) (emphasis added). Here, by contrast, Plaintiffs do not license the Westlaw Content as AI training material because there is economic value in its current exclusivity, not lack of demand or value. *Supra* 18–19. Likewise, in *Swatch Group Management Services Ltd. V. Bloomberg L.P.*, there was no evidence of an existing or potential licensing market (as here) and therefore nothing suggested any possible market effect at all. 756 F.3d 73 (2d Cir. 2014).

23

A2772

sense for multiple reasons.  First, copying of the Westlaw Content as AI training material was not a "step" in the process of the alleged infringement, it *was* the infringement.  Second, in *Sony* and *Sega*, the plaintiffs did not argue or present evidence of harm to the licensing market for derivatives, only harm to the market for the end-product; here there is evidence of *both*.  *Supra* 17–19.  Third, as this Court already found, citing Supreme Court precedent, factor four "*must* take account not only of harm to the original but also of harm to the market for derivative works." Op. 23 (emphasis added) (*citing Harper*, 471 U.S. at 568.)  The market for derivatives of Westlaw Content as training material thus cannot be blithely ignored.

4.    ROSS's Use Harms the Public

In assessing factor 4, as ROSS admits, Mot. 39–40, courts also must look at the impact on the public.  The Supreme Court has admonished courts that "gave insufficient deference to the scheme established by the Copyright Act for fostering the [creation of] original works," *Harper*, 471 U.S. at 545–46, 560, as the Framers intended copyright to promote "free expression" by "establishing a marketable right." *Eldred v. Ashcroft*, 537 U.S. 186, 219 (2003).  By doing so, copyright protection "supplies the economic incentive to create and disseminate ideas." *Harper*, 471 U.S. at 558. Thus, where "there is a fully functioning market that encourages the creation and dissemination" of a work, "permitting 'fair use' to displace normal copyright channels disrupts the copyright market without a commensurate public benefit." *Harper*, 471 U.S. at 568 n.9; *see also Princeton Univ. Press v. Mich. Document Servs., Inc.*, 99 F.3d 1381, 1391 (6th Cir. 1996).

ROSS admits that "making legal opinions easier to find would increase access to legal services" and benefit the public, Mot. 39–40, but it overlooks the fact that its use actually disrupts the fully functioning market that *already* incentivizes the creation of products, like Westlaw, that

24

A2773

# EXHIBITS 104-114

A2774

# EXHIBIT 115

A2775

# *lexis.com*® Quick Reference Guide

## Basic steps in a LexisNexis® research session

Use this guide to walk through a research session at *www.lexis.com* and familiarize yourself with the simple steps for signing in, selecting sources, retrieving documents, and delivering search results. Also learn to use *Shepard's*® Citations Service, update your results automatically with LexisNexis® Alerts, and much more.

Here's some of what's covered in this guide:

- Finding the source you need . . . . . . . . . . . . . 3 – 4
- Retrieving one or more specific documents . . 5 – 6
- *Shepardizing*™ one or more cases or statutes . . . . . . . . . . . . . . . . . . . . . . . . . . . 6 – 7
- Searching reliable legal Web sites . . . . . . . . . . . . . 8
- Creating different types of search requests . . 9 – 10
- Completing search forms . . . . . . . . . . . . . . . 10 – 11
- Viewing your search results . . . . . . . . . . . . . 12 – 13
- Refining your search results . . . . . . . . . . . . . 13 – 14
- Updating your search results . . . . . . . . . . . . 14 – 15
- Delivering your search results . . . . . . . . . . . . . . 16



A2776

## Signing In

1. Establish an Internet connection and go to **www.lexis.com**.
2. At the sign-in screen (shown below), enter your LexisNexis® ID or Custom ID in the **ID** box.
3. Enter your password in the **Password** box.
4. Click **Sign In**.
5. Enter your Client ID, if prompted.

**Note: If you lose or forget your ID, please call 800.543.6862.**



(A) See product/feature announcements and other LexisNexis news.

(B) Have *lexis.com*® remember your sign-on information from session to session—a great timesaver for your personal computer (not recommended for public work stations).

(C) Change your password.

(D) Create a custom ID and password—such as an easy-to-remember alias or nickname.

(E) Manage your custom IDs.

## Working from the main *lexis.com*® screen



(A) Use the easy main source-selection hierarchy.

(B) Go quickly to various means of retrieving a specific document.

(C) Go directly to all *Shepard's* Citations Service options.

(D) Get quick access to related LexisNexis® products and services.

(E) Rerun a search from a previous session or resume interrupted research.

(F) Go directly to your saved Alerts and results.

(G) Access and select from your most recent 20 sources.

(H) Perform these common research tasks right from the main screen.

(I) Use this simple search method with easy source selection.

(J) Compile a thorough overview of a legal topic, pinpoint relevant case annotations, or build U.S. federal and state case digests.

(K) Access practice-area-specific pages that pull together valuable resources on one screen page.

On other screens, the right side of the screen may offer other relevant research options. For example, if you're viewing bankruptcy sources, you might see "Search by Bankruptcy Task" and "Pending Bankruptcy Legislation" sections.

https://www.lexisnexis.com/documents/20110615015922_small.pdf?srsltid=AfmBOophRO-ebYIPPWhsb5pIpmb2JKaL4D1optJn3fsbbk5HLDTkaTso    2/16

A2777

## Selecting Sources

Get the results you want by selecting specific sources from our unparalleled collection. (Also see "Pricing Information" section on page 4.)

### Surface the Practice Area or Jurisdictional Content You Need Most by Customizing Your Tabs

You can add Search subtabs to your main *lexis.com* page (up to 18 subtabs total). Choose from **60 practice areas** (from Accounting to Workers' Compensation), **56 jurisdictions** (all 50 U.S. states, combined states, District of Columbia, Guam, Northern Mariana Islands, Puerto Rico, and Virgin Islands), and **three specialized search tabs** (By Topic or Headnote, By Guided Search Form, and By Dot Command).

To add a subtab for sources or tasks you use frequently:

1. Click **+Add/Edit Subtabs** in the far-right section of the subtab bar.
2. Indicate your choices by clicking the appropriate checkboxes.
3. Click the **Next** button.
4. Customize your subtabs—change the default subtab or change the order of your subtabs—by highlighting the name of the subtab and clicking **Set as Default**, **Move Up**, or **Move Down** and clicking the **Set** button.

### Recently Used Sources

The *lexis.com* service saves your most recent 20 selected sources. Just click the pull-down list in the **Recently Used Sources** section on the right side of the screen to view the last 20 sources you've used and make a selection.

You can retain or delete sources from this list. Click the **Edit Sources** link and then:

- To retain a source in the list, click the **checkbox** next to the source name and click the **Set** button.
- To delete a source from the list, click the **Delete** link next to the source name and click the **OK** button in the pop-up box. Then click the **Set** button.

## Find a Source

### Find a source by using key words

1. Enter a full or partial source name (such as *wall street journal*) or a subject (such as *oil spill*) in the search box in the **Quick Tools** section on the right side of the screen.
2. Click the **Find a Source** button.
3. View the list of sources retrieved–they appear in order by relevance.
4. Click the source you wish to search (or click checkboxes and then the **Combine Sources** button to select multiple sources).

*Tip:*

*You can also click on the pull-down menu at the **Search** tab or under Option 1 on the **Find a Source** subtab under the **Search** tab (see screen below).*





### Find a source by using an alphabetic list

1. Click either the **Find a Source** subtab under the **Search** tab OR the **Find a Source** button in the **Quick Tools** section on the right side of the screen.
2. Click any of the letters displayed under **Option 2: Browse Alphabetically** (see screen above).
3. View the list of sources beginning with that letter.
4. Click the source you wish to search.

### Find a source by using the source hierarchy

1. Select any of the default search subtabs—**Legal, News & Business**, or **Public Records**—or any custom search subtab that you've added (such as *Labor & Employment*). (See the "Surface the Practice Area or Jurisdictional Content You Need Most by Customizing Your Subtabs" section above left.)
2. Click a source category (such as *Find Statutes & Regulations*).
3. Click the source you wish to search (such as *State Codes, Constitutions, Court Rules & ALS, Combined*).

