**No. 25-2153**

# In The United States Court of Appeals For the Third Circuit

THOMSON REUTERS ENTERPRISE CENTRE GMBH and
WEST PUBLISHING CORPORATION,
Plaintiffs-Appellees,

v.

ROSS INTELLIGENCE INC.,
Defendant-Appellant.

*On Appeal from an Order of the United States
District Court for the District of Delaware
Civil Action No. 20-613 (The Honorable Stephanos Bibas)*

## APPELLANT'S REDACTED FINAL FORM OPENING BRIEF

Anne M. Voigts
Ranjini Acharya
PILLSBURY WINTHROP
SHAW PITTMAN
2400 Hanover Street
Palo Alto, CA 94304

Kayvan M. Ghaffari
PILLSBURY WINTHROP
SHAW PITTMAN
Four Embarcadero
Center, 22nd Floor
San Francisco, CA 94111

Yar R. Chaikovsky
WHITE & CASE
3000 El Camino Real
2 Palo Alto Square
Suite 900
Palo Alto, CA 94306

Andy M. LeGolvan
WHITE & CASE
555 S Flower Street,
Suite 2700
Los Angeles, CA 90071

Mark S. Davies
*Counsel of Record*
Anna B. Naydonov
Kufere J. Laing
WHITE & CASE
701 Thirteenth Street, NW
Washington, DC 20005
(202) 626-3600
mark.davies@whitecase.com

*Counsel for Defendant-Appellant*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Third Circuit Local Appellate Rule 26.1(b), Petitioner ROSS Intelligence, Inc. discloses that it has no parent corporation, does not issue stock, and there is no publicly held corporation with a financial interest in the outcome of this proceeding.

## STATEMENT OF RELATED CASES

This appeal concerns copyright law questions certified under 28 U.S.C. § 1292(b) by the United States District Court for the District of Delaware (The Honorable Stephanos Bibas). No other appeal in or from the same civil action or proceeding in the originating tribunal was previously before this or any other appellate court. There is no other tribunal that will directly affect or be directly affected by this court's decision in the pending case.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................ii

STATEMENT OF RELATED CASES ....................................................iii

INTRODUCTION .................................................................................. 1

STATEMENT OF FACTS ........................................................................3

    Legal publications facilitate the development of American
    common law ...............................................................................3

    Westlaw's headnotes copy portions of judicial opinions.................5

    University of Toronto students build an AI legal search model .....6

    An AI company, ROSS Intelligence, Inc., is born............................8

    West again uses copyright law to derail a competitor .................14

STATEMENT OF THE CASE ............................................................... 16

    The district court sends the copyright questions to a jury............17

    The district court had an abrupt "change of heart" .....................19

    The Court certifies this appeal ..................................................20

STATEMENT OF THE ISSUES............................................................. 21

JURISDICTIONAL STATEMENT ......................................................... 21

SUMMARY OF THE ARGUMENT ...................................................... 21

STANDARD OF REVIEW.................................................................... 23

ARGUMENT ...................................................................................... 24

  I.   A West headnote is not a copyrightable individual work..........24

      A.  A headnote is not original..............................................24

      B.  The district court's opinion defies precedents....................28

  II.  ROSS fairly used Westlaw's headnotes to train its AI
      legal search engine. ................................................................ 33

      A.  Westlaw's headnotes are far from creative. .......................35

      B.  ROSS used an insubstantial percentage of Westlaw's
           headnotes to train an AI legal search engine. .................37

C.   ROSS transformed the headnotes when using them to train its AI legal search engine. .......................................39

    1.   ROSS's use facilitates radical technological advances...............................................................40

    2.   The district court's transformative analysis is wrong. ..................................................................42

D.   ROSS's use does not harm any existing or potential market for headnotes......................................................47

    1.   The relevant market is the market for headnotes. ............................................................48

    2.   There is no existing or potential market for headnotes as independent search tools....................50

    3.   There is no existing or potential market for headnotes as training data......................................51

III.  The public will benefit from protecting ROSS's training of an AI legal search engine. ...................................................52

CONCLUSION ...............................................................................54

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*A&M Recs., Inc. v. Napster, Inc.,*
239 F.3d 1004 (9th Cir. 2001)......................................................49

*A.V. ex rel. Vanderhye v. iParadigms, LLC,*
562 F.3d 630 (4th Cir. 2009)........................................................41

*Am. Soc'y for Testing and Materials v. Public.Resource.Org.,*
*Inc.,* 82 F.4th 1262 (D.C. Cir. 2023) ...................................... 36, 37, 47

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith,*
598 U.S. 508 (2023)............................................................. *passim*

*Authors Guild, Inc. v. HathiTrust,*
755 F.3d 87 (2d Cir. 2014) ..........................................................41

*Authors Guild v. Google, Inc.,*
804 F.3d 202 (2d Cir. 2015) ................................................. *passim*

*Banks v. Manchester,*
128 U.S. 244 (1888)........................................... 4, 24, 25, 28, 29

*Bartz v. Anthropic PBC,*
No. C 24-05417, 2025 WL 1741691,
(N.D. Cal. June 23, 2025) ..................................................... *passim*

*Brunswick Corp. v. Vineberg,*
370 F.2d 605 (5th Cir. 1967).......................................................27

*Burrow-Giles Lithographic Co. v. Sarony,*
111 U.S. 53 (1884).....................................................................31

*Callaghan v. Myers,*
128 U.S. 617 (1888).......................................................................5

*Cambridge Univ. Press v. Patton,*
769 F.3d 1232 (11th Cir. 2014)...............................................47, 51

*Campbell v. Acuff-Rose Music, Inc.,*
  510 U.S. 569 (1994)................................................................ *passim*

*Educ. Testing Servs. v. Katzman,*
  793 F.2d 533 (3d Cir. 1986), *abrogated on other
  grounds by TD Bank N.A. v. Hill,*
  928 F.3d 259 (3d Cir. 2019) ........................................................ 32

*Ellis v. Westinghouse Elec. Co.,*
  11 F.4th 221 (3d Cir. 2021)..................................................... 23, 24

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,*
  499 U.S. 340 (1991)................................................................ *passim*

*Georgia v. Public.Resource.Org, Inc.,*
  590 U.S. 255 (2020).................................................................. 2, 28

*Google LLC v. Oracle America, Inc.,*
  593 U.S. 1 (2021)................................................................... *passim*

*Hachette Book Grp., Inc. v. Internet Archive,*
  115 F.4th 163 (2d Cir. 2024)..................................................... 48, 51

*Harper & Row Publ'g v. Nation Enters.,*
  471 U.S. 539 (1985).................................................... 29, 30, 36, 38

*Kadrey v. Meta Platforms, Inc.,*
  No. 23-cv-03417-VC, 2025 WL 1752484,
  (N.D.Cal. June 25, 2025) ......................................................... 42, 53

*Kelly v. Arriba Soft Corp.,*
  336 F.3d 811 (9th Cir. 2003)......................................................... 42

*Matthew Bender & Co. v. W. Publ'g Co.,*
  158 F.3d 674 (2d Cir. 1998) ..................................................... *passim*

*New Hampshire v. Maine,*
  532 U.S. 742 (2001).................................................................... 50

*Oasis Publ'g Co. v. W. Publ'g Co.,*
  924 F. Supp. 918 (D. Minn. 1997).................................................. 14

*Perfect 10, Inc. v. Amazon.com, Inc.,*
  508 F.3d 1146 (9th Cir. 2007)......................................................34, 41

*Satava v. Lowry,*
  323 F.3d 805 (9th Cir. 2003)..............................................................28

*Sega Enters. v. Accolade, Inc.,*
  977 F.2d 1510 (9th Cir. 1992)........................................ 18, 19, 44, 46

*Sony Comput. Ent., Inc. v. Connectix Corp.,*
  203 F.3d 596 (9th Cir. 2000)....................................................... *passim*

*Sony Corp. of Am. v. Universal City Studios, Inc.,*
  464 U.S. 417 (1984) .........................................................................34

*Southco, Inc. v. Kanebridge Corp.,*
  390 F.3d 276 (3rd Cir. 2004)....................................................... 30, 31

*Stewart v. Abend,*
  495 U.S. 207 (1990)...........................................................................22

*Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.,*
  756 F.3d 73 (2d Cir. 2014) .......................................................... 49, 51

*Twentieth Century Music Corp. v. Aiken,*
  422 U.S. 151 (1975)..................................................................1, 21, 52

*United States v. Google*, No. 20-cv-3010,
  2025 WL 2523010 (D.D.C. Sept. 2, 2025)..........................................16

*W. Publ'g Co. v. Mead Data Cent., Inc.,*
  799 F.2d 1219 (8th Cir. 1986)...........................................................14

*Wheaton v. Peters,*
  33 U.S. 591 (1834)........................................................................4, 27

*Whelan Assocs., Inc. v. Jaslow Dental Lab'y, Inc.,*
  797 F.2d 1222 (3d Cir. 1986) ...........................................................23

