No. 25-2153

# In The United States Court of Appeals For the Third Circuit

THOMSON REUTERS ENTERPRISE CENTRE GMBH and
WEST PUBLISHING CORPORATION,
Plaintiffs-Appellees,

v.

ROSS INTELLIGENCE INC.,
Defendant-Appellant.

*On Appeal from an Order of the United States
District Court for the District of Delaware
Civil Action No. 20-613 (The Honorable Stephanos Bibas)*

## APPELLANT'S REDACTED FINAL FORM REPLY BRIEF

Anne M. Voigts
Ranjini Acharya
PILLSBURY WINTHROP
SHAW PITTMAN
2400 Hanover Street
Palo Alto, CA 94304

Kayvan M. Ghaffari
PILLSBURY WINTHROP
SHAW PITTMAN
Four Embarcadero
Center, 22nd Floor
San Francisco, CA 94111

Yar R. Chaikovsky
WHITE & CASE
3000 El Camino Real
2 Palo Alto Square
Suite 900
Palo Alto, CA 94306

Andy M. LeGolvan
WHITE & CASE
555 S Flower Street,
Suite 2700
Los Angeles, CA 90071

Mark S. Davies
*Counsel of Record*
Anna B. Naydonov
Kufere J. Laing
WHITE & CASE
701 Thirteenth Street, NW
Washington, DC 20005
(202) 626-3600
mark.davies@whitecase.com

Ji Won Oh
WHITE & CASE
1221 Avenue of Americas
New York, NY 10020

*Counsel for Defendant-Appellant*

# TABLE OF CONTENTS

INTRODUCTION ................................................................ 1

SUMMARY OF THE ARGUMENT ..................................... 2

ARGUMENT ....................................................................... 4

    I.   West's headnotes are not individually copyrightable. ............. 4

        A.   West concedes that the parroting headnotes are not original works. ............................................................... 4

        B.   The trivially altered headnotes are not original works. .. 6

        C.   The trivially altered headnotes merge with the holding. ........................................................................ 10

        D.   This is not a factual compilation dispute. ...................... 11

    II.   ROSS fairly used headnotes to train an AI legal search engine. ........................................................................... 13

        A.   The nature of West's functional headnotes strongly supports fair use. ......................................................... 13

        B.   ROSS used at most a trivial amount of any creative expression in West's headnotes. .................................... 15

        C.   ROSS transformed the headnotes when using them to train its AI legal search engine. .................................... 17

            1.   ROSS's use facilitated radical technological advances. ............................................................. 18

            2.   ROSS's use is permissible intermediate copying. . 21

            3.   ROSS's use was consistent with fair use's purposes. ............................................................ 23

        D.   ROSS did not harm the market for headnotes ............... 24

            1.   The relevant market is for headnotes, and West concedes there is no such market. ........................ 24

            2.   West's "AI licensing market" theory is circular. ... 28

            3.   West does not provide evidence of market substitution. ...................................................... 30

    III. The public will benefit from protecting ROSS's training. ....... 33

CONCLUSION .................................................................. 34

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*A&M Records, Inc. v. Napster Inc.*,
239 F.3d 1004 (9th Cir. 2001) ....................................................... 26, 31

*Am. Geophysical Union v. Texaco Inc.*,
60 F.3d 913 (2d Cir. 1994) ................................................................. 19

*Am. Soc'y for Testing and Materials v. Public.Resource.Org*,
82 F.4th 1262 (D.C. Cir. 2023) .......................................................... 14

*Am. Soc'y for Testing and Materials v. Public.Resource.Org*,
896 F.3d 437 (D.C. Cir. 2018) ........................................................... 10

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*,
598 U.S. 508 (2023) ....................................................... 16, 25, 30, 32

*Assessment Techs. of WI, LLC v. WIREdata, Inc.*,
350 F.3d 640 (7th Cir. 2003) ............................................................... 6

*Authors Guild v. Google, Inc.*,
804 F.3d 202 (2d Cir. 2015) ....................................................... *passim*

*Baker v. Selden*,
101 U.S. 99 (1879) ..................................................................... 12, 17

*Bartz v. Anthropic PBC*,
787 F. Supp. 3d 1007 (N.D. Cal. 2025) ............................................... 19

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
448 F.3d 605 (2d Cir. 2006) .............................................................. 29

*Callaghan v. Myers*,
128 U.S. 617 (1888) .......................................................................... 5

*Cambridge Univ. Press v. Patton*,
769 F.3d 1232 (11th Cir. 2014) .......................................................... 28

*Campbell v. Acuff-Rose Music, Inc.*,
  510 U.S. 569 (1994) ............................................................... 17

*CCC Info. Servs., Inc. v. Maclean Hunter Mkt. Reps.*,
  44 F.3d 61 (2d Cir. 1994) ..................................................... 13

*Dr. Seuss Enters. v. ComicMixLLC*,
  983 F.3d 443 (9th Cir. 2020) ................................................ 27

*Educ. Testing Servs. v. Katzman*,
  793 F.2d 533 (3d Cir. 1986) .................................................. 13

*Feist Publications, Inc. v. Rural Tel. Serv. Co.*,
  499 U.S. 340 (1991) ...................................................... *passim*

*Fox News Network, LLC v. TVEyes, Inc.*,
  883 F.3d 169 (2d Cir. 2018) ................................................. 14

*Georgia v. Public.Resource.Org, Inc.*,
  590 U.S. 255 (2020) .............................................................. 6

*Google v. Oracle*,
  593 U.S. 1 (2021) ........................................................ *passim*

*Google v. United States*,
  747 F. Supp. 3d 1 (D.D.C. 2024) ............................................ 1

*Harper & Row, Publrs. v. Nation Enters.*,
  471 U.S. 539 (1985) ............................................................ 15

*Kadrey v. Meta Platforms, Inc.*,
  788 F. Supp. 3d 1026 (N.D. Cal. 2025) ............................. 19, 32

*Kregos v. Associated Press*,
  937 F.2d 700 (2d Cir. 1991) ................................................. 13

*Lexmark Int'l v. Static Control, Inc.*,
  387 F.3d 522 (6th Cir. 2004) ............................................ 24, 27

