# United States Court of Appeals

## for the

# Third Circuit

Case No. 25-2153

THOMSON REUTERS ENTERPRISE CENTRE GMBH;
WEST PUBLISHING CORP,

*Plaintiffs-Appellees,*

— v. —

ROSS INTELLIGENCE INC,

*Defendant-Appellant.*

ON APPEAL FROM AN ORDER OF THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

## FINAL BRIEF FOR PLAINTIFFS-APPELLEES
## (REDACTED)

MIRANDA D. MEANS
KIRKLAND & ELLIS
200 Clarendon Street
Boston, Massachusetts 02116
(617) 385-7419
miranda.means@kirkland.com

DALE M. CENDALI
JOSHUA L. SIMMONS
KIRKLAND & ELLIS
601 Lexington Avenue
New York, New York 10022
(212) 446-4800
dale.cendali@kirkland.com

*Attorneys for Plaintiffs-Appellees*

CP COUNSEL PRESS    (800) 4-APPEAL • (389125)

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Third Circuit Local Appellate Rule 26.1(b), Plaintiffs-Respondents Thomson Reuters Enterprise Centre GmbH ("Thomson Reuters") and West Publishing Corporation ("West," together with Thomson Reuters, "TR") certify:

Thomson Reuters Enterprise Centre GmbH is a wholly-owned indirect subsidiary of Thomson Reuters Corporation.

West Publishing Corporation is a wholly-owned indirect subsidiary of Thomson Reuters Corporation.

There is no other publicly held corporation with a financial interest in the outcome of the proceeding.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iv

INTRODUCTION ...................................................................................1

STATEMENT OF THE CASE.................................................................7

    A.    The Legal Research Problem That Westlaw Solved .............7

    B.    Westlaw and the History of Artificial Intelligence.................9

    C.    ROSS's Widescale Copying of Westlaw ................................11

    D.    TR Proudly Protects the Creativity of its Attorney-Editors ...................................................................................18

JURISDICTIONAL STATEMENT ......................................................23

STANDARD OF REVIEW....................................................................23

SUMMARY OF ARGUMENT ..............................................................23

ARGUMENT ........................................................................................25

I.    ROSS Copied Protectable Headnotes.......................................25

    A.    The Supreme Court Has Held That Headnotes Are Copyrightable ......................................................................25

    B.    The Headnotes Are Original.................................................27

    C.    Each of ROSS's Arguments Is Meritless .............................32

        1.    The West Headnotes Are Not Mere Quotations from Cases................................................................32

        2.    The West Headnotes Are Not Dictated by Industry Conventions ...................................................33

        3.    The West Headnotes Have Not "Merged" with Facts .............................................................................37

   4. ROSS Ignores Selection and Arrangement ................. 38

**II. ROSS's Copying is Not Fair Use** ............................................. **40**

 A. Factor Four – ROSS Affected the Market for and Value of Westlaw .................................................................................... 41

   1. ROSS Created a Substitute for Westlaw .................... 42

   2. ROSS Harmed TR's Training Material Market .......... 46

   3. ROSS Inhibited Licensing Markets for Westlaw Content ......................................................................... 48

   4. Widespread Uses Like ROSS's Would Harm the Market for Westlaw ...................................................... 54

   5. ROSS's Use Harms the Public ................................... 54

 B. Factor One – ROSS Copied to Create a Commercial Substitute ................................................................................. 57

   1. ROSS's Use Was Commercial ................................... 58

   2. ROSS's Use Was in Bad Faith ................................... 59

   3. ROSS's Purpose Was Not Transformative ................. 61

 C. Factor Two – Westlaw Is Creative ........................................ 67

 D. Factor Three – ROSS Took the Heart of Westlaw ............... 69

**CONCLUSION** .................................................................................... **72**

**CERTIFICATE OF COMPLIANCE** .................................................. **74**

**CERTIFICATE OF SERVICE** ........................................................... **74**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A&M Records, Inc. v. Napster,*
239 F.3d 1004 (9th Cir. 2001)............................................................44

*Am. Geophysical Union v. Texaco Inc.,*
60 F.3d 913 (2d Cir. 1994) ................................................................62

*Am. Soc'y for Testing & Materials v. PublicResource.Org, Inc.,*
82 F.4th 1262 (D.C. Cir. 2023)...........................................................69

*Andy Warhol Found. for Visual Arts, Inc. v. Goldsmith,*
11 F.4th 26 (2d Cir. 2021)..................................................................42

*Andy Warhol Found. for the Visual Arts v. Goldsmith,*
598 U.S. 508 (2023) ......................................................................5, 57

*Apple Computs., Inc. v. Franklin Comput. Corp.,*
714 F.2d 1240 (3d Cir. 1983) .............................................................37

*Authors Guild v. Google, Inc.,*
804 F.3d 202 (2d Cir. 2015) ..................................................46, 57, 64

*Balsley v. LFP, Inc.,*
691 F.3d 747 (6th Cir. 2012).............................................................53

*Banks v. Manchester,*
128 U.S. 244 (1888)..........................................................................26

*Bartz v. Anthropic PBC,*
787 F. Supp. 3d 1007 (N.D. Cal. 2025)..............................................62

*Burrow-Giles Lithographic Co. v. Sarony,*
111 U.S. 53 (1884).............................................................................31

*Callaghan v. Myers,*
128 U.S. 617 (1888)..........................................................................26

*Cambridge Univ. Press v. Patton*,
   769 F.3d 1232 (11th Cir. 2014) .........................................................53

*Campbell v. Acuff-Rose Music, Inc.*,
   510 U.S. 569 (1994) ................................................................. *passim*

*Capitol Recs., LLC v. ReDigi Inc.*,
   910 F.3d 649 (2d Cir. 2018) .............................................................42

*Castle Rock Ent., Inc. v. Carol Publ'g Grp.*,
   150 F.3d 132 (2d Cir. 1998) .............................................................52

*CCC Info. Servs., Inc. v. Maclean Hunter Mkt. Reps., Inc.*,
   44 F.3d 61 (2d Cir. 1994) .................................................................28

*Dam Things from Denmark v. Russ Berrie & Co.*,
   290 F.3d 548 (3d. Cir. 2002) ............................................................38

*Davis v. Gap, Inc.*,
   246 F.3d 152 (2d Cir. 2001) .............................................................50

*Dr. Seuss Enters. v. ComicMix LLC*,
   983 F.3d 443 (9th Cir. 2020) ..................................................... *passim*

*Dun & Bradstreet Software Servs, Inc. v. Grace Consulting, Inc.*,
   307 F.3d 197 (3d Cir. 2002) .............................................................25

*Eckes v. Card Prices Update*,
   736 F.2d 859 (2d Cir. 1984) .............................................................28

*Educ. Testing Servs. v. Katzman*,
   793 F.2d 533 (3d Cir. 1986) .............................................................37

*FameFlynet, Inc. v. Jasmine Enters., Inc.*,
   344 F. Supp. 3d 906 (N.D. Ill. 2018) ................................................46

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
   499 U.S. 340 (1991) ................................................................. *passim*

*FMC Corp. v. Control Sols., Inc.*,
   369 F. Supp. 2d 539 (E.D. Pa. 2005) ..........................................28, 68

*Fox News Network, LLC v. TVEyes, Inc.*,
    883 F.3d 169 (2d Cir. 2018) ...................................................... *passim*

*Garza v. Citigroup Inc.*,
    881 F.3d 277 (3d Cir. 2018) ............................................................. 32

*Georgia v. Public.Resource.org*,
    590 U.S. 255 (2020) ..................................................................... 1, 27

*Google LLC v. Oracle Am., Inc.*,
    593 U.S. 1 (2020) ........................................................... 45, 55, 59, 72

*Hachette Book Grp., Inc. v. Internet Archive*,
    115 F.4th 163 (2d Cir. 2024) ........................................................... 48

*Harper & Row Publishers, Inc. v. Nation Enters.*,
    471 U.S. 539 (1985) ................................................................... *passim*

*Hustler Mag. Inc. v. Moral Majority Inc.*,
    796 F.2d 1148 (9th Cir. 1986) ......................................................... 67

*Jurisearch Holdings, LLC v. Lawriter, LLC*,
    2009 WL 10670588 (C.D. Cal. 2009) ................................................. 27

*Kadrey v. Meta*,
    788 F.Supp.3d 1026 (N.D. Cal. 2025) .......................................... 45, 62

*Kelly v. Arriba Soft Corp.*,
    336 F.3d 811 (9th Cir. 2003) ........................................................... 64

*Kregos v. Associated Press*,
    937 F.2d 700 (2d Cir. 1991) ........................................................ 37, 70

*L.A. News Service v. KCAL-TV Channel 9*,
    108 F.3d 1119 (9th Cir. 1997) ......................................................... 60

*Love v. Kwitny*,
    706 F. Supp. 1123 (S.D.N.Y. 1989) .................................................. 68

*Matthew Bender & Co., Inc. v. West Publ'g Co.*,
    158 F.3d 674 (2d Cir. 1998) ........................................................ 33, 34

*MCA, Inc. v. Wilson,*
677 F.2d 180 (2d Cir. 1981) ............................................................. 68

*Monge v. Maya Mags.,*
688 F.3d 1164 (9th Cir. 2012) ........................................... 47, 52, 55, 61

*Murphy v. Millennium Radio Grp., LLC,*
650 F.3d 295 (3d Cir. 2011) ................................................... 41, 49, 58

*Oasis Publ'g Co. v. West Publ'g Co.,*
924 F. Supp. 918 (D. Minn. 1996)...................................................... 63

*Oracle Am., Inc. v. Google Inc.,*
750 F.3d 1339 (Fed. Cir. 2014) ............................................. 37, 59, 72

*Pac. & S. Co., Inc. v. Duncan,*
744 F.2d 1490 (11th Cir. 1984).................................................... 53, 59

*Pearson Educ., Inc. v. Ishayev,*
963 F. Supp. 2d 239 (S.D.N.Y. Aug. 1, 2013) .................................... 31

*Perfect 10, Inc. v. Amazon, Inc.,*
508 F.3d 1146 (9th Cir. 2007)............................................................ 64

*Ringgold v. Black Entm't Television, Inc.,*
126 F.3d 70, 81 (2d Cir. 1997) .......................................................... 49

*Rogers v. Koons,*
960 F.2d 301 (2d Cir. 1992) .............................................................. 58

*Salinger v. Colting,*
607 F.3d 68 (2d Cir. 2010) ................................................................ 48

*Salinger v. Random House,*
811 F.2d 90 (2d Cir. 1987) ................................................................ 52

*Satava v. Lowry,*
323 F.3d 805 (9th Cir. 2003)............................................................. 38

*Schroeder v. William Morrow & Co.,*
566 F.2d 3 (7th Cir. 1977)................................................................. 31

vii

*Sega Enterprises Ltd. v. Accolade, Inc.*,
    977 F.2d 1510 (9th Cir. 1992) ................................................. 65, 66, 67

*Shihab v. Source Digital, Inc.*,
    2024 WL 3461351 (S.D.N.Y. July 18, 2024) ....................................... 52

*Sony Computer Entertainment, Inc. v. Connectix Corp.*,
    203 F.3d 596 (9th Cir. 1999) ....................................................... 65, 66

*Southco Inc. v. Kanebridge Corp.*,
    390 F.3d 276 (3d Cir. 2004) ........................................................ 35

*Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P*,
    756 F.3d 73 (2d Cir. 2014) .......................................................... 52

*TD Bank, N.A. v. Hill*,
    2015 WL 4523570 (D.N.J. July 27, 2014) .......................................... 68

*TD Bank N.A. v. Hill*,
    928 F.3d 259 (3d. Cir. 2019) ........................................................ 23

*A.V. ex rel. Vanderhye v. iParadigms, LLC*,
    562 F.3d 630 (4th Cir. 2009) ........................................................ 63

*Video Pipeline, Inc. v. Buena Vista Home Ent., Inc.*,
    342 F.3d 191 (3d Cir. 2003) ....................................................... 58, 62

*Wainwright Secs. Inc. v. Wall Street Transcript Corp.*,
    558 F.2d 91 (2d Cir. 1977) .......................................................... 31

*Walker v. Univ. Books, Inc.*,
    602 F.2d 859 (9th Cir. 1979) ....................................................... 65, 66

*Wall Data, Inc. v. LA Cnty. Sheriff's Dept.*,
    447 F.3d 769 (9th Cir. 2006) ....................................................... 61, 68

*Warner Bros. Ent. Inc. v. RDR Books*,
    575 F. Supp. 2d 513 (S.D.N.Y. 2008) ............................................... 61

*Weissmann v. Freeman*,
    868 F.2d 1313 (2d Cir. 1989) ........................................................ 63

*West Publ'g Co. v. Lawyers' Co-operative Pub. Co.*,
   79 F. 756 (2d Cir. 1897) ....................................................... 27

*West Publ'g. Co. v. Mead Data Center, Inc*,
   799 F.2d 1219 (8th Cir. 1986)................................... 27, 28, 59

*West Publ'g Co. v. On Point Sols., Inc.*,
   1994 WL 778426 (N.D. Ga. 1994) ....................................... 27

*Worldwide Church of God v. Phila. Church of God, Inc.*,
   227 F.3d 1110 (9th Cir. 2000)....................................... 53, 63

## Statutes

17 U.S.C. §107 ................................................................. *passim*

17 U.S.C. §410 ........................................................................ 25

28 U.S.C. §1292 ..................................................................... 23

28 U.S.C. §1331 ..................................................................... 23

28 U.S.C. §1338 ..................................................................... 23

## Other Authorities

Nimmer on Copyright §13F.08 (2024) ..................................... 48

## <u>INTRODUCTION</u>

Copying protectable expression to create a competing substitute isn't innovation: it's theft.  This basic principle is as true in the AI context as it is in any other.  ROSS Intelligence Inc. copied copyrighted, editorial content from Westlaw, West Publishing Corporation and Thomson Reuters Enterprise Centre GmbH's (together, "TR") legal research platform, to create its own legal research platform.  Given those undisputed facts, Judge Bibas sitting by designation in the District of Delaware correctly held that, under binding Supreme Court precedent, ROSS's creation of a direct substitute for Westlaw was copyright infringement and not fair use.  A35-57.

In terms of copying ***protectable expression***, this case is not about who owns "the law."  ROSS did not copy from Westlaw to get access to the law—it already had the law.  This case is about ROSS's copying of legal analysis, including at least 2,243 headnotes from Westlaw that its own expert found were dissimilar from the cases (the "West Headnotes").  For over a hundred years and as recently as 2020, the Supreme Court has upheld "the reporter's copyright interest in several explanatory materials" including "headnotes." *Georgia v.*

1

*Public.Resource.org*, 590 U.S. 255, 256 (2020).  As a result, headnotes have been described as a paradigmatic example of protectable material. This proposition is so uncontroversial that defendants in many of ROSS's cited cases concede that headnotes are protectable and avoid copying them.    And for good reason.    Westlaw headnotes are painstakingly prepared by West's attorney-editors, who decide how they should be worded, how many headnotes (if any) to write, what material should be included or excluded, what case passage should be linked to the headnote, and where they fall within West's complex and proprietary classification system, the West Key Number System ("WKNS").  Such headnotes implicate myriad creative choices, such that different attorney-editors—and competitors like Lexis—choose to create different headnotes and word them differently.   The 2,243 West Headnotes addressed by the district court and, thus, at issue in this appeal are far more creative than the low bar required for protection.

ROSS asks this Court to disregard a century of Supreme Court precedent and the district court's holding on just the West Headnotes. Instead, it asks for a categorical rule that headnotes are ineligible for copyright protection.  ROSS may want to ignore the Supreme Court's

numerous statements that headnotes are protectable, as it did in its opening brief, but this Court must follow binding precedent. Moreover, ROSS's contention that the West Headnotes are uncopyrightable because they merely quote judicial opinions, D.I.27 ("Br.") 21, is flat wrong. ***ROSS's own expert*** confirmed that the 2,243 headnotes, a subset of what ROSS copied, are dissimilar from judicial opinions. Yet, nowhere in ROSS's brief does it mention this critical admission. Instead, it swings for the fences with its categorical rule, ignoring the district court's caveat that it was "not granting summary judgment on any headnotes that are verbatim copies of the case opinion." A42. Given the extensive evidence that West's attorney-editors create the West Headnotes by making numerous creative decisions, they easily pass the bar required for copyright protection. This Court should reject ROSS's entreaty to disregard the Supreme Court, the facts, and the scope of the district court's opinion.

In terms of ***fair use***, ROSS copied from Westlaw to build a substitute for Westlaw. ROSS repeatedly touted to customers that the ROSS platform could replace Westlaw. A6496-00 (advertisement asking, "ROSS or Westlaw?"). ROSS planned ███████████

3

A6482. ROSS used the Westlaw content it pilfered for the same purpose as TR: to provide a commercial service that helps researchers find relevant law. And ROSS hurt the existing and potential markets for Westlaw in the process. ROSS may want to invoke "artificial intelligence," but that is not a talisman. Even ROSS's cited out-of-Circuit district court AI cases did not permit this kind of substitutive copying. Instead, one expressly agreed with the district court here that copying to build a substitute was not fair use, and the other noted that when substitution results in lost sales, like here, it causes market harm. The district court rightfully dismissed ROSS's fair use defense; it cannot apply in this scenario.

On appeal, ROSS asks this Court to excuse its substitutive copying, but it cannot meet its burden as to any of the fair use factors:

- On **<u>factor four</u>** (the effect of the use on the market or value of the copyrighted work), considered the most important, ROSS harmed the original market for Westlaw in multiple ways. Its platform substituted for and competed with Westlaw in the legal research platform market. It also diminished the value of

the Westlaw content by depriving TR of its exclusive ability to train its own AI on that content.  And it usurped the licensing market for the Westlaw content as AI training material.

- On **<u>factor one</u>** (the purpose and character of the use), ROSS is a for-profit company that copied TR's content illicitly.  Under *Andy Warhol Foundation for the Visual Arts v. Goldsmith*, the use would need to be drastically different to support ROSS.  598 U.S. 508, 1275 (2023) ("*Warhol II*").  It is not.  ROSS copied TR's editorial content (including West Headnotes, their connections with case passages, and their organization within the WKNS) to create a legal research platform, built on Westlaw content, that would compete with and replace Westlaw in the market.  Further, it used that editorial content to do ***precisely*** what TR designed it to do: help researchers find and understand the law.

- On **<u>factor two</u>** (the nature of the copyrighted work), TR's editorial content is the result of a significant investment in the creativity of its attorney-editors.  These attorney-editors make many choices about what and how legal material should be

presented, summarized, synthesized, and organized—such creativity is precisely what copyright is designed to protect.

- On **<u>factor three</u>** (the amount and substantiality of the copying), ROSS took editorial content, including thousands of headnotes in their entirety.  The editorial content is the heart of Westlaw—it is what helps researchers find a "needle in the haystack" when faced with a large corpus of law.  Without it, we would just have the haystack.

ROSS insists that enforcing copyright here will "halt AI development."  Br.52.  But there are two AI companies in this case: Westlaw was using AI long before the founders of ROSS were in school. Moreover, AI development has moved forward at a rapid pace since the decision below was entered, and will surely continue to do so.  This Court need not resolve the question of whether every single instance of training an AI algorithm using copyrighted content is or is not a fair use.  There may be factual circumstances where such copying *is* a fair use.  But as the district court rightly recognized, this scenario—where the copying was for purposes of creating a commercial substitute for the original—is not one of them.  The Court should affirm.

## STATEMENT OF THE CASE

### A.    The Legal Research Problem That Westlaw Solved

Legal research was once akin to finding a needle in a haystack.  It required hours in the library poring over physical case reporters and hunting for answers buried in verbose judicial decisions.  In 1975, TR changed that with its revolutionary platform: Westlaw. *Our AI Timeline* (https://www.thomsonreuters.com/en/artificial-intelligence/ai-timeline) ("AI Timeline").   Westlaw's online legal research platform collects, organizes, designs, structures, and publishes legal content.  A335 ¶3; A8707-16; A6946-48 (documents explaining the content available on Westlaw). Three types of Westlaw content are at issue (the "Westlaw Content"):

**West Headnotes**: These are summaries that identify and synthesize key issues and link to relevant parts of a case. Headnotes "are written to be understood standing alone," so "West's attorney-editors write them to summarize only certain, selected facts, and explain the court's holding and parties' contentions in clear language." A4336 ¶6; A4899:2-9.

**West Key Number System**: This is a set of topics and subtopics into which West Headnotes and cases are arranged, which reflect

7

creative choices about how to organize, classify, structure, and synthesize the law.  A4337-38 ¶¶9-12.  Although the WKNS uses legal language, exactly what verbiage to use and how to organize and adapt topics to the changing technological and legal landscape can be done in numerous ways and requires creativity and judgment.  ROSS's putative library expert, Richard Leiter, admitted that the WKNS is not the only choice available for organizing the law.  A4883:12-15, A4884:2-7; A8605:18-07:19.  Indeed, Lexis uses its own organization.  A4875:20-76:16, A4882:6-14.

**West Synopses**: These are summaries that typically appear at the beginning of judicial opinions, which synthesize key issues in a case.  A4335-36 ¶¶3-6.

Laurie Oliver, Manager, U.S. Case Editorial at TR, submitted two unrebutted declarations in this case that describe how West's team of highly-trained attorney-editors create the Westlaw Content.  A4335-37 ¶¶4, 8-11; A8630:12-31:21.  The attorney-editors draft the West Headnotes and Synopses, decide which concepts and key points of law to include, and make choices about which cases to analyze, how many West Headnotes to create for a given case, and which case passages

should be linked to which West Headnotes, among other choices. A4335-37 ¶¶4, 8-11. West's attorney-editors also decide which "Key Numbers"—*i.e.*, granular legal topics—are assigned to headnotes for purposes of integrating the headnotes and cases into the WKNS. A4895:9-22, A4896:21-97:9, A4898:14-01:6; A1853 ¶¶9-10. They regularly create and update the Westlaw Content as the law evolves. A4336 ¶7. The Westlaw Content reflects decades of creative choices about how to explain, organize, classify, structure, and synthesize the law. A4437-38 ¶¶9-12.

The Copyright Office has recognized the creativity of Westlaw by registering TR's original content and its original selection and arrangement. A174-501. TR's registrations expressly state that "copyright is not claimed as to any part of the original work prepared by a United States officer or employee as part of that person's official duties." A176.

