No. 25-2153

## IN THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

THOMSON REUTERS ENTERPRISE CENTRE GMBH AND
WEST PUBLISHING CORPORATION,

*Plaintiffs-Appellees*

v.

ROSS INTELLIGENCE INC.,
*Defendant-Appellant.*

On Appeal from the United States District Court
for the District of Delaware

## APPELLEE'S BRIEFING REGARDING *AMERICAN SOCIETY FOR TESTING AND MATERIALS v. UPCODES, INC.*

| | |
|---|---|
| Miranda D. Means | Dale M. Cendali |
| Kirkland & Ellis LLP | Joshua L. Simmons |
| 200 Clarendon Street | Kirkland & Ellis LLP |
| Boston, MA 02116 | 601 Lexington Ave. |
| Tel: (617) 385-7500 | New York, NY 10022 |
| | Tel: (212) 446-4800 |

*Attorneys for Plaintiffs-Appellees*
*Thomson Reuters Enterprise Centre GmbH and*
*West Publishing Corporation*

## TABLE OF CONTENTS

INTRODUCTION ....................................................................................... 1

ARGUMENT ............................................................................................... 3

      A.    ROSS's Commercial, Substitutive Purpose Differs from
           UpCodes' Access-to-Law Purpose ............................................. 3

      B.    Westlaw Editorial Content Does Not Carry "Legal Force" ..................... 5

      C.    Copying the Westlaw Content was Not Necessary ................................. 5

      D.    ROSS Harmed Multiple Markets for Westlaw ....................................... 6

CONCLUSION ........................................................................................... 7

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*American Society for Testing & Materials v. PublicResource.Org, Inc.*,
82 F.4th 1262 (D.C. Cir. 2023) ........................................................................ 1, 5

*American Society for Testing & Materials v. UpCodes, Inc.*,
172 F.4th 253 (3d. Cir. 2026) ...................................................................*passim*

*Andy Warhol Found. for Visual Arts, Inc. v. Goldsmith*,
598 U.S. 508 (2023) ........................................................................ 1, 3, 4

*Bartz v. Anthropic PBC*,
787 F. Supp. 3d 1007 (N.D. Cal. 2025) ................................................... 2

*Callaghan v. Myers*,
128 U.S. 617 (1888) ........................................................................ 5

*Campbell v. Acuff-Rose Music, Inc.*,
510 U.S. 569 (1994) ........................................................................ 1

*Eldred v. Ashcroft*,
537 U.S. 186 (2003) ........................................................................ 7

*Google LLC v. Oracle Am.*,
593 U.S. 1 (2020) ........................................................................ 3

*Murphy v. Millennium Radio Grp. LLC*,
650 F.3d 295 (3d Cir. 2011) ........................................................................ 1

*Video Pipeline, Inc. v. Buena Vista Home Ent., Inc.*,
342 F.3d 191 (3d Cir. 2003) ........................................................................ 1

**INTRODUCTION**

Binding Supreme Court and Third Circuit precedents draw a distinction between the commercial, substitutive use of a work (which is **not** fair use) and the use of a work for a new purpose that does not supplant the work's existing or potential markets (which **may** be fair use). *Compare Andy Warhol Found. for Visual Arts, Inc. v. Goldsmith* ("*Warhol II*"), 598 U.S. 508, 525 (2023) (commercial substitute weighed against fair use); *Murphy v. Millennium Radio Grp. LLC*, 650 F.3d 295, 308 (3d Cir. 2011) (commercial use for same purpose as original was not fair use); *Video Pipeline, Inc. v. Buena Vista Home Ent., Inc.*, 342 F.3d 191, 198–200 (3d Cir. 2003) (commercial use of clips as substitutes for original was not fair use) *with Campbell v. Acuff-Rose Music, Inc.,* 510 U.S. 569, 592 (1994) (parody use for new purpose from original was fair use).

Nothing in *American Society for Testing & Materials v. UpCodes, Inc.* changes this fundamental paradigm. 172 F.4th 253 (3d. Cir. 2026). Instead, the *UpCodes* analysis hews to precedent and closely mirrors *American Society for Testing & Materials v. PublicResource.Org, Inc.*, another case involving standards incorporated into law that predates this appeal and was addressed in the parties' prior briefing. 82 F.4th 1262, 1269 (D.C. Cir. 2023) ("*ASTM II*"). In *UpCodes*, the Third Circuit, in a preliminary-injunction posture, found that it likely was fair to use a work for a different purpose than the original, in a minimally commercial way, where evidence of market harm was scant. 172 F.4th at 262–271.

