NO. 25-2153

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE THIRD CIRCUIT**

---

THOMSON REUTERS ENTERPRISE CENTRE GMBH;
WEST PUBLISHING CORP.,
*Plaintiffs-Appellees,*
v.

ROSS INTELLIGENCE INC.,
*Defendant-Appellant.*

---

On Appeal from The United States District Court
For The District of Delaware
No. 1:20-cv-00613, Judge Stephanos Bibas (sitting by designation)

---

# APPELLANT ROSS INTELLIGENCE INC.'S PETITION FOR PANEL REHEARING OR REHEARING EN BANC

---

JEFFREY B. WALL
MORGAN L. RATNER
NICK HARPER
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
202.955.8500
JWall@gibsondunn.com
MRatner@gibsondunn.com
NHarper@gibsondunn.com

YAIRA DUBIN
*Counsel of Record*
PARISA SADEGHI
ISABEL E. ALEXIADES
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
212.351.4000
YDubin@gibsondunn.com
PSadeghi@gibsondunn.com
IAlexiades@gibsondunn.com

*Counsel for ROSS Intelligence Inc.*
*(Additional counsel on inside cover)*

ANNE M. VOIGTS
RANJINI ACHARYA
PILLSBURY WINTHROP
SHAW PITTMAN
2400 Hanover Street
Palo Alto, CA 94304

KAYVAN M. GHAFFARI
PILLSBURY WINTHROP
SHAW PITTMAN
Four Embarcadero Center
22nd Floor
San Francisco, CA 94111

YAR R. CHAIKOVSKY
ANDY M. LEGOLVAN
WHITE & CASE
3000 El Camino Real
2 Palo Alto Square
Suite 900
Palo Alto, CA 94306

MARK S. DAVIES
KUFERE J. LAING
WHITE & CASE
701 Thirteenth Street, N.W.
Washington, D.C. 20005

*Additional Counsel for ROSS Intelligence Inc.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Third Circuit Local Appellate Rule 26.1.1(b), Petitioner ROSS Intelligence Inc. discloses that it has no parent corporation and does not issue stock, and no publicly held corporation has a financial interest in the outcome of this proceeding.

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ..... i
TABLE OF CONTENTS ..... ii
TABLE OF AUTHORITIES ..... iii
STATEMENT OF COUNSEL ..... 1
INTRODUCTION ..... 2
BACKGROUND ..... 4
ARGUMENT ..... 7
I. The Panel Misconstrued Factor One By Focusing On ROSS's Ultimate Business Objective Rather Than Its Specific Use Of Copyrighted Material ..... 7
II. The Panel Misconstrued Factor Three By Ignoring That ROSS Did Not Make Any Copyrighted Material Available To The Public ..... 12
III. The Panel Incorrectly Defined The Relevant Markets Under Factor Four ..... 14
IV. This Case Presents Questions Of Exceptional Importance For Both Copyright Law And AI ..... 16
CONCLUSION ..... 19
CERTIFICATE OF COMPLIANCE ..... 21
CERTIFICATE OF SERVICE ..... 22

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Soc'y for Testing & Materials* v. *UpCodes, Inc.*,
172 F.4th 253 (3d Cir. 2026) .......... 1, 10, 15

*Andy Warhol Found. for the Visual Arts, Inc.* v. *Goldsmith*,
598 U.S. 508 (2023) .......... 1, 2, 3, 8, 9, 10, 11, 13, 16

*Authors Guild* v. *Google, Inc.*,
804 F.3d 202 (2d Cir. 2015) .......... 1, 13, 14

*Bartz* v. *Anthropic PBC*,
787 F. Supp. 3d 1007 (N.D. Cal. 2025) .......... 9

*Bill Graham Archives* v. *Dorling Kindersley Ltd.*,
448 F.3d 605 (2d Cir. 2006) .......... 14

*Campbell* v. *Acuff-Rose Music, Inc.*,
510 U.S. 569 (1994) .......... 12, 13, 14, 15, 16, 17

*Concord Music Grp., Inc.* v. *Anthropic PBC*,
772 F. Supp. 3d 1131 (N.D. Cal. 2025) .......... 18

*Google LLC* v. *Oracle Am., Inc.*,
593 U.S. 1 (2021) .......... 1, 8, 9, 14

*Hachette Book Grp., Inc.* v. *Internet Archive*,
115 F.4th 163 (2d Cir. 2024) .......... 15

*Harper & Row, Publishers, Inc.* v. *Nation Enters.*,
471 U.S. 539 (1985) .......... 13

*Kadrey* v. *Meta Platforms, Inc.*,
788 F. Supp. 3d 1026 (N.D. Cal. 2025) .......... 9

*Keck* v. *Mix Creative Learning Ctr., LLC*,
116 F.4th 448 (5th Cir. 2024) .......... 1, 11, 12, 15

*Sega Enters., Ltd.* v. *Accolade, Inc.*,
977 F.2d 1510 (9th Cir. 1992)....................................................1, 11

*Sony Computer Entm't, Inc.* v. *Connectix Corp.*,
203 F.3d 596 (9th Cir. 2000)....................................................1, 11, 13

*Stewart* v. *Abend*,
495 U.S. 207 (1990)....................................................13

*Tresona Multimedia, LLC* v. *Burbank High Sch. Vocal Music Ass'n*,
953 F.3d 638 (9th Cir. 2020)....................................................15

*Whyte Monkee Prods., LLC* v. *Netflix, Inc.*,
174 F.4th 761 (10th Cir. 2026)....................................................15

**Statutes**

17 U.S.C. § 107....................................................3, 12, 14

**Other Authorities**

Ron Schmelzer, *Decisions, Decisions: A Guide to the New Wave of AI Decision Models Besides Jev*, Forbes (Oct. 12, 2026),
https://tinyurl.com/nh3hktwt....................................................19

Tweet: @AdamEisgrau (Oct. 21, 2026),
https://perma.cc/CT5Y-F2JH....................................................18

U.S. Statement of Interest, *In re OpenAI, Inc., Copyright Infringement Litig.*,
No. 25-md-3143, Dkt. 1682 (S.D.N.Y. Sept. 1, 2026)....................................................17

## STATEMENT OF COUNSEL

I express a belief, based on a reasoned and studied professional judgment, that: (i) the panel decision is contrary to decisions of the United States Court of Appeals for the Third Circuit and the Supreme Court of the United States, including *American Society for Testing & Materials* v. *UpCodes, Inc.*, 172 F.4th 253 (3d Cir. 2026); *Google LLC* v. *Oracle America, Inc.*, 593 U.S. 1 (2021); and *Andy Warhol Foundation for the Visual Arts, Inc.* v. *Goldsmith*, 598 U.S. 508 (2023), and consideration by the full Court is necessary to secure and maintain uniformity of decisions in this Court; (ii) the panel decision conflicts with authoritative decisions of other courts of appeals, including *Sega Enterprises, Ltd.* v. *Accolade, Inc.*, 977 F.2d 1510 (9th Cir. 1992); *Sony Computer Entertainment, Inc.* v. *Connectix Corp.*, 203 F.3d 596 (9th Cir. 2000); *Keck* v. *Mix Creative Learning Center, LLC*, 116 F.4th 448 (5th Cir. 2024); and *Authors Guild* v. *Google, Inc.*, 804 F.3d 202 (2d Cir. 2015); and (iii) this appeal involves questions of exceptional importance.

## INTRODUCTION

In 2014, nearly a decade before OpenAI released ChatGPT, ROSS Intelligence set out to build an AI-powered legal-search engine. The concept was simple: a user would type a legal question in plain English, and the search engine would answer with responsive passages from judicial opinions. To teach the engine how to find relevant passages, ROSS trained the model on memoranda that paired sample questions with responsive opinion excerpts. The questions were developed using Westlaw headnotes—one-sentence statements describing points of law in a judicial opinion. Once trained, ROSS's model produced only one kind of output: verbatim quotations from judicial opinions, which are not copyrightable. Everything a ROSS user saw, in other words, came straight from the public text of a court's opinion. The headnotes stayed entirely behind the scenes; ROSS used them only to prepare training material that users never saw. Thomson Reuters, which owns Westlaw, sued anyway for copyright infringement.

ROSS defended its use of headnotes to train its AI model as fair use. Fair use "'permits courts to avoid rigid application of the copyright statute when…it would stifle the very creativity…that law is designed to foster.'" *Warhol*, 598 U.S. at 527 (citation omitted). To evaluate this defense, courts

weigh four statutory factors: (1) "the purpose and character of the use"; (2) "the nature of the copyrighted work"; (3) "the amount and substantiality of the portion used"; and (4) "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107. The factors are designed to distinguish between uses that are "likely to substitute for" the original work, and uses that have "a further purpose or different character" from the original and so are "transformative." *Warhol*, 598 U.S. at 528-529.

