**No. 25-2153**

# United States Court of Appeals
***for the***
# Third Circuit

THOMSON REUTERS ENTERPRISE CENTRE GMBH and WEST PUBLISHING CORPORATION,

*Plaintiffs-Appellees,*

v.

ROSS INTELLIGENCE INC.,

*Defendant-Appellant.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**
**CIVIL ACTION NO. 1:20-cv-00613-SB**
**(THE HONORABLE STEPHANOS BIBAS)**

---

**BRIEF OF AMICUS CURIAE FOUNDATION FOR AMERICAN INNOVATION IN SUPPORT OF APPELLANT'S PETITION FOR PANEL REHEARING OR REHEARING EN BANC**

---

Tim Hwang
D.C. Bar No. 1722206
California Bar No. 292599
FOUNDATION FOR AMERICAN INNOVATION
408 C St NE
Washington, DC 20002
(973) 960-4955
tim.hwang@thefai.org
Counsel for Amicus Curiae

## CORPORATE DISCLOSURE STATEMENT

The Foundation for American Innovation (FAI) is a nonprofit corporation organized under Section 501(c)(3) of the Internal Revenue Code. FAI has no parent company and issues no stock. No company owns an interest of ten percent or more in FAI.

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES....1

IDENTITY AND INTEREST OF AMICUS CURIAE....2

INTRODUCTION AND SUMMARY OF ARGUMENT....3

ARGUMENT....4

I. A WORK'S VALUE IN ATTRACTING USERS DOES NOT MAKE EVERY LOSS OF USERS COGNIZABLE COPYRIGHT HARM....4

II. THE BREADTH OF AI TRAINING MAKES A LIMIT ON COGNIZABLE TRAINING MARKETS ESSENTIAL....7

CONCLUSION....12

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES


**Cases**

*American Geophysical Union v. Texaco Inc.*,
60 F.3d 913 (2d Cir. 1995)........................................................7, 9–11

*Authors Guild v. Google, Inc.*,
804 F.3d 202 (2d Cir. 2015)........................................................5–7

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
448 F.3d 605 (2d Cir. 2006)........................................................7, 9–11

*Campbell v. Acuff-Rose Music, Inc.*,
510 U.S. 569 (1994)........................................................3, 6

*Castle Rock Entertainment, Inc. v. Carol Publishing Group, Inc.*,
150 F.3d 132 (2d Cir. 1998)........................................................11

*Google LLC v. Oracle America, Inc.*,
593 U.S. 1 (2021)........................................................3, 9

*TD Bank N.A. v. Hill*,
928 F.3d 259 (3d Cir. 2019)........................................................4

*Video Pipeline, Inc. v. Buena Vista Home Entertainment, Inc.*,
342 F.3d 191 (3d Cir. 2003)........................................................4–7

**Statutes and Rules**

17 U.S.C. § 107(4)........................................................4

Fed. R. App. P. 29(b)........................................................2

**Other Authorities**

Yann LeCun et al., *Deep Learning*,
521 Nature 436 (2015)........................................................8–9

Alec Radford et al., *Learning Transferable Visual Models From Natural Language Supervision*,
139 Proceedings of Machine Learning Research 8748 (2021)..............................8

Hugo Touvron et al., *LLaMA: Open and Efficient Foundation Language Models*,
arXiv:2302.13971 (2023)........................................................8

## IDENTITY AND INTEREST OF AMICUS CURIAE

The Foundation for American Innovation (FAI) is a 501(c)(3) nonprofit organization. Its mission is to develop technology, talent, and ideas that support a better, freer, and more abundant future. FAI advances this mission by helping policymakers foster innovation, encouraging technologists and founders to engage in governance, and informing the public about how such collaboration is vital to the continued success of the American project.

FAI participated as amicus at the merits stage. Its work on technology policy and the business environment for AI informs its interest in rules that protect copyrighted expression while upholding the principles of fair use. FAI seeks leave under Federal Rule of Appellate Procedure 29(b) to support ROSS's petition for panel rehearing or rehearing en banc. Counsel for both sides have stated that they have no objection to the filing of this brief.

