No. 25-2153

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

---

THOMSON REUTERS ENTERPRISE CENTRE GMBH;
WEST PUBLISHING CORP.,

*Plaintiffs-Appellees*,

*v.*

ROSS INTELLIGENCE INC.,

*Defendant-Appellant*.

---

On Appeal from the United States District Court for the District of Delaware, No. 1:20-cv-00613 (Bibas, J., sitting by designation)

---

**AMICUS BRIEF OF DINGDUFF INC.**
**IN SUPPORT OF APPELLANT'S PETITION FOR PANEL REHEARING OR REHEARING EN BANC**

---

MICHAEL J. SHOWALTER
*Counsel of Record*
SHOWALTER PLLC
1629 K Street NW, Suite 300
Washington, DC 20006
(614) 893-7596
michael@showalterpllc.com
*Counsel for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Third Circuit Local Appellate Rule 26.1.1, amicus curiae DingDuff Inc. states that it is a Texas corporation, that it has no parent corporation, and that no publicly held corporation owns ten percent or more of its stock. No publicly held corporation has a financial interest in the outcome of this proceeding.

## STATEMENTS UNDER RULE 29(a)(4)

No party's counsel authored this brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting this brief. No person other than amicus curiae and its counsel contributed money that was intended to fund preparing or submitting this brief. DingDuff files this brief with a motion for leave under Federal Rule of Appellate Procedure 29(b)(2).

## TABLE OF CONTENTS

INTRODUCTION AND INTEREST OF *AMICUS CURIAE* .................. 1

ARGUMENT ........................................................................................ 6

I. Copyright protects authors against copies that take the place of their work. ........................................................ 6

II. Every harm the panel found was ordinary competition........... 10

CONCLUSION ..................................................................................... 13

## TABLE OF AUTHORITIES

Page(s)

Cases

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508 (2023) .......... 7, 11

*Banks v. Manchester*, 128 U.S. 244 (1888) .......... 9

*BMG Music v. Gonzalez*, 430 F.3d 888 (7th Cir. 2005) .......... 8

*Callaghan v. Myers*, 128 U.S. 617 (1888) .......... 4

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994) .......... 7, 11

*Edward Thompson Co. v. Am. Law Book Co.*, 122 F. 922 (2d Cir. 1903) .......... 5

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340 (1991) .......... 6

*Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539 (1985) .......... 8

*Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417 (1984) .......... 8

*Video Pipeline, Inc. v. Buena Vista Home Ent., Inc.*, 342 F.3d 191 (3d Cir. 2003) .......... 11–12

*West Publ'g Co. v. Edward Thompson Co.*, 169 F. 833 (C.C.E.D.N.Y. 1909), *modified*, 176 F. 833 (2d Cir. 1910) .......... 4

Constitutional Provisions

U.S. Const. art. I, § 8, cl. 8 .......... 6

Statutes

17 U.S.C. § 102(b) .......... 6, 9

17 U.S.C. § 107 .......... 7

## INTRODUCTION AND INTEREST OF *AMICUS CURIAE*

Imagine that a student writes pages of *Harry Potter* into a notebook to learn how J.K. Rowling writes. Years later, the student sells a novel in the same genre. Perhaps the student's novel is successful and takes market share from *Harry Potter*. Regardless, no one would think that the student has infringed Rowling's copyright. Rowling keeps everyone who wants to read *Harry Potter* and has no claim on the readers who prefer the student's book. A lawsuit would lose, and lose handily.

That is because copyright law exists for a particular reason. Creative and informational works cost a lot to make and almost nothing to copy. A novel can take years to write, and once it is published anyone can reproduce it. If copying were free and legal, copiers could undercut the original creator, who must recover the cost of making the work. Creators would then have less reason to invest, and fewer works would be made. Copyright fixes this by giving the author a temporary exclusive right to copy and distribute the work. It does not guard her against a competitor who learned from her work and then sold something that contained no copy of it.

The panel's decision erases that line. ROSS Intelligence used Westlaw headnotes to write training materials that taught a search engine which passages of judicial opinions answer which legal questions. *See* Pet. 2, 5. The finished tool showed its users only quotations from court opinions, which belong to everyone. Op. 5 (the tool "would only return text passages from preexisting judicial opinions"). No user ever saw a headnote, and Thomson Reuters has never claimed that anything that the tool produced infringed. *See* Pet. 5.