*Tips:*

*To select more than one source, click the checkbox next to each source name (you can move between menu pages to select sources if you wish). Then click the **Combine Sources** button. The combined source set you create will be saved in your Recently Used Sources list for later use. (Please see "Pricing Information" section on page 4.)*

*As you click through the levels of the source hierarchy,* lexis.com *creates a "trail" showing your path and displays it in the top-left section of the screen. To return to any previous level, just click on the name of that level.*

A2778

## Practice Area/Jurisdictional Sources

Specialized *lexis.com* practice-area or jurisdictional pages highlight relevant practice-area and jurisdictional content and tools.

Find sources relevant to a particular practice area:

1. Select the **Search** tab.
2. Select the **Legal** tab.
3. Click the **Area of Law – By Topic** link.
4. Select from 60 practice areas—Accounting to Workers' Compensation—to view relevant sources.

Find sources relevant to a particular jurisdiction:

1. Select the **Search** tab.
2. Select the **Legal** tab.
3. Click the **States Legal – U.S.** link.
4. Select from 56 jurisdictions—50 U.S. states, the District of Columbia, Guam, Northern Mariana Islands, Puerto Rico, Virgin Islands, and Combined States—to view relevant sources.

## Pricing Information

Depending on your subscription, some sources may be provided at a separate charge. This is indicated by a 💲 next to the source name.

To view pricing information for such a source:

- Click on the 💲 next to the source name OR
- Click on the **ℹ**, which shows you the source description, and scroll to the end

## Additional Resources (found under the More tab)

Get quick access to related products and services. Just click the **More** tab and find links to:

- **LexisNexis® Verdict & Settlement Analyzer—**helps you see the likely outcome of your new case and consider the risks and opportunities so you can recommend settlement, consider trial, or perhaps pass on the matter entirely

- **Lexis® Transactional Advisor—**provides, through more than a dozen topical and practice area centers, resources to accomplish the major stages of your work process, including assessing new matters, analyzing issues, advising clients, and acting on strategy
- **LexisNexis® Analyzer—**gives you quick, easy access to critical information about judges, attorneys, expert witnesses, arbitrators, and companies
- **LexisNexis® Total Litigator—**designed around your workflow (early case assessment, drafting/filing/serving, discovery, legal research, gathering intelligence, trial prep, staying current), this task-based research platform suggests appropriate resources based on the task you choose
- **LexisNexis® Full Service Expert Witness Search *powered by IDEX®*—**benefit from a search of more than one million revealing documents, including resumes, authored articles, jury awards, settlement amounts, depositions, full-text testimony transcripts, Daubert challenges, and more
- **LexisNexis® Tax Center—**take advantage of an easy-to-use tax-specific interface that streamlines your tax research and helps you provide the most comprehensive and accurate tax advice to your clients
- **TotalPatent™—**get access to a comprehensive collection of patent information through a single platform that combines first-level data coverage with user-friendly design and powerful search functionality, including transparent and controllable semantic analysis
- **Counsel Selector—**take advantage of the power of *martindale.com®* when you need to find lawyers or law firms
- And more

## Setting Your Preferences

You can customize your *lexis.com* searching experience to meet your specific research needs. (See callout information on page 5.)



A2779

Preference options include the ability to choose the following (refer to screen on page 4):

(A) Your starting location

(B) Natural Language search options

(C) Search editing options

(D) Search results display options related to the FOCUS™ bar, toolbar, navigation frame, pagination, tables of contents, and more

(E) Search history options

(F) *Shepard's* display and document delivery

To change your preferences:

1. Click the **Preferences** link in the top-right portion of the screen to display the **Preferences** screen.
2. Select the **General** or *Shepard's* subtab.
3. Click the appropriate checkboxes and make selections from the pull-down lists.
4. Click the **Set** button.

*Tip:*

*You can also add Search subtabs to your main* lexis.com *page (see "Surface the Practice Area or Jurisdictional Content You Need Most by Customizing Your Subtabs" section on page 3).*

# Frequent Research Tasks

You can perform a number of common research tasks right from the main *lexis.com* screen.

## Retrieve a Specific Document

Retrieve individual full-text documents—cases, U.S. federal and state statutes, agency decisions, law review articles, treatise sections, and more—with **Get a Document**. You can use citations, party names, or docket numbers.

### Get a Document by Citation

Retrieve the full text of a case, statute, law review, treatise, etc., when you know the citation:

1. Enter the citation (*800 f2d 111*, for example) in the **Quick Tools** search box.
2. Click the **Get a Doc** button.



*Tips:*

*You can also select the **Get a Document** tab and then select the **By Citation** subtab.*

*Within the **By Citation** subtab, you can get help with a citation format by clicking the **Citation Formats** link. Just enter a publication name or review an alphabetic list of publication names.*

### Get a Document by Party Name

Retrieve the full text of a case, docket, brief, etc., when you know the name of at least one party:



1. Click the drop-down menu at the **Get a Document** tab (next to the **Search** tab).
2. Select **By Party Name**.
3. Choose **Case Law**, **Federal Dockets**, or **Briefs, Motions, Pleadings & Verdicts**.
4. Enter party name(s) (*mcneil* and *economics laboratory*, for example) in the box(es).
5. Select a jurisdiction (*US Courts of Appeals*, for example), court (*7th Circuit*, for example), and/or source (and restrict by date, if you choose).
6. Click the **Search** button.

A2780

### Get a Document by Docket Number

Retrieve the full text of a case, docket, brief, etc., when you know the docket number:

1. Click the drop-down menu at the **Get a Document** tab (next to the **Search** tab).
2. Select **By Docket Number**.
3. Choose **Case Law** or **Federal Dockets**.
4. Enter the docket number (*85-1332*, for example).
5. Select a jurisdiction (*US Courts of Appeals*, for example), court (*7th Circuit*, for example), and/or source (and restrict by date, if you choose).
6. Click the **Search** button.

### Retrieve and Print Multiple Documents

All it takes is a single request from a single screen (shown below). Here's how:

1. Click the drop-down menu at the **Get a Document** tab.
2. Click the **Get & Print** link.
3. Enter your LexisNexis ID and password, if prompted.
4. Enter your citations.
5. Make your selections for type of document (full-text documents and/or *Shepard's* reports) and delivery (browser, printer, download, or e-mail).
6. Click the **Get** button.



### *Shepardize*® Documents

Is your authority still good law? Verify a case, statute section, regulation, and much more. *Shepard's* Citations Service also shows you cases and other authorities that have cited your case.

### *Shepardize* a Single Document

1. Enter the citation (*800 f2d 111*, for example) in the **Quick Tools** box.
2. Click the *Shepardize* button.



***Tip:***
*You can also select the **Shepard's** tab.*

### *Shepardize* Multiple Documents

All it takes is a single request from a single screen (shown at left). Here's how:

1. Click the drop-down menu at the **Shepard's** tab.
2. Click the **Get & Print** link.
3. Enter your LexisNexis ID and password, if prompted.
4. Enter your citations.
5. Make your selections for type of document (*Shepard's* reports) and delivery (browser, printer, download, or e-mail).
6. Click the **Get** button.

***Tip:***
*From the **Get & Print** screen (shown at left), you can retrieve and print documents and their Shepard's reports—all with a single request. Just follow the steps as indicated in the "Retrieve and Print Multiple Documents" and "Shepardize Multiple Documents" sections, making sure to click both the **Retrieve Full Text of Citations** and **Shepardize these Citations** links.*

https://www.lexisnexis.com/documents/20110615015922_small.pdf?srsltid=AfmBOophRO-ebYlPPWhsb5pIpmb2JKaL4D1optJn3fsbbk5HLDTkaTso    6/16

A2781

**Read Your *Shepard's* Report**

(A) *Shepard's* Signal™ indicators show that the McNeil ruling has strong negative treatment in its subsequent history.

(B) The *Shepard's* Summary condenses your report and shows why your case or statute received its *Shepard's* Signal indicator.

(C) Find LexisNexis headnote references ("HN16 (61)" means Headnote 16 of your case has been referenced 61 times in citing cases) and click to go directly to the first citing reference.

(D) Link to vital references—including law reviews, statutes, treatises, court documents.

(E) Click on the citation to view the full text of the document you *Shepardized*™.

(F) Click on a treatment phrase (such as "Followed by") to get a detailed definition of that phrase—or you can click on the **Legend** link in the lower navigation bar to get a complete list with definitions.