## STATUTES AND RULES

17 U.S.C. § 102(a) ................................................................... 21

17 U.S.C. § 107 ........................................................ 2, 34, 47, 49

17 U.S.C. § 107(2) ................................................................... 35

28 U.S.C. § 1292(b) ........................................................... 20, 21

28 U.S.C. §§ 1331 ................................................................... 21

28 U.S.C. §§ 1338 ................................................................... 21

Fed. R. Civ. P. 56(a) ............................................................... 24

U.S. Const. Article I, § 8, cl. 8 ............................................... 21

## MISCELLANEOUS

Andrew Edgecliffe-Johnson, *How Steve Hasker plotted
an AI course for Thomson Reuters,* SEMAFOR (July 11, 2025),
https://tinyurl.com/yntksmhv ........................................... 15

Edward Lee, *Fair Use and the Origin of AI Training*
(forthcoming in the Hou. L. Rev.),
https://tinyurl.com/LeeFairUse .................................... 39, 53

*Ethical uses of generative AI in the practice of law*,
THOMSON REUTERS (Aug. 8, 2025),
https://tinyurl.com/4uy3uyuh .................................... 15, 52

*Funding Snapshot: ROSS Intelligence Raises $8.7 Million
to Assist Lawyers Using AI,* WALL ST. J. (Oct. 11, 2017),
https://tinyurl.com/ROSSWSJ87 ........................................ 9

Hilary Hurd Anyaso, *Northwestern Law and ROSS
Intelligence partner to address access to justice through AI*,
NORTHWESTERN NOW (Nov. 3, 2017),
https://tinyurl.com/ROSSNWAI ...................................... 15

Hon. Pierre Leval, *Toward a Fair Use Standard*,
   103 Harv. L. Rev. 1105 (1990) ............................................... 40, 41, 45

Kim Luke, *From Jeopardy! to the classroom: IBM
   Brings its Watson platform to computer science,*
   Univ. of Toronto News (Oct. 2, 2014),
   https://tinyurl.com/nhjh4b5f........................................................ 7, 8

*ROSS partners with OpenAI for the launch of its API,*
   ROSS (June 11, 2020),
   https://tinyurl.com/tm3mw3um....................................................... 16

Steve Lohr, *A.I. Is Doing Legal Work. But It Won't
   Replace Lawyers, Yet*, N.Y. Times (Mar. 19, 2017),
   https://tinyurl.com/ROSSNYT. ...................................................... 15

## INTRODUCTION

Today, artificial intelligence is all the rage. But a decade ago, to many, it was a fantasy. The founders of ROSS Intelligence, Inc. were members of the small group who drove the technological advancements that led to the current AI boom. They knew that AI was the future. And they also knew that AI could transform the legal industry that was in dire need of competition and innovation.

In 2014, they built ROSS—the world's first AI legal search engine that allowed the public to ask a question in plain English and returned ranked excerpts from judicial opinions as answers. As part of training this engine, ROSS paid for 25,000 legal memoranda. Each memo featured one question and four to six answers. As ROSS later learned, the questions in those memoranda were developed from a small fraction of Westlaw's millions of headnotes—verbatim or close-to-verbatim quotes from uncopyrightable judicial opinions.

ROSS's innovations embody the Copyright Act's "ultimate aim": "to stimulate artistic creativity for the public good." *Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156 (1975). The technology and legal communities appreciated ROSS's contributions. But West Publishing,

Westlaw's owner, and Thomson Reuters, its parent company, saw ROSS as a threat. So they sued, alleging that ROSS's use of the headnotes in the legal memoranda was copyright infringement. This case asks whether West Publishing can use copyright law to prevent transformative innovation and protect its dominant market share.

The district court originally concluded that a jury must decide whether ROSS's limited use was infringing and whether it was protected by fair use. But then it had a spontaneous change of mind and granted West summary judgment, holding that headnotes that parrot uncopyrightable judicial opinions are nonetheless copyrightable and ROSS's minimal use was not protected.

This Court should reverse. The headnotes are not copyrightable because "no one can own the law." *Georgia v. Public.Resource.Org, Inc.*, 590 U.S. 255, 256 (2020). And ROSS's minimal use of the headnotes was quintessential fair use—it radically promoted scientific progress without impacting any market for those headnotes because no such market existed. 17 U.S.C. § 107. ROSS also served the public good—it increased access to justice and sparked innovation in a market that lacked competition.

2

If allowed to stand, the district court decision would put an end to that, with sweeping consequences for innovation, not just in legal research, but in artificial intelligence more broadly. The ROSS AI legal search engine rests on the same fundamental technology as any AI model, and that technology requires vast quantities of training data. The district court's decision siding with West over ROSS risks ending the American lead in AI development, a lead that is fundamental to economic success and national security. The Court must reverse.

## STATEMENT OF FACTS

### *Legal publications facilitate the development of American common law*

In the early days of the United States, common law judges confronted a new-found problem: Where were the published opinions? English common law was no longer precedential, and American common law was not accessible. A7125. To solve this problem, states passed "reception statutes" that, among other things, encouraged states to publish judicial decisions. *Id.* But publishing decisions was only half the battle—they had to be accessible to be useful. To fill this void, commercial publishers began to compile opinions in reporters and sell them. *Id.*

That made case law more accessible, but finding the right case was still difficult. Finding a relevant case required prior knowledge or stumbling across it by happenstance after browsing a reporter. Benjamin and Austin Abbott, two New York attorneys, solved this problem by introducing a classification and indexing system that organized cases by legal topic and principle. A7128. Of course, that system effectively grouped cases based on the opinion's text. *Id.*

The competition amongst publishers soon became fierce and required the Supreme Court to intervene and answer the same question underlying this case: Can anyone own the law?

Time and again, the Supreme Court has said no. In its first copyright case, *Wheaton v. Peters*, it made clear: "[N]o reporter has or can have any copyright in the written opinions delivered by this court; and … the judges thereof cannot confer on any reporter any such right." 33 U.S. 591, 668 (1834). Fifty years later, the Supreme Court confirmed: "The whole work done by the judges constitutes the authentic exposition and interpretation of the law, which, binding every citizen is free for publication to all." *Banks v. Manchester*, 128 U.S. 244, 253 (1888). One month later, the Court explained that while reporters' explanatory

4

materials are copyrightable, judicial opinions always remained the public's property. *Callaghan v. Myers*, 128 U.S. 617, 647 (1888).

### *Westlaw's headnotes copy portions of judicial opinions*

In 1889, a year after *Callaghan*, West Publishing purchased *United States Digest*. A7129. West organized opinions using a Key Number System based on that digest's system. A7135. West continues to use that system today. Attached to each Key Number is a headnote—a short sentence that states ██████████████████████████ ███████████████████████████ A6510. ██████████

███████████████████████████

███████████████████████████

███████████ A8219.

Thus, the first rule "for headnoting" forbids exercising any independent thought or judgment: ████████████████████ ██████████████████████ A8233. In the rare instances where the headnote does not follow judicial language, it is usually because █████████████████████ █████████████████ A8220. For example, ████████

███████████████████████████

███████████████████████████ *Id.* Other times, a headnote

███████████████████████████████████████████████

████████████████████████████ A8240. West acknowledges that

headnotes are ████████████████████████████████████

███████████████████████████████████████████████

██████████ A7253; A7255. And West does not offer headnotes as an

independent search product.

***University of Toronto students build an AI legal search model***

Today's artificial intelligence revolution springs from research at the University of Toronto led by Geoffrey Hinton, often referred to as the Godfather of AI, Alex Krizhevsky, an innovator in deep learning technology, and Ilya Sutskever, who would later cofound OpenAI and release ChatGPT. Deep learning technology uses neural networks—a computational model that has many layers of interconnected artificial neurons. A7231. Like the brain's neurons, artificial neurons in these networks are connected through weighted pathways. *Id.* These weights are numerical values that determine how strongly one neuron influences another—positive weights amplify the signal passing through while negative weights suppress it. *Id.* When a user provides an input to the

6

network, it flows through these weighted connections layer by layer—each neuron receives signals, multiplies them by the connection weights, sums them up, and passes the result forward to the next layer. A7177. Through this cascading process, the network transforms the input into an output. *Id.* During its training, the network adjusts these weights based on whether its outputs were correct, strengthening connections that led to good answers and weakening those that didn't. *Id.*

Think of it this way. Humans learn to speak as they listen to thousands of examples. Over time, humans learn the patterns—how certain sounds blend, where stress falls, and the sounds that are consistent across words. This training allows us to pronounce words we've never seen and do not know. *E.g.*, Human Brain Project, *Study presents large brain-neural networks for AI*, https://tinyurl.com/3saxrv85. Similarly, the artificial intelligence model developed at the University of Toronto trained neural networks to recognize unique inputs, synthesize them, and produce outputs.