*Matthew Bender & Co. v. W. Publ'g Co.*,
 158 F.3d 674 (2d Cir. 1998) ................................................. 7, 8, 9, 10

*MCA, Inc. v. Wilson*,
 677 F.2d 180 (2d Cir. 1981) ............................................................. 15

*Monge v. Maya Magazines, Inc.*,
 688 F.3d 1164 (9th Cir. 2012) ...................................................... 30, 31

*Morrissey v. Procter & Gamble Co.*,
 379 F.2d 675 (1st Cir. 1967) ............................................................ 11

*New York Times Co. v. Sullivan*,
 376 U.S. 254 (1964) .................................................................... 8, 11

*Oasis Publ'g v. W. Publ'g Co.*,
 924 F. Supp. 918 (D. Minn. 1996) ..................................................... 23

*Sega Enter. v. Accolade, Inc.*,
 977 F.2d 1510 (9th Cir. 1992) ............................................... 17, 25, 28

*Seymour & Burford Buick Corp. v. Richardson*,
 194 Va. 709 (1953) ..................................................................... 7

*Silvertop Assocs. Inc. v. Kangaroo Mfg. Inc.*,
 931 F.3d 215 (3d Cir. 2019) ....................................................... 10, 11

*Sony v. Connectix Corp.*,
 203 F.3d 596 (9th Cir. 2000) ........................................... 17, 22, 23, 26

*Southco, Inc. v. Kanebridge Corp.*,
 390 F.3d 276 (en banc) ............................................................ 4, 7, 10

*Swatch Grp. Mgmt. Servs. v. Bloomberg L.P.*,
 756 F.3d 73 (2d Cir. 2014) ............................................................ 28

*Torah Soft Ltd v. Drosnin*,
 136 F. Supp. 2d 276 (S.D.N.Y. 2001) .................................................. 7

*Ty, Inc. v. Publications Int'l*,
 292 F.3d 512 (7th Cir. 2002) .......................................................... 32

*Video Pipeline, Inc. v. Buena Vista Home Ent., Inc.*,
    342 F.3d 191 (3d Cir. 2003) ............................................................ 19

*W. Penn Allegheny Health Sys. v. UPMC*,
    627 F.3d 85 (3d Cir. 2010) .............................................................. 30

*W. Publ'g Co. v. Lawyers' Co-operative Publ'g Co.*,
    79 F. 756 (2d Cir. 1897) .................................................................. 6

*Wall Data, Inc. v. LA Cnty. Sheriff's Dept.*,
    447 F.3d 769 (9th Cir. 2006) .......................................................... 14

## STATUTES AND RULES

17 U.S.C. § 107(1) ................................................................................. 17

17 U.S.C. § 107(2) ................................................................................. 13

17 U.S.C. § 107(3) ................................................................................. 15

17 U.S.C. § 107(4) ................................................................................. 24

## MISCELLANEOUS

4 NIMMER ON COPYRIGHT ....................................................... 15, 26, 29

Edward Lee, *Fair Use and the Origin of AI Training*,
    68 HOU. L. REV. 105 (2025) .............................................................. 18

Executive Order 14365, *Ensuring a National Policy Framework for
    Artificial Intelligence*,
    90 Fed. Reg. 58499 (Dec. 11, 2025) .................................................. 34

*Thomson Reuters CoCounsel Tests Custom LLM from OpenAI*,
    https://tinyurl.com/WLOPA ............................................................. 21

Will Douglas Heaven, *How DeepSeek ripped up the AI playbook*, MIT
    TECH. R., https://tinyurl.com/DSOPI ................................................ 34

## INTRODUCTION[1]

West's answering brief is a hallucination. On originality, for example, West handpicks a "creative" sample headnote but 39 of the 43 words are copied words from the corresponding judicial opinion. On fair use, West's brief focuses on the Westlaw platform but ROSS used .08% of West headnotes and nothing else.

West's brief does not address much less rebut the true context of this suit: West sued because ROSS's transformative AI legal search platform interfered with its profits from owning the law. For the past century, West has pursued monopoly and ignored copyright law's purpose. West wonders "why on earth anyone would pay" for its platform if others can use headnotes to build transformative technologies. WB54. This Court should offer a reminder: Copyrights are not get-out-of-competition-free cards. They reward creativity and scientific advancements. "AI is perhaps the clearest example of competition advancing search quality." *Google v. United States*, 747 F. Supp. 3d 1, 53 (D.D.C. 2024). ROSS's innovations epitomize copyright's purposes.

---

[1] "RB" is ROSS's Opening Brief and "WB" is West's Answering Brief.

West's economic fears cannot stand in the way of the most important technological advancement of this century.

## SUMMARY OF THE ARGUMENT

**I.** ROSS's opening brief explained that West's headnotes fail *Feist*'s originality test—they replicate judicial opinions as closely as possible. West's sample headnote proves it; the headnote parrots the opinion and includes no copyrightable expression. West's alternative argument—it can copyright pairings of individual headnotes and case passages—also fails. West cannot copyright its selection of a headnote any more than the headnote itself.

**II.** On fair use, ROSS explained that its use of headnotes to train an AI legal search engine was fair. West's arguments to the contrary focus on Westlaw Content, which has little to do with the headnotes that were in the allegedly infringing legal memos. West does not dispute that its works are nowhere near copyright's core, does not dispute that ROSS copied a "tiny, fungible" amount of headnotes (.08%), and does not dispute that ROSS's copying of the headnotes' functional aspects is identical to the copying approved in *Google*, *Sega*, and *Sony*. West also does not

dispute that ROSS's training memos effectively copied works in the same ways that *Bartz* and *Kadrey* credited as spectacularly transformative.

West's assertion that ROSS was a market substitute for Westlaw finds no support in copyright law, the record, or economic theory. ROSS was an innovative start-up that did not replace headnotes (the original work). And West's copyright does not allow it to monopolize the market for legal research platforms. In any event, there is no evidence that ROSS hurt market demand for Westlaw. As for West's theory that ROSS harmed its ability to license its headnotes as training data, courts have repeatedly rejected that circular argument.