## B.    Westlaw and the History of Artificial Intelligence

ROSS claims that a "decade ago" AI "was a fantasy." Br.1. Not for TR. In 1992, TR launched the "first commercially available search engine with probabilistic rank retrieval." AI Timeline. In 1996, it

released "History Assistant," a "large scale natural language processing [] system." *Id.* And four years before ROSS's founding, TR offered WestSearch, a product that used AI-based ranking algorithms that enabled researchers to search without using Boolean logic. A8717-21. Natural language search became available across the entire Westlaw platform in 2010, allowing researchers to use their own words to find relevant case law. A8710-11.

These AI milestones were achieved fifteen or more years ago. And although West was on the cutting-edge, it certainly was not alone. Lexis also offered natural language search by 2010. A8700. Since then, TR's AI capabilities have grown. Undisputed testimony from Isabel Moulinier, VP of Applied Research for AI at TR, ███████████████ ███ TR used the Westlaw Content to train Westlaw's AI. A4338 ¶¶12-13; A4912:13-14:13, A4915:18-20, A4916:19-24, A4917:6-11; A6105-08 ¶¶75-80; A6924-43; A4792:13-98:5, A4799:20-03:15, A4804:3-05:15. In 2018, TR launched WestSearch Plus, which allowed users to ask questions and retrieve answers from relevant cases. A8611:6-1; A8654-55 ¶44. TR has since released several new AI-powered products, including AI-assisted research on Westlaw Precision. *See* AI Timeline.

10

### C.    ROSS's Widescale Copying of Westlaw

Although ROSS tries to associate itself with the University of Toronto because its founders were once students there, Br.8-9, make no mistake: ROSS is not a research institution. ROSS executives and documents confirm the following undisputed facts: ROSS is a for-profit company.  A4809:18-10:4.  It created the ROSS platform to compete with and replace Westlaw.  Br.14 (calling ROSS a "competitor"); A6478; A4816:23-17:11 ████████████████████████████████████████

████████████████████████████████████████████████████████

██████; A4963:21-64:20.  According to ROSS co-founder Andrew Arruda, ROSS hoped law firms would stop using Westlaw and start using ROSS, and ████████████████." A4814:25-15:11, A4815:16-21:1; A4989:17-20.  ROSS designed promotional material that targeted Westlaw's customers and ████████████████████████████ A6482;  A6460  (██████ ████████ ██ ████████ ██ ████████ ████████████████████████); A6424.  ROSS marketed its Westlaw replacement ████████████████ Westlaw. A4519; A4494-97.

ROSS entered the legal research market in 2015, claiming that it provided "faster and more accurate" responses to legal research

questions using the power of AI.  A4517.  The problem is that █████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████  A4395:7-96:21.  Against this backdrop, ROSS

desperately wanted to train an actual AI algorithm how to find relevant

law in response to user queries posted in natural language.  Before it

copied from Westlaw, ROSS admits in briefing and testimony that it

*already had* a "repository" of case law.  Br.9-10; A4976:17-19; A6148-

49 ¶149.  This case is not about who can "own" the law—ROSS did not

*need* the law.  ROSS needed analysis, specifically, legal questions

mapped to relevant passages from the cases in its repository that

answered the query.  Br.9-10; A4929:23-31:9; A6487; A4824:23-25:12.

ROSS admittedly could have developed this analysis itself, without

copying from Westlaw.  A4831:5-10.  But its competitor, TR, already

spent decades investing in creating content on Westlaw that helps

researchers find and understand relevant law.  This content was perfect

for training an AI algorithm how to do the same.  Rather than creating

similar content itself, ROSS copied Westlaw's.  A6456; A4944:3-7;

A6458.

ROSS knew that it could not legally access Westlaw. When ROSS directly asked TR for a Westlaw subscription, TR expressly declined. A6444-47; A6287-347; A6945. When ROSS asked its ████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████ A6443; A6495; A6454; A4969:19-71:5. ROSS ████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████ A6449. As further evidence that it knew accessing Westlaw was illicit, when ROSS later had an employee sign up for Westlaw, ███████████████████████████████████████████████ ██████████████████████████ A6491-93; A6956.

Ultimately, ROSS got the Westlaw Content it trained its algorithm on by hiring one of TR's clients, LegalEase Solutions Inc., a legal process outsourcer. A6415-17. ROSS directed LegalEase to use ████████████████████████, and contracted with LegalEase to provide ROSS with 25,000 memos that copied Westlaw Content (the "Bulk Memos"). A6388-92; A6400-14; A6483-85; A4993:14-19; A4863:3-17, A4871:8-12.

13

ROSS's brief is tellingly vague about how the Bulk Memos were made.  But the practice guides for creating them reveal that, LegalEase and its subcontractor, Morae Global, copied the topics from the WKNS to create practice area labels that are in the file names of each Bulk Memo sent to ROSS.    A6358-77; A6378-87; A6120-21 ¶102; A6779. ROSS's contractors then looked at the Key Numbers within each topic and assigned each to an employee.  A6354; A6358-77; A6381.





A6394-95.

As shown below from the "Best Practices Guide for ROSS Intelligence," for each West Headnote falling under an assigned Key Number, ROSS's contractors copied the West Headnotes into the form of questions. A6358-77; A6378-87; A6393-99.



A6366.

To create the best "answers" to those questions, they copied the case passages that West's attorney-editors had selected to link to those West Headnotes. A4839:14-19; A6781; A4933:12-35:23. This systematic process meant that both the headnotes and their arrangement within the WKNS was being copied, as described in an example from a guide for the project:

> Topics will be assigned based upon the Westlaw key system. At the top level will be the Westlaw key topic e.g. 298 Perpetuities. Within each key will be individual keys and within each key will be a list of cases that each have headnotes. We will prepare a memo for every **unique** headnote that appears under a given Westlaw Key.
>
> For example, for topic 298 Perpetuities, Key 2- "What law Governs" there are 42 cases with headnotes so we would prepare 42 memos.

A6381. This was also admitted to by ROSS's contractors. A4862:1-3, A4869:24-70:2; A4839:14-19.

Using this process, ROSS's contractors created thousands of Bulk Memos quickly, even using a bot to scrape Westlaw *en masse*. They copied verbatim approximately ***17,000*** annotated cases to obtain the copied West Headnotes and ***hundreds of thousands*** of annotated cases in total during the course of its project for ROSS. A6217; A6356; A4858:8-10.

ROSS vaguely claims it did not "capture" this content during training, but ROSS admittedly copied the Bulk Memos (and the corresponding Westlaw Content therein) ***multiple times*** to train its legal research platform. A6026-28 ¶¶25-27; A5987-89 ¶¶31-36, 38; A6465-69; A6461-64; A4985:14–21.

Hoping to argue that the copied headnotes were verbatim copies of judicial opinions or that the Bulk Memo questions were dissimilar to the copied headnotes, ROSS hired an expert, Barbara Frederiksen-Cross, to conduct a three-way comparison. Even she was compelled to

17

admit that **no fewer than** 3,384 Bulk Memo questions were identical to West Headnotes and are **not** verbatim or near-verbatim quotations for judicial opinions. A6057-61; A3361:17-10; A3369-4333; A5010-5974. Of those, at least 2,830 Bulk Memo questions come from headnotes post-dating 1927, *i.e.*, the relevant date for purposes of the copyright term. A5010-5974; A604-06.

ROSS's copying resulted in real-world market substitution.  Mr. Arruda admitted ███████████████████████████████ ███████████████  A4815:9-11;  A4814:25-15:2.   Mr. van der Heijden confirmed that ████████████████████████████████████ ███████  A4983:16-19.  When asked about customers who canceled their Westlaw subscriptions for ROSS, he testified that ROSS ██████ ██████████████████████████  A4984:4-18.  ROSS's documents reflect ████████████████████. A6784; A6474.

## D.    TR Proudly Protects the Creativity of its Attorney-Editors

As soon as TR learned of ROSS's widescale infringement, it took action.  On May 6, 2020, understanding that ROSS would not stop its infringement unless enjoined, TR commenced this lawsuit.  A157-73. ROSS severely misrepresents the scope of TR's lawsuit by contending

that "the only original West works at issue" are the "West Headnotes."
Br.48-49.  TR brought this lawsuit based on its copyright registrations
for Westlaw, which include the three types of Westlaw Content
described herein.  A157-73.  The wording of the West Headnotes is ***not***
and has never been the only Westlaw Content that ROSS copied.  ROSS
directly copied the WKNS and the selection and the arrangement of the
West Headnotes and case passages that appear in the question/answer
pairs in the Bulk Memos.  It indirectly copied Westlaw through
LegalEase, including copying thousands of annotated cases containing
Westlaw Content.

ROSS filed its Second Amended Answer to TR's Complaint
asserting twenty-three defenses.[1]  A563-67.  On December 22, 2022, TR
moved for summary judgment on copyright infringement, tortious
interference with contract, fair use, and other defenses. A549-A56;
D.I.252; D.I.254.  ROSS moved for summary judgment on tortious
interference with contract and fair use. D.I.270; D.I.272.

---

[1] ROSS claims this lawsuit forced it to close its doors, but the reality is
that ROSS's executives and an investor admitted ███████████████
███████████████████████████████████████████████████████████
A4380:11-22; A4444:16-45:9; A4354:10-55:9.

On September 25, 2023, the district court issued an opinion on the Parties' competing summary judgment motions. It granted in part and denied in part TR's motion for summary judgment on copyright infringement. The district court found there were factual issues on the originality of the headnotes, but granted summary judgment on actual copying, noting that "LegalEase admitted to copying at least portions of the headnotes directly," it "had access to Westlaw, which included access to the headnotes," and that "no reasonable jury could say that the similarities" between ROSS's and TR's works are "not at least probative of some copying." A8-9. The district court also granted TR's motion for summary judgment on ROSS's miscellaneous defenses. A33-34. It denied both Parties' motions for summary judgment on fair use, finding factual issues remained. A15-26.

As trial approached, the district court indicated that upon considering the evidence more closely, it was inclined to grant TR's motion for summary judgment on copyright infringement. ROSS requested further briefing, and the district court agreed, allowing TR to renew its summary judgment motion on copyright infringement. D.I.663; A6352. At ROSS's request, the district court also permitted

both parties to renew their motions for summary judgment on fair use. *Id.* So, although ROSS frames the district court's opinion as an "abrupt" change of mind, new briefing on fair use was only done at ROSS's insistence.

On October 1, 2024, TR moved for summary judgment on fair use and direct infringement of a subset of West Headnotes where it contended originality was undisputed in light of the admissions of ROSS's expert. D.I.672; D.I.674. In response to TR's motion on direct infringement, ROSS argued "there is a genuine factual dispute about how original the headnotes are." A8587, A8589. ROSS moved on fair use. D.I.676. Without being invited by the district court, ROSS moved on copyright infringement; the district court did not require a response from TR to that motion, so it was not fully briefed. D.I.667.

On February 11, 2025, the district court issued an order on summary judgment. ***First***, it held as a matter of law that ROSS infringed TR's copyrights in Westlaw by copying 2,243 West Headnotes. A39. To get there, the district court painstakingly "slogged" through these headnotes "one by one" and compared them ***both*** to what ROSS copied ***and*** to the underlying judicial opinions to which they were

linked. A46, A8726-9720. It concluded that the West Headnotes were both substantially similar to what ROSS copied and **_different_** from the underlying judicial opinions. A46. **_Second_**, the district court held that ROSS's copying was not fair use as a matter of law. It found that ROSS's use of Westlaw was commercial and insufficiently transformative because ROSS copied for the same purpose as the original. A50-51. Moreover, ROSS, despite bearing the burden, did not put forward sufficient facts to show that existing and potential markets for the Westlaw Content would not be affected by its use. A56. The district court noted that "[t]here is nothing that Thomson Reuters created that Ross could not have created for itself" without infringing. A57.