The **differences** between *UpCodes* and this appeal show why the law on which *UpCodes* relied compels the opposite result on these facts. For example, in *UpCodes*,

1

the defendant copied standards that had statutorily been ***made part of the law***. ROSS did not copy the law. ROSS copied legal analysis, organization, and synthesis painstakingly developed by TR's highly-trained attorney editors to create a competing product. Moreover, the *UpCodes* defendant made otherwise unavailable standards available for ***free***. ROSS made nothing available for free. It sold its legal research platform for-profit, expressly urging customers in the market for legal research to choose between "ROSS or Westlaw," and bragging that it would bring an end to Westlaw contracts.

There are other key differences. In *UpCodes*, the defendant copied only as necessary to further its purpose of increasing public access to the law. ROSS had no access-to-law purpose. It copied the Westlaw content for the same purpose as TR. As the *Bartz v. Anthropic PBC* court put it, ROSS used "a proprietary system for finding court opinions in response to a given legal topic" to create "a competing AI tool for finding court opinions in response to a given legal topic. That was not transformative." 787 F. Supp. 3d 1007, 1022 (N.D. Cal. 2025). And ROSS did not need to copy to achieve its purpose, as its own expert admitted. A4831:5–10. In addition, unlike the limited market harm evidence in *UpCodes*, this case abounds with such evidence, including evidence of harm to the original market for Westlaw and harm to the market for AI training material.

Accordingly, as explained below, the differences between *UpCodes* and this appeal demonstrate why ROSS's conduct here was not fair use under existing Supreme Court and Third Circuit set precedent.

2

## ARGUMENT

Fair use is highly fact dependent, and "its application may well vary depending upon context." *UpCodes,* 172 F.4th at 261 (*citing Google LLC v. Oracle Am.*, 593 U.S. 1, 20 (2020)).  The application of the law to the specific factual context presented by *UpCodes* demonstrates why fair use does not apply as a matter of law in this appeal, with its crucially different factual context.

### A.    ROSS's Commercial, Substitutive Purpose Differs from UpCodes' Access-to-Law Purpose

In *UpCodes*, with respect to factor one (purpose and character of the use), the Third Circuit found UpCodes' for-profit status was "relevant" but ultimately diminished by Upcodes' freemium model.  *Id.* at 265-266.  Against this **reduced commerciality**, the Third Circuit weighed the two parties' **distinct purposes**.  It found that plaintiff ASTM's purpose was to publish technical standards to "positively impact public health and safety."  *Id.* at 263–265.  UpCodes, by contrast, published ASTM's works to convey "only what the law is."  *Id.*  This was demonstrated by the fact that, as the Third Circuit noted, UpCodes published **only** the standards that were made part of the law, even if they were outdated.  Id.  UpCodes did not copy newer editions of code if they were not part of the law.  On top of these different purposes, the panel found that UpCodes had "a particularly compelling independent justification for copying," the dissemination of the law itself, which it could not have accomplished without copying the law.  *Id.* (citing *Warhol II* at 532).

Nothing similar is presented in this appeal.  ROSS is a fully profit-making entity, with no free or even freemium option to mitigate its commerciality.

3

D.E.173.at.11; A4809:18-10:4.  No access-to-law purpose justifies ROSS's copying. The case law is free. A56.  ROSS already had it. And the use is not transformative because unlike in *UpCodes*, the parties' purposes here are identical.  ROSS copied TR's editorial content to create a legal research platform, built on Westlaw content, that would compete with and replace Westlaw in the market.  A6478; A4816:23-17:11; A4963:21-64:20.  It used that editorial content to do precisely what TR designed it to do: help researchers find and understand the law.  A6456; A4944:3-7; A6458.  And the Westlaw content served as valuable training material for **both** parties' legal research algorithms.  D.E.173.at.10.  Moreover, unlike in *UpCodes*, ROSS did not **need** to copy Westlaw to achieve its purpose; it could have created the legal analysis it needed independently.  A4831:5-10.

ROSS has argued its use was not substitutive because it created an "entirely new product" that does not output headnotes.  D.E.164.at.31.  But as *Andy Warhol Foundation for the Visual Arts, Inc.* makes clear, the question is not whether the product is "new," which is often true in fair use cases, but whether the **purpose** of the use is the same as the original.  *Warhol II*, 598 U.S. at 510.  Focusing on the parties' purposes, the district court correctly concluded that ROSS's purpose was not transformative, as "Ross took the headnotes to make it easier to develop a competing legal research tool."  A53.  In other words, ROSS copied the Westlaw content to create a Westlaw replacement, a quintessential non-transformative use.  At a more granular level, ROSS copied TR's headnotes, which help customers find and understand relevant law about a given legal topic and which TR uses to train its algorithm, to

4

train ROSS's algorithm to do the exact same thing.