ROSS's use of the Westlaw headnotes was transformative. Westlaw uses headnotes to help readers navigate judicial opinions. ROSS used them for an entirely different purpose: to teach an AI model what makes an opinion passage responsive to a legal question. The result was a new kind of legal-research tool, one that responded to a user's questions with relevant opinion passages. And because users never saw a single headnote, ROSS's tool could not substitute for the headnotes themselves.

Yet a panel of this Court rejected ROSS's fair-use defense. At every turn, the panel asked the wrong question. Rather than analyze the purpose of ROSS's *use* of headnotes, the panel analyzed the purpose of ROSS's *business*—and so deemed ROSS's use "minimally transformative" under factor one. Rather than ask how much copyrighted material ROSS made

publicly available, the panel considered only the extent of ROSS's background use—and so held that factor three favored Thomson Reuters. And rather than examine the market for the headnotes themselves, the panel circularly found harm to Thomson Reuters's lost opportunity to license the very use at issue.

In so holding, the panel departed from Supreme Court precedent, disregarded this Circuit's own precedent, and split from other courts of appeals. Left uncorrected, the decision will have far-reaching consequences. ROSS's AI engine was unique, but the way it learned was not. Like authors who read books to develop their own writing style, AI models train on existing material, much of it copyrighted, to generate output that looks nothing like the training material. If feeding copyrighted materials into a training universe is copyright infringement—whether or not the outputs resemble the copyrighted work—AI development will come to an abrupt halt.

Rehearing is warranted.

## BACKGROUND

1. Thomson Reuters owns Westlaw, an online legal-research platform that publishes judicial opinions. Westlaw places headnotes—short statements of an opinion's "key point[s] of law"—at the top of each opinion. A41.

ROSS Intelligence Inc. was founded in 2014 by two computer-science students and a lawyer, who wanted to build an AI legal-search engine that could answer plain-English legal questions with quotations from judicial opinions. ROSS trained the engine using memoranda consisting of sample questions and responsive judicial quotations ranked from "great" to "irrelevant." A2395-A2396. ROSS's contractor drafted the memo questions using Westlaw headnotes. A37. ROSS converted the memos into machine-readable data and fed that data into its model to train it to identify what makes a judicial passage responsive to a user's question. A2396, A2406.

Once trained, the model could respond to questions it had never seen before with quotations from public judicial opinions. The model's output did not include any Westlaw headnotes or memo questions. A55. No one has argued that any outputs were infringing.

2. Thomson Reuters sued ROSS, alleging that ROSS's use of headnotes to train its engine infringed its copyrights.

The district court initially denied summary judgment, then reversed course and granted summary judgment for Thomson Reuters. The court held that ROSS's use of the headnotes infringed Thomson Reuters's copyrights,

rejecting ROSS's fair-use defense. A41-A50. The court certified its ruling for interlocutory appeal. A61.

3. A panel of this Court affirmed.

On the first fair-use factor, the panel acknowledged that ROSS used the headnotes "to train an AI program," but found that use "minimally transformative" because ROSS's "ultimate purpose" was to create a legal-research platform like Westlaw. Op. 16-17. On factor two, the panel held that the headnotes' factual nature favored fair use. Op. 21-22. On factor three, the panel held that the amount and substantiality of the headnotes used weighed against fair use because ROSS used the "entire text" of selected headnotes "without a…transformative purpose." Op. 22-23. Finally, on factor four, the panel held that ROSS harmed "Westlaw's position in [the] market" for legal-research platforms by building a competing product. Op. 24-25. It also concluded that ROSS "usurped Thomson Reuters's opportunity to enter [the] derivative market" for licensing headnotes as AI training data, even though Thomson Reuters had never licensed its headnotes to others. Op. 26.

Finding that the first, third, and fourth factors weighed against fair use, the panel concluded that ROSS's use was not fair. Op. 27.

## ARGUMENT

The panel decision breaks from precedent of the Supreme Court, this Court, and other circuits. The panel misconstrued three of the four fair-use factors in fundamental ways. On the first factor, the panel analyzed ROSS's ultimate commercial objective—offering a legal-research tool—rather than its specific purpose in using the copyrighted material at issue. On the third factor, the panel failed to ask how much of the copyrighted material was made available to the public, which should be the central inquiry on that prong. And on the fourth factor, the panel assessed market harm by defining the derivative market circularly, as the market for licensing the very use at issue.[1]

Left uncorrected, these errors will unsettle copyright law. Just as troubling, they will destabilize the current AI market and impede further AI innovation. The full Court should correct course before that happens.

### I. The Panel Misconstrued Factor One By Focusing On ROSS's Ultimate Business Objective Rather Than Its Specific Use Of Copyrighted Material.

The panel asked the wrong question under factor one. The question is not whether the defendant's *business* and the rightsholder's share the same

[1] Although this petition focuses on the panel's fair-use holding, ROSS maintains that the panel also erred in holding that the headnotes are sufficiently original to warrant copyright protection. OB 24-33.

general purpose. It is whether the defendant's *use* and the rightsholder's use of the copyrighted work share the same purpose. Other courts have consistently embraced that distinction.

Start with the Supreme Court. Echoing its earlier decision in *Google*, the Supreme Court in *Warhol* instructed courts analyzing factor one to consider the "specifically described purpose[]" of "the *particular use at issue*." 598 U.S. at 535 n.11 (emphasis added). *Warhol* applied that standard to one use of Lynn Goldsmith's 1981 photograph of the artist Prince. *Id.* at 534. That photograph had been put to "multiple" uses: it was licensed to *Vanity Fair* as an "artist reference" in 1984; Warhol used it to make a purple silkscreen for the magazine's November 1984 issue; he later made fifteen *other* works using the photo (the "Prince Series"); and in 2016, the Warhol Foundation gave Condé Nast a license to use one of those works ("Orange Prince") for a commemorative magazine cover. *Id.* at 517-521. Recognizing that each use demanded a different factor-one analysis, the Court began by isolating the specific use "alleged to be infringing"—there, the last one. *Id.* at 534.

Then, the Court analyzed the "purpose or character" of that "specific use." *Warhol*, 598 U.S. at 545. It held that because Condé Nast used Orange Prince "in [a] magazine[]" to "illustrate [a] stor[y] about Prince"—which was

"similar to the photograph's typical use" by Goldsmith—the use in question was not transformative. *Id.* at 535-536, 547. But the Court reserved the question of whether "the creation, display, or sale of any of the original Prince Series works" was transformative, and rejected the dissent's suggestion that "any and all uses of an original work entail the same first-factor analysis." *Id.* at 534 & n.10.

Here, ROSS's "specific use" of the headnotes was transformative. *Warhol*, 598 U.S. at 545. ROSS's contractor used the headnotes to draft legal questions for memos, which ROSS used to teach its AI model what makes an opinion passage responsive to a question. ROSS's purpose in using the headnotes was to produce legal memoranda to train its AI model. That use was categorically different from Westlaw's purpose in using the headnotes as a reader's guide to judicial opinions. See Op. 16; see also *Google*, 593 U.S. at 30, 32 (copying to "create new product[]" is "transformative"); *Kadrey* v. *Meta Platforms, Inc.*, 788 F. Supp. 3d 1026, 1035 (N.D. Cal. 2025) ("no disput[e] that" AI training use is "transformative"); *Bartz* v. *Anthropic PBC*, 787 F. Supp. 3d 1007, 1027 (N.D. Cal. 2025) (same).

The panel reached a contrary conclusion only by asking the wrong question. The panel deemed ROSS's use "minimally transformative" because

its "ultimate purpose" was the same as Thomson Reuters's: "to create and optimize a legal-research platform." Op. 16-17. But *Warhol* directs courts to look not to a defendant's "ultimate purpose" divorced from any particular use, but to the *particular* purpose of the *specific* use at issue—here, as the panel recognized, "train[ing] an AI program." Op. 16-17. Indeed, by reserving whether Warhol's original illustration *was* transformative while holding that a later use of that same illustration was *not*, the Supreme Court underscored that intermediate and downstream uses must be analyzed separately. See *supra* p. 9.