No party's counsel authored this brief in whole or in part. No party, party's counsel, or person other than FAI and its counsel contributed money intended to fund preparing or submitting this brief.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The panel's factor-four analysis rests on two propositions whose reach extends far beyond this case. Headnotes help attract subscribers to Westlaw, so using them to develop a competing research tool diminishes their value even in the absence of a headnote-specific market. Headnotes can also be licensed for AI training, so unlicensed training displaces a potential license. Panel Op. 24-26, ECF No. 214 ("Op."). Each proposition identifies something economically valuable, but neither standing alone explains why the claimed injury falls within copyright's protection.

Content can attract customers to a larger service, and much of that content can also become an input to model training. If those connections suffice for the factor-four analysis, almost any competitive use can be traced to lost subscribers or an unpaid training fee. The inquiry would then assume the entitlement it is supposed to examine.

The Court should grant rehearing to keep that inquiry within the limits recognized in *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 590-92 (1994), and *Google LLC v. Oracle America, Inc.*, 593 U.S. 1, 35-38 (2021). These cases distinguish harm to protected uses of a work from other economic consequences of copying.

# ARGUMENT

## I. A WORK'S VALUE IN ATTRACTING USERS DOES NOT MAKE EVERY LOSS OF USERS COGNIZABLE COPYRIGHT HARM

Section 107(4) directs courts to consider effects on the potential market for *or value of* the copyrighted work. A work need not be sold separately to possess protected value. Headnotes can make a Westlaw subscription valuable, just as a free movie trailer can help sell films and attract visitors to a website. But a work's capacity to attract users cannot, by itself, make every use of those works weigh against a fair use determination.

*Video Pipeline, Inc. v. Buena Vista Home Entertainment, Inc.*, 342 F.3d 191, 202-03 (3d Cir. 2003), abrogated in part on other grounds by *TD Bank N.A. v. Hill*, 928 F.3d 259, 278-79 (3d Cir. 2019), concerned competing ways to supply film previews. Disney's trailers promoted its films and attracted visitors to websites where it marketed other products. The defendant offered unauthorized film excerpts that served the same preview function. The Court found threatened harm to trailer licenses and website traffic from those substitutes. 342 F.3d at 202-03. It expressly declined to decide harm to sales of the full-length films. *Id.* at 202.

The relevant distinction is what attracted the users. In *Video Pipeline*, users sought a preview of a copyrighted film, and the defendant supplied competing excerpts of that film. Here, the panel relied on headnotes' usefulness in finding and

analyzing judicial opinions. Op. 25. Headnotes summarize points of law and link researchers to corresponding opinion passages. Op. 3-4. That navigation function directs users to public-domain law. ROSS likewise returned passages from judicial opinions, not substitute headnotes or excerpts of some larger copyrighted work. Op. 5-6. Its appeal was a different way to find the law, not a competing presentation of Westlaw's editorial summaries.

That function makes *Authors Guild v. Google, Inc.*, 804 F.3d 202, 224-25 (2d Cir. 2015), the closer analogy for the claimed loss of value. Search and limited snippets could satisfy a reader's demand for information without supplying a significant substitute for the author's expression. The court rejected an exclusive derivative right to supply the particular search information about the books. *Id.* at 225. Here, the distinction is between using headnotes as readable legal summaries and using examples derived from them to retrieve public-domain opinions. The fact that both methods attract researchers does not establish that the second supplies a substitute for the first's protected expression.

This does not deny copyright protection to headnote prose or make navigation tools categorically immune. If a competing tool supplies headnotes or adapted summaries that replace them, their role in helping users navigate does not excuse that substitution. But *Video Pipeline* does not establish that every use of copyrighted material to attract an existing service's customers impairs protected

value. *Campbell* likewise recognizes that real losses caused by criticism can fall outside cognizable market harm. 510 U.S. at 591-92. The source of the loss matters.

The panel separately treated legal-research platforms as the relevant original market, and some law firms switched from Westlaw to ROSS. Op. 6, 25. It also distinguished *Authors Guild*: book search differed from reading and could promote book purchases, while ROSS aimed to replace Westlaw. Op. 18-19. *Authors Guild* also explained that supplying an unprotected historical fact could eliminate a book purchase without cognizable harm. 804 F.3d at 224. Its reasoning therefore does not depend solely on promoting sales. Here, a lost Westlaw subscription does not answer whether the displaced demand was for protected headnote summaries or for finding public-domain opinions by another method. The latter function remains informational search even when a rival supplies it.