To nonetheless hold the training copies unfair, the panel relied on competitive harm: customers switched from Westlaw to ROSS and the headnotes sold fewer subscriptions. *See* Op. 24–26. But copyright does not recognize those ordinary competitive harms.

Like ROSS, amicus curiae DingDuff competes with Westlaw. DingDuff, a Texas corporation founded by two practicing lawyers, offers a free legal-research tool—specifically, a server that links Claude and other LLMs directly to primary legal sources, allowing (sufficiently powerful) AI models to conduct legal research tasks grounded in the text of those sources. As Claude and other LLMs have grown more powerful, their legal research capabilities have dramatically increased. DingDuff

and similar connectors eliminate the need for Boolean searches on Westlaw and let lawyers delegate research to AI as they would to a junior associate. Moreover, because the underlying caselaw dataset is complete and the citing relationship between cases is mapped, LLMs are capable of evaluating negative treatment on the fly by reading every subsequent decision in a citation chain, eliminating the need for Shepard's-style tracking of overturns (similar to how desktop calculators eliminated the need for published, pre-computed logarithm tables).

For clarity, everything DingDuff serves is in the public domain. DingDuff does not utilize headnotes (from West or anyone else) anywhere, among other reasons because they are not actually perceptibly helpful to AI-assisted legal research. Headnotes, like blue topic digests and multi-colored Shepard's volumes, helped lawyers organize the law in a world where large volumes of text were hard to locate and process. But in a world where large volumes of text are easy for machines to process on an as-needed basis, pre-generated headnotes serve a diminished purpose.

Nevertheless, in order to successfully create DingDuff, founders Kyle Dingman and Stephanie Duff-O'Bryan had to understand the law

and how to conduct legal research. And, as with all practicing attorneys, that human understanding of the law came into being as a slow accretion from reading (and taking notes on) thousands of cases and secondary sources, many of which contained headnotes or were otherwise copyrighted. As with ROSS, DingDuff serves no copyrighted content to its users, but it also probably could not have been created by someone who had read no copyrighted content over the course of their career.

West itself was built the same way. Court reporters wrote and copyrighted headnotes decades before West published its first reporter. *See Callaghan v. Myers*, 128 U.S. 617, 645–49 (1888). West's digest classification was "a development from time to time, growing out of the work of Mr. Abbott," an earlier digester, and the editor who completed it had been Abbott's assistant. *West Publ'g Co. v. Edward Thompson Co.*, 169 F. 833, 849 (C.C.E.D.N.Y. 1909), *modified*, 176 F. 833 (2d Cir. 1910). When West compiled the Federal Cases, "some of these digest or syllabus paragraphs were taken from previous publications." *Id.* at 848. On appeal, the Second Circuit held that using West's digests "to assist [writers] in running down the cases" was "fair," because "a digest considered by itself is nothing." 176 F. at 838. That is how legal

publishing has always worked: "The literature of the law as it exists to-day is the result of evolution. Each author has had the benefit of all that preceded him and has thus been able to add something to the common fund intended to lighten the labors of the profession." *Edward Thompson Co. v. Am. Law Book Co.*, 122 F. 922, 925 (2d Cir. 1903).

DingDuff files this amicus brief out of a concern that the panel decision converts harm (which all competition creates) plus an attenuated connection to a protected work (which will always exist in any field built on existing works) into a basis for liability. If that net is drawn too broadly, the unintended consequence is to give works which have reached social obsolescence a second life as a litigation-based barrier against socially beneficial competition.

The panel's reasoning treats that competition as harm that copyright guards against: it held ROSS's copies unfair because the finished tool drew customers away from Westlaw and threatened Westlaw's position in the "legal-research platform market." Op. 25; *see* Pet. 15–16 (the relevant market is the market for headnotes, not for research platforms). The panel also discounted the public benefit of ROSS's tool because the "underlying judicial opinions are freely

available." Op. 27. But as its users know, DingDuff's tool creates major societal value notwithstanding that it relies on free judicial opinions. Copyright law must stay focused on its objective—to encourage creation, not to protect a creator against competition—so that it is not used to thwart socially beneficial competition.