(G) Click a pinpoint page number to go to that page within the reference—from there you can click on the headnote number to the portion of the citing case where that headnote is discussed.

(H) *Shepard's* Table of Authorities (TOA) identifies the cases your case cited and includes *Shepard's* Signal indicators to point out the case's treatment by other courts.

(I) Click to display or hide your citing references' *Shepard's* Signal indicators, pinpoint page numbers and headnote references.

(J) Click to customize your report—restrict by specific treatments, headnotes, jurisdictions, or dates or find vital point of law or fact patterns within references.

(K) Select a treatment, jurisdiction, or LexisNexis headnote from the pull-down list and go.



7

A2782

## Search Web Sources (Lexis® Web)

Lexis Web is a legal-specific search engine offering free Web content from legal Web sites validated by LexisNexis attorney editors. It provides powerful navigation tools to help you search for legal resources on the Web and at *lexis.com* and achieve a more productive research session. You'll get access to content from thousands of Web sites and millions of Web pages, including:

- Governmental agency information—federal, state, and local levels
- Informal commentary on legal issues, such as blogs specifically for lawyers and legal professionals
- General Web information about legal topics

To perform a search:

1. Enter your search words (*original work of authorship*, for example) in the **Quick Tools** Search box.
2. Click the **Lexis Web** button.



Lexis Web categorizes your search results automatically and allows you to filter by topic, practice area, jurisdiction, site type, topic, and more.



*Tips:*

*To see recommended documents from lexis.com, look under the lexis.com Content heading. Click any of the links to go to a document of interest.*

*You can also reach the Lexis Web option by clicking on the **More** tab near the top of the screen and then clicking on the **Lexis Web** link.*

## Lexis® Quick Search

It's a simple search method with easier source selection. Select jurisdictions, practice areas, and source categories and let Lexis Quick Search compile a list of relevant sources for your search:

1. Select a jurisdiction from the pull-down list in the **Quick Search** section of the main *lexis.com* screen (click the **Select Multiple** link if you want to choose more than one jurisdiction).
2. Select a practice area from the next pull-down list (click the **Select Multiple** link if you want to choose more than one practice area).
3. Choose your source categories.
4. Click the **Next** button.
5. Enter your search words in the **Search Terms** box.
6. Select your sources from the compiled list.
7. Click the **Search** button.

*Tip:*

*You may see suggested sources that are not part of your subscription. Please see "Pricing Information" section on page 4..*



A2783

## General Searching

A few basic notes:

- A **term** or **word** is any series of letters or numbers with a space on either side (*contract* or *$1,234*, for example).
- **Singular**, **possessive**, and **plural** forms are found automatically, if the plural or possessive ends with *s*, *'s*, *es*, or *ies*
- Some common **equivalents** are found (*cal* finds *Calif* and *California*, for example)
- A **hyphen** is read as a space
- Use the **@** symbol for the section symbol used in citations (*Section 305 = @ 305* or *@305*)

### Types of Searching

**Using Terms and Connectors**

Terms and Connectors searching (Boolean search logic) uses words and connectors to create phrases and concepts. Here's an example of a Terms and Connectors search: *drug /15 test! OR screen! /10 employ!*

**Universal characters** replace letters in your search terms:

| CHARACTER | EXAMPLE | EXPLANATION |
|---|---|---|
| ! | *litigat!* finds *litigation, litigate, litigator* | Replaces any number of letters after a word root—use only one ! per word at the end of the word |
| * | *wom*n* finds *woman* or *women*<br>*bank\*\*\** finds *banked* or *banking*, but not *bankruptcy* | Replaces one letter in a word—you can use more than one * in a word, anywhere except as the first letter |

**Connectors** establish a logical connection among search terms, operating left to right in this order:

| CONNECTOR | EXAMPLE | EXPLANATION |
|---|---|---|
| OR | *doctor OR physician* | Finds documents containing any of the terms or phrases connected by *OR* |
| /n | *market /5 share* | Finds two search words in the same document within *n* words of each other (*n* = any number from 1 to 255) |
| /s | *circumstances /s mitigating* | Finds words in the same sentence |
| /p | *rule /p sanction* | Finds words in the same paragraph |
| AND | *bank! AND deregulat!* | Finds documents containing all terms or phrases connected by *AND* |
| PRE/n | *cable PRE/2tv OR television* | Finds documents in which the first word precedes the second within the specified number of words |

***Tip:*** *The connectors /s and /p cannot be used with the connector /n.*

**Precision search commands** help you form even more precise search requests:

| COMMAND | EXAMPLE | EXPLANATION |
|---|---|---|
| atleast*n* | *atleast10 (cercla)* | Finds documents that mention your term (*CERCLA*, for example) at least *n* times: searches for documents with significant coverage of your topic. Use any number from 1 to 255. |
| allcaps | *allcaps (aids)* | Finds words in all capital letters (*AIDS* and not *aids*, for example) |
| nocaps | *nocaps (aid)* | Finds words that include no capital letters (*aid* or *aids*, but not *AIDS*, for example) |
| caps | *caps (jobs)* | Finds words that are initial-capped (*Jobs* [as in Steve], but not *jobs* [as in jobs market], for example) |
| plural | *plural (jobs)* | Finds plural forms only (*Jobs* [as in Steve] and *jobs* [as in jobs market], but not job [as in job creation], for example) |
| singular | *singular (job) /5 discrimination* | Finds singular form only |

**Segments** help you restrict your search to specific parts, or segments, of documents, such as the headline of a news article or the heading of a case:

| SEGMENT | EXAMPLE | EXPLANATION |
|---|---|---|
| NAME | *name (roe AND wade)* | Finds all cases in which a particular person or entity was a party |
| WRITTENBY | *writtenby (scalia)* | Finds all decisions—majority, concurring, and dissenting—written by a particular judge |
| DATE | *date is 3/31/2005*<br>*date bef 4/1/2005*<br>*date aft 3/30/2005*<br>*date aft 3/30/2005 AND date bef 7/1/2005* | Finds documents issued on, before, or after the specified date, or within a specified date range |
| HEADLINE | *headline (oil /5 spill!)* | Finds articles with your search terms in the headline |

***Tip:*** *You can choose segments relevant to any source from the pull-down list on the search form. (See the "Using the Basic Search Form" section on page 10.)*

https://www.lexisnexis.com/documents/20110615015922_small.pdf?srsltid=AfmBOophRO-ebYlPPWhsb5pIpmb2JKaL4D1optJn3fsbbk5HLDTkaTso   9/16

A2784

**Using Natural Language**

Natural Language searching uses "plain English" questions or phrases. Here's an example of a Natural Language search: *Can employment drug screening be a contract arbitration issue?* Use Natural Language to research conceptual issues rather than specific topics or when you're searching complex issues and are unsure of the words to use. Your search results will appear ranked by relevance.

**Using Easy Search™**

The Easy Search feature lets you enter search terms to run a quick search. You need not use any particular search syntax (either Terms and Connectors or Natural Language), but if you do, the LexisNexis services can detect which type of search to perform. You can use quotation marks for phrase searching. When you use the Easy Search feature, up to 250 documents will display in an expanded Cite view, with your search terms in bold.

## Search Forms

### Using the Basic Search Form



To submit your search:

1. Select a source (or combination of sources).
2. *Optional:* Click any of the checkboxes under the "Broaden this search with additional sources" heading to choose sources related to the one(s) you selected (this option does *not* appear for every source).
3. Click the type of search you'd like to perform—either **Terms & Connectors**, **Natural Language**, or **Easy Search**.
4. Enter your search in the box (see the "Using Terms & Connectors" section on page 9 and the "Using Natural Language" section above for more details)—if you choose, you can then click the **Suggest terms for my search** link to see additional terms you may wish to incorporate.
5. Depending on the type of search you selected, you have additional options:
   - For a Terms & Connectors search, you can search for terms in specific parts, or segments, of documents and restrict by date
   - For a Natural Language search, you can specify mandatory terms and restrict by date
6. Click the **Search** button.