In 2014, IBM invited the University of Toronto's Department of Computer Science to participate in a competition. Kim Luke, *From Jeopardy! to the classroom: IBM Brings its Watson platform to computer*

*science*, UNIV. OF TORONTO NEWS (Oct. 2, 2014), https://tinyurl.com/nhjh4b5f. The competition invited students to use Watson, IBM's latest technology, to build a system that solved a "challenging big-data problem in a chosen industry." *Id.* One team would represent the University in the competition.

Andrew Arruda, Jimoh Ovbiagele, and Pargles Dall'Oglio, joined forces and entered the challenge. Using their talents and institutional resources, the group applied Watson to solve a problem that has plagued lawyers for centuries: Legal research is difficult and takes a lot of time. What if Watson could be used to train a model to learn the law, think like a lawyer, and answer questions? Exit: Boolean and key word searches. Enter: AI legal searches. A6998-7000. The trio, who built their model in the same labs that Hinton, Sutskever, and Krizhevsky built their model, placed second in the competition.

### *An AI company, ROSS Intelligence, Inc., is born*

Arruda, Ovbiagele, and Dall'Oglio continued to develop their ideas. They founded ROSS Intelligence, Inc. to transform legal research. ROSS, an AI legal search engine, was their first product.

ROSS's profile quickly grew. It raised Series A funding. *Funding Snapshot: ROSS Intelligence Raises $8.7 Million to Assist Lawyers Using AI,* WALL ST. J. (Oct. 11, 2017), https://tinyurl.com/ROSSWSJ87.  ROSS was also accepted into Y-Combinator, the prestigious tech incubator that helped launch successful tech start-ups such as Airbnb, Reddit, and DoorDash.

ROSS's technology impressed investors. ROSS had moved on from Watson's technology and built an AI legal search engine that used neural language models to understand the meaning behind legal questions—allowing computers (that understand math) to respond to humans (who communicate in prose). *See* A7165. Users asked questions about any area of law. ROSS received the queries, used keyword search to retrieve an initial set of passages from its repository of purchased opinions, and then used AI technology to find the best passages in light of the users' questions. ROSS generated responses within milliseconds—final lists of passages ranked in order of relevance. ROSS had developed an AI model that captured *meaning*—a critical technological breakthrough.

Here's how ROSS developed its AI legal search engine:

9

*First*, ROSS paid for a repository of judicial opinions. ROSS could now use an open source tool to keyword search judicial opinions and thereby identify possible passages responsive to a user's question. A7109.

*Second*, ROSS hired LegalEase Solutions to write legal memoranda—a library of training data. A8193-96. ROSS paid LegalEase $1,000,000 to produce 25,000 questions and between 100,000 and 150,000 answers—approximately 50,000 pages of work product. *Id.* ROSS expected the LegalEase attorneys to cite cases and to use any "reliable" legal database. A8578. This was a sizeable investment, especially for a startup.

Below is an excerpt of a LegalEase memo:

**MEMORANDUM # 4**

**1. Question**

Is it necessary to establish a fiduciary relationship for a claim of accounting?

**2. Reference List**

**Issue: Is it necessary to establish a fiduciary relationship for a claim of accounting?**

Case 1: In re U.S. Mortg. Corp., 491 B.R. 642.
Great Quote 1: Once it has been shown that there is no adequate remedy at law, the court will look to whether a claim for accounting has been established. Under New Jersey law, "[a]n accounting in equity cannot be demanded as a matter of right or of course. The exercise of the equitable jurisdiction to compel an account rests upon three grounds." Borough of Kenilworth v. Graceland Memorial Park Ass'n, 124 N.J. Eq. 35, 199 A. 716, 717 (N.J.Ch.Div.1938). [[The party seeking to obtain an accounting must establish: (1) a fiduciary or trust relationship; (2) the complicated nature of the character of the account; and (3) the need of discovery. Id.]]

Case 2: Picard v. Madoff (In re Bernard L. Madoff Inv. Sec. LLC), 458 B.R. 87.
Great Quote 1: Under New York law, an accounting is a cause of action that seeks "an adjustment of the accounts of the parties and a rendering of a judgment for the balance ascertained to be due." DiTolla v. Doral Dental IPA of New York, LLC, 469 F.3d 271, 275 (2d Cir.2006) (internal quotations omitted). Its purpose is to "help sort out what assets are involved [and] enable the parties to meaningfully pursue their respective claims concerning their private or business arrangement." Wesselmann v. Int'l. Images, 259 A.D.2d 448, 687 N.Y.S.2d 339 (N.Y.App.Div.1999) (finding that where the parties shared a close working relationship, an accounting is appropriate to determine what assets are involved). It is not necessary to "identify a particular asset or fund of money in the defendant's possession." DiTolla, 469 F.3d at 275 (internal quotations omitted). [[But it is necessary to establish the "existence of a confidential or fiduciary relationship and a breach of the duty imposed by that relationship respecting property in which the party seeking the accounting has an interest." Palazzo v. Palazzo, 121 A.D.2d 261, 503 N.Y.S.2d 381 (N.Y.App.Div.1986); see Akkaya v. Prime Time Transp., Inc., 45 A.D.3d 616, 845 N.Y.S.2d 827, 828 (N.Y.App.Div.2007); 1 N.Y. Jur.2d Accounts and Accounting § 34 (2011) (finding a fiduciary relationship between the parties and wrongdoing by the defendant to be "essential elements of an equity complaint where an accounting is demanded").]]

Case 3: Rock v. Pyle, 720 A.2d 137.
Good Quote 1: [[An equitable accounting is improper where no fiduciary relationship exists between the parties, no fraud or misrepresentation is alleged, the accounts are not mutual or complicated, or the plaintiff possesses an adequate remedy at law.]] Buczek v. First National Bank of Mifflintown, 366 Pa.Super. 551, 531 A.2d 1122, 1124 (Pa.Super.1987) (citing Ebbert v. Plymouth Oil Company, 348 Pa. 129, 34 A.2d 493 (1943); Shaw v. Newingham, 279 Pa. 180, 123 A. 783 (1924); Graham v. Cummings, 208 Pa. 516, 532, 57 A. 943, 949 (1904)). Equitable jurisdiction does not exist simply because the petitioner desires information. Buczek, supra.

A7152. As shown above, the memos posed basic legal questions (e.g., "Is it necessary to establish a fiduciary relationship for a claim of accounting?") often adapted from Westlaw headnotes, which provided "an easy way [to] fram[e] questions," and allowed LegalEase to focus their "research" on providing the ranked answers that reflected the LegalEase lawyer's opinion. A8545; A8550-51. In addition to the question, each memo included between four to six ranked answers—up to four were

11

rated "great" or "good," one "topical," and one "irrelevant." A7152-53. The memos gave ROSS the labeled examples needed to teach its system how to identify good, bad, and irrelevant answers. *Id.*

*Third*, ROSS prepared the memo for transformation into machine readable data. To do so it needed to "tokenize" each memo—removing "stop words" ("is, to, be, of, and by," for example) because they disrupt computational analysis. A6992-93. Once tokenized, each word was "lemmatized"—reduced to its base dictionary form (e.g., "swam," "swum," and "swimming" all reduced to "swim"; "was" and "were" to "be"). A6993.

*Fourth*, and this is the key step, the memos were transformed into "numerical representations" that reflected syntax (grammar), semantics (meaning), and pragmatics (context). Take two examples: "the dog chased the cat" and "the cat chased the dog." A simple signal—say, a keyword match—recognizes these two examples discuss dogs and cats and can identify passages by focusing on word frequency. A complex signal, however, recognizes that those two examples have entirely different meanings—it recognizes the relationship between words. A7160.

To create the signals, ROSS created twenty-seven "features"— signals the AI model could use to evaluate how well a passage answered

a question. Each feature captured the attributes of the question, the corresponding judicial excerpt, and the relationship between them. A7156-59. ROSS's system would then represent each passage using these features and assign a label: 0-3 for great, good, topical, or irrelevant. A7167. ROSS could do more than identify and match words, it understood the relationship between words.

*Fifth*, ROSS used these numerical representations to train LambdaMART, an open source ranking model, to rank passages for legal questions it had never seen before. A7167-69. As with all machine learning, the more questions ROSS received, the more accurate its answers became. *Id.* And because ROSS could learn from user queries, its initial training data set would have become less important over time. A7169. ROSS did "not capture or retain the actual expression of text from the questions and answers from its training data, including any training data that might have been derived from" the legal memos "during the training of its machine learning model." A7149.

The final product was ROSS's AI legal search engine. ROSS had trained a computer to "think like a lawyer." It allowed the public to ask a question in plain English and to get AI-driven direct, cited answers

drawn from primary law without the editorial scaffolding that defines Westlaw and Lexis. ROSS "flip[ped] the research pyramid" through a new method of case retrieval. ROSS, How ROSS AI Turns Legal Research On Its Head (Aug. 6, 2019), https://tinyurl.com/ycxymr57. It learned a language … the language of the law.