**III.** The public benefits from ROSS's training methodologies. A ruling for ROSS here is essential to protecting the critical efforts of the United States to lead the world in AI.

# ARGUMENT

## I. West's headnotes are not individually copyrightable.

West's headnotes either do not deviate from the judicial opinion or deviate trivially. None are creative. None are copyrightable.

### A. West concedes that the parroting headnotes are not original works.

The district court held that "a headnote taken verbatim from an opinion" is "an individual, copyrightable work," analogizing a lawyer's editorial judgment to that of a sculptor. A41. West does not dispute that then-Judge Alito's en banc opinion in *Southco* rejected a similar comparison of product numbers to photographs as "no real analogy." RB30 (citing *Southco, Inc. v. Kanebridge Corp.*, 390 F.3d 276, 284 (en banc) (Alito, J.)).

Instead, West argues that whether "headnotes are protectable was not briefed below," and "is irrelevant to whether granting summary judgment was proper." WB32. West wants the Court to consider only the 2,243 headnotes that trivially depart from an opinion's text. WB32; *see also* WB1, WB3, WB20, WB22, WB23, WB24, WB28, WB40. West asserts that "ROSS's claim that the headnotes merely 'parrot' the cases is simply

4

disingenuous" and ROSS has "forfeited" the argument that parroting headnotes are not original. WB32-33.

This argument is inconsistent with the record. At summary judgment, ROSS argued that the headnotes that "are verbatim copies of the words of judicial opinions" and "near verbatim copies with only trivial modifications" are "not copyrightable." D.E. 697 at 28; *see also* A2765-66 (arguing the 5,367 headnotes "are not original"). The district court disagreed, but certified this question for appeal because "trial would be unnecessary if [it is] wrong." A63.

West briefs the certified question only tangentially. It suggests that *Callaghan v. Myers*, 128 U.S. 617, 650 (1888), governs because it recognized the "general proposition that the reporter … can obtain a copyright" for the "parts of the book of which he is the author" and that includes "head-notes." WB26. But a century later, *Feist* interpreted "author" to mean "he to whom anything owes its origin," and held that "originality" thus "requires independent creation plus a modicum of creativity." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340 (1991). *Public.Resource.Org*'s recent endorsement of *Callaghan* reiterated that the "reporter" must create headnotes "himself," but did not suggest that

headnotes were per se copyrightable. *Georgia v. Public.Resource.Org*, 590 U.S. 255, 265 (2020). Hence, this appeal asks: "How much 'creative spark' is legally required for originality"? A62 (citing *Feist*, 499 U.S. at 345).

West provides one case that expressly considers its headnotes, *W. Publ'g Co. v. Lawyers' Co-operative Publ'g Co.*, and it does so in dicta that recites the repudiated sweat of the brow doctrine. WB27 (citing 79 F. 756, 761 (2d Cir. 1897) ("a reporter [of opinions of a court] may acquire a valid copyright for the headnotes" if the headnotes "are the result of his labor and research")). "[T]he text of a federal judicial opinion" is "in the public domain" and therefore headnotes that parrot individual sentences cannot be copyrighted. *Assessment Techs. of WI, LLC v. WIREdata, Inc.*, 350 F.3d 640, 644 (7th Cir. 2003) (Posner, J.). Because "no one can own the law," West cannot copyright entire judicial opinions nor can it copyright an opinion's sentences. RB2, RB27-29 (quoting *Public.Resource.Org*, 590 U.S. at 265).

## B. The trivially altered headnotes are not original works.

Headnotes that "deviate from the judge's precise language" are not original because those edits are "obvious, garden-variety, or routine" and "dictated by 'industry conventions.'" RB25-27 (citing *Matthew Bender &*

*Co. v. W. Publ'g Co.*, 158 F.3d 674, 682 (2d Cir. 1998)). These headnotes follow the court's language as closely as possible such that "an essential attribute" of the editor's publication is the "utter absence of creativity." *Southco, Inc.*, 390 F.3d at 282.

West never disputes that legal principles are uncopyrightable facts. RB24-25, RB33, RB46. Headnotes are not "independent creation[s]" but result from an editor "find[ing]" and "report[ing]" a legal principle. *Feist*, 499 U.S. at 346-47. The editor's trivial additions do not "possess some creative spark" because those words do not "add[] written expression." *Id.* at 347-48; *see also Torah Soft Ltd. v. Drosnin*, 136 F. Supp. 2d 276, 287 (S.D.N.Y. 2001) (holding that "functional, as opposed to creative, alteration[s]" are not protectible). They let the "facts speak for themselves." *Id.*

Instead, West mischaracterizes its trivially altered headnotes as encompassing "editorial content," "analysis," and "numerous creative decisions." WB1, WB3. West provides a chart to prove its point. WB29-30.

West's chart backfires. The "corresponding" judicial opinion is *Seymour & Burford Buick Corp. v. Richardson*, 194 Va. 709, 713 (1953).

Here is a revised chart which shows the corresponding passage from *Seymour*.

| West's Sample Headnote | *Seymour* |
|---|---|
| A cause of action accrues to a person when that person first comes to a right to bring action and consists of act or omission constituting violation of duty but differs from a right of action which is the right to bring suit. | A cause of action is said to accrue to any person when that person first comes to a right to bring an action. . . . A right of action is the right to bring suit in a case . . . The cause of action means the act or omission constituting the violation of duty complained of. |

The headnote's substance is copied from *Seymour*. The editor's additions (in green) are garden-variety or obvious. *Matthew Bender*, 158 F.3d at 688; RB25-28. This headnote fails *Feist*'s test: it was "copied from" the opinion, not "independently created by" the editor. 499 U.S. at 345.

Take another example from *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964):

| *Sullivan* | Westlaw | Lexis |
|---|---|---|
| Thus we consider this case against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials. | There is a national commitment to principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials. | Debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials. |

*See* EFF Br. 9. Lexis copies from *Sullivan* verbatim, and West essentially does too. West's additions ("there is a") are "obvious, garden-variety, or routine" and show that "a competitor would have difficulty creating [an alternative] without using many of the same words." *Matthew Bender*, 158 F.3d at 688; RB25-28.