The parties prepared for trial on ROSS's direct infringement of the remaining Westlaw Content, indirect infringement, and tortious interference, which will happen regardless of how this appeal is resolved. On April 4, 2025, the district court stayed trial and certified the appeal, while stating that it "remain[s] confident in [its] February 2025 summary judgment opinion." A59.

## STATEMENT OF THE ISSUES

Whether the district court correctly held that (1) the 2,243 West Headnotes on which it granted summary judgment are original and (2) ROSS's copying was not fair use.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over TR's copyright claims. 28 U.S.C. §§1331, 1338. This Court has jurisdiction under 28 U.S.C. §1292.

## STANDARD OF REVIEW

The Third Circuit reviews grants of summary judgment *de novo*. *TD Bank N.A. v. Hill*, 928 F.3d 259, 270 (3d. Cir. 2019).

## SUMMARY OF ARGUMENT

The district court recognized that "copyrights encourage people to develop things that help society, like good legal-research tools. Their builders earn the right to be paid accordingly." A57; *see* Brief of Association of American Publishers ("AAP.Br.") §I. This observation echoed *Harper & Row Publishers, Inc. v. Nation Enterprises*, which held that copyright supplies "the economic incentive to create and disseminate ideas" because "encouragement of individual effort by personal gain is the best way to advance public welfare through the

23

talents of authors and inventors." 471 U.S. 539, 558 (1985). The district court's holdings on originality and fair use help secure this fundamental goal, ensuring that the incentives for legal-research platforms to innovate remain intact. It should be affirmed.

*First*, the West Headnotes are protectable. Headnotes have long been recognized as a *quintessential* example of copyrightable legal material. And the specific 2,243 headnotes here—the creation of which involved creative choices about wording, selection, organization and context—easily meet the low bar for creativity required, as ROSS's own experts admitted.

*Second*, each of the fair use factors militates against fair use as a matter of law. On **Factor 4**, ROSS harmed the original market for Westlaw by substituting therefor, and also harmed the potential market for Westlaw Content as AI training material. On **Factor 1**, ROSS's purpose was commercial and in bad faith. Moreover, it was not transformative, as ROSS copied Westlaw for the same purpose as the original work. On **Factor 2**, the creation of the Westlaw Content requires many creative choices, and is thus close to the core of

copyright.  Finally, on **Factor 3**, ROSS copied the heart of Westlaw; the editorial content that makes it valuable.

Accordingly, the district court's ruling should be affirmed.

## ARGUMENT

## I.    ROSS COPIED PROTECTABLE HEADNOTES

To establish a claim of copyright infringement, a plaintiff must establish: "(1) ownership of a valid copyright; and (2) unauthorized copying of original elements of the plaintiff's work."  *Dun & Bradstreet Software Servs, Inc. v. Grace Consulting, Inc.*, 307 F.3d 197, 206 (3d Cir. 2002).  West holds a presumptively valid copyright in Westlaw. A174-501; 17 U.S.C. §410(c).  The question ROSS presents on this appeal relates to the second prong: whether the West Headnotes are a protectable part of Westlaw.  The district court correctly held that they were, concluding that ROSS infringed West's copyrights in Westlaw by copying at least 2,243 protectable headnotes in the question-answer pairs comprising the Bulk Memos.  A43-48.

### A.    The Supreme Court Has Held That Headnotes Are Copyrightable

Although ROSS's brief claims it is an unsettled question, the Supreme Court repeatedly has held that headnotes are copyrightable.

Over a century ago, in *Callaghan v. Myers*, it considered whether portions of legal reports reflecting the "work of the mind and hand of the reporter," including "head-notes" were the "proper subject of copyright under the act of congress." 128 U.S. 617, 626 (1888). It concluded that they were. *Id.* at 649. And a valuable copyright at that—the Court recognized that "a publication of the mere opinions of the court, in a volume, without more, would be comparatively valueless to anyone." *Id.*

*Callaghan* was decided in the same term as *Banks v. Manchester*, which ROSS cites as supposed support for its argument that headnotes "are not copyrightable." Br.24-25 (*citing* 128 U.S. 244, 253 (1888)). The two holdings, however, are consistent: *Banks* found that judges cannot hold copyrights in cases that bear the force of law, but *Callaghan* clarified that private parties *can* hold copyrights in legal annotations and summaries, like headnotes and syllabi, based on those cases. Just five years ago, the Supreme Court reaffirmed these basic principles in *Georgia*; in a discussion of headnotes that ROSS tellingly fails to disclose, the Court found that *Callaghan* "upheld the reporter's copyright interest in several explanatory materials" including

26

"headnotes."  590 U.S. at 265.  This was so uncontroversial that even the dissenters noted that "all agree" headnotes are protectable.  *Id.* at 293.

Lower courts too have consistently treated headnotes, including West's, as protectable. *See*, *e.g.*, *West Publ'g Co. v. Lawyers' Co-operative Pub. Co.*, 79 F. 756, (2d Cir. 1897) (reporter "may acquire a valid copyright for the headnotes"); *Jurisearch Holdings, LLC v. Lawriter, LLC*, 2009 WL 10670588, at *5 (C.D. Cal. 2009) (noting if the material at issue includes "headnotes or case summaries, then this original material would be subject to copyright protection."). Indeed, in *West Publ'g. Co. v. Mead Data Center, Inc.*, on which ROSS relies, ***even the defendant*** conceded that "headnotes prepared by West, merit copyright protection." 799 F.2d 1219, 1223 (8th Cir. 1986); *see also West Publ'g Co. v. On Point Sols., Inc.*, 1994 WL 778426, at *1 (N.D. Ga. 1994) ("The parties are in agreement that West has a valid copyright in the editorial enhancements," including "headnote paragraphs").

## B.    The Headnotes Are Original

As in the numerous cases finding headnotes are protectable, the 2,243 headnotes at issue here are protectable because they are original.

To be original, a work needs to be "independently created" by the author and "possesses at least some minimal degree of creativity." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340 at 345 (1991). The bar for originality is extremely low. It requires only "***some creative spark, no matter how crude, humble or obvious***." *Id.* (emphasis added). Accordingly, courts have extended copyright protection to various types of works, from car valuations to product labels. *See CCC Info. Servs., Inc. v. Maclean Hunter Mkt. Reps., Inc.*, 44 F.3d 61, 65-66 (2d Cir. 1994) (car valuation information was protectable); *Eckes v. Card Prices Update*, 736 F.2d 859, 863 (2d Cir. 1984) (selection of which baseball cards were "premium" was protectable); *FMC Corp. v. Control Sols., Inc.*, 369 F. Supp. 2d 539 (E.D. Pa. 2005) (product label was protectable); *Mead Data,* 799 F.2d at 1224 (arrangement of opinions in case reporter was protectable). Moreover, "choices as to selection and arrangement, so long as they are made independently by the compiler and entail a minimal degree of creativity, are sufficiently original that Congress may protect such compilations through the copyright laws." *Feist*, 499 U.S. at 348.

The West Headnotes easily clear this low bar. They were independently authored by West's attorney-editors. *See, e.g.*, A6501-775; A6785-6923; A4877:1-22. And they are far more than minimally creative, both in their phrasing and in their selection and arrangement. In terms of the ***phrasing*** of the headnotes, Erik Lindberg, Senior Director of Westlaw Product Management, testified that ███████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ █████████████████████████ A4898:14-01:6. In terms of the ***selection and arrangement*** of the headnotes, Ms. Oliver explained how West's attorney-editors decide how many headnotes to create, which concepts get headnoted, and with which case passages they correspond. A4335-36 ¶¶4-6; A1851-52 ¶¶3-5; A6963-73 ¶¶11-16.

These creative choices can be seen in the example below:

| West Headnote | Corresponding passage from original judicial opinion |
|---|---|
| A 'cause of action' accrues to a person when that person first comes to a right to bring action and consists of act or omission constituting violation of duty but differs from a 'right of action' which is the right to bring suit. | The Anderson case, however, was dealing with the effect of the statutes of limitation on the right of action. 'It is frequently the case that more or less confusion arises from a failure to distinguish between the cause and the right of action. 'A cause of action is said to accrue to any person when that person first comes to a right to bring an action. There is, however, an obvious distinction between a cause of action and a right, though a cause of action generally confers a right. * * *.'' Lewis' Adm'r v. Glenn, Trustee, 84 Va. 947, 979 (1888). *Mercer v. Richmond,* **80 152 Va. 736, 744 (1929). In the latter case the question was whether the sixty-day notice of injury required by city ordinance to be given before a suit could be maintained related to the date of the injury or to the qualification of the personal representative of the injured person whose death resulted from the injury. The court said that it agreed with the principle stated in the Anderson case, and other cases cited, that the right of action which accrued to the administrator upon the death of his intestate was entirely different from the right of action which accrued to the injured party, but that the right of action referred to in those cases 'is entirely different from the cause of action.' |

D.I.675.at.2.  The attorney-editor who wrote this headnote synthesized the complex case passage to which it corresponds into a single abstract legal principle.  The editor added context from different portions of the passage so that it could be better understood.  The editor made legal concepts from a specific factual context abstract and generally applicable, and rephrased the legal concepts so that they are more readily understandable.  As a result, two different lawyers, annotating the same opinion, can make different choices about what information to present and how.

30

ROSS claims that headnotes are "facts" or "data" about cases, Br.24, 33, 44, but this is wrong. Headnotes are not facts. They are the expression of the attorney-editor creating them. That headnotes are annotations about the law does not, as ROSS suggests, take away from these creative contributions. The Supreme Court held in its seminal decision, *Harper & Row*, that the "[c]reation of a nonfiction work, even a compilation of pure fact, entails originality." 471 U.S. 539 (*citing Schroeder v. William Morrow & Co.*, 566 F.2d 3 (7th Cir. 1977) (copyright in gardening directory)); *cf. Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53, 58, (1884) (originator of a photograph may claim copyright in his work); *Wainwright Secs. Inc. v. Wall Street Transcript Corp.*, 558 F.2d 91 (2d Cir. 1977) (protection accorded author's analysis, structuring of material and marshaling of facts); *Pearson Educ., Inc. v. Ishayev*, 963 F. Supp. 2d 239, 247 (S.D.N.Y. Aug. 1, 2013) (finding that manuals containing answers to questions in TR's textbooks were sufficiently original). The attorney-editors, like nonfiction writers, journalists, and textbook writers, maintain accuracy while exercising creativity in how they structure material, marshal facts, and word

complex issues. *Supra* 8-9. This is more than sufficient to meet the "modicum" of creativity required by *Feist*.