### B.    Westlaw Editorial Content Does Not Carry "Legal Force"

With respect to factor two (nature of the work), *UpCodes* found that "when the Works were incorporated by reference into law—which occurred before UpCodes' copying—they moved even further to the periphery of copyright's core protection." This is consistent with the standards case that the parties already briefed, *ASTM II*, which held that "legal text" is outside the realm of copyright and because the standards "have legal force" they, "at best, at the outer edge of copyright's protective purpose." 82 F.4th at 1268. Thus, factor two favored fair use.

Westlaw's editorial content, by contrast, is not law. It merely reflects TR's attorney-editor's legal analysis, which can differ from the analysis of, say, a Lexis editor. There are many different ways to summarize and synthesize the law. Thus, not surprisingly, when the Supreme Court considered whether headnotes were the "proper subject of copyright," it concluded that they were. *Callaghan v. Myers*, 128 U.S. 617, 626, 649 (1888). That over-a-hundred-year-old precedent led to the development of the reporter system and the growth of the legal research companies that lawyers rely upon every day. The reasoning applied in *UpCodes* is neither inconsistent with *Callaghan* nor undermines a finding of infringement here.

### C.    Copying the Westlaw Content was Not Necessary

On factor three (amount and substantiality of the use), the Third Circuit in *UpCodes* concluded that UpCodes "reasonably copied the entirety of the [w]orks" and that "[i]t cannot fulfill its purpose of disseminating the law without copying standards that have been incorporated in full into the law." 172 F.4th at 267. Again, this

reasoning shows why the opposite result makes sense in this appeal. ROSS did not need to copy ***any*** Westlaw editorial content to achieve its purpose. A4831:5-10.

### D.    ROSS Harmed Multiple Markets for Westlaw

On factor four (effect on the potential market or value), the *UpCodes* panel found that, on a preliminary-injunction record, the evidence relevant to this factor was equivocal and the market effects seemed limited. It was not clear that subscribers were cancelling their subscriptions to ASTM in favor UpCodes. *UpCodes* at 270. And importantly, "many standards incorporated into law are outdated," which "call[ed] into question the robustness of the market." *Id.* On the other side of the coin, the panel did note the effect on the public of allowing the copying, recognizing that unfettered copying could "threaten ASTM's ability to develop technical standards," which would "undermine copyright's 'ultimate aim'" of promoting creativity for the public good. *Id.* at 271.

*UpCodes* further reiterated the Supreme Court's caution that "[s]ince fair use is an affirmative defense, its proponent [will] have difficulty carrying the burden of demonstrating fair use without favorable evidence about relevant markets." *Id.* at 268. Here, after discovery, the record evidence is ***all unfavorable*** to ROSS. ROSS certainly cannot meet its burden to show a lack of substitution risk when it expressly marketed its product as a replacement for Westlaw, touting that it would destroy Westlaw contracts. A6482. ROSS's CEO testified that in the short time ROSS was on the market not only were customers urged to switch from Westlaw to ROSS, some of them in fact did make the switch. A4814:25–15:11, A4815:16–21:1; A4989:17-20.

Moreover, as detailed in TR's brief, there is evidence of two other types of harm

in this case: harm to the value of the Westlaw content as exclusive training data for TR and harm to the market for Westlaw content as AI training material. D.E.173.46-48. Neither form of harm was addressed by the *UpCodes* panel and, when widespread use of these kinds are considered, the effect on Westlaw's potential market and value is clear and pronounced.

Finally, particularly without countervailing evidence of a lack of market harm, the "potential public harm" from unfettered copying that the *UpCodes* panel noted, weighs strongly against fair use. 172 F.4th at 270. Copyright "celebrates the profit motive, recognizing that the incentive to profit from the exploitation of copyrights will redound to the public benefit by resulting in the proliferation of knowledge." *Eldred v. Ashcroft*, 537 U.S. 186, n.18 (2003). "Rewarding authors for their creative labor and 'promot[ing] … Progress' are thus complementary; as James Madison observed, in copyright '[t]he public good fully coincides … with the claims of individuals.'" *Id*. (*citing* The Federalist No. 43, p. 272 (C. Rossiter ed.1961)). Here, copyright provides the economic incentive to create legal editorial content like Westlaw, which benefits the public. Permitting fair use to displace normal copyright channels disrupts a functioning market that already encourages creation, and such disruption harms the public in return.

## CONCLUSION

*UpCodes* changes nothing about how the binding law applies to the facts of this appeal. Instead, it demonstrates why uses like ROSS's fall on the opposite side of the fair use line. This Court should affirm.

Dated:  May 11, 2026                           Respectfully submitted,

                                               */s/ Dale M. Cendali*
                                               Dale M. Cendali

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the appellate CM/ECF system on May 11, 2026. All counsel of record are registered CM/ECF users and service will be accomplished by the CM/ECF system.

Dated:  May 11, 2026                    */s/ Dale M. Cendali*
                                                      Dale M. Cendali