The panel departed from Third Circuit precedent too. In *UpCodes*, this Court reiterated that under *Warhol*, factor one depends on "what [the user] actually '*does* with the original work.'" 172 F.4th at 263. The defendant there had published copyrighted technical standards that were incorporated into law. To evaluate if that use was transformative, this Court compared the defendant's specific purpose in publishing the standards ("to convey…what the law is") with the original publisher's purpose ("to inform industry professionals of current best practices"). *Ibid.* (citation omitted). Because those purposes were distinct, the defendant's use was transformative. *Ibid.* The same should have been true here.

Other courts of appeals have also rejected an ultimate-purpose test. In *Sega*, the Ninth Circuit held that copying computer code to make a video game compatible with a specific console was transformative because the copying's "direct purpose"—to study compatibility requirements—was transformative. 977 F.2d at 1522-1523. Although the defendant's "ultimate purpose" was to produce games that competed against the rightsholder's, that did not matter. *Ibid.* Instead, "the use at issue was an intermediate one only" and "any commercial 'exploitation' was indirect or derivative." *Ibid.* Similarly, in *Sony Computer Entertainment*, the Ninth Circuit held that using copyrighted code to create software that competed against the rightsholder's product was "transformative." 203 F.3d at 606-607. The court held that the defendant's "commercial use of the [copyrighted] material was an intermediate one, and thus was only 'indirect or derivative.'" *Id.* at 607 (quoting *Sega*, 977 F.2d at 1522). The panel here distinguished *Sega* and *Sony* as cases where "copying was necessary to access the unprotected functional aspects of computer code." Op. 20. But factor one has never depended on whether copying is "necessary," much less on whether the case involves computer code.

The panel also split with the Fifth Circuit's decision in *Keck*. There, the Fifth Circuit held that under *Warhol*, using copyrighted art to teach students

to create their own art was "transformative" because, even if the defendant had commercial goals, the *specific use* at issue had an "educational purpose." 116 F.4th at 454-455. As in *Keck*, the specific use of the works here had a transformative teaching purpose: teaching an AI model what makes an opinion passage relevant to a question. The Fifth Circuit, like the Ninth, thus approaches factor one differently than the panel did.

## II. The Panel Misconstrued Factor Three By Ignoring That ROSS Did Not Make Any Copyrighted Material Available To The Public.

The panel likewise misconstrued factor three. As other courts of appeals have recognized, that factor—the "amount and substantiality of the portion used," 17 U.S.C. § 107(3)—focuses on how much of a copyrighted work is presented to the public. Here, that was *nothing*. But because the panel focused only on how much of the headnotes ROSS used in background training materials, it incorrectly held that factor three weighed against fair use.

The Supreme Court has explained that factor three is important for what it reveals about "the degree to which the [secondary work] may serve as a market substitute for the original." *Campbell* v. *Acuff-Rose Music, Inc.*, 510 U.S. 569, 586-588 (1994). After all, "a work composed primarily of an original…is more likely to…fulfill[] demand for the original." *Id.* at 587-588.

Consistent with *Campbell*, the Second and Ninth Circuits hold that the third factor is most concerned with how much copyrighted material the defendant makes available *to the public*. In the Second Circuit, "[w]hat matters…is not so much 'the amount and substantiality of the portion used' *in making a copy*, but rather the amount and substantiality of *what is thereby made accessible* to a public for which it may serve as a competing substitute." *Authors Guild*, 804 F.3d at 222 (emphasis in original). In the Ninth Circuit, "in a case of intermediate infringement when the final product does not itself contain infringing material," the third factor likewise receives "very little weight." *Sony*, 203 F.3d at 606 (citation omitted). And in every case where the Supreme Court has rejected a fair-use defense, the defendant made copyrighted content publicly available. See *Warhol*, 598 U.S. at 515 (magazine publication); *Harper & Row, Publishers, Inc.* v. *Nation Enters.*, 471 U.S. 539, 542, 569 (1985) (same); *Stewart* v. *Abend*, 495 U.S. 207, 212-213, 238 (1990) (publicly released film).

Here, however, the panel began and ended its analysis with what was copied. It reasoned that "ROSS copied the entire text of the…headnotes into its [training] memos" and so weighed factor three in Thomson Reuters's favor. Op. 22. But the panel disregarded the undisputed fact that ROSS made none

of those headnotes accessible to the public, A55; Op. 5, so the amount ROSS used said little about whether its product could substitute for headnotes. The panel thus severed the third factor from its core purpose of evaluating substitutability. *Campbell*, 510 U.S. at 587.

As the district court's decision confirms, that approach cost ROSS: applying *Authors Guild*, the district court held that factor three favored ROSS. A55. But the panel's legal error flipped factor three against ROSS, counting it as among the factors that, "[e]valuat[ed]…together," defeated fair use. Op. 27.

## III. The Panel Incorrectly Defined The Relevant Markets Under Factor Four.

Factor four asks whether the defendant's use harms "the potential market" for "the copyrighted work" and its derivatives. 17 U.S.C. § 107(4). Here, the panel legally erred in defining both the original and derivative markets.

As the Supreme Court and other courts of appeals have recognized, the "potential market" under factor four cannot be defined "as the theoretical market for licensing the very use at bar." *Google*, 593 U.S. at 38 (citation omitted). If it could, this "factor [would] *always* favor the copyright holder." *Bill Graham Archives* v. *Dorling Kindersley Ltd.*, 448 F.3d 605, 614 (2d Cir.

2006) (citation omitted); see *Keck*, 116 F.4th at 456; *Tresona Multimedia, LLC* v. *Burbank High Sch. Vocal Music Ass'n*, 953 F.3d 638, 652 (9th Cir. 2020); *Whyte Monkee Prods., LLC* v. *Netflix, Inc.*, 174 F.4th 761, 804-806 (10th Cir. 2026). But the panel here engaged in precisely that circular reasoning. It defined the relevant derivative market as the potential market for licensing "headnotes…as training data," and easily found harm to that gerrymandered market. Op. 26.

The panel's original-market holding also looked to the wrong market, focusing on the "legal-research platform market." Op. 24-25. Supreme Court and Third Circuit precedent make clear that "the relevant market is that in which [the plaintiff] operates and sells *the Works*…and the relevant source of the loss is substitution." *UpCodes*, 172 F.4th at 269 (emphasis added); *Campbell*, 510 U.S. at 593 (factor four requires court to consider market "for the original"). A court must therefore examine actual "sales of" and "demand" for the original works. *UpCodes*, 172 F.4th at 270; see *Campbell*, 510 U.S. at 593 (factor-four analysis of rap parody required evidence of parody's impact on "market for…original" or "rap version of…original"); *Hachette Book Grp., Inc.* v. *Internet Archive*, 115 F.4th 163, 189 (2d Cir. 2024) (similar). Here, the "originals" are the headnotes, not Thomson Reuters's search platform. So the

relevant market is the market for headnotes—which, as Thomson Reuters did not meaningfully dispute, does not exist. Thomson Br. 49 n.6. On both ends of the market analysis, the panel thus departed from principles broadly accepted elsewhere.

## IV. This Case Presents Questions Of Exceptional Importance For Both Copyright Law And AI.

If allowed to stand, the panel's reasoning will unsettle copyright law in this Circuit. Under the panel opinion, a use is not transformative so long as the defendant's ultimate commercial objective resembles the rightsholder's—no matter how much "the specific purposes of the original work and the secondary use at issue" differ. *Warhol*, 598 U.S. at 535 n.11. Factor three can weigh against fair use even if no copyrighted expression was ever reproduced to the public. And the defendant will *always* lose on factor four because a court can always hypothesize a potential market for licensing the very use at issue.

Taken together, these errors hollow out the fair-use defense. That important defense reflects that, while courts must "secure every man in the enjoyment of his copy-right, one must not put manacles upon science." *Campbell*, 510 U.S. at 575 (citation omitted). The panel's approach does just that. ROSS transformed the headnotes that Westlaw deploys as user summary and navigation tools into background training materials that taught

an AI model what makes a good answer to a legal question. That is precisely the kind of use that "adds something new, with a further purpose" instead of "supersed[ing] the objects" of the original. *Id.* at 579 (citation omitted). Yet the panel disfavored that use because of the commercial product it ultimately made possible.