The panel found that both parties ultimately used headnotes to help researchers find responsive legal material. Op. 16-17. Rehearing should consider whether that level of generality obscures the distinction relevant to factor four. In *Video Pipeline*, competing previews supplied the same kind of expressive content to viewers. ROSS used headnote-derived questions and graded opinion passages as training examples, then supplied judicial opinions to researchers. Op. 5-6. For the

claimed injury to subscription value, the closer comparison is the information-retrieval function in *Authors Guild*, not substitute previews in *Video Pipeline*.

Otherwise, placing copyrighted material inside a research service would allow nearly any use that helps a competitor attract customers to weigh against fair use. A database, newspaper archive, or image collection could invoke the same theory. *Video Pipeline* protects the value of supplying authorized previews; it does not settle whether a different means of navigating public information impairs protected value. That question requires comparing the uses, even where competition and lost customers are undisputed.

## II. THE BREADTH OF AI TRAINING MAKES A LIMIT ON COGNIZABLE TRAINING MARKETS ESSENTIAL

The panel found a rapidly developing market for licensing headnotes as training data, noted Thomson Reuters's use of headnotes to train its own products, and concluded that ROSS usurped a licensing opportunity. Op. 26. FAI does not dispute the evidence of demand. The claimed license should be assessed through the distinction illustrated by *Texaco* and *Bill Graham*: copying that serves the work's ordinary purpose versus copying for a transformatively different purpose. AI makes that distinction important across nearly every category of copyrightable content.

Training makes content useful in ways that extend far beyond its original subject or audience. A language model can learn by predicting the next word from preceding words: ordinary text supplies both the context and the answer against which the prediction is assessed. See Yann LeCun et al., *Deep Learning*, 521 Nature 436, 436-37, 440-41 (2015). The material need not have been written as instructional data for a particular purpose to furnish a valuable training example.

This process creates demand for variety as well as volume. Different texts expose a model to different vocabulary, subjects, and patterns of language. The researchers who developed the LLaMA family of models documented a training mixture combining web pages, books, Wikipedia, software repositories, scientific papers, and question-and-answer discussions. Hugo Touvron et al., *LLaMA: Open and Efficient Foundation Language Models* 2 & tbl. 1 (2023), arXiv:2302.13971. Materials serving distinct audiences can thus contribute to the same training process. Their relevance as examples does not depend on a common original market.

The principle extends beyond text. The CLIP image-text model was trained using 400 million image-text pairs collected from the internet, learning to identify which descriptions belonged with which images. Alec Radford et al., *Learning Transferable Visual Models From Natural Language Supervision*, 139 Proceedings of Machine Learning Research 8748, 8749-50 (2021). Photographs and

accompanying descriptions could thereby supply examples for a recognition system. Text, images, and other media can have training value because of the relationships they reveal, even when the developer's product serves a different purpose from the works themselves. See LeCun et al., *supra*, at 436.

ROSS used a nongenerative system to learn relationships between legal questions and responsive opinion passages. Op. 5-6. Its architecture differed from the models described above, but the examples show why a training-license rationale can reach far beyond legal research. Works written for many different audiences can become useful inputs to a model.

A novel, scientific article, software file, or photograph may furnish training examples irrespective of its original audience. Training therefore permits a licensing claim to be asserted across nearly every category of copyrighted material. Breadth alone does not invalidate a market. But if usefulness for training establishes the protected market and failure to buy permission establishes the harm, the fourth factor will routinely favor the owner without examining the use. The availability of a license cannot supply its own legal justification.

*Oracle* cautions against defining the potential market as the theoretical market for licensing the challenged use. 593 U.S. at 38. *Texaco* and *Bill Graham* illustrate why the purpose of the particular copying matters when assessing claimed licensing loss. The unpaid fee alone cannot decide that inquiry.