## ARGUMENT

### I. Copyright protects authors against copies that take the place of their work.

The Constitution gives Congress power over copyright "[t]o promote the Progress of Science and useful Arts." U.S. Const. art. I, § 8, cl. 8. The Supreme Court reads that clause as the measure of the right: "The primary objective of copyright is not to reward the labor of authors, but '[t]o promote the Progress of Science and useful Arts.'" *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 349 (1991). Copyright assures authors "the right to their original expression," but "encourages others to build freely upon the ideas and information conveyed by a work." *Id.* at 349–50. Congress wrote the same limit into the statute, which withholds protection from "any idea, procedure, process, system, method of operation, concept, principle, or discovery." 17 U.S.C. § 102(b); *see also id.*

§ 107 (fair use, including reproduction in copies for purposes such as criticism, comment, or research, "is not an infringement").

Copyright's central concern is a copy that takes the work's place in the marketplace. The first fair-use factor "relates to the problem of substitution," which is copyright's "bête noire." *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 528 (2023). The fourth factor asks whether the use harms the market for the original "by acting as a substitute for it." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 591 (1994).

When the loss comes from something other than a substitute, copyright does not count it. For example, "when a lethal parody, like a scathing theater review, kills demand for the original, it does not produce a harm cognizable under the Copyright Act." *Id.* at 591–92. The courts' task is to "distinguish" between an act that merely "suppresses demand" and an act that "usurps it." *Id.* at 592 (quotation marks omitted).

The cases on private copying apply the same standard. Taping a television program at home to watch later copies the entire work, yet the Supreme Court held the practice fair, because "time-shifting for private home use must be characterized as a noncommercial, nonprofit activity"

and the viewer "had been invited to witness [the work] in its entirety free of charge." *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 449 (1984). Downloading songs to keep is not fair, because a downloaded song is "a direct substitute for a purchased copy." *BMG Music v. Gonzalez*, 430 F.3d 888, 890 (7th Cir. 2005). The recording in *Sony* replaced nothing that the studios sold. The downloaded music in *Gonzalez* was itself the product, played in place of purchased copies.

So a copy can infringe in one of two ways. It can reach the public and take the author's readers, as a novel does when it copies protected expression and a research tool does when its output does. Or it can stay private and do the work of a purchase, as the downloads in *Gonzalez* did and as a reader's transcription does when she copies out a whole book at the library so that she never has to buy it. Those two routes to infringement come from the one central principle that copyright protects the market for the work. *See Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 568 (1985) (explaining that "a use that supplants any part of the normal market for a copyrighted work" generally infringes (quotation marks omitted)).

Competition is not infringement. An author who loses readers to a better book, or a publisher who loses subscribers to a better search engine, has lost something copyright never promised. And the limits on copyright expressly protect learning from a work: the ideas and information in a work belong to everyone, § 102(b). A copy made to extract the ideas, that is kept private and never used in place of the work, promotes progress without diminishing the author's reward. A reader who goes to the library, reads the book, and writes a different one has not supplanted anything.

That decides this case. The headnotes are *Harry Potter*, in the analogy. The training memos are the reader's notebook: ROSS kept them private and used them to learn which passages of judicial opinions answer which legal questions. ROSS's output that reached the public contained no headnotes, just as the student's novel reached the public after she learned from J.K. Rowling but contained none of *Harry Potter*'s prose. *See* Pet. 13–14 (ROSS "made none of those headnotes accessible to the public"). ROSS's tool "would not create any new expression; it would only return text passages from preexisting judicial opinions," Op. 5, which are "free for publication to all," *Banks v. Manchester*, 128 U.S. 244,

253 (1888). And no training memo did the work of a purchase. ROSS did not keep the memos to consult in place of a Westlaw subscription, as Gonzalez kept her downloads in place of the albums; it fed them to a machine to learn from them. That is reading in the library, not transcribing the book to avoid purchasing it. The panel's concession that "there may be no standalone market for headnotes," Op. 25, should have been fatal to its conclusion, because it means that ROSS neither sold into such a market nor bought from it. *See also* Pet. 16 (Thomson Reuters "did not meaningfully dispute" that no market for headnotes exists).