**Using the Guided Search Form**

To submit your search:

1. Select **Guided Search Form** from the pull-down list on the **Search** tab.
2. Choose the form you wish to use (such as **Cases**, **Codes**, **News**, **Company**, etc.).
3. Indicate your search requirements—each Guided Search Form may have different options, as appropriate, such as:
   - Search terms
   - Sources, as appropriate for the form you chose
   - Date restrictions
   - Area of law
   - Name(s)
4. Click the **Search** button.

https://www.lexisnexis.com/documents/20110615015922_small.pdf?srsltid=AfmBOophRO-ebYlPPWhsb5pIpmb2JKaL4D1optJn3fsbbk5HLDTkaTso    10/16

A2785

**LexisNexis Search by Topic or Headnote**

Compile a thorough overview of any of thousands of legal topics, pinpoint relevant case annotations or build U.S. federal and state case digests.

**LexisNexis Search by Topic**

Need an overview on a topic or area of law? LexisNexis Search by Topic pulls together all of the relevant materials you need—cases; Matthew Bender® treatises; checklists; forms; LexisNexis Briefs, Pleadings & Motions; and more—in one search. If the source is listed on the search form, you know your topic is discussed.

To create an overview:

1. Click the pull-down list from the **Search** tab and select the **Topic or Headnote** link.
2. Choose a topic:
   – Enter key words (*doctrine equivalents*, for example) in the **Option 1: Find a Legal Topic** box
   – Click the **Find** button
   – Click your choice in the topic list (**Ordinary Skill**, for example)
   OR
   – Browse the 40+ topics you'll see under the **Option 2: Explore Legal Topics** box, drilling down to find the precise topic you need (for example, click **Patent Law**, expand **Infringement Actions**, expand **Doctrine of Equivalents**, expand **Elements**, and select **Ordinary Skill**)
3. Build your search by making selections under **Option 1 – Search across Sources** (see screen below):
   – **Jurisdiction—**choose federal, all states, a specific state, etc., or click the **Select Multiple** link and choose the federal/state combination that fits your needs
   – **Sources—**click the **Select Sources** button and choose from the list of relevant materials which have been compiled based on your topic and jurisdiction
   – **Search Terms** *(Optional)***—**choose **Terms and Connectors** or **Natural Language** searching and add terms to refine your research
4. Click the **Search** button.

**LexisNexis Search by Headnote**

Build a case digest on the fly! Choose your topic and, in one step, Search by Headnote generates a summary list of relevant and current cases on any legal issue, including emerging legal issues. And it adds in-depth case discussions on your topic.

To create a case digest:

1. Click the pull-down list from the **Search** tab and select the **Topic or Headnote** link.
2. Choose a topic:
   – Enter key words (*doctrine of equivalents*, for example) in the **Option 1: Find a Legal Topic** box
   – Click the **Find** button
   – Click your choice in the topic list (**Ordinary Skill**, for example)
   OR
   – Browse the 40+ topics you'll see under the **Option 2: Explore Legal Topics** box, drilling down to find the precise topic you need (for example, click **Patent Law**, expand **Infringement Actions**, expand **Doctrine of Equivalents**, expand **Elements**, and select **Ordinary Skill**)
3. Build your search by making selections under **Option 2 – Search by Headnote** (see screen below):
   – Make a selection from the pull-down **Jurisdiction** list (*Patent Cases from Federal Courts*, for example)
   – Choose date restrictions (optional)
4. Click the **Retrieve All** button.



*Tip:*

*On many* lexis.com *source selection screens, you can also use the* **Search by Topic or Headnote** *box on the right side of the screen to begin the Search by Headnote process.*

11

A2786

**Viewing Your Search Results**

### Display Formats

- **Cite—**displays a bibliographic list of the citations
- **KWIC™—**displays a 25-word window of text around your search words (you can change the size of the window of text by clicking the **KWIC** link, clicking the **KWIC±25** link, entering a number from 1 to 999, and clicking the **OK** button
- **Full—**displays the full text of your document
- **Custom—**displays only the document parts (segments) you want to view; just click the Custom link, select the segments you wish to view, and click the **OK** button

Some highlights of what you'll see in a cite list of cases:

- Ⓐ **Cite List Overview—**provides a summary of the case's legal issues to help you determine quickly which documents are relevant.
- Ⓑ **Core Terms—**provide a snapshot view of the case.
- Ⓒ **Show Hits—**displays each sentence where one of your search words appears.
- Ⓓ **Checkboxes—**lets you select the cases you want to print, download, or use for a FOCUS search.
- Ⓔ *Shepard's* **Signal indicator—**click on an indicator to *Shepardize* that case.



### Tabbed Results Sets



If you combine sources, your results will appear in the form of a Summary Results page, offering up to 12 tabs by source type (such as case law, statutes, regulations, news, etc.). From the Summary Results page, you can:

- Click any tab, or any of the links in the **Category** column, to view all the results in that category
- Click any of the links in the **Sources** column to show the results from that source
- Rest your cursor on any tab's red arrow and a pop-up window will show you the document results types available for that tab

For easy navigation, your results tabs stay near the top of the screen as you browse documents.

https://www.lexisnexis.com/documents/20110615015922_small.pdf?srsltid=AfmBOophRO-ebYlPPWhsb5pIpmb2JKaL4D1optJn3fsbbk5HLDTkaTso    12/16

A2787

### LexisNexis® Related Content

The Related Content pane brings together all the related documents for the case you're viewing so they're readily available to you—without your having to search for them. You get convenient access to additional information about the case you're viewing to enhance your understanding of: the impact of the case, the arguments to support the case, or the impact of various issues found within the case. Related Content appears in a left-side navigation pane.



**Related Content features:**

(A) The LexisNexis Related Content pane displays automatically

(B) The **Case File** link lets you print or download a list of all documents related to the case that are available at *lexis.com*

(C) The **Prior and Subsequent Proceedings** section helps you track the entire lifecycle of the case without running separate searches

(D) The **Filings** section shows you motions and pleadings associated with the case

(E) The **Issue Analysis** section gives you access to an exclusive combination of analytical resources

(F) The **Outline** section allows you to navigate through sections of the case you're viewing

(G) As you use the forward and back arrows to view other documents in your search results, the Related Content pane updates to display related items for each document

## Refining Your Search Results

### Narrow Your Search Results with the FOCUS Feature

Use the FOCUS feature to pinpoint words within your search results—even if those words were not part of your original search request. It narrows your results, delivering a subset of those documents while retaining your original search and results, and highlights your added search terms in your FOCUS results for easy viewing.

To perform a FOCUS search:

1. Review your original search results.

   (NOTE: If you wish to run your FOCUS search against only selected documents in your results, indicate those documents by clicking the checkboxes on the left side of the screen and choose **Selected Documents** from the **Search Within** pull-down list near the top of the screen.)

2. Enter additional search terms in the **FOCUS Terms** box near the top of the screen.

3. Click the **Go** button.



To return to your original results, click the **Exit FOCUS™** link near the top of the screen.

*Tips:*

*If you are viewing tabbed search results, you cannot select documents for a FOCUS request from the All Results tab. Select a category or a source first, then select documents.*

*The FOCUS feature is not available in some circumstances (in **Book Browse** mode, for example).*

13

A2788

### Find Cases with Similar LexisNexis Headnotes

Have you found an on-point decision with a relevant LexisNexis Headnote? Finding decisions with similar headnotes could help you make your case. Here's a quick way to search for them:

1. Click the **More Like This Headnote** link that appears at the end of the relevant headnote.
2. Choose a jurisdiction (the one you were just searching is the default) and restrict by date (if you wish).
3. Click the **Search** button.



You'll retrieve up to 250 cases with the most closely matched headnotes or case discussions, ranked by relevance.

## Updating Your Search Results

Use LexisNexis Alerts to get regular research updates without re-entering your search. Click on the **Alerts** icon in the top-right section of the screen.

### LexisNexis Alerts

Follow any research issue—legal, news, legislative/political, and more—on a regular basis. You can receive updates on a monthly, weekly, business daily, or daily basis—even up to three times per day.



Once you've run your search and reviewed your results:

1. Click the **Save As Alert** link at the top of the results screen (you can save a search for update even if that search retrieved no documents) and the **Save LexisNexis® Alert** screen will appear.
2. Name your saved search.
3. Select your update frequency:
   - *Monthly* (choose date and time of day)
   - *Weekly* (choose day of week and time of day)
   - *Every business day* (choose one, two, or three times per day)
   - *Every day* (choose one, two, or three times per day)
4. Set your delivery and notification options:
   - Click the **Online only** or **E-mail** radio button and click the corresponding option links to indicate your preferences
   - Select the appropriate checkboxes if you want to: be notified via e-mail when your search does not retrieve new documents; exclude any duplicate documents; or be notified via e-mail each time your search retrieves new documents— as opposed to a specific frequency
5. Click the **Save** button.