### *West again uses copyright law to derail a competitor*

Although the law belongs to no one (or, more accurately, to everyone), West has a long history of attempting to own it. Copyright has been West's primary weapon.

From the mid-1980s through the early 2000s, West battled competitors by asserting copyright interests in page numbers on cases and the subsequent citations that had "essentially become the standard citation for case law." *Matthew Bender & Co. v. W. Publ'g Co.*, 158 F.3d 674, 685 (2d Cir. 1998); *see also W. Publ'g Co. v. Mead Data Cent., Inc.*, 799 F.2d 1219 (8th Cir. 1986); *Oasis Publ'g Co. v. W. Publ'g Co.*, 924 F. Supp. 918 (D. Minn. 1997); Brief of United States in support of Oasis Publishing Co., No. 96-2887 D.E. 16 (8th Cir. Sept. 10, 1996); *see also* Brief of the United States in support of Matthew Bender & Co., No. 97-7430, D.E. 22 (2d Cir. July 28, 1997). This campaign ended in 2002, after

14

the Second Circuit held that West's attempts to copyright its "alterations to judicial opinions" were "obvious, typical, and lacking even minimal creativity." *Matthew Bender*, 158 F.3d at 677.

West's behavior has not changed in the last two decades: when a competitor appears, it sues and alleges copyright infringement. West broadcasts this to the world—even when it comes to AI, the strategy remains the same: "build, buy, partner, or sue." Andrew Edgecliffe-Johnson, *How Steve Hasker plotted an AI course for Thomson Reuters,* SEMAFOR (July 11, 2025), https://tinyurl.com/yntksmhv.

West could not build ROSS, but it recognized its promise. Thomson Reuters, *Ethical uses of generative AI in the practice of law*, Thomson Reuters (Aug. 8, 2025), https://tinyurl.com/4uy3uyuh. It watched ROSS build partnerships to increase access to justice. *E.g.*, Hilary Hurd Anyaso, *Northwestern Law and ROSS Intelligence partner to address access to justice through AI*, NORTHWESTERN NOW (Nov. 3, 2017), https://tinyurl.com/ROSSNWAI. It saw that AM100 law firms were impressed with ROSS's technology. *E.g.*, Steve Lohr, *A.I. Is Doing Legal Work. But It Won't Replace Lawyers, Yet*, N.Y. TIMES (Mar. 19, 2017), https://tinyurl.com/ROSSNYT. And it caught wind of ROSS's partnership

15

with OpenAI. *ROSS partners with OpenAI for the launch of its API*, ROSS (June 11, 2020), https://tinyurl.com/tm3mw3um.

So West sued. The lawsuit forced ROSS to close its doors to pay its lawyer fees. A8675-76. Three years into this lawsuit, having removed ROSS from the market, Thomson Reuters purchased ROSS's main competitor, Casetext, an AI legal search engine, for $650 million. It promptly shut down Casetext as an independent alternative, bundled its features into the expensive Westlaw platform, and raised its prices. Thus, while AI has broken down barriers to competition in other markets, *United States v. Google*, No. 20-cv-3010, 2025 WL 2523010, at *2 (D.D.C. Sept. 2, 2025), Thomson Reuters has staved off progress in this one.

## STATEMENT OF THE CASE

Thomson Reuters and West Publishing sued ROSS alleging that using Westlaw's headnotes to write memos for training its AI legal search engine violates the Copyright Act, and that ROSS tortiously interfered with West and LegalEase's contract under state law. A157. ROSS counterclaimed under the Sherman Act (and other unfair competition laws), and requested declaratory judgments on copyright invalidity, non-infringement, and no tortious interference with contract. A502. This

16

appeal is limited to the copyright claim (originality and fair use), which resulted in two conflicting summary judgment opinions.[1] *Compare* A1 *with* A35.

### *The district court sends the copyright questions to a jury*

In its first opinion, the court concluded that a jury needed to decide whether West's Key Number System and headnotes were original. A1. The headnotes, it explained, "are not aptly described by the compilation caselaw." A7. Considered individually, the district court recognized that each headnote "reflects uncopyrightable judicial opinions. So the strength of its copyright depends on how much the headnotes overlap with opinions." *Id*. Because the parties disputed how West "develops its headnotes and how closely those headnotes resemble uncopyrightable opinions," a jury needed to determine "how original" they are. *Id*. at 8. Originality, the court explained, "affects the strength and extent of Thomson Reuters's copyright, and … also goes to whether ROSS was copying the headnotes or the opinions themselves." *Id*.

---

[1] Earlier in the case, the district court granted Thomson Reuters summary judgment on ROSS's antitrust claims. A1848. Two of the tortious interference claims survived summary judgment and are set to go to a trial that is stayed pending the outcome of this appeal.

The court also concluded that a jury needed to decide fair use. A15. Although crediting ROSS's argument that it used the headnotes only to "analyze language patterns" and translate "human language into something understandable by a computer," the court left it up to a jury to decide the "precise nature of ROSS's actions." A19. In so doing, the court "decline[d] to overread" *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508 (2023), and reasoned that if the jury agreed with ROSS's explanation of its technology, then ROSS's use was "transformative intermediate copying" and fair use under *Sony* and *Sega*. A20 (referencing *Sony Comput. Ent., Inc. v. Connectix Corp.*, 203 F.3d 596 (9th Cir. 2000), and *Sega Enters. v. Accolade, Inc.*, 977 F.2d 1510 (9th Cir. 1992)).

Whether ROSS's use was transformative, the court continued, "feeds into" whether its use "had a meaningful or significant effect on the value of the original or its potential market." A24. And when considering any market effect, it identified a "hotly debated question" that the jury would ultimately decide: "Is it in the public benefit to allow AI to be trained with copyrighted material?" A25.

18

***The district court had an abrupt "change of heart"***

Two days before trial, the district court sua sponte postponed the trial and invited the parties to renew summary judgment briefing on the copyright issues. D.E. 663. Six months later, the district court published a second opinion reversing itself on nearly every issue.

This time around, the court determined that "the headnotes are a compilation" and "easily" original. A41. "More than that," it opined, "each headnote is an individual, copyrightable work." *Id*. It thus granted summary judgment for West "on whether the headnotes" "are original enough to prevent ROSS from rebutting any presumption of validity." *Id*.

On fair use, the court now concluded that ROSS's transformative technology was no longer legally significant because "intermediate copying cases," like *Google LLC v. Oracle Am.*, 593 U.S. 1 (2021), *Sony*, 203 F.3d 596, and *Sega*, 977 F.2d 1510, "are all about copying computer code." A52. Because "ROSS did computer programming," but did not copy "computer code," the only fact that mattered is that "ROSS took the headnotes to make it easier to develop a competing legal research tool." A52-53. Accordingly, any public benefit resulting from ROSS's innovation was irrelevant because the "public has no right to [West's] parsing of the

19

law." A57. It thus granted "summary judgment for [West] on fair use" as well. *Id.*

### *The Court certifies this appeal*

Given the substantial differences between the district court's two opinions, ROSS moved for interlocutory appeal under 28 U.S.C. § 1292(b). Recognizing that the "controlling law is unclear here," "that these questions are hard under existing precedent," and that this Court "has not yet spoken on this novel and difficult question of first impression," the district court granted the motion. A63. This Court granted review.

20

## STATEMENT OF THE ISSUES

1. Is a short quote or paraphrase of a judicial holding copyrightable?

2. Does the fair use doctrine protect ROSS's internal use of Westlaw's headnotes in memos that served as training data for an AI legal search engine that produced only non-infringing outputs?

## JURISDICTIONAL STATEMENT

The district court's jurisdiction over the Copyright Act claims arose under 28 U.S.C. §§ 1331, 1338. This Court's jurisdiction arises under 28 U.S.C. § 1292(b).

## SUMMARY OF THE ARGUMENT

The Constitution empowers Congress to "secur[e] for limited Times to Authors … the exclusive right to their respective Writings and Discoveries." U.S. Const. art. I, § 8, cl. 8. The "crucial terms 'authors' and 'writings'" "presuppose a degree of originality." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 346 (1991). Hence, the Copyright Act, consistent with its "ultimate aim" to "stimulate artistic creativity for the general public good," *Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156 (1975), protects only "original works of authorship," 17 U.S.C. § 102(a). But where an author's "exclusive right to his work" stands in the "way of others exercising their own creative powers," *Google LLC v.*

21

*Oracle Am.*, 593 U.S. 1, 16, 17 (2021), the fair use doctrine protects the innovator to ensure that Section 102(a) does not "stifle the very creativity which that law is designed to foster," *Stewart v. Abend*, 495 U.S. 207, 236 (1990).

**I.** Westlaw's headnotes are not original—in fact, that is their whole point: they are intended to (and do) replicate as closely as possible the language of uncopyrightable judicial opinions. That is good for accuracy but defeats any claim to originality. Concluding that headnotes are original would effectively give West a monopoly over the law, which, as courts have recognized, belongs to no one. The district court's contrary opinion defies this Court's and the Supreme Court's precedents.