West cannot distinguish *Matthew Bender*. Including "relevant context" or "essential facts," WB34-35, are examples of "industry conventions," *Matthew Bender*, 158 F.3d at 682. Indeed, West's examples of "right" and "wrong" ways to headnote are barely different (*e.g.*, changing "existed" to "as" and changing the tense of "preclude"). WB36.

The "right" headnote does not introduce any creativity that the wrong headnote omits. WB36. This is by design: "precision is ten-tenths of the law." *Am. Soc'y for Testing and Materials v. Public.Resource.Org*, 896 F.3d 437, 452 (D.C. Cir. 2018). And West does not dispute that its manuals' strict rules for deviation "ensure fidelity to the law" and are "made only to clarify" the underlying opinion. RB26. These manuals confirm that West's headnoting process is "rigid[]" and "without the slightest element of creativity." *Southco*, 390 F.3d at 282.

## C. The trivially altered headnotes merge with the holding.

Because West cannot dispute that its editors must "follow the court's language," merger separately defeats any claim to copyrightability. RB28.

The doctrine is not avoided by pointing to "isolated differences" in two works, *Matthew Bender*, 158 F.3d at 687, because merger asks whether two differently worded works express the same "underlying idea," *Silvertop Assocs. Inc. v. Kangaroo Mfg. Inc.*, 931 F.3d 215, 222 (3d Cir. 2019). There are only so many ways to recite a legal holding. West, like the district court, argues: "headnotes could be worded in a number of different ways." WB37. Both ignore that merger forbids copyrighting

"future use of the substance," here the law. *Morrissey v. Procter & Gamble Co.*, 379 F.2d 675, 678 (1st Cir. 1967).

On this record, merger is easy. The sample headnote from *Sullivan*, 376 U.S. at 270, shows that Lexis and West both take the court's language and publish headnotes that ███████████████ A6063-65. In fact, some allegedly infringing questions are ███████████ ███████████████████ A6061. ROSS's expert acknowledged that ███████████████████ different from West's headnotes, A4876 at 39:6-16, but that has no legal significance—differently worded headnotes provide the same "substance." *Morrissey*, 379 F.2d at 678; *see also* RLEX Am. Br. 13-16 (examples of differently worded headnotes that express the same legal principle). When competitors publish identical headnotes, it proves expression has merged with the "underlying idea." *Silvertop Assocs.*, 931 F.3d at 222.

### D. This is not a factual compilation dispute.

The district court stated that this "dispute boils down to whether the [memos] copied [West's] headnotes or were instead taken from uncopyrightable judicial opinions." A38. Nevertheless, it also certified whether the Key Number System was original. A59. West notes that

LegalEase included Key Number System topics in the "file names" of the memos it sent to ROSS, WB14, but does not show where the Key Number System appears in ROSS's training memos, and does not argue that ROSS intended to create an analogous compilation.

Instead, West asserts that it can copyright headnotes and case passages because its editors "chose what headnotes to pair to which legal passages." WB40. If West means that it can copyright "decisions as to how to label and organize" holdings and the original case, *Google v. Oracle* rejects that because deciding "what counts as" a holding is not copyrightable "although one might argue about decisions as to how to label and organize" holdings. 593 U.S. 1, 26 (2021) (citing *Baker v. Selden*, 101 U.S. 99 (1879)).

West also asserts that it can copyright headnotes and case passages because ROSS's memos copied "headnotes" and the corresponding "great answer" copied West's selection of a "case passage." WB40. West's cases (WB28) reject that argument: the compilation's copyright covers "the resulting work as a whole" and "only to those aspects of the compilation that embody the original creation of the compiler," but the "facts set forth in the compilation are not protected and may be freely copied." *See, e.g.*,

*CCC Info. Servs., Inc. v. Maclean Hunter Mkt. Reps.*, 44 F.3d 61, 65-66 (2d Cir. 1994). And its other cases are distinguishable. *E.g., Kregos v. Associated Press*, 937 F.2d 700, 706 (2d Cir. 1991) (electing outcome predictive statistics to rate pitching performances); *Educ. Testing Servs. v. Katzman*, 793 F.2d 533, 540 (3d Cir. 1986) (questions testing "square roots or dangling participles" not so limited that they merge with the underlying ideas). West's amorphous compilation theory is clear on only one point: it seeks (again, *see* RB15) to abuse copyright law to own the law.

## II. ROSS fairly used headnotes to train an AI legal search engine.

ROSS advanced science by building an AI search engine that made a new form of legal research possible. In so doing, ROSS used a tiny fraction of West headnotes. This is a fair use under a straightforward application of settled copyright law.

### A. The nature of West's functional headnotes strongly supports fair use.

ROSS's brief explained that as to the "nature of the copyrighted work," 17 U.S.C. § 107(2), "headnotes are functional works" "far from copyright's core." RB35-36 (district court agreeing that "nature" factor

supports fair use). We explained that the court erred in not giving this factor any weight. RB36 (citing *Am. Soc'y*, 82 F.4th at 1269).

West tries to evade *American Society*, suggesting that "legal standards that were incorporated by reference into the law" are distinguishable from judicial holdings. WB69. But the headnotes are "inextricably bound together" with judicial opinions that "no one claims [are] a proper subject of copyright." *Google*, 593 U.S. at 27. Signaling that the "nature" factor cuts against it, West pivots: the "nature of the copyrighted work" "has rarely played a significant role" determining fair use. WB69 (citing *Fox News Network, LLC v. TVEyes, Inc.*, 883 F.3d 169, 178 (2d Cir. 2018)). This case is not analogous to *TVEyes*: sentences from judicial opinions are not comparable to the creative video "news reports." 883 F.3d at 178.

West nonetheless asks the Court to credit the "time and resources" it spent "developing the Westlaw Content" as "imaginative and original." WB67-68. Implicitly conceding that this argument flouts the sweat of the brow doctrine, West states that "the Ninth Circuit and the Second Circuit" have credited this argument post-*Feist*. WB68 (citing *Wall Data, Inc. v. LA Cnty. Sheriff's Dep't.*, 447 F.3d 769, 780 (9th Cir.