### C.   Each of ROSS's Arguments Is Meritless

#### 1.   The West Headnotes Are Not Mere Quotations from Cases

ROSS's primary argument against originality is that the headnotes lack creativity because they are "nothing more than excerpts" of cases that "follow the court's language" and "parrot" cases. Br.24-25. But ROSS ignores what the district court actually held. The district court was "not granting summary judgment on any headnotes that are verbatim copies of the case opinion." A42. Instead, it focused on the 2,830 headnotes that ROSS admitted were both similar to the Bulk Memos and different from the cases, reviewing each one and holding that ROSS's copying of 2,243 of these specific headnotes constituted infringement. A48; A8726-9720. Whether *other* headnotes are protectable was not briefed below, and is irrelevant to whether granting summary judgment was proper. And ROSS claimed there were factual issues on originality in response to TR's motion, not that *all* of the West Headnotes were unoriginal; it has thus forfeited that argument. *Garza v. Citigroup Inc.*, 881 F.3d 277, 284 (3d Cir. 2018).

The district court's focus on 2,830 headnotes was based on ROSS's own admissions. ROSS's expert, Ms. Frederiksen-Cross, analyzed and categorized the headnotes, and compared them with the Bulk Memo questions. Of the questions that she found were identical or nearly-identical to a West Headnotes, 2,830 were not verbatim or even near verbatim quotations from a case. A6057-61; A5010-5974. This was conservative. The district court directed ROSS to "submit a list of all headnotes it believes are verbatim quotations, or vary trivially from verbatim quotations, of cases." D.I.612. ROSS excluded 5,367 from its list, admitting that these headnotes vary more than trivially from the underlying case. ROSS's claim that the headnotes merely "parrot" the cases is simply disingenuous.

2. <u>The West Headnotes Are Not Dictated by Industry Conventions</u>

Despite its insistence that the West Headnotes are mere quotations, ROSS contradicts itself by conceding that some headnotes are not. To account for these, ROSS argues that headnotes deviating from judicial opinions are not sufficiently creative because they are "dictated by 'industry conventions.'" Br.25 (citing *Matthew Bender & Co., Inc. v. West Publ'g Co.*, 158 F.3d 674 (2d Cir. 1998)). In *Matthew*

33

*Bender*, the material at issue included case captions, attorney information, and subsequent history. Headnotes were expressly ***not*** at issue because there they were "redacted" by the defendants, who avoided taking the material that ROSS stole here. *Id.* at 682. Regardless, *Matthew Bender* did not hold that works subject to industry standards are always uncopyrightable—it held that, in the context of selection and arrangement specifically, where industry standards "***so dictate*** selection that ***any person*** composing a compilation of the type at issue would necessarily select the same categories of information," the result is unprotectable. *Id.* (emphasis added).

ROSS's invocation of *Matthew Bender* is unavailing. ROSS presented no evidence of industry conventions at all—West's manuals, to which ROSS points, are internal training documents reflecting ***TR's*** original editorial choices, not an industry standard. And the ███████ ████████████████████████████████████████████ show precisely why ROSS's argument that attorney-editors follow conventions and avoid independent judgment when creating headnotes, Br.25, is wrong; ██████ ████████████████████████████████████████████████ ████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████ A8247. ████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

*See* A6525. ███████████████████████████████████

██████████████████████████████████████████████

> **EXAMPLE 1**
>
> **WRONG**: Material issues of fact, precluding summary judgment, existed as to whether surgeon negligently damaged patient's urethra while performing hysterectomy and bilateral salpingo-oophorectomy; patient gave deposition testimony that physician told her urethra might have been stitched during surgery, and medical expert's report stated patient's urethra condition was caused by the surgery.
>
> **RIGHT**: Genuine issue of material fact existed as to whether surgeon negligently damaged patient's urethra while performing hysterectomy and bilateral salpingo-oophorectomy, precluding summary judgment in medical malpractice action.
>
> **RIGHT** (alternately): Genuine issue of material fact as to whether surgeon negligently damaged patient's urethra while performing hysterectomy and bilateral salpingo-oophorectomy precluded summary judgment in medical malpractice action.

*Id.*

ROSS's reliance on *Southco Inc. v. Kanebridge Corp.* is similarly misplaced. There, the court found that part numbers were not protectable because they were "rigidly" dictated by rules of a system "without the slightest element of creativity." 390 F.3d 276, 282 (3d Cir. 2004). That is not the case here, where West's own manuals show that there are multiple ways editors could create headnotes for the same

35

case passage. A6525.  This evidence also shows why ROSS's argument that "a competitor would have difficulty" creating an alternative to the headnotes is wrong.  Br.26.  ROSS's expert admitted that the number and content of the headnotes can vary, like the headnotes on Lexis. A4875:20-76:16, A4882:6-14.

ROSS argues attorney-editors do not "add to or amend substance" in headnotes. Br.26.  ROSS is wrong.  West's ███████████████

████████████████████████████████████████████████

████████████████████████████  A8240.  This is consistent with the other record evidence.  Ms. Frederiksen-Cross's analysis shows that the headnotes do, in fact, deviate from the original.  *Supra* 18.  Likewise, Mr. Lindberg explained that █████████████████████████

████████████████████████████████████████████████

██████████████████████████████  A4899:16-01:6 ████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████    The record shows that ROSS's claim that the headnotes mechanically "parrot" cases is wrong.

3.    <u>The West Headnotes Have Not "Merged" with Facts</u>

ROSS claims that, regardless of whether the headnotes deviate from the cases, the idea of the law and the expression of the headnotes have "merged."  Br.28.  Not so.  "Under the merger doctrine, a court will not protect a copyrighted work from infringement if the idea contained therein can be expressed in only one way." *Oracle Am., Inc. v. Google Inc.*, 750 F.3d 1339, 1360 (Fed. Cir. 2014).  The fact that "there are a sufficient number of ways of expressing [an] idea ... preclude[s] a ruling that the idea has merged into its expression." *Kregos v. Associated Press*, 937 F.2d 700, (2d Cir. 1991); *Apple Computs., Inc. v. Franklin Comput. Corp.*, 714 F.2d 1240, 1253 (3d Cir. 1983); *Educ. Testing Servs. v. Katzman*, 793 F.2d 533, 538 (3d Cir. 1986).  The fact that headnotes could be worded in a number of different ways—by adding different context or including/excluding different concepts—shows merger does not apply.  *Supra* 35.  As the district court rightfully noted in rejecting this defense, "there are many ways to express points of law."  A49.

37

ROSS protests that allowing copyright protection would give TR a "monopoly" in the law.[2]  ROSS is wrong.  As an initial matter, copyright protection extends to only TR's creative contributions, not the underlying legal concepts, which can be described in a multitude of ways.  *Feist*, 499 U.S. at 350.   Moreover, copyright infringement requires a showing of "actual copying."  *Dam Things from Denmark v. Russ Berrie & Co.*, 290 F.3d 548, 562 (3d. Cir. 2002).  Regardless of the protectability of the headnotes, the public is and remains free to copy the law directly from cases or describe that law however it likes.  In fact, ROSS could have done that.  ROSS *had* all of the cases in its possession.  *Supra* 12.   ROSS could have used those cases to independently create training material, but instead—like a student copying from another kid in class—ROSS copied TR's editorial content.

4.    <u>ROSS Ignores Selection and Arrangement</u>

ROSS's focus on how similar the headnotes are to the language of the cases ignores another fundamental part of their creativity that the district court properly recognized: selection and arrangement.  *Supra* 29.  ROSS argues that "[t]his is not a compilation case."  Br.32.  But

---

[2] ROSS relies on *Satava v. Lowry*, but that case concerned the look of lifelike jellyfish, not editorial works. 323 F.3d 805, 811 (9th Cir. 2003)

that is the opposite of what ROSS told the district court below, where it contended that compilation was the ***only*** thing at issue. A8588. ROSS suggests that the district court focused on selection and arrangement as a supposed "distraction." Br.30. But the district court discussed that ROSS copied ***both*** the wording of the headnotes and their selection and arrangement. A41.

ROSS and its amici claim that choosing which portions of cases to headnote is not copyrightable, taking issue with the district court's comparison between attorney-editors crafting headnotes and sculptors crafting a sculpture. Br.29. But the district court's opinion is in line with *Feist*, which held "***even a directory that contains absolutely no protectible written expression, only facts, meets the constitutional minimum for copyright protection if it features an original selection or arrangement***." 499 U.S. at 348. In particular, *Feist* found:

> The compilation author typically chooses ***which facts to include***, in what order to place them, and how to arrange the collected data so that they may be used effectively by readers. These choices as to selection and arrangement, so long as they are made independently by the compiler and entail a minimal degree of creativity, are sufficiently original that Congress may protect such compilations through the copyright laws.

*Id.* (emphasis added).

Regardless, West's attorney-editors did not just select what headnotes to create, they also chose what headnotes to pair to which legal passages, pulling abstract concepts from different portions of sometimes large passages (as shown above), and synthesizing them into a single legal point. ROSS copied ***this*** arrangement—the headnotes (the "questions" in the Bulk Memos) paired with the case passages (the "great answer" in the Bulk Memos).

## II.    ROSS'S COPYING IS NOT FAIR USE

In the AI context or otherwise, where the copying at issue is a direct commercial substitute for the original work, fair use does not apply as a matter of law. Each of the four fair use factors confirm this.[3] And rightfully so. Any other conclusion would invert the economic incentive structure that rewards creators by preventing theft of their works.

---

[3] To clarify, although the district court granted summary judgment on direct infringement as to only 2,243 headnotes, leaving copying of other content and indirect infringement for the jury, ROSS's fair use defense does not excuse, as a matter of law, ***any*** of the copying in this case. This section thus discusses the Westlaw Content, not merely the West Headnotes.

**A.**    <u>Factor Four</u> – **ROSS Affected the Market for and Value of Westlaw**

This factor considers "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. §107(4); *Harper*, 471 U.S. at 566. TR begins with factor four because the Supreme Court recognized it as the most important factor. *Harper*, 471 U.S. at 566. Courts analyzing factor four consider effects on both the actual and the potential markets for the work and derivatives, including "those that creators of original works" would "license others to develop." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 592 (1994). And, although ROSS ignores it, courts must assess "whether unrestricted and widespread conduct of the sort engaged in by the defendant" would affect the potential market for the original. *Id.* at 590; *Murphy v. Millennium Radio Grp., LLC*, 650 F.3d 295, 308 (3d Cir. 2011); *see also Harper*, 471 U.S. at 568.

Contrary to ROSS's claim that TR bears the burden on factor four, Br.47, the "burden of proving that the secondary use does not compete in the relevant market is … ***borne by the party asserting the defense***." *Andy Warhol Found. for Visual Arts, Inc. v. Goldsmith* ("*Warhol I*"), 11 F.4th 26, 49 (2d Cir. 2021) (emphasis added); *Dr. Seuss*

41

*Enters. v. ComicMix LLC*, 983 F.3d 443, 459 (9th Cir. 2020); *see Campbell*, 510 U.S. at 590 (proponent of fair use has burden of bringing forward evidence). ROSS fails to carry its burden.

### 1. ROSS Created a Substitute for Westlaw

First, as the district court correctly notes, ROSS's copying of Westlaw affected the market for Westlaw by allowing ROSS to create a competing substitute. "When a secondary use competes in the rightsholder's market as an effective substitute for the original, it impedes the purpose of copyright to incentivize new creative works by enabling their creators to profit from them." *Capitol Recs., LLC v. ReDigi Inc.*, 910 F.3d 649, 662 (2d Cir. 2018); *see also Harper*, 471 U.S. at 550.