For the AI industry, the stakes of that distortion are existential. AI models generally train on large amounts of material, much of which is copyrighted. "[N]arrow[ing the] fair-use doctrine to exclude the training" of those models would thus "thwart…creative and scientific progress" in this critical and rapidly developing industry. U.S. Statement of Interest 4, *In re OpenAI, Inc., Copyright Infringement Litig.*, No. 25-md-3143, Dkt. 1682 (S.D.N.Y. Sept. 1, 2026).[2]

Perhaps recognizing the destabilizing effects of its decision, the panel tried to cabin its holding to AI that "cannot generate original expression." Op. 17 n.7. But there is no reason a fair-use defense for alleged infringement in *training* the model should turn on the model's *output*. And the panel's

---

[2] The panel erred in drawing an adverse inference from this statement. Op. 17 n.7. That statement strongly confirms that the issues here are weighty and warrant rehearing; the federal government's decision to file in one case does not imply that it takes a different view in the many similar cases where it does not file.

errors—evaluating the training's purpose by the downstream product, ignoring what training makes publicly available, and treating lost licensing *opportunities* as market harm—would reach generative and non-generative AI alike. Indeed, none of the panel's reasoning turned on the output's form or nature, and rightsholders are already arguing that the panel's decision applies to generative AI.[3] Copyright holders, moreover, can challenge a model's outputs directly, see *Concord Music Grp., Inc.* v. *Anthropic PBC*, 772 F. Supp. 3d 1131, 1135-1136 (N.D. Cal. 2025), yet Thomson Reuters brought no such challenge. If anything, the fact that ROSS's engine does *not* generate new expression strengthens its fair-use defense, because it means that ROSS never generated competing headnotes.

But even if the panel's decision could be limited to AI models that do not generate new expression, its consequences would be severe. A fast-growing class of non-generative tools, known as "decision models," evaluates information and returns an answer—*e.g.*, a yes or no, a choice among set options, or a score—without creating new expression. Because these models

[3] Tweet: @AdamEisgrau (Oct. 21, 2026), https://perma.cc/CT5Y-F2JH (counsel for publisher in *Concord* argued panel's fair-use analysis applies to generative AI). In *In re OpenAI*, 13 of the 26 plaintiffs'-side amicus briefs cited the panel's decision. E.g., Dkt. 2373-1.

do not write out their answers, they deliver judgments more quickly and cheaply than generative models and are being developed at unprecedented rates.[4] If the panel's goal was to limit its decision's effect, it should not have swept in one of the fastest-growing frontiers in AI technology.

* * *

The panel warned that ROSS did not have "carte blanche to violate copyright law merely because it incorporates AI." Op. 27. But ROSS simply asked the Court to apply the same fair-use analysis that governs every copyright-infringement claim. By contrast, the *panel* distorted copyright law in the process of applying it to novel AI technology. A decision this significant—which conflicts with decisions of the Supreme Court, this Court, and other circuits—warrants the full Court's review.

## CONCLUSION

The Court should grant rehearing en banc or panel rehearing.

[4] Ron Schmelzer, *Decisions, Decisions: A Guide to the New Wave of AI Decision Models Besides Jev*, Forbes (Oct. 12, 2026), https://tinyurl.com/nh3hktwt.

November 3, 2026

Respectfully submitted,

/s/ *Yaira Dubin*
YAIRA DUBIN
*Counsel of Record*
PARISA SADEGHI
ISABEL E. ALEXIADES
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
212.351.4000
YDubin@gibsondunn.com
PSadeghi@gibsondunn.com
IAlexiades@gibsondunn.com

JEFFREY B. WALL
MORGAN L. RATNER
NICK HARPER
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
202.955.8500
JWall@gibsondunn.com
MRatner@gibsondunn.com
NHarper@gibsondunn.com

*Counsel for ROSS Intelligence Inc.*

## CERTIFICATE OF COMPLIANCE

1. I certify that this petition complies with the type-volume limitation of Federal Rule of Appellate Procedure 40(d)(3)(A) because it contains 3,899 words, excluding the portions exempted by Rule 32(f), and I further certify that the petition complies with the typeface and type-style requirements of Rules 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Century Expanded BT, 14-point font.

2. I certify that this petition complies with Third Circuit Rule 31.1(c) because the text of the electronic petition will be identical to the text of any hard-copy petitions the Court may request. Pursuant to Third Circuit Rule 35.2(a), no paper copies of this petition will be provided unless directed by the Court.

3. I certify that this petition complies with Third Circuit Rule 31.1(c) because Microsoft Defender version 1.463.110.0 was run on the file containing the electronic version of the petition and no viruses were detected.

/s/ *Yaira Dubin*
YAIRA DUBIN

## CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of November 2026, I caused the foregoing petition to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the Court's CM/ECF system. I further certify that service was accomplished on all parties via the Court's CM/ECF system.

November 3, 2026

/s/ *Yaira Dubin*
YAIRA DUBIN

# EXHIBIT A

# UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

No. 25-2153

THOMSON REUTERS ENTERPRISE CENTRE GMBH;
WEST PUBLISHING CORP

v.

ROSS INTELLIGENCE INC,
Appellant

---

On Appeal from the U.S. District Court, D. Del.
Judge Stephanos Bibas,* No. 1:20-cv-00613

Before: RESTREPO, MONTGOMERY-REEVES, and BOVE,
*Circuit Judges*
Argued: June 11, 2026; Filed: Sept. 29, 2026

---

OPINION OF THE COURT

MONTGOMERY-REEVES, *Circuit Judge*.

Artificial intelligence ("AI") is a powerful machine learning technology that is poised to impact many facets of American life, including how we work, how we make art, and, critically for this case, how we study the law. In this case, the

---

* The Honorable Stephanos Bibas, Circuit Judge sitting by designation pursuant to 28 U.S.C. § 291(b).

veteran creator of a legal staple, Thomson Reuters Enterprise Center GmbH ("Thomson Reuters"), charges a new competitor with copying its editorial materials to train an AI platform. The newcomer, ROSS Intelligence, Inc. ("ROSS"), counters that Thomson Reuters seeks to squelch innovative AI technology. But new technology is often at the forefront of our copyright cases. And when it is, we regularly apply "the principles underlying our venerable copyright laws." *Whelan Assocs., Inc. v. Jaslow Dental Lab'y , Inc.*, 797 F.2d 1222, 1224 (3d Cir. 1986). Stripped to its essence, this interlocutory appeal asks us to do just that.

Under ROSS's framing, this case *appears* to concern the future of AI legal technology. But appearances can be deceiving. In truth, this is no more than an ordinary copyright case; we must determine whether Thomson Reuters's materials are sufficiently original for copyright protection and whether ROSS's use of those materials was fair. The undisputed evidence reflects that Thomson Reuters's materials possess a creative spark, and ROSS aspired to be a direct competitor by using them for a highly similar purpose. We therefore hold that Thomson Reuters's materials are copyrightable and that ROSS's use was not fair. Thus, we will affirm the District Court's order granting Thomson Reuters partial summary judgment.

## I. FACTS & PROCEDURAL HISTORY

This story begins with our country's founding. As the United States took its first steps as an independent nation, it

began developing its own common law. In these early days, there were few official reporters publishing this developing corpus of American case law. Private commercial publishers sought to fill this void, and case reporters proliferated. One such publisher was West Publishing Corporation, which exists today as part of Thomson Reuters.

Later, Thomson Reuters created Westlaw, an online legal-research platform that collects, organizes, annotates, and publishes legal content such as judicial opinions. Westlaw organizes judicial opinions using its topic and Key Number System, which indexes opinions based on the legal topics addressed therein. These topics are connected to and expressed in headnotes. Headnotes are annotations on opinions that explain "what the law is in the abstract or the result which it compels on the facts of the case." Appendix (hereinafter App. __") 6510. In Westlaw's user interface, the headnotes sit above the opinion, and clicking on a headnote takes the Westlaw user to the corresponding passage of the opinion upon which the headnote is based. Headnotes reflect a point of law made in the judicial opinion and are "distinguished from statements of fact and from [statements explaining the] reasoning [supporting the point of law]." App. 6510.

When drafting headnotes, Thomson Reuters's editors must follow precise guidelines. They must make each headnote clear and concise, including only the essential facts for the legal contention or holding at issue. They are directed to limit each headnote to 800 characters, where possible. Headnotes

are meant to convey to a reader the "most important points" in an opinion. App. 8219. Accurate description of the law is paramount for headnotes, so the editors "[g]enerally . . . follow the court's language . . . [but] each headnote must have enough context to stand on its own, and make sense to a reader who doesn't have the opinion." App. 8233.

Thomson Reuters owns a registered copyright in Westlaw and its content, including the Key Number System, headnotes, and synopses at the beginning of opinions. Thomson Reuters disclaims any copyright in "any part of the original work prepared by a United States Government officer or employee as part of that person's official duties," such as the opinions underlying the headnotes. App. 176. Thomson Reuters also used its headnotes to train other Westlaw products like WestSearch Plus, an AI powered search function.