In *American Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 919-20, 930-31 (2d Cir. 1995), researchers made additional readable copies of scientific articles for continued reference. The copies served the articles' ordinary research and reading function. The court recognized a workable photocopy-licensing market and treated potential licensing losses as weighing against fair use. Internal copying could thus cause cognizable harm without public redistribution. But the court also warned that the availability of payment cannot conclusively defeat fair use. *Id.* at 931.

*Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 614-15 & n.6 (2d Cir. 2006), distinguished that use from reduced reproductions of concert posters used as historical artifacts in a biography. The owner already licensed its images and had offered to license the defendant's project. The court nevertheless rejected harm based merely on the unpaid fee because the use was transformatively different from the images' original expressive purpose. Its footnote 6 contrasted *Texaco*'s substantially similar licensed uses with licenses for poster reproductions materially different from the defendant's historical treatment. The distinction concerned the function of the copying, not whether the defendant copied protected content at all.

ROSS's use belongs on the *Bill Graham* side of that comparison. Its training memos paired headnote-derived questions with opinion passages rated for responsiveness. Those examples taught a system which passages answered legal

questions; users received the opinions. Op. 5-6. The claimed license therefore concerned learning relationships from the material, rather than obtaining additional headnotes for researchers to read as summaries. FAI submits that this change in function is transformative, with the licensing consequence recognized in *Bill Graham*. Noninfringing outputs support that comparison, but do not by themselves establish fair use.

This argument asks the Court to reconsider the panel's finding that ROSS's use was minimally transformative because both parties ultimately served legal research. Op. 16-18. That shared commercial objective does not fully describe the particular copying. Training a system on graded examples differs from consulting copies for the same reading and reference purpose, as in *Texaco*. The label "training" alone cannot establish transformation; the specific change in function supplies our argument here.

Thomson Reuters's own use of headnotes for training is a further distinction from *Bill Graham,* whose evidence of actual licenses concerned less transformative uses. Op. 26; 448 F.3d at 614-15 & n.6. But an owner's entry into a market cannot alone reserve an otherwise fair, transformative use. *Castle Rock Entertainment, Inc. v. Carol Publishing Group, Inc.*, 150 F.3d 132, 145-46 & n.11 (2d Cir. 1998). The Court must still decide whether this particular training use falls within that

limit. FAI seeks no categorical exemption or favoritism for AI training or exclusion of legitimate reproduction licenses.

The panel rejected ROSS's unsupported prediction that the ruling below would halt AI development. Op. 27. FAI's concern is narrower: attracting users and supplying useful training examples describe an enormous range of content. Neither should make factor four automatically adverse without examining what the competing use supplies and whether the claimed license concerns an ordinary or transformatively different use. Those recurring questions warrant rehearing of the panel's market analysis and resulting fair-use balance.

## CONCLUSION

The Court should grant ROSS's petition for panel rehearing or rehearing en banc.

November 10, 2026

Respectfully submitted,
/s/ Tim Hwang
Tim Hwang
D.C. Bar No. 1722206
California Bar No. 292599
FOUNDATION FOR AMERICAN INNOVATION
408 C St NE
Washington, DC 20002
(973) 960-4955
tim.hwang@thefai.org
Counsel for Amicus Curiae

## CERTIFICATE OF COMPLIANCE

I certify that I am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit. 3d Cir. L.A.R. 28.3(d).

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(b)(4) because it contains 2,203 words, excluding the parts exempted by Rule 32(f).

This brief complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) and (6) because it uses a proportionally spaced typeface, Times New Roman, in fourteen-point type.

The Malwarebytes virus protection program, version 5.28.4, has been run on this file, and no virus was detected. 3d Cir. L.A.R. 31.1(c).

November 10, 2026

/s/ Tim Hwang
Tim Hwang

## CERTIFICATE OF SERVICE

I certify that on November 10, 2026, I electronically filed the foregoing Brief of Amicus Curiae Foundation for American Innovation in Support of Appellant's Petition for Panel Rehearing or Rehearing En Banc with the Clerk of the United States Court of Appeals for the Third Circuit through the Court's CM/ECF system.

All parties are represented by registered CM/ECF users, and service was accomplished through that system.

November 10, 2026 /s/ Tim Hwang
Tim Hwang