## II. Every harm the panel found was ordinary competition.

The panel answered the question whether the training memos were fair by looking at the product instead of the training memos. On the first factor, it reasoned that ROSS "used the headnotes to train an AI program for the benefit of its legal-research platform," so its use "shares the same ultimate purpose as Thomson Reuters's use." Op. 16–17 (emphasis omitted). On the fourth factor, it found that ROSS "diminished [the headnotes'] value as a draw for users to Thomson Reuters's legal-research platform," that copying of this kind "would harm Westlaw's position" in the "legal-research platform market," and that ROSS

"usurped Thomson Reuters's opportunity" to license headnotes as training data. Op. 25–26. Each of those findings describes ordinary competition between two research platforms.

The petition shows that the first factor asks about the "particular use at issue," not the defendant's line of business. Pet. 7–12 (quoting *Warhol*, 598 U.S. at 535 n.11) (emphasis omitted). The panel's question imported the product's competition with Westlaw into the analysis of copies that never left the building. By the panel's reasoning, the student's notebook shares the "same ultimate purpose" as *Harry Potter*, since each exists to sell a novel. That is clearly not the law.

The panel relied on a "draw" theory, finding that by building a competing platform, ROSS diminished the headnotes' value as a "draw for users to [Westlaw]." Op. 25. That theory comes from *Video Pipeline, Inc. v. Buena Vista Home Ent., Inc.*, 342 F.3d 191 (3d Cir. 2003), where a company copied clips from Disney films and streamed them online. This Court found cognizable harm because "display of the clip previews would substitute for the derivative works" and the clips would "'serve[] as a market replacement' for the trailers," drawing viewers to other websites. *Id.* at 202–03 (quoting *Campbell*, 510 U.S. at 591). The copies of the

copyrighted works in *Video Pipeline* reached the public. Here, by contrast, it is undisputed that no copy of any copyrighted material reached the public. *See* Pet. 13–14. Westlaw's headnotes lost whatever draw they lost because a rival tool answered legal questions well.

The petition explains why a market defined as the market for licensing the very use at bar is circular. *See* Pet. 14–15. The panel's purported market was exactly that: its only evidence was Thomson Reuters's use of its headnotes to train its own products, Op. 26, and the only harm it identified was that Thomson Reuters did not charge a license fee for the headnotes. Thomson Reuters may charge for its headnotes, but copyright gives it no second fee for what a paying reader learns from them.

The difference is between a fee for accessing the work and a fee for using the knowledge gained from it. A copier who takes the headnotes to avoid paying for access has made a substitute for a purchase. A fee for learning from headnotes already lawfully obtained is a price for a use. Whether a use requires a fee is the question that fair use decides, and the panel simply assumed the answer.

The panel stressed that ROSS "aspired to be a direct competitor" and that its executives "hoped ROSS would serve as a substitute for Westlaw," Op. 2, 6, but that does not matter. A novelist who pays an assistant to copy passages from bestsellers so that she can study them, and who sets out to outsell those bestsellers, has made commercial copies for a competitive purpose but has not infringed. It is substitute copies, not ordinary competition, that copyright law addresses.

## CONCLUSION

The Court should grant the petition.

November 10, 2026

Respectfully submitted,

/s/ Michael J. Showalter
MICHAEL J. SHOWALTER
*Counsel of Record*
SHOWALTER PLLC
1629 K Street NW, Suite 300
Washington, DC 20006
(614) 893-7596
michael@showalterpllc.com

*Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

1. I certify that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(b)(4) because it contains 2,564 words, excluding the portions exempted by Federal Rule of Appellate Procedure 32(f) and Third Circuit Local Appellate Rule 29.1(b), and I further certify that the brief complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook, 14-point font.

2. I certify that this brief complies with Third Circuit Local Appellate Rule 31.1(c) because the text of the electronic brief is identical to the text of any hard-copy briefs the Court may request. Pursuant to Third Circuit Local Appellate Rules 25.1(a) and 35.2(a), no paper copies of this brief will be provided unless directed by the Court.

3. I certify that this brief complies with Third Circuit Local Appellate Rule 31.1(c) because Malwarebytes for Mac version 5.29.2 was run on the file containing the electronic version of the brief and no viruses were detected.

4. I certify pursuant to Third Circuit Local Appellate Rule 28.3(d) that I am a member of the bar of this Court.

/s/ Michael J. Showalter
MICHAEL J. SHOWALTER

## CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of November 2026, I caused the foregoing brief to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the Court's CM/ECF system. I further certify that service was accomplished on all parties via the Court's CM/ECF system.

November 10, 2026
/s/ Michael J. Showalter
MICHAEL J. SHOWALTER