Each time your search is updated, you receive only new items.

You can find a list of all your stored LexisNexis Alert searches by clicking the **Alerts** icon in the top-right section of the screen and then the **Alerts** tab. From here, you can:

- Edit a saved search
- Update a saved search on the spot
- Delete a saved search
- Run a FOCUS search on the most recent search results
- Review current and previous search results

https://www.lexisnexis.com/documents/20110615015922_small.pdf?srsltid=AfmBOophRO-ebYlPPWhsb5pIpmb2JKaL4D1optJn3fsbbk5HLDTkaTso    14/16

A2789

### *Shepard's* Alerts® Program

Get regular updates on citing authorities that could potentially affect the validity of your case and on pending or recently enacted legislation that could affect the validity of your statute.

1. Get to the **Set Up *Shepard's* Alert** setup screen (shown below):
   – If you're viewing a *Shepard's* report, just click on the **Save As Shepard's Alert®** link at the top of the screen
   – Click the ***Shepard's*** tab near the top of the screen, enter a citation, and click the **Set up Shepard's Alert** link
   – Click the **Alerts** icon in the top-right section of the screen, click the ***Shepard's* Alert** tab, enter a citation and click the **Set Up** button
2. Name your *Shepard's* update search (the case name is the default).
3. Choose your monitoring option by clicking the radio button for:
   – *Any Change*
   – *New Negative Analysis*
   – *Custom Settings* (and click the link to indicate your preferences)
4. Select update frequency ...
   – *Monthly* (choose date)
   – *Every other week* (choose day of week)
   – *Weekly* (choose day of week)
   – *Every business day*
   ... and set a date to end your updates.
5. Choose a delivery option by clicking the **Online Only** or **E-mail** radio button (click the **E-mail Options** link to indicate your preferences).
6. Click the **Continue** button, review your selections, and click the **Save** button to confirm.



You can find a list of all your stored *Shepard's* Alert searches by clicking the **Alerts** icon and then the ***Shepard's* Alert** tab. From here, you can:

- Edit a saved search
- Delete a saved search
- Pause a saved search
- Review current and previous search results

### Continuous Alerts

Be the first to know the most recent news on clients and other hot topics. LexisNexis® Continuous Alerts *powered by Factiva®* delivers convenient, continuously updated news to your e-mail from the Factiva collection of more than 10,000 authoritative sources, including the exclusive combination of *The Wall Street Journal®*, Dow Jones® and Reuters® newswires, and the Associated Press®, as well as hundreds of other influential newspapers and periodicals, 120 continuously updating wire services, and more. Only Factiva content is available in this application.

This gateway application may have fees that are outside of your general LexisNexis subscription.

### New Docket Alerts and Track Existing Docket Alerts

Get regular updates on court filing activity. Contact your administrator to learn whether this is part of your subscription.

### View Your Research History

It's easy to rerun a search from a previous session or resume interrupted research. Click the **History** icon in the top-right section of the screen.

The **Recent Results** tab on the **History** screen will show you your searches and results from the last 24 hours. You can:

- Sort results by date or client ID by clicking the column heading
- View the original results of a search (or Get a Document or *Shepard's* request), at no additional charge, by clicking on the appropriate link in the **View Original Results** column
- Rerun a search, either as is or modified, by clicking the **Re-run/Edit** link

### *Tip:*

*You can rerun a search within 24 hours at no additional charge, even if it was one you performed using a source that's outside your subscription plan.*

https://www.lexisnexis.com/documents/20110615015922_small.pdf?srsltid=AfmBOophRO-ebYlPPWhsb5pIpmb2JKaL4D1optJn3fsbbk5HLDTkaTso   15/16

A2790

The **Archived Activity** tab on the **History** screen will show your your search activity (without results) from an additional 29 days. You can:

- Sort results by date or client ID by clicking the column heading
- Rerun a search, either as is or modified, by clicking the **Re-run/Edit** link

*Tip:*

*If you rerun an archived search—one that's more than 24 hours old but less than 30 days old—that you performed within a source that's outside your subscription plan, you will incur the applicable additional charge.*

## Delivering Your Search Results

The following options display in the upper-right corner of each document in your results set:

     

### Printing Your Documents

**Print**

1. Once you've reviewed your results, click the **Print** icon on any search results page.
2. Choose your options from the **Print Documents** pop-up—documents to print (all or selected); document display format (the default is the display you were viewing); dual-column print; use of bold, italics, and underlining; choice of font; page breaks; and more.
3. Click the **Print** button.

**FAST Print**

Eliminate steps in the printing process by using this shortcut.



One-time *FAST* Print setup:

1. Once you've reviewed your results, click the **FAST Print** icon on any search results page.
2. Select a LexisNexis dedicated printer or a format for your attached printer as the default.
3. Click the **Set** button.

Using *FAST* Print after initial setup:

1. In Cite view, click the **FAST Print** button and select whether to print the current page or the entire list.
2. In KWIC, Full, or Custom view, click the **FAST Print** button to print the current document immediately.

Any print options—such as dual-column printing; use of bold, italics, and underlining; font; or page breaks—that you selected previously on the **Print Documents** screen will be the default options for *FAST* Print.

### Downloading Your Documents

1. Once you've reviewed your results, click the **Download** icon on any search results page.
2. Choose your options from the **Download Documents** pop-up—documents to download (all or selected); file format; document display format (the default is the display you were viewing); use of bold, italics, and underlining; choice of font; page breaks; and more.
3. Click the **Download** button.

### E-Mailing Your Documents

1. Once you've reviewed your results, click the **E-mail** icon on any search results page.
2. Choose your options from the **E-mail Documents** pop-up—e-mail address (you can send to three addresses), subject line, and brief note; documents to e-mail (all or selected); document display format (the default is the display you were viewing); use of bold, italics, and underlining; choice of font; page breaks; and more.
3. Click the **Send** button.

### Faxing Your Documents

1. Once you've reviewed your results, click the **Fax** icon on any search results page.
2. Choose your options from the **Fax Documents** pop-up—"to" and "from" information, fax number, and brief note; documents to e-mail (all or selected); document display format (the default is the display you were viewing); use of bold, italics, and underlining; choice of font; page breaks; and more.
3. Click the **Fax** button.



LexisNexis, Lexis, *lexis.com*, *Shepard's*, *Shepardize*, *Shepard's* Alert, *martindale.com*, and the Knowledge Burst logo are registered trademarks, and KWIC, FOCUS, Easy Search, *Shepardized*, *Shepard's* Signal and *Shepardizing* are trademarks of Reed Elsevier Properties Inc., used under license. IDEX is a registered trademark and TotalPatent is a trademark of LexisNexis, a division of Reed Elsevier Inc. Matthew Bender is a registered trademark of Matthew Bender Properties Inc. Other products or services may be trademarks or registered trademarks of their respective companies.
© 2010 LexisNexis, a division of Reed Elsevier Inc. All rights reserved. LP20827-0 1010

A2791

# EXHIBIT 116

A2792



**WHITE PAPER**

# The past, present, and future of legal research with generative AI

Helping the legal researcher complete their work more efficiently

February 22, 2024     ⏱ 18 min

**A** steady stream of legal research innovations has helped lawyers find better answers more efficiently for over a century.

Since the 1800s, many innovations improved the accessibility of law and standardized the publication of court decisions. Later innovations, including indexing and classification systems, made searching for precedents in published cases faster and more comprehensive. Digitalization freed researchers from the confines of a physical library. Citation analysis systems allowed researchers to determine the current legal validity of a given precedent. Litigation analytics brought data-driven insights to legal strategy.

These innovations have built on each other as legal research has become more accurate and efficient.

Today, the introduction of generative AI (GenAI) to legal research is a giant leap forward for lawyers — but like earlier innovations, it does not stand alone. Generative AI dramatically improves a researcher's "time to answer" by building on and integrating those previous innovations. GenAI will profoundly impact legal research, not just because of the strength of the underlying technology but because of the quality of data and the human-based enhancements the technology operates on.