**II.** ROSS's use of less than 0.08% of Westlaw's millions of headnotes to train an AI legal engine was fair. The fair use doctrine is "an equitable rule of reason, which permits courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster." *Stewart,* 495 U.S. at 236 (cleaned up). Westlaw's headnotes fall far from copyright's core; ROSS appropriately used an insubstantial amount of Westlaw's headnotes as issue statements in legal memoranda that trained an AI legal search

22

engine. ROSS's use of the legal memoranda transformed the headnotes' character with a further purpose—progressing science and technology at once. And ROSS's use has no adverse effect on the market for Westlaw headnotes because there is none.

**III.** The district court's decision here disrupts copyright law's purpose: "to create the most efficient and productive balance between protection (incentive) and dissemination of information, to promote learning, culture and development." *Whelan Assocs., Inc. v. Jaslow Dental Lab'y, Inc.,* 797 F.2d 1222, 1235 (3d Cir. 1986). ROSS's use benefits the public—it increases access to justice and advances AI technology, which, as a whole, is critical to our national security.

In sum, the decision below reads copyrightability too broadly and fair use too narrowly. Either error warrants reversal. The two combined compel it.

## STANDARD OF REVIEW

When exercising jurisdiction over an interlocutory appeal, the Court "may consider any grounds justifying reversal." *Ellis v. Westinghouse Elec. Co.*, 11 F.4th 221, 229 (3d Cir. 2021) (cleaned up). Because this appeal arises out of summary judgment, the Court's

"standard of review is plenary, meaning" it reviews the district court's "summary judgment decisions" "anew" and under the "same standard." *Id.* Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## ARGUMENT

### I.    A West headnote is not a copyrightable individual work.

Headnotes are individual facts about a particular judicial opinion. To the degree that a headnote reflects any originality or creativity, it is the originality or creativity of the authoring judge. And that underscores why headnotes are not entitled to any copyright protection: "Every citizen is presumed to know the law, and it needs no argument to show that all have free access to its contents." *Banks v. Manchester*, 128 U.S. 244, 253 (1888). The district court's contrary holding is wrong. It twists a limited exception that applies to factual compilations into a replacement for the bedrock rule that individual facts are never copyrightable.

### A.    A headnote is not original.

Westlaw's headnotes are nothing more than excerpts from judicial opinions. A8233. They repeat "what the law is in the abstract or the result which it compels on the facts of the case," A6510, "follow[s] the court's

24

language," A8240, and avoid any independent thought or judgment. Indeed, for "West or any other editor of judicial opinions for legal research, faithfulness to the public-domain original is the dominant editorial value." *Matthew Bender & Co. v. W. Publ'g Co.*, 158 F.3d 674, 688 (2d Cir. 1998).

West cannot evade this principle by parroting sentences from uncopyrightable judicial opinions and renaming them headnotes. Just as a newspaper cannot copyright specific quotes from a judicial opinion even if it provides independent analysis, West cannot copyright specific quotes from judicial opinions that it isolates without any added analysis. *Feist*, 499 U.S. at 348. This is nothing more than an attempt to steal "the fruits of [] judicial labors," which belong to the public. *Banks*, 128 U.S. at 253. The principle that "raw facts may be copied at will … is neither unfair nor unfortunate. It is the means by which copyright advances the progress of science and art." *Feist*, 499 U.S. at 350.

It does not matter that some headnotes deviate from the judge's precise language. As the Second Circuit explained, edits to legal opinions dictated by "industry conventions or other external factors" or "obvious, garden-variety, or routine" edits are not copyrightable. *Matthew Bender*,

25

158 F.3d at 682. A choice is "obvious and typical" where, as here, "a competitor would have difficulty creating [an alternative] without using many of the same" words. *Id.* at 688. Applying this rule, *Matthew Bender* held that West could not copyright case captions, attorney information, subsequent history, and citations that it added to legal opinions. *Id.* at 683-89.

West trains its editors not to deviate from the judge's language. As West's training manual makes clear, any deviations from the opinion must be limited, and made only to clarify—not to add or amend substance. A8233. Accordingly, editors exercise ministerial, not substantive, discretion: ████████████████████████████

████████████████████████████████████

████████████████████████ A8220. This rule ensures that a headnote's language reflects the judge's thoughts, "not West's judgment," and therefore does not "demonstrate the requisite originality or creativity." *Matthew Bender*, 158 F.3d at 682.

At its core, the headnotes' text is constrained by an external factor—the law itself. Courts, not Westlaw editors, make holdings clear. To ensure fidelity to the law, editors can make only "garden-variety"

alterations. *Matthew Bender*, 158 F.3d at 687. Thus, it is nearly impossible to write a holding without "using many of the same" words that Westlaw editors include in headnotes and affording Westlaw's headnotes copyright protection would "give West an effective monopoly over the commercial publication of case reports." *Id.* at 688. In West's world, it is infringement to copy a headnote, but not when that same sentence is copied from the opinion directly below. That is nonsensical.

Consider these hypotheticals. A law student uses headnotes as issue statements in their outline. A law clerk copies into a bench memo a pithy quote from an opinion that West has designated as a headnote such as, "summary judgment is a lethal weapon," *Brunswick Corp. v. Vineberg*, 370 F.2d 605, 612 (5th Cir. 1967). An AI system is trained on a law firm's database of memos that include copied and pasted headnotes. Under West's theory, each hypothetical involves copying original work. That cannot be correct.

It was true two centuries ago, and it remains true today: "no reporter has or can have any copyright in the written opinions delivered by this court." *Wheaton v. Peters*, 33 U.S. 591, 668 (1834). And if a judge cannot "confer on any reporter" a copyright in a judge's opinion, then

27

surely, the reporter cannot take the judge's writings and confer the copyright upon themselves. This would violate the "animating principle" behind *Wheaton*'s rule: "no one can own the law." *Georgia v. Public.Resource.Org, Inc.*, 590 U.S. 255, 265 (2020).

Here, because there are only so many ways to accurately say what the law is, "the creative is the enemy of the true." *Matthew Bender*, 158 F.3d at 688. Under "the merger doctrine," a copyrighted work is not protected "if the idea underlying the copyrighted work can be expressed in only one way, lest there be a monopoly on the underlying idea." *Satava v. Lowry*, 323 F.3d 805, 812 n.5 (9th Cir. 2003). And as *Matthew Bender* warned, protecting West's attempts to copyright portions of judicial opinions would allow it to obtain "an effective monopoly over" the law itself. 158 F.3d at 688.

## B.    The district court's opinion defies precedents.

The district court begins with the most important rule in this case: "The text of judicial opinions is not copyrightable," A41 (citing *Banks*, 128 U.S. at 253-54). But without engaging with the fundamental rule recognized in *Banks*, the district court asserted that "a headnote can introduce creativity by distilling, synthesizing, or explaining part of an

28

opinion, and thus be copyrightable." *Id.* To reach this holding, the court "analogized the lawyer's editorial judgment to that of a sculptor" and "judicial opinion[s]" to "raw block[s] of marble." *Id.*

The court's sculptor analogy undermines, rather than supports, its decision. The court stated that lawyers, like sculptors, choose "what to cut away and what to leave in place," and consequently express an original "idea about what the important point of law from an opinion is." *Id.* "So all headnotes, even any that quote judicial opinions verbatim, have original value as individual works." *Id.* In essence, the court reasoned that a sentence is not copyrightable when included in an uncopyrightable judicial opinion, but is when isolated from that passage. This is wrong.

Editors do not creatively choose a holding—they are identifying a relevant fact. And to protect factual identification "flout[s] basic copyright principles" while ignoring that, historically, "'copyright law has recognized a greater need to disseminate factual works than works of fiction or fantasy.'" *Feist,* 499 U.S. at 354 (quoting *Harper & Row, Publ'g, Inc. v. Nation Enters.,* 471 U.S. 539, 563 (1985)). Thus, copyright protection does not extend to the "fruits of [] research" because doing so

would create "a monopoly in public domain materials without the necessary justification of protecting and encouraging the creation of 'writings' by 'authors.'" *Id.*

In fact, a similar analogy has already been rejected by this Court sitting en banc. *Southco* asked whether a manufacturer could copyright "serial numbers" that it assigned to its products. *Southco, Inc. v. Kanebridge Corp.*, 390 F.3d 276, 277 (3rd Cir. 2004) (en banc) (Alito, J.). In holding that it could not, then-Judge Alito rejected the argument that picking, choosing, and arranging a string of numbers was akin to photographers exercising "creativity in arranging the bit of reality to be captured by the photo." *Id.* at 284. That analogy ignored that the numerical arrangement was "purely functional"; that is, it "convey[ed] information about a few objective characteristics" because the numbers were "produced mechanically using a system with fixed rules." *Id.* Photography, on the other hand, "may also convey more complex and indeterminate ideas" and whatever general principles photographers may (or may not) choose to follow "are not at all like the fixed rules of the [numbering] system." *Id.* "Accordingly, there is no real analogy." *Id.*

30

So too here. West's strict rules privilege "faithfulness to the public-domain original" because any exercise of creativity destroys "the dominant editorial value." *Matthew Bender*, 158 F.3d at 688. "Indeed, if any creativity were allowed to creep into the [headnote publication] process, the system would be defeated." *Southco*, 390 F.3d at 282. Photographs and sculptures, however, are "indisputably [] work[s] of art" because their value derives from "the randomness that is employed, [which] expresses the artist's 'mental conception.'" *Id.* at 284 (quoting *Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53, 60 (1884)). Thus, the court's reasoning rests on an idea that *Southco* flatly (and correctly) rejected.