14

2006) and *MCA, Inc. v. Wilson*, 677 F.2d 180, 182 (2d Cir. 1981)). Not quite. *Wall Data* ignores *Feist* and instead cites *MCA*, decided a decade before *Feist*.

In any event, fair use "requires judicial balancing, depending upon relevant circumstances, including 'significant changes in technology.'" *Google*, 593 U.S. at 19; *see* 4 NIMMER ON COPYRIGHT § 13F.06[A][2] (*Google* "brought [the second factor] roaring to primary status"). And it must play a significant role here because ROSS's AI model is a radical technological change that outweighs the headnotes' nature as functional works. *E.g.*, Next-Gen Legal Research Br. 17-19; Copyright Law Professors Br. 17-18.

## B. ROSS used at most a trivial amount of any creative expression in West's headnotes.

ROSS explained that "the amount and substantiality" factor (17 U.S.C. § 107(3)) supports fair use because ROSS used a "tiny, fungible fraction" of the 28 million West headnotes. RB41. West argues that 25,000 headnotes are an "indisputably large" amount and are "the 'heart' of Westlaw" and its search algorithms. WB70. But the heart of a work is its "distinctive expression," and West headnotes (and its algorithms) are heartless. *Harper & Row, Publrs. v. Nation Enters.*, 471 U.S. 539, 565

15

(1985). ROSS copied headnotes for their function, not "creativity," "beauty," "or even … purpose." *Google*, 593 U.S. at 33-34. The headnotes are therefore viewed as "part of the considerably greater whole." *Id.* at 33. West does not dispute that .08% is a minuscule amount.

West nevertheless suggests that .08% counts for more here because "unlike in other generative AI cases involving large training data sets where the copyrighted content is only a small piece," ROSS trained on only the "infringing Bulk Memos." WB71. ROSS welcomes this comparison; unlike its counterparts, ROSS did not train on millions of creative works. RB10-12. ROSS paid $1 million to build its training library on publicly available judicial opinions.

West complains that LegalEase's "copying" on westlaw.com "was so extensive that it triggered an automated alert for excessive usage." WB70. But West does not identify anything in the record that connects LegalEase's "excessive usage" of westlaw.com with the headnotes in the legal memos, the "specific use at issue." *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 545 (2023). In fact, West was

█████████████████████████████████████████████████████

████████ A4893 at 70:34. So when LegalEase downloaded cases, or clicked

through the Key Number System, that was a method of legal research, which cannot be copyrighted. *E.g.*, *Baker v. Selden*, 101 U.S. 99 (1879); RB48-49.

West cannot circumvent the core point: the actual number of headnotes used to generate the questions in the legal training memos represent less than .08% of West's 28 million West headnotes. That limited use was "reasonable in relation to the purpose of the copying." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 586-87 (1994).

### C. ROSS transformed the headnotes when using them to train its AI legal search engine.

The "purpose and character of the use" (17 U.S.C. § 107(1)) also supports fair use. ROSS's use of West's headnotes facilitated radical technological advances by using deep learning techniques that trained its search engine to understand and answer a legal researcher's question. RB6-8, 39-46. ROSS's use of headnotes is an example of "intermediate" copying which scores of cases recognize as transformative. RB44-46; *see also Google*, 593 U.S. at 29-33; *Sony v. Connectix Corp.*, 203 F.3d 596, 606-07 (9th Cir. 2000); *Sega Enter. v. Accolade, Inc.*, 977 F.2d 1510, 1522 (9th Cir. 1992).

West disputes neither point. Nor can it point to a case that holds commercialism outweighs transformation, where, as here, a new technological work does not reproduce the original work.

### 1. ROSS's use facilitated radical technological advances.

West does not dispute that ROSS's final product was a technological marvel—it publicly credited ROSS as a milestone in generative AI in legal technology, RB52, and privately credited it as ███████ A4491. Offering a new method of legal research that changed both the function and the user experience comfortably fits in a long line of precedent supporting transformative use. RB43-44 (collecting cases); *see also* CCIA Br. 8-14; Copyright Law Professors Br. 3-11; FAI Br. 8-18. Indeed, every use of an original work to build a new technological platform that does not involve reproducing the copyrighted work has been deemed transformative. RB40-42 (collecting cases); *see also* Authors Alliance Br. 11-12; Edward Lee, *Fair Use and the Origin of AI Training*, 68 HOU. L. REV. 105, 133-37 (2025) (collecting and explaining cases). West cannot identify a single case suggesting otherwise.

West also does not dispute that ROSS's use is fundamentally the same as what *Kadrey* and *Bartz* deemed exceedingly and spectacularly

transformative. RB42; RB53; *Kadrey v. Meta Platforms, Inc.*, 788 F. Supp. 3d 1026 (N.D. Cal. 2025); *Bartz v. Anthropic PBC*, 787 F. Supp. 3d 1007 (N.D. Cal. 2025). Instead, West tries to distinguish *Kadrey* and *Bartz* by claiming this case does not involve "generative AI" (even though it publicly described ROSS as generative AI). WB62. As an initial matter, this distinction is irrelevant because the "generative" AI label is technologically meaningless. Goebel Br. 10-12. Nor is it true that *Bartz*, which restated the district court's reasoning without endorsing it, "expressly agreed with" the district court. WB62; 787 F. Supp. 3d at 1022.

The cases that West cites are inapplicable. There, defendants did not create new platforms. Instead, they copied and reproduced the original work. WB62-63 (citing *Video Pipeline, Inc. v. Buena Vista Home Ent., Inc.*, 342 F.3d 191, 198 (3d Cir. 2003); *Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 923 (2d Cir. 1994)).

And West misreads *Google Books* and *HathiTrust*. *Google Books* and *HathiTrust* champion creating search engines because no one has "an exclusive right to supply information." *Authors Guild v. Google, Inc.*, 804 F.3d 202, 207 (2d Cir. 2015) ("*Google Books*"). ROSS responds to queries with judicial opinions, providing more "insight or information"

about the law than a headnote or "Westlaw Content." Those cases did not require ROSS to "create a way to search Westlaw" or "direct users to Westlaw" so that it could provide "insight or information about the original." WB64.