It is undisputed that ROSS and TR offer the same service: helping customers identify relevant law by searching through cases. *Compare* A4995-07 *with* A5008-09; A4952:25-53:11. ROSS explicitly offered its platform as a "replacement" for Westlaw and targeted the same customers. *Supra* 11-12. An example is shown below:



A6497. ROSS's actions resulted in actual market substitution, including actual customers who switched from Westlaw to ROSS. *Supra* 11-12.

ROSS advances two meritless arguments in response. ***First***, it claims that the market for Westlaw is irrelevant and that the only relevant market is the market for headnotes. Br.47-49. ROSS is incorrect. ROSS is accused of directly and indirectly infringing TR's

copyrights *in Westlaw*. Indeed, in its discussion of factor three, ROSS asks the Court to consider the "entire" work and look at the percentage of headnotes copied compared with all of the headnotes on "Westlaw.com." Br.37. ROSS's claim in factor four that "Westlaw.com was not copied" rings hollow. Br.49. The bottom line is that Westlaw is the registered work. A174-501. Factor four considers the effect of the use on the market for the copyrighted work. 17 U.S.C. §107(4).[4]

Moreover, ROSS ignores that the Westlaw Content is licensed through subscriptions to Westlaw. In *A&M Records, Inc. v. Napster*, which ROSS cites, the Ninth Circuit considered the effect of copying songs on the market for "CD sales." 239 F.3d 1004, 1018 (9th Cir. 2001). Just as one gets songs from CDs, one gets Westlaw Content from Westlaw. A8724:13-18. Here, ROSS used the Westlaw Content to create a platform that affects TR's ability to license the Westlaw Content through Westlaw—that market effect cannot be ignored.[5]

---

[4] ROSS also copied *more* than just the headnotes, so limiting the market to only headnotes would be too narrow for this reason, too.

[5] Contrary to ROSS's characterization, the *Google* court *did* consider the market for phones, concluding that the jury heard evidence that "Sun was poorly positioned to succeed in the mobile phone market." 593 U.S. at 36.

***Second***, ROSS and its amici argue that its blatant market substitution does not matter because its "AI legal search engine" does not provide the infringing content and is itself a "non-infringing work." Br.50.  But ROSS's platform is ***built*** on infringing content—it does not matter if that content appears in the end-product.  Indeed, *Kadrey v. Meta*, a case on which ROSS relies, explicitly recognized that an AI algorithm could harm the market for the original even where it did not deliver infringing content.  788 F.Supp.3d 1026, 1053 (N.D. Cal. 2025) ("The third way that using copyrighted books to train an LLM might harm the market for those works is by helping to enable the rapid generation of countless works that compete with the originals, even if those works aren't themselves infringing."); *see* Brief of Recording Industry Association of America and National Music Publishers Association ("RIAA.Br.") §II.B (explaining why fixating on the output is wrong as a matter of law).  ROSS's citation to *Google Books* on this point also is misplaced, as that case involved a tool that provided searchers access to small, arbitrarily distributed snippets of books that were unlikely to substitute for the original books and actually helped customers ***find*** the original books (and potentially buy them).  804 F.3d

at 224.  Here, customers are not directed to the original; they are being pitched to purchase ROSS ***instead*** of Westlaw.

## 2.    ROSS Harmed the Value of the Westlaw Content

Although ROSS ignores the issue, it separately harmed the value of the Westlaw Content by depriving TR of exclusivity in using the content to train AI. 17 U.S.C. §107(4) (considering effect on the market "or value" of the copyrighted work).  Copyright law recognizes that exclusivity can contribute to the value of a copyrighted work, and that depriving an author of that exclusivity can decrease its value.  *See Harper*, 471 U.S. at 543 (exclusivity factored into the licensing fee for work); *FameFlynet, Inc. v. Jasmine Enters., Inc.*, 344 F. Supp. 3d 906, 913 (N.D. Ill. 2018) (loss of ability to control a photographs' exclusivity diminished its value).  In *Seuss*, for example, the Ninth Circuit recognized the author's decision "not to saturate those markets with variations of their original," by holding back on allowing certain uses. 983 F.3d at 461.  Similarly, in *Monge v. Maya Magazines*, the value of a photograph was "severely diminished" by an unauthorized first use. 688 F.3d 1164, 1182 (9th Cir. 2012).

Westlaw Content was especially valuable at the time ROSS was using it because TR had chosen to use it to develop its own proprietary algorithms.  A4912:4-11, A4917:1-11; A4851:21-52:13.  TR elected ***not*** to make this content available for competitors to create comparable algorithms at that time.  *See* A4338 ¶13; A4906:30-24.  ROSS has recognized the competitive advantage afforded by exclusivity.  After purchasing the Bulk Memos, ROSS ███████████████████████ ████████████████████████████████████. A4937:24-40:19. ROSS specifically did not want ████████████████████████ ████████████████████████████████████████ ████████████████████ *Id.* (emphasis added).

TR similarly wanted to retain the benefits both from having an unmatched algorithm trained on its own content ***and*** from being able to enter the AI market at a strategically advantageous time and under suitable terms.  A4907:5-08:22.  Thus, the market effect here is similar to that in *Seuss*, where ComicMix harmed the market for the plaintiff's content by pushing out content "hop[ing] to get to one of the potential markets for Seuss's derivative works before Seuss."  983 F.3d at 460; *see Salinger v. Colting*, 607 F.3d 68, 74, 83 (2d Cir. 2010). ROSS jumped the

47

gun, and thus, as TR's damages expert explained, deprived TR of the

███████████████████████████████████████████

A4907:5-08:22.

### 3. ROSS Inhibited Licensing Markets for Westlaw Content

ROSS also copied the Westlaw Content without paying for it, thereby impeding TR's ability to license that content and its derivatives in existing and potential licensing markets therefor. The "impact on potential licensing revenues is a proper subject for consideration in assessing the fourth factor." *Hachette Book Grp., Inc. v. Internet Archive*, 115 F.4th 163, 192 (2d Cir. 2024); Nimmer on Copyright §13F.08 (2024) (considering effect on "any potential market [the plaintiff] might plausibly enter"). Using a work without paying the customary licensing fee constitutes market harm. *Id.*; *Fox News Network, LLC v. TVEyes, Inc.*, 883 F.3d 169, 180 (2d Cir. 2018) (by using content without payment, TVEyes deprived Fox News of "licensing revenues from TVEyes"); *Murphy*, 650 F.3d at 308 (finding ability to reproduce photographer's work without paying traditional license fee would adversely impact "ability to license his photographs," making it "likely that cognizable market harm" would occur). To

prevent the fourth factor analysis from becoming circular, courts only consider harm from the loss of fees paid to license the work in traditional, reasonable, or likely to develop markets. *Ringgold v. Black Entm't Television, Inc.*¸ 126 F.3d 70, 81 (2d Cir. 1997).

There are two licensing markets impacted by ROSS's copying. There is an ***existing*** market for and clearly defined value to Westlaw.[6] TR's customers pay to access the Westlaw Content on Westlaw.com. ROSS disrupted this market by creating a Westlaw substitute *and* by not paying the customary fee for the content it directly accessed and induced LegalEase to access outside the scope of a license.  Failing to pay the customary fee in the existing market for the work is a recognized market harm, impairing TR's ability to charge others for the same content.  A4907:5-08:22; *see Davis v. Gap, Inc.*, 246 F.3d 152, 167-168, 175-76 (2d Cir. 2001) (freely taking a copyrighted work allowed defendant to avoid "paying the customary price," that plaintiff "was entitled to charge" for use of work, causing plaintiff to "suffer[] market harm").

---

[6] ROSS claims that there is no market for headnotes as "independent search tools," Br.50, but this does not matter because the content is licensed through Westlaw.

ROSS similarly hurt the licensing market for derivatives of Westlaw Content as AI training material. *See* AAP.Br §II.B; Brief of AI Coalition for Data Integrity ("AICDI Br.") §IV. ROSS claims that the Bulk Memos, derivatives of the Westlaw Content, were "never offered at market," Br.51, but they were—ROSS paid LegalEase ███████████ ████████ for them and profited from the resulting ROSS Platform. A4957:1-25; A6435; A6252-55; *see Fox,* 883 F.3d at 180 (willingness to pay showed value). And there is other extensive, undisputed evidence that this market for AI training is both an actual that already exists and a potential market that is likely to continue to expand and develop:

(i)  Markets for other content to train AI already exist. TR's AI expert, Dr. Jonathan Krein, ████████████████████████ ██████████████████████████████████ ██████████████████. A6107-13.

(ii)  ROSS's market expert, Dr. Alan Cox, admitted there is at ██████████████████████████████████ ██████████████ A4855:5-12, A4856:8-18.

(iii)   TR's use of the Westlaw Content to train its **own** AI algorithm confirms its usefulness for this purpose. *Supra* 10.

(iv)   There are other potential customers for this content; other legal research companies use AI on their own platforms, indicating potential demand. A6209-12; A4843:20-44:3.

(v)   ROSS recognized that other companies would want the Westlaw Content ███████████████████████████ ███████████████████████████████ ████████████████ A4937:2-38:20.

ROSS claims TR is not harmed because it "made no attempt to enter the AI training market" and has a policy against licensing its content to competitors. Br.51.[7] But TR gets to decide when to license its works, especially as the licensing market for AI increases in value. *See* AAP.Br. §II.A-B.

---

[7] ROSS relies on *Swatch Group Management Services Ltd. v. Bloomberg L.P.*, but that case involves a news service copying an earnings call, and there was no market harm because Swatch had no interest in the protected aspects of the call. 756 F.3d 73 (2d Cir. 2014). This is the polar opposite of the situation here, where TR licenses the Westlaw Content for a fee currently.

The Second Circuit has recognized that "[i]t would [] not serve the ends of the Copyright Act—*i.e.*, to advance the arts—if artists were denied their monopoly over derivative versions of their creative works merely because they made the artistic decision not to saturate those markets with variations of their original." *Castle Rock Ent., Inc. v. Carol Publ'g Grp.*, 150 F.3d 132, 145-46 (2d Cir. 1998); *Salinger v. Random House*, 811 F.2d 90, 99 (2d Cir. 1987) (even where author disavowed intention to publish works, unauthorized publication harmed potential licensing market); *Shihab v. Source Digital, Inc.*, 2024 WL 3461351, at *7 (S.D.N.Y. July 18, 2024). Although the Third Circuit has not expressly considered this issue, the Ninth, Sixth, and Eleventh Circuits are all in accord. *See, e.g., Monge*, 688 F.3d at 1181 (plaintiff had right to control delayed future markets where he disavowed intent to enter them); *Worldwide Church of God v. Phila. Church of God, Inc.*, 227 F.3d 1110, 1119 (9th Cir. 2000) (same); *Balsley v. LFP, Inc.*, 691 F.3d 747, 761 (6th Cir. 2012) (adverse market effects where plaintiffs "have no present intention of exploiting the market"); *Pac. & S. Co., Inc. v. Duncan*, 744 F.2d 1490, 1496 (11th Cir. 1984) ("Copyrights protect

owners who immediately market a work no more stringently than owners who delay before entering the market.").

ROSS argues that TR "did not think that there would be enough such use to bother making a license available." Br.51. The quotation, which it attributes to TR, in fact comes from another case, *Cambridge University Press v. Patton*, where there was little or no demand and the value of the market was "de minimis or zero." 769 F.3d 1232, 1277 (11th Cir. 2014). ROSS does not provide a ***single*** record cite to support this claim, and unlike in *Cambridge*, TR plainly recognized the value of the Westlaw Content as training data by itself training its AI thereupon and maintaining that right as exclusive. *Supra* 10.