But Westlaw has competitors in the legal-research industry, including ROSS. ROSS was founded by three University of Toronto computer science students who entered an IBM competition, in which competing teams used IBM's Watson computer to solve a data-related problem in the team's chosen industry. The trio's idea was to use Watson to train a computer program to answer legal research questions without using traditional Boolean or keyword searches. After this competition,

the students founded ROSS to expand their idea and build an AI legal-research platform.[1]

ROSS then created an AI legal search engine that would respond to plain-language legal questions with relevant passages of text from judicial opinions. ROSS had access to a bank of approximately ten million uncopyrighted judicial opinions from which it could respond with an excerpt relevant to a user's query. ROSS's AI was not a generative AI, meaning it would not create any new expression; it would only return text passages from preexisting judicial opinions.

For ROSS's AI legal search engine to work, the AI program had to learn what made a judicial opinion responsive to a user's legal question. To train its AI program to do so, ROSS enlisted a company called LegalEase Solutions ("LegalEase") to create AI training memoranda. LegalEase wrote approximately 25,000 legal memos, each of which presented a legal question and four to six judicial opinion passages in response. Memo-drafters for LegalEase, and its subcontractor Morae Global, used thousands of Westlaw headnotes to create the memos'

[1] AI here refers to machine learning technology in which a software program analyzes data to learn how to perform a task. The program is given data which contains examples of inputs paired with outputs. By analyzing enough data, the program can improve its performance, effectively learning to recognize patterns regarding which outputs are responsive to which inputs.

legal questions, as the headnotes provided "an easy way [to] fram[e] questions." App. 8545. The memos' responses to the legal questions needed to include at least one great, good, topical, and irrelevant judicial opinion passage, labeled as such. A great passage was completely responsive; a good passage was mostly responsive; a topical passage was somewhat responsive; and an irrelevant passage was not responsive. The "[g]reat" passages were "[m]ost frequently" the judicial opinion passages that Westlaw linked to the headnote that ROSS used as the memo's legal question.[2] App. 4837–39. These memos were then converted into a machine-readable format and used to train the ROSS AI program to identify patterns regarding which judicial opinion passages respond well to legal questions.

ROSS did not hide its intention that this for-profit AI platform compete with Westlaw. ROSS ran ads directly comparing its platform to Westlaw at prices "in line with" Westlaw. App. 4519. ROSS executives hoped ROSS would serve as a substitute for Westlaw, and some law firms switched from using Westlaw to ROSS.

Upon learning of ROSS's actions, Thomson Reuters sued ROSS, alleging copyright infringement and tortious

[2] For purposes of this appeal, ROSS is not challenging (1) that LegalEase and Morae Global's actions are attributable to ROSS and (2) that LegalEase and Morae Global copied Westlaw headnotes.

interference with contract. The District Court ultimately granted partial summary judgment for Thomson Reuters, holding as a matter of law that ROSS's use of 2,243 Westlaw headnotes[3] infringed Thomson Reuters's copyright and was not fair use. Then, at the parties' request, the District Court certified for interlocutory review "(1) whether the West headnotes and the West Key Number System[[4]] are original as a matter of law and (2) whether ROSS's alleged use of the headnotes was fair use." App. 61.

## II. JURISDICTION AND STANDARD OF REVIEW

The District Court had jurisdiction under 28 U.S.C. §§ 1331, 1338. We have jurisdiction to hear this interlocutory appeal under 28 U.S.C. § 1292(b). We are "generally constrained

[3] An expert for ROSS stated that the memo questions corresponding to a batch of 2,830 headnotes closely resembled the headnote text but differed significantly from the underlying judicial opinions' text. The District Court scrutinized this batch, comparing the headnotes to the memo questions and the opinions. The District Court concluded that for 2,243 headnotes, the memo questions were so similar to the headnote text but so dissimilar to the opinion text that no reasonable juror could conclude these headnotes were not copied.

[4] ROSS never challenged the originality of the Key Number System in any of its briefing, despite its inclusion in the certified questions. We do not address that forfeited issue.

to the questions certified for review" in an interlocutory appeal, but we "may consider any grounds justifying reversal." *Ellis v. Westinghouse Elec. Co.*, 11 F.4th 221, 229 (3d Cir. 2021) (quoting *Morris v. Hoffa*, 361 F.3d 177, 196 (3d Cir. 2004)). We review a grant of summary judgment de novo. *TD Bank N.A. v. Hill*, 928 F.3d 259, 270 (3d Cir. 2019). Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "We view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor." *Tundo v. Cnty. of Passaic*, 923 F.3d 283, 287 (3d Cir. 2019) (citation modified).

## III. ANALYSIS

Our Constitution empowers Congress "to promote the progress of science and useful arts, by securing for limited times to authors and inventors the exclusive right to their respective writings and discoveries." U.S. Const., Art. 1, § 8, cl. 8 (citation modified). Congress promotes the progress of science and arts through the Copyright Act, 17 U.S.C. § 101 *et seq.*, which "encourage[s] creativity by granting to the author of an original work 'a bundle of exclusive rights,'" like the rights to "reproduce" a copyrighted work and "prepare derivative works." *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 526 (2023) (quoting *Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 546 (1985)).

But the Copyright Act does not focus solely on encouraging creativity. It also promotes the availability of creative works. Stated differently, it "reflects a balance of competing claims upon the public interest: Creative work is to be encouraged and rewarded, but private motivation must ultimately serve the cause of promoting broad public availability of" creative works. *Id.* (quoting *Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156 (1975)). That "balancing act between creativity and availability (including for use in new works)" is reflected, in part, in the "fair use" defense, a common-law doctrine codified at 17 U.S.C. § 107. *Id.* at 526–27.

To establish a claim of copyright infringement, one must demonstrate "ownership of a valid copyright and copying of original elements of the plaintiff's work." *Am. Soc'y for Testing & Materials v. UpCodes, Inc.,* 172 F.4th 253, 261 (3d Cir. 2026) (citing *Whelan Assocs.*, 797 F.2d at 1231). But one can have a copyright only in "original works of authorship." 17 U.S.C. § 102(a). Even if these elements are satisfied, the "fair use" of a work's original elements "for purposes such as criticism, comment, news reporting, teaching . . ., scholarship, or research, is not an infringement of copyright." *Id.* § 107. This case turns on the originality requirement and ROSS's fair use defense. We first consider whether Thomson Reuters's headnotes were original, and then whether ROSS's copying them into AI training memos for its legal-research platform was a fair use.

### A. Originality[5]

We begin with originality. "Copyright protection subsists . . . in original works of authorship." 17 U.S.C. § 102(a). This is an "extremely low" bar, as works need only be "independently created" with a "modicum of creativity" for copyright protection; such creativity is present when a work "possess[es] some creative spark." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345–46 (1991). Although "the vast majority of [works] will pass this test," "[t]here remains a narrow category of works in which the creative spark is utterly lacking or so trivial as to be virtually nonexistent." *Id.* at 359 (holding that the alphabetical arrangement of a phonebook does not possess the requisite "creative spark").

All 2,243 independently created headnotes at issue in this appeal have "some creative spark." *Id.* at 345. For each headnote, Thomson Reuters's editors made creative decisions about which points of law were important enough to include in a headnote and how to word those points of law consistent with Westlaw's drafting criteria. Each headnote had to convey enough factual background and reasoning to stand on its own

[5] The District Court mused that even headnotes that quoted judicial opinions verbatim may be original enough for copyright protection. While this dictum raises an interesting question, we do not answer it here as the District Court only granted summary judgment as to 2,243 headnotes that do not copy opinion text verbatim.

without reference to the opinion or any other headnote, while accurately reflecting the corresponding opinion passage. Because these decisions show the requisite minimal "creative spark," the headnotes are original. *Id.*

Supreme Court authority supports this conclusion. Indeed, the Supreme Court has suggested that headnotes prepared by private case reporters like Thomson Reuters are copyrightable. In *Callaghan v. Myers*, 128 U.S. 617 (1888), the Court held that works produced by judges in their official capacity were not copyrightable, but a reporter may obtain "a copyright for the volume which will cover the matter which is the result of his intellectual labor" such as "head-notes." *Id.* at 647–49. Over a century later, the Court applied this principle to work produced by legislators in their legislative capacity, noting that *Callaghan* "upheld the reporter's copyright interest in several explanatory materials that the reporter had created himself: *headnotes*, syllabi, tables of contents, and the like" so long as "they came from an author who had no authority to speak with the force of law." *Georgia v. Public.Resource.Org, Inc.*, 590 U.S. 255, 265 (2020) (emphasis added).