"The problems legal researchers are solving haven't changed significantly in the past thirty years," says attorney and Thomson Reuters Law School Account Manager Mark Frongillo. "What has changed are the tools they have to solve the problems. When I practiced law and then began training future lawyers, we started with book research. Now, law professors, students, librarians, and associates are conducting research the way they think: by asking questions, considering fact patterns, filtering by jurisdiction — and trusting their research tool to help them identify and interpret documents that are on point."

Below are eight stages of how legal research has become modernized throughout the years.

## Stage one: Accessing the law

### Innovation — access and standardization

The first step in the modernization of modern legal research was simply making source materials — particularly court decisions and statutes — available to a broader audience. Since the Middle Ages,

A2793

various court reporters have recorded and published court decisions. As American jurisprudence matured in the 19th century, legal publishers like John B. West saw lawyers needing help to keep track of a higher volume of legal decisions and apply precedent in their jurisdiction. Since 1879, West's National Reporter System has compiled cases from state and federal courts and organized them into reporter sets by jurisdiction.

The reporter sets grew, and law firms, corporate legal departments, law schools, judges, government agencies, and public law libraries amassed collections. They updated them as supplemental inserts arrived and devoted significant space to their care.

Standardization and widespread access were the innovations here. Soon, nearly every lawyer had access to a comprehensive set of authoritative court reports in their jurisdiction and beyond. Publishers like West added a layer of human editorial treatment that enhanced the quality of court documents and standardized their structure and organization by jurisdiction.

## Stage two: Finding the law

### Innovation — classification, analysis, and summarization

Simply making the law more available in a standardized format was not enough. The proliferation of court decisions created a new challenge: keeping up with the law in a given jurisdiction or finding just the right cases to address the precise legal issue the lawyer was researching.

On top of the body of published law, publishers built a layer of editorial enhancements that made it easier to find and interpret the law. For example, West developed the Key Number System as a master classification system for U.S. law. Attorney-editors read every published opinion and assigned each issue in the case to a Topic and Key Number, taking context from the decision. Using printed digests, lawyers could quickly identify cases that addressed a specific issue, narrowing their search by jurisdiction as needed.

Headnotes — another editorial enhancement — helped researchers understand and organize court decisions. Attorney-editors identified the principal legal issues in a case and then wrote a brief description summarizing the facts, holding, and reasoning applied so researchers could determine the case's relevance. The headnotes helped lawyers understand a case's substantive and procedural issues to assess its relevance and value as precedent.

Other analytic tools, such as American Law Reports, organized commentary on legal issues in a way that helped lawyers understand the prevailing law and find the underlying case precedents. Volumes of statutes and regulations, law review articles, and topical treatises or practice guides also served this dual purpose of helping to understand the state of the law and to identify essential precedents.

The innovations developed in this era of legal research moved legal publishing beyond collection and publication and added a level of human intelligence to primary legal sources.

"Our editorial enhancements help attorneys to research more efficiently and to have a lot of confidence they understand the state of the law," says Jim Scott, Director of the Current Awareness team at Thomson Reuters. "All the attorney-editors' work is organized around supporting those two principles."

## Stage three: Digitalization

### Innovation — 24/7 availability and new search capabilities

Digitization of legal research began in the 1970s with the introduction of online research systems like

A2794

Westlaw. The legal content formerly locked up in books is now available for remote access from anywhere, any time. But this innovation did more than simply make book content more accessible; it added a new arrow to the researcher's quiver. Where the West Key Number System classification scheme enhanced print research, researchers could now augment those techniques with searches for specific words, phrases, concepts, proper names, etc.

While early versions of Westlaw allowed researchers to work from more locations, save their research histories, and expand their search techniques, it still mimicked the book research experience. Researchers still had to know how the case law was organized to find the right area of law. The documents returned by the computer still had to be read and sorted to determine which ones were on point and good law. Research processes had to reflect the organization and structure of the underlying print sources, which wasn't always intuitive or easy to learn.

However, the innovations were building on each other as the new online research tools leveraged all the editorial enhancements and finding tools that started in the print era.

> " *What really gives Westlaw such an amazing lift are those editorial enhancements that are all created by humans. We have human attorney editors who are reading virtually every case and every statute, and then summarizing, organizing, and classifying the most critical parts.*"

**Erik Lindberg**
Senior Director for Westlaw Product Management

Thus, Westlaw built even its earliest versions on the foundation of the editorial capabilities first appearing in the print era and augmented them with new research approaches.

### Stage four: Natural-language search

#### Innovation — natural-language searching

The marriage of artificial intelligence and the human element took another giant step forward in 2010 when Westlaw introduced natural-language searching alongside the traditional terms-and-connectors approach. With natural-language searching across all of Westlaw, researchers could use their own words and Westlaw would deliver relevant results for their jurisdiction. The attorney-editors' thorough approach to assigning Topics and Key Numbers and adding synonyms to headnotes enabled Westlaw to deliver more targeted and comprehensive search results — with less input and less effort from legal researchers.

These advances focused primarily on helping researchers find results related to their specific questions. What does the law say on this particular topic with this set of facts? Can I still rely on this case for this point of law? What have other attorneys written about similar cases?

> " *Superior AI really requires three things: domain expertise, quality data, and AI experts. Fortunately for us, Thomson Reuters is uniquely positioned as having superiority in all three areas. Legal issues are very rarely black and white;*

A2795

*they are often riddled with nuance. And nuance in language, especially legal language, is incredibly challenging for humans, let alone machines. That's why we need human brainpower."*

**C.J. Lechtenberg**
Senior Director of Westlaw Product Management

The pivot to natural-language searching signaled the growing ability of machines to process large amounts of legal data and see patterns and connections within it.

## Stage five: Automating with AI

### Innovation — automation in the research process

In 2018, Thomson Reuters introduced new ways of working with the release of Westlaw Edge. "Westlaw Edge is full of breathtaking science, and the AI and machine-learning components build perfectly upon our previous innovations and exclusive legal expertise," said Mike Dahn, Senior Vice President and Head of Westlaw Product Management. "With Westlaw Edge, legal professionals can conduct legal research more quickly than ever before and uncover valuable new insights, giving them greater confidence when filing court documents or advising clients."

Critical artificial intelligence innovations included:

### AI in citation analysis

An essential task for lawyers is determining the validity of a cited source. Traditional citator services only flagged direct citation relationships between cases. Those citators did not warn researchers when a point of law had been overruled by implication, which could leave them at risk of citing invalidated law. Westlaw Edge introduced KeyCite Overruling Risk, which uses AI to identify cases that implicitly overrule or invalidate another case. This feature can be necessary, for example, when a court cites a case as authority, and that cited case is then overruled in a subsequent decision without explicitly overruling the original cited case.

### AI in document analysis

Technological advances have also made it possible to leverage AI when analyzing briefs. Quick Check allows researchers to upload a brief and receive an in-depth report with recommendations for additional relevant authority, warnings for cited authority, an analysis of quotations, and a table of authorities.

Quick Check and Key Cite Overruling Risk are examples of tools that leverage AI to expand online legal research beyond just searching into deeper analysis.

## Stage 6: Analytics for case strategy

### Innovation — data-driven legal strategy techniques

Legal data consists of more than just the content of court decisions. Every legal document — case, statute, regulation, motion, pleading, or brief — includes "metadata." Metadata is data about the data itself. In legal sources, metadata encompasses information about parties, judges, legal counsel, and damage award amounts. It also includes data about jurisdiction, specific courts, and the subject

A2796

matter of the data. Finally, the metadata provides information about the web of legal authorities cited and cross-referenced across a set of legal documents.

Machines are uniquely capable of ingesting and making sense of metadata in legal documents in a way that humans can't manage on their own due to the size and scope of the data sources. Because of the sheer amount of raw data that AI can now analyze, the scope of legal research has grown beyond its traditional boundaries.

For instance, Westlaw's Litigation Analytics can provide insights about the judge in your case:

- How often has this judge sided with a plaintiff in this type of case? In this specific type of motion?

- What kind of arguments have historically resonated with this judge?

- What kinds of authority does the judge typically rely on?