If West can copyright a holding because its editor identified it, then any use of a holding "would potentially infringe the copyright." *Id.* at 286. As explained, this cannot be squared with the merger defense, which the district court dismissed in conclusory fashion: "there are many ways to express points of law from judicial opinions." A49. Tellingly, the district court failed to provide one example. And to the degree that the district court meant that, in the abstract, language permits infinite variation, that fundamentally misunderstands the merger doctrine, which asks

31

whether practical alternatives exist given the work's function and constraints. *Educ. Testing Servs. v. Katzman*, 793 F.2d 533, 540 (3d Cir. 1986), *abrogated on other grounds by*, *TD Bank N.A. v. Hill*, 928 F.3d 259, 278 (3d Cir. 2019).

The district court opinion includes a distraction: "the headnotes are a compilation," A41. It effectively made a similar statement when certifying the questions for appeal, adding the Key Number System to the questions ROSS proposed. A59. This is not a compilation case. As the court put it, this "dispute boils down to whether the LegalEase Bulk Memo questions copied Thomson Reuters's headnotes or were instead taken from uncopyrightable judicial opinions." A38. To make that determination, the court continued, "one must compare the Bulk Memo questions, headnotes, and opinions side by side." *Id.*

The only thing that matters, as West has argued all along, is whether headnotes are individually copyrightable. West argued that "the copying of the Westlaw Content as AI training material … *was* the infringement." A8592; A157 (defining Westlaw Content as West Key Number System and Westlaw Headnotes). ROSS never copied the Key

Number System—the features used to train its model derived solely from the legal memoranda that ROSS paid LegalEase to draft. A7001.

ROSS used the headnotes (and the memos writ large) as "raw data," i.e., "wholly factual information." *Feist*, 499 U.S. at 346, 361. As explained, the headnotes were used to create are questions in legal memoranda that were then used as "bits of information," to train the AI legal search engine. *Id.* at 361. Therefore, *Feist*'s recognition that "the selection and arrangement" in a compilation of uncopyrightable facts may have an "expressive element" is irrelevant here. *Id.* at 349.

## II.    ROSS fairly used Westlaw's headnotes to train its AI legal search engine.

As in *Google v. Oracle*, the court may "assume, purely for argument's sake," that the headnotes are "within the definition of that which can be copyrighted" and "ask instead whether" ROSS's use "was a 'fair use.'" 593 U.S. at 7. It was fair in *Google* and it is fair here.

Fair use originated "as an equitable rule of reason that permits courts to avoid the rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster." *Id.* at 18 (cleaned up). When Congress codified the fair use doctrine it framed the inquiry around four nonexclusive factors:

1.   the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

2.   the nature of the copyrighted work;

3.   the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

4.   the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107. But Congress has never displaced the doctrine's common law roots, and the statute sets forth "general principles, the application of which requires judicial balancing, depending upon relevant circumstances, including 'significant changes in technology.'" *Google*, 593 U.S. at 19 (quoting *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 430 (1984)).

Time and again, courts have held that using outdated technology as a base to invent a modern tool that progresses the sciences is fair use. *See Authors Guild v. Google, Inc.*, 804 F.3d 202, 225 (2d Cir. 2015) ("*Google Books*") (Leval, J.) (fair use to scan millions of books to create a searchable corpus); *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1168 (9th Cir. 2007) (fair use to copy images on the internet and distill them into thumbnails displayed to users); *Google*, 593 U.S. 1, 40 (fair use

34

to copy software elements to build a new platform). This case is no different—all four general principles support a finding of fair use.

For "expository purposes," this section is organized as follows. *Google*, 593 U.S. at 26. First, as the district court recognized, there is no dispute that headnotes are far from copyright's "core." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 586 (1994). Second, there was no disagreement about the amount of the copied headnotes "in relation to" the millions of other headnotes, so ROSS's use was reasonable given the context. *See Google*, 593 U.S. at 33. The remaining factors—purpose and character of the use and the effect of the use upon the potential market—are closely related and therefore treated sequentially. *See also id.* at 26 (ordering factors 2, 1, 3, 4); *Sony*, 203 F.3d at 603-08 (ordering factors 2, 3, 1, 4). Both cut in ROSS's favor: ROSS's use of the training memoranda (including the headnotes) was spectacularly transformative and did not negatively affect the market for headnotes—no such market exists.

## A.    Westlaw's headnotes are far from creative.

"[T]he nature of the copyrighted work," 17 U.S.C. § 107(2), recognizes that some works are far from copyright's "core." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. at 586. Fair use weighs towards

35

innovators who copy "utilitarian" works. *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 532 (2023).

Here, copyright's protection is weak because the headnotes are functional works that recite the language of uncopyrightable judicial opinions. As explained, *see above* § I.B, the court erred in finding these works creative enough to be a copyrightable "work." But even the district court recognized that "the material is not *that* creative." A54. Whatever "creative elements" the headnotes have, they are "far from the most creative works." *Id.*

The court declared this "nature of the copyrighted work" factor irrelevant, asserting that it "has rarely played a significant role in the determination of a fair use dispute." *Id.* This was error. All four factors "are to be explored, and the results weighed together, in light of the purposes of copyright law." *Campbell*, 510 U.S. at 578. Indeed, the "nature of the interest at stake is highly relevant to whether a given use is fair." *Harper & Row*, 471 U.S. at 552-53.

*American Society* is instructive. There, at issue was the non-commercial use of industry standards incorporated by reference into law. *Am. Soc'y for Testing and Materials v. Public.Resource.Org., Inc.*, 82

36

F.4th 1262 (D.C. Cir. 2023). The D.C. Circuit held that the nature of the work factor "strongly supports a finding of fair use" because "legal text 'falls plainly outside the realm of copyright protection.'" *Id.* at 1271 (cleaned up). So too here, the headnotes' nature as legal text strongly supports a finding of fair use.

### B.    ROSS used an insubstantial percentage of Westlaw's headnotes to train an AI legal search engine.

The "clear implication" of the "amount" factor is that "a finding of fair use is more likely when small amounts, or less important passages are copied." *Google Books*, 804 F.3d at 221.

Here, when "viewed in isolation," the "quantitative amount" ROSS used was 25,000 headnotes. *Google*, 593 U.S. at 33. But *Google* instructs that "the better way to look at the numbers" is to consider the "entire" work. *Id.* Westlaw.com has over 28 million headnotes. A7081. In that context, the 25,000 headnotes that ROSS used in the legal memoranda is just .08%, far lower than the .4% copied in *Google. Compare id. with Google*, 593 U.S. at 33, 34.

Beyond quantity, the headnotes are not a "substantial" part of the training data given all the steps necessary to transform the memos into "numerical representations." For starters, each memo included between

four to six ranked answers along with the headnotes reframed as questions. ROSS then prepared the memo for transformation, transformed it into "numerical representations," and then used these numerical representations to train LambdaMART. The memos' value did not turn on a specific headnote-turned-question because (1) the ranked answers were just as important as the questions and (2) ROSS transformed the memos into "numerical representations" that did "not capture or retain the actual expression of text from the questions and answers." A7149. Though "a small amount of copying may fall outside of the scope of fair use where the excerpt copied consists of the 'heart' of the original work's creative expression," not so here. *Google*, 593 U.S. at 33 (quoting *Harper & Row*, 471 U.S. at 564-65). The .08% of the headnotes used here are not the "heart" of any limited creative expression by West because any meaningful creative expression belongs to the courts and is not copyrightable. And to ROSS, their "expression" is fundamentally fungible for its training.

Moreover, copying 25,000 headnotes is "reasonable in relation to the purpose of the copying." *Campbell*, 510 U.S. at 586-87. ROSS wanted "to create a different task-related system"—a new type of legal search—

38

"and to create a platform … that would help achieve and popularize that objective." *Google*, 593 U.S. at 34. Although "larger data sets are necessary to develop better AI models," ROSS used just a small amount. Edward Lee, *Fair Use and the Origin of AI Training* at 158 (forthcoming in the HOU. L. REV.), https://tinyurl.com/LeeFairUse. This minimal reliance on a tiny, fungible fraction of the millions of headnotes illustrates their use was "tethered to a valid, and transformative, purpose," so the "substantiality factor" weighs even more heavily in ROSS's favor. *Google*, 593 U.S. at 34; *see also Google Books*, 804 F.3d at 221 (copying satisfies "amount and substantiality" factor when done to learn "limited, important information").