West closes with a Hail Mary, comparing its technology to ROSS's because both used headnotes to train search algorithms. WB61-62. But ROSS and West do not have analogous algorithms. West admitted ▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮ A4912-13. Unlike Westlaw, ROSS does not search across headnotes or Key Numbers. It runs across judicial opinions and its database did not return opinions annotated with headnotes, synopses, or any of the material that West claims is copyrighted, and ROSS's responses were not organized by the Key Number System. And ROSS used deep learning techniques that responded to queries with applicable opinions. This is far different from the headnotes and Key Number System that forced users to sift through scores of materials and click around for a relevant case passage.

West does not suggest that it used anything analogous to ROSS's deep learning techniques; in fact, West does not explain its technology at

all. WB11; *see also* Abe Kang Br. 9-11. To the extent that █████

████████████████████████████████████████████████████

████████████ expert testimony confirmed that ██████████

█████████████████████████████ A6004. (Indeed, only now does

westlaw.com include an AI chatbot and West markets its partnership

with OpenAI. *Thomson Reuters CoCounsel Tests Custom LLM from

OpenAI*, https://tinyurl.com/WLOPA).

### 2. ROSS's use is permissible intermediate copying.

West agrees that the district court erroneously limited

intermediate copying to cases involving computer code. WB66; RB44-45

("*Sega* discusses cases involving intermediate copying in the context of

books, scripts, or literary characters").

Trying to rehabilitate the district court's error, West offers two

unremarkable points: (1) *Sega* and *Sony* are out-of-circuit cases and (2)

"intermediate or not, the key consideration is whether the use was

transformative." WB65-66. Neither point moves the needle.

West suggests that the intermediate copying cases do not apply

because "ROSS did not disassemble a computer program to access its

underlying ideas or functionality." RB66. But ROSS did far more than its

21

predecessors—ROSS disassembled language to learn the relationship between words. RB12-13. In so doing, ROSS removed the actual expression of text to create a computer code. The prior transformative uses made new code from old code. RB13, RB33, RB38; *see also* Copyright Law Professors Br. 5-6.

West contends that ROSS did not copy for "a recognized, legitimate interest such as compatibility with a new product." RB66. West suggests the *Sony* innovators made a new product (the Virtual Game Station) compatible with the original (the PlayStation), but that is wrong: "Connectix's Virtual Game Station … creates a new platform, the personal computer, on which consumers can play games designed for Sony PlayStation." *Sony*, 203 F.3d at 607. And even under West's strained reading, ROSS had a legitimate reason to use the headnotes: ROSS was a new platform that expanded the headnotes' "use and usefulness" (using deep learning techniques) and making a new search "compatible" with its new platform. *Google*, 593 U.S. at 30. Thus, building an innovative AI model is a legitimate reason to copy headnotes. RB46.

### 3. ROSS's use was consistent with fair use's purposes.

"[M]any common fair uses are indisputably commercial." *Google*, 593 U.S. at 32; *see also Google Books*, 804 F.3d at 218 n.19 (collecting cases). Given ROSS's "highly convincing transformative" use, there is no reason its "overall profit motivation should prevail," *Google Books*, 804 F.3d at 219, particularly because its use "was an intermediate one, and thus [] only 'indirect or derivative.'" *Sony*, 203 F.3d at 607.

West complains about competition—specifically, ROSS offering "a commercial substitute of Westlaw with the unrebutted goal of taking" its market share. WB58. ROSS's subjective intent is irrelevant. WB58, WB60. *Warhol*, for example, does not discuss intent at all, and *Google* was skeptical "about whether bad faith has any role in a fair use analysis." 593 U.S. at 32; *see also* Authors Alliance Br. 17. Instead, commerciality is an objective inquiry that focuses on the specific use of the copyrighted work rather than the user's financial ambitions or "business plans." WB63 (citing *Oasis Publ'g v. W. Publ'g Co.*, 924 F. Supp. 918, 927 (D. Minn. 1996)); Authors Alliance Br. 5-6.

## D. ROSS did not harm the market for headnotes.

The market factor assesses the use's effect "upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). Though fair use is an affirmative defense, West does not dispute that plaintiffs must produce evidence of injury in a market for the copyrighted work. RB47. West failed to do so.

### 1. The relevant market is for headnotes, and West concedes there is no such market.

As to "the effect of the use on the value of the copyrighted material—the relevant question [] is whether the infringement impacted the market for the copyrighted work itself." *Lexmark Int'l v. Static Control, Inc.*, 387 F.3d 522, 544 (6th Cir. 2004). As ROSS's opening brief explained, the headnotes are the relevant work. A59; RB48-50. West concedes that "there is no market for headnotes as 'independent search tools,'" WB49 n.6, so neither the legal memos (the allegedly infringing work and challenged use) nor ROSS bring "a competing substitute for the original, or its derivative" to "the marketplace," *Google Books*, 804 F.3d at 223. West provides not a single case that ignores the absence of a market for the copyrighted work. That ends the matter.

24

But West lobs another misdirection: ROSS harmed the "market for Westlaw" and "Westlaw Content's" value as training data. *See, e.g.*, WB42-48. This argument threatens to transform copyright protection into business model protection.

The fair use "statute's focus" is on the "*specific use* alleged to be infringing." *Warhol*, 598 U.S. at 549 (emphasis added). Here, the specific use is ROSS's copying of headnotes in legal memos for the "direct purpose" of creating training data. *Sega*, 977 F.2d at 1522. The "ultimate purpose," however, was to build a new AI search platform. *Id*. Because ROSS copied the headnotes "for a legitimate, essentially non-exploitative purpose," any impact on Westlaw was "indirect." *Id.* at 1523; Copyright Law Professors Br. 5-11.

In any event, ROSS did not copy West's outdated platform. It produced judicial opinions, not headnotes, or Westlaw Content, and had no equivalent to the Key Number System. West argues that losses to Westlaw matter because "Westlaw is the registered work" and its content is "licensed through subscriptions to Westlaw." WB44. Wrong.