Finally, ROSS argues that TR's policy against licensing the Westlaw Content to competitors makes headnotes a "lock" preventing future creativity. Br.51. Not so. ROSS already had a corpus of judicial opinions from which it could create its own legal analysis. *Supra* 12. ROSS's own expert admitted that ROSS could have developed its legal research platform independently. A4831:5-10. That ROSS took a shortcut does not mean that TR of any of these other platforms has or will have a "lock" on the market.

### 4.   Widespread Uses Like ROSS's Would Harm the Market for Westlaw

ROSS does not address a central aspect of market harm set out in *Campbell*—"whether unrestricted and widespread conduct of the sort engaged in" by ROSS would undermine the potential market for the copyrighted work.  510 U.S. at 590.  If similar uses were to become widespread, it would encroach on the copyright by diminishing TR's ability to command a price.  A6253-54.  In the original market for Westlaw, why invest in hiring editors to create this editorial content if anyone can copy it outside of the scope of their license?  In the AI training market, if any competitor could copy the Westlaw Content to train their own legal research platform, why on earth would anyone pay TR for it?  This burgeoning licensing market would be destroyed, which is textbook market harm.  *Monge*, 688 F.3d at 1182 (widespread use would cause "the bottom literally dropp[ing] out of the market").

### 5.   ROSS's Use Harms the Public

ROSS treats the question of whether the public benefits from the copying as a standalone issue, but the Supreme Court discussed it in the context of factor four and TR does the same here.  *Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 36 (2020).  Copyright provides the

economic incentive for the creation of legal editorial content like Westlaw, which benefits the public. *Supra* 23-24. Where "there is a fully functioning market that encourages the creation and dissemination" of a work, "permitting 'fair use' to displace normal copyright channels disrupts the copyright market without a commensurate public benefit." *Harper*, 471 U.S. at 568 n.9. This is precisely what ROSS is asking this Court to do. As detailed above, there is a fully functioning market that encourages the creation and dissemination of legal research content. Companies like Lexis and Bloomberg offer legal research tools **without** copying Westlaw. Allowing uses like ROSS's would disrupt this already operational market.

ROSS claims four public benefits from its copying, none of which have merit. **First**, ROSS claims it increased "access to justice and sparked innovation" in the legal research market. Br.2. But as the district court recognized, "legal opinions are freely available"; copyright

encourages the creation of new search tools.  A56.  And ROSS sold its platform at ██████████ Westlaw.  *Supra* 12. [8]

***Second***, ROSS argues that if fair use is not found here, "no innovator will attempt to apply AI to new legal access projects."  Br.52.  ROSS has presented no evidence that innovators must copy Westlaw to develop their AI models, and ROSS itself could have developed its own platform without copying from Westlaw.  *Supra* 12.  The public does not benefit from protecting and encouraging ROSS's behavior, which included accessing Westlaw illicitly.  *Supra* 13.

***Third***, ROSS claims that "copyright law will halt AI development" if the district court's decision is not reversed.  Br.52.  But the district court did not purport to resolve the question of how copyright law applies to use of works by AI systems in all scenarios, let alone all scenarios involving generative AI.   And the Court need not do that now.  Much of AI development is ***not*** built on illicit copying, and many companies license the content they use for training.  AICDI.Br. §IV.

---

[8] Authors Alliance's argument that increasing access to the law justifies the commercial copying here, D.I.047, fails for the same reason.

*Finally*, ROSS claims its AI implicates "national security." Nothing in the record supports this claim. ROSS's product is a legal research platform that has nothing to do with national security. It is improper for ROSS to suggest that the Court in this case needs to resolve the question of whether *all* AI training for *all* purposes is fair use or not. It is also worth noting that TR itself is a major contributor to responsible AI development, and its copyrights aid that development. ROSS's parasitic copying of TR's investment disincentivizes similar future investments.

The district correctly weighed factor four against fair use.

## B.    <u>Factor One</u> – ROSS Copied to Create a Commercial Substitute

This "factor [] focuses on whether an allegedly infringing use has a further purpose or different character" from the original. *Warhol II*, 598 U.S. at 509. Courts consider whether the use was (1) commercial, (2) in bad faith, and (3) transformative. *Authors Guild v. Google, Inc.*, 804 F.3d 202, 214, 218–19 (2d Cir. 2015). Each weighs against fair use here.

### 1.    ROSS's Use Was Commercial

Where the user stands to profit from the exploitation of copyrighted material "without paying the customary price," this weighs against fair use. *Harper,* 471 U.S. at 562; *Rogers v. Koons*, 960 F.2d 301, 309 (2d Cir. 1992) (defendant's "substantial profit" and "intentionally exploitive" use weighed against fair use). Accordingly, the Third Circuit consistently has held that commerciality weighs against fair use. *See, e.g., Murphy*, 650 F.3d at 308; *Video Pipeline, Inc. v. Buena Vista Home Ent., Inc.*, 342 F.3d 191, 198 (3d Cir. 2003) ("If a new work is used commercially rather than for a nonprofit purpose, its use will less likely qualify as fair."); *see also Dr. Seuss*, 983 F.3d at 451 (same); *Fox*, 883 F.3d at 178 (same).

ROSS is a for-profit company that was selling the ROSS platform commercially. *Supra* 11-12. And ROSS specifically offered a commercial substitute for Westlaw with the unrebutted goal of taking

███████████████████████████████████████████████████

██████████  *Supra* 11. This militates "strongly against a finding of fair use." *See Duncan*, 744 F.2d at 1496 ("unabashedly commercial" use was not fair use); *West Publ'g* 616 F. Supp. at 1580 (use of proprietary West

58

content to "enhance [the defendant's] position in the marketplace" not fair use).

ROSS claims that the district court "erroneously zeroed in" on commerciality, and contends that "commerciality weighs less heavily when the copyrighted work is functional, not creative." Br.46. ROSS's argument improperly collapses factor two, which focuses on the nature of the copyrighted work, into factor one. The argument is also unsupported by *Google*, on which relies, as *Google* held that the commerciality of the use was not dispositive due to the "inherently transformative" nature of the use, ***not*** because of the functional nature of the copyrighted work. 593 U.S. at 31. ROSS contends that commerciality does not matter because the district court's reasoning "leaves no room for innovation" as "virtually any unauthorized use of the headnotes would result in building a legal research platform." Br.46-47. This argument is incomprehensible. It is perfectly possible to create a legal research platform without copying from TR.

### 2.    ROSS's Use Was in Bad Faith

ROSS fails to address bad faith, but the Supreme Court has held that "the propriety of the defendant's conduct" is part of factor one. *See*

*Harper*, 471 U.S. at 562 ("Fair use presupposes 'good faith' and 'fair dealing'" (internal citations omitted)).  In a similar case decided after the Supreme Court's *Campbell* decision, the Ninth Circuit found bad faith where the defendant requested a license, was refused one, and **then** obtained a copy from a third party rather than paying the requisite fee.  *L.A. News Service v. KCAL-TV Channel 9,* 108 F.3d 1119, 1122 (9th Cir. 1997).  That is precisely what happened here, where ROSS was refused a license and then illicitly went through a third party.  *Supra* 13-14.

Moreover, acquiring a copyrighted work in violation of the law weighs against fair use.  *See Harper*, 471 U.S. at 563.  ROSS knew that TR ███████████████████████████████████████████████ A6445.  Yet, **after** learning this, ROSS induced first ███████ and then LegalEase to get ROSS access anyway.  *Supra* 13.   Even after being expressly told by TR that it would not license to ROSS, ROSS made efforts to access Westlaw under false identities.  *Supra* 13.  Fair use should not be twisted to encourage such behavior.

### 3.    ROSS's Purpose Was Not Transformative

Transformativeness turns on "whether and to what extent" the use at issue has a purpose or character different from the original. *Warhol II*, 447 F.3d at 778.  Whether the defendant's use has a different or further purpose from the plaintiff's "is a matter of degree."  *Id.* at 525; *see* RIAA Br.§I.A (discussing history of transformativeness). Given ROSS's commercial and bad faith use, even modest transformativeness is not sufficient to tip factor one in ROSS's favor. *See Fox*, 883 F.3d at 178 (no fair use where transformative nature of the use was "modest"); *Monge*, 688 F.3d at 1176 (no fair use where use was "minimally transformative"); *Warner Bros. Ent. Inc. v. RDR Books*, 575 F. Supp. 2d 513, 542 (S.D.N.Y. 2008) (no fair use where work was "slightly transformative").  ROSS cannot meet its burden.

This is not a generative AI case where ROSS's technology allows for the creation of wholly new works.  Rather, ROSS used the Westlaw Content—summations and syntheses of legal issues, selected and arranged in coherent categories to help researchers find and understand relevant portions of legal opinions—to train its algorithm to help researchers find relevant portions of legal opinions.  *Supra* 12-13.

TR used the Westlaw Content for exactly that purpose. *Supra* 10. Accordingly, the AI cases that ROSS cites support the district court's finding here. The *Bartz v. Anthropic PBC* court distinguished its "generative AI" case from this one and expressly agreed with the district court here that ROSS's use "was not transformative" because "what was trained—using a proprietary system for finding court opinions in response to a given legal topic—was a competing AI tool for finding court opinions in response to a given legal topic." 787 F. Supp. 3d 1007, 1022 (N.D. Cal. 2025). In *Kadrey*, although the court did not address this case directly, it agreed that fair use's purpose is to allow "new expression that won't substitute for the original work." 788 F.Supp.3d at 1046.

Unlike in *Kadrey* and *Bartz*, ROSS copied from Westlaw to create an avowed substitute for Westlaw, which it touted as a Westlaw "replacement." *Supra* 11-12. Copying for purposes of creating a competing substitute is a classic example of a non-transformative use. *See, e.g., Video Pipeline*, 342 F.3d at 199; *Am. Geophysical Union v. Texaco Inc.,* 60 F.3d 913, 923 (2d Cir. 1994); *Worldwide Church*, 227 F.3d at 1117 (copying for "same intrinsic purpose as" original was not

transformative (*quoting Weissmann v. Freeman*, 868 F.2d 1313, 1324 (2d Cir. 1989))); *Oasis Publ'g Co. v. West Publ'g Co.*, 924 F. Supp. 918, 927 (D. Minn. 1996) (no fair use where business plans showed "directly competitive" nature of infringing products with West products); RIAA.Br. §I.B.[9]

Accordingly, the district court correctly concluded that under *Warhol II*,[10] given that the purposes of the use are the same, ROSS's use is not transformative. A53. Each of ROSS's arguments to the contrary is meritless. **First**, ROSS argues that it "removed a barrier to entry" to the market, citing nothing in the record to support that claim. *Id.* But companies do not need to use Westlaw to create AI-powered legal research platforms. Even ***ROSS*** could have launched without copying from Westlaw. *Supra* 12.

---

[9] ROSS cites *A.V. ex rel. Vanderhye v. iParadigms, LLC*, but that case involved copying works for a plagiarism detection tool, which unlike here was a different purpose than the original. 562 F.3d 630 (4th Cir. 2009).

[10] ROSS attempts to distinguish *Warhol II* by arguing that it involved "creative photographs," but that improperly conflates transformativeness with factor two. Br.44.