ROSS offers three counters. First, ROSS argues that recognizing Thomson Reuters's copyright in its headnotes "would effectively give [Thomson Reuters] a monopoly over the law." Opening Br. 22. Not so. Headnotes are not law; judicial opinions are. And judicial opinions remain "free for publication to all." *Banks v. Manchester*, 128 U.S. 244, 253 (1888).

Second, ROSS argues the headnotes are not copyrightable under the merger doctrine. This doctrine precludes copyright in the "rare" case where "a work's underlying idea can effectively be expressed in only one" or a "few . . . ways" such that "copyrighting a design feature would effectively monopolize an underlying idea." *Silvertop Assocs. Inc. v. Kangaroo Mfg. Inc.*, 931 F.3d 215, 222 (3d Cir. 2019) (quoting *Educ. Testing Servs. v. Katzman*, 793 F.2d 533, 539 (3d Cir. 1986)). But the merger doctrine does not apply when there "are many other ways to" convey a work's underlying idea. *Id.* at 223. So, for instance, we have said that the merger doctrine does not apply to a "banana costume" due to the possibility of different costumes based on "shape, curvature, tips, tips' color, overall color, length, width, lining, texture, and material." *Id.* And just as a banana costume can take myriad designs, so too can headnotes have differing expressions. Indeed, copyrighting the headnotes does not effectively monopolize judicial opinions because, as the District Court correctly noted, "there are many ways to express points of law from judicial opinions." App. 49; *see, e.g.*, Amicus Br. for RELX, Inc. (hereinafter the "Lexis Br. ___") at 13–16. So the merger doctrine does not apply.

Third and finally, ROSS cites *Matthew Bender & Co. v. West Publishing Co.*, 158 F.3d 674 (2d Cir. 1998), to support the conclusion that headnotes are insufficiently original for copyright protection. But that out-of-circuit case does not support ROSS's argument. The Second Circuit held that West lacked a copyright in its arrangement of information like party names and its addition of information like parallel citations

because that information was not sufficiently original. *Id.* at 677. Those materials lacked originality, according to the court, because "industry conventions . . . dictate[d]" the selections and because "creativity inheres in making non-obvious choices from among more than a few options." *Id.* at 682. In contrast, the Second Circuit described headnotes as "independently composed," and it never suggested that industry standards dictated headnote composition. *Id.* at 676. Indeed, such reasoning would make little sense because Thomson Reuters's editors make independent judgments about which points of law to include and how to concisely write headnotes to stand alone without reference to the underlying opinion.[6] *Cf. Southco, Inc. v. Kanebridge Corp.*, 390 F.3d 276, 282 (3d Cir. 2004) (Alito, J.) (finding unoriginal product serial numbers in which "each number is rigidly dictated by . . . mechanical application of the [numbering] system, not creative thought" (citation modified)). So the Second Circuit offers ROSS no refuge.

### B. Fair Use

We turn next to ROSS's purported fair-use defense. "[T]he fair use of a copyrighted work . . . is not an infringement of copyright." 17 U.S.C. § 107. Fair use is an equitable doctrine that "permits courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity

---

[6] *See* Lexis Br. at 12 (explaining that Lexis, a Westlaw competitor, employs a different creative process as it generates different headnotes for the same opinions).

which that law is designed to foster." *Andy Warhol*, 598 U.S. at 527 (quoting *Steward v. Abend*, 495 U.S. 207, 236 (1990)). "Fair use is a mixed question of law and fact." *Harper & Row*, 471 U.S. at 560. But where there are undisputed facts "sufficient to evaluate each of the statutory factors," the Court "may conclude as a matter of law that the challenged use does not qualify as a fair use." *Id.* (citation modified).

In determining whether a use is fair, we must consider the following statutory factors:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107. As the proponent of this affirmative defense, ROSS bears the burden of demonstrating its copying was justified. *See Andy Warhol*, 598 U.S. at 547 n.21; *UpCodes*, 172 F.4th at 261. We address each factor in turn.

### 1. Purpose and Character of the Use

The first factor examines the "purpose and character" of ROSS's use. 17 U.S.C. § 107(1); *Andy Warhol*, 598 U.S. at

532–33. To assess this factor, we first consider whether "a use is commercial as opposed to nonprofit" because a commercial use weighs against a finding of fair use. *Andy Warhol*, 598 U.S. at 531; *see also UpCodes*, 172 F.4th at 265 ("If a new work is used commercially rather than for a nonprofit purpose, its use will less likely qualify as fair."). Next, we consider how transformative the copier's use is—that is, "whether the new work merely supersedes the objects of the original creation . . . or instead adds something new, with a further purpose or different character." *Andy Warhol*, 598 U.S. at 528 (citation modified) (quoting *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994)). The "lodestar" of this inquiry is whether the copier maintains a "distinctive purpose" for its use. 4 Nimmer on Copyright § 13F.10[G][2][a][i] (2026); *see also Andy Warhol*, 598 U.S. at 531 ("[A] use that has a distinct purpose is justified because it furthers the goal of copyright, namely, to promote the progress of science and the arts, without diminishing the incentive to create."). And, because uncovering the differences between an originator's and a copier's purposes is "a matter of degree," we ask "whether and to what extent the use at issue has a purpose or character different from the original." *Andy Warhol*, 598 U.S. at 528–29 (citation modified). "The larger the difference," the Supreme Court has said, "the more likely the first factor weighs in favor of fair use." *Id.* at 529.

In sum, we must balance "the degree of difference [in purpose] . . . against the commercial nature of the use." *Id.* at 532. And if "an original work and a secondary use share the same

or highly similar purposes, and the secondary use is of a commercial nature, the first factor is likely to weigh against fair use, absent some other justification for copying." *Id.* at 532–33.

We start with whether ROSS's use of Thomson Reuters's headnotes is commercial. ROSS aimed to create a legal-research platform charging comparable prices to Westlaw to compete with Westlaw for customers. So ROSS's use is commercial.

But because commercialism is not "dispositive" of fair use, *id.* at 531, we must ask whether ROSS's use of Thomson Reuters's headnotes is transformative—that is "whether *and to what extent*" ROSS's use of the headnotes "has a purpose or character different from" Thomson Reuters's use. *Id.* at 529 (emphasis in original) (quoting *Campbell*, 510 U.S. at 579). Thomson Reuters uses its headnotes to help legal researchers find and understand judicial opinions containing points of law related to their searches. ROSS uses Thomson Reuters's headnotes to create a legal-research platform to help users find judicial opinion passages responsive to their searches. True, ROSS did not use the headnotes in precisely the same fashion as Thomson Reuters. ROSS took an intermediate step of using the headnotes to train an AI program, which arguably presents a slight degree of difference in use. But the undisputed evidence demonstrates that ROSS used the headnotes to train an AI program *for the benefit of its legal-research platform*. So both Thomson Reuters and ROSS use the headnotes to create

and optimize a legal-research platform that helps users find responsive legal material. Thus, ROSS's use of the headnotes shares the same ultimate purpose as Thomson Reuters's use, making ROSS's use minimally transformative, at best.[7]

[7] We note that the United States Department of Justice ("DOJ") filed a statement of interest relating to generative AI in a pending case in the Southern District of New York. Statement of Interest of the United States, *In re: OpenAI, Inc. Copyright Infringement Litig.*, No. 1:25-md-3143 (S.D.N.Y. Sept. 1, 2026) (hereinafter "DOJ Statement __"). The concerns raised in that separate case do not apply here. The DOJ relied on *Bartz v. Anthropic PBC*, 787 F. Supp. 3d 1007, 1014 (N.D. Cal. 2025) to contend that training an AI large language model, which can "generate original responses," is a transformative use. DOJ Statement at 10; *see also Kadrey v. Meta Platforms, Inc.*, 788 F. Supp. 3d 1026, 1034 (N.D. Cal. 2025) (exploring whether generative AI programs transformatively use training materials). Unlike the AI models in *Bartz* and *In re: OpenAI*, ROSS's AI platform cannot generate original expression, and the evidence here supports the opposite conclusion about transformativeness. The DOJ also argued that the large language model training in *OpenAI* did not result in "substitutive competition." DOJ Statement at 13 (citation modified). Here, ROSS trained its AI for the purpose of creating a commercial substitute for Westlaw. In any event, the DOJ's filing in *In re: OpenAI* demonstrates that the DOJ is tracking these issues and knows how to assert its interests, but the DOJ notably did not do so here.