Attorneys can use this data to interpret patterns and use that insight to build the strongest case strategy and respond to clients even faster. They can also use those insights to manage client expectations surrounding the outcome, timeline, and cost.

Knowing how often a judge sides with a plaintiff in a certain type of case or how that judge has viewed certain motions is very powerful — especially when those insights come from hundreds or thousands of data points rather than from a few anecdotes from colleagues or personal experience.

Litigation insights can also track data about opposing counsel or their law firm to obtain insights about their experience on a particular issue, their success at specific types of motions, and whether they have a significant history with a given judge.

All this data gives legal researchers more insights and helps them create their strategies and pleadings with confidence about how the court and opposing counsel might respond.

## Stage 7: Case analysis and workflow

### Innovation — enhanced analysis, outline generation, and visualization

Earlier stages of legal research innovation focused on improving the process of finding relevant sources and precedents. But even the best search tools leave much work on lawyers' shoulders as they read, filter, review, and organize retrieved documents to align with the case they are working on. The introduction of Westlaw Precision with CoCounsel in 2022 responded to the need to drill down the search results that are most relevant to their current research issue more efficiently.

As with earlier innovations, Westlaw built these innovations on a combination of trusted and enhanced data, exclusive editorial enhancements, and cutting-edge technology. Westlaw Precision with CoCounsel allows you to find what you need quickly without sacrificing confidence in your results.

The following are some of the new capabilities introduced.

### Precision Research

This feature builds on the expansion of the human editorial enhancements by Thomson Reuters that improve and expand the data on which Westlaw operates. Where earlier innovations leveraged the classification of cases into the Key Number System, Westlaw Precision with CoCounsel also classifies cases by other attributes such as issue outcome, fact pattern, motion type, motion outcome, cause of action, and party type.

A2797

That enhanced data helps users find legally and factually similar cases with unparalleled speed and accuracy. Researchers often look for one case that addresses a particular issue, in a particular context, or with a particular outcome. They may be looking for a specific party type or fact pattern. They may want to identify cases with one distinct cause of action or a precise kind of motion. Ideally, they are looking for material facts that match their case.

Precision Research reveals these critical case attributes as part of the research process, enabling researchers to search, filter, and browse more efficiently than ever before.

As with earlier innovations, Westlaw built these innovations on a combination of trusted and enhanced data, exclusive editorial enhancements, and cutting-edge technology. Westlaw Precision with CoCounsel allows you to find what you need quickly without sacrificing confidence in your results.

The following are some of the new capabilities introduced.

### KeyCite Cited With and Overruled features

Westlaw Precision with CoCounsel also introduced new KeyCite capabilities. KeyCite Cited With shows related cases with a pattern of being cited together, even if neither cites the other. It helps legal researchers quickly find connections between cases that would traditionally be difficult to uncover and locate additional relevant authority for the research issue. It also allows researchers to find regularly cited law for a specific rule or issue.

The new KeyCite Overruled in Part flag shows you the specific point of law in a case that has been invalidated so that other valid points of law aren't missed.

### Optimized research workflow

Outline Builder aids in the transition from research to drafting. Researchers can build outlines quickly and easily without needing to leave Westlaw Precision with CoCounsel. Outline Builder can be used alongside a document while researching so important text or citations can be dragged and dropped directly into an outline. Linked and formatted citations and KeyCite flags are automatically included.

### Visualization

Graphical View of History displays a visualization of research history, graphically mapping out the steps taken and the searches and documents that were interacted with the most. This feature helps identify the most important documents and keep them front and center. The Keep List/Hide Details capability allows researchers to save cases of interest and hide cases they don't want to see again.

## Stage 8: Generative AI comes to legal research

### Innovation — large-language models plus retrieval-augmented generation

Most lawyers are familiar with the excitement around generative AI. For example, they might have tested ChatGPT or Copilot in the Bing search engine. The large-language models (LLMs) behind these GenAI tools are very good at producing a well-written answer to a question that is responsive to the user's specific questions and sounds accurate and authoritative.

The "sound accurate and authoritative" part concerns many lawyers, however.

The freely available generative AI tools that most people have used have been trained on a wide variety of content captured from the Internet and other sources. Lawyers who have tested those

A2798

systems with legal questions see many shortcomings. A New York lawyer was recently sanctioned after submitting a court brief that sounded like it contained convincing legal arguments but contained references to non-existent cases presented as legal authority. Anyone who has used the Internet regularly knows it is full of non-authoritative content.

It turns out that popular GenAI systems are good at the "generative" part but not as good at the "authoritative" part. In the generally available tools, there is more emphasis on generating language that sounds good and less emphasis on accuracy in the specifics of how the systems' answers are sourced or on ensuring that the information returned is up to date.

Fortunately, there are sophisticated techniques that address that problem. Westlaw Precision with CoCounsel has recently incorporated a new capability called AI-Assisted Research. It delivers a solution that lawyers can trust and significantly enhances the speed with which they find the answers to their legal research questions.

## How AI-Assisted Research works

AI-Assisted Research gets around the limitations of generative AI in a few ways. First, the tool begins by looking for applicable primary law before generating text. The underlying content searched is essential. Many LLMs use training data that's only current up to a point in time, and their responses won't reflect anything that happened after that time. But the law continues to evolve, and because the LLM relies on Westlaw's primary law, AI-Assisted Research is constantly taking in and learning from the latest and most relevant law.

This process, called research-automated generation (RAG), takes all the AI has learned from a broad knowledge base but applies that knowledge to the more focused data sources identified from the Westlaw database. The selection of the relevant, current, and authoritative sources in this process leverages many of the previous innovations we have discussed above, including the editorial enhancements that Westlaw attorney-editors add to these primary law sources, such as West Key Number System classifications, headnotes, and KeyCite analysis.

Only after it has identified a more targeted set of relevant data and documents does it generate a response to the research question. It then delivers the answer as a well-written response that answers the legal question. Notably, the response also includes footnotes so the researcher can see the legal passages that informed the response.

## What it means for legal research

The use of RAG within Westlaw Precision with CoCounsel's AI-Assisted Research addresses several common concerns expressed by lawyers about relying on AI to help them with legal research:

- **Authority**. It bases its responses on a set of data culled from the authoritative set of sources contained in Westlaw rather than on the broader world of unverified data that popular generative AI systems like ChatGPT use.

- **Currency.** It bases its responses on up-to-date and verified data, unlike more general large-language models limited to data existing at some defined date in the past.

- **Verifiability.** It puts more control in the hands of the lawyer. Unlike the "black box" responses that other systems provide, AI-Assisted Research delivers a complete answer to the research question but also identifies the specific sources relied on for that answer so lawyers can verify the accuracy of the results .

This combination of GenAI and existing Westlaw data and capabilities brings new dimensions to legal

A2799

research.

"The ability to type a question, get an answer, and have all the supporting resources right underneath that answer so you can ensure it is supported by case law within Westlaw is very important. And I think it's proven to be a very effective and accurate way to get answers to complex legal questions," said Andrew Bedigian, Counsel, Larson LLP.

He added, "As lawyers, we should be cautious when using AI to develop responses to complex legal issues that are often dependent on nuance. Because AI-Assisted Research relies on Thomson Reuters' proven database, I can have confidence that a response generated from AI relies on actual sources and not something that is made up."

His other big piece of advice? "No tool can do all of your research for you. No matter what you're using to understand the law, be sure you're checking the sources the results come from and using it as a starting point for your research. The real wisdom still comes from the legal professional, not the research system."

## Technology for finding the right answer, not just the right documents

AI-Assisted Research is not a stand-alone AI technology that Thomson Reuters has simply bolted onto Westlaw Precision with CoCounsel. As this look back at the history of innovation in legal research shows, several previous generations of research innovations shaped a generative AI solution uniquely suited to today's lawyers and legal researchers.

Generative AI and many of these other innovations have combined to help lawyers arrive at comprehensive, relevant answers more quickly and efficiently. Most importantly, they do so in a way that leaves the lawyer in charge of the outcome, with a level of transparency that helps lawyers verify that answers are correct and on point to serve clients' needs better.

Get a jumpstart on your research with faster answers to legal questions with Westlaw Precision with CoCounsel.