### C.   ROSS transformed the headnotes when using them to train its AI legal search engine.

The "purpose" and "character of the use" factor "considers the reasons for, and nature of, the copier's use of an original work." *Warhol*, 598 U.S. at 528. At bottom, this factor seeks to determine whether the "new work" "adds something new, with a further purpose or different character," such that it is "transformative." *Campbell,* 510 U.S. at 578. And it weighs the transformative nature of the use "against other considerations, like commercialism." *Id.* at 579. Research, as "one of the

purposes listed in the preamble paragraph of Section 107," illustrates the sort of "copying that courts and Congress most commonly have found to be fair uses," and thus "guide[s]" the inquiry." *Id.* (quoting *Campbell*, 510 U.S. at 578).

Using copyrighted works to train an AI legal search engine is transformative. Building a "search engine" that "makes possible new forms of research," *Google Books*, 804 F.3d at 209, or "a distinct and different computing environment," *Google*, 593 U.S. at 31, is transformative because it "fulfill[s] the objective of copyright law to stimulate creativity for public illumination." Hon. Pierre Leval, *Toward a Fair Use Standard*, 103 HARV. L. REV. 1105, 1111 (1990). ROSS did both.

### 1. ROSS's use facilitates radical technological advances.

An "author's derivative rights do not include an exclusive right to supply information," so copying to facilitate broad knowledge transfers is a transformative purpose. *Google Books*, 804 F.3d at 207. In *Google Books*, the Second Circuit held that a search tool that allowed researchers to "enter search words or terms of their choice" and, in return, receive a "list of all books" digitally copied into its database "in which those terms

appear, as well as the number of times the term appears in each book" "highly" transformed the purpose of the copied books. *Id.* at 209, 216. And this, Judge Leval explained, has a further purpose because it makes "available significant information *about those books*." *Id.* at 217.

ROSS's AI legal search engine is at least as transformative as the search tool in *Google Books*. Like the *Google Books* search engine, ROSS "makes possible new forms of research" because it moved legal research beyond keyword search to semantic understanding—re-ranking case law passages by how well they answered a lawyer's question *and* searching across actual case law rather than editorial content. *Google Books*, 804 F.3d at 217. Instead of replicating existing tools, it offered a new, meaning-based method of accessing the law that changed both the function and the user experience of legal research. The same precedents that supported the conclusion of transformative use in *Google Books* apply here too. *See Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 97 (2d Cir. 2014) (creation of full-text searchable database "a quintessentially transformative use"); *A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 639-40 (4th Cir. 2009) (use of copyrighted work "need not alter or augment the work to be transformative in nature"); *Perfect 10*, 508

F.3d at 1165 ("search engine provides social benefit"); *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 819 (9th Cir. 2003) (copying images to build a search tool is transformative).

### 2. The district court's transformative analysis is wrong.

Given the above, it is no surprise that the other two federal district courts to recently consider AI training and copyright have held that "there's no disputing that," as a "factual matter," using copyrighted work to train AI is "highly creative" and "transformative," *Kadrey v. Meta Platforms, Inc.*, No. 23-cv-03417-VC, 2025 WL 1752484, at *2 (N.D. Cal. June 25, 2025), "spectacularly so," *Bartz v. Anthropic PBC*, No. C 24-05417, 2025 WL 1741691, at *7 (N.D. Cal. June 23, 2025) at *7. There "is no serious question" that transforming prose into data to train a machine learning model has a "further purpose" and "different character" than the text itself—it is "highly transformative." *Kadrey*, 2025 WL 1752484 at *9; *see also Bartz*, 2025 WL 1741691 at *5 (such training is "exceedingly" and "spectacularly" transformative).

Nevertheless, here, the district court found it was not "transformative." A51. In doing so, the court misapplied *Warhol*, misread

42

the intermediate copying cases, and overemphasized ROSS's commercial use.

*Warhol* reaffirmed that "fair use is a flexible concept" and its "application may well vary depending on context." 598 U.S. at 527. At issue there were two creative works—Lynn Goldsmith's original photograph of Prince and Andy Warhol's silkscreen copy of that same photograph. *Id.* at 515. Because the case centered on two highly creative works, *Warhol* balances fair use against "the copyright owner's exclusive right to create derivative works." *Id.* at 529. To that end, *Warhol* considers whether Warhol's silkscreen "copying [was] reasonably necessary to achieve the user's new purpose." *Id.* at 532. "The question of justification," *Warhol* further explains, "is one of degree." *Id.* And these justifications "must be balanced against the commercial nature of the use." *Id.*

The district court concluded that this case fits "neatly into the framework advanced by *Warhol*." A53. In its view, *Warhol* "advanced" a "framework" that looks to "the broad purpose and character of the use." *Id.* From there, the district court oversimplified this case: "ROSS took the

43

headnotes to make it easier to develop a competing legal research tool. So ROSS's use is not transformative." *Id.*

That was wrong. There is a world of difference between (1) the protected works: here, functional headnotes; there, creative photographs; (2) the use of those works: here, transforming legal memoranda into a machine-readable language; there, the photographs accompanied magazine articles on Prince, 598 U.S. at 550; and (3) the economic markets: here, ROSS's copying removed a barrier to entry; there, Andy Warhol copied and prevented Lynn Goldsmith from entering certain markets.

Next, the district court refused to apply the "intermediate copying" cases because headnotes are "not computer code" while *Google*, *Sony*, and *Sega* "are all about copying computer code." A52. It further distinguished the intermediate copying cases because the "computer-programming cases … rely on a factor absent here: The copying was necessary for competitors to innovate." *Id.*

The district court's justifications for rejecting the intermediate copying cases are meritless. *Sega* makes clear that intermediate copying had previously applied to "books, scripts, or literary characters." *Sega*,

977 F.2d at 1518. And the use in *Sony*, 203 F.3d 596 at 600, is analogous to ROSS's use here. Both built a "machine-readable object code" by copying "the words" of a prior work. *Id.* at 600. And, there as here, "none of the [] copyrighted material was copied into, or appeared in [the] final product." *Id.* This is quintessential intermediate copying.

The district court's discussion of necessity, its second ground of distinction, is also wrong. *Sony* asked whether it was necessary to copy the protected "nature" of the work to access the unprotected ideas. *See Sony*, 203 F.3d at 603-05. No copyright case—neither *Sega*, *Sony*, nor *Google*—asks whether copying is "necessary" in the abstract because "[t]here is no such thing as a wholly original thought or invention." Hon. Pierre Leval, 103 HARV. L. REV. at 1109. Innovation necessitates copying, and the fair use doctrine arises from this premise: it "protects secondary creativity as a legitimate concern of the copyright." *Id.*

Indeed, *Sony* explains that copyright does not bar "public access to the ideas and functional elements in a copyrighted" work. 203 F.3d at 603. It then asks whether copying the entire work was "necessary" to access the "ideas and functional elements embodied in a copyrighted" work and if "there is a legitimate reason for seeking such access,

45

disassembly is a fair use of the copyrighted work, as a matter of law." *Id.* (quoting *Sega*, 977 F.2d at 1527-28).

ROSS easily satisfies any "necessary" test. The headnotes, as a rule, parroted opinions insofar as possible, and headnotes (like computer code) are accorded "a lower degree of protection than more traditional literary works." *Sony*, 203 F.3d at 603 (citing *Sega*, 977 F.2d at 1526). ROSS provided a "legitimate reason" for seeking access—to build an innovative AI model. The fact that ROSS could have copied holdings directly from an opinion is of no import. Intermediate copying does not require a copier to "follow the least efficient solution. … This is precisely the kind of wasted effort that the proscription against the copyright of ideas and facts is designed to prevent." *Id.* at 605.

Last, the district court erroneously zeroed in on ROSS's commercial ambitions. But as *Google* explained, focusing on an innovator's commercial ambitions here "would severely limit the scope of fair use in the functional context," and commerciality weighs less heavily when the copyrighted work is functional, not creative. *Google*, 593 U.S. at 30. Indeed, the district court's reasoning leaves no room for the innovation that copyright law is intended to protect because "virtually any

46

unauthorized use of" the headnotes would result in building a legal research platform. *Google*, 593 U.S. at 30. And every legal research platform "spits back relevant judicial opinions," so under the district court's theory, every platform resembles "how Westlaw uses headnotes and key numbers to return a list of cases." A51.

In sum, using copyrighted work to train an AI legal search engine is transformative, spectacularly so.