"The mere fact that a work is copyrighted does not mean that every element of the work may be protected." *Feist*, 499 U.S. at 348. What

matters is the specific use's effect on the market for the "*protected aspect of the [original] work*," *Google Books*, 804 F.3d at 224 (original emphasis); 4 NIMMER ON COPYRIGHT § 13F.06[A][2] ("fair use analysis" must be "calibrat[ed]" to the "protectability of the precise material copied."). Westlaw hosts millions of uncopyrightable judicial opinions and other "content" that ROSS never copied. *E.g.*, *Google*, 593 U.S. at 27 (distinguishing between a work's uncopyrightable and copyrightable portions and its copied and uncopied portions); *see also* FAI Br. 19-20; CCIA Br. 14-16. This argument protects West's business model, not its allegedly original works. So if Westlaw users ultimately left for ROSS, they did so because ROSS introduced a "wholly new product"; any resulting competition is one of copyright's virtues, not a vice. *Sony*, 203 F.3d at 606.

West does not cite a single case that supports its approach. WB44. In *Napster*, because users downloaded music files that could "be transferred back onto an audio CD," the court considered the downloads' effect "on audio CD sales." *A&M Records, Inc. v. Napster Inc.*, 239 F.3d 1004, 1012, 1016 (9th Cir. 2001). But here West conceded that "***[n]o***

**consumer has ever <u>sought</u> to purchase a separate ... legal tool.**" RB50 (West's emphasis).

West also argues that ROSS "harmed the value of the Westlaw Content by depriving [West] of exclusivity in using the content to train AI," WB46, and in so doing, beat it to the marketplace. WB48 (citing *Dr. Seuss Enters. v. ComicMixLLC,* 983 F.3d 443, 460 (9th Cir. 2020)). West's premise is wrong: it has no right to exclusivity in that market because ROSS never copied West's algorithms. RB10-12, RB42, RB44-45. Because West does not explain whether its "AI" retains the headnotes' expressive components, there is no evidence that its training data is a derivative work. West likewise fails to show how ROSS (or anyone else's training use) exploits "the [headnotes] 'commercial value *as a copyrighted work*'" because all expression is removed during the training process. *Google*, 593 U.S. at 39 (quoting *Lexmark Int'l*, 387 F.3d at 544) (emphasis in original).

*Seuss* proves this point. 983 F.3d at 443. There, the plaintiff had a right to exclusivity in a derivative market because the new work "meticulously copied" and "merely repackaged" the original. *Id.* at 453-55. But ROSS transformed the headnotes, removed any copyrightable

27

expression, and did not reproduce any outputs. RB13-14, RB32. Neither the ROSS model nor its outputs are a derivative of the headnotes, and the "source" of any loss is ROSS's innovative model, not the headnotes' use in training memos. This is "legitimate" competition that drives the innovations that copyright law protects. *Sega*, 977 F.2d at 1523.

### 2. West's "AI licensing market" theory is circular.

West does not dispute that it made no attempt to enter the AI training data market and has never licensed its headnotes for any purpose. RB51. Such inaction, ROSS's opening brief explained, requires an "inference [] that the author or publisher did not think that there would be enough such use to bother making a license available." *Cambridge Univ. Press v. Patton*, 769 F.3d 1232, 1277 (11th Cir. 2014); *see also Swatch Grp. Mgmt. Servs. v. Bloomberg L.P.*, 756 F.3d 73, 91 (2d Cir. 2014) (no market harm "especially" where plaintiff has no interest in exploiting the copyright-protect aspects of a work).

Nevertheless, West argues that ROSS harmed the market for Westlaw Content as AI training material. This argument is "circular"; "it is a given in every fair use case that plaintiff suffers a loss of a potential market if that potential is defined as the theoretical market for licensing

the very use at bar." *Google*, 593 U.S. at 38 (citing 4 NIMMER ON COPYRIGHT § 13.05[A][4]). To "establish a traditional license market," West must provide evidence of "fees paid to other copyright owners." *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 614 (2d Cir. 2006).

West tries (WB51) but fails. West's expert did not identify a single company that specializes in legal training data that includes copyrighted works. WB51 (citing A6150-59). Nor did ROSS's expert "admit" there is a market for Westlaw Content as training data, WB51; in fact, ███████ ████████████████████ A4855 at 172:16-23; A4857 at 179:1-4.

Existence of AI platforms is not proof of a market for headnotes as training data either. Each platform is unique and there is no evidence that anyone other than ROSS used headnotes as training data— ████ ██████████████████████████ A6004.

ROSS's use of headnotes in legal memos, and its instruction to destroy its dataset, is also not proof. RB50. ██████████████ ████████████████████████████ ████████████████████████ A6148. LegalEase was hired as an independent contractor to create the memos

solely for ROSS and at its direction. If West's arrangement can be called a "market," it is nothing more than a monopsony. *Cf. W. Penn Allegheny Health Sys. v. UPMC*, 627 F.3d 85, 103 (3d Cir. 2010) (defining monopsony as a single buyer market). This kind of theory amplifies the danger of circularity.

### 3. West does not provide evidence of market substitution.

Even if West's theories were correct, its argument has no support in the record: ROSS was not a market substitute for Westlaw. Courts must determine "whether *consumers* treat a challenged use 'as a market replacement' for a copyrighted work or a market complement that does not impair demand for the original." *Warhol*, 598 U.S. at 555 (Gorsuch, J., concurring) (emphasis added). Proof of "*some* loss of sales" is not enough. *Google Books*, 804 F.3d at 224. There "must be a meaningful or significant effect 'upon the potential market for or value of the copyrighted work.'" *Id.*

No evidence of such substitution exists here. ROSS's model did not output headnotes and it eschewed the sort of scaffolding West offers. West's cases articulate the difference between a competing product and a market substitute. *E.g.*, *Monge v. Maya Magazines, Inc.*, 688 F.3d 1164,

1181 (9th Cir. 2012) ("[T]he market harm analysis is affected by whether the harm is caused by commercial use of a mere duplicate or by commercial use post-transformation."). Hence, West's argument that widespread conduct like ROSS's would harm its markets falls flat. *Monge*, which West cites for this point, WB55, involved a gossip magazine republishing stolen photographs—the original work was duplicated, so widespread copying would have cascading harms. *Id.* at 1169, 1182.