63

***Second***, ROSS and its amici argue that its purpose here is similar to the transformative use in *Google Books* and *Hathitrust*.[11]  Br.41.  But these cases show why ROSS's purpose was not transformative.  In both *Google Books* and *Hathitrust*, the defendant took a large corpus of books and made them digitally searchable, making it easier to find information ***about the original*** and ***directing users back to the original book***.  804 F.3d at 207.  ROSS's supposed transformative purpose provides no insight or information about the original.  *See* AAP.Br §III.B.  ROSS did not create a way to search Westlaw, nor did it direct users to Westlaw.  Rather, it copied the Westlaw Content that ***already*** provided a way for researchers find and understand law to develop a ***competing*** way to find and understand law.  A Westlaw user can input a natural language question into Westlaw, and Westlaw will return a West Headnote that links to a case passage that answers that question.  *Supra* 10; AI Timeline.  ROSS copied the West Headnotes and linked case passages so that it could do the exact same thing:

---

[11] *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 818 (9th Cir. 2003) and *Perfect 10, Inc. v. Amazon, Inc.,* 508 F.3d 1146 (9th Cir. 2007) are likewise inapplicable because they involved searching and improving access to images on the Internet.

provide case passages that answer the queries. The purposes here, unlike in *Google Books* and *Hathitrust*, are ***identical***.

***Finally***, ROSS claims that the district court erred in distinguishing two out-of-Circuit cases, *Sony Computer Entertainment, Inc. v. Connectix Corp.*, 203 F.3d 596 (9th Cir. 1999) and *Sega Enterprises Ltd. v. Accolade, Inc.*, 977 F.2d 1510 (9th Cir. 1992). Br.44-46. ROSS and its amici argue that under these cases, it engaged in excusable "intermediate copying" because it copied the Westlaw Content during the development of the ROSS platform, not in the final product. Br.44. The district court was right to distinguish these cases.

At the outset, neither is precedential in this Court. Moreover, neither stands for the broad principle that all so-called "intermediate copying" is fair. In *Sega*, the Ninth Circuit specifically held that "the Copyright Act does not distinguish between unauthorized copies of a copyrighted work on the basis of what stage of the alleged infringer's work the unauthorized copies represent." 977 F.2d at 1518. It pointed to its prior decision in *Walker v. University Books, Inc.*, where it held "the fact that an allegedly infringing copy of a protected work may itself be only an inchoate representation of some final product to be marketed

commercially does not in itself negate the possibility of infringement." 602 F.2d 859, 864 (9th Cir. 1979). The *Sega* court agreed with the *Walker* court's reasoning, explaining it was based on the plain language of the Copyright Act that on its face "unambiguously encompasses and proscribes 'intermediate copying.'" *Sega,* 977 F.2d at 1518. ROSS asserts that *Sega* discusses cases involving intermediate copying in the context of "books, scripts, or literary characters." Br.44. True, but *Sega* distinguishes these cases, because while they involved intermediate copying, the infringement claims ultimately ***only*** related to the final work. *Sega,* 977 F.2d at 1518. *Sega* concluded that they do not "alter or limit the holding of *Walker*." *Id.*

Accordingly, intermediate or not, the key consideration is whether the use was transformative. *Sony* and *Sega* stand for the principle that disassembly of computer programs is transformative where disassembly is (1) "the only way to gain access to the ideas and functional elements embodied in a copyrighted computer program" and (2) "where there is a legitimate reason for seeking such access." In both cases, the courts recognized that a "legitimate" purpose was to enable compatibility with a new product. *Sega*, 977 F.2d at 1520-28; *Sony*, 203 F.3d at 606.

Against this backdrop, it is easy to see why the district court distinguished these cases. ROSS did not disassemble a computer program to access its underlying ideas or functionality. And ROSS was not copying for purposes of a recognized, legitimate interest such as compatibility. ROSS was not even copying the Westlaw Content to access the underlying cases: ROSS *already had* a bank of cases in its possession. A4976:17-19. ROSS wanted points and summaries across a range of topics, corresponding to a selection of relevant passages from cases. *Supra* 12-13. And unlike in *Sega*, where there was "no evidence in the record that Accolade sought to avoid performing its own [ ] work," 977 F.2d at 1522, ROSS's own expert admitted ███████████████ ████████████████████████████████████████ ███████████████████████ A4831:5-10.

The district correctly weighed factor one against fair use.

**C.    Factor Two – Westlaw Is Creative**

This factor focuses on the nature of the copyrighted work. 17 U.S.C. §107(2). Courts assessing this factor consider "whether the work [was] imaginative and original." *Hustler Mag. Inc. v. Moral Majority Inc.,* 796 F.2d 1148, 1153-54 (9th Cir. 1986)). Factor two may weigh

against fair use *even* for factual or informational works, where such works are creative. *See TD Bank, N.A. v. Hill*, 2015 WL 4523570, at *18 (D.N.J. July 27, 2014) (second factor cut for plaintiff even where work was factual in nature); *FMC Corp. v. Control Sols., Inc.*, 369 F. Supp. 2d 539, 579 (E.D. Pa. 2005); *Fox*, 883 F.3d at 178 (fact-based work could be creative); *Love v. Kwitny*, 706 F. Supp. 1123, 1134 (S.D.N.Y. 1989) (same).

Although the district court thought this factor favored ROSS, A54,[12] as detailed above, the Westlaw Content involved immense creativity to create. *Supra* 8-9. Additionally, TR invested significant time and resources in developing the Westlaw Content. Although post-*Feist* sweat-of-the-brow is irrelevant to *copyrightability*, both the Ninth Circuit and the Second Circuit have recognized it *is* part of fair use factor two. *Wall Data, Inc. v. LA Cnty. Sheriff's Dept.*, 447 F.3d 769, 780 (9th Cir. 2006) (post-*Feist* finding fair use and *citing MCA, Inc. v. Wilson*, 677 F.2d 180, 182 (2d Cir. 1981)). TR paid and trained a large team of attorney-editors to analyze cases and create the Westlaw

---

[12] ROSS claims the district court declared this factor "irrelevant," Br.36, but the court in fact weighed this factor. A57.

Content.  A4336-37 ¶¶ 9-12; A4922:12-23:21.  Ms. Oliver testified ■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

A4921:25-4.

ROSS asserts that *American Society for Testing & Materials v. PublicResource.Org, Inc.* held that the legal nature of a work strongly favors fair use.  82 F.4th 1262, 1269 (D.C. Cir. 2023).  That case, however, involved legal standards that were incorporated by reference into the law, and does not stand for the principle that *all* content about law favors fair use.  *Id*.  Thus, although this factor "has rarely played a significant role in the determination of a fair use dispute," *Fox News*, 883 F.3d at 178, it nonetheless weighs against fair use here.

### D.    <u>Factor Three</u> – ROSS Took the Heart of Westlaw

The third statutory fair use factor considers "the amount and substantiality of the portion used in relation to the copyrighted work as a whole."  17 U.S.C. §107(3).  Factor three requires a qualitative analysis of the content copied.  *Harper*, 471 U.S. at 544; *see Campbell*, 510 U.S. at 589.  Even a small amount of copying may fall outside the scope of fair use where the excerpt copied consists of the "heart" of the

original works creative expression.  *Associated Press*, 931 F. Supp. 2d at 558.

Although the district court thought this factor favored fair use, A55, ROSS's copying was both qualitatively and quantitatively significant.  ***Qualitatively***, ROSS took the "heart" of Westlaw.  The Westlaw Content both powers TR's AI search algorithms, *supra* 10, and helps researchers understand and find law in an otherwise disorganized mass of cases.  *See* A6949-51 █████████████████████

████████████████████████████████████████

████████████  A6946-48.  TR thus touts the Westlaw Content in marketing materials.  A6953.  ROSS asserts this content "belongs" to the courts, Br.38, but it belongs to TR because its attorney-editors craft it.

***Quantitatively***, the amount of content used is indisputably large. ROSS claims that it only used 25,000 headnotes, Br.37, but the copying asserted here—that is, one issue still before the district court for resolution—goes far beyond that.  The copying was so extensive that it

████████████████████████████████████████

A4893:19-94:2.  ███████████████████████

██████████████████████     A6356; A6776; A4865:13-66:20, A4867:9-

68:3.  All this copying resulted in a large dataset that ROSS 30(b)(6)

witness, Jimoh Ovbiagele, called ████████████████████████████████

██████████████████████████████     A6287-347; A4941:3-

43:17.

In response, ROSS claims that the headnotes were not a

"substantial part" of the training data.  Br.37.  But unlike in other

generative AI cases involving large training data sets where the

copyrighted content is only a small piece, there is no evidence that

ROSS trained on anything *other* than the infringing Bulk Memos; the

infringement constituted the *entire* training data set.  While ROSS

relies on technical smoke-and-mirrors to argue that the memos are

ultimately turned into "numerical representations," during training, it

does not change the fact that the memos themselves were copied.

*Supra* 17.  And ROSS is *also* responsible for LegalEase's verbatim

copying on Westlaw.  *Supra* 17.  In any event, factor three's focus is on

the amount used "in relation to the copyrighted work," not in relation to

the infringing work.  17 U.S.C. §107(3).

ROSS claims its copying was "reasonable" in light of its purpose. Copying tethered to a "valid, and transformative purpose" may be reasonable even where substantial. *Google*, 593 U.S. at 34. But here, ROSS's purpose was not transformative under *Warhol II* because it copied for the same purpose as the original. And ROSS could have created a legal research platform without copying a ***single*** headnote. ROSS's AI expert, Karl Branting, testified that ROSS ███████████ ████████████████████████████████████████████ A4832:18-33:1. Dr. Cox similarly testified that the Bulk Memos ███████████████ ██████████████████████████████████████████████████████████ █████████████████████████ A4857:5-24. Thus, unlike in cases like *Google*, where the Court found that using the code at issue was necessary and tethered to Google's compatibility purpose, 593 U.S. at 34, the copying here is not tied to a valid transformative purpose. This factor weighs against fair use.

## CONCLUSION

This case may involve AI, but it is far from novel. ROSS indisputably pilfered the creativity of a competitor to bring to market a

substitute.  ROSS's copying was not technological advancement.  It was theft, and the Court should affirm.

Dated:  January 16, 2026   Respectfully submitted,

          */s/ Dale M. Cendali*
          Dale M. Cendali
          Joshua L. Simmons
          Kirkland & Ellis LLP
          601 Lexington Ave.
          New York, NY 10022
          Tel: (212) 44604846

          Miranda D. Means
          Kirkland & Ellis LLP
          200 Clarendon Street
          Boston, MA 02116
          Tel: (617) 385-7500

          *Attorneys for Plaintiffs-Appellees*
          *Thomson Reuters Enterprise*
          *Centre GmbH and West*
          *Publishing Corporation*

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 5(c)(1), because, excluding the parts of the document exempted by Fed. R. App. P. 32(f): this document contains 12,992 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because: this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font Century Schoolbook font.

I am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

The electronic copy of this brief has been virus scanned with Vipre Virus Protection, version 3.1, and no virus was detected.

The text in the electronic brief is identical to the text in the paper copies.


Dated: January 16, 2026          */s/ Dale M. Cendali*
                                  Dale M. Cendali

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the appellate CM/ECF system on January 16, 2026. All counsel of record are registered CM/ECF users and service will be accomplished by the CM/ECF system.

Dated:  January 16, 2026                    */s/ Dale M. Cendali*
                                         Dale M. Cendali