Given that ROSS's use was highly commercial and minimally transformative, we conclude that the first factor weighs against fair use. *Andy Warhol*, 598 U.S. at 537–38 ("Taken together, these two elements—that Goldsmith's photograph and AWF's 2016 licensing of Orange Prince share substantially the same purpose, and that AWF's use of Goldsmith's photo was of a commercial nature—counsel against fair use . . . ."); *Fox News Network, LLC v. TVEyes, Inc.*, 883 F.3d 169, 178 (2d Cir. 2018) (reasoning that the "commercial nature of a secondary use weighs against a finding of fair use . . . especially when . . . the transformative character of the secondary use is modest").

ROSS offers two arguments to support the opposite conclusion. Neither convinces. First, ROSS argues that *Authors Guild v. Google, Inc.*, 804 F.3d 202 (2d Cir. 2015), dictates a different conclusion. There, the Second Circuit held that Google's scanning of entire books had the "highly transformative purpose" of creating a feature to search for and read small snippets of books that matched their search terms. *Id.* at 216–17; s*ee also Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 97 (2d Cir. 2014) (holding similar use was fair where there was no snippet feature and the use was noncommercial). Deciding a dispute that "test[ed] the boundaries of fair use," the court held that the search feature served a completely different function that was highly transformative of the original work. *Authors Guild*, 804 F.3d at 206, 216–17. The purpose of the original books was to be read while the purpose of the search

function was to enable users to find "books containing a term of interest to the searcher." *Id.* at 216.

No such transformative purpose is present here. Instead, ROSS's platform uses Thomson Reuters's headnotes to help users find judicial opinions related to their legal research inquiries, something Thomson Reuters already does with its headnotes. Also favoring fair use in *Authors Guild* was that Google's search feature may have driven users toward a book the users would then purchase from the original author. *Id.* at 217–18. Not so here. ROSS's use does not lead a user to Westlaw; instead, as ROSS admits, it aims to replace Westlaw.

Second, ROSS argues that three "intermediate copying" cases, one from the Supreme Court and two from the Ninth Circuit, dictate a different conclusion. Opening Br. 44. In a recent case, the Supreme Court held that Google could copy a portion of Oracle's Java computer programming language to enable users to create applications using Java code on Android phones. *Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 6–7 (2021). The Ninth Circuit concluded similarly in earlier cases. It held that a video game developer could copy Sega's computer program code to create video games that could be played on Sega's gaming system. *Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1514 (9th Cir. 1992). Another panel similarly held that Connectix could copy Sony's computer program code to create a product that made Sony video games playable on personal computers. *Sony Comput. Ent., Inc. v. Connectix Corp.*, 203 F.3d 596, 599, 606–08 (9th Cir. 2000).

In each of these cases, computer code was copied to enable users to make their software operable with an existing computer system. These uses were transformative because, in each case, copying was necessary to access the unprotected functional aspects of computer code. *See Oracle*, 593 U.S. at 30–31 (stating that Google copied Oracle API "only insofar as needed" and explaining that "shared interfaces are necessary for different programs to speak to each other"); *Sega*, 977 F.2d at 1514 (noting that "no other means of access to the unprotected elements exists"); *Connectix*, 203 F.3d at 599 (holding that copying was "necessary to permit Connectix to make its non-infringing Virtual Game Station function with PlayStation games").[8] Here, ROSS does not *need* to copy Thomson Reuters's headnotes to access the underlying unprotected information. ROSS had access to the underlying judicial opinions and could freely copy them to make the memos needed to train its AI. It chose not to do so because copying the headnotes offered an "easy" way to create its training memos. App.

---

[8] Also critical to the outcome in *Oracle* was that the at-issue computer code was "declaring code," the use of which "is inherently bound together with uncopyrightable ideas" and that the value of Java as a program "lies in its efforts to encourage programmers to learn and to use that system." 593 U.S. at 28–29. By contrast, Thomson Reuters's headnotes do not derive value from others copying them.

8545–46. Unlike necessity, ease is not a justification for copying. In sum, the first factor weighs against fair use.[9]

### 2. Nature of the Copyrighted Work

The second factor evaluates the "nature" of the headnotes. 17 U.S.C. § 107(2). Under this factor we consider whether the work was published or unpublished when it was used and if the work, while creative enough for copyright protection, has factual or functional elements. *Harper & Row*, 471 U.S. at 563–64. More creative, less factual works are "closer to the core of intended copyright protection." *Campbell*, 510 U.S. at 586. This factor will generally weigh in favor of fair use when a

---

[9] Courts have at times considered whether copying was done in good faith when evaluating the first factor. *See Oracle*, 593 U.S. at 32–33 (explaining the good faith consideration but expressing skepticism about whether good faith still plays any role in the fair use analysis). Here, the undisputed evidence reflects that ROSS at times acted in bad faith. *See, e.g.*, App. 4969–76, 6443, 6449, 6454, 6495 (ROSS attempting to access Westlaw with law-firm investor credentials despite notice that doing so was prohibited by Westlaw's terms of service); App. 6491–93 (stating ROSS employee inquired about a Westlaw account under the guise of a solo practitioner); App. 6956 (stating ROSS employee used student account to access Westlaw, hiding his employment by a competitor). So to the extent good faith remains relevant, that consideration weighs against fair use.

work is primarily factual or functional. *Oracle*, 593 U.S. at 20, 28–29. But courts have noted that "[t]he second factor has rarely played a significant role in the" fair use determination. *Authors Guild*, 804 F.3d at 220. Here, Thomson Reuters published the headnotes before ROSS used them. And the headnotes are more factual than fictional because they must accurately convey the law and describe uncopyrightable judicial opinions. This factor thus favors fair use.

### 3. Amount and Substantiality of the Portion Used

For the third factor, we evaluate whether "the amount and substantiality of the portion used in relation to the copyrighted work as a whole" is "reasonable in relation to the purpose of the copying." *Campbell*, 510 U.S. at 586 (quoting 17 U.S.C. § 107(3)). This factor requires us to assess, quantitatively, how much of the copyrighted work was used and, qualitatively, whether the use took "the heart" of the work. *Harper & Row*, 471 U.S. at 565. In evaluating the third factor, we "recognize that the extent of permissible copying varies with the purpose and character of the use." *Campbell*, 510 U.S. at 586–87.

As to the amount and substantiality of the headnotes used, ROSS copied the entire text of the 25,000 Westlaw-written headnotes into its memos and used those to train its AI program. ROSS's purpose in copying the headnotes was highly similar to the headnotes' original purpose, and ROSS aimed to make a commercial substitute for Westlaw using Westlaw's work. *See supra* Section II.B.1. ROSS thus lacked a

transformative purpose and character that would make extensive copying reasonable. *See Authors Guild*, 804 F.3d at 221 (explaining that a transformative purpose allows more extensive copying than copying done to offer a competing substitute for the original).

ROSS responds that it took an insubstantial portion of Thomson Reuters's work—only 0.08% of Thomson Reuters's 28 million headnotes. But copying even an "insubstantial portion" of an original work is not fair if, qualitatively, an important part of the work is copied. *Harper & Row*, 471 U.S. at 564–65. "The crux of the inquiry is whether 'no more was taken than necessary'" to achieve the copier's purpose. *HathiTrust*, 755 F.3d at 98 (quoting *Campbell*, 510 U.S. at 589). The purpose behind ROSS's copying was minimally transformative, at best. Copying the headnotes was also not necessary to train ROSS's AI, as the underlying judicial opinions were freely available. So, ROSS took more than necessary when it copied these headnotes without a justifying transformative purpose.[10] Thus, the third factor weighs against fair use.

[10] Additionally, we affirm the District Court's holding that each individual headnote is a copyrightable work. *See supra* Section II.A; *cf. Oracle*, 593 U.S. at 33 (recognizing that taking one sentence from a book may seem insubstantial, unless that sentence itself constituted the entirety of a short story). So for each headnote taken, ROSS copied an entire work. Such extensive copying was not reasonable because it was not supported by a sufficiently transformative purpose.

**4. Market Effect of the Use**

The fourth factor concerns "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). The "potential market" includes both the market for the original work and any market for derivative uses of the original work. *Campbell*, 510 U.S. at 590 (quoting 17 U.S.C. 107(4)). In this context, we will also consider any "public benefits the copying will likely produce." *Oracle*, 593 U.S. at 35. So to resolve this appeal, we consider harm to the original market, harm to the value of the copyrighted work, harm to the potential derivative market, and the alleged public benefits of the copying.