## Experience Westlaw Precision with CoCounsel for yourself

**Free trial**    **Learn more**

**PRODUCTS**

Westlaw

Practical Law

CLEAR

All products

**RESOURCES**

About us

Our purpose

Press releases

Insights

**SUPPORT**

Support center

Reference attorneys

Legal notices

Contact us

**CONNECT WITH US**

Facebook

Twitter

LinkedIn

YouTube

A2800

Events                    Account management

Product logins

Thomson Reuters

Cookie policy ↗    Cookies Settings    Terms of use ↗    Privacy statement ↗    Copyright ↗    Accessibility ↗

Do not sell or share my personal information and limit the use of my sensitive personal information

A2801

# EXHIBITS 117-137

RE          E

E R

E    RE

A2802

Case 1:20-cv-00613-SB    Document 731-1    Filed 11/06/24    Page 30 of 38 PageID #: 210917

# EXHIBIT 138

A2803

10/30/24, 10:53 AM    Case 1:20-cv-00613-SB    Document 731-1    Filed 11/06/24    Page 31 of 38 PageID #:
What is image compression? | Algorithms & techniques | Cloudflare
210918





🔍  Log in  🌐 ⌄  ☰

# What is image compression?

Compressing an image reduces its file size. Image compression can be either lossy or lossless.

**More on Performance**    ▶

Copy article link 🔗

## Boost website performance with Cloudflare Pro and our speed tools add-ons

**Explore Bundles**

# What is image compression?

Image compression is a process that makes image files smaller. Image compression most often works either by removing bytes of information from the image, or by using an image compression algorithm to rewrite the image file in a way that takes up less storage space. Compressing an image is an effective way to ensure that the image loads quickly when a user interacts with a website or application. It is an important part of image optimization.

As an example, here is an image that is 96 KB in size:

A2804



Here is the same image, compressed to 70 KB:



And here it is compressed to 35 KB:

A2805

Case: 25-2153     Document: 156-6     Page: 555     Date Filed: 01/02/2026

Case 1:20-cv-00613-SB     Document 731-1     Filed 11/06/24     Page 33 of 38 PageID #: 210920



# Why is image compression important?

Compressed images load faster than uncompressed images. This matters because the speed at which webpages and applications load has a huge impact on SEO, conversion rates, the user's digital experience, and other crucial metrics. Improving web performance is one of the major ways that developers optimize websites.

Image compression is typically used alongside other methods for improving web performance as well. For instance, a CDN caches content to deliver it more quickly to end users. Load balancing helps prevent web servers from becoming overloaded. The use of lazy loading can allow the most important content of a webpage to load even faster. Overall, however, image compression is often one of the quickest ways of fixing slow page performance.

# What is lossy image compression?

Consider a traveler packing clothes for a trip. It is possible for the traveler to pack everything in their closet, from shoes to hats to formalwear. But such an approach results in a large amount of luggage that the traveler needs to carry around, slowing them down and perhaps costing more money to transport. Instead, the traveler selects the most important clothing items and packs them into a single suitcase.

A2806

Just as our traveler did not need to pack their entire wardrobe, people rarely need to view an entire image in its maximum resolution and largest dimensions. (The most-used desktop screen size is 1680x1050 pixels, and the most-used mobile screen size is even smaller, at 360x800 pixels. Even at those dimensions, it is rare that an image takes up the entire screen.) Usually, an image can be reduced in quality and size in a way that is not noticeable to the typical viewer — an approach that is called "lossy" image compression.

Lossy image compression retains the most significant information for the image without keeping every single pixel. There are several types of lossy compression algorithms, described in more detail below. But all work by removing information from the image file so that the file is comprised of fewer bytes.

## Lossy image compression methods

Many images hosted on the web are in a file format that uses lossy compression. This ensures the images load quickly and do not use too much bandwidth. Common examples of lossy compression methods include:

- **JPEG:** This file format, named after the Joint Photographic Experts Group, is perhaps the most widely used image compression method. It can usually compress files by a ratio of 10:1 with a minimal reduction in image quality. More recent versions of JPEG include JPEG 2000 and JPEG XR, but many browsers do not support these formats.

- **WebP:** While WebP also supports lossless compression, it is more commonly used for lossy image compression. Google originally developed WebP to replace the JPEG, PNG, and GIF file formats.

- **High Efficiency Image Format (HEIF):** The High Efficiency Image Format (HEIF) is a type of container file for compressed images. Images compressed with this method are sometimes called HEIC files.

# What is lossless image compression?

If our traveler's desired clothes do not fit in the suitcase, they may try re-folding and rearranging the clothes to make them fit better. Similarly, "lossless" image compression uses mathematical algorithms to rewrite an image file without removing any information. An image treated with

A2807

lossless compression should appear basically identical to the original, but should have a much smaller file size.

While lossless compression can reduce image file sizes by as much as 40%, it is still less effective than lossy compression for reducing file size and optimizing images for the web. Website builders should carefully consider the needs of their end users and test the speed of their websites when deciding between lossy and lossless image compression.

## Lossless compression methods

Widely used lossless compression methods include:

- *Portable Network Graphics (PNG)*, which is sometimes used on the web instead of JPEG or WebP.

- *Graphics Interchange Format (GIF)*, often used on the web as well.

- *Bitmap (BMP)* files are usually too large for practical use on the web.

- *RAW* images are not compressed at all. Digital cameras shoot photos in RAW, but the photos should be converted to another format and compressed before they are used on a website (unless the website is specifically intended for displaying extremely high-quality images).

# What are some common image compression algorithms?

Both lossy and lossless compression methods use various image compression algorithms (an algorithm is a set of rules for a computer to follow) to achieve smaller file sizes. Transform coding, run-length encoding, arithmetic coding, LZW, flate/deflate, and Huffman coding are all examples of image compression algorithms.

**Transform coding** is a lossy image compression algorithm that often uses a technique called discrete cosine transform (DCT), which is a way to mathematically represent a file using less information. JPEG relies on transform coding.

**Run-length encoding (RLE)** is a lossless compression algorithm that encodes repeated pixels. For instance, if there are eight white pixels in a row, instead of writing out all eight pixels (like

A2808

WWWWWWWW), it records the number of pixels (like 8W).

**Arithmetic coding** is another kind of lossless compression algorithm. Like any digital file, digital images are represented on lower computational levels with a string of characters. Arithmetic coding encodes frequently used characters in an image file with fewer bits and less-used characters with more bits. The result is fewer bits overall compared to the original string of characters.

**Huffman coding** is somewhat similar to arithmetic encoding, but usually does not reduce file size by quite as much.

**LZW** — the Lempel–Ziv–Welch algorithm is a lossless compression method based on LZ77 and LZ78, two older compression algorithms.

**Flate/deflate** is a lossless compression algorithm based on Huffman coding and LZ77 compression.

# How to compress an image using Cloudflare

Cloudflare offers three products for storing, caching, optimizing, and resizing images to ensure they load as quickly as possible:

- Cloudflare Images

- Cloudflare Image Resizing

- Cloudflare Polish

With these services, website owners can optimize images with a click, convert images to compressed file formats like WebP, and customize which image sizes load for which devices. Learn more about these services in the links above, or get started with a Cloudflare plan here.

**RELATED CONTENT**

**What is an Image Optimizer?**

**What is Latency?**

**What is Load Balancing?**

A2809

Core Web Vitals

Performance and Conversion Rates

## Want to keep learning?

Subscribe to theNET, Cloudflare's monthly recap of the Internet's most popular insights!

### Subscribe to theNET

Refer to Cloudflare's Privacy Policy to learn how we collect and process your personal data.

**Getting Started**

Free plans

For enterprises

Compare plans

Request a demo

Contact sales

**About Performance**          ⌄

**Performance and SEO**          ⌄

**More on Performance**          ⌄

**Glossary**          ⌄

**Learning Center Navigation**          ⌄

A2810

Case 1:20-cv-00613-SB    Document 731-1    Filed 11/06/24    Page 38 of 38 PageID #: 210925

What is image compression? | Algorithms & techniques | Cloudflare



© 2024 Cloudflare, Inc. | Privacy Policy | Terms of Use | Report Security Issues | ✅❌ Your Privacy Choices | Trademark

A2811

Case 1:20-cv-00613-SB    Document 740-1    Filed 11/18/24    Page 1 of 1 PageID #: 211280

# EXHIBIT 139

RE          E

E     RE

A2812