## D.    ROSS's use does not harm any existing or potential market for headnotes.

The market factor considers "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107. Plaintiffs must provide evidence of a cognizable copyright injury in a relevant market. *See Am. Soc'y for Testing and Materials,* 82 F.4th at 1271 ("plaintiffs have been unable to produce any economic analysis" showing harm); *Cambridge Univ. Press v. Patton*, 769 F.3d 1232, 1279 (11th Cir. 2014) ("[p]laintiffs offered no trial testimony or evidence showing" market harm). The "only harm" under this factor is that of "market substitution." *Campbell*, 510 U.S. at 593. Copyright law does not protect against "some economic loss" that results from "competition" nor does it "confer" a right to "monopoly." *Sony*, 203 F.3d at 607; *see also Bartz*, 2025

47

WL 1741691 at \*16-\*17. That is why "obvious" competition (Google and Oracle were competitors, for example) has minimal impact on the market analysis. *E.g.*, *Google*, 593 U.S. at 39.

Here, the relevant market is the market for headnotes. And there is no market for headnotes either as an independent search tool or for licensing.

## 1. The relevant market is the market for headnotes.

The market harm factor begins with identifying "the relevant market" that the copier has allegedly harmed. *Hachette Book Grp., Inc. v. Internet Archive*, 115 F.4th 163, 189 (2d Cir. 2024). This includes "both the market for the original work and the market for any derivative works the rightsholder might develop." *Id.* (citing *Campbell*, 510 U.S. at 590). The relevant market focuses on the original and derivative work. *Google Books*, 804 F.3d at 223.

Here, there is no dispute that the original work and any derivative work are the headnotes because they are the only original West works at issue. A8592; A4789; A7000. The only purported derivative works are the legal memoranda which included questions based on the headnotes. A8592; A4789; A7000. This appeal is about ROSS's use of Westlaw

48

headnotes in those memos. This appeal is not about any attempt to use Westlaw, generally, or using Westlaw to research and write legal memos. Westlaw.com was not copied into the memos. Put simply, for purposes of copyright law, ROSS did not "use" Westlaw—it used headnotes.

Nevertheless, the district court wrote that there was an "obvious," "original market" for "legal-research platforms." This was error. Section 107 instructs courts to consider the "effect of the [defendant's] use." 17 U.S.C. § 107. Thus, in *Campbell* the "fact that 2 Live Crew's parody sold as part of a collection of rap songs says very little about the parody's effect on a market for a rap version of the original." *Campbell*, 510 U.S. at 593. Similarly, *Google* focused on the demand for copied code in "the emerging smartphone technology" market, it ignored the general market for "mobile phones" or "smartphones." 593 U.S. at 36. The market for legal research platforms is not the relevant fair use inquiry, which focuses on the copyrighted work, not businesses in general. *See also A&M Recs., Inc. v. Napster, Inc.*, 239 F.3d 1004, 1017 (9th Cir. 2001) (relevant market audio CD sales among college students from files available on defendant's service); *see also Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.,* 756

F.3d 73, 90-91 (2d Cir. 2014) (relevant market use of journalist recordings of particular meeting rather than use of all journalist recordings).

Even if the market for legal research platforms is relevant, it favors ROSS. Any loss that West would incur would have stemmed from ROSS's AI legal search engine—a non-infringing work. *Google Books*, 804 F.3d at 215 (no market harm where the reproduced snippets were not a market substitute for books "in the protected aspect of the author's work"); *Bartz*, 2025 WL 1741691 at *17 (no market harm where the training data is not reproduced to consumers).

### 2. There is no existing or potential market for headnotes as independent search tools.

Headnotes are not used as independent search tools. West does not offer headnotes for sale as an independent search tool nor is there any evidence of consumer demand. A1836-43. As West argued in opposition to ROSS's antitrust claims: "***No consumer has ever <u>sought</u> to purchase a separate … legal search tool.***" D.E. 520 at 13 (emphasis in the original). West is judicially estopped from now taking a "contrary position." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001). Moreover, ROSS did not offer any copies of headnotes to the public. A7149; A7171-

72. And the LegalEase memos—the allegedly infringing use here—were also never offered at market. A8193-96.

### 3. There is no existing or potential market for headnotes as training data.

The market factor requires courts to consider "the particular *actions* of the alleged infringer." 510 U.S. at 590; *see also Internet Archive*, 115 F.4th at 194; *Bloomberg L.P.*, 756 F.3d at 90.

West made no attempt to enter the AI training data market. West stated that it will not license its content as AI training data. A8584-85. West has never licensed its headnotes for any purpose. A4338 ("Plaintiffs have a policy against selling their content to competitors for any purpose*, including training artificial intelligence algorithms*"). Indeed, West "did not think that there would be enough such use to bother making a license available" and, accordingly, "there is little damage to the publisher's market." *Cambridge Univ. Press*, 769 F.3d at 1277. If anything, West's steadfast refusal to license to competitors harms the AI training market by using the headnotes as "a lock limiting the future creativity of new programs[,] [where it] alone would hold the key." *Google*, 593 U.S. at 35.

### III.  The public will benefit from protecting ROSS's training of an AI legal search engine.

The Copyright Act must be construed in light of" its "ultimate aim:" "to stimulate artistic creativity for the general public good." *Aiken*, 422 U.S. at 156. If ever there was a case where the "general public good" warranted reversal, this is it. This is so for three fundamental reasons.

First, unless the decision below is reversed, no innovator will attempt to apply AI to new legal access projects. The public needs better access to law. And in this case, the ROSS founders used their university AI lab training to do just that. The ROSS AI legal search engine was a dramatic advance in legal technology. Thomson Reuters characterized ROSS's launch as a milestone. Thomson Reuters, *Ethical uses of generative AI in the practice of law*, Thomson Reuters (Aug. 8, 2025), https://tinyurl.com/4uy3uyuh. But due to this copyright suit, ROSS has stopped functioning. If founders as promising as the ones here cannot bring an AI legal search engine to market, the legal search market will continue to be dominated by West.

Second, unless the decision below is reversed, copyright law will halt AI development, which is a national priority. *See* Executive Order 14179, *Removing Barriers to American Leadership in American*

52

*Intelligence*, 90 Fed. Reg. 8741. The "numerical representations" and other techniques that ROSS's founders used are the techniques taught by Professor Geoffrey Hinton and others in the University of Toronto labs. Those techniques, however, require training data—often vast quantities of it. *See* Lee, *supra* at 158. The decision below rules unlawful minimal amounts of copying for training data. But the logic of the decision below directly applies to any model using the same fundamental technology.

The district court tried to cabin the scope of its holding by asserting that it was not confronted with "generative" AI technology. A53. But this case—like the "generative AI" cases *Kadrey* and *Bartz*—asks whether it is fair to use copyrightable material to train an AI model. The fundamentals of ROSS's use to train are the same as in *Kadrey* and *Bartz*. *See Kadrey*, 2025 WL 1752484 at *5; *see also Bartz*, 2025 WL 1741691, at *4. And the infringement claims here related to "only the inputs, not the outputs" of the machine learning model, as in *Kadrey* and *Bartz*. *Bartz*, 2025 WL 1741691 at *7, *8; *Kadrey*, 2025 WL 1752484 at *4. The logic of the decision below applies to AI broadly.

Third, the Court should notice the rapidly evolving national security interests at stake in the urgent race to innovate in AI.

## CONCLUSION

For the foregoing reasons, the Court should reverse the district court's decision on originality or fair use or both.

Respectfully submitted,

/s/ *Mark S. Davies*
Mark S. Davies
*Counsel of Record*

Anne M. Voigts
Ranjini Acharya
PILLSBURY WINTHROP
SHAW PITTMAN
2400 Hanover Street
Palo Alto, CA 94304

Kayvan M. Ghaffari
PILLSBURY WINTHROP
SHAW PITTMAN
Four Embarcadero Center,
22nd Floor
San Francisco, CA 94111

Andy M. LeGolvan
WHITE & CASE
555 S Flower Street, Suite 2700
Los Angeles, CA 90071

Anna B. Naydonov
Kufere J. Laing
WHITE & CASE
701 Thirteenth Street, NW
Washington, DC 20005
(202) 626-3600
mark.davies@whitecase.com

Yar R. Chaikovsky
WHITE & CASE
3000 El Camino Real
2 Palo Alto Square, Suite 900
Palo Alto, CA 94306

Dated: January 12, 2026

54

## CERTIFICATE OF COMPLIANCE

I hereby certify that (i) this document complies with the world limit of Federal Rule of Appellate Procedure 5(c)(1) because it contains 10,197 words exclusive of the portions exempted by Federal Rule of Appellate Procedure 32(f); (ii) this document complies with the typeface requirement of Federal Rule of Appellate Procedure 32(a)(5)(A) because it was typed in 14-point Century Schoolbook font; (iii) I am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit; (iv) the electronic copy of this brief has been virus scanned using CrowdStrike Falcon and no virus was detected; (v) the text in the electronic brief is identical to the text in the paper copies.

Dated: January 12, 2026                    /s/ *Mark S. Davies*
                                           Mark S. Davies

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the appellate CM/ECF system on January 12, 2026. All counsel of record are registered CM/ECF users, and service will be accomplished by the CM/ECF system.

Dated: January 12, 2026                     /s/ *Mark S. Davies*
                                            Mark S. Davies