Not so here. ROSS is an entirely new product. That is why West provides no evidence that ROSS caused a "meaningful or significant effect" on Westlaw Content's market value. Unlike in *Napster*, here, there is no expert testimony of lost sales, lost licenses, lost revenue, or decline in demand. 239 F.3d at 1017. Five years of litigation. Zero proof of harm.

Indeed, consumers purchased ROSS and Westlaw; some preferred ROSS, but still needed Westlaw's "case summaries," "headnotes," or comprehensive repository of secondary sources. A4460; A4464-67; A4484-85; A4449-52. Consumers also used both because ROSS could not obtain new cases as quickly as Westlaw (or Lexis). *E.g.*, A4484-85. The use of ROSS alongside bigger platforms suggests that consumers saw ROSS as

an economic "complement[]" to Westlaw, not a market "substitute." *Ty, Inc. v. Publ'ns Int'l*, 292 F.3d 512, 517-18 (7th Cir. 2002) (Posner, J.).

West gestures at "actual customers" who switched platforms—how many is anyone's guess. WB43. West also republishes a Facebook post that confirms ROSS was cheaper than Westlaw, but this shows commercial ambition, not market harm. WB11-12; WB43. Nothing "in the fourth factor call[s] on courts to speculate about artistic ambitions." *Warhol*, 598 U.S. at 555 (Gorsuch, J., concurring). It is all about how "consumers" treated the "challenged use." *Id.*

West's charge of "blatant market substitution" is meritless. WB45. West's invocation of *Kadrey*'s dicta suggesting that AI outputs may compete with original creative works is meritless. WB45 (citing *Kadrey*, 788 F. Supp. 3d at 1053). ROSS's outputs are judicial opinions, which belong to the public, so it could not have diluted any market for copyrightable works. *Kadrey*, 788 F. Supp. 3d at 1053.

West's arguments about the training data market are also wrong. In their raw form, headnotes are useless for training an answer-retrieval engine. Even West's expert understood that training an AI model to answer a question required headnotes paired with relevant and

irrelevant case passages. RB10-14; A6114. ROSS could not, and did not, use the West headnotes as is. ROSS had to transform them in training examples that created questions mapped to case passages and "four to six ranked answers." RB11-12. Those items then had to be further "tokenized" and "lemmatized" to be used for computational analysis before transforming that content into "numerical representations" useful to a computer learning system. RB12-14. As a factual matter, there is no "off-the-shelf" market for West headnotes as training data because they are not usable in their raw form but rather require significant transformation—exactly what ROSS did.

## III. The public will benefit from protecting ROSS's training.

ROSS's opening brief made the public benefits clear. RB54-57. Amici agree. *E.g.*, Authors Alliance Br. 3 ("ROSS's use serves compelling public interests by increasing access to legal information through innovative research tools, while its outputs consist entirely of public domain judicial opinions."); Goebel Br. 6 (noting "sweeping implications for technical and business innovation for years to come").

Recently, the President directed the nation's "leadership in AI" to "promote United States national and economic security and dominance

across many domains." Executive Order 14365, *Ensuring a National Policy Framework for Artificial Intelligence*, 90 Fed. Reg. 58499, 58499 (Dec. 11, 2025). A key premise of the order is that "[t]o win, United States AI companies must be free to innovate without cumbersome regulation." *Id.* Chinese AI companies are advancing quickly with little oversight— DeepSeek, for example, trains on copyrighted works without any threats of liability. Will Douglas Heaven, *How DeepSeek ripped up the AI playbook*, MIT TECH. R., https://tinyurl.com/DSOPI. ROSS's is a sterling example of the innovations that copyright should not stifle and fair use is intended to protect. FAI Br. 12-13.

## CONCLUSION

The Court should hold that West's headnotes are not copyrightable or, in any event, ROSS's use is fair.

Respectfully submitted,

/s/ *Mark S. Davies*
Mark S. Davies
*Counsel of Record*

Anne M. Voigts
Ranjini Acharya
PILLSBURY WINTHROP
SHAW PITTMAN
2400 Hanover Street
Palo Alto, CA 94304

Anna B. Naydonov
Kufere J. Laing
WHITE & CASE
701 Thirteenth Street, NW
Washington, DC 20005
(202) 626-3600
mark.davies@whitecase.com

Kayvan M. Ghaffari
PILLSBURY WINTHROP
SHAW PITTMAN
Four Embarcadero Center,
22nd Floor
San Francisco, CA 94111

Andy M. LeGolvan
WHITE & CASE
555 S Flower Street, Suite 2700
Los Angeles, CA 90071

Yar R. Chaikovsky
WHITE & CASE
3000 El Camino Real
2 Palo Alto Square, Suite 900
Palo Alto, CA 94306

Ji Won Oh
WHITE & CASE
1221 Avenue of the Americas
New York, NY 10020

Dated: January 12, 2026

*Attorneys for Defendant-Appellant*

# CERTIFICATE OF COMPLIANCE

I hereby certify that (i) this document complies with the world limit of Federal Rule of Appellate Procedure 5(c)(1) because it contains 6,431 words exclusive of the portions exempted by Federal Rule of Appellate Procedure 32(f); (ii) this document complies with the typeface requirement of Federal Rule of Appellate Procedure 32(a)(5)(A) because it was typed in 14-point Century Schoolbook font; (iii) I am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit; (iv) the electronic copy of this brief has been virus scanned using CrowdStrike Falcon and no virus was detected; (v) the text in the electronic brief is identical to the text in the paper copies.

Dated: January 12, 2026            /s/ *Mark S. Davies*
                                   Mark S. Davies

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the appellate CM/ECF system on January 12, 2026. All counsel of record are registered CM/ECF users, and service will be accomplished by the CM/ECF system.

Dated: January 12, 2026          /s/ *Mark S. Davies*
                                 Mark S. Davies