We begin with the original market. The parties dispute which is the relevant original market. ROSS argues that the relevant original market is the market for headnotes as a standalone product, which ROSS claims does not exist. Even assuming this is the relevant market, ROSS's argument ignores the effect of ROSS's use on the value of Thomson Reuters's headnotes. Our Court rejected a similar argument in *Video Pipeline, Inc. v. Buena Vista Home Entertainment, Inc.*, 342 F.3d 191, 202 (3d Cir. 2003), *abrogated in part on other grounds by TD Bank N.A.*, 928 F.3d at 278. There, a website that published trailers and clips of Disney movies argued that no market existed for movie trailers because no one "ever paid or will ever pay any money merely to see trailers." *Id.* at 202. We rejected that argument, stating that "[t]he [fair use] statute directs us to consider the effect of the use upon the . . . *value*

of the copyrighted work, not only the effect upon the market, however narrowly that term is defined." *Id.* (emphasis in original) (citation modified). Video Pipeline's publishing of the trailers damaged the trailers' value in drawing users to Disney's website, where Disney could induce purchases or cross-market other products; it made no difference that no standalone trailer market existed. *Id.* The same is true here. While there may be no standalone market for headnotes, Thomson Reuters touts the headnotes as a feature to attract users to buy a Westlaw subscription. By copying the headnotes and using them to build its own competing legal-research platform, ROSS appropriated the headnotes' value for finding and analyzing judicial opinions and diminished their value as a draw for users to Thomson Reuters's legal-research platform. So, *Video Pipeline* supports the conclusion that ROSS's copying harmed the value of Thomson Reuters's headnotes.

Thomson Reuters argues that the legal-research platform market is the relevant original market. ROSS offers no convincing reason to ignore this market, so we consider it. The undisputed evidence here reveals that ROSS copied the headnotes to create a competing legal-research platform in the same market as Westlaw. "[U]nrestricted and widespread" copying of Thomson Reuters's headnotes to develop substitute legal-research tools, like ROSS did, would harm Westlaw's position in that original market. *Andy Warhol*, 598 U.S. at 524 n.3 (quoting *Campbell*, 510 U.S. at 590). ROSS offers no evidence to rebut the alleged harm in this market.

We turn now to potential derivative markets for Thomson Reuters's headnotes. The parties dispute the relevant potential derivative market. ROSS argues it did not harm any potential derivative market because no derivative market for headnotes exists. Thomson Reuters argues that ROSS harmed its position in the potential derivative market for licensing headnotes as AI training data. "The market for potential derivative uses includes only those that creators of original works would in general develop or license others to develop." *Campbell*, 510 U.S. at 592. But a potential derivative market is not illusory just because an author "has evidenced little if any interest in exploiting this market for derivative works." *Castle Rock Ent., Inc. v. Carol Publ'g Grp., Inc.*, 150 F.3d 132, 145–46 (2d Cir. 1998).

Here, the evidence shows that the market for licensing headnotes as text to train AI is rapidly developing. Additionally, Thomson Reuters presented evidence that it is using its headnotes as training data for its own AI search products. ROSS offers no evidence to disprove this. That Thomson Reuters did not license its headnotes to others does not disprove that a market exists to do so. Additionally, ROSS's copying harmed Thomson Reuters in this market. By copying the headnotes for use as training data without Thomson Reuters's authorization, ROSS usurped Thomson Reuters's opportunity to enter that derivative market and license its headnotes for that purpose. The market harm caused by ROSS's use weighs against fair use.

Finally, we consider whether the public benefits are "related to copyright's concern for the creative production of new expression" and how "comparatively important, or unimportant" the public benefits are "when compared with dollar amounts likely lost" due to copying. *Oracle*, 593 U.S. at 35–36. ROSS claims its copying will benefit the public by increasing access to the law. But the underlying judicial opinions are freely available, and ROSS's service was offered at prices comparable to Westlaw. So it is unclear how ROSS's copying would greatly increase public access to the law. ROSS also argues the District Court's decision will halt AI development. But ROSS presents no evidence to support that broad claim. Finally, ROSS argues that AI is critical for national security purposes so copyright should not impede ROSS's AI development. ROSS again presents no evidence connecting its legal-research platform to national security. Despite doing so in other circumstances,[11] the DOJ has not raised national security concerns about the conduct in this case. While some AI technology may implicate national security concerns, this does not give ROSS carte blanche to violate copyright law merely because it incorporates AI. Thus, the fourth factor weighs against fair use.

In conclusion, the second factor weighs slightly in favor of fair use, but the first, third, and fourth factors weigh against it. Evaluating these factors together, and in light of copyright's purposes, we hold that ROSS's use was not fair. *See UpCodes*,

---

[11] *See, e.g.*, DOJ Statement at 1.

172 F.4th at 261 (exploring and weighing all factors "together, in light of the purposes of copyright") (quoting *Murphy v. Millennium Radio Grp. LLC*, 650 F.3d 295, 306 (3d Cir. 2011)).

* * * * *

Because Thomson Reuters's 2,243 headnotes are original enough for copyright protection and ROSS's use of the headnotes was not fair, we will AFFIRM.

*Counsel for Appellant*

Ji Won Oh
Kufere Laing
Mark S. Davies [Argued]
Andrew M. Legolvan
Yar R. Chaikovsky
WHITE & CASE

Kayvan M. Ghaffari
Anne M. Voigts
Ranjini Acharya
PILLSBURY WINTHROP SHAW PITTMAN

Anna Naydonov
CLEARY GOTTLIEB STEEN & HAMILTON

*Counsel for Appellees*

Dale M. Cendali [Argued]
Joshua L. Simmons
Miranda D. Means
KIRKLAND & ELLIS

*Counsel for Amici Appellant*

Heather J. Meeker
TECHNOLOGY LAW PARTNERS

Victoria J. Noble
ELECTRONIC FRONTIER FOUNDATION

Rebecca L. Tushnet
HARVARD LAW SCHOOL

Karen E. Keller
SHAW KELLER

Tim R. Hwang
HWANG INDUSTRIES

Abraham J. Kang
LAW OFFICE OF ABRAHAM KANG

Michael P. Abate
KAPLAN JOHNSON ABATE & BIRD

Michael T. Hensley
CARLTON FIELDS

Michael S. Kwun
KWUN BHANASALI LAZARUS

August Gebhard-Koenigstein
Phillip R. Mallone
STANFORD LAW SCHOOL INTELLECTUAL PROPERTY AND
INNOVATION CLINIC, MILLS LEGAL CLINIC

*Counsel for Amici Appellees*

Lawrence J. Spiwak
PHOENIX CENTER FOR ADVANCED LEGAL & ECONOMIC
PUBLIC POLICY STUDIES

Lucy Grace D. Noyola
ASSOCIATION OF AMERICAN PUBLISHERS

J. Kevin Fee
Jane Wise
Stanley Panikowski
DLA PIPER

Jacqueline Charlesworth
BAYLA LAW GROUP

Nicholas M. Medellin
EISNER

Regan A. Smith
NEWS MEDIA ALLIANCE

Nancy E. Wolff
COWAN DEBAETS ABRAHAMS & SHEPPARD

Michael D. Hobbs
Austin D. Padgett
Brooke R. Watson

TROUTMAN PEPPER LOCKE

Irina Tarsis
CENTER FOR ART LAW

Tod H. Cohen
AI COALITION FOR DATA INTEGRITY

Jonathan Iwry

Jonathan Z. King
COWAN LIEBOWITZ & LATMAN

Felicity Kohn
PRYOR CASHMAN

Adam G. Unikowsky
JENNER & BLOCK

# UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

No. 25-2153

THOMSON REUTERS ENTERPRISE CENTRE GMBH;
WEST PUBLISHING CORP

v.

ROSS INTELLIGENCE INC,
Appellant

---

On Appeal from the U.S. District Court, D. Del.
Judge Stephanos Bibas*, No. 1:20-cv-00613

Before: RESTREPO, MONTGOMERY-REEVES, and BOVE, *Circuit Judges*
Argued: June 11, 2026

---

JUDGMENT

This cause came to be considered on the record from the United States District Court for the District of Delaware and was argued on June 11, 2026.

On consideration whereof, it is now **ORDERED** and **ADJUDGED** that the District Court's order entered on February 11, 2025, is hereby **AFFIRMED**. Costs will be taxed against the Appellant. All of the above in accordance with the Opinion of this Court.

ATTEST:

s/Patricia S. Dodszuweit
Clerk

Dated: September 29, 2026

---

* The Honorable Stephanos Bibas, Circuit Judge sitting by designation pursuant to 28 U.S.C. § 291(b).